**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| KEY WEST POLICE & FIRE PENSION FUND, on behalf of itself and all others similarly situated, | Civil Action No. 1:20-cv-22109-KMW |
| Plaintiff, | |
| v. | <u>CLASS ACTION</u> |
| RYDER SYSTEM, INC., ROBERT E. SANCHEZ, ART A. GARCIA, and SCOTT T. PARKER, | **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| Defendants. | <u>JURY TRIAL DEMANDED</u> |

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................... 1

II.     JURISDICTION AND VENUE ...................................................................... 8

III.    PARTIES ........................................................................................................... 9

        A.      Lead Plaintiffs ...................................................................................... 9

        B.      Defendants .......................................................................................... 10

IV.     SUMMARY OF THE FRAUD ..................................................................... 11

        C.      The Success of Ryder's Business Depended on the Prompt Sale of Its Used
                Trucks Through Its Used Truck Sales Division .................................. 11

        D.      GAAP Required Ryder to Accurately Report the Residual Values and
                Depreciation Expenses of Its Vehicles During the Reporting Periods They Were
                Generating Revenue ............................................................................ 12

        E.      Ryder Faced a Serious Competitive Threat from Its Chief Rival, Penske, and
                Manipulated Its Residual Values to Compete on Lease Pricing and Overstate
                Profits ................................................................................................. 17

        F.      Costly Problems with the MaxxForce Reduced-Emissions Engines Drastically
                Reduced the Vehicles' Market Value and Ryder's Ability to Sell Them ............ 22

        G.      Ryder Witnessed a Sharp Decline in the Demand for, and Sales Prices of, Used
                Vehicles .............................................................................................. 27

        H.      Ryder Executives Controlled the Prices and Residual Values of Ryder's Entire
                Fleet from Its Miami Headquarters ...................................................... 29

        I.      During the Class Period, Ryder Saw that Its Vehicles' Resale Values Were Far
                Below their Residual Values, But Ryder Increased Residual Values, Understated
                Depreciation Expense and Overstated Net Income ............................... 31

        J.      Ryder Maintained Excessively High Prices on Its Vehicles in a Futile Attempt to
                Avoid Recognizing the Losses from Sales Below the Inflated Residual Values . 43

        K.      During the Class Period, Ryder's Used Truck Inventory Ballooned, a Red Flag
                that Price Discounts and Serious Decreases in Residual Values Were Necessary 45

V.      THE TRUTH EMERGES ............................................................................. 48

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND
        OMISSIONS .................................................................................................... 53

        A.      The Second Quarter of 2015 ............................................................... 53

        B.      The Third Quarter of 2015 .................................................................. 56

        C.      The Fourth Quarter of 2015 and Full Year 2015 ................................ 60

        D.      The First Quarter of 2016 ................................................................... 65

        E.      The Second Quarter of 2016 ............................................................... 68

        F.      The Third Quarter of 2016 .................................................................. 71

G. The Fourth Quarter of 2016 and Full Year 2016 ................................................... 73

H. The First Quarter of 2017 ...................................................................................... 76

I. The Second Quarter of 2017 .................................................................................. 78

J. The Third Quarter of 2017 ..................................................................................... 80

K. The Fourth Quarter of 2017 and Full Year 2017 .................................................. 81

L. The First Quarter of 2018 ...................................................................................... 84

M. The Second Quarter of 2018 .................................................................................. 87

N. The Third Quarter of 2018 ..................................................................................... 89

O. The Fourth Quarter of 2018 and Full Year 2018 .................................................. 91

P. The First Quarter of 2019 ...................................................................................... 93

Q. The Second Quarter of 2019 .................................................................................. 94

R. The Third Quarter of 2019 ..................................................................................... 96

VII. LOSS CAUSATION ......................................................................................................... 98

VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................ 98

IX. CLASS ACTION ALLEGATIONS ............................................................................... 124

X. INAPPLICABILITY OF STATUTORY SAFE HARBOR ......................................... 125

XI. PRESUMPTION OF RELIANCE ................................................................................. 126

XII. CAUSES OF ACTION .................................................................................................. 127

COUNT I ...................................................................................................................................... 127

COUNT II ..................................................................................................................................... 129

XIII. PRAYER FOR RELIEF ................................................................................................ 129

XIV. JURY DEMAND ........................................................................................................... 130

Lead Plaintiffs the State of Alaska, Alaska Permanent Fund; the City of Fort Lauderdale General Employees' Retirement System; and the City of Plantation Police Officers Pension Fund ("Lead Plaintiffs") bring this securities class action on behalf of all persons or entities that purchased shares of Ryder common stock between July 23, 2015 and February 13, 2020, inclusive (the "Class Period"). Lead Plaintiffs' claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder. Lead Plaintiffs assert these claims against Ryder and certain of the Company's current and former senior executives (collectively, "Defendants"). Lead Plaintiffs, by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Ryder System, Inc. ("Ryder" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued and disseminated by the Company; (c) analyst and media reports concerning Ryder; (d) transcripts of Ryder's investor conference calls; (e) other public information regarding the Company; and (f) interviews with Ryder former employees (referred to herein as "FEs").

## I.   **INTRODUCTION**

1.      The action arises from Defendants' materially false and misleading statements and omissions concerning Ryder's financial performance and the value of its core assets. Ryder is a global provider of transportation and supply chain management solutions. The Company operates through three segments: Fleet Management Solutions (FMS); Dedicated Transportation Solutions (DTS); and Supply Chain Solutions (SCS). The FMS segment is a key driver of Ryder's business and accounts for over 60 percent of the Company's revenue. FMS provides leasing, commercial rental, and contract or transactional maintenance services of trucks, tractors and trailers. As part

of Ryder's truck-leasing model, Ryder assigns so-called "residual values" to its trucks for depreciation purposes (i.e., the value at which Ryder believes it will be able to sell the vehicles at the end of their useful lives) and then sells those vehicles at the end of their useful lives.  This case concerns how Defendants artificially inflated Ryder's vehicle fleet's residual values in order to knowingly or recklessly understate depreciation expense, overstate profits, increase incentive compensation, and make highly-lucrative insider sales of Ryder stock at artificially inflated stock prices.

2.      Ryder has the largest commercial vehicle fleet in North America.  Most of Ryder's assets, as a vehicle-leasing company, are tied up in its revenue-earning equipment, which primarily consists of Ryder's fleet of commercial trucks and tractors.  According to the Company's 2019 Form 10-K filed on February 27, 2020, of Ryder's $14.76 billion in total assets, approximately $10.43 billion were associated with Ryder's revenue-earning equipment.  As would be revealed by Defendants' later corrective disclosures, the valuation of the Company's revenue-earning equipment was critical to the Company's finances.  Because Ryder's revenue-earning equipment is such a large share of the Company's assets, any notable movements in the fleet's value could result in earnings swings of tens and hundreds of millions of dollars.

3.      The residual values of Ryder's vehicles were critical to almost all aspects of Ryder's core business, as a vehicle's residual value is a key component of the price of the lease that Ryder offered to consumers.  As the name suggests, a vehicle's "residual value" is the value that is left over at the end of the lease term.  The amount by which the vehicle's original value declines over the term of the lease—as represented between the difference between the vehicle's value at the start of the lease and its residual value—is the vehicle's depreciation.  Over the term of the lease, a Ryder customer pays, on a monthly basis, a portion of the value of that depreciation.

Therefore, if Ryder increases the residual value of its vehicles, then the amount of depreciation on the vehicles declines mathematically, which lowers the monthly payments on the lease and makes the lease more competitive compared to Ryder's competition in the marketplace. Thus, by inflating the residual values, and maintaining them at their inflated rates, Ryder not only understated its depreciation expense and inflated its earnings, it also drove its leasing business during the Class Period.

4.    For each year between 2011 and 2016, Ryder adjusted the residual values of certain assets upwards between $10 million and $40 million. Since increasing its assets' residual values enabled Ryder to decrease the incremental depreciation charge it recorded on these assets each year, this had the effect of increasing Ryder's earnings on a dollar-for-dollar basis.

5.    Ryder has—until recently—understated the depreciation on is vehicle fleet for accounting purposes, which caused a significant overstatement of adjusted net income prior to 2019. In total, Ryder's upward adjustments resulted in a cumulative benefit of $158 million, or $1.92 per share, over this six-year span. However, in addition to Ryder upwardly adjusting its residual values, it also failed to make downward adjustments to the residual values as the market for used Ryder vehicles plummeted, which overstated its earnings by hundreds of millions of dollars during the Class Period.

6.    When Ryder finally made the necessary and belated reductions to its residual values in the third and fourth quarters of 2019, it disclosed that the financial impact of its reduced residual value estimates was more than $1 billion. At the time Ryder made these adjustments, it blamed two causes: (i) increased maintenance costs on vehicles with new, defective emissions technology; and (ii) the fact that Ryder would be selling its used vehicles into a "down market" for used trucks. However, Defendants were well aware of, or recklessly disregarded, that, starting in mid-2015 and

continuing throughout the Class Period, Ryder experienced increased maintenance costs from the lower-emissions vehicles and that Ryder was already in the throes of a sharp and prolonged downturn in the market for used vehicles.

7.      Indeed, as Ryder's data showed, by the end of 2015, the used vehicle market had collapsed due to over-supply and decreased demand.  In addition, in 2010, the U.S. Environmental Protection Agency ("EPA") passed a set of historic emissions regulations meant to substantially lower the amount of air pollution caused by large, commercial vehicles.  The new emissions requirements wreaked havoc on the commercial truck and tractor industry, as vehicle manufacturers experimented with and installed new, unreliable technology into their engines and exhaust systems in a rush to meet the standards.  The new exhaust systems, incorporated into the Navistar International MaxxForce engines, substantially raised the maintenance costs for tractors. Moreover, because these vehicles' maintenance costs were so high and the technology so unreliable, there was very little demand for these vehicles at the end of their useful lives, which drastically lowered their eventual sales prices (and their residual values).

8.      Ryder internally set a goal of selling its used vehicles within 90 days of the vehicle entering Ryder's Used Truck Centers ("UTCs").  Vehicles that remained unsold for more than six months presented a serious financial problem for Ryder, as they would continue to depreciate, become more and more unsellable, and require costly maintenance and upkeep as they effectively "rotted" on the sales lots.

9.      The number of Ryder used vehicles available for sale increased dramatically between 2015 and 2016, rising to 8,000 at the end of the fourth quarter of 2015, up from 5,500 units in the prior year, a 45% increase.  An internal Ryder document from August 2016 also shows

that Ryder had a significant number of unsold vehicles that exceeded Ryder's 90-day threshold, including a large number of vehicles equipped with the MaxxForce engine.

10.    As numerous senior former Ryder managers and executives recounted, starting in 2015, they knew that it was necessary for Ryder to drastically reduce its vehicles' residual values and used vehicle sales prices.  According to those former Ryder employees:

      a.    By 2015, it was "loud and clear" that Ryder's used truck sales were declining;

      b.    Ryder's vehicle values were "upside down" by 2015 and it was "completely obvious" that Ryder's residual value estimates likely exceeded the expected future values that would be realized upon the sale of power vehicles in their fleet, with the residual values being overstated by approximately 30%; and

      c.    For the vehicles with the MaxxForce engines, their values were easily overstated by 50%, and the MaxxForce vehicles comprised approximately 40% of the fleet during the years they were used.

11.    In 2015/2016, there were discussions internally at Ryder of the need for a write-down, as the vehicle values had depreciated much lower than expected.  Ryder managers wondered internally how they were going to show a profit when the vehicles were eventually sold if Ryder did not write them down.  However, according to former executives, at that time, Ryder "had no interest in writing down whatsoever."  Ryder executives at the Company's Miami headquarters controlled the used truck pricing and the vehicles' residual values and they resisted internal calls to reduce the residual values to their correct amounts.

12.    Several former employees recounted that they repeatedly raised to more senior executives, including Defendants Sanchez, Garcia and Cooke, the need for Ryder to lower its residual values or used vehicle sales prices in order to move the ballooning inventory, and to reflect the new market reality, but they were repeatedly rebuffed because Ryder did not want to "bite the bullet."

13.     Indeed, despite the pronounced negative developments and trends in the used vehicle sales market, throughout the Class Period, Defendants misstated Ryder's true financial condition by overstating the residual value of its vehicle fleet, which caused the Company to record smaller depreciation expenses on those assets each year, and artificially inflated Ryder's earnings. Defendants misrepresented to investors that Ryder's financial results "benefited from lower depreciation associated with increased residual values" and that the Company had been "conservative" in establishing the residual values of its vehicles.  While Ryder kept increasing the expected residual value of its trucking fleet, the actual amount Ryder was receiving from sales of its used trucks fell sharply starting in 2015.

14.     When asked publicly about the residual values of the Company's trucks during Ryder's July 27, 2016 earnings call, Chairman and Chief Executive Officer ("CEO"), Defendant Robert Sanchez, falsely stated that "I wouldn't envision an increase or decrease in residual values out over the next four, five years."

15.     Similarly, during an industry conference on November 8, 2016, former Ryder Chief Financial Officer ("CFO") Defendant Art Garcia falsely stated that the decline in used truck prices would not "result in us changing residual [values] right now."  And, later, during a February 16, 2018 earnings call, in response to an analyst's question about expected depreciation, Garcia responded that, based on Ryder's expectations for used truck pricing, depreciation will be at "a lower level than what we had seen this year."  Then, during an October 26, 2018 Ryder earnings call, Defendant Sanchez falsely assured investors that, with respect to the Company's accounting treatment of its residual values, Ryder "keep[s] the residuals in the middle of the fairway as best we can."

16.     These and similar statements during the Class Period about consistent or increased residuals values, were misleading because Defendants knew or recklessly disregarded that the residual values that Ryder assigned to its trucking fleet were grossly overstated.  This had the intended effect of allowing the Company to record smaller depreciation expenses, artificially inflated Ryder's earnings in violation of Generally Accepted Accounting Principles ("GAAP"), and, in turn, artificially inflated Ryder's stock price.  The Company's inflated earnings boosted the executives' incentive compensation and allowed them to sell millions of dollars of their personally-held Ryder stock at artificially-inflated prices during the Class Period.

17.     Ryder continued this deceptive behavior until shortly after its CFO, Defendant Garcia, left Ryder in April 2019.  It was almost immediately apparent to his successor (who came to Ryder from outside the Company) that Ryder needed to significantly reduce its residual values and increase depreciation expense.

18.     The truth began to emerge just months later, on July 30, 2019, when the Company sharply reduced its full-year 2019 earnings forecast and management indicated that the majority of the lowered guidance reflected Ryder's weaker valuations of its tractors.  In response to these disclosures, Ryder's stock price fell 10%, from $59.32 per share to $53.38 per share, as investors began to learn of the long-term negative impact of Ryder's devalued used vehicle fleet.

19.     Then, on October 29, 2019, the Company dropped a bombshell on the market and disclosed that it was reducing its residual value estimates by $844 million.  Defendants admitted to investors that "management concluded that our residual value estimates likely exceeded the expected future values that would be realized upon the sale of power vehicles in our fleet." Specifically, the Company significantly lowered the residual values for all its vehicles and incurred $177 million in additional depreciation expense in the third quarter of 2019; reduced its residual

value estimates for the entire second half of 2019 by <u>$289 million</u>; and reduced its residual value estimates for the period from the second half of 2019 through 2024-2025 by an extraordinary <u>$844 million</u> in total.  In response to these disclosures, Ryder's stock price fell sharply, by more than 12% over two trading days, from $55.12 per share to $48.44 per share.  As J.P. Morgan reported on October 29, Ryder's taking this "big bath" on its residual values "<u>confirms Ryder was over-earning by a significant amount in prior years</u> based on the $844mm cumulative write-down."

20.     Then, on February 13, 2020, Ryder shocked investors further by reporting that the financial toll of Ryder's residual value manipulation in fact now <u>exceeded $1 billion</u>.[1]  In response to the February 13, 2020 disclosure, Ryder's stock price fell by 23% over three trading days, from $50.19 per share to $38.45 per share.

21.     As a result of Defendants' violations of the securities laws through their material artificial inflation of the Ryder vehicles' residual values and overstatement of Ryder's income during the Class Period, Lead Plaintiffs and other Ryder investors suffered significant financial harm.

## II.     **JURISDICTION AND VENUE**

22.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

---

[1] Specifically, the Company reported that, as a result of the significant reductions to the residual value of its fleet, it had incurred a total of <u>$357 million</u> in depreciation expense for 2019 (instead of $289 million) plus a loss of approximately $59 million on the sale of used vehicles.  The Company also announced that, for 2020, it expected to incur another $25 million in depreciation expense on its fleet due to the reductions in residual value (bringing the depreciation increase to $275 million for 2020) plus an additional $20 million estimated loss on used vehicle sales.  This brought the cumulative negative financial impact disclosed through February 13, 2020 to <u>$1.021 billion</u> ($357 million + $59 million + $275 million + $20 million + $130 million (2021) + $180 million (2022-225)).

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Ryder maintains its headquarters in Miami, Florida, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.     Lead Plaintiffs

24.     Lead Plaintiff the State of Alaska is a constitutionally-established permanent fund managed by the state-owned corporation Alaska Permanent Fund Corporation on behalf of the citizens of Alaska.  As of June 30, 2020, Alaska Permanent Fund held over $65 billion in assets. As reflected in its certification previously filed with the Court (ECF No. 22-3), Alaska purchased a significant amount of Ryder shares during the Class Period and suffered substantial losses as a result of the violations of the federal securities laws alleged in this Action.

25.     Lead Plaintiff the City of Fort Lauderdale General Employees' Retirement System ("Plantation Police") is a defined benefit pension plan that provides retirement benefits to eligible employees of the City of Fort Lauderdale.  As of March 31, 2020, Fort Lauderdale managed approximately $590 million in assets on behalf of over 2,100 members.  As reflected in its certification previously filed with the Court (ECF No. 22-3), Fort Lauderdale purchased a significant amount of Ryder shares during the Class Period and suffered substantial losses as a result of the violations of the federal securities laws alleged in this Action.

26.     Lead Plaintiff the City of Plantation Police Officers Pension Fund is a defined-benefit pension plan that is administered by its Board of Trustees and provides retirement benefits to City of Plantation police officers and their beneficiaries.  As of the end of 2019, Plantation Police managed more than $170 million in assets on behalf of nearly 300 active, inactive, and retired participants and beneficiaries.  As reflected in its certification previously filed with the Court (ECF No. 22-3), Plantation Police purchased a significant amount of Ryder shares during the Class Period and suffered substantial losses as a result of the violations of the federal securities laws alleged in this Action.

27.     As indicated in Lead Plaintiffs' previously-filed certifications, Lead Plaintiffs purchased Ryder common stock at artificially-inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.     Defendants**

28.     Defendant Ryder is incorporated in Florida and maintains its corporate headquarters at 11690 N.W. 105th Street, Miami, Florida.  The Company's common stock trades on an efficient market, the New York Stock Exchange ("NYSE"), under ticker symbol "R."  As of January 31, 2020, Ryder had over 53 million shares of common stock outstanding, owned by hundreds or thousands of investors.

29.     Defendant Robert E. Sanchez ("Sanchez") has served as Ryder's CEO since January 2013 and as Chairman of Ryder's Board since May 2013.

30.     Defendant Art A. Garcia ("Garcia") served as Executive Vice President and CFO of Ryder from December 2010 until April 5, 2019, and then served as a Special Advisor to the CEO until April 30, 2019.

31.     Defendant Dennis C. Cooke ("Cooke") served as President of Ryder's Global Fleet Management Solutions segment from 2012 until 2019.  Prior to that role, Cooke had served as

Senior Vice President and Chief of Operations for Ryder's Fleet Management Solutions segment in the United States and Canada since 2011.

32.     Defendants Sanchez, Garcia, and Cooke are collectively referred to hereinafter as the "Officer Defendants."   The Officer Defendants, because of their positions with Ryder, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.     <u>SUMMARY OF THE FRAUD</u>

### A.     **The Success of Ryder's Business Depended on the Prompt Sale of Its Used Trucks Through Its Used Truck Sales Division**

33.     Ryder is a global provider of transportation and supply chain management products, including truck leasing.  As noted above, the Company operates through three segments: Fleet Management Solutions (FMS); Dedicated Transportation Solutions (DTS); and Supply Chain Solutions (SCS).

34.     Through Ryder's FMS segment, the Company provides full-service leasing and leasing with flexible maintenance options, commercial rental, and contract or transactional maintenance services of trucks, tractors and trailers.  The FMS segment accounts for over 60% of the Company's revenue and it operates in the United States, Canada and Europe.  The FMS

segment has five principal components: (1) ChoiceLease (2) Commercial Rental; (3) SelectCare; (4) Fuel Services; and (5) Used Vehicles.  Ryder's FMS segment's financial performance is principally dependent on (1) demand for truck rentals and leases; and (2) the residual value of its vehicles.

36.     The ChoiceLease program is Ryder's largest, accounting for over 50% of FMS revenue and over 30% of Ryder's total revenue.  ChoiceLease "provides customers with vehicles, maintenance services, supplies, and related equipment necessary for operation of the vehicles while our customers furnish and supervise their own drivers and exercise control over the vehicles." Commercial Rental provides short-term vehicle rentals to customers who need to supplement their private fleet of vehicles.  SelectCare provides "maintenance services to customers who do not choose to lease vehicles from [Ryder]."

36.     The vehicles that Ryder leases to consumers typically have a useful life of approximately seven to eight years.  Once the long-term lease on a Ryder vehicle ends, or after the vehicle reaches its useful life, Ryder sells the vehicle through its Used Truck Centers ("UTCs"). The Used Vehicles segment sells Ryder's used vehicles, including from one of its 51 retail sales centers throughout North America and through its website www.Usedtrucks.Ryder.com.

37.     It is important for Ryder to sell its vehicles promptly, because the longer that Ryder holds on to a vehicle on one if its lots, the more it will depreciate, which increases the likelihood that its value will fall below the residual value that Ryder has internally set for it.  If Ryder is unable to sell the vehicle at a favorable price, it will need to incur a loss from the sale, which has a negative impact on Ryder's earnings.

**B.     GAAP Required Ryder to Accurately Report the Residual Values and Depreciation Expenses of Its Vehicles During the Reporting Periods They Were Generating Revenue**

38.     Compliance with Generally Accepted Accounting Principles ("GAAP") is a fundamental obligation of publicly-traded companies like Ryder.  GAAP is the official standard for accounting accepted by the SEC and it is primarily promulgated by the Financial Accounting Standards Board ("FASB") and American Institute of Certified Public Accountants ("AICPA"), whose standards are referred to as "Accounting Standards Codification" ("ASC").  In addition, the FASB has issued guidance in the form of FASB Concept Statements ("FASCON"), which set the objectives, qualitative characteristics, and other concepts used in the development of GAAP and which reflect the underlying basis and framework for the promulgation of accounting standards.

39.     The accounting profession recognizes GAAP as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

40.     Under GAAP, financial elements such as assets, liabilities, revenues, and expenses must be recorded pursuant to the "accrual" method of accounting.  The objective of accrual accounting is to reflect transactions within the financial reporting periods to which their component costs and associated revenues relate.  Specifically, FASCON No. 6, Elements of Financial Statements ("FASCON 6"), provides:

> Accrual accounting uses accrual, deferral, and allocation procedures whose goal is to relate revenues, expenses, gains, and losses to periods to reflect an entity's performance during a period instead of merely listing its cash receipts and outlays. Thus, recognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities--including matching of costs and revenues, allocation, and amortization--is the essence of using accrual accounting to measure performance of entities. The goal of accrual accounting is to account in the periods in which they occur for the effects on an entity of transactions and other events and circumstances, to the extent that those financial effects are recognizable

13

and measurable.[2]

41.     Central to accrual accounting is the "matching principle," which requires that companies report expenses[3] in the same period as the revenues to which the expenses relate (as opposed to when cash is actually received or paid out).  Under the matching principle, recognizing revenue or expenses at the wrong time may distort an entity's financial results relative to GAAP and depict an improper statement of financial position for the business at any given point in time.

42.     In its Class Period SEC filings, Ryder referred to the assets[4] that primarily contributed to its reported revenue as "revenue-earning equipment."  Such equipment was comprised of vehicles and operating property and equipment (e.g., trucks, tractors, and trailers). Throughout the Class Period, the reported value of Ryder's revenue-earning equipment constituted the majority of its assets.

43.     Under GAAP's matching principle, Ryder was required to recognize expenses associated with its revenue-earning equipment in the same reporting periods that revenue generated by such equipment was recognized.  One such expense was depreciation.  Depreciation refers to a reduction in the value of an asset with the passage of time, due in particular to wear and tear.  Accordingly, Ryder was required to reduce the carrying value of its revenue-earning equipment by recognizing depreciation expense during the reporting periods that such equipment was expected to provide economic benefits to the Company.

