**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

STATE OF ALASKA, ALASKA
PERMANENT FUND, THE CITY OF FORT
LAUDERDALE GENERAL EMPLOYEES'
RETIREMENT SYSTEM, and THE CITY
OF PLANTATION POLICE OFFICERS
PENSION FUND, On Behalf of Themselves
and All Others Similarly Situated,

                      *Plaintiffs*,

          v.

RYDER SYSTEM, INC., ROBERT E.
SANCHEZ, ART A. GARCIA, and DENNIS
C. COOKE,

                      *Defendants*.

Civil Action No. 1:20-cv-22109-AMC

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page(s)**

I.  PRELIMINARY STATEMENT ...................................................................................... 1

II. STATEMENT OF FACTS ............................................................................................. 4

    A.    GAAP Required Ryder to Accurately Report the Residual Values and
        Depreciation Expenses of Its Vehicles ................................................................... 4

    B.    Ryder Told Investors It Based Its Estimated Residual Values on Current
        Market Values and Trends ...................................................................................... 5

    C.    Ryder's Overstated Residual Values, and Understated Depreciation
        Expense, Artificially Inflated Ryder's Reported GAAP Financials ...................... 6

        1.    By 2012, Ryder Knew Its Vehicles with Navistar International
            MaxxForce Engines Were Defective .......................................................... 7

        2.    Starting in 2015, Ryder Saw a Sharp, Historic and Prolonged
            Decline in the Market Prices for Used Vehicles ........................................ 9

        3.    Ryder Executives Repeatedly Voiced Concerns to Defendants ............... 11

    D.    The Truth Emerges ............................................................................................... 13

III. ARGUMENT ............................................................................................................... 14

    A.    The Complaint Adequately Alleges that Defendants Made Materially
        False and Misleading Statements .......................................................................... 14

        1.    Plaintiffs Pled Ryder Overstated Its Residual Value Estimates and
            Net Earnings and Understated Its Depreciation Expense ......................... 15

            a.    Defendants' Residual Value Estimates, Depreciation Expense, and
                Net Earnings Are Not Inactionable Opinions .............................. 19

            b.    Defendants' Residual Value Estimates, Depreciation Expenses,
                and Net Earnings Are Excluded from the Safe Harbor ................. 22

            c.    Defendants' Residual Value Estimates Are Not Protected by
                Cautionary Language, and Were Made with Actual Knowledge . 23

        2.    Plaintiffs Have Adequately Pled Defendants Made Materially
            False or Misleading Claims During Investor Calls and Conferences ....... 25

        3.    Plaintiffs Have Not Omitted Necessary Context from Defendants'
            False Statements ....................................................................................... 30

B.      The Complaint's Allegations Support a Strong Inference of Scienter ................ 32

      1.      Defendants Witnessed a Sharp Decline in Resale Truck Values and Were Warned that Ryder's Residual Values Were Overstated ............... 32

      2.      Defendants Were Keenly Focused on Residual Values and Depreciation ...................................................................................... 36

      3.      The Magnitude of the Write-Down Supports Scienter ........................... 37

      4.      Defendants Made $11 Million of Insider Sales of Ryder Stock .............. 38

      5.      The New CFO Promptly Saw the Need for a $1 Billion Write-Down ...................................................................................................... 39

      6.      Defendants Have Not Proven a Truth on the Market Defense ................ 39

IV.   THE COMPLAINT ADEQUATELY PLEADS CONTROL PERSON LIABILITY ......... 40

V.    CONCLUSION ............................................................................................................ 40

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abrams v. MiMedx Grp., Inc.*,
   37 F. Supp. 3d 1271 (N.D. Ga. 2014) .......................................................................................38

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008) ......................................................................................................32

*In re Acuity Brands, Inc. Sec. Litig.*,
   2019 WL 10246166 (N.D. Ga. Aug. 12, 2019) ..................................................................33, 34

*In re Adaptive Broadband Sec. Litig.*,
   2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ..............................................................................39

*In re Allaire Corp. Sec. Litig.*,
   224 F. Supp. 2d 319 (D. Mass. 2002) .................................................................................15, 16

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................................................................................37, 38

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...................................................................................21

*In re Apple Comp. Sec. Litig.*,
   886 F.2d 1109 (9th Cir.1989) ..................................................................................................40

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................................................14

*Baker v. MBNA Corp.*,
   2007 WL 2009673 (D. Del. July 6, 2007) ................................................................................23

*In re BellSouth Corp. Sec. Litig.*,
   355 F. Supp. 2d 1350 (N.D. Ga. 2005) ....................................................................................36

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) .........................................................................................19, 20

*In re Catalina Mktg. Corp. Sec. Litig.*,
   390 F. Supp. 2d 1110 (M.D. Fla. 2005) ..............................................................................15, 25

*In re Champion Enters. Inc., Sec. Litig.*,
   144 F. Supp. 2d 848 (E.D. Mich. 2001) ...................................................................................22

*In re Clarus Corp. Sec. Litig.*,
   201 F. Supp. 2d 1244 (N.D. Ga. 2002) ....................................................................................36

*Davidco Inv'rs, LLC v. Anchor Glass Container Corp.*,
  2006 WL 547989 (M.D. Fla. Mar. 6, 2006) ..............................................................34

*In re Diamond Foods, Inc., Sec. Litig.*,
  2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ..........................................................40

*Dillard v. Platform Prods. Corp.*,
  2016 WL 10586301 (S.D. Fla. Dec. 8, 2016) ...........................................................39

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)......................................................34, 35

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019) .....................................................................20

*Fait v. Regions Fin'l Corp.*,
  712 F. Supp. 2d 117 (S.D.N.Y 2010).........................................................................20

*FindWhat Inv'r Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ................................................................................14

*In re Flowers Foods, Inc. Sec. Litig.*,
  2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)......................................................25, 36

*In re ForceField Energy Inc. Sec. Litig.*,
  2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ...........................................................19

*Friedman v. Hammer*,
  2020 WL 2559549 (S.D. Fla. May 20, 2020) ......................................................24, 25

*In re Friedman's, Inc. Sec. Litig.*,
  385 F. Supp. 2d 1345 (N.D. Ga. 2005) .....................................................................33

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)......................................................................................40

*Gross v. Medaphis Corp.*,
  977 F. Supp. 1463 (N.D. Ga. 1997) ..........................................................................29

*In re Hamilton Bankcorp., Inc. Sec. Litig.*,
  194 F. Supp. 2d 1353 (S.D. Fla. 2002) .....................................................................32

*Harvey Jasper Ret. Trust v. Ivax Corp.*,
  920 F. Supp. 1260 (S.D. Fla. 1995) ..........................................................................29

*In re HD Supply Holdings Inc. Sec. Litig.*,
  341 F. Supp. 3d 1342 (N.D. Ga. 2018)......................................................................33

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ........................................................36, 37

*Holmes v. Baker*,
  166 F. Supp. 2d 1362 (S.D. Fla. 2001) ..................................................................22

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  2009 WL 3261941 (S.D. Fla. May 12, 2009) ........................................................33

*Katz v. Image Innovations Holdings*, *Inc.*,
  542 F. Supp. 2d 269 (S.D.N.Y. 2008)....................................................................37

*In re KLX, Inc. Sec. Litig.*,
  232 F. Supp. 3d 1269 (S.D. Fla. 2017) ..................................................................36

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
  2011 WL 12855820 (N.D. Ala. June 7, 2011)...................................................20, 24

*Luczak v. Nat'l Beverage Corp.*,
  812 F. App'x 915 (11th Cir. 2020) ....................................................................34, 35

*Lynn v. Helf*,
  2014 WL 5431221 (M.D. Tenn. Oct. 24, 2014) .....................................................22

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ..............................................................................34

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .................................................................................................14

*Mogensen v. Body Cent. Corp.*,
  15 F. Supp. 3d 1191 (M.D. Fla. 2014)....................................................................35

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................39, 40

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)....................................................................................36

*In re NUI Sec. Litig.*,
  314 F. Supp. 2d 388 (D.N.J. 2004) .........................................................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)........................................................................2, 19, 21, 22

*In re Paincare Holdings Sec. Litig.*,
  541 F. Supp. 2d 1283 (M.D. Fla. 2008)........................................................15, 32, 37

v

*In re Penn Treaty Am. Corp. Sec. Litig.*,
   202 F. Supp. 2d 383 (E.D. Pa. 2002) ...............................................................15, 16

*Phillips v. Sci.-Atlanta, Inc.*,
   374 F.3d 1015 (11th Cir. 2004) .......................................................................32

*In re Providian Fin. Corp. Sec. Litig.*,
   152 F. Supp. 2d 814 (E.D. Pa. 2001) ...............................................................29

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   930 F. Supp. 68 (S.D.N.Y.1996) .....................................................................24

*Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*,
   847 F. Supp. 2d 1333 (S.D. Fla. 2012) .............................................................32

*Ramirez v. Exxon Mobil Corp.*,
   334 F. Supp. 3d 832 (N.D. Tex. 2018) .............................................................19

*In re Reliance Sec. Litig.*,
   91 F. Supp. 2d 706 (D. Del. 2000)....................................................................39

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..............................................................................34

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ............................................................................21

*In re Sci. Atlanta, Inc. Sec. Litig.*,
   754 F. Supp. 2d 1339 (N.D. Ga. 2010), *aff'd sub nom. Phillips v. Sci.-Atlanta,
   Inc.*, 489 F. App'x 339 (11th Cir. 2012) .................................................................32

*SEC v. Merchant Capital, LLC*,
   483 F.3d 747 (11th Cir. 2007) .........................................................................24

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992)..............................................................................30

*Slayton* v. *American Express Co.*,
   604 F.3d 758 (2d Cir. 2010)..............................................................................23

*In re Stellent, Inc. Sec. Litig.*,
   326 F. Supp. 2d 970 (D. Minn. 2004)...............................................................40

*In re Sunbeam Sec. Litig.*,
   89 F. Supp. 2d 1326 (S.D. Fla. 1999) ...............................................22, 29, 38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...............................................................................32, 38

*In re Towne Servs., Inc. Sec. Litig.*,
  184 F. Supp. 2d 1308 (N.D. Ga. 2001) ..................................................................15

*Tung v. Dycom Indus., Inc.*,
  454 F. Supp. 3d 1244 (S.D. Fla. 2020) ............................................................14, 35

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)....................................................................29

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011).....................................................................34

*Waterford Twp. Gen. Emps. Ret. Sys.* v. *BankUnited Fin. Corp.*,
  2010 WL 133257 (S.D. Fla. Mar. 30, 2010)...........................................................37

*In re World Access, Inc. Sec. Litig.*,
  119 F. Supp. 2d 1348 (N.D. Ga. 2000) ...................................................................36

*Worthy v. City of Phenix City*,
  930 F.3d 1206 (11th Cir. 2019) ..............................................................................14

*Ziemba v. Cascade Int'l, Inc.*,
  256 F.3d 1194 (11th Cir. 2001) ..............................................................................36

*Zucco Partners v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..................................................................................39

## STATUTES AND RULES

15 U.S.C. § 77z-2(b)(2)(A).................................................................................2, 22

15 U.S.C. § 78t(a) ......................................................................................................40

15 U.S.C. § 78u–5(c)(1)....................................................................................22, 23, 25

17 CFR § 240.10b–5 ...................................................................................................21

Lead Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss Lead Plaintiffs' Amended Complaint.[1]

## I. PRELIMINARY STATEMENT

This case concerns Ryder's inflation of the reported value of its rental truck fleet through accounting manipulation. Ryder's value to its shareholders is tied to its billions of dollars-worth of rental vehicles. But every Ryder vehicle is an asset whose value deteriorates. Each year that a truck ages or requires significant service, and whenever the resale market for trucks materially declines, the truck's likely resale value at the end of its useful life (its "residual value") declines. Ryder had a duty under the securities laws and Generally Accepted Accounting Principles ("GAAP") to accurately report its residual values. Indeed, Ryder told its investors it did just that.

Defendants breached that duty. By artificially inflating the vehicles' estimated residual values, Defendants artificially decreased the amount of reported depreciation expense and, as a result, made Ryder's net earnings and overall financial performance appear better than they were. From mid-2015 through early 2020, Ryder materially overstated its residual values, understated its depreciation expense, and overstated Ryder's net earnings. Through this manipulation, Defendants artificially inflated Ryder's stock price and profited by selling $11 million of their personally-held Ryder stock at inflated prices while hiding the truth from investors.

Defendants concealed the truth from the market until late 2019 and early 2020, after Defendant Garcia departed as Ryder's CFO. Ryder's new CFO caused the Company, almost immediately, to take the necessary $1 billion reduction in its residual value estimates to conform its reported financial results to reality. In response to this news, Ryder's stock price fell dramatically. As analysts wrote, Ryder was "paying the price for years of underpricing its leases to drive growth" by previously using a depreciation methodology that had "introduce[d] a significant distortion into earnings." And, as J.P. Morgan added, Ryder's taking of a "big bath" on its residual values "confirms Ryder was over-earning by a significant amount in prior years."

