**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| STATE OF ALASKA, ALASKA PERMANENT FUND, THE CITY OF FORT LAUDERDALE GENERAL EMPLOYEES' RETIREMENT SYSTEM, and THE CITY OF PLANTATION POLICE OFFICERS PENSION FUND, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RYDER SYSTEM, INC., ROBERT E. SANCHEZ, ART A. GARCIA, and DENNIS C. COOKE,<br><br>Defendants. | 1:20-cv-22109-AMC |

**DEFENDANTS' REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT...........................................................................................................................4

    I.  PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISSTATEMENT. ......................4

        A.  Ryder's residual value estimates are not actionable. ......................................................4

        B.  Ryder management's statements are not actionable. ......................................................8

    II.  PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER .................10

CONCLUSION.......................................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cole* v. *Health Mgmt. Assocs., Inc.*,
2009 WL 2713178 (M.D. Fla. July 17, 2009) .................................................................. *passim*

*DiLeo* v. *Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) .......................................................................................11

*Friedman* v. *Hammer*,
2020 WL 2559549 (S.D. Fla. May 20, 2020) .......................................................9 n.7

*Harris* v. *Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999) ........................................................................................9

*Hubbard* v. *BankAtlantic Bancorp., Inc.*,
2008 WL 5250271 (S.D. Fla. Dec. 12, 2008).............................................................11

*In re Adaptive Broadband Sec. Litig.*,
2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ................................................................19

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ......................................................................19

*In re Gen. Elec. Sec. Litig.*,
2020 WL 2306434 (S.D.N.Y. May 7, 2020) ................................................6, 17, 18

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
2015 WL 4469143 (D.N.J. July 22, 2015)...................................................................14

*In re Immucor Inc. Sec. Litig.*,
2006 WL 3000133 (N.D. Ga. Oct. 4, 2006) .....................................................20 n.18

*In re KLX, Inc. Sec. Litig.*,
232 F. Supp. 3d 1269 (S.D. Fla. 2017) .......................................................................11

*In re Mako Surgical Corp. Sec. Litig.*,
2013 WL 2145661 (S.D. Fla. May 15, 2013) ...............................................................8

*In re Ocwen Fin. Corp. Sec. Litig.*,
2015 WL 12780960 (S.D. Fla. Sept. 4, 2015) .......................................................5, 15

*In re Paincare Holdings Sec. Litig.*,
541 F. Supp. 2d 1283 (M.D. Fla. 2008).............................................................18 n.17

*In re Penn Treaty Am. Corp. Sec. Litig.*,
  202 F. Supp. 2d 383 (E.D. Pa. 2002) ...................................................................................6

*In re Progress Energy, Inc.*,
  371 F. Supp. 2d 548 (S.D.N.Y. 2005)...................................................................................7

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996)..................................................................................9 n.7

*In re Serologicals Sec. Litig.*,
  2003 WL 24033694 (N.D. Ga. Feb. 20, 2003) ....................................................................18

*In re Synchronoss Techs., Inc. Sec. Litig.*,
  2019 WL 2849933 (D.N.J. July 2, 2019).......................................................................20 n.18

*Katz* v. *Image Innovations Holdings, Inc.*,
  542 F. Supp. 2d 269 (S.D.N.Y. 2008).........................................................................18 n.17

*Local 703, I.B. of T. Grocery & Food Employees Welfare Fund* v.
  *Regions Fin. Corp.*,
  2011 WL 12855820 (N.D. Ala. June 7, 2011)...................................................................9 n.7

*Mizzaro* v. *Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ............................................................................... 12-13

*Owens* v. *Jastrow*,
  789 F.3d 529 (5th Cir. 2015) .............................................................................................17

*Slayton* v. *Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010)............................................................................................7, 8

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................................................ 20

*Zucco Partners, LLC* v. *Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .............................................................................................14

**Statutes and Rules**

15 U.S.C. § 78u-5 ...............................................................................................................8

**PRELIMINARY STATEMENT**

The primary question presented by this motion is whether the pleaded facts support a compelling inference that Ryder acted to mislead investors when it estimated the residual values of its vehicles in the midst of an exceptionally severe and prolonged downturn in used vehicle prices. The plain answer to that dispositive question is no.

Instead, the pleaded facts show that Ryder *disclosed* how it calculated residual values (and adjusted them over the life of the vehicle); *disclosed* that used vehicle prices began to decline in late 2015, informing investors of the precise amounts of those declines, as they occurred; *disclosed* the impact those declines had on Ryder's residual value estimates; *disclosed* that Ryder had recognized hundreds of millions of dollars of additional depreciation as those prices continued to fall; and *warned*, specifically heading into 2018, that if prices did not come back in a "big" way, Ryder would need to recognize still more depreciation in years to come.

As it turned out, prices did start to improve in late 2018, suggesting the kind of comeback Ryder had experienced in the past. But when the market took an unexpected turn back down in the summer of 2019, followed by a nose dive in the fall—that is, the opposite of the big comeback needed—Ryder recognized more depreciation on vehicles to be sold in 2019 and well beyond.

Plaintiffs' opposition does not (and cannot) dispute any of this. And so, in the face of Ryder's robust disclosures to the market, plaintiffs resort to criticizing management. They say that Ryder should have abandoned its disclosed methodology for estimating residual values, and marked all those values to then-current prices. Plaintiffs cite nothing (no law or accounting rule) requiring, or even favoring, such an approach. Which is not surprising, given that a residual value is *not* estimating what a vehicle would sell for today, but what the vehicle would sell for *in the future* based on the prevailing prices *at the time* it is sold. Nor is that *post hoc* criticism even relevant, as the securities laws "regulate disclosure of information, not [alleged] mismanagement."

