UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION
CASE NO. 20-22109-CIV-CANNON

STATE OF ALASKA, ALASKA
PERMANENT FUND, ET AL.,

    Plaintiffs,    FORT PIERCE, FLORIDA

  vs.

           APRIL 7, 2021

RYDER SYSTEM, INC., ET AL.,

          PAGES 1 - 89

    Defendants.
_____/


TRANSCRIPT OF **VIDEO-CONFERENCED** MOTION HEARING
BEFORE THE HONORABLE AILEEN M. CANNON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFFS:  ROBERT KLAUSNER, ESQ.
        Klausner Kaufman Jenson & Levinson
        7080 Northwest 4th Street
        Plantation, Florida  33317

        JOHN RIZIO-HAMILTON, ESQ.
        HANNAH ROSS, ESQ.
        ADAM WEIRZBOWSKI, ESQ.
        MATTHEW TRAYLOR, ESQ.
        Bernstein Litowitz Berger & Grossmann
        1251 Avenue of the Americas
        New York, New York  10020


REPORTED BY:    DIANE M. MILLER, RMR, CRR, CRC
        Official Court Reporter
        United States District Court
        101 South U.S. Highway 1
        Fort Pierce, FL  34950
        (772)467-2337
        diane_miller@flsd.uscourts.gov

```
APPEARANCES CONTINUED:

FOR THE DEFENDANTS:      JONATHAN K. OSBORNE, ESQ.
                         Gunster, Yoakley & Stewart
                         450 East Olas Boulevard, Suite 1400
                         Fort Lauderdale, Florida  33301


FOR THE DEFENDANTS:      STEVEN P. WINTER, ESQ.
                         WILFRED T. BEAYE, ESQ.
                         Wachtell, Lipton, Rosen & Katz
                         51 West 52nd Street
                         New York, New York  10019
```

Wednesday, April 7, 2021.

P-R-O-C-E-E-D-I-N-G-S

THE COURT:  Good morning.  Ms. Glass, you may call the case.

THE COURTROOM DEPUTY:  Calling case 20-CV-22109-CANNON, State of Alaska, Alaska Permanent Fund, et al., versus Ryder System, Inc., et al.

Can we please have Counsel state their appearance, beginning with the Plaintiffs.

MR. KLAUSNER:  Robert Klausner, Klausner Kaufman Jensen & Levinson, on behalf of the Plaintiffs.

MR. RIZIO-HAMILTON:  Good morning, Your Honor.  John Rizio-Hamilton of the firm Bernstein Litowitz Berger & Grossmann, also on behalf of the Plaintiffs.

With me today are some other colleagues who will introduce themselves momentarily, but I should also add that Mr. Ben Hofmeister, an Assistant Attorney General from the State of Alaska, is also observing today's proceedings and is present by audio.

Hannah, you're up.

MS. ROSS:  Sorry about that, Your Honor.

Good morning, Your Honor; Hannah Ross on behalf of the Plaintiffs from Bernstein Litowitz Berger & Grossmann.

MR. WIERZBOWSKI:  Good morning, Your Honor; Adam Wierzbowski from Bernstein Litowitz Berger & Grossmann on behalf of the Plaintiffs as well.

Wednesday, April 7, 2021.

MR. RIZIO-HAMILTON:  We have one final colleague from Bernstein joining us by audio only, just observing, Mr. Matthew Traylor, also for the Plaintiffs.

THE COURT:  So on behalf of Plaintiffs, who is going to be taking the lead this morning?

MR. RIZIO-HAMILTON:  I will, Your Honor, that's John Rizio-Hamilton.

THE COURT:  Excellent.

Anybody else here on behalf of Plaintiffs?

All right.  Let's move to Defense Counsel.

MR. OSBORNE:  Good morning, Your Honor; Jonathan Osborne from Gunster Law Firm, on behalf of the Defendants.

THE COURT:  Good morning, Mr. Osborne.

MR. WINTER:  Good morning, Your Honor; Steven Winter from Wachtell, Lipton, Rosen & Katz on behalf of the Defendants.  I'm also joined by Will Beaye, also from the Wachtell firm, who is on as well.

MR. BEAYE:  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Beaye.  And same question for Defense Counsel, who will be taking the lead this morning in today's arguments?

MR. WINTER:  I will, Your Honor, Steven Winter.

THE COURT:  Excellent.

All right.  Well, good morning, everybody.  I'm pleased to hold this hearing.  We are here on Defense's motion

Wednesday, April 7, 2021.

to dismiss, which appears at docket entry 42.

Before we proceed, I just want to remind all of the parties on the prohibition of recording this proceeding, both in audio and video.  I also want to remind the parties to speak as clearly and as slowly as possible for the benefit of our court reporter and the record.

Since it is a Defense motion, Mr. Winter, why don't you start us off.

MR. WINTER:  Thank you, Your Honor, and we do appreciate the opportunity to be with the Court this morning.

We prepared a few slides that we were planning to refer to during the argument and with the Court's permission, my colleague, Mr. Beaye, can use the screen share functionality for that purpose.

THE COURT:  Certainly.

MR. WINTER:  So in terms of a roadmap, I would like to start briefly with the basics of Ryder's residual value methodology, which kind of cuts across a number of the issues here, and then turn to the first ground for dismissal, the failure to allege an actionable misstatement.

And then perhaps most significantly, the failure to plead scienter which, as we say, is a complete and independent basis for dismissal of the complaint.

First on the concept of a residual value, if you take a look at slide three --

Wednesday, April 7, 2021.

MR. BEAYE:  Your Honor, you have to -- I believe someone from the Court has to grant us permission to share our screen, and so if that could be granted, I will be able to.

THE COURT:  One moment, let's take care of that.

Ms. Glass, can you activate that function?

THE COURTROOM DEPUTY:  I'm sorry, Your Honor?

THE COURT:  We have a screen sharing issue, so if you could --

THE COURTROOM DEPUTY:  Okay, absolutely.

It should work now, Your Honor.

THE COURT:  Can everybody see what is on the screen at the moment?

MR. OSBORNE:  Yes, Your Honor.

THE COURT:  All right, excellent.  Mr. Winter, please go on.

MR. WINTER:  Thank you, Your Honor.

So first on the concept of a residual value, if we can move to slide three, there are a couple of key points I want to emphasize.

First and foremost, it is an estimate and not only that, it is an estimate about the future, about what a tractor or truck will sell for years, and often many years down the road.

And if we could just pull up slide nine, Your Honor will see that given the volatility and the [unintelligible] of

Wednesday, April 7, 2021.

these vehicle prices over the years, what Ryder has done is use a rolling five-year average to set residual value.

And contrary to the thrust of Plaintiffs' argument here, Ryder doesn't just set them and forget them.  Those values get adjusted for accounting purposes over the course of the vehicle's so-called useful life, which means they get adjusted each year until the vehicle is ready to be sold, and there are two elements to that.

If we can take a look at slide four.

First you have policy depreciation, which you know, each year, what you do is you adjust the rolling average by basically swapping out the fifth year and using the new current year.  And then each year you compare where the vehicles are in the fleet to this new rolling average and either adjust the residuals upward or downward.

And then second, you have accelerated depreciation, which is a near term measure, and so as the vehicles get closer to actually being sold, you know, when you have a better sense of what kind of market they are actually going to be selling into, you may recognize additional depreciation at that point.

And then, when the vehicle is ready to be sold, when it goes into inventory, Ryder marks those vehicles down to their then current prices, the so-called fair value, and that's called valuation adjustment.

And then after all of that, the vehicle is sold and

you record a gain if the sale price is above the adjusted residual value or an additional expense if it is below it.

If we can go on to slide five, we sort of put together this little chart just to kind of illustrate the moving parts and just to see how a residual value gets adjusted over the life of the vehicle. You see sort of a checkmarks on the policy side; and then when you get a little closer, you have accelerated; and then when you are finally ready to sell it, you get the valuation adjustment.

And if we could take a look at the next slide, slide six, I think it is important to emphasize that all of these numbers, the policy, the accelerated, the valuation adjustment are disclosed each and every quarter. And so what we see here is that as prices started to decline, policy depreciation, that first row, that increases as the lower prices get rolled into the average. And then accelerated depreciation, on the next line, also increases as the vehicles are now expected to be sold in a down market.

And even beyond those trends, you know, Ryder was explicit about what was actually happening to these vehicle prices during the time.

And if we take a look at slide seven, you can see that Ryder disclosed the precise amount of the pricing changes each and every quarter. And as Your Honor hopefully can see, we put these little red boxes around 2016 and 2017, when prices

were going down; and then in green, right next to it, you can see this rise in 2018, suggesting the prices may have been coming back.

And it is a really important part of the chronology here, Your Honor, and we will get to it and it is something that Plaintiffs really do ignore. As you can see, when you get to 2019, we have another red box in the third and fourth quarter, prices reverse again and are now falling pretty dramatically, double digit declines for tractors and trucks. And the disclosures in terms of the pricing, you know, weren't limited to numbers in a queue or a que, they were also in plain English, so if we could take a look at slide 18.

Ryder talked about the weakening conditions in the used vehicle market in each annual report from '15 all the way through '18. It reiterated those -- it's called headwinds and [unintelligible] called analysts, Your Honor has seen some of that in the briefing. And far from secrets that Ryder was keeping, the analysts themselves called the downturn the elephant in the room, that was their word.

You can take the slide down.

I would like to turn briefly now to the first statement for dismissal here, the failure to plead an actionable misstatement. And as we broke out --

Will, you can take this one down.

As we broke it out in the papers, there were really

two categories of statements here; first the financial metric, five years worth, which Plaintiffs say were all false because Ryder's residual values were all overstated; and then second, the statements by management on earnings calls and investor conferences.  And mindful of the time because the briefing covers this ground pretty thoroughly, Your Honor, there are just a few items on this I would like to emphasize before turning to scienter.

First is that for the residual value estimates themselves to be actionable, those estimates must be -- I think the cases call it contemporaneously false.  What that means is just because those estimates turned out to be too high based on what ended up happening with prices, that doesn't mean they are false when made, false at the time, and it's a threshold point, but we do think it is important.

And then second, there is an argument in the opposition brief that Ryder somehow misled investors by saying it took into account current market value.  We put a little slide on this together as well, slide 14.

We think the claim is easily disposed of.  You know, first of all, it shows exactly what accelerated depreciation is and Plaintiffs do their best to avoid mentioning it, but it is a critical part of the overall approach.  By definition, it is looking at current and expected future price trends for vehicles that are going to be sold in that year term, that

current market.

And even on the policy side, you know, as we point out, it is not just an historical backward-looking measure, it gets adjusted each year as the new current year gets rolled into the average.

You can take this one down as well.

The third and last point on this is the suggestion that the five-year average was some way for Ryder to artificially increase profit, but as we pointed out in our opening brief, and again Plaintiffs essentially ignore this in the opposition, the period preceding the class period here, 2011 to 2015 when prices were rising, really does belie this charge.

Because of the five-year average, what that meant was Ryder didn't raise residuals all the way up to the height of the then current prices.  And you can see this in the complaint in paragraph 90, which shows relatively tiny increases in depreciation benefit from 2011 through 2015 despite the significant runup in prices, and that's even though raising residuals more would have benefited earnings, would have increased net income.

I think what it shows, Your Honor, is that this is just how the methodology worked and there is no suggestion that Ryder was making actionable misstatements then by not maxing its residuals to the then current higher prices.

Wednesday, April 7, 2021.

On the management statements, just very briefly, as we pointed out in the papers, you know, Plaintiffs challenge nearly all of them, so every time Ryder executives so much as mention, you know, residual values, they throw the red flag with the same reasons why the [unintelligible].  We don't think that satisfies the PSLRA particularity requirements, but even beyond that pleading defect, there are two fundamental and unfixable problems.

The first is that nearly all of them are forward-looking, and subject to the Safe Harbor, and we address it at some length in the papers and I won't go over it again here, but we don't think they have identified anything that was false or misleading.

I would like to turn to scienter now.  We can take a look at slide 16.  The Court's familiar with the standard; under the PSLRA you need particularized facts that give rise to a strong inference of fraudulent intent, more than just plausible, it must be cogent, compelling and powerful, that's what *Tellabs* teaches, and the complaint here respectfully we don't think meets that high bar.

Plaintiffs argue that because Ryder knew that prices had started to decline, that means it also knew at the time that residual values were overstated, but that really just belies, we think, what a residual value is, which is an estimate of future value.

There is no pleaded facts here, not one, suggesting that Defendants here knew that prices would continue to fall for the duration that ultimately occurred.

Can we go to slide ten again.

You know, we are talking a 70 percent drop at 2015 peak and over six years, if you take it out through 2021, we nearly double the length of other recent decline, and Plaintiffs concede that Ryder did recognize additional depreciation during this period.  They just say that Ryder should have recognized more and done it sooner.

But as we set out in the brief, and if you take a look at slide 17, Courts have expressed great skepticism for this Monday morning criticism.  And we cited the *Cull* case, [phonetic]; the *KLX* case, which relies on Judge Easterbrook's decision in *DiLeo*; and the very recent decision by Judge Cote in the Southern District of New York in the *GE* case, and I think these are all cases involving accounting estimates that depend on making judgments about what is going to happen in the future and when.

And I think the insight you see is that these kinds of predictions are really hard and Courts should be especially careful about sanctioning fraud claims that are brought with the benefit of knowing how things turned out.

So we put the question to Plaintiffs in the papers, you know, When was Ryder supposed to take this additional

Wednesday, April 7, 2021.

depreciation, and we didn't really get an answer. You know, should it have been in 2015, when Ryder's used vehicles sold for $100 million more than their residual value; in 2016 when they still sold for a small gain; in 2017, when in light of the additional depreciation that we just looked at, that Ryder already recognized it lost just $17 million; or in 2018, when prices started to rise, suggesting a reversal of the downward trend?

If we can go back to slide seven for a moment, I would like to linger on 2018 for just a moment. Plaintiffs basically ignore it, but here we are, this is the green box again, three years in, and the market, and this isn't disputed, starts coming back, just as it had in the past in terms of the cycle, and this is late 2018 into the first half of 2019, and if we take a look at the next slide, slide ten, you can see the same thing graphically, you can see the bump in 2018 and it's pretty sharp. And the question is, why wasn't that a current trend that Ryder was permitted to rely on?

In fact, if the current trend had continued, there wouldn't have been the need for the same sort of depreciation adjustments taken the following year. So we don't think this criticism makes sense, let alone as a basis to plead fraudulent intent, to plead scienter.

And on top of that, if we take a look at slide 13, and I think this is pretty revealing, Your Honor, you can see

that Ryder was candidly discussing all of this with investors as it played out in realtime.  So you know, the first -- and this is all in the papers.  The first box we have on the top, in February 2016, this is just after prices started going down, Roberts Sanchez, the CEO, is saying, Look, we are projecting a 20 percent decline in prices for 2016, but given the way we have handled the residuals using a five-year average, it is still below that number, so that's February 2016 and there is still room there.

Then let's look at February '18, so two years later, this is after prices fell in 2016 and again in 2017, so two big drops in a row, and Sanchez here is very clear, he is emphatic, This is an extended downturn.  For us to be able to leave depreciation where it is, we need pricing to come up, we need this thing to turn around and really start moving back up; that is what the CEO was telling investors.

And then a year later, in February 2019, which is now in the middle of this price bump that we just looked at starting in late 2018, what Sanchez says to investors is, Look, if prices remain stable over the next couple of years, then by 2022, we think that residual values and book values will largely reach parity, which means you won't need any more accelerated depreciation, that's what he is telling the investors.

Of course we now know, and it is helpful if you can

go back to slide ten, but by the middle of 2019, we see prices weren't heading up or even staying put.  They reversed and began to fall, and did so very substantially, with expected declines persisting until 2021, which is when Ryder recognized the additional depreciation.

And so Your Honor, we don't think this is evidence of Ryder's executives covering things up.  This is I think, you know, the executives candidly confronting ups and downs as they occurred in realtime, which I think the *Cull* case [phonetic] describes the basis there for dismissal, and we think it is totally inconsistent with any inference, let alone a compelling inference of scienter.

I would like now to address this Navistar or MaxxForce issue that has sort of become a focal point in the opposition, and we think it is really just a red herring.

If we can take a look at slide 19.

The first point, Your Honor, is that, you know, Ryder disclosed the problems that it and everyone else had with these particular vehicles, these engines and the impact they had on pricing.  We didn't get a response from Plaintiffs on that, so we take it as a confession.  And what is important, I think, is this isn't some case where a company is trying to hide a defect or a problem with a counter [unintelligible], there is no allegation like that.

And critically and most importantly -- let's go to

slide 22 -- there is no pleaded basis here to say, as Plaintiffs try to claim, that the additional depreciation that was recognized in October of 2019 had anything to do with these Navistar vehicles, and so Plaintiffs say over and over again in their brief that Ryder supposedly admitted, throughout the brief, in October 2019 that the reduction here was due to the impact of higher maintenance costs on these vehicles, on these engines, and we have the cites to the pages.

So this is a key part of their argument, but Sanchez, who they attribute this admission to, did not say that, he just didn't. And when you look at what he actually said, and it is in this white box here in the middle of the slide, it's Exhibit 27 at page six, what he was saying was when this class of vehicles was initially priced, back when the initial leases came off the line, this is the 2010s, the '11s and the '12s, Ryder didn't set the monthly lease payments, which are fixed at origination, high enough. It didn't ask the customers for enough money, right, and that was for two reasons.

He said, one, the maintenance costs on these vehicles turned out to be higher than anticipated given the new technology, and because Ryder is now selling them in a down market. So we think this is quite clearly about the performance of the leases and as Sanchez says just a few lines away, if Your Honor will look at the transcript, and not about accounting residuals.

Wednesday, April 7, 2021.

And why that is so clear, Your Honor, in the very same call, Sanchez addressed why Ryder was taking the reduction in residual values, and he was very clear about that.

If we can go to slide 24.  And you can see it on the slide, in short, the uptick that they saw was happening in late 2018 basically fizzled, and you're now seeing double digit drops in prices across all vehicles with no end in sight, so there is just no admission here that the additional depreciation was caused by Navistar or MaxxForce engines, which is really the lynchpin of this whole argument for Plaintiffs, it all kind of relates back to this point.  It is just another mischaracterization of what management said.

And I should add that Plaintiffs also ignore -- if we can go to slide 23 -- that Ryder had previously disclosed just before this that those vintages of those years, of which those MaxxForce engines are only a part, would be mostly out of the fleet by the end of 2019.  So what that means is that those vehicles weren't part of the $144 million in going-forward depreciation that's the focus of complaint, because by definition, that amount is just on active vehicles to be sold in the future and that's what depreciation is; not for those already held or for sale or in inventory as Plaintiffs, I think incorrectly, try to suggest.

Now, Plaintiffs also rely heavily on statements from former employees, confidential witness statements and for the

Wednesday, April 7, 2021.

court reporter, I'm just going to use FEs for short as an abbreviation, and if we can go to slide 25, Will.

So, you know, those statements themselves, you know, we think demonstrate that the former employees, all of whom concededly worked in sales or leasing, were simply not in a position to know how Ryder was accounting for residual values or how those values were adjusted or changed over the life of the vehicle, which we do think undermines any attempt to infer scienter here.

They say the market was bad and that Ryder should have lowered sales prices, you know, more quickly or better to reflect their perception of the current market, which would have the result of moving inventory faster, but there is no pleaded basis to suggest that these former employees had any idea how Ryder was accounting for the same vehicle; no statement that talks about what was happening with policy depreciation or the five-year average or how much accelerated depreciation was taken.  Or even, you know, importantly all of the hundreds of millions of dollars of valuation adjustments that we just saw on the chart that were recognized when those vehicles were placed in inventory and ready to be sold.

THE COURT:  Mr. Winter, let me pause there for a moment.  I mean, why do these former employees necessarily have to be in the accounting department necessarily to have useful information about the reliability of the residual values?  I

don't see any sort of requirement that they simply have to come from accounting to offer useful information in that regard.

It does seem like the complaint does go through those former employees in significant detail, arguably more than in a conclusory fashion, providing their basis of knowledge, and I was hoping you could speak to that point a little bit more.

Why does it matter so much if they are not in the accounting department specifically and are coming more from the sales side?

MR. WINTER:  Yes, Your Honor.  So, you know, we are certainly not arguing that the former employees needed to be sort of within the accounting function or an accountant in order to provide, you know, relevant information, that's definitely not the argument here.

The question, though, is what they are alleged to say, and we can go through this in a bit.  Do they -- are they talking about the same thing, are they talking about the residual values that are being used for accounting purposes, that are the ones that are being adjusted, the ones that are the basis for really the argument here, the complaint here, do they have an basis to know what those were?

And we think that when the Court focuses on the allegations, which, you know, I'm sure Your Honor already has, you know, you see there's a lot of indications that that's not the case here.

Wednesday, April 7, 2021.

And just for example, I think most of these are sort of of focused on paragraph 103 in the complaint, there is sort of a lot of A, B, C, numbering and I think what you see is that the concerns being raised here are about the sales prices, about how much Ryder is actually selling these vehicles for when they are ready to be sold, that they are being sold too high, that that number should go down more and the complaints are being raised to people in the sales function.

So you know, 103B, FE6 is talking to the three people all in sales, You have to lower the sales prices.

FE10, this is 103D, The company is overpricing its trucks.  The sales prices are too high, they are too low below their listed values, we can't afford to lower sales prices.

FE4, same thing, I received a lot of pushback from sales, talking about the senior people in the sales function.

And the reason why I think this is important is that, you know, lowering residual values, which is an accounting concept, does nothing to change the sale price, it does nothing to change what you are going to sell it for on the market.  So these are really two separate concepts, Your Honor, and I think it is important to keep them distinct.

And if I may --

THE COURT:  Are they really that separate?  I mean, if these inside sales folks are having so much trouble selling these vehicles and the lots are getting clogged up with these

Wednesday, April 7, 2021.

vehicles that just won't move off the lot, that's indicative of the value of the vehicles, so presumably it does have a relationship on the residual value of the vehicles.

MR. WINTER:  Yes, Your Honor.  Maybe, I think, this will answer the question:  Everything that the former employees are saying, we think, is very much indicative, accepting it all as true, of a bad sales market; that the values that they are seeing in the current -- when they are selling them is their clients, and those were all things that were disclosed in terms of the exact percentage decline, there is no secret there.

The question, though, is on the sales side, that's what is happening.  And you know, I think we say in the papers there may have been, you know, I think fair inferences that the senior people in the sales function may have wanted the to company try to keep those prices high to try to test the market, get as much as you can, but that is not the same thing as what those same vehicles are being accounted for, and I think I can show this to Your Honor, if you take a look at slide 20.

So this goes to the business about vehicles as you put it, you know, clogging up inventory, and Ryder not taking, quote, unquote, "write downs," and I think that's the phrase or very generic phrase you see over and over again in the complaint and in Plaintiffs papers, so whatever the narrative and the criticism about how you should move the inventory, we

Wednesday, April 7, 2021.

think, you know, the public disclosures show it and it certainty doesn't extend to the accounting.

So as we pointed out in the brief and we showed on the slide, this is the sort of the lighter blue line here, the valuation adjustment, you know, Ryder took $197 million in valuation adjustments between 2015 and 2018, and this is what they are called in the filing, inventory valuation adjustments.

So when the vehicles are ready to be sold, whatever prices are being, you know, are on the sales side or however they are doing it, they get marked down to what vehicles are currently selling for in that market, the fair value.

And what the numbers show is that in each of those years, Ryder was reporting actual gains on those sales, that's the blue row, the 118 million, the 68 million, the 41 million, and the 32, and what that means is that Ryder is actually selling them for more than what it marked the vehicles down to.

I'm not exactly sure what write down means.  It is a term that is used, I think, to belie some of these important distinctions, but what the map shows is that they are being sold for more than what the valuation adjustment marked the vehicles down to when they were placed in inventory, that's what the map shows.

And so, you know, I do think that the concerns raised by the former employees, which, you know, really go to, this is a difficult sales market and that there may have been

Wednesday, April 7, 2021.

disagreements about, Hey, should we lower prices more quickly to sell more inventory, we are not going to make our numbers, taking all of that as true, I think there is no pleaded basis to say that it extends to the accounting.  And it's not because they are not accountants, it's not because that's not their job; it is because it is two separate concepts.

The residual value is an accounting concept in terms of how you think about it for disclosure purposes and it's a completely separate idea, you know, what number was in the lease that was signed with a particular customer that never gets adjusted and stays there from the beginning of time.  And it is also different from the sales price, which I think, as I read paragraph 103, most of the complaints or most of the criticism is focused on.

And then, if I can then -- did I answer Your Honor's question?

THE COURT:  Yes, thank you.

MR. WINTER:  And I just wanted to add that, you know, the very red flags here that Plaintiffs point to as a basis for scienter, including the price declines, the Navistar troubles, the inventory clogging up, they were all disclosed, every one of them.

And the law is clear on this, if we take a look at slide 21 and we put up some of the cases here, but these kinds of disclosures greatly undermine any inference of scienter,

Wednesday, April 7, 2021.

which makes sense because if they are telling the world about these problems, that prices are going down, inventory is going up, we have these small group of Navistar vehicles that are causing trouble, it undermines the notion that the company was engaged in some sort of deception, that it is engaged in -- that it has fraudulent intent, and that's an important concept here as reflected in the cases both in this Circuit and elsewhere.

THE COURT:  What disclosure can you point me to that actually shows the company revealing that residual values were not accurate?

I mean, taking all of the allegations as true, that the residual values were highly overstated, what disclosure would have gone to that point specifically?

MR. WINTER:  So I think, Your Honor, it is important that we recite to that residual value because I think that's sort of the key.  I don't know that there is an allegation, and we should go through it, that says that, you know, Hey, the residual values on the fleet, you know, as of '15 and '16 or during the class period for vehicles to be sold in '19, '20, '21, were overstated at the time, contemporaneously, that's just, I think, an important clarification.

But in terms of disclosures, let me take this in two pieces, there is the inputs and the outputs, right?  If we take a look at inputs and go to slide seven -- it may take a moment

for my colleague to get there -- these are the inputs, right, what is going on with the prices, it is a five-year average, this is the new current, this is what we are seeing, this is the inventory, so the inputs are all there.

And then in terms of the outputs, I think Your Honor's question was what disclosure can we point to to say they weren't accurate, I think accurate, you know, is a difficult concept there because it is not really accurate, it is that the residual values are not being, I think, calculated in accordance with the methodology that Ryder discloses, and I think that's sort of the key point.

So if we can go to slide eight, if we can, Will.

