**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 20-22109-CIV-CANNON/Otazo-Reyes**

**STATE OF ALASKA, et al.**,

Plaintiffs,

v.

**RYDER SYSTEM, INC., et al.**,

Defendants.

_________________________________/

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**THIS CAUSE** comes before the Court upon Defendants' Motion to Dismiss the Amended Complaint ("Motion to Dismiss") [ECF No. 42]. The Court has reviewed the Motion to Dismiss, Plaintiffs' Response in Opposition [ECF No. 51], and Defendants' Reply in Support of the Motion [ECF No. 62]. As discussed in greater detail below, the Court determines that Plaintiffs have satisfied the heightened pleading standards in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4. Accordingly, Defendants' Motion to Dismiss [ECF No. 42] is **DENIED**.

**BACKGROUND**

The Court assumes familiarity with the facts and procedural history of this case, which are set forth in detail in the Amended Complaint [ECF No. 28] and the parties' responses thereto [ECF Nos. 51, 62]. This case stems from allegations that Defendants, Ryder System, Inc. ("Ryder") and its executives, Robert E. Sanchez, Art. A. Garcia, and Dennis C. Cooke (collectively, the "Officer Defendants"), made false and misleading statements and omissions to investors about the residual value of Ryder's truck fleet and the level of depreciation of those

assets, which artificially inflated Ryder's net earnings, income, and financial metrics [ECF No. 28 ¶ 1]. As part of its business model, Ryder leases vehicles and then resells them after their "useful life" [ECF No. 28 ¶ 3]. Each year, Ryder calculates the depreciation expense it must record on those vehicles as "the difference between the vehicle's value at the start of the lease and its residual value" [ECF No. 28 ¶ 3]. Thus, if Ryder estimated that its vehicles will have higher residual values at the end of their useful life, then it could claim lower depreciation expenses and report higher profits that year [ECF No. 28 ¶ 3].

According to the Amended Complaint, Defendants were aware as early as 2015 that the used vehicle market had declined dramatically and knew that a significant portion of Ryder's vehicles were faulty and would likely never resell—but nonetheless made statements assuring investors that the residual values for the fleet would remain stable [ECF No. 28 ¶¶ 5, 7, 11–12]. For instance, at a February 11, 2016 BB&T Transportation Services Conference, Defendant Sanchez told investors that "[w]e don't have a situation where we've got a bunch of vehicles that are at high residual values [and] have to be written down" [ECF No. 28 ¶ 184 (alterations in original)]. Plaintiffs contend that this statement, and others like it, were materially misleading because, at the time the statements were made, "Ryder's vehicle residual values had materially decreased[,] and its depreciated expense had materially increased, yet the Company failed to make necessary adjustments to its residual values or depreciation expense" [ECF No. 28 ¶ 185].

Plaintiffs allege that because of Defendants' misrepresentations, shares of Ryder stock were artificially inflated, only to come crashing down on October 19, 2019, when Ryder disclosed that it needed to make a corrective adjustment by reducing its residual value estimates from the second half of 2019 through 2024–2025 by $844 million [ECF No. 28 ¶ 19]. This disclosure led to a 12% drop in Ryder's stock value [ECF No. 28 ¶ 19]. On February 13, 2020, Ryder disclosed

that the total depreciation expense for its fleet would exceed $1 billion, which led to an additional 23% drop in stock share value [ECF No. 28 ¶¶ 19, 143].

Defendants maintain that Ryder did not mislead investors, but rather that "Ryder did not foresee the depth and duration of the decline in used vehicle prices, and as a result, had to later substantially increase depreciation expense on its vehicles" [ECF No. 42 p. 46]. Plaintiffs argue that these sharp drops in value of the stock were preventable because Ryder executives knew of the problem with its fleet but refused to take corrective action [ECF No. 28 ¶ 268]. The Amended Complaint contains statements from former employees of Ryder alleging that they warned Defendants about the need to lower residual values, but "their concerns were recklessly ignored and pushed aside" [ECF No. 28 ¶ 103].

