**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

<table>
<tr><td>

STATE OF ALASKA, ALASKA PERMANENT FUND, THE CITY OF FORT LAUDERDALE GENERAL EMPLOYEES' RETIREMENT SYSTEM, and THE CITY OF PLANTATION POLICE OFFICERS PENSION FUND, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

RYDER SYSTEM, INC., ROBERT E. SANCHEZ, ART A. GARCIA, and DENNIS C. COOKE,

Defendants.

</td><td>

Civil Action No. 1:20-cv-22109-AMC

</td></tr>
</table>

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................................................1

BACKGROUND ...............................................................................................................................3

      A.      Ryder and its methodology for estimating residual values......................................3

      B.      Declining conditions in the used vehicle market ......................................................4

      C.      Plaintiffs' alleged corrective disclosures ................................................................5

      D.      This lawsuit...............................................................................................................7

ARGUMENT.....................................................................................................................................7

I.      PLAINTIFFS FAIL TO DEMONSTRATE THAT DAMAGES CAN BE
CALCULATED ON A CLASSWIDE BASIS, AND AS SUCH DO NOT
SATISFY RULE 23(B)(3)'S "PREDOMINANCE" REQUIREMENT. ...........................8

      A.      Plaintiffs fail to provide any information about how they would actually
calculate classwide damages in this case. ...............................................................9

      B.      Plaintiffs fail to address the mismatch between the alleged
misrepresentations and corrective disclosures. ......................................................10

      C.      Plaintiffs fail to explain how their damages methodology will account for
information unrelated to the alleged fraud..............................................................11

      D.      Plaintiffs fail to explain how their damages methodology will account for
the materialization of allegedly understated risks..................................................13

      E.      Plaintiffs fail to explain how their methodology will disentangle damages
attributable to plaintiffs' distinct theories of liability. ..........................................13

II.      CLASS CERTIFICATION SHOULD ALSO BE DENIED BECAUSE
PLAINTIFFS FAIL TO SATISFY RULE 23(A)............................................................14

III.      THE CLASS PERIOD SHOULD END NO LATER THAN OCTOBER 29, 2019. ........19

CONCLUSION................................................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boca Raton Cmty. Hosp., Inc.* v. *Tenet Healthcare Corp.*,
238 F.R.D. 679 (S.D. Fla. 2006) ................................................................................. 15, 17

*City Pension Fund for Firefighters & Police Officers in the City of Miami Beach*
v. *Aracruz Cellulose S.A.*,
2009 WL 10664427 (S.D. Fla. Aug. 7, 2009) .................................................................. 15

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013) ......................................................................................... *passim*

*Erica P. John Fund, Inc.* v. *Halliburton Co.* ("*Halliburton I*"),
563 U.S. 804 (2011) .................................................................................................. 11

*Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990) ........................................................................................ 15

*George* v. *China Auto. Sys., Inc.*,
2013 WL 3357170 (S.D.N.Y. July 3, 2013) ............................................................... 15, 17

*Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*,
141 S. Ct. 1951 (2021) .................................................................................... *passim*

*Halliburton Co.* v. *Erica P. John Fund, Inc.* ("*Halliburton II*"),
573 U.S. 258 (2014) .................................................................................................... 1

*Hubbard* v. *BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) ...................................................................................... 12

*In re Data Access Sys. Sec. Litig.*,
103 F.R.D. 130 (D.N.J. 1984) ................................................................................ 19, 20

*In re Grupo Televisa Sec. Litig.*,
2020 WL 3050550 (S.D.N.Y. June 8, 2020) .................................................................... 17

*In re HealthSouth Corp. Sec. Litig.*,
213 F.R.D. 447 (N.D. Ala. 2003) ............................................................................. 15, 17

*In re Safeguard Scis.*,
216 F.R.D. 577 (E.D. Pa. 2003) ............................................................................... 18, 19

*In re Vivendi Universal, S.A. Sec. Litig.*,
183 F. Supp. 3d 458 (S.D.N.Y. 2016) ....................................................................... 16 n.8

*Keippel* v. *Health Ins. Innovations, Inc.*,
   2020 WL 5094840 (M.D. Fla. Aug. 28, 2020) ........................................................................19

*Loritz* v. *Exide Techs.*,
   2015 WL 6790247 (C.D. Cal. July 21, 2015) .................................................................... 12-13

*Ludlow* v. *BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) ...............................................................................................13

*Marcus* v. *J.C. Penney Co.*,
   2014 WL 11394911 (E.D. Tex. Feb. 28, 2014) ....................................................................17

*Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*,
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ................................................................9, 10

*Piazza* v. *Ebsco Indus., Inc.*,
   273 F.3d 1341 (11th Cir. 2001) ...........................................................................................14

*Randolph* v. *J.M. Smucker Co.*,
   303 F.R.D. 679 (S.D. Fla. 2014) ......................................................................................9, 10

*Ravens* v. *Iftikar*,
   174 F.R.D. 651 (N.D. Cal. 1997) .........................................................................................18

*Thorpe* v. *Walter Inv. Mgmt., Corp.*,
   2016 WL 4006661 (S.D. Fla. Mar. 16, 2016) ..................................................................11 n.6

*Valley Drug Co.* v. *Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) .................................................................................8, 17, 18

*Vega* v. *T-Mobile USA, Inc.*,
   564 F.3d 1256 (11th Cir. 2009) .............................................................................................7

*Wal-Mart Stores, Inc.* v. *Dukes*,
   564 U.S. 338 (2011)...............................................................................................................7

**Statutes and Rules**

FED. R. CIV. P. Rule 23(a) .................................................................................................. *passim*