44.     ASC 360, *Property, Plant, and Equipment* ("ASC 360"), provides that depreciation expense on assets recognized and reported by companies in financial statements "shall be

---

[2] FASCON 6, para. 145.
[3] FASCON 6 defines expenses as "outflows or other using up of assets or incurrences of liabilities (or a combination of both) from delivering or producing goods, rendering services, or carrying out other activities that constitute the entity's ongoing major or central operations." (FASCON 6, para. 80; footnote omitted).
[4] FASCON 6 defines assets as "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events." (FASCON 6, para. 25; footnote omitted).

determined based on the asset's useful life."[5]   ASC 360 further states that GAAP "require[s] that this cost be spread over the expected useful life of the facility in such a way as to allocate it as equitably as possible to the periods during which services are obtained from the use of the facility."[6]

45.    In its financial statements, Ryder stated that the reported depreciation expense on its revenue-earning equipment was based on the straight-line method.   Using the straight-line method to compute depreciation expense for a given year is done by subtracting an asset's estimated salvage value, otherwise known as residual value, from its cost,[7] and dividing the remaining amount by the number of years such asset is expected to be used (i.e., its useful life).

46.    As the reported value of Ryder's revenue-earning equipment constituted the majority of its assets during the Class Period, and its depreciation expense was reported to be greater than $1 billion in each year during such period, the assumptions used to compute depreciation expense for such equipment – specifically the useful lives and residual values of such equipment – were critical to the propriety of the Company's reported financial results.

47.    To that end, the Company explained in its SEC filings that "[r]eductions in [its] residual values … or useful lives [would] result in an increase in depreciation expense over the life of the equipment,"[8] and, therefore, would reduce the Company's reported earnings.   In fact, the Company reported in its 2018 Form 10-K that "[b]ased on the mix of revenue earning equipment at December 31, 2018, a 10% decline in expected vehicle residual values would increase

---

[5] ASC 360-10-35-3.
[6]  ASC 360-10-35-4; footnote added.   FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("FASCON 5"), similarly requires that depreciation expense be "allocated by systematic and rational procedures to the periods during which the related assets are expected to provide benefits." (FASCON 5, para. 86).
[7] Ryder reported that its revenue earning equipment was initially recorded at cost inclusive of vendor rebates. (Ryder's 2018 Form 10-K, p. 82).
[8] Ryder's 2018 Form 10-K, p. 53.

depreciation expense in 2019 by approximately $123 million,"[9] an amount that would have constituted approximately one-third of its reported 2018 earnings from continuing operations before tax.[10]

48.     Ryder described the residual value of its revenue-earning equipment as "the price at which we ultimately expect to dispose of revenue-earning equipment."[11]   In view of the foregoing, the residual values used by the Company in its computation of depreciation expense on its revenue-earning equipment were required to be based on the most accurate and timely information the Company had at the time such residual value estimates were made in order for the financial results reported in its SEC filings to comply with GAAP.

49.     During the Class Period, the Company stated in its SEC filings that it "review[ed] residual values and useful lives of revenue-earning equipment on an annual basis or more often if deemed necessary."[12]  In addition to such claimed annual reviews, Ryder further disclosed that it had a process to "monitor market trends throughout the year and assess residual values of vehicles expected to be sold in the near term."[13]  As a result of this process, the Company explained that it "may adjust residual values for [its] vehicles."[14]

50.     Although such statements would have led investors to believe that the Company had a reliable process for arriving at accurate and timely estimates of residual values that were used to compute and report depreciation expense (and the reported earnings such expense directly impacted), this was not the case.  Instead, as discussed in more detail below, throughout the Class

---

[9] Ryder's 2018 Form 10-K, p. 53.
[10] In its 2018 Form 10-K, Ryder reported earnings from continuing operations before tax for the year 2018 of approximately $374 million. (Ryder's 2018 Form 10-K, p. 74).
[11] Ryder's 2018 Form 10-K, p. 53.
[12] Ryder's 2018 Form 10-K, p. 53.
[13] Ryder's 2018 Form 10-K, p. 53.
[14] Ryder's 2018 Form 10-K, p. 53.

Period, Defendants misrepresented Ryder's true financial condition by overstating the residual value of its trucking fleet (i.e., revenue-earning equipment), which allowed the Company to record lower depreciation expense on those assets each year, and artificially inflated Ryder's earnings.

51.    Further, Ryder overstated the net book value of its revenue-generating equipment in its SEC filings by recording lower-than-required depreciation expense during the economic life of its revenue-earning equipment, and failing to reduce the net book value of such equipment by way of impairment.[15]  ASC 360 requires that equipment which is intended to be "held and used" (which applied to the majority of Ryder's revenue generating equipment throughout the Class Period), must be tested for recoverability when a company is aware of indications that the equipment's carrying amount may not be recoverable by comparing the carrying value of such equipment to its fair value.[16,17]  As the carrying value of Ryder's revenue-generating equipment was inflated due to the recognition of lower-than-required depreciation expense by way of overstated residual values, the fair value of the Company's revenue generating equipment was lower than such carrying value, meaning that such equipment was impaired.  Accordingly, a test for impairment of Ryder's revenue generating equipment in accordance with GAAP would have resulted in the recognition of an impairment loss(es) by Ryder which would have reduced the net book value of such equipment to its fair value during the Class Period.

**C.**    **Ryder Faced a Serious Competitive Threat from Its Chief Rival, Penske, and Manipulated Its Residual Values to Overstate Income and Compete on Lease Pricing**

---

[15] ASC 360 defines impairment as "the condition that exists when the carrying amount of a long-lived asset (asset group) exceeds its fair value." (ASC 360-10-20).

[16] ASC 360-10-35-17 & 21.

[17] GAAP defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." (ASC 820-10-20).

52.     In 2015 and 2016, Ryder faced steep competition for truck leasing from its chief rival, Penske.  On May 11, 2016, Key Banc Capital Markets reported on "channel commentary" it gathered from conversations with Ryder employees.  The comments emphasized how competitive the truck leasing environment was at the time.  The comments included that "Competition is aggressive out there; we have to fight for customers"; "There's a lot of trucks available out there, which is definitely hurting us a bit"; "It's tough to raise prices right now when we are trying to grow and competition is tough"; and "Margins are definitely getting squeezed; higher overhead, but tough to make up for it on the price front."

53.     During Ryder's March 8, 2016 conference call, an analyst asked Defendant Sanchez, "Who are your competitors, and what is your market share?"  Sanchez responded, "On the truck leasing side … Penske Truck Leasing is our biggest competitor.  We're about similar size.  We're about 28%, they're about 25% of the market.  The rest of the market is really made up of small, local competitors."  Ryder's other, smaller competitors include Idealease and PacLease.

54.     The market understood that Ryder's success was critically dependent on how competitive its leasing program was with Penske's.  In their September 1, 2017 analyst report, market analysts at Stephens wrote that while there was "[p]otential for a [r]ebound in [Ryder's] [c]ommercial [r]ental [b]usiness," Stephens "believe[d] there are a couple items to watch on the competitive landscape" as "Penske Truck Leasing (PTL) seems to be pursuing a more aggressive growth strategy."

55.     During the Class Period, Ryder artificially inflated the residual value of its vehicle fleet in order to compete with Penske and inflate earnings.  As Ryder has disclosed in its annual Form 10-Ks filed with the SEC, "[c]hanges in residual values … impact the overall

competitiveness of our full service lease product line" because "<u>estimated sales proceeds are a</u> <u>significant component</u> of the overall price of the lease."  As Ryder's 2016 Form 10-Ks further explained:

> Substantially all of our FMS lease and maintenance services and our DTS and SCS services are provided under contractual arrangements with our customers.  The pricing structure for our lease and contract maintenance business is based on certain assumptions regarding capital costs, our ability to acquire equipment at competitive rates from our suppliers, maintenance expense over the life of the contract, particularly in light of new engine technologies, <u>residual values</u>, productivity, and the mix of fixed and variable costs, many of which are derived from historical data and trends.

56.     The residual value of a vehicle represents its anticipated selling price at the end of the lease, and <u>the residual value determines the price of the lease itself</u>.  Understanding this begins with a basic definition of residual value.  "Residual" means the part of something left over after some of it has been taken away.  This applies to vehicle leases in the sense that, when a lessee leases a vehicle, the lessee is paying for that portion of the vehicle's value that he or she uses up.

57.     As with a new car, a new Ryder vehicle's value drops once it is sold or leased and driven off the lot, and that loss is known as depreciation.  The longer a vehicle is driven, and the more miles added to the odometer, the greater the depreciation amount will be.  This depreciation is what is being "taken away" from the vehicle's new value.

58.     A Ryder vehicle's residual value is an estimate of the dollar amount the vehicle will be worth at the end of the lease term.  This estimate comes from Ryder, who holds the lease contract.  Ryder calculates its depreciation expense by subtracting the residual value from the present value of its trucks and dividing that number by the number of years in the trucks' useful lives.  An increase in the residual value of the Company's trucks enables it to decrease the incremental depreciation expense recorded on those assets.  Thus, the higher the residual value

that Ryder assigns to its fleet, the less depreciation expense the Company must record, which has the effect of increasing Ryder's earnings on a dollar-for-dollar basis.

59.     Two simple examples are helpful to illustrate how residual value impacts lease pricing.  First, assume a consumer leased a Ryder vehicle with a manufacturer's suggested retail price ("MSRP") of $20,000 for a three-year lease term, and this vehicle had a 60% residual value. That would mean the vehicle was projected to be worth 60% of the original MSRP at the end of the lease (60% of $20,000 is $12,000).  The difference between the price of the vehicle and its residual value is what makes up much of the consumer's lease payment.  A consumer's lease payment would be based on the difference between the selling price ($20,000) and the residual value ($12,000). This $8,000 difference would be divided over the consumer's 36-month lease — $8,000 divided by 36 months nets the consumer a base monthly payment of $222.  Taxes, interest and other fees and maintenance costs would be added to this base payment to give the consumer its overall payment:

> ***Example 1***:
>
> MSRP: $20,000
> Residual value: 60%
> 60% of $20,000 = $12,000
> Selling price: $20,000
> Selling price minus residual value: $20,000 - $12,000 = $8,000
> (This $8,000 is the depreciation amount and is the basis for the consumer's lease)
> Lease length: 36 months
> $8,000 divided by 36 months = $222.22 per month base payment (before taxes, fees, etc.)

60.     If one assumes that the vehicle the consumer had decided to lease had a lower, 45% residual value instead of 60%, then the consumer's $20,000 vehicle would be projected to lose $11,000 of its value, reducing the residual value from $12,000 to $9,000.  The consumer's cost would jump from $8,000 spread out over his or her lease to $11,000.  Here is how that would look:

> ***Example 2***:

20

MSRP: $20,000
Residual value: 45%
45% of $20,000 = $9,000
Selling price: $20,000
Selling price minus residual value: $20,000 - $9,000 = $11,000
(This $11,000 is the depreciation amount and is the basis for the consumer's lease)
$11,000 divided by 36 months = $305.55 per month (before taxes, fees, etc.)

61.      As these two examples show, a higher residual value results in a lower depreciation amount and lower monthly payments (Example 1).  Conversely, a lower residual value results in a higher depreciation amount and higher monthly payments (Example 2).

62.      Accordingly, when Ryder increased (or artificially maintained) the residual values of its leased vehicles, this lowered its monthly lease rates and made its leases more competitive with other companies' leases, including Penske's.  However, as this scheme became divorced from the actual market prices for Ryder used vehicles, and market prices in fact fell, Ryder would be caught with vehicles whose inflated residual values result in a loss when sold, a negative financial "hit" to earnings, and a negative impact on Ryder's share price.

63.      Moreover, when Ryder finally disclosed to investors the need to reduce the residual value of its fleet by $844 million in October 2019, Ryder and Defendant Sanchez admitted that the need to reduce the residual values would be tied to an increase in lease rates, which would hurt Ryder's competitiveness going-forward.  Ryder's slide deck from its October 29, 2019 investor presentation stated that the "Key ROC [Return on Capital] Improvement Actions" that it was taking included "Increased lease rates on all power vehicles by reducing priced residual assumptions."

64.      FE 1 was a Ryder Inside Account Manager from before the start of the Class Period through the end of 2017.  He managed corporate full service lease accounts in the mid-Atlantic region and marketed financial solutions, operating lease packages and ongoing maintenance

services to corporate customers. FE 1 stated that, during his time at Ryder, the Company was focused on being competitive in the market and that Ryder used a formula to develop the terms of its truck leases. As he stated, elements of Ryder's lease price formula are the amount of depreciation in the truck lease, the amount of the operations and maintenance cost, as well as profit. He explained that the depreciation amounts determine the lease price and market competitiveness. He stated that a leasing company like Ryder has no actual control over the need to maintain the trucks, so Ryder instead modified the amount of depreciation in its leases (which, as discussed above, is tied to the residual values of the trucks) to make the terms of the truck leases more attractive to consumers. However, as FE 1saw, and as discussed in more detail below, when the leases expired, Ryder was left with thousands of trucks that it could not sell because they were internally overvalued.

65.     As FE 1 explained, the establishment of unrealistically high residual values was used by Ryder to improve the competitiveness of their lease and rental pricing vis-à-vis the other leasing companies (Penske, Idealease, PacLease). FE 1 explained that this was done to try to achieve unrealistic lease and rental sales goals but that, at the end of the truck lease, Ryder would be left with returned trucks that had unrealistic depreciation still attached to them. As FE 1 said, the remaining depreciation would be far higher than the true market value of the truck and so the truck would suffer a loss when sold. He said that this game of presenting unrealistic sales revenue forecasts to Wall Street was used to try to drive the stock value up with little regard for the fact that earnings would suffer later on as a result of overvaluation of assets, which would ultimately require a loss on the sale of the trucks, a corresponding write down and ultimately an earnings loss and drop in stock value.

**D.     Costly Problems with the MaxxForce Reduced-Emissions Engines Drastically Reduced the Vehicles' Market Value and Ryder's Ability to Sell Them**

66.     During the Class Period, Ryder incurred significant increased costs due to problems with vehicles with engines designed to comply with emissions-reduction requirements.  This included numerous issues with the Navistar International MaxxForce engine.  Navistar International introduced its MaxxForce 11-liter and MaxxForce 13-liter diesel engines in 2008, specifically designed for its International brand heavy trucks.

67.     Navistar used exhaust gas recirculation ("EGR") technology instead of selective catalytic reduction ("SCR") technology to comply with U.S. emissions rules that took effect in 2010, but the EGR setups were plagued with problems.  The technology failed to meet federal emissions standards, and after other truck makers used SCR technology to control emissions, Navistar eventually launched a new lineup of engines that employed SCR setups.

68.     During 2010-2012 as Navistar tried to "perfect" its EGR-only technology, many trucking companies with MaxxForce-powered units experienced repeated breakdowns and engine failures.  Navistar's International trucks and MaxxForce engines also had numerous recalls and dozens of service bulletins during this time, which led to increased downtime, repair costs, and lost profits for the companies operating the trucks.  The overall problems with the engine were worsened by the fact that, due to the unique MaxxForce wiring harness, MaxxForce-powered trucks could not be cost-effectively retrofitted with a non-MaxxForce engine.

69.     Overall, the MaxxForce engines tarnished Navistar's reputation; sales plunged; and Navistar lost almost half its market share as costs soared and losses climbed.  In May 2019, Navistar settled a federal class-action lawsuit related to its MaxxForce engines in the U.S. District Court for the Northern District of Illinois for $135 million.  The case was filed on behalf of truck owners and lessees alleging that Navistar, Inc. and Navistar International, Inc. sold or leased 2011-2014 model year vehicles equipped with certain MaxxForce 11- or 13-liter diesel engines equipped

23

with a defective EGR emissions system.  The $135 million settlement provides class members with up to $2,500 per truck, or up to a $10,000 rebate off a new truck, depending on months of ownership or lease, or the option to seek up to $15,000 per truck in out-of-pocket damages caused by the alleged defect.

70.     Not including this latest settlement, Navistar also paid more than $2 billion in warranty costs to cover reliability and fuel-economy problems with the trucks, and it wrote off almost $500 million to cover used trucks it repurchased from angry customers and resold at a loss, which was on top of the $700 million development cost of the engines.

71.     The existence of the significant performance issues with the MaxxForce engine are reflected in its poor valuation in the industry.  The National Automobile Dealers Association ("NADA") Official Commercial Truck Guide reflects a nearly $19,000 deduction in value for 2011 International ProStar+ trucks with the MaxxForce engine.  Data from major auction companies like Ritchie Brother's Auctions also reflect the lower auction prices for similar vehicles with the MaxxForce engines, versus those without.

72.     Former Ryder employees discussed the serious problems they witnessed with Ryder's ownership and leasing of vehicles with MaxxForce engines.  For example,  FE 2 was a Ryder Vehicle Sales Representative from before the Class Period to December 2019.  As a vehicle sales representative, FE 2 worked with the other functional groups at Ryder, including sales, marketing, operations, and asset management, to meet sales projections and maximize proceeds while providing high level customer service.  FE 2 stated that a decline in Ryder's sales began in approximately 2015 because of emissions restrictions based on the new trucks and tractors.  FE 2 stated that the emissions filters for the exhaust systems and engines of these vehicles made them "a mess" and caused "bugs" in the engines that lowered their fuel efficiency and harmed the

engines which cost $10,000 and more depending on the size of the vehicle.  Ryder's UTC customers did not want trucks with emissions filters built in, yet Ryder was trying to sell them, and this caused a decline in sales.

73.    FE 3 was a Vehicle Sales Center Manager from before the start of the Class Period until July 2019.  As a sales manager, FE 3 dealt with the sales of the used vehicles, including reporting customer feedback to his managers.  He was responsible for managing Ryder's business operations covering multi-million dollar assets for the East Region.  He also led planning processes including marketing, budgeting, forecasting and long range planning.  FE 3 recounted that the market was consistently declining while he was at Ryder (from before the Class Period to July 2019) because of the new emissions requirements for the trucks.  FE 3 said that Ryder saw the trucks with the new technologies coming down the pipeline in small amounts on the used truck side around 2010-2012, and things went downhill from there.  The prices for repairs on these trucks were "sky-high," and the parts were expensive.  FE 3 said that the used truck market was never the same since those new trucks entered it.  The new trucks also cut his export sales by more than half.  In the past, on average, he would make 4-5 export sales per month to Nigeria or El Salvador.  But this dropped to approximately one sale per month because of the emissions technology in around 2011/2012.

74.    FE 4, a Director of Asset Management Canada from 2011 to 2018, explained that every month for the last couple years of his tenure at the Company, he delivered the same basic message about the MaxxForce issues to senior management at Ryder, including Executive Vice President and Chief Sales Officer John Gleason.  FE 4 oversaw the entire used truck sales operation across Canada.  FE 4 reported that Ryder was increasingly pushing Navistar International to take back its MaxxForce trucks, but with limited success.  He stated that he twice lined up 250 tractors

to go back to Navistar International but if he was lucky, he got 35 or 50 taken back.  Particularly troubling for Ryder was the fact that Navistar International often claimed that Ryder's trucks were not in returnable condition because of scrapes or damage, as Navistar International was "100% looking for any excuse not to take the trucks back."  Compounding these issues even further, FE 4 reported that on the customer-facing side, Ryder had record numbers of Maxxforce customers say they were breaking their leases because they could not work with the trucks.  FE 4 stated that as a result Ryder took a lot of leased and rented vehicles back early, yet there was no way they could rent them again or sell them for the residual value that was on the books.  Indeed, some of the vehicles went out for lease on four or five year terms, but a lot of them did not make it to their lease term, and in general Ryder was trying to sell them sooner than they had originally intended. FE 4 stated that nobody wanted to buy them and people walked right by them.

75.     FE 5 was a Director of Used Vehicles Sales from May 2018 to September 2018 who previously worked for Navistar.   FE 5 worked at Ryder's corporate headquarters in Miami and focused on used truck pricing.  As part of his role, he participated in pricing team meetings, during which Ryder's vehicles' condition versus their value was discussed.   FE 5 stated that, especially in 2015 when the MaxxForce trucks worked their way up into reports on the used truck industry, it became apparent that the values had declined.  The value of the trucks went from $60,000 to $20,000 in a matter of weeks or months.  The trucks took quite a depreciation hit; they went from being worth a lot to being worth nothing.   FE 5 explained that, in order to maintain the Diesel Particulate Filter ("DPF") in the MaxxForce engines, a company would need to put these filters in a kiln and bake them at high temperatures in order to remove the soot from the filter. However, Ryder did not have that process in place, nor did it have it in its maintenance plan for the used truck department, which meant the motor in those vehicles was running on soot.   FE 5

explained that Ryder had quite a few of these vehicles in their stock and that it was apparent in the used truck department that there was an issue and concerns; however, Ryder had no answers for the problem.

76.     FE 12 was a Vehicle Sales Representative from 2016 to 2018 and a Sales Manager from 2018 to May 2019.  In his role,  FE 12 was focused on used vehicle pricing and managing assets to create solutions for customers' lease and rental needs.  FE 12 stated that the newer emissions requirements added additional costs to the trucks.  He said that the emission issues were mainly with International units and that, in 2012, those issues occurred across the board mainly because of the DPF tank and filter.  As  FE 12 related, these trucks with the new technology had problems and, therefore, were more difficult to sell.  From 2012 on, FE 12 saw that the maintenance prices of the trucks were frequently high.  He stated that, because of how the DPF filter ran with the MaxxForce engine, more times than not, the engine would almost seize up.  It was therefore tough for Ryder to sell those units, as customers would treat MaxxForce as "lemon" products.  FE 12 stated that Ryder had a lot of these trucks in its inventory, as the main trucks Ryder sold were International and Freightliner.

### E.    Ryder Witnessed a Sharp Decline in the Demand for, and Sales Prices of, Used Vehicles

77.     By late 2015, including because of the new emissions technology, the market for used vehicles, and especially tractors, weakened drastically.  As Defendant Sanchez, Ryder's CEO, recently acknowledged: "Following the mid-2015 peak [in used vehicle prices], tractor proceeds declined sharply through 2017 to below our accounting residuals as supply entered the market and the freight environment slowed."

78.     FE 6 was a Vehicles Sales Manager from before the Class Period to September 2016.  He also served on Ryder's Asset Management Board.  He was responsible for selling the

used off-lease vehicles/equipment, and the Asset Management Board was responsible for the pricing of the vehicles and for changing the values of the vehicles. FE 6 stated that the market for used trucks and trailers was challenging and took a huge hit in 2015. In his words, "the market" "got it hard."

79.    FE 4 recounted that, by 2015, it was "loud and clear" that trucks sales were declining. Ryder suddenly went from making money on used sales to losing money.

80.    FE 1 stated that, in 2015 or 2016, Ryder needed to make a push to sell the used trucks by starting a new, internal sales division within Ryder at its Alpharetta Georgia office that hired 40 to 50 people to try and sell Ryder used trucks by phone and online. That department had not existed just two years earlier, as Ryder had previously sold its used trucks through a wholesaler. FE 1 stated that, based on a conversation with a current Ryder truck salesperson, as of 2020, the number of Ryder employees in its inside sales group had increased to 90 total, which included 40 lead generation specialists, 21 sales people (who sell trucks by phone), six managers, one director of sales, and others.

81.    FE 7 was a Senior Business Development Manager from 2016 to March 2019. In that role, FE 7 was responsible for the development of profitable new customer business within his assigned sales territory. FE 7 stated that during his time at Ryder (2016 through early 2019), the demand for used trucks was "really bad." He said that as a result, Ryder had trucks on its balance sheet whose prices were excessively high and Ryder could not sell them. Accordingly, there was a large surplus of trucks just sitting available for sale. When he moved to Ryder's Alpharetta Georgia office, he also noticed that Ryder had hired upwards of 80 people to its used truck sales division. In his words, Ryder was "hiring so much to try and move that inventory."

82.     FE 8 was a Rental Management Trainee at Ryder from 2015 to 2017 and a Location Rental Manager from 2017 to November 2018.  In his roles,  FE 8 was responsible for assisting the Senior Rental Manager from the Northwest Business Unit in day to day operations to maximize revenue and increase customer retention.[18]   FE 8 stated that, in the three years he was at Ryder (2015 to 2018), the used vehicle sales did not make a profit.  He stated that the CEO would have a video call every quarter and would state that used vehicle sales are still down and that people were not buying used trucks.