---

[1] Lead Plaintiffs are The State of Alaska, Alaska Permanent Fund; The City of Ft. Lauderdale General Employees' Retirement System; and The City of Plantation Police Officers Pension Fund ("Plaintiffs"). Cites to "¶__" are to paragraphs of Plaintiffs' Amended Complaint, ECF No. 28 (the "Complaint"), and cites to "D.Br." are to Defendants' memorandum of law in support of their motion to dismiss the Complaint, ECF No. 42. Citations to Pl.Ex. are to Plaintiffs' Exhibits to the Declaration of Robert D. Klausner, filed herewith. All emphasis in quotations is added.

Defendants assert that Plaintiffs' case is a mere "fraud by hindsight," but it is not. Defendants do not dispute that they have long known about the two facts that they admit required Ryder to reduce its residual values earlier by $1 billion in 2019 and early 2020. First, as Ryder repeatedly admits in its brief, the Company witnessed a sharp and prolonged decline in its vehicles' resale values that began in mid-2015 and persisted until early 2020. Second, Ryder does not dispute that the value of its trucks fell sharply as Ryder learned (as Plaintiffs allege, by 2015 at the latest) that large numbers of Ryder's vehicles suffered from defects in their new "MaxxForce" reduced-emissions engines. The engines were at risk of seizing up, and the defects were impossible to repair, which rendered the trucks unsellable "lemons" on Ryder's used vehicle lots.

Defendants argue that Ryder's residual value estimates are mere opinions and thus not actionable. They also try to make it sound as if accurately estimating the prices at which Ryder's vehicles will sell in the future requires a crystal ball. But, under the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 185-86 (2015), statements of opinion are actionable if the supporting fact on which they are based is untrue. Ryder told investors that its residual value estimates were based, in part, on current market prices and trends. Indeed, there is no better predictor of the price at which one can sell an asset in the future than the current market price of similar assets. But Ryder's reported residual values did not reflect market reality. Ryder's vehicles with reduced-emissions engines were ticking time bombs that the Company knew would lead to massive losses. Ryder's new CFO thus saw, almost immediately after he joined the Company in 2019, that Ryder's residual values were overstated by $1 billion.

Defendants also claim that Ryder's residual value estimates are protected by the safe harbor for forward-looking statements under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). They are not. Congress made clear that the PSLRA safe harbor "shall not apply to a forward-looking statement ... that is included in a financial statement prepared in accordance with generally accepted accounting principles." 15 U.S.C. § 77z-2(b)(2)(A). Plaintiffs allege that Ryder: (i) overstated its residual value estimates and (ii) understated its depreciation expense, which (iii) overstated numerous additional Ryder financial metrics including total assets, comprehensive income, and net earnings. Ryder claimed to report all of these metrics in

accordance with GAAP, and the PSLRA safe harbor does not apply to them as a matter of law. The Complaint also alleges that Ryder's residual value estimates were made with "actual knowledge" of their falsity, which removes them from safe harbor protection.

Defendants assert that Ryder's disclosure during the Class Period of approximately $300 million in accelerated depreciation expense and valuation adjustments undermines an inference of fraud and shows that Ryder was promptly updating its depreciation expenses and residual values. To the contrary, the $300 million in adjustments between 2016 and 2018 falsely reassured investors that Ryder was making all necessary changes to its residual values and depreciation expenses to reflect current market prices and trends. But, in reality, the $300 million in adjustments over three years was just the tip of a much larger iceberg. ¶¶138-42. This case concerns the far greater $1 billion in depreciation expense that Ryder hid from investors.

Defendants further assert that the Complaint fails to allege facts that give rise to a strong inference of a culpable mental state, or scienter. Not so. The Complaint pleads a litany of facts that, considered collectively, allege scienter. These include that: (1) Ryder internally discussed the need for a write-down of its assets in 2015 or 2016, and numerous Ryder executives warned Defendants about the declining market prices of Ryder's used vehicles and the need for Ryder to reduce its vehicle prices, but Defendants refused (¶103); (2) the costly defect in Ryder's vehicles with MaxxForce lower-emissions engines was highly problematic and well-known within Ryder, Ryder's internal reports identified the specific type of engines in each Ryder vehicle, and those reports showed material numbers of those vehicles (*id*.); (3) to hide Ryder's declining residual values, Ryder violated GAAP by overstating its residual value estimates and net earnings, and understated its depreciation expense (¶38-51, 95); (4) the $1 billion magnitude of the residual value estimate changes was immediately apparent to Ryder's new CFO (¶¶138-57); and (5) Defendants personally benefited from the fraud through their sale of $11 million of Ryder stock (¶¶317-30). These facts support a strong inference that Defendants acted with at least severe recklessness, if not actual intent. For the reasons set forth herein, Defendants' motion should be denied.

3

## II.   STATEMENT OF FACTS

### A.   GAAP Required Ryder to Accurately Report the Residual Values and Depreciation Expenses of Its Vehicles

Ryder has the largest commercial vehicle fleet in North America and most of Ryder's assets are tied up in its revenue-earning fleet of commercial vehicles. ¶2. According to Ryder's 2019 Annual Report, approximately $10.43 billion of Ryder's $14.76 billion in total assets was associated with Ryder's revenue-earning equipment as of December 31, 2019. *Id.* However, as Ryder only belatedly disclosed, the residual value of that equipment was overstated by $1 billion.

A residual value estimate for the Company's vehicles reflects "the value at which Ryder believes it will be able to sell [such] vehicles at the end of their useful lives." ¶1. The residual values of Ryder's vehicles are critical to almost all aspects of Ryder's core business, as a vehicle's residual value is a key component of the price of the lease that Ryder offered to consumers. ¶3. The higher a residual value is, the less expensive the vehicle lease is for the consumer, and the more competitive Ryder can be on lease pricing. But overstatement of Ryder's residual values also directly impacts Ryder's reported financial results, including by overstating Ryder's total assets and net earnings, and understating Ryder's depreciation expense. ¶¶55-57.

Compliance with GAAP is a fundamental obligation of publicly-traded companies like Ryder. ¶38. Under the concept of the "matching principle" that underlies GAAP, Ryder was required to recognize expenses associated with its vehicle fleet in the same reporting periods that it recognized the revenue generated by such equipment. ¶41. One such expense was depreciation. ¶43. Depreciation refers to a reduction in the value of an asset with the passage of time, often reflected in the relevant financial statements ratably over the life of the asset. *Id.* Under the matching principle, recognizing revenue or expenses at the wrong time may distort an entity's financial results relative to GAAP and depict an improper statement of financial position for the business at any given point in time. ¶41.

In its SEC filings, Ryder stated that the reported depreciation expense on its revenue-earning equipment was based on the straight-line method. ¶45. This is done by subtracting an asset's estimated residual value from its cost, and dividing the remaining amount by its useful life:

$$\text{Depreciation Expense} = \frac{\text{Vehicle Cost} - \text{Estimated Residual Value}}{\text{Useful Life}}$$

For example, if Ryder purchases a truck for $100,000, and estimates that it will lease out the truck for eight years (its Useful Life), and then be able to sell the truck as a used vehicle for $60,000 (its Estimated Residual Value), the annual depreciation that Ryder reports as an expense to its investors each year of the vehicle's useful life is $5,000:

$$\$5,000/\text{year} = \frac{\$100,000 - \$60,000}{8 \text{ years}}$$

Thus, by increasing its vehicles' estimated residual values, Ryder can decrease the amount of depreciation expense it must report to shareholders and make it appear as if its net earnings, and overall financial performance, are better than they truly are. Ryder reported cumulative depreciation expense of more than $1 billion in each year during the Class Period. Accordingly, the assumptions that Ryder used to compute the depreciation expense for its equipment – specifically the useful lives and residual values of the equipment – were critical to the overall accuracy of Ryder's reported financial results. ¶46.

**B.      Ryder Told Investors It Based Its Estimated Residual Values on Current Market Values and Trends**

To set residual values and calculate depreciation expense in compliance with GAAP, Ryder was required to use the most accurate and timely information the Company had. ¶48. During the Class Period, Ryder told investors that it calculated its residual values in two ways: *first*, by employing a "five-year rolling average" of actual used vehicle sales prices as the basis for estimating residual values ("policy depreciation"), ¶101, and *second*, by adjusting the residual values and useful lives of its vehicles "on an annual basis or more often if deemed necessary" based on, among other things, "historical market price changes" and "<u>current</u> and expected future market <u>price trends</u>," as explained in Ryder's SEC filings as a "critical accounting estimate" since at least 2015. ¶102. As Sanchez also claimed on July 25, 2018, Ryder's leasing program was "more derisked than it was historically" because Ryder had lowered its residuals to "<u>generally the current levels that we're seeing today as opposed to using our normal rolling 5-year average</u>." ¶249.

Ryder also described its use of "accelerated depreciation" to "<u>monitor market trends throughout the year</u> and assess estimates of residual values of vehicles expected to be made available for sale in the near-term (generally 12 to 24 months)" such that Ryder "may adjust estimates of residual values for these vehicles to reflect <u>current market rates</u>." Pl.Ex. 1. On March

5, 2019, Defendant Sanchez also claimed that: "every year, we've looked out 18 months and said, all right, for the trucks that I think I'm going to sell in the next 18 months, which I probably have more certainty around what the price is going to be, I'm going to accelerate the depreciation on those to the current market value in order to get me down quicker to get to really mark-to-market, if you will, those units." Pl.Ex. 2. *First*, this is directly contrary to Defendants' assertion that Ryder's methodology was "not based on 'mark to market' pricing." D.Br. at 7. *Second*, all such statements led investors to believe that Ryder was accurately recording residual values given current market information and trends, which were used to compute and report depreciation expense (and earnings). That was not the case. ¶50.

**C.  Ryder's Overstated Residual Values, and Understated Depreciation Expense, Artificially Inflated Ryder's Reported GAAP Financials**

For each year between 2011 and 2016, Ryder adjusted the residual values of revenue-generating equipment upwards between $10 million and $40 million based on "historically high" prices. ¶¶4, 88-90, 279. Since increasing its assets' residual values enabled Ryder to decrease the depreciation expense it recorded on these assets each year, this increased Ryder's earnings on a dollar-for-dollar basis. ¶¶90-92. Ryder's upward residual value adjustments resulted in a cumulative benefit of $158 million over the six-year span of 2011 through 2016. ¶90.

However, as the market for used Ryder vehicles plummeted starting in 2015, Ryder misrepresented Ryder's true financial condition by overstating the residual value of its trucking fleet, which allowed the Company to record lower depreciation expense on those assets each year, and artificially inflated Ryder's earnings. ¶50. As FE1[2] explained, Ryder maintained unrealistically high residual values to improve the competitiveness of its lease and rental pricing vis-à-vis other leasing companies like Penske. ¶65. FE1 explained that this was done to try to achieve unrealistic lease and rental sales goals but that, at the end of the truck leases, Ryder was left with returned trucks that had unrealistic depreciation still attached to them. *Id*. As FE1 said, the remaining depreciation would be far higher than the true market value of the truck and so the truck would suffer a loss when sold. *Id*. He said that presenting unrealistic revenue forecasts to

---

[2] The Complaint identifies Ryder former employees ("FEs") numerically (e.g., FE1) and for ease of reference uses male pronouns for all FEs irrespective of gender. FE1 was a Ryder Inside Account Manager from before the Class Period through the end of 2017. ¶64.

6

Wall Street was used to try to drive the stock price up with little regard for the fact that earnings would suffer later on from the overvalued assets, which would ultimately require a loss on the sale of the trucks, a corresponding write down and an earnings loss and drop in stock value. *Id*.

At the end of the Class Period in 2019 and 2020, however, Ryder disclosed its need to lower the residual values of its vehicles by a collective $1 billion.  When Ryder reduced its residual value estimates by $844 million in the third quarter of 2019, Defendant Sanchez attributed it to how: (i) the residual values of the vehicles have "been negatively impacted by maintenance costs on the early model years of the <u>post-2010 emissions technology</u>"; and (ii) "these vehicles as they come off lease are now expected to be sold in a <u>down market</u> at below price levels." ¶95. Ryder was aware of those two facts by the start of the Class Period and witnessed repeated, contemporaneous reminders of them. Yet, Ryder inflated its residual values, understated its depreciation expense, and overstated its net earnings from 2015 through 2020. *E.g*., ¶¶207-09.

### 1. By 2012, Ryder Knew Its Vehicles with Navistar International MaxxForce Engines Were Defective

In 2010, the U.S. Environmental Protection Agency passed historic emissions regulations meant to substantially lower the amount of air pollution caused by large commercial vehicles. ¶7. During the Class Period, Ryder saw significant increased costs due to problems with vehicles that had new engines that were designed to comply with the regulations. ¶66. This included serious, unfixable defects in the MaxxForce engine manufactured by Navistar International. *Id*. Navistar International introduced the MaxxForce engines in 2008, and their exhaust gas recirculation ("EGR") technology was plagued with problems. ¶67. FE6 stated that Ryder's trucks have 7-8 years of useful life on their leases before the Company sells them and that the trucks with the new emissions technology came out in 2009. These trucks thus started coming off lease in 2015, and FE6 believed that a lot of the values were upside down at that time. ¶108.