-1-

Plaintiffs say that Ryder misled investors when it said its methodology took into account current price trends.  But Ryder did just that, as each new current year was rolled into the five-year average *and* by recording $258 million in additional accelerated depreciation and valuation adjustments based on *current* prices for vehicles to be sold in that *current* market.

Plaintiffs next double down on a handful of statements purportedly made by "former employees."  But those statements are fundamentally inconsistent with plaintiffs' own pleading, and themselves demonstrate that those "FEs," all of whom concededly worked in sales, were not in a position to know how Ryder was *accounting* for the residual values of its vehicles, let alone how those values were *adjusted* over the vehicle's life.

Finally, grasping at straws, plaintiffs now appear to want to make this case all about one type of "defective engine" used by one vehicle manufacturer over a decade ago.  But that dog won't hunt, as the saying goes, as Ryder specifically *disclosed* the problems it (and everyone else) had with those Maxxforce engines.  And plaintiffs' claim that Ryder supposedly "admitted" that those engines were the reason why Ryder recognized additional depreciation in October 2019 rests on yet another distortion of what management actually said to investors.

The complaint should be dismissed for multiple independent reasons, as explained in the opening brief and herein.  *First*, plaintiffs do not allege an actionable misstatement.  Point I, *infra*. Their opposition confirms the absence of any pleaded facts suggesting that Ryder's residual value estimates (and they are just that, estimates) were false at the time they were made based on the disclosed methodology Ryder employed.  As for the litany of management statements plaintiffs originally challenged in the complaint:  plaintiffs now concede that nearly all are forward-looking and subject to the PSLRA safe harbor, and plaintiffs' quibbles with Ryder's unusually specific cautionary language are makeweight.  And while plaintiffs spend pages trying to explain away

their selective editing of management's statements, they utterly fail to explain how any of the few statements plaintiffs now focus on were false or misleading in any way.

*Second*, and perhaps most fundamentally, plaintiffs fail to plead a strong inference of scienter.  Point II, *infra*.  Stripped to its essentials, plaintiffs' claim is that the $300 million of additional depreciation Ryder recognized between 2016 and 2018 was not enough, and that Ryder should have recognized more, sooner than it did.  But as courts have found in dismissing similar complaints, such second-guessing of the timing and amount of uncertain accounting estimates does not sound in *fraud*.  And that is especially the case here, where Ryder disclosed the methodology it used to make those estimates and it is undisputed that Ryder was *actually* selling vehicles at or above their residual values during that period.  Despite plaintiffs' confidence in their own forecasting, Ryder did not have the benefit of hindsight as to what would come next.

And even beyond all of that, any inference of scienter here is completely undermined by defendants' repeated *disclosures* of the same "red flags" on which plaintiffs rest their claim:  that prices had dropped, that inventory was up, and the troubles with the Maxxforce engines.  As courts have recognized, that those "red flags were *disclosed* to the public … *negates* the inference that defendants acted with scienter."

The Supreme Court has instructed that, to survive a pleadings motion, the inference of scienter must be "powerful," "cogent," and "compelling."  Here, it is none of those things, and pales in comparison to the opposing inference of *non*-fraudulent intent:  that defendants simply did not foresee the depth and duration of the decline in prices that ultimately occurred.  That is not fraud.  And the complaint should be dismissed in full, including for failure to plead scienter.

## ARGUMENT

### I.       PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISSTATEMENT

#### A.       Ryder's residual value estimates are not actionable.

Plaintiffs do not dispute that if they cannot plead an actionable misstatement based on Ryder's residual value estimates, their challenge to Ryder's other "financial metrics" fails as well. POB 15; Def. Br. 16.  As shown, those estimates are not actionable for three independent reasons.

*Not contemporaneously false*.  Plaintiffs' lead argument is that Ryder's residual value estimates were overstated beginning at some point in 2015, because, by then, prices had started to decline.  POB 15-18.  But this argument simply rests on a misconception of what a residual value is:  an estimate of *future*, not present, value.  Def. Br. 8-9.  And plaintiffs ignore that Ryder's vehicles were *actually* selling above or in line with their residual values for 2015, 2016, 2017, and 2018, including as a result of the residual value adjustments Ryder had made over that period.  *Id.*

Citing nothing, plaintiffs assert that "current market" conditions provide the best estimate of future value.  *E.g.*, POB 2 ("Indeed, there is no better predictor of the price at which one can sell an asset in the future than the current market price of similar assets.").  Why is that the case? Was the "current" price of GameStop stock in January 2021 the best predictor of its future stock price?  Years later?  An even cursory examination of the two decades of used vehicle price data reproduced in plaintiffs' complaint (and again in their brief) suffices to rebut that unsupported assertion.  POB 11; Def. Br. 10 (showing historical volatility and cyclicality in used tractor prices).

In any event, plaintiffs cite no law, no accounting rule, that would require conformity of future residual value estimates to *current* prices—a methodology that if adopted would (plaintiffs don't dispute) create a whipsaw effect in Ryder's accounting, as prices rise and fall in any given year.   Plaintiffs' attempt to impose their (unsupported) business judgment in place of the methodology that Ryder employed for years and disclosed to investors finds no home in the federal

securities law, which "regulates disclosure of information, not [alleged] mismanagement." *In re Ocwen Fin. Corp. Sec. Litig.*, 2015 WL 12780960, at *4 (S.D. Fla. Sept. 4, 2015).[1]

In a sign of its importance, plaintiffs try to bury (literally, in footnote 29 on page 38 of their brief) the five-year period immediately preceding the class period.  Def. Br. 17.  If plaintiffs' "current is all that matters" approach is required, were Ryder's residual value estimates actionably false when it did not increase them to match the then-current *rising* prices between 2011 and 2015?  Plaintiffs' silence is deafening, and reveals one of many fundamental flaws in plaintiffs' pleading.