So you know, the executives here were actually pretty clear, I thin, and candid about how this relationship all worked.  And you know, we only put up some of the quotes here, obviously within the constraints of the slide, but we do suggest the Court look at the full context in these exhibits here.  But what Sanchez, and actually it's Sanchez and also Mr. Garcia, the CFO, the back and forth of the analysts here, it is very much on this exact point, right?  It is sort of making the point, Okay, we do your five-year average, this is how it works.  Yes, in 2016 -- I'm looking at the second line here, Yes, in 2016, prices are going down, but our residuals that we have across the fleet, those are actually not below the set price decline, and the reason for that is that we were

never marking them exactly to the current price.

So in 2011 and 2012 and 2013 and before 2015, you were never putting in exactly where the current prices were, that's not the five-year average, it's the opposite.  So what he is saying here is we are forecasting a 20 percent drop in prices, and we saw that it turned out to be a little less, 15 percent, when the year was done.  And what he is saying is, Even because of that decline, by residual values, they are still above it, right, I still have room.  And this interplay continues on throughout the -- throughout the period.

And so if you look at the next disclosure on this very slide, I think, here we are in early 2018, it's for 2017, but the actual call is in February of 2018, and the question from the investor here is, Look -- or the analyst, It looks like prices on both tractors and trucks was up year after year in the fourth quarter, so prices are going up, so what is driving the change in residuals and additional depreciation you're taking, he's talking about downward adjustment here is the point he is making?

And what Sanchez is saying is, Look, we use this five-year average, so we are not there yet, and we need pricing to pick back up, we need it to increase more, and if it doesn't, we are going to have more accelerated depreciation to get us in that line.

So I think just to go back to Your Honor's question,

and this is really important because I think it is a foundational point, is this is not a mark-to-mark situation. This is not fair value accounting, it is not.

And if we actually can go back to slide three, I just want to make sure Your Honor has it.  It's cited in the papers, but this is the sort of the accounting standard that the Plaintiffs cite and we put up on the screen, but this is not a fair value measure.  It's -- what it is trying to do is basically say, you know, Come up with an estimate of what the thing is going to be worth, here a vehicle, seven years away, eight years away, right; that could be ups and downs or four ups and downs until you get there.  Then what you do, and this is customary, you do a straight line method to depreciate the asset, you go backwards in a straight line.

And at no point in time is accounting residual, I want to emphasize that, it is never going to bear an exact resemblance to the actual marketplace because a straight line would never do that; as soon as you take the vehicle off the lot, it is going to depreciate a lot more.

So the whole point of the accounting concept here, and it's in the quotes, is just to figure out a way to, in a rational manner and systemic manner, depreciate the assets, and straight line methodology is that and it's very customary.

So when we talk about this idea of accurate residual value, what you are really talking about is the estimate of

what it is going to be in the future, the estimate of what it was going to be in 2021, 2022, which no one has perfect insight into.  So what we are talking about here is the methodology to get there and hopefully to answer Your Honor's question, both in numbers and words, Ryder was very clear with investors, This is how we are doing it and here is the policy side, and then, look, when we get closer and we think we are missing it, there is the accelerated and that should bring us down, and if we don't get all the way there, then there is valuation adjustment.  So the math shows we ultimately got there, Ryder was showing gains, so at the time of sale, this was leading to that result.

And just one final point, Your Honor, and this is on *Tellabs*.  The inference of scienter, the Supreme Court has instructed, doesn't only need to be cogent and compelling, it has to be at least as compelling as any opposing inference of non-fraudulent intent.

If we can go to slide 30.

We don't think that comparative evaluation here, Your Honor, meets that test or is really even close.  We submit the compelling inference, when you take all of the facts alleged, is really the simplest and the most obvious one, which is that in the middle of it all, in the middle of the ups and downs, Ryder did not foresee the depth of a 70 percent decline, the duration of six years of a decline that ultimately occurred and

ultimately led to the additional depreciation recognized.

So unless Your Honor has any further questions now, I ask to reserve a few minutes for rebuttal if necessary.

THE COURT:  Sure.  Thank you.

Why don't we turn now to Mr. Rizio-Hamilton in response.

MR. RIZIO-HAMILTON:  Thank you very much, Your Honor. Good morning.

So there was a lot to sort of unpack there, and you know, I'll probably just make my presentation orally, because unfortunately, Mr. Winter didn't share his slide deck with us before the hearing, so that was the first time I had seen it, but what I can tell you is that when you step back and take a look at what happened in this case, what you see from a big picture perspective at the outset is that Ryder's business model incentivized recording an extremely high residual value in the first place, at the time leases were written because that allowed the company to very competitively price its leases at lower rates.

There were then a number of factors that emerged throughout the class period which demonstrated that the residual values were too high and that the company needed to take very large charges by way of depreciation expense to reflect the new reality that the company was seeing.

Ryder didn't do that because doing so would have had

kind of a double whammy effect on the company.  It would have severely harmed the company's reported earnings because of the depreciation charges taken against income, and it would have harmed the company's lease pricing because it would have caused the company to have to raise lease pricing, and ultimately that's what occurred at the end of the class period.

So a lot of discussion was had on the issue of the MaxxForce vehicles, and I do think it is an important issue in the case.  The company, from the beginning of the class period, was well aware of the problems with the MaxxForce vehicles.  Simply put in a word, they were complete lemons, Your Honor.  The problems with the engines were not fixable and the problems with the engines severely harmed the value of those vehicles.

Significantly, the MaxxForce vehicles, these class A tractors, made up about 40 percent of the fleet at the time and the problems with their severely harmed value were apparent as of 2015, when these vehicles first started being reflected in industry sales reports.

As former employee five put it, who was a director of used vehicle sales at the company in 2018, and actually previously worked at Navistar, the manufacturer of the MaxxForce engines, those vehicles fell from a $60,000 resale value to like a $20,000 resale value as soon as they started working up into this reports, and that was in 2015.

Now, there was also a lot of discussion about how the

nature of the case is one of prediction, but there are contemporaneous facts here, very significant ones of which the company was well aware, and the defective nature of these vehicles I think is a prominent and important one.

The vehicles were defective, that's not disputed. The defects in the vehicles severely harmed the vehicles' values at the time; that's also not disputed.

Importantly, Your Honor, defective vehicles do not become undefective.  There is no prediction involved in that, they are what they are, and there is not going to be a miraculous recovery in the market for defective vehicles. Customers are just not suddenly going to want to buy them at favorable prices, so that also doesn't involve any predictions.

I think recognizing this, Defendants principally contend that we got it wrong when we said that the write down that the company belatedly took at the end of the class period, toward the end of the class period didn't relate to these defective vehicles, but that's simply not true.

Paragraph 95 of the complaint, and there is more detail on this in Exhibit 27, specifically states that the write down related in significant part to residual values of vehicles which had been negatively impacted by maintenance costs on the early model years of the 2010 emissions technology.  That was a reference to the Navistar MaxxForce vehicles, and further that those vehicles were now being

expected to be sold into a market that had continued a very severe decline that began years earlier, in mid 2015.

And I think that Exhibit 27, if I could turn to that momentarily, makes the point even more clear.  When you look at Exhibit 27, and I'm now on page six of that transcript, it is Defendant Sanchez who said, Leases signed prior to 2014 are now expected to result in returns below our target level for two reasons.  First, they have been negatively impacted by maintenance costs on the early model years, the post 2010 emissions technology, that turned out to be higher than anticipated.

So again, he is saying that driving this increased depreciation expense is the problems with the MaxxForce emission technology engines, which they had known about for years before this point.

And he further says, The negative P&L impact of these vehicles will largely end by 2020, as these vintages account for the majority of the accelerated depreciation not projected.

That statement is significant in two respects.  First, it is significant because he is saying that the problems with the engines led to the accelerated depreciation expense.  He is not saying, Look, we have a problem with lease underperformance.  He is saying it is a depreciation expense problem, and that's the metric at the heart of the case and that's the metric through which the company takes down the

residual values.

So this distinction between maintenance costs and lease underperformance doesn't really matter, because Defendant Sanchez specifically says, The problems with the engines led to the majority of the accelerated depreciation, that is the majority of the reduction in residual value, and these problems with the engines, again, are something that they had known about since prior to 2014, that's when these leases were signed, and that's before the class period begins, there is no element of prediction in that.

THE COURT:  What do you say to Defense Counsel's point that corporate officials were sufficiently disclosing these risks essentially in various public statements?

MR. RIZIO-HAMILTON:  So I think Your Honor really put your finger on it with your question.

So I will acknowledge that there are disclosures around the edges in this case, okay.  I'm not going to sit here and tell you that they withheld from the market the fact that they had some of these vehicles or -- but they didn't say how many, they certainly didn't say what the true financial impact was, and that's really the heart of the matter here.

Although they disclosed that these vehicles had some engine problems and that they had some of them, what they didn't do throughout the class period, until the very end, was adjust the financial statements to reflect the reality of the

true negative impact and it was massive.  I mean, we are talking about a nearly billion dollar charge.

And I'll turn at some point in my presentation to the argument that, you know, they -- they were convinced by this tiny little blip of a dead cat bounce in late 2018 and early 2019 that they could avoid that billion dollar charge, but I don't think it holds up to scrutiny, even when you just look at the chart of the market decline even before that, when you consider the fact that these engines were a known problem long before the disclosure of the charge was made.

But I think just to circle back around to Your Honor's question before I roundup my last point on this quote, nowhere do they ever disclose the true financial impact of the situation as it stood on the ground throughout the class period.

THE COURT:  By situation, what are you referring to precisely?

MR. RIZIO-HAMILTON:  I'm referring precisely to the fact that given that they had so many of these trucks and given that the problem with them was so severe, and further given that these problems were existing in a period of what was a multiyear market meltdown, the company was sitting on an impairment charge that was gigantic and undisclosed.

And that caused an analyst's remark, and I'll turn to this in greater detail momentarily, but when they finally

disclosed the impairment charge that frankly got extended for years, analysts specifically reported, and I'm talking about J.P. Morgan, I'm talking about sophisticated market analysts who have no dog in this fight at all, reported that the disclosure confirmed that the company had been significantly over-earning in prior years and had introduced a distortion into the company's publicly reported financial statements. That's what wasn't disclosed, that's the essence of the problem here.

THE COURT:  I guess what was disclosed is that they were using this five-year rolling average and so in that sense, they are sort of openly telling the investing public that, You need to realize, it is a broader scope of numbers and we are not doing sort of the current realtime assessment.

Although I understand, too, that they were communicating that they were reevaluating or evaluating the numbers on a yearly basis, so I am somewhat unclear about, is the problem the five-year methodology or is the problem the reliability of the figures underlying that methodology?

MR. RIZIO-HAMILTON:  So the problem isn't just the five-year methodology, and in their disclosures to the market, they didn't say, We rely only on a five-year rolling methodology.  They did say, in multiple respects and in multiple places in the SEC filings, that their residual values accurately accounted for current market conditions.

THE COURT:  Where did they say that?

MR. RIZIO-HAMILTON:  Just one moment, Your Honor, I want to get the precise paragraph correct.

At paragraph 102, in the form 10-K, they stated that they reviewed and adjusted the residual values and useful lives of its vehicles on an annual basis or more often if deemed necessary based on, among other things, quote, "historical market price changes," and quote, "current and expected future market price trends."

And beyond that, there were three different ways in the accounting methodology used that my colleague Mr. Winter outlined through which the company purported to take account of current market trends and conditions and reflect them in the residual value number and the depreciation expense.

The first is the so-called accelerated depreciation, which looks out, you know, two years from current and takes account of the current price and the expected trend over two years, so that's not just a five-year rolling methodology.

The second way the accounting methodology took account of market trends at the moment was with respect to the analysis of the value of vehicles being prepared for sale; that is the vehicles about to come on to the market, and that was referred to as the valuation adjustment.

And the third was through the netting against the residual values of the actual sales price that the vehicles

actually sold for.

So the company stated to the market that it took account of current trends and trends in the near term that it saw, and its accounting methodology purported to do that in those three ways.

Now, before I move on, I just want to make one more point on this Navistar MaxxForce problem, which is that Mr. Winter had mentioned that the company -- that the MaxxForce problems could bear no relation as a matter of law to the write down, they couldn't be considered a driver because the MaxxForce vehicles, the problem with the vehicles that had the problem with the emissions technology had already been sold by the time the write down occurred, so they were gone out of inventory, and that's just not true.

When you look at Exhibit 27, and again, it's that same page six, Mr. Sanchez very clearly says, The negative P&L impact of these vehicles will largely end by 2020 and they are now expected to be sold into a down market at below price levels.  The vehicles with the emissions technology problems were still in inventory and they were driving the write down.

Furthermore, on page four of Exhibit 27, Mr. Sanchez very clearly states that the majority of underperforming leases written prior to 2014 -- again, that's referencing the problematic MaxxForce vehicles -- exit the fleet over the next 18 months or so.  They were still there.

Wednesday, April 7, 2021.

So not only were they present in the fleet and expected to be sold over the next 18 months, they were not gone, but they were accounting for the vast majority of this write down by way of increased depreciation, which is the metric that relates directly to residual values.

Now, I respectfully submit that in light of all of this -- and this is still a motion to dismiss.  I know it is a PSLRA case, but it is still a 12(b)(6) motion and we are still entitled to have our allegations accepted as true and we are entitled to reasonable inferences therefrom -- I don't see any way that the Court can concluded as a matter of law that these defective vehicles had nothing to do with this write down.

In fact, the company said they were the main driver, and that they were still in the fleet and wouldn't be out of the fleet for another 18 months.

Now, so that was one contemporaneous fact, the problems with the MaxxForce engine.  The second big picture contemporaneous fact is Defendants knew at the time throughout the class period that the market for these vehicles was collapsing overall, so it was kind of like a double whammy of a problem.  They had a market that at large was just in severe decline, and they had an enormous kind of bubble of these defective vehicles that were working their way up for sale that they knew were going to hit.

Now, the problem -- and neither of those things were

unknown to the company throughout the class period.

THE COURT:  Can we tie all of this, though, to particular statements and just really kind of hone in on, let's say your top three material misstatements or omissions, why are they false when made, and why did the Defendants know they were false?

MR. RIZIO-HAMILTON:  Yeah.  So I think that really, the misstatement at the core of the case is the understated depreciation expense.  The billion dollars or so that they ultimately took is something that was apparent to them years earlier and should have been taken years earlier and written into the financial statements.  And had that been done, the depreciation expense would have increased dramatically in the financial statements and the net income would have decreased dramatically, and we set that forth in chart form in paragraph 100 of the complaint, but those are the metrics that were materially overstated and understated throughout the class period.

And the reason they knew it at the time was because they had known since 2014, prior to the class period, that they had the MaxxForce problem; they had known in mid 2015 that the market was in essentially meltdown.  I mean, if you take a look --

THE COURT:  What allegations do you have about knowledge in 2014 that would support the class period starting

in 2015?

MR. RIZIO-HAMILTON:  So the vehicles at issue were purchased and leased prior to 2014.  It was apparent at the time when these vehicles were produced, which is in the 2010, 2012 timeframe, that they were a disaster.  From beginning -- beginning from the time that they were purchased, the engine problems were open and notorious, and former employee five stated that as they trucks began to work their way up through used sales reports in the industry, you could see a dramatic decrease in their value from about 60,000 to $20,000, and that was as of 2015 and the class period begins mid-ish 2015.  And so, you know, the engine problems were known.  It wasn't like a defect that took a long time to become apparent, neither in function, nor in pricing.

Coupled with that is the fact that the market was just -- the market was just declining severely overall.  If you look at the price changes, you see that it declined from mid 2015 to 2018 by 38.5 percent.  At that point in time; that is 2018, the vehicles were selling for way, way, way below cost.

THE COURT:  I understand the market did go up in 2018 and the argument is that these things are cyclical, and there is no way to predict with such accuracy.

MR. RIZIO-HAMILTON:  I think when you look at the chart of the market movements, there is a suggestion by the

Defense that that gave them comfort that the market was going to rebound, and I think that fails for two principal reasons.

The first is that there is no really like discernible pattern when you look at that chart.  You can only really take with certainty the prevailing condition, that's the one thing you know when you look at that chart.  At any given in point in time, you know where you are, but that chart doesn't give you the ability to say confidently prices are going to rebound, and so I don't think that it supports their contention as a matter of law.

The second point is they make a really big deal out of what they say was a rebound in late 2018, early 2019, but respectfully, I just don't think that argument holds water.  If you look at paragraph 93 of the complaint and you look at the rebound they are talking about in late 2018, early 2019, what you see is that it's essentially a tiny big cat bounce that is occurring within the context of this gigantic meltdown that has persisted for multiple years.  That's point one, I don't know how that could have given them real firm confidence in any way that they could predict a significant rebound.

Point two, and this is very interesting, is that when the market turned back down again and they ultimately took the very large depreciation charge, the market had just turned back down to where it originally was in 2018.  So they had -- they took the write down at a point when prices were the same as

they were in 2018.  It is not as if the market had plunged deeper in a material way at the time they took the write down than where it had been in 2018, when they refused to take the write down.

And the third point, Your Honor, as I have mentioned multiple times, is that it wasn't just the broad market meltdown, they had a particular problem with MaxxForce as well that they knew was coming into this horrible market.

Mr. Winter --

THE COURT:  Can we get back though to the statement -- I mean, so you started with the understated depreciation expense that I assume is reflected in the publicly filed financial statements.  What other misstatements are you relying on most heavily?

MR. RIZIO-HAMILTON:  There are some statements in conference calls that were made that concerned the company's accounting and the fact that there were no vehicles on the lots that needed to be written down significantly.

THE COURT:  Can you point me to that, please.

MR. RIZIO-HAMILTON:  Sure.  Give me one moment, Your Honor, I want to pull up the exact paragraphs.

Okay.  So on October 26th of 2018, and this is at paragraph 254 of the complaint, Defendant Sanchez stated that the use of the five-year rolling methodology allowed the company to keep the residual prices in the middle of the

44

fairway as best as we can, and that's misleading.

It is a misleading statement because by that time -- and it is important to know -- you know, to acknowledge at what point in time the statement is being made.  We are talking relatively late in 2018, so they have had many years to observe the MaxxForce problem, they have had multiple years to observe the severe market decline, and what he is saying is that their accounting methodology allows them to keep the residual in the middle of the fairway, but that's not really true.  I mean, if you use his analogy, they were way off into the water at this point.  The residual values were dramatically overstated and, you know, omitting that fact is misleading, so that's one example of --

THE COURT:  I don't know if you can get that much out of that statement, frankly.  I mean, what else do you have?

MR. RIZIO-HAMILTON:  So there is a statement in 2016, for instance, where Defendant Sanchez stated that, We do not have a situation where we have got a bunch of vehicles that are at high residual values and need to be written down, but that wasn't true at the time because the company had a substantial number of the MaxxForce vehicles that really did need to be written down.

THE COURT:  What paragraph is that?

MR. RIZIO-HAMILTON:  That is paragraph 184, Your Honor.

So those are the kinds of statements on the conference calls that we allege were false or misleading by omission, but really, it is true that the heart of the case is centered on the depreciation expense.

Now, Mr. Winter had mentioned that the company disclosed movements in market pricing throughout the class period and that this sufficiently put investors on notice of a problem, but that's not really the case.

I think when you examine their disclosures, and they are summarized, I believe, in footnote two of their reply brief, what you see is the company disclosed some market declines in 2016 and 2017 and then a rebound in 2018.  So when investors take a look at those statements collectively, they would see -- and I'm just now adding up the percentage market movements in the tractor market that the company disclosed that Defendants have relied upon, you would see that between 2016 and 2018, they would have disclosed a net movement of about a 14 percent decline.

But in reality, at that point in time, the market had declined by nearly 40 percent from the 2015 highs and that's not something that investors would have understood just by looking at those disclosures that Mr. Winter highlighted.

Now, the third contemporaneous fact that Defendants were aware of during the class period is that they were repeatedly told by multiple former employees in the company

that the residual values were too high and that they did not reflect the reality.

We have three former employees here, former employees ten, six and four, who had direct contact with the Defendants, and that is I think a pretty extraordinary thing for a Plaintiff to have at the pleading stage, whereas Your Honor knows, we are subject to a discovery stay, we can't take discovery, and so, you know, we have to go out and conduct our own investigation through non-discovery means and that's what we have done here and for us to have multiple former employees who have direct personal interaction with the Defendants, I respectfully submit is remarkable and is a strong positive in our favor.

Former employee ten, for example stated that Defendants Sanchez and Garcia participated in weekly and monthly calls during which they discussed vehicle valuations and depreciation.  Former employee ten stated that he would scream until he was blue in the face that Ryder's vehicles were overpriced, but he witnessed pushback from Sanchez and Garcia all of the time, as he put it, in response to these complaints.

And he said that they excused the failure to take additional depreciation expense because the company didn't want to lose money on the trucks and Ryder couldn't afford to lower the prices.

Former employee six gave a very similar report.

Former employee six importantly was a member of the asset management board.  The asset management board met quarterly to determine the value and depreciation of all vehicles in the fleet.  Former employee six reported that the values of the equipment were completely off, and it was pretty clear that they needed to be written down.

Former employee six, like former employee ten, reported that Ryder had no interest in writing them down whatsoever while former employee six was there, and that everyone in upper management, including Defendants Sanchez and Garcia, pushed back on writing down the used vehicles.

Former employee four gave a report to very similar effect.  He was the director of asset management in Canada from 2011 to 2018 and he said during his time at Ryder, he was, quote, unquote, "raising red flags like crazy" that the residual values were too high and that he received a lot of pushback, including from Defendant Cooke and the company's vice president of sales.

Former employee four reported that he sat with other executives, including the CFO, Defendant Garcia, every month to talk about the high residual values and that management, including Defendant Cooke, as former employee four put it, kicked his teeth in every month when he gave them all kinds of statistics on what was selling, the issues with MaxxForce, and how the residual values that the company wanted to maintain

were making pricing these vehicles accurately a problem.

And when former employee four left the company, he told other Ryder executives, including Defendant Cooke, This isn't going away. We are holding these trucks so they are just losing value.

Now Defendants' principal response to these detailed reports is that they're irrelevant and they should be ignored as a matter of law because they didn't work in accounting. Your Honor rightfully noted that there is no requirement that they work in accounting, and I think that sort of animating the relevance of their reports is the fact that these are the individuals who were charged with overseeing the value and depreciation of the company; former employee six, for example, being on the asset management board, and who were ultimately responsible for selling the vehicles at or above their residual value.

That's precisely what residual value is supposed to represent, what they are selling the vehicles for at the time they come to market. These were the employees who worked in that critical moment of when the vehicles were coming to market and who were absolutely in a position to know whether the residual values that they were getting pressure to maintain were accurate in light of the condition of the vehicles in the then prevailing market forces.

THE COURT: I think Mr. Winter's point was that it is

not strictly that they don't work in accounting, it is that the information they have is just not relevant for accounting purposes.

MR. RIZIO-HAMILTON:  That's a fair point to make; however, it is incorrect.  That is -- I think you are right, when you characterize Mr. Winter's point, I just think his point isn't correct, and it is incorrect in three ways.

First of all, as noted, the essence of the residual value is what it is supposed to sell for; that's exactly what these employees were doing.  Second, the accounting itself absolutely took into account the facts that these witnesses were reporting in three ways, again; number one, the accelerated depreciation was a line item that purportedly captured the change in value of vehicles that were coming to market over the next approximately 18 months.  That's something that these employees have firsthand knowledge about.

Second, the valuation adjustment in the account is a line item that is supposed to capture adjustments in value for vehicles that are getting prepped for sale; again, that's something that these witnesses have information about.

Third, the accounting is also supposed to take into account the Delta between, you know, adjusted residual and actual sale price, which working in sales, these employees certainly had knowledge of.

So I don't think that it is possible for the Court to

hold as a matter of law that their allegations are not relevant to the issues at the heart of the case or should somehow be disregarded.  They are quite supported and I would just emphasize that it is -- it is rare to have multiple former employees in a complaint at the pleading stage who interacted with the named Defendants on the issue at the heart of the case.

And then, I also think the market reaction upon the corrected disclosures is important here.  As I mentioned earlier, when the company announced this very large write down in October of 2019 of almost $850 million, J.P. Morgan reports that, This big bath on residual values confirms Ryder was over earning by a significant amount in prior years based on the $844 million cumulative write down, and that's paragraph 142.

That is a significant piece of market reaction because as I mentioned, J.P. Morgan has no dog in this fight. J.P. Morgan is a very sophisticated analyst, whose job it is to scrutinize the company's public disclosures, and so their reaction is quite telling and I think not only supports our claim that the company was reporting earnings that were too high by failure to take a depreciation expense in prior years, it also demonstrates the disclosures upon which the Defense relies so heavily were not adequate to put the market on notice that this was happening.

So there are a few other things I would like to

mention.

THE COURT:  Perhaps, Mr. Rizio, what is your best case that a metric like residual value that is sort of inherently in estimate form could give rise to liability under section 10(b) in light of some of the disclosures that were made?  And I know it is hard to find something that is factually on point, but if you were to select your top case, what would it be?

MR. RIZIO-HAMILTON:  So with the caveat that Your Honor noted, which is that these cases, they really do rise and fall on their own individual facts, so each case is a unique thing, but I appreciate the question, so let me directly answer it.

It would be the *Regions Financial Corporation* case from the Northern District of Alabama for a few reasons.  First of all, you know, that case involves CW allegations that the court credited to find falsity and scienter; second, the case involved calculations of goodwill in loan lost reserves and those are similar in kind, although not exactly identical to depreciation of residual value; similar in kind because they involve estimates and they do have arguably some forward-looking component.

And the court held there that, you know, those statements of loan lost reserve and goodwill were nevertheless actionable, despite their character, because Plaintiffs had

pled many facts showing Defendants had information that did not support Defendants' opinions, and I think much is the same -- much of that applies here based on the facts that I have summarized.

The court noted that CW reports supported it and that Defendants were aware of the collapse in the commercial real estate market in Florida, which was another fact that supported the contemporaneous falsity.

The case is also important in two other respects. One is that it held that Defendants' sort of cautionary language in their warnings about, you know, what could occur and why their loan lost reserve and goodwill statements might be off was inadequate to insulate them from liability because the cautionary language of future risks does not protect defendants if the risks had already occurred, and that's the essence of our claim here.

And finally, Your Honor, and this brings me to something that they have got a fair amount of attention in the briefing, but wasn't really addressed today in detail, but I think it is important to speak about; this case rejects the contention that loan lost reserve and goodwill statements are protected by the PSLRA Safe Harbor and notes that the Safe Harbor specifically includes statements -- specifically excludes as a matter of law statements that are included in a financial statement that is purportedly prepared in accordance

with GAAP and that's spot-on for this case.

Defendants have contended that the statements at issue here in the financial statements are protected by the PSLRA Safe Harbor, but I respectfully submit that that argument is just wrong as a matter of law for two reasons.

First of all, it directly contradicts the plain language of the statute, I really think the statute is the beginning and the end of the analysis here, it's a textualist point pure and simple.  The statute, by its plain terms, specifically include -- exclude from protection statements included in a financial statement purportedly prepared in accordance with GAAP, and in fact --

THE COURT:  Has Eleventh Circuit weighed in on that issue at all?