For instance, Former Employee 4, a Director of Asset Management for Ryder in Canada, reported that he was "raising red flags like crazy" about Ryder's residual numbers, and that he "told the finance group at the Company that they should be writing the trucks down because there was no way Ryder could get rid of them at the losses they had on the business plan, but was told to sit on the inventory" [ECF No. 28 ¶ 103(f), (h)]. Former Employee 4 also stated that he told Ryder executives that the problem with residual values "isn't going away," that "[w]e're holding these trucks so they're just losing value," but that Ryder told its sales associates, "[d]on't make excuses, go out there and sell" [ECF No. 28 ¶ 103(i)]. Former Employee 4 further reported that Ryder's Vice President of Vehicle Sales, Eugene Tangney, "knew exactly what was happening" with the declining sales of Ryder vehicles because of the high residuals, and that everyone in Former Employee 4's work group was "bewildered" because Ryder chose not to write down their vehicles [ECF No. 28 ¶ 106].

According to Former Employee 6, a Vehicle Sales Manager in Ryder's Asset Management Division, the residual value depreciation of Ryder's vehicles was determined at Ryder's quarterly Asset Management Board meetings [ECF No. 28 ¶ 103(b)]. During these meetings, there was "talk of the need for a write-down in 2015/2016," but Ryder "had no interest in writing down whatsoever" [ECF No. 28 ¶ 103(b)]. Former Employee 6 stated that "the values of the equipment were completely off," that "it was pretty clear that [Ryder] needed to write-down the equipment," and that although Ryder sales managers "were always raising concerns," "everyone in upper management, including Tangney and Defendants Sanchez and Garcia, pushed back on not writing down the used vehicles" [ECF No. 28 ¶ 103(a)–(b)].

Former Employee 10, a Vehicle Sales Manager, Bailment Supervisor, and Senior Logistics Analyst at Ryder, stated that senior management, including Defendants Sanchez and Garcia, participated in weekly and monthly phone calls to discuss Ryder's vehicles' valuations and depreciation [ECF No. 28 ¶ 103(c)]. Former Employee 10 reported that he "heard [Defendant Sanchez's] voice on many phone calls" and that, at those meetings, Former Employee 10 would "scream until [he] was blue in the face" that Ryder's vehicles were overpriced but that Sanchez and Garcia pushed back "all the time" in response to these complaints [ECF No. 28 ¶ 103(c)–(d) (alterations in original)].

Based on these allegations, Plaintiffs filed the instant action asserting violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, against all Defendants (Count 1) [ECF No. 28 ¶¶ 353–61], and violations of Section 20(a) of the Exchange Act against the Officer Defendants (Count 2) [ECF No. 28 ¶¶ 362–63]. Defendants filed a Motion to Dismiss [ECF No. 42], which is ripe for adjudication.

## LEGAL STANDARD

Rule 8(a)(2) requires complaints to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To avoid dismissal under Rule 12(b)(6), a complaint must allege facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* Fed. R. Civ. P. 12(b)(6). A claim for relief is plausible if the complaint contains factual allegations that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 545). Conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b). *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). That Rule requires a party to "state with particularity the circumstances constituting fraud or mistake," but allows "[m]alice, intent, knowledge, and other conditions of a person's mind" to be alleged generally. Fed. R. Civ. P. 9(b). The Eleventh Circuit has explained that:

> While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). Under Rule 9(b), it is "sufficient to plead the who, what, when, where, and how of the allegedly false statements and

then allege generally that those statements were made with the requisite intent." *Mizzaro*, 544 F.3d at 1237.