FED. R. CIV. P. Rule 23(b)(3) .............................................................................................. *passim*

## PRELIMINARY STATEMENT

The Supreme Court has made clear:  "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23."  *Halliburton II*, 573 U.S. 258, 275 (2014).  Paying lip service to that mandate, plaintiffs have failed to meet their affirmative burden in multiple critical respects:

*First*, plaintiffs fail to demonstrate compliance with Rule 23(b)(3):  they fail to prove (as they must) that damages may be calculated on a classwide basis consistent with their theories of liability.  *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33-34 (2013).  To meet their burden, plaintiffs rely on an opinion from their proposed expert, Dr. Hartzmark.  But Dr. Hartzmark mailed it in.  His damages framework is generic, conclusory, and incomplete.  He devoted only *four* pages to purporting to demonstrate that classwide damages could be reliably calculated—four pages that said precisely *nothing* about Ryder or the claims at issue.  At deposition, we learned why, as Dr. Hartzmark simply copies and pastes the same section from report to report.

This casual approach to satisfying Rule 23 should be insufficient in any case.  And it is clearly insufficient here, given the distinctive features of plaintiffs' claims and the proposed class they seek to certify.  Running from July 2015 through February 2020, plaintiffs' class period is nearly five years long; begins at the very moment that (plaintiffs allege) used vehicle prices started to decline from record highs; covers at least 300 alleged misstatements (which are, by their nature, estimates of future prices); and concludes with three different supposedly "corrective" disclosures, which do not match up with *any* of the alleged misstatements.

That last feature—a "mismatch" between the alleged corrective disclosures and the alleged misstatements—is a critical flaw in plaintiffs' damages framework.  In their motion, plaintiffs say that they will calculate inflation in Ryder's stock at the time of the alleged misstatements based on

stock drops following the alleged corrective disclosures.  But just last year, the Supreme Court emphasized in *Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*, 141 S. Ct. 1951, 1961 (2021), that this "indirect" approach to calculating damages based on "back-end price drop[s]…starts to break down where there is a mismatch between the contents of the misrepresentation and the corrective disclosure."

Plaintiffs completely fail to address the implications of that mismatch, along with numerous other distinctive features of plaintiffs' case—including the forward-looking nature of the residual value estimates at issue and public information already in the market about the declines in used vehicle prices—which, as defendants' expert, Professor Amy Hutton, shows, further undermines the reliability of plaintiffs' one-size-fits-all damages model.  Plaintiffs' failure to carry their Rule 23 burden requires denial of their motion.  Point I, *infra*.

*Second*, plaintiffs' motion should also be denied because they fail to satisfy Rule 23(a)'s typicality and adequacy requirements.  The proposed class representatives engaged in atypical trading that subjects them to unique reliance defenses and creates the potential for class conflicts. Among other revelations, plaintiffs loaded up on Ryder stock *after* the supposed fraud was revealed, and one even ███████ Ryder during the proposed class period—and thus, if plaintiffs' allegations are to be believed, may have even profited from the alleged fraud.  Point II, *infra*.

And *finally*, even if a class is certified, the Court should end the class period no later than October 29, 2019, when, according to plaintiffs, Ryder disclosed the changes in its residual value estimates that form the gravamen of plaintiffs' complaint.  Plaintiffs' efforts to extend the class period through February 13, 2020 (and increase potential damages) are based on a plain misreading of Ryder's disclosures and should be rejected.  Point III, *infra*.

## BACKGROUND

### A.    Ryder and its methodology for estimating residual values

Ryder is a global provider of transportation and supply chain management solutions, and manages one of the largest fleets of commercial power vehicles in the United States.  Compl. ¶¶1-2.[1]  As one part of its business, Ryder leases vehicles to customers on a long-term basis, and sells those vehicles at the end of their "useful lives," which can be seven years or more.  *Id.* ¶36.

For accounting purposes, Ryder estimates the price at which it expects to sell each vehicle at the end of its useful life (its "residual value"), and subtracts that estimate from the vehicle's original cost to determine total depreciation.  The vehicle's depreciation is then recognized as an expense in equal installments over its useful life.  *Id.* ¶¶45, 48.  Generally, the higher Ryder's residual value estimates, the lower its depreciation expense.  *Id.*

Ryder's methodology for estimating residual values incorporated three main components:

1. *Policy depreciation*: the long-term component, calculated residual values primarily based on a five-year historical average of actual used vehicle prices.  Each year, the current year's prices would get rolled into the new average.  Compl. ¶¶49, 101.

2. *Accelerated depreciation*: the medium-term component, adjusted residual values for vehicles nearing the end of their useful lives (one to two years before sale) if needed based on then-prevailing market prices.  Compl. ¶315; Ex. 2 (2019 10-K) at 49.

3. *Valuation adjustments*: the shortest-term component, adjusted residual values for vehicles ready to be sold if then-current sale prices were below their then-adjusted residual values.  Ex. 2 (2019 10-K) at 94-95; Ex. 3 (Q3 2019 Presentation) at 7.

Ryder's methodology for estimating residual values was well-known to investors.  It was

---

[1]    This background assumes familiarity with plaintiffs' claims; includes only those matters relevant to defendants' opposition; and is drawn primarily from plaintiffs' complaint and publicly available sources.  Cites to "Compl. ¶" are to Plaintiffs' Amended Complaint (ECF No. 28); cites to "Mot." are to Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification; cites to "Hartzmark ¶" are to the Expert Report of Michael L. Hartzmark submitted in support of plaintiffs' motion; and cites to "Hutton ¶" are to the Expert Report of Professor Amy Hutton, attached as Ex. 1 to the transmittal declaration of Jonathan Osborne submitted herewith.

disclosed in SEC filings, described on earnings calls, and discussed by analysts throughout the proposed class period.  *See, e.g.*, Hutton ¶¶51-67 & Exs. 2-3 (collecting sources); *see also* Ex. 4 (JPMorgan Q2 2019) at 1 ("We believe the used vehicle headwind will remain through 2021 as the five year rolling average valuation adjustment cycles out the 2016 peak in tractor pricing.").