**F.      Ryder Executives Controlled the Prices and Residual Values of Ryder's Entire Fleet from Its Miami Headquarters**

83.     Despite the sharp decline in the demand and market prices for Ryder vehicles, the executives at Ryder headquarters repeatedly pushed back against efforts by Ryder management and employees to reduce the sales prices of Ryder vehicles or their residual values.  Indeed, the pricing and valuation of the Ryder trucks was a centralized, top-down process centered at Ryder headquarters in Miami that left very little to no discretion to specific Ryder retail offices across the country.

84.     Multiple former employees recounted that the setting of residual values was performed by a small group of Ryder executives called asset managers, with the ultimate decision-making done at Ryder's corporate headquarters in Miami, Florida:

    a.     FE 8 stated that typically depreciation was handled by the Ryder "asset managers" along with people at corporate;

    b.     FE 6 served on the Asset Management Board, which was responsible for the pricing of the vehicles and for changing the values of the vehicles.  He said

---

[18] FE 8 was responsible for, among other things, the overall profitability of Ryder's rental product line, specifically achieving both revenue and margin plans, forecasting monthly, quarterly and annual results accurately and timely, and analyzing and interpreting performance through multiple financial reports and metrics. FE 8 was also responsible for maximizing utilization of vehicles, controlling operational costs, and planning marketing strategies.

that there were only four sales managers in the United States on the Board.[19] He added that the managers on the Asset Management Board met quarterly in a conference room in Miami with the asset managers and the Vice President, Eugene Tangney.  FE 6 described Tangney as the top of the food chain in asset management.

c.  FE 10 was a Vehicle Sales Manager from before the Class Period to 2017, a Bailment Supervisor from 2017 to 2019, and Senior Logistics Analyst from 2019 to February 2020.  He was closely involved with vehicle pricing and participated in weekly and monthly conference calls with Ryder executives during which vehicle valuation and depreciation were discussed.  FE 10 said that he was on weekly and monthly phone calls during which valuations and depreciation were discussed, and the C-suite was on the phone call.  He added that "they saw all the reports we had."  He stated that discussions on the calls included what units were coming up, their prices, where they were coming from, where they were going, what they were selling for and who they were trying to sell to.  He said the information about a truck went from the repair shop to the district managers and then to the area manager and the regional managers and eventually the directors and CEO.  He specifically related that all of the C-suite level individual defendants were in "all those meetings" and "Robert Sanchez for sure … I heard his voice on many phone calls."

d.  FE 9 stated that Sanchez and other executives "had to" have received reports on valuation and depreciation in order to run the business.  The VP of Sales Tangney had to know this information and he was "always" in meetings with Sanchez.

e.  FE 4 stated that the pricing department in Miami was behind the calculation of residual values.

85.  More specifically,  FE 9, a former Ryder Vehicle Sales Representative from November 2016 through April 2019, worked in UTC sales during his 2.5 years at the Company. As a Vehicle Sales Representative,  FE 9 was responsible for, among other things, evaluating used vehicles for a pricing determination.  He stated that he and his manager did not have control over the pricing of the vehicles they sold.  When a truck came to the UTC for sale, the sales representatives at the UTC filled out a checklist evaluation of the vehicle, took pictures, and <u>sent</u>

---

[19] The Asset Management Board consisted of the Used Vehicle Manager, the four Directors of Asset Management, the four field asset managers, and four vehicle sales managers (including FE 6).

them to corporate headquarters in Miami.  Also, upon sale of a vehicle, depending on the amount of discount a customer wanted, the director of sales for the region would make the determination on the vehicle's sales price.  If the percentage of the requested discount was too high, the decision then went to the Vice President of Vehicle Sales, Eugene Tangney.

86.    FE 9 stated that the individuals approving the sales price of a vehicle would have to know the depreciation on the vehicle in order to approve a price.  As he explained, those approving a sale cannot give an informed answer on the deal if they do not know all of the facts, including how much depreciation has occurred and how much value is left on the vehicle.  The chain of approval for individual deals ended with Tangney and Tangney spoke with Sanchez often.

G.    **During the Class Period, Ryder Saw that Its Vehicles' Resale Values Were Far Below their Residual Values, But Ryder Increased Residual Values, Understated Depreciation Expense and Overstated Net Income**

87.    As Ryder only admitted through a series of partial corrective disclosures in 2019 and early 2020, during the Class Period, Ryder overstated the residual values of its entire fleet and thereby understated its depreciation expense by more than a billion dollars.  This overstated Ryder's net income during the Class Period.

88.    The impact of Ryder's residual value calculations on its financial statements can be seen by contrasting the way the same industry trends in used truck prices impacted its financial statements as compared with its competitors.  For example, in Ryder competitor Paccar's Form 10-K for the fiscal year ended December 31, 2016, Paccar admitted: "A higher volume of used truck sales increased operating lease, rental and other revenues by $3.2 million.  Depreciation and other expenses increased by $5.2 million due to higher volume and impairments of used trucks reflecting lower used truck prices."[20]  This stands in contrast to Ryder's Form 10-K disclosures for

---

[20] https://www.sec.gov/Archives/edgar/data/75362/000119312517050405/d283100d10k.htm  accessed  9-29-2020 at page 20

the same fiscal year, which stated that depreciation expense increased 6% in 2016 and increased 7% in 2015 but that "[t]he increases in both years were partially offset by $35 million and $40 million, respectively, from increases in residual values."

89.     As shown by this one example, the same used truck price trends, which should have impacted Ryder and its competitors in a uniform manner, put upward pressure on Paccar's and Ryder's depreciation expense, yet also inexplicably increased Ryder's residual values.

90.     Despite the sharp decline in used vehicle prices starting in 2015, Ryder adjusted residual values and depreciable lives upward from 2011 through 2016, and benefited handsomely in 2017 and 2018 from the overstated residual values and understated depreciation expense.  Table 1 below shows the impact of Ryder's increases in residual values on the Company's pretax income for the years 2011-2016, with each year's "Cumulative benefit" relative to 2010 ($ in millions):

|  | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|---|
| **Benefit from changes in residual values and useful lives** | $35 | $40 | $25 | $30 | $18 | $10 |
| **Cumulative benefit (2011 – 2016)** | $158 | $123 | $83 | $58 | $28 | $10 |
| **% of adjusted pre-tax income** | 35.2% | 24.3% | 17.9% | 14.8% | 8.8% | 3.5% |
| **Cumulative benefit, after tax, per share** | $1.92 | $1.50 | $1.02 | $0.72 | $0.36 | $0.13 |

**Table 1.**

91.     As Table 1 shows, the percentage contribution of Ryder's scheme to increase residual values made an increasingly large contribution to Ryder's adjusted pre-tax income from 2011 through 2016.

92.     In 2017, Ryder made miniscule reductions in its residual value assumptions, before it finally took in 2019 a $357 million increase in depreciation that eliminated Ryder's second half 2019 earnings and also reported a $58 million loss resulting from the sale of used vehicles (for a

total impact of $415 million).  As shown in Table 2 below, in 2017, pretax income was still inflated by $154 million, or 41.7%, relative to 2010.  Similarly, in 2018, pretax income was also inflated by $75 million, or 18.5%, relative to 2010 ($ in millions):

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| **Benefit from changes in residual values and useful lives\*** | ($415) | ($79) | ($4) |
| **Cumulative benefit (2011 - 2019)** | ($443) | $75 | $154 |
| **% of adjusted pre-tax income** | -789.7% | 18.5% | 41.7% |
| **Cumulative benefit, after tax, per share** | ($6.78) | $1.14 | $1.89 |

**Table 2.**

93.     Beginning in mid-2015 at the latest, however, Ryder's changes to its residual values far exceeded the actual used sales prices that Ryder obtained in the market for its used vehicles.  During Ryder's October 29, 2019 earnings conference call, Ryder disclosed the below chart identifying its "Used Tractor Sales Price History" from 1999 through 2018:



94.     As shown by the above graphic, Ryder's used tractor sales price as a percentage of their original cost had declined from approximately 130% in 2015 to approximately 110% in 2016, a 15% decline (130% - 110% / 130% = 15%).  This sharp price decline, as well as those that followed in subsequent years, were not fully reflective of the full actual decline in Ryder's tractors' values because Ryder internally resisted calls to reduce the prices of its vehicles further in order to sell them off, and instead held onto the vehicles to avoid the significant financial hit from their sales.  Nevertheless, despite even the sharp 15% decline in Ryder's used tractor sales prices in 2016, as set forth above, rather than decrease the residual value of its fleet, Ryder increased its residual values by $35 million in 2016.

95.     When Ryder finally reduced its residual value estimates by $844 million in the third quarter of 2019, Defendant Sanchez attributed it to how: (i) the residual values of the vehicles have "been negatively impacted by maintenance costs on the early model years of the post-2010 emissions technology"; and (ii) "these vehicles as they come off lease are now expected to be sold in a down market at below price levels."  However, by mid-2015, Ryder already knew of these two negative developments and that it needed to adjust downward its vehicles' residual values at that time as a result.  Its failure to do so was a violation of GAAP.

96.     As also shown in the above graphic, the used tractor sales price as a percentage of the original cost continued to decline in 2017 from approximately 130% in 2015 to approximately 85% in 2017, a 35% decline from 2015 (130% - 85% / 130% = 35%).  Again, despite this even sharper decline in used vehicle sale prices in 2017 (compared to the high of 2015), as set forth above, Ryder decreased the residual value of its fleet by a miniscule $4 million in 2017.

97.     The decline in used tractor sale prices continued and only worsened, falling in 2018 from approximately 130% in 2015 to approximately 80% in 2018, a 38.5% decline from 2015

(130% - 80% / 130% = 38.5%). Again, despite this continued decline in used vehicle sale prices in 2018 (compared to the high of 2015), as set forth above, Ryder decreased the residual value of its fleet by a mere $79 million in 2018.

98.     As Ryder's subsequent admissions make clear, the $79 million residual value reduction in 2018 was woefully inadequate. When Ryder disclosed in the third quarter of 2019 the need for drastic residual value reductions, Ryder based it on the decline in used tractor sale prices <u>in the third quarter of 2019</u>. But that third quarter 2019 "decline" was simply a return to the same prices that Ryder was obtaining for its tractors in <u>2018</u>, as shown by this graphic from Ryder's October 29, 2019 earnings conference call presentation:



99.     In explaining the above slide during Ryder's October 29, 2019 earnings call, Defendant Sanchez claimed that "we started seeing softening market conditions for used tractors" in June 2019 and those conditions "continued to worsen in the third quarter [of 2019]" and "[t]his triggered a review and lowering of residual value estimates on power vehicles." But the mere blip of an increase and decrease in used tractor prices in late 2018/early 2019, which resulted in those

prices returning to Ryder's first quarter 2018 prices, was not the first trigger of Ryder's need to re-evaluate its residual values.  In reality, it was the sharp, consistent decline in prices from the 2015 peak, which Ryder experienced <u>starting in mid-2015 and continuing throughout the Class Period,</u> and whose extraordinary size comports with the actual $844 million decrease in residual value estimates that Ryder finally made in the third quarter of 2019 (rather than the paltry $75 million adjustment it took in 2018, when its tractors were at the <u>identical market values</u> as in the third quarter of 2019), as well as the total, more than $1 billion financial impact it later more fully disclosed in February 2020.

100.    As set forth in Table 2 above, the $357 million adjustment made in the second half of 2019, as well as the $58 million loss recorded in 2019 on sales of used vehicles, entirely wiped out the financial benefits of increased residual values that Ryder had reported through 2018.  Allocating just that additional $415 million ($357 million adjustment + $58 million loss on sales of used vehicles) to the years between mid-2015 to 2018 on a *pro rata* basis results in the below estimates of Ryder's true pretax earnings.  Based on that analysis, Ryder's estimated pretax earnings peaked at $408.3 million in 2015, or approximately 19.3% below Ryder's reported adjusted pretax income figure.  As shown in the Table below, if the residual values were correctly estimated by the Company from mid-2015 through 2019, and the resulting depreciation expense was correctly accounted for by Ryder in its income statement, the GAAP-based adjusted pretax income ($ in millions) would have been significantly diminished amounts in 2015 through 2018 compared to what Ryder actually reported in its financial statements:

|  | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|
| **Ryder's reported adjusted pretax income** | $56.1 | $406.5 | $369.7 | $448.8 | $506.0 |
| **Add (subtract) share of additional depreciation (mid-2015 to 2019)** | $254.5 | ($146.7) | ($212.2) | ($212.9) | ($97.7) |

| Estimated adjusted pretax income | $310.6 | $259.8 | $157.5 | $235.9 | $408.3 |
|---|---|---|---|---|---|
| Change to Ryder's reported adjusted pretax income | 453.7% | -36.1% | -57.4% | -47.4% | -19.3% |

**Table 3.**

101.    Ryder repeatedly claimed to investors that it applied a "five-year rolling average" to calculate its residual values and depreciation expense, suggesting to investors that it employed a rigid mathematical formula to which Ryder held itself.  Instead, the "five-year rolling average" was a convenient excuse for Ryder to use what it knew to be excessively high residual values, and Ryder only followed it when it was convenient for its purposes.

102.    Ryder in fact claimed in its Forms 10-K that it reviewed its residual values and depreciation expense annually, in order to ensure that they accurately reflected "historical market price changes, current and expected future market price trends, expected life of vehicles included in the fleet and extent of alternative uses for leased vehicles[.]"  According to Ryder's Forms 10-K, Ryder set its residual values through a review of a variety of factors, not blind adherence to a supposed five-year rolling average:

> Depreciation and Residual Value Guarantees. We periodically review and adjust the residual values and useful lives of revenue earning equipment of our FMS business segment as described in Note 1, "Summary of Significant Accounting Policies — Revenue Earning Equipment, Operating Property and Equipment, and Depreciation" in the Notes to Consolidated Financial Statements.  Reductions in residual values (i.e., the price at which we ultimately expect to dispose of revenue earning equipment) or useful lives will result in an increase in depreciation expense over the life of the equipment. . . .

> We review residual values and useful lives of revenue earning equipment on an annual basis or more often if deemed necessary for specific groups of our revenue earning equipment.  Reviews are performed based on vehicle class, generally subcategories of trucks, tractors and trailers by weight and usage.  Our annual review is established with a long-term view considering historical market price changes, current and expected future market price trends, expected life of vehicles included in the fleet and extent of alternative uses for leased vehicles (e.g., rental fleet, and DTS and SCS applications).  As a result, future depreciation expense rates

are subject to change based upon changes in these factors.  While we believe that the carrying values and estimated sales proceeds for revenue earning equipment are appropriate, there can be no assurance that deterioration in economic conditions or adverse changes to expectations of future sales proceeds will not occur, resulting in lower gains or losses on sales.

103.    Despite these claims of periodic review and adjustment of residual values, and hidden from investors, Ryder senior management and executives knew during the Class Period that the market for Ryder used vehicles had fallen sharply, that the new emissions vehicles had materially greater maintenance costs, and that Ryder was overstating its residual values.  The executives repeatedly brought those serious concerns to their superiors (who were involved in the most senior discussions to set the residual values), but their concerns were recklessly ignored and pushed aside.  For example:

a.    FE 6, a Vehicle Sales Manager in the Asset Management Division from before the Class Period to September 2016 and also a member of Ryder's Asset Management Board, reported that "the values of the equipment were completely off" and "it was pretty clear that they needed to write-down the equipment."  Despite the general recognition that the vehicles in Ryder's fleet were overvalued,  FE 6 said that everyone in upper management, including Tangney and Defendants Sanchez and Garcia pushed back on not writing down the used vehicles.

b.    FE 6 added that the value of all vehicles and the depreciation of the vehicles were determined at the quarterly Asset Management Board meetings.[21]  According to  FE 6, there was talk of the need for a write-down in 2015/2016, as the values had depreciated much lower than expected on the back end.  The managers wondered how they were going to show a profit if Ryder did not write them down and were always raising concerns.  However, Ryder "had no interest in writing down whatsoever" while  FE 6 was there.  Eugene Tangney (the Director of Asset Management), Marlene Daubar (Vehicle Sales Operations Manager at Ryder Transportation) and Linda Williams (the Director of Fleet Sales) were involved in the decisions to not adjust the values.

c.    FE 10 stated that senior management, including Defendants Sanchez and Garcia, participated in weekly and monthly phone calls which discussed Ryder's vehicles' valuations and depreciation.  FE 10 stated that he "heard

---

[21] FE 6 did not believe that the reports generated at the meetings had a name, but that he is sure the reports went to Ryder's senior executives.

[Defendant Sanchez's] voice on many phone calls" and that, at these meetings, FE 10 would "scream until [he] was blue in the face" that Ryder's vehicles were overpriced. He also stated that <u>he expressed these complaints directly to Defendants Sanchez and Garcia at these meetings</u>, as they respected his opinion because he met his quotas and was known for doing more than the average salesperson.

d.      FE 10 stated that <u>he witnessed pushback from Sanchez and Garcia "all the time" in response to these complaints</u> and said that their excuses included that the Company did not want to lose money on the trucks, and that the Company could not afford to lower the prices. It was FE 10's view that the Company overpriced its trucks far above their true residual values, and FE 10 reported that used vehicle salespeople had to obtain clearance from field asset managers repeatedly for sales prices because the vehicles were regularly selling at least 10% below their listed value.

e.      FE 4 worked at Ryder in Toronto from October 2010 to September 2018. His last role was director of asset management Canada and he was in charge of 1,250 vehicles across Canada. His role had two components: ensuring the assets were depreciating as they should, and selling the vehicles. He was also a member of the pricing committee and any deal that was slightly "off spec" would come across his desk so that he could make sure the residuals were correct.     FE 4 explained that the residuals were never adjusted during the course of the lease, and they should have been. He recounted that he knew it would be a disaster and there were some deals where he tried to increase the depreciation to level things out, but he did not have much success doing that. Instead, <u>FE 4 received a lot of pushback from sales, and in particular from John Gleason[22] (Vice President of Sales), Defendant Dennis Cooke (President), and Chris Fairey (Vice President of Sales for Canada)</u>.

f.      FE 4 stated that deals would come across his desk that he would deny and change the residual number and then he would get overridden by Gleason's group in Miami. He said that, during his time at Ryder, <u>he was "raising red flags like crazy."</u> He was involved in business planning and any time Ryder set business plans he could never get the Company to agree to put down the losses that he thought were a more accurate number.     He kept communicating to others that Ryder's residuals were unrealistic.

g.      FE 4 said that Ryder had internal reports memorializing residuals and depreciation, and that Ryder executives tracked proceeds historically and met quarterly to assess the status of the fleet valuation and pricing. FE 4 stated that the top executives were "100%" receiving these reports, and that

---

[22] John Gleason is Executive Vice President & Chief Sales Officer at Ryder.

FE 4 sat with other executives, including CFO Garcia every month to talk about them.

h.  FE 4 stated that he also told the finance group at the Company that they should be writing the trucks down because there was no way Ryder could get rid of them at the losses they had on the business plan, but was told to sit on the inventory.  FE 4 reported that management, <u>including Gleason and Cooke</u>, "kicked his teeth in" every month where he gave them "all kinds of statistics on what wasn't selling, the issues with MaxxForce, and how the residuals were making pricing a problem."  He also reported that Gleason would often tell FE 4 that he "just had to have his people push harder to sell."

i.  When FE 4 left in September 2018 there was no indication that Ryder was planning to bite the bullet and take the necessary write down.  On the last conference call he was on, he was getting beat up for not making sales, and <u>he told the other Ryder executives (including Gleason and Cooke)</u>, "This isn't going away.  We're holding these trucks so they're just losing value."  FE 4 stated that the lack of transparency was "strange."  The used vehicles salespeople were told, "Don't make excuses, go out there and sell," and Ryder would not acknowledge the reality that the trucks were unsellable.  FE 4 said that he kept wondering when they were going to "bite the bullet."

104.  FE 4 stated that Ryder overshot on its residuals "big time."  Ryder wanted to secure more leasing deals, and higher residuals brought down the leasing price.  FE 4 added that all of the directors of asset management had the same problems regarding the higher residuals and subsequent sale of those vehicles, and FE 4 spoke about it with all of them constantly.  He described it as a "disaster" and "a very tough time."

105.  FE 4 stated that how much Ryder was overstating the residual values varied by equipment type.  For the MaxxForce vehicles, they were easily overstated by 50%.  The MaxxForce vehicles made up about 40% of the fleet during the years they were used. The rest of the fleet was probably overvalued by 20% plus.

106.  When  FE 4 would push back internally on a high residual amount, the salespeople would take it to the U.S. executives and say, "We really need this to get the deal," and it would get approved by Tangney or Gleason.   FE 4 stated that Tangney knew there would be an issue with

the sales of these vehicles down the line because of the high residuals.  FE4 said, "He knew exactly what was happening."  And in 's FE 4 group, they were "bewildered."  FE 4's superior, who was on FE 4's side regarding the residuals and depreciation, knew FE 4 was right, but his superior could not get the executives to listen, and his superior left the week after FE 4 did.

107.    FE 6 stated that, since 2015, the internal value set by Ryder for the vehicles was too high because the vehicles had depreciated.  He said that, the new emissions technology (including the MaxxForce engine) increased the maintenance costs of the vehicles, and that, starting in 2015, such costs were far higher for those vehicles.  As a result,  FE 6 did not believe that the depreciation amounts on the vehicles was correct.  As  FE 6 explained, the residual value at the end of the trucks' useful life was not what they had expected.

108.    Specifically, FE 6 stated that Ryder's trucks have 7-8 years on their leases before the Company sells them.  The trucks with the new emissions technology came out in 2009, and these trucks started coming off lease in 2015, and  FE 6 believed that a lot of the values were upside down at that time.  He added that the business for the used vehicles changed significantly in 2015 and had been rocky ever since.

109.    As FE 6 further explained, in 2015, the values were starting to be upside down across the board; "the values of stuff just dropped so fast because of the maintenance issues on the trucks"; and it was "completely obvious" that Ryder's residual value estimates likely exceeded the expected future values that would be realized upon the sale of power vehicles in their fleet.  He explained that Ryder was not properly writing down its equipment in order to get rid of it, so the values on the rear end were not worth what Ryder thought they would be.  FE 6 said that <u>the vehicles were worth 20-40% less</u> than what Ryder thought they were worth.

110.    FE 6 estimated that the residual values were overstated by approximately 30%, and that it was substantial and applied to all of Ryder's trucks and trailers.  Class 8 vehicles (the large tractors) were the biggest issue and had depreciated more, yet Class 8 is the bread and butter of the business.  Further, FE 6 explained that Ryder was aware of the reasons their vehicles' pricing was dropping so fast, as they "had maintained the truck for seven years, and it cost an arm and a leg [to maintain the vehicles]."

111.    FE 6 believes that in 2015, the Company was talking about making changes but they were not sure what they were going to do.  But by the time he left Ryder in 2016, Ryder still had not made the changes to the residual values.  He added that employees like himself always thought the values were way too high, but the Company did not change anything.  The sales managers were always raising concerns; they were in the field and could see that the values of the used vehicles were too high; and it was "pretty apparent."  However, the pushback on the values came from the top.  FE 6 stated that Ryder should have taken a write-down sooner but that Ryder waited until the market basically crashed to take the huge write-down.

112.    FE 5 is a former Director of Used Vehicle Sales at Ryder from May 2018 through September 2018.  He said that it was evident to him when he started at the Company that its residual value estimates exceeded the expected future values that would be realized upon the sale of power vehicles in their fleet.  He stated that he brought this up directly to his superior, the Marc Thibeau. FE 5 recounted that Ryder understood that the Company would suffer a loss on the sale of its over-valued vehicles when they would be sold.  However, he emphasized that, at the time, Ryder was highly engaged in a "beat Penske mentality."  After  FE 5 voiced his concerns on the way that Ryder was selling vehicles and recognizing revenue, and they were dismissed, it became apparent

that his relationship with the Company was not going to last.  In his words, "They were acting with disregard for their investment community."

### H.      Ryder Maintained Excessively High Prices on Its Vehicles in a Futile Attempt to Avoid Recognizing the Losses from Sales Below the Inflated Residual Values

113.    Numerous former Ryder employees also stated that they repeatedly brought to Ryder executives' attention, throughout the Class Period, that Ryder was trying to sell its used vehicles at market prices that far exceeded their true value.  However, again, these serious concerns were repeatedly cast aside by Ryder's most senior executives, who kept the list prices for the vehicles consistently high.

114.    FE 9 stated that the pricing of Ryder vehicles was "a lot" higher than competitors and there was nothing average salespeople could do about it.  He stated that the used vehicles averaged between 300,000 and 700,000 miles on the odometer and were always overpriced even if they had 700,000 miles on the odometer.