FE5[3] explained that Ryder lacked any ability to perform the necessary maintenance on the MaxxForce engines, and that Ryder had several of these vehicles in its stock and there were concerns about it in Ryder's used truck department. ¶75. However, Ryder had no answers for the

---

[3] FE5 was a Ryder Director of Used Vehicles Sales from May 2018 to September 2018 who previously worked for Navistar. ¶75. FE5 worked at Ryder's corporate headquarters in Miami and focused on used truck pricing. *Id*.

problem. *Id.* During 2010-2012, many trucking companies with MaxxForce-powered units experienced repeated breakdowns and engine failures. ¶68. MaxxForce engines also had numerous recalls and dozens of service bulletins during this time, which led to increased downtime and repair costs for the companies operating the trucks. *Id.* These problems were worsened by the fact that MaxxForce engines could not be cost-effectively replaced with a non-MaxxForce engine. *Id.*

Overall, the MaxxForce engines tarnished Navistar's reputation, sales plunged, and Navistar lost almost half its market share as costs soared and losses climbed. ¶69. In May 2019, Navistar settled a federal class-action lawsuit related to its MaxxForce engines for $135 million. *Id.* The case was filed on behalf of truck owners and lessees alleging that Navistar sold or leased 2011-2014 model year vehicles equipped with certain MaxxForce 11- or 13-liter diesel engines equipped with the defective EGR emissions system. *Id.* The $135 million settlement provides class members with the option to seek up to $15,000 per truck in out-of-pocket damages caused by the alleged defect. *Id.* Not including that settlement, Navistar also paid more than $2 billion in warranty costs to cover reliability and fuel-economy problems with the trucks, and it wrote off almost $500 million to cover used trucks it repurchased from angry customers and resold at a loss, which was on top of the $700 million development cost of the engines. ¶70. For these reasons, there was very little demand for MaxxForce vehicles at the end of their useful lives, which drastically lowered their sales prices. ¶¶7, 71-76.[4] Critically, MaxxForce vehicles comprised approximately 40% of Ryder's fleet and their values were overstated by at least 50%. ¶105.

Former Ryder employees discussed the serious problems they witnessed with Ryder's ownership of MaxxForce vehicles. FE12[5] stated that, from 2012 on, he saw that the maintenance prices of the trucks with the new emissions technology were frequently high and that the filter in the engines caused the engines to almost seize up. ¶76. As a result, customers would treat MaxxForce trucks as "lemons." *Id.* FE3[6] recounted that the market was consistently declining while he was at Ryder (from before 2015 through July 2019) because of the new emissions requirements. ¶73. He also said that Ryder started to see used trucks with the new technologies in

---

[4] The National Automobile Dealers Association Official Commercial Truck Guide, and data from major auction houses, reflect significant deductions in value for MaxxForce vehicles. ¶71.
[5] FE12 was a Vehicle Sales Representative from 2016 to 2018 and a Sales Manager from 2018 to May 2019. ¶76. FE12 was focused on used vehicle pricing and managing assets. *Id.*
[6] FE3 was a Vehicle Sales Center Manager from before the Class Period until July 2019. ¶73.

2010-2012, and things went downhill from there as the prices for repairs were "sky-high." *Id*. FE2[7] stated that a decline in Ryder's sales began in approximately 2015 because the emissions filters for the new exhaust systems and engines made them "a mess" and caused "bugs." ¶72.

FE4[8] added that Ryder had record numbers of MaxxForce customers try to break their leases with Ryder because they could not work with the trucks. ¶74. FE4 stated that as a result Ryder took leased and rented vehicles back before the four to five-year lease terms expired, yet Ryder could not re-lease them or sell them for the residual value that was on the books because customers walked right past them. *Id*. FE5 stated that, especially in 2015, it became apparent that the values of the MaxxForce trucks had declined, falling from approximately $60,000 to $20,000 in a matter of weeks or months. ¶75. FE4 reported that Ryder was increasingly pushing Navistar International to take back its MaxxForce trucks, but with only limited success. ¶74. He stated that he twice arranged for 250 vehicles to go back to Navistar but Navistar only took back 35 or 50, and that Navistar was "100% looking for any excuse not to take the trucks back." *Id*.

Ryder internally set a goal of selling its used vehicles within 90 days of the vehicle entering Ryder's Used Truck Centers ("UTCs"). Vehicles that remained unsold for more than six months presented a serious financial problem for Ryder, as they would continue to depreciate, become more and more unsellable, and require costly maintenance and upkeep as they effectively "rotted" on the sales lots. ¶8. Because of lower demand and Ryder's refusal to sell these plagued vehicles at a loss, the number of Ryder used vehicles available for sale increased dramatically between 2015 and 2016, rising to 8,000 at the end of the fourth quarter of 2015, up from 5,500 units in the prior year, a 45% increase.[9] ¶¶9, 128. Defendants concealed the plain financial consequences of this problem, however, by understanding the depreciation expense on these vehicles.

### 2. Starting in 2015, Ryder Saw a Sharp, Historic and Prolonged Decline in the Market Prices for Used Vehicles

As Ryder's data showed, the used vehicle market also had collapsed due to over-supply and decreased demand by the end of 2015. As Defendant Sanchez, Ryder's CEO, recently

---

[7] FE2 was a Vehicle Sales Representative from before the Class Period to December 2019. ¶72.
[8] FE4 was a Director of Asset Management Canada from 2011 to 2018 who oversaw the entire used truck sales operation across Canada. ¶74.
[9] An internal Ryder document from August 2016 shows a significant number of Ryder vehicles exceeded Ryder's 90-day threshold, including 400 tractors with MaxxForce engines. ¶131.

9

acknowledged: "Following the mid-2015 peak [in used vehicle prices], tractor proceeds declined sharply through 2017 to below our accounting residuals as supply entered the market and the freight environment slowed." ¶77. FE6 stated that the market for used trucks and trailers was challenging and took a huge hit in 2015. ¶78. FE4 said that, by 2015, it was "loud and clear" that Ryder's used truck sales were declining (¶79). FE7[10] stated that during his time at Ryder (2016 through early 2019), the demand for used trucks was "really bad." ¶81. He said that as a result, Ryder's balance sheet carried trucks with excessively high prices it could not sell. *Id*. FE6 said that Ryder's vehicle values were "upside down" by 2015 and it was "completely obvious" that Ryder's residual value estimates likely exceeded the expected future values that would be realized upon the sale of power vehicles in their fleet, with the residual values being overstated by approximately 30%. ¶¶109, 285. FE8[11] added that the CEO would have a video call every quarter and state that used vehicle sales were still down and that people were not buying used trucks. *Id*.

FE1 stated that, in 2015 or 2016, Ryder made a push to sell the accumulating used trucks by starting a new, internal sales division within Ryder at its Alpharetta Georgia office that hired 40 to 50 people to try and sell Ryder used trucks by phone and online. ¶80. That department had not existed just two years earlier, as Ryder had previously sold its used trucks through a wholesaler. *Id*. FE1 stated that, based on a conversation with a current Ryder truck salesperson, as of 2020, the number of Ryder employees in its inside sales group had increased to 90 total. *Id*.

The below graph, only disclosed to investors at the end of the Class Period, shows the sharp decline in the residual values of Ryder vehicles starting in 2015 and continuing through 2018:

---

[10] FE7 was a Ryder Senior Business Development Manager from 2016 to March 2019. ¶81.
[11] FE8 was a Rental Management Trainee at Ryder from 2015 to 2017 and a Rental Manager from 2017 to November 2018. ¶82.



**Used Tractor Sales Price History: 1999 - 2018**

As shown by the graph, Ryder's used tractor sales price as a percentage of the original cost fell by approximately 15% from 2015 to 2016. ¶94. Despite that 15% drop, Ryder increased its residual values by $35 million in 2016. *Id*. Ryder's used tractor sales price as a percentage of original cost continued to fall in 2017, with a 35% decline from 2015. ¶96. Despite this even sharper decline in 2017, Ryder decreased the residual value of its fleet by a miniscule $4 million in 2017. *Id*. The decline in used tractor sale prices continued and only worsened, falling in 2018 by a 38.5% decline versus 2015. ¶97. Despite this continued decline in used vehicle sale prices in 2018, Ryder decreased the residual value of its fleet by a mere $79 million in 2018. *Id*.

When, near the end of the Class Period, Ryder took a $357 million reduction to its residual values and recorded a $58 million loss in 2019 on sales of used vehicles, those revisions entirely wiped out the financial benefits of increased residual values that Ryder had reported through 2018. ¶100. Conservatively allocating just that additional $415 million ($357 million adjustment + $58 million loss on sales of used vehicles) to the years between mid-2015 to 2018 on a *pro rata* basis, Ryder's estimated pretax earnings in 2015 were approximately 19.3% below Ryder's reported adjusted pretax income figure, and were 57.4% below Ryder's reported pretax income in 2017. *Id*.

### 3. Ryder Executives Repeatedly Voiced Concerns to Defendants

Hidden from investors, Ryder executives knew during the Class Period that the market for Ryder used vehicles had declined dramatically, that the new emissions vehicles had become unsellable "lemons," and that Ryder was overstating the vehicles' residual values. ¶¶76, 103. The executives repeatedly raised those serious concerns to their superiors (who were involved in the

11

most senior discussions to set the residual values), but Defendants Sanchez, Garcia and Cooke brushed them aside, and continued to make contrary statements to investors, assuring the market that Ryder was updating its residual value estimates based on current market prices and trends.

According to FE6,[12] there was talk inside Ryder of the need for a write-down by 2015 or 2016, as vehicle values had depreciated much faster than expected. FE6 reported that the value and depreciation of all vehicles were determined at quarterly Asset Management Board meetings and that "the values of the equipment were completely off" and "it was pretty clear that they needed to write-down the equipment." ¶103. FE6 said that Ryder "had no interest in writing down whatsoever" while FE6 was there. *Id*. Despite the recognition that the vehicles in Ryder's fleet were overvalued, FE6 said that everyone in upper management, including Defendants Sanchez and Garcia pushed back on writing down the used vehicles. *Id*.

FE10 stated that senior management, including Defendants Sanchez and Garcia, participated in weekly and monthly phone calls which discussed Ryder's vehicle valuations and depreciation. *Id*. FE10 also said he "heard [Defendant Sanchez's] voice on many phone calls" and that, at these meetings, FE10 would "scream until [he] was blue in the face" that Ryder's vehicles were overpriced. *Id*. He stated that he expressed these complaints directly to Defendants Sanchez and Garcia at the meetings. *Id*. FE10 also witnessed pushback from Sanchez and Garcia "all the time" in response to these complaints and said that their excuses included that the Company did not want to lose money on the trucks, and that Ryder could not afford to lower the prices. *Id*.

In addition, FE4[13] stated that the residuals should have been adjusted during the course of the lease. *Id*. He recounted that there were some deals where he tried to increase the depreciation, but he did not have much success doing that. *Id*. Instead, FE4 received a lot of pushback from sales, and in particular from Defendant Dennis Cooke (President), John Gleason (Vice President of Sales), and others. *Id*. FE4 added that potential deals would come across his desk that he would deny and change the residual number and then he would get overridden by Gleason's group in

---

[12] FE6 was a Ryder Vehicle Sales Manager in the Asset Management Division from before the Class Period to September 2016 and a member of Ryder's Asset Management Board. ¶103.
[13] FE 4 worked at Ryder in Toronto from October 2010 to September 2018. ¶103. His last role was director of asset management Canada and he was in charge of 1,250 vehicles across Canada. *Id*. His role had two components: ensuring the assets were depreciating as they should, and selling the vehicles. *Id*. He was also a member of the pricing committee and any deal that was slightly "off spec" would come across his desk so that he could make sure the residuals were correct. *Id*.

12

Ryder's Miami headquarters. *Id*. He said that, during his time at Ryder, he was "raising red flags like crazy," and that while he was involved in business planning, he could never get the Company to agree to put down the losses that he thought were a more accurate number. *Id*. He kept communicating to others that Ryder's residuals were unrealistic. *Id*.

According to FE4, Ryder had internal reports memorializing residuals and depreciation, and Ryder executives tracked proceeds historically and met quarterly to assess the status of the fleet valuation and pricing. *Id*. FE4 stated that the top executives were "100%" receiving these reports, and that FE4 sat with other executives, including CFO Garcia every month to talk about them. *Id*. FE4 stated that he told the finance group at Ryder that they should be writing the trucks down because there was no way Ryder could get rid of them at the losses they had on the business plan, but was told to sit on the inventory.[14] *Id*. FE 4 also said that management, including Gleason and Cooke, "kicked his teeth in" every month where he gave them "all kinds of statistics on what wasn't selling, the issues with MaxxForce, and how the residuals were making pricing a problem." *Id*. When FE4 left Ryder in September 2018 there was no indication that Ryder was planning to take the necessary write down. On the last conference call he was on, he was getting beat up for not making sales, and he told the other Ryder executives (including Gleason and Cooke), "This isn't going away. We're holding these trucks so they're just losing value." *Id*. FE 4 stated that Ryder would not acknowledge the reality that the trucks were unsellable and that he kept wondering when they were going to "bite the bullet." *Id*.