Plaintiffs thus switch gears, and now assert that Ryder supposedly misrepresented its methodology by saying its annual review considers "current and expected future market price trends."  POB 5, 16; Def. Br. 6 (including same language).  Not so.  Ryder's review has *two* main components:  a long-term component (policy depreciation) that adjusts depreciation across Ryder's fleet based principally on a rolling average, and a short-term component (accelerated depreciation) that looks to current and expected future price trends for vehicles that are expected to be sold soon, *i.e.*, during *that* current trend.  And even Ryder's long-term view also has a current element, as each new year is rolled into the average.  Def. Br. 7-9, 14.

Plaintiffs appear to fault Ryder for not having published the pricing "graph" reproduced in the complaint until nearly the end of the class period.  POB 35-36.  But plaintiffs totally ignore that in each and every quarterly and annual report Ryder disclosed the *actual percentage* year-over-year changes in used vehicle sales prices, *i.e.*, the data that's illustrated in the graph.[2]  That

---

[1]  Plaintiffs suggest (p. 4) that Ryder's methodology violates GAAP's "matching principle."  But as the complaint recognizes, that principle simply requires that depreciation expense be recorded "*in the same period* as the revenues to which the expenses relate," *i.e.*, *when* the vehicle is earning lease revenue.  ¶¶ 41-44; Ex. 47 (ASC 360-10-35-17) at 1.  There's no allegation that Ryder failed to do so, nor any authority that the customary "straight-line" method it used (¶ 45) violates GAAP.

[2]  Ryder disclosed a 14% decline in tractor prices and a 1% decline for trucks in 2016 (Ex. 15 at 31); a 12% decline for tractors and another 12% for trucks in 2017 (Ex. 13 at 31); price *increases*

prices were declining (up until late 2018) was no secret; as one analyst put, it was "the elephant in the room." Def. Br. 29. The securities law require materially accurate disclosures, not pictures.

And those disclosures set this case apart from *In re Penn Treaty Am. Corp. Sec. Litig.*, 202 F. Supp. 2d 383, 391-92 (E.D. Pa. 2002) (cited at POB 16), where the company "made efforts to shield the investing public" from the truth "until it was too late." Here, Ryder repeatedly *told* investors prices were going down, inventory was going up, and that unless those trends abated, Ryder would "need to adjust [its estimates] again." *Cole* v. *Health Mgmt. Assocs., Inc.*, 2009 WL 2713178, at *7 (M.D. Fla. July 17, 2009). That those estimates needed to be "adjust[ed] again" as the market continued to deteriorate "does not mean the initial [estimates] were 'false'" when made.

Plaintiffs assert that those estimates were "contemporaneously" false because existing market factors "pointed to a prolonged decline." POB 15. (How long or severe a decline, plaintiffs don't say.) But in all events, "a company's knowledge of unfavorable trends does not show that its [estimates] were misleading as of the time they were stated," as "previously known trends may later reveal themselves to be of a different magnitude or importance." *In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *14 (S.D.N.Y. May 7, 2020). And that is certainly the case here, where the factors plaintiffs point to were "all publicly disclosed," and "plaintiffs' assertion of falsity rests … entirely on a disagreement" involving "projections of future" results. *Id*; *infra* p. 17 (no scienter).[3]

**Inactionable opinion.** Plaintiffs do not dispute that residual values are accounting estimates subject to higher standards for pleading falsity of opinions. POB 19; Def. Br. 18 (citing cases). They say that their pleading nevertheless satisfies *Omnicare*'s strictures because

---

of 12% and 9% respectively for tractors and trucks in 2018; and by mid-2019, that prices had turned sharply down again. Exs. 1 & 2 at 31; *see also* Def Br. 12-14 (summarizing disclosures).

[3]   Plaintiffs' allegations based on former employee statements and Navistar's Maxxforce engines are addressed in Point II, *infra*.

defendants did not "actually believe[]" Ryder's estimates were appropriately stated.  POB 19-20.

But the complaint does not plead scienter (*infra* Point II), let alone that Ryder's residual values

were "intentionally [overstated] or that defendants knew that [those estimates were] different than

what they told the investing public."  *Cole*, 2009 WL 2713178, at *8.  Plaintiffs rehash (p. 20) that

defendants misrepresented that they "accurately took into account current market values."  But

Ryder never said that it matched residuals to "current" values.  *Supra* p. 5.[4]  And the claim that

Ryder omitted facts relating to "observed sales data" is contradicted by public filings and need not

be credited.  *See supra* pp. 5-6; *In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y.

2005) ("[T]here can be no omission where the allegedly omitted facts are disclosed.").[5]

> ***Forward-looking***.  Plaintiffs also do not dispute that Ryder's residual value estimates are
> "forward-looking" statements under the PSLRA.  POB 22.  And if those estimates are protected,
> plaintiffs can't get around the safe harbor by pointing to other "financial metrics" they claim were
> misstated *only* because of that protected, forward-looking measure.

> Plaintiffs criticize the Second Circuit's decision in *Slayton* as supposedly divorced from
> the PSLRA's text.  Just the opposite.  *Slayton* looked to the plain language of the safe harbor,
> which distinguishes between a forward-looking statement in a financial statement (not protected)
> and a forward-looking statement in the MD&A (protected and where Ryder's residual values are

---

[4]    Plaintiffs point to Sanchez's March 5, 2019 statement referencing "mark-to-market," but ignore that it was about *accelerated depreciation*, *i.e.*, "accelerat[ing] the depreciation" on vehicles to be sold "in the next 18 months" when there is "more certainty around what the price is going to be … in order to get [ ] down quicker" to "mark-to-market" pricing.  POB 6; Reply Ex 3 at 9-10. And, as Ryder disclosed, once those vehicles were ready to be sold, it applied further valuation adjustments if necessary to "mark" those prices to market.  Def. Br. 9.