MR. RIZIO-HAMILTON:  The Eleventh Circuit has not specifically weighed in on it, Your Honor.  There are a number of district courts that have and they are all in accord.  We cited a variety of cases at pages 22 to 23 of our brief all to the same effect, which is to say that the text of the statute is plain and dispositive.  If a statement is included in a financial statement prepared in accordance with GAAP, it is excluded from Safe Harbor protection.

And the *Health* case is one such example, that's the first case we cite in our string cite and in itself, it includes in the cited passage, I think it's like page 16 of the

Wednesday, April 7, 2021.

decision, a large string cite embedded in that case for the same proposition.  As I mentioned, the *Regions* case from Alabama also holds as much.

And Defendants -- I should note Defendants have not cited a single case, and I am not aware of one, in which a court has held that a financial statement item, such as depreciation expense, net income and the like that are alleged to be false in this case qualify for Safe Harbor protection.

So with this argument, what their Safe Harbor argument is asking you to do is to, A, contravene the plain text of the statute; and B, do something that is totally unprecedented.  I'm not aware of any court, and they have not cited one, that has ever so held.

Now, they do cite the *Slayton* case from the Second Circuit for the proposition that something mentioned in the MDA section of a SEC filing qualifies for Safe Harbor protection, but *Slayton* is totally inapposite on its facts and actually, when you take a look at what the cases are saying, supports our position.

*Slayton* concerned not a financial metric like the kind at issue here, rather it concerned a textual statement that the company didn't expect any additional losses on a particular asset, I think it was like a bond or some sort of complex security that the company owned, so it is distinguishable in two respects.

Wednesday, April 7, 2021.

First of all, it did not concern a financial statement line item, it concerned a textual statement that was set forth in the MDA about, We don't expect any additional losses.  Second, that textual statement was contained only in the MDA, it was not a financial statement line item by definition.

So here we have the opposite situation; we have a situation where the financial statement line items are challenged and they do obviously occur in the financial statement.

THE COURT:  Mr. Rizio, why don't you wrap up in the next couple of minutes and we will take a five-minute break, allow Mr. Winter to offer rebuttal, and then if I have any additional questions, we will address those.

MR. RIZIO-HAMILTON:  Okay.  The last thing I'll say, two final points:  I think it is also supportive of our claims that when the new CFO came in approximately the end of March of 2019, the write down was taken, a very large write down was taken a couple of months later.

So we have a situation here where for years the company had been refusing to take this write down, despite deducting known material information demonstrating that it was required.  The current -- then current CFO, Mr. Garcia, leaves and within months, the new CFO says, We have to take this write down.  That is very supportive of our claims because it

demonstrates that it was apparent at the time.

The second point I want to make is Defendants have put a lot of weight in the papers and again on oral argument today on a purported statement, the warning, the caution that Defendant Sanchez gave, which is set forth in Exhibit 6, but -- I won't spend a lot of time on this, but when you look closely at Exhibit 6, and I'm talking about page 13 of Exhibit 6 now, you can see that the warning does nothing to disclose the fact that the company is sitting on this massive impairment.

This is in February 2018. Mr. Garcia, after Mr. Sanchez makes his statement, he says only, first of all, that there may be some additional depreciation. He doesn't say that the company is sitting on a massive undisclosed charge.

Mr. Garcia then follows that up in the immediately following Q and A by saying, If it comes in at 2018, at the plan level, we probably would still continue to have some depreciation and policy headwinds, it will be at a lower level than what we have seen this year.

And then he further says, It's about 20 million of accelerated depreciation that is in the 2018 forecast right now. Then finally he says, to your point, it would be a reduced headwind from that probably [unintelligible] for us.

So this warning from February 2018 that they rely so significantly on in Exhibit 6, the language on page 13 just doesn't support all of the weight they are putting on it. If

their contention that this warning was sufficient as a matter of law to sort of put the market on notice of the depth and gravity and size of the problem here, I respectfully submit it doesn't hold up to scrutiny.

That's all I have for now, Your Honor.  Thank you very much for listening to me, I really appreciate it.

THE COURT:  Thank you.  It is 11:32, let's pause until 11:40 and then, Mr. Winter, we will hear from you.  Thank you.

MR. WINTER:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  This Court is in recess.

(Recess was had at 11:32 a/m/; and the proceedings resumed at 11:40 a.m.)

THE COURT:  All right.  We are back on the record, is everybody here?

MR. WINTER:  Yes, Your Honor.

THE COURT:  Okay, great.  Mr. Winter, I'm actually going to ask one more question of Mr. Rizio.

Can we just return -- you know, I wanted to hone in a bit more on the alleged misstatements themselves, specifically the understated depreciation expense, starting with mid July or July 2015, Mr. Rizio.  What allegation in the amended complaint supports the notion that that first data point was false when made and knowingly made so at the time?

I'm just trying to really tie all of the dots

together and I'm curious about that 2015 period, it seems like we need a little bit more explanation of that.

MR. RIZIO-HAMILTON: Yes, thank you for the question.

So the principal allegation for that early in the class period, that is the very beginning of the class period, is that the company had, at that time, a very large amount of the defective MaxxForce vehicles and that as of 2015, the harmed residual values of those vehicles had become apparent.

Former employee 15 stated that in 2015, it became apparent that the values of the MaxxForce vehicles had declined, falling from approximately 60,000 to $20,000, which was set forth in sales reports used in the vehicle industry.

And in addition, Your Honor, I believe that the former employees also reported that the talk about the need for a write down began internally at Ryder in the 2015 time period.

THE COURT: I guess that's one of my concerns, is that focusing on the chronology, we can say 2015 kind of broadly speaking, but when exactly did the issues truly materialize to the point such that management would have known, and I'm not so sure that just saying 2015 or around 2015/2016 is sufficient?

MR. RIZIO-HAMILTON: Well, I think you need to step back and take a look at it. The MaxxForce vehicles were produced in the 2010 to 2012 timeframe, the leases on these vehicles were entered into prior to 2014, we know that.

The vehicles were immediately defective, and the price declines in these vehicles became apparent in 2015. Now --

THE COURT:  So what allegation can you point me to to support that timing?

MR. RIZIO-HAMILTON:  The main allegation would be the one that I summarized; that the vehicles were produced in 2010 to 2012; that the leases that were driving the large majority of the write down were signed prior to 2014, so the company had bought these vehicles and had experience with them by the time mid 2015 rolls around.

Former employee five reports that in 2015, it was apparent that the vehicles' prices were declining, and the reports of the other former employees that there was talk of a need for a write down in the 2015 to 2016 time period, that's paragraph 103B from former employee six, who was on the asset management board.

Now, you are right to the extent that you are saying -- you are asking me for a month in 2015.  You are right that I didn't give you a particular month in 2015, but I think that when you look at the totality of those facts, the mid 2015 time period is a fair place to start the class period.

And I would agree to the extent that you are suggesting that, you know, the facts build up and get stronger over time, that's certainly the case, but I do think that there

Wednesday, April 7, 2021.

is enough here to justify a mid 2015 class period based on the particular facts that I mentioned.

THE COURT:  All right.  I mean, I'm just -- I'm not so sure about that.  It just seems in my review of the amended complaint that perhaps the selection of mid 2015 was overly aggressive and may be premature, but I'll have to review the amended complaint in more detail to really drill that down.

I mean, if we were to start with this second quarter 2015 press release, which is the first materially false statement listed in the amended complaint, what allegation would support falsity at that time?

MR. RIZIO-HAMILTON:  It would be the ones -- it would be the ones that I mentioned; that at that time, the company had, you know, a highly material amount of defective MaxxForce lemons in the fleet.  The company knew at that point in time that the vehicles were defective, and the company knew circa 2015 -- admittedly, I can't put a month on it -- that the vehicles' residual values had declined as former employee five stated, and that in the 2015 and 2016 time period, there was internal discussion of the need for a write down.

THE COURT:  All right.  Well, thank you.

Mr. Winter, why don't you -- I know there has been a lot that we have covered, so I leave it to you to structure your rebuttal.

MR. WINTER:  Thank you, Your Honor.  I'll try to be

as efficient as I can.

I would like to start with this MaxxForce issue, if we can, and just for some nomenclature first, because I think a lot of terms have been thrown around and that clarity here is important.  So there has been talk about vehicles in a certain class year, so you heard about the 2010s, '11s and '12s, but those are talking about the vintages or the year that those vehicles were produced.

And then there is a company called Navistar that manufactures one type of tractor, which is one company, and then there these MaxxForce engines that are sort of one type of tractor that Navistar manufactured during this early time period.  So I just want to make sure we have that nomenclature right because I think a lot of terms are being thrown around and it's important to distinguish between those things.

Can we just go to slide 22, I think it will be easier just to see it on the screen.  22; great.

So Counsel, I think, began by reciting a paragraph in the complaint and I don't know if it was cited correctly in the transcript, but I think it was 95, and we see -- this is the second bullet on the slide, this is what they pleaded.  And, you know, in the context here, as the Court knows, there's the *Harris* case, *KLX*, we are not limited to how the Plaintiffs paraphrased the actual statement to investors, and so what they are doing here is really paraphrasing the thing in the white

box under here, and I think you will see that, Your Honor, when you kind of compare the Romanettes.

And what this is saying here, this is G32019, this is the earnings call when Sanchez is saying, you know, Let me explain sort of what is happening here, the statement about these pre 2014 leases is going to -- and I cover this in the opening, but how those leases performed over the course of their leases; how well the company did in terms of how much they got each month compared to how much they were ultimately able to recover once you are going to sell these vehicles. And so I think, you know, that this idea that there was an admission that the reductions in 2019 were the result of or caused by the Navistar lemons, as Counsel calls them, is just not supported by the actual disclosure that they are paraphrasing here; that's the first point.

And the second is -- and we don't have to show it here, but Your Honor will have it, July 24, same exhibit, page five earlier, that's where it essentially explains why the initial depreciation is being taken and it has to do with a fleetwide decline in prices, not just declines on these vehicles and that's at pages five and six and 16.

If we can go to slide 24.

That would be -- take a look at slide 27, if we can.

And this is, Your Honor, just to get a little bit more of the exhibit in front of the Court, these are, you know,

the earning calls, this is the actual communication, Your Honor, that -- that -- that is being referred to in that piece, and I think it is very clear when Your Honor goes back -- it is cited in the papers and goes back and looks, this is what -- what Sanchez and the rest of management is talking about.

You can take that down.

The we heard this idea, and I think I want to -- I think I'm quoting Counsel accurately, but that the majority or the vast majority of the $844 million had to do with the MaxxForce or Navistar vehicles that were in inventory, I think that's what we heard, and there is a lot of problems with that statement because it really is inaccurate.

If we take a look at slide 28, this has to do with, you know, what the -- what the $844 million really is, and again, I think precision here is important.  If a vehicle is in inventory, it can't be part of the $844 million, just it can't be, because the $844 million was comprised of two things.  It is comprised of 30 percent of accelerated depreciation for vehicles that are going to be sold through 2021 and the lion's share, 70 percent, almost $600 million, is policy depreciation, which has to do with -- and we can talk about this in a bit -- how you deal with the five-year average, and then you propagate it forward across the entire fleet, the entire $15 billion fleet of vehicles that was going to be sold not just in '19, and '20, but through 2025, okay.

So once a vehicle is in inventory, it is not part of the 844, it is just not.  And, you know, that concept there is the valuation adjustment, it gets written down, and I don't think there is anything in the complaint that is tying the 844 to anything having to do with any kind of valuation adjustments or things that were for sale, that's not pled at all, it is not accurate.  So this connection between, you know, Navistar vehicles being sold in 2019 or 2020 and the 844 is just -- it is inconsistent with the filing and it is not part of the complaint either.

THE COURT:  Mr. Winter, it can you pause there.

Mr. Rizio, could you clarify that?  I mean, this 844 million, if it is truly a prospective figure, then how is it indicative of alleged fraud during the class period?

MR. RIZIO-HAMILTON:  Because it is a depreciation charge on defective vehicles that had been in the fleet since before 2014.

I mean, if you look in Exhibit 6 at what Mr. Sanchez says, he specifically says that, Leases signed prior to 2014 are now expected to result in returns below our target level for two reasons.  First, they have been negatively impacted by maintenance costs on the early model years of emissions technology, that's a reference to the MaxxForce emission engine problems.  And he says, Second, they are now expected to be sold in a down market, and he further says that the negative

P&L impact of the vehicles will largely end by 2020, and these vintages account for the majority of the accelerated depreciation now projected. I mean, he is tying -- he is tying the charge to those vehicles, or the majority of it.

And when you look further on in the transcript, page 16, there is an analyst from Seaport Global Securities who says, Robert, if I can kind of dig in on the equipment that's prior to 2014, where it obviously seems like the biggest issue is. I mean, even the analyst understood these to be a major part of the problem and where the biggest issue was.

Again on page four of the same exhibit, he specifically states again, Mr. Sanchez, that the majority of underperforming leases written prior to 2014, they exit over the next 18 months or so, so they are going to be sold over the next 18 months or so and they are a huge driver of the charge.

And I would just say from a big picture perspective, again, this is a motion to dismiss. This is like, I've got literally like two feet of binders of factual material that they have submitted on my desk right now. I have a 30 page slide deck that I haven't seen before, and it is frankly a gigantic, fact ridden supplemental submission that is effectively an attempt to turn this into a summary judgment motion before it had a stitch of discovery, all of which is my way of saying that we have pled enough and there is enough in the documents before the Court to, at a bare minimum, create a

serious fact issue as to whether these defective engines were a material driver of the charge.  That's what Defendant Sanchez is saying.

THE COURT:  All right, thank you.

Mr. Winter.

MR. WINTER:  Your Honor, let's just say on Exhibit -- I think it is our Exhibit 27, I gather it is Plaintiffs' 6, which is confusing me a little bit with the numbering.

Counsel is just on the wrong page of the document, I hear that, you know, there is a sense or suggestion that we are looking at factual materials or something.  I mean, this is a case about disclosures to the market and the basis of the allegation in the entire complaint that ties the $844 million to what Counsel described as defective lemons, and I do want to get to that in a bit, is essentially this exhibit, Exhibit 27.

And he is on page six, and what Sanchez says, and we can play it back if we need it, but he is talking about lease performance.  He is talking about -- he's moved on from the issue of the depreciation and he is talking about, and I think Counsel just said it, results and returns below our target level.  That is not depreciation, they are talking about the returns on the leases, and so that's very clear.

And the prior page, page five, is when he talks about the depreciation and the prices fleetwide.  And there was a suggestion about, well, some of these vehicles, and I think

these vehicles -- and again, were talking very large here, we are talking 2012, not limited to Navistar, not limited to MaxxForce.  I think Counsel said some of those would be sold through 2021.

Again, just to be clear, and this is why I have the slides up, that is the lion's share of the depreciation, it's just not.  The allegations in the complaint are based on the disclosures and the disclosures are very clear that separates out the depreciation between the go-forward amount and what is currently there, so I just wanted to make that clear.

In terms of the -- I think we heard earlier about that the vast majority of all of this had to do with these defective lemons.  As we looked at it, the only allegation in the complaint in terms of the size, the proportion of the Navistar MaxxForce vehicles I believe is in paragraph 105.  It comes from former employee number four, this is the Canada employee, and you know, we are constrained obviously by the pleading, where we are, in terms of, you know, I think we are very skeptical of that number, but when the Court looks at 105, I think two things are really important.

The first is he is saying that it was 40 percent at the time the vehicle was in service, so that they were there.  There is no allegation in the complaint tying how many of these vehicles were leftover in 2018, 2019, 2020, when we are taking the depreciation, there is no allegation there.  And so that

lack of specificity is, we think, very important when Counsel, I think in a bit of a change of how you read the pleading, is making this case all about just these Navistar MaxxForce vehicles, which I think the complaint otherwise suggests, starting in 2015, are being sold in the market, right, and that's why you get all these [unintelligible] things, we can't get enough money for these vehicles, they're not getting what we need.

If that's happening in '15, to Your Honor's point, well, there is a lot less happening later on, and I think that those are fair inferences one can draw from the actual pleaded allegations here.

The other thing is FE4, and we pointed out this in the papers, it's sort of really interesting.  The -- there is an allegation in paragraph 103 that Ryder never adjusted its residual value, they never did it.  And we pointed out, I think in the opening brief, that that just didn't square with the public disclosures, and Plaintiffs' response to that in the opposition was actually really interesting.  They sort of ran away from FE4 and said, Well, you know, FE4 only works in Canada, and he was only talking about the 1,250 vehicles out of the 200,000 vehicles in Ryder's fleet that he was involved with.

And you know, while we think it is implausible that those thousand vehicles' residual values were never adjusted,

and given what the Court has seen in terms of disclosures, putting that aside, it can't be the case that Plaintiffs basically rely on FE4 basically for his entire case, to say that Navistar was the big problem, it was 40 percent, et cetera, and then walk away from FE4 because the things he actually says or at least what is in the complaint that he says isn't consistent with other things in the complaint and the record.

I guess the last thing I'll say, you know, there is no allegation here as to how Ryder was accounting for what the residual values were on these MaxxForce Navistar vehicles.  I'm talking a little bit in the negative, but I think it is important to note there is no allegation that these weren't addressed separately in the depreciation analysis as a result of the issues that Counsel mentioned.  And that lack of an allegation we do think is important, we don't think there could be such an allegation, and the Court can take that into account.

If we turn to the next issue I wanted to address, if we can, is -- is -- there is -- there is a sense of the pattern we talked about in terms of [unintelligible] and volatility, I think there was this argument that you can't kind of rely on that to say, Well, you know, what Defendants did sort of makes sense and is reasonable.

You know, it is really quite the opposite, Your

Wednesday, April 7, 2021.

Honor, and I want to make this point:  The point is that, you know, when you are in the middle of it, you don't know where you are on the chart.  You don't know if you're at the high, you don't know if you're at the low, and it is easy for us all, after the fact and Counsel after the fact, to say, Look, this was so obvious.  Prices had risen in 2015, they had just started to decline, by the way, by the beginning of the class period and that from that, Ryder and the actual individual Defendants named should have known then that there was going to be this massive drop, right, that you see in the chart and that the blip for 2018, that was just a blip, don't worry about it, and how is anyone supposed to know that?

I think it puts -- the point, Your Honor, is that we are talking about something very, very far in the future, five years into the future after the class period starts here, and this idea that like everyone knew that this is how things would turn out, and I think that's kind of the key point.

If we continue to look at slide 12 as well, and on the last one here, Exhibit 38 at page 13, which is from our exhibits to the original motion to dismiss, there is this idea that the 2018, you know, increases should just be ignored because they were small and, you know, everyone knew what was going to happen, so this is 2-2-2018, this is what is being told to investors, and they are saying, Look, to avoid the need for accelerated depreciation the following year, we estimate

about a 25 to 30 percent increase in pricing from these levels would be necessary to eliminate that need, okay, that's what they are talking about here.

You know, these are, as Mr. Rizio said, Mr. Rizio said sophisticated investors, they could have raised their hands and said, That's nuts, what are you talking about?  The point is that -- that -- that in the middle of it, Ryder was being upfront as to sort of what we need to happen in prices for there to be less depreciation, no depreciation, more depreciation, and it was something that was happening in realtime, and I think it is very difficult to say that any of these statements were false or misleading.  We didn't hear a lot about which statements were, let alone made with scienter, that they knew that these statements were false or recklessly so.

If we take a look at -- I don't know if we have to go to the slide, but we heard about this argument that how could it be that in 2018, when prices were where they were, that later on in 2019, there needed to be additional depreciation taken, and I think again this has to do with what a residual value is and how depreciation works.

In 2018, those are valuation adjustments.  That gets taken if the vehicle is being sold then, it is getting marked down.  It is all about trends and perspective looking forward. So in 2018, when prices are rising, the perspective trend isn't

like, Wow, I need to now take the depreciation in 2019 and change the way I'm doing my policy depreciation because of this issue, let's see what happens.

And the big thing that changed was the market did go down.  I know Counsel glosses over it, but that's what happened, and in Q2 and then in Q3, there's a recognition that this price increase that we saw and that we're living isn't continuing, it is actually changing and so we need to make that adjustment, so that's that.

Can we take a look at slide 15, Will.

THE COURT:  Mr. Winter, why don't you start to wrap up.

MR. WINTER:  Sure, no problem, Your Honor.

Just real briefly, you heard a lot about the former employees.  Your Honor, I think Counsel is right, they had access to these people, we don't.  I think when we talk about sort of the lack of specificity in the allegations here, something the Court should keep in mind in terms of the analysis, they used the term write down, things that aren't really tied to the issues we are talking about here.

So to take Your Honor's point about telling a story about declining prices and the inventory lot, but I think we need to be very careful about taking vague statements that lack specificity and transposing those issues in terms of how the residual values were actually being accounted for.

Wednesday, April 7, 2021.

And then very briefly --

THE COURT:  I do think the former employees in this case arguably set this complaint apart from some others, and I'm not so sure their statements are as vague as you suggest, I did see a fair amount of particularized references there. Whether they are sufficient to clear the scienter threshold, I'm not sure at this time, it will require more review.

But I do think that's one challenge you have, and I'm not sure I have heard enough this morning to undermine those former employee statements to the point of sort of defeating the presentation of scienter.

MR. WINTER:  With respect to the former employees, I think what I would say is the -- there's really two issues.  I think the first is when we look at the allegations carefully, you're really seeing if there is anything that they are saying that is being tied to something they are telling a senior executive here, the Defendant, that the residual values they are taking are being adjusted are wrong, as opposed to a statement about pricing and current pricing, that's number one.

Number two point, and I think we made this point in the papers, there is no allegation by any former employee, right, about how pricing would turn out in the future, okay. So if this is all '15 and '16, and we have a lack of specificity here in terms of dates, which I think is important, to say that because, you know, we are seeing real problems in

Wednesday, April 7, 2021.

terms of selling vehicles in '15 and '16, for example, I think Counsel relies on FE6, who left the company in 2015, so in 2016, you know, concerns about current pricing, you know, should have led the Defendants to know that in mid 2019, there would be an issue and a problem.  And I think that's a real leap, Your Honor, and I think it's a big problem, so that's the second thing I mention.

But finally on this, in terms of the scienter analysis, I think the *Hearth* [phonetic] case makes this point, we have to then take these individual former employees and look at them in terms of what the allegations are, and even if you sort of credit all that, these are just respective individual employees on individual issues.

If you take that to sort of fleetwide and say, Well, in 2019, the senior executives knew and were reckless and knowing then that you were going to need to make changes based on the declines in prices that ultimately occurred, I think that is a big leap, Your Honor, and I think it's a bigger leap than the cases permit and with [unintelligible].

And with that I conclude.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Winter, and Counsel.  I appreciate the able advocacy.  This has been very helpful.

I'm going to reserve ruling on this motion.  It does require a lot of detailed analysis, I have worked may way through many of the materials, but there is a lot there and I

Wednesday, April 7, 2021.

want to be sure that I devote the necessary time to this.

So with that, I don't have anything further. Mr. Rizio, do you have anything else?

MR. RIZIO-HAMILTON:  No, Your Honor.  The only thing I would add is just my thanks to you on behalf of our clients for your obviously very detailed and careful consideration and all of the time you have given us today.

THE COURT:  Thank you.

MR. WINTER:  Thank you, Your Honor.  Just one other point, would it be the Court's preference to e-mail Counsel and the Court a copy of the presentation or a hard copy?  If we were all sitting there in chambers, we would hand it out to everyone obviously, but I just want to know what the Court's preference is.

THE COURT:  You are welcome to e-mail it to cannon@FLSD.uscourts.gov e-mail address.

I would encourage you, though, in the future to share any materials with Counsel prior to a motions hearing so that they can respond in kind if necessary.

MR. WINTER:  Thank you, Your Honor.

THE COURT:  All right.  Thank you all, and have a good rest of the day.

MR. KLAUSNER:  Thank you, Your Honor.

(PROCEEDINGS ADJOURNED AT 12:06 P.M.)

Wednesday, April 7, 2021.

C-E-R-T-I-F-I-C-A-T-E

I hereby certify that the foregoing is an accurate transcription of digitally recorded proceedings in the above-entitled matter to the best of my abilities.