Further, to survive a motion to dismiss, a securities-fraud claim brought under Rule 10b–5 also must satisfy the special fraud pleading requirements imposed by the PSLRA. The PSLRA requires a complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). It also requires, "with respect to each act or omission alleged," that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A). The required state of mind is an "intent to defraud or severe recklessness on the part of the defendant." *FindWhat*, 658 F.3d at 1299 (quoting *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F. 3d 783, 790 (11th Cir. 2010)). And a "strong inference" is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute. *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004). If these PSLRA pleading requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

## DISCUSSION

To state a claim for a violation of Section 10(b), Plaintiffs must allege: (1) the existence of a material misrepresentation (or omission), (2) made with scienter (i.e., "a wrongful state of mind"), (3) in connection with the purchase or sale of any security, (4) on which the plaintiff relied, and (5) which was causally connected to (6) the plaintiff's economic loss. *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 633 (11th Cir. 2010). Defendants seek dismissal of the

entire action, arguing that Plaintiffs do not allege fraud with the particularity required by Federal Rule of Civil Procedure 9(b) or plead scienter with the specificity required under the PSLRA [ECF No. 42 pp. 22–48]. As discussed below, the Court determines that Plaintiffs have satisfied the pleading requirements of Rule 9(b) and the PSLRA sufficient to survive a motion to dismiss.

**A. Plaintiffs Have Alleged Actionable Material Misrepresentations.**

The first element of a Section 10(b) and Rule 10b–5 securities fraud claim requires an actionable misstatement or omission of a material fact. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). The Amended Complaint identifies 18 separate quarterly reporting periods where, despite knowledge that depreciation was understated, Defendants allegedly misstated Ryder's financial results and told investors that they were updating the residual value estimates based on current market prices and trends [*see* Amended Complaint listing financial statements, press releases, and statements to investors covering the period between the First Quarter of 2016 through the Third Quarter of 2019, ECF No. 28 ¶ 184–267]. Plaintiffs contend that these statements were materially false and misleading because Defendants had artificially inflated the residual values of the fleet and understated the depreciation expense to portray a positive financial performance [ECF No. 28 ¶ 185; ECF No. 51 pp. 23–26].

Plaintiffs have satisfied the requirements of Federal Rule of Civil Procedure 9(b) by setting forth the allegedly false statements; the time and place the statements were made; who made them; the content of the statements; how the statements misled Plaintiffs and investors; and what Defendants obtained as a consequence of the alleged fraud [ECF No. 28 ¶¶ 148–267]. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (articulating standard to survive dismissal under Rule 9(b)).

Additionally, Plaintiffs have pleaded sufficient facts to establish that the alleged omitted facts were material. The materiality requirement is satisfied when there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic*, 485 U.S. at 231 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)). Here, the alleged omitted information, that the residual values were inflated, is a material fact that a reasonable investor would have found to alter the total mix of information available, because the profit and loss trajectory of the company depended heavily on whether Ryder could sell its vehicles for a high value even after depreciation. "In the light of the facts existing at the time," a "reasonable investor, in the exercise of due care," would have been misled by financial statements and investor presentations that understated depreciation values for the fleet and the residual values that were purported to be stable. *FindWhat*, 658 F.3d at 1305.

Defendants argue that the investor statements identified in the Amended Complaint were mere expressions of opinion or forward-looking statements and not actionable misstatements [ECF No. 42 p. 24]. But Plaintiffs have pleaded facts alleging that Defendants possessed information that did not support Defendants' opinions as articulated to investors. For instance, the Amended Complaint includes statements from former Ryder employees that senior management was aware of the declining value of the used vehicle fleet, and that although those former employees directly expressed their concerns to Defendants Sanchez and Garcia, there was pushback "all the time" [ECF No. 28 ¶ 103(c)]. As described above, Former Employee 4 reported that by 2015, it was "loud and clear" that trucks sales were declining; that he was "raising red flags like crazy" about Ryder's residual numbers; and that he "told the finance group at the Company that they should be writing the trucks down because there was no way Ryder could get rid of them

at the losses they had on the business plan, but was told to sit on the inventory" [ECF No. 28 ¶¶ 79, 103(h)]. Former Employee 6 reported that, despite "the general recognition that the vehicles in Ryder's fleet were overvalued, everyone in upper management, including Tangney and Defendants Sanchez and Garcia pushed back on not writing down the used vehicles" [ECF No. 28 ¶ 103(a)]. And Former Employee 10 stated that he (1) participated consistently in weekly and monthly phone calls with Ryder executives during which valuations and depreciation were discussed [ECF No. 28 ¶ 84(c)]; and (2) vociferously voiced his complaints about Ryder's vehicles being overpriced directly to Defendants Sanchez and Garcia, but Sanchez and Garcia pushed back "all the time" in response [ECF No. 28 ¶ 103(c)–(d)].