### B.    Declining conditions in the used vehicle market

Between 2011 and 2015, used vehicle prices rose to record highs.  Compl. ¶270.  Beginning in late 2015, however, prices began to fall.  *Id.*  As the market turned (for Ryder and everyone else), Ryder applied the same residual value methodology it applied in prior years.  Using that same "long-term view," Ryder only gradually increased its residual values as prices were increasing.  Ex. 5 (2015 10-K) at 50; Ex. 6 (Feb. 2016 Conf.) at 8.  As a result, even when prices started to fall in late 2015 and again in 2016, Ryder recognized (and disclosed) *gains* on its used vehicle sales, because its residual values for those vehicles were still below then-current market prices.  Ex. 7 (chart); Ex. 8 (2017 10-K) at 13, 31; Compl. ¶90.[2]

As the downturn continued into 2017, and then 2018, market prices fell below the five-year average.  As a result, Ryder disclosed hundreds of millions of dollars of additional depreciation on vehicles to be sold soon, while cautioning that more would be needed if the market didn't reverse its downward course.  Ex. 7; Hutton Ex. 2; Ex. 9 (Q4 2017 Earnings Call) at 4.

Investors were also well aware of the decline—not only because it affected the entire used vehicle market, but also because Ryder itself disclosed the changes in its own pricing and inventory each quarter.  *See* Hutton ¶¶42-45 & n.62, Ex. 1a; Ex. 11 (Stephens Q4 2016) (attributing Ryder's earnings miss to "weaker-than-expected used truck market"); Ex. 12 (Baird Q4 2017) (cautioning

---

[2]    The total amount of expense thus turns on the actual sale price, not the amount of depreciation previously recognized.  If Ryder did not recognize enough depreciation prior to a sale, it recognized a loss. If Ryder recognized too much depreciation, it recognized a gain.  Ex. 7.

"[u]sed vehicle sales (UVS) headwinds remain the key source of risk"); Ex. 13 (May 2018) at 2 (referring to "length of the [UVS] downturn" as the "elephant in the room").

In late 2018, used vehicle prices started to improve, suggesting an upward trend that would have been consistent with previous sales cycles.  Compl. ¶98; Ex. 3 (Q3 2019 Presentation) at 5-6.  However, by mid-2019, prices started to decline yet again.  *Id.*  As one analyst commented, "trends deteriorated meaningfully since the end of April, consistent with commentary from other covered public carriers."  Ex. 14 (Baird Q2 2019) at 1.

As Ryder disclosed these declines, its stock price went down too.  On July 23, 2015, the first day of the proposed class period, Ryder's stock price dropped by 5%.  On October 13, not even three months later, Ryder lowered its guidance, including due to softening it was seeing in the used vehicle market.  Ex. 15.  Ryder's stock price dropped by over 9%.[3]  After this "██████████," one of the plaintiffs *sold nearly its entire stake*.  *Infra* p.16.  The pattern continued throughout the proposed class period—when, plaintiffs say, Ryder was supposedly misrepresenting its financial condition.  Indeed, according to plaintiffs' expert, of the 14 earnings releases where Ryder's stock price had statistically significant price reactions, 10 were *negative*, including substantial drops of 7.75% on February 2, 2017 (when Ryder announced its 2017 depreciation estimates), and 9.19% on February 16, 2018 (when it did the same for 2018).  Ex. 16.

## C.    Plaintiffs' alleged corrective disclosures

Plaintiffs allege that Ryder's disclosures on three earnings calls—on July 30, 2019, October 29, 2019, and February 13, 2020—were "corrective disclosures" that supposedly revealed that Ryder was artificially inflating its residual value estimates.  Compl. ¶¶135-43.

---

[3]    According to plaintiffs' expert, these stock price declines equated to -3.57% and -7.06% abnormal returns, even after controlling for market and industry reactions.  Ryder's daily stock price performance during the proposed class period is included in Dr. Hartzmark's Appendix E.

**July 30, 2019**:  In mid-2019, as prices resumed their decline, Ryder lowered its earnings forecast to reflect the "weaker expected market conditions."  Ex. 18 (Q2 2019 Earnings) at 1.  This disclosure was similar to numerous other disclosures during the proposed class period, where Ryder lowered guidance in response to the weaker market conditions.  *See* Hutton Ex. 1.  Ryder's stock price again declined, this time by ~10%.  Hartzmark App'x E.

**October 29, 2019**:  As prices continued to decline sharply, with double-digit declines in the third quarter alone (and no sign of abating), Ryder adjusted its five-year rolling average "to better align with [its] updated outlook."  Ex. 3 (Q3 2019 Presentation) at 6, 10.  Specifically, Ryder eliminated the fifth historical year from the rolling average and replaced it with a forecast year.  Given the size of Ryder's fleet, this change resulted in an additional $591 million in policy depreciation on vehicles to be sold *through 2025*.  Ryder also recognized an additional $286 million in accelerated depreciation for vehicles expected to be sold through 2021.  *Id*. at 10.