115.    When FE 9 began working for Ryder, his office sold 50-60 trucks a month.  However, this eventually drastically declined.  He stated that the quotas were set at about 30 vehicles a month, but by the time he left in 2019, his office was only selling 15-20 per month.  He stated that sales were falling and there was a lot of pressure on offices to sell or offices would close.  However, the quoted prices stayed consistently overpriced.

116.    FE 10 stated that Ryder always overpriced the sales price of its used trucks, constantly pricing them above the market value or above what they were worth.  Ryder had what was called an "ask and take" system for selling its trucks.  The Company always wanted to receive 90% of the price it was asking, and that's the lowest price it would take.  Anything that was sold below 90% of the asking price required approval from the Field Asset Manager ("FAM"), and anything under 85% to 80% required approval from both the FAM and Director of Asset

Management.   FE 10 said that Ryder was overpricing its trucks because he would look up Penske and DHL rates and found the same trucks for a fraction of Ryder's prices, as much as $10,000 less. FE 10 compared Ryder's sales process to trying to sell a sedan with 200,000 miles on it at Lamborghini prices.

117.   FE 10 stated that Ryder always thought trucks were worth more than they were, and recalled constantly having the conversation with UTC salespeople in other locations about the issue of constant overpricing.   FE 10 said he constantly complained about the overpricing and need to adjust the sales matrix because, as a salesperson, he wanted to be able to sell trucks and receive a monthly bonus.  This was tough when the trucks were never fairly priced and were not at a competitive level with competitors' pricing models.  This was a countrywide issue for UTC and he surmised that vehicles were overpriced by $5,000 per $10,000 per vehicle.  The Company told the salespeople that the demand for trucks in the market was not there anymore, and this was said by managers and directors and he heard it in one-on-one meetings.

118.   FE 3 said that pricing was not an issue in his early years at the Company, but it started becoming an issue when the newer trucks came on the market.  He said that, "We were way out of whack with the other market; we were constantly getting beat with pricing a lot."  He continued that "The pricing, I personally think, was way off," and he said that he would get a lot of feedback from customers about pricing.

119.   FE 11 was a Vehicle Sales Manager from before the Class Period to December 2015.   FE 11 was responsible for selling previously-leased vehicles, including working to keep Ryder's pricing competitive in the pre-owned vehicle market.  FE 11 stated that customers would always tell Ryder that the pricing on their trucks was extremely high.  He said that the high prices

had always been the case, that when the value of the trucks does not match the pricing, it is difficult to sell the vehicles, and that his lot stayed full due to the pricing.

120.    FE 12 stated that the pricing numbers came from the people above him at Ryder. For the Used Sales Fleet, there was a President, two Vice Presidents, and regional managers who worked together on the quarterly numbers that they needed to meet.   FE 12 would say that the fleet was overvalued by 30-50%, especially the box trucks.

121.    FE 5 was part of the pricing team meetings, during which they would have round table discussions based on conditions.   There was a process in place to price assets based on their condition and specifications.   However, it was an old, antiquated system.   Part of 's FE 5 job was to look at how to improve it, and it was going to take a major overhaul that he does not think Ryder was prepared to make to improve the system.   The pricing team meetings included all of the senior management team from Ryder's Used Truck division, asset managers, the Fleet Department, and Operations.   Thibeau chaired these meetings, and he was the highest-ranking employee in the meetings.

122.    FE 5 said, "I knew I needed to leave on the first week of the job."   "Their pricing was out of line; their approach to pricing was redundant; they were trying to find ways to add values to trucks to create some values to the trucks, and it just wasn't there."

I.    **During the Class Period, Ryder's Used Truck Inventory Ballooned, a Red Flag that Price Discounts and Serious Decreases in Residual Values Were Necessary**

123.    FE 4 said that as of February 2016, Ryder had a large number of vehicles with high residual values that should have been written down.   As a result, Ryder ended up with a significantly oversized used vehicle fleet.   FE 4 explained that while usually Ryder liked to get rid of its vehicles within six months, he estimated that by 2018, 20% of its inventory had been siting for over a year "rotting away."   As he recounted, Ryder's inventory grew because it could not sell

the vehicles and the Company did not want to send the vehicles that were not selling to auction and thereby realize the losses. The trucks were fully advertised, there was just no demand. The trucks were simply sitting there going down in value, and Ryder would let employees send them to auction only in small portions. For example, Ryder would say, "Okay. This month you can send ten to auction." At other times, FE 4 said that when he was pushing management to sell the vehicles and take the hit, he was told to sit on inventory.

124.    As FE 6 also recounted, Ryder was sitting on vehicles for extended periods because it would not write them down or sell them at a lower price. Vehicles were sitting on the Ryder lots for 180-365 days, whereas the target is typically only 90-180 days. Anything past 180 days is a problem, and many trucks were sitting on the lots for over six months, and there were probably 6,000-10,000 used vehicles sitting at any time. FE 6 stated that the large number of vehicles sitting on the lot for an extended time beginning in 2015 was significantly different than it had been in the past and that "it got worse and worse and worse."

125.    According to FE 9, vehicles sat on the lot for more than 180 days, and vehicles that were not sold would develop "lot rot" if they sat for long periods and their engines were not run regularly. Ryder would also not hire personnel to periodically run the vehicles and they would deteriorate as a result. FE 9 stated that the Company "no doubt" should have taken a write down of the residual values sooner because the pricing was too high, sales had fallen off, and by the time Ryder incurred additional depreciation expenses the Company had been putting depreciation on the books and were failing to cover depreciation costs through sales.

126.    FE 1 likewise stated that Ryder accumulated a large number of trucks because it could not sell them, and it also avoided selling them, in order to avoid taking the financial hit from selling them at a price below the trucks' residual value. As he explained, when a customer finishes

its lease and the truck is still worth something, Ryder would typically try to sell it. However, since the Company was overvaluing the trucks, Ryder would have taken a significant loss if they did try to sell them. As a result, Ryder would instead try to find another consumer to whom to lease the same used truck. FE 1 stated that, in 2015, Ryder faced an "astronomical" amount of used trucks, such that Ryder would not allow anyone to lease new trucks to customers. Ryder had a list of all the used trucks available and would send to him spreadsheets that were pages long. There was a "surplus of equipment" and he recalled one spreadsheet in particular that had 2,500-3,500 units of used trucks on it. When asked if CEO Sanchez saw these spreadsheets, FE 1 stated he was sure that he would have. FE 1 said that Ryder wanted its salespeople to go down the list and find a used piece of equipment to try and lease it to a consumer before it leased out a new piece of equipment. This would supposedly "delay any pain" so that the Company could avoid taking the losses.

127.     FE 5 stated that Ryder's aging inventory for used trucks sales was very, very high. In addition, the trucks would come into used truck sales "as ready to go," but in reality, they still had a lot of work to be done on them to prepare them for sale.

128.     As Ryder disclosed, as of February 12, 2016, its units held for sale at the end of the fourth quarter of 2015 had increased to 8,000, up from 5,500 units held for sale in the prior year, a 45% increase. Sequentially from the third quarter of 2015, the units held for sale had increased by 1,900 units in a single quarter. This was a red flag to Defendants that the used vehicle market had suffered a dramatic downturn.

129.     As of August 2016, as reflected in a Ryder internal document that was sent anonymously to Plaintiffs' counsel, there were at least 1,000 Ryder trucks available for sale that

had been at the Ryder Used Truck Centers ("UTCs") for six months or more.  Of those, more than 300 had been at the UTC for a year or more.

130.    In addition, as of August 2016, there were at least <u>1,980 Ryder tractors</u> available for sale that had been at the Ryder UTCs for six months or more.  Of those, more than 450 had been at a UTC for a year or more.

131.    Moreover, as of August 2016, more than 400 of the Ryder tractors available for sale, or in process to be sold, were equipped with the International MaxxForce engines, which experienced repeated costly breakdowns and engine failures.

132.    By February 2017, the total Ryder units held for sale was still extremely high at 7,500 units, but this figure excluded 1,200 lease vehicles being "prepared for sale."  Including those vehicles resulted in an increase of 700 vehicles versus the prior year.

133.    By February 2019, Ryder still had 6,900 units held for sale, which had increased by 900 units over the past year, and which was still 25% higher than the 5,500 units held for sale in 2014.  By the end of the fourth quarter in 2019, Ryder's used vehicles inventory was <u>9,400</u> vehicles, an increase of <u>71% versus 2015</u>.

## V.    <u>THE TRUTH EMERGES</u>

134.    The full truth about Ryder's overstated residual values was not revealed until the end of the Class Period on February 13, 2020, and was disclosed to investors on a piecemeal basis through a series of partial corrective disclosures, as explained below.

135.    First, on July 30, 2019, the Company reported earnings before tax for the second quarter of 2019 in its FMS business segment of $57.7 million compared to $72.9 million the prior year period, driven by lower used vehicle sales results which had declined from the prior year as a result of higher valuation adjustments of $10.4 million on a larger inventory and higher depreciation of $7.6 million due to residual value changes.  As a result, Ryder reduced its earnings

per share forecast for 2019 to a range of $4.80 to $5.10, as compared to its prior forecasted range of $5.28 to $5.58.

136.    Although the Company did not quantify the impact of used vehicle prices on its 2019 outlook, management indicated that the majority of the lowered guidance reflected weaker tractor valuations.  As Deutsche Bank wrote on July 30, 2019 in an analyst report entitled "Good operating Q[uarter], but used truck prices sting":  "Ryder can't seem to shake the impact of weaker used truck prices, which is something that is taking longer to recover than we had previously expected[.]"  In response to Ryder's disclosures, the Company's stock price declined 10%, from $59.32 per share on July 29, 2019 to $53.38 per share on July 30, 2019, on unusually high volume of more than 1.4 million shares traded.  This decline was statistically significant at the 99% confidence level or greater.

137.    Analysts immediately commented on this disclosure, with J.P. Morgan reporting on July 30, 2019 that "[v]ersus our model, FMS was weaker than expected, as used vehicle results and higher bad debt weighed on performance, partially offset by a solid topline and operating beat at DTS during the quarter."  Wolfe Research similarly reported the same day that its 2019 "EPS estimate was already below the low-end of R's [Ryder's] guidance, but the magnitude of today's cut is worse than we expected."

138.    Thereafter, on October 29, 2019, the Company shocked the market with the bombshell disclosure that it was decreasing its residual value estimates by more than $840 million. That day, Defendants disclosed to investors that "management concluded that our residual value estimates likely exceeded the expected future values that would be realized upon the sale of power vehicles in our fleet."  On that day's conference call with investors, Defendant Sanchez admitted that, "[f]ollowing the mid-2015 peak [in used tractor prices], tractor proceeds declined sharply

49

through 2017 to below our accounting residuals as supply entered the market and the freight environment slowed." As a result, Ryder significantly lowered the residual value estimates for all vehicles and incurred $177 million in additional depreciation expense in the third quarter of 2019, and reduced its residual value estimates for the second half of 2019 by $289 million and 2020 by $250 million. All told, Ryder disclosed a cumulative reduction of its residual values covering the period from the second half of 2019 through 2024-25 in the total amount of $844 million, as reflected in the slide below from Ryder's October 29, 2019 investor presentation:



139.    As SunTrust Robinson Humphrey summarized on October 29, 2019, "The total impact of the revised residual values as reflected in higher depreciation expense is estimated to be $289M or $3.96/share in 2H19 and $250M or $3.50/share in 2020. … Overall this change results in earlier recognition of depreciation in 2019 and 2020 that would have been recognized in 2021 or later years under its prior estimate."

140.    Ryder also reported a third quarter 2019 adjusted loss of ($1.49) that was well below consensus of +$1.49 and the guidance range of $1.45-$1.60, which was primarily driven by the increase in depreciation expense.

141.    In response to Ryder's disclosures, the Company's stock price fell by more than 12% over two trading days, from a closing price of $55.12 per share on October 28, 2019 to first a closing price of $52.12 on October 29, 2019, and then to a closing price of $48.44 per share on October 30, 2019, on unusually high trading volume of more than 2 million shares on October 29, and more than 1.4 million shares on October 30.  The declines on October 29 and 30, 2019 were each individually statistically significant at the 99% confidence level or greater.

142.    Analysts were shocked by Defendants' disclosure.  Analysts at Wolfe Research wrote that even though "expectations were low heading into the report . . . the impact in 3Q was much bigger than expected (huge understatement) and C20 estimates need to come down materially."  J.P. Morgan similarly reported on October 30, 2019 that Ryder took a "big bath" that "confirms Ryder was over-earning by a significant amount in prior years based on the $844mm cumulative write-down."

143.    Finally, on February 13, 2020, during the trading day, Ryder further shocked investors by reporting that the financial toll of Ryder's residual value manipulation now in fact exceeded $1 billion.  Specifically, Ryder disclosed that, as a result of the significant reductions to the residual value of its fleet, it had incurred a total of $357 million in depreciation expense for 2019 (instead of $289 million) plus a loss of approximately $59 million on the sale of used vehicles.  The Company also announced that, for 2020, it expected to incur another $25 million in depreciation expense on its fleet due to the reductions in residual value (on top of the already-disclosed $250 million increased depreciation expense for 2020) plus an additional $20 million

estimated loss on used vehicle sales. This brought the cumulative negative financial impact of Ryder's residual value manipulation to $1.021 billion ($357 million + $59 million + $275 million + $20 million + $130 million (2021) + $180 million (2022-225)).

144.    In response to these disclosures, Ryder's stock price fell sharply by 23% over three trading days, from a closing price of $50.19 per share on February 12, 2020, to a closing price of $45.01 on February 13, 2020, to a closing price of $40.12 on February 14, 2020, and a closing price of $38.45 on February 18, 2020, on unusually high trading volume of more than 1.9 million shares on February 13, more than 2.5 million shares on February 14, and more than 1.7 million shares on February 18. The declines on February 13, 14, and 18, 2020 were each individually statistically significant at the 99% confidence level or greater.

145.    Analysts reacted harshly. SunTrust Robinson Humphrey reported on February 13, 2020 that "[f]ollowing the 4Q EPS miss and much lower-than-expected 2020 EPS guidance, we expect the stock to be down today. We had hoped the company cleared the decks in 3Q after significantly lowering EPS expectations following its residual value changes." Analysts at SunTrust Robinson Humphrey also reported the same day that "We are certainly frustrated as this marks the third consecutive quarter of meaningful EPS estimate revisions. . . . We are lowering our 2020 and 2021 EBITDA estimates to $2.24B and $2.30B, respectively (from $2.40B and $2.43B)." J.P. Morgan reported that "[t]he trajectory of used vehicle prices remains the key determinant of near term performance in our view considering the additional drag in 4Q19 and continued loss on sale in 2020 are indicative that last quarter's 'big bath' and write-down of residual values did not completely clear the deck." J.P Morgan also reported on February 13, 2020 that "Management's 2020 forecast assumptions include a 2H20 recovery common to the transports group, but headwinds from used vehicle prices and commercial rental remain specific to Ryder."

146.    In its February 28, 2020 analyst report, Pacific Square Research described Ryder as "paying the price for years of underpricing its leases to drive growth" with a depreciation methodology that had "Gone Awry" and "introduce[d] a significant distortion into earnings." Further, Pacific Square Research stated that "[w]hat is shocking to us is that Ryder continued to adjust residual values and depreciable lives upward from 2011-2016 as if management assumed the good times would never end.  It was the new normal for then – until it wasn't."  Similarly, in its August 3, 2020 analyst report, Pacific Square Research reported that "[t]he Company blames a continuing, unexpected and seemingly impossible-to-predict decline in the selling prices for used equipment . . . [t]he trouble is, repeatedly raising residual values – as Ryder did from 2011-2016 – is just another form of borrowing from the future. In our view, it represents a cosmetic boost that benefits earnings in the short term, at the expense of future earnings."

147.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiffs and other Class members have suffered significant losses and damages.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

148.    Throughout the Class Period, Defendants made numerous materially false and misleading statements and omissions concerning the residual value of Ryder's truck fleet and the level of depreciation of those assets, which artificially inflated Ryder's net earnings, comprehensive income and additional financial metrics.  These materially false and misleading statements and omissions are set forth below by financial quarter.

### A.    The Second Quarter of 2015

149.    On July 23, 2015, Ryder issued a press release entitled "Ryder Reports Record Second Quarter 2015 Results" that announced its financial and operating results for the quarter

ended June 30, 2015 (the "Second Quarter 2015 Press Release").  Ryder filed the Second Quarter 2015 Press Release with the SEC on Form 8-K and Defendant Garcia signed the 8-K (the "Second Quarter 2015 Form 8-K").  The Second Quarter 2015 Press Release and Second Quarter 2015 Form 8-K reported a comparable EPS from Continuing Operations of $1.65, an EPS from Continuing operations of $1.61, and $86.2 million in GAAP Earnings for the three months ended June 30, 2015.

150.    Ryder's Second Quarter 2015 Press Release stated further that the Company's full-service lease results benefited from "lower depreciation associated with increased residual values." Defendants' statement that Ryder's lease results benefited from "lower depreciation associated with increased residual values" was materially false and misleading because, at that time, Ryder's vehicles' residual values had materially decreased and its depreciation expense had materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.

151.    Ryder's reported financial metrics and statements were materially misstated in the manner set forth in ¶¶91-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  This resulted in a material overstatement of its net earnings, earnings per share, and residual values, as well as an understatement in depreciation expense.

152.    On August 7, 2015, Ryder filed its Form 10-Q for the quarter ended June 30, 2015 with the SEC, which Defendants Sanchez and Garcia signed (the "Second Quarter 2015 Form 10-Q").  The Second Quarter 2015 Form 10-Q contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) | | |
| --- | --- | --- |

| | | |
|---|---|---|
| Cost of lease and rental | $531,308 | Understated |
| Gains on vehicles, net | $33,237 | Overstated |
| Earnings from continuing operations before income taxes | $133,447 | Overstated |
| Provision for income taxes | $47,530 | Overstated |
| Earnings from continuing operations | $85,917 | Overstated |
| Net earnings | $85,159 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $1.61 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $1.59 | Overstated |
| **Consolidated Statement of Comprehensive Income** | | |
| Net earnings | $85,159 | Overstated |
| Comprehensive income | $111,333 | Overstated |
| **Consolidated Balance Sheet** | | |
| Operating property and equipment, net of accumulated depreciation | $707,886 | Overstated |
| Total assets | $10,638,264 | Overstated |
| Retained earnings | $1,544,047 | Overstated |
| Total shareholders' equity | $1,913,439 | Overstated |
| Total liabilities and shareholders' equity | $10,638,264 | Overstated |
| **Consolidated Statement of Cash Flows (Six months ended June 30, 2015)** | | |
| Net earnings | $137,948 | Overstated |
| Depreciation expense | $546,699 | Understated |
| Gains on used vehicle sales, net | $62,816 | Overstated |

153.    These financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period.  This resulted in a material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

154.     Thereafter, in Ryder's Second Quarter 2015 Form 10-Q, Defendants reported that the Company's lease and rental gross margin within its FMS business segment increased 10% in the second quarter of 2015 to $247.7 million and attributed the increase in margin, in part, to "benefits from improved residual values."  The Company also reported that earnings before tax in its FMS business segment increased 8% in the second quarter of 2015 to $122.5 million and stated that these "[r]esults benefited from $10.0 million of lower depreciation in the second quarter of 2015" due, in part, to "residual value policy changes."

155.     The statements set forth above were materially false and misleading because, at that time, Ryder's vehicles' residual values had materially decreased and its depreciation expense had materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.

156.     On July 23, 2015, Defendants held a conference call with investors and analysts to discuss Ryder's financial results for the second quarter of 2015 (the "Second Quarter 2015 Earnings Call").  During the Second Quarter 2015 Earnings Call, Defendant Sanchez falsely assured investors that the headwind the Company faced in its FMS business from a decline in used vehicle sales "is being offset on the earnings line by the improvements that we've seen in depreciation expense also."

157.     Defendant Sanchez's statement in ¶156 above was materially false and misleading because, at that time, Ryder's vehicles' residual values had materially decreased and its depreciation expense had materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.

B.     The Third Quarter of 2015

158.     On September 10, 2015, Defendants participated in the RBC Capital Markets Global Industrials Conference.  During the conference, Defendant Garcia stated that "we've been

56

benefiting from the solid used truck environment because of an increase in residuals, which helped bring down depreciation expense, which more than offset any gains headwind that we saw." Defendant Garcia stated further that "we probably haven't raised our residuals fast enough" and "we've been kind of conservative in that."

159.     Defendant Garcia's statements were materially false and misleading because, at that time, Ryder's vehicles' residual values had materially decreased and its depreciation expense had materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.   As described in Section IV.G., Ryder was not "kind of conservative" in establishing the residual values of its fleet, which were artificially inflated by hundreds of millions of dollars.

160.     On October 22, 2015, the Company issued a press release entitled "Ryder Reports Record Third Quarter 2015 Results" announcing its financial and operating results for the quarter ended September 30, 2015 (the "Third Quarter 2015 Press Release").   Ryder filed the Third Quarter 2015 Press Release for the three months ended September 30, 2015 with the SEC on Form 8-K, which was signed by Defendant Garcia (the "Third Quarter 2015 Form 8-K").   The Third Quarter 2015 Press Release and Third Quarter 2015 Form 8-K reported a comparable EPS from Continuing Operations of $1.74, an EPS from Continuing Operations of $1.70, GAAP Earnings of $90.8 million, and Comparable Earnings of $93.3 million.

161.     These financial metrics were materially misstated in the manner set forth in ¶¶90-92 because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.   This resulted in a material overstatement of its net earnings and earnings per share.

162.    On October 22, 2015, Ryder also filed with the SEC its Form 10-Q for the quarter ended September 30, 2015, which was signed by Defendants Sanchez and Garcia (the "Third Quarter 2015 Form 10-Q").  The Third Quarter 2015 Form 10-Q contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings | | |
|---|---|---|
| Cost of lease and rental | $550,541 | Understated |
| Gains on vehicles, net | $29,294 | Overstated |
| Earnings from continuing operations before income taxes | $139,900 | Overstated |
| Provision for income taxes | $49,089 | Overstated |
| Earnings from continuing operations | $90,811 | Overstated |
| Net earnings | $90,619 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $1.71 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $1.69 | Overstated |
| Consolidated Statement of Comprehensive Income | | |
| Net earnings | $90,619 | Overstated |
| Comprehensive income | $52,332 | Overstated |
| Consolidated Balance Sheet | | |
| Operating property and equipment, net of accumulated depreciation | $712,169 | Overstated |
| Total assets | $10,820,186 | Overstated |
| Retained earnings | $1,612,744 | Overstated |
| Total shareholders' equity | $1,952,064 | Overstated |
| Total liabilities and shareholders' equity | $10,820,186 | Overstated |
| Consolidated Statement of Cash Flows (Nine months ended September 30, 2015) | | |
| Net earnings | $228,567 | Overstated |
| Depreciation expense | $838,100 | Understated |
| Gains on used vehicle sales, net | $92,110 | Overstated |

163.    These financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder significantly underreported its depreciation expenses during the Class Period.  This resulted in a material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

164.    Also in Ryder's Third Quarter 2015 Form 10-Q, Ryder reported that the Company's lease and rental gross margin within its FMS business segment increased 8% in the third quarter of 2015 to $252.3 million and attributed the increase in margin, in part, to "benefits from improved residual values."  The Company also reported that earnings before tax in its FMS business segment increased 5% in the third quarter of 2015 to $126.4 million and stated that results benefited from $10.0 million of lower depreciation due to "residual value policy changes."  The Company also reported that revenue "[r]esults benefited from $10.0 million and $30.0 million of lower depreciation in the three and nine months ended September 30, 2015, respectively, due to residual value policy changes implemented January 1, 2015, driven by higher sales proceeds realized on used vehicles, as well as growth in average lease and rental fleet size."

165.    These statements were materially false and misleading because, at that time, Ryder's vehicles' residual values had materially decreased and its depreciation expense had materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.

166.    On October 22, 2015, Defendants also held a conference call with investors to discuss Ryder's third quarter 2015 financial results (the "Third Quarter 2015 Conference Call").  During the Third Quarter 2015 Conference Call, Defendant Sanchez assured investors that the

Company would realize a "<u>benefit in depreciation due to higher residual values using our five-year</u> <u>rolling average methodology</u>.  We are currently conducting our annual residual value analysis <u>and</u> <u>will provide an earnings benefit on this on our fourth quarter earnings call</u>."

167.    During the same conference call, in response to an analyst's question whether, despite "gains on sales down in the order of magnitude of $30 million" for the following year, "you think you can offset most of that with residual value benefit?" Defendant Sanchez responded that "if you think about a price decline in that 5% to 10% range, gains are going to drop let's say roughly $30 million . . . And what we're saying is that in that environment <u>we would expect our</u> <u>residual value uptick to probably offset the decline that's going to occur in 2016</u>."