### D.  The Truth Emerges

The truth began to emerge on July 30, 2019, when Ryder sharply reduced its full-year 2019 earnings forecast due to Ryder's lower valuations of its tractors. ¶¶18, 135-37. In response, Ryder's stock price fell 10%, from $59.32 per share to $53.38 per share, as investors began to learn of the long-term negative impact of Ryder's devalued used vehicle fleet.

Then, on October 29, 2019, the Company dropped a bombshell on the market and disclosed that Ryder was reducing its residual value estimates by $844 million. ¶138. Defendants admitted to investors that "management concluded that our residual value estimates likely exceeded the

---

[14] This contradicts Defendants' insistence that the Complaint's FEs had no insight into Ryder's accounting for residual values, as FE4 was involved in business planning and stated that he could never get Ryder to put down the losses that he thought were a more accurate number. ¶103.

expected future values that would be realized upon the sale of power vehicles in our fleet." *Id*. The Company significantly lowered the residual values for <u>all</u> its vehicles and incurred $177 million in additional depreciation expense in the third quarter of 2019; reduced its residual value estimates for the entire second half of 2019 by $289 million; and, in total, reduced its residual value estimates for the period from the second half of 2019 through 2024-2025 by an extraordinary $844 million. In response to these disclosures, Ryder's stock price fell by more than 12% over two trading days, from $55.12 per share to $48.44 per share. As J.P. Morgan reported on October 29, Ryder's taking this "big bath" on its residual values "confirms <u>Ryder was over-earning by a significant amount in prior years</u> based on the $844mm cumulative write-down." ¶142.

On February 13, 2020, Ryder further shocked investors by reporting that the toll of Ryder's residual value manipulation exceeded $1 billion. In response to the February 13, 2020 disclosure, Ryder's stock price fell by 23% over three trading days, from $50.19 per share to $38.45 per share.

## III.   ARGUMENT

"When evaluating a motion to dismiss under Rule 12(b)(6), the question is whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Worthy v. City of Phenix City*, 930 F.3d 1206, 1217 (11th Cir. 2019) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011). In ruling on Defendants' motion to dismiss, the Court accepts the facts pleaded in the complaint as true and "views them in the light most favorable to the plaintiff." *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1254 (S.D. Fla. 2020); *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).

### A.   The Complaint Adequately Alleges that Defendants Made Materially False and Misleading Statements

Federal Rule of Civil Procedure 9(b) requires that plaintiffs set forth (1) what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud. *FindWhat*, 658 F.3d at 1296. Plaintiffs

14

amply satisfy this burden of pleading the "who, what, when, where, why and how" of the alleged fraud. *See In re Paradyne Networks, Inc. Sec. Litig.*, 197 F. Supp. 2d 1349, 1353 (M.D. Fla. 2002).

### 1. Plaintiffs Pled Ryder Overstated Its Residual Value Estimates and Net Earnings and Understated Its Depreciation Expense

Plaintiffs adequately pled that Ryder misstated its residual value estimates and depreciation expense because it was <u>contemporaneously</u> apparent to Defendants <u>during the Class Period</u>, and not merely at the end of it, that the market prices of Ryder's vehicles had sharply declined and all signs pointed to a prolonged decline. ¶¶7-13. It was apparent to Defendants no later than 2015 that Ryder's residual values would remain depressed because the most significant problem that Ryder admitted caused the market price decline – the defective emissions engines – could not be remediated and only worsened as Ryder's sale centers accumulated unsellable vehicles. *Id.*

Failing to properly account for this, Ryder overstated its financial results throughout the Class Period. ¶¶87-112. Indeed, the Complaint alleges with the requisite particularity each misstated financial metric, and explains why each metric was materially misstated. *Id.* Plaintiffs accordingly plead that Defendants' reported financial metrics were materially false <u>when made</u>, in violation of Section 10(b) of the Exchange Act, and Defendants ignore the allegations that make this case not a "fraud by hindsight." *See*, *e.g.*, *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1291 n.7 (M.D. Fla. 2008) (allegations were not "fraud by hindsight" where "Plaintiff asserts that the Defendants knew that the statements were false and misleading when made"); *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1115 (M.D. Fla. 2005) (defendants' "fraud by hindsight" argument ignored plaintiffs' allegations that defendants made "contemporaneous statements praising the success of Catalina U.K. while simultaneously failing to disclose the loss of its largest contract"); *In re Towne Servs., Inc. Sec. Litig.*, 184 F. Supp. 2d 1308, 1322 (N.D. Ga. 2001) (finding that plaintiffs' "properly-plead allegation of an existing problem at the time the statements and omissions were made renders the no-hindsight cases inapplicable"); *In re Penn Treaty Am. Corp. Sec. Litig.*, 202 F. Supp. 2d 383, 390 (E.D. Pa. 2002) (finding that plaintiffs pled "more than hindsight" where they alleged that defendants were aware of declining trends that rendered their class period statements false); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319,

15

330 (D. Mass. 2002) (rejecting "fraud by hindsight" argument where defendants knew information rendering their statements false).

In *Penn Treaty*, the court rejected similar "fraud by hindsight" arguments as those made here. 202 F. Supp. 2d at 390. The *Penn Treaty* defendants argued that the plaintiffs were supposedly relying only on belated disclosures to show scienter. *Id.* The court disagreed, finding that the plaintiffs "offer[ed] more than [fraud by] hindsight" by setting forth allegations that the defendants were aware of certain declining trends that were impacting the company's financial health" at the same time they made contrary assurances to investors. *Id.* Here, Defendants assured investors that Ryder's residual values were accurate and accounted for real-time factors. *See*, *e.g*., ¶¶102, 249. However, Defendants had access to information and trends directly contradicting those statements, including that that Ryder was having significant difficulties selling its used vehicles and, based on constant warnings from employees responsible for valuation and depreciation, the fleet was significantly overvalued. ¶¶103-12.[15] Defendants also knew that historical sales data did not account for the factors negatively and permanently affecting used vehicle prices. ¶¶284-85. The *Penn Treaty* court also rejected the defendants' argument that they could not have known that the issues they were facing would continue into the future because the defendants were alleged to have become aware of "red flags." 202 F. Supp. 2d at 391. The same logic applies here.

Defendants assert Ryder made no misstatements because it disclosed its residual value methodology and its financial results based on it. D.Br. at 17. But it is not clear what methodology Ryder is referring to, because it disclosed at least two: (i) a rolling five-year average market price methodology; and (ii) the practice disclosed in its Form 10-Ks since at least 2015 of updating its residual values at least annually based in part on current market prices and trends. Ryder also said it would accelerate depreciation based on the current market value. *See* Pl.Exs. 3-6.

*First*, Ryder did not strictly adhere to the five-year methodology. As Defendants' brief repeatedly acknowledges, Ryder only "generally" followed it.[16] D.Br. at 2, 6, 7. *Second*, on July 25, 2018, Sanchez claimed that although Ryder "historically" "used a 5-year rolling average to

---

[15] *See* ¶103 (FE6 said "it was pretty clear that they needed to write-down the equipment" but Sanchez and Garcia pushed back on that); *id*. (by September 2018, there was still no indication Ryder was planning to take the necessary write down).
[16] On November 14, 2019, Sanchez also admitted that instead of simply "us[ing] a rolling average of certain years" Ryder "also use[d] judgment ... in addition to using an average." Pl.Ex. 7.

determine our residual value or our sales proceed at the end of the lease term," "[a]t the beginning of this year [2018] is when we switched and then said, rather than just do a rolling 5-year average, let's just bring it to generally to where we're seeing sales today." ¶277. Defendants argue that this relates only to Ryder's pricing of leases and not its accounting, but they are inextricably linked. On July 25, 2018, Sanchez claimed that Ryder's leasing program was "more derisked than it was historically" because "what we've done on the pricing is we have lowered the residual expected sales proceeds at the end of that lease life" and as a result, "we've lowered that residual to generally the current levels that we're seeing today as opposed to using our normal rolling 5-year average." ¶249; *see also* Pl.Ex. 8. Under Defendants' argument in support of their motion to dismiss, Ryder adjusted its lease prices by lowering its "residual expected sales proceeds at the end of th[e] lease life" (i.e., its residual value estimates), but that had no relation to Ryder's accounting. That is clearly wrong. Lowering residual value estimates impacts pricing and accounting.

The FEs also stated that used vehicles residual values were materially inflated by as much as 50% throughout the Class Period. *See supra* at 12-14. Defendants also neglect to explain how, if, in 2018, Defendants accounted for the current market prices of Ryder vehicles (which were at their lowest level during the entire Class Period, according to Defendants' own pricing graph reproduced above) in their depreciation calculations, how just over a year later[17] Ryder needed to record $357 million in depreciation charges for the second half of 2019 alone. ¶¶92-100. Prices had not materially changed in the interim nor did Defendants sell their vehicles at anything but a significant loss. *Id*. There is thus no explanation for why, if Ryder had truly accounted for the 10-year low used vehicle prices in its residual values at the beginning of 2018, Ryder then only took its $844 million "big bath" on residual values a mere year later in September 2019. In reality, as Plaintiffs allege, throughout the Class Period, Defendants maintained knowingly inflated residual values in order to avoid jeopardizing the Company's (and therefore their personal) earnings and did so with complete disregard for the full economic reality.

Defendants argue that Plaintiffs do not satisfy the PSLRA "particularity" requirement for pleading falsity, arguing that Plaintiffs merely allege depreciation was "understated" and residual

---

[17] *See* Defendants' 3Q 2018 Earnings Call, where Defendant Sanchez claimed Ryder "really brought [pricing] down to the current levels that we were seeing at the beginning of the year." D.Br. at 31; Pl.Ex. 9.

values were "overstated." D.Br. at 17. Defendants also argue that Plaintiffs fail to identify which vehicles' values were overstated. D.Br. at 18. To the contrary, Plaintiffs' allegations are particularized and identify the specific financial metrics that were overstated or understated by each quarter (¶¶148-267), and the percentages by which the residual values were overstated. *See, e.g.*, ¶10 (alleging that, by 2015 the vehicles' residual values were overstated by "approximately 30%; and for vehicles with MaxxForce engines, their values were easily overstated by 50%"). FE6 also stated that Class 8 vehicles (the large tractors) were the most significant problem and had depreciated more. ¶110; *see also* ¶120 (according to FE12 the fleet was overvalued by 30-50%); ¶130 (as of August 2016, there were at least 1,980 Ryder tractors available for sale that had been at Ryder UTCs for six months or more and, of those, more than 450 had been at a UTC for a year or more); ¶123 (FE4 explained that while usually Ryder liked to sell off its vehicles within six months, he estimated that by 2018, 20% of its inventory had been siting for over a year "rotting away"). The Complaint also identifies the amounts by which adjusted pretax income was artificially inflated in each year based on the residual value adjustments Ryder made in 2019 on a *pro rata* basis. ¶100. These allegations satisfy the requirements of the PSLRA.

Defendants also assert that Plaintiffs are wrong to allege that Ryder "never" adjusted its residual values to account for deteriorating market conditions because Ryder did take accelerated depreciation charges during the Class Period. D.Br. at 17 (citing ¶¶103, 282). Plaintiffs' allegations are not inconsistent. The first allegation cited by Defendants is that FE 4 said, for his specific 1,250 Ryder vehicles in Canada, "the residuals were never adjusted during the course of the lease, and they should have been" (¶103) and for the second, FE 6 witnessed a large number of vehicles in 2015 that Ryder refused to sell at lowered prices (¶282). *First*, Defendants criticize Plaintiffs for conflating residual values for the purpose of lease pricing and residual values for accounting purposes. D.Br. at 35. Yet, Defendants' argument about FE4's allegation concedes that if Ryder never adjusted residuals for the purpose of lease pricing then that meant Ryder did not also adjust residuals for accounting purposes. *Second*, neither allegation conflicts with the fact that, in 2016-2019, Ryder disclosed some accelerated depreciation expense, and the Complaint acknowledges Ryder took accelerated depreciation. *See* ¶307 (discussing 2019 accelerated depreciation).

18

### a.   Defendants' Residual Value Estimates, Depreciation Expense, and Net Earnings Are Not Inactionable Opinions

Defendants argue that their residual value estimates are inactionable statements of opinion. D.Br. at 18. Defendants thus concede that the other financial metrics that Plaintiffs allege were false or misleading when made (such as depreciation expense, net earnings, and the failure to recognize an impairment of the Ryder assets (¶¶51, 88)) are not opinions. *See, e.g.*, *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 848 (N.D. Tex. 2018) (defendants' "alleged GAAP violation and ... failure to recognize the impairment of the [asset] are not opinion statements but create a fact question"); *In re ForceField Energy Inc. Sec. Litig.*, 2017 WL 1319802, at *13 (S.D.N.Y. Mar. 29, 2017) ("Whether such circumstances ... trigger a duty to reassess goodwill is a factual question that should not be resolved on a motion to dismiss.").