[5]    Plaintiffs fail to respond to defendants' showing that plaintiffs' claim that Ryder should have recorded an "impairment" was based on a flawed premise, conceding the point.  Def. Br. 32 n.13.

found).  *Slayton* v. *Am. Exp. Co.*, 604 F.3d 758, 767 (2d Cir. 2010).  None of plaintiffs' parade of district court decisions even address, let alone disagree with, that holding.  POB 22-23.

### B.      Ryder management's statements are not actionable.

Plaintiffs all but concede that the litany of management statements challenged in their complaint are forward-looking statements subject to the PSLRA safe-harbor.  *Compare* Def. Br. 19-20, *with* POB 22-23.  They respond by claiming that (i) Ryder's cautionary language was inadequate and (ii) a handful of statements supposedly misrepresented present statements of fact about Ryder's residual value estimates.  Neither response has merit.

*First*, as shown, the forward-looking statements plaintiffs challenge were "accompanied by meaningful cautionary statements."  15 U.S.C. § 78u-5(c)(1); Def. Br. 20-22.  Ryder's disclosures were unusually specific, warning investors that "market factors" and "technology changes" "mak[e] it difficult to accurately predict residual values"; that "beginning in the latter part of 2015 and continuing through 2018, [Ryder] experienced a weakening of conditions in the used vehicle sales market, which adversely affected used vehicle sales volume and pricing"; and that further declines "would likely negatively impact the residual value estimates."  *Id*.  That is all (indeed, more than) the PSLRA requires.  *In re Mako Surgical Corp. Sec. Litig.*, 2013 WL 2145661, at *7-8 (S.D. Fla. May 15, 2013) (cautionary language "meaningful" where it warns about "factors which could lead to … risks actually realized").

Plaintiffs complain that Ryder did not specifically warn about risks of "defective-reduced emissions engines."  POB 23-24.  Putting aside that Ryder *repeatedly* disclosed the challenges it experienced with those particular engines (Def. Br. 36; *infra* pp. 15-16), plaintiffs ignore the Court of Appeals' clear command:  "when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment," even if the

"cautionary language [does not] explicitly mention the factor that [plaintiffs claim] ultimately belies a forward-looking statement."  *Harris* v. *Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999).

Plaintiffs next contend that Ryder's cautionary language was inadequate because in late 2015 prices had "already sharply declined," invoking the totally inapposite example of "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."  POB 24.  But Ryder specifically disclosed those declines, and their impact on residual value estimates, *as they occurred* throughout plaintiffs' nearly *five-year* class period.  *See supra* pp. 5-6; Def. Br. 11-13.  And Ryder repeatedly warned that residual values would need to be lowered *further* still if prices continued to fall.  *Id.*[6]  Five years of warnings of increasing emphasis is a far cry from a foot.[7]

*Second*, plaintiffs spend pages in an unconvincing attempt to explain away their selective editing of Ryder's public statements.  POB 25-32.  And contrary to plaintiffs' "no-harm no-foul" appeal, the missing words make clear that Ryder's executives were making predictions about the *future* based on disclosed assumptions about *future* pricing.  Def. Br. 23-25.

Plaintiffs now focus principally on Sanchez's February 11, 2016 statement that:  because "we're doing a five-year rolling average," and didn't "mark to market residual values" during the

---

[6]   Plaintiffs appear to fault Ryder for not disclosing in 2018 that it would need to recognize additional depreciation even if prices stayed the same.  POB 17.  But Ryder disclosed *exactly* that, informing investors that "for us to be able to leave depreciation where it is … we need pricing to … turn around and really start moving back up" and estimating that prices would need to *rise* "about 10% to 15%" to "slow or stop the accelerated depreciation."  Ex. 6 at 13, 19.

[7]   Plaintiffs' cases (p. 24) are inapposite.  *E.g.*, *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("knew" but did not warn that value "would decline … to the point of virtual non-existence"); *Friedman* v. *Hammer*, 2020 WL 2559549, at *3 (S.D. Fla. May 20, 2020) (assurance that "investment carried 'zero risk'" material); *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund* v. *Regions Fin. Corp.,* 2011 WL 12855820, at *6 (N.D. Ala. June 7, 2011) (knew of undisclosed "increased loan loss reserves" before "cautionary statements").

"run-up … over the last five years," "our residual values are still below" the "20% drop" in prices "we expect … in 2016," and as a result "*[w]e do not have a situation where we've got a bunch of vehicles that are at high residual values [and] have to be written down*." Ex. 5 at 8; POB 25 (italicized text). But plaintiffs *still* can't identify anything false or misleading about what Sanchez said when he said it. And that is especially so given that in 2016 Ryder's vehicles were *still* selling at or above their residual values, notwithstanding the "20% drop" in prices. Def. Br. 9, 26.[8]

Plaintiffs also challenge *another* February 2016 statement by Sanchez about what "*would*" happen in 2017 "*if*" prices stayed at the depressed level Ryder was projecting for 2016. POB 27-28; Reply Ex. 1 at 23. But that is plainly a *forward-looking* statement protected by the safe harbor. *Supra* p. 8. Nor is it false or misleading, as Sanchez's projection that depreciation "would be flat" in that scenario is just a function of the math. Of course, prices fell even further in 2017, triggering $92 million of *additional* depreciation and valuation adjustments. Def. Br. 9.