**This hearing occurred during the COVID-19 pandemic and is therefore subject to the technological limitations of reporting remotely.**

*4/9/21*
DATE

*/s/DIANE MILLER*
DIANE MILLER, RMR, CRR
Official Court Reporter
United States District Court
101 South U.S. Highway 1
Fort Pierce, FL  34950
772-467-2337

Wednesday, April 7, 2021.

| | | | | |
|---|---|---|---|---|
| **MR. KLAUSNER: [2]** 3/8 75/22 | **'16 [3]** 25/19 73/23 74/1 | 64/19 65/8 65/13 | **4** | **accountants [1]** 24/5 |
| **MR. OSBORNE: [2]** 4/10 6/12 | **'18 [2]** 9/15 15/10 | **2015 [37]** 11/12 11/18 13/5 14/2 23/6 27/2 31/17 31/24 33/2 40/21 41/1 41/11 41/11 41/18 45/20 57/22 58/1 58/7 58/9 58/15 58/17 58/20 59/2 59/11 59/12 59/15 59/19 59/20 59/21 60/1 60/5 60/9 60/17 60/19 68/5 70/6 74/2 | **4/9/21 [1]** 76/11 | **accounted [3]** 22/17 36/25 72/25 |
| **MR. RIZIO-HAMILTON: [25]** 3/10 3/25 4/5 30/6 34/13 35/17 36/19 37/1 40/6 41/1 41/23 43/14 43/19 44/15 44/23 49/3 51/8 53/14 55/14 58/2 58/21 59/5 60/11 64/14 75/3 | **'19 [2]** 25/20 63/24 | | **40 percent [4]** 31/15 45/20 67/21 69/4 | **accounting [31]** 7/5 13/17 17/25 19/6 19/15 19/24 20/2 20/8 20/12 20/18 21/17 23/2 24/4 24/7 28/3 28/6 28/15 28/20 37/11 37/19 38/4 39/3 43/17 44/8 48/8 48/10 49/1 49/2 49/10 49/21 69/10 |
| | **'20 [2]** 25/20 63/25 | | **41 [1]** 23/14 | |
| | **'21 [1]** 25/21 | | **42 [1]** 5/1 | |
| | **/** | | **450 [1]** 2/3 | |
| | **/s/DIANE [1]** 76/11 | | **467-2337 [1]** 1/23 | |
| | **1** | | **4th [1]** 1/15 | |
| **MR. WIERZBOWSKI: [1]** 3/22 | **1,250 [1]** 68/21 | | **5** | **accuracy [1]** 41/23 |
| | **10 [1]** 51/5 | **2015/2016 [1]** 58/20 | **51 [1]** 2/6 | **accurate [8]** 25/11 26/7 26/7 26/8 28/24 48/23 64/7 76/4 |
| **MR. WINTER: [17]** 4/13 4/21 5/8 5/15 6/15 20/9 22/3 24/17 25/14 57/9 57/15 60/24 66/5 72/12 73/11 75/8 75/19 | **10-K [1]** 37/4 | **2016 [15]** 8/25 14/3 15/4 15/6 15/8 15/11 26/22 26/23 44/16 45/12 45/16 58/20 59/15 60/19 74/3 | **52nd [1]** 2/6 | |
| | **100 [1]** 40/16 | | **6** | **accurately [3]** 36/25 48/1 63/8 |
| | **10019 [1]** 2/7 | | **60,000 [2]** 41/10 58/11 | |
| | **10020 [1]** 1/19 | | **68 [1]** 23/14 | **acknowledge [2]** 34/16 44/3 |
| | **101 [2]** 1/22 76/13 | **2017 [5]** 8/25 14/4 15/11 27/12 45/12 | **7** | |
| **THE COURT: [46]** 3/1 4/3 4/7 4/12 4/18 4/22 5/14 6/3 6/6 6/10 6/13 19/21 21/22 24/16 25/8 30/3 34/10 35/15 36/9 36/25 40/1 40/23 41/20 43/9 43/18 44/13 44/22 48/24 51/1 53/12 55/10 57/6 57/13 57/16 58/15 59/3 60/2 60/20 64/10 66/3 72/10 73/1 74/20 75/7 75/14 75/20 | **102 [1]** 37/4 | | **70 percent [3]** 13/5 29/24 63/20 | **across [4]** 5/18 18/7 26/24 63/23 |
| | **103 [3]** 21/2 24/13 68/15 | **2018 [36]** 9/2 14/6 14/10 14/14 14/16 15/19 18/6 23/6 27/12 27/13 31/20 35/5 41/18 41/19 41/21 42/12 42/15 42/24 43/1 43/3 43/22 44/5 45/12 45/17 47/14 56/10 56/15 56/20 56/23 67/24 70/11 70/21 70/23 71/18 71/22 71/25 | | **actionable [5]** 5/20 9/23 10/10 11/24 51/25 |
| | **103B [2]** 21/9 59/16 | | **7080 [1]** 1/15 | **activate [1]** 6/5 |
| | **103D [1]** 21/11 | | **772 [1]** 1/23 | **active [1]** 18/20 |
| | **105 [2]** 67/15 67/19 | | **772-467-2337 [1]** 76/14 | **actual [10]** 23/13 27/13 28/17 37/25 49/23 61/24 62/14 63/1 68/11 70/8 |
| | **118 million [1]** 23/14 | | **8** | |
| | **11:32 [2]** 57/7 57/12 | | **844 [3]** 64/2 64/4 64/8 | **actually [19]** 7/18 7/19 8/20 17/11 21/5 23/15 25/10 26/13 26/18 26/24 28/4 31/20 38/1 54/17 57/17 68/19 69/6 72/8 72/25 |
| | **11:40 [2]** 57/8 57/13 | | **844 million [1]** 64/13 | |
| | **12 [2]** 39/8 70/18 | **2019 [19]** 9/7 14/14 15/17 16/1 17/3 17/6 18/17 35/6 42/12 42/15 50/11 55/18 62/12 64/8 67/24 71/19 72/1 74/4 74/15 | **89 [1]** 1/7 | |
| | **1251 [1]** 1/19 | | **9** | |
| | **12:06 [1]** 75/24 | | **90 [1]** 11/17 | |
| | **13 [4]** 14/24 56/7 56/24 70/19 | | **93 [1]** 42/14 | **ADAM [2]** 1/17 3/23 |
| | **14 [1]** 10/19 | | **95 [2]** 32/19 61/20 | **add [4]** 3/15 18/13 24/18 75/5 |
| **THE COURTROOM DEPUTY: [4]** 3/3 6/5 6/8 57/10 | **14 percent [1]** 45/18 | **2020 [5]** 33/17 38/17 64/8 65/1 67/24 | **A** | **adding [1]** 45/14 |
| | **1400 [1]** 2/3 | | **a.m [1]** 57/13 | **addition [1]** 58/13 |
| | **142 [1]** 50/14 | **2021 [6]** 1/6 13/6 16/4 29/2 63/19 67/4 | **a/m [1]** 57/12 | **additional [16]** 7/20 8/2 13/8 13/25 14/5 16/5 17/2 18/8 27/17 30/1 46/22 54/22 55/3 55/14 56/12 71/19 |
| **$** | **15 [2]** 58/9 72/10 | | **abbreviation [1]** 19/2 | |
| **$100 [1]** 14/3 | **15 percent [1]** 27/7 | **2022 [2]** 15/21 29/2 | **abilities [1]** 76/6 | |
| **$100 million [1]** 14/3 | **16 [4]** 12/15 53/25 62/21 65/6 | **2025 [1]** 63/25 | **ability [1]** 42/8 | |
| **$144 [1]** 18/18 | **17 [1]** 13/12 | **21 [2]** 24/24 76/11 | **able [4]** 6/3 15/13 62/10 74/22 | **address [5]** 12/10 16/13 55/14 69/19 75/16 |
| **$144 million [1]** 18/18 | **18 [7]** 9/12 38/25 39/2 39/15 49/15 65/14 65/15 | **22 [4]** 17/1 53/18 61/16 61/17 | | |
| **$15 [1]** 63/23 | **184 [1]** 44/24 | **23 [2]** 18/14 53/18 | **about [85]** | **addressed [3]** 18/2 52/19 69/14 |
| **$15 billion [1]** 63/23 | **19 [2]** 16/16 76/7 | **2337 [2]** 1/23 76/14 | **above [4]** 8/1 27/9 48/15 76/5 | |
| **$17 [1]** 14/6 | **2** | **24 [3]** 18/4 62/17 62/22 | **above-entitled [1]** 76/5 | **adequate [1]** 50/23 |
| **$17 million [1]** 14/6 | **2-2-2018 [1]** 70/23 | **25 [2]** 19/2 71/1 | **absolutely [3]** 6/9 48/21 49/11 | **ADJOURNED [1]** 75/24 |
| **$197 [1]** 23/5 | **20 [2]** 15/6 22/19 | **254 [1]** 43/23 | **accelerated [18]** 7/16 8/8 8/12 8/16 10/21 15/23 19/17 27/23 29/8 33/18 33/21 34/5 37/15 49/13 56/20 63/18 65/2 70/25 | **adjust [3]** 7/11 7/14 34/25 |
| **$197 million [1]** 23/5 | **20 million [1]** 56/19 | **26th [1]** 43/22 | | |
| **$20,000 [3]** 31/23 41/10 58/11 | **20 percent [1]** 27/5 | **27 [9]** 17/13 32/20 33/3 33/5 38/15 38/21 62/23 66/7 66/15 | | **adjusted [13]** 7/5 7/7 8/1 8/5 11/4 19/7 20/19 24/11 37/5 49/22 68/15 68/25 73/18 |
| **$60,000 [1]** 31/22 | **20-22109-CIV-CANNON [1]** 1/3 | **28 [1]** 63/13 | | |
| **$600 [1]** 63/20 | **20-CV-22109-CANNON [1]** 3/5 | **3** | | |
| **$600 million [1]** 63/20 | **200,000 [1]** 68/22 | **30 [3]** 29/18 65/19 71/1 | **accepted [1]** 39/9 | **adjustment [11]** 7/24 8/9 8/12 23/5 23/20 27/18 29/10 37/23 49/17 64/3 72/9 |
| **$844 [6]** 50/14 63/9 63/14 63/16 63/17 66/13 | **2010 [5]** 32/23 33/9 41/4 58/24 59/7 | **30 percent [1]** 63/18 | **accepting [1]** 22/6 | |
| | **2010s [2]** 17/15 61/6 | **32 [1]** 23/15 | **access [1]** 72/16 | |
| **$844 million [3]** 63/9 63/14 63/17 | **2011 [4]** 11/12 11/18 27/2 47/14 | **33301 [1]** 2/3 | **accord [1]** 53/17 | |
| **$850 [1]** 50/11 | **2012 [5]** 27/2 41/5 58/24 59/8 67/2 | **33317 [1]** 1/15 | **accordance [4]** 26/10 52/25 53/12 53/21 | **adjustments [7]** 14/21 19/19 23/6 23/7 49/18 64/5 71/22 |
| **$850 million [1]** 50/11 | **2013 [1]** 27/2 | **34950 [2]** 1/23 76/13 | **account [11]** 10/18 33/17 37/12 37/17 37/20 38/3 49/11 49/17 49/22 65/2 69/18 | |
| **'** | **2014 [13]** 33/6 34/8 38/23 40/20 40/25 41/3 58/25 59/9 62/6 64/17 | **38 [1]** 70/19 | | |
| **'11s [2]** 17/15 61/6 | | **38.5 percent [1]** 41/18 | | **admission [3]** 17/10 |
| **'12s [2]** 17/15 61/6 | | | **accountant [1]** 20/12 | |
| **'15 [5]** 9/14 25/19 68/9 73/23 74/1 | | | | |

Page 78

Case 1:20-cv-22109-JB Document 74 Entered on FLSD Docket 04/09/2021 Page 78 of 89

State of Alaska Perm Fund vs. Ryder System, Inc.

## A

**admission... [2]** 18/8 62/12
**admitted [1]** 17/5
**admittedly [1]** 60/17
**advocacy [1]** 74/22
**afford [2]** 21/13 46/23
**after [8]** 7/25 15/4 15/11 27/15 56/10 70/5 70/5 70/15
**again [23]** 9/8 11/10 12/11 13/4 14/12 15/11 17/4 22/23 33/12 34/7 38/15 38/23 42/22 49/12 49/19 56/3 63/15 65/11 65/12 65/17 67/1 67/5 71/20
**against [2]** 31/3 37/24
**aggressive [1]** 60/6
**agree [1]** 59/23
**AILEEN [1]** 1/11
**al [4]** 1/4 1/7 3/6 3/6
**Alabama [2]** 51/15 54/3
**ALASKA [5]** 1/4 1/4 3/5 3/5 3/17
**all [65]** 4/10 4/24 5/2 6/14 7/25 8/11 9/14 10/2 10/3 10/21 11/15 12/3 12/9 13/17 15/1 15/3 18/7 18/11 19/4 19/18 21/10 22/6 22/9 24/3 24/21 25/12 26/4 26/14 29/9 29/21 29/23 36/4 39/6 40/2 46/20 47/3 47/23 49/8 51/16 53/6 53/14 53/17 53/18 55/1 56/11 56/25 57/5 57/14 57/25 60/3 60/21 64/6 65/23 66/4 67/12 68/3 68/6 70/4 71/24 73/23 74/12 75/7 75/12 75/21 75/21
**allegation [17]** 16/24 25/17 57/22 58/4 59/4 59/6 60/10 66/13 67/13 67/23 67/25 68/15 69/10 69/13 69/16 69/17 73/21
**allegations [11]** 20/23 25/12 39/9 40/24 50/1 51/16 67/7 68/12 72/17 73/14 74/11
**allege [2]** 5/20 45/2
**alleged [5]** 20/15 29/21 54/7 57/20 64/14
**allow [1]** 55/13
**allowed [2]** 30/18 43/24
**allows [1]** 44/8
**almost [2]** 50/11 63/20
**alone [3]** 14/22 16/11 71/13
**already [5]** 14/6 18/22 20/23 38/12 52/15
**also [24]** 3/13 3/15 3/17 4/3 4/16 4/16 5/4 8/17 9/11 12/22 18/13 18/24 24/12 26/18 31/25 32/7 32/13 49/21 50/8 50/22 52/9 54/3 55/16 58/14
**also ignore [1]** 18/13
**although [3]** 34/22 36/15 51/19
**am [2]** 36/17 54/5
**amended [4]** 57/22 60/4 60/7 60/10
**Americas [1]** 1/19
**among [1]** 37/7
**amount [8]** 8/23 18/20 50/13 52/18 58/6 60/14 67/9 73/5
**analogy [1]** 44/10
**analysis [6]** 37/21 53/8 69/14 72/19 74/9 74/24
**analyst [4]** 27/14 50/17 65/6 65/9
**analyst's [1]** 35/24
**analysts [5]** 9/16 9/18 26/19 36/2 36/3
**animating [1]** 48/10
**announced [1]** 50/10
**annual [2]** 9/14 37/6
**another [4]** 9/7 18/11 39/15 52/7
**answer [5]** 14/1 22/5 24/15 29/4 51/12
**anticipated [2]** 17/20 33/11
**any [20]** 15/22 16/11 19/8 19/14 20/1 24/25 29/16 30/2 32/13 39/10 42/6 42/19 54/12 54/22 55/3 55/13 64/5 71/11 73/21 75/18
**Anybody [1]** 4/9
**anyone [1]** 70/12
**anything [7]** 12/12 17/3 64/4 64/5 73/15 75/2 75/3
**apart [1]** 73/3
**apparent [9]** 31/16 40/10 41/3 41/13 56/1 58/8 58/10 59/2 59/13
**appearance [1]** 3/7
**APPEARANCES [2]** 1/13 2/1
**appears [1]** 5/1
**applies [1]** 52/3
**appreciate [4]** 5/10 51/12 57/6 74/22
**approach [1]** 10/23
**approximately [3]** 49/15 55/17 58/11
**APRIL [1]** 1/6
**are [175]**
**aren't [1]** 72/19
**arguably [3]** 20/4 51/21 73/3
**argue [1]** 12/21
**arguing [1]** 20/11
**argument [16]** 5/12 7/3 10/16 17/9 18/10 20/14 20/20 35/4 41/22 42/13

## B

**back [22]** 9/3 14/9 14/13 15/15 16/1 17/14 18/11 26/19 27/22 27/25 28/4 30/13 35/11 42/22 42/23 43/10 47/11 57/14 58/23 63/3 63/4 66/17
**backward [1]** 11/3
**backward-looking [1]** 11/3
**backwards [1]** 28/14
**bad [2]** 19/10 22/7
**bar [1]** 12/20
**bare [1]** 65/25
**based [7]** 10/12 37/7 50/13 52/3 60/1 67/7 74/16
**basically [6]** 7/12 14/11 18/6 28/9 69/3 69/3
**basics [1]** 5/17
**basis [13]** 5/23 14/22 16/10 17/1 19/14 20/5 20/20 20/21 24/3 24/19 36/17 37/6 66/12
**bath [1]** 50/12
**be [80]**
**bear [2]** 28/16 38/9
**BEAYE [6]** 2/5 4/16 4/18 4/19 5/13 6/1
**became [2]** 58/9 59/2
**because [43]** 10/2 10/5 10/12 11/14 12/21 17/21 18/19 24/4 24/5 24/6 25/1 25/16 26/8 27/8 28/1 28/17 30/10 30/17 30/25 31/2 31/4 33/20 34/3 38/10 40/19 44/2 44/20 46/22 48/8 50/16 51/20 51/25 52/13 55/25 61/3 61/14 63/12 63/17 64/15 69/5 70/22 72/2 73/25
**become [4]** 16/14 32/9 41/13 58/8
**been [19]** 9/2 14/2 14/20 22/13 23/25 32/22 33/8 36/5 38/12 40/11 40/12 43/3 55/21 60/22 61/4 61/5 64/16 64/21 74/22
**before [16]** 1/11 5/2 10/7 18/15 27/2 30/12 33/15 34/9 35/8 35/10 35/12 38/6 64/17 65/20 65/23 65/25
**began [5]** 16/3 33/2 41/8 58/15 61/18
**beginning [8]** 3/8 24/11 31/9 41/5 41/6 53/8 58/5 70/7
**begins [2]** 34/9 41/11
**behalf [9]** 3/10 3/13 3/21 3/25 4/4 4/9 4/12 4/15 75/5
**being [26]** 7/18 20/18 20/19 21/4 21/6 21/8 22/17 23/9 23/19 26/9 31/17 32/25 37/21 44/4 48/14 61/14 62/19 63/2 64/8 68/5 70/23 71/8 71/23 72/25 73/16 73/18
**belatedly [1]** 32/16
**belie [2]** 11/12 23/18
**belies [1]** 12/24
**believe [4]** 6/1 45/10 58/13 67/15
**below [9]** 8/2 15/8 21/12 26/24 33/7 38/18 41/19 64/20 66/20
**Ben [1]** 3/16
**benefit [3]** 5/5 11/18 13/23
**benefited [1]** 11/20
**Berger [4]** 1/18 3/12 3/22 3/24
**Bernstein [5]** 1/18 3/12 3/22 3/24 4/2
**best [4]** 10/22 44/1 51/2 76/6
**better [2]** 7/18 19/11
**between [7]** 23/6 34/2 45/16 49/22 61/15 64/7 67/9
**beyond [3]** 8/19 12/7 37/10

**big [11]** 15/11 30/14 39/17 42/11 42/16 50/12 65/16 69/4 72/4 74/6 74/18
**bigger [1]** 74/18
**biggest [2]** 65/8 65/10
**billion [4]** 35/2 35/6 40/9 63/23
**binders [1]** 65/18
**bit [10]** 20/6 20/16 57/20 58/2 62/24 63/21 66/8 66/15 68/2 69/12
**blip [3]** 35/5 70/11 70/11
**blue [3]** 23/4 23/14 46/18
**board [4]** 47/2 47/2 48/14 59/17
**bond [1]** 54/23
**book [1]** 15/21
**both [4]** 5/3 25/7 27/15 29/4
**bought [1]** 59/10
**Boulevard [1]** 2/3
**bounce [2]** 35/5 42/16
**box [5]** 9/7 14/11 15/3 17/12 62/1
**boxes [1]** 8/25
**break [1]** 55/12
**brief [9]** 10/17 11/10 13/11 17/5 17/6 23/3 45/11 53/18 68/17
**briefing [3]** 9/17 10/5 52/19
**briefly [5]** 5/17 9/21 12/1 72/14 73/1
**bring [1]** 29/8
**brings [1]** 52/17
**broad [1]** 43/6
**broader [1]** 36/13
**broadly [1]** 58/18
**broke [2]** 9/23 9/25
**brought [1]** 13/22
**bubble [1]** 39/22
**build [1]** 59/24
**bullet [1]** 61/21
**bump [2]** 14/16 15/18
**bunch [1]** 44/18
**business [2]** 22/20 30/15
**buy [1]** 32/12

## C

**C-E-R-T-I-F-I-C-A-T-E [1]** 76/2
**calculated [1]** 26/9
**calculations [1]** 51/18
**call [5]** 3/2 10/11 18/2 27/13 62/4
**called [9]** 7/6 7/23 7/24 9/15 9/16 9/18 23/7 37/15 61/9
**Calling [1]** 3/4
**calls [6]** 10/4 43/16 45/2 46/16 62/13 63/1
**came [2]** 17/15 55/17

State of Alaska Perm Fund vs. Ryder System Inc.

**C**

**can [64]** 3/7 5/13 6/5 6/11 6/18 7/9 8/3 8/22 8/24 9/1 9/6 9/20 9/24 11/6 11/16 12/14 13/4 14/9 14/15 14/16 14/25 15/25 16/16 18/4 18/4 18/14 19/2 20/16 22/16 22/18 24/15 25/9 26/6 26/12 26/12 28/4 29/18 30/13 39/11 40/2 42/4 43/10 43/19 44/1 44/14 56/8 57/19 58/17 59/4 61/1 61/3 61/16 62/22 62/23 63/6 63/21 64/11 65/7 66/17 68/11 69/17 69/20 72/10 75/19

**can't [8]** 21/13 46/7 60/17 63/16 63/16 68/6 69/2 69/22

**Canada [3]** 47/13 67/16 68/21

**candid [1]** 26/14

**candidly [2]** 15/1 16/8

**cannon [4]** 1/3 1/11 3/5 75/16

**capture [1]** 49/18

**captured [1]** 49/14

**care [1]** 6/4

**careful [3]** 13/22 72/23 75/6

**carefully [1]** 73/14

**case [44]** 1/3 3/3 3/4 13/13 13/14 13/16 16/9 16/22 20/25 30/14 31/9 32/1 33/24 34/17 39/8 40/8 45/3 45/8 50/2 50/7 51/3 51/7 51/11 51/14 51/16 51/17 52/9 52/20 53/1 53/23 53/24 54/1 54/2 54/5 54/8 54/14 59/25 61/23 66/12 68/3 69/2 69/3 73/3 74/9

**cases [8]** 10/11 13/17 24/24 25/7 51/10 53/18 54/18 74/19

**cat [2]** 35/5 42/16

**categories [1]** 10/1

**caused [4]** 18/9 31/4 35/24 62/13

**causing [1]** 25/4

**caution [1]** 56/4

**cautionary [2]** 52/10 52/14

**caveat [1]** 51/9

**centered [1]** 45/4

**CEO [2]** 15/5 15/16

**certain [1]** 61/5

**certainly [5]** 5/15 20/11 34/20 49/24 59/25

**certainty [2]** 23/2 42/5

**certify [1]** 76/3

**cetera [1]** 69/5

**CFO [5]** 26/19 47/20 55/17 55/23 55/24

**challenge [2]** 12/2 73/8

**challenged [1]** 55/9

**chambers [1]** 75/12

**change [6]** 21/18 21/19 27/17 49/14 68/2 72/2

**changed [2]** 19/7 72/4

**changes [4]** 8/23 37/8 41/17 74/16

**changing [1]** 72/8

**character [1]** 51/25

**characterize [1]** 49/6

**charge [12]** 11/13 35/2 35/6 35/10 35/23 36/1 42/23 56/13 64/16 65/4 65/15 66/2

**charged [1]** 48/12

**charges [2]** 30/23 31/3

**chart [10]** 8/4 19/20 35/8 40/15 41/25 42/4 42/6 42/7 70/3 70/10

**checkmarks [1]** 8/6

**chronology [2]** 9/4 58/17

**circa [1]** 60/16

**circle [1]** 35/11

**Circuit [4]** 25/7 53/13 53/15 54/15

**cite [5]** 28/7 53/24 53/24 54/1 54/14

**cited [8]** 13/13 28/5 53/18 53/25 54/5 54/13 61/19 63/4

**cites [1]** 17/8

**CIV [1]** 1/3

**claim [4]** 10/20 17/2 50/20 52/16

**claims [3]** 13/22 55/16 55/25

**clarification [1]** 25/22

**clarify [1]** 64/12

**clarity [1]** 61/4

**class [28]** 11/11 17/13 25/20 30/21 31/6 31/9 31/14 32/16 32/17 34/9 34/24 35/14 39/19 40/1 40/17 40/20 40/25 41/11 45/6 45/24 58/5 58/5 59/22 60/1 61/6 64/14 70/7 70/15

**clear [14]** 15/12 18/1 18/3 24/23 26/14 29/5 33/4 47/5 63/3 66/22 67/5 67/8 67/10 73/6

**clearly [4]** 5/5 17/22 38/16 38/22

**clients [2]** 22/9 75/5

**clogged [1]** 21/25

**clogging [2]** 22/21 24/21

**close [1]** 29/20

**closely [1]** 56/6

**closer [3]** 7/17 8/7 29/7

**cogent [2]** 12/18 29/15

**collapse [1]** 52/6

**collapsing [1]** 39/20

**colleague [4]** 4/1 5/13

26/1 37/11

**colleagues [1]** 3/14

**collectively [1]** 45/13

**come [5]** 15/14 20/1 28/9 37/22 48/19

**comes [2]** 56/15 67/16

**comfort [1]** 42/1

**coming [6]** 9/3 14/13 20/8 43/8 48/20 49/14

**commercial [1]** 52/6

**communicating [1]** 36/16

**communication [1]** 63/1

**company [48]** 16/22 21/11 22/15 25/4 25/10 30/18 30/22 30/24 31/1 31/5 31/9 31/20 32/3 32/16 33/25 35/22 36/5 37/12 38/2 38/8 39/13 40/1 43/25 44/20 45/5 45/11 45/15 45/25 46/22 47/25 48/2 48/13 50/10 50/20 54/22 54/24 55/21 56/9 56/13 58/6 59/9 60/13 60/15 60/16 61/9 61/10 62/8 74/2

**company's [6]** 31/2 31/4 36/7 43/16 47/17 50/18

**comparative [1]** 29/19

**compare [2]** 7/13 62/2

**compared [1]** 62/9

**compelling [5]** 12/18 16/11 29/15 29/16 29/21

**competitively [1]** 30/18

**complaint [28]** 5/23 11/16 12/19 18/19 20/3 20/20 21/2 22/24 32/19 40/16 42/14 43/23 50/5 57/22 60/5 60/7 60/10 61/19 64/4 64/10 66/13 67/7 67/14 67/23 68/4 69/6 69/7 73/3

**complaints [3]** 21/7 24/13 46/20

**complete [2]** 5/22 31/11

**completely [2]** 24/9 47/5

**complex [1]** 54/24

**component [1]** 51/22

**comprised [2]** 63/17 63/18

**concede [1]** 13/8

**concededly [1]** 19/5

**concept [8]** 5/24 6/17 21/18 24/7 25/6 26/8 28/20 64/2

**concepts [2]** 21/20 24/6

**concern [1]** 55/1

**concerned [4]** 43/16 54/20 54/21 55/2

**concerns [4]** 21/4 23/23 58/16 74/3

**conclude [1]** 74/20

**concluded [1]** 39/11

**conclusory [1]** 20/5

**condition [2]** 42/5 48/23

**conditions [3]** 9/13 36/25 37/13

**conduct [1]** 46/8

**conference [2]** 43/16 45/2

**CONFERENCED [1]** 1/10

**conferences [1]** 10/5

**confession [1]** 16/21

**confidence [1]** 42/19

**confidential [1]** 18/25

**confidently [1]** 42/8

**confirmed [1]** 36/5

**confirms [1]** 50/12

**confronting [1]** 16/8

**confusing [1]** 66/8

**connection [1]** 64/7

**consider [1]** 35/9

**consideration [1]** 75/6

**considered [1]** 38/10

**consistent [1]** 69/7

**constrained [1]** 67/17

**constraints [1]** 26/16

**contact [1]** 46/4

**contained [1]** 55/4

**contemporaneous [5]** 32/2 39/16 39/18 45/23 52/8

**contemporaneously [2]** 10/11 25/21

**contend [1]** 32/15

**contended [1]** 53/2

**contention [3]** 42/9 52/21 57/1

**context [3]** 26/17 42/17 61/22

**continue [3]** 13/2 56/16 70/18

**continued [3]** 2/1 14/19 33/1

**continues [1]** 27/10

**continuing [1]** 72/8

**contradicts [1]** 53/6

**contrary [1]** 7/3

**contravene [1]** 54/10

**convinced [1]** 35/4

**Cooke [3]** 47/17 47/22 48/3

**copy [2]** 75/11 75/11

**core [1]** 40/8

**corporate [1]** 34/12

**Corporation [1]** 51/14

**correct [2]** 37/3 49/7

**corrected [1]** 50/9

**correctly [1]** 61/19

**cost [1]** 41/20

**costs [6]** 17/7 17/19 32/23 33/9 34/2 64/22

**Cote [1]** 13/15

**could [19]** 6/3 6/8 6/24 8/10 9/12 20/6 28/11 33/3 35/6 38/9 41/9 42/19 42/20 51/4 52/11

64/12 69/16 71/5 71/17

**couldn't [2]** 38/10 46/23

**Counsel [19]** 3/7 4/10 4/20 61/18 62/13 63/8 66/9 66/14 66/20 67/3 68/1 69/15 70/5 72/5 72/15 74/2 74/21 75/10 75/18

**Counsel's [1]** 34/11

**counter [1]** 16/23

**couple [4]** 6/18 15/20 55/12 55/19

**Coupled [1]** 41/15

**course [3]** 7/5 15/25 62/7

**court [28]** 1/1 1/21 1/22 5/6 5/10 6/2 19/1 20/22 26/17 29/14 39/11 49/25 51/17 51/23 52/5 54/6 54/12 57/11 61/22 62/25 65/25 67/19 69/1 69/17 72/18 75/11 76/12 76/12