Based on the allegations in the Amended Complaint, the Court concludes that Plaintiffs have alleged actionable misstatements sufficient to survive a motion to dismiss.

**B. Plaintiffs Have Adequately Alleged Scienter.**

To satisfy the scienter element of a Section 10(b) claim, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Thompson*, 610 F.3d at 633 (citing 15 U.S.C. § 78u–4(b)(2)). This entails "a showing of either an intent to deceive, manipulate, or defraud, or severe recklessness." *Id.* at 634; *see also FindWhat*, 658 F.3d at 1299 ("Rule 10b–5 requires a plaintiff to show that the defendant made the material misstatement or omission with the requisite culpable state of mind, or scienter," which is "intent to defraud or severe recklessness" (citation omitted)). To determine the sufficiency of a pleading's scienter allegations, "the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *FindWhat*, at 1300 (citations omitted).

The Court concludes that Plaintiffs have adequately pleaded a strong inference of scienter when viewing the allegations collectively. The Amended Complaint specifies each statement alleged to have been misleading, the reasons why the statements were misleading, and has stated with particularity facts giving rise to a strong inference that the Defendants acted with the required state of mind. Plaintiffs allege: (1) Defendants knew of a decline in resale truck values [*see, e.g.*, ECF No. 28 ¶ 103]; (2) Defendants relied on an outdated methodology to calculate residual value, which boosted financial results [ECF No. 28 ¶¶ 272–90]; (3) Defendants' new CFO adjusted residual values within months of taking the job [ECF No. 28 ¶¶ 295–98]; (4) the depreciation changes were significant [ECF No. 28 ¶¶ 313–16]; (5) the individual defendants sold millions of dollars' worth of stock preceding the first corrective disclosure [ECF No. 28 ¶¶ 317–30]; and (6) higher residual values boosted executive compensation [ECF No. 28 ¶¶ 331–41].

Although the Eleventh Circuit has noted that confidential statements often are viewed with skepticism, *Mizzaro*, 544 F. 3d at 1240, this skepticism can be overcome "when confidential witnesses come forward with or describe the actual contents of contemporaneous internal reports that contradict or cast doubt on defendants' public statements." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1220 (M.D. Fla. 2014). "Similarly, courts will find a strong inference of scienter when confidential witnesses point to the specific details of first-hand interactions with a defendant in which they advised him that existing facts contradicted his public disclosures—especially when the defendant admits as much in his responses to the witnesses." *Id.* (citing *Primavera Investors v. Liquidmetal Tech., Inc.*, 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2005)).

Here, the Amended Complaint contains sufficiently detailed confidential statements from former Ryder executives who attest that (1) they repeatedly warned Defendants that Ryder's residual values were materially inflated; (2) Defendants assured investors that Ryder was updating

its residual value estimates based on current market prices and trends; and (3) Defendants actively discouraged those who spoke up about the problems with the fleet [ECF No. 28 ¶¶ 103–27]. The Amended Complaint further alleges that, contemporaneous with these clear warnings, Defendants omitted material information and misled investors—through quarterly reports, financial statements, press releases, and during investor calls and conferences—about the residual value of Ryder's truck fleet and the level of depreciation of those assets [ECF No. 28 ¶¶ 149–267 (showing Ryder's quarterly reports and financial statements between the Second Quarter of 2015 and the Third Quarter of 2019 where Ryder allegedly misstated its financial metrics by failing to reduce the residual values of its fleet vehicles or to increase its depreciation expense); ECF No. 28 ¶ 184 (alleging that Defendant Sanchez falsely reassured investors at the February 11, 2016 BB&T Transportation Services Conference that "[w]e do not have a situation where we've got a bunch of vehicles that are at high residual values [and] have to be written down" (alterations in original)).