Following this disclosure, which plaintiffs labeled a "bombshell," Ryder's stock price declined by only 5.44% (a -4.90% abnormal return).  Hartzmark App'x E.  As analysts recognized, "[w]hile the impact from non-cash depreciation expense is meaningful," Ryder's residual value changes pulled forward depreciation that would have been recognized over "the next several years"; were "based on used sale price levels at 10-year lows"; and set Ryder up for gains "on the next trucking up-cycle."  Exs. 19 (SunTrust) at 1; 20 (Wolfe) at 1; 21 (JPMorgan) at 1.

**February 13, 2020**:  Contrary to the complaint's inaccurate description (p.8 n.1), Ryder reported only *$8 million* of incremental depreciation expense as compared to the amounts Ryder recognized in the October 29, 2019 Q3 earnings release.  Ex. 22 (Q4 2019 Presentation) at 26 ("variance").  Analysts recognized that the depreciation figures remained "largely unchanged," but that nearly "everything else" in Ryder's business was worse than expected.  Ex. 23 (Wolfe) at 1;

Hutton App'x D at III; *infra* pp.19-20.  With those worse results, Ryder's stock price declined (by ~10%), with further declines on subsequent trading days.  Hartzmark App'x E.

### D.     This lawsuit

In May 2020, this lawsuit was filed.  Plaintiffs allege that each and every disclosure of Ryder's financial results during the proposed class period was false and misleading because Ryder allegedly had overstated its residual values throughout the entire period.  Plaintiffs do not specify how much additional depreciation should have been recognized at the start of, or at any point during, that period.  The complaint asserts two distinct theories of liability:  *first*, that Ryder knew that used vehicle prices would continue to decline as they did (Compl. ¶¶77-82); and *second*, that Ryder knew that a large portion of its vehicles were "lemons" due to defective Navistar engines, but failed to commensurately adjust those vehicles' residual values (*Id.* ¶¶66-76).

In their motion, plaintiffs ask the Court to certify a class of investors who purchased Ryder stock from July 23, 2015 through February 13, 2020.  For the reasons below, and in the expert report of Professor Amy Hutton submitted herewith, the Court should refuse to certify the proposed class, as plaintiffs have failed to demonstrate that damages can be reliably calculated on a classwide basis consistent with their theories of liability.  The Court should also refuse to certify lead plaintiffs as class representatives, as their atypical trading subjects them to unique defenses.

ARGUMENT

Class-action treatment is the "exception," not the "rule."  *Comcast*, 569 U.S. at 27, 33.  Plaintiffs must "affirmatively demonstrate" compliance with Rule 23, and courts must conduct a "rigorous analysis" before certifying a class.  *Id.*; *Vega* v. *T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009).  As the Supreme Court has explained, that will often "entail some overlap with the merits," *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 351 (2011), as the court may need "to probe behind the pleadings before coming to rest on the certification question."  *Comcast*, 569

U.S. at 33; *Valley Drug Co.* v. *Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 & n.15 (11th Cir. 2003).

**I.  PLAINTIFFS FAIL TO DEMONSTRATE THAT DAMAGES CAN BE CALCULATED ON A CLASSWIDE BASIS, AND AS SUCH DO NOT SATISFY RULE 23(B)(3)'S "PREDOMINANCE" REQUIREMENT.**

To satisfy Rule 23(b)(3)'s "predominance" requirement, plaintiffs bear the affirmative burden of demonstrating that "damages are capable of measurement on a classwide basis" consistent with their theories of liability.  *Comcast*, 569 U.S. at 33-34.

With that burden in view, plaintiffs claim that damages "are readily calculable based on the inflation in the price of Ryder's stock caused by Defendants' alleged misstatements and omissions, which can be calculated *based on the price reaction to the disclosures revealing* the alleged misstatements and omissions." Mot. 18-19.  Specifically, plaintiffs intend to use "an event study that measures the price impact" of the alleged corrective disclosures to calculate the "daily level of artificial inflation" during the proposed class period.  *Id.*; Hartzmark ¶91.

The Supreme Court recently considered this "indirect[]" approach to calculating damages. *Goldman*, 141 S. Ct. at 1961.  As the Court observed, securities plaintiffs often "point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation."  The trouble, the Court recognized, is that this approach hinges on an *inference* "that the back-end price drop equals front-end inflation."  *Id.*

Here, plaintiffs have failed to demonstrate that a damages model based on an alleged "back-end price drop" is a reliable way to measure classwide damages in this case.  Specifically, plaintiffs (a) provide a one-size-fits-all damages methodology lacking any case-specific details; (b) fail to address the "mismatch" between the alleged misrepresentations and corrective disclosures; and (c) fail to explain how their methodology will account for previously disclosed and confounding information—all of which undermine the inference that damages can be calculated based on a

back-end drop in Ryder's stock price consistent with their theories of liability.

> **A.       Plaintiffs fail to provide any information about how they would actually calculate classwide damages in this case.**

To satisfy their *Comcast* burden, plaintiffs rely on a report from their proposed expert, Dr. Hartzmark.[4]  Dr. Hartzmark's discussion of his damages methodology spans less than four pages. It includes *no case-specific information whatsoever*, other than mentioning Ryder's name. Hartzmark ¶¶85-98.  That's no surprise, because—by his own admission—Dr. Hartzmark simply copies and pastes the same damages section from report to report.  Ex. 24 at 28:5-13, 288:13-18; Ex. 25 (redline).  As Dr. Hartzmark also admitted, he didn't review Ryder's actual disclosures; didn't review the analyst reports cited in his report; and had only a cursory understanding of the plaintiffs' theories of liability.  Ex. 24 at 80:19-83:2, 91:13-96:19, 146:6-47:4.  Where, as here, plaintiffs present only a "vague, indefinite, and unspecific" damages model, they fail to demonstrate that damages can be reliably calculated on a classwide basis.  *Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018).