168.    Defendant Sanchez's statements were materially false and misleading because, at that time, Ryder's vehicles' residual values had materially decreased and its depreciation expense had materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.

## C.    The Fourth Quarter of 2015 and Full Year 2015

169.    On November 3, 2015, Defendants presented at the Goldman Sachs Industrial Conference.  During the conference, an analyst asked Defendant Sanchez, "So if you have the environment where used trucks sales prices are coming down, can residual values still go up in that environment?" To which Defendant Sanchez responded "Well, they can because of the way we calculate our residual values . . . <u>Obviously we step back and take a look at it and make sure</u> <u>that we're still selling vehicles below -- still selling vehicles above where our residual values are</u> <u>going to be set</u>."

170.    On November 10, 2015, Defendants participated in the Robert W. Baird & Co. Industrials Conference.   During the conference, Defendant Sanchez explained that Ryder determines the residual value of its vehicles based on a rolling five-year average of Ryder's used

truck sales prices and "as used truck pricing has really gone up we've been lagging in that just because you don't want to overshoot the residual values."  Defendant Sanchez assured investors that "even in this environment I would expect that <u>a five-year rolling average is going to cause an increase in residual values which is a benefit to depreciation expense</u>" and "[s]o you kind of view used truck gains headwinds primarily offset by <u>depreciation policy benefit</u>."

171.    The next day, on November 11, 2015, Defendants participated in the Stephens Fall Investment Conference.  During the conference, Defendant Garcia falsely stated that, for 2016, Defendants "still would expect there to be a <u>positive from residual values</u> despite a declining environment [for used truck prices] here in the last few months."  Defendant Garcia also told investors that even though used truck prices were declining, "we're still saying there's still an opportunity to raise residuals in light of that."

172.    The statements set forth in ¶¶169-71, above, were materially false and misleading because, at that time, Ryder's vehicles' residual values had materially decreased and its depreciation expense had materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.  Specifically, it was materially misleading for Defendant Sanchez to state that "[o]bviously we step back and take a look at [residual values] and make sure that we're still selling vehicles below -- still selling vehicles above where our residual values are going to be set" when in fact, Ryder's vehicles were almost universally selling below their listed residual values, as described by FE 10 in ¶116.

173.    On February 2, 2016, the Company issued a press release entitled "Ryder Reports Record Fourth Quarter and Full-Year 2015 Results, and Provides 2016 Forecast" announcing Ryder's financial and operating results for the fourth quarter and full year ended December 31, 2015 (the "Fourth Quarter 2015 Press Release").  Ryder filed the Fourth Quarter 2015 Press

Release with the SEC on Form 8-K, which was signed by Defendant Garcia (the "Fourth Quarter 2015 Form 8-K"). The Fourth Quarter 2015 Press Release and Fourth Quarter 2015 Form 8-K reported Comparable EPS from Continuing Operations of $1.66, EPS from Continuing Operations of $1.42, GAAP earnings of $75.9 million, and Comparable Earnings of $88.8 million.

174.     These financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense. This resulted in a material overstatement of its net earnings and earnings per share.

175.     The Fourth Quarter 2015 Press Release and Fourth Quarter 2015 Form 8-K also stated that Ryder's full-service lease results benefited from "lower depreciation associated with increased residual values."

176.     This statement was also materially false and misleading because, at that time, Ryder's vehicles' residual values had already materially decreased and its already depreciation expense had already materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.

177.     Ryder filed its Form 10-K for the year ended December 31, 2015 with the SEC on February 12, 2016, which was signed by Defendants Sanchez and Garcia (the "2015 Form 10-K"). The 2015 Form 10-K contained the following financial metrics, each of these which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) (Full year 2015) | | |
|---|---|---|
| Cost of lease and rental | $2,153,450 | Understated |
| Gains on vehicles, net | $117,809 | Overstated |
| Earnings from continuing operations before income taxes | $469,215 | Overstated |
| Provision for income taxes | $163,226 | Overstated |

| Earnings from continuing operations | $305,989 | Overstated |
|---|---|---|
| Net earnings | $304,768 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $5.78 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $5.73 | Overstated |
| **Consolidated Statement of Comprehensive Income** | | |
| Net earnings | $304,768 | Overstated |
| Comprehensive income | $212,303 | Overstated |
| **Consolidated Balance Sheet** | | |
| Operating property and equipment, net of accumulated depreciation | $714,970 | Overstated |
| Total assets | $10,967,809 | Overstated |
| Retained earnings | $1,667,080 | Overstated |
| Total shareholders' equity | $1,987,111 | Overstated |
| Total liabilities and shareholders' equity | $10,967,809 | Overstated |
| **Consolidated Statement of Cash Flows** | | |
| Net earnings | $304,768 | Overstated |
| Depreciation expense | $1,139,922 | Understated |
| Gains on used vehicle sales, net | $117,809 | Overstated |

178.     For the reasons set forth herein, the financial metrics set forth above in ¶177 were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period. This resulted in a material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

179.     In Ryder's 2015 Form 10-K filed with the SEC on February 12, 2016, Ryder reported that the Company's lease and rental gross margin within its FMS business segment increased 7% in 2015 to $968 million and attributed the increase in margin, in part, to "benefits

from improved vehicle residual values." The 2015 Form 10-K also stated that full-service lease results benefited from "lower depreciation associated with increased residual values." The 2015 Form 10-K also stated that depreciation expense increased 8% in 2015, "partially offset by $40 million . . . from changes in residual values."

180.    These statements were materially false and misleading because, at that time, Ryder's vehicles' residual values had already materially decreased and its depreciation expense had already materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.

181.    On February 2, 2016, Ryder held a conference call with investors to discuss fourth quarter 2015 and full year 2015 earnings (the "Fourth Quarter 2015 Conference Call"). During the Fourth Quarter 2015 Conference Call, Defendant Sanchez falsely stated that "[s]ignificant increases in used vehicle pricing over the past five years will benefit depreciation rates in 2016, as these results are blended into our vehicle residual calculation," and that "[t]hese benefits will partially offset lower expected gains on used vehicles sold." After describing the headwinds from used vehicle sales and the forecasted decline in used vehicle pricing, Defendant Sanchez assured investors that "I feel really good about our ability to respond quickly to them."

182.    Also during the Fourth Quarter 2015 Conference Call, in response to an analyst's question about how the "expected decline in the used truck pricing" would impact the depreciation benefit going forward, Defendant Sanchez stated that "[i]f we had a type of bleak environment, as we've painted here, you would be in a situation probably 2017 where things would be flat . . . in terms of depreciation. So there wouldn't be depreciation policy movement one way or the other."

183.    Defendants Sanchez's statements set forth in ¶¶181-82, above, were materially false and misleading because, at that time, Ryder's vehicles' residual values had already materially

decreased and its depreciation expense had already materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.

### D.       The First Quarter of 2016

184.    On February 11, 2016, Defendants participated in the BB&T Transportation Services Conference.  During the conference, Defendant Sanchez assured investors that "[w]e don't have a situation where we've got a bunch of vehicles that are at high residual values [and] have to be written down."

185.    This statement was materially false and misleading because, at that time, Ryder's vehicles' residual values had already materially decreased and its depreciation expense had already materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.  In addition, Ryder in fact did have a large number of vehicles that are at high residual values that needed to be written down.  Specifically, since Ryder had at least 300 Ryder trucks and 450 tractors available for sale that had been at the Ryder Used Truck Centers for a year or more as of August 2016, those 300 trucks and 450 tractors had already been at the Used Truck Centers for at least six months as of February 2016 and they needed to be written down.

186.    On April 26, 2016, the Company issued a press release entitled "Ryder Reports Record First Quarter 2016 Results" announcing its financial and operating results for the quarter ended March 31, 2016 (the "First Quarter 2016 Press Release").  Ryder filed the First Quarter 2016 Press Release with the SEC on Form 8-K and signed by Defendant Garcia (the "First Quarter 2016 Form 8-K").  The First Quarter 2016 Press Release and First Quarter 2016 Form 8-K reported Comparable EPS from Continuing Operations of $1.12, GAAP EPS from Continuing Operations of $1.05, Comparable Earnings of $60.1 million, and GAAP Earnings of $56.2 million.  The First

Quarter 2016 Press Release and First Quarter 2016 Form 8-K also stated that the Company's full-service lease results benefited from "lower depreciation associated with increased residual values."

187.    These statements and financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  This resulted in a material overstatement of its net earnings and earnings per share.

188.    On April 26, 2016, Ryder filed its Form 10-Q for the quarter ended March 31, 2016 with the SEC, which was signed by Defendants Sanchez and Garcia (the "First Quarter 2016 Form 10-Q").  The First Quarter 2016 Form 10-Q contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) | | |
|---|---|---|
| Cost of lease and rental | $552,490 | Understated |
| Gains on vehicles, net | $19,129 | Overstated |
| Earnings from continuing operations before income taxes | $88,708 | Overstated |
| Provision for income taxes | $32,523 | Overstated |
| Earnings from continuing operations | $56,185 | Overstated |
| Net earnings | $55,794 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $1.05 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $1.04 | Overstated |
| Consolidated Statement of Comprehensive Income | | |
| Net earnings | $55,794 | Overstated |
| Comprehensive income | $74,193 | Overstated |
| Consolidated Balance Sheet | | |
| Operating property and equipment, net of accumulated depreciation | $717,444 | Overstated |
| Total assets | $11,054,530 | Overstated |
| Retained earnings | $1,700,816 | Overstated |

| | | |
|---|---|---|
| Total shareholders' equity | $2,045,318 | Overstated |
| Total liabilities and shareholders' equity | $11,054,530 | Overstated |
| **Consolidated Statement of Cash Flows** | | |
| Net earnings | $55,794 | Overstated |
| Depreciation expense | $287,170 | Understated |
| Gains on used vehicle sales, net | $19,129 | Overstated |

189.     For the reasons set forth herein, the financial metrics set forth above in ¶188 were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period. This resulted in a material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

190.     In the First Quarter 2016 Form 10-Q, Ryder also reported that the Company's lease and rental gross margin within its FMS business segment increased 2% in the first quarter of 2016 to $215.3 million and attributed the increase in margin, in part, to "benefits from improved residual values."  The Company also stated that "[f]ull service lease and commercial rental results benefited from approximately $9 million of lower depreciation in the first quarter of 2016 due to residual value changes implemented January 1, 2016."

191.     In the Investor Presentation that accompanied Ryder's first quarter 2016 earnings call ("First Quarter 2016 Investor Presentation"), Ryder also stated that "Lease results benefited from fleet growth and vehicle residual value benefits."

192.     The financial metrics and statements set forth above in ¶¶190-91 were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual

values of its fleet vehicles or increase its depreciation expense.  This resulted in material overstatement of its net earnings and margins.

>   **E.      The Second Quarter of 2016**

193.     On May 19, 2016, Defendants held a conference call with analysts and investors as part of Ryder's 2016 Investor Day.  During the conference call, Dennis Cooke, Ryder's President of Global Fleet Management Solutions, stated that Ryder is "the largest retailer of used trucks in the industry, and so we have a higher residual as a result."

194.     Also during the conference call, in response to an analyst's question about whether Ryder expected the residual value to be flat over the next few years given the drop in used truck pricing, Defendant Garcia stated "[y]es."

195.     These statements were materially false and misleading when made because, at that time, Ryder's vehicles' residual values had already materially decreased and its depreciation expense had already materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.  In addition, Ryder had a large number of vehicles that were at high residual values and needed to be written down, as discussed in Section IV.I..

196.     On July 27, 2016, the Company issued a press release entitled "Ryder Reports Second Quarter 2016 Results" announcing its financial and operating results for the quarter ended June 30, 2016 (the "Second Quarter 2016 Press Release").  The Second Quarter 2016 Press Release was filed with the SEC on Form 8-K and signed by Defendant Garcia (the "Second Quarter 2016 Form 8-K").  The Second Quarter 2016 Press Release and Second Quarter 2016 Form 8-K reported GAAP EPS from Continuing Operations of $1.38, Comparable EPS from Continuing Operations of $1.56, GAAP Earnings of $116.8 and Comparable (non-GAAP) Earnings of $132.0 million.

197.    The Second Quarter 2016 Press Release also reported that earnings before tax in the FMS business segment were $111.2 million in the second quarter of 2016, down 9% compared with $122.5 million in the same period of 2015, driven, in part, by lower results in used vehicle sales.  However, the Second Quarter 2016 Press Release also stated that the Company's full-service lease and commercial rental results "benefited from lower depreciation associated with increased residual values."

198.    These statements and financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  This resulted in a material overstatement of its net earnings and earnings per share.

199.    On July 27, 2016, Ryder filed its Form 10-Q for the quarter ended June 30, 2016 with the SEC, which was signed by Defendants Sanchez and Garcia (the "Second Quarter 2016 Form 10-Q").  The Second Quarter 2016 Form 10-Q contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) | | |
| --- | --- | --- |
| Cost of lease and rental | $555,302 | Understated |
| Losses on used vehicles, net | $12,000 | Understated |
| Earnings from continuing operations before income taxes | $116,779 | Overstated |
| Provision for income taxes | $42,737 | Overstated |
| Earnings from continuing operations | $74,042 | Overstated |
| Net earnings | $73,750 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $1.39 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $1.38 | Overstated |
| Consolidated Statement of Comprehensive Income | | |
| Net earnings | $73,750 | Overstated |

| Comprehensive income | $35,431 | Overstated |
| **Consolidated Balance Sheet** | | |
| Operating property and equipment, net of accumulated depreciation | $741,022 | Overstated |
| Total assets | $11,136,127 | Overstated |
| Retained earnings | $1,736,839 | Overstated |
| Total shareholders' equity | $2,047,098 | Overstated |
| Total liabilities and shareholders' equity | $11,136,127 | Overstated |
| **Consolidated Statement of Cash Flows (Six months ending June 30, 2016)** | | |
| Net earnings | $129,544 | Overstated |
| Depreciation expense | $581,043 | Understated |
| Gains on used vehicle sales, net | $31,129 | Overstated (loss) |

200.    In the Second Quarter 2016 Form 10-Q, Ryder also reported that earnings before tax in its FMS business segment decreased 9% in the second quarter of 2016 and stated that "[f]ull service lease and commercial rental results benefited from approximately $9 million of lower depreciation in the second quarter and $17 million in the first half of 2016 due to residual value changes implemented January 1, 2016."

201.    The financial metrics set forth above in ¶¶199-200 were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period.  This resulted in a material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

202.    On July 27, 2016, Ryder also held a conference call with investors to discuss the Company's second quarter 2016 earnings (the "Second Quarter 2016 Conference Call").  During the Second Quarter 2016 Conference Call, Defendant Sanchez stated that based on "what we're

seeing in the current marketplace, . . . I wouldn't envision an increase or decrease in residual values out over the next four, five years."

203.    This statement was materially false and misleading at that time, Ryder's vehicles' residual values had already materially decreased and its depreciation expense had already materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.  In addition, Ryder in fact did have a large number of vehicles that were at high residual values and needed to be written down.

###    F.    The Third Quarter of 2016

204.    On October 25, 2016, the Company issued a press release entitled "Ryder Reports Third Quarter 2016 Results" announcing its financial and operating results for the quarter ended September 30, 2016 (the "Third Quarter 2016 Press Release").  The Third Quarter 2016 Press Release was filed with the SEC on Form 8-K and signed by Defendant Garcia (the "Third Quarter 2016 Form 8-K").  The Third Quarter 2016 Press Release and Third Quarter 2016 Form 8-K reported GAAP EPS from Continuing Operations of $1.59, Comparable EPS (non-GAAP) from Continuing Operations of $1.67, GAAP Earnings of $131.7 million and Comparable (non-GAAP) Earnings of $138.9 million.

205.    The Third Quarter 2016 Press Release and Third Quarter 2016 Form 8-K also reported that earnings before tax in the FMS business segment were $112.3 million in the third quarter of 2016, down 11% compared with $126.4 million in the same period of 2015, driven, in part, by lower results in used vehicle sales.  However, the press release stated that the Company's full-service lease and commercial rental results "benefited from lower depreciation associated with increased residual values."

206.    These statements and financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles

or increase its depreciation expense.  This resulted in a material overstatement of its net earnings and earnings per share.

207.    On October 25, 2016, Ryder also filed its quarterly report with the SEC on Form 10-Q, which was signed by Defendants Sanchez and Garcia and reported the Company's financial and operating results for the quarter ended September 30, 2016 (the "Third Quarter 2016 Form 10-Q").  The Third Quarter 2016 Form 10-Q contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings | | |
|---|---|---|
| Cost of lease and rental | $557,901 | Understated |
| Gains on vehicles, net | $1,873 | Overstated |
| Earnings from continuing operations before income taxes | $131,698 | Overstated |
| Provision for income taxes | $46,560 | Overstated |
| Earnings from continuing operations | $85,138 | Overstated |
| Net earnings | $84,752 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $1.60 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $1.59 | Overstated |
| Consolidated Statement of Comprehensive Income | | |
| Net earnings | $84,752 | Overstated |
| Comprehensive income | $69,960 | Overstated |
| Consolidated Balance Sheet | | |
| Operating property and equipment, net of accumulated depreciation | $740,375 | Overstated |
| Total assets | $11,108,773 | Overstated |
| Retained earnings | $1,795,445 | Overstated |
| Total shareholders' equity | $2,097,041 | Overstated |
| Total liabilities and shareholders' equity | $11,108,773 | Overstated |
| Consolidated Statement of Cash Flows (Nine months ending September 30) | | |
| Net earnings | $214,296 | Overstated |

| | | |
|---|---|---|
| Depreciation expense | $878,173 | Understated |
| Gains on used vehicle sales, net | $33,002 | Overstated |

208.     In the Third Quarter 2016 Form 10-Q, Ryder also reported that earnings before tax in its FMS business segment decreased 11% in the third quarter of 2016 driven, in part, by lower results in used vehicle sales but stated that "[f]ull service lease and commercial rental results benefited from approximately $9 million of lower depreciation in the third quarter and $26 million in the nine months ended September 30, 2016, due to residual value changes implemented January 1, 2016."

209.     These financial metrics and statements set forth above in ¶¶207-08 were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period.  This resulted in a material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

### G.     The Fourth Quarter of 2016 and Full Year 2016

210.     On November 8, 2016, Defendants participated in the Stephens Fall Investor Conference.  During the conference, Defendant Garcia stated that the decline in used truck prices that the Company has experienced "will not result in us changing residuals right now."

211.     This statement was materially false and misleading because, at that time, Ryder's vehicles' residual values had already materially decreased and its depreciation expense had already materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.  In addition, Ryder in fact did have a large number of vehicles that were at high residual values and needed to be written down.

212.     On February 2, 2017, the Company issued a press release entitled "Ryder Reports Fourth Quarter and Full-Year 2016 Results, and Provides 2017 Forecast" announcing its financial and operating results for the quarter ended September 30, 2016 (the "Fourth Quarter 2016 Press Release").  The Fourth Quarter 2016 Press Release was filed with the SEC on Form 8-K and signed by Defendant Garcia (the "Fourth Quarter 2016 Form 8-K").  The Fourth Quarter 2016 Press Release and Fourth Quarter 2016 Form 8-K reported GAAP EPS of $0.92, Comparable (Non-GAAP) EPS of $1.07, EPS Earnings of $69.2 million, and Comparable (non-GAAP) Earnings of $82.3 million.

213.     These financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period. This resulted in a material overstatement of its net earnings and earnings per share.

214.     On February 14, 2017, Ryder filed its annual report on Form 10-K with the SEC, which was signed by Defendants Sanchez and Garcia and reported the Company's financial and operating results for the year ended December 31, 2016 (the "2016 Form 10-K").  The 2016 Form 10-K contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) (Full year 2016) | | |
|---|---|---|
| Cost of lease and rental | $2,234,284 | Understated |
| Gains on vehicles, net | $972 | Overstated |
| Earnings from continuing operations before income taxes | $406,381 | Overstated |
| Provision for income taxes | $141,741 | Overstated |
| Earnings from continuing operations | $264,640 | Overstated |

| | | |
|---|---|---|
| Net earnings | $262,477 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $4.94 | Overstated |
| Earnings per common share—Diluted Net Earnings | $4.90 | Overstated |
| **Consolidated Statement of Comprehensive Income** | | |
| Net earnings | $262,477 | Overstated |
| Comprehensive income | $141,180 | Overstated |
| **Consolidated Balance Sheet** | | |
| Operating property and equipment, net of accumulated depreciation | $745,870 | Overstated |
| Total assets | $10,902,454 | Overstated |
| Retained earnings | $1,827,026 | Overstated |
| Total shareholders' equity | $2,052,275 | Overstated |
| Total liabilities and shareholders' equity | $10,902,454 | Overstated |
| **Consolidated Statement of Cash Flows** | | |
| Net earnings | $262,477 | Overstated |
| Depreciation expense | $1,187,050 | Understated |
| Gains on used vehicle sales, net | $972 | Overstated |

215.     The 2016 Form 10-K also stated that depreciation expense increased 6% in 2016 and increased 7% in 2015 and stated that "[t]he increases in both years were partially offset by $35 million and $40 million, respectively, from increases in residual values." The Company also stated that "[f]ull service lease and commercial rental results benefited from lower depreciation of $35 million due to residual value changes implemented January 1, 2016."

216.     The financial metrics set forth above in ¶¶214-215 were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense. In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period. This resulted in a

material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

217.    That same day, Defendants participated in the Stifel Transportation & Logistics Conference.  During that conference, in response to an analyst's question about whether the Company would be revisiting its residual values, Defendant Garcia stated that "most likely, it's going to go down a little bit."

218.    Defendant Garcia's statement was materially false and misleading because, at that time, Ryder's vehicles' residual values had already materially decreased and its depreciation expense had materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense valued at hundreds of millions of dollars.  In addition, Ryder in fact did have a large number of vehicles that were at excessively high residual values and needed to be written down.

**H.    The First Quarter of 2017**

219.    On April 25, 2017, the Company issued a press release entitled "Ryder Reports First Quarter 2017 Results" announcing its financial and operating results for the quarter ended March 31, 2017 (the "First Quarter 2017 Press Release").  The First Quarter 2017 Press Release was filed with the SEC on Form 8-K and signed by Defendant Garcia (the "First Quarter 2017 Form 8-K").  The First Quarter 2017 Press Release and First Quarter 2017 Form 8-K reported GAAP EPS of $0.71, Comparable (Non-GAAP) EPS of $0.82, EPS Earnings of $60.0 million, and Comparable (non-GAAP) Earnings of $69.4 million.

220.    These financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its

depreciation expenses during the Class Period. This resulted in a material overstatement of its net earnings and earnings per share.

221.    On April 25, 2017, Ryder also filed its quarterly report with the SEC on Form 10-Q, which was signed by Defendants Sanchez and Garcia and reported the Company's financial and operating results for the quarter ended March 31, 2017 (the "First Quarter 2017 Form 10-Q"). The First Quarter 2017 Form 10-Q contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) | | |
|---|---|---|
| Cost of lease and rental | $578,762 | Understated |
| Gains on vehicles, net | $780 | Overstated |
| Earnings from continuing operations before income taxes | $59,956 | Overstated |
| Provision for income taxes | $21,677 | Overstated |
| Earnings from continuing operations | $38,279 | Overstated |
| Net earnings | $38,149 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $0.72 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $0.71 | Overstated |
| **Consolidated Statement of Comprehensive Income** | | |
| Net earnings | $38,149 | Overstated |
| Comprehensive income | $58,955 | Overstated |
| **Consolidated Balance Sheet** | | |
| Operating property and equipment, net of accumulated depreciation | $754,307 | Overstated |
| Total assets | $10,973,807 | Overstated |
| Retained earnings | $1,829,114 | Overstated |
| Total shareholders' equity | $2,079,796 | Overstated |
| Total liabilities and shareholders' equity | $10,973,807 | Overstated |
| **Consolidated Statement of Cash Flows** | | |
| Net earnings | $38,149 | Overstated |

| | | |
|---|---|---|
| Depreciation expense | $311,207 | Understated |
| Gains on used vehicle sales, net | $780 | Overstated |

222.     These financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period.  This resulted in a material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

**I.     The Second Quarter of 2017**

223.     On July 26, 2017, the Company issued a press release entitled "Ryder Reports Second Quarter 2017 Results" announcing its financial and operating results for the quarter ended June 30, 2017 (the "Second Quarter 2017 Press Release").  The Second Quarter 2017 Press Release was filed with the SEC on Form 8-K and signed by Defendant Garcia (the "Second Quarter 2017 Form 8-K").  The Second Quarter 2017 Press Release and Second Quarter 2017 Form 8-K reported GAAP EPS of $0.97, Comparable (non-GAAP) EPS of $1.00, GAAP Earnings of $80.7, and Comparable (non-GAAP) Earnings of $84.7 million.