To begin with, a statement is an opinion only when it is expressly stated as a belief or opinion. *Omnicare,* 575 U.S. at 185-86. The majority of Defendants' statements were not so qualified but are instead actionable statements of present fact under *Omnicare. See*, *e.g.*, ¶199 (alleging that Ryder misstated the cost of lease and rental, earnings from continuing operations, comprehensive income, net earnings, and depreciation expense).

To the extent Ryder's residual values are deemed opinions, the Complaint alleges their falsity. Under the Supreme Court's *Omnicare* decision, opinions are actionable: (i) "if the speaker did not hold the belief she professed," *id.* at 185-86; (ii) where the opinion rests on "embedded statements of facts" that were "untrue," *id.* at 184-86; or (iii) where the opinion omits facts that contradict what a reasonable investor would understand the statement to mean, thus making it misleading by omission, *id.* at 187-89. Each of these prongs provides a basis for liability here.

*First*, the Complaint alleges that Defendants did not believe that Ryder's reported residual values were accurate and refused to lower residuals, in order to artificially inflate the Company's earnings. *See, e.g.*, ¶103 (FE10 witnessed pushback from Sanchez and Garcia "all the time" because the Company did not want to lower prices); *see Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 (11th Cir. 2019) ("[E]very statement of opinion 'explicitly affirms one fact: that the speaker actually holds the stated belief.'" A statement of opinion that "falsely describe[s] [the speaker's] own state of mind" is an untrue statement of fact—as to what the speaker actually

believes—and accordingly will "subject the issuer to liability (assuming the misrepresentation were material)." *Id*. As the Northern District of Alabama held in a similar case:

> Defendants cite to *Fait v. Regions Financial Corp.*, 712 F. Supp. 2d 117 (S.D.N.Y 2010), to show that defendants' calculations of goodwill and loan loss reserves are not statements of fact but rather are matters of opinion. The court in that case went on to find that the complaint was "devoid of any allegation that defendants did not truly hold those opinions at the time they were made public." *Id*. at 124. However, in this case, plaintiffs have pled many facts showing that the defendants had information that did not support defendants' opinions. For example, plaintiffs have brought forth statements of CWs [confidential witnesses] showing … [among other things that] defendants were aware of the collapsing commercial real estate market in Florida yet continued to push for more growth there …

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 WL 12855820, at *6 (N.D. Ala. June 7, 2011). Here, the Complaint alleges that Defendants Sanchez, Garcia, and Cooke were repeatedly informed that Ryder's vehicle prices and residual values were inflated but they refused to lower residual values, which directly benefited the Company's bottom line and their personal fortunes. ¶103 (FE6 stated that "it was pretty clear that they needed to write-down the equipment" yet everyone in upper management including Defendants Sanchez and Garcia pushed back on not writing down the used vehicles); *id*. (FE10 would "scream until [he] was blue in the face" that Ryder's vehicles were overpriced at vehicle valuation meetings Defendants Sanchez and Garcia attended); *id*. (Defendant Cooke would "kick[] [FE4's] teeth in" when he delivered "all kinds of statistics on what wasn't selling, the issues with MaxxForce, and how the residuals were making pricing a problem"); ¶¶317-30 (alleging lucrative stock sales).

*Second*, the Complaint adequately alleges that Ryder's financial statements contained false embedded facts. ¶¶148-267; *see Ocwen*, 934 F.3d at 1322 ("[W]hen statements of opinion 'contain embedded statements of fact,' a speaker may be liable 'if the supporting fact she supplied were untrue.'"). The false embedded facts included Ryder's representation that the residual value estimates accurately took into account current market values, when they did not. ¶102.

*Third*, the Complaint alleges that Ryder's residual value estimates and related statements omit facts that contradict what a reasonable investor would understand the statement to mean, thus making the statement misleading by omission. 575 U.S. at 187-89; *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1237 (N.D. Ga. 2019) (finding that defendant's statements, "despite his

20

knowledge of experts' advice to the contrary, [were] actionable."). Defendants assert that the Complaint does not include "a single material omission anywhere." D.Br. at 19. To the contrary, the Complaint alleges that Ryder made "materially false and <u>misleading</u> statements and <u>omissions</u> concerning the residual value of Ryder's truck fleet and the <u>level of depreciation</u> of those assets." ¶148; *see also* S.E.C. Rule 10b-5, 17 CFR § 240.10b–5 (making it unlawful "to <u>omit</u> to state a material fact necessary in order to make the statements made ... <u>not misleading</u>"). Plaintiffs allege that Sanchez's February 11, 2016 statement claiming that Ryder did not have "a situation where we've got a bunch of vehicles that are at high residual values [and] have to be written down" was "misleading" because, in fact, "Ryder had at least 300 Ryder trucks and 450 tractors available for sale that had been at the Ryder [UTCs] for a year or more as of August 2016, those 300 trucks and 450 tractors had already been at the [UTCs] for at least six months as of February 2016 and they needed to be written down." ¶185; *see also* ¶218 ("Ryder in fact did have a large number of vehicles that were at excessively high residual values and needed to be written down.").

Further, under *Omnicare*, a plaintiff may establish the falsity of an opinion by "identify[ing] particular (and material) facts <u>going to the basis</u> for the issuer's opinion … whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." 575 U.S. at 194. Again, Ryder told investors that part of the basis for its residual value estimates was the current market price of used vehicles and current market trends, but Ryder's omission of the substantial disparity between Ryder's price assumptions for residual values and observed sales data  (plus internal calls to lower the prices further, which Ryder resisted, ¶¶103-112) rendered the stated residual values materially misleading by omission.[18] *See In re Amgen Inc. Sec. Litig*., 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008) ("The disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."); *Schueneman v. Arena Pharms., Inc*., 840 F.3d 698, 707-08 (9th Cir. 2016) (once defendants choose to speak on a subject, they are "bound to do so in a manner that wouldn't mislead investors as to potentially negative information within their

---

[18] These price assumptions were important to analysts, who were blindsided by Ryder's depreciation expense revisions at the end of the Class Period. *See* ¶145 (SunTrust Robinson Humphrey wrote on February 13, 2020, "We are certainly frustrated as this marks the third consecutive quarter of meaningful EPS estimate revisions ...").

possession"). These principles apply equally to opinion statements: if an opinion "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," then the opinion is actionable. *Omnicare*, 575 U.S. at 189.

> **b.    Defendants' Residual Value Estimates, Depreciation Expenses, and Net Earnings Are Excluded from the Safe Harbor**

Defendants assert that Ryder's residual values are protected by the PSLRA's "safe harbor" for forward-looking statements. 15 U.S.C. § 78u–5(c)(1); D.Br. at 19-22.  Defendants are wrong.

*First*, by focusing solely on the residual value estimates (D.Br. at 19-21), Defendants concede that the numerous other financial metrics that Plaintiffs allege Ryder misstated (such as net earnings and depreciation expense (¶¶87-112)) are <u>not</u> protected by the PSLRA safe harbor.

*Second*, the PSLRA excludes from safe harbor protection statements that are "in a financial statement prepared in accordance with generally accepted accounting principles." U.S.C. § 77z-2(b)(2)(A).  Here, that exception applies to <u>all</u> of the financial metrics that Plaintiffs allege Ryder materially misstated, including residual value estimates, depreciation expense, and net earnings, because Ryder claimed that it reported those in accordance with GAAP. *See* ¶¶148-267. Courts across the country apply this plain statutory exception to hold that the safe harbor does not apply to financial statements that a corporation claims it prepared in accordance with GAAP. *See, e.g.*, *Lynn v. Helf*, 2014 WL 5431221, at *16 (M.D. Tenn. Oct. 24, 2014) ("[E]ven assuming arguendo that the ALL [the allowance for loan and lease losses, which approximates the portion of a lender's total loan portfolio that is impaired or otherwise not likely to be collected in the future] is a forward-looking statement, TNCC's representations in their 10–K financial statements <u>categorically exempt</u> those statements from the PSLRA's safe harbor provision"); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 416 (D.N.J. 2004) (finding that statements in SEC filings prepared in accordance with GAAP did not fall within safe harbor); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1381 (S.D. Fla. 2001) ("The safe harbor provision does not apply to 'financial statement[s] prepared in accordance with generally accepted accounting principles.'"); *In re Champion Enters. Inc., Sec. Litig.*, 144 F. Supp. 2d 848, 868 (E.D. Mich. 2001) (safe harbor does not apply to financial statements within Form 10–K); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1339

22

(S.D. Fla. 1999) (same); *Baker v. MBNA Corp.*, 2007 WL 2009673, at \*5 (D. Del. July 6, 2007) ("The court finds that the statements regarding MBNA's restructuring charges and the <u>statements concerning expected earnings</u> to the extent both were made in the Company's Form 8–K do not fall under the protection of the safe harbor provisions … <u>as a matter of law</u>.").

*Third*, Defendants argue that because "[t]he residual value estimates challenged by plaintiffs are contained in the MD&A [Management Discussion & Analysis] section of Ryder's financial reports" they "are not subject to the exclusion in the safe harbor for otherwise forward-looking statements 'included in a financial statement prepared in accordance with generally accepted accounting principles.'" D.Br. at 20 n.5 (citing *Slayton* v. *American Express Co.*, 604 F.3d 758, 767 (2d Cir. 2010)). The *Slayton* holding has no support in the statutory language itself, and no court outside of the Second Circuit has ever adopted it. Even if the Court were to adopt the *Slayton* holding, Plaintiffs do not allege that only Ryder's residual values were false and misleading at the time they were made. Rather, the Complaint alleges that several other key financial metrics tied to residual value estimates that are <u>not</u> in the MD&A section of Ryder's SEC filings (including Ryder's net earnings and comprehensive income) were materially overstated, while Ryder's depreciation expense was materially understated. *See e.g.*, ¶¶148-267. As the Complaint also alleges, Ryder overstated the net book value of its vehicles by refusing to reduce its residual values and similarly failed to impair its revenue-earing equipment's value by properly recognizing lowered residual values, all of which were reported pursuant to GAAP. ¶51.

      c.      **Defendants' Residual Value Estimates Are Not Protected by Cautionary Language, and Were Made with Actual Knowledge**

Even assuming the residual value estimates are not excluded from the statutory safe harbor because they are included in the MD&A portion of Ryder's SEC filings, those figures are still not protected by the safe harbor because they were not accompanied by "meaningful cautionary statements" and they were "made with actual knowledge" that they were false or misleading. 15 U.S.C. § 78u-5(c)(1)(A), (B).

Here, the cautionary statements on which Ryder relies (D.Br. at 20-21) were not specific to the actual problems Ryder faced and failed to disclose to investors—i.e., Ryder vehicles with defective reduced-emissions engines were selling significantly below their recorded residual

23

values and would only grow as a share of used vehicle sales, and the growing disparity between Ryder's recorded residual values and actual market prices, due to the sharp decline in Ryder's used vehicle sales prices and Ryder's refusal to sell its vehicles below their residual values.  ¶¶66-82.

Moreover, Ryder warned of only possible risks at the time when the adverse events had already materialized.  As the Northern District of Alabama held in *Regions Financial Corp.*, "even if statements are forward-looking, <u>cautionary language of future risks does not protect defendants if the risks warned against had already occurred</u>." 2011 WL 12855820, at \*6 (citing *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 769 (11th Cir. 2007)).  Here, Ryder stated to investors that the Company faced a negative impact on residual value estimates <u>only if</u> the decline in market prices worsened or only if the quality, maintenance or condition of Ryder's vehicles became a "concern": i.e., "<u>If</u> the market for used vehicles declines further, or there is a concern regarding the quality, maintenance or condition of our vehicles, we <u>may</u> obtain lower sales proceeds upon the sale of used vehicles, which <u>would</u> likely negatively impact the residual values." D.Br. at 21. But as of the time of all such statements during the Class Period, Ryder's used vehicles prices had already sharply declined, and senior Ryder employees had already repeatedly raised serious internal concern over the "quality, maintenance [and] condition" of Ryder's vehicles due to the defective MaxxForce engines. Ryder could not remedy these problems and they caused an actual known decline in the value of those Ryder vehicles materially below their recorded residual values.

By superficially warning of possible risks while failing to disclose the actual critical facts, Ryder was akin "to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y.1996). Ryder's disclosures thus do not fall under the bespeaks-caution doctrine or the PSLRA safe harbor because the purported cautionary language was not sufficiently meaningful and Plaintiffs have pled that Defendants were aware of the adverse facts that rendered their statements to investors materially false and misleading. *See, e.g.*, *Friedman v. Hammer*, 2020 WL 2559549, at \*3 (S.D. Fla. May 20, 2020) (finding that there was "no language in the PPM warning Plaintiffs that they were falling victim to the Defendants' fraud" where plaintiffs alleged defendants "intentionally defrauded them

24

by lying to them about <u>the then-current state</u> of TRC Funding Group's affairs and the risks inherent in their investments," not about "unforeseen risks that might have arisen in the future").