Plaintiffs' remaining challenges to the handful of other statements (partially) quoted in their opposition[9] likewise fail because they are on their face forward-looking and because their alleged falsity rests entirely on plaintiffs' flawed theory of scienter.

## II.    PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER

The opposition confirms that the complaint should be dismissed for the independent reason that it fails to plead facts giving rise to a strong inference that any defendant acted with scienter.

---

[8]   Plaintiffs say that "miss[es] the point" because the complaint alleges that Ryder refused to lower sales prices on vehicles in 2016. POB 26-27. But that makes no sense. If Ryder sold more vehicles in 2016 for less money, that would just mean that those vehicles would *not* have suffered losses in 2017 when they were ultimately sold. But Ryder recorded just a small net loss of $17 million in 2017, rendering plaintiffs' counterfactual inapposite. Def. Br. 9.

[9]   *See* POB 27-30 (identifying May 19, 2016, July 27, 2016, February 16, 2018, and October 26, 2018 statements), reproduced in full at Exs. 6 at 13, 16 at 10, 35 at 18; Reply Ex. 4 at 42.

*Price declines*.  Plaintiffs contend that due to the price declines that began in late 2015, defendants "knew with almost complete certainty" (pp. 27, 31) that Ryder's residual values would turn out to be overstated.  But missing from the complaint is any allegation that any defendant (or anyone) knew that prices would fall to the depths and for the duration that ultimately occurred.  As Yogi Berra said:  "It's tough to make predictions, especially about the future."  Courts agree, routinely dismissing complaints like this one relying on "hindsight" to infer scienter.  Def. Br. 29.

Plaintiffs concede that Ryder recognized an additional $300 million of depreciation and valuation adjustments between 2016 and 2018 in response to those price declines.  They just think that Ryder should have taken *more* depreciation *earlier*.  But such *post hoc* criticism of the timing or amount of an uncertain accounting estimate is plainly insufficient.  As Judge Easterbrook put it:  "[I]f all that is involved is a dispute about the timing of [a] writeoff … we do not have fraud; we may not even have negligence."  *DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (cited in *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1279 (S.D. Fla. 2017)); *Hubbard* v. *BankAtlantic Bancorp., Inc.*, 2008 WL 5250271, at *18 (S.D. Fla. Dec. 12, 2008) ("The argument that Defendants, looking back after the fall of the Florida real estate market, should have reserved more than they did does not reflect an extreme departure from the standards of ordinary care").

And that criticism is not even well taken here.  What exactly do plaintiffs think Ryder should have done (without the benefit of hindsight)?  Take additional fleetwide depreciation in 2015 when Ryder's used vehicles sold for $100 million *more* than their residual values?  In 2016, when vehicles *still* sold for a small gain?  In 2017, when in light of the additional appreciation Ryder recognized, it lost just $17 million on those sales?  Or in 2018, when prices started to *rise*, suggesting a reversal of a downward trend that would have been consistent with prior cycles?  "Plaintiff[s]' allegations are more consistent with a company and executives confronting a

-11-

deterioration in the business … than they are with a company and executives recklessly deceiving the investing community." *Cole*, 2009 WL 2713178, at *9.

Plaintiffs say that defendants can't explain why Ryder made the forward-looking changes to its depreciation estimates that it did in October 2019, when the actual prices of used vehicles then were the same as they were in 2018. POB 17. Defendants *did* explain that; plaintiffs just chose to ignore it. Def. Br. 13. As Sanchez specifically told investors heading into 2018: "for us to be able to leave depreciation where it is, we need … used vehicle market pricings to come up. … [W]e really haven't seen [that] big move," and "until we see that, you'll see … some additional depreciation." Ex. 6 at 13. And when instead of that "big move" up, prices instead turned sharply down by late 2019, with further declines forecasted through 2021, Ryder recognized additional depreciation for vehicles now expected to be sold in that "down" market. Ex. 27 at 5-6.[10]

At bottom, plaintiffs' claim rests on this: a *post hoc* criticism that Ryder should have abandoned its disclosed methodology for calculating residual values beginning in 2015, even while Ryder was selling vehicles above or near their residual values through 2018 based on that methodology, and should have instead, again beginning in 2015, further accelerated depreciation on vehicles to be sold in 2019 and beyond, years before Ryder knew what the then "current" market prices would be. That's not fraud. That's not even negligence. It's not even logical. And it certainly is not a basis to sustain a claim under Section 10(b).

***"Former employees."*** Plaintiffs' reliance on FEs does not support an inference of scienter either. "[T]he weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations," including "the foundation or basis of the

---

[10] Plaintiffs also invoke the "core operations" theory. POB 36-37. But it is irrelevant here, as dismissal is warranted not because the defendants were unaware of the declines in used vehicle prices, but because those declines do not support an inference of scienter.

confidential witness's knowledge." *Mizzaro* v. *Home Depot, Inc.*, 544 F.3d 1230, 1239-40 (11th Cir. 2008). But the FEs' statements themselves demonstrate that they were *not* in a position to know how Ryder was *accounting* for residual values, which is the basis for the claim of scienter.[11]

To begin, plaintiffs continue to conflate (i) the residual values included in a particular lease for pricing purposes, and (ii) the residual values set and adjusted for accounting purposes. As the complaint recognizes, the former happens at the beginning of the lease, helps determine how much the customer will pay for the lease, and *stays the same* throughout the life of the lease. ¶¶ 57-62. It's just like leasing a car at a dealership: once your payments are set, the residual value in your lease (and associated monthly payments) does not change, even if prices do after you leave the lot.[12] But as Ryder's public filings make clear, the residual values on those same vehicles *are* adjusted for *accounting* purposes, through a combination of policy depreciation (as each new year is incorporated), then accelerated depreciation and valuation adjustments as the vehicle nears and reaches the end of its useful life. Def. Br. 9 (table). Plaintiffs' assertion that "if Ryder never adjusted residuals for the purpose of lease pricing … that meant Ryder did not also adjust residuals for accounting purposes" is just confused *ipse dixit*. POB 18.