**Court's [4]** 5/12 12/15 75/10 75/13

**courts [3]** 13/12 13/21 53/17

**cover [1]** 62/6

**covered [1]** 60/23

**covering [1]** 16/7

**covers [1]** 10/6

**COVID [1]** 76/7

**COVID-19 [1]** 76/7

**crazy [1]** 47/15

**CRC [1]** 1/21

**create [1]** 65/25

**credit [1]** 74/12

**credited [1]** 51/17

**critical [2]** 10/23 48/20

**critically [1]** 16/25

**criticism [4]** 13/13 14/22 22/25 24/14

**CRR [2]** 1/21 76/11

**Cull [2]** 13/13 16/9

**cumulative [1]** 50/14

**curious [1]** 58/1

**current [26]** 7/12 7/23 10/18 10/24 11/1 11/4 11/16 11/25 14/17 14/19 19/12 22/8 26/3 27/1 27/3 36/14 36/25 37/8 37/13 37/16 37/17 38/3 55/23 55/23 73/19 74/3

**currently [2]** 23/11 67/10

**customary [2]** 28/13 28/23

**customer [1]** 24/10

**customers [2]** 17/17 32/12

**cuts [1]** 5/18

**CV [1]** 3/5

**CW [2]** 51/16 52/5

**cycle [1]** 14/14

**cyclical [1]** 41/22

**D**

**DATE [1]** 76/11
**dates [1]** 73/24
**day [1]** 75/22
**dead [1]** 35/5
**deal [2]** 42/11 63/22
**deception [1]** 25/5
**decision [3]** 13/15 13/15 54/1
**deck [2]** 30/11 65/20
**decline [16]** 8/14 12/22 13/7 15/6 22/10 26/25 27/8 29/24 29/25 33/2 35/8 39/22 44/7 45/18 62/20 70/7
**declined [4]** 41/17 45/20 58/11 60/18
**declines [7]** 9/9 16/4 24/20 45/12 59/2 62/20 74/17
**declining [3]** 41/16 59/13 72/22
**decrease [1]** 41/10
**decreased [1]** 40/14
**deducting [1]** 55/22
**deemed [1]** 37/6
**deeper [1]** 43/2
**defeating [1]** 73/10
**defect [3]** 12/7 16/22 41/13
**defective [15]** 32/3 32/5 32/8 32/11 32/18 39/12 39/23 58/7 59/1 60/14 60/16 64/16 66/1 66/14 67/13
**defects [1]** 32/6
**Defendant [11]** 33/6 34/3 43/23 44/17 47/17 47/20 47/22 48/3 56/5 66/2 73/17
**defendants [26]** 1/8 2/2 2/5 4/12 4/16 13/2 32/14 39/18 40/5 45/16 45/23 46/4 46/11 46/15 47/10 50/6 52/1 52/6 52/15 53/2 54/4 54/4 56/2 69/23 70/9 74/4
**Defendants' [3]** 48/6 52/2 52/10
**Defense [6]** 4/10 4/20 5/7 34/11 42/1 50/22
**Defense's [1]** 4/25
**definitely [1]** 20/14
**definition [3]** 10/23 18/20 55/6
**Delta [1]** 49/22
**demonstrate [1]** 19/4
**demonstrated [1]** 30/21
**demonstrates [2]** 50/22 56/1
**demonstrating [1]** 55/22
**department [2]** 19/24 20/8
**depend [1]** 13/18

**depreciate [3]** 28/13 28/19 28/22
**depreciation [70]** 7/10 7/16 7/20 8/14 8/16 10/21 11/18 13/9 14/1 14/5 14/20 15/14 15/23 16/5 17/2 18/9 18/19 18/21 19/17 19/18 27/17 27/23 30/1 30/23 31/3 33/13 33/18 33/21 33/23 34/5 37/14 37/15 39/4 40/9 40/13 42/23 43/12 45/4 46/17 46/22 47/3 48/13 49/13 50/21 51/20 54/7 56/12 56/17 56/20 57/21 62/19 63/18 63/20 64/15 65/3 66/19 66/21 66/24 67/6 67/9 67/25 69/14 70/25 71/9 71/9 71/10 71/19 71/21 72/1 72/2
**depth [2]** 29/24 57/2
**described [1]** 66/14
**describes [1]** 16/10
**desk [1]** 65/19
**despite [3]** 11/18 51/25 55/21
**detail [5]** 20/4 32/20 35/25 52/19 60/7
**detailed [3]** 48/6 74/24 75/6
**determine [1]** 47/3
**devote [1]** 75/1
**diane [4]** 1/21 1/24 76/11 76/11
**did [19]** 13/8 16/3 17/10 24/15 29/24 36/23 37/1 40/5 41/21 44/21 46/1 52/1 55/1 58/18 62/8 68/16 69/23 72/4 73/5
**didn't [19]** 11/15 14/1 16/20 17/11 17/16 17/17 30/11 30/25 32/17 34/19 34/20 34/24 36/22 46/22 48/8 54/22 59/20 68/17 71/12
**different [2]** 24/12 37/10
**difficult [3]** 23/25 26/8 71/11
**dig [1]** 65/7
**digit [2]** 9/9 18/6
**digitally [1]** 76/4
**DiLeo [1]** 13/15
**direct [2]** 46/4 46/11
**directly [3]** 39/5 51/12 53/6
**director [2]** 31/19 47/13
**disagreements [1]** 24/1
**disaster [1]** 41/5
**discernible [1]** 42/3
**disclose [2]** 35/13 56/8
**disclosed [14]** 8/13 8/23 16/18 18/14 22/9 24/21 34/22 36/1 36/8 36/10

45/6 45/11 45/15 45/17
**discloses [1]** 26/10
**disclosing [1]** 34/12
**disclosure [8]** 24/8 25/9 25/13 26/6 27/11 35/10 36/5 62/14
**disclosures [17]** 9/10 23/1 24/25 25/23 34/16 36/21 45/9 45/22 50/9 50/18 50/22 51/5 66/12 67/8 67/8 68/18 69/1
**discovery [4]** 46/7 46/8 46/9 65/23
**discussed [1]** 46/16
**discussing [1]** 15/1
**discussion [3]** 31/7 31/25 60/20
**dismiss [4]** 5/1 39/7 65/17 70/20
**dismissal [4]** 5/19 5/23 9/22 16/10
**disposed [1]** 10/20
**dispositive [1]** 53/20
**disputed [3]** 14/12 32/5 32/7
**disregarded [1]** 50/3
**distinct [1]** 21/21
**distinction [1]** 34/2
**distinctions [1]** 23/19
**distinguish [1]** 61/15
**distinguishable [1]** 54/25
**distortion [1]** 36/6
**district [8]** 1/1 1/2 1/11 1/22 13/16 51/15 53/17 76/12
**DIVISION [1]** 1/2
**do [47]** 5/9 7/11 9/6 10/15 10/22 17/3 19/8 19/23 20/16 20/20 23/23 26/16 26/21 28/8 28/12 28/13 28/18 30/25 31/8 32/8 34/11 34/24 35/13 38/4 39/12 40/24 44/15 44/17 51/10 51/21 54/10 54/11 54/14 55/9 59/25 62/19 63/9 63/13 63/21 64/5 66/14 67/12 69/16 71/20 73/2 73/8 75/3
**docket [1]** 5/1
**document [1]** 66/9
**documents [1]** 65/25
**does [10]** 11/12 20/3 20/3 20/7 21/18 21/18 22/2 52/14 56/8 74/23
**doesn't [11]** 7/4 10/13 23/2 27/23 29/15 32/13 34/3 42/7 56/12 56/25 57/4
**dog [2]** 36/4 50/16
**doing [7]** 23/10 29/6 30/25 36/14 49/10 61/25 72/2
**dollar [2]** 35/2 35/6
**dollars [2]** 19/19 40/9
**don't [34]** 5/7 12/5

12/12 12/20 14/21 16/6 20/1 25/17 29/9 29/19 30/5 35/7 39/10 42/9 42/13 42/18 44/14 49/1 49/25 55/3 55/11 60/22 61/19 62/16 64/3 69/16 70/2 70/3 70/4 70/11 71/16 72/11 72/16 75/2
**done [5]** 7/1 13/10 27/7 40/12 46/10
**dots [1]** 57/25
**double [5]** 9/9 13/7 18/6 31/1 39/20
**down [54]** 6/22 7/22 8/18 9/1 9/20 9/24 11/6 15/4 17/21 21/7 23/10 23/16 23/17 23/21 25/2 26/23 29/8 32/15 32/21 33/25 38/10 38/13 38/18 38/20 39/4 39/12 42/22 42/24 42/25 43/2 43/4 43/18 44/19 44/22 47/6 47/8 47/11 50/10 50/14 55/18 55/18 55/21 55/25 58/15 59/9 59/15 60/7 60/20 63/6 64/3 64/25 71/24 72/5 72/19
**downs [5]** 16/8 22/22 28/11 28/12 29/23
**downturn [2]** 9/18 15/13
**downward [3]** 7/15 14/7 27/18
**dramatic [1]** 41/9
**dramatically [4]** 9/9 40/13 40/15 44/11
**draw [1]** 68/11
**drill [1]** 60/7
**driver [4]** 38/10 39/13 65/15 66/2
**driving [4]** 27/17 33/12 38/20 59/8
**drop [3]** 13/5 27/5 70/10
**drops [2]** 15/12 18/7
**due [1]** 17/6
**duration [2]** 13/3 29/25
**during [10]** 5/12 8/21 13/9 25/20 45/24 46/16 47/14 61/12 64/14 76/7

**E**

**e-mail [3]** 75/10 75/15 75/16
**each [10]** 7/7 7/11 7/13 8/13 8/24 9/14 11/4 23/12 51/11 62/9
**earlier [6]** 33/2 40/11 40/11 50/10 62/18 67/11
**early [9]** 27/12 32/23 33/9 35/5 42/12 42/15 58/4 61/12 64/22
**earning [3]** 36/6 50/13 63/1
**earnings [5]** 10/4 11/20 31/2 50/20 62/4

**easier [1]** 61/16
**easily [1]** 10/20
**East [1]** 2/3
**Easterbrook's [1]** 13/14
**easy [1]** 70/4
**edges [1]** 34/17
**effect [3]** 31/1 47/13 53/19
**effectively [1]** 65/22
**efficient [1]** 61/1
**eight [2]** 26/12 28/11
**either [2]** 7/14 64/10
**element [1]** 34/10
**elements [1]** 7/8
**elephant [1]** 9/19
**Eleventh [2]** 53/13 53/15
**eliminate [1]** 71/2
**else [4]** 4/9 16/18 44/15 75/3
**elsewhere [1]** 25/8
**embedded [1]** 54/1
**emerged [1]** 30/20
**emission [2]** 33/14 64/23
**emissions [5]** 32/23 33/10 38/12 38/19 64/22
**emphasize [5]** 6/19 8/11 10/7 28/16 50/4
**emphatic [1]** 15/12
**employee [23]** 31/19 41/7 46/14 46/17 46/25 47/1 47/4 47/7 47/7 47/9 47/12 47/19 47/22 48/2 48/13 58/9 59/12 59/16 60/18 67/16 67/17 73/10 73/21
**employees [24]** 18/25 19/4 19/14 19/23 20/4 20/11 22/5 23/24 45/25 46/3 46/3 46/10 48/19 49/10 49/16 49/23 50/5 58/14 59/14 72/15 73/2 73/12 74/10 74/13
**encourage [1]** 75/17
**end [11]** 18/7 18/17 31/6 32/16 32/17 33/17 34/24 38/17 53/8 55/17 65/1
**ended [1]** 10/13
**engaged [2]** 25/5 25/5
**engine [5]** 34/23 39/17 41/6 41/12 64/23
**engines [14]** 16/19 17/8 18/9 18/16 31/12 31/13 31/22 33/14 33/21 34/4 34/7 35/9 61/11 66/1
**English [1]** 9/12
**enormous [1]** 39/22
**enough [7]** 17/17 17/18 60/1 65/24 65/24 68/7 73/9
**entered [1]** 58/25
**entire [4]** 63/23 63/23 66/13 69/3

**E**

entitled [3] 39/9 39/10 76/5
entry [1] 5/1
equipment [2] 47/5 65/7
especially [1] 13/21
ESQ [8] 1/14 1/16 1/17 1/17 1/18 2/2 2/5 2/5
essence [3] 36/8 49/8 52/16
essentially [6] 11/10 34/13 40/22 42/16 62/18 66/15
estate [1] 52/7
estimate [8] 6/20 6/21 12/25 28/9 28/25 29/1 51/4 70/25
estimates [5] 10/9 10/10 10/12 13/17 51/21
et [5] 1/4 1/7 3/6 3/6 69/5
et al [1] 3/6
et cetera [1] 69/5
evaluating [1] 36/16
evaluation [1] 29/19
even [13] 8/19 11/2 11/19 12/6 16/2 19/18 27/8 29/20 33/4 35/7 35/8 65/9 74/11
ever [2] 35/13 54/13
every [6] 8/13 8/24 12/3 24/21 47/20 47/23
everybody [3] 4/24 6/11 57/15
everyone [5] 16/18 47/10 70/16 70/22 75/13
Everything [1] 22/5
evidence [1] 16/6
exact [4] 22/10 26/20 28/16 43/21
exactly [7] 10/21 23/17 27/1 27/3 49/9 51/19 58/18
examine [1] 45/9
example [6] 21/1 44/13 46/14 48/13 53/23 74/1
excellent [3] 4/8 4/23 6/14
exclude [1] 53/10
excluded [1] 53/22
excludes [1] 52/24
excused [1] 46/21
executive [1] 73/17
executives [7] 12/3 16/7 16/8 26/13 47/20 48/3 74/15
exhibit [19] 17/13 32/20 33/3 33/5 38/15 38/21 56/5 56/7 56/7 56/24 62/17 62/25 64/18 65/11 66/6 66/7 66/15 66/15 70/19
Exhibit 27 [7] 17/13 32/20 33/5 38/15 38/21

66/7 66/15
Exhibit 38 [1] 70/19
Exhibit 6 [1] 56/24
exhibits [2] 26/17 70/20
existing [1] 35/21
exit [2] 38/24 65/13
expect [2] 54/22 55/3
expected [11] 8/17 10/24 16/3 33/1 33/7 37/8 37/17 38/18 39/2 64/20 64/24
expense [14] 8/2 30/23 33/13 33/21 33/23 37/14 40/9 40/13 43/12 45/4 46/22 50/21 54/7 57/21
experience [1] 59/10
explain [1] 62/5
explains [1] 62/18
explanation [1] 58/2
explicit [1] 8/20
expressed [1] 13/12
extend [1] 23/2
extended [2] 15/13 36/1
extends [1] 24/4
extent [2] 59/18 59/23
extraordinary [1] 46/5
extremely [1] 30/16

**F**

face [1] 46/18
fact [19] 14/19 34/18 35/9 35/19 39/13 39/16 39/18 41/15 43/17 44/12 45/23 48/11 52/7 53/12 56/8 65/21 66/1 70/5 70/5
factors [1] 30/20
facts [12] 12/16 13/1 29/21 32/2 49/11 51/11 52/1 52/3 54/17 59/21 59/24 60/2
factual [2] 65/18 66/11
factually [1] 51/7
fails [1] 42/2
failure [5] 5/20 5/21 9/22 46/21 50/21
fair [10] 7/23 22/13 23/11 28/3 28/8 49/4 52/18 59/22 68/11 73/5
fairway [2] 44/1 44/9
fall [3] 13/2 16/3 51/11
falling [2] 9/8 58/11
false [13] 10/2 10/11 10/14 10/14 12/13 40/5 40/6 45/2 54/8 57/23 60/9 71/12 71/14
falsity [3] 51/17 52/8 60/11
familiar [1] 12/15
far [2] 9/17 70/14
fashion [1] 20/5
faster [1] 19/13
favor [1] 46/13
favorable [1] 32/13
FE10 [1] 21/11
FE4 [6] 21/14 68/13

68/20 68/20 69/3 69/5
FE6 [2] 21/9 74/2
February [7] 15/4 15/8 15/10 15/17 27/13 56/10 56/23
February 2016 [2] 15/4 15/8
February 2018 [2] 56/10 56/23
February 2019 [1] 15/17
February of [1] 27/13
feet [1] 65/18
fell [2] 15/11 31/22
FEs [1] 19/1
few [6] 5/11 10/7 17/23 30/3 50/25 51/15
fifth [1] 7/12
fight [2] 36/4 50/16
figure [2] 28/21 64/13
figures [1] 36/19
filed [1] 43/13
filing [3] 23/7 54/16 64/9
filings [1] 36/24
final [3] 4/1 29/13 55/16
finally [5] 8/8 35/25 52/17 56/21 74/8
financial [19] 10/1 34/20 34/25 35/13 36/7 40/12 40/14 43/13 51/14 52/25 53/3 53/11 53/21 54/6 54/20 55/1 55/5 55/8 55/9
find [2] 51/6 51/17
finger [1] 34/15
firm [4] 3/12 4/12 4/17 42/19
first [35] 5/19 5/24 6/17 6/20 7/10 8/15 9/21 10/1 10/9 10/21 12/9 14/14 15/2 15/3 16/17 30/12 30/17 31/17 33/8 33/20 37/15 42/3 49/8 51/15 53/6 53/24 55/1 56/11 57/23 60/9 61/3 62/15 64/21 67/21 73/14
firsthand [1] 49/16
five [27] 7/2 8/3 10/2 11/8 11/14 15/7 19/17 26/2 26/21 27/4 27/21 31/19 36/11 36/18 36/21 36/22 37/18 41/7 43/24 55/12 59/12 60/18 62/18 62/21 63/22 66/23 70/14
five-minute [1] 55/12
five-year [16] 7/2 11/8 11/14 15/7 19/17 26/2 26/21 27/4 27/21 36/11 36/18 36/21 36/22 37/18 43/24 63/22
fixable [1] 31/12
fixed [1] 17/16
fizzled [1] 18/6
FL [2] 1/23 76/13

flag [1] 12/4
flags [2] 24/19 47/15
fleet [15] 7/14 18/17 25/19 26/24 31/15 38/24 39/1 39/14 39/15 47/4 60/15 63/23 63/24 64/16 68/22
fleetwide [3] 62/20 66/24 74/14
FLORIDA [5] 1/2 1/5 1/15 2/3 52/7
flsd.uscourts.gov [2] 1/24 75/16
focal [1] 16/14
focus [1] 18/19
focused [2] 21/2 24/14
focuses [1] 20/22
focusing [1] 58/17
folks [1] 21/24
following [3] 14/21 56/15 70/25
follows [1] 56/14
footnote [1] 45/10
forces [1] 48/24
forecast [1] 56/20
forecasting [1] 27/5
foregoing [1] 76/3
foremost [1] 6/20
foresee [1] 29/24
forget [1] 7/4
form [3] 37/4 40/15 51/4
former [41] 18/25 19/4 19/14 19/23 20/4 20/11 22/5 23/24 31/19 41/7 45/25 46/3 46/3 46/10 46/14 46/17 46/25 47/1 47/4 47/7 47/7 47/9 47/12 47/19 47/22 48/2 48/13 50/4 58/9 58/14 59/12 59/14 59/16 60/18 67/16 72/14 73/2 73/10 73/12 73/21 74/10
FORT [5] 1/2 1/5 1/23 2/3 76/13
forth [5] 26/19 40/15 55/3 56/5 58/12
forward [6] 12/10 18/18 51/22 63/23 67/9 71/24
forward-looking [2] 12/10 51/22
foundational [1] 28/2
four [10] 7/9 28/11 38/21 46/4 47/12 47/19 47/22 48/2 65/11 67/16
fourth [2] 9/7 27/16
frankly [3] 36/1 44/15 65/20
fraud [2] 13/22 64/14
fraudulent [4] 12/17 14/22 25/6 29/17
front [1] 62/25
full [1] 26/17
function [6] 6/5 20/12 21/8 21/15 22/14 41/14

flag [1] 12/4
functionality [1] 5/13
FUND [2] 1/4 3/5
fundamental [1] 12/7
further [8] 30/2 32/25 33/16 35/20 56/19 64/25 65/5 75/2
Furthermore [1] 38/21
future [12] 6/21 10/24 12/25 13/19 18/21 29/1 37/8 52/14 70/14 70/15 73/22 75/17

**G**

G32019 [1] 62/3
GAAP [3] 53/1 53/12 53/21
gain [2] 8/1 14/4
gains [2] 23/13 29/11
Garcia [8] 26/19 46/15 46/19 47/11 47/20 55/23 56/10 56/14
gather [1] 66/7
gave [5] 42/1 46/25 47/12 47/23 56/5
GE [1] 13/16
General [1] 3/16
generic [1] 22/23
get [26] 7/5 7/6 7/17 8/7 8/9 8/15 9/5 9/6 14/1 16/20 22/16 23/10 26/1 27/24 28/12 29/4 29/7 29/9 37/3 43/10 44/14 59/24 62/24 66/15 68/6 68/7
gets [6] 8/5 11/4 11/4 24/11 64/3 71/22
getting [5] 21/25 48/22 49/19 68/7 71/23
gigantic [3] 35/23 42/17 65/21
give [5] 12/16 42/7 43/20 51/4 59/20
given [10] 6/25 15/6 17/20 35/19 35/19 35/20 42/6 42/19 69/1 75/7
Glass [2] 3/2 6/5
Global [1] 65/6
glosses [1] 72/5
go [28] 6/15 8/3 12/11 13/4 14/9 16/1 16/25 18/4 18/14 19/2 20/3 20/16 21/7 23/24 25/18 25/25 26/12 27/25 28/4 28/14 29/18 41/21 46/8 61/16 62/22 67/9 71/16 72/4
go-forward [1] 67/9
goes [4] 7/22 22/20 63/3 63/4
going [38] 4/4 7/19 9/1 10/25 13/18 15/4 18/18 19/1 21/19 24/2 25/2 25/2 26/2 26/23 27/16 27/23 28/10 28/16 28/19 29/1 29/2 32/10 32/12 34/17 39/24 42/1 42/8

Page 82

Case 1:20-cv-22109-JB Document 74 Entered on FLSD Docket 04/09/2021 Page 82 of 89

State of Alaska Perm Fund vs. Ryder System, Inc.