Additionally, the Amended Complaint sufficiently alleges facts giving rise to a strong inference of scienter on the part of each defendant alleged to have committed each violation of the statute [ECF No. 28 ¶ 103(a) (Former Employee 6 stating that "it was pretty clear that [Ryder] needed to write-down the equipment," but "Defendants Sanchez and Garcia pushed back on not writing down the used vehicles"); ECF No. 28 ¶ 103(c)–(d) (Former Employee 10 describing that he conveyed the problems with Ryder's residual values "directly to Defendants Sanchez and Garcia," both of whom excused their refusal to write down the vehicles because "the Company did not want to lose money on the trucks"); ECF No. 28 ¶ 103(h) (Former Employee 4 stating that Defendant Cooke "kicked his teeth in" when Former Employee 4 gave Ryder management "all kinds of statistics on what wasn't selling, the issues with MaxxForce, and how the residuals were making pricing a problem"); ECF No. 28 ¶ 103(i) (Former Employee 4 describing that he told

Defendant Cooke that the problem with residual values "isn't going away"). These allegations, "taken collectively," give rise to a "cogent and compelling" inference that Ryder elected not to reduce the residual values on its fleet because it sought a greater profit margin, which ultimately led to a billion dollar write down. *Tellabs*, 551 U.S. at 323.

Defendants contend that the most compelling inference from the allegations is "that Ryder did not foresee the depth and duration of the decline in used vehicle prices, and as a result, had to later substantially increase depreciation expense on its vehicles" [ECF No. 42 p. 46]. That inference of non-fraudulent intent is plausible, to be sure, but the facts as a whole yield a contrary inference that is at least as compelling, and it is that Defendants acted with the requisite scienter to permit the claims to proceed. *Tellabs*, 551 U.S. at 326 ("We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").

At this stage of the litigation, therefore, the Court determines that Plaintiffs have adequately set forth the requisite elements of their claims and have done so with the specificity required by Rule 9(b) and the PSLRA. The misstatements and omissions alleged in the Amended Complaint for violations of Section 10(b) of the Exchange Act are sufficient to withstand the Motion to Dismiss.

**C. Plaintiffs Have Adequately Alleged Section 20(a) Claims**

Defendants also seek dismissal of Plaintiffs' Section 20(a) claims, arguing that "Plaintiffs' failure to allege a primary violation under Section 10(b) requires dismissal of their control person claims under Section 20(a)" [ECF No. 42 p. 46].

Section 20(a) provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted

> in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

To state a claim under Section 20(a), Plaintiffs must allege three elements: "(1) that [Ryder] committed a primary violation of the securities laws; (2) that the individual defendants had the power to control the general business affairs of [Ryder]; and (3) that the individual defendants 'had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability.'" *Mizzaro*, 544 F.3d at 1237 (quoting *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001)). "Because a primary violation of the securities laws is an essential element of a § 20(a) derivative claim," the Eleventh Circuit has held that "a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded." *Id.*

As explained above, Plaintiffs have adequately pleaded a Section 10(b) violation by Defendants, satisfying the first element required for Section 20(a) control-person liability. As to the other prongs of their Section 20(a) claims, Plaintiffs allege that the Officer Defendants are liable as "control persons" by virtue of their "direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Ryder, the Officer Defendants had the power and ability to control the actions of Ryder and its employees" [ECF No. 28 ¶ 363]. Defendants do not challenge these allegations [ECF No. 42 p. 46]. Accordingly, Plaintiffs have adequately alleged Section 20(b) claims against the Officer Defendants as controlling persons of Ryder sufficient to withstand a motion to dismiss.

## CONCLUSION

For the reasons stated above, it is hereby **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Motion to Dismiss [ECF No. 42] is **DENIED**.

2. Defendants shall file an Answer to the Complaint on or before **May 27, 2022**. *See* Fed. R. Civ. P. 12(a)(4)(A).

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida this 12th day of May 2022.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record