Further, where a plaintiff "simply asserts" that "unspecified 'tools'" may be used to calculate damages on a classwide basis, his or her damages model amounts to "no damages model at all."  *Id.*; *see also Randolph* v. *J.M. Smucker Co.*, 303 F.R.D. 679, 697 (S.D. Fla. 2014)  ("[T]o satisfy *Comcast*, a plaintiff must actually demonstrate, through evidentiary proof, that class-wide damages are capable of measurement, not simply assert that it is so.").

This is precisely what Dr. Hartzmark has done.  To calculate damages, Dr. Hartzmark claims that "inputs"—the "daily levels of artificial inflation in the prices for Ryder common stock"—"are calculated."  Hartzmark ¶87.  After they are calculated, these inputs "are applied on

---

[4]    Dr. Hartzmark is a professional plaintiffs' expert.  He hasn't taught since 1988, when he left academia for consulting.  In the last four years alone, he has submitted 26 reports for plaintiffs in securities cases, and none opposed to class certification.  Ex. 24 at 23:11-24:17, 50:6-11, 148:2-5.

a class-wide basis." *Id.* ¶88.  Relying doubly on the passive voice, Dr. Hartzmark does not explain *how* these inputs are calculated; *what* tools will be used to calculate them; or *why* they may be applied on a classwide basis, let alone consistent with the case-specific features of plaintiffs' liability theories.  Hutton ¶112.  When asked at deposition about these omissions, Dr. Hartzmark claimed that "*whatever*" tools are used to calculate these inputs, he was confident they will "be used to determine a reliable, reasonable inflation ribbon" in this case.  Ex. 24 at 238:15-239:4.

Because Dr. Hartzmark has done little more than "simply assert" that his damages methodology is capable of doing so, plaintiffs fail to demonstrate that damages can be calculated on a classwide basis consistent with their theories of liability in this case.  *Randolph*, 303 F.R.D. at 698; *Ohio Pub. Emps.*, 2018 WL 3861840, at *19.

### B.       Plaintiffs fail to address the mismatch between the alleged misrepresentations and corrective disclosures.

Plaintiffs' superficial approach to satisfying Rule 23(b)(3)'s predominance requirement also runs afoul of the Supreme Court's recent caution in *Goldman*, that the inference at the center of plaintiffs' damages methodology—"that the back-end price drop equals front-end inflation—starts to break down where there is a mismatch between the contents of the misrepresentation and the corrective disclosure."  141 S. Ct. at 1961.

The alleged misstatements here are over 300 specific financial metrics (and countless qualitative remarks) reported in 18 different financial statements spanning almost five years. Compl. ¶¶148-267.[5]  The alleged corrective disclosures, by contrast, are adjustments to residual values made at the very end of the proposed class period—which are, by their very nature, an

---

[5]    Of the 31 days when Ryder made alleged misrepresentations, on 26 of those days there was *no* statistically significant increase in Ryder's stock price.  In fact, on ~70% of the days where there was a statistically significant price reaction, Ryder's stock price *decreased*.  Ex. 17.  Plaintiffs therefore will need to rely even more heavily on the "back-end price drop" considered in *Goldman* to calculate any purported "front-end inflation."  141 S. Ct. at 1961.

"estimate" of the price at which Ryder expects to sell the vehicle in the "future."  Compl. ¶48.

Even assuming that the alleged corrective disclosures are in fact "corrective," plaintiffs offer no explanation for how the changes to Ryder's residual values on any of the alleged corrective disclosure dates relate to any one of the 300 plus alleged misrepresentations—let alone how inflation could be reliably calculated based on residual value changes that are, by definition and design, estimates of what Ryder's vehicles will sell for even further in the future.

The rudimentary damages methodology presented by plaintiffs ignores the reality of this "mismatch," *Goldman*, 141 S. Ct. at 1961, even though it's predicated on "going backwards" from the corrective disclosure to establish inflation at the time of alleged misrepresentations.  Mot. 18-19; Ex. 24 at 181:2-15.  As Professor Hutton explains, Dr. Hartzmark fails to show how "the company-specific price movement on the alleged corrective disclosure date[s] measured by an event study can establish inflation" at *any* point during the proposed class period.  Hutton ¶78.  While plaintiffs are not required at the class certification stage to show that back-end losses were caused by any particular misstatement, *Halliburton I*, 563 U.S. 804, 810-12 (2011), they *are* required to show that classwide damages are capable of being measured consistent with the distinctive features of plaintiffs' theories of liability, *Comcast*, 569 U.S. at 34-35.  Plaintiffs have failed to make that showing here, requiring denial of plaintiffs' motion.[6]

### C.  Plaintiffs fail to explain how their damages methodology will account for information unrelated to the alleged fraud.

"To succeed in a fraud-on-the-market case, it is not enough to point to a decline in the security's price…The plaintiff must also offer evidence sufficient to allow the jury to separate

---

[6]  Plaintiffs rely, for example, on the decision in *Thorpe* v. *Walter Inv. Mgmt., Corp.*, 2016 WL 4006661 (S.D. Fla. Mar. 16, 2016), as support for "using an event study that measures the price impact" of an alleged coercive disclosure to calculate classwide damages.  Mot. 18.  But the court there did not consider the impact of the "mismatch" present here—and later addressed by the Supreme Court in *Goldman*—on plaintiffs' burden to establish Rule 23 compliance.

portions of the price decline attributable to causes unrelated to the fraud." *Hubbard* v. *BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 726 (11th Cir. 2012).  At the class certification stage, to show damages are capable of measurement on a classwide basis consistent with their theories of liability, plaintiffs must demonstrate that their damages model "measure[s] *only those damages* attributable to th[ose] theor[ies]." *Comcast*, 569 U.S. at 34-35.  Here, plaintiffs fail to explain how their damages model will account for information unrelated to the alleged fraud.  Specifically:

- *Publicly available information*.  Throughout the proposed class period, public information was available about both the decline in UVS and Ryder's methodology for estimating residual values.  Hutton Exs. 1-3.  If plaintiffs are correct that Ryder's stock traded "in an efficient market," all of that information "would have already been reflected in Ryder's stock price" at the time of any alleged misstatement.  Hutton ¶40.