224.     These financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period. This resulted in a material overstatement of its net earnings and earnings per share.

225.     On July 26, 2017, Ryder also filed its quarterly report on Form 10-Q with the SEC, which was signed by Defendants Sanchez and Garcia and reported the Company's financial and operating results for the quarter ended June 30, 2017 (the "Second Quarter 2017 Form 10-Q").

The Second Quarter 2017 Form 10-Q contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) | | |
|---|---|---|
| Cost of lease and rental | $578,389 | Understated |
| Losses on vehicles, net | $15,322 | Understated |
| Earnings from continuing operations before income taxes | $80,692 | Overstated |
| Provision for income taxes | $29,349 | Overstated |
| Earnings from continuing operations | $51,343 | Overstated |
| Net earnings | $50,816 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $0.96 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $0.96 | Overstated |
| Consolidated Statement of Comprehensive Income | | |
| Net earnings | $50,816 | Overstated |
| Comprehensive income | $83,822 | Overstated |
| Consolidated Balance Sheet | | |
| Operating property and equipment, net of accumulated depreciation | $762,404 | Overstated |
| Total assets | $11,124,784 | Overstated |
| Retained earnings | $1,827,139 | Overstated |
| Total shareholders' equity | $2,106,099 | Overstated |
| Total liabilities and shareholders' equity | $11,124,784 | Overstated |
| Consolidated Statement of Cash Flows (Six months ended June 30) | | |
| Net earnings | $88,965 | Overstated |
| Depreciation expense | $621,020 | Understated |
| Losses on used vehicle sales, net | $14,542 | Understated |

226.    These financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its

depreciation expenses during the Class Period. This resulted in a material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

J.    **The Third Quarter of 2017**

227.    On October 25, 2017, the Company issued a press release entitled "Ryder Reports Third Quarter 2017 Results" announcing its financial and operating results for the quarter ended September 30, 2017 (the "Third Quarter 2017 Press Release"). The Third Quarter 2017 Press Release was filed with the SEC on Form 8-K and signed by Defendant Garcia (the "Third Quarter 2017 Form 8-K"). The Third Quarter 2017 Press Release and Third Quarter 2017 Form 8-K reported GAAP EPS from Continuing Operations of $1.11, Comparable EPS from Continuing Operations of $1.33, GAAP Earnings of $94.2 million, and Comparable (non-GAAP) Earnings of $111.0 million.

228.    These financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense. In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period. This resulted in a material overstatement of its net earnings and earnings per share.

229.    On October 25, 2017, Ryder filed its quarterly report with the SEC on Form 10-Q, which was signed by Defendants Sanchez and Garcia and reported the Company's financial and operating results for the quarter ended September 30, 2017 (the "Third Quarter 2017 Form 10-Q"). The Third Quarter 2017 Form 10-Q contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) | | |
|---|---|---|
| Cost of lease and rental | $588,626 | Understated |

| | | |
|---|---|---|
| Gains on vehicles, net | $2,727 | Overstated |
| Earnings from continuing operations before income taxes | $94,343 | Overstated |
| Provision for income taxes | $35,430 | Overstated |
| Earnings from continuing operations | $58,913 | Overstated |
| Net earnings | $58,623 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $1.11 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $1.11 | Overstated |
| **Consolidated Statement of Comprehensive Income** | | |
| Net earnings | $58,623 | Overstated |
| Comprehensive income | $92,029 | Overstated |
| **Consolidated Balance Sheet** | | |
| Operating property and equipment, net of accumulated depreciation | $778,879 | Overstated |
| Total assets | $11,258,974 | Overstated |
| Retained earnings | $1,855,806 | Overstated |
| Total shareholders' equity | $2,175,064 | Overstated |
| Total liabilities and shareholders' equity | $11,278,974 | Overstated |
| **Consolidated Statement of Cash Flows (Nine months ended September 30)** | | |
| Net earnings | $147,588 | Overstated |
| Depreciation expense | $932,772 | Understated |
| Losses on used vehicle sales, net | $11,815 | Understated |

230.    These financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period.  This resulted in a material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

### K.    The Fourth Quarter of 2017 and Full Year 2017

231.    On February 16, 2018, the Company issued a press release entitled "Ryder Reports Fourth Quarter and Full-Year 2017 Results, and Provides 2018 Forecast" announcing its financial and operating results for the year ended December 31, 2017 (the "Fourth Quarter 2017 Press Release").  The Fourth Quarter 2017 Press Release was filed with the SEC on Form 8-K and signed by Defendant Garcia (the "Fourth Quarter 2017 Form 8-K").  The Fourth Quarter 2017 Press Release and Third Quarter 2017 Form 8-K reported GAAP EPS from Continuing Operations of $12.10 (includes one-time net benefit from 2017 tax reform), Comparable EPS (non-GAAP) from Continuing Operations of $1.37, GAAP Earnings of $78.8 million, and Comparable (non-GAAP) Earnings of $104.5 million.

232.    These financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period. This resulted in a material overstatement of its net earnings and earnings per share.

233.    On February 20, 2018, Ryder filed its Form 10-K for the year ended December 31, 2017 with the SEC, which was signed by Defendants Sanchez and Garcia (the "2017 Form 10-K").  The 2017 Form 10-K contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) (Full year 2017) | | |
|---|---|---|
| Cost of lease and rental | $2,355,043 | Understated |
| Gains on vehicles, net | $17,241 | Understated |
| Earnings from continuing operations before income taxes | $313,786 | Overstated |
| Provision for income taxes | ($477,229) | Benefit is understated |
| Earnings from continuing operations | $791,015 | Overstated |

| | | |
|---|---|---|
| Net earnings | $790,558 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $14.97 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $14.87 | Overstated |
| **Consolidated Statement of Comprehensive Income** | | |
| Net earnings | $790,558 | Overstated |
| Comprehensive income | $917,089 | Overstated |
| **Consolidated Balance Sheet** | | |
| Operating property and equipment, net of accumulated depreciation | $776,704 | Overstated |
| Total assets | $11,452,231 | Overstated |
| Retained earnings | $2,465,022 | Overstated |
| Total shareholders' equity | $2,835,016 | Overstated |
| Total liabilities and shareholders' equity | $11,452,231 | Overstated |
| **Consolidated Statement of Cash Flows** | | |
| Net earnings | $790,558 | Overstated |
| Depreciation expense | $1,255,175 | Understated |
| Losses on used vehicle sales, net | $17,241 | Understated |

234.    Ryder's 2017 Form 10-K also reported that "lease and rental gross margin . . .

decreased 3% and gross margin as a percentage of revenue decreased to 30% in 2016, due to lower

commercial rental demand, partially offset by lease fleet growth, as well as benefits from improved

residual values." The 2017 Form 10-K also stated that "ChoiceLease and commercial rental results

benefited from lower depreciation of $35 million due to residual value changes implemented on

January 1, 2016."

235.    The statements and financial metrics set forth above in ¶¶233-34 were materially

misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual

values of its fleet vehicles or increase its depreciation expense. In fact, as set forth in ¶¶90-92,

Ryder had significantly underreported its depreciation expenses during the Class Period. This

resulted in a material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

236.    On February 16, 2018, Ryder also held a conference call with investors to discuss the Company's fourth quarter and full-year 2017 earnings (the "Fourth Quarter 2017 Conference Call"). During the Fourth Quarter 2017 Conference Call, an analyst asked "what is it that's driving the change in residuals and the additional depreciation that you're taking? Is it something specific with the vintage of equipment that you're seeing? Or is it the expectation as you look out and the supply that's coming into—potentially coming into the market here into '18? If you can just give us a sense of maybe why some of the fundamentals seem a little bit better, but you are still dealing with the change in the residuals and the incremental depreciation." Defendant Garcia responded that, based on Ryder's expectations for used truck pricing, depreciation will be at "a lower level than what we had seen this year."

237.    These statements were materially false and misleading because, at that time, Ryder's vehicles' residual values had materially decreased and its depreciation expense had materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense. In addition, Ryder in fact did have a large number of vehicles that are at high residual values that needed to be written down.

### L.    The First Quarter of 2018

238.    On February 22, 2018, Ryder presented at the Citi Global Industrials Conference. In his presentation, Defendants Sanchez stated, in touting the success of the Company despite some headwinds, that "[i]f you were to take out the negative impact of used trucks and depreciation, we'd be up 15% on an – from an earnings standpoint."

239.    Defendant Sanchez's statement was materially false and misleading because, at that time, Ryder's vehicles' residual values had already materially decreased and its depreciation

84

expense had already materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period.  Thus, it was not true that "[i]f you were to take out the negative impact of used trucks and depreciation, we'd be up 15% on an – from an earnings standpoint."

240.    On April 24, 2018, the Company issued a press release entitled "Ryder Reports First Quarter 2018 Results" announcing its financial and operating results for the quarter ended March 31, 2018 (the "First Quarter 2018 Press Release").  The First Quarter 2018 Press Release was filed with the SEC on Form 8-K and signed by Defendant Garcia (the "First Quarter 2018 Form 8-K").  The First Quarter 2018 Press Release and First Quarter 2018 Form 8-K reported GAAP EPS From Continuing Operations of $0.64, Comparable EPS (non-GAAP) from Continuing Operations of $0.91, GAAP Earnings of $48.1 million, and Comparable (non-GAAP) Earnings of $65.1 million.

241.    These financial metrics were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period. This resulted in a material overstatement of its net earnings and earnings per share.

242.    On May 2, 2018, Ryder filed its Form 10-Q for the quarter ended March 31, 2018 with the SEC, which was signed by Defendants Sanchez and Garcia (the "First Quarter 2018 Form 10-Q").  The First Quarter 2018 Form 10-Q contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

**Consolidated Statement of Earnings ($ in thousands)**

| | | |
|---|---|---|
| Cost of lease and rental | $619,207 | Understated |
| Losses on vehicles, net | $7,409 | Understated |
| Earnings from continuing operations before income taxes | $48,100 | Overstated |
| Provision for income taxes | $14,168 | Overstated |
| Earnings from continuing operations | $33,932 | Overstated |
| Net earnings | $33,505 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $0.64 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $0.63 | Overstated |
| **Consolidated Statement of Comprehensive Income** | | |
| Net earnings | $33,505 | Overstated |
| Comprehensive income | $51,003 | Overstated |
| **Consolidated Balance Sheet** | | |
| Operating property and equipment, net of accumulated depreciation | $790,476 | Overstated |
| Total assets | $11,736,157 | Overstated |
| Retained earnings | $2,468,005 | Overstated |
| Total shareholders' equity | $2,858,815 | Overstated |
| Total liabilities and shareholders' equity | $11,736,157 | Overstated |
| **Consolidated Statement of Cash Flows** | | |
| Net earnings | $33,505 | Overstated |
| Depreciation expense | $336,745 | Understated |
| Gains on used vehicle sales, net | $7,409 | Understated |

243.   The financial metrics set forth above in ¶242 were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.   In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period.   This resulted in a material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

244.    On April 24, 2018, Ryder also held a conference call with investors to discuss first quarter 2018 earnings (the "First Quarter 2018 Conference Call").  During the First Quarter 2018 Conference Call, in response to an analyst's question about what the Company's residual value adjustment would be for 2019, Defendant Garcia stated that "[i]t could be a little bit less than what it was this year" and guided analysts to "model[] in that $30 million to $40 million range." Defendant Sanchez also assured investors during the First Quarter 2018 Conference Call that "the earnings in the rest of the business is going to more than offset the earnings headwind from used vehicle sales and depreciation."

245.    These statements were materially false and misleading because, at that time, Ryder's vehicles' residual values had materially decreased and its depreciation expense had materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.  In addition, Ryder in fact did have a large number of vehicles that were at high residual values and needed to be written down.

## M.    The Second Quarter of 2018

246.    On July 25, 2018, the Company issued a press release entitled "Ryder Reports Second Quarter 2018 Results" announcing its financial and operating results for the quarter ended June 30, 2018 (the "Second Quarter 2018 Press Release").  The Second Quarter 2018 Press Release was filed with the SEC on Form 8-K and signed by Defendant Garcia (the "Second Quarter 2018 Form 8-K").  The Second Quarter 2018 Press Release and Second Quarter 2018 Form 8-K reported a GAAP EPS from Continuing Operations of $0.82, a Comparable EPS (non-GAAP) from Continuing Operations of $1.42, GAAP Earnings of $98.3 million, and Comparable (non-GAAP) Earnings of $102.8 million.

247.    On July 25, 2018, Ryder also filed its Form 10-Q for the quarter ended June 30, 2018 with the SEC, which was signed by Defendants Sanchez and Garcia (the "Second Quarter

2018 Form 10-Q"). The Second Quarter 2018 Form 10-Q contained the following financial

metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) | | |
|---|---|---|
| Cost of lease and rental | $636,359 | Understated |
| Losses on vehicles, net | $6,013 | Understated |
| Earnings from continuing operations before income taxes | $98,283 | Overstated |
| Provision for income taxes | $54,764 | Overstated |
| Earnings from continuing operations | $43,519 | Overstated |
| Net earnings | $42,258 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $0.80 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $0.80 | Overstated |
| Consolidated Statement of Comprehensive Income | | |
| Net earnings | $42,258 | Overstated |
| Comprehensive income | $4,861 | Overstated |
| Consolidated Balance Sheet | | |
| Operating property and equipment, net of accumulated depreciation | $823,893 | Overstated |
| Total assets | $12,228,866 | Overstated |
| Retained earnings | $2,580,262 | Overstated |
| Total shareholders' equity | $2,841,403 | Overstated |
| Total liabilities and shareholders' equity | $12,228,866 | Overstated |
| Consolidated Statement of Cash Flows (Six months ended June 30) | | |
| Net earnings | $75,763 | Overstated |
| Depreciation expense | $681,285 | Understated |
| Losses on used vehicle sales, net | $13,422 | Understated |

248. These financial metrics set forth above in ¶¶246-47 were materially misstated in

the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its

fleet vehicles or increase its depreciation expense. In fact, as set forth in ¶¶90-92, Ryder had

significantly underreported its depreciation expenses during the Class Period.  This resulted in a material overstatement of its net earnings, earnings per share, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

249.    On the same day, Ryder held a conference call with investors to discuss second quarter 2018 earnings (the "Second Quarter 2018 Conference Call").  During this call, in response to an analyst question asking if "there's any renewed focus on accelerating the growth within DTS and SCS" "given some of the headwinds in recent years with some of the cyclical elements."  In response, Defendant Sanchez stated "you can look at ChoiceLease today as being more derisked than it has historically" as "we've lowered that residual to generally the current levels that we're seeing today as opposed to using our normal rolling 5-year average."

250.    This statement was materially false and misleading because, at that time, Ryder's vehicles' residual values had already materially decreased and its depreciation expense already had materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.  ChoiceLease was nowhere near "derisked."

**N.    The Third Quarter of 2018**

251.    On October 26, 2018, the Company issued a press release entitled "Ryder Reports Third Quarter 2018 Results" announcing its financial and operating results for the quarter ended September 30, 2018 (the "Third Quarter 2018 Press Release").  The Third Quarter 2018 Press Release was filed with the SEC on Form 8-K and signed by Defendant Garcia (the "Third Quarter 2018 Form 8-K").  The Third Quarter 2018 Press Release and Third Quarter 2018 Form 8-K reported GAAP EPS from Continuing Operations of $1.69, Comparable EPS from Continuing Operations of $1.64, GAAP Earnings of $116.1, and Comparable (non-GAAP) Earnings of $117.6 million.

252.   On October 26, 2018, Ryder also filed its Form 10-Q for the quarter ended September 30, 2018 with the SEC, which was signed by Defendants Sanchez and Garcia (the "Third Quarter 2018 Form 10-Q").  The Third Quarter 2018 Form 10-Q contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) | | |
|---|---|---|
| Cost of lease and rental | $649,407 | Understated |
| Losses on vehicles, net | $3,012 | Understated |
| Earnings from continuing operations before income taxes | $116,140 | Overstated |
| Provision for income taxes | $26,629 | Overstated |
| Earnings from continuing operations | $89,511 | Overstated |
| Net earnings | $88,751 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $1.69 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $1.68 | Overstated |
| **Consolidated Statement of Comprehensive Income** | | |
| Net earnings | $88,751 | Overstated |
| Comprehensive income | $100,571 | Overstated |
| **Consolidated Balance Sheet** | | |
| Operating property and equipment, net of accumulated depreciation | $826,183 | Overstated |
| Total assets | $12,684,305 | Overstated |
| Retained earnings | $2,632,589 | Overstated |
| Total shareholders' equity | $2,918,398 | Overstated |
| Total liabilities and shareholders' equity | $12,684,305 | Overstated |
| **Consolidated Statement of Cash Flows (Nine months ended September 30)** | | |
| Net earnings | $164,514 | Overstated |
| Depreciation expense | $1,028,491 | Understated |
| Losses on used vehicle sales, net | $16,434 | Understated |

253.     The financial metrics set forth above in ¶¶251-52 were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.   In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period.  This resulted in a material overstatement of its net earnings, earnings per share, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

254.     On October 26, 2018, Defendants held a conference call with investors to discuss Ryder's third quarter 2018 earnings (the "Third Quarter 2018 Conference Call").  During the Third Quarter 2018 Conference Call, Defendant Sanchez assured investors that, with respect to the Company's accounting treatment of its residual values, Ryder "keep[s] the residuals in the middle of the fairway as best we can."

255.     This statement was materially false and misleading because, at that time, Ryder's vehicles' residual values had already materially decreased and its depreciation expense had materially increased, yet the Company failed to make the necessary adjustments to its residual values or depreciation expense.  In addition, Ryder's residual values were grossly inflated, as evidenced by the Company's later admissions and set forth in ¶¶134-47, and were in no way "in the middle of the fairway."

O.     **The Fourth Quarter of 2018 and Full Year 2018**

256.     On February 14, 2019, the Company issued a press release entitled "Ryder Reports Record 2018 Revenue of $8.4 Billion, Up 15%; Strong Contractual Revenue Growth Drives 2019 Earnings Forecast" announcing its financial and operating results for the year ended December 31, 2018 (the "Fourth Quarter 2018 Press Release").  The Fourth Quarter 2018 Press Release was filed with the SEC on Form 8-K and signed by Defendant Garcia (the "Fourth Quarter 2018 Form 8-K").  The Fourth Quarter 2018 Press Release and Fourth Quarter 2018 Form 8-K reported GAAP

EPS from Continuing Operations of $2.05, Comparable EPS (non-GAAP) from Continuing

Operations of $1.82, GAAP Earnings of $111.3 million, and Comparable (non-GAAP) Earnings

of $121.0 million.

257.   On February 21, 2019, Ryder filed its annual Form 10-K for the year ended

December 31, 2018 with the SEC, which was signed by Defendants Sanchez and Garcia (the "2018

Form 10-K").  The 2018 Form 10-K contained the following financial metrics, each of which was

either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) (Full year 2018) | | |
|---|---|---|
| Cost of lease and rental | $2,566,257 | Understated |
| Losses on vehicles, net | $21,739 | Understated |
| Earnings from continuing operations before income taxes | $373,861 | Overstated |
| Provision for income taxes | $98,254 | Overstated |
| Earnings from continuing operations | $275,607 | Overstated |
| Net earnings | $273,298 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $5.20 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $5.17 | Overstated |
| Consolidated Statement of Comprehensive Income | | |
| Net earnings | $273,298 | Overstated |
| Comprehensive income | $170,047 | Overstated |
| Consolidated Balance Sheet | | |
| Operating property and equipment, net of accumulated depreciation | $843,813 | Overstated |
| Total assets | $13,051,084 | Overstated |
| Retained earnings | $2,710,696 | Overstated |
| Total shareholders' equity | $2,910,327 | Overstated |
| Total liabilities and shareholders' equity | $13,051,084 | Overstated |
| Consolidated Statement of Cash Flows | | |
| Net earnings | $273,298 | Overstated |

| Depreciation expense | $1,394,964 | Understated |
| Gains on used vehicle sales, net | $21,739 | Understated |

258.    The financial metrics set forth above in ¶¶256-57 were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.  In fact, as set forth in ¶, Ryder had significantly underreported its depreciation expenses during the Class Period.  This resulted in a material overstatement of its net earnings, earnings per share, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

### P.    The First Quarter of 2019

259.    On April 30, 2019, the Company issued a press release entitled "Ryder Reports First Quarter 2019 Revenue of $2.2 Billion, Up 15%" announcing its financial and operating results for the quarter ended March 31, 2019 (the "First Quarter 2019 Press Release").  The First Quarter 2019 Press Release was filed with the SEC on Form 8-K and signed by CFO Parker (the "First Quarter 2019 Form 8-K").  The First Quarter 2019 Press Release and First Quarter 2019 Form 8-K reported GAAP EPS from Continuing Operations to $0.87, Comparable EPS (non-GAAP) from Continuing Operations of $1.11, GAAP Earnings of $68.2 million, Comparable (non-GAAP) Earnings of $80.8 million.

260.    On May 9, 2019, Ryder filed its Form 10-Q for the quarter ended March 31, 2019 with the SEC, which was signed by Defendant Sanchez and CFO Parker (the "First Quarter 2019 Form 10-Q").  The First Quarter 2019 Form 10-Q contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings | | |
|---|---|---|
| Cost of lease and rental | $664,289 | Understated |
| Losses on vehicles, net | $8,217 | Understated |

| | | |
|---|---|---|
| Earnings from continuing operations before income taxes | $68,151 | Overstated |
| Provision for income taxes | $22,261 | Overstated |
| Earnings from continuing operations | $45,890 | Overstated |
| Net earnings | $45,316 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $0.86 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $0.86 | Overstated |
| **Consolidated Statement of Comprehensive Income** | | |
| Net earnings | $45,316 | Overstated |
| Comprehensive income | $66,532 | Overstated |
| **Consolidated Balance Sheet** | | |
| Operating property and equipment, net of accumulated depreciation | $871,524 | Overstated |
| Total assets | $13,948,985 | Overstated |
| Retained earnings | $2,343,857 | Overstated |
| Total shareholders' equity | $2,566,804 | Overstated |
| Total liabilities and shareholders' equity | $13,948,985 | Overstated |
| **Consolidated Statement of Cash Flows** | | |
| Net earnings | $45,316 | Overstated |
| Depreciation expense | $377,357 | Understated |
| Losses on used vehicle sales, net | $8,217 | Understated |

261.     The financial metrics set forth above in ¶¶259-60 were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.   In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period.  This resulted in a material overstatement of its net earnings, earnings per share, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

Q.     **The Second Quarter of 2019**

262.    On July 30, 2019, the Company issued a press release entitled "Ryder Reports Record Second Quarter 2019 Revenue of $2.2 Billion, Up 7%" announcing its financial and operating results for the quarter ended June 31, 2019 (the "Second Quarter 2019 Press Release"). The Second Quarter 2019 Press Release was filed with the SEC on Form 8-K and signed by Defendant Parker (the "Second Quarter 2019 Form 8-K"). The Second Quarter 2019 Press Release and Second Quarter 2019 Form 8-K reported GAAP EPS from Continuing Operations of $1.43, Comparable EPS (non-GAAP) from Continuing Operations of $1.40, GAAP Earnings of $103.1 million, and Comparable (non-GAAP) Earnings of $101.0 million.