Under the express terms of the statute, with respect to the actual knowledge prong of the PSLRA safe harbor, a defendant may avail itself of the safe harbor for forward-looking statements only "<u>if and to the extent that</u> … the plaintiff <u>fails to prove</u> that the forward-looking statement … was …. made or approved … with actual knowledge … that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B).  In other words, a defendant may evade liability for a forward-looking statement only "if and to the extent that" there is a failure of proof at the trial stage that the statement was made with actual knowledge of its falsity.  *Contra* D.Br. at 22 n.6.

To the extent the Court were to analyze the actual knowledge prong of the safe harbor test at the pleading stage, Ryder's alleged false statements remain actionable because the Complaint sufficiently alleges that Defendants had actual knowledge of their falsity because they were made aware of the wide discrepancy between (i) Ryder's residual values and (ii) current market prices and market trends. *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1116 (M.D. Fla. 2005) ("The safe harbor does not apply, however, to forward-looking statements made with 'actual knowledge ... that the statement was false or misleading.'"); *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *11 (M.D. Ga. Mar. 23, 2018) ("Plaintiff did sufficiently allege Defendants' actual knowledge of their statements' falsity, and thus, Defendants' forward-looking statements made prior to April 25, 2015 are not shielded by the PSLRA.").

### 2.     Plaintiffs Have Adequately Pled Defendants Made Materially False or Misleading Claims During Investor Calls and Conferences

Defendants not only misstated Ryder's financial results but they also made materially false or misleading statements to investors during Ryder's investor calls and conferences. *See*, *e.g.*, ¶¶148-267, 299-308. For example, on February 11, 2016, despite the decline in Ryder's used vehicle prices, Sanchez falsely reassured the market that "[w]e do not have a situation where we've got a bunch of vehicles that are at high residual values [and] have to be written down." ¶184. This statement was materially false or misleading when made because Ryder did have a material number of vehicles that required write-downs. FE6, a Vehicle Sales Manager in the Asset Management Division until September 2016 and also a member of Ryder's Asset Management

25

Board stated that as early as 2015/2016, there was talk internally of the need for a write-down, as residual values had depreciated. FE6 said, however, that Defendants Sanchez and Garcia pushed back on writing down Ryder's used vehicles and "had no interest in writing down whatsoever," even as managers continued to raise concerns. ¶103.

Ryder knew it had a growing inventory of trucks it could not sell (particularly not near their estimated residual values), including those with the plagued MaxxForce engines, which, according to FE4, accounted for approximately 40% of Ryder's vehicle fleet and whose value was easily overstated by 50%. ¶¶105, 284. In 2015 and into early 2016, the number of Ryder's used vehicles available for sale rose from 5,500 at the beginning of 2015 to 8,000 at the end of 2015, a 45% increase. ¶¶9, 128. By the end of 2019, that number had risen to 9,400, a 71% increase from the beginning of 2015. ¶133. In addition, under internal Ryder policy, Ryder set a goal to sell all used vehicles within 90 days of entering the UTCs, as any used vehicle that remains unsold for <u>more than 90 days would depreciate at a faster rate, become even less desirable, and require more extensive and costly upkeep</u>. ¶8. Ryder had at least 300 Ryder trucks and 450 tractors available for sale that had been at the Ryder UTCs for <u>a year or more</u> as of August 2016, which meant that those 300 trucks and 450 tractors had already been at the UTCs for <u>at least six months</u> as of Sanchez's February 2016 statement and needed to be written down. ¶¶128-33.

Defendants argue that the Complaint's reliance on Sanchez's February 11, 2016 statement "fails" because "Ryder recorded a small gain of $1 million on used vehicle sales [in 2016], meaning that Ryder was still selling vehicles at or above their residual values." D.Br. at 26. Defendants miss the point. The Complaint alleges that, as the market for used vehicles crashed, Defendants Sanchez, Garcia and Cooke resisted repeated internal calls to reduce the prices of Ryder used vehicles in order to sell off the growing backlog of unsold inventory. ¶103. To avoid taking losses on these vehicles, Ryder instructed its sales personnel to "sit on" vehicles instead of selling them at increasingly larger losses either at auction or wholesale. ¶¶123, 283.

Defendants respond that this was merely good business judgment because selling goods when prices are low is economically irrational. D.Br. at 35. But, as many FEs recounted, Ryder's behavior was irrational and reckless because it only deferred the day of reckoning, as used vehicles simply accumulated, further depreciated, and exacerbated the problem. *See*, *e.g.*, ¶103 ("FE 4 told

26

[Defendant Cooke] 'This isn't going away. We're holding these trucks so they're just losing value.'").[19] As a result, during the Class Period, Ryder's inventory of used trucks ballooned while Defendants knew, with almost complete certainty, that Ryder would take a substantial loss on its new emissions vehicles alongside its increasingly old and dilapidated fleet of vehicles. Ryder's booking a small gain of $1 million in 2016 was therefore because of Ryder's resistance to sell vehicles and properly take a write down, and not a sign that nothing was wrong.

Defendants also assert that the sentences preceding Defendant Sanchez's statement made clear that, since Ryder uses a rolling five-year methodology, its residual values were still below the 20% drop in market values that it anticipated seeing in 2016, and it was in that context that Ryder did not have a large amount of used vehicles on hand that required write-downs. D.Br. at 26. However, Defendants' argument lacks merit. Sanchez made his statement in the context of actual vehicles for sale, when in fact, Ryder did have thousands of vehicles with residual values significantly higher than their expected sales proceeds.

On February 2, 2016, in response to an analyst's question about how a decline in used truck pricing would impact depreciation, Sanchez said, "If we had a type of bleak environment, as we've painted here, you would be in a situation probably 2017 where things would be flat ... in terms of depreciation" and "there wouldn't be depreciation policy movement one way or the other." ¶182. Similarly, on May 19, 2016, in response to an analyst's question about whether Ryder expected its residual value to be flat over the next few years, Garcia said "yes." ¶194. On July 27, 2016, Garcia also claimed that, based on "what we're seeing in the current marketplace ... I wouldn't envision an increase or decrease in residual values out over the next four, five years." ¶202; see also ¶210. And, on February 16, 2018, Garcia said that, based on Ryder's expectations for used truck pricing, depreciation will be at "a lower level than what we had seen this year." ¶236; see also ¶238. These statements were materially false or misleading when made given the well-pled allegations that Defendants were aware of the collapse of the used vehicle market and that customers were

---

[19] The FEs' accounts are corroborated by the fact that, after Ryder disclosed its $844 million "big bath" in October 2019, Ryder almost immediately began selling significantly more used vehicles, selling 33% more used vehicles in the three months ended December 31, 2019 than the same period the prior year. See Pl.Ex. 10.

returning Ryder's MaxxForce vehicles at a record pace before their leases ended, with their residual values 50% more than their selling prices. ¶¶10, 105.

On July 25, 2018, Sanchez also falsely stated "you can look at ChoiceLease today as being more derisked than it has historically" because "we've lowered that residual to generally the current levels that we're seeing today as opposed to using our normal rolling 5-year average." ¶249.[20] This statement was materially false or misleading because Ryder's vehicles' residual values had materially declined, yet Ryder had not lowered its residual values to "generally the current levels that we're seeing today" and ChoiceLease was thus not "derisked." ¶250. Defendants assert that statements like this were discussing residual values for lease pricing, and not accounting. D.Br. at 31. That is wrong. The context of Sanchez's July 25, 2018 statement shows that his reference to lowering Ryder's "residual" was an explicit reference to how Ryder had supposedly "lowered the residual expected sales proceeds at the end of that lease life"—i.e., Ryder's residual value estimates, the accounting measure at issue here. Pl.Ex. 8. Defendants do not explain their brazen assertion that Ryder's "lower[ing] the residual expected sales proceeds at the end of th[e] lease life" has no relationship to Ryder's accounting, and it clearly does.

In addition, on October 26, 2018, Sanchez falsely stated that Ryder's continuing use of its rolling five-year methodology allowed Ryder to "keep[] the residuals in the middle of the fairways as best we can." ¶254. This statement, particularly when read in the context of Sanchez's July 25, 2018 claim that Ryder had already supposedly lowered residual values to "generally the current levels we're seeing today" (¶249) was materially false and misleading when made because, instead of being "in the middle of the fairways," contemporaneous facts showed Ryder's reported residual values were significantly higher than what the Company could realize in sales proceeds.

By 2018, for example, Defendants knew that used tractor prices had fallen approximately 38.5% from the peak prices in 2015 and by 50% as a percentage of original cost. ¶97. The month or two before Defendant Sanchez's "middle of the fairways" statement, FE4, who was the Director of Asset Management Canada and in charge of 1,250 vehicles, told Defendant Cooke that "This [issue of overvalued vehicles] isn't going away. We're holding these trucks so they're just losing

---

[20] The ChoiceLease program is Ryder's largest leasing program, accounting for over 50% of Fleet Management Solutions revenue and over 30% of Ryder's total revenue. ¶35.

value." ¶103. FE4 said that he was "raising red flags like crazy" about inflated residual values and that he expressed these concerns repeatedly to Defendant Cooke, Chris Fairey (Vice President of Sales) and John Gleason. ¶103. FE4 stated that Gleason repeatedly overruled FE4's attempts to reduce Ryder's residual values. ¶103. Instead, FE4 was instructed to simply sit on the inventory if he could not successfully "have his people push harder to sell." *Id.*[21] FE4 also estimated that by 2018, 20% of its inventory had been sitting for over a year "rotting away." This all led directly and foreseeably to Ryder's need to take the $1 billion "big bath" in September 2019 and early 2020.

Defendants' conference call statements are also not protected by the PSLRA safe harbor because the safe harbor does not protect "statements that misrepresent historical/hard or current facts." *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1473 (N.D. Ga. 1997). Here, the alleged statements fall outside the protection of the PSLRA's safe harbor, as Defendants' purported cautionary language gave investors the impression that the risks at issue had not materialized when they had (*see supra* at 26) and the Complaint adequately pleads that Defendants did not honestly believe their statements. *See supra* at 27. As such, it would be imprudent to grant Defendants' motion to dismiss based upon the possibility that some of the alleged statements might be protected by the safe harbor. *See, e.g.*, *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1339 (S.D. Fla. 1999); *Harvey Jasper Ret. Trust v. Ivax Corp.*, 920 F. Supp. 1260, 1268 (S.D. Fla. 1995).

Defendants also repeatedly attributed Ryder's favorable financial performance to "lower depreciation associated with increased [or improved] residual values," or favorable "residual value policy changes," or lowered "depreciation expense."[22] These statements were materially false or misleading when made because, throughout the Class Period, Ryder hid the fact that its vehicles' residual values had materially decreased and its depreciation expense had materially increased. *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (holding that where the company "puts the topic of the cause of its financial success at issue," it was then "obligated to disclose information concerning the source of its success, since reasonable

---

[21] Corroborating FE4's claim, inventory increased dramatically, at over 50%, from 2017 to 2019. ¶133. Ryder also had record or near record highs in redeployments, extensions, and early terminations in 2017. *See* Pl.Ex. 11.

[22] *See* ¶150 (6/30/2015); ¶154 (8/7/2015); ¶156 (7/23/2015); ¶158 (9/10/2015); ¶164 (10/22/2015); ¶166 (10/22/2015); ¶170 (11/10/2015); ¶171 (11/11/2015); ¶175 (2/2/2016); ¶179 (2/12/2016); ¶181 (2/2/2016); ¶186 (4/26/2016); ¶190 (4/26/2016); ¶191 (4/26/2016); ¶197 (7/27/2016); ¶205 (10/25/2016); ¶208 (10/25/2016); ¶215 (2/14/2017); ¶234 (2/20/2018).

29

investors would find that such information would significantly alter the mix of available information") (citing *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281-82 (3d Cir. 1992)).

### 3. Plaintiffs Have Not Omitted Necessary Context from Defendants' False Statements

Defendants assert that Plaintiffs took Defendants' alleged false statements out of context. *See*, *e.g.*, D.Br. at 24-26. However, a review of the Complaint's language demonstrates that including Defendants' supposedly crucial context does nothing to alter the meaning of these statements, nor the reasons why such statements were materially false or misleading when made.

The Complaint quotes Defendant Garcia's statement on July 27, 2016 that, "I wouldn't envision an increase or a decrease in residual values out over the next four, five years." ¶202. Defendants accuse Plaintiffs of wrongly attributing this statement to Defendant Sanchez. D.Br. at 24. But Plaintiffs' source for that quotation is Alpha-Sense, an established source of corporate information such as SEC filings and conference call transcripts. Alpha-Sense attributed that statement to Sanchez, rendering this an inadvertent error on Alpha-Sense's part. *See* Pl.Ex. 12. For the avoidance of confusion, Plaintiffs herein attribute the July 27, 2016 statement to Garcia.

Defendants then point out that when Garcia claimed he would not envision an increase or decrease in residual values, he made that statement in the context of the assumption that "if prices stay at these [current] levels." D.Br. at 24. According to the graph of Ryder's vehicle prices set forth above, as of mid-2016, the prices for Ryder's used vehicles had declined by approximately 15% from their 2015 highs. If Ryder's market prices remained at mid-2016 levels (i.e., below the 2015 peak) for the next 3-5 years, then, by operation of Ryder's purported five-year rolling average methodology, and based on Ryder's claims that it updated its residual values based on current market values and trends, Ryder's residual values would necessarily have to decline over five years, rather than show no increase or decrease, as Garcia falsely claimed. Defendants' additional "context" thus does not materially alter the meaning of Garcia's statement nor the reasons the Complaint claims it was false or misleading when made. The Complaint also acknowledged that Garcia based his statement on "what [Ryder was] seeing in the current marketplace." ¶202.