Plaintiffs heavily rely on FE 6's assertion that "residual values" on "all of Ryder's trucks and trailers were overstated by approximately 30%." POB 18; ¶¶ 10, 110. FE 6 left Ryder in

---

[11]   Contrary to plaintiffs' strawman, the trouble is not that "none of the former employees was an accountant" (POB 34), but that none of the FEs was in a position to know how Ryder was *accounting* for the vehicles (including the Maxxforce) over their useful lives. Def. Br. 35-36.

[12]   Plaintiffs again mischaracterize Sanchez's July 25, 2018 statement (POB 16-17, 28), which referred to the methodology for setting residual values at the beginning of the lease for *pricing* purposes. Def. Br. 31; *see also* Ex. 27 at 6 ("[W]ell before the current change in residual estimates for accounting purposes, we lowered the residuals we were using for pricing purposes."). As he explained, this meant that the "leasing program" (POB 17) was "more derisked," because it was less likely that customers' monthly lease payments, which (unlike accounting residuals) are fixed at origination, would not cover the vehicle's true cost over the lease's life.

2016. ¶ 78. When exactly was Ryder's entire fleet overstated by 30%? In 2015, when Ryder sold vehicles for a $100 million *more* than their residual values? In 2016, when they were *still* sold for a small gain? Pointing out these inconsistencies is not an attack on FE 6's "credibility," as plaintiff suggests. POB 34. Rather, they show that FE 6, who like all the other FEs worked in sales, was simply not in a position to know how Ryder was *accounting* for the residual values of vehicles, regardless of the price at which Ryder was willing to sell. Def. Br. 34-35. Confidential witness statements that are "incongruous with the [the company's] public actions alleged in the complaint" need not be credited. *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009).

So too FE 4's claim (p. 18) that Ryder "*never*" adjusted residual values, which were as a consequence overstated from anywhere between 20% and 50%. Def. Br. 35-36 (discrediting allegation as inconsistent with the public record and plaintiffs' pleading). Plaintiffs try to square the circle by saying that FE 4 worked only in Canada and was talking only about "his specific 1,250 Ryder vehicles." POB 18. Setting aside the incredible suggestion that *none* of the residual values for those vehicles were *ever* adjusted for accounting purposes during his seven-year tenure, plaintiffs can't have it both ways: they can't ask the Court to rely on FE 4's statement that Ryder's residual value estimates were overstated by at least 20%, POB 18, but then suggest that any inconsistency be overlooked because FE 4 knew only about *Canada* (less than 6% of Ryder's leasing business), and his *1250* vehicles (less than 1% of Ryder's over 200,000 vehicle fleet). *E.g.*, Ex. 1 at 38, 91; *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at *19 (D.N.J. July 22, 2015) (refusing to draw inferences beyond CW's "respective regions or locations").

Nor finally do *any* of the FEs point to *anything* suggesting that defendants were aware of *any* undisclosed fact contrary to their public statements. The FEs' various observations, even if credited, reflected their views of the then-*current* market, and not any undisclosed information

-14-

regarding Ryder's expectations of *future* pricing.  Def Br. 34.  And plaintiffs can't point to anything about the current market that Ryder failed to disclose.  *See, e.g.*, *Cole*, 2009 WL 2713178, at *9-10 (no scienter where plaintiffs failed to allege that "reports showing [the company's] bad debt situation … differed from the data reported in connection with the reserves actually taken"); pp. 5, 15 (showing that Ryder disclosed pricing, sales results, and inventory levels on a quarterly basis).

Plaintiffs next criticize how Ryder managed its inventory (POB 26-27), adopting the view of various FEs (who, again, worked in sales) that Ryder should have lowered sales prices more quickly to sell more vehicles.  But whatever its merit, such criticism is not a basis to plead scienter.  Def. Br. 35; *Ocwen*, 2015 WL 12780960, at *4.  Nor do plaintiffs explain how not lowering sales prices on the relatively small number of vehicles Ryder held in inventory even relates to their claim that the residual values of Ryder's entire (and much larger) fleet were overstated.[13]

Plaintiffs also ignore that Ryder *disclosed* both the number of vehicles it had in inventory each quarter (and the target range) and the $194 million in *valuation adjustments* that Ryder recognized on those vehicles between 2015-18.  Def. Br. 9; *e.g.*, Ex. 39 at 7; Ex. 13 at 44 (even calling them "inventory valuation adjustments").  And contrary to the FEs's repeated charge that Ryder refused to "write down" vehicles in inventory, Ryder recorded *gains* on the *actual* sales of those vehicles—again demonstrating that the FEs did not have a basis to know how Ryder accounted for them.  Def. Br. 9 (gains:  $118M (2015); $68M (2016); $41M (2017); $32M (2018)).

***Navistar engines***.  Plaintiffs also lean heavily on the FEs' descriptions of problems with Navistar's Maxxforce engines.  But plaintiffs completely ignore that Ryder repeatedly *disclosed* those problems, and their impact on the prices of *those* vehicles, fatally undermining any inference of scienter.  Def. Br. 36 (highlighting disclosures throughout the class period); *see also, e.g.*, Reply

---

[13]   *E.g.*, 5,800 out of 179,100 in 2015, and 7,600 out of 209,300 in 2019.  Exs. 31 at 32, 26 at 46.