**G**

**going... [11]** 48/4 57/18 62/6 62/10 63/19 63/24 65/14 70/9 70/23 74/16 74/23
**going-forward [1]** 18/18
**gone [3]** 25/14 38/13 39/3
**good [12]** 3/2 3/11 3/21 3/23 4/11 4/13 4/14 4/18 4/19 4/24 30/8 75/22
**goodwill [4]** 51/18 51/24 52/12 52/21
**got [7]** 29/10 32/15 36/1 44/18 52/18 62/9 65/17
**grant [1]** 6/2
**granted [1]** 6/3
**graphically [1]** 14/16
**gravity [1]** 57/3
**great [3]** 13/12 57/17 61/17
**greater [1]** 35/25
**greatly [1]** 24/25
**green [2]** 9/1 14/11
**Grossmann [4]** 1/18 3/13 3/22 3/24
**ground [3]** 5/19 10/6 35/14
**group [1]** 25/3
**guess [3]** 36/10 58/16 69/9
**Gunster [2]** 2/2 4/12

**H**

**had [63]** 12/22 14/13 14/19 16/18 16/19 17/3 18/14 19/14 30/12 30/25 31/7 32/22 33/1 33/14 34/7 34/19 34/22 34/23 35/19 36/5 36/6 38/8 38/11 38/12 39/12 39/21 39/22 40/12 40/20 40/21 40/21 42/23 42/24 43/1 43/3 43/7 44/5 44/6 44/20 45/5 45/19 46/4 47/8 49/24 51/25 52/1 52/15 55/21 57/12 58/6 58/8 58/10 59/9 59/10 60/14 60/18 63/9 64/16 65/23 67/12 70/6 70/6 72/15
**half [1]** 14/14
**HAMILTON [4]** 1/16 3/12 4/7 30/5
**hand [1]** 75/12
**handled [1]** 15/7
**hands [1]** 71/6
**HANNAH [3]** 1/17 3/19 3/21
**happen [3]** 13/18 70/23 71/8
**happened [2]** 30/14 72/6
**happening [10]** 8/20

10/13 18/5 19/16 22/12 50/24 62/5 68/9 68/10 71/10
**happens [1]** 72/3
**Harbor [8]** 12/10 52/22 52/23 53/4 53/22 54/8 54/9 54/16
**hard [3]** 13/21 51/6 75/11
**harmed [6]** 31/2 31/4 31/13 31/16 32/6 58/8
**Harris [1]** 61/23
**has [25]** 6/2 7/1 9/16 16/14 20/23 25/6 28/5 29/2 29/14 29/16 30/2 42/17 50/16 53/13 53/15 54/6 54/13 60/22 61/5 62/19 63/13 63/21 69/1 71/20 74/22
**have [110]**
**haven't [1]** 65/20
**having [2]** 21/24 64/5
**he [48]** 15/12 15/23 17/10 17/11 17/13 17/19 18/3 27/5 27/7 27/19 33/12 33/16 33/20 33/22 33/23 44/7 46/17 46/18 46/19 46/20 46/21 47/13 47/14 47/14 47/16 47/19 47/23 48/2 56/11 56/12 56/19 56/21 64/19 64/24 64/25 65/3 65/3 65/11 66/16 66/17 66/18 66/19 66/23 67/21 68/21 68/22 69/5 69/6
**he's [2]** 27/18 66/18
**heading [1]** 16/2
**headwind [1]** 56/22
**headwinds [2]** 9/15 56/17
**Health [1]** 53/23
**hear [3]** 57/8 66/10 71/12
**heard [7]** 61/6 63/7 63/11 67/11 71/17 72/14 73/9
**hearing [5]** 1/10 4/25 30/12 75/18 76/7
**heart [5]** 33/24 34/21 45/3 50/2 50/6
**Hearth [1]** 74/9
**heavily [3]** 18/24 43/14 50/23
**height [1]** 11/15
**held [5]** 18/22 51/23 52/10 54/6 54/13
**helpful [2]** 15/25 74/22
**here [79]**
**hereby [1]** 76/3
**herring [1]** 16/15
**Hey [2]** 24/1 25/18
**hide [1]** 16/22
**high [14]** 10/12 12/20 17/17 21/7 21/12 22/15 30/16 30/22 44/19 46/1 47/16 47/21 50/21 70/3

**higher [4]** 11/25 17/7 17/20 33/10
**highlighted [1]** 45/22
**highly [2]** 25/13 60/14
**highs [1]** 45/20
**Highway [2]** 1/22 76/13
**his [7]** 30/11 44/10 47/14 47/23 49/6 56/11 69/3
**historical [2]** 11/3 37/7
**hit [1]** 39/24
**Hofmeister [1]** 3/16
**hold [3]** 4/25 50/1 57/4
**holding [1]** 48/4
**holds [3]** 35/7 42/13 54/3
**hone [2]** 40/3 57/19
**Honor [71]** 3/11 3/20 3/21 3/23 4/6 4/11 4/14 4/18 4/22 5/9 6/1 6/6 6/10 6/13 6/16 6/24 8/24 9/5 9/16 10/6 11/22 14/25 16/6 16/17 17/24 18/1 20/10 20/23 21/20 22/4 22/18 25/15 28/5 29/13 29/20 30/2 30/7 31/11 32/8 34/14 37/2 43/5 43/21 44/25 46/6 48/9 51/10 52/17 53/16 57/5 57/10 57/16 58/13 60/25 62/1 62/17 62/24 63/2 63/3 66/6 70/1 70/13 72/13 72/15 74/6 74/18 74/20 75/4 75/9 75/20 75/23
**Honor's [7]** 24/15 26/6 27/25 29/4 35/12 68/9 72/21
**HONORABLE [1]** 1/11
**hopefully [2]** 8/24 29/4
**hoping [1]** 20/6
**horrible [1]** 43/8
**how [33]** 8/5 11/23 13/23 19/6 19/7 19/15 19/17 21/5 22/25 24/8 26/14 26/22 29/6 31/25 34/19 42/19 47/25 61/23 62/7 62/8 62/8 62/9 63/22 64/13 67/23 68/2 69/10 70/12 70/16 71/17 71/21 72/24 73/22
**however [2]** 23/9 49/5
**huge [1]** 65/15
**hundreds [1]** 19/19

**I**

**I'll [7]** 30/10 35/3 35/24 55/15 60/6 60/25 69/9
**I'm [28]** 4/16 4/24 6/6 19/1 20/23 23/17 26/22 33/5 34/17 35/18 36/2 36/3 45/14 54/12 56/7 57/17 57/25 58/1 58/20 60/3 60/3 63/8 69/11 72/2 73/4 73/7 73/8

74/23
**I've [1]** 65/17
**idea [7]** 19/15 24/9 28/24 62/11 63/7 70/16 70/20
**identical [1]** 51/19
**identified [1]** 12/12
**ignore [4]** 9/6 11/10 14/11 18/13
**ignored [2]** 48/7 70/21
**illustrate [1]** 8/4
**immediately [2]** 56/14 59/1
**impact [8]** 16/19 17/7 33/16 34/20 35/1 35/13 38/17 65/1
**impacted [3]** 32/22 33/8 64/21
**impairment [3]** 35/23 36/1 56/9
**implausible [1]** 68/24
**important [25]** 8/11 9/4 10/15 16/21 21/16 21/21 23/18 25/6 25/15 25/22 28/1 31/8 32/4 44/3 50/9 52/9 52/20 61/5 61/15 63/15 67/20 68/1 69/13 69/16 73/24
**importantly [4]** 16/25 19/18 32/8 47/1
**inaccurate [1]** 63/12
**inadequate [1]** 52/13
**inapposite [1]** 54/17
**INC [2]** 1/7 3/6
**incentivized [1]** 30/16
**include [1]** 53/10
**included [3]** 52/24 53/11 53/20
**includes [2]** 52/23 53/25
**including [6]** 24/20 47/10 47/17 47/20 47/22 48/3
**income [4]** 11/21 31/3 40/14 54/7
**inconsistent [2]** 16/11 64/9
**incorrect [2]** 49/5 49/7
**incorrectly [1]** 18/23
**increase [4]** 11/9 27/22 71/1 72/7
**increased [4]** 11/21 33/12 39/4 40/13
**increases [4]** 8/15 8/17 11/17 70/21
**independent [1]** 5/22
**indications [1]** 20/24
**indicative [3]** 22/1 22/6 64/14
**individual [5]** 51/11 70/8 74/10 74/12 74/13
**individuals [1]** 48/12
**industry [3]** 31/18 41/9 58/12
**infer [1]** 19/8
**inference [7]** 12/17

16/11 16/12 24/25 29/14 29/16 29/21
**inferences [3]** 22/13 39/10 68/11
**information [7]** 19/25 20/2 20/13 49/2 49/20 52/1 55/22
**inherently [1]** 51/4
**initial [2]** 17/14 62/19
**initially [1]** 17/14
**inputs [4]** 25/24 25/25 26/1 26/4
**inputs and [1]** 25/25
**inside [1]** 21/24
**insight [2]** 13/20 29/2
**instance [1]** 44/17
**instructed [1]** 29/15
**insulate [1]** 52/13
**intent [4]** 12/17 14/23 25/6 29/17
**interacted [1]** 50/5
**interaction [1]** 46/11
**interest [1]** 47/8
**interesting [3]** 42/21 68/14 68/19
**internal [1]** 60/20
**internally [1]** 58/15
**interplay [1]** 27/9
**introduce [1]** 3/15
**introduced [1]** 36/6
**inventory [18]** 7/22 18/22 19/13 19/21 22/21 22/25 23/7 23/21 24/2 24/21 25/2 26/4 38/14 38/20 63/10 63/16 64/1 72/22
**investigation [1]** 46/9
**investing [1]** 36/12
**investor [2]** 10/4 27/14
**investors [12]** 10/17 15/1 15/16 15/19 15/24 29/5 45/7 45/13 45/21 61/24 70/24 71/5
**involve [2]** 32/13 51/21
**involved [3]** 32/9 51/18 68/22
**involves [1]** 51/16
**involving [1]** 13/17
**irrelevant [1]** 48/7
**is [425]**
**ish [1]** 41/11
**isn't [8]** 14/12 16/22 36/20 48/4 49/7 69/7 71/25 72/7
**issue [17]** 6/7 16/14 31/7 31/8 41/2 50/6 53/3 53/14 54/21 61/2 65/8 65/10 66/1 66/19 69/19 72/3 74/5
**issues [9]** 5/18 47/24 50/2 58/18 69/15 72/20 72/24 73/13 74/13
**it [237]**
**it's [24]** 9/15 10/14 14/16 17/12 24/4 24/5 24/8 26/18 27/4 27/12

## I

**it's... [14]** 28/5 28/8 28/21 28/23 38/15 42/16 53/8 53/25 56/19 61/15 67/6 68/14 74/6 74/18
**item [5]** 49/13 49/18 54/6 55/2 55/5
**items [2]** 10/7 55/8
**its [8]** 11/25 21/11 30/18 37/6 38/4 53/9 54/17 68/15
**itself [2]** 49/10 53/24

## J

**J.P [4]** 36/3 50/11 50/16 50/17
**Jensen [1]** 3/10
**Jenson [1]** 1/14
**job [2]** 24/6 50/17
**JOHN [3]** 1/16 3/11 4/6
**joined [1]** 4/16
**joining [1]** 4/2
**JONATHAN [2]** 2/2 4/11
**JUDGE [3]** 1/11 13/14 13/15
**judgment [1]** 65/22
**judgments [1]** 13/18
**July [3]** 57/21 57/22 62/17
**July 2015 [1]** 57/22
**July 24 [1]** 62/17
**just [94]**
**justify [1]** 60/1

## K

**Katz [2]** 2/6 4/15
**Kaufman [2]** 1/14 3/9
**keep [5]** 21/21 22/15 43/25 44/8 72/18
**keeping [1]** 9/18
**key [5]** 6/18 17/9 25/17 26/11 70/17
**kicked [1]** 47/23
**kind [18]** 5/18 7/19 8/4 18/11 31/1 39/20 39/22 40/3 51/19 51/20 54/21 58/17 62/2 64/5 65/7 69/22 70/17 75/19
**kinds [4]** 13/20 24/24 45/1 47/23
**KLAUSNER [4]** 1/14 1/14 3/9 3/9
**KLX [2]** 13/14 61/23
**knew [13]** 12/21 12/22 13/2 39/18 39/24 40/19 43/8 60/15 60/16 70/16 70/22 71/14 74/15
**know [100]**
**knowing [2]** 13/23 74/16
**knowingly [1]** 57/24
**knowledge [4]** 20/5 40/25 49/16 49/24
**known [9]** 33/14 34/7 35/9 40/20 40/21 41/12

55/22 58/19 70/9
**knows [2]** 46/7 61/22

## L

**lack [5]** 68/1 69/15 72/17 72/23 73/23
**language [4]** 52/11 52/14 53/7 56/24
**large [9]** 30/23 39/21 42/23 50/10 54/1 55/18 58/6 59/8 67/1
**largely [4]** 15/22 33/17 38/17 65/1
**last [5]** 11/7 35/12 55/15 69/9 70/19
**late [7]** 14/14 15/19 18/5 35/5 42/12 42/15 44/5
**later [5]** 15/10 15/17 55/19 68/10 71/19
**Lauderdale [1]** 2/3
**law [10]** 4/12 24/23 38/9 39/11 42/10 48/8 50/1 52/24 53/5 57/2
**lead [2]** 4/5 4/20
**leading [1]** 29/11
**leap [3]** 74/6 74/18 74/18
**lease [7]** 17/16 24/10 31/4 31/5 33/22 34/3 66/17
**leased [1]** 41/3
**leases [15]** 17/14 17/23 30/17 30/18 33/6 34/8 38/22 58/24 59/8 62/6 62/7 62/8 64/19 65/13 66/22
**leasing [1]** 19/5
**least [2]** 29/16 69/6
**leave [2]** 15/13 60/23
**leaves [1]** 55/23
**led [4]** 30/1 33/21 34/4 74/4
**left [2]** 48/2 74/2
**leftover [1]** 67/24
**lemons [5]** 31/11 60/15 62/13 66/14 67/13
**length [2]** 12/11 13/7
**less [3]** 27/6 68/10 71/9
**let [7]** 14/22 16/11 19/22 25/23 51/12 62/4 71/13
**let's [8]** 4/10 6/4 15/10 16/25 40/3 57/7 66/6 72/3
**level [5]** 33/7 56/16 56/17 64/20 66/21
**levels [2]** 38/19 71/1
**Levinson [2]** 1/14 3/10
**liability [2]** 51/4 52/13
**life [3]** 7/6 8/6 19/7
**light [4]** 14/4 39/6 48/23 51/5
**lighter [1]** 23/4
**like [28]** 5/16 9/21 10/7 12/14 14/10 16/13 16/24

20/3 27/15 31/23 39/20 41/12 42/3 47/7 47/15 50/25 51/3 53/25 54/7 54/20 54/23 58/1 61/2 65/8 65/17 65/18 70/16 72/1
**limitations [1]** 76/9
**limited [4]** 9/11 61/23 67/2 67/2
**line [14]** 8/17 17/15 23/4 26/22 27/24 28/13 28/14 28/17 28/23 49/13 49/18 55/2 55/5 55/8
**lines [1]** 17/23
**linger [1]** 14/10
**lion's [2]** 63/19 67/6
**Lipton [2]** 2/6 4/15
**listed [2]** 21/13 60/10
**listening [1]** 57/6
**literally [1]** 65/18
**Litowitz [4]** 1/18 3/12 3/22 3/24
**little [11]** 8/4 8/7 8/25 10/18 20/6 27/6 35/5 58/2 62/24 66/8 69/12
**lives [1]** 37/5
**living [1]** 72/7
**loan [4]** 51/18 51/24 52/12 52/21
**long [2]** 35/9 41/13
**look [51]** 5/25 7/9 8/10 8/22 9/12 12/15 13/12 14/15 14/24 15/5 15/10 15/19 16/16 17/11 17/24 22/18 24/23 25/25 26/17 27/11 27/14 27/20 29/7 30/14 33/4 33/22 35/7 38/15 40/23 41/17 41/24 42/4 42/6 42/14 42/14 45/13 54/18 56/6 58/23 59/21 62/23 63/13 64/18 65/5 70/5 70/18 70/24 71/16 72/10 73/14 74/10
**looked [3]** 14/5 15/18 67/13
**looking [8]** 10/24 11/3 12/10 26/22 45/22 51/22 66/11 71/24
**looks [4]** 27/14 37/16 63/4 67/19
**lose [1]** 46/23
**losing [1]** 48/5
**losses [2]** 54/22 55/4
**lost [5]** 14/6 51/18 51/24 52/12 52/21
**lot [22]** 20/24 21/3 21/14 22/1 28/19 28/19 30/9 31/7 31/25 47/16 56/3 56/6 60/23 61/4 61/14 63/11 68/10 71/13 72/14 72/22 74/24 74/25
**lots [2]** 21/25 43/17
**low [2]** 21/12 70/4
**lower [7]** 8/15 21/10 21/13 24/1 30/19 46/23 56/17

**lowered [1]** 19/11
**lowering [1]** 21/17
**lynchpin [1]** 18/10

## M

**made [11]** 10/14 31/15 35/10 40/5 43/16 44/4 51/6 57/24 57/24 71/13 73/20
**mail [3]** 75/10 75/15 75/16
**main [2]** 39/13 59/6
**maintain [2]** 47/25 48/22
**maintenance [6]** 17/7 17/19 32/22 33/9 34/2 64/22
**major [1]** 65/9
**majority [12]** 33/18 34/5 34/6 38/22 39/3 59/8 63/8 63/9 65/2 65/4 65/12 67/12
**make [12]** 24/2 28/5 30/10 38/6 42/11 49/4 56/2 61/13 67/10 70/1 72/8 74/16
**makes [6]** 14/22 25/1 33/4 56/11 69/23 74/9
**making [6]** 11/24 13/18 26/21 27/19 48/1 68/3
**management [12]** 10/4 12/1 18/12 47/2 47/2 47/10 47/13 47/21 48/14 58/19 59/17 63/5
**manner [2]** 28/22 28/22
**manufactured [1]** 61/12
**manufacturer [1]** 31/21
**manufactures [1]** 61/10
**many [7]** 6/22 34/20 35/19 44/5 52/1 67/23 74/25
**map [2]** 23/19 23/22
**March [1]** 55/17
**mark [2]** 28/2 28/2
**mark-to-mark [1]** 28/2
**marked [4]** 23/10 23/16 23/20 71/23
**market [61]** 7/19 8/18 9/14 10/18 11/1 14/12 17/22 19/10 19/12 21/19 22/7 22/16 23/11 23/25 32/11 33/1 34/18 35/8 35/22 36/3 36/21 36/25 37/8 37/9 37/13 37/20 37/22 38/2 38/18 39/19 39/21 40/22 41/15 41/16 41/21 41/25 42/1 42/22 42/23 43/1 43/6 43/8 44/7 45/6 45/11 45/14 45/15 45/19 48/19 48/20 48/24 49/15 50/8 50/15 50/23 52/7 57/2 64/25 66/12 68/5 72/4
**marketplace [1]** 28/17
**marking [1]** 27/1

**marks [1]** 7/22
**massive [4]** 35/1 56/9 56/13 70/10
**material [6]** 40/4 43/2 55/22 60/14 65/18 66/2
**materialize [1]** 58/19
**materially [2]** 40/17 60/9
**materials [3]** 66/11 74/25 75/18
**math [1]** 29/10
**matter [12]** 20/7 34/3 34/21 38/9 39/11 42/9 48/8 50/1 52/24 53/5 57/1 76/5
**MATTHEW [2]** 1/18 4/2
**maxing [1]** 11/24
**MaxxForce [31]** 16/14 18/9 18/16 31/8 31/10 31/14 31/22 32/24 33/13 38/7 38/8 38/11 38/24 39/17 40/21 43/7 44/6 44/21 47/24 58/7 58/10 58/23 60/14 61/2 61/11 63/10 64/23 67/3 67/15 68/3 69/11
**may [11]** 3/2 7/20 9/2 21/22 22/13 22/14 23/25 25/25 56/12 60/6 74/24
**Maybe [1]** 22/4
**MDA [3]** 54/15 55/3 55/5
**me [13]** 3/14 19/22 25/9 25/23 43/19 43/20 51/12 52/17 57/6 59/4 59/19 62/4 66/8
**mean [16]** 10/13 19/23 21/23 25/12 35/1 40/22 43/11 44/9 44/15 60/3 60/8 64/12 64/18 65/3 65/9 66/11
**means [8]** 7/6 10/11 12/22 15/22 18/17 23/15 23/17 46/9
**meant [1]** 11/14
**measure [3]** 7/17 11/3 28/8
**meets [2]** 12/20 29/20
**meltdown [4]** 35/22 40/22 42/17 43/7
**member [1]** 47/1
**mention [3]** 12/4 51/1 74/7
**mentioned [10]** 38/8 43/5 45/5 50/9 50/16 54/2 54/15 60/2 60/13 69/15
**mentioning [1]** 10/22
**met [1]** 47/2
**method [1]** 28/13
**methodology [15]** 5/18 11/23 26/10 28/23 29/3 36/18 36/19 36/21 36/23 37/11 37/18 37/19 38/4 43/24 44/8

**M**

**metric [6]** 10/1 33/24 33/25 39/5 51/3 54/20
**metrics [1]** 40/16
**mid [10]** 33/2 40/21 41/11 41/18 57/21 59/11 59/21 60/1 60/5 74/4
**mid 2015 [1]** 41/18
**mid-ish [1]** 41/11
**middle [9]** 15/18 16/1 17/12 29/23 29/23 43/25 44/9 70/2 71/7
**might [1]** 52/12
**miller [4]** 1/21 1/24 76/11 76/11
**million [17]** 14/3 14/6 18/18 23/5 23/14 23/14 23/14 50/11 50/14 56/19 63/9 63/14 63/16 63/17 63/20 64/13 66/13
**millions [1]** 19/19
**mind [1]** 72/18
**mindful [1]** 10/5
**minimum [1]** 65/25
**minute [1]** 55/12
**minutes [2]** 30/3 55/12
**miraculous [1]** 32/11
**mischaracterization [1]** 18/12
**misleading [6]** 12/13 44/1 44/2 44/12 45/2 71/12
**misled [1]** 10/17
**missing [1]** 29/7
**misstatement [3]** 5/20 9/23 40/8
**misstatements [4]** 11/24 40/4 43/13 57/20
**model [4]** 30/16 32/23 33/9 64/22
**moment [10]** 6/4 6/12 14/9 14/10 19/23 25/25 37/2 37/20 43/20 48/20
**momentarily [3]** 3/15 33/4 35/25
**Monday [1]** 13/13
**money [3]** 17/18 46/23 68/7
**month [6]** 47/20 47/23 59/19 59/20 60/17 62/9
**monthly [2]** 17/16 46/16
**months [8]** 38/25 39/2 39/15 49/15 55/19 55/24 65/14 65/15
**more [28]** 11/20 12/17 13/10 14/3 15/22 19/11 20/4 20/6 20/8 21/7 23/16 23/20 24/1 24/2 27/22 27/23 28/19 32/19 33/4 37/6 38/6 57/18 57/20 58/2 60/7 62/25 71/9 73/7
**Morgan [4]** 36/3 50/11 50/16 50/17

**N**

**named [2]** 50/6 70/9

**morning [16]** 3/2 3/11 3/21 3/23 4/5 4/11 4/13 4/14 4/18 4/19 4/21 4/24 5/10 13/13 30/8 73/9
**most [7]** 5/21 16/25 21/1 24/13 24/13 29/22 43/14
**mostly [1]** 18/16
**motion [9]** 1/10 4/25 5/7 39/7 39/8 65/17 65/23 70/20 74/23
**motions [1]** 75/18
**move [5]** 4/10 6/18 22/1 22/25 38/6
**moved [1]** 66/18
**movement [1]** 45/17
**movements [3]** 41/25 45/6 45/15
**moving [3]** 8/5 15/15 19/13
**MR [13]** 4/18 4/19 5/13 6/1 55/11 55/23 56/10 56/14 57/18 57/22 64/12 71/4 71/4
**Mr. [31]** 3/16 4/2 4/13 5/7 6/14 19/22 26/19 30/5 30/11 37/11 38/8 38/16 38/21 43/9 45/5 45/22 48/25 49/6 51/2 55/13 56/11 57/8 57/17 60/22 64/11 64/18 65/12 66/5 72/11 74/21 75/3
**Mr. Ben [1]** 3/16
**Mr. Garcia [1]** 26/19
**Mr. Matthew [1]** 4/2
**Mr. Osborne [1]** 4/13
**Mr. Rizio [2]** 51/2 75/3
**Mr. Rizio-Hamilton [1]** 30/5
**Mr. Sanchez [5]** 38/16 38/21 56/11 64/18 65/12
**Mr. Winter [17]** 5/7 6/14 19/22 30/11 37/11 38/8 43/9 45/5 45/22 55/13 57/8 57/17 60/22 64/11 66/5 72/11 74/21
**Mr. Winter's [2]** 48/25 49/6
**Ms [3]** 3/2 3/20 6/5
**much [16]** 12/3 19/17 20/7 21/5 21/24 22/6 22/16 26/20 30/7 44/14 52/2 52/3 54/3 57/6 62/8 62/9
**multiple [8]** 36/23 36/24 42/18 43/6 44/6 45/25 46/10 50/4
**multiyear [1]** 35/22
**must [2]** 10/10 12/18
**my [13]** 5/13 26/1 30/10 35/3 35/12 37/11 58/16 60/4 65/19 65/23 72/2 75/5 76/6

**narrative [1]** 22/24
**nature [2]** 32/1 32/3
**Navistar [18]** 16/13 17/4 18/9 24/20 25/3 31/21 32/24 38/7 61/9 61/12 62/13 63/10 64/7 67/2 67/15 68/3 69/4 69/11
**near [2]** 7/17 38/3
**nearly [5]** 12/3 12/9 13/7 35/2 45/20
**necessarily [2]** 19/23 19/24
**necessary [5]** 30/3 37/7 71/2 75/1 75/19
**need [25]** 12/16 14/20 15/14 15/14 15/22 27/21 27/22 29/15 36/13 44/19 44/21 58/2 58/14 58/22 59/15 60/20 66/17 68/8 70/24 71/2 71/8 72/1 72/8 72/23 74/16
**needed [5]** 20/11 30/22 43/18 47/6 71/19
**negative [5]** 33/16 35/1 38/16 64/25 69/12
**negatively [3]** 32/22 33/8 64/21
**neither [2]** 39/25 41/13
**net [4]** 11/21 40/14 45/17 54/7
**netting [1]** 37/24
**never [8]** 24/10 27/1 27/3 28/16 28/18 68/15 68/16 68/25
**nevertheless [1]** 51/24
**new [13]** 1/19 1/19 2/7 2/7 7/12 7/14 11/4 13/16 17/20 26/3 30/24 55/17 55/24
**next [13]** 8/10 8/16 9/1 14/15 15/20 27/11 38/24 39/2 49/15 55/12 65/14 65/15 69/19
**nine [1]** 6/24
**no [31]** 1/3 11/23 13/1 16/23 17/1 18/7 18/8 19/13 19/15 22/10 24/3 28/15 29/2 32/9 34/9 36/4 38/9 41/23 42/3 43/17 47/8 48/9 50/16 67/23 67/25 69/10 69/13 71/9 72/13 73/21 75/4
**nomenclature [2]** 61/3 61/13
**non [2]** 29/17 46/9
**non-discovery [1]** 46/9
**non-fraudulent [1]** 29/17
**Northern [1]** 51/15
**Northwest [1]** 1/15
**not [87]**
**note [2]** 54/4 69/13
**noted [4]** 48/9 49/8 51/10 52/5
**notes [1]** 52/22

**nothing [4]** 21/18 21/18 39/12 56/8
**notice [3]** 45/7 50/23 57/2
**notion [2]** 25/4 57/23
**notorious [1]** 41/7
**now [37]** 6/10 8/17 9/8 9/21 12/14 15/17 15/25 16/13 17/21 18/6 18/24 30/2 30/5 31/25 32/25 33/5 33/6 38/6 38/18 39/6 39/16 39/25 45/5 45/14 45/23 48/6 54/14 56/7 56/21 57/5 59/3 59/18 64/20 64/24 65/3 65/19 72/1
**nowhere [1]** 35/13
**number [13]** 5/18 15/8 21/7 24/9 30/20 37/14 44/21 49/12 53/16 67/16 67/19 73/19 73/20
**numbering [2]** 21/3 66/8
**numbers [7]** 8/12 9/11 23/12 24/2 29/5 36/13 36/17
**nuts [1]** 71/6

**O**

**observe [2]** 44/5 44/6
**observing [2]** 3/17 4/2
**obvious [2]** 29/22 70/6
**obviously [6]** 26/16 55/9 65/8 67/17 75/6 75/13
**occur [2]** 52/11 55/9
**occurred [8]** 13/3 16/9 29/25 31/6 38/13 52/15 74/17 76/7
**occurring [1]** 42/17
**October [4]** 17/3 17/6 43/22 50/11
**October 2019 [1]** 17/6
**October 26th [1]** 43/22
**off [7]** 5/8 17/15 22/1 28/18 44/10 47/5 52/13
**offer [2]** 20/2 55/13
**Official [2]** 1/21 76/12
**officials [1]** 34/12
**often [2]** 6/22 37/6
**okay [9]** 6/9 26/21 34/17 43/22 55/15 57/17 63/25 71/2 73/22
**Olas [1]** 2/3
**omission [1]** 45/3
**omissions [1]** 40/4
**omitting [1]** 44/12
**once [2]** 62/10 64/1
**one [35]** 4/1 6/4 9/24 11/6 13/1 17/19 24/21 29/2 29/13 29/22 32/1 32/4 37/2 38/6 39/16 42/5 42/18 43/20 44/12 49/12 52/10 53/23 54/5 54/13 57/18 58/16 59/7 61/10 61/10 61/11 68/11

**nothing** (cont.)
**70/19** 73/8 73/19 75/9
**ones [5]** 20/19 20/19 32/2 60/12 60/13
**only [15]** 4/2 6/20 18/16 26/15 29/15 36/22 39/1 42/4 50/19 55/4 56/11 67/13 68/20 68/21 75/4
**open [1]** 41/7
**opening [3]** 11/10 62/7 68/17
**openly [1]** 36/12
**opinions [1]** 52/2
**opportunity [1]** 5/10
**opposed [1]** 73/18
**opposing [1]** 29/16
**opposite [3]** 27/4 55/7 69/25
**opposition [4]** 10/17 11/11 16/15 68/19
**oral [1]** 56/3
**orally [1]** 30/10
**order [1]** 20/13
**original [1]** 70/20
**originally [1]** 42/24
**origination [1]** 17/17
**OSBORNE [3]** 2/2 4/12 4/13
**other [12]** 3/14 13/7 37/7 43/13 47/19 48/3 50/25 52/9 59/14 68/13 69/7 75/9
**others [1]** 73/3
**otherwise [1]** 68/4
**our [21]** 5/5 6/2 11/9 24/2 26/23 33/7 39/9 46/8 46/13 50/19 52/16 53/18 53/24 54/18 55/16 55/25 64/20 66/7 66/20 70/19 75/5
**out [30]** 7/12 9/23 9/25 10/12 11/3 11/9 12/2 13/6 13/11 13/23 15/2 17/20 18/16 23/3 27/6 28/21 33/10 37/16 38/13 39/14 42/11 44/14 46/8 67/9 68/13 68/16 68/21 70/17 73/22 75/12
**outlined [1]** 37/12
**outputs [2]** 25/24 26/5
**outset [1]** 30/15
**over [22]** 7/1 7/5 8/6 12/11 13/6 15/20 17/4 17/4 19/7 22/23 22/23 36/6 37/17 38/24 39/2 49/15 50/12 59/25 62/7 65/13 65/14 72/5
**over-earning [1]** 36/6
**overall [3]** 10/23 39/20 41/16
**overly [1]** 60/5
**overpriced [1]** 46/19
**overpricing [1]** 21/11
**overseeing [1]** 48/12
**overstated [6]** 10/3 12/23 25/13 25/21 40/17 44/11

State of Alaska Prem Fund vs. Ryder System, Inc.