- *Other bad news*.  On the alleged corrective disclosure dates, Ryder also disclosed unrelated news that market indicators suggest had a price impact, including higher overhead, increased debt, and unanticipated costs from strategic investments.  Hutton ¶¶72-74.

- *New information*.  If the information disclosed is itself new, any stock price reaction attributable to that new information is also unrelated to the alleged fraud.  As an example, on July 30, 2019, Ryder lowered its outlook for the second half of the year because "trends [in the UVS market] *deteriorated meaningfully since the end of April*," something that Ryder could not have disclosed earlier and which was "consistent with commentary from other covered public carriers during 2Q19 reporting."  Ex. 14 (Baird Q2 2019) at 1.

As Professor Hutton explains, the type of event study proposed by Dr. Hartzmark cannot disentangle the impact of any of this previously disclosed or confounding information.  ¶80.  And while Dr. Hartzmark suggests that "there are *many* techniques that could be used to estimate the portion of the price reaction due to the revelation of the truth and how that price response might change over time," he performed *no* analysis as to whether any of those techniques could even be used in this case, and testified he was just giving examples of techniques he's "utilized in the past."  Hartzmark ¶97; Ex. 24 (Hartzmark Tr.) 211:11-12.  Because Dr. Hartzmark does nothing more than "describe[] generally some techniques that he asserts can be used," and has made no effort "to tie these [techniques] to the facts of this case," *Loritz* v. *Exide Techs.*, 2015 WL 6790247, at

\*22 (C.D. Cal. July 21, 2015), plaintiffs have not demonstrated their ability to "measure only those damages attributable" to plaintiffs' theories of liability. *Comcast*, 569 U.S. at 34-35.

> **D.      Plaintiffs fail to explain how their damages methodology will account for the materialization of allegedly understated risks.**

Plaintiffs allege that Ryder did not sufficiently disclose the "*risk* posed by further residual value deterioration," and that "artificial inflation in Ryder's stock price was removed when the facts and *risks* misstated…were revealed." Compl. ¶¶268, 299. Where, as here, plaintiffs argue that defendants understated risks that later materialized (a "materialization of the risk" theory), they may be unable to demonstrate that damages can be calculated on a classwide basis consistent with this theory of liability. *Ludlow* v. *BP, P.L.C.*, 800 F.3d 674, 689-90 (5th Cir. 2015). The reason is "[t]hat theory hinges on a determination that each plaintiff would not have bought [defendant's] stock at all were it not for the alleged misrepresentation—a determination… requiring individualized inquiry." *Id.*

In addition to requiring individualized determinations, a materialization of the risk theory is at odds with plaintiffs' proposed damages model, which is based on stock price declines following the alleged corrective disclosures. The reason, Professor Hutton explains, is that those stock price declines will reflect not only the alleged understated risk, but also the risk's *materialization*, and thus "may overstate the amount of inflation attributable to the alleged misrepresentations." Hutton ¶103. Plaintiffs thus fail to demonstrate that a damages model based on those stock price declines is a reliable way to calculate classwide damages in this case.

> **E.      Plaintiffs fail to explain how their methodology will disentangle damages attributable to plaintiffs' distinct theories of liability.**

As noted above, plaintiffs present at least two theories of liability. *Supra* p.7. If one is discredited, plaintiffs' damages model must be capable of "measur[ing] only those damages attributable" to plaintiffs' remaining theory; otherwise, it cannot "establish that damages are

susceptible of [classwide] measurement" for Rule 23(b)(3) purposes.  *Comcast*, 569 U.S. at 35.

Take, for example, plaintiffs' theory that defendants supposedly failed to disclose that a large portion of its fleet were defective "lemons."  Compl. ¶¶66-76.  That theory will be a nonstarter, as defendants will show that these Navistar vehicles were depreciated separately starting at the beginning of the proposed class period and were in any event only a *de minimus* portion of Ryder's fleet as of the alleged corrective disclosures.  Ex. 26 (Oct. 2015 Audit Committee) at 59, 69, 88-89 (adopting "distinct depreciation policy"); Ex. 5 (2015 10-K) at 50.[7]

If either theory is found inactionable, plaintiffs' damages methodology would need to eliminate the impact of any stock price declines attributable to those alleged misstatements— otherwise, it would compensate plaintiffs for "damages that are not the result of the wrong." *Comcast*, 569 U.S. at 37; Hutton ¶¶93-97.  Here, plaintiffs have identified no methodology for doing so, and have thus not satisfied their Rule 23 burden to demonstrate that classwide damages can be calculated consistent with their two distinct theories of liability.

**II.    CLASS CERTIFICATION SHOULD ALSO BE DENIED BECAUSE PLAINTIFFS FAIL TO SATISFY RULE 23(A).**

Rule 23(a) requires plaintiffs to demonstrate that "the claims or defenses of the representative parties are typical" of the class and that "the representative parties will fairly and adequately protect the interests of the class."  *Piazza* v. *Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001).  Plaintiffs fail to satisfy both of these requirements.