263.    On July 30, 2019, Ryder also filed its Form 10-Q for the quarter ended June 31, 2019 with the SEC, which was signed by Defendant Sanchez and CFO Parker (the "Second Quarter 2019 Form 10-Q"). The Second Quarter 2019 Form 10-Q contained the following financial metrices, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) | | |
|---|---|---|
| Cost of lease and rental | $687,540 | Understated |
| Losses on vehicles, net | $18,140 | Understated |
| Earnings from continuing operations before income taxes | $103,069 | Overstated |
| Provision for income taxes | $27,617 | Overstated |
| Earnings from continuing operations | $75,452 | Overstated |
| Net earnings | $75,215 | Overstated |
| Earnings (loss) per common share—Basic Net Earnings | $1.43 | Overstated |
| Earnings (loss) per common share—Diluted Net Earnings | $1.43 | Overstated |
| Consolidated Statement of Comprehensive Income | | |
| Net earnings | $72,215 | Overstated |
| Comprehensive income | $66,245 | Overstated |
| Consolidated Balance Sheet | | |
| Operating property and | $866,908 | Overstated |

| | | |
|---|---|---|
| equipment, net of accumulated depreciation | | |
| Total assets | $14,522,054 | Overstated |
| Retained earnings | $2,385,620 | Overstated |
| Total shareholders' equity | $2,607,706 | Overstated |
| Total liabilities and shareholders' equity | $14,522,054 | Overstated |
| **Consolidated Statement of Cash Flows (Six months ended June 30)** | | |
| Net earnings | $120,531 | Overstated |
| Depreciation expense | $768,030 | Understated |
| Losses on used vehicle sales, net | $26,357 | Understated |

264.     The financial metrics set forth above in ¶¶262-63 were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.   In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period.  This resulted in a material overstatement of its net earnings, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

R.      **The Third Quarter of 2019**

265.     On October 29, 2019, the Company issued a press release entitled "Ryder Reports Third Quarter 2019 Revenue of $2.2 Billion, Up 3%; Earnings Impacted by Change in Residual Value Estimates" announcing its financial and operating results for the quarter ended September 30, 2019 (the "Third Quarter 2019 Press Release").  The Third Quarter 2019 Press Release was filed with the SEC on Form 8-K and signed by Defendant Parker (the "Third Quarter 2019 Form 8-K").  The Third Quarter 2019 Press Release and Third Quarter 2019 Form 8-K reported a GAAP EPS loss of $1.75, a Comparable (non-GAAP) loss of $1.49, GAAP Earnings loss of $91.3 million, and Comparable (non-GAAP) Earnings loss of $73.0 million.

266.     On October 30, 2019, Ryder filed its Form 10-Q for the quarter ended September 30, 2019 with the SEC, which was signed by Defendant Sanchez and CFO Parker (the "Third Quarter 2019 Form 10-Q").  The Third Quarter 2019 Form 10-Q contained the following financial metrics, each of which was either understated or overstated, as set forth in the chart below:

| Consolidated Statement of Earnings ($ in thousands) | | |
|---|---|---|
| Cost of lease and rental | $877,767 | Understated |
| Losses on vehicles, net | $22,734 | Understated |
| Earnings from continuing operations before income taxes | ($91,260) | Understated |
| Provision for income taxes | $278 | Overstated |
| Earnings from continuing operations | ($91,538) | Understated |
| Net earnings | ($91,455) | Understated |
| Earnings (loss) per common share—Basic Net Earnings | ($1.75) | Understated |
| Earnings (loss) per common share—Diluted Net Earnings | ($1.75) | Understated |
| Consolidated Statement of Comprehensive Income | | |
| Net earnings | ($91,455) | Understated |
| Comprehensive income | ($107,221) | Understated |
| Consolidated Balance Sheet | | |
| Operating property and equipment, net of accumulated depreciation | $891,689 | Overstated |
| Total assets | $14,482,844 | Overstated |
| Retained earnings | $2,262,356 | Overstated |
| Total shareholders' equity | $2,476,987 | Overstated |
| Total liabilities and shareholders' equity | $14,482,844 | Overstated |
| Consolidated Statement of Cash Flows (Nine months ended September 31) | | |
| Net earnings | $29,076 | Overstated |
| Depreciation expense | $1,342,746 | Understated |
| Losses on used vehicle sales, net | $49,091 | Understated |

267.    The financial metrics set forth above in ¶¶265-66 were materially misstated in the manner set forth in ¶¶90-92, because Ryder failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense.   In fact, as set forth in ¶¶90-92, Ryder had significantly underreported its depreciation expenses during the Class Period.  This resulted in a material overstatement of its net earnings, earnings per share, the value of its operating property and equipment, its total assets, retained earnings, and total shareholders' equity.

## VII.    LOSS CAUSATION

268.    Defendants' material misstatements and omissions complained of herein artificially inflated the market price of Ryder's publicly traded common stock.  The artificial inflation in Ryder's stock price was removed when the facts and risks misstated and omitted by Defendants were revealed to the market.  Such corrective information was disseminated to investors through public disclosures on July 30, 2019, October 29, 2019, and February 13, 2020.  Each disclosure partially revealed relevant facts regarding the false and misleading nature of Defendants' material misstatements concerning the residual value and depreciation of Ryder's truck fleet.   Each disclosure, more particularly described above, removed artificial inflation in the price of Ryder's publicly traded stock, causing economic injury to Lead Plaintiffs and other members of the Class.

## VIII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

269.    As alleged herein, numerous facts give rise to the strong inference that, throughout the Class Period, Ryder and the Officer Defendants knew or recklessly disregarded that their statements and omissions, as set forth in Section VI above were materially false and misleading when made.  The information in this section summarizes certain of the allegations that detail the Officer Defendants' scienter, and the cumulative knowledge of all members of Ryder's senior management team, including the Officer Defendants, regarding the matters addressed herein is properly imputed to Ryder.

270.    ***Defendants Admitted That They Saw a Sharp Decline in Resale Truck Values.***
Defendants have admitted that they had observed a steep decline in used tractor sales prices in late 2015, which, according to FE 6, was the "bread and butter" of Ryder's business.  In its third quarter 2019 earnings call, for example, Defendants' accompanying company presentation contained the following chart, which, for the first time, detailed Ryder's used sales price index from 1999-2018:



271.    Further, according to multiple former employees, Ryder's senior executives tracked used vehicle sales proceeds historically and met quarterly to assess the status of the fleet's valuation and pricing.  FE 4, for example, reported that the head of the Asset Management Board, Eugene Tangney, stated that he escalated the Board's findings on residual values directly to the CFO, Defendant Garcia.  Moreover FE 6 reported that despite the fact that used vehicle prices were falling, upper management, including Defendant Garcia, pushed back on not writing down the used vehicle fleet.  Thus, the Ryder management was aware of the precipitous decline in used

tractor pricing during the Class Period yet did not accurately modify the Company's vehicles residual values to reflect these price changes.

272.   ***Ryder Altered Its Residual Value Accounting Methodologies Throughout the Class Period to Cover-up Its Fraud***.   Unbeknownst to investors, Ryder utilized its misleading five-year rolling average residual value methodology to retain the advantage of higher (but by then inaccurate) historical used truck and tractor sales pricing data from 2012-2015  which, according to Ryder's own chart referenced above, had "increased above historical levels."   Defendants did so even though they recognized that this methodology increasingly did not accurately reflect the Company's vehicles' actual residual value.

273.   In fact, early in the Class Period, Defendants reported earnings benefits due to the increase in residual values even as used vehicle pricing had fallen significantly.  For example, in Ryder's third quarter 2015 earnings call, Defendant Sanchez stated that while Ryder was "likely to see lower gains on sales due to pricing [in 2016] . . . we should see a benefit in depreciation due to higher residual values using our five-year rolling average methodology."   In another presentation to investors on September 10, 2015 at the RBC Capital Markets Global Industrials Conference, Defendant Garcia stated that "we probably haven't raised our residuals fast enough" and "we've been kind of conservative in that."

274.   By continuing to tout reliance on a five-year rolling average methodology, Ryder continued to benefit from historically high prices, which had a recurring positive impact on the Company's reported financial results.  However, and for reasons to be discussed in more detail below, the Company continued to value its vehicles significantly above the price the market was willing to pay, which rendered Ryder's reported residual values misleading.

275.    In the ongoing years, despite the almost complete collapse of used truck and tractor pricing, Defendants continued to mislead the market about the residual value of the Company's fleet, and would only piecemeal recognize falling residual values when Ryder was finally forced to sell its overvalued vehicles.

276.    As multiple former employees would explain, Ryder inflated the residual values of its vehicles for a number of financially beneficial reasons–however any residual value inflation would become evident when the Company tried to sell the vehicle.  Thus, instead of making fleet-wide residual value adjustments, Ryder would take small charges in the anticipation of vehicle sales.  However, these charges still did not properly account for the depreciation of the fleet's vehicles, as Ryder continued to overstate the residual values of many of its vehicles, especially its older and MaxxForce vehicles as described in further detail in Section IV.D.

277.    As further evidence of Defendants' scienter, by mid-2018, Ryder claimed to abandon its 5-year rolling price average to better capture "where [they were] seeing sales today."  Specifically, on July 25, 2018, during Ryder's second quarter 2018 earnings call, Defendant Sanchez, in direct response to an analyst question, stated that:

> just so you know, w''ve historically always used a 5-year rolling average to determine our residual value or our sales proceed at the end of the lease term.  At the beginning of this year is when we switched and then said, rather than just do a rolling 5-year average, let's just bring it to generally to where we're seeing sales today.  And we did that.  That's primarily a Class 8 issue.  So we did that really across the tractor business.  And so beginning of the year is when we started that.

278.    However, just over a year later in Ryder's third quarter 2019 earnings call, Defendant Sanchez explained that "[e]ffective July 1, we further lowered our long-term view of residual values for vehicles expected to be sold starting in late 2021 to reflect more recent multiyear market trends in our outlook.  This view now excludes the peak pricing year of 2015."  Wolf Research picked up on this, reporting that day (October 29, 2019) that, "R[yder] is now excluding

the 2014-15 peak in used truck pricing from its residual calculations and assuming a further significant reduction in near-term used truck prices from current levels." But Defendants <u>gave no explanation</u> as to why, despite previously telling the market that it no longer used its 5-year rolling average methodology, any of its 2019 residual values supposedly had still included 2015 peak pricing.

279. ***Ryder's Reported Residual Values Incorporated Completely Unrealistic Used Vehicle Price Rebounds***. Defendants were also aware that, given the precipitous decline in the prices of its used vehicle fleet, their reported residual values often assumed and required highly unrealistic used vehicle pricing rebounds to the "historically high" 2012-2015 levels to reflect Ryder's reported residual values. For example, on February 16, 2018 at Ryder's fourth quarter 2017 earnings call, an analyst asked Defendant Sanchez if he could "quantify how much of an increased [price in used vehicle sales] to stem [the accelerated depreciation]? Is it 1%, 2% increase in used vehicle price? Is it 5%, 10%? Is there a way to kind of help quantify that?" Defendant Sanchez answered: "It's probably, Kevin, about 10% to 15% up from where we are now. And that's adjusting for inflation so as a percent of our vehicle investment." However, even this number was grossly inadequate, as Ryder's vehicles' residual values were overstated by as much as 30%, according to FE 6.

280. Defendants' later corrective disclosures exposed just how unrealistic Defendants' stated residual values had been. For example, when Defendants disclosed Ryder's first major additional depreciation expense in the third quarter of 2019 to the tune of $177 million, reduced its residual value estimates for the entire second half of 2019 by $289 million, and reduced its residual value estimates for the period from the second half of 2019 through 2024-2025 by a shocking <u>$844 million</u>, Defendant Sanchez said that "[t]his [long-term view of residuals values]

102

now excludes the peak pricing year of 2015." Analysts at Pacific Square Research, asked "When Does It Get Better?" and pointed out in their August 3, 2020 analyst report that Defendants, despite announcing another massive depreciation charge, informed the market that used vehicle pricing would still have to improve by 30% for tractors and 10% for trucks for their depreciation estimates to come to fruition.

281.   ***Ryder's False Residual Value Accounting Resulted in Substantial Losses on Its Used Vehicle Sales***.   Strongly supporting the inference that Ryder significantly overstated its vehicles' residual values is the fact that Ryder took increasingly larger losses on the sale of its used vehicles as the Class Period progressed.   In 2015, Ryder sold its used vehicles for proceeds of approximately $100 million. The very next year, Ryder's net sales fell almost 99% to only $972,000.  In 2017, Ryder sold its vehicles at a <u>loss</u> of $17.24 million.  In 2018, net used vehicles losses <u>increased another 26%, to $21.74 million</u>.  And finally, in 2019, Ryder's net loss on used vehicles increased 263% to $58.7 million.

282.   Internal Company reports showed, and former employees corroborated, that there were hundreds, and sometimes thousands of vehicles that remained unsold for much more than six months despite reaching the point of sale, whose residual values were <u>never</u> updated either as a matter of course or to reflect deteriorating market conditions.  FE 6 reported that Ryder was sitting on vehicles for extended periods because Ryder would not write them down or sell them at the lower price.  Specifically, FE 6 stated that "a lot" of trucks were sitting on the used truck lot for over six months," noting how unusual this was, and stating that the larger number of vehicles sitting on the lot for an extended time in 2015 was significantly different than it had been in the past.

283.    Ryder also attempted to realize the expected proceeds from its highly inflated residual values by selling the vehicles retail instead of wholesale but failed miserably. FE 4 explained that Ryder was extending the leases on aging vehicles and converting them to short-term rentals without altering the residual value of the vehicles accordingly. As a result, Ryder could not sell its vehicles in the target numbers or at the target price and had to send increasingly large numbers of its vehicles to auction, often for "pennies on the dollar."

284.    ***Ryder's Residual Values Were Negatively Affected by the MaxxForce Emissions Scandal***. Further inflating the Company's vehicles' residual values, Ryder refused to make timely appropriate adjustments to its vehicles' residual values when faced with clear price-reducing circumstances, such as in the case of its MaxxForce vehicles (discussed above in Section IV.D.) or when maintenance costs for certain vehicle classes increased significantly. According to FE 4, the MaxxForce vehicles made up about 40% of the fleet during the years they were used and stated that Ryder started using MaxxForce vehicles in 2013 and 2014. FE 4 also stated that most of Ryder's MaxxForce vehicles were returned by its clients and did not make it to the end of their lease, due to the myriad of technical defects with the engines, many of which made the tractors essentially unusable.

285.    However, FE 6 reported that because these vehicles incorporated purportedly innovative technology to meet the emissions standards and were expensive to maintain, on "the back-end" the "values were upside down because no one wanted to buy those vehicles and pay for that maintenance."

286.    ***Ryder Increased Residual Values to Compete with Penske, Ryder's Main Competitor***. As explained above in Section IV.B., residual values in part determine the price of a vehicle's lease. FE 1 explained that in order to compete with Penske, Ryder had to lower the

prices on its leases because it could not compete with its "more together and efficient" competitor. FE 1 further explained that the only way to lower the price of the lease in accordance with its pricing formula was to "fiddle with [] the depreciation numbers to make the trucks more competitive for the lease," which was "fine until you have to go try and sell the trucks."

287.     FE 6, a Vehicle Sales Manager in the Asset Management Division, reported that "the values of the equipment were completely off" and "it was pretty clear that they needed to write-down the equipment." Despite the general recognition that the vehicles in Ryder's fleet were overvalued, FE 6 said that everyone in upper management, including Tangney and Defendants Sanchez and Garcia pushed back on not writing down the used vehicles. Defendants' knowledge of the inflated residual values and refusal to conduct a residual value write-down to maintain the lower prices of its leases strongly supports an inference of scienter.

288.     ***Ryder's Manipulation of the Residual Values Had a Direct Impact on Reported Net Income.*** Ryder's overstated residual values also significantly lowered its reported depreciation expenses and increased its reported earnings. As discussed above in Section IV.B., residual values are a key component in determining depreciation expense. Higher residual values lower depreciation expense by projecting a smaller financial loss from the future sale of the vehicle. Thus, by artificially inflating its vehicle fleet's residual values, Ryder was able to minimize depreciation expenses throughout the Class Period. Depreciation expense is subtracted from income for the purposes of reporting net income, or earnings. Thus, Ryder was able to report significantly inflated earnings and earnings per share (key financial metrics) during the Class Period by artificially inflating its vehicle fleet's residual values through its residual pricing methodology, despite recognizing the severe decline in vehicle pricing beginning in 2015 and the discrepancies between the used vehicles' residual values and sale prices. The windfall to

Defendants was enormous.  As of the time of the filing of this Complaint, Ryder has recognized over $868 million in additional depreciation charges across 2019 and 2020, $415 million of which came solely in 2019.

289.    ***Defendants Purposefully Delayed Selling Used Vehicles in Order to Avoid Taking Write-downs***.  Many of Ryder's former employees explained that Ryder, as a matter of policy, would indefinitely hold onto used vehicles instead of selling them to avoid, or at the very least postpone, recording a loss on the sale of the vehicle.  For example, FE 1 reported that the Company "held onto the inventory indefinitely instead of taking the steps to sell."  He further explained that the decision to sell each truck was dependent on the margin generated at the end of the lease.

290.    As a result of these factors, as discussed above in Section IV.I., Ryder's used vehicle inventory ballooned during the Class Period.  FE FE 6 stated that were probably 6,000 to 10,000 used vehicles on the lot at any time, which was more than then Ryder had in the past, and that the problem got "worse and worse and worse" during the Class Period.

291.    ***This Case Bears Striking Resemblance to the Infamous Waste Management Accounting Scandal of the 1990s***.  Notably, Defendants' conduct here has several striking similarities to another infamous accounting fraud case, the $1.7 billion Waste Management fraud of the mid-1990s.  In the case of Waste Management, the SEC and plaintiff investors had alleged that the defendants used a number of misleading tactics to defer depreciation expenses, principally by extending the useful lives of Waste Management's vehicles, overstating the vehicles' (and shipping containers') residual value, and "netting," or the process of using one-time earned revenues to cover up past expenses.  After years of manipulating the Company's financials, the

Waste Management defendants revealed that their fraud had overstated Waste Management's income by $1.7 billion over the course of a five-year period.

292.    Further, the SEC found that management "made unsupported changes to the estimated useful life or salvage value of one or more categories of vehicles, containers, or equipment, always resulting in a net reduction of depreciation expenses." Moreover, the SEC found that management made "repeated unsupported changes in depreciation estimates" through "top-level adjustments."

293.    Similarly, here Defendants repeatedly assigned its vehicles unsupported residual values to make its leases more competitive and to minimize recorded depreciation expense and maximize earnings. Specifically, FE 4 reported that Ryder was running vehicles longer and longer (in effect lengthening its useful lives but did not take a corresponding depreciation expense) to avoid having to sell the vehicles at a loss. Further, as FE 4, a member of the Ryder's pricing committee reported, he was "raising red flags like crazy" with the committee, who repeatedly refused to lower the vehicles residual values.

294.    Further, the financial significance of the frauds is equally egregious. As of the time of the filing of this Complaint, Ryder has already admitted to more than $1 billion in reduced residual estimates and losses from used vehicle sales, much of which Ryder had previously claimed as income in the time leading up to the first corrective disclosure.

295.    ***The Departure of Defendant Garcia as CFO and the Speed at Which His Replacement Detected the Residual Value Overstatement Support a Strong Inference of Defendants' Scienter***. On September 25, 2018, Ryder announced that Defendant Art Garcia, Executive Vice President and CFO, would retire from the Company on April 30, 2019. Mr. Garcia

had had a 20-year career with Ryder and had acted as CFO since 2010.  At the time of his departure Ryder did not have a new CFO lined up but embarked on a search for Garcia's replacement.

296.    On March 27, 2019, Ryder named Scott Parker as the Company's new CFO responsible for Ryder's financial management functions including finance and audit, treasury, tax, accounting, corporate strategy, and investor relations.  He formally joined Ryder on April 5, 2019.

297.    Then, just months later, Ryder began disclosing its lower used vehicle sales, the resulting negative impact on Ryder's earnings, and the need to reduce its earnings per share forecast.  On July 30, 2019, the Company reported earnings before tax for the second quarter of 2019 in its FMS business segment of $57.7 million compared to $76.6 million the prior year period, driven by lower used vehicle sales results which had declined as a result of higher valuation adjustments of $10.4 million on a larger inventory and higher depreciation of $7.6 million due to residual value changes.  As a result, Ryder reduced its earnings per share forecast for 2019 to a range of $4.80 to $5.10, as compared to its prior forecasted range of $5.28 to $5.58.  Then, on October 29, 2019, the Company disclosed to investors that "management concluded that our residual value estimates likely exceeded the expected future values that would be realized upon the sale of power vehicles in our fleet."  As a result, Ryder significantly lowered the residual value estimates for all vehicles and incurred $177 million in additional depreciation expense in the third quarter of 2019.  The next quarter, the Company announced that for the full year, it had incurred a total of $357 million in additional depreciation expense in 2019 from residual value estimated changes, over $310 million more than was predicted to the market just a year earlier.  Similarly, Ryder warned investors, for the first time, that the Company expected to incur another $275 million in depreciation charges on its trucking fleet plus an additional $20 million estimated loss on used vehicle sales in 2020.

298.    The short timeframe between (i) Parker becoming CFO after Garcia's departure and (ii) Ryder publicly admitting to the need to lower the residual values of its vehicles, supports a strong inference that the disparity between the true residual values of Ryder's vehicles, and the residual values Ryder reported to the market was so stark and obvious that it was apparent to Ryder's executives, including Parker when he first joined the Company

299.    ***Defendants Made Repeated Reference to Depreciation Expense and Residual Values During Conference Calls with Investors.***  The Officer Defendants' scienter is further supported by their repeated references to depreciation expenses and residual values during conference calls with investors, often in direct response to detailed analyst questions.  As detailed above in Sections IV.G., VI, and below, Defendants repeatedly made false and misleading statements to the market concerning the then-current residual values of Ryder's vehicle fleet, the associated depreciation expense, and the risk posed by further residual value deterioration and an increase in depreciation expense.

300.    On July 23, 2015, Defendants held a conference call with investors and analysts to discuss Ryder's financial results for the second quarter of 2015 (the "Second Quarter 2015 Earnings Call").  During the Second Quarter 2015 Earnings Call, Defendant Sanchez assured investors that the headwind the Company faced in its FMS business from a decline in used vehicle sales "is being offset on the earnings line by <u>the improvements that we've seen in depreciation expense also</u>."

301.    On September 10, 2015, Defendants participated in the RBC Capital Markets Global Industrials Conference.  During the conference, Defendant Garcia stated that "we've been benefiting from the solid used truck environment <u>because of an increase in residuals</u>, which helped <u>bring down depreciation expense</u>, which more than offset any gains headwind that we saw."

Defendant Garcia stated further that "we probably haven't raised our residuals fast enough" and "we've been kind of conservative in that."

302.    On July 27, 2016, Ryder held a conference call with investors to discuss second quarter 2016 earnings (the "Second Quarter 2016 Conference Call").  During the Second Quarter 2016 Conference Call, Defendant Sanchez stated that based on "what we're seeing in the current marketplace, . . . I wouldn't envision an increase or decrease in residual values out over the next four, five years."

303.    On November 8, 2016, Defendants participated in the Stephens Fall Investor Conference.  During the conference, Defendant Garcia stated that the decline in used truck prices that the Company has experienced "will not result in us changing residuals right now."

304.    On February 16, 2018, Ryder held a conference call with investors to discuss fourth quarter and full-year 2017 earnings (the "Fourth Quarter 2017 Conference Call").  During the Fourth Quarter 2017 Conference Call, an analyst asked "what is it that's driving the change in residuals and the additional depreciation that you're taking?  Is it something specific with the vintage of equipment that you're seeing?  Or is it the expectation as you look out and the supply that's coming into—potentially coming into the market here into '18?  If you can just give us a sense of maybe why some of the fundamentals seem a little bit better, but you are still dealing with the change in the residuals and the incremental depreciation."  Defendant Garcia responded that, based on Ryder's expectations for used truck pricing, depreciation will be at "a lower level than what we had seen this year."

305.    On April 24, 2018, Ryder held a conference call with investors to discuss first quarter 2018 earnings (the "First Quarter 2018 Conference Call").  During the First Quarter 2018 Conference Call, in response to an analyst's question about what the Company's residual value

adjustment would be for 2019, Defendant Garcia stated that "[i]t could be a little bit less than what it was this year" and guided analysts to "model[] in that $30 million to $40 million range." Defendant Sanchez also assured investors during the First Quarter 2018 Conference Call that "the earnings in the rest of the business is going to more than offset the <u>earnings headwind from used vehicle sales and depreciation</u>."

306.    On October 26, 2018, Defendants held a conference call with investors to discuss Ryder's third quarter 2018 earnings (the "Third Quarter 2018 Conference Call").  During the Third Quarter 2018 Conference Call, Defendant Sanchez assured investors that, with respect to the Company's accounting treatment of its residual values, Ryder "keep[s] the residuals in the middle of the fairway as best we can."

307.    On February 14, 2019, Ryder held a conference call with investors to discuss fourth quarter and full-year 2018 earnings (the "Fourth Quarter 2018 Conference Call").  During the Fourth Quarter 2018 Conference Call, Defendant Sanchez stated that the Company saw an improvement in the parity between the market price and residual value of Ryder's used trucks as "the impact of all the accelerated [depreciation] and depreciation policy changes we're making starts to bring that number down" and "[s]o I feel really good about where we're headed with that." Defendant Sanchez also stated that "going forward, I see the growth continuing and the headwinds really beginning to subside" and "that really helps us feel really good about where we're going to be facing in the next couple of years."  He further stated that the Company expected a $0.38 headwind to earnings per share due to accelerated depreciation, changes to residual values, and used vehicle sales in 2019 and thus "the headwinds that we're looking at for this year [ ] are a lot less than last year."