30

Defendants also assert that Plaintiffs "badly misquote" Defendant Garcia's February 16, 2018 statement that depreciation will be at a "lower level than what we had seen this year," but again, Defendants' added "context" does not alter the meaning of the statement. D.Br. at 24. The relevant sentence in the Complaint, which follows a <u>full quote</u> of the analyst's question, says "Defendant Garcia responded that, <u>based on Ryder's expectations for used truck pricing</u>, depreciation will be at 'a lower level than what he had seen this year.'" ¶236 (emphasis added). Defendants' additional "contextual language" (i.e., "[i]f [pricing for 2019] comes in [as planned in 2018]. We probably would still continue to have some depreciation and policy headwinds," "we have to see … how it all plays out, right," and "[i]t's dependent on what our used vehicle sales results are and everything") does not justify their consternation. D.Br. at 24. This language does not change the meaning of or render this statement any less actionable. The Complaint explicitly alleges that Garcia's statement that depreciation will be at a "lower level than what we had seen this year" was conditioned on Ryder's expectations for used truck pricing. ¶236. Further, the Complaint alleges that this statement was false because Garcia knew with almost complete certainty that depreciation expense would materially rise in 2019 given that the 2010-2012 vintage classes of used vehicles were plagued with defective engines and commanded significantly lower prices on the used vehicle market, and that these vehicles would increasingly reach the end of their useful lives and have to be sold in 2019 and 2020. ¶¶103-33. The Complaint also alleges that, at this time, Defendants were refusing to sell these vehicles at lower costs. *Id.*

Finally, Defendants claim that Plaintiffs misquote Defendant Sanchez's February 14, 2019 statement that "the impact of all the accelerated [depreciation] and depreciation policy changes we're making starts to bring that number down" and "[s]o I feel really good about where we're headed with that [residual values and depreciation]." ¶307; D.Br. at 25. Defendants assert that the "full text of that statement reveals that Sanchez was optimistic precisely because ... in the second half of 2018 'prices [had] improved' and 'the impact of all the accelerated depreciation and policy changes [Ryder was] making' was bringing residual values down." D.Br. at 25. This "additional context" does not materially alter the meaning of Defendant Sanchez's statements or why Plaintiffs claim it was false or misleading. The Complaint alleges that this statement, made a mere eight months before Ryder's $844 million residual value write-down, was made without a reasonable

31

basis because Sanchez knew Ryder's vehicles with defective engines had reached the end of their useful lives *en masse*, that the residual values for these vehicles were overstated by 50%, and that Ryder's inventory had ballooned and would have to be reduced and sold off. ¶¶103-33.

### B. The Complaint's Allegations Support a Strong Inference of Scienter

A plaintiff may plead scienter by alleging with particularity facts giving rise to a strong inference that Defendants acted with either severe recklessness or an intent to deceive, manipulate, or defraud. *See Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*, 847 F. Supp. 2d 1333, 1343 (S.D. Fla. 2012). A strong inference of scienter exists where, as here, the complaint alleges that defendants "possessed knowledge of facts or access to information contradicting their public statements," *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1360 (N.D. Ga. 2010), *aff'd sub nom. Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012), or "egregious[ly] refus[ed] to see the obvious or investigate the doubtful," *In re Hamilton Bankcorp., Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1359 (S.D. Fla. 2002).

The inquiry "is whether <u>all</u> of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007); *see also Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004) (allegations were not sufficient standing alone but taken together established scienter). The inference of "scienter <u>need not</u> be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the '<u>most</u> plausible of competing inferences.'" *Id.* at 324. Instead, a scienter inference is "strong" when it is <u>as likely as</u> any other inference, and a tie goes to the plaintiff. *Id.* at 328; *accord In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1291 (M.D. Fla. 2008) (finding scienter adequately pled where "the inference of scienter is equal to the inference of non-fraudulent intent"); *see also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) ("*Tellabs* now <u>awards the draw to the plaintiff</u>."). Plaintiffs meet these standards.

#### 1. Defendants Witnessed a Sharp Decline in Resale Truck Values and Were Warned that Ryder's Residual Values Were Overstated

Defendants have admitted that, starting in 2015, they observed a steep and continuous decline in used vehicle sales prices. ¶¶270-72. Specifically, the Complaint alleges that Defendants

knew that in the years after truck and tractor prices reached "historic levels" due to a temporary lack of supply related to the 2007-2009 recession, truck and tractor prices fell precipitously. Defendants were also directly told that as a result of this decline, Ryder needed to adjust its residual values because as they were, the vehicles were significantly over-valued. ¶103. Multiple former Ryder employees reported that Ryder's senior executives tracked historical used vehicle sales and met on a quarterly basis to assess the Ryder fleet's valuation and pricing. *Id.* Former employees similarly said they reported their concerns over residual values to Ryder executives, including Defendant Garcia, but that those findings and concerns were consistently ignored.  ¶¶103, 271.[23]

For example, FE6, a Vehicle Sales Manager in Ryder's Asset Management Division and a member of Ryder's Asset Management Board, reported that even though it was "clear that they needed to write-down the equipment," Defendants Sanchez and Garcia pushed back and chose not to write down the used vehicles. ¶103. FE6 had direct access to this information because the value and depreciation of the vehicles in Ryder's fleet were determined at Ryder's quarterly Asset Management Board meetings. *Id.* FE10 participated in weekly and monthly calls with Ryder senior management—including Defendants Garcia and Sanchez—during which FE10 himself expressed his concern that Ryder's fleet was overvalued. *Id.* Like FE6, FE10 reported that Sanchez and Garcia consistently pushed back and stated that they did not want to lose money on the trucks. *Id*. FE4, who was responsible for ensuring that assets were depreciating properly, stated that he was "raising red flags like crazy." *Id*. FE4 stated further that, like FE10, Ryder's C-suite, including Defendant Garcia, received reports that memorialized residuals and depreciation, and that FE4 met with Garcia and other Ryder executives to discuss these reports. *Id*. That Defendants were directly and consistently warned that residual values needed to be adjusted and pushed back without ever making the requisite adjustments is strong evidence of scienter.  *See In re Acuity Brands, Inc. Sec. Litig*., 2019 WL 10246166, at *24-25 (N.D. Ga. Aug. 12, 2019) (strong inference of scienter where

---

[23] The Complaint alleges that the pricing and valuation of Ryder's trucks was a centralized process managed out of Ryder's headquarters primarily by Ryder's Asset Management Board. ¶¶83-86. This included weekly and monthly calls with Defendants to discuss valuation and depreciation, which supports a strong inference of scienter. ¶84; *In re HD Supply Holdings Inc. Sec. Litig*., 341 F. Supp. 3d 1342, 1361 (N.D. Ga. 2018) (scienter where defendants were involved in weekly updates concerning supply chain); *Hubbard v. BankAtlantic Bancorp, Inc*., 2009 WL 3261941, at *3 (S.D. Fla. May 12, 2009) (allegations that the defendants were presented with information that would have shown falsity of company's financials or were confronted with concerns regarding company's lending practices, as supported by confidential witnesses, sufficient to show scienter).

confidential witnesses reported that the defendants were informed of dropping sales and slowing growth and that reports detailing the business were sent to the defendants); *In re Friedman's, Inc. Sec. Litig*., 385 F. Supp. 2d 1345, 1363 (N.D. Ga. 2005) (strong inference of scienter based on internal reports revealing company's true financial condition).

Defendants argue that the former employee allegations in the Complaint do not contribute to a strong inference of scienter. D.Br. at 34-37. Defendants primarily complain that because none of the former employees was an accountant at Ryder, they cannot possess relevant information, and their statements amount to "second-guessing of management decisions." D.Br. at 35.[24] As discussed above, and as Defendants admitted, the steep decline in used vehicle prices and the defective MaxxForce engines were the reasons for the need to reduce Ryder's residual values. Not only did the former Ryder employees cited in the Complaint personally observe those developments in real-time, they also personally raised their concerns directly to Defendants Sanchez, Garcia and Cooke, and others. ¶103. Moreover, assessing former employees' credibility is inappropriate on a motion to dismiss. *Luczak v. Nat'l Beverage Corp*., 812 F. App'x 915, 924 (11th Cir. 2020) (holding, where defendants challenged the credibility of confidential witnesses, that "it is improper to weigh the evidence in this way on a motion to dismiss"). But, in any event, Plaintiffs' allegations satisfy the standards in the Eleventh Circuit for reliance on such allegations.

In the Eleventh Circuit, as a matter of law, "the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir. 2008). Where, like here, a "complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame," confidentiality will not undermine the weight afforded to an allegation. *Id.*; *accord Luczak*, 812 F. App'x at 924-25; *Davidco Inv'rs, LLC v. Anchor Glass Container Corp.*, 2006 WL 547989, at *15 (M.D. Fla. Mar.

---

[24] The FE allegations here differ significantly from those in Defendants' cases. Unlike here, the FEs in *In re Downey Securities Litigation*, 2009 WL 2767670, at *11 (C.D. Cal. Aug. 21, 2009) merely expressed disagreement with management with no factual basis for doing so. *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) does not deal with former employees. And, contrary to the FEs in *In re Wachovia Equity Securities Litigation*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011), the FEs here were involved in fleet valuation and <u>did</u> voice concerns about it.

6, 2006) (Confidential witnesses may be used to sustain complaints as long as "sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.").

The Complaint sufficiently describes the foundation of each FE's knowledge and makes clear that the FEs had access to relevant information concerning Defendants' misstatements. For example, the Complaint alleges that FEs 4, 6, and 10 participated in conference calls and meetings with Defendants, and that they were responsible for asset valuation and depreciation, in particular as part of Ryder's Asset Management Board. ¶103. This is all that is required under the law at the pleading stage. *See, e.g*., *Tung v. Dycom Indus., Inc*., 454 F. Supp. 3d 1244, 1258 (S.D. Fla. 2020) (basis of witnesses' knowledge sufficiently alleged where complaint alleged that witnesses sat in on monthly calls with CEO); *Mogensen v. Body Cent. Corp*., 15 F. Supp. 3d 1191, 1214–15 (M.D. Fla. 2014) (crediting witness accounts even though "the witnesses appear to have lacked knowledge concerning Body Central's overall sales trends, all of them—including the former regional vice president, who oversaw almost 100 stores—described widespread stale merchandise and short-staffing problems in the stores under their supervision.").

Defendants also assert that Plaintiffs are incorrect to draw the connection between residual values as an accounting matter, and the residual values used to calculate lease prices. D.Br. at 27-29. Defendants could not be more wrong, as there is a clear link between Ryder's need to adjust its residual values and the actual lease prices. ¶¶38-65. When Ryder finally disclosed to investors in 2019 the reduction in the residual value of Ryder's fleet by $844 million, Sanchez admitted that the need to do so would necessarily involve an increase in lease rates, which would hurt Ryder's competitiveness going-forward. ¶63. Ryder's October 29, 2019 investor presentation stated that the "Key ROC [Return on Capital] Improvement Actions" that it was taking included "[i]ncreased lease rates on all power vehicles by reducing priced residual assumptions." *Id*. In other words, Ryder acknowledged that its major reduction in residual value estimates would necessarily cause an increase in lease rates—because those metrics are linked to one another.

Defendants also argue that they could not possibly have known what Ryder's vehicles would sell for in the future and assert that they disclosed declines in market pricing during the Class Period. D. Br. 28-29. These arguments miss the mark. Defendants did not disclose the graph

35

showing the actual material decline in the pricing of Ryder's vehicles until at the end of the Class Period. Plaintiffs also allege that Defendants failed to accurately quantify the impact of these declines in Ryder's published financials. ¶¶113-22. Defendants' cited cases are thus inapposite. *See Ziemba v. Cascade Int'l, Inc*., 256 F.3d 1194, 1210-11 (11th Cir. 2001) (regarding company's outside auditor, no allegations raising any inferences that the defendants knew of any fraud); *In re BellSouth Corp. Sec. Litig*., 355 F. Supp. 2d 1350, 1375 (N.D. Ga. 2005) (bare assertion that company somehow "knew" a Public Service Commission Order invalidating late fees would be upheld insufficient to allege scienter regarding the lack of a reserve against late fees).  Importantly, a key part of Ryder's disclosed methodology was that it would update its residual values to accurately reflect current market prices. The Complaint sets forth detailed allegations that Ryder failed to do so, hiding a $1 billion shortfall from investors.[25]

### 2.   Defendants Were Keenly Focused on Residual Values and Depreciation

Defendants' comments throughout the Class Period (*see, e.g*., *supra* note 22) and the reports of numerous FEs establish that residual value estimates and depreciation were central to Ryder's business throughout the Class Period. That the subject of Defendants' misstatements was core to Ryder's operations and reported financials—demonstrating Defendants' focus on these issues throughout the Class Period—supports an inference of scienter. *See, e.g.*, *Flowers Foods*, 2018 WL 1558558, at \*14 ("An inference of scienter is bolstered by Plaintiff's numerous allegations indicating that the DSD model was a 'core operation' of Flowers."); *In re Clarus Corp. Sec. Litig.*, 201 F. Supp. 2d 1244, 1251 (N.D. Ga. 2002) ("[I]t would be an extreme departure from the standard of ordinary care" for senior officers to be unfamiliar with facts surrounding significant corporate transactions); *In re World Access, Inc. Sec. Litig.*, 119 F. Supp. 2d 1348, 1356 (N.D. Ga. 2000) (inference that senior officers knew or recklessly disregarded serious problems with "flagship product"); *see also In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at \*26

---

[25] Defendants mistakenly assert that Plaintiffs merely criticize Ryder's accounting methodology. D.Br. at 30-31. But Defendants failed to adhere to their methodology and misstated Ryder's financial condition. Defendants' cases do not apply. *In re KLX, Inc. Sec. Litig*., 232 F. Supp. 3d 1269, 1279 (S.D. Fla. 2017) involved only a failure to recognize an impairment in the first quarter rather than the third. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) recognized that "corporate officials," like defendants, are "responsible for revealing those material facts reasonably available to them."