Ex. 2 (Q1 2016 Earnings Call) at 9 ("pricing pressure" on the "2011 and 2012 Navistars"); Ex. 22 (Q2 2017 Earnings Call) at 13 (analyst even referring to "the 2012 problem child").[14]  Nor is there any well-pled allegation that Ryder did not separately reduce the residual values on Maxxforce vehicles for accounting purposes to reflect those particular challenges.  Def. Br. 36.

Plaintiffs stake much on their claim that Sanchez supposedly "admit[ed]" that Ryder recognized additional depreciation in October 2019 because residual values had been "negatively impacted by maintenance costs on the early model years of the post-2010 emissions technology." POB 2, 7, 15.  But Sanchez said no such thing.  Rather, he explained that *leases* Ryder signed prior to 2014 had *performed* worse than expected, due to maintenance costs that were higher, and sale prices that were lower, than what Ryder anticipated *at the time it set the monthly payments on those leases*.  Ex. 27 at 6 (describing "lease pricing actions" and "lease performance").  As to what drove the changes in residual value estimates across Ryder's fleet, Sanchez was explicit:

> [After [t]he used tractor market showed signs of stabilization and improvement during 2018 and early '19 … [suggesting] market prices and the accounting residual values used for depreciation were moving towards alignment,[15] … this trend began to change in June … [and] continued to worsen in the third quarter and we now expect this downward trend to continue in the near term.

Ex. 27 at 5; *see also id.* at 15-16 ("[W]e're seeing a price decline … across the broader market"); Reply Ex. 7 (ACT reporting "first time since the fall of 2012 … prices f[e]ll month-over-month for three straight months").  And indeed, Ryder previously disclosed that the 2011-12 vehicles (of which Maxxforce was only a part) were largely "out of [the] operating fleet" by mid-2019, *i.e.*,

---

[14]   Plaintiffs rely (pp. 8, 26) on FE 4's statement that Maxxforce vehicles made up about "40% of [the] fleet" at some unidentified point in time.  But even if credited, FE 4 was, by plaintiffs' own admission, talking only about Canada, a very small fraction of Ryder's fleet.  *See supra* p. 14.

[15]   *See also* Ex. 24 (Q4 2018) at 7 (previously disclosing that "if used vehicle prices remains stable over the next couple of years, we expect … [b]y 2022, pricing and book values will have largely reached parity, and we would no longer expect to need any accelerated depreciation").

before Ryder recognized that additional depreciation.  Ex. 24 at 20-21 (Q4 2018); Reply Ex. 3 at 11 ("the issue with the 2012[s] … goes away next year as those trucks … leave the fleet"); *infra* p. 18 (showing that October 2019 additional deprecation was only on vehicles in operating fleet).

Through no measure of legal alchemy can plaintiffs transform a particular and *disclosed* issue regarding problematic engines from one manufacturer into "*almost complete certain*[]" knowledge that, starting in 2015, there would be a "*permanent*[]" fleetwide decline in prices years later.  POB 16, 27.  It is exactly the kind of speculative leap the PSLRA does not permit.

Moreover, what is remarkable is that the very "red flags" on which plaintiffs rest their claim—that used vehicles prices were declining, inventory was going up, and the Navistar problems—were repeatedly *disclosed* to investors, completely undermining any inference that Ryder was trying to deceive them.  Def. Br. 30 (collecting cases); *see also Owens* v. *Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015) ("[T]he red flags were disclosed to the public, which negates the inference that defendants acted with scienter."); *Gen. Elec.*, 2020 WL 2306434, at *14 ("Strikingly, the trends that plaintiffs rely on in alleging that GE should have more quickly written down its goodwill were all publicly disclosed to investors").[16]

Indeed, in the *GE* case, the court specifically rejected the argument, similarly advanced by plaintiffs here, that scienter should be inferred "[b]ecause the same factors that led to the impairment [there] had existed before."  *Id.* at *14-15.  But as those factors were "all publicly disclosed," and like here there was no allegation that "defendants knew of facts or had access to information" contrary to their public statements, plaintiffs' allegations that GE should have "more

---

[16]  Plaintiffs' strawman (pp. 39-40) that defendants are asserting a "truth on the market" defense is incorrect.  Defendants are pointing to disclosures fundamentally inconsistent with an inference of scienter, which, consistent with Congress's judgment, appropriately results in dismissal.  *Id.*

-17-

quickly written down its assets," were, again like here, "at worst failures of judgment," and accordingly fall far short of the "conscious recklessness" needed to sustain a claim of fraud. *Id*.

*Magnitude*. Plaintiffs claim that scienter should be inferred simply based on the *amount* of additional depreciation recognized. POB 37-38. To start, plaintiffs mischaracterize that depreciation. They repeatedly refer to an October 2019 "$844 million write down," but that was the *cumulative* amount of going-forward depreciation Ryder was recognizing for the next *six* years (2019-2025) for active vehicles expected to be sold during that period. Ex. 28 at 5-6; ¶ 280. And the sheer size of Ryder's $15 billion fleet meant that 70% ($591 million in policy depreciation) resulted just from the adjustments made to the rolling five-year average. Def. Br. 14.

But in all events, the "magnitude of an alleged fraud is not enough to support an inference of scienter." *Gen. Elec.*, 2020 WL 2306434, at *15 (largest "impairment since the 2008 financial crisis"); Def. Br. 37 (cases). For example, plaintiffs in *In re Serologicals* similarly argued that the "size" of an impairment charge supported an inference that defendants "must have known" the assets were overstated "months earlier." 2003 WL 24033694, at *12-13 (N.D. Ga. Feb. 20, 2003). The court firmly rejected the argument, explaining that the "mere magnitude of the improperly overestimated value provides no indication of how or when the defendants became aware of its true value," and that to "travel from magnitude of fraud to evidence of scienter, the court must blend hindsight, speculation and conjecture to forge a tenuous chain of inferences." And that was especially so, as the "estimat[ion] [of] future cash flows" at issue there, like the residual value estimates at issue here, requires the "exercise [of] considerable business judgment." *Id*.[17]

---

[17]   Plaintiffs' cases (p. 37) involved substantial indicia of fraud accompanying a restatement, neither of which is the case here. *See In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2008) ("false reason for the accounting errors"); *Katz* v. *Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273-75 (S.D.N.Y. 2008) ("fictitious sales").