**O**

**own [2]** 46/9 51/11
**owned [1]** 54/24

**P**

**P-R-O-C-E-E-D-I-N-G-S [1]** 3/1
**P.M [1]** 75/24
**page [16]** 17/13 33/5 38/16 38/21 53/25 56/7 56/24 62/17 65/5 65/11 65/19 66/9 66/16 66/23 66/23 70/19
**pages [4]** 1/7 17/8 53/18 62/21
**pandemic [1]** 76/8
**papers [12]** 9/25 12/2 12/11 13/24 15/3 22/12 22/24 28/5 56/3 63/4 68/14 73/21
**paragraph [16]** 11/17 21/2 24/13 32/19 37/3 37/4 40/15 42/14 43/23 44/23 44/24 50/14 59/16 61/18 67/15 68/15
**paragraphs [1]** 43/21
**paraphrased [1]** 61/24
**paraphrasing [2]** 61/25 62/15
**parity [1]** 15/22
**part [10]** 9/4 10/23 17/9 18/16 18/18 32/21 63/16 64/1 64/9 65/10
**participated [1]** 46/15
**particular [7]** 16/19 24/10 40/3 43/7 54/23 59/20 60/2
**particularity [1]** 12/6
**particularized [2]** 12/16 73/5
**parties [2]** 5/3 5/4
**parts [1]** 8/5
**passage [1]** 53/25
**past [1]** 14/13
**pattern [2]** 42/4 69/20
**pause [3]** 19/22 57/7 64/11
**payments [1]** 17/16
**peak [1]** 13/6
**people [5]** 21/8 21/9 21/15 22/14 72/16
**percent [14]** 13/5 15/6 27/5 27/7 29/24 31/15 41/18 45/18 45/20 63/18 63/20 67/21 69/4 71/1
**percentage [2]** 22/10 45/14
**perception [1]** 19/12
**perfect [1]** 29/2
**performance [2]** 17/23 66/18
**performed [1]** 62/7
**perhaps [3]** 5/21 51/2 60/5
**period [35]** 11/11 11/11

13/9 25/20 27/10 30/21 31/6 31/9 32/16 32/17 34/9 34/24 35/15 35/21 39/19 40/1 40/18 40/20 40/25 41/11 45/7 45/24 58/1 58/5 58/5 58/15 59/15 59/22 59/22 60/1 60/19 61/13 64/14 70/8 70/15
**PERMANENT [2]** 1/4 3/5
**permission [2]** 5/12 6/2
**permit [1]** 74/19
**permitted [1]** 14/18
**persisted [1]** 42/18
**persisting [1]** 16/4
**personal [1]** 46/11
**perspective [4]** 30/15 65/16 71/24 71/25
**phonetic [3]** 13/14 16/9 74/9
**phrase [2]** 22/22 22/23
**pick [1]** 27/22
**picture [3]** 30/15 39/17 65/16
**piece [2]** 50/15 63/2
**pieces [1]** 25/24
**PIERCE [4]** 1/2 1/5 1/23 76/13
**place [2]** 30/17 59/22
**placed [2]** 19/21 23/21
**places [1]** 36/24
**plain [5]** 9/11 53/6 53/9 53/20 54/10
**Plaintiff [1]** 46/6
**Plaintiffs [32]** 1/5 1/14 3/8 3/10 3/13 3/22 3/25 4/3 4/4 4/9 9/6 10/2 10/22 11/10 12/2 12/21 13/8 13/24 14/10 16/20 17/2 17/4 18/10 18/13 18/22 18/24 22/24 24/19 28/7 51/25 61/23 69/2
**Plaintiffs' [3]** 7/3 66/7 68/18
**plan [1]** 56/16
**planning [1]** 5/11
**Plantation [1]** 1/15
**plausible [1]** 12/18
**play [1]** 66/17
**played [1]** 15/2
**plead [4]** 5/22 9/22 14/22 14/23
**pleaded [6]** 13/1 17/1 19/14 24/3 61/21 68/11
**pleading [5]** 12/7 46/6 50/5 67/18 68/2
**please [3]** 3/7 6/14 43/19
**pleased [1]** 4/25
**pled [3]** 52/1 64/6 65/24
**plunged [1]** 43/1
**point [62]** 7/20 10/14 11/2 11/7 16/14 16/17 18/11 20/6 24/19 25/9 25/14 26/6 26/11 26/20

26/21 27/19 28/2 28/15 28/20 29/13 33/4 33/15 34/12 35/3 35/12 38/7 41/18 42/6 42/11 42/18 42/21 42/25 43/5 43/19 44/4 44/11 45/19 48/25 49/4 49/6 49/7 51/7 53/9 56/2 56/21 57/23 58/19 59/4 60/15 62/15 68/9 70/1 70/1 70/13 70/17 71/7 72/21 73/10 73/20 73/20 74/9 75/10
**pointed [5]** 11/9 12/2 23/3 68/13 68/16
**points [2]** 6/18 55/16
**policy [10]** 7/10 8/7 8/12 8/14 11/2 19/16 29/6 56/17 63/20 72/2
**position [3]** 19/6 48/21 54/19
**positive [1]** 46/12
**possible [2]** 5/5 49/25
**post [1]** 33/9
**powerful [1]** 12/18
**pre [1]** 62/6
**preceding [1]** 11/11
**precise [2]** 8/23 37/3
**precisely [3]** 35/17 35/18 48/17
**precision [1]** 63/15
**predict [2]** 41/23 42/20
**prediction [3]** 32/1 32/9 34/10
**predictions [2]** 13/21 32/13
**preference [2]** 75/10 75/14
**premature [1]** 60/6
**prepared [5]** 5/11 37/21 52/25 53/11 53/21
**prepped [1]** 49/19
**present [2]** 3/18 39/1
**presentation [4]** 30/10 35/3 73/11 75/11
**president [1]** 47/18
**press [1]** 60/9
**pressure [1]** 48/22
**presumably [1]** 22/2
**pretty [7]** 9/8 10/6 14/17 14/25 26/13 46/5 47/5
**prevailing [2]** 42/5 48/24
**previously [2]** 18/14 31/21
**price [18]** 8/1 10/24 15/18 21/18 24/12 24/20 26/25 27/1 30/18 37/8 37/9 37/17 37/25 38/18 41/17 49/23 59/2 72/7
**priced [1]** 17/14
**prices [51]** 7/1 7/23 8/14 8/15 8/21 8/25 9/2 9/8 10/13 11/12 11/16 11/19 11/25 12/21 13/2 14/7 15/4 15/6 15/11

15/20 16/1 18/7 19/11 21/4 21/10 21/12 21/13 22/15 23/9 24/1 25/2 26/2 26/23 27/3 27/6 27/15 27/16 32/13 42/8 42/25 43/25 46/24 59/13 62/20 66/24 70/6 71/8 71/18 71/25 72/22 74/17
**pricing [15]** 8/23 9/10 15/14 16/20 27/21 31/4 31/5 41/14 45/6 48/1 71/1 73/19 73/19 73/22 74/3
**principal [3]** 42/2 48/6 58/4
**principally [1]** 32/14
**prior [15]** 33/6 34/8 36/6 38/23 40/20 41/3 50/13 50/21 58/25 59/9 64/19 65/8 65/13 66/23 75/18
**probably [3]** 30/10 56/16 56/22
**problem [25]** 16/23 33/22 33/24 35/9 35/20 36/8 36/18 36/18 36/20 38/7 38/11 38/12 39/21 39/25 40/21 43/7 44/6 45/8 48/1 57/3 65/10 69/4 72/13 74/5 74/6
**problematic [1]** 38/24
**problems [21]** 12/8 16/18 25/2 31/10 31/12 31/12 31/16 33/13 33/20 34/4 34/6 34/23 35/21 38/9 38/19 39/17 41/7 41/12 63/11 64/24 73/25
**proceed [1]** 5/2
**proceeding [1]** 5/3
**proceedings [4]** 3/17 57/12 75/24 76/5
**produced [4]** 41/4 58/24 59/7 61/8
**profit [1]** 11/9
**prohibition [1]** 5/3
**projected [2]** 33/18 65/3
**projecting [1]** 15/5
**prominent [1]** 32/4
**propagate [1]** 63/22
**proportion [1]** 67/14
**proposition [2]** 54/2 54/15
**prospective [1]** 64/13
**protect [1]** 52/14
**protected [2]** 52/22 53/3
**protection [4]** 53/10 53/22 54/8 54/16
**provide [1]** 20/13
**providing [1]** 20/5
**PSLRA [5]** 12/6 12/16 39/8 52/22 53/4
**public [5]** 23/1 34/13 36/12 50/18 68/18
**publicly [2]** 36/7 43/12

**pull [2]** 6/24 43/21
**purchased [2]** 41/3 41/6
**pure [1]** 53/9
**purported [3]** 37/12 38/4 56/4
**purportedly [3]** 49/13 52/25 53/11
**purpose [1]** 5/14
**purposes [4]** 7/5 20/18 24/8 49/3
**pushback [3]** 21/14 46/19 47/17
**pushed [1]** 47/11
**put [19]** 8/3 8/25 10/18 13/24 16/2 22/21 24/24 26/15 28/7 31/11 31/19 34/14 45/7 46/20 47/22 50/23 56/3 57/2 60/17
**puts [1]** 70/13
**putting [3]** 27/3 56/25 69/2

**Q**

**Q2 [1]** 72/6
**Q3 [1]** 72/6
**qualifies [1]** 54/16
**qualify [1]** 54/8
**quarter [5]** 8/13 8/24 9/8 27/16 60/8
**quarterly [1]** 47/2
**que [1]** 9/11
**question [16]** 4/20 13/24 14/17 20/15 22/5 22/11 24/16 26/6 27/13 27/25 29/4 34/15 35/12 51/12 57/18 58/3
**questions [2]** 30/2 55/14
**queue [1]** 9/11
**quickly [2]** 19/11 24/1
**quite [4]** 17/22 50/3 50/19 69/25
**quote [5]** 22/22 35/12 37/7 37/8 47/15
**quotes [2]** 26/15 28/21
**quoting [1]** 63/8

**R**

**raise [2]** 11/15 31/5
**raised [4]** 21/4 21/8 23/23 71/5
**raising [2]** 11/19 47/15
**ran [1]** 68/19
**rare [1]** 50/4
**rates [1]** 30/19
**rather [1]** 54/21
**rational [1]** 28/22
**reach [1]** 15/22
**reaction [3]** 50/8 50/15 50/19
**read [2]** 24/13 68/2
**ready [6]** 7/7 7/21 8/8 19/21 21/6 23/8
**real [5]** 42/19 52/6 72/14 73/25 74/5
**reality [4]** 30/24 34/25

State of Alaska Perm Fund vs. Ryder System, Inc.

**R**

**reality...** **[2]** 45/19 46/2
**realize** **[1]** 36/13
**really** **[47]** 9/4 9/6 9/25 11/12 12/23 13/21 14/1 15/15 16/15 18/10 20/20 21/20 21/23 23/24 26/8 28/1 28/25 29/20 29/22 34/3 34/14 34/21 40/3 40/7 42/3 42/4 42/11 44/9 44/21 45/3 45/8 51/10 52/19 53/7 57/6 57/25 60/7 61/25 63/12 63/14 67/20 68/14 68/19 69/25 72/20 73/13 73/15
**realtime** **[4]** 15/2 16/9 36/14 71/11
**reason** **[3]** 21/16 26/25 40/19
**reasonable** **[2]** 39/10 69/24
**reasons** **[7]** 12/5 17/18 33/8 42/2 51/15 53/5 64/21
**rebound** **[6]** 42/2 42/8 42/12 42/15 42/20 45/12
**rebuttal** **[3]** 30/3 55/13 60/24
**received** **[2]** 21/14 47/16
**recent** **[2]** 13/7 13/15
**recess** **[2]** 57/11 57/12
**recite** **[1]** 25/16
**reciting** **[1]** 61/18
**reckless** **[1]** 74/15
**recklessly** **[1]** 71/14
**recognition** **[1]** 72/6
**recognize** **[2]** 7/20 13/8
**recognized** **[6]** 13/10 14/6 16/4 17/3 19/20 30/1
**recognizing** **[1]** 32/14
**record** **[4]** 5/6 8/1 57/14 69/8
**recorded** **[1]** 76/4
**recording** **[2]** 5/3 30/16
**recover** **[1]** 62/10
**recovery** **[1]** 32/11
**red** **[6]** 8/25 9/7 12/4 16/15 24/19 47/15
**reduced** **[1]** 56/22
**reduction** **[3]** 17/6 18/2 34/6
**reductions** **[1]** 62/12
**reevaluating** **[1]** 36/16
**refer** **[1]** 5/12
**reference** **[2]** 32/24 64/23
**references** **[1]** 73/5
**referencing** **[1]** 38/23
**referred** **[2]** 37/23 63/2
**referring** **[2]** 35/16 35/18
**reflect** **[5]** 19/12 30/24 34/25 37/13 46/2

**reflected** **[3]** 25/7 31/17 43/12
**refused** **[1]** 43/3
**refusing** **[1]** 55/21
**regard** **[1]** 20/2
**Regions** **[2]** 51/14 54/2
**reiterated** **[1]** 9/15
**rejects** **[1]** 52/20
**relate** **[1]** 32/17
**related** **[1]** 32/21
**relates** **[2]** 18/11 39/5
**relation** **[1]** 38/9
**relationship** **[2]** 22/3 26/14
**relatively** **[2]** 11/17 44/5
**release** **[1]** 60/9
**relevance** **[1]** 48/11
**relevant** **[3]** 20/13 49/2 50/1
**reliability** **[2]** 19/25 36/19
**relied** **[1]** 45/16
**relies** **[3]** 13/14 50/23 74/2
**rely** **[6]** 14/18 18/24 36/22 56/23 69/3 69/22
**relying** **[1]** 43/14
**remain** **[1]** 15/20
**remark** **[1]** 35/24
**remarkable** **[1]** 46/12
**remind** **[2]** 5/2 5/4
**remotely** **[1]** 76/9
**repeatedly** **[1]** 45/25
**reply** **[1]** 45/10
**report** **[3]** 9/14 46/25 47/12
**reported** **[9]** 1/21 31/2 36/2 36/4 36/7 47/4 47/8 47/19 58/14
**reporter** **[4]** 1/21 5/6 19/1 76/12
**reporting** **[4]** 23/13 49/12 50/20 76/9
**reports** **[10]** 31/18 31/24 41/9 48/7 48/11 50/11 52/5 58/12 59/12 59/14
**represent** **[1]** 48/18
**require** **[2]** 73/7 74/24
**required** **[1]** 55/23
**requirement** **[2]** 20/1 48/9
**requirements** **[1]** 12/6
**resale** **[2]** 31/22 31/23
**resemblance** **[1]** 28/17
**reserve** **[5]** 30/3 51/24 52/12 52/21 74/23
**reserves** **[1]** 51/18
**residual** **[62]** 5/17 5/24 6/17 7/2 8/2 8/5 10/3 10/9 12/4 12/23 12/24 14/3 15/21 18/3 19/6 19/25 20/18 21/17 22/3 24/7 25/10 25/13 25/16 25/19 26/9 27/8 28/15

28/24 30/16 30/22 32/21 34/1 34/6 36/24 37/5 37/14 37/25 39/5 43/25 44/8 44/11 44/19 46/1 47/16 47/21 47/25 48/15 48/17 48/22 49/8 49/22 50/12 51/3 51/20 58/8 60/18 68/16 68/25 69/11 71/20 72/25 73/17
**residuals** **[8]** 7/15 11/15 11/20 11/25 15/7 17/25 26/23 27/17
**respect** **[2]** 37/20 73/12
**respectfully** **[6]** 12/19 39/6 42/13 46/12 53/4 57/3
**respective** **[1]** 74/12
**respects** **[4]** 33/19 36/23 52/9 54/25
**respond** **[1]** 75/19
**response** **[5]** 16/20 30/6 46/20 48/6 68/18
**responsible** **[1]** 48/15
**rest** **[2]** 63/5 75/22
**result** **[6]** 19/13 29/12 33/7 62/12 64/20 69/14
**results** **[1]** 66/20
**resumed** **[1]** 57/13
**return** **[1]** 57/19
**returns** **[4]** 33/7 64/20 66/20 66/22
**revealing** **[2]** 14/25 25/10
**reversal** **[1]** 14/7
**reverse** **[1]** 9/8
**reversed** **[1]** 16/2
**review** **[3]** 60/4 60/6 73/7
**reviewed** **[1]** 37/5
**ridden** **[1]** 65/21
**right** **[25]** 4/10 4/24 6/14 9/1 17/18 25/24 26/1 26/20 27/9 28/11 49/5 56/20 57/14 59/18 59/19 60/3 60/21 61/14 65/19 66/4 68/5 70/10 72/15 73/22 75/21
**rightfully** **[1]** 48/9
**rise** **[5]** 9/2 12/16 14/7 51/4 51/10
**risen** **[1]** 70/6
**rising** **[2]** 11/12 71/25
**risks** **[3]** 34/13 52/14 52/15
**RIZIO** **[12]** 1/16 3/12 4/7 30/5 51/2 55/11 57/18 57/22 64/12 71/4 71/4 75/3
**RIZIO-HAMILTON** **[3]** 1/16 3/12 4/7
**RMR** **[2]** 1/21 76/11
**road** **[1]** 6/23
**roadmap** **[1]** 5/16
**ROBERT** **[3]** 1/14 3/9 65/7
**Roberts** **[1]** 15/5

**rolled** **[2]** 8/15 11/4
**rolling** **[7]** 7/2 7/11 7/14 36/11 36/22 37/18 43/24
**rolls** **[1]** 59/11
**Romanettes** **[1]** 62/2
**room** **[3]** 9/19 15/9 27/9
**Rosen** **[2]** 2/6 4/15
**ROSS** **[3]** 1/17 3/20 3/21
**roundup** **[1]** 35/12
**row** **[3]** 8/15 15/12 23/14
**ruling** **[1]** 74/23
**runup** **[1]** 11/19
**RYDER** **[51]** 1/7 3/6 7/1 7/4 7/22 8/19 8/23 9/13 9/17 10/17 11/8 11/15 11/24 12/3 12/21 13/8 13/9 13/25 14/5 14/18 15/1 16/4 16/17 17/5 17/16 17/21 18/2 18/14 19/6 19/10 19/15 21/5 22/21 23/5 23/13 23/15 26/10 29/5 29/10 29/24 30/25 46/23 47/8 47/14 48/3 50/12 58/15 68/15 69/10 70/8 71/7
**Ryder's** **[7]** 5/17 10/3 14/2 16/7 30/15 46/18 68/22

**S**

**Safe** **[8]** 12/10 52/22 52/22 53/4 53/22 54/8 54/9 54/16
**said** **[14]** 17/11 17/19 18/12 32/15 33/6 39/13 46/21 47/14 66/20 67/3 68/20 71/4 71/5 71/6
**sale** **[9]** 8/1 18/22 21/18 29/11 37/21 39/23 49/19 49/23 64/6
**sales** **[26]** 19/5 19/11 20/9 21/4 21/8 21/10 21/10 21/12 21/13 21/15 21/15 21/24 22/7 22/11 22/14 23/9 23/13 23/25 24/12 31/18 31/20 37/25 41/9 47/18 49/23 58/12
**same** **[17]** 4/19 12/5 14/16 14/20 18/2 19/15 20/17 21/14 22/16 22/17 38/16 42/25 52/2 53/19 54/2 62/17 65/11
**Sanchez** **[26]** 15/5 15/12 15/19 17/9 17/23 18/2 26/18 26/18 27/20 33/6 34/4 38/16 38/21 43/23 44/17 46/15 46/19 47/10 56/5 56/11 62/4 63/5 64/18 65/12 66/2 66/16
**sanctioning** **[1]** 13/22
**sat** **[1]** 47/19
**satisfies** **[1]** 12/6
**saw** **[5]** 18/5 19/20 27/6

38/4 72/7
**say** **[35]** 5/22 10/2 13/9 17/1 17/4 17/10 19/10 20/16 22/12 24/4 26/6 28/9 34/11 34/19 34/20 36/22 36/23 37/1 40/4 42/8 42/12 53/19 55/15 56/12 58/17 65/16 66/6 69/3 69/9 69/23 70/5 71/11 73/13 73/25 74/14
**saying** **[23]** 10/17 15/5 17/13 22/6 27/5 27/7 27/20 33/12 33/20 33/22 33/23 44/7 54/18 56/15 58/20 59/19 62/3 62/4 65/24 66/3 67/21 70/24 73/15
**says** **[18]** 15/19 17/23 25/18 33/16 34/4 38/16 55/24 56/11 56/19 56/21 64/19 64/19 64/24 64/25 65/7 66/16 69/6 69/6
**scienter** **[14]** 5/22 10/8 12/14 14/23 16/12 19/9 24/20 24/25 29/14 51/17 71/13 73/6 73/11 74/8
**scope** **[1]** 36/13
**scream** **[1]** 46/18
**screen** **[6]** 5/13 6/3 6/7 6/11 28/7 61/17
**scrutinize** **[1]** 50/18
**scrutiny** **[2]** 35/7 57/4
**Seaport** **[1]** 65/6
**SEC** **[2]** 36/24 54/16
**second** **[18]** 7/16 10/3 10/16 26/22 37/19 39/17 42/11 49/10 49/17 51/17 54/14 55/4 56/2 60/8 61/21 62/16 64/24 74/7
**secret** **[1]** 22/10
**secrets** **[1]** 9/17
**section** **[2]** 51/5 54/16
**Securities** **[1]** 65/6
**security** **[1]** 54/24
**see** **[35]** 6/11 6/25 8/5 8/6 8/13 8/22 8/24 9/2 9/6 11/16 13/20 14/15 14/16 14/25 16/1 18/4 20/1 20/24 21/3 22/23 30/14 39/10 41/9 41/17 42/16 45/11 45/14 45/16 56/8 61/17 61/20 62/1 70/10 72/3 73/5
**seeing** **[6]** 18/6 22/8 26/3 30/24 73/15 73/25
**seem** **[1]** 20/3
**seems** **[3]** 58/1 60/4 65/8
**seen** **[5]** 9/16 30/12 56/18 65/20 69/1
**select** **[1]** 51/7
**selection** **[1]** 60/5
**sell** **[6]** 6/22 8/8 21/19 24/2 49/9 62/10
**selling** **[12]** 7/19 17/21 21/5 21/24 22/8 23/11

State of Alaska Perm Fund vs. Ryder System, Inc.