***Plaintiffs' non-reliance***.    Rule 23(a)'s typicality and adequacy requirements are not satisfied where a class representative's claim is subject to one or more unique defenses that

---

[7]    Plaintiffs alleged (on the strength of a confidential witness allegation) that these Navistar vehicles comprised ~40% of Ryder's fleet.  Compl. ¶105.  This is false.  These vehicles made up only ███ of Ryder's active fleet at the start of the class period (when it depreciated them separately), and only ███ by the time of the alleged corrective disclosures.  Ex. 27.

threaten to become a focus of the litigation.  *In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447, 459 (N.D. Ala. 2003); *Boca Raton Cmty. Hosp., Inc.* v. *Tenet Healthcare Corp.*, 238 F.R.D. 679, 694 (S.D. Fla. 2006) ("Even an arguable defense can vitiate certification…").  Plaintiffs here seek to represent a class of purchasers of Ryder common stock that suffered losses in reliance on claimed misrepresentations.  But all three dramatically *increased* their Ryder holdings "*after* a potential corrective disclosure"—"atypical trading" that "expose[s] the class to [the] unique defense[]" that none of the plaintiffs actually relied on the claimed misrepresentations.  *City Pension Fund for Firefighters & Police Officers in the City of Miami Beach* v. *Aracruz Cellulose S.A.*, 2009 WL 10664427, at *5 (S.D. Fla. Aug. 7, 2009).

Indeed, *almost half* of Alaska's purchases and *nearly 40%* of Plantation's occurred after the first alleged corrective disclosure.  And following the second alleged corrective disclosure, Alaska made almost one-quarter of its total purchases and Plantation more than one-third.  Even Fort Lauderdale, which (among plaintiffs) had the smallest proportion of post-disclosure purchases, made its sixth-largest purchase on the day of the second alleged corrective disclosure.  Ex. 28 (Loss Charts) at 2-4, 7-8.  Worse still, all three ███████████████████████████████████ ████████████████████████████████—"despite having received notice of, and having investigated, the alleged fraud."  Ex. 29 (Alaska) at 5, 7-8, 12; Exs. 44-45 (Fort Lauderdale) at 1; Exs. 46-47 (Plantation) at 1; *Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179-80 (2d Cir. 1990).  As courts have found, these purchases are "subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision."  *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013); *Aracruz*, 2009 WL 10664427, at *5; *Gary Plastic*, 903 F.2d at 179-80.

And in plaintiffs' case, there's corroborating evidence that the claimed misrepresentations were not a factor in their purchasing decisions.[8] Alaska sold nearly *all* of its Ryder shares just months into the proposed class period, after Ryder lowered guidance due to softening it was seeing in the UVS market. Ex. 32 (Alaska Tr.) 175:6-22; Ex. 33 at 1. This massive selloff began shortly after this ████████████████████████████████████████████████████████ ████████████████, an Alaska investment manager that ████████████████████████ ██████████ *Id.*; Ex. 32 (Alaska Tr.) 175:23-76:2.

And even though ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████ *Id.* 247:19-25. To the contrary, ████████████████████████, the day of the second alleged corrective disclosure, one of those managers ███████████████ ██████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* 236:1-22, 238:5-16, 243:6-44:2.

Likewise, ████████████████ DePrince, Race & Zollo (DRZ), an investment manager it shares with Fort Lauderdale, ████████████, DRZ responded by *buying more* Ryder stock. Ex. 30 at 206:13-07:13; 251:11-52:1; Exs. 44-47 at 1. Internal documents explain why. DRZ consistently ████████████████████████████████████████████████, and ████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ Ex. 35 at 1; Ex. 31 at 1. And Copeland Capital, who managed the vast majority of Fort Lauderdale's portfolio, ██████████████████████████████████████████████████████████████████████████████

---

[8] All three plaintiffs delegated investment decisions to investment managers, Ex. 34 at 5-6, and in such a case, courts will impute an investment manager's reliance (or lack thereof) to the plaintiff. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 183 F. Supp. 3d 458, 466 (S.D.N.Y. 2016).

███████████████████ Exs. 36-37.

At this stage, it is enough that defendants intend to aggressively pursue this line of inquiry, as it will require each named plaintiff to expend considerable time on a "unique defense"— "precisely the situation the case law does not condone." *George*, 2013 WL 3357170, at *6; *Boca Raton*, 238 F.R.D. at 694.

***Alaska's atypical trading***.   Rule 23(a)'s requirements are also undermined by potential conflicts between a class representative and absent class members. *In re HealthSouth*, 213 F.R.D. at 458.  Here, Alaska's atypical trading creates a clear conflict in three additional respects:

*First*, discovery has revealed that ████████████████████████████ ██████████████████████████████████, none of which were likely considered in the calculation of the losses Alaska represented to this Court. *See* Ex. 29; Ex. 32 (Alaska Tr.) 286:7-92:20, 294:14-99:11; *infra* pp.18-19.  Investors who sell short are "atypical of the class as profit accrues when the price of the security decreases." *Marcus* v. *J.C. Penney Co.*, 2014 WL 11394911, at *7 (E.D. Tex. Feb. 28, 2014).  To conclude otherwise would require impermissibly adopting the "counter intuitive assum[ption that] the typical member of the proposed class would purchase shares of [the company's] stock with the hopes the stock would decrease." *Id.* at *7 n.48.

Moreover, as discovery remains ongoing, it is unclear whether—████████████████ ██████████████—Alaska would have actually *profited* from the alleged fraud.  In that case, Alaska plainly would be disqualified. *See, e.g.*, *In re Grupo Televisa Sec. Litig.*, 2020 WL 3050550, at *7 (S.D.N.Y. June 8, 2020); *Valley*, 350 F.3d at 1190.