308.    These statements were highly detailed and often directly in response to analysts' inquiries.  Defendants' answers implied that, at a bare minimum, they had a reasonable basis for these claims, which they in fact lacked.

309.    ***Analysts Were Focused on the Depreciation of Ryder's Used Truck Fleet and Defendants Professed Knowledge About the Issue.***  As set forth herein, given the importance of the vehicle fleet to Ryder's business, the market focused closely on its valuation and depreciation.  Indeed, analysts issued dozens of reports addressing these subjects and consistently asked questions about the Company's residual values, used vehicle sales, and depreciation expenses.  In light of the attention that the market paid to these subjects—and the fact that Defendants spoke reassuringly on the subject dozens of times—any failure by Defendants to ensure the accuracy of their repeated statements was severely reckless at a minimum.

310.    ***Leasing Trucks is Ryder's Core Operation and the Sale of Used Trucks Comprised a Material Aspect of its Business.***  The topic of Ryder's vehicle fleet value formed the basis of many of Defendants' misstatements and omissions, and the fact that the Company's truck and tractor leasing and used vehicle sales were a core operation of Ryder's business and critical to Ryder's financial success strongly supports an inference of the Officer Defendants' scienter.

311.    As discussed above in Section IV.A., Ryder is a provider of transportation and supply chain management solutions, with most of the Company's revenue coming from its FMS business, which mainly provides truck and tractor leasing to a variety of entities.  The FMS segment accounts for approximately 60% of the Company's total revenue.  As discussed above, the vast majority of Ryder's assets are in the form of revenue-earning equipment, which mostly consists of its vehicle fleet.  According to Ryder's second quarter Form 10-Q filed on July 30, 2019, as of June 30, 2019 $10 billion of Ryder's $14.5 billion in assets was attributable to revenue-

earning equipment. The proceeds from Ryder's sale of that revenue-earning equipment was also material to the Company's cash flow. For example, according to the Company's Form 10-K filed on February 21, 2019, for the years 2016, 2017, and 2018, sales from "revenue-earning equipment" i.e., trucks, tractors, and trailers, constituted between 18% to 20% of total cash generated each year. FE 6 corroborated the importance of used truck sales to Ryder, stating that "[i]t was huge for the Company because it was bottom-line profit," and recalled seeing a report indicating that he Company made $100 million in sales in 2014 or 2015.

312.   In addition, the terms of Ryder's leasing contracts depend heavily on the residual value of the vehicle–the higher the residual value of the vehicle, the "cheaper" Ryder could price the lease, and vice versa. And because of how competitive the truck and tractor leasing market is, with many customers' main consideration being lease pricing, residual pricing was incredibly significant to how competitive Ryder's lease pricing would be in the market. According to FE 10, the price of its trucks was "extremely important" to Ryder because Ryder had "so much" dependent on the prices of Ryder's trucks.

313.   ***Defendants' Understatement of Depreciation Expense was Significant.*** The scale of Defendants' understatement of depreciation expense over the course of the Class Period was also significant, and Defendant's retroactive, partial, and belated disclosure of increasing accelerated depreciation expense with each corrective disclosure failed to fully disclose the actual depreciation expenses the Company should have reported.

314.   In its 2019 Form 10-K, Ryder reported an additional depreciation expense of <u>$317 million</u> for 2019 and a net income loss of approximately $42 million. Later, by August 2020, Ryder reported an overall additional depreciation expense of $415 million for 2019. In effect,

Ryder's additional depreciation expenses singlehandedly wiped out the Company's entire net income before income taxes for 2019.

315.    The depreciation charges in 2020 are shaping up to be even greater.   In the Company presentation that accompanied Ryder's third quarter 2019 earnings call, Ryder estimated an impact of change in "residual estimates on policy depreciation and accelerated depreciation" of $250 million for 2020.   Once again, even these drastically increased residual value adjustments were significantly understated.   As of July 29, 2020, Defendants projected a further impact of changed residual estimates of $520 million for 2020, roughly $475-480 million over early 2019 estimates and still $270 million over late 2019 residual estimates.

316.    These depreciation charges had, and continue to have, a disastrous effect on the Company's finances.   For each quarter beginning the third quarter 2019, Ryder has reported at least a 148.1% year-over-year decrease in GAAP EPS.   Similarly, EBIT has declined at least 100% each quarter year-over-year.

317.    ***Defendants Sanchez, Garcia, and Cooke Made Significant Insider Sales of Personally-Held Ryder Stock.***   Officer Defendants Sanchez, Garcia,  and Cooke were among the highest-ranking executives at Ryder during the Class Period, and in the case of Defendants Sanchez and Garcia, exercised control over, and signed, the Company's public filings with the SEC.   All three Officer Defendants spoke repeatedly to investors about Ryder's financial performance, depreciation expense, and its commercial fleet's residual values.  They therefore had the opportunity to defraud Ryder investors with respect to such.

318.    Defendants Sanchez, Garcia, and Cooke also had a significant personal financial motive to make false statements to investors about Ryder's fleet's residual values.   First, Defendants greatly benefitted from the sale of personally-held stock at artificially inflated prices.

114

Defendant Sanchez and Cooke, in particular, sold over $6.6 and $3.8 million, respectively, worth of personally held stock in the three years preceding the first corrective disclosure. The sales made by Defendants Sanchez, Garcia, and Cooke are set forth in the following chart.

| Defendant Sanchez | | | |
|---|---|---|---|
| **Date** | **Shares Sold** | **Share Price** | **Total Value** |
| 05/24/2016 | 37,550 | $68.05 | $2,555,360.11 |
| 08/04/2017 | 26,275 | $72.43 | $1,902,995.78 |
| 08/07/2018 | 27,830 | $78.04 | $2,171,928.34 |
| | | **Total** | **$6,630,284.23** |
| **Defendant Garcia** | | | |
| **Date** | **Shares Sold** | **Price** | **Total Value** |
| 02/19/2016 | 2,000 | 56.38 | $112,753.60 |
| 02/15/2017 | 2,205 | 78.83 | $173,827.65 |
| 07/30/2018 | 3,412 | 76.82 | $262,110.18 |
| | | **Total** | **$548,691.43** |
| **Defendant Cooke** | | | |
| **Date** | **Shares Sold** | **Price** | **Total Value** |
| 11/14/2016 | 6,000 | $79.27 | $475,615.80 |
| 7/31/2017 | 9,650 | $72.75 | $702,052.94 |
| 10/31/2017 | 32,328 | $81.46 | $2,633,542.32 |
| | | **Total** | **$3,811,211.06** |

319.    Further, none of these executives used a "Rule 10b5-1 plan" to execute these trades. In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5- 1, which provides that a person will be deemed to have traded "on the basis of" material, nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade.  Previously, courts had split on whether simple possession of material, nonpublic information at the time of the trade was a sufficient basis for imposing liability, and some courts had held that liability attached to a trade only if the insider "used" inside information in making the trade.  *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51, 716, at 51,727 (Aug. 24, 2000).  To provide a safe harbor under the "aware of" standard, the SEC created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 Trading Plans").  *See id.* at 51,727-28. Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability only if it is entered into by an insider "before becoming aware" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading. Based on Ryder's Form 4s filed with the SEC, none of Sanchez, Garcia, or Cooke's trades were made pursuant to 10b5-1 trading plans. This suspiciously contrasts with how, before the Class Period, Sanchez, Garcia, and Cooke utilized such plans.

320.    By taking advantage of the significantly inflated stock prices during the Class Period, Defendants Sanchez, Garcia, and Cooke recognized substantial windfalls.  Each of these Defendants' stock sales, discussed in more detail below, were precipitated by false and misleading statements concerning Ryder's financials and more specifically, Ryder's depreciation expense and the residual values of the Company's fleet.

321.    **Defendant Sanchez**.  Defendant Sanchez sold $6.6 million worth of personally held stock in the three years preceding the first corrective disclosure.  Defendant Sanchez's sales

of Ryder securities were suspicious in size, timing, and amount because, in each sale, he sold at least 23% of his total holdings, and each sale closely followed false or misleading statements issued by the Company or made by him, Defendant Garcia, or Defendant Cooke.

322.    For example, on May 19, 2016, Ryder held a conference call with analysts and investors as part of its 2016 investors day, five days before Defendant Sanchez sold 37,550 shares of Ryder stock (or 36% of his total shares) at $68.05.  During the May 19, 2016 call, Defendant Garcia told investors that Ryder's residual values would remain flat over the next several years. Then, more than a year later, on July 26, 2017, less than 10 days before Defendant Sanchez sold 26,275 Ryder shares (or 25% of his total shares) at $72.43, Defendant Garcia told the market that his "views about the residual impact [were] still there," referencing the guidance that Defendants Sanchez and Garcia had given the prior quarter that investors should expect "something similar" to the residual value drop in 2017.

323.    Finally, on July 25, 2018, less than two weeks before Defendant Sanchez sold over 27,000 shares of Ryder stock (or 23% of his total shares) at $78.04, Sanchez told the market that Ryder would "still be able to generate some nice earnings growth" despite 2019 depreciation expense "in that $40 million to $45 million range."

324.    **Defendant Garcia**.  Defendant Garcia sold almost $550,000 of personally held Ryder stock in the years preceding the first corrective disclosure.  Defendant Garcia's sales were suspicious in size, timing, and amount as in each sale he sold at least 9.5% of his total holdings, and each sale closely followed false or misleading statements issued by the Company or made by him, Defendant Sanchez, or Defendant Cooke.

325.    On February 2, 2016, two and a half weeks before Defendant Garcia sold 2,000 shares of Ryder stock (or 9.5% of his total shares) at $56.38, the Company issued a press release

announcing its financial and operating results for the fourth quarter and full year ended December 31, 2015.  In that press release, Ryder stated that the Company's fourth quarter earnings benefitted from "lower depreciation associated with increased residual values."

326.    On February 14, 2017, just one day before Defendant Garcia sold 2,205 shares of Ryder stock (or 18.1% of his total shares) at $78.83, Ryder filed its annual report with the SEC on Form 10-K.  In that 2016 Form 10-K Ryder reported that depreciation expense increased 6% in 2016 and increased 7% in 2015 and stated that "[t]he increases in both years were partially offset by $35 million and $40 million, respectively, from increases in residual values."  The Company also stated that "[f]ull service lease and commercial rental results benefited from lower depreciation of $35 million due to residual value changes implemented January 1, 2016."  Finally, on July 25, 2018, five days before Garcia sold 3,412 shares of Ryder stock (18.2% of all shares), Defendant Sanchez claimed that while depreciation would remain a headwind in 2019 Ryder should "still be able to generate some nice earnings growth . . .  driven by the contractual parts of the business."

327.    **Defendant Cooke**.  Defendant Cooke sold more than $3.8 million of personally held Ryder stock, virtually all of his vested shares, in the years preceding the first corrective disclosure.  Defendant Cooke's sales were suspicious in size, timing, and amount as in each sale he sold at least 33.6% of his total holdings, and each sale closely followed false or misleading statements issued by the Company or made by him, Defendant Sanchez, or Defendant Garcia.

328.    For example, on November 8, 2016, just six days before Defendant Cooke sold 6,000 shares of Ryder stock (or 33.6% of his total shares) at $79.27 for proceeds of $475,615, Defendants participated in the Stephens Fall Investor Conference.  During the conference,

Defendant Garcia stated that the decline in used truck prices that the Company has experienced "will not result in us changing residuals right now."

329.    On July 31, 2017, just five days after Ryder filed its quarterly report with the SEC on Form 10-Q, which contained materially misstated financial results as discussed above in ¶¶225-26, Defendant Cooke sold 9,650 shares of Ryder stock (or 77% of his total shares) at $72.75 for proceeds of $702,062.

330.    Finally, On October 31, 2017, just six days after Ryder issued its press release announcing its financial and operating results for its third quarter 2017, which contained materially misstated financial results as discussed above in ¶¶229-230, Defendant Cooke made his largest, by far, stock sale during his tenure at the Company and sold  32,328 Ryder shares (or 91.8% of his total shares) at $81.46 (near its Class Period high) for proceeds of $2,633,542.

331.    ***Higher Residual Values Significantly Boosted the Officer Defendants' Executive Compensation.***  Further, the vast majority of the Officer Defendants' compensation during the Class Period was performance-based and tied to the overall success of the Company, with base salary never exceeding 14% of total compensation at any point during the Class Period.  Thus, the Officer Defendants' statements regarding residual values directly and indirectly affected their compensation over the Class Period.  As discussed above in Section IV.B., an asset's residual (or salvage) value is integral to a company's calculation of depreciation expense.  Depreciation expense, in turn, reduces net income (or earnings) under GAAP.  Thus, as alleged herein, inflated residual values artificially lowered Ryder's calculated depreciation expense and thus increased net income during the Class Period.  Further, as discussed above in SectionIV.C., higher residual values lowered the prices of leases, allowing Ryder to better compete on leasing prices with its largest competitors – increasing revenue in the process.

332.    According to Ryder's annual Definitive Proxy Statement, filed on March 18, 2019, Ryder's executive compensation program, which applied to Defendants Sanchez, Garcia, and Cooke, consisted of three principle elements: (1) Base Salary; (2) Annual Cash Incentive Awards ("cash incentive"); and (3) Long Term Incentive Program ("LTIP"). Each is explained in further detail below.

333.    Each executive's base salary, paid in cash, is established based on "experience, market, performance, tenure, responsibility, and succession potential" and is "reviewed annually based on market position and individual qualifications." Base salary represented a small percentage of the executives' overall compensation.

334.    Each executive's cash incentive was determined based on two factors: 60% of the cash incentive was based on the Company's comparable earnings per share ("EPS"); and the remaining 40% was based on the Company's Operating Revenue[23].

335.    Lastly, but most importantly, the executive's LTIP was determined based on three factors:

    a.    60% on Performance Based Restricted Stock Rights ("PBRSRs), which consisted of the Return on Capital over Cost of Capital Spread (3-year performance period) ("Capital Return[24]") and the "Strategic Revenue Growth (3-year performance period). These PBRSRs vested immediately. The PBRSR was also subject to a total shareholder return ("TSR") metric, which compared Ryder stock price to industry competitors.

    b.    30% on Stock Options based on 3-year ratable vesting; and

    c.    10% on Restricted Stock based on 3-year ratable vesting.

---

[23]  According to Ryder's 2019 Proxy Statement, "Operating Revenue [] is defined as total revenue for [the Company] excluding any (1) fuel and (2) subcontracted transportation."

[24]  The Company defined the ROC/COC spread as "the difference between adjusted ROC and the weighted average cost of capital. The Company's adjusted ROC is defined as the Company's net (after-tax) earnings from continuing operations, excluding restructuring and other items (which are the same items adjusted from comparable earnings as disclosed in our SEC filings), as a percentage of the sum of the Company's 12 month average (i) debt, (ii) off-balance sheet debt and (iii) shareholders' equity."

336.    As indicated by the structure of their compensation packages, the Officer Defendants benefitted personally from reporting artificially high operating income, net income and revenue.  For example, 60% of the executives' cash incentive was based off EPS or earnings per share.  EPS is determined by dividing net income (or net earnings) by the number of outstanding shares.  Thus, a higher net income would result in a higher EPS, increasing the Officer Defendants' cash incentive.

337.    Further, the Company's LTIP program heavily relied on stock performance and stock options to incentivize the Officer Defendants.  The market analyzes stock based on several financial metrics, which often rely on operating income, net income or earnings as a key variable.[25] As described above, The LTIP program consisted of three categories: performance based restricted stock rights, stock options, and restricted stock units.  The PBRSRs, which vest after a three-year performance period, were determined by both the Company's Capital Return ratios and Strategic Revenue Growth.  The Company's Capital Return ratio is determined by dividing adjusted net earnings over liabilities including on-balance sheet debt, off-balance debt, and shareholder's equity.  Adjusted net earnings are derivative of net income, thus higher net income would result in higher PBRSRs.  The PBRSRs reward could also be modified by "TRS" to the extent of a 15% reward or 15% penalty to the executive's PBRSRs award.  According to Ryder's proxy statements:

338.    TSR is calculated for Ryder and each peer company based on the percentage change in Ryder's stock price from the average closing price of the last ten trading days prior to the beginning of the relevant performance period to the average of the last ten trading days prior to the end of the relevant performance period, assuming reinvestment of dividends.  The custom peer group for 2018 consisted of 26 companies plus Ryder and included the 13 companies in Ryder's

---

[25] *See e.g.,* Stephens May 1, 2019 Ryder System, Inc. research brief. Stephens focuses almost exclusively on EPS, operating EPS, pre-tax income, and adjusted EPS.

2018 Industry Peer Group plus additional related companies (provided in the chart below) that are subject to similar market conditions and economic recovery cycles as Ryder.  At the end of the three-year performance period, the companies in the custom peer group are sorted by TSR performance, and the 25th, 50th and 75th percentiles of the custom peer group are calculated. Ryder's TSR performance is compared to the TSR of the companies in the custom peer group.  The number of accrued PBRSRs will then be adjusted up or down by a percentage based on the TSR relative percentile rank as shown below; provided, however, that (i) in no event will the TSR modifier adjustment result in accrual of more than 200% of the target PBRSRs and (ii) even if the Company's TSR rank is above the 50th percentile, no positive TSR modifier will be applied if the Company's TSR is negative.

339.     TSR is meant to link executive compensation to Ryder's stock performance as compared to its largest competitors.  Similarly, stock options attempt to align executive and stockholder interests by incentivizing executives to increase the price of stock to benefit from the exercise price of the stock option.  Restricted stock units also incentivize executives to maximize the price of the Company's common stock at least until the restricted stock units vest.  Thus, Defendants Sanchez, Garcia, and Cooke had a pecuniary interest in maximizing the stock price, particularly by increasing the reported EPS numbers.

340.     The Officer Defendants also benefitted personally from the lower lease prices caused by the artificially inflated residual values.  The ability to lower prices is key to increasing sales volume.  Operating Revenue and Strategic Growth Revenue are key metrics in determining the Defendants' cash incentive compensation as well as their PBRSR grants.  Higher revenues correlated to higher stock prices, which for all the reasons mentioned above, benefitted the Officer Defendants financially in a number of ways.

341.    As a result, Defendants Sanchez, Garcia and Cooke personally benefited from their material misstatements of Ryder's financial condition by obtaining the compensation, including incentive-based compensation, set forth below:

| Defendant Sanchez | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Salary ($) | Stock Awards ($) | Options Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All other Compensation ($) | Total ($) |
| **2019** | 870,468 | 3,897,431 | 860,002 | 501,247 | 196,915 | 278,788 | **6,604,851** |
| **2018** | 820,080 | 3,558,155 | 1,230,369 | 1,595,259 | — | 190,013 | **7,393,876** |
| **2017** | 804,000 | 2,140,487 | 1,640,009 | 1,309,625 | 101,879 | 218,186 | **6,214,186** |
| **2016** | 785,225 | 1,351,441 | 1,539,987 | 1,207,635 | 65,069 | 156,329 | **5,105,686** |
| **2015** | 768,825 | 1,628,493 | 1,539,956 | 1,520,137 | — | 183,526 | **5,640,937** |
| Defendant Garcia | | | | | | | |
| Year | Salary ($) | Stock Awards ($) | Options Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All other Compensation ($) | Total ($) |
| **2019** | 166,667 | 90,876 | — | — | 115,698 | 1,503,808 | **1,877,049** |
| **2018** | 500,000 | 1,028,202 | 360,113 | 509,282 | — | 85,698 | **2,483,295** |
| **2017** | 492,500 | 601,366 | 480,031 | 410,686 | 62,842 | 87,804 | **2,135,229** |
| **2016** | 479,783 | 337,208 | 392,027 | 351,234 | 42,095 | 78,347 | **1,680,694** |
| **2015** | 440,800 | 372,679 | 359,954 | 424,426 | — | 80,825 | **1,678,684** |
| Defendant Cooke | | | | | | | |

| Year | Salary ($) | Stock Awards ($) | Options Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All other Compensation ($) | Total ($) |
|------|-----------|------------------|--------------------|----------------------------------|------------------------------------------------------------------|---------------------------|-----------|
| 2019 | 527,358 | 1,228,413 | 270,002 | — | — | 2,188,591 | 4,214,364 |
| 2018 | 566,825 | 1,147,463 | 405,127 | 708,217 | — | 97,427 | 2,925,059 |
| 2017 | 555,000 | 666,620 | 539,966 | 558,692 | — | 100,151 | 2,420,429 |
| 2016 | 543,750 | 353,692 | 399,982 | 456,462 | — | 89,800 | 1,843,686 |
| 2015 | 533,050 | 424,134 | 400,010 | 600,559 | — | 95,801 | 2,053,554 |

## IX.    CLASS ACTION ALLEGATIONS

342.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded common stock of Ryder during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Ryder and their families and affiliates.

343.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of January 31, 2020, Ryder had over 53 million shares of common stock outstanding, owned by hundreds or thousands of investors.

344.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.    Whether Defendants violated the Exchange Act;

b.    Whether Defendants omitted and/or misrepresented material facts;

c.    Whether Defendants' statements omitted material facts necessary in order

124

to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      Whether the Officer Defendants are personally liable for the alleged misrepresentations and omissions described herein;

e.      Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

f.      Whether Defendants' conduct impacted the price of Ryder common stock;

g.      Whether Defendants' conduct caused the members of the Class to sustain damages; and

h.      The extent of damage sustained by Class members and the appropriate measure of damages.

345.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

346.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

347.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## X.      **INAPPLICABILITY OF STATUTORY SAFE HARBOR**

348.    Ryder's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

349.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer

of Ryder who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI.    PRESUMPTION OF RELIANCE

350.    At all relevant times, the market for Ryder common stock was an efficient market for the following reasons, among others:

a.    Ryder common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, Ryder filed periodic public reports with the SEC and the NYSE;

c.    Ryder regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    Ryder was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

351.    As a result of the foregoing, the market for Ryder common stock promptly digested current information regarding Ryder from all publicly available sources and reflected such

information in the price of Ryder common stock.  Under these circumstances, all purchasers of Ryder common stock during the Class Period suffered similar injury through their purchase of Ryder common stock at artificially inflated prices and the presumption of reliance applies.

352.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Ryder's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance residual values have on the accounting for depreciation expense and the impact a change in residual values has on the Company's earnings, that requirement is satisfied here.

## XII.   CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

353.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

354.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Ryder common stock at artificially inflated prices.

355.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Ryder common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

356.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

357.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

358.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Ryder's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

359.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Ryder common stock.  Lead Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Ryder common stock had been artificially inflated by Defendants' fraudulent course of conduct.

360.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

361.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act
Against the Officer Defendants**

362.     Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

363.     The Officer Defendants acted as controlling persons of Ryder within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Ryder, the Officer Defendants had the power and ability to control the actions of Ryder and its employees.  By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses

incurred in this action, including attorneys' fees and expert fees; and

    D. Awarding such equitable/injunctive or other further relief as the Court

may deem just and proper.

## XIV. <u>JURY DEMAND</u>

  Lead Plaintiffs demand a trial by jury.

DATED: October 5, 2020     Respectfully submitted,

          **KLAUSNER KAUFMAN JENSEN
           & LEVINSON**

          */s/ Robert D. Klausner*
          Robert D. Klausner
          Florida Bar Number 244082
          Stuart A. Kaufman
          Florida Bar Number 979211
          7080 NW 4th Street
          Plantation, FL 33317
          Tel: (954) 916-1202
          Fax: (954) 916-1232
          bob@robertdklausner.com
          stu@robertdklausner.com

          *Liaison Counsel for Lead Plaintiffs the State of
          Alaska, Alaska Permanent Fund; the City of Fort
          Lauderdale General Employees' Retirement
          System; and the City of Plantation Police Officers
          Pension Fund*

          **BERNSTEIN LITOWITZ BERGER
           & GROSSMANN LLP**
          Salvatore Graziano, *pro hac vice* forthcoming
          Hannah Ross, *pro hac vice* forthcoming
          John Rizio-Hamilton, *pro hac vice* forthcoming
          Brenna Nelinson, *pro hac vice* forthcoming
          Matthew Traylor, *pro hac vice* forthcoming
          1251 Avenue of the Americas
          New York, NY 10020
          Tel: (212) 554-1400
          Fax: (212) 554-1444
          salvatore@blbglaw.com

hannah@blbglaw.com
johnr@blbglaw.com
brenna.nelinson@blbglaw.com
matthew.traylor@blbglaw.com

*Counsel for Lead Plaintiffs the State of Alaska,
Alaska Permanent Fund; the City of Fort
Lauderdale General Employees' Retirement
System; and the City of Plantation Police Officers
Pension Fund*