(S.D.N.Y. Dec. 2, 2013) ("[M]embers of [issuer's] senior management team ... can be presumed to have knowledge of the company's core operations."). That Ryder's used truck fleet was "critical" to its business is particularly probative of scienter here, given Defendants' repeated statements demonstrating they were focused on depreciation and residual values.

Defendants thus knew that Ryder accumulated losses on its used vehicle sales throughout the Class Period, but refused to write down the vast majority of Ryder's vehicles' inflated residual values. Defendants assert that the fact that they disclosed losses during the Class Period negates an inference of scienter. D.Br. at 33. This ignores that the amount of losses was woefully inadequate, as evidenced by the magnitude of the belated write-down. Defendants cite *Waterford Township General Employees Retirement System* v. *BankUnited Financial Corp.*, 2010 WL 133257, at *12 (S.D. Fla. Mar. 30, 2010), on this point. D.Br. at 33. But in *Waterford*, the plaintiffs alleged that BankUnited failed to maintain adequate loan loss reserves, and the Class Period ended with BankUnited's disclosure of $98 million of loan loss reserves. 2010 WL 133257 at *16. The court held that the sequential disclosure of loan loss reserves of $10.4 million, then $19.1 million, then $65 million, undermined an inference that BankUnited intentionally maintained inadequate reserves. *Id*. Here, Ryder's disclosures of accelerated depreciation expense of only $10 million (2016), $30 million (2017), and $39 million (2018) do not undermine an inference that Ryder concealed a materially much larger problem, since they were a far cry from Ryder's ultimate $844 million reduction in its residual values. ¶138.

### 3. The Magnitude of the Write-Down Supports Scienter

The $1 billion total magnitude of the changes Ryder made in 2019 and early 2020 supports the strong inference that Defendants had recklessly disregarded drastic changes in market prices and vehicle defects, or purposely overstated Ryder's residual values to understate depreciation expense and overstate its earnings. As alleged in the Complaint, Defendants took a $415 million additional depreciation hit in 2019 alone, as compared to approximately $80 million in 2018. ¶¶313-16. The magnitude of the 2019 and early 2020 write-downs supports a strong inference of scienter. *See Paincare*, 541 F. Supp. 2d at 1292 (M.D. Fla. 2008); *Katz v. Image Innovations Holdings*, *Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (magnitude of fraud supports scienter); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 460 (S.D.N.Y. 2005) (significant length of time

of undisclosed errors supports scienter); *Sunbeam*, 89 F. Supp. 2d at 1338 (continuing nature of fraud supports scienter). Indeed, as Pacific Square Research reported in its February 28, 2020 analyst report, Ryder "pa[id] the price for years of underpricing its leases to drive growth" with a depreciation methodology that had "introduce[d] a significant distortion into earnings." ¶146.[26]

### 4. Defendants Made $11 Million of Insider Sales of Ryder Stock

"Personal financial gain may weigh heavily in favor of a scienter inference," *Tellabs*, 551 U.S. at 325, and Defendants Sanchez, Garcia, and Cooke made $11 million worth of insider sales of personally-held Ryder stock at suspicious times during the Class Period. *See Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1277 (N.D. Ga. 2014) (scienter where defendant sold shares while knowing nonpublic negative information). Sanchez sold $6.6 million worth of personally-held Ryder stock during the Class Period and, in each sale, he sold at least 23% of his total holdings, with each sale closely following false or misleading statements issued by Defendants. ¶321. Cooke also sold more than $3.8 million of personally-held Ryder stock, virtually all of his vested shares, in the years preceding the first corrective disclosure. ¶327. Cooke's sales were also suspicious in size, timing, and amount as in each sale he sold at least 33.6% of his total holdings, and each sale closely followed false or misleading statements issued by Defendants. *Id.*[27]

Defendants assert that because Plaintiffs did not plead a "control period" of prior stock sales for Defendants' pre-Class period stock sales, they cannot establish that Defendants' Class Period stock sales were suspicious.[28] D.Br. at 38. This argument ignores the fact—as pled in the Complaint—that none of these executives used a Rule 10b5-1 plan to execute their Class Period trades, whereas, by contrast, they made their pre-Class Period trades pursuant to such plans.[29] That stark difference between the two time periods supports a strong inference of scienter.[30]

---

[26] Defendants' attempts to downplay the similarities between the present case and *Waste Management* also fail. *See* D.Br. at 39. Like the defendants' $1.7 billion fraud to overstate residual values in *Waste Management*, Defendants overstated Ryder's earnings by $1 billion. ¶¶291-94.
[27] Garcia also sold almost $550,000 of Ryder stock. ¶324.
[28] Defendants assert Plaintiffs failed to account for the strike price in Defendants' stock sales (D.Br. at 37), but doing so would still result in $4.5 million in illicit profits. ¶318.
[29] Defendants assert Plaintiffs did not challenge Ryder's pre-Class Period residual values. D.Br. at 35. But the issue here is Ryder's overstatement of residual values as prices fell starting in 2015. Ryder also asserts that, from 2011 through 2015, Ryder "did not increase residual values to the highs of then-prevailing market prices." D.Br. at 2. But that hinges only on Defendants' say-so.
[30] Defendants also benefitted from the lower lease prices caused by the artificially-inflated residual values through increased incentive compensation tied to lease volumes. ¶¶340-41.

### 5.    The New CFO Promptly Saw the Need for a $1 Billion Write-Down

On September 25, 2018, Ryder announced that Defendant Garcia, Executive Vice President and CFO, would retire from the Company on April 30, 2019. ¶295. Garcia had spent a 20-year career with Ryder and had acted as its CFO since 2010. At the time of his departure Ryder did not have a new CFO lined up but embarked on a search for Garcia's replacement. *Id*. Sudden departures of executives whose area of work responsibility is directly related to the subject matter of the underlying alleged fraud can "add one more piece to the scienter puzzle." *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002). Here, it cannot be ignored that a 20-year veteran CFO left Ryder just one year before the Company disclosed a $844 million adjustment to the residual value estimates Ryder reported on his watch. On March 27, 2019, Ryder named Scott Parker as the Company's new CFO and, almost immediately upon Parker joining Ryder, the Company made the disclosures of a total $1 billion adjustment to Ryder's residual values.[31] ¶296-97. As courts have explained, "the fact that [a] new CEO ... discovered the [issues] within months of taking the position is a strong indication that these [misstatements] were obvious enough that a new officer found them quickly." *In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 725 (D. Del. 2000) (allegations that new CFO "discovered that the Company's income was overstated within weeks of becoming its CFO" support scienter).[32]

### 6.    Defendants Have Not Proven a Truth on the Market Defense

Defendants assert that the Complaint fails to take into account Ryder's vague disclosures to investors about the defective reduced-emissions vehicles and its inventory levels, and that such disclosures undermine an inference of scienter. *See* D.Br. at 35 n.15, 36. Defendants' assertions amount to the claim that the market was aware of the facts that Plaintiffs allege Ryder materially misstated and omitted from its disclosures, which is a "truth on the market" defense. But Defendants do not satisfy the stringent standard to invoke such a defense, which is "intensely fact-

---

[31] Defendants assert Ryder began disclosing accounting adjustments before Garcia left (D.Br. at 37), but the disclosed adjustments during his tenure pale in comparison to those made after he left.
[32] Defendants' cited cases are inapplicable. *See Dillard v. Platform Prods. Corp.*, 2016 WL 10586301, at *7-8 (S.D. Fla. Dec. 8, 2016) (discounting resignations because witness who claimed executive left for "ethical reasons" did not work at the company at the time of the departure, and another witness's claim that an executive left because of his "difficult temperament" had nothing to do with the fraud); *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) (resignation of accounting firm a month after a restatement is not "surprising").

39

specific" and "rarely an appropriate basis for [dismissal]." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). To establish the defense, Defendants must show that the truth was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression." *In re Apple Comp. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir.1989). Defendants have not met that burden, which "is a notoriously difficult burden to carry short of trial." *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 985-86 (D. Minn. 2004).

Specifically, Defendants have not established the market was aware during the Class Period of the true, material scope of Ryder's overstatement of its residual values or the cost of the unfixable problems Ryder faced with its reduced-emissions vehicles. Ryder's mentions of the existence of an increasing inventory or general challenges with the MaxxForce engines in fact gave investors the false impression that Ryder not only understood these potential problems existed but that Ryder was adequately accounting for them. Wall Street analysts also remarked that the three corrective disclosures that end the Class Period and form the basis of Plaintiffs' allegations of the truth being revealed (in July 2019, October 2019, and February 2020) were materially different than prior disclosures. Specifically, analysts at SunTrust Robinson Humphrey wrote in February 2020 about those three disclosures that: "We are certainly frustrated as this marks the third consecutive quarter of <u>meaningful</u> EPS [Earnings Per Share] estimate revisions." ¶145.[33]

## IV.   THE COMPLAINT ADEQUATELY PLEADS CONTROL PERSON LIABILITY

Since Plaintiffs adequately alleged an underlying claim against Ryder under Section 10(b), and that the Executive Defendants controlled Ryder and its statements to investors, Plaintiffs have pled "control person" violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## V.   CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss should be denied.  If any claims are dismissed, Plaintiffs respectfully request the opportunity to amend pursuant to Federal Rule of Civil Procedure 15.

---

[33] Defendants are wrong to assert that unqualified audit opinions here undermine an inference of scienter. *See In re Diamond Foods, Inc., Sec. Litig.*, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012) (unqualified audit opinion did not undermine inference of scienter, as "we will eventually have to evaluate … what, if anything, was hidden from the auditor"); *In re New Century*, 588 F. Supp. 2d 1206, 1231-32 (C.D. Cal. 2008) ("The Court … does not consider the audit opinion to undermine the particularity with which Plaintiffs have alleged scienter.").

Dated: February 2, 2021                                Respectfully submitted,

                                                        /s/ *Robert D. Klausner*
                                                       Robert D. Klausner
                                                       **KLAUSNER KAUFMAN JENSEN**
                                                       **& LEVINSON**
                                                       Florida Bar No. 244082
                                                       Stuart A. Kaufman
                                                       Florida Bar No. 979211
                                                       7080 NW 4th Street
                                                       Plantation, FL 33317
                                                       Tel:     (954) 916-1202
                                                       Fax:     (954) 916-1232
                                                       Email: bob@robertdklausner.com
                                                       Email: stu@robertdklausner.com

                                                       *Liaison Counsel for Lead Plaintiffs the*
                                                       *State of Alaska, Alaska Permanent Fund;*
                                                       *the City of Fort Lauderdale General*
                                                       *Employees' Retirement System; and the*
                                                       *City of Plantation Police Officers*
                                                       *Pension Fund*

                                                       **BERNSTEIN LITOWITZ BERGER**
                                                       **& GROSSMANN LLP**
                                                       Salvatore Graziano (*pro hac vice* forthcoming)
                                                       Hannah Ross (*pro hac vice* forthcoming)
                                                       Adam Wierzbowski (*pro hac vice* forthcoming)
                                                       John Rizio-Hamilton (*pro hac vice* forthcoming)
                                                       Brenna Nelinson (*pro hac vice* forthcoming)
                                                       Matthew Traylor (*pro hac vice* forthcoming)
                                                       1251 Avenue of the Americas
                                                       New York, NY 10020
                                                       Tel:     (212) 554-1400
                                                       Fax:     (212) 554-1444
                                                       Email: salvatore@blbglaw.com
                                                       Email: hannah@blbglaw.com
                                                       Email: adam@blbglaw.com
                                                       Email: johnr@blbglaw.com
                                                       Email: brenna.nelinson@blbglaw.com
                                                       Email: matthew.traylor@blbglaw.com

                                                       *Lead Counsel for Lead Plaintiffs and the Class*

41

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of February, 2021, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

/s/ *Robert D. Klausner*