Plaintiffs say that "[d]efendants are wrong to assert that [the] unqualified audit opinions here undermine an inference of scienter." POB 40 n.33 (citing two California federal court decisions). But in this Circuit, the receipt of "a clean opinion as to [the company's] financials … *is* a competing inference of scienter." *Cole*, 2009 WL 2713178, at \*10; Def. Br. 39 n.18.

***Management changes***. Plaintiffs contend that Garcia's "sudden departure … add[s] one more piece to the scienter puzzle." POB 39. But "[t]he fact that an executive resigned, on its own, does not support an inference of scienter." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1245 (N.D. Ga. 2019); Def. Br. 37 (citing cases). And this case is nothing like *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at \*6, \*14 (N.D. Cal. Apr. 2, 2002), on which plaintiffs rely (POB 39), where a CFO was replaced within a month of the company "admit[ing] it had wrongfully recorded [gains]." Here, Garcia's retirement was announced more than a year *before* the October 2019 disclosure; and he stayed on, at Ryder's request, until a "successor [was] named and commence[d] service," and even *after*, as a "Special Advisor." Ex. 48 at 2, 5. The pleaded facts confirm that Garcia's departure was anything but "sudden," and none remotely "suggest that intentional or reckless misconduct had occurred." *Equifax*, 357 F. Supp. 3d at 1245.

Plaintiffs claim that scienter should be inferred because "almost immediately" after Parker joined as CFO in March 2019 Ryder "disclosed a $844 million [residual value] adjustment." POB 39. But the adjustment was anything but "almost immediate," as it came over seven months into Parker's tenure. And most significantly, plaintiffs ignore that something else significant happened between March and October: the price *increases* observed in late 2018 and early 2019 abruptly *reversed*, with the prices in free fall by October. *Supra* pp. 16-17.

***Stock sales***. Plaintiffs don't even dispute their failure to meet their pleading "burden of showing that [insider] sales … were in fact unusual or suspicious in amount and in timing," by

failing to "compare the number of shares sold during the class period with the number of shares sold either before or after the class period." Def. Br. 38 (citing cases). That should end the inquiry.

And plaintiffs' observation (p. 38) that the sales were made without a Rule 10b5-1 plan gets the law backwards. Courts *reject* inferences of scienter when stock sales are made pursuant to a Rule 10b5-1 plan; they don't *infer* scienter because sales are made without one.[18] Nor is there any pleaded fact tying the expiration of those plans in *2013* (two years before prices even began to fall) to anything relating to plaintiffs' claims here. *Compare* Reply Ex. 5 *with* Reply Ex. 6.

**Tellabs.** The PSLRA requires that plaintiffs plead inferences of scienter that are "cogent," "compelling," and "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; Def. Br. 27. Plaintiffs say that they satisfy that heightened pleading standard because a "tie" goes to them. POB 32. But the inferences here are not remotely in equipoise. The far more cogent and compelling inference from the facts alleged is that Ryder did the best it could in making uncertain estimates of future value; was up front with investors as to both its disclosed methodology for making those estimates and the sharp declines in pricing it (and everyone else) was observing in real time; and when it became clear that prices were not coming back as they had in the past (after a time in 2018-19 when it looked like they would), responded by making further changes to reduce the likelihood of losses in future years. That is not fraud, and the complaint should be dismissed for failure to plead scienter.

## CONCLUSION

For the reasons set forth above, the complaint should be dismissed with prejudice.

---

[18]   *See, e.g.*, *In re Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at \*18 n.8 (N.D. Ga. Oct. 4, 2006) (according no "weight" to stock sales in light of "valid 10b5-1 plan"); *Synchronoss Techs., Inc. Sec. Litig.*, 2019 WL 2849933, at \*17 (D.N.J. July 2, 2019) ("[E]ven if [the] transactions were not made pursuant to Rule 10b5-1 plans, Plaintiff's allegations regarding the timing and amount of these sales are not particularly suggestive of scienter.").

Dated:  March 4, 2021

Respectfully submitted,

**GUNSTER, YOAKLEY & STEWART, P.A.**

*/s/ Jonathan K. Osborne*
Jonathan K. Osborne
Florida Bar No. 95693
David M. Wells
Florida Bar No. 309291
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
Telephone:  (954) 462-2000
Facsimile:  (954) 523-1722
Email: josborne@gunster.com
Email: dwells@gunster.com


**WACHTELL, LIPTON, ROSEN & KATZ**
William D. Savitt, *pro hac vice*
Steven P. Winter, *pro hac vice*
Wilfred T. Beaye, Jr., *pro hac vice pending*
51 West 52nd Street
New York, New York 10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
Email:  wdsavitt@wlrk.com
Email:  swinter@wlrk.com
Email:  wtbeaye@wlrk.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 4th day of March, 2021, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

**GUNSTER, YOAKLEY & STEWART, P.A.**
*Attorneys for Defendants*
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL  33301
Telephone:  (954) 462-2000
Facsimile:  (954) 523-1722

By: */s/ Jonathan K. Osborne*
      Jonathan K. Osborne, Esq.
      josborne@gunster.com
      Florida Bar No.: 95693
      David M. Wells
      Florida Bar No. 309291
      dwells@gunster.com