**S**

**selling...** [6]  23/16 41/19 47/24 48/15 48/18 74/1
**senior** [4]  21/15 22/14 73/16 74/15
**sense** [7]  7/18 14/22 25/1 36/11 66/10 69/20 69/24
**separate** [4]  21/20 21/23 24/6 24/9
**separately** [1]  69/14
**separates** [1]  67/8
**serious** [1]  66/1
**service** [1]  67/22
**set** [10]  7/2 7/4 13/11 17/16 26/25 40/15 55/3 56/5 58/12 73/3
**seven** [4]  8/22 14/9 25/25 28/10
**severe** [4]  33/2 35/20 39/21 44/7
**severely** [5]  31/2 31/13 31/16 32/6 41/16
**share** [6]  5/13 6/2 30/11 63/20 67/6 75/17
**sharing** [1]  6/7
**sharp** [1]  14/17
**short** [2]  18/5 19/1
**should** [20]  3/15 6/10 13/10 13/21 14/2 18/13 19/10 21/7 22/25 24/1 25/18 29/8 40/11 48/7 50/2 54/4 70/9 70/21 72/18 74/4
**show** [4]  22/18 23/1 23/12 62/16
**showed** [1]  23/3
**showing** [2]  29/11 52/1
**shows** [7]  10/21 11/17 11/22 23/19 23/22 25/10 29/10
**side** [6]  8/7 11/2 20/9 22/11 23/9 29/6
**sight** [1]  18/7
**signed** [5]  24/10 33/6 34/9 59/9 64/19
**significant** [9]  11/19 20/4 32/2 32/21 33/19 33/20 42/20 50/13 50/15
**significantly** [5]  5/21 31/14 36/5 43/18 56/24
**similar** [4]  46/25 47/12 51/19 51/20
**simple** [1]  53/9
**simplest** [1]  29/22
**simply** [4]  19/5 20/1 31/11 32/18
**since** [4]  5/7 34/8 40/20 64/16
**single** [1]  54/5
**sit** [1]  34/17
**sitting** [4]  35/22 56/9 56/13 75/12
**situation** [7]  28/2 35/14

35/16 44/18 55/7 55/8 55/20
**six** [16]  8/11 13/6 17/13 29/25 33/5 38/16 46/4 46/25 47/1 47/4 47/7 47/9 48/13 59/16 62/21 66/16
**size** [2]  57/3 67/14
**skeptical** [1]  67/19
**skepticism** [1]  13/12
**Slayton** [3]  54/14 54/17 54/20
**slide** [46]  5/25 6/18 6/24 7/9 8/3 8/10 8/10 8/22 9/12 9/20 10/19 10/19 12/15 13/4 13/12 14/9 14/15 14/15 14/24 16/1 16/16 17/1 17/12 18/4 18/5 18/14 19/2 22/19 23/4 24/24 25/25 26/12 26/16 27/12 28/4 29/18 30/11 61/16 61/21 62/22 62/23 63/13 65/20 70/18 71/17 72/10
**slides** [2]  5/11 67/6
**slowly** [1]  5/5
**small** [3]  14/4 25/3 70/22
**so** [142]
**so-called** [3]  7/6 7/23 37/15
**sold** [28]  7/7 7/18 7/21 7/25 8/18 10/25 14/2 14/4 18/20 19/21 21/6 21/6 23/8 23/20 25/20 33/1 38/1 38/12 38/18 39/2 63/19 63/24 64/8 64/25 65/14 67/3 68/5 71/23
**some** [24]  3/14 9/16 11/8 12/11 16/22 23/18 24/24 25/5 26/15 34/19 34/22 34/23 35/3 43/15 45/11 51/5 51/21 54/23 56/12 56/16 61/3 66/25 67/3 73/3
**somehow** [2]  10/17 50/2
**someone** [1]  6/2
**something** [15]  9/5 34/7 40/10 45/21 49/15 49/20 51/6 52/18 54/11 54/15 66/11 70/14 71/10 72/18 73/16
**somewhat** [1]  36/17
**soon** [2]  28/18 31/23
**sooner** [1]  13/10
**sophisticated** [3]  36/3 50/17 71/5
**sorry** [2]  3/20 6/6
**sort** [32]  8/3 8/6 14/20 16/14 20/1 20/12 21/1 21/2 23/4 25/5 25/17 26/11 26/20 28/6 30/9 36/12 36/14 48/10 51/3 52/10 54/23 57/2 61/11 62/5 68/14 68/19 69/23

71/8 72/17 73/10 74/12 74/14
**South** [2]  1/22 76/13
**SOUTHERN** [2]  1/2 13/16
**speak** [3]  5/4 20/6 52/20
**speaking** [1]  58/18
**specifically** [12]  20/8 25/14 32/20 34/4 36/2 52/23 52/23 53/10 53/16 57/20 64/19 65/12
**specificity** [4]  68/1 72/17 72/24 73/24
**spend** [1]  56/6
**spot** [1]  53/1
**spot-on** [1]  53/1
**square** [1]  68/17
**stable** [1]  15/20
**stage** [2]  46/6 50/5
**standard** [2]  12/15 28/6
**start** [7]  5/8 5/17 15/15 59/22 60/8 61/2 72/11
**started** [8]  8/14 12/22 14/7 15/4 31/17 31/23 43/11 70/7
**starting** [4]  15/19 40/25 57/21 68/5
**starts** [2]  14/13 70/15
**state** [4]  1/4 3/5 3/7 3/17
**stated** [9]  37/4 38/2 41/8 43/23 44/17 46/14 46/17 58/9 60/19
**statement** [27]  9/22 19/16 33/19 43/11 44/2 44/4 44/15 44/16 52/25 53/11 53/20 53/21 54/6 54/21 55/2 55/2 55/4 55/5 55/8 55/10 56/4 56/11 60/10 61/24 62/5 63/12 73/19
**statements** [30]  10/1 10/4 12/1 18/24 18/25 19/3 34/13 34/25 36/7 40/3 40/12 40/14 43/13 43/15 45/1 45/13 51/24 52/12 52/21 52/23 52/24 53/2 53/3 53/10 71/12 71/13 71/14 72/23 73/4 73/10
**states** [7]  1/1 1/11 1/22 32/20 38/22 65/12 76/12
**statistics** [1]  47/24
**statute** [5]  53/7 53/7 53/9 53/19 54/11
**stay** [1]  46/7
**staying** [1]  16/2
**stays** [1]  24/11
**step** [2]  30/13 58/22
**STEVEN** [3]  2/5 4/14 4/22
**Stewart** [1]  2/2
**still** [12]  14/4 15/8 15/9 27/9 27/9 38/20 38/25 39/7 39/8 39/8 39/14

56/16
**stitch** [1]  65/23
**stood** [1]  35/14
**story** [1]  72/21
**straight** [4]  28/13 28/14 28/17 28/23
**Street** [2]  1/15 2/6
**strictly** [1]  49/1
**string** [2]  53/24 54/1
**strong** [2]  12/17 46/12
**stronger** [1]  59/24
**structure** [1]  60/23
**subject** [3]  12/10 46/7 76/8
**submission** [1]  65/21
**submit** [5]  29/20 39/6 46/12 53/4 57/3
**submitted** [1]  65/19
**substantial** [1]  44/20
**substantially** [1]  16/3
**such** [5]  41/23 53/23 54/6 58/19 69/17
**suddenly** [1]  32/12
**sufficient** [3]  57/1 58/21 73/6
**sufficiently** [2]  34/12 45/7
**suggest** [4]  18/23 19/14 26/17 73/4
**suggesting** [4]  9/2 13/1 14/7 59/24
**suggestion** [5]  11/7 11/23 41/25 66/10 66/25
**suggests** [1]  68/4
**Suite** [1]  2/3
**summarized** [3]  45/10 52/4 59/7
**summary** [1]  65/22
**supplemental** [1]  65/21
**support** [5]  40/25 52/2 56/25 59/5 60/11
**supported** [4]  50/3 52/5 52/7 62/14
**supportive** [2]  55/16 55/25
**supports** [4]  42/9 50/19 54/18 57/23
**supposed** [6]  13/25 48/17 49/9 49/18 49/21 70/12
**supposedly** [1]  17/5
**Supreme** [1]  29/14
**sure** [13]  20/23 23/17 28/5 30/4 43/20 58/20 60/4 61/13 72/13 73/4 73/7 73/9 75/1
**swapping** [1]  7/12
**SYSTEM** [2]  1/7 3/6
**systemic** [1]  28/22

**T**

**take** [50]  5/24 6/4 7/9 8/10 8/22 9/12 9/20 9/24 11/6 12/14 13/6 13/11 13/25 14/15 14/24 16/16 16/21 22/18 24/23 25/23

25/24 25/25 28/18 29/21 30/13 30/23 37/12 40/22 42/4 43/3 45/13 46/7 46/21 49/21 50/21 54/18 55/12 55/21 55/24 58/23 62/23 63/6 63/13 69/17 71/16 72/1 72/10 72/21 74/10 74/14
**taken** [9]  14/21 19/18 31/3 40/11 55/18 55/19 62/19 71/20 71/23
**takes** [2]  33/25 37/16
**taking** [10]  4/5 4/20 18/2 22/21 24/3 25/12 27/18 67/24 72/23 73/18
**talk** [7]  28/24 47/21 58/14 59/14 61/5 63/21 72/16
**talked** [2]  9/13 69/21
**talking** [28]  13/5 20/17 20/17 21/9 21/15 27/18 28/25 29/3 35/2 36/2 36/3 42/15 44/4 56/7 61/7 63/5 66/17 66/18 66/19 66/21 67/1 67/2 68/21 69/12 70/14 71/3 71/6 72/20
**talks** [2]  19/16 66/23
**target** [3]  33/7 64/20 66/20
**teaches** [1]  12/19
**technological** [1]  76/8
**technology** [7]  17/21 32/24 33/10 33/14 38/12 38/19 64/23
**teeth** [1]  47/23
**tell** [2]  30/13 34/18
**Tellabs** [2]  12/19 29/14
**telling** [7]  15/16 15/23 25/1 36/12 50/19 72/21 73/16
**ten** [7]  13/4 14/15 16/1 46/4 46/14 46/17 47/7
**term** [5]  7/17 10/25 23/18 38/3 72/19
**terms** [22]  5/16 9/10 14/13 22/9 24/7 25/23 26/5 53/9 61/4 61/14 62/8 67/11 67/14 67/18 69/1 69/21 72/18 72/24 73/24 74/1 74/8 74/11
**test** [2]  22/15 29/20
**text** [2]  53/19 54/11
**textual** [3]  54/21 55/2 55/4
**textualist** [1]  53/8
**than** [10]  12/17 14/3 17/20 20/4 23/16 23/20 33/10 43/3 56/18 74/19
**thank** [20]  5/9 6/16 24/17 30/4 30/7 57/5 57/7 57/8 57/10 58/3 60/21 60/25 66/4 74/20 74/21 75/8 75/9 75/20 75/21 75/23
**thanks** [1]  75/5

State of Alaska Perm Fund vs. Ryder System Inc.

**T**

**that [558]**

**that's [76]** 4/6 7/23 11/19 12/18 15/8 15/23 18/19 18/21 20/13 20/24 22/1 22/11 22/22 23/13 23/21 24/5 25/6 25/16 25/21 26/11 27/4 31/6 32/5 32/7 32/18 33/24 33/25 34/8 34/9 34/21 36/8 36/8 37/18 38/14 38/23 42/5 42/18 44/1 44/9 44/12 45/8 45/20 46/9 48/17 49/4 49/9 49/15 49/19 50/14 52/15 53/1 53/23 57/5 58/16 59/15 59/25 62/15 62/18 62/21 63/11 64/6 64/23 65/7 66/2 66/22 68/6 68/9 70/17 71/2 71/6 72/5 72/9 73/8 73/19 74/5 74/6

**their [35]** 3/7 7/23 9/19 10/22 14/3 17/5 17/9 19/12 20/5 21/13 22/8 24/5 31/16 36/21 36/24 39/23 41/8 41/10 42/9 44/7 45/9 45/10 48/11 48/15 50/1 50/18 51/11 51/25 52/11 52/12 54/9 57/1 62/8 71/5 73/4

**them [24]** 7/4 7/4 12/3 12/9 17/21 21/21 22/8 23/16 24/22 27/1 32/12 34/23 35/20 37/13 40/10 42/1 42/19 44/8 47/8 47/23 52/13 59/10 62/13 74/11

**themselves [5]** 3/15 9/18 10/10 19/3 57/20

**then [46]** 5/19 5/21 7/13 7/16 7/21 7/23 7/25 8/7 8/8 8/16 9/1 10/3 10/16 11/16 11/24 11/25 15/10 15/17 15/20 24/15 24/15 26/5 28/12 29/6 29/9 30/20 45/12 48/24 50/8 55/13 55/23 56/14 56/19 56/21 57/8 61/9 61/11 63/22 64/13 69/5 70/9 71/23 72/6 73/1 74/10 74/16

**there [100]**

**there's [4]** 20/24 61/22 72/6 73/13

**therefore [1]** 76/8

**therefrom [1]** 39/10

**these [85]**

**they [161]**

**they're [2]** 48/7 68/7

**thin [1]** 26/14

**thing [16]** 14/16 15/15 20/17 21/14 22/16 28/10 42/5 46/5 51/12 55/15 61/25 68/13 69/9 72/4

74/7 75/4

**things [16]** 13/23 16/7 22/9 37/7 39/25 41/22 50/25 61/15 63/17 64/6 67/20 68/6 69/5 69/7 70/16 72/19

**think [132]**

**third [6]** 9/7 11/7 37/24 43/5 45/23 49/21

**this [174]**

**thoroughly [1]** 10/6

**those [47]** 7/4 7/22 8/19 9/15 10/10 10/12 18/15 18/15 18/15 18/17 18/21 19/3 19/7 19/20 20/3 20/21 22/9 22/15 22/17 23/12 23/13 26/24 31/13 31/22 32/25 38/5 39/25 40/16 45/1 45/13 45/22 51/19 51/23 55/14 58/8 59/21 61/7 61/7 61/15 62/7 65/4 67/3 68/11 68/25 71/22 72/24 73/9

**though [6]** 11/19 20/15 22/11 40/2 43/10 75/17

**thousand [1]** 68/25

**three [11]** 5/25 6/18 14/12 21/9 28/4 37/10 38/5 40/4 46/3 49/7 49/12

**threshold [2]** 10/14 73/6

**through [15]** 9/15 11/18 13/6 20/3 20/16 25/18 33/25 37/12 37/24 41/8 46/9 63/19 63/25 67/4 74/25

**throughout [10]** 17/5 27/10 27/10 30/21 34/24 35/14 39/18 40/1 40/17 45/6

**throw [1]** 12/4

**thrown [2]** 61/4 61/14

**thrust [1]** 7/3

**tie [2]** 40/2 57/25

**tied [2]** 72/20 73/16

**ties [1]** 66/13

**time [47]** 8/21 10/5 10/14 12/3 12/22 24/11 25/21 28/15 29/11 30/12 30/17 31/15 32/7 38/13 39/18 40/19 41/4 41/6 41/13 41/18 42/7 43/2 44/2 44/4 44/20 45/19 46/20 47/14 48/18 56/1 56/6 57/24 58/6 58/15 59/10 59/15 59/22 59/25 60/11 60/13 60/15 60/19 61/12 67/22 73/7 75/1 75/7

**timeframe [2]** 41/5 58/24

**times [1]** 43/6

**timing [1]** 59/5

**tiny [3]** 11/17 35/5 42/16

**today [4]** 3/14 52/19 56/4 75/7

**today's [2]** 3/17 4/21

**together [3]** 8/4 10/19 58/1

**told [3]** 45/25 48/3 70/24

**too [9]** 10/12 21/6 21/12 21/12 30/22 36/15 46/1 47/16 50/20

**took [11]** 10/18 23/5 32/16 37/19 38/2 40/10 41/13 42/22 42/25 43/2 49/11

**top [4]** 14/24 15/3 40/4 51/7

**totality [1]** 59/21

**totally [3]** 16/11 54/11 54/17

**toward [1]** 32/17

**tractor [4]** 6/21 45/15 61/10 61/12

**tractors [3]** 9/9 27/15 31/15

**transcript [5]** 1/10 17/24 33/5 61/20 65/5

**transcription [1]** 76/4

**transposing [1]** 72/24

**TRAYLOR [2]** 1/18 4/3

**trend [5]** 14/8 14/18 14/19 37/17 71/25

**trends [8]** 8/19 10/24 37/9 37/13 37/20 38/3 38/3 71/24

**trouble [2]** 21/24 25/4

**troubles [1]** 24/20

**truck [1]** 6/22

**trucks [7]** 9/9 21/12 27/15 35/19 41/8 46/23 48/4

**true [12]** 22/7 24/3 25/12 32/18 34/20 35/1 35/13 38/14 39/9 44/9 44/20 45/3

**truly [2]** 58/18 64/13

**try [5]** 17/2 18/23 22/15 22/15 60/25

**trying [3]** 16/22 28/8 57/25

**turn [12]** 5/19 9/21 12/14 15/15 30/5 33/3 35/3 35/24 65/22 69/19 70/17 73/22

**turned [7]** 10/12 13/23 17/20 27/6 33/10 42/22 42/23

**turning [1]** 10/8

**two [26]** 7/8 10/1 12/7 15/10 15/11 17/18 21/20 24/6 25/23 33/7 33/19 37/16 37/17 42/2 42/21 45/10 52/9 53/5 54/25 55/16 63/17 64/21 65/18 67/20 73/13 73/20

**two feet [1]** 65/18

**tying [4]** 64/4 65/3 65/3 67/23

**type [2]** 61/10 61/11

**U**

**U.S [2]** 1/22 76/13

**ultimately [10]** 13/3 29/10 29/25 30/1 31/5 40/10 42/22 48/14 62/9 74/17

**unclear [1]** 36/17

**undefective [1]** 32/9

**under [3]** 12/16 51/4 62/1

**underlying [1]** 36/19

**undermine [2]** 24/25 73/9

**undermines [2]** 19/8 25/4

**underperformance [2]** 33/23 34/3

**underperforming [2]** 38/22 65/13

**understand [2]** 36/15 41/21

**understated [4]** 40/8 40/17 43/11 57/21

**understood [2]** 45/21 65/9

**undisclosed [2]** 35/23 56/13

**unfixable [1]** 12/8

**unfortunately [1]** 30/11

**unintelligible [8]** 6/25 9/16 12/5 16/23 56/22 68/6 69/21 74/19

**unique [1]** 51/11

**UNITED [4]** 1/1 1/11 1/22 76/12

**unknown [1]** 40/1

**unless [1]** 30/2

**unpack [1]** 30/9

**unprecedented [1]** 54/12

**unquote [2]** 22/22 47/15

**until [6]** 7/7 16/4 28/12 34/24 46/18 57/8

**up [33]** 3/19 6/24 10/13 11/15 15/14 15/15 16/2 16/7 21/25 22/21 24/21 24/24 25/3 26/15 27/15 27/16 27/22 28/7 28/9 31/15 31/24 35/7 39/23 41/8 41/21 43/21 45/14 55/11 56/14 57/4 59/24 67/6 72/12

**upfront [1]** 71/8

**upon [3]** 45/16 50/8 50/22

**upper [1]** 47/10

**ups [4]** 16/8 28/11 28/12 29/23

**uptick [1]** 18/5

**upward [1]** 7/15

**us [11]** 4/2 5/8 6/2

15/13 27/24 29/8 30/11 46/10 56/22 70/4 75/7

**use [6]** 5/13 7/1 19/1 27/20 43/24 44/10

**used [10]** 9/14 14/2 20/18 23/18 31/20 37/11 41/9 47/11 58/12 72/19

**useful [4]** 7/6 19/24 20/2 37/5

**using [3]** 7/12 15/7 36/11

**V**

**vague [2]** 72/23 73/4

**valuation [14]** 7/24 8/9 8/12 19/19 23/5 23/6 23/7 23/20 29/9 37/23 49/17 64/3 64/5 71/22

**valuations [1]** 46/16

**value [41]** 5/17 5/24 6/17 7/2 7/23 8/2 8/5 10/9 10/18 12/24 12/25 14/3 22/2 22/3 23/11 24/7 25/16 28/3 28/8 28/25 30/16 31/13 31/16 31/23 31/23 34/6 37/14 37/21 41/10 47/3 48/5 48/12 48/16 48/17 49/9 49/14 49/18 51/3 51/20 68/16 71/21

**values [43]** 7/5 10/3 12/4 12/23 15/21 15/21 18/3 19/6 19/7 19/25 20/18 21/13 21/17 22/7 25/10 25/13 25/19 26/9 27/8 30/22 32/7 32/21 34/1 36/24 37/5 37/25 39/5 44/11 44/19 46/1 47/4 47/16 47/21 47/25 48/22 50/12 58/8 58/10 60/18 68/25 69/11 72/25 73/17

**variety [1]** 53/18

**various [1]** 34/13

**vast [3]** 39/3 63/9 67/12

**vehicle [18]** 7/1 7/7 7/21 7/25 8/6 8/20 9/14 19/8 19/15 28/10 28/18 31/20 46/16 58/12 63/15 64/1 67/22 71/23

**vehicle's [1]** 7/6

**vehicles [105]**

**vehicles' [4]** 32/6 59/13 60/18 68/25

**versus [1]** 3/6

**very [45]** 12/1 13/15 15/12 16/3 18/1 18/3 22/6 22/23 24/19 26/20 27/12 28/23 29/5 30/7 30/18 30/23 32/2 33/1 34/24 38/16 38/22 42/21 42/23 46/25 47/12 50/10 50/17 55/18 55/25 57/6 58/5 58/6 63/3 66/22 67/1 67/8 67/19 68/1 70/14 70/14 71/11 72/23

**V**

**very... [3]** 73/1 74/22 75/6
**vice [1]** 47/17
**video [2]** 1/10 5/4
**VIDEO-CONFERENCED [1]** 1/10
**vintages [4]** 18/15 33/17 61/7 65/2
**volatility [2]** 6/25 69/21

**W**

**Wachtell [3]** 2/6 4/15 4/17
**walk [1]** 69/5
**want [17]** 5/2 5/4 6/19 28/5 28/16 32/12 37/3 38/6 43/21 46/22 56/2 61/13 63/7 66/14 70/1 75/1 75/13
**wanted [6]** 22/14 24/18 47/25 57/19 67/10 69/19
**warning [4]** 56/4 56/8 56/23 57/1
**warnings [1]** 52/11
**was [131]**
**wasn't [6]** 14/17 36/8 41/12 43/6 44/20 52/19
**water [2]** 42/13 44/10
**way [23]** 9/14 11/8 11/15 15/6 28/21 29/9 30/23 37/19 39/4 39/11 39/23 41/8 41/19 41/19 41/19 41/23 42/19 43/2 44/10 65/24 70/7 72/2 74/24
**ways [4]** 37/10 38/5 49/7 49/12
**we [216]**
**we're [1]** 72/7
**weakening [1]** 9/13
**weekly [1]** 46/15
**weighed [2]** 53/13 53/16
**weight [2]** 56/3 56/25
**WEIRZBOWSKI [1]** 1/17
**welcome [1]** 75/15
**well [17]** 3/25 4/17 4/24 10/19 11/6 31/10 32/3 43/7 58/22 60/21 62/8 66/25 68/10 68/20 69/23 70/18 74/14
**were [122]**
**weren't [5]** 9/10 16/2 18/18 26/7 69/13
**West [1]** 2/6
**whammy [2]** 31/1 39/20
**what [124]**
**whatever [2]** 22/24 23/8
**whatsoever [1]** 47/9
**when [72]** 7/18 7/21 7/21 8/7 8/8 8/25 9/6 10/14 11/12 13/19 13/25

14/2 14/3 14/4 14/6 16/4 17/11 17/13 17/14 19/20 20/22 21/6 22/8 23/8 23/21 27/7 28/24 29/7 29/21 30/13 31/17 32/15 33/4 34/8 35/7 35/8 35/25 38/15 40/5 41/4 41/24 42/4 42/6 42/21 42/25 43/3 45/9 45/12 47/23 48/2 48/20 49/6 50/10 54/18 55/17 56/6 57/23 58/18 59/21 62/1 62/4 63/3 65/5 66/23 67/19 67/24 68/1 70/2 71/18 71/25 72/16 73/14
**where [18]** 7/13 15/14 16/22 27/3 37/1 42/7 42/24 43/3 44/17 44/18 55/8 55/20 62/18 65/8 65/10 67/18 70/2 71/18
**whereas [1]** 46/6
**whether [3]** 48/21 66/1 73/6
**which [54]** 5/1 5/18 5/22 7/6 7/10 7/17 10/2 11/17 12/24 13/14 15/17 15/22 16/4 16/9 17/16 18/9 18/15 19/8 19/12 20/23 21/17 23/24 24/12 25/1 29/2 29/22 30/21 32/2 32/22 33/14 33/25 37/12 37/16 38/7 39/4 41/4 46/16 49/23 50/22 51/10 52/7 53/19 54/5 56/5 58/11 60/9 61/10 63/21 65/23 66/8 68/4 70/19 71/13 73/24
**while [2]** 47/9 68/24
**white [2]** 17/12 61/25
**who [18]** 3/14 4/4 4/17 4/20 17/10 31/19 33/6 36/4 46/4 46/11 48/12 48/14 48/19 48/21 50/5 59/16 65/6 74/2
**whole [2]** 18/10 28/20
**whom [1]** 19/4
**whose [1]** 50/17
**why [18]** 5/7 12/5 14/17 18/1 18/2 19/23 20/7 21/16 30/5 40/4 40/5 52/12 55/11 60/22 62/18 67/5 68/6 72/11
**Wierzbowski [1]** 3/24
**WILFRED [1]** 2/5
**will [28]** 3/14 4/6 4/16 4/20 4/22 6/3 6/22 6/25 9/5 9/24 15/21 17/24 19/2 22/5 26/12 33/17 34/16 38/17 55/12 55/14 56/17 57/8 61/16 62/1 62/17 65/1 72/10 73/7
**WINTER [20]** 2/5 4/14 4/22 5/7 6/14 19/22 30/11 37/11 38/8 43/9 45/5 45/22 55/13 57/8 57/17 60/22 64/11 66/5

72/11 74/21
**Winter's [2]** 48/25 49/6
**withheld [1]** 34/18
**within [4]** 20/12 26/16 42/17 55/24
**witness [1]** 18/25
**witnessed [1]** 46/19
**witnesses [2]** 49/11 49/20
**won't [4]** 12/11 15/22 22/1 56/6
**word [2]** 9/19 31/11
**words [1]** 29/5
**work [5]** 6/10 41/8 48/8 48/10 49/1
**worked [6]** 11/23 19/5 26/15 31/21 48/19 74/24
**working [3]** 31/24 39/23 49/23
**works [3]** 26/22 68/20 71/21
**world [1]** 25/1
**worry [1]** 70/11
**worth [2]** 10/2 28/10
**would [50]** 5/16 9/21 10/7 11/20 11/20 12/14 13/2 14/10 16/13 18/16 19/12 25/14 28/18 30/25 31/1 31/3 31/4 40/13 40/14 40/25 45/14 45/16 45/17 45/21 46/17 50/3 50/25 51/8 51/14 56/16 56/21 58/19 59/6 59/23 60/11 60/12 60/12 61/2 62/23 65/16 67/3 70/16 71/2 73/13 73/22 74/5 75/5 75/10 75/12 75/17
**wouldn't [2]** 14/20 39/14
**Wow [1]** 72/1
**wrap [2]** 55/11 72/11
**write [23]** 22/22 23/17 32/15 32/21 38/9 38/13 38/20 39/4 39/12 42/25 43/2 43/4 50/10 50/14 55/18 55/18 55/21 55/24 58/15 59/9 59/15 60/20 72/19
**writing [2]** 47/8 47/11
**written [9]** 30/17 38/23 40/11 43/18 44/19 44/22 47/6 64/3 65/13
**wrong [4]** 32/15 53/5 66/9 73/18

**Y**

**Yeah [1]** 40/7
**year [33]** 7/2 7/7 7/11 7/12 7/13 7/13 10/25 11/4 11/4 11/8 11/14 14/21 15/7 15/17 19/17 26/2 26/21 27/4 27/7 27/15 27/15 27/21 36/11 36/18 36/21 36/22 37/18 43/24 56/18 61/6 61/7 63/22 70/25

**yearly [1]** 36/17
**years [31]** 6/22 6/22 7/1 10/2 13/6 14/12 15/10 15/20 18/15 23/13 28/10 28/11 29/25 32/23 33/2 33/9 33/15 36/2 36/6 37/16 37/18 40/10 40/11 42/18 44/5 44/6 50/13 50/21 55/20 64/22 70/15
**Yes [8]** 6/13 20/10 22/4 24/17 26/22 26/23 57/16 58/3
**yet [1]** 27/21
**Yoakley [1]** 2/2
**York [5]** 1/19 1/19 2/7 2/7 13/16
**you [244]**
**you're [6]** 3/19 18/6 27/18 70/3 70/4 73/15
**your [87]**