*Second*, the timing of Alaska's (even disclosed) transactions creates another conflict.  As noted, Alaska sold nearly all of its stock at the beginning of the class period, and made most of its purchases towards the end, including after the alleged corrective disclosures. *Supra* pp.15-16.

-17-

Alaska therefore maximizes its recovery by "minimizing" inflation early, and "maximizing…inflation at the time of [its] purchases"—*i.e.*, at the tail end of a nearly five-year class period. *Ravens* v. *Iftikar*, 174 F.R.D. 651, 672 (N.D. Cal. 1997). Alaska and other class members "do not have a uniform stake in shaping the evidence," particularly where, as here, the class period is "continuous and prolonged" and "different frauds are alleged to be operating on the market when [the] respective plaintiffs entered the market." *Id.*; *Valley*, 350 F.3d at 1190.

*Finally*, Alaska's representations to date create "serious concerns with credibility." *In re Safeguard Scis.*, 216 F.R.D. 577, 582 (E.D. Pa. 2003). Alaska's "sworn statement in a Certification Pursuant to the Federal Securities Laws omits a significant number of trades," which leads one to "believe that the misstatement was more than mere clerical mishap." *Id.* at 581 n.4. Alaska disclosed that it engaged in less than a hundred transactions, all ordinary purchases and sales of Ryder common stock. Ex. 38 (PSLRA Certification) at 3-5. Then, in response to defendants' discovery requests,[9] and after initially refusing to respond at all, Alaska finally represented through counsel that its only other transaction in a Ryder security was ████████████████ ███████████████████████████████████████████. And then, at deposition, ████████████████████████████████████████████████████████ ████████████████████████████████. Ex. 32 at 281:15-282:23.

None of that appears true. One of Alaska's investment managers produced trading records revealing ████████████████████████████████████████████████ ██. Ex. 29. Those records (by just one of Alaska's more than 30 investment managers)████ ████████████████████████████████████████████████████

---

[9]   Defendants' document requests and interrogatories asked explicitly about plaintiffs' investments in all Ryder securities, including short sales and any indirect transactions through funds in which plaintiffs had invested. Ex. 39 (RFPs) at 11-15; Ex. 40 (ROGs) at 10, 12; Ex. 41.

████████████████████.  *Id.*; Ex. 32 at 286:7-92:20, 294:14-99:11.  As defendants will also be aggressively pursuing this line of inquiry, Alaska is left "vulnerable to further attacks that would impose an unnecessary disadvantage on the class."  *In re Safeguard Scis.*, 216 F.R.D. at 582.

**III.   THE CLASS PERIOD SHOULD END NO LATER THAN OCTOBER 29, 2019.**

A proposed class period should end no later than "when curative information is publicly announced or otherwise effectively disseminated."  *Keippel* v. *Health Ins. Innovations, Inc.*, 2020 WL 5094840, at *2 (M.D. Fla. Aug. 28, 2020).  Specifically, at the class certification stage, a court must ascertain at what point in time "the facts which underlie the gravamen of the plaintiff's complaint [no longer] represent a reasonable basis on which an individual purchaser or the market would rely."  *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 143 (D.N.J. 1984).

In this case, that date is no later than October 29, 2019, when Ryder announced the additional depreciation it was recognizing on vehicles to be sold through 2025, including as a result of the adjustment Ryder made to its rolling five-year average.  *Supra* p.6.  Contrary to plaintiffs' claims (Compl. ¶20), the February 13, 2020 disclosure revealed virtually *no* new information with respect to Ryder's residual values—except for a minor *$8 million* variance in the depreciation estimates disclosed in the prior quarter.  *See* Ex. 22 (Q4 2019 Presentation) at 26; *supra* pp.6-7.

Commenting on the February 13, 2020 disclosure, analysts recognized that Ryder's "residual value assumptions / depreciation expense guidance is ***largely unchanged for 2020***."  Ex. 42 (SunTrust Q4 2019) at 1.  Another analyst explained, "R[yder] expects a $1.65 tailwind in [2020] from lower [year-over-year] deprecation and moderating losses on sales, just ***slightly worse than our expectations***.  However, ***pretty much everything else in R[yder]'s guidance was worse than we expected*** including lower Commercial Rental and Dedicated earnings, a higher tax rate, and continued strategic investments."  Ex. 23 (Wolfe Q4 2019) at 1.

Because information regarding Ryder's residual value changes was "effectively

disseminated" no later than October 29, 2019, should a class period be certified, it should end no later than that date. *In re Data Access Sys.*, 103 F.R.D. at 143.

## CONCLUSION

The Court should deny plaintiffs' motion and refuse to certify the proposed class. Alternatively, if the Court certifies a class, the class period should end by October 29, 2019.

December 16, 2022                           Respectfully submitted,

**GUNSTER, YOAKLEY & STEWART, P.A.**

By: */s/* Jonathan Osborne
Jonathan K. Osborne
Florida Bar No. 95693
David M. Wells
Florida Bar No. 309291
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301

Telephone:  (954) 462-2000
Facsimile:  (954) 523-1722
Email: josborne@gunster.com
Email: dwells@gunster.com

**WACHTELL, LIPTON, ROSEN & KATZ**
William D. Savitt, *pro hac vice*
Steven P. Winter, *pro hac vice*
Wilfred T. Beaye, Jr., *pro hac vice*
51 West 52nd Street
New York, New York 10019

Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
Email:  wdsavitt@wlrk.com
Email:  swinter@wlrk.com
Email:  wtbeaye@wlrk.com

*Attorneys for Defendants*