# EXHIBIT 24

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
-----------------------------------
STATE OF ALASKA, ALASKA PERMANENT
FUND, THE CITY OF FORT LAUDERDALE
GENERAL EMPLOYEES' RETIREMENT
SYSTEM, and THE CITY OF PLANTATION
POLICE OFFICERS PENSION FUND,
on Behalf of Itself and All
Others Similarly Situated,
          Plaintiffs,
          v.
RYDER SYSTEM, INC.; ROBERT E.
SANCHEZ; ART A. GARCIA; and DENNIS
C. COOKE,
          Defendants.

Civil Action No. 1:20-cv-22109-AMC
-----------------------------------

REMOTE VIDEO DEPOSITION OF
Michael L. Hartzmark, Ph.D.
November 30, 2022
Lead: Steven P. Winter, Esquire
Firm: Wachtell Lipton Rosen & Katz

FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

Page 2

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFFS AND THE CLASS

Adam H. Wierzbowski, Esquire
John J. Esmay, Esquire
John Rizio-Hamilton, Esquire
Mathews R. de Carvalho, Esquire
BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 554-1400

ATTORNEYS FOR DEFENDANTS

Steven P. Winter, Esquire
Wilfred T. Beaye, Junior, Esquire
Alison B. Brockman, Esquire
WACHTELL LIPTON ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000

Page 3

A P P E A R A N C E S   C O N T I N U E D

JANE ROSE REPORTING
74 Fifth Avenue
New York, New York 10011
1-800-825-3341
Joan V. Cain, Court Reporter
Marvin Oltman, Legal Videographer

Page 4

TABLE OF CONTENTS

Witness:
Michael L. Hartzmark, Ph.D.

Examination
By Mr. Winter.............................Page 6

Reporter Certificate.......................Page 290

Notice to Read and Sign....................Page 292

Index of Exhibits.........................Page 294

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 5

P R O C E E D I N G S

- - -

9:36 a.m. EST

November 30, 2022

THE VIDEOGRAPHER:  Here begins Media No. 1, Volume 1, in the deposition of Dr. Michael L. Hartzmark in the matter of State of Alaska, et al. versus Ryder System, et al.

Today's date is November 30th, 2022.  The time is now 9:37 a.m. Eastern Time.  My name is Marvin Oltman, the legal video specialist.  The court reporter is Joan Cain.  We are both from Jane Rose Reporting, New York, New York.

Counsel has been identified off the record.

Will the court reporter please swear in the witness.

THE COURT REPORTER:  Good morning.  My name is Joan Cain.  I am a court reporter and a Notary Public in the Commonwealth of Virginia.

Before we proceed, I will ask counsel for today's deposition to stipulate on the record that I may swear in the deponent, even though I am not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

Page 6

Let's start with the noticing attorney, please.

MR. WINTER:  No objection.

MR. WIERZBOWSKI:  No objection from plaintiffs either.

Whereupon,

MICHAEL L. HARTZMARK, PH.D., having been duly sworn under penalties of perjury by the Notary Public, was examined and did testify as follows:

THE COURT REPORTER:  Thank you.

Please begin.

EXAMINATION BY COUNSEL FOR DEFENDANTS
BY MR. WINTER:

Q   Good morning, Dr. Hartzmark.  My name is Steven Winter.  I'm counsel for Ryder and the other defendants in this action.

Because we're doing this remotely, just a couple of ground rules to start with, which I'm sure you're familiar with.  So while we're on the record, you can't look at any other electronic devices other than the computer you're using for the Zoom deposition.

I see you had your cell phone with you just a moment ago.  Is it turned off for --

Page 7

A   Yes, the cell phone is turned off.  I use it only for -- as a clock.  I don't wear -- I don't wear a watch anymore (indicating.)

Q   Got it.  And while we're on the record, there shouldn't be any other programs on your computer screen other than the Zoom program and any of the documents that we introduced during the deposition today.

Do you understand that?

A   Yes, I am -- I do have -- I'm going to take this off.  I have my settings program because I had to change my display.

Q   That's okay.  Just -- we want to avoid, you know, any other kind of, you know, programs running or any kind of document --

A   Yeah, just, again, to be clear, I do have -- Adobe is open because when I clicked on Tab 1, it opened in my Adobe.  But, otherwise, the only programs open are Zoom and Adobe.

Q   Okay.  So no email?

A   No email.

Q   Okay.  Do you have any other documents with you today?

A   The only document I have with me today is -- is the expert report (indicating) of Michael

Page 8

Hartzmark.  It's Exhibit D to -- I believe to -- it would have been to plaintiffs' motion to -- in support of class certification, I believe.

It's a document of -- in terms of the header, of 387 pages.

Q   Thank you for that.

And I think the last one is that while we're on the record, you just can't communicate with anyone except in a manner that's visible to everyone and reflected on the stenographic record.

Do you understand that as well?

A   Yes.

Q   Okay.  And I think you said you're testifying from home today; is that right?

A   Yes.

Q   Okay.  And no one else in the room with you right now?

A   No.

Q   Okay.  If you need to take a break at all today, just let me know.  Except if the question is pending, I'm going to ask that you complete your answer before we take the break, but, otherwise, just let me know when -- when you need a break.

What did you do to prepare for today's deposition?

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 9

A   For today's deposition, I reviewed my expert report. I briefly reviewed the complaint in this -- this matter, this Ryder matter. I briefly reviewed the Motion to Dismiss document, the decision that Judge Cannon made, and I had a Zoom discussion with counsel.

Q   Did you speak with counsel on one day in preparation, or was it more than one day?

A   I spoke with counsel on -- on two days.

Q   And, roughly, about how long was each -- each day?

A   One day would have been approximately, I'll say, three hours, and one day, one hour, approximately.

Q   And did you speak with anyone other than counsel as part of those preparation sessions?

A   I did not speak with any -- my recollection is I didn't speak with anyone else regarding this deposition.

Q   Did anyone else help you prepare for the deposition?

MR. WIERZBOWSKI: Objection. Form.

THE WITNESS: I'm not sure. Help me prepare for the deposition?

BY MR. WINTER:

Page 10

Q   Well, it sounded like you were saying that you didn't recall speaking to someone, but I just interpreted that there might have been someone else that was involved in your preparation. That may be incorrect, but that was the purpose of the question.

A   Oh. The -- I would have corresponded with -- nonverbally, with staff with a few questions.

Q   Okay. We'll get to that in a bit.

And this is staff that was working for you?

A   This is staff that works, yeah, under my direction.

Q   And I think you mentioned your report, the complaint, and then the court's Motion to Dismiss decision.

Did you review any other documents, other than those three documents?

A   Not that I recall.

Q   Okay. So I think you have in front of you the -- the full expert report, so we don't need to mark that again.

- - -

(Hartzmark Exhibit 1 was marked for identification.)

- - -

Page 11

BY MR. WINTER:

Q   And this is the report, I think you said, that was submitted to the court as an exhibit in support of the Plaintiffs' Motion for Class Certification; is that right?

A   That's a -- I speculated that that would be, though, what is in front of me on the screen as Tab 1 is my expert report.

Q   Okay.

A   I just -- I noticed that it says exhibit in the copy that I have, and you can see on the screen it says 2 of 387. The Tab 1 is, I believe, missing the first page (indicating.)

Q   You're right about that. Let me -- let me help you. We took that off just because we don't want it to be too confusing when it said Exhibit 1 once it gets stamped and had the exhibit D on it, but it's the same document --

A   Right.

Q   -- just without the Exhibit D.

A   Yeah. And so I guess as I understand the header, it's document 90-5, if I'm reading that correctly, that was submitted on September 23rd, 2022.

Q   Okay. And when you wrote the report,

Page 12

though, you understood that the plaintiffs were going to be submitting it to the court in support of their Motion for Class Certification, correct?

MR. WIERZBOWSKI: Objection to form.

BY MR. WINTER:

Q   You can answer.

A   I -- I wrote my report based on an engagement to evaluate whether the market for the stock was traded in an efficient market and whether there's a common damages methodology. As to whether it was going to be an attachment or not, I -- you know, I think that is commonly the case, but that was not -- at least in my recollection, that was never suggested to me. They said they were going to submit the report. So --

Q   So when you were writing the report, you didn't know that the plaintiffs would be submitting it to the court?

MR. WIERZBOWSKI: Objection to form. Mischar- -- misstates testimony.

THE WITNESS: No, that's not what I said. I said that it was my understanding that it would be filed by the court. Whether it's filed individually or as part of another document, I -- that -- that's a legal component.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 13

BY MR. WINTER:
Q   I see.
So leaving aside the form in which it went to the court, you understood when you wrote your report that it would be submitted to the court in support of the Plaintiffs' Motion for Class Certification?
MR. WIERZBOWSKI: Objection. Asked and answered.
THE WITNESS: Yeah, I'll -- I guess I'll say it -- it's likely I've done this before with these types of expert reports, and they have generally been submitted to the -- to the court, but I can't say that in every case and every expert report associated -- well, in any situation that -- that it was definitely submitted to the -- to the court. There have been extenuating circumstances that have resulted.
But needless to say, I -- it was my feeling -- it was my understanding that it would likely be submitted to the court.
BY MR. WINTER:
Q   Okay. And does the report that's in front of you contain the complete and accurate statement of the opinion -- opinions you intend to offer in

Page 14

support of class certification?
A   The report itself, as -- as is, is an economics report, and it represents the opinions that I have related to whether the common stock of Ryder System traded in an open and well-developed and efficient market and whether there's a common damages methodology that can be applied classwide.
Q   Okay. And those are the only two opinions that you've formed presently in this action, correct?
MR. WIERZBOWSKI: Objection to form.
THE WITNESS: As I sit here today, the -- the four corners of the report speak for itself. As I state in -- in -- in my summary of opinions, Section III, I present two different -- two opinions and -- in paragraph 10, and those are the opinions I will express today.
BY MR. WINTER:
Q   I think you may have answered this, but let me just be sure. The report contains all the reasons for your opinions?
A   The report contains the support backup and that I rely on to make Opinion 1 and Opinion 2.
Q   Are there any facts or analyses that you relied on in forming your opinions that are not

Page 15

included in your report?
MR. WIERZBOWSKI: Objection to form.
THE WITNESS: That are not included in my report?
BY MR. WINTER:
Q   Sure.
A   No. No. I mean, everything I relied on in terms of documents and such is -- is specified in what is called Appendix B. Let me just make sure we're all on the same page.
That's on header -- starts on page 81 in terms of the header, Appendix B, which are the materials that I relied upon for this particular report.
Q   And since the date you submitted the report, have you updated any of the analyses that are included in the report?
MR. WIERZBOWSKI: Objection to form.
THE WITNESS: I've not updated any of the analyses that are presented in this report.
BY MR. WINTER:
Q   Any statements that you believe are inaccurate?
A   Any statements --
MR. WIERZBOWSKI: Object to form.

Page 16

THE WITNESS: -- that I believe are inaccurate? No.
BY MR. WINTER:
Q   Have you identified any errors in the report since it was submitted?
MR. WIERZBOWSKI: Objection to form.
THE WITNESS: Yes.
BY MR. WINTER:
Q   What are those errors?
MR. WIERZBOWSKI: Objection to form.
THE WITNESS: Well, there's one error. It begins on page 84 of 387, and you'll see in the header of -- starting on page 84 and ending on page 306 that there is a header that says "Draft," with three asterisks in front of it and three asterisks after it. That should have been removed from this report.
BY MR. WINTER:
Q   Okay. Other than the draft label, any other errors that you identified since it was submitted?
A   There are none that I recall and that I have today, no.
Q   Do you presently intend to amend or supplement your report in any way?

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 17

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I would only do so if counsel requested I amend or supplement my report, and counsel has not asked that I amend or supplement my report.

BY MR. WINTER:

Q   All right.  So let's -- and it would be easier for me to refer to the page number at the top of the header or to go by, you know, Appendix A and B as we kind of go through this today.

A   Is that --

Q   I don't think it's a question, but I wanted to make this, you know, a little bit easier.  I know there's numbers -- there's page numbers at the bottom.  There's page numbers at the top.  There's appendices, there's exhibits.  I just wanted to get on the same page as to how we're going to navigate this today.

A   Yeah, I'm often redundant in some sense, as I did with Appendix B, where I said Appendix B, and whatever -- I forget what the page was, Appendix B, header 81.  I have no preference --

Q   Okay.

A   -- you know, if we can both sort of be clear, you know, I think we can be redundant

Page 18

actually in so many different ways with this.  Appendix B, page 81, page B-1, but, yeah, whatever you're comfortable with, however you prepared is fine with me.

Q   Okay.  Great.

So if we could turn to your Appendix A, which I think is page 76 at the top?

A   Yes.  Page 75 is the -- in the caption, which indicates it's Appendix A, and then it begins on 76 at the top header, header 76, yeah.

Q   And this is the CV that was attached to your report, correct?

A   Yes.

Q   All right.  And does it accurately -- accurately reflect your employment history since, I guess, 1981?

A   My employment history?

Q   Or your professional experience.  Let's start there.

A   Well, I would say my professional experience goes before 1981 and that I -- as an economist at the University of Chicago, there's -- there is -- there is a foundation of my expertise that began 1978, when I began that program, and you can go back to 1974 when I began my economics career

Page 19

at University of Michigan, and if you wanted to, I was inspired by my junior -- junior high -- my teacher in junior high school, a former Green Beret, who convinced me at that point that I wanted to become an economist.  And that, in some sense, is the foundation of everything that follows.

Q   I think we're going to avoid going back that far.

But at least on your professional experience list, you start in 1981.  So let me just ask this: Is there any employment since 1981 that's not reflected on this list of -- on page 2 of Appendix A?

A   No, and it correctly reflects my employment and professional experience.

Q   And where do you work currently?

A   I currently am the president of Hartzmark Economics Litigation Practice, LLC.

Q   Okay.  I'm going to refer to that as Hartzmark Economics Litigation, if that's okay with you.

A   It's fine with me, although I always refer to it even easily -- more easily as HELP, H-E-L-P.

Q   What is Hartzmark Economics Litigation?

A   Hartzmark Economics Litigation is a company

Page 20

that specializes in the application of economics, financial and accounting principles and statistics, and applies those principals to securities, litigation, complex commercial litigation, litigation associated with investment, intellectual property, antitrust, and automotive issues, as well as certain regulatory issues, and I have done some business consulting.

Q   Okay.  And you said you're the president.  What do you do in that position?

A   I oversee the types of matters that we are talking about today, generally, as a testifying expert.

Q   Does Hartzmark Economics Litigation have any other employees?

A   No.

Q   And you mentioned that the firm provides services in support of I think you said litigation, regulatory matters.  Anything else?

A   I think I also mentioned that it has done some business consulting as well.

Q   If you can give me a rough estimate as to what portion of Hartzmark Economics Litigation's work is in support of litigation as compared to the other two buckets that you mentioned?

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 21

A   Over what period of time?

Q   Let's start with the last four years.

A   The last four years, 95 to 99 percent is associated with litigation.

Q   Okay.  And would that percentage change if we went back in time?

MR. WIERZBOWSKI:  Objection.  Vague.

THE WITNESS:  If you'd go back to its founding in 2013, I'd say it's still in 90s.  It's in the 90 percent, but it's -- you know, that would take it down, you know, between 90 and 95 percent litigation.

BY MR. WINTER:

Q   Got it.

And I think we -- I asked the question in terms of the amount of work.  If I ask the question in terms of the amount of earnings that come from matters in support of litigation, can you give me a rough sense of the percentage breakdown there?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Earnings?  You mean my personal earnings?

BY MR. WINTER:

Q   Well, the earnings of Hartzmark Economics Litigation.  We'll start there.

Page 22

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Over what period?

BY MR. WINTER:

Q   Last four years.

A   Last four years, the earnings associated with Hartzmark Economics Litigation Practice is probably in the same percentages that I gave you earlier in terms of the amount of time that I spend.

Q   So something on the order of 95-plus percentage?

A   Of the earnings of Hartzmark Economics Litigation, yes.

Q   And I think you mentioned some different types of litigation matters that Hartzmark Economics Litigation works on.

Securities litigation is one of those areas?

A   Securities litigation?

Q   Yes.

A   Generally, there's -- securities litigation is something that I am -- I've -- I've been engaged in, yes.

Q   Okay.  And I think you said that one of your principal responsibilities as president was to serve as an expert witness in connection with or in

Page 23

support of litigation matters; is that accurate?

A   Yes, I'm often engaged as an expert, which often turns into becoming a testifying expert.

Q   And about what portion of your expert witness experience has been in securities litigation matters as compared to other litigation matters?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Can you be more specific?

BY MR. WINTER:

Q   Sure.

Of all of the litigation matters that you've served as an expert witness in the last four years, what percentage were securities cases, approximately?

A   Can you be more specific as to what you mean by "securities"?

Q   Oh, sure.  Yeah.

Cases involving claims under the Securities Act or the Exchange Act.

A   Securities or exchange?  Okay.  I think the easiest way to look at that is -- is going to page 4 of my CV, which is header page 79, and I'm happy to walk you through which involved Exchange Act or Securities Act.  If we go through it, Finisar was the Exchange and Securities Act.

Page 24

TerraForm was more associated with plan of allocation, but it was involved in the Securities Act.

Illumina, Adeptus, and I'm leaving out the other ones.  HD Supply, Signet, U.S. Steel, Applied Optoelectronics, Navient, Volkswagen, Symantec, CenturyLink, Mallinckrodt, Tesla, Sasol, Amneal, Evoqua.  I don't remember -- CitiGroup probably, but I don't remember.  Myriad, Alta Mesa, McDermott, Venator, Facebook Meta.  I believe Activision was, Mohawk.  I think Bumble.  I don't -- I don't think Pattern was, and that would be -- that would be associated.

And so I don't know if that's -- is that half, maybe, in the last four years?

Q   It's like a little more than half, but we can count later.

So you mentioned that you had staff working under your direction.  Where are they employed?

A   Most of the staff is employed by a company called Forensic Economics.

Q   And what relationship, if any, does Hartzmark Economics Litigation have with Forensic Economics?

MR. WIERZBOWSKI:  Objection.  Vague.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 25

THE WITNESS: I don't think I have any -- I don't think -- now that you made me think about it, there's no written or defined relationship or no written contract between the two companies.

BY MR. WINTER:

Q   So how did it come about that persons employed by Forensic Economics are assisting you in this matter?

A   About a decade ago when I -- when I and everybody else pretty much left Navigant Economics and I went out on my own, I had -- I had a -- I actually had a couple groups that supported me, and I migrated to using personnel at Forensic Economics to support my practice.

Q   And, roughly, how many people at Forensic Economics have helped you with the report in this matter?

A   In this matter, I would say roughly five.

Q   And generally what type of work did they do to help support you in this matter?

A   Forensic Economics' personnel under my direction and supervision will pull down data, including the voluminous chronology that I refer to as Appendix C. The personnel will assist me in pulling down data in data analysis and in, for

Page 26

example, creation of the -- the tables that I have -- well, the construction of the tables that I had created, and they will also offer me suggestions, suggested edits to my report, which is, you know, sort of the common practice in both I think plaintiffs' and defense firms -- or economics consulting firms.

Q   And approximately how many hours did you spend working on your report in this case?

A   How many hours has been billed in total on this case?

Q   If that's easier to answer the question that way, that's fine.

A   Yeah, I -- I'll -- I mean, it's somewhat speculative because I don't know exactly, but I would say in the area of, you know, 150.

Q   And when you wrote your report in this case, did you start from scratch, or did you rely on other reports as precedents?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I'm not sure what you mean, "as precedents." Whose reports? What reports?

BY MR. WINTER:

Q   Your -- your prior reports.
Did you rely on any of your prior reports

Page 27

in other matters as a -- as a template for starting this report?

A   Yes, I would -- I would do that. The -- for example, the academic literature related to efficient markets hasn't changed, so I will utilize language associated with that, the Cammer factors and the Krogman factors and the discussions associated with them haven't changed so, yes.

Q   Was there a specific report, if you recall, that you started with when you were writing this report here?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: Well, I mean, the -- the report goes back many reports. I don't recall any specific report that I utilized in -- in drawing certain language in this report. It might have come from multiple reports.

But often, again, as I mentioned, issues associated with efficiency, Cammer, the basically universal and standard damages methodology are consistent across reports, and it would both get my -- the folks that engage me upset if I rewrote it from scratch with -- in terms of billing; and, two, potential -- you know, one could find inconsistencies associated with reports which --

Page 28

which don't exist.

So -- but I couldn't say specifically where I began.

BY MR. WINTER:

Q   But mechanically speaking, even if you don't remember which report, was it a process of taking certain sections and copying them and pasting them into the report here?

Is that how you proceeded?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I'll generally, you know, do that, depending on the nature of the specific -- the case. You know, again, for example, take my qualification section. It's generally the case that I would look at a report associated with 10(b) litigation that is most recent because it would have my most up-to-date qualifications to utilize that as the starting point for the -- the text that you see in this report.

BY MR. WINTER:

Q   And in addition to your qualifications, you do the same thing for sections of the report describing, for example, the Cammer factors if those had not changed since the last report you worked on?

MR. WIERZBOWSKI: Objection to form.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 29

THE WITNESS:  Yes.  To the extent that the Cammer factors, which come out of the late 1980s, Krogman soon thereafter, and then the various other ones that have come haven't changed or there's no new -- you know, nothing new that I want to incorporate, I would -- would look at, again, a specific report and probably utilize similar language as a starting point.

BY MR. WINTER:

Q   And as a starting point, you'd also do the same with sections dealing with the calculation of damages on a classwide basis, the second opinion in the report?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Well, clearly, as I state in -- in the report, if you turn to page -- page -- header page 45, paragraph 86:  "The calculation of class-wide damages for a violation of Section 10(b) of the Exchange Act can be done using a common and broadly accepted methodology that is routinely applied and has become a virtual standard in federal securities litigation like this matter."

Just -- you can see from that language that the fact that it is universal, consistent, a virtual standard and a routine, you know, I think you would

Page 30

question as to why it would change substantially from one report to another.

BY MR. WINTER:

Q   Okay.  We'll get to that opinion a little later today.  But just so I make sure I understand, what you just read, I guess, comes from Section VII of your report, correct?

A   Section VII of the report, paragraph 86.

Q   Okay.  And -- but Section VII of the report would be another place where you'd look at another report, use that as a starting point for the report here, correct?

A   Yes.

Q   And you said that it may or may not change for the report here?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Well, much like if I was to write a report on the equation of a slope of a line that you took in your basic algebra classes, and I had to do that in a prior report, it would be similar language, if not the same language.

BY MR. WINTER:

Q   Because the issues there are the same issues here?

MR. WIERZBOWSKI:  Objection to form.

Page 31

THE WITNESS:  I missed the --

BY MR. WINTER:

Q   I think you said the slope of -- the formula for the slope of a line, if you're writing that in one report, it wouldn't change in another report.  I think that's what you had said, right?

A   Well, yeah, to the extent that both reports related to how do you calculate the slope of a line, which is consistent with how do you calculate common damages in a class of security holders, you know, the language would be similar or the same, and I would start with that.

Q   Understood.

Because how you calculate the slope of a line doesn't change whether or not you're writing it in one report or another report, correct?

MR. WIERZBOWSKI:  Object to the form.

THE WITNESS:  Yeah, doesn't matter whether I'm using it to figure out the trajectory of a rocket to the moon or my grandson Max throwing a rock into the -- into the pool.

BY MR. WINTER:

Q   Okay.  And the same principle applies that the common and broadly accepted methodology for calculating classwide damages, you know, wouldn't

Page 32

change from one report to the other?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  It could, but as I state in here, it's a common and broadly accepted methodology that is routinely applied and becomes a -- and has become a virtual standard.

So to the extent that it's the same here as in some prior report or reports, plural, the language would be -- would be the same.  You know, again, not -- the slope of the line, the equation is the same whether I've been asked to write something associated with a rocket to the moon or my grandson throwing a rock and the trajectory of that.

The slope of the line, that formula, is a virtual standard, and so this -- the -- the nature of the common damages methodology is a virtual standard as well, and, you know, whether you're writing about this matter or the other 10(b) matters that might be listed in my Appendix B.

BY MR. WINTER:

Q   And your report, I guess, comprises, you know, what I refer to as the body of the report as well as a number of appendixes and exhibits; is that right?

A   Yes.  When I refer to my report, I refer to

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 33

the -- generally, to sort of the report text, and then there are a series of -- I want to give the specific number -- 13 exhibits, which are all -- all listed, and then there are a series of appendices, A through H.

Q   And did you personally review and approve everything that's stated in the body of -- of your report?

A   Yes.

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Yeah, I -- I -- I personally approved everything.  I don't necessarily -- for example, I did not go through all 306 pages of headlines, but I did go through and I look at -- I go through every page, and -- and in terms of the nature and the layout and the format of the table, that is -- was created by -- by me.

BY MR. WINTER:

Q   So -- I was actually going to go there next.  So can you actually just describe for me what you do in reviewing and approving -- we'll start with the -- the text of the report.

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I don't understand the question.

Page 34

BY MR. WINTER:

Q   Yeah.  It sounded -- you sounded like you said there were certain parts of the report that you wouldn't have read every line of, but you would have looked at for purposes of format or things like that, and I wanted to follow up on that, that testimony.

So I was going to break this up into buckets:  talk about the body of the report, the appendices, and then the exhibits.

A   Okay.

Q   So let's just start it again.

Did you personally review everything that's in the body of the report, the text of the report?

A   Yes.

Q   Okay.  Did you personally review everything that's in the exhibits to the report?

A   Well, I reviewed every page of the exhibits.  I reviewed the numbers, but, you know, some of the more sizable exhibits, I did not -- I have a group that audits it.  I didn't audit it. But I would have gone through each page and more or less reviewed it, but, you know, for example, I didn't go through to look at -- I don't know -- spelling of each of the institutions listed in

Page 35

Exhibit 3.  That type of thing.

Nor did I audit or, you know, even memorize, but I did look at, you know, basically, especially summary numbers in Exhibit 4.  You know, I would have looked at text and footnotes and exhibit titles associated with various graphs, such as Exhibit 5 and 6.

So, yeah, I mean -- yes, I mean, I would review it, but not -- how can I say?  I mean, the body as you called it, or the text as I call it, I would go through -- I would start, again, through pulling in information, crafting the report, pass that on.  Certain things would be suggested or numbers would be calculated and input.  I would have to -- I -- I -- everything comes to me in a redline in that case, and I correct it or I accept it or reject it.

As it relates to the appendices, I already told you about Appendix C.  Appendix D is something that I try to carefully go over, much like the text. I must admit I've not read every line of Appendix E, but I've certainly reviewed it.  Same thing with Appendix F, G, and H.

Q   That was helpful.

So just take Appendix C as an example.  So

Page 36

what in Appendix C reflects your work and review and what doesn't?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Well, as I said before, the folks at Forensic Economics would do a search and pull down all articles.  They would get a list of analyst reports and input that.  The structure and format is -- is something I've created that has evolved over time, and then it would be -- the data would be input into this chronology, printed out.

I would -- you know, again, I can't say I reviewed every page.  I would -- in that particular case because it's a -- what? -- 300 or 223 page appendix, I would, you know, go through and, you know, do a cursory review.

But I can also state that -- that I have -- everything I do is -- is audited.  It's at least two people have -- have reviewed it.

BY MR. WINTER:

Q   Did you review the -- if you take a look at Appendix C, on each date there's -- each trading date there are various columns associated with it, starting with "Volume," column 2, "Price," column 3.

Do you see that?

A   Yes.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 37

Q   Okay.  Did you review, for each trading date, what numbers were associated, I guess, with each of these columns in Appendix C?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I think that, again, would be the sort of thing that my client would be upset about if I reviewed one, two, three, four, five, six, seven, eight, nine, ten, 11, 12, 13 numbers for over 1150 entries.  I did not review each number.  But each number is audited and comes from a series of regressions that are specifically described in both the text in Appendix D and with backup material that's been provided to the defendants.

BY MR. WINTER:

Q   That's where I was going to go next.

So you would have reviewed the output of the regression analyses that are contained in the appendixes, but wouldn't have looked at, you know, for each trading date, what the associated columns would have said?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Yes.  I mean, unlike having come from the defense side of the world and indeed worked with Wachtell, unlike the most defense experts, I'm actually somewhat hands-on.  I like to

Page 38

play with the data, and so I would have reviewed it.  But if you asked me right now what is the p-value on -- on February 3rd, 2016 that came out of my regression, I can't answer that, but I can turn to the page and then give you the answer that the p-value is 86.03 percent.

BY MR. WINTER:

Q   Yeah, I understand that.

I guess what I'm trying to get at is, in forming your opinions, were you relying on the output of the calculations that are -- or the data that's in the appendices, or are you also relying on the data that's set forth in the appendix -- appendices?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I -- I -- I really apologize, and I'm sure it was a clear question, but my mind didn't -- I didn't follow it.

BY MR. WINTER:

Q   We'll come back to this.  We're going to take a look at this later.  I think we'll -- I think we'll use some examples that will help.

So just going back to your CV, if we take a look at Appendix A.  So there's another firm here that's listed.  I think it's called MDA Financial.

Page 39

What is MDA Financial?

A   MDA Financial, over its lifetime has taken on various roles, but I would say it's a family financial company.

Q   When you say a "family financial company," it's a family investment office?  Is that a fair description?

A   No.

Q   Help me out then.  What does it do?

A   Well, MDA has over -- again, it's -- I'm looking now.  41 years -- has been involved in assisting companies, business plans, some fundraising, some partnerships, and then various family investments as well.

Q   And -- and you are also listed as the president at that firm, I guess, for over 40 years.

What responsibilities do you have in that role?

A   Currently, just to oversee the -- you know, the assets in the portfolio.

Q   Do you earn income from MDA Financial?

A   I would earn income associated with interest, dividends, and capital gains, but as to payment for any labor component, no.

Q   Do you earn --

Page 40

A   Not currently.  I'm sorry.  Not currently.

Q   Do you currently earn income from any other employment source other than Hartzmark Economics Litigation?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I'm -- I'm -- do -- I think you need to describe it as the nature of the income.

BY MR. WINTER:

Q   So leaving aside any dividends, investment income that might have come from MDA Financial, are you earning income from any other employment, other than your work at Hartzmark Economics Litigation?

A   Again, that's sort of -- I mean, I have assets outside of MDA Financial that generate income in terms of dividends, capital gains, and interest.

Q   Yeah.  I guess I'm not asking about investment assets.  I'm asking about, you know, work that you perform and income that you recognize from that employment.

Is it just Hartzmark Economics, or is there some other -- some other, you know, firm that you're currently associated with, where you also receive compensation?

A   Personally, my income would come from Hartzmark Economics Litigation Practice's income.

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

Page 41

Q   All right.  So just going back in time a bit, it looks like you were an assistant professor at the University of Michigan after receiving your Ph.D.; is that right?

A   Yes.  Actually, I -- I became a lecturer first in 1984.  My dissertation was accepted and my Ph.D. was granted in the latter part of 1984.  At that point, I became an assistant professor with tenure track, joint in the Michigan Business School and the Department of Economics.

Q   And you were in that role until 1988; is that right?

A   Correct.

Q   And that was the last time you held a faculty position, correct?

A   Correct.

Q   And then it looks like you spent two years at Lexecon, Inc.  What is Lexecon, Inc.?

A   Lexecon, Inc., much like Hartzmark Economics Litigation Practice, offers litigation support.

Q   Is Lexecon, Inc., a predecessor firm of Compass Lexecon?

A   That's my understanding.  I was at Lexecon closer to its founding, and since then it's been

Page 42

sold, bought back and sold a couple times and merged.  Mostly a defense-oriented litigation support firm.  As I mentioned, at Lexecon I believe I did some work with Wachtell.

Q   Did you work with Dan Fischel while at Lexecon?

A   Yes.

Q   And do you have any ongoing professional relationship with Compass Lexecon today?

A   Professional relationship?

Q   Yes.

A   No.

Q   And then I see you were around, I guess, ten years, the chairman, CEO, president, and treasurer of a firm called Cragar Industries.  What is Cragar Industries?

A   Cragar Industries was a developer, designer, marketer, distributor, seller, and manufacturer and assembler of automotive wheels sold in the aftermarket.

Q   And I guess you identified four different positions that you held.  You held all of those at the same time?

A   I don't think I ever simultaneously held all four.

Page 43

Q   Okay.  It seemed like a lot of -- a lot of work.

A   Yeah.

Q   So were you do- -- also doing expert consulting work while employed at Cragar?

A   No.

Q   And then after you left Cragar, looks like you started at Navigant Economics, a firm you referenced earlier in your testimony; is that right?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  And when I -- when I left -- well, Cragar was -- was actually merged with another company, and I remained on the board there, and so it's not like -- I guess, I didn't leave it at that point, but I began work at Chicago Partners, LLC in 2004.

BY MR. WINTER:

Q   Okay.  And so Chicago Partners, and then known as Navigant, that's another expert consulting firm?

A   Yeah.  Chicago Partners was, I would say, much like Lexecon in the early stage, mostly a defense-oriented firm, providing litigation practices.  A little more entrepreneurial because it was smaller and the head of it was a little more

Page 44

entrepreneurial.  But I began there in 2004 until it was acquired in 2008, at which point I folded into Navigant Economics.

Q   So fair to say that from 2004 until today, your primary work has been as an expert consultant?

A   Well, again, if I went year by year, that would not be true, but if I look over that what is now almost two decades, the largest proportion of my time and income has been associated with litigation.

Q   Okay.  And we looked a little bit at your list of reports on page 4, and I think those are for the last four years.

Do you have a sense about how many expert reports you've submitted in -- in your career?

A   That'd be an interesting question.  Four years -- I mean, I would say at least twice as many than are listed on pages 4 and 5 of Appendix A.

Q   You said: "At least twice."  Would it be -- this is four years.  I think you said you were working for around 20 years in total.

Would it be more than twice?

A   I -- I can't say.  I can't say.  Much of my work was done on the defense side, and much of it was also associated with supporting other experts and consulting.

State of Alaska                                    [FINAL]                              November 30, 2022
v. Ryder System                                                                    Michael Hartzmark, Ph.D.

Page 45

Q   Okay.  So do you think you submitted more or less than 50 reports where you were the consulting expert?

A   I think there's close -- so my guess is there are probably 36 reports on these two, so if I've done 50 reports, that's -- I mean, I've probably done north of 50 reports.

Q   You think north of a hundred?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I don't want to speculate as to whether it's north of a hundred.

BY MR. WINTER:

Q   Could be.  You just don't know here today?

A   Have I -- involved?  In what sense?

Q   Sure.

I guess, how many, you know, were instances where you signed the report?  Let's start there.

A   Between -- I would say between 50 and a hundred.

Q   Okay.  And then more that you were associated with but may -- may not have been the signing expert?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Yeah.  I mean, there -- there were -- there was a period when I would write

Page 46

reports, but it would be on behalf of mostly defense experts who would be testifying.

BY MR. WINTER:

Q   And then so taking a look at this list of reports over the last four years, which you started to go through earlier, are these all on behalf of plaintiffs?

A   No.

Q   Can you identify which ones are on behalf of defendants?

A   There's Appaloosa, National Indemnity.  I don't remember Kraft Heinz.  Help at Home.

THE COURT REPORTER:  What's the name?  I'm sorry.

THE WITNESS:  Help at Home.

Those are the ones that stick out on pages 4 and 5 of my Appendix A.

BY MR. WINTER:

Q   And I think I got -- you identified three; is that right?

A   I wasn't counting when I went through.  It sounds about right.

Q   Okay.  Have you, in the last four years, submitted an expert report in opposition to class certification?

Page 47

A   In opposition of class certification, can you be more specific?

Q   Yeah.

Have you submitted an expert report in support of a party arguing that a class should not be certified?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I believe, and it's been a while, but I believe my Help at Home report --

BY MR. WINTER:

Q   Okay.

A   -- was a -- was -- was that the class should not be certified.

Q   And where -- just I'm looking at the same list here.  Where is the Help at Home, so I can just identify it?

A   Help at Home is on page 5, about a third down, Jennifer Phillips, et al., versus Help at Home.

Q   Got it.  Okay.

And was that a securities or Exchange Act case?

A   No.

Q   What -- what type of case was it?

A   That was an employment/labor case.

Page 48

Q   I see.  All right.

So fair to say, in the last four years, you have not submitted a report in a securities matter in opposition to class certification?

A   Yes.  As I said before, I worked many years on the defense side.  Once I got the very favorable decision in the D, as in David; V, as an victory; I, as in intellectual, once I got the decision that was public in DVI, really no defense firm was willing to engage me.

So I have not -- although I tried to solicit back in the days.  And, indeed, I -- there is a bifurcation with respect to plaintiffs and defense experts, especially plaintiffs' experts serving on the defense side as the defense bar appears to have some, you know, concerns about using somebody who has a public -- public decision.

And, indeed, in 2008 when Chicago Partners, which was a firm that did mostly defense, but was willing to do plaintiffs' and defense work, was acquired by Navigant Economics, I was immediately -- even though I was promised that I could do plaintiffs' work, it was immediately cut off, my work at that point, for any plaintiffs' securities work.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 49

So there's nothing here, but that's much more a function of the defense bar's bias than mine.

Q So -- and since founding Hartzmark Economics Litigation, have you submitted an expert report in a securities case in opposition to class certification?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: No defense has engaged me to submit a report in opposition to class certification in a 10(b) or Section 11 or Section 12 case.

BY MR. WINTER:

Q Okay. So I think this is true just based upon those two answers. But -- so in every report that you've submitted since founding Hartzmark Economics Litigation in a securities case, those reports have been in support of class certification, correct?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: Again, you're using an ambiguous term. What do you mean by "securities cases"?

BY MR. WINTER:

Q Cases -- well, I'll make it more specific.

Since founding Hartzmark Economics Litigation, in all of the cases that involved claims

Page 50

under Section 10(b) of the Exchange Act and where class certification was at issue, the reports you submitted were in support of class certification, correct?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: The nature of my engagements since Hartzmark Economics Litigation was founded has been associated with the plaintiffs, and that became the case after unsuccessful attempts to -- to serve as an expert in securities litigation for defense firms.

BY MR. WINTER:

Q I understand that's the reason you're giving. I just really want the -- just the factual answer, though.

So the answer to my prior question was yes?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: Prior question was associated with?

BY MR. WINTER:

Q Yeah. I'll just -- I'll just read it back.

So since founding Hartzmark Economics Litigation, in all of the cases that involved claims under Section 10(b) of the Exchange Act and where class certification was at issue, the reports you

Page 51

submitted were in support of class certification -- class certification, yes?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: The reports that I submitted were much like this, offering opinions on whether the security traded in an open, well-developed, and efficient market and whether there was a common damages methodology and potential other issues that might have emerged.

Whether in support or not, I -- that's a legal question.

BY MR. WINTER:

Q Okay. So let's break those up.

In the reports that you've submitted since founding Hartzmark Economics Litigation in cases under Section 10(b) of the Exchange Act, have any of those reports offered the opinion that damages could not be calculated on a classwide basis pursuant to a common methodology?

A Well, that question is -- I hate to use the word "absurd," on two levels. One, that I've read it before, and I've been involved -- you know, the 50 cases I've been involved with, the common damages methodology is -- is very straightforward and standard and is basically inflation at sale and

Page 52

inflation at purchase, the difference between those two, and it's consistent across those in the 10(b) cases that I've been there.

So I have not been -- I've not written a report, to my recollection, there. As it relates to the -- whether the market is open, well-developed, and efficient, no client that I'm aware of, who -- which I have suggested that the market is not open or well-developed or efficient has submitted a report.

Q So --

A The -- I think -- and the reason I say absurd is I can't imagine that they would want to submit a report when I suggest the market is not open or not well-developed or not efficient.

Q So it may be an absurd question, but I really just want to limit it to a yes or no if we can, and then we can move on. So I'll just read it back.

In the reports that you've submitted since founding Hartzmark Economics Litigation in cases under Section 10(b) of the Exchange Act, have any of those reports offered the opinion that damages could not be calculated on a classwide basis pursuant to a common methodology?

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 53

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  In the reports that have been submitted which can be different than the engagements, they have all indicated that there is a common damages methodology that can be applied classwide.

BY MR. WINTER:

Q   Okay.  You know, you mentioned a couple of times the difference between defense side consulting firms and plaintiff side consulting firms.  Do you consider Hartzmark Economics Litigation a plaintiff side consulting firm?

MR. WIERZBOWSKI:  Objection to form and misstates testimony.

THE WITNESS:  No.  I'm an economic -- I'm an economist trained at the University of Chicago, which arguably, certainly in my time, was the best economics program in the world.  I solve problems. If defendants came to me with a problem, I would look at it.  As I stated before, after attempts to market to defense-related firms in securities, was not -- not helpful, and my engagements have been on the plaintiffs' side, but I don't consider myself a plaintiffs' firm, per se.

BY MR. WINTER:

Page 54

Q   And I didn't mean that to be pejorative at all.  I was just interested in how you saw the difference.  You said for a couple instances so-and-so is a defense side firm and so-and-so is a plaintiff side firm, and I was trying to understand what you meant by that.

MR. WIERZBOWSKI:  Objection to form. Misstates testimony.

THE WITNESS:  My understanding is as well Wachtell was generally there to defend corporations, you know, and that's its bread and butter, and, you know, even more so than Hartzmark Economics, which is there to try and objectively determine, in this particular case, whether the market is open, well developed, and efficient and whether there's a common damages methodology.

I have -- I've been approached by firms and had to say no.  I mean, I look at it and I solve problems.  I've got a toolkit that I've learned over what is now -- it's unbelievable to think, but is now 40 years, and I use it to solve problems.  As to whether it's on behalf of plaintiffs or defendants, you know, there's -- I guess I would call it, as an economist, a selection bias, and maybe you would call it the same thing as a lawyer, if Wachtell is

Page 55

considered by your peers as a defense-related firm or a firm defending corporations.

BY MR. WINTER:

Q   Okay.  If you've solved problems, can you give me an example of what problems you've solved?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  What problems I've solved?

BY MR. WINTER:

Q   Yeah.  In your role at Hartzmark Economics Litigation.

A   I've solved problems associated with determining whether the price movements of the -- of a stock are consistent with an efficient market.

Q   Okay.  I thought you meant something different.  Okay.

A   I mean, economists solve problems, I mean as you're well aware of on the TV -- or attempt to solve problems in all different areas, and I've solved problems from estimating the impact of interchange fees on credit card purchases and credit card profits.  I mean, that's a problem that economists would say.

I've solved problems associated with defining a market, which is something that economists do regularly, and as I've said, I've

Page 56

solved the problems associated with what I was engaged to examine in this particular matter.

Q   Have you submitted a report in a securities case purported to calculate damages?

A   I have submitted reports that calculate damages.

Q   About how many have you submitted in cases under Section 10(b)?

A   In the last four years, damages related cases -- I think, you know, if I go through there, TerraForm Global was a POA-related issue, and I believe that had some damage component.  I forget in New Senior whether it was damage -- yeah, because it was not a class I don't think.  So it was damages.

I might have done a damages report but I didn't submit it in Adeptus.  Appaloosa was damages. Oh, at the very top, Christopher Porrino was a damages report that I did.  National Indemnity was damages.  Signet, I did a damages report.  U.S. Steel, I did a damages report.  Lord Abbett and Navient, I did a damages report -- oh, no, I never did -- Symantec, I did a damages report.  Tesla, done a damages report.  I might have done some damages in Help at Home.  I don't remember.

So those would be the damages reports over

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 57

the last four years.

Q   Okay.  And would you say you're familiar with the methodologies that are used by experts to calculate damages in a class action under Section 10(b)?

A   Well, I'm very familiar with the common damages methodology that I propose in my report, yes.

Q   Yeah, I guess what I'm asking is it sounded like you've actually implemented or, you know, attempted to implement a methodology to actually calculate damages in some of the cases you had identified, and I'm just asking:  Are you familiar with those methodologies that experts use to actually calculate damages?

A   I'm confused by your term "methodologies."

Q   Okay.  Sure.

How about ways?  Are you familiar with the different ways an expert would attempt to calculate damages in a Section 10(b) class action?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I'm -- I'm familiar with the techniques that economists utilize to calculate the inputs that represent the losses caused by alleged fraud that are then fed into what is called an

Page 58

inflation ribbon, which is then applied classwide, and the common damages methodology that is clearly laid out in my Section VII is then employed to calculate individual investor damages.

And I have -- I have utilized those specific techniques to calculate the inputs and calculate inflation ribbons such that the common damages methodology that I clearly lay out in Section VII is employed to calculate the individual damages in the matters that I mentioned before that are 10(b) cases.

BY MR. WINTER:

Q   Thank you.  That was exactly my question.  Thank you.

What subject matters do you consider yourself an expert in?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  That's sort of a general issue.  I don't know.  I can say watching -- watching the news, I'm a political expert.

BY MR. WINTER:

Q   Okay.

A   That's a general -- I'm an economist with a 40-year background from the finest university in the world.  Economists are given a toolkit to solve

Page 59

problems, whether it be in a transportation-related market; a pharmaceutical market; as I mentioned before, a credit card market.  You can go down an RMBS market associated with issuance from any of the banks associated with steel markets.  We look at markets.  We then are able to apply facts to solve problems, and that's my expertise.

Q   Got it.

Do you consider yourself an expert in accounting matters?

A   I've not been asked to offer an accounting opinion here, nor am I a certified public accountant.  I have a fairly reasonable and substantial background on accounting issues and, therefore, utilize accounting matters as a former CFO of a public company, where I directed an accounting -- you know, CPAs and other accountants and controllers, as a CEO of another public company, but I do not consider myself an accounting expert as it relates to issues associated with GAAP, but I do utilize certain tools of accounting in my economics practice.

Q   And -- but you've never been accepted by a court, for example, as a -- as an expert in the field of accounting?

Page 60

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I've never been engaged in the field of accounting.  I think I would be hesitant.  So I've never been engaged and, therefore, I would never have been put up to be qualified as an expert in, you know, again, GAAP accounting.

BY MR. WINTER:

Q   Understood.

So if you could go to Appendix B in your report, this is the materials relied upon.

A   I'm there.  Header page 81 is the first page.

Q   Okay.  So we'll come back to this in a bit, but if you take a look at B-1, there's a heading that says:  "Court Documents."

Do you see that?

A   Yes.

Q   And then there's -- it looks like there are well over 20 court decisions that are cited under that.

Do you see that?

A   Yes.  I don't know exactly the number, but it's probably north of 20.

Q   So how did you determine which court

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 61

decisions to include in your materials relied upon?

A Well, these are court decisions which are either favorable or demonstrative decisions. For example, "in re Signet Jewelers," where the court said "Plaintiff's burden at this stage simply to propose a methodology for calculating damages that corresponds with the [sic] theory of liability. It has done so here. Dr. Hartzmark's" -- it goes on you can see in footnote 8, the same damages methodology the court accepted in Signet is the same as I proposed in this particular case and/or -- for example, so I cite to that case.

And that's a material I rely upon right above it in footnote 7, Christakis Vrakas and U.S. Steel Corporation, "Plaintiffs cite several cases in this Circuit and elsewhere that affirm the appropriateness of the out-of-pocket methodology that Dr. Hartzmark" --

THE COURT REPORTER: Can you read slower?

THE WITNESS: Oh, I'm sorry.

"Plaintiffs cite several cases in this Circuit and elsewhere that affirm the appropriateness of the out-of-pocket methodology that Dr. Hartzmark proposes as a sufficient damages" -- method -- "model for class certification

Page 62

purposes."

And that was another case, again, that I rely upon. So there are those cases. Then there are the cases that relate to, I would say, descriptive -- describing how a court has evaluated one or more of the so-called Cammer, which is C, as in cat; A, double M, E-R, slash Krogman, K, as in King, R-O-G-M-A-N, Cammer/Krogman factors.

Let me see if there are any others that I cite to. They're either background on myself and decisions related to class certification, but I think those are the two general components under Court Documents except for those specifically as they relate to this Ryder matter.

BY MR. WINTER:

Q Thinking about that second bucket, the decisions about class certification, did you determine which ones to include? Did counsel? How did that come about?

A Well, I -- I've read, over the last -- really, I got involved in securities litigation, obviously, in the late '80s, when Fischel was involved in really developing the science associated with it, and it extends to the analyses that I present.

Page 63

And I -- really, I would say, though, beginning in 2004 when one of my partners at Chicago Partners introduced me to a plaintiffs' litigation, a legal plaintiff firm, a firm that dealt only on the plaintiffs' side of litigation, and I got involved in DVI.

At that point, I've probably read most of the decisions that -- you know, the major decisions that came out and has -- have continually, you know, utilized where they help, where -- I think they can help the court in evaluating a particular Cammer/Krogman factor, I've added that to the report and that this has evolved, based on my reading of these decisions, not -- you know, often it's me, you know, that I supply the decision to -- in a specific engagement or even pre-engagement when somebody asks me a question related to a specific issue that maybe was dealt with, you know, at some point, you know, especially with a young attorney that hasn't -- you know, doesn't know the specific case.

Q But you're not a lawyer, correct?

A I'm not a lawyer, but I am a reader, and most of these decisions relate to the discussion of the economics and the problems solved using economic tools in those decisions.

Page 64

Q And you're not offering any legal opinions in this case?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: No.

BY MR. WINTER:

Q Okay. And I think in -- in a prior case, you've actually had portions of your report stricken for venturing too close to legal matters; is that right?

MR. WIERZBOWSKI: Objection to form. Assumes facts.

THE WITNESS: Yeah, can you be more specific?

BY MR. WINTER:

Q Yeah. I think it was the Vrakas/U.S. Steel case.

Do you recall that?

A I do.

Q And I think you had a discussion of the Supreme Court's Comcast decision in your report that got stricken in the court's decision in that matter; is that correct?

MR. WIERZBOWSKI: Objection to form. Assumes facts.

THE WITNESS: Yeah, I mean, U.S. Steel --

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 65

and, again, I'm giving the interpretation of the judge. First of all, the judge credited my opinions as it relates to market efficiency and the common damages methodology and certified the class.

The judge then struck two components that -- that I had put into a rebuttal report at the request of my client. The first issue was numerosity. I mean, almost -- again, I'll say it, absurdly so, the defendants suggested that for U.S. Steel, a heavily traded security, that it did not meet the numerosity requirements. And they, just as a background, had -- had indicated that they weren't going to make that an issue.

Their economic expert did not state anything about it, and then in their brief, though, in opposition to class certification, brought up the issue of numerosity, and I had -- I was able to examine, using the data that I had, nothing new, absolutely all the data that I had presented in my opening report demonstrate that there were substantially more than 40 traders who would be harmed based on the just, again, not an investment analysis, because I had not been asked to do a damages analysis, but I -- I demonstrated that on that particular issue, the judge eliminated it

Page 66

because the economic expert that was engaged by the defendants didn't discuss that issue, and, therefore, they said that I couldn't discuss that issue.

As it relates to the -- the discussion in my rebuttal report that I was asked to submit related to Comcast, as a former student of law and economics at University of Chicago with Judge Posner, Judge Easterbrook, Richard Epstein, Lester Telser, Sam Peltzman, and hordes of others, as an assistant professor who taught antitrust law and antitrust regulation and regulation of markets and industrial organization, the ideas associated with Comcast were such that they felt that I was able to describe why the issues associated with Comcast and the service or product market of cable television is so different than an information market such as a securities market, such as with Ryder.

And I discussed it. The judge decided it was too much of a legalistic discussion and decided to eliminate it, but it had no impact because, again, the judge credited my opinions on the issues that I'm here on this case to provide.

BY MR. WINTER:
    Q   All right. I'm at a good stopping point

Page 67

for a break if you want to take one now. I think I've been going around an hour and 20 minutes, but happy to keep going if you want.
    A   Yeah, I mean, I'm fine to keep going.
    Q   All right, let's do it.
    All right. So let's go to your report, paragraph 1.
    A   Paragraph 1, the header on that is five of 1 -- of 387, and I am there.
    Q   So I think we covered this a bit in your prior answers, but you were asked by counsel to opine on two questions, correct?
    A   Yes.
    Q   All right. And the first is whether Ryder's stock traded in an efficient market during the class period, correct?
    A   Yes. As of -- and let's make sure, now that we've mentioned efficient market, as I mentioned, Cammer and Krogman really suggest an open and well-developed and efficient market, but I put those three terms together, and when we speak about efficient market, I'm -- I'm utilizing, in essence, all of that concept.
    Q   Understood. And I see that's defined here.
    And the class period, as you defined it

Page 68

here, is from July 23, 2015 through February 13th, 2020; is that correct?
    A   I did not define the class period.
    Q   As defined in your report?
    A   The class period was -- was specified in the complaint, and I define a term called class period, which is July 23rd, 2015 through February 13, 2020.
    Q   Okay.
    A   But I did not define, determine, what the class period was.
    Q   Understood. You're taking that from the complaint.
    And then the second question is whether the -- this is: "...the calculation of damages on a class-wide basis is subject to a common methodology for all Class members in connection with their claims under...the Exchange Act" here; is that correct?
    A   Yes. You summarized part of --
    Q   Yeah.
    A   But that's fine. Yeah. Yes.
    Q   In the interest of time. So just a quick question. When you say "their claims" here in the second sentence, what claims are you referring to?

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 69

A    Wait.  I've got to -- class members.

Q    Okay.  That's what I -- so what is your understanding of the plaintiffs' claims in this case?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  My general understanding is that the stock of Ryder was inflated between July 23rd, 2015 through really February 13th, 2020 because it's alleged that Ryder misstated the residual value on depreciation expense associated with certain of its assets.

BY MR. WINTER:

Q    Okay.  And where did you look to form that understanding?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  As I said in my -- in our earliest discussion, that I reviewed the court's Motion to Dismiss opinion and -- and the complaint.

BY MR. WINTER:

Q    Okay.  And you read the entire complaint?

A    I reviewed the complaint.  I did not memorize it, but I did, you know, review it.  I've read it.  So --

Q    Do you remember how many times you read it?

A    Well, it would have been -- when I first

Page 70

received it, it would have been associated with the deposition, and then I would have gone to it at various other points in time.

Q    So twice, and maybe referring to it in discrete portions?

A    I can't say, you know, how many times.  I can't say, for example, did I research sections ten times and others once.  I probably did not read the defendants' section, you know, ten times, but I might have read the truth emerges section, you know.

Q    Okay.  You have a pretty good understanding, though, from that review of what the claims plaintiffs are asserting in this case are; is that fair?

A    I just -- I think I just summarized those.

Q    Okay.  So if we could take a look at paragraph 10 -- this is your summary of opinions.

A    Yes, header 10 of 387.

Q    And Opinion 1 is -- I'm going to take all those words and make it a little simpler, is that Ryder's common stock traded in an efficient market, correct?

A    Throughout the class period, Ryder's common stock traded in an efficient market, as I defined it.

Page 71

Q    And in Opinion 2, which bleeds over to page 7, is that: "The calculations of damages for violations of Section 10(b) of the Exchange Act may be computed on a class-wide basis using broadly accepted methodologies that would be common to all Class members."

A    To all -- what did you say?

Q    To all class members.

A    All class members, yes.

Q    So are you -- is that opinion generally for all violations of Section 10(b) of the Exchange Act, or is it just specific to the class members' claims here?

MR. WIERZBOWSKI:  Objection to form.  Calls for a legal conclusion.

THE WITNESS:  I'm -- I'm confused by your question.  All claims?  You mean all claims in past, present, future, all companies?  I'm not clear what you --

BY MR. WINTER:

Q    I'm just trying to understand what you wrote.  So you say:  "The calculations of damages for violations of Section 10(b) of the Exchange Act..." and I'll stop there.

Are you talking about calculations for

Page 72

damages for violations of the -- of Section 10(b) of the Exchange Act generally, or are you talking about only the claims for damages asserted in this case?

A    Well, I assume that the allegations asserted in this class -- this case are true.  I'm assumed that the allegations, because they -- I assume they are true, that the calculation of the harm caused by the inflation caused by the alleged activity can be calculated and applied, computed, on a classwide basis.

Q    So you're -- so I just want to make sure I understand.

You're not offering the opinion that, as a general matter, calculations of damages for violations of Section 10(b) of the Exchange Act may be computed on a classwide basis.  You're only offering an opinion that that can be done for the claims asserted by the class members here?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I'm confused by the question with -- Opinion 2 specifically relates to my engagement, which is associated with claims under 10(b), and it cites to this Ryder matter.  I mean, so opinion --

BY MR. WINTER:

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 73

Q   That's good enough.  I was trying to figure out -- because the language was a little bit different between the scope and then the opinion itself.

So you -- you understand the opinion you're offering in Opinion 2 to be specific to the claims alleged by plaintiffs in this action?

A   Yes.  I'm looking at the Ryder action.  I'm not -- you know, I'm not generalizing.

Q   Okay.  You're not saying that for every Section 10(b) case under the Exchange Act damages could always be calculated on a classwide basis?  You're not offering that opinion, right?

A   Well, I -- I haven't been in a situation where I've submitted a report that -- otherwise.  Because as we go into Section VII, it's, again, a virtual standard.  So I haven't been -- it's sort of a difficult situation to say that there exists a situation under 10(b) where there's a fraud that inflates or deflates a price, you know, that -- that their damages couldn't be calculated.

THE COURT REPORTER:  Couldn't or could?  I'm sorry.

THE WITNESS:  Could not be calculated.

BY MR. WINTER:

Page 74

Q   So sitting here today, you can't think of a situation under Section 10(b) of the Exchange Act where the claim is that the stock price was artificially inflated or deflated or damages could not be calculated on a classwide basis?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I think you -- I think you answered your own question.  If a stock has been inflated or deflated, then the damages will be calculated as the level of inflation at purchase less the level of inflation at sale.  So to the extent that you're in a 10(b) case, stock is inflated or a stock is deflated, the difference between those two levels gives you the damages.

BY MR. WINTER:

Q   Right.  So let me just make sure I understand.

So were the allegations of the case that the stock is allegedly inflated or deflated, damages could always be calculated under Section 10(b) on a classwide basis?

MR. WIERZBOWSKI:  Objection.  Form.  Incomplete hypothetical.

THE WITNESS:  Yeah, as I've stated a number of times before, if a stock is inflated or deflated

Page 75

based on fraudulent statements or misrepresentations, then damages can be calculated as the difference between inflation at purchase and inflation at sale.

BY MR. WINTER:

Q   All right.  And you're not offering any other opinions other than Opinion 1 and 2 that are identified here, correct?

MR. WIERZBOWSKI:  Objection to form.  Asked and answered.

THE WITNESS:  Yeah, the four corners of this report incorporate my opinions, and Opinions 1 and 2 are the opinions that I'm expressing as I sit here today that I'm expecting you would want to ask me questions about.

BY MR. WINTER:

Q   All right.  Understood.  And then in paragraph 11 on the same page, you say: "In reaching these opinions, I have relied upon various materials, which are listed in Appendix B and/or are otherwise cited in this report."

Do you see that?

A   Yes.

Q   All right.  And then if we could go to Appendix B.

Page 76

A   Yes.  I am there.

Q   And apologies if I asked you this already, but just so I have it:  And you're not relying on anything other than what's listed in Appendix B or cited in the report, right?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  You know, other than my economic expertise, which incorporates 40 years of experience, and I did not cite, for example -- I don't think I've cited -- yeah, I mean, you know, for example, a textbook, Eugene Fama, Foundations of Finance, I mean, are textbooks that I had as a student.  I mean, I've got articles and such that are part of my foundation, but as it relates specifically to this matter, these are the materials relied upon.

BY MR. WINTER:

Q   Understood.  And then at the top, it says: "Ryder System, Inc.," and "News and Disclosures."

Do you see that?

A   Yes.

Q   And then the first line says: "News Articles," July 23rd, 2015 to February 18th, 2020.

Do you see that?

A   And it ends: "comma, searched through

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 77

Factiva, period."
   Q   Understood.
      So what news articles are you relying on?
   A   All the news articles as a -- as a whole.
Doing the analysis that I'm offering -- or doing the
analysis that supports my opinions is a holistic
analysis.
   Q   Okay.  And just --
   A   All of it.
   Q   Take it in steps.  So what news articles
are they?  Are these the ones in Appendix C or -- I
just want to understand the --
   A   Yeah, Appendix C lists articles that were
found -- well, articles and other disclosures
associated with Ryder.
   Q   Okay.  And did you review any of those news
articles?
   A   Possibly.
   Q   Sorry.  I think someone is on -- not on
mute.
      But you don't recall -- you can't say,
sitting here today, that you definitely looked at
any of those articles?
   A   I can't recall.
   Q   Okay.  And if you didn't review them, for

Page 78

what purpose are you relying on them for?
   A   For evaluating the Cammer and Krogman
factors.
   Q   So it's not what's in the article, the
content; it's the fact that the article exists.  Is
that fair?
      MR. WIERZBOWSKI:  Objection to form.
      THE WITNESS:  Yeah.  I mean, the nature of
media and disclosure is associated with whether a
market is an open, well-developed, and efficient
market.  The specific contents which might, you
know, for example, offer insight into how much the
alleged fraud inflated the stock at this stage is
not necessary that I examine it.
      As I stated before, this is a holistic
approach, and I'm listing -- I'm trying to evaluate
and help the court to evaluate whether this is an
open, well-developed, and efficient market, and by
looking at the media coverage, that can assist my --
that can support my opinion and assist the court.
BY MR. WINTER:
   Q   Got it.
      And just to try to make this a little more
efficient, the testimony you just gave about news
articles, would that be the same for the transcripts

Page 79

of teleconference that are identified on the
third -- third line?
      MR. WIERZBOWSKI:  Objection to form.
      THE WITNESS:  Well, again, it's all a
holistic -- the transcripts are for a couple
different purposes, but, again, they're there for
supporting my opinion on Cammer and Krogman, you
know, in terms of participation, frequency of
transcript, timing, and such.
      But so, yes, again, the issue is that they
exist, that you can identify participants, and that
is assisting me -- well, support -- assists -- helps
support my opinion and assists the court.
BY MR. WINTER:
   Q   Okay.  But you didn't review the
transcripts themselves?
      MR. WIERZBOWSKI:  Objection to form.
      THE WITNESS:  For the purposes of this
opening report, you know, maybe I looked at a
transcript or two, but I don't recall it and -- as
being something that was -- that I -- that I looked
at.
BY MR. WINTER:
   Q   All right.  And you didn't review the SEC
filings listed in the fifth line?

Page 80

      MR. WIERZBOWSKI:  Objection to form.
      THE WITNESS:  Oh.  The -- oh, the Ryder
System's, Inc. filings with U.S. securities and
exchange, U.S. SEC?
BY MR. WINTER:
   Q   Yeah.
   A   I would look at those -- for example, I
think I looked at them for the purposes of
examining, you know, what companies Ryder compared
itself to, what other indices in terms of its stock
performance, a description of the company.  But,
again, the issue there is the timing, the frequency.
You know, is this a company that, you know, is --
is -- is disclosing information?  Is that
information getting disseminated, and is that
information getting digested and reflected in the
market price?
   Q   Understood.  Understood.
      And then on the fourth line and the sixth
line, you say:  "List of investor/conferences," and
then list of analyst reports.
      Do you see that?
   A   Yeah, the one, two, three, four, fourth
line, "List of investor/conferences participated by
Ryder System, Inc.," -- from -- "July 23rd, 2015 -

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 81

February 18th, 2020 from Bloomberg."  And then I also created a "List of analyst reports on Ryder System, Inc., July 23rd, 2015 - February 18, 2020," -- that were -- "available through S&P Capital IQ and Thomson Eikon databases."

Q   And is there a reason you say, in lines 4 and 6, "list of," but don't say list of on the other lines?  Are you trying to draw some distinction between how you're relying on the investor conferences and the analyst reports as compared to the news articles, the transcripts of teleconference, and the Ryder SEC filings?

A   Yes, in the sense that those are backups, backup to various exhibits that are basically numerical and, therefore, the lists are, in essence, utilized to create the numbers.

Q   Okay.  Okay.  But you didn't review the content of any of the analyst reports that are identified in the sixth line here?

A   I --

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Yeah, I think that's a little bit overly broad.  Possibly, I might have looked at an analyst report or two throughout.  But the critical issue, as it relates to evaluating whether

Page 82

the market is open, well-developed, and efficient, is the fact that, again, there's extensive analyst coverage.

In fact, Cammer 2 -- Cammer 2 specifically, you know, addresses that issue and suggests why that's important, and, therefore, the number is more critical at this point than the content.  Same thing with the list of investor conferences and such.  Are they out there providing information to the market, which would suggest that it's then more open, well-developed, and efficient.

So, yeah, in the case, for example, of analysts, the number is often referred to and there -- because that's an important issue as to whether there's coverage, and, therefore, the disclosures are disseminated and digested by investment professionals.

BY MR. WINTER:

Q   Understood.

But sitting here today, you don't recall or can't identify any specific analyst report that you reviewed in forming your opinions today?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Yeah, I would say that I've probably referred to them, but I can't, as I sit

Page 83

here today, recall which specific analyst reports I might have looked at.

BY MR. WINTER:

Q   Okay.  So if we go to Appendix C -- all right.  So this is the very long spreadsheet you mentioned earlier.

So if you -- am I right that column 1 lists a trading date?  Is that -- is that correct?

A   Column 1 is like -- yeah.  Lists a date and a specific day, such as Monday through -- Monday, Tuesday, Wednesday, through Sunday.

Q   Understood.

And so for each of those days, you've included information about Ryder's stock price performance on that day in the columns that go to the right?

A   What I provide is both the stock price performance, the stock activity in the market, and then also how it performed relative to certain benchmarks.

Q   Okay.  And number -- in column 13, there's a heading that says:  "Events."

Do you see that?

A   Yeah.  I didn't want to interrupt you.  And that was, yes, the third column are what I referred

Page 84

to as events, which -- yeah, which is in column 13, which are many of those news articles, SEC filings, analyst reports, et cetera.

Q   Okay.  And this list was put together by your team through the Factiva and other searches?

A   Well, this was, I think in this particular case with five years in terms of the class period, I only did ask them to do a Factiva search.

Q   Okay.  And just to -- you may have taken a look at something, you know, one of these, but you don't recall actually reviewing the reports that are listed under the Events for any of these trading days, correct?

MR. WIERZBOWSKI:  Objection to form.  Asked and answered.

THE WITNESS:  Yeah, as I sit here today, I can't recall which of these I reviewed.

BY MR. WINTER:

Q   And sitting here today, you wouldn't know what they say?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I don't understand the question.  What they say is -- is written out here.

BY MR. WINTER:

Q   Sorry.  What the actual reports themselves,

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 85

the content of the reports, you wouldn't be able to say what's in them?

A   Well, I'd be able to say some of what might -- what would be in them.  For example, on -- on July 23rd, 2015, Ryder System's second quarter adjusted EPS was $1.65, you know, so that would have been in that -- that article.

Q   And you're looking at the heading, the titles?

A   Yeah.  Yeah.

Q   So on July 23rd, if we start there, your regression specifies that there was an abnormal return for Ryder of negative 3.57 percent, right?

A   Correct.  Yes.

Q   All right.  And July 23rd, 2015 is the first day of the class period, right?

A   Yes.

Q   Okay.  Do you know what market news caused Ryder's stock price to drop on that date?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  What market news caused?

BY MR. WINTER:

Q   Yeah.

A   Well, no.  I mean, right there, just from your question, I did not, and I think I stated it

Page 86

specifically -- hold on a second.

I can't find it, but I did not do a loss causation analysis.  So I did not evaluate what might have caused the investor harm on that particular date and -- and whether investor harm associated with alleged fraud issues or non-fraudulent issues caused that stock to decline.

Q   But if you were going to investigate that, would -- would you look at the various reports and articles that are listed under events in your column 13?

MR. WIERZBOWSKI:  Objection to form.  Incomplete hypothetical.

THE WITNESS:  Yeah, I -- I don't understand the question.  You're saying if I was to do a loss causation report?

BY MR. WINTER:

Q   Well, no.  If you were -- if you were looking to understand what caused Ryder's stock price to drop on July 23rd, 2015, would a place that you'd look be the reports that are listed under Events in your column 13?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Well, first of all, I don't know what -- how that would affect my overall -- my

Page 87

opinions, one or two.

BY MR. WINTER:

Q   Yeah.  That's not the question.  I'm just asking if that's where you'd look.

A   Hypothetically?

Q   Yeah.

A   Would I -- and when you say 13, the 223 pages here?

Q   No.  The -- not the 223 pages, but the reports that are listed and associated with the July 23rd, 2015 trading date on page 1 and page 2.

MR. WIERZBOWSKI:  Objection to form.  Incomplete hypothetical.

THE WITNESS:  Yeah, I mean, if I were asked and engaged to do a loss causation report and calculate the inputs into an inflation ribbon, I would likely examine some of these reports.  I can't say exactly which ones or if I would at all.  There could be past reports that I would look at.  There could be future reports I would look.

That's -- that's why you don't look at one day to evaluate whether a market is -- whether the stock trades in an efficient market.  Because the issues in these reports are linked backwards and forwards.

Page 88

BY MR. WINTER:

Q   Okay.  Did you consider the market's reaction -- or stock price reaction on the first day of the proposed class period informing either of the two opinions that you express in this report?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Well, the first day, my recollection is that it's a -- what would be considered, quote/unquote, an earnings date, which is what economists might refer to as an information-rich date.  You know, there's -- there's -- on those earnings dates, especially for a company like Ryder, there is generally disclosures that the market participants would be interested in.

In essence, they have a chance, not necessarily a requirement or a necessity, that they would alter the mix of information that market participants would be interested in.

And I utilized this date, along with 19 other dates, that are these information-rich dates as the core of my examination of what is called cause and effect and Cammer 5.  Okay?  And so I utilize it in that way for a holistic approach to evaluate market efficiency, which I was engaged to look at.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 89

BY MR. WINTER:

Q   Understood.

But is it correct that you didn't consider the direction of the stock price reaction on this trading day or any other trading day informing the two opinions that you express in this report?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Okay.  So let me -- let me make sure I'm clear.  You're asking me did I look at any day to see whether any loss or gain was caused by any specific information disclosed on that date?  Is that correct?

BY MR. WINTER:

Q   Not from -- not precisely.  I'm asking if you considered -- I thought we were almost there.

I'm asking if you were -- you considered on each of the trading days whether there was a loss or a gain.

MR. WIERZBOWSKI:  Objection.  Assumes facts.

THE WITNESS:  I don't understand.  Right as I look here statistically, there was a negative 3.57 percent abnormal return, which is highly statistically significant.  Okay?  I examined -- I took that, put it into my bucket that evaluates in a

Page 90

holistic approach whether there is support for an opinion as to whether the market is open, well-developed, and efficient.  Okay?

I'm not sure what you're asking.

BY MR. WINTER:

Q   Yeah.  So I think we may be talking past each other.

So leaving aside the statistical significance of a stock price reaction on a given day -- put that aside -- I'm just asking whether you considered the direction of the stock price reaction, whether it's positive or negative, on any of the trading days in forming the two opinions in this report?

MR. WIERZBOWSKI:  Objection to form.  Assumes facts.  Incomplete hypothetical.

THE WITNESS:  Yeah, I did not examine losses, you know, what -- you know, whether there was a lot or a gain.

BY MR. WINTER:

Q   Okay.  That's all I was asking.  That's it.

A   And I -- I'm not -- if you could be clear as -- it's not -- it does not affect my opinion as it relates to the -- the issue of open, well-developed, and efficient and you eliminated the

Page 91

criteria, that is generally used -- not wholly used, but generally used for that, which was statistical significance.  So when --

Q   Yeah, we'll get to it.  I just want to understand.

A   Yeah, hypothetical, you know, on any given day, stocks move.

Q   Right.

A   I mean, it's just the nature -- even though we're willing to sit and listen to those pundits on CNBC and Bloomberg, stocks move, and they can try and explain them all they want.

Q   All right.  So I want to talk a little about plaintiffs' theories of liability in this case for a second.

So I think you said this earlier, but just so we have a common frame, your understanding is that plaintiffs' claim that Ryder's residual value estimates were inflated during the class period.

Is that your understanding of the -- of the claim?

MR. WIERZBOWSKI:  Objection.

THE WITNESS:  In its most general form, it's my understanding, and -- and it's almost like the common damages formula in the sense that the

Page 92

value of -- of a truck, for example, less its, you know, residual value is equal to some measure of depreciation which is then expensed.  And so it's my understanding that the primary issues in this case are associated with inflated residual values and, thus, deflated depreciation expenses.

But that flows through into the balance sheet and the income statement in the various ways that I'll let the accountant describe.

BY MR. WINTER:

Q   Sounds good.  Let's just make sure we're on the same page.

What is your understanding of a residual value?

A   Residual value?  The anticipated value that you would get, you know, upon the sale of a particular asset.

Q   Okay.  And the -- that sale might be well into the future, correct?

MR. WIERZBOWSKI:  Objection to form.  Vague.

THE WITNESS:  Well, I think in this particular case, and I -- well, I'm speculating that it -- that Ryder had specific time periods in their analyses, but I -- I can't recall.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 93

BY MR. WINTER:
Q   Okay. But whatever the specific time periods, the residual value estimate would be an estimate of what the vehicle would sell for whenever it sold at some point in the future?
A   That seems a reasonable explanation.
Q   Okay. And that's different from -- let me ask it this way: What is fair market value?
A   I'm not offering an accounting -- I don't want to --
Q   Okay.
A   I don't want to state what -- I'm not offering an accounting --
Q   So let me do it without some terminology.
You'd agree that a residual value estimate is different from the price at which a firm could sell the vehicle for today?
MR. WIERZBOWSKI: Objection to form. Outside the scope.
THE WITNESS: Yeah, I -- I'm not offering -- I told you I'm not offering an accounting opinion. That -- that question has nothing to do with anything in this report associated with whether the market is open, well-developed, and efficient or whether there's a

Page 94

common damages methodology.
BY MR. WINTER:
Q   Well, I understand that's your -- your view. We might differ a little bit, but let me ask a slightly different question that I think you'd be able to answer.
So a residual value estimate is a forward-looking measure of what Ryder expects to sell the vehicle for in the future when it's sold?
MR. WIERZBOWSKI: Objection to form. Calls for a legal conclusion. Outside the scope.
MR. WINTER: I'm not asking for his legal understanding. I'm asking if he understands the claims --
MR. WIERZBOWSKI: You said forward looking.
BY MR. WINTER:
Q   The question stands.
A   I'm not answering -- if you tell me that that's what you're defining it as, I can follow on to the next question. Go ahead.
Q   All right. Do you have an understanding of the methodology that Ryder uses to estimate its residual values?
MR. WIERZBOWSKI: Objection. Outside the scope.

Page 95

THE WITNESS: I have not evaluated that for the purposes of my report. If you can point to me in my report where -- you know, especially in the text, I'm happy to answer that question, but -- but I'm not going to speculate at this point. I've not evaluated that methodology.
BY MR. WINTER:
Q   Understood. So --
A   Plus, I would think that's an internal issue, and as I -- there's no materials relied upon that are -- you know, I haven't looked at internal documents on Ryder's algorithms, methodologies, whatever it might be, techniques.
Q   Yeah. I'm just trying to get a lay of the land of what you understand or have not -- let me put it this way: What you focused on and what you didn't focus on in terms of plaintiffs' allegations in forming your opinions. So that's the purpose of these questions.
MR. WIERZBOWSKI: Objection to form.
BY MR. WINTER:
Q   So the -- are the plaintiffs -- is the plaintiffs' theory here that Ryder failed to disclose the methodology that it was using to estimate residual values?

Page 96

MR. WIERZBOWSKI: Objection to form. Outside the scope. Calls for a legal conclusion.
THE WITNESS: Yeah, that's a -- that's a legal question. I -- as I state in here, I assume that the allegations that there was inflation in the stock caused by misstatements and the residual value and the depreciation expenses were both introduced into the stock and then subsequently eliminated and that investors were harmed because of that.
BY MR. WINTER:
Q   Okay. So your -- your understanding of -- your understanding of plaintiffs' theory of liability, for purposes of your report, is that the residual value estimates during the proposed class period were higher than they should have been; is that -- is that fair?
A   I believe, yes, in the complaint and the Motion to Dismiss, it's alleged as one of the allegations that residual values were misstated.
MR. WINTER: All right. Let's mark Tab 3 as Exhibit 2.
- - -
(Hartzmark Exhibit 2 was marked for identification.)
- - -

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 97

BY MR. WINTER:

Q   So this is the court's May 22 decision in this matter that I think you've said, Dr. Hartzmark, that is one of the case documents you relied on.

Let me know when you have that available?

A   Oh, I -- it has appeared, as I mentioned, here on my monitor on the right.

Q   Oh, okay.  Technology is working.

A   Yeah.

Q   If you take a look at the -- and this is one of the materials you relied on, correct?

A   Yes, I believe so.  14 pages, yes.

Q   All right.  And if you'd turn to page 10 at the bottom.

A   Ten.  I see page 10, yes.

Q   Okay.  And if you'd take a look at the third sentence, it begins with: "Plaintiffs allege..."

Do you see that?

A   Plaintiffs -- third -- first paragraph, third sentence: "Plaintiffs allege:  (1) Defendants knew of a decline in resale truck values," and then there's --

Q   I want to focus you on No. 2, where it says: "Defendants relied on an outdated methodology

Page 98

to calculate residual value, which boosted financial results."

Do you see that?

A   Yes, I see that.

Q   Okay.  And that's your understanding of plaintiffs' allegations in this case?

MR. WIERZBOWSKI:  Objection.  Calls for a legal conclusion.  Outside the scope.

THE WITNESS:  Yeah, my assumption is that they will prove that to be true.

BY MR. WINTER:

Q   Okay.  That was the question.

And that your assumption is that if they prove that to be true, that as a result of relying on an outdated methodology, Ryder's residual value estimates were too high during the class period?

MR. WIERZBOWSKI:  Objection.  Calls for a legal conclusion.  Outside the scope.

THE WITNESS:  Again, I'm not going to go further than the fact that the residual values were misstated throughout the class period as the allegation.  As to exactly what the cause was, you know, this is what they suggest that was -- that they relied on an outdated methodology.

BY MR. WINTER:

Page 99

Q   Okay.  Do you have an understanding of what plaintiffs' claim Ryder's residual values should have been during the class period?

MR. WIERZBOWSKI:  Objection to form. Outside the scope.

THE WITNESS:  Yeah, it's my understanding that it's alleged that the residual values should have been lower.

BY MR. WINTER:

Q   Okay.  So the idea is that it should have been lower, but you don't know how much lower at any point during the class period?

MR. WIERZBOWSKI:  Objection to form. Outside the scope.

THE WITNESS:  Yeah, I'm not sure how I could answer that at this particular juncture.

BY MR. WINTER:

Q   Yeah.  I'm just asking based on plaintiffs' allegations.  That's all.

A   That'll be -- that's a factual issue and a dispute between the parties that I think through discovery might be, you know, fully understood and, with an accounting expert, fully documented.  But at this point, I haven't done a calculation of the -- of the residual values and what they -- what they

Page 100

were versus what they would have been but for the misstatements.

Q   Understood you haven't that analysis, and I'm actually just asking about plaintiffs' allegations.

So do you have an understanding of what plaintiffs allege that the residual value should have been during the proposed class period?

MR. WIERZBOWSKI:  Objection to form.  Calls for a legal conclusion.

THE WITNESS:  Read that -- can you read it back to me?  I'm unclear.

BY MR. WINTER:

Q   Yeah.  Sure.  Yeah, let me get my realtime up.

Do you have an understanding of what plaintiffs allege the residual values should have been during the proposed class period?

MR. WIERZBOWSKI:  Objection to form.  Calls for a legal conclusion.

THE WITNESS:  Yeah, my understanding is they should have been lower.

BY MR. WINTER:

Q   Okay.  So your understanding is that they should have been lower, but you don't have an

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 101

understanding of how much lower at any given point in time, correct?

MR. WIERZBOWSKI:  Objection to form.  Calls for a legal conclusion.

THE WITNESS:  That's not something that at all impacts my opinion.  Nor was I asked to examine or quantify either that measure, nor the quantum of damages.

BY MR. WINTER:

Q   Okay.  But you -- you at least understand plaintiffs' allegations to be that Ryder's residual values should have been lower no later than the first day of the proposed class period?

A   Yeah.

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I mean, it -- it -- that as of the first date of the class period, they were misstated, and I believe the allegation is they would have been misstated because they were overstated or, alternatively, the depreciation expense would have been understated, but there are -- that's the primary allegations associated with this.

And I have not evaluated them specifically, but I do assume that they will demonstrate that the

Page 102

stock -- that there were misstatements, that it inflated the stock, that once the inputs are developed in a loss causation analysis, those inputs will go into an inflation ribbon, and then what's critical for my opinion is that that inflation ribbon can be applied classwide and my common damages methodology can be used to calculate individual investor damages.

BY MR. WINTER:

Q   Okay.  So earlier you, I think, described your understanding of the relationship between a residual value and depreciation.

Do you recall that testimony?

A   Yeah, in its -- in its most general form.

Q   Yeah, understood.  We're being very general.

A   Right.

Q   So am I right, though, that's a depreciation expense to be recognized over the life of the vehicle until it's sold?  Is that your understanding?

MR. WIERZBOWSKI:  Objection.  Outside the scope of his testimony.

THE WITNESS:  Yeah, I mean, again, generally it's my understanding that the

Page 103

depreciation expense is probably taken as a whole and then, you know, somehow, some way, and I don't know whether it's equally or weighted average or exactly because it doesn't impact my opinion, but would be expensed over some -- you know, based on some algorithm.

BY MR. WINTER:

Q   Okay.  And if -- if Ryder sells a vehicle for more than its residual value, is it your understanding that Ryder then would recognize a gain on that sale?

MR. WIERZBOWSKI:  Objection.  Outside the scope of his report.

Steve, you keep asking him questions related to accounting issues.  We previously established that he's not being offered here as an accounting expert.  I'm not really quite sure what the purpose or point of these questions are, but I'd just like to lodge a general objection to these accounting-related questions for --

MR. WINTER:  Your objection's noted.

BY MR. WINTER:

Q   You can answer, Dr. Hartzmark.

A   Okay.  So if -- if it's the case that there is excess -- excess depreciation expense and the --

Page 104

well, no.  Your question was if the residual -- if -- if -- if you'd -- in a simple world, if you have A as the value of the vehicle, B as the residual expense, and D as the depreciation, if it's the case that B is higher, then D is lower, and I guess there would be a, you know -- you know, just, in a simple world, profit from that.

Q   Right.  Right.  Exactly.  So just --

A   Again, I'm not -- I don't want to -- there might be other issues:  tax issues, other types of depreciation issues, other types of accounting issues that I am not here to opine upon.  I've given you a simple answer to what I hope is a simple question.

Q   Understood.  And once more, simple answer -- simple question and I think a simple answer, but just to take the flip side of it, right?

So the flip side is that Ryder sells the vehicle for less than its residual value, right?  And in that case, it hadn't recognized enough depreciation over the life of the vehicle, so it'd recognize a loss at the sale -- at the time of sale, right?

MR. WIERZBOWSKI:  Objection to form.  Incomplete hypothetical.  Outside the scope of his

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 105

report.

THE WITNESS: Yeah, I mean, if it's the case that -- again, using the same letters, B, the residual value is lower, then the depreciation expense or D would be higher, and to the extent that B was lower and was known previously, then that depreciation expense, you know, I guess should have been higher previously.

BY MR. WINTER:

Q So do you have an understanding of how Ryder's residual value estimates at any given point in time impacted its stock price?

MR. WIERZBOWSKI: Objection to form. Vague. Outside the scope of his report.

THE WITNESS: Specifically? No. In my holistic approach, that -- that's not -- I mean, I -- one can pick out -- no. And even there you can pick out news stories or headlines as residual value. It -- it, you know, apparently is the case, although I've not done a loss causation analysis, that announcements associated with residual values and depreciation expense adjustments were -- were included in disclosures on February 13th, 2020 and October 29th, 2019 and July, I believe, 29th, 2019 and that there was -- there was a substantial and

Page 106

statistically significant decline that was observed on those days. That -- I can tell you that.

BY MR. WINTER:

Q All right. Well, then, let's -- focusing on that, how do you know or how did you determine that there were adjustments to Ryder's residual values on February 13th, 2020?

A Adjustments to -- oh, can I -- do I have the ability to -- I guess I do -- to move this report? Do I also have -- oh. I don't understand. I guess I -- this is not searchable? Hold on one second.

Okay. So on page 2 of the judge's Motion to Dismiss opinion, the second full paragraph: "Plaintiffs allege that because of Defendants' misrepresentations, shares of Ryder stock were artificially inflated, only to come crashing down on October 19, 2019, when Ryder disclosed that it needed to make a corrective adjustment by reducing its residual value estimates from the second half of 2019 through 2024-2025 by $844 million." Okay. So there's that.

And then --

Q I think you're there, just to speed this along.

Page 107

And then: "On February 13th, 2020..." the last sentence on page 2?

A Yeah. On page 2 then -- right. After this: "On February 13th, 2020" -- Ryder -- "Ryder disclosed that the total depreciation expense for its fleet would exceed $1 billion, which led to an additional 23% drop in stock share value."

It's my assumption that the plaintiffs will prove that at trial.

Q Okay. And you didn't look at the actual February 13th, 2020 disclosures as part of your report here, correct?

MR. WIERZBOWSKI: Objection to form. Assumes facts.

THE WITNESS: Not only do I refer to it in the text, but it's in my chronology. It's my news/no-news test. It's in -- February 13th -- there's information related to February 13th in Appendix E, in Appendix F, in Appendix G, and Appendix H.

BY MR. WINTER:

Q Okay. And so based on all those places you referenced the February 13th, 2020 disclosure in your report, it's your -- is it your understanding that that disclosure says that Ryder's total

Page 108

depreciation expense would exceed $1 billion?

A Is it my -- it's my understanding that the complaint says that and that those allegations will be proven true at trial.

Q Okay. So you're relying on the complaint, not the actual disclosure that's referenced here?

A Well, I'm relying on the complaint and the Motion to Dismiss at this stage, yes.

Q And what's the significance to you of the fact that plaintiffs allege that a disclosure on February 13th, 2020 regarding Ryder's depreciation expense led to a drop in stock price? What's the significance of that for your report?

MR. WIERZBOWSKI: Objection to form. Vague.

THE WITNESS: That is an information-rich date that has a statistically significant return, and that as part of my holistic news and no-news analysis, supports my opinion that Cammer 5 is -- and cause and effect is demonstrated.

BY MR. WINTER:

Q Okay. And as it turned out that Ryder on February 13th, 2020 actually did not disclose any new information regarding its depreciation expense, would that impact your opinion in any way?

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 109

MR. WIERZBOWSKI:  Objection to form. Incomplete hypothetical.

THE WITNESS:  Yeah, you're -- you're saying that if -- again, to be clear, that if it were demonstrated that there were -- was no loss, none of that decline had anything to do whatsoever about changes in the depreciation expense, I couldn't say by itself what that -- I mean, because, again, you've been sort of throwing around residual value and depreciation expense.

You know, if it was demonstrated that none of that loss that was caused to investors was due to any of the allegations put forth in this -- in this complaint -- okay? -- then a loss causation analysis, that would suggest that there was no inflation eliminated from the stock on that date; however, that doesn't affect my opinion.

Because if there's no inflation on February 13th, 2020, that -- that in and of itself is an input into the inflation ribbon that is used to apply classwide, and the common damage methodology would still be utilized to calculate investor harm.

BY MR. WINTER:

Q   Okay.  It'd just be that that stock price -- that stock price drop would become zero for

Page 110

purposes of moving that through the inflation ribbon.

Is that what you're saying?

MR. WIERZBOWSKI:  Objection to form. Incomplete hypothetical.

THE WITNESS:  Yeah, I mean, in a -- in a hypothetical world where the trier of fact determines that there is no inflation that exists, for example between October 29th, 2019 and February 13th, 2020, then the inflation is zero.  But that doesn't affect my opinion.

The stock still trades in an efficient market.  The stock still -- and I can still calculate damages using the same common damages methodology, and I can apply classwide to calculate individual harm.

BY MR. WINTER:

Q   Okay.  All right.  If we can, let's go back to your report.  I want to talk a little bit about your market efficiency opinion.

A   That's my whole report, or a substantial portion of my report.

Q   Not all of it, Doctor.  Not all of it.

A   Not all, okay.

Q   41 of 45, but not all of it.

Page 111

A   Okay.

Q   So if we go to paragraph 10, you summarize that opinion here.  I'm just directing us.  I'm not asking for your summary.

Okay.  So you concluded that the economic analysis of the basket of factors typically used by courts to analyze market efficiency, and I'm skipping over a little bit, supports the conclusion that throughout the class period Ryder's common stock traded in an efficient market.

What does it mean for a market to be efficient?

A   Well, in the -- in the case of the Cammer/Krogman factors, it means that it's open. You know, traders can easily and at low cost, you know, come into that market.  Well-developed -- and in this particular case, this is a stock that traded on the New York Stock Exchange, which is arguably, the most well-developed exchange in the world, and then efficient, that the price, that the information that is available publicly is reflected in that stock price.

Q   Okay.  And then if you take a look at paragraph 12.

A   Paragraph 12, okay.  Let me read it.

Page 112

Q   Sure.  Why don't you read that.

A   Okay.

Q   So you used the phrase "informationally efficient" in the first sentence, and then in the second sentence, you say:  "...informational efficiency means that prices of securities rapidly change to reflect new, unanticipated, material, public information."

Do you see that?

A   Yes.

Q   All right.  Is informationally efficient different from efficient?  I'm just trying to understand the lexicon here.

A   Well, not as I define it.

Q   Okay.  So I just want to unpack that second sentence a little bit.  The last word used is "information."

What do you mean by "information"?

A   Facts that investors would utilize to make their investment decisions.

Q   Okay.  So that could be about the economy, about Ryder, about the industry, anything that impacts the investors' views of -- of value; is that fair?

MR. WIERZBOWSKI:  Objection to form.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 113

Vague.

THE WITNESS: Yeah, I mean, that's -- I don't --

BY MR. WINTER:

Q   I can break it up.

A   But, yeah, just you're limiting -- it is information -- I mean, some traders use Ryder's stock movements as, you know, that's their information.  I mean, information is -- is -- again, it is -- there are facts that alter the investor mix and their decision as to whether they think the stock is going to go up or down, and it's -- you know, it's sort of based on an individual, and then it is aggregated within the market.

Q   Right.  What I was actually getting at, though, is it's not limited to company-specific information.  It's not limited to information that Ryder discloses, for example?

MR. WIERZBOWSKI: Objection.  Form.  Compound.

THE WITNESS: Information -- and I think what you're getting at is information generally can impact a stock.  Okay?  It can impact it both in terms of its -- and information that's exogenous.  You know, factors that are exogenous to the company

Page 114

can impact its -- its stock movements, you know, so that, for example, something that affects the cash flow of the company that is not specific to the company can -- can impact the stock price.  And then the riskiness associated with it or its relationship to the market in general or whatever could affect it as well.

And that's why, when you do an analysis such as I do, you use an event study, and you use the market model, is to try to incorporate exogenous factors and account for the influences of the general market and the industry.

MR. WIERZBOWSKI: And, Steve, I hate to interject, but we just hit the noon mark, and I'm just wondering when might be a good time for us to potentially break.

MR. WINTER: I was happy to leave that to Dr. Hartzmark.  He seems to have quite the stamina for this.

BY MR. WINTER:

Q   You tell us what you want to do.  I'm happy to --

A   Yeah, why don't we, if we can get through this line of questioning, you think, and then -- and then we'll move on to lunch?

Page 115

Q   I'm happy to do a little bit more.  This is going to take a little bit longer in terms of a whole section, so I'm happy to break now.  I'm happy to do another ten minutes.

A   I mean, are you going to be asking some general questions about market efficiency right now?  I mean --

Q   I will be asking some general questions about market efficiency.

A   Okay.  Why don't we finish that up and then if we get specific, or if I pass out, or if I collapse in front of the camera --

Q   Let me do a couple more, and then I think I know a good stopping place.

A   Okay.

Q   What do you mean for information to be public?

A   Public?

Q   Yeah.

A   That it's disclosed and disseminated and digested.

Q   Okay.  So that would include Ryder's SEC filings, for example?  That would be an example of public information?

A   That includes -- it's a disclosure that

Page 116

includes public -- publicly disclosed information, yeah.

Q   Okay.  Not to belabor, but the trans- -- all the stuff you were listing in your appendix, the transcripts of the earnings calls, the news articles, the analyst reports, those are all examples of public information?

A   There -- first, there's a disclosure, right?  So let's take the SEC disclosure.  Then there is dissemination.  Okay?

So you can have disclosure from a variety of sources, but the SEC filing a 10-K, 10-Q is disclosed.  Press release is disclosed.  You know, generally in an open, well-developed, and efficient, and certainly in Ryder's case, though that is disseminated, then you have the digestion.  I would put the analysts more in terms of digesting the information, as well as, obviously, they're important in disseminating it, but they help with the digestion of that information.  So it's got to go through that process.

Q   Okay.  And when you say to reflect new information, why is it relevant that it be new?

A   Well, markets anticipate all of the information, and, for example, if you've got an

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 117

exogenous factor that everybody knows, it should be incorporated into the -- the price.

Q   Okay.  So if the information, you know, wasn't new but was old information, that wouldn't be expected to impact the company's stock price?

MR. WIERZBOWSKI:  Objection to form. Incomplete hypothetical.

THE WITNESS:  Yeah, I mean, it -- it -- if it's old -- old, anticipated, and material information -- so it's, in essence, not news -- then, you know, to the extent -- and, again, you've got to look at it holistically.  Anecdotally, I don't want to say yes or no because you can't -- there are all types of other types things that can move market prices.

But, you know, old -- you know, information that is old, in essence, has been previously disclosed in the same form, in the same format doesn't change the risk element of the company.  So it could be -- then, yeah.  Then you shouldn't expect there to be a -- you know, a substantial change in the mix of information that investors rely on.

BY MR. WINTER:

Q   Okay.  And you've referenced a couple of

Page 118

times the Cammer and the Krogman factors.  What's the reason that you rely on those for purposes of demonstrating market efficiency here?

MR. WIERZBOWSKI:  Objection to form.  Calls for a legal conclusion.

THE WITNESS:  Here?

BY MR. WINTER:

Q   Let me actually ask that follow-up.

Is it -- are you doing it because courts have sort of cited them before or because you're offering an economic opinion that those are the right factors to look at for purposes of deciding whether or not the market is efficient?

MR. WIERZBOWSKI:  Objection to form. Compound.

THE WITNESS:  Well, first of all, it'd be arrogant for me to say what it is that the courts should or should not look at.  The courts look at these -- these factors.  People your age or younger generally don't understand how this has evolved since the 1970s when I began as a student.  These factors have very firm and extensive academic support, and I cite to some of these, the support in my report, and I cite to them in the papers -- the scholarly papers that I have published.

Page 119

And so it's a combination of the two.  The courts have evolved, and I don't want to be -- I'm not here today to say what the court should look at.  The courts have historically looked at those.  They do have academic support to suggest that the market is open, well-developed, and efficient, and, therefore, I have utilized those for now -- what? -- since certainly 2004 as sort of my benchmarks when I am engaged to answer that question and utilize my economic tools to answer whether the -- the stock trades in an open, well-developed, and efficient market.

BY MR. WINTER:

Q   I think now's a good time for a break.  How long do you want to take?

A   Well, it's a lunch break, so how about 12:45?

Q   Sounds great.

MR. WIERZBOWSKI:  Okay.

THE WITNESS:  Is that okay?  Is it enough?

MR. WIERZBOWSKI:  Sure, if it's enough for you.

THE WITNESS:  That should be fine.

THE VIDEOGRAPHER:  I'm sorry to interrupt. We're now going off the record at 12:06

Page 120

p.m.

(Whereupon, at 12:06 p.m., the proceedings in the above-entitled matter were recessed, to reconvene at 12:49 p.m., this same day.)

Page 121

AFTERNOON SESSION

(12:49 p.m.)

THE VIDEOGRAPHER:  We are now going back on the record at 12:49 p.m.

CONTINUED EXAMINATION BY COUNSEL FOR DEFENDANTS

BY MR. WINTER:

Q   Good afternoon, Dr. Hartzmark.

So we were talking before about the Cammer and Krogman factors, and you conclude in your report that those factors strongly support that Ryder stock traded in an efficient market; is that right?

A   That's correct.  In fact, I can't remember the Cammer and Krogman factors, you know, being as supportive, sort of across the board, as a basket in any of the cases I've been involved in.

Q   So that actually leads to a question.

So do you think about market efficiency as a spectrum, that some stocks are more efficient than others?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I mean, there are different levels of liquidity.  I guess part of it is my own experience.  I mean, I was the CEO, chairman, president, and treasurer, as you mentioned earlier, of Cragar Industries, and I took the company public.

Page 122

And we were a small -- basically a microcap public company, and so, needless to say, we didn't have -- we didn't have extensive turnover.  We didn't have extensive analyst coverage.  We didn't have large, institutional investors.  We didn't have large market -- market capitalization.  We didn't have large media dissemination of our information.  We didn't have a particularly active -- in fact, I don't think we had any shorts.  We didn't -- our float was -- was relatively small.  We were controlled mostly by insiders.

And I look at that as sort of one extreme, and then you take Ryder, on the other hand, with extensive turnover, extensive analyst coverage, extensive media coverage, trading on the New York Stock Exchange.  We were -- we were NASDAQ small cap at the time, you know, short activity with a wide range, a very narrow bid-ask spread, the ability to file an S-3, which, again, Cragar did not.  All of these things.  And then the fact that when information is released on these information-rich days, you get immediate response.

All of that together is -- you know, is basically, you know, a strong statement that the market is open, well-developed, and efficient.  And,

Page 123

therefore -- I mean, I'm giving you these examples -- I could not, and there are other stocks that I've been approached -- or other litigation that I've been approached, and it didn't have -- it didn't -- the characteristics weren't there, and -- and, therefore, I suggested to the potential client that they go elsewhere.

Cragar -- if Cragar would have been sued and somebody would have come to me, I would have said, no, you know, I don't think it is a candidate to be at least considered to be traded in an open, well-developed, and efficient market.

BY MR. WINTER:

Q   Okay.  And not to belabor it, but in looking at some of the factors identified in Cammer and Krogman, you then compared where Ryder fit to other publicly traded issuers on the New York Stock Exchange and NASDAQ; is that right?

A   Yes.  I mean, in terms of the economic comparisons, there are -- especially with respect to the paper that I -- that I cite to.  I think it's Bharat, Surana, and Torchio, there are other types of metrics, and, you know, in the -- in essence, Ryder is in the top portion of that in terms of what you would look at as -- as the bundle.  I refer to

Page 124

the paper as B, as in boy; S, as in Sam; T, as in Tom.

Q   And just to make sure we're talking about the same thing, for example, I guess in paragraph 24 you talk about weekly trading volume, and you -- you say that Ryder's weekly turnover would have placed it between the 75th and 90th percentiles, I guess, on the New York Stock Exchange and NASDAQ.

Is that what you were referring to before?

A   Right.  And that refers to the paper by Bharat, the whole -- Sunita Surana and Frank Torchio.  They've -- they've provided some benchmarks that one can use, and, you know, again, the -- with respect to the average daily turnover, you know, it's one of the Cammer factors where there's sort of a black and white that Cammer came up with.

Basically, if the stock turns over in a year, then they -- you know, Cammer considered that to be a -- you know, an efficient one, and if it was, you know, more than a year -- and in this case, you know, it's what? -- 6.3, so it's three times what Cammer suggested was a strong support for an efficient market.

Q   Okay.  We talked a little bit analyst

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 125

reports already, so maybe we could just go to the third factor, market makers and arbitrageurs.

A   Mm-hmm.

Q   And I guess in paragraph 31 you quote the Cammer court in saying that:  "These individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."

What's the significance of arbitrageurs reacting swiftly to company news and reported financial results as it pertains to market efficiency?

A   I'm sorry, but I was getting -- which did you read?

Q   I was reading paragraph 31, Cammer --

A   Oh, okay.  Right.

Q   And I was asking:  What's the significance of these market participants reacting swiftly to company news as it pertains to market efficiency?

A   You mean to the extent that they didn't act swiftly?

Q   Yeah, sure, if they didn't act swiftly, that would present an opportunity for investors to earn abnormal returns; is that right?

A   Potentially.  I mean, it just -- I mean,

Page 126

the whole idea is the competition.  I mean, that's -- you know, that's very clear in the efficient -- the academic efficient markets research and the extensive literature is that, you know, it's based on a theory of competition.  Everybody wants to earn a -- earn a buck.

Information, again, is very different than, say, a cable service in terms of earning profits, and -- and, therefore, once you -- once you earn -- once the price goes to the new equilibrium, you know, it -- then in essence only offers a -- you know, there's no abnormal or returns available.

Q   Right.  I think I understand.  Okay.

And then you actually conducted a series of empirical tests to detect whether Ryder's stock price itself rapidly reacted to the disclosure of new information -- I'm in paragraph 56 of the report -- if it's useful?

A   Paragraph 56 is a discussion of the event study methodology used to test for cause and effect.

Q   And you say, the first sentence:  "To detect whether the price of Ryder common stock rapidly reacted to disclosures of material, new information," you, "ran an event study"?

A   Correct.

Page 127

Q   Okay.  Just, if you can, explain what you did in your news versus non-news day event study, and then I'll ask you -- I'm going to ask some questions about that.

MR. WIERZBOWSKI:  Objection.  Form.

THE WITNESS:  In my news/no news, I separated information-rich days objectively to non-information-rich days and -- and compared the price responses in one sample versus the other.

BY MR. WINTER:

Q   Okay.  And the conclusion you reached was that based on the event study, that Ryder's stock price in fact reacted rapidly to the disclosure of these information-rich days; is that right?

A   Well, I mean, let's be more specific.  I point out in paragraph 67, I say:  "...Ryder's common stock price exhibited an abnormal price reaction that is statistically significant at or below the 5% level on 85% of news days."

That's 17 out of about 20 objectively defined news dates, compared to just 6.7 percent of the no news days, 76 of the 1,131 other days, so that the significant price movements on news days was over 12 times more frequently observed than on the no-news days.

Page 128

And using statistical testing of that difference basically suggests that there's, you know, virtual -- virtually no chance that random movements would cause that -- that type of difference.

Q   Okay.  And to perform that analysis, you looked at the -- Ryder's daily returns on each of those information-rich days, right?

A   I looked at the abnormal returns on the -- I would call it the price-impact day, which is the date related to when that information would have -- yeah, when you would have had basically a 24-hour period to have incorporated that news.

Q   Okay.  And is that standard sort of how you would perform an event study like this?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Standard?  Yes.  I mean, an event study -- you know, if you call it standard -- I mean, I've been doing this type of news/no-news analysis, you know, for -- for -- well, since 2008 I think, and in the academic literature, I mean, there -- there's evaluation of -- of different windows.  Some people have looked at it literally minute by minute, 15 minute by interval by interval, week after week, month -- I mean, it started

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 129

actually month over month.  An event study is, you know, is done that way.

In this particular -- you know, in the litigation context, one generally looks at -- you know, at -- at close-to-close returns.

BY MR. WINTER:

Q   Okay.  And is that because the stock price of a company like Ryder would be expected to -- its stock price would be expected to respond to news disseminated within a day?

Is that -- is that the idea?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Well, it's often.  But, again, you can't take one -- a sample of one and take meaning out of it.

The nature of -- again, I said it before.  The disclosure, the dissemination, and the digestion of that news is going to, for all intents and purposes, determine whether -- you know, sort of how long, you know, whether it's instantaneous, an hour, a day, two days, a week.  You know, again, generally in a holistic approach, you would look at one day as it relates to, you know, news being reflected in the -- in the stock price.

BY MR. WINTER:

Page 130

Q   Okay.  And then you also did a study examining something called autocorrelation; is that right?

A   Yes, in -- on page 36 of my report, paragraphs 71 through 79, I examine cause and effect using an analysis of autocorrelation.

Q   Okay.  And you performed a similar event study looking at daily abnormal returns?

A   No.

Q   No?  Okay.  Tell me what was wrong about that.

A   Oh, I -- I ran a market model, calculated abnormal returns, as I did -- in the first test, I looked at those information-rich days and compared them to non-information-rich days.  Autocorrelation looks over the whole class period and doesn't separate that and basically looks at the relationship between today's news and yesterday's news over this -- in this case, 1150-plus day -- 1150, right around, day period and asks the question, you know, are there, you know, daily trends that you could pick up, and the answer in this particular case is no.

Q   Okay.

A   There -- there were not, and in any --

Page 131

whatever -- however you sliced it, there's no autocorrelation.

Q   And I just want to make sure I'm understanding.

So take a look at paragraph 71 of your report.

A   Uh-huh.

Q   So we're under the heading, "Cause and Effect Analysis Examining Autocorrelation."

And you say that -- in the second sentence that: "...using a series of empirical tests I show that there is additional evidence supporting the conclusion that throughout the Class Period Ryder's common stock price rapidly reflected the daily flow of information."

Do you see that?

A   I do.

Q   Okay.  And so what do you mean here, I guess, when you say that -- or you conclude that the study you looked at supported the conclusion that Ryder's stock price rapidly reflected the daily flow of information?

A   Well, with respect to the first test: "I have demonstrated above that Ryder common stock reacted to earnings or guidance disclosures, as

Page 132

expected in an efficient market."

That test, you draw a bright line and you say, here's earnings days.  Here are non-earnings days.  Here are information-rich days.  Here are, you know, what is a pool -- even though we know there is some days in there that are information-rich days, but here's -- here's another sample -- okay? -- that is the leftovers -- okay? -- because I want to objectively determine what the news days are.

And so there I'm doing -- I've got this sort of bifurcation, and I separated and do a comparison of the samples.  But we know information is flowing in, whether it be exogenous information or different types of information, on a regular basis.  Literally, daily the stock price is -- is moving.  And we want to know whether those movements are, in essence, reflected quickly.

And so in this case, I don't separate these two.  I don't bifurcate the sample.  I use the whole sample, 1,150 days, and ask whether the return from yesterday is related to the return today.  And that's an economist's test or a statistician's test to ask the question whether information is rapidly incorporated into the stock price.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 133

Q   Okay.  And at least for purposes of that test, then the measurement window, in order to make the determination about whether that's occurring, is also daily?

A   Yeah.  The way that I've run it is daily. Again, you could run this minute by minute, hour by hour.  I mean, this is -- this is to assist the court in making the determination to support my opinions.  I mean, you could go ad infinitum, to use maybe, I think, a legal term, in terms of that.

But -- but a daily, close-to-close return is -- is commonly used for that particular test.  I could look at two-day returns.  I could look at weekly returns.  And, indeed, a lot of the early finance research was based on -- literally, on monthly returns.

Q   So is there a reason why it's kind of moved from, you know, monthly to weekly to daily?  Is it because we had better information or because, you know, now there's so many more, you know, traders and they trade fast?

Do you have a sense of why it's moving that direction?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I would speculate that it's

Page 134

computer power -- computing power.  I mean, when I started doing computing, I had a box full of cards, and I could take it to a mainframe computer at University of Michigan, and it would allow me to program how to play one game of Solitaire.  Now your phone can do -- can do that.

When I started in 2008 or '09 doing bootstrapping analysis as it relates to news and no news, I would have to -- if I wanted to run a thousand simulations, I would have to do that overnight.  Now I can do a million simulations while you and I ask and answer a question.  Computing power has changed substantially.

Indeed, you know, Eugene Fama, the father of modern finance, I mean, part of the reason -- you know, I don't want to downplay the fact that the guy's a genius, but when he started writing Foundations of Finance and starting looking at issues such as autocorrelation, the computing power was just starting to come about, and he used lots of, you know, periods that were not close to close.

BY MR. WINTER:

Q   Got it.  Got it.

All right.  If we take a look at, if we can, the body of your report on page 1.

Page 135

A   Oh, okay.

Q   All right.  And you have a footnote here, footnote 2.

Do you see that?

A   Footnote 2, it starts:  "Amended complaint"?

Q   Yeah.  And in the third paragraph, you start:  "The final alleged corrective disclosure."

Do you see that?

A   I see that.

Q   And then in the second sentence, there's a reference to something called "Class Period+."

Do you see that?

A   I do.

Q   What is Class Period+?

A   Well, it's the class period plus Friday, February 14th, 2020 and Tuesday, February 18th, 2020.  It just adds those two days for the purposes of doing my statistical analysis.

Q   Okay.  And why did you add those days in coming up with this Class Period+ definition?

A   I believe I added those because of the statements in the complaint.

Q   Okay.  And you're referring to the statements in the complaint in the prior sentence in

Page 136

this footnote?

A   Yes.  I mean, the complaint makes those statements and, therefore, you know -- and generally a complaint is written and they're, you know, looking at the price movement.  So the question then becomes whether they're statistically significant or not.

Q   Okay.  And I don't think this is what you're saying, but just to be clear, you're not saying that the class period here should be longer, right?

A   I can't define the class period.  That's a legal definition.  Based on the complaint, as I understand it, individuals who purchase between July 23rd and February 13th, 2020 would be included in the -- the class.  Okay?

As to damages calculation subsequent, if I was asked to do a loss causation and damages report, I might use, you know, some dates afterwards. Indeed, I've -- I've actually been engaged in a number of cases in Canada where they actually look at -- I think it's the ten days following any type of corrective disclosure.  That's just their -- you know, their mechanism to determine what the equilibrium price should be for the purposes of

State of Alaska                                    [FINAL]                              November 30, 2022
v. Ryder System                                                                     Michael Hartzmark, Ph.D.

Page 137

calculating damages.

Q   Okay.  But in any event, the Class Period+ here relates back to the plaintiffs' allegations in the complaint alleging stock price declines, not only on February 13th, but February 14th, and February 18th.  That's where you're getting it from?

A   Yes.

Q   Okay.  All right.  Let's take a look at paragraph 80 of your report.

All right.  So you say in the first sentence: "Although not necessary to support my conclusions as to the efficiency of the market for Ryder common stock, I have been asked by Counsel to also analyze whether Ryder's stock price reacted to the alleged corrective disclosures in a way that would be expected of a stock that trades in an efficient market."

Do you see that?

A   Yes.

Q   All right.  I guess, first, just, why do you say it's not necessary to support your conclusions as to market efficiency?

A   I want to make clear, you know, that I don't rely on stock price impacts on corrective disclosures as support.  I'm really looking for

Page 138

consistency.  The reason being objectivity.  Okay?  I try to be as objective as possible.

I've chosen earnings days, and the fact that these prices on the corrective disclosure dates were chosen by counsel and are in the complaint would make it look as if -- you know, especially often they're not earnings dates -- would make it look as if I was choosing dates -- information-rich dates based on what counsel was telling me as opposed to an objective criteria.

Q   Okay.  And then you go on, in this paragraph, to say that in Appendix C and E you present empirical information related to the calculation of all the abnormal returns throughout the Class Period+, and then it goes on, and then you identify the three alleged corrective disclosures here, right?  July 30th, October 29th, and February 13th.

Do you see that?

A   Yes.

Q   All right.  And then for July 30th, it says here there's a price impact alleged on July 30th.  So one day, right?

A   The next day, yes.

Q   Or the same day?

Page 139

A   Well, yes.  It was the -- if my recollection is correct, all three of these are earnings days.  In essence, when there are earnings announcements, earnings disclosures, and they're done prior to the opening of trade in the -- in the New York Stock Exchange.

Q   And that was going to be my next question.

So all three of these are earnings announcements, right?

A   That's my recollection.

Q   All right.  And market participants would have advance notice of when an earnings announcement is going to happen, correct?

A   Generally, companies will put out a disclosure that they're going to hold an earnings -- or they'll -- usually it's a -- that they're going to have a conference call, I think, and Ryder had their conference calls in the middle of the day, sometime after the close.

Q   I think it was, you know, the release comes out before 8 a.m. and then the conference call was usually 11 a.m.  Does that sound right?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  It's -- my recollection is I think it was 11:00 or someplace around there.  It

Page 140

was the middle of the day, which in some sense complicates this analysis in that often there is additional information, clarification, some type of certainty, whatever, that comes about in a conference call, and, you know, so often what you'll see with companies is that they'll have maybe the earnings after the market closes and then the conference call before the market opens or both before it opens.

Here, with Ryder, we have, you know, the disclosure of their -- their filings and financial statements, and then, in the middle of the day, the conference call.

BY MR. WINTER:

Q   All right.  And if you'd take a look at -- well, let me ask it this way.

So on July 30th, 2019, you concluded that the market reacted in a way that would be expected in an efficient market, correct?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  If I take July 30th, 2019 as the price impact date in my news/no-news analysis, it was statistically significant, which reinforces, yeah, which was what -- I had 20 days, so it was one of the 20 -- I'm sorry -- one of the 17 of the 20

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 141

that was statistically significant.

BY MR. WINTER:

Q   Okay.  And -- and your focus is on whether or not the stock price reaction was statistically significant, correct?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Well, I always -- again, I'll define -- if I misstate, statistically significant for the purposes of this analysis is 5 percent.  I think that the bright line that is often used, you know, is that 5 percent.  But I present the p-values, and in this case, again, so that I can bifurcate the sample, I use a bright line of 5 percent statistical significance and define that as a statistically significant, or a sig day.

BY MR. WINTER:

Q   Okay.  And all three of your alleged corrective disclosure dates, you found that the Ryder's stock price reacted in a statistically significant way and resulted in a -- well, we've -- I'll strike that.

You found that on all three corrective disclosure dates, the market reacted negatively and statistically significantly?

A   Correct.  And those three were included in

Page 142

the 17 other earnings day -- the 17 other earnings dates, with the other 17 earnings dates.  So, basically, three of three reacted statistical -- had statistical significance of 5 percent -- below the 5 percent level, and -- and then there were what?  14 other dates, earnings dates where there were statistically significant below the 5 percent level.

Q   And if the market had reacted positively, but also statistically significantly, would you have also reached the conclusion that the market reaction was consistent with what would be expected in an efficient market?

MR. WIERZBOWSKI:  Objection to form.  Incomplete hypothetical.

THE WITNESS:  On -- on these corrective disclosure dates?

BY MR. WINTER:

Q   Yeah.

A   I -- I would have -- I think I would have had to look a little deeper into those dates to -- to understand what information had been -- been disclosed.  But --

Q   Is the reason for that is because you would have expect a corrective disclosure to produce a negative market reaction?

Page 143

A   Well, I expect -- by definition, I expect an alleged corrective disclosure to remove inflation.

Q   Okay.  And does this mean that -- or does that mean that you'd also expect an alleged misstatement to produce a positive market reaction?

MR. WIERZBOWSKI:  Objection to form.  Assumes facts.

THE WITNESS:  No.  I would expect an alleged misstatement to either maintain inflation or to introduce additional inflation.

BY MR. WINTER:

Q   Okay.  Okay.

A   But --

Q   Would you expect it to lead to a negative reaction, though?

MR. WIERZBOWSKI:  Objection to form.  Assumes facts.  Incomplete hypothetical.

THE WITNESS:  And what's it?

BY MR. WINTER:

Q   Oh, sorry.

So you said you'd have expected an alleged misstatement to either maintain inflation or produce a positive market reaction, and I was just asking whether or not you would have expected it the --

Page 144

A   You totally misstated my answer.

MR. WIERZBOWSKI:  Objection to form.

BY MR. WINTER:

Q   I didn't mean to do that, so let me hear it again then.

A   Well, read my answer back.  I never said that.

Q   All right.  Let's see where it's asked --

A   Or at least I didn't mean it.  I'll correct my statement if I said what you said.

Q   So this is at 13:19.  I asked:

"Does this mean or does that mean that you'd also expect an alleged misstatement to produce a positive market reaction?"

You said:

"No, I would expect an alleged misstatement to either maintain inflation or introduce additional inflation."

A   That's what I said --

Q   Okay.

A   -- and I stand by that.

Q   Okay.  All right.

Did you examine whether the stock price

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 145

reaction on July 30th, 2019, so the first alleged corrective disclosure date, was consistent with the expected impact of the news released on that day?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I don't understand the -- the question.

BY MR. WINTER:

Q Yeah.

Did you look at the -- any of the -- did you look at any of the reports that were issued on or after July 30th to understand whether or not the information that Ryder disclosed on July 30th was different than the information that the market anticipated it would disclose?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I don't understand the question. I looked -- these are dates with alleged corrective disclosures, and I asked the question were there statistically significant negative returns, and the answer is yes. And that's consistent with an efficient market. It's also consistent with there being what's called, at least initially -- or I'm sorry. It's consistent with what's called back-end price impact.

BY MR. WINTER:

Page 146

Q Okay. What's back-end price impact?

A Back end is that -- that it's -- back end generally refers to dates when the inflation is removed, where front end is -- generally refers to when inflation is maintained or introduced.

Q Okay. But your conclusion that inflation was removed on the alleged corrective disclosure dates, that's based on the allegations in plaintiffs' complaint, not an analysis of the actual disclosures on those dates; is that right?

MR. WIERZBOWSKI: Objection to form. Misstates testimony. Outside the scope.

THE WITNESS: The -- if you look at paragraph 2 of my report, it says I've reviewed the complaint, Motion to Dismiss order, and assume the allegations sustained in the Motion to Dismiss order are true for the purposes of this report.

Within the Motion to Dismiss and the complaint, there are three dates that are alleged to be corrective disclosure dates. Okay? I assume that plaintiffs will prove at trial the allegations to be true. To the extent they prove that those are true and, therefore, the alleged corrective disclosure dates are corrective disclosure dates, there are statistically significant price movements

Page 147

on those dates. That --

BY MR. WINTER:

Q Okay. So I think we're having --

A That is what I've demonstrated.

Q Right. So -- so whatever new or relevant information that was disclosed on those dates, that would come from plaintiffs' complaint or the Motion to Dismiss decision accepting those allegations as true, not any of the underlying disclosures?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: Well, I think -- I think what you're saying is did I look at whether the losses incurred on those days were caused by the allegations.

Is that what you're asking?

BY MR. WINTER:

Q Not precisely.

What I'm asking is not whether the losses were caused by those allegations, but whether or not the reason the market -- the reason for the stock price reaction was consistent with plaintiffs' allegations.

A But isn't that -- the reason for the market's reaction being consistent with the plaintiffs' allegations -- okay? -- is basically

Page 148

asking the question of whether the decline is due to the allegations, isn't it? Isn't that the same thing? Or am I mistaken?

I'm trying -- I just want to clarify --

Q Yeah, I understand.

A -- I don't want to be argumentative, but it seems to me as though you're asking -- you're trying to word a question without just being direct and stating it. And I don't understand it. The reason --

Q Yeah. Let me -- let me come back to this when we have an actual example. I think that will help.

So on October 29th, 2019, which is the second alleged corrective disclosure, you considered price impact on both October 29th and October 30th; is that right?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I examined that, and interestingly enough, they were both statistically significant so that the allegations in the complaint were -- were supported, but conservatively I did not use the second date as a news date.

That, in essence, demonstrates actually why I'm conservative in the news/no news, because when

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 149

one examines this in a loss causation analysis, you might find that some of the losses that were based on the financial statements issued on the -- before the stock traded on October 29th and then further clarified in the middle of the day on October 29th, and then digested and disseminated later by analysts on the 29th and the 30th were all related to the allegations.

So -- but I -- this actually -- what you just pointed out just demonstrates that -- that the tests that I have, the news/no-news test, is -- is very conservative.

BY MR. WINTER:

Q   Okay.  I think you may have answered this in your prior answer, but let me just be sure.

Do you have an understanding as to whether or not there was corrective disclosures on both October 29th and October 30th?

MR. WIERZBOWSKI:  Objection to form. Outside the scope.

THE WITNESS:  I understand that there's an allegation of corrective information, curative information being disclosed throughout the 29th, being disseminated, and then being digested and -- and that analysts covered this through the 29th and

Page 150

the 30th as to how it relates directly to the -- to the allegations in terms of the measurement.  I haven't looked at that.

Were the losses on the 30th a result of the curative information on the 29th?  That's not a question that I had -- had looked at, but it seem -- you know, it seems reasonable that it might be.

BY MR. WINTER:

Q   Okay.  But you haven't looked -- looked at that question for purposes of your report?

A   Well, as I've stated, I haven't done a loss causation, so I haven't asked the question of whether the losses inflected upon investors on October 30th was based on the news that came out on the 29th and was further disseminated and digested on the 30th.  I haven't answered that question at this point.

This is -- and, again, that's why this is just an analysis -- it's consistent with the information that's disclosed on the 29th and then further refined in the middle of the day on the 29th, and then the follow-on analyst coverage on the 30th.  That's consistent with that -- those losses, that whole amount or a portion of it being associated with the allegations.

Page 151

Q   Did you do any analysis of the intraday trading on any of the alleged corrective disclosure dates?

A   If you can point me to where I cite to that here.

Q   I'm just asking the question.

A   No.

Q   Yeah, did you or did you not?

A   No.  Again, the strength of the Cammer and Krogman factors and the efficiency, you know, didn't really suggest that -- that going ad infinitum, as I mentioned before, made sense in this particular instance.

Q   Okay.  On February 13th, the third corrective disclosure date, you looked at price impact on the 13th, the date of the disclosure, the 14th, and then the 18th; is that right?

A   Yes.

Q   Okay.  And in your opinion, is a three-day price impact window consistent with market efficiency?

A   Can be.

MR. WIERZBOWSKI:  Objection.

BY MR. WINTER:

Q   Okay.

Page 152

A   There -- as I said, there's academic research that looks at months.  I mean, it's -- there's academic research that has windows.  There is certainly court precedent where, you know, courts have been very clear multiple days are -- are consistent.

You know, again, I will suggest that there -- there are analyst reports and such that are coming out.  I haven't looked exactly what the information is, but, you know, I'm not -- it's certainly not inconsistent with an efficient market, but it would -- you know, I -- you might -- well, as I said, it's not inconsistent with an efficient market.

Q   Okay.  We talked about how each of these corrective disclosures were actually earnings announcements, correct?

A   Yeah.  I want to add to what I just said before, because you have to -- as I mentioned before, it's a holistic approach, and so that even if -- you said something was -- was awry on the 18th, and, remember, the 17th was a -- was a holiday -- it's Presidents' Day -- that you got to look at it with the other 11 empirical tests and factors that I've put together to demonstrate and

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 153

strongly support that the stock of Ryder traded in an efficient market.

I think this issue of 13, 14, and 18 is going to really be an issue associated with measuring the losses to individual investors and the harm and whether, you know, the 18th is a day, again, associated with harm to investors. But in terms of efficiency, you know, there -- there's just such strong evidence that the stock traded in an efficient market.

Q   So does the fact that there is such strong evidence that Ryder's stock traded in an efficient market, in your opinion, wouldn't that lead to the -- the conclusion that Ryder's stock price would respond more rapidly to information than maybe other firms where the Cammer and Krogman factors weren't so strongly supported?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: Let me -- let me put this in perspective: On 17 of 20 days, including July 30th, October -- July 30th, 2019; October 29th, 2019; and February 13th, 2020, 17 out of 20 days, 85 percent, the stock immediately responded to that. That is -- that -- I think that might be the highest proportion of earnings announcements that I have -- I've had in

Page 154

my -- my experience doing 10(b)(5) litigation. Okay? And so that is very strong evidence that there was immediate response to that information. Okay?

Did it get fully reflected? There are a couple components to that. First, as I mentioned, the conference call was the middle of the day. I don't -- you know, and, therefore, analysts were in the middle of the day before they were able to maybe update their models.

I haven't examined the specific information, and I'm not going to anecdotally -- if you want to pick a day at random, you can always find a market that -- that might be inconsistent in certain respects by anecdotally choosing a sample of one, but if you want to take a sample of one and generalize when I've taken a sample of 1,150 days and I've looked at the turnover, I've looked at the analyst reports, I've looked at the widespread media, I've looked at the S-3, I've looked at the shorts, I've looked at the market cap, I've looked at the institutional trading, I've looked at the -- the float, I've looked at cause and effect showing this, again, 17 out of 20 days, and I've looked at autocorrelation.

Page 155

You want to look at those 12 factors and say that there's something wrong on the -- on the 18th of February based on a sample of one without even evaluating why it -- it might have taken a slightly greater amount of time than is often the case. That's fine, but that does not demonstrate that there is any inefficiency with respect to Ryder common stock.

BY MR. WINTER:

Q   You're aware that for earnings announcements, academic studies have found that stock prices adjust even more quickly than for other events, correct?

A   Again, in general, yes. Again, if you want to anecdotally take an unequal sample size of equal to one, that's one thing. The reason being that often, as you suggested, everybody has congregated. Okay?

Two, earnings are often such -- for certain companies it's a pure black and white, you know, in terms of meat, how much -- you know, what -- what -- you know, where were you, earnings per share. You know, what was the change? What's your multiple? You know, here -- you know, updated.

Here, you know, again, I -- I haven't

Page 156

looked at the information. I haven't examined the 14th and the 18th. What I have said is that following the corrective disclosure on the 13th through the 20th, which was alleged to be adverse, there were statistically significant negative returns on the 13th, 14th, and 18th. I've shown that in these earnings disclosures there was an immediate response on July 30th, 2019; October 29th, 2019; and February 13th, 2020.

As to the second days, you know, again, if those are news days, then my -- my support for efficiency is even greater because, you know --

Q   Are you aware of academic studies finding that the majority of the abnormal returns for stocks trading on major exchanges, like Ryder's, occur within the first few trades after an earnings announcement?

MR. WIERZBOWSKI: Objection to form. Assumes facts.

THE WITNESS: If you can point me to the articles. I've seen articles in terms of the first few trades. I've seen articles in terms of minutes and such, not necessarily in terms of the numbers of trades. But it often is rapid. And, again, one can -- if you want to show that this is ultra

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 157

efficient, you know, you can go -- go to the intraday.  This is efficient.  I mean, it responds.

On July 30th there's an adverse earnings announcement.  Stock adjusts.  On October 28th, 2019, adverse earnings announcement, the stock adjusts.  February 13th, 2020, the stock adjusts.  As to whether there's further digestion, whether analysts have to update their models and create new price targets, that might take some time, and maybe then there's further adjustments responding to that new adverse information that took place after that.

BY MR. WINTER:

Q    Okay.  All right.  I want to talk a little bit about the corrective disclosures here.  If we can just start with the July 30th, the first one -- I'm guessing I'm going to get an objection from counsel on this one, but I think it'll move things along.

If I asked you what is your understanding of the corrective information disclosed on a day, I assume you're going to point me to the plaintiff's complaint --

MR. WIERZBOWSKI:  Objection to form.

BY MR. WINTER:

Q    -- we should look at?

Page 158

A    Again, I don't -- if you show me in here where I discuss the specific news, maybe I can help you, but --

Q    Okay.  All right.  Let's just -- yeah.  Let's just do this.

MR. WINTER:  Will, can we -- let's mark as Exhibit, I guess now, 3 Tab 2, which is the Amended Complaint.

- - -

(Hartzmark Exhibit 3 was marked for identification.)

- - -

BY MR. WINTER:

Q    Sir, when you get there --

A    Okay.

Q    -- if you could turn to paragraph 135.

A    Okay.

Q    So this is under the section "The Truth Emerges," which I think is maybe one of the sections you remember spending a little bit more time with than others.

And it says:  "First on July 30, 2019, the Company reported earnings before tax for the second quarter of 2019," and it goes on:  "...driven by lower used vehicle sales results which had declined

Page 159

from the prior year as a result of higher valuation adjustments of $10.4 million on a larger inventory and higher depreciation of $7.6 million due to residual value changes.  As a result, Ryder reduced its earnings per share forecast for 2019 to a range of $4.80 to $5.10, as compared to its prior forecasted range of $5.28 to $5.58."

Do you see that?

A    Yes, it appears -- I think you read it correctly.

Q    All right.  And that's the first alleged corrective disclosure posed by plaintiffs here, right?

A    I'm confused.  That's a summary of what the -- how the -- the alleged truth, but it's a summary.  I haven't read the -- the --

Q    Okay.

A    -- the whole corrective disclosure --

Q    Understood.

A    -- evaluated it, nor do I do an accounting analysis.

Q    Okay.  So do you have an understanding of how this announcement was different from other earlier announcements during the proposed class period where Ryder either lowered guidance or

Page 160

recognized additional depreciation expense?

MR. WIERZBOWSKI:  Objection to form.  Outside the scope.

THE WITNESS:  Yeah, I don't understand the question, and I am not -- I haven't been asked to do a loss causation to link this to prior disclosures.

BY MR. WINTER:

Q    Okay.  So you're relying on the complaint's allegations for the fact that the July 30th announcement is an alleged corrective disclosure as compared to other disclosures earlier in the class period?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Well, I rely on the complaint, and I assume it's going to be -- this will be proven to be true at trial.  I'm not sure what the -- the detail here has to do with the -- you know, how it relates to my opinion, one, that Ryder common stock trades in an efficient market; or, two, that there is a common damages methodology.  If you can ask me a question about that, I'm happy to answer it.

But the linkage, you know, why this -- you know, why the loss that we observe was caused, you know, and if this is a reasonable explanation of

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 161

that, I haven't done that loss causation at this point.

BY MR. WINTER:

Q   Okay.  So let's take a look at your Appendix C, if we can, and it's a little -- it's a long document.  So let me know if it's a little difficult to get to.  I want to direct you to the February 2nd, 2017 trading day, and it's page 71 out of 223.

A   Page 71?

Q   Yeah.

A   Okay.  And the date is the 2nd?

Q   February 2nd, 2017.

A   And that appears to be an earrings announcement date as well?

Q   Yeah.  Exactly.  You can look at -- just from the titles over there.  Looks like it's the fourth quarter of 2016 announcement, right?

A   Yeah, this would be one of the 20 dates that are earnings announcements, and as would be expected in an efficient market on an information-rich date that there's a greater likelihood there's a statistically significant return, and in this case there was a negative 7.03 percent.

Page 162

Q   Okay.  It's also one of the alleged misstatements by plaintiffs in this case, right?

A   Well, I don't remember.  I don't recall whether this is a misstatement date or not.

Q   Okay.  You don't recall that plaintiffs alleged that every quarterly earnings announcement was a misstatement during the proposed class period?

A   You know, I just can't recall.

Q   Okay.  And so you wouldn't have any understanding about what makes this an alleged misstatement or the earnings announcement on February 2nd, 2017 an alleged misstatement and what makes the July 30th, 2019 disclosure an alleged corrective disclosure, what distinguishes those two things?

A   I believe I answered your question earlier by saying I was not asked to link corrective disclosures to misstatements and to determine whether the losses on the corrective disclosures are linked to prior misstatements because that's a loss causation analysis.

Q   Okay.

A   I mean, I'm not sure what you want to -- you're saying that this date's inefficient?  That's my opinion one.  Or are you saying that the nature

Page 163

of this date somehow suggests that there's not a common damages methodology?

Q   I'm just asking questions about the analyses here, and you can draw whatever conclusions you want about how it impacts your opinions.  But I'm just asking the questions whether you considered something or you didn't, and it looks like you answered no to that question.

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I mean, I think I clearly utilized this date for my news/no-news study.  I clearly, with this date, along with 19 others, suggest that the market is efficient.

BY MR. WINTER:

Q   Right.  But when you utilize the date, you're just utilizing it for the -- well, let me rephrase that.

When you utilize the date, you're focused on whether or not there's a statistically significant abnormal return, not the direction of the return, correct?

MR. WIERZBOWSKI:  Objection to form.  Asked and answered.

THE WITNESS:  The direction of the return would be two things.  First of all, you'd have to do

Page 164

an analysis of what caused, in this case, a 7 percent loss --

BY MR. WINTER:

Q   Right.

A   -- and the analysis, that's loss causation.  I mean, that is straight loss causation.

Two, the issue of the direction of the return -- okay? -- and, you know, markets are not -- and courts have always agreed they're not perfectly efficient or, as economists would say, fundamentally efficient.  They don't necessarily reflect information so that the stock price is guaranteed dollar for dollar to be correct.  Okay?  What they do say is that they're informationally efficient, which suggests that on information-rich days traders are going to compete, come in, and on average should be a greater -- you know, greater volatility, and that's what we have on this date.

I've told you time again I haven't done a loss causation analysis.

Q   And I understand that.  But let me ask it this way.

So the fact that on an alleged misstatement date the market reacted with a negative 7 percent residual return that doesn't impact, in your view,

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 165

the market efficiency of Ryder stock one way or another?

MR. WIERZBOWSKI: Objection. Assumes facts. Incomplete hypothetical.

THE WITNESS: Say that again.

BY MR. WINTER:

Q   It doesn't impact your view of the efficiency of Ryder's stock one way or the other?

A   I think the fact that it was statistically significant on an earnings date would support my opinion that the stock is informationally efficient. I think the fact that you have 3 million shares, you know -- I don't know. What is that? -- four or five times the normal volume would suggest that it's well developed and open.

The fact that it -- it happens there's an earnings date on there, and then, you know, it adjusts, that's all consistent with an efficient market.

Q   Okay. I just want to follow up on something you said. You said that -- I think you said the literature or academics don't suggest that the market is fundamentally efficient.

Is that what -- is that your testimony?

A   I think even the father of finance, Eugene

Page 166

Fama, would not suggest the markets are fund- -- have -- exhibit fundamental efficiency. Okay?

Q   I was going to actually ask you that.

So isn't it Fama's view that -- just give me a second here -- that market efficiency requires not only that stock prices respond quickly to new information, but that it correctly uses the available information?

A   I -- I --

MR. WIERZBOWSKI: Objection to form. Assumes facts.

THE WITNESS: Yeah, show me in the literature where he said that it correctly -- I mean, the fact of the matter is, he's on the board of Dimensional Fund Advisors, which is a firm that takes advantage of inefficiencies. I think his actions speak more than his words.

The other issue is -- is Dr. Fama has -- how can I say? He has progressed over time, evolved over time with respect to his views on efficiency. But I don't think there's -- there's any court in the land, nor do I -- do I know of any academic who suggests that stock markets are fundamentally efficient and that they reflect the true or correct value at all times.

Page 167

BY MR. WINTER:

Q   All right. Well, I don't know that we have to belabor it. I could direct you, if you'd like, to his efficient capital markets reply at page 143, if you'd like to take a look at where I was reading from after the --

MR. WIERZBOWSKI: Objection to form. I don't know what you're talking about.

THE COURT REPORTER: One at a time.

THE WITNESS: What market was that and what year?

BY MR. WINTER:

Q   Efficient Capital Markets reply from The Journal of Finance, 1976.

A   Oh, okay. So that's 1976. I'll tell you it's a little different if you'd go back to -- if you look at Efficient Capital Markets II published in 1991 and Market Efficiency, Long-Term Returns, and Behavioral Finance in 1998, I think you'll see a slightly different answer than -- than 1976. As I said, he's -- he's evolved.

You know, I hope you, you know, bring an expert in that says markets should always be perfect. That's -- that's fine. I'll deal with that in rebuttal.

Page 168

Q   So if a market -- let me make sure I understand.

In your view, if a market responds quickly but systematically in the wrong direction or in the wrong amount, is that an efficient market?

MR. WIERZBOWSKI: Objection. Assumes facts. Incomplete hypothetical.

THE WITNESS: So you're saying that some guru, probably multibillionaire because he knows more -- he's so smart then. He's rich. So he knows which way the stock should go. So he can then contend that the stock moves in the wrong direction -- right? -- and therefore it's inefficient. Again, if he's so smart, why is he doing -- maybe he is, he's doing investment advisory. But I think that's -- it's an absurd hypothetical, speculative, and for all intents and purposes, meaningless hypothetical.

BY MR. WINTER:

Q   Okay. So if you'd go back to your Appendix C and we now look at page 123, and if you'd take a look at the trading date February 16th, 2018.

A   February 16th, 2018. Okay.

Q   It's another -- it's another news day, right?

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 169

A    This appears to be a news day.  It would make sense, yes.

Q    So this is a year later before 2017, and the residual abnormal return is a negative 9.27 percent, right?

A    Yeah, the abnormal return is nine point -- negative 9.27 percent.

Q    Okay.  And this is an alleged misstatement by the plaintiffs?

A    If you suggest that.

Q    And just make sure -- I think it's the same answer as before.  But the fact that there's a residual negative return of 9.27 percent on an alleged misstatement date, that does not bear in any way on your opinion that Ryder's stock traded in an efficient market, correct?

MR. WIERZBOWSKI:  Objection to form.  Assumes facts.  Incomplete hypothetical.

THE WITNESS:  I don't understand the question.  I mean, again, we got an information-rich day.  We've got a statistically significant return.  That would suggest we have volume of 2 million shares.  We would suggest -- this suggests anecdotally that this is open, well-developed and efficient based on the fact that it is responding to

Page 170

information.  As to exactly what caused the decline with an abnormal return of 9.27 percent negative, that's a loss causation question.  As to whether that's the wrong direction, as your financial genius would suggest, that we have to look into.

As to whether it is -- whether it is taking inflation -- potentially taking inflation out of the stock as it moved down or potentially putting -- putting inflation into the stock, because basically there should have been an 11 percent decline, but because of misstatements it was cushioned and inflation was added to the stock.

Only a loss causation analysis will allow you to -- to do that, and I haven't been engaged to do a loss causation analysis.

BY MR. WINTER:

Q    I think I understand.

So -- so your view is that the market efficiency is determined based upon the immediacy, you know, of the stock price reaction and it being statistically significant.  The direction it goes, positive or negative, you don't have to worry about that for purposes of determining whether or not the stock's trading in an efficient market?

MR. WIERZBOWSKI:  Objection to form.

Page 171

Misstates testimony.

THE WITNESS:  My opinion is, and it's been supported by dozens of courts in my -- in my -- related to my reports as well as others, is that based on a series of factors that are often referred to as Cammer and Krogman, one can answer the question of whether a stock is open, well-developed, and efficient.

So based on turnover, based on analyst reports, media following, S-3 filing, shorts, institutional holdings, float, market cap, those help you, as a basket, to evaluate these things.  To look at one day anecdotally and decide, because you're some genius, that the price should be up or down -- okay? -- at this particular juncture to use that one date is both, one, relying just on one factor; and, two, relying on one date and one factor.

What I can tell you is this date, along with 19 other news dates, exhibit what would be considered to be reactions that are consistent with and support the opinion that the Ryder stock traded in an open, well-developed, and efficient market.

BY MR. WINTER:

Q    Okay.  So on the next corrective disclosure

Page 172

date, October 29th, just as a general matter, you understand that Ryder announced additional depreciation expense as part of that disclosure, right?

A    The allegations, according to the court, are:  On October 29th, the company shocked the market with the bombshell disclosure that it was decreasing its residual value estimates by more than $840 million.

That's -- that's what the Motion to Dismiss -- that's what the judge wrote.

Q    Yeah.  And you understand that the -- the court -- you've mentioned the judge, a number of times, the Motion to Dismiss decision is a decision by the court accepting plaintiffs' allegations as true.

You understand that, right?

A    I don't understand that question.  The Motion to Dismiss I thought was basically the court deciding whether they should dismiss the case or not.

Q    Right.  And in -- in issuing its opinion, the standard the court uses is one in which it accepts as true the plaintiffs' allegations.

You understand that, right?

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 173

MR. WIERZBOWSKI: Objection to form. Calls for legal conclusions.

THE WITNESS: Legal, but I -- I guess I thought that it was more -- and this is purely an economist speaking, plausible as opposed to true.

BY MR. WINTER:

Q   I see. I don't mean to belabor it.

All right. So let's take a look at -- well, let me see if I can do it this way.

We talked earlier about the concept of a -- of a residual value estimate, right? That it's an estimate of what Ryder would sell the vehicle for when it sells it in the future?

MR. WIERZBOWSKI: Objection. Calls for an accounting opinion.

MR. WINTER: I'm not asking for an accounting opinion. I'm just asking if that's his understanding.

THE WITNESS: Again, conditioning on the fact that I've not been asked to provide an accounting opinion, that I am not a CPA, it -- it's my understanding that residual value is -- is a value that you expect to sell your vehicle at.

BY MR. WINTER:

Q   Okay. And so -- when you sell the vehicle?

Page 174

A   Again, I don't know what Ryder's -- I don't know what their method was. You know, is it when you sell it or on this specific date. I don't know whether it's an assumption on the exact sales date or that they assumed they'll sell it on a certain -- I -- I -- you're asking an accounting question that I cannot --

Q   Let me -- let me try to -- try it a different way.

When Ryder or any company changes a residual value estimate, do you agree that that communicates to the market information about Ryder's expectations for what the used vehicle market would look like in the future when it sells the vehicle?

MR. WIERZBOWSKI: Objection. Calls for an accounting opinion. Misstates facts.

THE WITNESS: How that information is utilized is -- I haven't been asked to opine on that.

BY MR. WINTER:

Q   Okay. Let me ask this.

Would you agree that -- would you agree that information in the market, from whatever source, about what the used vehicle market would look like in the future is an example of the type of

Page 175

public information that would affect the stock price?

MR. WIERZBOWSKI: Objection to form. Calls for accounting opinion.

THE WITNESS: Are we talking about -- there's a word missing there. Are we talking about Ryder? Are we talking about -- what are we talking about?

I guess markets are based on expected future cash flow. Do we expect cash flow to go up or down? That's one. Do we expect it to be -- is there more risk associated with it? That affects it. To the extent that the information affects that, that is a fundamental principle of finance, and so if the -- if you -- if you say to me in a particular hypothetical that the cash flow -- it's disclosed that the cash flow is supposed to go up, all else constant, I would expect the price to go up. Cash flow is supposed to go down, all else constant, the price would go down.

BY MR. WINTER:

Q   If information -- if a disclosure would not be expected to change the cash flows of the firm -- just picking up on your prior answer -- would that be expected to cause a change in the company's stock

Page 176

price?

MR. WIERZBOWSKI: Objection. Incomplete hypothetical.

THE WITNESS: Incomplete. I mean, you can have no change in cash flow but, for example, you know, the fact -- let's take, for example, that you have a company and management has made a disclosure, and then, oops, they make another disclosure, and the market -- they lose credibility. That can affect -- even though the cash flow might remain constant, what could affect the stock price or issues associated with the riskiness of that cash flow, to the extent that it's changed, which is often linked to the credibility of management, can affect the stock price/cash flow constant.

But I'm not sure what that -- I mean, I guess it has to do with stock prices and, therefore, efficiency, but I haven't examined how on each of these days the cash flow has changed or what caused the change in the expected cash flow.

BY MR. WINTER:

Q   Okay. Okay. And I think I know the answer to that.

So you haven't analyzed whether the information in any of the three alleged corrective

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 177

disclosures in this case were actually corrective of the alleged misstatements?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: Well, as I stated time and time prior to this, to just your question have I evaluated the corrective disclosures and linked them to prior misstatements, that's what you do in a loss causation analysis, to determine the losses caused by -- by the misstatements. I have not done a loss causation analysis.

As I stated before, you can look at my first paragraph, if you'd go back to it. I've not been engaged to do a loss causation analysis.

BY MR. WINTER:

Q   How would you analyze whether or not an alleged corrective disclosure is actually corrected?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I'm not going to speculate on that at this point. What I can say is that there is strong evidence that the stock traded in an efficient market, and what I can say is that when I -- should I be asked to evaluate and link the corrective disclosure to the misstatements -- okay? -- that whatever technique I use, it's going to create an input. That input's going to go into

Page 178

the inflation ribbon. The inflation ribbon is going to be applied classwide, and my common -- and the common damages methodology that I propose will be utilized to calculate individual class member damages.

So when -- you know, when you -- you keep asking me the same loss question. I have not evaluated loss causation.

BY MR. WINTER:

Q   Okay. So let's turn actually to Section VII in your second opinion.

MR. WINTER: But mindful of the court reporter, would now be a good time for a five-minute break or longer?

THE COURT REPORTER: Sure.

THE WITNESS: Okay. So it is -- I've got 2:02 --

MR. WINTER: Want to say 2:10?

THE WITNESS: 2:10 sounds good.

THE VIDEOGRAPHER: Okay. We are now going off the record at 2:03 p.m.

(Recess.)

THE VIDEOGRAPHER: We're now going -- we are now going back on the record at 2:13 p.m.

BY MR. WINTER:

Page 179

Q   Okay. If you could take a look at Section VII of your report. It's page 41 at the bottom and 45 at the top.

A   I'm at -- I'm on page 41.

Q   Great.

And this is your second opinion that damages for --

A   Sorry.

Q   -- claims can be calculated on a classwide basis using a common methodology. That's in paragraph 85.

In your report, you refer to the methodology as an out-of-pocket methodology. Can you explain what you mean by that?

A   The out-of-pocket methodology, which is the virtual standard in 10(b)(5) securities litigation, is basically examining the harm to investors based on the inflation in the stock price when the class member purchased the shares less the inflation of the stock price when the class member sold the shares.

Q   And if you take a look at paragraph 87, you say: "To implement the out-of-pocket methodology, which is based on a relatively straightforward, standard, and commonly used formula, inputs are

Page 180

calculated."

Do you see that?

A   Yes.

Q   What inputs are you referring to?

A   Inputs?

Q   Yes.

A   Well, the inputs are basically measures of inflation on specific dates, potential scaling of that inflation over time, and those inputs are then utilized to create what's called an inflation ribbon, which is basically a measure of the actual price less what would be considered a but-for price. And that inflation ribbon then -- it's called a ribbon because it carries through either from the beginning of the class period to the end or from the end of the class period back.

That then is utilized, along with class member trading activity, to calculate their individual damages based on the common damages methodology that I proposed, the out-of-pocket damages methodology.

Q   Okay. And paragraphs 85 through 98, this is where you explain the basis for your opinion that damages in this case can be calculated on a classwide basis pursuant to the out-of-pocket

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 181

methodology you just described; is that right?

A   Yeah.  It basically describes my opinion and how it's implemented, what the equation is, and, you know, it -- you know, it's consistent with either examining it and looking at inflation and going backwards or calculating a but-for price and subtracting that from the actual price and calculating inflation.  But the concept is inflation at purchase, less inflation at sale.

Q   I'm going to come back to that, but when you said inflation and going backward, is that called backcasting?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I mean, some people might call it backcasting.

BY MR. WINTER:

Q   Is that not an accurate description?  It sounds like you were --

A   I -- you know, I don't think I've ever used that terminology --

Q   Okay.

A   -- that I can recall.

Q   Now, in this section that we just bracketed, I guess, paragraphs 85 through 98, are any of these paragraphs specific to Ryder?

Page 182

A   They're all specific to Ryder.

Q   So it looks like you used -- I tried to count.  Looks like the word "Ryder" is used five times in this section, and each time it precedes either common stock or stock.

Is there anything specific about Ryder as a company or the -- the claims that are asserted here against Ryder that's reflected in Section VII of your report?

MR. WIERZBOWSKI:  Objection to form.  Assumes facts.

THE WITNESS:  It's very clear from -- from this that this is a virtual standard, a routine.  It's a formula.  As for the specific facts that are under dispute between you and the plaintiffs, those will be evaluated during discovery, and that will enable a defense expert and an economic expert to calculate those inputs.

BY MR. WINTER:

Q   Okay.  But for purposes of your opinion that damages can be calculated on a classwide basis, you could just swap Ryder for any other public company that's a defendant in a Section 10(b) claim where there's an alleged misrepresentation that inflates the stock price, right?

Page 183

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Well, let me -- let's turn back to page -- to page 4.

BY MR. WINTER:

Q   Page 4.

A   Okay?  Because I don't want to basically take what you're saying about -- Rougier -- footnote 6, Rougier, Applied Optoelectronics.  Okay?  Basically, it suggests that -- I can say that the out-of-pocket damages method is -- is acceptable.  Vrakas versus U.S. Steel, the damages model was accepted.  Signet Jewelers Limited, the notion of inflation at sale and purchase is accepted.  DFC was accepted.  Cobalt was more associated with efficiency.  They didn't discuss because I don't think there was a question of damages.

William Wallace, very clear while calculating proper damages based on the date of purchase and sale may be complicated, does not demand excessive individual inquiry.  In essence, it basically says what I say is that, whatever that number is, whatever that input is, is put into this common damages methodology formula, and it's applied classwide.

Should it be the case that the trier of

Page 184

fact says this is so difficult in this particular 10(b)(5) case and Dr. Hartzmark's calculation is so unreliable and unreasonable?  Again, I don't think any court is looking for perfection, but is unreliable, unreasonable, doesn't measure it, that still allows me to suggest that there's a common damages methodology because in that case, if it's unreliable, you put in zero, or possibly if the defendant is being at least somewhat honest, some value that they calculate it other than zero.

The fact is that all of these cases, as well as the others that I've done, this is the nature of the damages because the allegations relate to the stock price being inflated.  Okay?  If it's a different type of allegation, then, yeah, the out-of-pocket methodology is not -- wouldn't necessarily be applied.  Okay?

But this is a very clear-cut case, as I understand it.  The liability theory is that because of misstatements on financial metrics, stock was inflated.  Inflation came out, investors were harmed by buying at inflated levels, whatever those levels are.  Whatever that input is to create the inflation ribbon will be calculated, and when I do a loss -- or when someone does a loss causation analysis and

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 185

it will be applied classwide and out-of-pocket damages methodology will do.

So that's a long-winded answer, but at least in the cases that I've been involved with, the fact-specific inquiry is done in the loss causation analysis. I mean, I don't have any internal documents to know what management knew and when they knew it. So how can I calculate the inputs --

Q   So --

A   -- at this stage?

Q   So just so I understand, you've mentioned a number of court decisions. For this opinion, are you relying on what other courts have said might be sufficient at the class certification stage --

MR. WIERZBOWSKI:  Objection to form.

BY MR. WINTER:

Q   -- to establish that damages can be calculated on a classwide basis using a common methodology?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  No, I'm relying on economics. It's simple, basic principal economics, inflation at sale and inflation at purchase. And it just so happens that a number of courts -- and this is only my decisions alone, other securities 10(b)

Page 186

litigation, they -- they have suggested that, yes, there is a common methodology. Yes, purchase inflation less sales inflation is a reasonable approach. Yes, inputs will be calculated at the loss causation stage.

BY MR. WINTER:

Q   And I think -- is it your view that even if an out-of-pocket methodology could not reliably calculate inflation during the proposed class period that you would still have the view that that methodology is able to calculate damages on a classwide basis?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I mean, if I interpret your question correctly, if it's the case -- yeah, because there are different ways of doing it: using an event study and various information, internal/external information, other types of -- of statistical analysis, accounting analysis, economic analysis, review of the internal documents linking the statements to the -- the corrective statements to the misstatements, you're saying after all of that is done, after all of that is done, even though the -- the plaintiffs have proven at trial that there is liability -- okay? -- that they did lie and

Page 187

the stock is inflated -- okay? -- but that Dr. Hartzmark or any other expert is not capable of measuring that inflation to -- with a reasonable degree of certainty -- okay? -- then my damages methodology no longer applies? That is not what I'm saying. I'm saying it does apply. You just put in that damage into the input.

What if it's the case that the damages methodology that I have is absolutely reliable from July of 2015 to July of 2019? Okay? And then I can calculate to the penny the inflation. But then from July 2019 to February 2020, the defense experts say there's no inflation. The defense experts are able to basically say Hartzmark's calculation is unreliable, unreasonable, not -- not a measure.

Well, you would still calculate damages for all of those class members, people who had purchased during the class period, based on the inflation ribbon from July of 2015 to February of 2020. It just won't so happen that the input into that inflation ribbon is zero. So --

BY MR. WINTER:

Q   That's what I'm struggling with.

So as an economist, why -- why is it the case that you're equating, I think in your words, a

Page 188

potential -- if there's a determination that a damage -- damages methodology is unreliable for the purposes of calculating inflation during the class period, if someone makes that determination, why --

A   You're misstating my words. I have never said the damages methodology was unreliable. I said the technique --

Q   That's fine. No problem.

A   -- the technique -- please let me finish. The technique to calculate the input, i.e., the input so that you could calculate the inflation measure -- okay? -- assume that your -- your defense expert shows that my statistics are wrong and that on February 13th, 14th, and 18th there's no statistically significant decline -- okay? -- and using that as an input into the inflation ribbon is wrong. Okay? Then my common damages methodology still applies. It's just the technique that I do for the input is there.

Assume for the moment that you bring in an accounting expert that somehow says, no, there's no inflation based on accounting principles that is removed on February 13th, 2020. Okay? Again, that doesn't say that the common damages methodology is unreliable. It says that my technique to calculate

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 189

the input is unacceptable to the court.

But what I can say -- what I can say is, A, I find that very hard to believe, especially in a case like this, where when we find out through disclosure who knew what when and their internal financials, that -- and analyst reports and news reports and all of the information that would go into discovery and the factual inquiry and the factual disputes that you all will resolve at trial, that we couldn't calculate a reasonable inflation.

That input, whatever that input is, whether it be zero or whether it be the $1.3 billion decline that we observed over the three corrective disclosures -- okay? -- whether -- whether those are the case, that will be input into the -- the inflation ribbon, and the inflation ribbon will be used, and the common damages methodology will be applied classwide to calculate individual damages.

You're confusing input and the techniques to calculate the input with the methodology, which is as simple -- as I said, as simple as the slope of the line.

Q   Let me try it this way.

If there's a determination that the techniques that are proposed to calculate --

Page 190

A   Somebody's not muted.

Q   If the techniques used to calculate inflation during the class period are unreliable -- right? -- the techniques, I had thought you said that in that circumstance you might sub in zero for the inflation input. Just stop there.

Did I get that right?

A   The finder of fact might.

Q   Okay. So I guess as an economist, what I'm asking is: Why is it the case, in your view, that a determination that the techniques used to calculate inflation during the class period is unreliable, why does that lead to the conclusion that inflation is zero? Why doesn't it lead to the conclusion that the techniques that would be used to calculate damages pursuant to the out-of-pocket methodology is unreliable?

MR. WIERZBOWSKI: Objection to form. Misstates testimony.

THE WITNESS: And I don't even understand the question. I just don't understand.

First of all, it's the finder of fact that determines it. I don't know whether you're using Lexecon or not. But ask -- having been on the defense side for Household, what does a jury do? A

Page 191

jury gets a -- gets a piece of paper every day and puts in a measure of inflation, and that is used to calculate individual damages with the out-of-pocket method. Okay?

If it's the case that the jury finds that it's unreliable -- I'm not saying Michael Hartzmark says it's unreliable, nor I'm saying that the jury says it's unreliable and they put zeros in for that. Okay? Well, it's still the methodology. They're still doing the same worksheet. It's still the same. It just means that the technique used -- which, again, is way premature.

You're -- you know, the technique is going to be based on examining the factual record when discovery is concluded. It's going to be based on utilizing other experts and the information that they can provide. The techniques -- you are confusing the techniques with the common damages methodology.

And as I read to you in those footnotes before, the courts have understood that -- that at this stage I haven't been asked to do a loss causation analysis and create those inputs. The courts understand that whatever those inputs are at the loss causation stage, whatever they might be

Page 192

will be put into the creation of a common damages -- will be put into a common inflation ribbon, and the common inflation ribbon, which is applied to the class member no matter who they are, what they are, what their characteristics are, what their risk preferences are, they'll be applied to that individual and damages will be calculated based on the inflation at purchase and inflation at sale.

BY MR. WINTER:

Q   Okay. So just to, I think, sum it up before we leave this: In your view, it doesn't matter, for purposes of this opinion, whether or not an out-of-pocket methodology -- sorry. Let me strike that.

It doesn't matter, for purposes of this opinion, whether or not an inflation ribbon could be reliably calculated in this case?

MR. WIERZBOWSKI: Objection to form. Misstates testimony.

THE WITNESS: First of all, again, my -- my opinion is that the inflation ribbon will be reliably calculated; but, two, what I do say is that whatever it is, it's going to be applied classwide, whether it's an unreliable ribbon or a reliable ribbon, and if it's unreliable and the finder of

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 193

fact were to determine that because it's unreliable and because the defendants have persuaded him that it's zero, then you put in zero.

BY MR. WINTER:

Q   When you said just earlier that your opinion is that the inflation ribbon will be reliably calculated, what is that based on?

A   On -- on a 40-year experience and the fact that this is a fairly -- this is -- you know, again, when the accounting expert comes out -- this is, you know, based on financial statements.  This is based on accounting information.  You know, I've been able to reliably calculate inflation ribbons for much more intangible, let me say, issues than -- than what we're talking about here.

But what I am saying, whether or not I'm right -- okay? -- that -- that I or some other expert will be able to calculate an inflation ribbon.  Whatever that ribbon is -- okay? -- whatever the finder of fact determines that ribbon is will be applied classwide, and the common damages methodology that is described on pages 41 to 45 will be utilized to calculate individual damages based on the inflation at sale and inflation at purchase.

Q   And the description of the out-of-pocket

Page 194

damages -- well, strike that.

The opinions set forth on paragraphs 85 through 98, you've used those same paragraphs in other expert reports, correct?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  They're -- they are perfectly consistent with expert reports.  There's probably a change of words here and there.  But as we -- I thought we went through it in pretty good detail early on that the nature of these -- that this is a virtually universal -- I'll read it again:  "The calculation of class-wide damages for a violation of...10(b) of the Exchange Act can be done using a common and broadly accepted methodology that is routinely applied and has become a virtual standard in federal securities litigation like this matter."

And so it's consistent with -- you know, I can go back to my Appendix B -- I'm sorry -- Appendix A, go through the cases, but to the extent that the allegations suggest that the price was inflated or deflated based on misstatements, then this will apply.  This common damages methodology will apply.

BY MR. WINTER:

Q   All right.  So let me just make sure I have

Page 195

that.

So if you have an efficient market, you have a plaintiff allegation that stock was inflated during the proposed class period and that is alleged to be a violation of Section 10(b) of the Exchange Act, if those three prerequisites are met, then your opinion is that you will always be able to calculate damages on a classwide basis using a common methodology?

MR. WIERZBOWSKI:  Objection to form.  Assumes facts.

MR. WINTER:  What was wrong about that?

THE WITNESS:  Lots.  Lots of things.

BY MR. WINTER:

Q   What?

A   First of all, damages are calculated every day in a market that's not efficient.

Q   That wasn't -- so I don't want to interrupt you, but I don't want to go off on a tangent.  Let me just back up.

A   Wait.  Read the question back.

Q   I will.

A   I'm answering your question.  Read the question back.  Okay.

Q   The question was:  So if you have an

Page 196

efficient market --

A   Okay.  There you go.  No.

Q   I'm not saying this is the only time you can calculate classwide damages.  I'm saying if you have these three things.

A   Then I don't understand why an efficient market has anything to do with the common damages methodology.  Why did you bring -- why is -- you're stating that --

THE COURT REPORTER:  One at a time.

BY MR. WINTER:

Q   Sorry.  We're talking over each other.  So I'll try to avoid that.  Let me try it again because I think I assumed something I shouldn't have.

If you have an allegation by plaintiffs that the stock was inflated during the proposed class period --

A   So the theory of liability is that the stock's inflated?

Q   Correct.

A   Okay.

Q   And that's alleged to be a violation of Section 10(b) of the Exchange Act.

A   That part I don't -- again, whatever -- whatever you say.  I mean, you're making a legal

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 197

question.

Q   This may be even simpler:
If a plaintiff alleges that stock -- that the stock price was inflated during a proposed class period, if that is true, your opinion is that damages for that claim can be calculated on a classwide basis using a common methodology?

A   I'll just add one thing, which is that the theory of liability is that the alleged misstatements caused an inflated stock price, then the common damages methodology can be applied classwide to calculate individual damages.

Q   Okay.  Great.
All right.  So go to paragraph 90 of your report.  All right.  You say: "To calculate the inputs for the out-of-pocket methodology or formula, an expert often begins with the same type of event study I used above in Section VI to evaluate the price-related factors."
Do you see that?

A   Yes.

Q   All right.  What type of event study here are you referring to?

A   The event study that is in -- that was utilized for cause and effect that is described in

Page 198

Section VI(B)(1) -- I'm sorry -- six -- yeah, VI(B)(1) and then Appendix D to my report.

Q   So I may be misreading what you wrote here, but when you say the same type of event study, are you saying the event study used in the out-of-pocket methodology is the same, or is it just in a similar genre or that -- that -- that would actually have some differences?
I'm trying to understand what kind of event study you're talking about.

A   Okay.  I think you're confused.  To calculate the inputs -- okay? -- the inputs, as I mentioned, that go into the inflation ribbon, you start with an events study similar to what I ran in -- well, let's go to -- which I describe in Appendix D.  Okay?
Appendix D has a -- on page D-1, header 307 shows the nature of the market model that is used to create the abnormal returns that are evaluated over different events.  Okay?  So you would run probably something like this model.  Okay?  This is a clean, objective model.  I use an off-the-shelf industry index so I don't have to, you know, deal with issues of subjectively choosing who's in and who's out.
When you get to the damages stage, you

Page 199

might do other things to adjust it.  I would start -- likely start here.  But, for example, there might be something associated with, in this particular case, exogenous factors, trends that aren't picked up on the daily movements of the industry index and of this.  Okay?  So you want to add that into it.  Okay.
So the point is you start here.  Okay?  In its simplest form, I would take the abnormal returns.  Look at the -- you know, let's assume for the moment that the court agreed that 100 percent of the abnormal returns on each of the three corrective disclosure dates and the dates following that are statistically significant and negative are associated with the removal of inflation.
You would use those -- okay? -- which came from this event study that I did for cause and effect, to calculate inflation going backwards.  To the extent that the court thought it was constant dollar -- constant dollar inflation, you would go back, as a constant dollar with each -- each corrective disclosure, removing a certain amount of inflation.  To the extent that the court agreed that it was constant percentage of the stock price, you would remove that.  You would have that inflation

Page 200

ribbon.
To the extent that there is some type of scaling over time about when you look at internal documents about what management knew and when they knew it -- okay? -- possibly information that an accounting expert might give, even a defense accounting expert, you might alter that inflation over time.
But the key that I talk about in 90 is you start with that regression.

Q   That was very helpful.  Thank you.
And then in the next sentence in 90 you refer to the disclosure of firm-specific information.
Do you see that?

A   Yes.

Q   Is that just the -- the -- is that corrective disclosure?  Is that what you mean there?

A   Yes.  Generally, you know, for example, you take a corrective disclosure.  You know, take February 13th, 14th, and 18th.  Let's assume for the moment, again, that those are all linked to misstatements in a loss causation analysis.  You would look at that to the extent that the court agreed that 100 percent of that was associated with

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 201

the inflation, that abnormal return would be the beginning of that.

It might be the case that after examining internal records, examining analyst reports, examining media information, doing an evaluation of accounting statements, looking at what the -- an expert accountant might say, that the court agrees that 70 percent of that abnormal return is associated with the revelation of the truth. Then you would utilize that. So -- but what this is basically saying is, is that is one way of doing it.

I've had a situation where, as I mentioned before, the difference -- the inflation ribbon also gives you the but-for price. What would the price be but for the revelation -- but for the misstatements. Okay? I've had a situation where I've calculated the but-for price, and so inflation is backed into. You have a but-for price and then you have a price that moves and then the difference between the actual price and the but-for price is inflation. Okay?

I actually got to the but-for price using a similar type of event study, very different case, though. That's what you do in a loss causation and damages report, and that's what I'm saying. One can

Page 202

do it here. It's my -- it's my view, based on my experience, that one would be able to reliably do it, but, again, as I said before, even if you -- even if the court deemed that my calculations or the calculations of some other plaintiffs' experts were unreliable, my common damages methodology still -- still applies classwide.

Q   Okay. So in paragraph 91, you -- you said some of this just now, but you describe, I think, how to calculate the inflation ribbon -- right? -- just a directional -- or what an inflation ribbon is --

A   I said that you calculate it through these inputs.

Q   Yeah.

A   I gave some very generalized hypotheticals as to how one might calculate the inflation ribbon.

Q   And in the second sentence, it says the: "...ribbon represents an estimate of the daily level of artificial inflation in the prices of Ryder common stock caused by the Defendants' alleged misrepresentations and/or omissions, which are based on the price reactions to disclosures either related to or revealing the alleged misstatements..."

What do you mean by "related to" here?

Page 203

A   Well, it's here: "...related to or revealing the alleged misstatements and omissions."

Q   Apologies.

So what do you mean by "related to"? How is that different from revealing?

A   Oh, linked. I mean, because you can have misstatements -- okay. This is the whole issue of linkage, right? So I can look at price reactions, as we did before in misstatements, and -- and decompose those, and that can help me to evaluate and create an inflation ribbon along with corrective disclosures.

Q   So sorry. Is revealing a synonym for corrective here?

A   Yeah. Yes. I think -- or revealing the alleged -- yeah, revealing -- revealing the truth.

Q   Okay. So if a disclosure is not revealing or corrective but just related to an alleged misstatement, how would you then calculate artificial inflation using an event study?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I -- can you read me back the question? I'm --

BY MR. WINTER:

Q   Sorry.

Page 204

If a disclosure is not revealing or corrective as a sentence, so it's not that --

A   It's not -- hold it. Hold it.

A disclosure is not -- so it's some type of disclosure totally unrelated to the allegation?

Q   No. No. I'm trying to -- I'm using your words here. I'm talking about a disclosure that is not revealing but is just related to an alleged misstatement or omission.

A   Okay.

Q   I'm asking: For that disclosure that's just related to the omission or misstatement, how would you calculate inflation using the result of an event study?

A   And, again, I'm not -- I can't be bound, but one examines misstatements, as we did before. Okay? So take, for example, the hypothetical that I gave before where the stock went down on a misstatement by 9 percent but should have gone down by 11 percent. Okay? Well, then, related to that misstatement is a 2 percent increase in inflation.

Q   Oh. I may be confusing this.

I had thought earlier what you said was that there might be disclosures that are corrective of alleged misstatements or omissions, but there

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 205

might be other disclosures that are merely related to or linked to prior alleged misstatements or omissions.  Let me just stop there.

Is that an accurate recitation of what you're saying in the second sentence of this paragraph?

A   Well, again, as an economist, you know, if the price reaction -- let's say, for example, if there's something that's basically an -- if you omit information -- okay? -- so that there's no price reaction, okay?  That's some information.  I'm not sure where -- where you're going with this.

Q   I'm trying to just understand what you mean by "related to" here.

What work is being done by disclosures that are related to an alleged misstatement or omission but not revealing the alleged misstatement or omission?

A   Again, I would -- and we did this before.  I would look at the -- in a loss causation analysis where you're linking corrective disclosures to misstatements -- okay? -- I would look at all the alleged misstatements, and probably I would look at every day as well.

Because sometimes, you know, a complaint is

Page 206

limited, but there are other -- when you do the in-depth dive and you see the internal documents and discovery is concluded and the facts have finally surfaced, oftentimes there are other dates that are important dates.  So you would look at those misstatement dates in the way that you asked me to look at them before.

Q   So you're not talking here -- I'm sorry.

I perceived that you were talking about, in this second half of this sentence, the disclosures that were in some way corrective, either fully or partially.  But it sounds like that's not what you're saying.

You're saying that a disclosure related to an alleged misstatement or omission is itself another misstatement or omission?

A   What?

Q   It didn't make sense to me either.  So I'm --

A   A statement related to the alleged misstatements is a misstatement.  I mean, I'm -- I'm very confused by this questioning.

If it's related to the alleged misstatements and omissions -- okay? -- it's -- it's going to be a misstatement.  If it reveals the

Page 207

alleged misstatements and omissions, it's -- it's revealing corrective, curative information.

Maybe the sentence is, you know -- but as you've brought up before, I've used the sentence before and --

Q   No.  And maybe -- maybe it's my -- my fault that I'm not reading this right.

But as I read this, you're saying that the ribbon is an estimate of the daily level of artificial inflation caused by alleged misrepresentations or omissions and that that inflation is based on the price reactions to disclosures, and then they can be either related to the misstatement or revealing the misstatement.

I'm just asking:  If the disclosure is only related to the misstatement, how is that used to estimate artificial inflation caused by that misstatement?  That's my question.

A   All right.  In a hypothetical perfect world -- okay? -- where every misstatement either has -- causes no price reaction or a positive reaction, you would have inflation possibly stair stepping with each misstatement based on the price reaction of the misstatement, and then on those disclosures revealing the alleged misstatement, you

Page 208

would have the stairstep moving down.  Okay?

Generally, because of the way companies -- companies deal with issues, especially issues associated with inventory, and I can speak with this having run a company myself, it's often that it's small in terms of the misstatements, relatively speaking, or they omit it totally and that the revelations are big.  So it turns out that economists generally, not always, will use the back end, as we talked about before, or the revelation.  Okay?

But, for example, again, I can tell you I just finished a case where the inflation was based on the misstatements -- okay? -- and the corrective disclosures thereafter.  And, in fact, I utilized a theory put forth by the folks at Lexecon related to leakage on the back end, but the front end, there were misstatements made -- right? -- and a stock goes up when a misstatement.

That's -- that's great.  But usually you don't have that -- that sort of single misstatement and then a series of corrective information.  Usually, you have a series of misstatements followed by more discontinuous or bigger corrections that come about.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 209

Take, for example, a classic inventory case where you have -- your inventory is stated to be a hundred -- okay? -- and it really -- it's really 90. Okay? And every quarter for ten quarters you overstated it for a dollar and there's no price impact, no price reaction from that overstatement. It's too small.

And then you say, "Oops. It's ten. I overstated it by ten." The cumulative amount -- and I state that on one day and the stock price falls. Okay? Economists will generally utilize that price reaction on that day and then do what's called scaling going backwards, and we might scale based on, say, the inventory at those different points. Okay?

So there are times when you're using -- and this is -- this is why -- this is -- again, this is more associated with the inflation ribbon and how you're going to do it. You had asked me before, techniques. What I'm saying, the inflation ribbon sometimes is used in the price reactions on the revelation and sometimes using the price reactions on the misstatements or sometimes both.

Q   Okay. So I think -- I think what I hear you saying is that if the disclosure is corrected

Page 210

and reveals an alleged misstatement, then you can use the stock price drop on the back end to try to estimate inflation during the class period -- I'll just stop there -- right?

A   Yes.

Q   And that if -- if a disclosure is related to an alleged misstatement, that is a bigger category of things that could include trying to estimate inflation on the front end based on the alleged misstatement.

Is that -- Is that a fair summary?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: Yeah, you -- I guess, put another way, you might utilize the misstatements on the front end. To the extent that they're measurable, material, you can decompose it to alter the level of inflation that you start with going backwards on the back end.

BY MR. WINTER:

Q   How would -- how would you know whether or not you could use the misstatements on the front end in order to estimate inflation?

A   You'd have to do loss causation. I'd have to look at internal documents. You know, again, you use the -- the toolkit that's available.

Page 211

But what I can say -- okay? Again -- and I'll say it again. Whatever that is -- okay? -- however it's determined, whether it be by your expert or by a plaintiffs' expert, whatever that input is, whatever that amount is, it's applied classwide, and then the common damages methodology is utilized to calculate individual damages. Okay?

I haven't done a loss causation. I can't tell you, and I can't tell you in this specific instance how I exactly would do it. Okay? But that's -- those are -- I've given you a whole bunch of methods that have been utilized in the past, and, indeed, the last one I gave you, the court just came out with a very favorable review of it.

Q   Okay. And if there was not a positive stock price reaction to the alleged misstatement, does that mean that you're in the world of relying on the corrective disclosure and trying to go backwards in time and estimate inflation based on the price reaction to the corrective disclosure?

MR. WIERZBOWSKI: Objection to form. Incomplete hypothetical.

THE WITNESS: Yeah, not necessarily.

Again, I'd have to look at the specific situation. As I said before, maybe -- take --

Page 212

again, I've given you the example. Take the situation where the stock went down by nine -- nine points. First of all, maybe there was a reduction in inflation. I can't tell you. Maybe there was a -- you know, maybe inflation is a billion, three at the end -- I'm sorry -- at its largest based on the declines over those three corrective disclosures and it's adjusted going backwards, and maybe that 9 percent is a reduction. Maybe it should have been 15 percent. Okay? You can look, and you can do analyses to look at that and -- and account for it.

The idea, then again, is first you parse, if you're doing backcasting, and then you scale, and so I -- I -- you know, again, how I'm going to scale in this particular case, that's an issue of loss causation. However that scaling factor is determined, though, will be applied classwide, and the common damages methodology will be utilized to calculate individual damages.

BY MR. WINTER:

Q   So that's where I was going to go next. So that's a good segue.

MR. WIERZBOWSKI: I'm just wondering, Steve, if this is a good time to break or if Dr. Hartzmark would like a break.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 213

THE WITNESS:  Depends how much more we have on the inflation ribbon and techniques.

MR. WINTER:  Probably another -- I would say 15, 20 minutes.

THE WITNESS:  How's the court reporter?

THE COURT REPORTER:  I'm fine.

THE WITNESS:  Is that okay, Adam?  If you need to break --

MR. WIERZBOWSKI:  I'm good.  I'm good.

MR. WINTER:  Don't be shy.

MR. WIERZBOWSKI:  Collective good.

MR. WINTER:  So we'll go for a little bit more, 15 minutes, and then we'll break.

BY MR. WINTER:

Q   Okay.  You mentioned parsing.  What is parsing?

A   Parsing is a term -- term of art utilized to take an abnormal return and separate it into components, some potentially related to the fraud, some unrelated to the fraud, and then possibly even separate it out even more, depending on the nature of the specific allegations.

Q   Is parsing the same as -- is parsing a technique you would use to address confounding information that is disclosed along with an alleged

Page 214

corrective disclosure?

A   Yes.

Q   Okay.  All right.  And I think you earlier referenced scaling.  If you could just help me a little bit more with that.

How would you describe what scaling means, and when you would need to do that?

A   Well, scaling is adjusting, generally, backwards over time.  So after you do your parsing, you then want to take that amount, dollar or percentage, and somehow adjust it based on what the internal documents say management knew at one point.  Okay?

Q   So is the idea that if you assume that the entire stock -- just to simplify it:

Can -- you assume that the entire stock price reaction to the alleged corrective disclosure is corrected.  Scaling is a question of how you then take that stock price drop, go back in time, and do you put more of it at a certain point?  Do you start it at a certain point?

Is that -- is that the analysis you're doing?

MR. WIERZBOWSKI:  Objection to form.  Compound.

Page 215

THE WITNESS:  I would say that it's better to think of it if the information that's disclosed at the -- on the date of the corrective disclosure had been disclosed earlier in the period, what would the -- what would have happened to the stock price.  You want to try and adjust that.

BY MR. WINTER:

Q   Okay.  So since scale -- and I'm going to use the allegations here to make it simple, but if they're causing you issues, we can -- we can try a different hypothetical.

But -- so taking your prior answer then, if Ryder disclosed, on an alleged corrective disclosure, let's just say $100 million of depreciation expense and the allegation is that should have been disclosed earlier, in order to scale, is it -- is it the case you need to know how much of that $100 million should have been disclosed earlier and in what amount?

A   Well, I mean, that's -- that's one way of think -- think about it -- again, let me go back to my inventory analysis of this hundred that you're talking about and that it grows over time.

So you're asking -- so I see this collapse -- again, let's assume it's a

Page 216

dollar-for-dollar collapse.  It's a hundred. They're off by ten.  They restate things by ten. But over time they weren't ten overstated, right? It was one.  Quarter 1 they overstated by one. Quarter 2 they overstated by two.  Quarter 3 they over stated by three, four, five, up to ten.  Okay?

So if I ask the question if they had revealed the same information; i.e., we now are correctly accounting for inventory back at the front part, you know, all else constant you would see, say, the $1 impact at that point as opposed to the $10 impact at the end.

So you might scale it, for example, based on some measure of inventory.

Q   Okay.  But an event study of the type that you did in Section VI, or as reflected in I guess Appendix E, that would not by itself let you calculate inflation when scaling is required, right?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Boy, I mean, how often we got to go through the same thing?

To calculate the inputs for the out-of-pocket methodology formula, an expert often begins -- begins, that's a very important word -- with the same event study I used in Section VI to

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

---

Page 217

evaluate the price-related factors.  I thought I've gone through this.  You pick the simplest of words. You use an event study.  You've got the corrective disclosure.  You parse the corrective disclosure. You then go backwards in scale.  Okay?  So you use it as a foundation.

But, I mean, did I say that the event study itself is the only tool -- economist's tool?  I've never said that.  I said they're techniques that you use, and I've given you just a boatload of techniques.

BY MR. WINTER:

Q   I never -- to be clear, I never said in my question that's the only thing you said.  I was trying to make sure --

A   No, you did say -- can I hear the question again?

Q   The question again:  I was asking whether or not an event study by itself --

THE COURT REPORTER:  One at a time.

THE WITNESS:  So let me -- let me put that another way.  So the -- only an event study -- an event study by itself says only an event study would be utilized, and I said not by itself.  It's the beginning.

---

Page 218

BY MR. WINTER:

Q   We're on the same page.

So your opinion in this case is not that the reason damages can be calculated on a classwide basis is because you're not going to have to parse or scale later.  Your -- that's not your opinion, correct?

A   My opinion is that when you parse and when you scale -- okay? -- those will develop the inputs into that is called an inflation ribbon, and whatever that inflation ribbon is, whatever the inputs are, whatever the parsing is, whatever the scaling is, that inflation ribbon will be applied classwide and the common damages methodology will be utilized to calculate individual damages, whatever that input is.  Whatever the finder of fact determines that input is -- as I said, whatever the finder of fact or the jury puts into their instructions as to what inflation is on each particular day -- okay?

I mean, I've got a case now.  I've got 2,000 securities.  2,000 securities each day has to have an inflation.  Okay?  It's -- my out-of-pocket approach -- my out-of-pocket methodology is utilized that way.  So the nature of the parsing and the

---

Page 219

scaling, it is done -- the key is -- what I'm saying in this report is it's applied classwide.

You as an investor -- Ms. Cain is an investor.  Michael Hartzmark, an investor.  We're all treated in a common way.  We all have the way -- we all face the same inflation ribbon.  Think of the claims that you get back -- or that you get for stocks that you've purchased.  Okay?  When there's been a litigation and a settlement -- okay? -- it applied -- doesn't matter who you are.  You get the same document.  You face the same inflation.

Q   So just to make sure I have this right, you're assuming, for your opinion, that you might need to parse or scale, but -- this is the question:

You're assuming that you may need to parse or scale, but for purposes of the opinion in Section VII, you don't need to identify what techniques you would use in order to calculate, if that's the right word, the parsing or scaling?

MR. WIERZBOWSKI:  Objection to form.  Asked and answered.

THE WITNESS:  To identify the parsing and scaling is to identify the causes of the harm or the losses to the investors.  The question, in and of itself, tells you that this is a question of loss

---

Page 220

causation.

BY MR. WINTER:

Q   So --

A   How can you parse without the factual record being disclosed?  How can I tell you who knew what when without certain documents?  That's not what I'm saying.

What I'm saying is no matter or whatever is the parsing that is done, whatever is the scaling that is done in this Ryder matter, it will be applied classwide and the common damages methodology will be utilized to calculate individual damages. Okay?

Q   And I understand that.  I'm not suggesting --

A   You --

Q   -- that --

A   When you're ready for a break, I'm ready for a break.

Q   One more question.

I'm not suggesting that you failed to calculate the amount of parsing or scaling that would be needed here based on the factual record.

My question is -- I want to make sure I understand -- you don't think that you need to be

---

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 221

able to conclude that parsing or scaling could be done in a reliable way in order to conclude that you can calculate classwide damages in a manner consistent with plaintiffs' liability theory.

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Again, you answered the question in your first clause where you said "the factual record."  The factual record is such that whatever the input is, whatever the trier of fact determines the input, whatever the parsing and scaling is that the trier of fact determines is appropriate, that will be applied classwide.  That is what I'm saying.  And the -- the technique, as you said -- you admitted right there, is going to be based on the factual record.  Okay?

It's premature at this point to do parsing and scaling.  Because parsing and scaling, by their definition, are evaluating the losses and the causes of the losses.

BY MR. WINTER:

Q    But just to be clear, you're assuming, for purposes of your opinion, that parsing or scaling could be done in a reliable way for purposes of calculating damages on a classwide basis.  Not --

MR. WIERZBOWSKI:  Objection.  Form.

Page 222

BY MR. WINTER:

Q    -- the amount, but you're assuming that it could be done in a reliable way, right?

A    That's a question of loss causation.  I've not been engaged to evaluate loss causation.

MR. WINTER:  I think we can take a break.

MR. WIERZBOWSKI:  We can go off the record.

THE VIDEOGRAPHER:  We are now going off the record at 3:10 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are now going back on the record at 3:24 p.m.

BY MR. WINTER:

Q    All right.  So if we take a look at paragraph 97 of your report, Dr. Hartzmark.

So you say here that: "...assuming parsing or scaling were appropriate, there are many techniques that could be used to estimate the portion of the price reaction due to the revelation of the truth and" -- how the price -- "how that price response might change over time."

Do you see that?

A    I do.

Q    And then you list some techniques.

A    "These include, among others:  The analysis

Page 223

of intraday pricing, (if disclosures are made at different times), analysis of market and media commentary, examination of the elements that cause changes in actual or estimated earnings-per share or EBITDA (by individual analysts, the company or consensus of analysts), or analysis of detailed accounting and company information, such as the breakdown of revenues and earnings for different divisions, businesses, types of customers, facilities, geographic locations, etc."

And there's a final sentence.

Q    So let's start with analysis of intraday pricing.  What is that technique?

A    Well, again, whether it applies here, it's speculative.  You -- you might look -- this is especially the case when there's a -- especially a corrective disclosure in the middle of a day, you might look at just the intraday pricing to look at the abnormal return.

Q    And why would you look at that?

A    Why would you look at the intraday pricing?

Q    Right.

A    For -- given the nature of the disclosure and the specific circumstances, it might give you a more precise measure of the impact of the revelation

Page 224

of the truth.

You know, let's take for example -- I don't know.  Again, might be -- it's not related to Ryder.  I look and there's a disclosure, you know, we are -- we are going to write off $100 million of inventory.  Price goes down by 100 million, and management comes back and starts spouting some other things and it bounces back a little bit, and the court determines that management coming up and, you know, potentially -- I don't know if they're misrepresenting, but they cushion the fall and that that $100 is a better measurement of the abnormal return.

Q    So the theory is you might be able to look at stock price movements that occur intraday in minutes, hours, whatever it is, and isolate a specific alleged corrective disclosure.

Is that the idea?

A    Yeah, I mean, the idea is basically -- again, I just did it in a case.  There was a disclosure at 12:47 p.m., and I looked at the movement from 12:47 p.m. to the close.  I was also able -- there were two components to the information disclosed, and at 12:47 there was component one.  The stock stopped trading -- I don't know -- 2

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 225

o'clock, 3 o'clock there was another component, and then it started trading again at 3:15 to the close.

So I was able to do a much more precise measurement on that particular situation.

Q   Have you done any analysis to determine whether or not this technique would be relevant to any of the three alleged corrective disclosures here?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I mean, we -- I -- this is going to be a very long day.

I think it's very clear what's in this report.  This is a generalized discussion of various techniques, tools in economists' toolbox.  Okay?

Did I look at intraday and parse and scale and determine what caused losses?  No.

BY MR. WINTER:

Q   It'll be a lot shorter day if you'd just answered no.  Because I think that was actually the answer to the question.

MR. WIERZBOWSKI:  Objection to form. Please refrain from commentary.

BY MR. WINTER:

Q   So the next technique you list is an analysis of market and media commentary.

Page 226

Do you see that?

A   Yes.  That's -- that's a part of what you would do in a loss causation analysis.

Q   All right.  Well, it's listed in your report.  So can you describe for me how that technique is used for parsing and for scaling, please?

A   Again, you might look at media commentary during the day and evaluate that, again, using intraday pricing.  You might look at media commentary, where the commentary is the company made an announcement and it's 15 percent of its change in EPS guidance is associated with this particular issue, and be able to utilize that as a potential measure.  There are all types of methods.

I mean, as I say, there are -- you can use that.  You can examine elements of the changes caused by changes in EPS or EBITDA.

Q   So sticking with the analysis of market and media commentary, so this technique is not limited to looking at intraday pricing changes, right?

A   What technique?

Q   The analysis -- looking at market and media commentary of an alleged corrective disclosure.

You referenced in your answer intraday

Page 227

pricing, and I'm just confirming this technique is not limited to looking at intraday pricing changes based on market or media commentary.

A   Well, what technique are we talking about?

Q   The second technique you list:  Analysis of market and media commentary.

A   These include -- many techniques that are available -- yeah, you use this -- it's information. These are things you use, among others, to parse and scale.

Q   Right.  And that's -- that's what I'm asking about.  So --

A   I would use that -- I mean, I would use the market and media commentary.  So we've got all that along with, possibly, intraday pricing.  I would use market and media commentary along with and possibly an examination of the elements that caused changes in the actual or estimated earnings per share or EBITDA.

I would use market and media commentary along with possible accounting data, say, from an accounting expert or company information that shows that the change in EPS, the miss -- let's say a third of the miss is due to, in our case, residual value.  I mean, you would use -- these are -- this

Page 228

is a bundle of information that you would use to develop a technique to do parsing and scaling.

Q   Okay.  I'm going to go through each of them -- you list them in your report -- so I understand what those techniques are.

So if we just isolate and focus on the analysis of market and media commentary, are you saying that you'd be looking at market and media commentary to determine whether or not the market and the media are attributing a price decline associated with an alleged collective -- alleged corrective disclosure for reasons different than what plaintiffs allege caused the stock price to decline?

A   It could be part of it.

Q   Okay.

A   I mean, for example, I can look at the media and when they go, Ryder writes down residual value by X after they increased it last time or shocks the market -- I mean, you know, those are -- you use that as part of the -- the -- the -- again, the toolkit to evaluate these things.

Q   And the flip side of that is if the market and media commentary were not focused on the reduction of the residual value estimates, that

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 229

might lead to the conclusion that you wouldn't be attributing the stock price drop on the alleged corrective disclosure date to the alleged misrepresentation, correct?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  You've got to be careful because companies -- companies control the narrative.  So, oftentimes, you really want to look at internal documents and everything, and a media might not pick something up because the company has controlled the narrative, and they often will do a little switch or a little obfuscation.

So, yeah, it could be used.  But, again, it's part of the whole -- whole component.  It's just one component, one point, that is -- that is utilized.  But I'm -- but I'm always careful when I look at analysts and -- and media because it's controlled by the company, and I'll often see -- once that factual record is finally produced, you'll see that internally the company has -- you know, they -- they sort of played loose with things, and you see internally what's going on.

The other issue is you often will see the detail in internal documents that is not provided externally.  So you'll see, "Here's an adjustment in

Page 230

EPS," but only when I look inside can I see how that adjustment to EPS came about.  EPS changes by 10 cents and -- and some of that -- and they go, and this is based on -- they list four things.  Okay?  And the analysts and the media pick up, you know, one of four of those things.

Then you look at the company documents, and you see exactly how those four things unfold, and sometimes you maybe even find a fifth or a sixth.

BY MR. WINTER:

Q   I'm not sure that I followed that.

Okay.  So if a corrective disclosure produces a stock price reaction -- right?

A   Uh-huh.

Q   -- and the market and the media are attributing -- right? -- that stock price reaction to something other than what's alleged to be the misrepresentation, why does it matter what the company's internal documents say about the alleged corrective disclosure?

A   Well, what I'm saying -- so -- so you might say because they don't use the word "residual value" that it's not related.  But they do use the word, for example, "EPS decline," or "change in guidance."  Okay?

Page 231

If you can go backwards and understand from the internal documents how that EPS change or how that guidance change came about, then, you know, you can parse what component of that, you know, was due to the -- you know, was related to the misstatements.

Q   Okay.  I think I understand what you're saying.

But -- so if you have a situation where you had two separate pieces of information disclosed, different topics -- all I'm asking is whether or not you're disputing that you would be looking at this technique and analysis of market and media commentary to help determine how you would parse and scale for a given corrective disclosure.

MR. WIERZBOWSKI:  Objection to form.  Asked and answered.

THE WITNESS:  I mean, first of all, as I said before, I'd be looking at the corrective disclosure.  I would be looking at the misstatements.  Media commentary is one thing.  If it's the case that the media says that -- that, you know, the stock came down because of raining cats and dogs because that's what the company said, you know, then, yeah, then I'd take that into account.

Page 232

Whether that's the conclusion, I can't say.  This is too hypothetical.

And, again -- I've said it again and again.  I have not done a loss causation analysis.  What this does is it lists various factors, elements that I have utilized in the past that have been utilized to calculate damages in many more complex cases than this.

BY MR. WINTER:

Q   Okay.  But -- that's fine.

So your -- but your testimony is that you just don't know whether or not this technique and analysis of market and media commentary would be useful for parsing and scaling here?

MR. WIERZBOWSKI:  Objection.  Misstates testimony.

THE WITNESS:  That totally misstates my testimony.

What I -- again, the -- the fact is I would evaluate market and media commentary as part of what I say are the -- the scaling and parsing, if it is appropriate.

BY MR. WINTER:

Q   Okay.  The next one is the:  Examination of the elements that cause changes in actual or

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 233

estimated EPS or EBITDA.

What is that technique, and how is it used for parsing and scaling?

A   Well, that one is -- is -- and might be actually quite good for this case since it's an accounting issue.  You never know.  But, I mean, in that one, for example, I've used the company announces EPS miss or a guidance change of 10 cents a share, let's say, and the stock falls by $10, a dollar per share.  Is that -- no, 10 cents is $10 -- no.  What am I -- hold on one second. -- ten cents per share and the stock falls by a dollar.  So it's a ten times multiple.  It's a ten times multiple.

You go in -- and that's what the market understands to be the case, and they reveal the information associated with that, as well as confounding information, and possibly then see, well, the confounding information caused one-third of the EPS change and the other caused two-thirds of the EPS change.  So you can reasonably suggest that a dollar is the same on each, that, you know, two-thirds of the stock drop is associated with the -- the alleged misstatements.

Q   Okay.  Do you know, one way or the other, whether or not Ryder's residual value estimates

Page 234

affected its EBITDA?

A   I have not done a loss causation analysis.

The other thing actually --

Q   I'm sorry.  Can I have an answer to the question?  Is the answer no?

MR. WIERZBOWSKI:  Objection.  Calls for an accounting opinion.

THE WITNESS:  Yeah, I just haven't been asked to do that, and I haven't done a loss causation.

BY MR. WINTER:

Q   So you don't know?  The question was do you know.  Is it yes or no?

A   Well, it's --

Q   Do you know -- I'll restate.

Do you know whether Ryder's estimates of its residual value affect EBITDA, yes or no?  Simple answer.

MR. WIERZBOWSKI:  Objection.  Calls for accounting opinion.

BY MR. WINTER:

Q   You can answer.

A   The earnings before interest, taxes, depreciation, amortization would suggest that it's before depreciation.

Page 235

Q   Okay.  And if Ryder's residual value estimates don't affect EBITDA, you'd agree you can't use this technique to help parse or scale for this case at least?

A   No.

MR. WIERZBOWSKI:  Objection.

THE WITNESS:  You're saying I can't use a measure of EBITDA to potentially scale or -- or parse and see how the process were caused -- in this case, no, I can't say what I can and cannot use because I haven't done a loss causation analysis.

BY MR. WINTER:

Q   Okay.  So you just don't know?

A   Again, these are -- I've made it very clear.  "Again, assuming parsing or scaling were appropriate, there are many techniques that could be used to estimate the portion of the price reaction due to the revelation of the truth and how the [sic] price response might change over time.  These include" -- and it's a list of all the elements that have been used, and there are more.  I even say: "These include, among others..."

So I listed some here -- okay? -- that I've had situations to use.  I will admit that every damages report that I've examined has included

Page 236

analysis of market and media commentary.  Okay?  Whether it's specific, that's just common practice.  I've looked at the financial.  Certain company's EBITDA is a good measure; others EPS.

I haven't looked and done a loss causation report, nor am I being asked to offer an accounting opinion.  And so -- but these are elements that you see -- if you go and look at analyst reports, you'll see what they're talking about.  You know, how are they valuing the company?  How are they coming up with target prices?

It also -- you know, let me just give you another example of how this might be used on the front end.  Okay?  You were talking about a decline before of, like, $9 per share for Ryder on one of these dates.  Okay?  So let's take a hypothetical unrelated to Ryder, and I've used this hypothetical before.

You've got an inventory going up by ten -- or up -- up by a dollar that's misstated over time to come to $10, and then you've got a $10 drop.  Okay?  Another way of looking at that is saying, "Okay.  Where would the impact have been in the past?  Where would the price have gone to if they had announced that in a prior period?"

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 237

Let's assume in a prior period the price went down by $9 -- okay? -- and that they had announced an inventory adjustment that was related to $3 of that price decline and that had they been honest, they would have had to announce another $3 -- we'll make it easier -- $4.

Well, we know that the -- the $3 caused the $3. So you would have had an extra $4 decline on that inventory on that misrepresentation, and you could do that using maybe EPS, maybe some other accounting method. But what that shows is, A, how you use various methods to come up with what the price might have been or should have been and also you know, how that can go backward -- how you can go backwards on that and also how you might have a price decline but it's cushioned. Because had they announced what they announced in a corrective disclosure in a prior period, it would have fallen even more.

Q   All right. I think we can do this quickly, hopefully.

So the four techniques that you list in paragraph 97 are examples of ways it sounds like you in the past have used to calculate parsing and scaling, just -- does that sound correct?

Page 238

A   I think the simplest thing -- I think the simplest thing would be that I wish I would have written the sentence: These include the use of a number of factors, among others, such as the analysis of -- none of these have I used in isolation.

Q   Understood. My only question is --

A   You keep asking in isolation how would I use it --

Q   It's impossible to understand --

A   Okay. So that's how I've changed this sentence, and maybe we can get questions related to how are these used with the others in a hypothetical world when I haven't done a loss causation analysis.

Q   The next question is actually a little bit more simple, which is: For purposes of this report, you haven't determined or done an analysis as to whether or not any of these factors in isolation or together could be used to parse or scale, correct?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: No. You're -- it's correct that I have not done any parsing or scaling, but I can say that whatever the parsing and scaling that is done at the loss causation and damages, whenever that is, will be used to determine a reliable,

Page 239

reasonable inflation ribbon, that inflation ribbon will be applied classwide, and the common damages methodology will be utilized to calculate individual damages.

BY MR. WINTER:

Q   Okay. Not my question.

So have you done an analysis to determine whether any of these techniques, in isolation or together, can be used to calculate parsing or scaling in this case?

MR. WIERZBOWSKI: Objection to form. Asked and answered.

MR. WINTER: He didn't answer the question.

THE WITNESS: I have not been asked to do that.

BY MR. WINTER:

Q   And you said before, I think -- let me just get the testimony so we have it.

You said:

"...but I can say that whatever the parsing and scaling that is done at the loss causation and damages, whenever that is, will be used to determine a reliable, reasonable inflation ribbon..."

Page 240

So it's your testimony that you know, sitting here today, based on the analysis you've done, that a reliable inflation ribbon can be calculated consistent with plaintiffs' allegations in this case?

A   That's -- you're -- you're basically asking me to be the finder of fact, and I can't -- I -- I -- it's my opinion I can calculate -- I haven't been presented with a situation where I can't calculate an inflation ribbon that I believe is reasonable and reliable.

But the finder of fact will determine that, and whatever the finder of fact determines is the appropriate inflation ribbon will be applied classwide, and the common damages methodology that is discussed in this Section VII will be utilized to calculate individual damages.

Q   Okay. I just want to be very clear about this.

Does it matter -- let me break it up.

It sounds like you think, based on your prior experience, that you'd be able to do a reliable inflation ribbon in this case, right?

A   Yes.

Q   Okay. What I'm trying to ask, though, is:

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 241

For purposes of your opinion here, does it matter to your opinion -- is it a predicate for your opinion that a -- there exists a methodology that would yield a reliable inflation ribbon?

Do you need to take that step for purposes of your opinion?

A   Again, you've used the word "methodology."

Q   Technique.

A   A technique?  But so what's the -- I was focused on methodology.  What's the question?

Q   I know that's the trigger word for you all. I won't use that again.

A   I'm trying to make it clear.

Q   I'm just trying to -- you've thrown this concept of reliability in a couple of times, so I just want to make sure that you're not using it in a way that I think is different from what's said in the report.

So is it part of your opinion in Section VII of your report that damages can be calculated on a classwide basis that are based on a reliable and reasonable inflation ribbon?

A   Yes.

Q   Okay.  And how do you know that a reliable and reasonable inflation ribbon can be calculated

Page 242

consistent with plaintiffs' allegations in this case?

A   First of all, again, I've got a 40-year experience.

Second of all, this is a -- when an accounting expert, defense or plaintiff, comes in, it's an accounting issue.  Okay?  It's a company that is widely followed, widely evaluated.  It seems to me to be a fairly straightforward type of -- of -- of allegation and misstatement.

Furthermore, to the extent that I come up with something that I am uncomfortable with that I consider not to be accurate, it'll be zero, and that's your reliable and reasonable estimate.  If I can't come up with an accurate and a reasonably precise measure, that -- I will tell my client that. I'm not going to put myself in a position, I mean, to -- to not do that.

I mean -- but I find it, you know, somehow -- and I guess that's your job.  This idea of this impossibility, yet it's done literally every day in 10(b)(5) securities litigation.

Q   And you're able to form that opinion without reviewing the contents of a single disclosure by Ryder during the class period, right?

Page 243

A   I don't understand.  I've read the complaint.  I assume -- okay.

Let's assume for the moment that we go to trial.  Let's assume for the moment that the accounting expert, the industry experts, the confidential witnesses are successful at proving that the residual value and depreciation was misstated throughout the whole class period.  Okay? That's what I assume.

Given that -- given that, so that they've convinced the court of those, I believe that I or some other expert will be able to come up with a damages inflation ribbon, and I believe that once the finder of fact -- whatever the finder of fact determines to be that inflation ribbon will be applied classwide and the common damages methodology will be utilized for individual damages.

So assuming liability, I believe that there will be a reasonable inflation ribbon that can be developed --

Q   Okay.

A   -- based on what the -- the judge said, Judge Cannon, and what the plaintiffs have pled.

Q   All right.  So slightly different topic.

So does the calculation of inflation, based

Page 244

on an alleged corrective disclosure, does that depend on the public information that was already available in the market at the time of that disclosure?

MR. WIERZBOWSKI:  Objection.  Vague.

THE WITNESS:  Yeah, I mean, I don't understand.  A corrective disclosure -- there's a disclosure and there's a price impact.  I'm not sure what you're asking me.

BY MR. WINTER:

Q   Yeah.

To determine sort of a connection, to determine whether or not or how much of an alleged corrective disclosure has or didn't have a price impact, do you have to also consider the information that was already publicly available at the time of the alleged corrective disclosure?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I guess I just don't understand what you mean by -- you mean the fact that the sun was up or information -- I mean, this is totally ambiguous.  I just don't understand this question.

BY MR. WINTER:

Q   So let's use some specifics.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 245

So you're aware, I think, that Ryder disclosed, during the class period, its methodology for how it calculated depreciation expense?

MR. WIERZBOWSKI: Objection to form. Assumes facts not in evidence.

THE WITNESS: I have not evaluated, nor have I been asked.

BY MR. WINTER:

Q   Okay. Just assume -- just assume that then.

The question is: Do you have to take into account, when determining the impact of an alleged corrective disclosure, what Ryder would have already disclosed in the public markets that's related to the contents of the alleged disclosure -- alleged corrective disclosure?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I mean, let me give you an example, and maybe we can -- you can understand this issue. The issue that somehow they disclosed something, which I don't know, and that they then subsequently disclosed something that I don't know and that they're -- maybe you're alleging they're identical.

I mean, I don't remember there being, you

Page 246

know, a disclosure of a billion, three change in -- in, you know, residual value or depreciation expense or whatever it might be earlier in the period.

But let me give you an example of a case that I was involved with. The case -- they disclosed, prior to their going bankrupt, that they were involved in five foreign currencies -- okay? -- bonds, bonds in five foreign currencies. I think it was, like, Swiss, British, French, Spanish -- actually, it was the PIGS: Portugal, Ireland, Greek, Spain, and -- I don't know -- maybe British. Okay? And they disclosed that. They then disclosed -- then that's -- they've got risky bonds. They're in the PIGS.

Then they disclose, a couple days before they go bankrupt, it happened to be about 80 percent of those were in Greek bonds. Okay? And of course the defendants say they disclosed they were in risky bonds. Traders should have known that. Well, those are totally different types of situations.

I mean, the way I look at it is I was a professor once. If I would go into class and say to my MBAs, "Tell me the optimal" -- "Tell me the return on a portfolio of PIG bonds" -- okay? -- "over this particular period," and they go,

Page 247

"Professor Hartzmark, how do we do that?"

Well, "Tell me that. I've given you all the information you need."

Then I come in the next day and say, "Who did it?"

Well, nobody did it. Next day I say, "Well, let me give it to you, and we're 20, 20, 20, 20, 20 percent in those bonds." Then they can do it. Okay?

Those are two very different situations. Okay? So I don't know what you're saying in terms of -- maybe they disclosed some type of methodology, but did they give full information, enough information to -- to do it? This is so hypothetical.

When -- when -- in a loss causation analysis when you will look at what was disclosed in the corrective disclosure and how that links, yeah, if they said, "Hey, we're -- we're overvalued on a residual by a billion dollars and that's the same," so you say, "Oh, well, they said that -- they said that two years before that," they said, "We're two -- we're a billion dollars overvalued," then, yeah. Then it's the same thing, and I would have a hard time finding -- you know, arguing that that --

Page 248

you know, that that announcement had any impact on it.

But when you start talking about situations like this where supposedly there's a misrepresentation and you're going to say that it's identical to the corrective disclosure, generally, when you see a price reaction the way that that was observed on these corrective disclosures, it's not an apples-to-apples comparison, and your -- your hypothetical certainly doesn't give me enough information to say that the information is the same as the information that you say is related.

BY MR. WINTER:

Q   All right. Well, again, not even close to my question.

So --

MR. WIERZBOWSKI: Objection. That was your question and he answered it.

MR. WINTER: It was not.

MR. WIERZBOWSKI: Yes, it was, Steve. Let's move on.

MR. WINTER: Counsel, I'm going to ask my question again.

BY MR. WINTER:

Q   So if there's publicly information out

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 249

there in the market from Ryder or from some other source -- okay? -- do you agree that that information needs to be taken into account to determine the price impact of the alleged corrective disclosure?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: Yeah, I just said I would do that.

In the case of the PIG bonds, I did. I looked at that and I compared the two. You've also said that if I had the same information on the PIG bonds when it was misrepresented as was disclosed, then they must have -- the price decline had to be something else.

BY MR. WINTER:

Q   That's true even if --

A   I mean, it's --

THE COURT REPORTER: One at a time.

BY MR. WINTER:

Q   That's true irrespective of whether or not the information that's out there in the public market is the same as the alleged corrective disclosure, correct?

MR. WIERZBOWSKI: Objection to form.

BY MR. WINTER:

Page 250

Q   You would take that into account?

A   You have -- yes.

Q   Thank you. That's all I need.

A   In a loss causation analysis, you will link the curative information to the misstatements. I think I've told you this a bunch of times.

To the extent they differ, you will evaluate. To the extent that it's identical -- I mean, I had another case where it was a sexual harassment case -- okay? -- and there were a number -- they say a number of women were sexually harassed. Okay? And then -- and so two years later, the specific names, the type of harassment come out, and the stock goes down.

Well, of course the defendants say, "We disclosed it two years before." Those are not the same disclosures.

Q   All right.

A   And I -- but I did --

Q   Go to paragraph 89 of your report, please.

All right. The last sentence says: "One can think of this out-of-pocket methodology in a similar manner as any straightforward, standard and commonly-used formula -- for example, akin to the formula of the slope of a line taught in elementary

Page 251

school algebra; namely $Y = a + bX$. To solve this simple formula for Y, one uses information to calculate a and b and then simply inputs X into the formula to solve for Y."

Do you see that?

A   Yes. I wrote that.

Q   In this example, what is X?

A   The trading activity.

Q   Okay.

A   And Y --

Q   What is -- okay.

And what is Y?

A   The damages.

Q   Okay. And A and B are?

A   When the factual record is disclosed in the disputes, they are the inflation ribbon --

Q   Okay.

A   -- inputs to it.

Q   So just so I'm clear, you're assuming here that Y can be solved because you can reliably calculate A plus B times X, correct?

A   Yeah. I used the factual record to estimate A and B within a reasonable degree of certainty. Then I take the actual trading activity, and that gives me the damages, Y.

Page 252

Q   And if A plus B aren't able to be reliably calculated, then you'd agree that Y also couldn't be reliably calculated using this formula, correct?

MR. WIERZBOWSKI: Objection to form. Assumes facts.

THE WITNESS: Yeah. You would -- you would -- as I've said before.

BY MR. WINTER:

Q   Okay.

A   If I went into a court and I said I'm going to -- okay? -- first of all, there's a formula for a line, and so, hopefully, a judge would agree to that. Okay? That's -- that's the class certification. There's a formula for a line. Do we agree on that? Okay? If we agree that there's a formula on a line, A plus B is the formula on a line.

There are techniques that have been utilized since Dan Fischel started this -- this event study approach in the 1980s -- okay? -- that have been used now for 40 years to calculate damages. Some accounting techniques; some based on event studies. And -- and that you can reliably calculate A and B and then put in X. Okay?

And the most critical thing is A and B are

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 253

the same A and B whether it is -- whether it is Mr. Winter, Mr. -- I can never pronounce your -- Adam, Ms. Cain, or myself. We all face the same A and B. So whatever A and B is, whatever the finder of fact determines A and B, that's what it is. Doesn't matter who you are. And then you put in your trading activity at that point, and you get your damages.

And so what I am saying is whatever that is, whatever that input is -- now, if it's the case that after we go to trial and the finder of fact says, "No good. Hartzmark's A and B aren't any good," you put zero in there. It's the same formula. Zero times X gives you zero.

Q   All right. So do you have -- I think it's Exhibit 3 -- in front of you? That's plaintiffs' complaint in the action.

A   Tab 2?

Q   Correct.

A   Not three?

Q   Well, it's Exhibit 3, but Tab 2.

A   Yeah, Tab 2. I gotcha.

Q   All right. If you could take a look at paragraph 299, please.

A   299.

Page 254

Q   It's PDF page 112, if helpful.

A   Okay. I just got there. There's a boldface. And --

Q   Yeah.

So focusing on the second sentence in that paragraph.

A   Okay. Well, let me read the first then.

Q   Sure. Read as much as you need.

A   Okay. I've read it.

Q   All right. So it says, in the second sentence, that: "As detailed above in Sections IV.G, VI, and below, Defendants repeatedly made false and misleading statements to the market concerning the then-current residual values of Ryder's vehicle fleet, the associated depreciation expense, and the risk posed by further residual value deterioration and an increase in depreciation expense."

Do you see that?

A   Yes.

Q   All right. And then if you'd take a look at paragraph 268.

A   Okay. So I should -- okay.

So I need to memorize this one and then 268?

Page 255

Q   Yeah.

A   Okay. 268, Loss Causation?

Q   Yeah. And then go to the second sentence of that.

A   Hold on.

Okay.

Q   So I want to focus on this concept of risks that you see in both of these things, and you're smiling because I guess you know where I'm going to go with my questions, having done this before.

But -- so how would you measure inflation when misstated or omitted risks materialize on the alleged corrective disclosure date?

A   To the extent it was relevant, probably use some type of probabilistic model.

Q   Okay. But just so I'm clear, you agree, though, that the inflation should measure how the price would have changed if the true risk -- the true risk was disclosed rather than how it changed once the risk itself materialized on the back end?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: No. First of all, you know, this is a -- you know, any business -- well, business basically is just a bundle of risks. That's -- that's the nature of -- of businesses.

Page 256

You know, it's -- everything is -- is risk related.

In this particular situation, you know, if there was known -- known measures that were misstated to the market, then it's -- it's fairly clear, and -- and the risks weren't there. To the extent that this is a materialization of a concealed risk -- okay? -- and, in essence, losses were caused by the revelation of results that are, in essence, based on the risk, you would use, again, some -- to the extent that it was relevant, you would use some type of probabilistic model.

The issue, though, as it relates to my class certification report -- okay? Do you see in the paragraph you just asked me, the -- the boldface -- the boldface Section VII to this complaint?

Do you see what it says?

BY MR. WINTER:

Q   Are you asking me that question?

A   Yeah. I mean, well, for the record, it says: "Loss Causation."

Okay. As I stated before and as I read in literally the first paragraph of my report, I was engaged to look at efficiency and damages. The issues associated with materialization of a risk is

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 257

the nature of, again, probabilistically examining a -- a harm to investors. Okay?

The key is that whatever the amount of -- that is proven at trial of concealed risk and whatever the measure of that level of concealed risk is an input into an inflation ribbon and the inflation ribbon will then be applied classwide, depending on -- and, you know, the inflation ribbon is depending on what the trier of fact determines to be the case. But whatever it is, it's going to be applied classwide, and the common damages methodology will be utilized to calculate individual damages.

Q   Okay. But because -- because you've said you didn't do a loss causation report, you haven't undertaken analysis to determine how you would control for the fact that an allegedly concealed risk itself materialized, correct?

A   I have not looked at whether there's a concealed risk here. They're generally concealed risks. But this is, as I stated before, somewhat of an accounting issue. You know, probably more black and white than pretty much any one I've had or been involved in.

Again, they're probabilistic models to the

Page 258

extent that it's meaningful and useful to this particular one, where you could potentially say, "Okay. There are risks" -- to the extent that you think materialization of a risk is a reasonable approach to this, the fact of the matter is, every disclosure is -- not just for Ryder, but for any company. I mean, I did it when I had Cragar. I had five pages of risks -- okay? -- generic risks. I mean, that's just the nature of the company. As I said, it's the nature of business.

Q   All right. So let's take a look at your Appendix E.

A   E?

Q   Correct.

A   As in Edward?

Q   E, as in Edward.

A   Appendix E is titled "Ryder Systems, Inc. Common Stock Data."

Q   Correct. And I could show it to you in your report if you need, but I think you recall this.

You identified, I think you said, 20 news days during the class period that you analyzed; is that right?

A   Yes.

Page 259

Q   Okay. And it's in paragraph 66 if you need to refer to it, but I think three of those days do not have statistically significant abnormal -- abnormal returns.

Do you recall that?

A   Yes. 17 out of 20, 85 percent, of the days had statistically significant returns.

Q   Got it.

And then there are some asterisks that are used on the right-hand column of Exhibit E. Some are double asterisks; some are single asterisks.

Do you see that?

A   Yes.

Q   All right. And just help me with -- how do you, as an economist, think about a situation where you have a single asterisk versus a double asterisk -- double asterisk -- asterisks, as that pertains to statistical significance?

A   Purely with respect to statistical significance, the single asterisk would mean below 1 percent -- I'm sorry -- above 1 percent and the double, below 1 percent.

MR. WINTER: I'd like to mark as the next exhibit Tab 19.

- - -

Page 260

(Hartzmark Exhibit 4 was marked for identification.)

- - -

BY MR. WINTER:

Q   So when you get it, just for the record, this is a demonstrative that we've put together based on your Appendix E that just highlights, so it's easier to follow, the news days that are not alleged to be also corrective disclosures.

A   These are earnings dates? Basically, you highlighted the earnings dates?

Q   I highlighted your -- so of the 20, three were corrective disclosures, right? And so I highlighted 17 of them.

Let me know when you have that up.

A   Okay.

Q   Okay. So we talked about that there were three news days that did not have statistically significant returns, and so that would leave 14 of these days where -- that are not alleged corrective disclosures but did have statistically significant returns during the class period. I just want to make sure you're tracking.

A   Yeah. You're saying that there are -- we have 14 of these highlighted days that have p-values

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 261

of 5 percent or less, and then we have 14 days and three days where p-values are not 5 percent.

Q So we've counted, and feel free to count as well, but it seems to us that ten of the 14 statistically significant days had negative residual returns.

A Ten of the 14 earnings announcements had negative returns?

Q Yes.

A Okay.

Q Does it impact your opinions here at all that a majority of the news days during the proposed class period are associated with statistically significant price decreases, even after controlling for, you know, market or industry factors?

MR. WIERZBOWSKI: Objection to form. Vague.

THE WITNESS: Yeah, no. I mean, this period, you know, I haven't read the disclosures, but they -- the company must be, you know, offering unanticipated negative information, adverse information.

MR. WINTER: Okay. And then if we can now mark as the next exhibit, Tab 18.

- - -

Page 262

(Hartzmark Exhibit 5 was marked for identification.)

- - -

THE WITNESS: Hold on one sec. So we start the period at $93 and we end the period -- yeah, I mean, $38. So you've got sixty -- $55 decline in the value of this company. What is that? Like, 2.5 billion?

BY MR. WINTER:

Q Yeah.

A So 55 -- so, I mean, the fact is there must have been -- given that there -- I mean, you would expect the negative -- more negative than positive. I mean, the company was going down.

Q Right. So during the proposed class period, the company's announcing information that causes the market to respond in a negative way that causes $2.5 billion of market capitalization decrease, correct?

A It seems that way.

Q All right. So let's take a look at the next exhibit, if we can. So it should be for you Tab 18.

A Okay. So this is Tab 18.

Q Yeah.

Page 263

A Appendix E again --

Q What we've done is, this is another demonstrative we've put together that highlights, based on the complaint, the alleged misrepresentation dates throughout the class period leading up to the alleged corrective disclosures. And we can all count, but I think there's 31 of those in the class period, you know, prior to the corrective disclosures and that we highlighted.

Let me know if you're tracking.

A Okay. So these are misrep dates. So, for example, the last misrep date is 5/9/2019?

Q Correct. Before you get to the corrective disclosures.

A Yeah. Those are mis- -- okay.

Q Okay?

A Yeah.

Q All right. So, again, we did a little counting, and looks to us that 26 of the 31 -- well, let me make this a little easier -- that five of the 31 alleged misrepresentations had residual returns that were both statistically significant and positive.

Do you see that?

A Well, I don't see that.

Page 264

Q I understand. I'll represent that to you. If you want to count it, you can count it.

A Wait a second. So five of --

Q Five of 31 --

A -- are statistically significant and positive on a stock that is collapsing over this period of time?

Q Correct.

A Okay.

Q All right. And then we also looked and -- just give me a second.

All right. And then of the 31 alleged misrepresentations, looks to us like 16 of those 31 had statistically significant returns, whether positive or negative. So let me just pause there.

A I thought we said -- okay.

So five of 31 misreps were positive. 16 of 31 were either -- were just significant?

Q Correct.

A Okay. Okay. So that means 11 of -- so five were positive. 11 were negative --

Q You got it.

A -- statistical significance. Okay.

Q So I think I know the answer, but similar question to what I asked before.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 265

So does the fact that the majority, or even more than a majority, of the alleged misrepresentation dates where there was -- statistically significant returns were negative, does that impact your opinions in any way for the report you submitted?

A   No.  No.

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  No.  It has nothing to do with my opinion about the common stock trades in an efficient market or that there's a common damage methodology.  What it does suggest to me is that things were bad and possibly, when we look at the factual record, they were propping -- propping it up because maybe the but-for price for this company should have been more in line with $38.45.  So as negative as those announcements were, they should have been more negative.

BY MR. WINTER:

Q   Okay.  Does it also suggest, though, that to calculate inflation according to plaintiffs' theory of liability, that you need to rely more heavily on the back-end stock price drops, given the residual returns that you see during the class period?

Page 266

MR. WIERZBOWSKI:  Objection to form. Assumes facts.

THE WITNESS:  Yeah, I -- I -- you're asking me, again, a question of whether to calculate the losses caused by the misrepresentations that I would have to rely on the back-end more than the front-end price movements, which is a quintessential question of loss causation.

But I can't tell you that whatever I do relying on the front end, back end, maybe even just using this price and coming up with the $38 price and coming up with a but-for price and the inflation, whatever it might be -- whatever that is, whatever the appropriate technique when the factual record is finally disclosed and the accounting data is disclosed and I've been engaged, if I do get engaged to evaluate loss causation and damages, whatever it'll be, it'll be applied -- it'll create -- I'll construct an inflation ribbon that'll be applied classwide and individual damages will be calculated.

I just -- the question is not relevant at all to the opinions I'm expressing in this -- this report.

BY MR. WINTER:

Page 267

Q   So, I mean, you can say you haven't thought about it, but I -- I would have thought that it would be difficult for an economist to calculate inflation on the front end for misrepresentations that are associated -- alleged misrepresentations that are associated with statistically significant price decreases.

MR. WIERZBOWSKI:  Objection to form.

BY MR. WINTER:

Q   If that's wrong, tell me.

A   I guess I just don't under- -- on the front end?

Q   Yeah.

A   To give you an example, let's assume for the moment that each one of these statistically significant declines has some accounting element directly associated with the allegations -- okay? -- and that there could have been a disclosure that some maybe accounting expert reveals on those particular dates.  I could potentially be able to quantify how -- how much further the price would have gone down on those misrepresentation dates.

We have a company here that is possibly, arguably, in a decline, and they're trying as hard as they can to keep it up.  Keep that balloon

Page 268

inflated.  I haven't looked because that's an issue of how the losses were caused, and I haven't looked at loss causation.

I have, though, stated in my report that whatever the inputs are -- okay? -- whether I measure them from the front end, and -- and you're giving me some good ideas for front-end inflation ribbon using that, whatever that is, it'll be applied classwide.

Q   Okay.  So I have a couple of more kind of discrete topics, but now's a good time for a break if other people want one.  So --

A   Okay.

MR. WIERZBOWSKI:  Whatever works.

THE WITNESS:  Yeah.

MR. WINTER:  Whatever the witness wants.

THE WITNESS:  4:30 reconvene?

MR. WINTER:  Sure.

Are we off the record?

THE COURT REPORTER:  Marvin?

THE VIDEOGRAPHER:  I'm sorry.  My focus on my computer keeps falling out.

We're going off the record at 4:22 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are now going back on

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 269

record at 4:35 p.m.

BY MR. WINTER:

Q   So, Dr. Hartzmark, we talked earlier about how plaintiffs are alleging here that Ryder's residual values were too high during the proposed class period -- do you -- decline in the used vehicle market.

Do you recall that?

A   That the residual values were overstated and the depreciation expense understated?

Q   Right.

And that, according to the plaintiffs, caused Ryder's stock price to be inflated during the proposed class period, correct?

A   The allegations suggest --

Q   The allegations --

A   -- yes, that the -- that their stock price was artificially inflated.

Q   All right.  So you may or may not be aware that used vehicle prices had increased substantially during the period prior to the start of the proposed class period, from 2011 to 2015.

Were you -- were you aware of that?

MR. WIERZBOWSKI:  Objection to form. Assumes facts.

Page 270

THE WITNESS:  I have not evaluated used vehicle prices for the purposes of my expert report.

BY MR. WINTER:

Q   Okay.  So just for purposes of the next couple of questions, I just want you to assume that. And I also want you to assume that by applying plaintiffs' reasoning that pertained to the class period itself, that Ryder's residual values during this 2011 to 2015 period were too low.  Okay?

A   If you say they were --

MR. WIERZBOWSKI:  Objection to form. Assumes facts.

BY MR. WINTER:

Q   That's fine.  It's just an assumption.

A   It's an assumption.  Okay.

Q   All right.  Now, would you agree that if Ryder's residual values were too low between 2011 and 2015, so assuming that, that applying plaintiffs' theory of liability here, Ryder's stock price would have been also lower than it should have been during the 2011 to 2015 period?

MR. WIERZBOWSKI:  Objection to form. Assumes facts.

THE WITNESS:  Is -- is that a question?

BY MR. WINTER:

Page 271

Q   Yeah.

I mean, I guess if we're assuming that Ryder's residual values being too high during the class period caused Ryder's stock price to be inflated -- right? -- then I think it would stand -- it seems to stand to reason that if Ryder's residual values were too low during the period prior to the start of the class period, that Ryder's stock price would also have been -- have been lower, that there would be deflation, not inflation?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I don't know what your point is, but all else constant in a perfect world where, you know, I guess -- and expectations are such, the stock price, you know, could have been lower in the -- this pre-period, and if they -- and are you saying they were misstated by Ryder as too low or that they were correctly stated as low?

BY MR. WINTER:

Q   Misstated by Ryder.

A   Oh, as -- as being -- the residual value -- I'm sorry.

Yeah, too low.  Maybe, you know, all else constant, yeah, I mean, I could see possibly.

Q   And so -- so this is just the question.  We

Page 272

talked about how you thought there were techniques to construct an inflation ribbon during the proposed class period, and I'm just wondering would you also be able to construct a deflation ribbon for the period from 2011 to 2015, assuming everything else we assumed.

Is that a possible thing for an economist to do?

A   That's -- that's way too hypothetical for me.

Q   Why --

A   I would think I can -- I would think I could construct a deflation ribbon given a situation where there are alleged misstatements which would artificially cause there to be a reduced value -- asset value on a book.  Okay?  Yeah, I mean, I think possibly straight -- you know, yeah.  I mean -- but, again, this is incredibly hypothetical and unrelated to my opinions that I'm expressing in my report.  So you've gone way outside the four sides of it.

But I'll say, based on your hypothetical, all else constant, allegations of deflation, you know, you'd -- you'd construct a deflation ribbon.

Q   Okay.  And when you're -- if you take the proposed class period -- right? -- and you assume

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 273

that there was artificial inflation, I think you've said that you would measure damages by taking into account that inflation for purchases made during the class period, right?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I would apply the common inflation ribbon to purchases made within the class period.

BY MR. WINTER:

Q   Okay. So if one of those same stockholders who purchased during the class period also bought Ryder's stock during what I'm going to call the deflationary period from 2011 to 2015, would you agree you need to take those pre-class period purchases into account when calculating damages for this case?

MR. WIERZBOWSKI: Objection to form. Incomplete hypothetical.

THE WITNESS: And a legal -- that's not -- that's not for me to determine. Let's assume for the moment that you can demonstrate this hypothetical deflationary world and, if the finder of fact were to make a determination that some -- for some reason there should be an offset, then you would do the calculation. I find that, you know --

Page 274

I just find it sort of crazy.

What it does demonstrate -- okay? -- as it relates -- since you're way outside the four corners of the report, what it demonstrates as it relates to I thought, at least when I came here today, was going to be my report, what it does say is that to the extent the finder of fact would determine that, you know, people who acquire their shares prior to July of 2015 somehow have earned an inflation gain that would be offset upon a sale during -- during the period -- or offset by another purchase during that period, it would be applied classwide.

They would -- you would now, in essence, say, "Okay. The out-of-pocket damages methodology is going to include purchases prior to that period." And, indeed, that's discussed throughout the literature. There's no -- and it's a legal decision: LIFO versus FIFO. How do you include purchases before? What is generally assumed is that there's no inflation before a class period. What you're saying is assume there's deflation before the class period.

What I'm saying is whatever that is, the deflation, zero inflation, before the class period, it's up to the trier of fact, but the key issue as

Page 275

it relates to this report, the expert report of Michael Hartzmark, Ph.D., is that that damages methodology could be applied classwide and damages could be calculated for individual shareholders based on a common methodology.

BY MR. WINTER:

Q   Okay. So we looked earlier at your Appendix B that listed a number of court decisions. Do you remember that?

A   Appendix B?

Q   Yeah.

A   Yes.

Q   A list of court decisions. Okay.

MR. WINTER: Let's just mark as the next exhibit Tab 17, Will.

- - -

(Hartzmark Exhibit 6 was marked for identification.)

- - -

BY MR. WINTER:

Q   All right. And this is a decision from the Supreme Court from June 2021 involving Goldman Sachs. Let me know when that comes up. Do you have it yet?

Page 276

A   I've got it. But --

Q   Okay. That's what I was asking. So --

A   It's a 28-page decision --

Q   Yeah. I'm not asking you -- I'll just direct you --

A   -- and I looked at it maybe year-and-a-half ago.

Q   That was going to be the first question. Are you familiar with the decision? Have you read it before?

A   I reviewed it and I've seen summaries, but I -- I think I'm going to take some time and --

Q   Yeah. Well, I'm happy to give you the time, but I'm going to ask you a pretty narrow question.

A   This is a legal opinion, the Supreme Court of the United States, dated -- decided on June 21st, 2021 that's now in front of me. Before I start reading, I'll let you ask the question.

Q   Thank you. Thank you. I'm going to ask you a very narrow question, so no need to belabor the 28 pages in the opinion. If you'd turn to page 8, which is PDF 11.

A   Wait. Why does it keep -- oh, four of

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 277

five.
Which PDF is it?
Q   PDF 11.
A   It starts -- this is page 8:  "The generic nature of the [sic] misrepresentation..."?
Q   So if you'd go to the third sentence.
A   Third sentence from the top?
Q   Yeah.
A   Price impact.  8 point negative --
Q   It's actually: "Plaintiffs typically try to prove..."
Do you see that?
A   "Plaintiffs typically try to prove the amount of inflation indirectly..."
Q   All right.  So I'll read: "They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation," and then there's some cases.
And then it says:  "But that final inference -- that the back-end price drop equals front-end inflation -- starts to break down when there is a mismatch between the contents of the

Page 278

misrepresentation and the corrective disclosure."
Do you see that?
A   Yeah.
Q   Okay.  I just have a couple of questions.
So do you agree that the inference that a back-end price drop equals front-end inflation breaks down when there's a mismatch between the contents of the misrepresentation and the contents of the corrective disclosure?
MR. WIERZBOWSKI:  Objection.  Calls for a legal conclusion.
THE WITNESS:  I -- I -- I can't answer that question.  That's a legal -- this is a legal document.
I've stated before that you look at the back-end price drop, link it to the misrepresentations, you parse, and you scale.  There's nothing here.  This is saying that it's equal to the amount.  I never said that it's equal to the amount, nor that they offset, and -- but this is a legal document.  I don't want to -- I don't state that --
BY MR. WINTER:
Q   I'll note for the record you cite quite a few legal documents in your expert report.

Page 279

MR. WIERZBOWSKI:  Objection to form.
MR. WINTER:  No problem.
BY MR. WINTER:
Q   So I'm actually asking a very narrow question, though.
A   Can you point out -- let me ask you a question.  The legal documents I've told you that I cite are related to my decisions, and I'll make it clear this is not related to a decision -- I do not see the name Hartzmark in here.
Two, can you stipulate that Cammer and Krogman are mentioned in here?  Because those are the other legal documents -- those are the two types of legal documents that I state.
Can you show me in here where Cammer and Krogman are stated so this, in some sense, relates to my opinion?
Q   You'll see where I'm going in a second.
So all I'm asking is --
A   You can't.
Q   You cite more decisions than what you're representing.  But for purposes of my question, which is pretty simple I think, is:  Have you done any analysis to examine whether there's a mismatch between the contents of the misrepresentations and

Page 280

the corrective disclosures in this case?
MR. WIERZBOWSKI:  Objection to form.
THE WITNESS:  If I -- if I understand your question, you're saying have I looked at the harm caused to investors stated by misrepresentation versus the harm caused to the investors on the back end of the price drop, and as I've stated probably a hundred times today, I've not done a loss causation analysis.  I have not linked the corrective disclosure to the misstatements.
And -- but what I can tell you and what relates to my report is that, to the extent that the -- whatever the input is, whether it be the back end or the back/front end or a combination of the back end and the front end or an accounting approach or an event study approach, whatever that is, it's going to be input -- an input into the construction of an inflation ribbon and that it will be applied classwide.
I don't think that this -- certainly, this sentence has nothing to do with whether there's a classwide common damages methodology, and, therefore, I'm not sure where it -- it has to do with my report.
BY MR. WINTER:

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 281

Q   Okay.

A   Secondly, it has nothing to do, as I read it, with respect to the Cammer and Krogman factors as I have -- have used as support for my report.

What it does appear to relate to, I believe, is something called price impact, and I have not been asked to examine price impact. Because I believe that price impact and demonstrating that there is a lack of price impact, which I think will -- is unlikely in this particular case, is a defendant's burden, and to the extent that this case and a price impact analysis be presented to me and counsel asks me to respond, I will do so.

Q   Okay.  Well --

A   But I've not been asked --

Q   I don't need your opinion as to the relevance of the decision, but, again, I'm asking a different question.  So --

A   The first sentence on this page says:  "The generic nature of the [sic] misrepresentation often will be important evidence of a lack of price impact," and that to me would suggest, at least from what you are allowing me to see -- unless you want me to read all 28 pages -- that this is about the

Page 282

lack of price impact.

This is not about whether there's a common damages methodology.  This is not about whether the Cammer and Krogman factors support and, in this case strongly support, that the common stock of Ryder traded in an efficient market.  I'll answer issues of price impact if I'm asked to examine that.

Q   Okay.  Thank you for that discussion.

So in part -- Section VII of your report, Opinion 2 --

A   Should I -- I'm turning to this?  Do I want to go to Section VII?

Q   No.  You don't need to go there.  I think you know it pretty well.

In your report where you talk about Opinion 2 -- right? -- you talk about the concept of calculating an inflation ribbon.  I think that's a yes or no.  Just trying to move this along.

Again, we can be here for as long as you want, but I think that's an easy yes or no.

A   Yes, I talk about how inflation ribbon is applied classwide.

Q   Right.  And you also testified earlier that you thought -- or part of your opinion was that inflation ribbon could be reliably calculated,

Page 283

correct?

A   Yes, I believe it -- you know, that's my belief, but it's not my decision.  The issue of reliability, reasonability is for the trier of fact.

Q   Okay.  And where there's a mismatch between the alleged corrective disclosure and the alleged misrepresentation -- okay? -- you'd agree --

A   This is a form or terminology --

Q   May I please finish my question?

A   -- I never heard before.

Q   Dr. Hartzmark?

A   Can you please define "mismatch"?  How can I answer a question if I don't understand the word. What do you mean by 'mismatch'?

Q   I'd appreciate, for the court reporter, if you let me finish my question before you give an answer, and if we can go that way, we can have a clear record.

A   I've given an answer.

Q   Thank you.

If there is a corrective disclosure that contains information that does not mirror or match the alleged misrepresentation, you'd agree that you would need to account for that when calculating inflation during the proposed class period, correct?

Page 284

MR. WIERZBOWSKI:  Objection to form. Incomplete hypothetical.

THE WITNESS:  Yeah, I mean, given your incomplete hypothetical, I've never seen a case where there is a mirror image corrective disclosure to a mis- -- to a misstatement, and I think you're -- you've created the impossible.

BY MR. WINTER:

Q   Okay.

A   And -- yeah.

And, in fact, in this case you've got three corrective disclosures.  So how could they mirror 31 misstatements?  It's a very unclear question, and, especially, I think the courts have even suggested you don't need mirror image corrective disclosures.

Q   But the point being made, and you can disagree if you want, I think is that in a situation where you can't rely on the back-end price decrease to account for the alleged front-end inflation -- right? -- in a situation where those things don't match up, you need to have some way to account for that difference when calculating an inflation ribbon during the class period, correct?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I just don't even understand

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 285

that question.  I've never -- I don't think I've seen it, from a defense or plaintiffs, where the front end adds up to the back end.  Because, usually, you do one or the other and the court agrees that they're linked.  I have not linked these because, as I've stated now 101 times, I haven't done a loss causation report.

In this particular issue when you're dealing with -- I think I saw on the first page a customer relationship as opposed to black-and-white financial measures and metrics.  I don't even understand how this is -- this is related.  I don't understand what a mismatch is, and I don't understand how you would have a mirror image corrective disclosure in a case where you have three corrective disclosures.  I mean, it just seems as though it's counterintuitive to this case.

And then, moreover, all of those issues are issues associated with loss causation.

MR. WINTER:  Okay.  Let's go off the record for five minutes.  I might be able to -- to cut this back end and finish a little early.

So let's do that, and then if we can reconvene at 5:02.

THE WITNESS:  Okay.

Page 286

THE VIDEOGRAPHER:  We're now going off the record at 4:57 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are now going on the record at 5:04 p.m.

BY MR. WINTER:
Q   Just a few more questions, Dr. Hartzmark.
Last month you submitted an expert report in a Section 10(b) case involving Wells Fargo; is that right?
A   I think so, yes.
Q   Okay.  And we have the report if you'd like to look at it, the full one.

- - -

(Hartzmark Exhibit 7 was marked for identification.)

- - -

BY MR. WINTER:
Q   But what we've marked as the next exhibit, Tab 16, is a redline that just compares the section of your report that's Section VII with the comparable section in the Wells Fargo report addressing classwide methodology.
Do you see that?
MR. WIERZBOWSKI:  Objection to form.

Page 287

THE WITNESS:  This redline?
BY MR. WINTER:
Q   Yeah.
A   It's a 12-page redline.
Q   Yeah.  So this is a -- what we did is we redlined and compared the expert report you submitted in Wells Fargo last month, the section having to do with calculating damages on a classwide basis, with the report submitted in this case.
A   Yeah.  It looks like I did this report about a week before -- a week after I submitted the -- this one, right?  Yeah.  They're -- they're -- I was doing them -- working on them simultaneously.
Q   Okay.  And simple question, but is there any substantive difference between the sections of the report in the Wells Fargo case and this case that you could discern from the redline?
A   I'm not --
MR. WIERZBOWSKI:  Objection to form.
THE WITNESS:  I don't understand the question.  I -- I will -- I mean, the fact is that whether it be Wells Fargo -- I mean, didn't we go through this question?
Whether it be Wells Fargo, Rougier/Applied

Page 288

Optoelectronics, Vrakas/U.S. Steel, Signet Jewelers Limited, West Palm Beach/DFC, Cobalt, William Wallace versus IntraLinks, any of the ones where the court has relied on my opinion related to the damages, it's virtually -- the damages methodology is virtually universal standard, and, therefore, I'd be a little concerned if there were substantial differences.
BY MR. WINTER:
Q   Okay.  So the answer is no to my question?
A   What was the question again?
Q   I'll read it back.
Are there any substantive differences between the section of the report in the Wells Fargo case and this case that you can discern from the redline?
MR. WIERZBOWSKI:  Objection to form.
THE WITNESS:  No --
BY MR. WINTER:
Q   Okay.
A   -- as would be expected because it's a universal, out-of-pocket damages methodology.
MR. WINTER:  I have nothing further.
MR. WIERZBOWSKI:  Thanks, Steven.
I have no questions for Dr. Hartzmark.

State of Alaska
v. Ryder System
[FINAL]
November 30, 2022
Michael Hartzmark, Ph.D.

## Page 289

Thank you for your time.

MR. WINTER:  Thank you, Dr. Hartzmark.
Really appreciate it.

THE WITNESS:  Thank you, Mr. Winter.
Thank you, Ms. Cain.
And thank you -- who was it?

THE VIDEOGRAPHER:  I'm Marvin.

THE WITNESS:  Marvin.

THE VIDEOGRAPHER:  But let me take us off the record.
We are now going off the record at 5:08 p.m.

(The following proceedings were held off the video record:)

THE COURT REPORTER:  I just need to know if you're purchasing the copy and if you want a rough, Mr. Wierzbowski.

MR. WIERZBOWSKI:  I don't think we need a rough, but we'll take a copy of the transcript.

THE COURT REPORTER:  Okay.  Regular service is ten business days.

MR. WIERZBOWSKI:  That should be fine.

(Signature having not been discussed, the deposition of Michael L. Hartzmark, Ph.D. was concluded at 5:09 p.m. EST)

## Page 290

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Joan V. Cain, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 30th day of November 2022.

My commission expires:
May 31, 2025

_____
NOTARY PUBLIC IN AND FOR THE
COMMONWEALTH OF VIRGINIA
VIRGINIA NOTARY REGISTRATION NO. 107144

## Page 291

INSTRUCTIONS FOR ERRATA

NOTARY PUBLIC SIGNATURE
Not required unless agreed upon by counsel that notary public signature is required.

Please return a copy of the signed errata within 30 days of receipt, unless otherwise agreed upon by counsel.  Once we receive the signed errata, we will distribute an electronic copy to all parties.

RETURN A SIGNED COPY VIA FAX, E-MAIL OR MAIL TO:
FAX:  1-800-825-9055
E-MAIL:  janerose@janerosereporting.com

Jane Rose Reporting
Administrative Offices
PO Box 542
Luck, WI 54853

## Page 292

NOTICE TO READ & SIGN

This transcript was electronically distributed to BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP to forward to witness.

ACKNOWLEDGMENT OF DEPONENT

I, Michael L. Hartzmark, Ph.D., do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____  _____
(DATE)   Michael L. Hartzmark, Ph.D.

Signed and subscribed to before me this
____ day of _____202_.

_____
Notary Public

State of Alaska                    [FINAL]                    November 30, 2022
v. Ryder System                                              Michael Hartzmark, Ph.D.

Page 293

PAGE  LINE   CHANGE     REASON

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

___ / _____ / _____ / _____

Page 294

I N D E X  O F  E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| EXHIBIT 1 | Expert Report of Michael L. Hartzmark, Ph.D., 9/22/22 | 10 |
| EXHIBIT 2 | Order Denying Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, 5/12/22 | 96 |
| EXHIBIT 3 | Amended Complaint for Violations of the Federal Securities Laws, 10/5/20 | 158 |
| EXHIBIT 4 | Appendix E Demonstrative (News Days) | 260 |

Page 295

I N D E X  O F  E X H I B I T S (Cont'd)

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| EXHIBIT 5 | Appendix E Demonstrative (Alleged Misrepresentation Days) | 262 |
| EXHIBIT 6 | Supreme Court of the U.S. Syllabus:  Goldman Sachs Group, Inc., et al. v. Arkansas Teacher Retirement System, et al., Decided 6/21/21 | 275 |
| EXHIBIT 7 | Excerpt of Dr. Hartzmark's Wells Fargo Report with Redline by Defendants' Counsel | 286 |

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 296

**A**

**Abbett** 56:20
**ability** 106:9 122:18
**able** 59:6 65:17 66:14 85:1,3 94:6 154:9 186:11 187:13 193:12,18 195:7 202:2 221:1 224:14 224:23 225:3 226:14 240:22 242:23 243:12 252:1 267:20 272:4 285:21
**abnormal** 85:12 89:23 125:24 126:12 127:17 128:9 130:8 130:13 138:14 156:14 163:20 169:4 169:6 170:2 198:19 199:9,12 201:1,8 213:18 223:19 224:12 259:3,4
**above-entitled** 120:3
**absolutely** 65:19 187:9
**absurd** 51:21 52:13,16 168:16
**absurdly** 65:9
**academic** 27:4 118:22 119:5 126:3 128:21 152:1,3 155:11 156:13 166:22
**academics** 165:22
**accept** 35:16
**acceptable** 183:10
**accepted** 29:20 31:24 32:4 41:6 59:23 61:10 71:5 183:12 183:13,14 194:14
**accepting** 147:8 172:15
**accepts** 172:24
**account** 114:11 212:11 231:25 245:12 249:3 250:1 273:3,15 283:24 284:19,21
**accountant** 59:13 92:9 201:7
**accountants** 59:17
**accounting** 20:2 59:10 59:11,14,15,17,19 59:21,25 60:3,7 93:9 93:13,22 99:23 103:15,17 104:11 159:20 173:15,17,21 174:6,16 175:4 186:19 188:21,22

193:10,12 200:6,7 201:6 216:9 223:7 227:21,22 233:6 234:7,20 236:6 237:11 242:6,7 243:5 252:22 257:22 266:15 267:16,19 280:15
**accounting-related** 103:20
**accurate** 13:24 23:1 181:17 205:4 242:13 242:15
**accurately** 18:14,15
**ACKNOWLEDGMENT** 292:8
**acquire** 274:8
**acquired** 44:2 48:21
**act** 23:19,19,23,24,25 24:3 29:19 47:21 50:1,24 51:16 52:22 68:18 71:3,11,24 72:2,15 73:11 74:2 125:20,22 194:13 195:6 196:23
**action** 1:13 6:17 14:9 57:4,20 73:7,8 253:17
**actions** 166:17
**active** 122:8
**Activision** 24:10
**activity** 72:9 83:18 122:17 180:18 251:8 251:24 253:7
**actual** 84:25 107:10 108:6 146:9 148:12 180:11 181:7 201:20 223:4 227:18 232:25 251:24
**ad** 133:9 151:11
**Adam** 2:5 213:7 253:3
**add** 135:20 152:18 197:8 199:7
**added** 63:12 135:22 170:12
**addition** 28:21
**additional** 107:7 131:12 140:3 143:11 144:19 160:1 172:2
**address** 213:24
**addresses** 82:5
**addressing** 286:23
**adds** 135:18 285:3
**Adeptus** 24:4 56:16
**adjust** 155:12 199:1 214:11 215:6
**adjusted** 85:6 212:8

**adjusting** 214:8
**adjustment** 106:19 229:25 230:2 237:3
**adjustments** 105:22 106:6,8 157:10 159:2
**adjusts** 157:4,6,6 165:18
**Administrative** 291:23
**admit** 35:21 235:24
**admitted** 221:14
**Adobe** 7:17,18,19
**advance** 139:12
**advantage** 166:16
**adverse** 156:4 157:3,5 157:11 261:21
**Advisors** 166:15
**advisory** 168:16
**affect** 86:25 90:23 109:17 110:11 114:6 175:1 176:10,11,15 234:17 235:2
**affirm** 61:16,22
**affixed** 290:13
**aftermarket** 42:20
**afternoon** 121:1,7
**age** 118:19
**aggregated** 113:14
**ago** 6:25 25:9 276:7
**agree** 93:15 174:11,22 174:22 235:2 249:2 252:2,12,15,15 255:16 270:16 273:14 278:5 283:7 283:23
**agreed** 164:9 199:11 199:23 200:25 291:6 291:12
**agrees** 201:7 285:5
**ahead** 94:20
**akin** 250:24
**al** 5:7,8 47:18 295:12 295:14
**Alaska** 1:3,3 5:7
**algebra** 30:19 251:1
**algorithm** 103:6
**algorithms** 95:12
**Alison** 2:18
**allegation** 98:22 101:18 149:22 184:15 195:3 196:15 204:5 215:15 242:10
**allegations** 72:4,6 74:18 95:17 96:5,19 98:6 99:19 100:5 101:11,22 108:3 109:13 137:3 146:8

146:16,21 147:8,14 147:19,22,25 148:2 148:21 149:8 150:2 150:25 160:9 172:5 172:15,24 184:13 194:20 213:22 215:9 240:4 242:1 267:17 269:15,16 272:22
**allege** 97:18,21 100:7 100:17 106:15 108:10 228:13 277:17
**alleged** 57:24 69:9 72:8 73:7 78:13 86:6 96:18 99:7 135:8 137:15 138:16,22 141:17 143:2,5,10 143:22 144:13,17 145:1,17 146:7,19 146:23 148:15 151:2 156:4 159:11,15 160:10 162:1,6,10 162:12,13 164:23 169:8,14 176:25 177:2,16 182:24 195:4 196:22 197:9 202:21,24 203:2,16 203:18 204:8,25 205:2,16,17,23 206:15,20,23 207:1 207:10,25 210:1,7 210:10 211:16 213:25 214:17 215:13 224:17 225:7 226:24 228:11,11 229:2,3 230:17,19 233:23 244:1,13,17 245:12,15,15 249:4 249:22 255:13 260:9 260:20 263:4,6,21 264:12 265:2 267:5 272:14 283:6,6,23 284:19 295:6
**allegedly** 74:19 257:17
**alleges** 197:3
**alleging** 137:4 245:23 269:4
**allocation** 24:2
**allow** 134:4 170:13
**allowing** 281:24
**allows** 184:6
**Alta** 24:9
**alter** 88:17 113:10 200:7 210:16
**alternatively** 101:20
**ambiguous** 49:20

244:22
**amend** 16:24 17:3,4
**Amended** 135:5 158:7 294:11,15
**Americas** 2:10
**Amneal** 24:7
**amortization** 234:24
**amount** 21:16,17 22:8 150:24 155:5 168:5 199:22 209:9 211:5 214:10 215:19 220:22 222:2 257:3 277:14,20 278:19,20
**analyses** 14:24 15:16 15:20 37:17 62:24 92:25 163:4 212:11
**analysis** 25:25 65:23 65:24 77:5,6,7 86:3 100:3 102:3 105:20 108:19 109:15 111:6 114:8 128:6,20 130:6 131:9 134:8 135:19 140:2,22 141:9 146:9 149:1 150:19 151:1 159:21 162:21 164:1,5,20 170:13,15 177:8,10 177:13 184:25 185:6 186:19,19,20 191:23 200:23 205:20 214:22 215:22 222:25 223:2,6,12 225:5,25 226:3,19 226:23 227:5 228:7 231:13 232:4,13 234:2 235:11 236:1 238:5,14,17 239:7 240:2 247:17 250:4 257:16 279:24 280:9 281:12
**analyst** 36:7 80:21 81:2,10,18,24 82:2 82:21 83:1 84:3 116:6 122:4,14 124:25 150:22 152:8 154:19 171:9 189:6 201:4 236:8
**analysts** 82:13 116:17 149:6,25 154:8 157:8 223:5,6 229:17 230:5
**analyze** 111:7 137:14 177:15
**analyzed** 176:24 258:23
**and/or** 61:11 75:20 202:22

State of Alaska                    [FINAL]                    November 30, 2022
v. Ryder System                                               Michael Hartzmark, Ph.D.

Page 297

**anecdotally** 117:12 154:12,15 155:15 169:24 171:13
**announce** 237:5
**announced** 172:2 236:25 237:3,17,17
**announcement** 139:12 156:17 157:4 157:5 159:23 160:10 161:15,18 162:6,11 226:12 248:1
**announcements** 105:21 139:4,9 152:17 153:25 155:11 159:24 161:20 261:7 265:17
**announces** 233:8
**announcing** 262:16
**answer** 8:22 12:6 26:12 38:4,5 50:15 50:16 94:6 95:4 99:16 103:23 104:13 104:16,17 119:9,10 130:22 134:12 144:1 144:6 145:20 149:15 160:22 167:20 169:12 171:6 175:24 176:22 185:3 215:12 225:20 226:25 234:4 234:5,18,22 239:13 264:24 278:12 282:6 283:13,17,19 288:10
**answered** 13:9 14:19 74:8 75:10 84:15 149:14 150:16 162:16 163:8,23 219:21 221:6 225:19 231:17 239:12 248:18
**answering** 94:18 195:23
**answers** 49:13 67:11 292:13
**anticipate** 116:24
**anticipated** 92:15 117:9 145:14
**antitrust** 20:6 66:11 66:12
**anymore** 7:3
**apologies** 76:2 203:3
**apologize** 38:16
**Appaloosa** 46:11 56:16
**apparently** 105:19
**appear** 281:5
**appeared** 97:6
**appears** 48:16 159:9

161:14 169:1
**appendices** 17:16 33:4 34:10 35:18 38:12,14
**appendix** 15:9,12 17:9 17:20,20,21 18:2,6,9 19:13 25:24 32:19 35:19,19,21,23,25 36:1,14,21 37:3,12 38:13,24 44:17 46:17 60:10 75:20 75:25 76:4 77:11,13 83:4 107:19,19,19 107:20 116:4 138:12 161:5 168:20 194:18 194:19 198:2,16,17 216:17 258:12,17 260:7 263:1 275:8 275:10 294:20 295:5
**appendixes** 32:23 37:18
**apples-to-apples** 248:9
**application** 20:1
**applied** 14:7 24:5 29:21 32:5 53:5 58:1 72:9 102:6 178:2 183:8,23 184:17 185:1 189:18 192:3 192:6,23 193:21 194:15 197:11 211:5 212:17 218:13 219:2 219:10 220:11 221:12 239:2 240:14 243:16 257:7,11 266:18,20 268:9 274:12 275:3 280:18 282:22
**applies** 20:3 31:23 187:5 188:18 202:7 223:14
**apply** 59:6 109:21 110:15 187:6 194:22 194:23 273:6
**applying** 270:6,18
**appreciate** 283:15 289:3
**approach** 78:16 88:23 90:1 105:16 129:22 152:20 186:4 218:24 252:20 258:5 280:15 280:16
**approached** 54:17 123:3,4
**appropriate** 221:12 222:17 232:22 235:16 240:14

266:14
**appropriateness** 61:17,23
**approve** 33:6
**approved** 33:12
**approving** 33:21
**approximately** 9:12,14 23:14 26:8
**arbitrageurs** 125:2,9
**area** 26:16
**areas** 22:17 55:18
**arguably** 53:17 111:18 267:24
**arguing** 47:5 247:25
**argumentative** 148:6
**Arkansas** 295:13
**arrogant** 118:17
**art** 1:9 213:17
**article** 78:4,5 85:7
**articles** 36:6 76:13,23 77:3,4,10,13,14,17 77:23 78:25 81:11 84:2 86:10 116:6 156:21,21,22
**artificial** 202:20 203:20 207:10,17 273:1
**artificially** 74:4 106:17 269:18 272:15
**aside** 13:3 40:9 90:8 90:10
**asked** 13:8 17:4 21:15 32:11 38:2 59:11 65:23 66:6 67:11 75:9 76:2 84:14 87:14 101:6 136:18 137:13 144:8,11 145:18 150:12 157:19 160:5 162:17 163:22 173:20 174:18 177:22 191:22 206:6 209:19 219:20 231:16 234:9 236:6 239:11,14 245:7 256:14 264:25 281:7,16 282:7
**asking** 40:16,17 57:9 57:13 87:4 89:9,14 89:16 90:4,10,21 94:12,13 99:18 100:4 103:14 111:4 115:5,8 125:17 143:24 147:15,18 148:1,7 151:6 163:3 163:6 173:16,17 174:6 178:7 190:10 204:11 207:15

215:24 217:18 227:12 231:11 238:8 240:6 244:9 256:19 266:3 276:2,4 279:4 279:19 281:18
**asks** 63:16 130:20 281:13
**assembler** 42:19
**asserted** 72:3,5,18 182:7
**asserting** 70:13
**asset** 92:17 272:16
**assets** 39:20 40:14,17 69:11
**assist** 25:24 78:19,20 133:7
**assistant** 41:2,8 66:11
**assisting** 25:7 39:12 79:12
**assists** 79:12,13
**associated** 13:15 20:5 21:4 22:5 24:1,13 27:6,8,19,25 28:15 32:12 35:6 36:22 37:2,19 39:22 40:22 44:9,24 45:21 50:8 50:18 55:11,23 56:1 59:4,5,20 62:23 66:13,15 69:10 70:1 72:22 77:15 78:9 86:6 87:10 92:5 93:24 101:22 105:21 114:5 150:25 153:4 153:7 175:12 176:12 183:14 199:3,15 200:25 201:9 208:4 209:18 226:13 228:11 233:16,22 254:15 256:25 261:13 267:5,6,17 277:17 285:19
**assume** 72:4,7 96:4 101:25 146:15,20 157:21 160:15 188:12,20 199:10 200:21 214:14,16 215:25 237:1 243:2 243:3,4,9 245:9,9 267:14 270:5,6 272:25 273:20 274:21
**assumed** 72:6 174:5 196:14 272:6 274:19
**Assumes** 64:11,24 89:19 90:16 107:14 143:8,18 156:19 165:3 166:11 168:6

169:18 182:11 195:11 245:5 252:5 266:2 269:25 270:12 270:23
**assuming** 219:13,15 221:21 222:2,16 235:15 243:18 251:19 270:18 271:2 272:5
**assumption** 98:9,13 107:8 174:4 270:14 270:15
**asterisk** 259:16,17,17 259:20
**asterisks** 16:15,15 259:9,11,11,17
**attached** 18:11 292:16
**attachment** 12:11
**attempt** 55:17 57:19
**attempted** 57:11
**attempts** 50:9 53:20
**attorney** 6:1 63:19
**ATTORNEYS** 2:3,14
**attributing** 228:10 229:2 230:16
**audit** 34:21 35:2
**audited** 36:17 37:10
**audits** 34:21
**autocorrelation** 130:2 130:6,15 131:2,9 134:19 154:25
**automotive** 20:6 42:19
**available** 81:4 97:5 111:21 126:12 166:8 210:25 227:8 244:3 244:16
**Avenue** 2:10 3:4
**average** 103:3 124:14 164:16
**avoid** 7:13 19:7 196:13
**aware** 52:7 55:17 155:10 156:13 245:1 269:19,23
**awry** 152:21
**a.m** 5:3,10 139:21,22

**B**
**b** 2:18 15:9,12 17:10 17:20,20,21 18:2 32:19 60:10 75:20 75:25 76:4 104:3,5 105:3,6 124:1 194:18 251:3,14,21 251:23 252:1,16,24 252:25 253:1,4,4,5 253:12 275:8,10

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 298

294:1 295:1
**back** 18:25 19:7 21:6
  21:8 27:14 38:20,23
  41:1 42:1 48:12
  50:21 52:19 60:14
  100:12 110:18 121:3
  137:3 144:6 146:2,2
  148:11 167:16
  168:20 177:12
  178:24 180:16
  181:10 183:3 194:18
  195:20,21,24 199:21
  203:22 208:9,17
  210:2,18 214:19
  215:21 216:9 219:7
  222:11 224:7,8
  255:20 266:10
  268:25 280:6,13,15
  285:3,22 288:12
**backcasting** 181:12
  181:15 212:13
**backed** 201:18
**background** 58:24
  59:14 62:10 65:12
**backup** 14:22 37:12
  81:14
**backups** 81:13
**backward** 181:11
  237:14
**backwards** 87:24
  181:6 199:18 209:13
  210:18 211:19 212:8
  214:9 217:5 231:1
  237:15
**back-end** 145:24
  146:1 265:23 266:6
  277:23 278:6,16
  284:18
**back/front** 280:14
**bad** 265:13
**balance** 92:7
**balloon** 267:25
**bankrupt** 246:6,16
**banks** 59:5
**bar** 48:15
**bar's** 49:2
**based** 12:7 49:12
  63:13 65:22 75:1
  99:18 103:5 107:22
  113:13 126:5 127:12
  133:15 136:13 138:9
  146:8 149:2 150:14
  155:3 169:25 170:19
  171:5,9,9 175:9
  179:17,24 180:19
  183:18 187:18
  188:22 191:14,15

192:7 193:7,11,11
  193:23 194:21 202:1
  202:22 207:12,23
  208:13 209:13 210:9
  211:19 212:6 214:11
  216:13 220:23
  221:15 227:3 230:4
  240:2,21 241:21
  243:22,25 252:22
  256:9 260:7 263:4
  272:21 275:5
**basic** 30:19 185:22
**basically** 27:19 35:3
  51:25 81:14 122:1
  122:24 124:18 128:2
  128:12 130:17 142:3
  147:25 170:9 172:19
  179:17 180:7,11
  181:2 183:6,9,21
  187:14 201:11 205:9
  224:19 240:6 255:24
  260:10
**basis** 29:12 51:18
  52:24 68:16 71:4
  72:10,16 73:12 74:5
  74:21 132:16 179:10
  180:23,25 182:21
  185:18 186:12 195:8
  197:7 218:5 221:24
  241:21 287:9
**basket** 111:6 121:14
  171:12
**Beach/DFC** 288:2
**bear** 169:14
**Beaye** 2:17
**becoming** 23:3
**began** 18:24,24,25
  28:3 43:15 44:1
  118:21
**beginning** 63:2 180:15
  201:2 217:25
**begins** 5:5 16:12 18:9
  97:17 197:17 216:24
  216:24
**behalf** 1:5 46:1,6,9
  54:22
**Behavioral** 167:19
**belabor** 116:3 123:14
  167:3 173:7 276:22
**belief** 283:3
**believe** 8:1,3 11:12
  15:22 16:1 24:10
  42:3 47:8,9 56:12
  96:17 97:12 101:18
  105:24 135:22
  162:16 189:3 240:10
  243:11,13,18 281:6

281:8 283:2
**benchmarks** 83:20
  119:8 124:13
**Beret** 19:3
**BERGER** 2:9 292:4
**BERNSTEIN** 2:9 292:4
**best** 53:17
**better** 133:19 215:1
  224:12
**Bharat** 123:22 124:11
**bias** 49:2 54:24
**bid-ask** 122:18
**bifurcate** 132:20
  141:13
**bifurcation** 48:13
  132:12
**big** 208:8
**bigger** 208:24 210:7
**billed** 26:10
**billing** 27:23
**billion** 107:6 108:1
  189:12 212:5 246:1
  247:20,23 262:8,18
**bit** 10:9 17:13 41:2
  44:10 60:14 67:10
  73:2 81:23 94:4
  110:19 111:8 112:16
  115:1,2 124:25
  157:14 158:20
  213:12 214:5 224:8
  238:15
**black** 124:16 155:20
  257:22
**black-and-white**
  285:10
**bleeds** 71:1
**Bloomberg** 81:1 91:11
**board** 43:13 121:14
  166:14
**boatload** 217:10
**body** 32:22 33:7 34:9
  34:14 35:10 134:25
**boldface** 254:3 256:15
  256:15
**bombshell** 172:7
**bonds** 246:8,8,13,17
  246:19,24 247:8
  249:9,12
**book** 272:16
**boosted** 98:1
**bootstrapping** 134:8
**bottom** 17:15 97:14
  179:2
**bought** 42:1 273:11
**bounces** 224:8
**bound** 204:15
**box** 134:2 291:24

**boy** 124:1 216:20
**bracketed** 181:24
**bread** 54:11
**break** 8:19,22,23 34:8
  51:13 67:1 113:5
  114:16 115:3 119:14
  119:16 178:14
  212:24,25 213:8,13
  220:18,19 222:6
  240:20 268:11
  277:24
**breakdown** 21:19
  223:8
**breaks** 278:7
**brief** 65:15
**briefly** 9:2,3
**bright** 132:2 141:10,13
**bring** 167:22 188:20
  196:8
**British** 246:9,11
**broad** 81:23
**broadly** 29:20 31:24
  32:4 71:4 194:14
**Brockman** 2:18
**brought** 65:16 207:4
**buck** 126:6
**bucket** 62:16 89:25
**buckets** 20:25 34:9
**Bumble** 24:11
**bunch** 211:11 250:6
**bundle** 123:25 228:1
  255:24
**burden** 61:5 281:11
**business** 20:8,21
  39:12 41:9 255:23
  255:24 258:10
  289:21
**businesses** 223:9
  255:25
**butter** 54:11
**but-for** 180:12 181:6
  201:14,17,18,20,22
  265:15 266:12
**buying** 125:7 184:22
**bX** 251:1
**B-1** 18:2 60:15

――――――――――
          **C**
――――――――――
**C** 1:10 2:1 3:1,1 5:1
  25:24 35:19,25 36:1
  36:21 37:3 62:6
  77:11,13 83:4
  138:12 161:5 168:21
**cable** 66:16 126:8
**Cain** 3:7 5:12,18 219:3
  253:3 289:5 290:2
**calculate** 31:8,9,14

56:4,5 57:4,12,15,19
  57:23 58:4,6,7,9
  87:16 98:1 102:7
  109:22 110:14,15
  178:4 180:18 182:18
  184:10 185:8 186:9
  186:11 187:11,16
  188:10,11,25 189:10
  189:18,20,25 190:2
  190:11,15 191:3
  193:13,18,23 195:7
  196:4 197:12,15
  198:12 199:18
  202:10,13,17 203:19
  204:13 211:7 212:19
  216:18,22 218:15
  219:18 220:12,22
  221:3 232:7 237:24
  239:3,9 240:8,10,17
  251:3,21 252:21,24
  257:12 265:21 266:4
  267:3
**calculated** 35:14
  51:18 52:24 72:9
  73:12,21,24 74:5,10
  74:20 75:2 130:12
  179:9 180:1,24
  182:21 184:24
  185:18 186:4 192:7
  192:17,22 193:7
  195:16 197:6 201:17
  218:4 240:4 241:20
  241:25 245:3 252:2
  252:3 266:21 275:4
  282:25
**calculating** 31:25 61:6
  137:1 181:6,8
  183:18 188:3 221:24
  273:15 282:17
  283:24 284:22 287:8
**calculation** 29:11,17
  68:15 72:7 99:24
  136:17 138:14 184:2
  187:14 194:12
  243:25 273:25
**calculations** 38:11
  71:2,22,25 72:14
  202:4,5
**call** 35:10 54:23,25
  128:10,18 139:17,21
  140:5,8,13 154:7
  181:15 273:12
**called** 15:9 24:21
  35:10 38:25 42:15
  57:25 68:6 88:21
  130:2 135:12 145:22
  145:24 180:10,13

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 299

181:12 209:12 218:10 281:6
**calls** 71:14 94:10 96:2 98:7,17 100:9,19 101:3 116:5 118:4 139:18 173:1,14 174:15 175:3 234:6 234:19 278:10
**camera** 115:12
**Cammer** 27:6,19 28:23 29:2 62:6 67:19 78:2 79:7 82:4 82:4 88:22 108:19 118:1 121:8,13 123:15 124:15,16,19 124:23 125:5,15 151:9 153:16 171:6 279:11,15 281:3 282:4
**Cammer/Krogman** 62:8 63:12 111:14
**Canada** 136:21
**candidate** 123:10
**Cannon** 9:5 243:23
**cap** 122:16 154:21 171:11
**capable** 187:2
**capital** 39:23 40:15 81:5 167:4,13,17
**capitalization** 122:6 262:18
**caption** 18:8
**card** 55:20,21 59:3
**cards** 134:2
**career** 18:25 44:14
**careful** 229:6,16
**carefully** 35:20
**carries** 180:14
**Carvalho** 2:8
**case** 12:12 13:14 26:9 26:11,18 28:13,14 35:16 36:13 47:22 47:24,25 49:5,10,15 50:9 54:14 56:4 61:11,12 62:2 63:20 64:2,6,16 66:23 69:4 70:13 72:3,5 73:11 74:12,18 82:12 84:7 91:14 92:4,23 97:4 98:6 103:24 104:5 104:20 105:3,19 111:13,17 116:15 124:21 130:19,23 132:19 141:12 155:6 161:24 162:2 164:1 172:20 177:1 180:24 183:25 184:2,7,18

186:15 187:8,25 189:4,15 190:10 191:5 192:17 199:4 201:3,23 208:13 209:1 212:15 215:17 218:3,21 223:16 224:20 227:24 231:22 233:5,15 235:4,10 239:10 240:5,23 242:2 246:4,5 249:9 250:9 250:10 253:10 257:10 273:16 280:1 281:11,12 282:4 284:4,11 285:15,17 286:9 287:9,17,17 288:15,15 290:10
**cases** 23:13,18 49:21 49:23,25 50:23 51:15,23 52:3,21 56:7,10 57:12 58:11 61:15,21 62:3,4 121:15 136:21 184:11 185:4 194:19 232:7 277:21
**cash** 114:2 175:10,10 175:16,17,19,23 176:5,10,12,19,20
**cat** 62:7
**category** 210:8
**cats** 231:23
**causation** 86:3,16 87:15 102:3 105:20 109:14 136:18 149:1 150:12 160:6 161:1 162:21 164:5,6,20 170:3,13,15 177:8 177:10,13 178:8 184:25 185:5 186:5 191:23,25 200:23 201:24 205:20 210:23 211:8 212:16 220:1 222:4,5 226:3 232:4 234:2,10 235:11 236:5 238:14 238:24 239:22 247:16 250:4 255:2 256:21 257:15 266:8 266:17 268:3 280:8 285:7,19
**cause** 88:22 98:22 108:20 126:20 128:4 130:5 131:8 154:23 175:25 197:25 199:17 223:3 232:25 272:15
**caused** 57:24 72:8,8

85:18,21 86:4,7,19 89:10 96:6 109:12 147:13,19 160:24 164:1 170:1 176:19 177:8 197:10 202:21 207:10,17 225:16 226:18 227:17 228:13 233:18,19 235:9 237:7 256:7 266:5 268:2 269:13 271:4 280:5,6
**causes** 207:21 219:23 221:18 262:17,18
**causing** 215:10
**cell** 6:24 7:1
**cents** 230:3 233:8,10 233:11
**CenturyLink** 24:7
**CEO** 42:14 59:18 121:23
**certain** 20:7 27:16 28:7 34:3 35:13 59:21 69:11 83:19 154:15 155:19 174:5 199:22 214:20,21 220:6 236:3
**certainly** 35:22 53:17 116:15 119:8 152:4 152:11 248:10 280:20
**certainty** 140:4 187:4 251:24
**Certificate** 4:12 290:1
**certification** 8:3 11:5 12:3 13:7 14:1 46:25 47:1 48:4 49:6,9,16 50:2,3,25 51:1,2 61:25 62:11,17 65:16 185:14 252:14 256:13
**certified** 47:6,13 59:12 65:4
**certify** 290:4 292:10
**cetera** 84:3
**CFO** 59:16
**chairman** 42:14 121:23
**chance** 88:15 128:3
**change** 7:12 21:5 30:1 30:14 31:5,15 32:1 112:7 117:19,22 155:23 175:23,25 176:5,20 194:8 222:21 226:12 227:23 230:24 231:2 231:3 233:8,19,20 235:19 246:1 293:1

**changed** 27:5,8 28:24 29:4 125:8 134:13 176:13,19 238:11 255:18,19
**changes** 109:7 159:4 174:10 223:4 226:17 226:18,21 227:2,17 230:2 232:25 292:15
**characteristics** 123:5 192:5
**Chicago** 18:22 43:15 43:18,21 48:18 53:16 63:2 66:8
**choosing** 138:8 154:15 198:24
**chosen** 138:3,5
**Christakis** 61:14
**Christopher** 56:17
**chronology** 25:23 36:10 107:16
**Circuit** 61:16,22
**circumstance** 190:5
**circumstances** 13:17 223:24
**cite** 61:12,15,21 62:10 76:9 118:23,24 123:21 151:4 278:24 279:8,21
**cited** 60:20 75:21 76:5 76:10 118:10
**cites** 72:23
**CitiGroup** 24:8
**CITY** 1:3,4
**Civil** 1:13
**claim** 74:3 91:18,21 99:2 182:23 197:6 277:19
**claims** 23:18 49:25 50:23 68:18,24,25 69:3 70:13 71:12,17 71:17 72:3,18,22 73:6 94:14 179:9 182:7 219:7
**clarification** 140:3
**clarified** 149:5
**clarify** 148:4
**class** 2:3 8:3 11:4 12:3 13:6 14:1 31:10 46:24 47:1,5,12 48:4 49:5,9,16 50:2,3,25 51:1,2 56:14 57:4,20 61:25 62:11,17 65:4 65:16 67:16,25 68:3 68:5,6,11,17 69:1 70:23 71:6,8,9,12 72:5,18 84:7 85:16 88:4 91:19 96:14

98:16,21 99:3,12 100:8,18 101:13,17 111:9 130:16 131:13 135:12,15,16,21 136:10,12,16 137:2 138:15 159:24 160:11 162:7 178:4 179:18,20 180:15,16 180:17 185:14 186:9 187:17,18 188:3 190:3,12 192:4 195:4 196:17 197:4 210:3 242:25 243:8 245:2 246:22 252:13 256:13 258:23 260:22 261:13 262:15 263:5,8 265:24 269:6,14,22 270:7 271:4,8 272:3 272:25 273:4,7,11 274:20,22,24 283:25 284:23
**classes** 30:19
**classic** 209:1
**classwide** 14:7 29:12 31:25 51:18 52:24 53:6 58:1 72:10,16 73:12 74:5,21 102:6 109:21 110:15 178:2 179:9 180:25 182:21 183:24 185:1,18 186:12 189:18 192:23 193:21 195:8 196:4 197:7,12 202:7 211:6 212:17 218:4,14 219:2 220:11 221:3,12,24 239:2 240:15 241:21 243:16 257:7,11 266:20 268:9 274:12 275:3 280:19,22 282:22 286:23 287:8
**class-wide** 29:18 68:16 71:4 194:12
**clause** 221:7
**clean** 198:21
**clear** 7:16 17:25 38:17 71:18 89:9 90:22 109:4 126:2 136:9 137:23 152:5 182:12 183:17 217:13 221:21 225:12 235:15 240:18 241:13 251:19 255:16 256:5 279:9 283:18
**clearly** 29:15 58:2,8

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 300

163:10,12
**clear-cut** 184:18
**clicked** 7:17
**client** 37:6 52:7 65:7
  123:6 242:16
**clock** 7:2
**close** 45:4 64:8
  134:21,21 139:19
  224:22 225:2 248:14
**closer** 41:25
**closes** 140:7
**close-to-close** 129:5
  133:11
**CNBC** 91:11
**Cobalt** 183:14 288:2
**collapse** 115:12
  215:25 216:1
**collapsing** 264:6
**collective** 213:11
  228:11
**column** 36:23,23 83:7
  83:9,21,25 84:1
  86:10,22 259:10
**columns** 36:22 37:3
  37:19 83:15
**combination** 119:1
  280:14
**Comcast** 64:20 66:7
  66:14,15
**come** 21:17 25:6
  27:16 29:2,4 37:23
  38:20 40:10,24
  60:14 62:19 106:17
  111:16 123:9 134:20
  147:7 148:11 164:16
  181:10 208:25
  236:21 237:12
  242:11,15 243:12
  247:4 250:14
**comes** 30:6 35:15
  37:10 139:20 140:4
  193:10 224:6 242:6
  275:24
**comfortable** 18:3
**coming** 135:21 152:9
  224:9 236:10 266:11
  266:12
**comma** 76:25
**commentary** 223:3
  225:22,25 226:8,11
  226:11,20,24 227:3
  227:6,14,16,20
  228:7,9,24 231:14
  231:21 232:13,20
  236:1
**commercial** 20:4
**commission** 290:16

**common** 12:10 14:4,6
  26:5 29:19 31:9,24
  32:4,16 51:7,19,23
  52:25 53:5 54:16
  57:6 58:2,7 65:3
  68:16 70:21,23 71:5
  91:17,25 94:1 102:6
  109:21 110:14 111:9
  126:22 127:17
  131:14,24 137:13
  155:8 160:19,20
  163:2 178:2,3
  179:10 180:19 182:5
  183:23 184:6 185:18
  186:2 188:17,24
  189:17 191:18 192:1
  192:2,3 193:21
  194:14,22 195:8
  196:7 197:7,11
  202:6,21 211:6
  212:18 218:14 219:5
  220:11 236:2 239:2
  240:15 243:16
  257:11 258:18
  265:10,11 273:6
  275:5 280:22 282:2
  282:5
**commonly** 12:12
  133:12 179:25
**commonly-used**
  250:24
**Commonwealth** 5:19
  290:22
**communicate** 8:8
**communicates** 174:12
**companies** 25:4 39:12
  71:18 80:9 139:14
  140:6 155:20 208:2
  208:3 229:7,7
**company** 19:25 24:20
  39:4,5 43:13 59:16
  59:18 80:11,13
  88:13 113:25 114:3
  114:4 117:19 121:25
  122:2 125:6,10,19
  129:8 158:23 172:6
  174:10 176:7 182:7
  182:23 208:5 223:5
  223:7 226:11 227:22
  229:10,18,20 230:7
  231:24 233:7 236:10
  242:7 258:7,9
  261:20 262:7,14
  265:15 267:23
  277:16
**company's** 117:5
  175:25 230:19 236:3

262:16
**company-specific**
  113:16
**comparable** 286:22
**compared** 20:24 23:6
  80:9 81:10 123:16
  127:8,21 130:14
  159:6 160:11 249:10
  287:6
**compares** 286:20
**comparison** 132:13
  248:9
**comparisons** 123:20
**Compass** 41:23 42:9
**compensation** 40:23
**compete** 164:16
**competition** 126:1,5
**complaint** 9:2 10:14
  68:6,13 69:18,20,21
  96:17 108:3,5,7
  109:14 135:6,23,25
  136:2,4,13 137:4
  138:5 146:9,15,19
  147:7 148:21 157:22
  158:8 160:15 205:25
  243:2 253:17 256:16
  263:4 294:12,15
**complaint's** 160:8
**complete** 8:21 13:24
**complex** 20:4 232:7
**complicated** 183:19
**complicates** 140:2
**component** 12:25
  39:24 56:12 224:24
  225:1 229:14,15
  231:4
**components** 62:12
  65:5 154:6 213:19
  224:23
**Compound** 113:20
  118:15 214:25
**comprises** 32:21
**computed** 71:4 72:9
  72:16
**computer** 6:22 7:6
  134:1,3 268:22
**computing** 134:1,2,12
  134:19
**concealed** 256:6
  257:4,5,17,20,20
**concept** 67:23 173:10
  181:8 241:15 255:7
  282:16
**concerned** 288:7
**concerning** 254:14
**concerns** 48:16
**conclude** 121:9

131:19 221:1,2
**concluded** 111:5
  140:17 191:15 206:3
  289:25
**conclusion** 71:15
  94:11 96:2 98:8,18
  100:10,20 101:4
  111:8 118:5 127:11
  131:13,20 142:10
  146:6 153:14 190:13
  190:14 229:1 232:1
  278:11
**conclusions** 137:12
  137:22 163:4 173:2
**conditioning** 173:19
**conducted** 126:14
**conference** 139:17,18
  139:21 140:5,8,13
  154:7
**conferences** 81:10
  82:8
**confidential** 243:6
**confirming** 227:1
**confounding** 213:24
  233:17,18
**confused** 57:16 71:16
  72:20 159:14 198:11
  206:22
**confusing** 11:16
  189:19 191:18
  204:22
**congregated** 155:17
**connection** 22:25
  68:17 244:12
**consensus** 223:6
**conservative** 148:25
  149:12
**conservatively** 148:22
**consider** 53:11,23
  58:15 59:9,19 88:2
  89:3 242:13 244:15
**considered** 55:1 88:9
  89:15,16 90:11
  123:11 124:19
  148:15 163:6 171:21
  180:12
**consistency** 138:1
**consistent** 27:21
  29:24 31:9 52:2
  55:13 142:11 145:2
  145:21,22,23 147:21
  147:24 150:19,23
  151:20 152:6 165:18
  171:21 181:4 194:7
  194:17 221:4 240:4
  242:1
**constant** 175:18,20

176:11,15 199:19,20
  199:21,24 216:10
  271:13,24 272:22
**construct** 266:19
  272:2,4,13,23
**construction** 26:2
  280:17
**consultant** 44:5
**consulting** 20:8,21
  26:7 43:5,19 44:25
  45:3 53:9,10,12
**contain** 13:24
**contained** 37:17
**contains** 14:20,22
  283:22
**contend** 168:12
**content** 78:5 81:18
  82:7 85:1
**contents** 4:1 78:11
  242:24 245:15
  277:25 278:8,8
  279:25
**context** 129:4
**continually** 63:9
**CONTINUED** 121:5
**contract** 25:4
**control** 229:7 257:17
**controlled** 122:11
  229:11,18
**controllers** 59:18
**controlling** 261:14
**Cont'd** 295:1
**convinced** 19:4
  243:11
**COOKE** 1:10
**copy** 1:24 11:11
  289:16,19 291:11,14
  291:18
**copying** 28:7
**core** 88:21
**corners** 14:13 75:11
  274:3
**Corporation** 61:15
**corporations** 54:10
  55:2
**correct** 12:3 14:10
  18:12 30:7,12 31:16
  35:16 41:13,15,16
  49:17 50:4 63:21
  64:22 67:12,16 68:2
  68:19 70:22 75:8
  83:8 84:13 85:14
  89:3,12 92:19 97:11
  101:2 107:12 121:12
  126:25 139:2,13
  140:19 141:5,25
  144:9 152:17 155:13

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 301

163:21 164:13 166:24 169:16 194:4 196:20 218:7 229:4 237:25 238:19,21 249:23 251:21 252:3 253:19 257:18 258:14,19 262:19 263:13 264:8,19 269:14 283:1,25 284:23 290:5 292:12
**corrected** 177:16 209:25 214:18 277:18
**corrections** 208:24 292:14
**corrective** 106:19 135:8 136:23 137:15 137:24 138:4,16 141:18,22 142:15,24 143:2 145:2,18 146:7,20,23,24 148:15 149:17,22 151:2,15 152:16 156:3 157:14,20 159:12,18 160:10 162:14,17,19 171:25 176:25 177:1,6,16 177:23 186:21 189:13 199:12,22 200:18,20 203:11,14 203:18 204:2,24 205:21 206:11 207:2 208:14,22 211:18,20 212:7 214:1,17 215:3,13 217:3,4 223:17 224:17 225:7 226:24 228:12 229:3 230:12,20 231:15,19 237:17 244:1,7,14 244:17 245:13,16 247:18 248:6,8 249:4,22 255:13 260:9,13,20 263:6,9 263:13 278:1,9 280:1,9 283:6,21 284:5,12,15 285:15 285:16
**correctly** 11:23 19:14 159:10 166:7,13 186:15 216:9 271:18
**corresponded** 10:6
**corresponds** 61:7
**cost** 111:15
**counsel** 5:14,20 6:13 6:16 9:6,7,9,16 17:2 17:4 62:18 67:11 121:5 137:13 138:5

138:9 157:17 248:22 281:13 290:8 291:6 291:13 295:21
**count** 24:17 182:3 261:3 263:7 264:2,2
**counted** 261:3
**counterintuitive** 285:17
**counting** 46:21 263:19
**couple** 6:19 25:12 42:1 53:8 54:3 79:5 115:13 117:25 154:6 241:15 246:15 268:10 270:5 278:4
**course** 246:17 250:15
**court** 1:1 3:7 5:12,15 5:17,18 6:11 11:3 12:2,18,23 13:4,5,13 13:17,21 46:13 59:24 60:16,20,25 61:2,4,10,19 62:5,13 63:11 73:22 78:17 78:20 79:13 119:3 125:5 133:8 152:4 166:21 167:9 172:5 172:13,15,19,23 178:12,15 184:4 185:12 189:1 196:10 199:11,19,23 200:24 201:7 202:4 211:13 213:5,6 217:20 224:8 243:11 249:18 252:10 268:20 275:8 275:13,22 276:16 283:15 285:4 288:4 289:15,20 295:10
**courts** 111:7 118:9,17 118:18 119:2,4 152:4 164:9 171:3 185:13,24 191:21,24 284:14
**court's** 10:14 64:20,21 69:17 97:2
**coverage** 78:19 82:3 82:15 122:4,14,15 150:22
**covered** 67:10 149:25
**CPA** 173:21
**CPAs** 59:17
**crafting** 35:12
**Cragar** 42:15,16,17 43:5,7,12 121:25 122:19 123:8,8 258:7
**crashing** 106:17
**crazy** 274:1
**create** 81:16 157:8

177:25 180:10 184:23 191:23 198:19 203:11 266:19
**created** 26:3 33:17 36:8 81:2 284:7
**creation** 26:1 192:1
**credibility** 176:9,14
**credit** 55:20,20 59:3
**credited** 65:2 66:22
**criteria** 91:1 138:10
**critical** 81:25 82:7 102:5 252:25
**cumulative** 209:9
**curative** 149:22 150:5 207:2 250:5
**currencies** 246:7,8
**currently** 19:16,17 39:19 40:1,1,2,22
**cursory** 36:15
**cushion** 224:11
**cushioned** 170:11 237:16
**customer** 285:10
**customers** 223:9
**cut** 48:23 285:21
**CV** 18:11 23:22 38:23

_____

**D**

**D** 3:1 5:1 8:1 11:17,20 35:19 37:12 48:7 104:4,5 105:5 198:2 198:16,17 294:1 295:1
**daily** 124:14 128:7 130:8,21 131:14,21 132:16 133:4,5,11 133:18 199:5 202:19 207:9
**damage** 56:12,13 109:21 187:7 188:2 265:11
**damages** 12:10 14:7 27:20 29:12,18 31:10,25 32:16 51:8 51:17,23 52:23 53:5 54:16 56:4,6,9,14,15 56:16,18,19,19,20 56:21,22,23,24,25 57:4,7,12,15,20 58:2 58:4,8,10 61:6,9,25 65:4,24 68:15 71:2 71:22 72:1,3,14 73:11,21 74:4,9,14 74:19 75:2 91:25 94:1 101:8 102:7,8 110:14,14 136:17,18

137:1 160:20 163:2 178:3,5 179:7 180:19,19,21,24 182:21 183:10,11,16 183:18,23 184:7,13 185:2,17 186:11 187:4,8,16 188:2,6 188:17,24 189:17,18 190:16 191:3,18 192:1,7 193:21,23 194:1,12,22 195:8 195:16 196:4,7 197:6,11,12 198:25 201:25 202:6 211:6 211:7 212:18,19 218:4,14,15 220:11 220:12 221:3,24 232:7 235:25 238:24 239:2,4,22 240:15 240:17 241:20 243:13,16,17 251:13 251:25 252:22 253:8 256:24 257:11,13 266:17,20 273:2,15 274:14 275:2,3 280:22 282:3 287:8 288:5,5,22
**Dan** 42:5 252:19
**data** 25:22,25,25 36:9 38:1,11,13 65:18,19 227:21 258:18 266:15
**databases** 81:5
**date** 5:9,25 15:15 36:21,22 37:2,19 83:8,9 85:19 86:5 87:11 88:9,11,19 89:11 101:17 108:17 109:16 128:11 140:22 145:2 148:23 148:23 151:15,16 161:12,15,22 162:4 163:1,11,12,15,18 164:18,24 165:10,17 168:22 169:14 171:16,17,19 172:1 174:3,4 183:18 215:3 229:3 255:13 263:12 292:19
**dated** 276:17
**dates** 88:12,20,20 127:21 136:19 138:4 138:7,8,9 141:18,23 142:2,2,6,6,16,20 145:17 146:3,8,10 146:19,20,24,24 147:1,6 151:3

161:19 171:20 180:8 199:13,13 206:4,5,6 236:16 260:10,11 263:5,11 265:3 267:20,22
**date's** 162:24
**David** 48:7
**day** 9:7,8,11,12,13 83:10,15 85:16 87:22 88:3,7 89:5,5 89:10 90:10 91:7 101:13 120:5 127:2 128:10 129:10,21,22 130:19,20 138:23,24 138:25 139:18 140:1 140:12 141:15 142:1 145:3 149:5 150:21 152:23 153:6 154:7 154:9,13 157:20 161:8 168:24 169:1 169:21 171:13 191:1 195:17 205:24 209:10,12 218:20,22 223:17 225:11,18 226:9 242:22 247:4 247:6 290:13 292:22
**days** 9:9 48:12 83:13 84:13 89:17 90:13 106:2 122:22 127:7 127:8,14,19,22,22 127:23,25 128:8 129:21 130:14,15 132:3,4,4,6,7,10,21 135:18,20 136:22 138:3 139:3 140:24 147:13 152:5 153:20 153:22 154:17,24 156:10,11 164:15 176:19 246:15 258:23 259:2,6 260:8,18,20,25 261:1,2,5,12 289:21 291:12 294:21 295:7
**de** 2:8
**deal** 167:24 198:23 208:3
**dealing** 29:11 285:9
**dealt** 63:4,18
**decade** 25:9
**decades** 44:8
**decide** 171:13
**decided** 66:19,20 276:17 295:14
**deciding** 118:12 172:20
**decision** 9:5 10:15 48:7,8,17 63:15

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 302

64:20,21 97:2 113:11 147:8 172:14 172:14 274:18 275:21 276:3,9 279:9 281:18 283:3
**decisions** 60:20 61:1 61:2,3 62:11,17 63:8 63:8,14,23,25 112:20 185:12,25 275:8,13 279:8,21
**decline** 86:7 97:22 106:1 109:6 148:1 170:1,10 188:15 189:12 228:10,14 230:24 236:14 237:4 237:8,16 249:13 262:6 267:24 269:6
**declined** 158:25
**declines** 137:4 212:7 267:16
**decompose** 203:10 210:16
**decrease** 262:19 284:18
**decreases** 261:14 267:7
**decreasing** 172:8
**deemed** 202:4
**deeper** 142:20
**defend** 54:10
**defendant** 182:23 184:9
**defendants** 1:11 2:14 6:13,17 37:13 46:10 53:19 54:22 65:9 66:2 70:9 97:21,25 106:15 121:5 193:2 202:21 246:18 250:15 254:12 294:9 295:20
**defendant's** 281:11
**defending** 55:2
**defense** 26:6 37:23,24 44:23 46:1 48:6,9,14 48:15,15,19,20 49:2 49:8 50:10 53:9 54:4 182:17 187:12,13 188:12 190:25 200:6 242:6 285:2
**defense-oriented** 42:2 43:23
**defense-related** 53:21 55:1
**define** 68:3,6,10 112:14 136:12 141:8 141:14 283:12
**defined** 25:3 67:24,25

68:4 70:24 127:21
**defining** 55:24 94:19
**definitely** 13:16 77:22
**definition** 135:21 136:13 143:1 221:18
**deflated** 74:4,9,13,19 74:25 92:6 194:21
**deflates** 73:20
**deflation** 271:10 272:4 272:13,22,23 274:21 274:24
**deflationary** 273:13,22
**degree** 187:4 251:23
**demand** 183:20
**demonstrate** 65:20 101:25 152:25 155:6 273:21 274:2
**demonstrated** 65:24 108:20 109:5,11 131:24 147:4
**demonstrates** 148:24 149:10 274:4
**demonstrating** 118:3 281:9
**demonstrative** 61:3 260:6 263:3 294:20 295:5
**DENNIS** 1:9
**Denying** 294:9
**Department** 41:10
**depend** 244:2
**depending** 28:12 213:21 257:8,9
**Depends** 213:1
**deponent** 5:22,23 292:8
**deposition** 1:16 5:6,21 6:23 7:8 8:25 9:1,19 9:21,24 70:2 289:24
**depreciation** 69:10 92:3,6 96:7 101:20 102:12,19 103:1,25 104:4,11,21 105:4,7 105:22 107:5 108:1 108:11,24 109:7,10 159:3 160:1 172:3 215:15 234:24,25 243:7 245:3 246:2 254:15,17 269:10
**describe** 33:20 40:7 66:15 92:9 198:15 202:9 214:6 226:5
**described** 37:11 102:10 181:1 193:22 197:25
**describes** 181:2
**describing** 28:23 62:5

**description** 39:7 80:11 181:17 193:25 294:3 295:3
**descriptive** 62:5
**designer** 42:18
**detail** 160:17 194:9 229:24
**detailed** 223:6 254:11
**detect** 126:15,22
**deterioration** 254:17
**determination** 133:3,8 188:1,4 189:24 190:11 273:23
**determine** 54:13 60:25 62:18 68:10 106:5 129:19 132:9 136:24 162:18 177:8 193:1 225:5,16 228:9 231:14 238:25 239:7 239:24 240:12 244:12,13 249:4 257:16 273:20 274:7
**determined** 170:19 211:3 212:17 238:17
**determines** 110:8 190:23 193:20 218:17 221:10,11 224:8 240:13 243:15 253:5 257:9
**determining** 55:12 170:23 245:12
**develop** 218:9 228:2
**developed** 54:15 102:3 165:15 243:20
**developer** 42:17
**developing** 62:23
**devices** 6:21
**DFC** 183:13
**differ** 94:4 250:7
**difference** 52:1 53:9 54:3 74:13 75:3 128:2,5 201:13,19 284:22 287:16
**differences** 198:8 288:8,13
**different** 14:15 18:1 22:13 42:21 53:3 55:15,18 57:19 66:17 73:3 79:6 93:7 93:16 94:5 112:12 121:21 126:7 128:22 132:15 145:13 159:23 167:16,20 174:9 184:15 186:16 198:20 201:23 203:5 209:14 215:11 223:2 223:8 228:12 231:11

241:17 243:24 246:20 247:10 281:19
**difficult** 73:18 161:7 184:1 267:3
**digested** 80:16 82:16 115:21 149:6,24 150:15
**digesting** 116:17
**digestion** 116:16,20 129:17 157:7
**Dimensional** 166:15
**direct** 148:8 161:7 167:3 276:5
**directed** 59:16
**directing** 111:3
**direction** 10:12 24:19 25:22 89:4 90:11 133:23 163:20,24 164:7 168:4,13 170:4,21
**directional** 202:11
**directly** 150:1 267:17
**disagree** 284:17
**discern** 287:18 288:15
**disclose** 95:24 108:23 145:14 246:15
**disclosed** 89:11 106:18 107:5 115:20 116:1,13,13 117:18 142:22 145:12 147:6 149:23 150:20 157:20 175:17 213:25 215:2,4,13 215:16,18 220:5 224:24 231:10 245:2 245:14,20,22 246:6 246:12,13,18 247:12 247:17 249:12 250:16 251:15 255:19 266:15,16
**discloses** 113:18
**disclosing** 80:14
**disclosure** 78:9 107:23,25 108:6,10 115:25 116:8,9,11 126:16 127:13 129:17 135:8 136:23 138:4 139:15 140:11 141:18,23 142:16,24 143:2 145:2 146:7 146:20,24,24 148:15 151:2,15,16 156:3 159:12,18 160:10 162:13,14 171:25 172:3,7 175:22 176:7,8 177:16,23

189:5 199:13,22 200:13,18,20 203:17 204:1,4,5,7,11 206:14 207:15 209:25 210:6 211:18 211:20 214:1,17 215:3,14 217:4,4 223:17,23 224:4,17 224:21 226:24 228:12 229:3 230:12 230:20 231:15,20 237:18 242:25 244:1 244:4,7,8,14,17 245:13,15,16 246:1 247:18 248:6 249:5 249:23 255:13 258:6 267:18 277:16,18 278:1,9 280:10 283:6,21 284:5 285:15
**disclosures** 76:19 77:14 82:16 88:13 105:23 107:11 126:23 131:25 137:15,25 138:16 139:4 145:18 146:10 147:9 149:17 152:16 156:7 157:14 160:6 160:11 162:18,19 177:1,6 189:14 202:23 203:12 204:24 205:1,15,21 206:10 207:13,25 208:15 212:7 223:1 225:7 248:8 250:17 260:9,13,21 261:19 263:6,9,14 280:1 284:12,15 285:16
**discontinuous** 208:24
**discovery** 99:22 182:16 189:8 191:15 206:3
**discrete** 70:5 268:11
**discuss** 66:2,3 158:2 183:15
**discussed** 66:19 240:16 274:16 289:23
**discussion** 9:6 63:23 64:19 66:5,20 69:17 126:19 225:13 282:8
**discussions** 27:7
**dismiss** 9:4 10:14 69:18 96:18 106:14 108:8 146:15,16,18 147:8 172:11,14,19 172:20 294:10

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 303

**display** 7:12
**dispute** 99:21 182:15
**disputes** 189:9 251:16
**disputing** 231:12
**disseminated** 80:15 82:16 115:20 116:16 129:10 149:6,24 150:15
**disseminating** 116:19
**dissemination** 116:10 122:7 129:17
**dissertation** 41:6
**distinction** 81:8
**distinguishes** 162:14
**distribute** 291:14
**distributed** 292:3
**distributor** 42:18
**DISTRICT** 1:1,1
**dive** 206:2
**dividends** 39:23 40:9 40:15
**divisions** 223:9
**Doctor** 110:23
**document** 7:15,24 8:4 9:4 11:18,22 12:24 161:6 219:11 278:14 278:21
**documented** 99:23
**documents** 7:7,22 10:16,17 15:8 60:16 62:13 95:12 97:4 185:7 186:20 200:4 206:2 210:24 214:12 220:6 229:9,24 230:7,19 231:2 278:25 279:7,13,14
**dogs** 231:24
**doing** 6:18 43:4 77:5,5 118:9 128:19 132:11 134:2,7 135:19 154:1 168:15,15 186:16 191:10 201:5 201:11 212:13 214:23 287:13
**dollar** 164:13,13 199:20,20,21 209:5 214:10 233:10,12,21 236:20
**dollars** 247:20,23
**dollar-for-dollar** 216:1
**double** 62:7 259:11,16 259:17,22
**downplay** 134:16
**dozens** 171:3
**Dr** 5:6 6:15 61:8,18,24 97:3 103:23 114:18 121:7 166:18 184:2

187:2 212:25 222:15 269:3 283:11 286:7 288:25 289:2 295:18
**draft** 16:14,19
**draw** 81:8 132:2 163:4
**drawing** 27:15
**driven** 158:24
**driving** 125:8
**drop** 85:19 86:20 107:7 108:12 109:25 210:2 214:19 229:2 233:22 236:21 277:17,19,23 278:6 278:16 280:7
**drops** 265:23
**due** 109:12 148:1 159:3 222:19 227:24 231:4 235:18
**duly** 6:8
**DVI** 48:9 63:6
**D-1** 198:17

---

### E

**E** 1:9 2:1,1 3:1,1,1 5:1 5:1 35:21 107:19 138:12 216:17 258:12,13,16,17 259:10 260:7 263:1 294:1,1,20 295:1,1,5
**earlier** 22:8 43:9 46:6 83:6 91:16 102:10 121:24 159:24 160:11 162:16 173:10 193:5 204:23 214:3 215:4,16,19 246:3 269:3 275:7 277:18,20 282:23
**earliest** 69:17
**early** 43:22 133:14 194:10 285:22
**earn** 39:21,22,25 40:2 125:24 126:6,6,9
**earned** 274:9
**earning** 40:11 126:8
**earnings** 21:17,21,22 21:24 22:5,11 88:9 88:12 116:5 131:25 132:3 138:3,7 139:3 139:3,4,8,12,15 140:7 142:1,1,2,6 152:16 153:25 155:10,19,22 156:7 156:16 157:3,5 158:23 159:5 161:20 162:6,11 165:10,17 223:8 227:18 234:23 260:10,11 261:7

**earnings-per** 223:4
**earrings** 161:14
**easier** 17:8,13 26:12 237:6 260:8 263:20
**easiest** 23:21
**easily** 19:23,23 111:15
**Easterbrook** 66:9
**Eastern** 5:10
**easy** 282:20
**EBITDA** 223:5 226:18 227:19 233:1 234:1 234:17 235:2,8 236:4
**economic** 53:15 63:24 65:14 66:1 76:8 111:5 118:11 119:10 123:19 182:17 186:19
**economics** 14:3 18:25 19:18,20,24,25 20:1 20:14,23 21:24 22:6 22:11,14 24:21,23 24:24 25:7,10,13,16 25:21 26:6 36:5 40:3 40:12,20,25 41:10 41:20 43:8 44:3 48:21 49:4,15,24 50:7,22 51:15 52:21 53:11,18 54:12 55:9 59:21 63:24 66:8 185:21,22
**economist** 18:22 19:5 53:16 54:24 58:23 173:5 187:24 190:9 205:7 259:15 267:3 272:7
**economists** 55:16,22 55:25 57:23 58:25 88:10 164:10 208:9 209:11 225:14
**economist's** 132:23 217:8
**economy** 112:21
**edits** 26:4
**Edward** 258:15,16
**effect** 88:22 108:20 126:20 130:5 131:9 154:23 197:25 199:18
**efficiency** 27:19 65:3 88:24 110:20 111:7 112:6 115:6,9 118:3 121:17 125:12,19 137:12,22 151:10,21 153:8 156:12 165:1 165:8 166:2,5,20 167:18 170:19

176:18 183:15 256:24
**efficient** 12:9 14:6 27:5 51:7 52:7,9,15 54:15 55:13 67:15 67:18,20,22 70:21 70:24 78:10,18,24 82:1,11 87:23 90:3 90:25 93:25 110:12 111:10,12,20 112:4 112:11,12 116:14 118:13 119:6,11 121:11,18 122:25 123:12 124:20,24 126:3,3 132:1 137:17 140:19 142:12 145:21 152:11,13 153:2,10 153:12 157:1,2 160:19 161:21 163:13 164:10,11,14 165:11,18,23 166:24 167:4,13,17 168:5 169:16,25 170:24 171:8,23 177:21 195:2,17 196:1,6 265:11 282:6
**eight** 37:8
**Eikon** 81:5
**either** 6:5 61:3 62:10 88:4 101:7 143:10 143:23 144:18 159:25 180:14 181:5 182:5 202:23 206:11 206:18 207:13,20 264:18
**electronic** 6:21 291:14
**electronically** 292:3
**element** 117:19 267:16
**elementary** 250:25
**elements** 223:3 226:17 227:17 232:5 232:25 235:20 236:7
**eliminate** 66:21
**eliminated** 65:25 90:25 96:8 109:16
**email** 7:20,21
**emerged** 51:9
**emerges** 70:10 158:19
**empirical** 126:15 131:11 138:13 152:24
**employed** 24:19,20 25:7 43:5 58:3,9 290:9
**employees** 1:4 20:15

**employment** 18:15,17 19:11,14 40:3,11,19
**employment/labor** 47:25
**enable** 182:17
**ends** 76:25
**engage** 27:22 48:10
**engaged** 22:21 23:2 49:8 56:2 60:2,4 66:1 87:15 88:24 119:9 136:20 170:14 177:13 222:5 256:24 266:16,17
**engagement** 12:8 63:16 72:22
**engagements** 50:6 53:4,22
**entire** 69:20 214:15,16
**entrepreneurial** 43:24 44:1
**entries** 37:9
**EPS** 85:6 226:13,18 227:23 230:1,2,2,24 231:2 233:1,8,19,20 236:4 237:10
**Epstein** 66:9
**equal** 92:2 155:15 277:19 278:19,19
**equally** 103:3
**equals** 277:23 278:6
**equating** 187:25
**equation** 30:18 32:10 181:3
**equilibrium** 126:10 136:25
**errata** 291:1,11,13 292:16
**error** 16:11
**errors** 16:4,9,20
**Esmay** 2:6
**especially** 35:4 48:14 63:19 88:12 95:3 123:20 138:6 189:3 208:3 223:16,16 284:14
**Esquire** 1:19 2:5,6,7,8 2:16,17,18
**essence** 67:22 81:15 88:15 117:10,17 123:23 126:11 132:18 139:3 148:24 183:20 256:7,8 274:13
**EST** 5:3 289:25
**establish** 185:17
**established** 103:16
**estimate** 20:22 93:3,4

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 304

93:15 94:7,22 95:25 173:11,12 174:11 202:19 207:9,17 210:3,9,22 211:19 222:18 235:17 242:14 251:23
**estimated** 223:4 227:18 233:1
**estimates** 91:19 96:14 98:16 105:11 106:20 172:8 228:25 233:25 234:16 235:2
**estimating** 55:19
**et** 5:7,8 47:18 84:3 295:12,14
**Eugene** 76:11 134:14 165:25
**evaluate** 12:8 78:16 78:17 86:3 87:22 88:24 171:12 177:22 197:18 203:10 217:1 222:5 226:9 228:22 232:20 250:8 266:17
**evaluated** 62:5 95:1,6 101:24 159:20 177:6 178:8 182:16 198:19 242:8 245:6 270:1
**evaluates** 89:25
**evaluating** 63:11 78:2 81:25 155:4 221:18
**evaluation** 128:22 201:5
**event** 114:9 126:19,24 127:2,12 128:15,18 129:1 130:7 137:2 186:17 197:17,22,24 198:4,5,9 199:17 201:23 203:20 204:14 216:15,25 217:3,7,19,22,23,23 252:20,23 280:16
**events** 83:22 84:1,12 86:10,22 155:13 198:14,20
**everybody** 25:10 117:1 126:5 155:17
**evidence** 131:12 153:9,12 154:2 177:20 245:5 281:22
**evolved** 36:9 63:13 118:20 119:2 166:19 167:21
**Evoqua** 24:8
**exact** 174:4
**exactly** 26:15 58:13 60:23 87:18 98:22 103:4 104:8 152:9

161:16 170:1 211:10 230:8
**examination** 4:8 6:13 88:21 121:5 223:3 227:17 232:24
**examine** 56:2 65:18 78:14 87:17 90:17 101:6 130:5 144:25 226:17 279:24 281:7 282:7
**examined** 6:9 89:24 148:19 154:11 156:1 176:18 235:25
**examines** 149:1 204:16
**examining** 80:9 130:2 131:9 179:17 181:5 191:14 201:3,4,5 257:1
**example** 26:1 27:4 28:13,23 33:13 34:23 35:25 55:5 59:24 61:4,12 70:7 76:9,11 78:12 80:7 82:12 85:4 92:1 110:9 113:18 114:2 115:23,23 116:25 124:4 148:12 174:25 176:5,6 199:2 200:19 204:17 205:8 208:12 209:1 212:1 216:13 224:2 228:17 230:24 233:7 236:13 245:19 246:4 250:24 251:7 263:12 267:14
**examples** 38:22 116:7 123:2 237:23
**exceed** 107:6 108:1
**Excerpt** 295:18
**excess** 103:25,25
**excessive** 183:20
**exchange** 23:19,20,23 23:25 29:19 47:21 50:1,24 51:16 52:22 68:18 71:3,11,23 72:2,15 73:11 74:2 80:4 111:18,19 122:16 123:18 124:8 139:6 194:13 195:5 196:23
**exchanges** 156:15
**exhibit** 8:1 10:23 11:3 11:10,16,17,20 35:1 35:4,6,7 96:21,23 158:7,10 166:2 171:20 253:16,21 259:10,24 260:1

261:24 262:1,22 275:15,17 286:15,19 294:3,5,9,15,20 295:3,5,10,18
**exhibited** 127:17
**exhibits** 4:16 17:16 32:23 33:3 34:10,17 34:19,20 81:14
**exist** 28:1 79:11
**exists** 73:18 78:5 110:8 241:3
**exogenous** 113:24,25 114:10 117:1 132:14 199:4
**expect** 117:21 142:24 143:1,1,5,9,15 144:13,17 173:23 175:10,11,18 262:13
**expectations** 174:13 271:14
**expected** 117:5 129:8 129:9 132:1 137:16 140:18 142:11 143:22,25 145:3 161:21 175:9,23,25 176:20 288:21
**expecting** 75:14
**expects** 94:8
**expense** 69:10 101:21 102:19 103:1,25 104:4 105:5,7,22 107:5 108:1,12,24 109:7,10 160:1 172:3 215:15 245:3 246:2 254:16,18 269:10
**expensed** 92:3 103:5
**expenses** 92:6 96:7
**experience** 18:18,21 19:10,15 23:5 76:9 121:23 154:1 193:8 202:2 240:22 242:4
**expert** 7:25 9:2 10:20 11:8 13:12,14 20:13 22:25 23:2,3,4,12 43:4,19 44:5,13 45:3 45:22 46:24 47:4 49:4 50:10 57:19 58:16,20 59:9,19,24 60:6 65:14 66:1 99:23 103:17 167:23 182:17,17 187:2 188:13,21 193:10,18 194:4,7 197:17 200:6,7 201:7 211:4 211:4 216:23 227:22 242:6 243:5,12

267:19 270:2 275:1 278:25 286:8 287:6 294:5
**expertise** 18:23 59:7 76:8
**experts** 37:25 44:24 46:2 48:14,14 57:3 57:14 187:12,13 191:16 202:5 243:5
**expires** 290:16
**explain** 91:12 127:1 179:14 180:23
**explanation** 93:6 160:25
**express** 14:17 88:5 89:6
**expressing** 75:13 266:23 272:19
**extends** 62:24
**extensive** 82:2 118:22 122:3,4,14,14,15 126:4
**extent** 29:1 31:7 32:7 74:12 105:5 117:11 125:20 146:22 175:13 176:13 194:19 199:19,23 200:2,24 210:15 242:11 250:7,8 255:14 256:6,10 258:1,3 274:7 280:12 281:11
**extenuating** 13:17
**externally** 229:25
**extra** 237:8
**extreme** 122:12
**E-MAIL** 291:18,20
**E-R** 62:7

---

**F**

**F** 35:23 107:19 294:1 295:1
**face** 219:6,11 253:3
**Facebook** 24:10
**facilities** 223:10
**fact** 29:24 78:5 82:2,4 98:20 108:10 110:7 121:12 122:8,20 127:13 134:16 138:3 153:11 160:9 164:23 165:9,12,16 166:14 169:12,25 173:20 176:6 184:1,11 190:8,22 193:1,8,20 208:15 218:16,18 221:9,11 232:19 240:7,12,13 243:14

243:14 244:20 253:5 253:11 257:9,17 258:5 262:11 265:1 273:23 274:7,25 283:4 284:11 287:22
**Factiva** 77:1 84:5,8
**factor** 63:12 117:1 125:2 171:17,18 212:16
**factors** 27:6,7 28:23 29:2 62:8 78:3 111:6 111:14 113:25 114:11 118:1,12,19 118:22 121:9,10,13 123:15 124:15 151:10 152:25 153:16 155:1 171:5 197:19 199:4 217:1 232:5 238:4,18 261:15 281:3 282:4
**facts** 14:24 59:6 64:11 64:24 89:20 90:16 107:14 112:19 113:10 143:8,18 156:19 165:4 166:11 168:7 169:18 174:16 182:11,14 195:11 206:3 245:5 252:5 266:2 269:25 270:12 270:23
**factual** 50:14 99:20 189:8,9 191:14 220:4,23 221:8,8,15 229:19 251:15,22 265:14 266:14
**fact-specific** 185:5
**faculty** 41:15
**failed** 95:23 220:21
**fair** 39:6 44:4 48:2 70:14 78:6 93:8 96:16 112:24 210:11
**fairly** 59:13 193:9 242:9 256:4
**fall** 224:11
**fallen** 237:18
**falling** 268:22
**falls** 209:10 233:9,12
**false** 254:13
**Fama** 76:11 134:14 166:1,18
**Fama's** 166:4
**familiar** 6:20 57:2,6,13 57:18,22 276:9
**family** 39:3,5,6,14
**far** 19:8
**Fargo** 286:9,22 287:7 287:17,23,25 288:14

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 305

295:19
**fast** 133:21
**father** 134:14 165:25
**fault** 207:6
**favorable** 48:6 61:3
 211:14
**FAX** 291:18,19
**February** 38:3 68:1,8
 69:8 76:23 81:1,3
 105:23 106:7 107:1
 107:4,11,17,18,23
 108:11,23 109:18
 110:9 135:17,17
 136:15 137:5,5,6
 138:17 151:14
 153:22 155:3 156:9
 157:6 161:8,13
 162:12 168:22,23
 187:12,19 188:14,23
 200:21
**fed** 57:25
**federal** 29:21 194:16
 294:16
**feel** 261:3
**feeling** 13:20
**fees** 55:20
**felt** 66:14
**field** 59:25 60:3
**FIFO** 274:18
**fifth** 3:4 79:25 230:9
**figure** 31:19 73:1
**file** 122:19
**filed** 12:23,23
**filing** 116:12 171:10
**filings** 79:25 80:3
 81:12 84:2 115:23
 140:11
**final** 1:24 135:8
 223:11 277:22
**finally** 206:3 229:19
 266:15
**finance** 76:12 133:15
 134:15,18 165:25
 167:14,19 175:14
**financial** 20:2 38:25
 39:1,2,4,5,21 40:10
 40:14 98:1 125:7,11
 140:11 149:3 170:4
 184:20 193:11 236:3
 285:11 290:10
**financials** 189:6
**find** 27:24 86:2 149:2
 154:14 189:3,4
 230:9 242:19 273:25
 274:1
**finder** 190:8,22 192:25
 193:20 218:16,18

240:7,12,13 243:14
 243:14 253:4,11
 273:22 274:7
**finding** 156:13 247:25
**finds** 191:5
**fine** 18:4 19:22 26:13
 67:4 68:22 119:23
 155:6 167:24 188:8
 213:6 232:10 270:14
 289:22
**finest** 58:24
**Finisar** 23:24
**finish** 115:10 188:9
 283:9,16 285:22
**finished** 208:13
**firm** 1:20 20:17 38:24
 39:16 40:21 41:22
 42:3,15 43:8,20,23
 48:9,19 53:12,24
 54:4,5 55:1,2 63:4,4
 93:16 118:22 166:15
 175:23
**firms** 26:6,7 50:11
 53:10,10,21 54:17
 153:16
**firm-specific** 200:13
**first** 11:13 41:6 60:12
 65:2,7 67:14 69:25
 76:22 85:16 86:24
 88:3,7 97:20 101:13
 101:17 112:4 116:8
 118:16 126:21
 130:13 131:23
 137:10,20 145:1
 154:6 156:16,21
 157:15 158:22
 159:11 163:25
 177:12 190:22
 192:20 195:16 212:3
 212:12 221:7 231:18
 242:3 252:11 254:7
 255:22 256:23 276:8
 281:20 285:9
**Fischel** 42:5 62:22
 252:19
**fit** 123:16
**five** 25:18 37:7 67:8
 84:7 165:13 182:3
 216:6 246:7,8 258:8
 263:20 264:3,4,17
 264:21 277:1 285:21
**five-minute** 178:13
**fleet** 107:6 254:15
**flip** 104:17,18 228:23
**float** 122:10 154:23
 171:11
**FLORIDA** 1:1

**flow** 114:3 131:14,21
 175:10,10,16,17,19
 176:5,10,13,15,19
 176:20
**flowing** 132:14
**flows** 92:7 175:23
**focus** 95:17 97:24
 141:3 228:6 255:7
 268:21
**focused** 95:16 163:18
 228:24 241:10
**focusing** 106:4 254:5
**folded** 44:2
**folks** 27:22 36:5
 208:16
**follow** 34:6 38:18
 94:19 165:20 260:8
**followed** 208:23
 230:11 242:8
**following** 136:22
 156:3 171:10 199:13
 289:13
**follows** 6:10 19:6
**follow-on** 150:22
**follow-up** 118:8
**footnote** 61:9,14
 135:2,3,5 136:1
 183:7
**footnotes** 35:5 191:20
**forecast** 159:5
**forecasted** 159:7
**foregoing** 290:3,4
 292:11
**foreign** 246:7,8
**Forensic** 24:21,23
 25:7,13,15,21 36:5
**forget** 17:21 56:12
**form** 9:22 12:4,19 13:3
 14:11 15:2,18,25
 16:6,10 17:1 21:20
 22:1 23:7 26:20
 27:12 28:10,25
 29:14 30:16,25
 31:17 32:2 33:10,23
 36:3 37:4,21 38:15
 40:5 43:10 45:9,23
 47:7 49:7,18 50:5,17
 51:3 53:1,13 54:7
 55:6 57:21 58:17
 60:1 64:3,10,23 69:5
 69:13,15 71:14
 72:19 74:6,22 75:9
 76:6 78:7 79:3,17
 80:1 81:21 82:23
 84:14,21 85:20
 86:12,23 87:12 88:6
 89:7 90:15 91:23

92:20 93:18 94:10
 95:20 96:1 99:4,13
 100:9,19 101:3,15
 102:14 104:24
 105:13 107:13
 108:14 109:1 110:4
 112:25 113:19 117:6
 117:18 118:4,14
 121:20 127:5 128:16
 129:12 133:24
 139:23 140:20 141:6
 142:13 143:7,17
 144:2 145:4,15
 146:11 147:10
 148:18 149:19
 153:18 156:18
 157:23 160:2,13
 163:9,22 166:10
 167:7 169:17 170:25
 173:1 175:3 177:3
 177:17 181:13
 182:10 183:1 185:15
 185:20 186:13
 190:18 192:18 194:5
 195:10 199:9 203:21
 210:12 211:21
 214:24 216:19
 219:20 221:5,25
 225:9,21 229:5
 231:16 238:20
 239:11 242:23
 244:18 245:4,17
 249:6,24 252:4
 255:21 261:16 265:8
 266:1 267:8 269:24
 270:11,22 271:11
 273:5,17 279:1
 280:2 283:8 284:1
 284:24 286:25
 287:20 288:17
 292:15
**format** 33:16 34:5 36:8
 117:18
**formed** 14:9
**former** 19:3 59:15
 66:7
**forming** 14:25 38:10
 82:22 90:13 95:18
**formula** 31:4 32:14
 91:25 179:25 182:14
 183:23 197:16
 216:23 250:24,25
 251:2,4 252:3,11,14
 252:16,16 253:14
**FORT** 1:3
**forth** 38:13 109:13
 194:2 208:16

**forward** 94:15 292:5
**forwards** 87:25
**forward-looking** 94:8
**found** 77:14 141:18,22
 155:11
**foundation** 18:23 19:6
 76:14 217:6
**Foundations** 76:11
 134:18
**founded** 50:7
**founding** 21:9 41:25
 49:3,14,24 50:22
 51:15 52:21
**four** 14:13 21:2,3 22:4
 22:5 23:12 24:15
 37:7 42:21,25 44:12
 44:15,19 46:5,23
 48:2 56:9 57:1 75:11
 80:23 165:13 216:6
 230:4,6,8 237:22
 272:20 274:3 276:25
**fourth** 80:19,23
 161:18
**frame** 91:17
**Frank** 124:11
**fraud** 57:25 73:19
 78:13 86:6 213:19
 213:20
**fraudulent** 75:1
**free** 261:3
**French** 246:9
**frequency** 79:8 80:12
**frequently** 127:24
**Friday** 135:16
**front** 10:19 11:7 13:23
 16:15 115:12 146:4
 208:17 210:9,15,21
 216:9 236:14 253:16
 266:10 267:4,11
 268:6 276:18 280:15
 285:3
**front-end** 266:6 268:7
 277:24 278:6 284:19
**full** 10:20 106:14
 134:2 247:13 286:13
**fully** 99:22,23 154:5
 206:11
**function** 49:2
**fund** 1:3,5 166:1,15
**fundamental** 166:2
 175:14
**fundamentally** 164:10
 165:23 166:23
**fundraising** 39:13
**further** 98:20 149:4
 150:15,21 157:7,10
 254:16 267:21

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 306

288:23
**Furthermore** 242:11
**future** 5:25 71:18
87:20 92:19 93:5
94:9 173:13 174:14
174:25 175:10

**G**

**G** 5:1 35:23 107:19
**GAAP** 59:20 60:6
**gain** 89:10,18 90:19
103:10 274:9
**gains** 39:23 40:15
**game** 134:5
**GARCIA** 1:9
**general** 1:4 58:18,23
62:12 69:6 72:14
91:23 102:14,16
103:19 114:6,12
115:6,8 155:14
172:1
**generalize** 154:17
**generalized** 202:16
225:13
**generalizing** 73:9
**generally** 13:13 20:12
22:20 25:19 28:11
28:14 33:1 54:10
71:10 72:2 88:13
91:1,2 102:25
113:22 116:14
118:20 129:4,21
136:3 139:14 146:3
146:4 200:19 208:2
208:9 209:11 214:8
248:6 257:20 274:19
**generate** 40:14
**generic** 258:8 277:4
281:21
**genius** 134:17 170:4
171:14
**genre** 198:7
**geographic** 223:10
**getting** 80:15,16
113:15,22 125:13
137:6
**give** 20:22 21:18 33:2
38:5 55:5 166:4
200:6 223:24 236:12
245:18 246:4 247:7
247:13 248:10
264:11 267:14
276:13 283:16
**given** 58:25 90:9 91:6
101:1 104:12 105:11
211:11 212:1 217:10
223:23 231:15

243:10,10 247:2
262:12 265:23
272:13 283:19 284:3
292:13
**gives** 74:14 201:14
251:25 253:14
**giving** 50:14 65:1
123:1 268:7
**Global** 56:11
**go** 17:9,10 18:25 21:8
23:24 33:13,14,15
33:19 34:24 35:11
35:20 36:14 37:15
46:6 56:10 59:3
60:10 67:6 73:16
75:24 83:4,15 94:20
98:19 102:4 110:18
111:2 113:12 116:21
123:7 125:1 133:9
138:11 157:1,1
167:16 168:11,20
175:10,17,18,19,20
177:12,25 189:7
194:18,19 195:19
196:2 197:14 198:13
198:15 199:20
211:18 212:21
213:12 214:19
215:21 216:21 217:5
222:7 228:3,18
230:3 231:1 233:14
236:8 237:14,14
243:3 246:16,22,25
250:20 253:11 255:3
255:10 277:6 282:12
282:13 283:17
285:20 287:23
**goes** 18:21 27:14 61:8
126:10 138:15
158:24 170:21
208:19 224:6 250:14
**going** 7:10 8:21 12:2
12:11,14 17:17 19:7
19:7,19 23:21 33:19
34:8 37:15 38:20,23
41:1 65:13 67:2,3,4
70:19 86:8 95:5
98:19 113:12 115:2
115:5 119:25 121:3
127:3 129:18 139:7
139:13,15,16 151:11
153:4 154:12 157:16
157:21 160:15
164:16 166:3 177:18
177:24,25 178:1,20
178:23,24 181:6,10
181:11 191:13,15

192:23 199:18
205:12 206:25
209:13,19 210:17
212:8,14,21 215:8
218:5 221:14 222:8
222:11 224:5 225:11
228:3 229:22 236:19
242:17 246:6 248:5
248:22 252:10 255:9
257:10 262:14
268:23,25 273:12
274:6,15 276:8,12
276:14,21 279:18
280:17 286:1,4
289:11
**Goldman** 275:22
295:11
**good** 5:17 6:15 66:25
70:11 73:1 92:11
114:15 115:14
119:14 121:7 178:13
178:19 194:9 212:22
212:24 213:9,9,11
233:5 236:4 253:12
253:13 268:7,11
**gotcha** 253:22
**grandson** 31:20 32:12
**granted** 41:7
**graphs** 35:6
**great** 18:5 119:18
179:5 197:13 208:20
**greater** 155:5 156:12
161:22 164:17,17
**Greek** 246:11,17
**Green** 19:3
**GROSSMANN** 2:9
292:4
**ground** 6:19
**group** 34:21 295:12
**groups** 25:12
**grows** 215:23
**guaranteed** 164:12
**guess** 11:21 13:10
18:16 30:6 32:21
37:2 38:9 39:16
40:16 42:13,21
43:14 45:4,16 54:23
57:9 104:6 105:7
106:9,11 121:22
124:4,7 125:4
131:19 137:20 158:7
173:3 175:9 176:17
181:24 190:9 210:13
216:16 242:20
244:19 255:9 267:11
271:2,14
**guessing** 157:16

**guidance** 131:25
159:25 226:13
230:24 231:3 233:8
**guru** 168:9
**guy's** 134:17

**H**

**H** 2:5 33:5 35:23
107:20 294:1 295:1
**half** 24:15,16 106:20
206:10
**hand** 122:13 290:13
**hands-on** 37:25
**happen** 139:13 187:20
**happened** 215:5
246:16
**happens** 165:16
185:24
**happy** 23:22 67:3 95:4
114:17,21 115:1,3,3
160:21 276:13
**harassed** 250:12
**harassment** 250:10,13
**hard** 189:3 247:25
267:24
**harm** 72:8 86:4,5
109:22 110:16 153:6
153:7 179:17 219:23
257:2 280:4,6
**harmed** 65:22 96:9
184:21
**Hartzmark** 1:17 4:4
5:7 6:7,15 8:1 10:23
19:17,20,24,25
20:14,23 21:24 22:6
22:11,14 24:23 40:3
40:12,20,25 41:19
49:3,14,24 50:7,22
51:15 52:21 53:11
54:12 55:9 61:18,24
96:23 97:3 103:23
114:18 121:7 158:10
187:2 191:6 212:25
219:4 222:15 247:1
260:1 262:1 269:3
275:2,17 279:10
283:11 286:7,15
288:25 289:2,24
292:10,19 294:6
**Hartzmark's** 61:8
184:2 187:14 253:12
295:18
**hate** 51:20 114:13
**HD** 24:5
**head** 43:25
**header** 8:5 11:22
15:11,12 16:13,14

17:9,22 18:10,10
23:22 29:17 60:12
67:8 70:18 198:17
**heading** 60:15 83:22
85:8 131:8
**headlines** 33:14
105:18
**hear** 144:4 209:24
217:16
**heard** 283:10
**heavily** 65:10 265:23
**Heinz** 46:12
**held** 41:14 42:22,22
42:24 289:13
**help** 9:20,23 11:15
19:23 25:20 38:22
39:9 46:12,15 47:9
47:15,17,18 56:24
63:10,11 78:17
116:19 148:13 158:2
171:12 203:10 214:4
231:14 235:3 259:14
**helped** 25:16
**helpful** 35:24 53:22
200:11 254:1
**helps** 79:12
**hereunto** 290:12
**hesitant** 60:4
**Hey** 247:19
**high** 19:2,3 98:16
269:5 271:3
**higher** 96:15 104:5
105:5,8 159:1,3
**highest** 153:24
**highlighted** 260:11,12
260:14,25 263:9
**highlights** 260:7 263:3
**highly** 89:23
**historically** 119:4
**history** 18:15,17
**hit** 114:14
**hold** 86:1 106:11
139:15 204:3,3
233:11 255:5 262:4
**holders** 31:10
**holdings** 171:11
**holiday** 152:23
**holistic** 77:6 78:15
79:5 88:23 90:1
105:16 108:18
129:22 152:20
**holistically** 117:12
**home** 8:14 46:12,15
47:9,15,17,19 56:24
**honest** 184:9 237:5
**hope** 104:13 167:22
**hopefully** 237:21

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 307

252:12
**hordes** 66:10
**hour** 9:13 67:2 129:20
133:6,7
**hours** 9:13 26:8,10
224:16
**Household** 190:25
**How's** 213:5
**hundred** 45:8,11,19
209:3 215:22 216:1
280:8
**hypothetical** 74:23
86:13 87:13 90:16
91:6 104:25 109:2
110:5,7 117:7
142:14 143:18 165:4
168:7,17,18 169:18
175:16 176:3 204:17
207:19 211:22
215:11 232:2 236:16
236:17 238:13
247:15 248:10 272:9
272:18,21 273:18,22
284:2,4
**Hypothetically** 87:5
**hypotheticals** 202:16
**H-E-L-P** 19:23

**I**

**idea** 99:10 126:1
129:11 212:12
214:14 224:18,19
242:20
**ideas** 66:13 268:7
**identical** 245:24 248:6
250:8
**identification** 10:24
96:24 158:11 260:2
262:2 275:18 286:16
**identified** 5:14 16:4,20
42:21 46:19 57:13
75:8 79:1 81:19
123:15 258:22
**identify** 46:9 47:16
79:11 82:21 138:16
219:17,22,23
**II** 167:17
**III** 14:15
**Illumina** 24:4
**image** 284:5,15
285:14
**imagine** 52:13
**immediacy** 170:19
**immediate** 122:22
154:3 156:8
**immediately** 48:21,23
153:23

**impact** 55:19 66:21
103:4 108:25 113:23
113:23 114:1,4
117:5 138:22 140:22
145:3,24 146:1
148:16 151:16,20
164:25 165:7 209:6
216:11,12 223:25
236:23 244:8,15
245:12 248:1 249:4
261:11 265:5 277:9
281:6,7,8,9,12,23
282:1,7
**impacted** 105:12
**impacts** 101:6 112:23
137:24 163:5
**implement** 57:11
179:23
**implemented** 57:10
181:3
**important** 82:6,14
116:19 206:5 216:24
281:22
**impossibility** 242:21
**impossible** 238:10
284:7
**inaccurate** 15:23 16:2
**include** 61:1 62:18
115:22 210:8 222:25
227:7 235:20,22
238:3 274:15,18
**included** 15:1,3,17
83:14 105:23 136:15
141:25 235:25
**includes** 115:25 116:1
**including** 25:23
153:20
**income** 39:21,22 40:2
40:7,10,11,14,18,24
40:25 44:9 92:8
**incomplete** 74:23
86:13 87:13 90:16
104:25 109:2 110:5
117:7 142:14 143:18
165:4 168:7 169:18
176:2,4 211:22
273:18 284:2,4
**inconsistencies** 27:25
**inconsistent** 152:11
152:13 154:14
**incorporate** 29:6
75:12 114:10
**incorporated** 117:2
128:13 132:25
**incorporates** 76:8
**incorrect** 10:5
**increase** 204:21

254:17
**increased** 228:19
269:20
**incredibly** 272:18
**incurred** 147:13
**Indemnity** 46:11 56:18
**index** 4:16 198:23
199:6
**indicated** 53:4 65:12
**indicates** 18:9
**indicating** 7:3,25
11:13
**indices** 80:10
**indirectly** 277:14
**individual** 58:4,9
102:8 110:16 113:13
153:5 178:4 180:19
183:20 189:18 191:3
192:7 193:23 197:12
211:7 212:19 218:15
220:12 223:5 239:3
240:17 243:17
257:12 266:20 275:4
**individually** 12:23
**individuals** 125:5
136:14
**industrial** 66:13
**Industries** 42:15,16,17
121:25
**industry** 112:22
114:12 198:22 199:6
243:5 261:15
**inefficiencies** 166:16
**inefficiency** 155:7
**inefficient** 162:24
168:14
**inference** 277:23
278:5
**infinitum** 133:9 151:11
**inflated** 69:7 74:4,9,13
74:19,25 78:13
91:19 92:5 102:2
106:17 184:14,21,22
187:1 194:21 195:3
196:16,19 197:4,10
268:1 269:13,18
271:5
**inflates** 73:20 182:25
**inflation** 51:25 52:1
58:1,7 72:8 74:10,11
75:3,4 87:16 96:5
102:4,5 109:16,18
109:20 110:1,8,10
143:3,10,11,23
144:19,20 146:3,5,6
170:7,7,9,12 178:1,1
179:18,19 180:8,9

180:10,13 181:5,8,8
181:9,11 183:13
184:21,23 185:22,23
186:3,3,9 187:3,11
187:13,18,21 188:3
188:11,16,22 189:10
189:16,16 190:3,6
190:12,13 191:2
192:2,3,8,8,16,21
193:6,13,18,24,24
198:13 199:15,18,20
199:23,25 200:7
201:1,13,17,21
202:10,11,17,20
203:11,20 204:13,21
207:10,12,17,22
208:13 209:18,20
210:3,9,17,22
211:19 212:4,5
213:2 216:18 218:10
218:11,13,19,23
219:6,11 239:1,1,25
240:3,10,14,23
241:4,22,25 243:13
243:15,19,25 251:16
255:11,17 257:6,7,8
265:21 266:13,19
267:4 268:7 271:10
272:2 273:1,3,7
274:9,20,24 277:14
277:20,24 278:6
280:18 282:17,21,25
283:25 284:19,22
**inflected** 150:13
**influences** 114:11
**information** 35:12
66:17 80:14,15,16
82:9 83:14 88:17
89:11 107:18 108:24
111:20 112:8,17,18
113:7,9,9,17,17,21
113:22,24 115:16,24
116:1,7,18,20,23,25
117:3,4,10,16,22
122:7,21 126:7,17
126:24 128:11
131:15,22 132:13,14
132:15,24 133:19
138:13 140:3 142:21
145:12,13 147:6
149:22,23 150:5,20
152:10 153:15 154:3
154:12 156:1 157:11
157:20 164:12 166:7
166:8 170:1 174:12
174:17,23 175:1,13
175:22 176:25

186:17,18 189:7
191:16 193:12 200:5
200:14 201:5 205:10
205:11 207:2 208:22
213:25 215:2 216:8
223:7 224:23 227:8
227:22 228:1 231:10
233:16,17,18 244:2
244:15,21 247:3,13
247:14 248:11,11,12
248:25 249:3,11,21
250:5 251:2 261:21
261:22 262:16
283:22
**informational** 112:5
**informationally** 112:3
112:11 164:14
165:11
**information-rich**
88:11,20 108:16
122:21 127:7,14
128:8 130:14 132:4
132:7 138:8 161:22
164:15 169:20
**informing** 88:4 89:5
**initially** 145:23
**input** 35:14 36:7,10
109:20 177:25
183:22 184:23 187:7
187:20 188:10,11,16
188:19 189:1,11,11
189:15,19,20 190:6
211:5 218:16,17
221:9,10 253:10
257:6 280:13,17,17
**inputs** 57:24 58:6
87:16 102:2,3
179:25 180:4,5,7,9
182:18 185:8 186:4
191:23,24 197:16
198:12,12 202:14
216:22 218:9,12
251:3,18 268:5
**input's** 177:25
**inquiry** 183:20 185:5
189:8
**inside** 230:1
**insiders** 122:11
**insight** 78:12
**inspired** 19:2
**instance** 151:13
211:10
**instances** 45:16 54:3
**instantaneous** 129:20
**institutional** 122:5
154:22 171:11
**institutions** 34:25

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 308

**instructions** 218:19 291:1
**intangible** 193:14
**intellectual** 20:5 48:8
**intend** 13:25 16:24
**intents** 129:18 168:17
**interchange** 55:20
**interest** 39:23 40:15 68:23 234:23 290:10
**interested** 54:2 88:14 88:18
**interesting** 44:15
**interestingly** 148:20
**interject** 114:14
**internal** 95:9,11 185:6 186:20 189:5 200:3 201:4 206:2 210:24 214:12 229:9,24 230:19 231:2
**internally** 229:20,22
**internal/external** 186:18
**interpret** 186:14
**interpretation** 65:1
**interpreted** 10:3
**interrupt** 83:24 119:24 195:18
**interval** 128:24,24
**intraday** 151:1 157:2 223:1,12,18,21 224:15 225:15 226:10,21,25 227:2 227:15
**IntraLinks** 288:3
**introduce** 143:11 144:19
**introduced** 7:7 63:3 96:7 146:5
**inventory** 159:2 208:4 209:1,2,14 215:22 216:9,14 224:5 236:19 237:3,9
**investigate** 86:8
**investment** 20:5 39:6 40:9,17 65:22 82:17 112:20 168:15
**investments** 39:14
**investor** 58:4 81:9 82:8 86:4,5 102:8 109:22 113:10 219:3 219:4,4
**investors** 96:9 109:12 112:19,23 117:22 122:5 125:23 150:13 153:5,7 179:17 184:21 219:24 257:2 280:5,6

**investor/conferences** 80:20,24
**involved** 10:4 23:23 24:2 39:11 45:14 49:25 50:23 51:22 51:23 62:21,23 63:6 121:15 185:4 246:5 246:7 257:24
**involving** 23:18 275:22 286:9
**in-depth** 206:2
**IQ** 81:5
**Ireland** 246:10
**irrespective** 249:20
**isolate** 224:16 228:6
**isolation** 238:6,8,18 239:8
**issuance** 59:4
**issue** 50:2,25 56:11 58:19 63:17 65:7,13 65:17,25 66:2,4 79:10 80:12 81:25 82:5,14 90:24 95:10 99:20 153:3,4 164:7 166:18 203:7 212:15 226:14 229:23 233:6 242:7 245:20,20 256:12 257:22 268:1 274:25 283:3 285:8
**issued** 145:10 149:3
**issuers** 123:17
**issues** 20:6,7 27:18 30:23,24 51:8 59:14 59:20 66:15,22 86:6 86:7 87:24 92:4 103:15 104:10,10,11 104:12 134:19 176:12 193:14 198:23 208:3,3 215:10 256:25 282:6 285:18,19
**issuing** 172:22
**it'd** 104:21 109:24 118:16
**it'll** 157:17 225:18 242:13 266:18,18,18 268:8
**IV.G** 254:12
**i.e** 188:10 216:8

**J**

**J** 2:6
**Jane** 1:25 3:3 5:12 291:22
**janerose@janerose...** 291:20
**Jennifer** 47:18

**Jewelers** 61:4 183:12 288:1
**Joan** 3:7 5:12,18 290:2
**job** 242:20
**John** 2:6,7
**joint** 41:9
**Journal** 167:14
**judge** 9:5 65:2,2,5,25 66:8,9,19,22 172:11 172:13 243:22,23 252:12
**judge's** 106:13
**July** 68:1,7 69:8 76:23 80:25 81:3 85:5,11 85:15 86:20 87:11 105:24 136:15 138:17,21,22 140:17 140:21 145:1,11,12 153:20,21 156:8 157:3,15 158:22 160:9 162:13 187:10 187:10,12,19 274:9
**juncture** 99:16 171:15
**June** 275:22 276:17
**junior** 2:17 19:2,2,3
**jury** 190:25 191:1,5,7 218:18

**K**

**K** 62:7
**Katz** 1:20 2:19
**keep** 67:3,4 103:14 178:6 238:8 267:25 267:25 276:25
**keeps** 268:22
**key** 200:9 219:1 257:3 274:25
**kind** 7:14,15 17:10 133:17 198:9 268:10
**King** 62:8
**knew** 97:22 185:7,8 189:5 200:4,5 214:12 220:5
**know** 7:14,14 8:20,23 12:12,17 17:9,13,13 17:24,25 21:10,11 24:14 26:5,15,16 27:24 28:11,13 29:5 29:25 31:10,25 32:9 32:17,22 34:19,23 34:24 35:2,3,4 36:11 36:14,15 37:18 39:19 40:17,21 45:13,16 48:16 51:22 53:8 54:11,12 54:23 56:10 57:10

58:19 59:17 60:6,23 63:8,9,14,15,18,18 63:20,20 69:22 70:6 70:9,10 73:9,20 76:7 76:10 78:12 79:8,19 80:9,13,13 82:5 84:10,19 85:6,18 86:25 88:11 90:18 90:18 91:6 92:2,16 95:3,11 97:5 98:23 99:11,22 103:2,3,5 104:6,6 105:7,19 106:5 109:11 111:15 111:16 113:8,13,25 114:1 115:14 116:13 117:3,11,16,16,21 121:13 122:17,23,24 123:10,23 124:13,15 124:19,20,21,22 126:2,4,11,12 128:3 128:18,20 129:2,3,5 129:19,20,21,23 130:21,21 132:5,5 132:13,17 133:18,20 133:20 134:14,16,21 136:3,4,19,24 137:23 138:6 139:20 140:5,10 141:11 150:7 151:10 152:4 152:7,10,12 153:6,8 154:8 155:20,21,22 155:23,24,24,25 156:10,12 157:1 160:18,23,24,25 161:6 162:8 164:8 164:17 165:13,13,17 166:22 167:2,8,22 167:22 170:20 174:1 174:2,2,3 176:6,22 178:6 181:4,4,19 185:7 190:23 191:13 193:9,11,12 194:17 198:23 199:10 200:19,20 205:7,25 207:3 210:20,24 212:5,14 215:17 216:10 224:2,3,4,9 224:10,25 228:20 229:20 230:5 231:3 231:4,5,23,25 232:12 233:6,21,24 234:12,13,15,16 235:13 236:9,12 237:7,14 240:1 241:11,24 242:19 245:21,22 246:1,2 246:11 247:11,25

248:1 255:9,22,23 256:1,2 257:8,22 260:15 261:15,19,20 263:8,10 264:24 271:12,14,15,23 272:17,23 273:25 274:8 275:24 282:14 283:2 289:15
**known** 43:19 105:6 246:19 256:3,3
**knows** 117:1 168:9,10
**Kraft** 46:12
**Krogman** 27:7 29:3 62:7 67:19 78:2 79:7 118:1 121:9,13 123:16 151:10 153:16 171:6 279:12 279:16 281:3 282:4

**L**

**L** 1:17 4:4 5:6 6:7 289:24 292:10,19 294:5
**label** 16:19
**labor** 39:24
**lack** 281:9,22 282:1
**laid** 58:3
**land** 95:15 166:22
**language** 27:6,16 29:8 29:23 30:21,21 31:11 32:9 73:2
**large** 122:4,5,7
**larger** 159:2
**largest** 44:8 212:6
**late** 29:2 62:22
**LAUDERDALE** 1:3
**law** 66:7,11
**Laws** 294:17
**lawyer** 54:25 63:21,22
**lay** 58:8 95:14
**layout** 33:16
**lead** 1:19 143:15 153:13 190:13,14 229:1
**leading** 263:6
**leads** 121:16
**leakage** 208:17
**learned** 54:19
**leave** 43:14 114:17 192:11 260:19
**leaving** 13:3 24:4 40:9 90:8
**lecturer** 41:5
**led** 107:6 108:12
**left** 25:10 43:7,11
**leftovers** 132:8
**legal** 3:8 5:11 12:25

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 309

51:11 63:4 64:1,8 71:15 94:11,12 96:2 96:4 98:8,18 100:10 100:20 101:4 118:5 133:10 136:13 173:2 173:3 196:25 273:19 274:17 276:16 278:11,13,13,21,25 279:7,13,14
**legalistic** 66:20
**Lester** 66:9
**letters** 105:3
**let's** 6:1 17:7 18:18 21:2 34:12 45:17 51:13 67:5,6,17 92:11 96:20 106:4 110:18 116:9 127:15 137:8 144:8 158:4,5 158:6 161:4 173:8 176:6 178:10 183:2 198:15 199:10 200:21 205:8 215:14 215:25 223:12 224:2 227:23 233:9 236:16 237:1 243:3,4 244:25 248:21 258:11 262:21 267:14 273:20 275:14 285:20,23
**level** 74:10,11 125:8 127:19 142:5,7 202:19 207:9 210:17 257:5
**levels** 51:21 74:14 121:22 184:22,22
**Lexecon** 41:18,18,19 41:22,23,24 42:3,6,9 43:22 190:24 208:16
**lexicon** 112:13
**liability** 61:7 91:14 96:13 184:19 186:25 196:18 197:9 221:4 243:18 265:22 270:19
**lie** 186:25
**life** 102:19 104:21
**lifetime** 39:2
**LIFO** 274:18
**likelihood** 161:23
**limit** 52:17
**limited** 113:16,17 183:12 206:1 226:20 227:2 288:2
**limiting** 113:6
**line** 30:18 31:4,8,15 32:10,14 34:4 35:21 76:22 79:2,25 80:19

80:20,24 81:19 114:24 132:2 141:10 141:13 189:22 250:25 252:12,14,16 252:17 265:16 293:1
**lines** 81:6,8
**link** 160:6 162:17 177:22 250:4 278:16
**linkage** 160:23 203:8
**linked** 87:24 162:20 176:14 177:6 200:22 203:6 205:2 280:9 285:5,5
**linking** 186:20 205:21
**links** 247:18
**Lipton** 1:20 2:19
**liquidity** 121:22
**list** 19:10,12 36:6 44:11 46:4 47:15 80:20,21,24 81:2,7,7 82:8 84:4 222:24 225:24 227:5 228:4 230:4 235:20 237:22 275:13
**listed** 32:19 33:4 34:25 38:25 39:15 44:17 75:20 76:4 79:25 84:12 86:10 86:21 87:10 226:4 235:23 275:8
**listen** 91:10
**listing** 78:16 116:4
**lists** 77:13 81:15 83:7 83:9 232:5
**literally** 128:23 132:16 133:15 242:21 256:23
**literature** 27:4 126:4 128:21 165:22 166:13 274:17
**litigation** 19:18,20,24 19:25 20:4,4,5,14,18 20:24 21:4,12,18,25 22:6,12,14,15,16,18 22:20 23:1,5,6,11 24:23 28:16 29:22 40:4,12,25 41:20,20 42:2 43:23 44:9 49:4 49:15,25 50:7,10,23 51:15 52:21 53:11 55:10 62:21 63:3,5 123:3 129:4 154:1 179:16 186:1 194:16 219:9 242:22
**Litigation's** 20:23
**LITOWITZ** 2:9 292:4
**little** 17:13 24:16 30:4

43:24,25 44:10 70:20 73:2 78:23 81:22 91:13 94:4 110:19 111:8 112:16 115:1,2 124:25 142:20 157:13 158:20 161:5,6 167:16 213:12 214:5 224:8 229:12,12 238:15 263:18,20 285:22 288:7
**LLC** 19:18 43:15
**LLP** 2:9 292:4
**locations** 223:10
**lodge** 103:19
**long** 9:10 83:5 119:15 129:20 161:6 225:11 282:19
**longer** 115:2 136:10 178:14 187:5
**Long-Term** 167:18
**long-winded** 185:3
**look** 6:21 23:21 28:15 29:6 30:10 33:14 34:24 35:3 36:20 38:21,24 44:7 46:4 53:20 54:18 59:5 60:15 69:13 70:16 80:7 84:10 86:9,21 87:4,19,20,21 88:25 89:9,22 97:10,16 107:10 111:23 117:12 118:12,18,18 119:3 122:12 123:25 129:22 131:5 133:13 133:13 134:24 136:21 137:8 138:6 138:8 140:15 142:20 145:9,10 146:13 147:12 152:24 155:1 157:25 161:4,16 167:5,17 168:21,22 170:5 171:13 173:8 174:14,25 177:11 179:1,22 199:10 200:3,24 203:8 205:20,22,23 206:5 206:7 210:24 211:24 212:10,11 222:14 223:15,18,18,20,21 224:4,14 225:15 226:8,10 228:17 229:8,17 230:1,7 236:8 246:21 247:17 253:23 254:21 256:24 258:11 262:21 265:13

278:15 286:13
**looked** 34:5 35:5 37:18 44:10 77:22 79:19,21 80:8 81:23 83:2 95:11 119:4 128:7,9,23 130:14 131:20 145:17 150:3 150:6,9,9 151:15 152:9 154:18,18,19 154:20,20,21,21,22 154:23,24 156:1 224:21 236:3,5 249:10 257:19 264:10 268:1,2 275:7 276:6 280:4
**looking** 39:11 47:14 73:8 78:19 85:8 86:19 94:15 123:15 130:8 134:18 136:5 137:25 181:5 184:4 201:6 226:21,23 227:2 228:8 231:12 231:19,20 236:22
**looks** 41:2,17 43:7 60:19 129:4 130:16 130:17 152:2 161:17 163:7 182:2,3 263:19 264:13 287:10
**loose** 229:21
**Lord** 56:20
**lose** 176:9
**loss** 86:2,15 87:15 89:10,17 102:3 104:22 105:20 109:5 109:12,14 136:18 149:1 150:11 160:6 160:24 161:1 162:20 164:2,5,6,20 170:3 170:13,15 177:7,9 177:13 178:7,8 184:24,25 185:5 186:5 191:22,25 200:23 201:24 205:20 210:23 211:8 212:15 219:25 222:4 222:5 226:3 232:4 234:2,9 235:11 236:5 238:14,24 239:22 247:16 250:4 255:2 256:21 257:15 266:8,17 268:3 280:8 285:7,19
**losses** 57:24 90:18 147:12,18 149:2 150:4,13,23 153:5 162:19 177:8 219:24

221:18,19 225:16 256:7 266:5 268:2
**lot** 43:1,1 90:19 133:14 225:18
**lots** 134:20 195:13,13
**low** 111:15 270:9,17 271:7,17,18,23
**lower** 99:8,11,11 100:22,25 101:1,12 104:5 105:4,6 158:25 270:20 271:9 271:15
**lowered** 159:25
**Luck** 291:25
**lunch** 114:25 119:16

---

**M**

**M** 62:7
**MAIL** 291:18
**mainframe** 134:3
**maintain** 143:10,23 144:18
**maintained** 146:5 277:20
**major** 63:8 156:15
**majority** 156:14 261:12 265:1,2
**makers** 125:2
**making** 133:8 196:25
**Mallinckrodt** 24:7
**management** 176:7,14 185:7 200:4 214:12 224:6,9
**manner** 8:9 221:3 250:23
**manufacturer** 42:19
**mark** 10:21 96:20 114:14 158:6 259:23 261:24 275:14
**marked** 10:23 96:23 158:10 260:1 262:1 275:17 286:15,19
**market** 12:8,9 14:6 51:7 52:6,8,14 53:21 54:14 55:13,24 59:2 59:2,3,4 65:3 66:16 66:17,18 67:15,18 67:20,22 70:21,24 78:10,11,18 80:17 82:1,9 83:18 85:18 85:21 87:22,23 88:14,17,24 90:2 93:8,24 110:13,20 111:7,10,11,16 113:14 114:6,10,12 115:6,9 117:15 118:3,13 119:5,12

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 310

121:11,17 122:6,6
122:25 123:12
124:24 125:2,11,18
125:19 130:12 132:1
137:12,17,22 139:11
140:7,8,18,19
141:23 142:8,10,12
142:25 143:6,24
144:15 145:13,21
147:20 151:20
152:11,14 153:2,10
153:13 154:14,21
160:19 161:21
163:13 164:24 165:1
165:19,23 166:5
167:10,18 168:1,3,5
169:16 170:18,24
171:11,23 172:7
174:12,13,23,24
176:9 177:21 195:2
195:17 196:1,7
198:18 223:2 225:25
226:19,23 227:3,6
227:14,16,20 228:7
228:8,9,20,23
230:15 231:13
232:13,20 233:14
236:1 244:3 249:1
249:22 254:13 256:4
261:15 262:17,18
265:11 269:7 282:6
**marketer** 42:18
**markets** 27:5 59:5,6
66:12 116:24 126:3
164:8 166:1,23
167:4,13,17,23
175:9 245:14
**market's** 88:2 147:24
**Marvin** 3:8 5:11
268:20 289:7,8
**match** 283:22 284:21
**material** 37:12 61:13
112:7 117:9 126:23
210:16
**materialization** 256:6
256:25 258:4
**materialize** 255:12
**materialized** 255:20
257:18
**materials** 15:13 60:11
61:1 75:20 76:15
95:10 97:11
**Mathews** 2:8
**matter** 5:7 9:3,3 25:8
25:17,18,20 29:22
31:18 32:18 48:3
56:2 62:14 64:21

72:14,23 76:15 97:3
120:3 166:14 172:1
192:4,12,15 194:16
219:10 220:8,10
230:18 240:20 241:1
253:6 258:5
**matters** 20:11,19
21:18 22:14 23:1,6,6
23:11 27:1 32:18
58:10,15 59:10,15
64:8
**Max** 31:20
**MBAs** 246:23
**McDermott** 24:9
**MDA** 38:25 39:1,2,10
39:21 40:10,14
**mean** 15:7 21:21
23:16 26:14,21
27:13 35:8,8,9 37:22
40:13 44:16 45:6,24
49:20 54:1,18 55:16
55:16,21 64:25 65:8
67:4 71:17 72:23
76:10,12,13 78:8
85:24 87:14 91:9
101:16 102:24 105:2
105:16 109:8 110:6
111:11 112:18 113:2
113:7,9 115:5,7,16
117:8 121:21,23
123:1,19 125:20,25
125:25 126:1 127:15
128:17,19,21,25
131:18 133:7,9
134:1,15 136:2
143:4,5 144:4,9,12
144:12 152:2 157:2
162:23 163:10 164:6
166:14 169:20 173:7
176:4,16 179:14
181:14 185:6 186:14
196:25 200:18
202:25 203:4,6
205:13 206:21
211:17 215:20
216:20 217:7 218:21
224:19 225:10
226:16 227:13,25
228:17,20 231:18
233:6 242:17,19
244:6,20,20,21
245:18,25 246:21
249:17 250:9 256:20
258:7,9 259:20
261:18 262:6,11,12
262:14 267:1 271:2
271:24 272:16,17

283:14 284:3 285:16
287:22,23
**meaning** 129:15
**meaningful** 258:1
**meaningless** 168:18
**means** 111:14 112:6
191:11 214:6 264:20
**meant** 54:6 55:14
**measurable** 210:16
**measure** 92:2 94:8
101:7 180:11 184:5
187:15 188:12 191:2
216:14 223:25
226:15 235:8 236:4
242:16 255:11,17
257:5 268:6 273:2
**measurement** 133:2
150:2 224:12 225:4
**measures** 180:7 256:3
285:11
**measuring** 153:5
187:3
**meat** 155:21
**mechanically** 28:5
**mechanism** 136:24
**media** 5:5 78:9,19
122:7,15 154:20
171:10 201:5 223:2
225:25 226:8,10,20
226:23 227:3,6,14
227:16,20 228:7,8
228:10,18,24 229:9
229:17 230:5,15
231:13,21,22 232:13
232:20 236:1
**meet** 65:11
**member** 178:4 179:19
179:20 180:18 192:4
**members** 68:17 69:1
71:6,8,9,12 72:18
187:17
**memorize** 35:3 69:22
254:24
**mentioned** 10:13
20:17,20,25 22:13
24:18 27:18 42:3
53:8 58:10 59:2
67:18,19 83:6 97:6
121:24 151:12
152:19 154:6 172:13
185:11 198:13
201:12 213:15
279:12
**merely** 205:1
**merged** 42:2 43:12
**Mesa** 24:9
**met** 195:6

**Meta** 24:10
**method** 61:25 174:2
183:10 191:4 237:11
**methodologies** 57:3
57:14,16 71:5 95:12
**methodology** 12:10
14:7 27:20 29:20
31:24 32:4,16 51:8
51:19,24 52:25 53:5
54:16 57:7,11 58:2,8
61:6,10,17,23 65:4
68:16 94:1,22 95:6
95:24 97:25 98:15
98:24 102:7 109:21
110:15 126:20
160:20 163:2 178:3
179:10,13,13,15,23
180:20,21 181:1
183:23 184:7,16
185:2,19 186:2,8,11
187:5,9 188:2,6,17
188:24 189:17,20
190:16 191:9,19
192:13 193:22
194:14,22 195:9
196:8 197:7,11,16
198:6 202:6 211:6
212:18 216:23
218:14,24 220:11
239:3 240:15 241:3
241:7,10 243:16
245:2 247:12 250:22
257:12 265:12
274:14 275:3,5
280:22 282:3 286:23
288:5,22
**methods** 211:12
226:15 237:12
**metrics** 123:23 184:20
285:11
**Michael** 1:17 4:4 5:6
6:7 7:25 191:6 219:4
275:2 289:24 292:10
292:19 294:5
**Michigan** 19:1 41:3,9
134:4
**microcap** 122:1
**middle** 139:18 140:1
140:12 149:5 150:21
154:7,9 223:17
**migrated** 25:13
**million** 106:21 134:11
159:2,3 165:12
169:22 172:9 215:14
215:18 224:5,6
**mind** 38:17
**mindful** 178:12

**mine** 49:2
**minute** 128:24,24,24
133:6,6
**minutes** 67:2 115:4
156:22 213:4,13
224:16 285:21
**mirror** 283:22 284:5
284:12,15 285:14
**mis** 263:15 284:6
**Mischar** 12:20
**misleading** 254:13
**mismatch** 277:25
278:7 279:24 283:5
283:12,14 285:13
**misreading** 198:3
**misrep** 263:11,12
**misrepresentation**
182:24 229:4 230:18
237:9 248:5 263:5
265:3 267:22 277:5
277:18,21 278:1,8
280:5 281:21 283:7
283:23 295:6
**misrepresentations**
75:2 106:16 202:22
207:11 263:21
264:13 266:5 267:4
267:5 278:17 279:25
**misrepresented**
249:12
**misrepresenting**
224:11
**misreps** 264:17
**missed** 31:1
**missing** 11:12 175:6
**misstate** 141:8
**misstated** 69:9 96:19
98:21 101:18,19
144:1 236:20 243:8
255:12 256:4 271:17
271:20
**misstatement** 143:6
143:10,23 144:14,18
162:4,7,11,12
164:23 169:8,14
203:19 204:9,12,19
204:21 205:16,17
206:6,15,16,21,25
207:14,14,16,18,20
207:23,24,25 208:19
208:21 210:1,7,10
211:16 242:10 284:6
**misstatements** 96:6
100:2 102:1 162:2
162:18,20 170:11
177:2,7,9,23 184:20
186:22 194:21

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 311

197:10 200:23 201:16 202:24 203:2 203:7,9 204:16,25 205:2,22,23 206:21 206:24 207:1 208:6 208:14,18,23 209:23 210:14,21 231:6,21 233:23 250:5 272:14 280:10 284:13
**misstates** 12:20 53:14 54:8 146:12 171:1 174:16 190:19 192:19 232:15,17
**misstating** 188:5
**mistaken** 148:3
**mix** 88:17 113:10 117:22
**Mm-hmm** 125:3
**model** 61:25 114:10 130:12 183:11 198:18,21,22 255:15 256:11
**models** 154:10 157:8 257:25
**modern** 134:15
**Mohawk** 24:11
**moment** 6:25 188:20 199:11 200:22 243:3 243:4 267:15 273:21
**Monday** 83:10,10
**monitor** 97:7
**month** 128:25 129:1,1 286:8 287:7
**monthly** 133:16,18
**months** 152:2
**moon** 31:20 32:12
**morning** 5:17 6:15
**motion** 8:2 9:4 10:14 11:4 12:3 13:6 69:18 96:18 106:13 108:8 146:15,16,18 147:7 172:10,14,19 294:10
**move** 52:18 91:7,11 106:9 114:25 117:15 157:17 248:21 282:18
**moved** 133:17 170:8
**movement** 136:5 224:22
**movements** 55:12 113:8 114:1 127:23 128:4 132:17 146:25 199:5 224:15 266:7
**moves** 168:12 201:19
**moving** 110:1 132:17 133:22 208:1
**multibillionaire** 168:9

**multiple** 27:17 152:5 155:23 233:13,13
**mute** 77:20
**muted** 190:1
**Myriad** 24:9

**N**

**N** 2:1 3:1,1,1 5:1 294:1 295:1
**name** 5:10,17 6:15 46:13 279:10
**names** 250:13
**narrative** 229:8,11
**narrow** 122:18 276:14 276:22 279:4
**NASDAQ** 122:16 123:18 124:8
**National** 46:11 56:18
**nature** 28:12 32:15 33:16 40:7 50:6 78:8 91:9 129:16 162:25 184:13 194:10 198:18 213:21 218:25 223:23 255:25 257:1 258:9 258:10 277:5 281:21
**Navient** 24:6 56:21
**Navigant** 25:10 43:8 43:19 44:3 48:21
**navigate** 17:17
**necessarily** 33:12 88:16 156:23 164:11 184:17 211:23
**necessary** 78:14 137:11,21
**necessity** 88:16
**need** 8:19,23 10:20 40:7 213:8 214:7 215:17 219:14,15,17 220:25 241:5 247:3 250:3 254:8,24 258:20 259:1 265:22 273:14 276:22 281:17 282:13 283:24 284:15,21 289:15,18
**needed** 106:19 220:23
**needless** 13:19 122:2
**needs** 249:3
**negative** 85:13 89:22 90:12 142:25 143:15 145:19 156:5 161:24 164:24 169:4,7,13 170:2,22 199:14 261:5,8,21 262:13 262:13,17 264:15,21 265:4,17,18 277:9

277:16
**negatively** 141:23
**neither** 290:8
**never** 12:14 56:21 59:23 60:2,4,5 144:6 188:5 217:9,13,13 233:6 253:2 278:19 283:10 284:4 285:1
**new** 2:11,11,21,21 3:5 3:5 5:13,13 29:5,5 56:13 65:18 108:24 111:18 112:7 116:22 116:23 117:4 122:15 123:17 124:8 126:10 126:17,23 139:6 147:5 157:8,11 166:6
**news** 58:20 76:19,22 77:3,4,10,16 78:24 81:11 84:2 85:18,21 105:18 108:18 116:5 117:10 125:6,10,19 127:2,6,19,21,22,23 128:13 129:9,18,23 130:18,19 132:10 134:8,9 145:3 148:23,25 150:14 156:11 158:2 168:24 169:1 171:20 189:6 258:22 260:8,18 261:12 294:21
**news/no** 127:6 148:25
**news/no-news** 107:17 128:19 140:22 149:11 163:11
**nine** 37:8 169:6 212:2 212:2
**nonverbally** 10:7
**non-earnings** 132:3
**non-fraudulent** 86:7
**non-information-rich** 127:8 130:15
**non-news** 127:2
**noon** 114:14
**normal** 165:14
**north** 45:7,8,11 60:24
**notarial** 290:13
**notary** 5:18 6:9 290:1 290:21,23 291:5,7 292:25
**note** 278:24
**noted** 103:21 292:16
**notice** 4:14 139:12 292:1
**noticed** 11:10
**noticing** 6:1
**notion** 183:12

**November** 1:18 5:4,9 290:14
**now's** 119:14 268:11
**no-news** 108:18 127:25
**number** 17:8 32:23 33:3 37:9,10 60:23 74:24 82:6,13 83:21 136:21 172:13 183:22 185:12,24 238:4 250:11,11 275:8
**numbers** 17:14,14,15 34:19 35:4,14 37:2,8 81:16 156:23
**numerical** 81:15
**numerosity** 65:8,11,17

**O**

**O** 3:1 5:1 294:1 295:1
**obfuscation** 229:12
**Object** 15:25 31:17
**objection** 5:24,25 6:3 6:4 9:22 12:4,19 13:8 14:11 15:2,18 16:6,10 17:1 21:7,20 22:1 23:7 24:25 26:20 27:12 28:10 28:25 29:14 30:16 30:25 32:2 33:10,23 36:3 37:4,21 38:15 40:5 43:10 45:9,23 47:7 49:7,18 50:5,17 51:3 53:1,13 54:7 55:6 57:21 58:17 60:1 64:3,10,23 69:5 69:15 71:14 72:19 74:6,22 75:9 76:6 78:7 79:3,17 80:1 81:21 82:23 84:14 84:21 85:20 86:12 86:23 87:12 88:6 89:7,19 90:15 91:22 92:20 93:18 94:10 94:24 95:20 96:1 98:7,17 99:4,13 100:9,19 101:3,15 102:22 103:12,19 104:24 105:13 107:13 108:14 109:1 110:4 112:25 113:19 117:6 118:4,14 121:20 127:5 128:16 129:12 133:24 139:23 140:20 141:6 142:13 143:7,17 144:2 145:4,15

146:11 147:10 148:18 149:19 151:23 153:18 156:18 157:16,23 160:2,13 163:9,22 165:3 166:10 167:7 168:6 169:17 170:25 173:1,14 174:15 175:3 176:2 177:3 177:17 181:13 182:10 183:1 185:15 185:20 186:13 190:18 192:18 194:5 195:10 203:21 210:12 211:21 214:24 216:19 219:20 221:5,25 225:9,21 229:5 231:16 232:15 234:6 234:19 235:6 238:20 239:11 244:5,18 245:4,17 248:17 249:6,24 252:4 255:21 261:16 265:8 266:1 267:8 269:24 270:11,22 271:11 273:5,17 278:10 279:1 280:2 284:1 284:24 286:25 287:20 288:17
**objection's** 103:21
**objective** 138:2,10 198:22
**objectively** 54:13 127:7,20 132:9
**objectivity** 138:1
**observe** 160:24
**observed** 106:1 127:24 189:13 248:8
**obviously** 62:22 116:18
**occur** 156:15 224:15
**occurring** 133:3
**October** 105:24 106:18 110:9 138:17 148:14,16,16 149:4 149:5,18,18 150:14 153:21,21 156:8 157:4 172:1,6
**offer** 13:25 26:3 59:11 78:12 236:6
**offered** 51:17 52:23 103:16
**offering** 51:5 64:1 72:13,17 73:6,13 75:6 77:5 93:9,13,21 93:21 118:11 261:20

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 312

**offers** 41:20 126:11
**office** 39:6
**officer** 290:2
**OFFICERS** 1:5
**Offices** 291:23
**offset** 273:24 274:10 274:11 278:20
**off-the-shelf** 198:22
**oftentimes** 206:4 229:8
**oh** 10:6 23:17 56:17 56:21 61:20 80:2,2 97:6,8 106:8,10 125:16 130:12 135:1 143:21 167:15 203:6 204:22 247:21 271:21 276:25
**okay** 7:13,20,22 8:13 8:16,19 10:9,19 11:9 11:25 13:23 14:8 16:19 17:23 18:5 19:19,20 20:9 21:5 22:23 23:20 30:4,9 31:23 34:11,16 37:1 43:1,18 44:10 45:1 45:20 46:23 47:11 47:20 49:12 51:13 53:8 55:4,14,15 57:2 57:17 58:22 60:14 64:6 68:9 69:2,13,20 70:11,16 73:10 77:8 77:16,25 79:15 81:17,17 83:4,21 84:4,9 85:18 88:2,22 89:8,24 90:3,21 92:18 93:2,7,11 96:11 97:8,16 98:5 98:12 99:1,10 100:24 101:10 102:10 103:8,24 106:13,21 107:10,22 108:5,22 109:14,24 110:18,24 111:1,5 111:23,25 112:2,15 112:21 113:23 115:10,15,22 116:3 116:10,22 117:3,25 119:19,20 123:14 124:25 125:16 126:13 127:1,11 128:6,14 129:7 130:1,7,10,24 131:18 132:8,8 133:1 135:1,20,24 136:8,16 137:2,8 138:1,11 141:3,17 143:4,13,13 144:22

144:24 146:1,6,20
147:3,25 149:14
150:9 151:14,19,25
152:15 154:2,4
155:18 157:13 158:4
158:15,17 159:17,22
160:8 161:4,12
162:1,5,9,22 164:8
164:13 165:20 166:2
167:15 168:20,23
169:8 171:15,25
173:25 174:21
176:22,22 177:24
178:10,16,20 179:1
180:22 181:21
182:20 183:6,8
184:14,17 186:25
187:1,4,10 188:12
188:15,17,23 189:14
190:9 191:4,9
192:10 193:17,19
195:24 196:2,21
197:13 198:11,12,16
198:20,21 199:6,7,8
199:16 200:5 201:16
201:21 202:8 203:7
203:17 204:10,17,20
205:10,11,22 206:24
207:20 208:1,11,14
209:3,4,11,15,24
211:1,2,7,10,15
212:10 213:7,15
214:3,13 215:8
216:6,15 217:5
218:9,20,23 219:8,9
220:13 221:15
225:14 228:3,16
230:4,12,25 231:7
232:10,24 233:24
235:1,13,23 236:1
236:14,16,22,23
237:2 238:11 239:6
240:18,25 241:24
242:7 243:2,8,21
245:9 246:7,12,17
246:24 247:9,11
249:2 250:10,12
251:9,11,14,17
252:9,11,13,15,20
252:24 254:2,7,9,23
254:23 255:2,6,16
256:7,13,22 257:2
257:14 258:3,8
259:1 260:16,17
261:10,23 262:24
263:11,15,16 264:9
264:16,20,20,23

265:20 267:17 268:5
268:10,13 270:4,9
270:15 272:16,24
273:10 274:2,14
275:7,13 276:2
278:4 281:1,15
282:8 283:5,7 284:9
285:20,25 286:12
287:15 288:10,20
289:20
**old** 117:4,9,9,16,17
**Oltman** 3:8 5:11
**omission** 204:9,12 205:16,18 206:15,16
**omissions** 202:22 203:2 204:25 205:3 206:24 207:1,11
**omit** 205:9 208:7
**omitted** 255:12
**once** 11:17 48:6,8 70:8 102:2 104:15 126:9,9,10 229:19 243:13 246:22 255:20 291:13
**ones** 24:5 29:4 46:9 46:16 62:18 77:11 87:18 288:3
**one-third** 233:18
**ongoing** 42:8
**oops** 176:8 209:8
**open** 7:17,19 14:5 51:6 52:6,8,15 54:14 67:19 78:10,18 82:1 82:10 90:2,24 93:24 111:14 116:14 119:6 119:11 122:25 123:11 165:15 169:24 171:7,23
**opened** 7:18
**opening** 65:20 79:19 139:5
**opens** 140:8,9
**opine** 67:12 104:12 174:18
**opinion** 13:25 14:23 14:23 29:12 30:4 51:17 52:23 59:12 69:18 70:19 71:1,10 72:13,17,21,24 73:3 73:5,6,13 75:7 78:20 79:7,13 90:2,23 93:22 101:6 102:5 103:4 106:14 108:19 108:25 109:17 110:11,20 111:3 118:11 151:19 153:13 160:18

162:25 165:11
169:15 171:2,22
172:22 173:15,17,21
174:16 175:4 178:11
179:6 180:23 181:2
182:20 185:12
192:12,16,21 193:6
195:7 197:5 218:3,6
218:8 219:13,16
221:22 234:7,20
236:7 240:8 241:1,2
241:2,6,19 242:23
265:10 276:16,23
279:17 281:17
282:10,15,24 288:4
**opinions** 13:25 14:3,8 14:14,15,16,21,25 38:10 51:5 64:1 65:2 66:22 70:17 75:7,12 75:12,13,19 77:6 82:22 87:1 88:5 89:6 90:13 95:18 133:9 163:5 194:2 261:11 265:5 266:23 272:19
**opportunity** 125:23
**opposed** 138:10 173:5 216:11 285:10
**opposition** 46:24 47:1 48:4 49:5,9 65:16
**optimal** 246:23
**Optoelectronics** 24:6 183:8 288:1
**order** 22:9 133:2 146:15,16 210:22 215:16 219:18 221:2 294:9
**organization** 66:13
**outcome** 290:11
**outdated** 97:25 98:15 98:24
**output** 37:16 38:11
**outside** 40:14 93:19 94:11,24 96:2 98:8 98:18 99:5,14 102:22 103:12 104:25 105:14 146:12 149:20 160:3 272:20 274:3
**out-of-pocket** 61:17 61:23 179:13,15,23 180:20,25 183:10 184:16 185:1 186:8 190:16 191:3 192:13 193:25 197:16 198:5 216:23 218:23,24 250:22 274:14 288:22

**overall** 86:25
**overly** 81:23
**overnight** 134:11
**oversee** 20:11 39:19
**overstated** 101:20 209:5,9 216:3,4,5 269:9
**overstatement** 209:6
**overvalued** 247:19,23
**o'clock** 225:1,1

---

**P**

**P** 1:19 2:1,1,16 3:1,1 5:1
**page** 4:9,12,14,16 11:13 15:10,11 16:12,13,13 17:8,14 17:15,17,21 18:2,2,7 18:8 19:12 23:21,22 29:16,16,17 33:15 34:18,22 36:12,13 38:5 44:11 47:17 60:12,13 71:1 75:18 87:11,11 92:12 97:13,15 106:13 107:2,3 130:4 134:25 161:8,10 167:4 168:21 179:2 179:4 183:3,3,5 198:17 218:2 254:1 276:24 277:4 281:20 285:9 293:1 294:3 295:3
**pages** 8:5 33:13 44:17 46:16 87:8,9 97:12 193:22 258:8 276:23 281:25 292:11
**Palm** 288:2
**paper** 123:21 124:1,10 191:1
**papers** 118:24,25
**paragraph** 14:16 29:17 30:8 67:7,8 70:17 75:18 97:20 106:14 111:2,24,25 124:4 125:4,15 126:17,19 127:16 131:5 135:7 137:9 138:12 146:14 158:16 177:12 179:11,22 197:14 202:8 205:6 222:15 237:23 250:20 253:24 254:6,22 256:14,23 259:1
**paragraphs** 130:5 180:22 181:24,25

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 313

194:2,3
**parse** 212:12 217:4 218:5,8 219:14,15 220:4 225:15 227:9 231:4,14 235:3,9 238:19 278:17
**parsing** 213:15,16,17 213:23,23 214:9 218:12,25 219:19,22 220:9,22 221:1,10 221:16,17,22 222:16 226:6 228:2 232:14 232:21 233:3 235:15 237:24 238:22,23 239:9,21
**part** 9:16 12:24 41:7 68:20 76:14 107:11 108:18 121:22 134:15 172:3 196:24 216:10 226:2 228:15 228:21 229:14 232:20 241:19 282:9 282:24
**partially** 206:12
**participants** 79:11 88:14,18 125:18 139:11
**participated** 80:24
**participation** 79:8
**particular** 15:13 36:12 54:14 56:2 61:11 63:11 65:25 84:6 86:5 92:17,23 99:16 111:17 129:3 130:23 133:12 151:12 171:15 175:16 184:1 199:4 212:15 218:20 225:4 226:13 246:25 256:2 258:2 267:20 281:10 285:8
**particularly** 122:8
**parties** 99:21 290:9 291:15
**partners** 43:15,18,21 48:18 63:2,3
**partnerships** 39:13
**parts** 34:3
**party** 47:5
**pass** 35:12 115:11
**pasting** 28:7
**Pattern** 24:12
**pause** 264:15
**payment** 39:24
**PDF** 254:1 276:24 277:2,3
**peers** 55:1
**pejorative** 54:1

**Peltzman** 66:10
**penalties** 6:8
**pending** 8:21
**penny** 187:11
**PENSION** 1:5
**people** 25:15 36:18 118:19 128:23 181:14 187:17 268:12 274:8
**perceived** 206:9
**percent** 21:3,10,11 38:6 85:13 89:23 127:21 141:9,11,14 142:4,5,7 153:22 161:25 164:2,24 169:5,7,13 170:2,10 199:11 200:25 201:8 204:19,20,21 212:9 212:10 226:12 246:16 247:8 259:6 259:21,21,22 261:1 261:2
**percentage** 21:5,19 22:10 23:13 199:24 214:11
**percentages** 22:7
**percentiles** 124:7
**perfect** 167:24 207:19 271:13
**perfection** 184:4
**perfectly** 164:9 194:6
**perform** 40:18 128:6 128:15
**performance** 80:11 83:15,18
**performed** 83:19 130:7
**period** 21:1 22:2 45:25 67:16,25 68:3,5,7,11 70:23 77:1 84:7 85:16 88:4 91:19 96:15 98:16,21 99:3 99:12 100:8,18 101:13,17 111:9 128:13 130:16,20 131:13 135:12,15,16 135:21 136:10,12 137:2 138:15 159:25 160:12 162:7 180:15 180:16 186:9 187:18 188:4 190:3,12 195:4 196:17 197:5 210:3 215:4 236:25 237:1,18 242:25 243:8 245:2 246:3 246:25 258:23 260:22 261:13,19

262:5,5,16 263:5,8 264:7 265:25 269:6 269:14,21,22 270:8 270:9,21 271:4,7,8 272:3,5,25 273:4,8 273:11,13,14 274:11 274:12,15,20,22,24 283:25 284:23
**periods** 92:24 93:3 134:21
**perjury** 6:8
**PERMANENT** 1:3
**personal** 21:22
**personally** 33:6,11 34:13,16 40:24
**personnel** 25:13,21,24
**persons** 25:6
**perspective** 153:20
**persuaded** 193:2
**pertained** 270:7
**pertains** 125:11,19 259:18
**pharmaceutical** 59:2
**Phillips** 47:18
**phone** 6:24 7:1 134:6
**phrase** 112:3
**physical** 5:23
**Ph.D** 1:17 4:4 6:7 41:4 41:7 275:2 289:24 292:10,19 294:6
**pick** 105:17,18 130:22 154:13 217:2 229:10 230:5
**picked** 199:5
**picking** 175:24
**piece** 191:1
**pieces** 231:10
**PIG** 246:24 249:9,11
**PIGS** 246:10,14
**place** 30:10 86:20 115:14 157:11
**placed** 124:6
**places** 107:22
**plaintiff** 53:10,11 54:5 63:4 195:3 197:3 242:6
**plaintiffs** 1:7 2:3 6:5 8:2 11:4 12:1,17 13:6 26:6 46:7 48:13 48:14,20,23,24 50:8 53:23,24 54:22 61:15,21 63:3,5 69:3 70:13 73:7 91:14,18 95:17,22,23 96:12 97:17,20,21 98:6 99:2,18 100:4,7,17 101:11 106:15 107:8

108:10 137:3 146:9 146:21 147:7,21,25 159:12 162:2,5 169:9 172:15,24 182:15 186:24 196:15 202:5 211:4 221:4 228:13 240:4 242:1 243:23 253:16 265:21 269:4,12 270:7,19 277:10,13 285:2 294:11
**plaintiff's** 61:5 157:21
**plan** 24:1
**plans** 39:12
**PLANTATION** 1:4
**plausible** 173:5
**play** 38:1 134:5
**played** 229:21
**please** 5:15 6:2,12 188:9 225:22 226:7 250:20 253:24 283:9 283:12 291:11
**pled** 243:23
**plural** 32:8
**plus** 95:9 135:16 251:21 252:1,16
**PO** 291:24
**POA-related** 56:11
**point** 19:4 28:18 29:8 29:10 30:11 41:8 43:15 44:2 48:24 63:7,18 66:25 82:7 93:5 95:2,5 99:12,24 101:1 103:18 105:11 127:16 150:17 151:4 156:20 157:21 161:2 169:6 177:19 199:8 214:12,20,21 216:11 221:16 229:15 253:7 271:12 277:9,15 279:6 284:16
**pointed** 149:10
**points** 70:3 209:14 212:3
**POLICE** 1:5
**political** 58:20
**pool** 31:21 132:5
**Porrino** 56:17
**portfolio** 39:20 246:24
**portion** 20:23 23:4 110:22 123:24 150:24 222:19 235:17
**portions** 64:7 70:5
**Portugal** 246:10
**posed** 159:12 254:16
**position** 20:10 41:15

242:17
**positions** 42:22
**positive** 90:12 143:6 143:24 144:14 170:22 207:21 211:15 262:13 263:23 264:6,15,17 264:21
**positively** 142:8
**Posner** 66:9
**possible** 138:2 227:21 272:7
**possibly** 77:18 81:23 184:8 200:5 207:22 213:20 227:15,16 233:17 265:13 267:23 271:24 272:17
**potential** 27:24 51:8 123:6 180:8 188:1 226:14
**potentially** 114:16 125:25 170:7,8 213:19 224:10 235:8 258:2 267:20
**power** 134:1,1,13,19
**practice** 19:18 22:6 25:14 26:5 41:20 59:22 236:2
**practices** 43:24
**Practice's** 40:25
**precedent** 152:4
**precedents** 26:19,22
**precedes** 182:4
**precise** 223:25 225:3 242:16
**precisely** 89:14 147:17
**predecessor** 41:22
**predicate** 241:2
**preference** 17:22
**preferences** 192:6
**premature** 191:12 221:16
**preparation** 9:8,16 10:4
**prepare** 8:24 9:20,24
**prepared** 18:3
**prerequisites** 195:6
**presence** 5:23
**present** 14:15 62:25 71:18 125:23 138:13 141:11
**presented** 15:20 65:19 240:9 281:13
**presently** 14:9 16:24
**president** 19:17 20:9

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 314

22:24 39:16 42:14 121:24
**Presidents** 152:23
**Press** 116:13
**pretty** 25:10 70:11 194:9 257:23 276:14 279:23 282:14
**previously** 103:15 105:6,8 117:17
**pre-class** 273:14
**pre-engagement** 63:16
**pre-period** 271:16
**price** 36:23 55:12 73:20 74:3 80:17 83:14,17 85:19 86:20 88:3 89:4 90:9 90:11 93:16 105:12 108:12 109:25,25 111:20,22 114:4 117:2,5 125:8 126:10,16,22 127:9 127:13,17,17,23 129:7,9,24 131:14 131:21 132:16,25 136:5,25 137:4,14 137:24 138:22 140:22 141:4,19 144:25 145:24 146:1 146:25 147:21 148:16 151:15,20 153:14 157:9 164:12 170:20 171:14 175:2 175:18,20 176:1,11 179:18,20 180:12,12 181:6,7 182:25 184:14 194:20 197:4 197:10 199:24 201:14,14,17,18,19 201:20,20,22 202:23 203:8 205:8,10 207:12,21,23 209:5 209:6,10,11,21,22 210:2 211:16,20 214:17,19 215:5 222:19,20,21 224:6 224:15 228:10,13 229:2 230:13,16 235:17,19 236:24 237:1,4,13,16 244:8 244:14 248:7 249:4 249:13 255:18 261:14 265:15,23 266:7,11,11,12 267:7,21 269:13,17 270:20 271:4,8,15 277:9,17,19,23

278:6,16 280:7 281:6,7,8,9,12,22 282:1,7 284:18
**prices** 112:6 117:15 138:4 155:12 166:6 176:17 202:20 236:11 269:20 270:2
**price-impact** 128:10
**price-related** 197:19 217:1
**price/cash** 176:15
**pricing** 223:1,13,18,21 226:10,21 227:1,2 227:15
**primary** 44:5 92:4 101:22
**principal** 22:24 185:22
**principals** 20:3
**principle** 31:23 175:14
**principles** 20:2 188:22
**printed** 36:10
**prior** 26:24,25 30:20 32:8 50:16,18 64:6 67:11 135:25 139:5 149:15 159:1,6 160:6 162:20 175:24 177:5,7 205:2 215:12 236:25 237:1 237:18 240:22 246:6 263:8 269:21 271:7 274:8,15
**probabilistic** 255:15 256:11 257:25
**probabilistically** 257:1
**probably** 22:7 24:8 29:7 45:5,7 60:24 63:7 70:8 82:25 103:1 168:9 194:7 198:20 205:23 213:3 255:14 257:22 280:7
**problem** 53:19 55:21 188:8 279:2
**problems** 53:18 54:19 54:21 55:4,5,7,11,16 55:18,19,23 56:1 59:1,7 63:24
**proceed** 5:20
**proceeded** 28:9
**proceedings** 120:3 289:13 290:3,5,6
**process** 28:6 116:21 235:9
**produce** 142:24 143:6 143:23 144:14
**produced** 229:19
**produces** 230:13
**product** 66:16

**professional** 18:18,20 19:9,15 42:8,10
**professionals** 82:17
**professor** 41:2,8 66:11 246:22 247:1
**profit** 104:7
**profits** 55:21 126:8
**program** 7:6,11 18:24 53:18 134:5
**programs** 7:5,14,19
**progressed** 166:19
**promised** 48:22
**pronounce** 253:2
**proper** 183:18
**property** 20:6
**proportion** 44:8 153:24
**propose** 57:7 61:6 178:3
**proposed** 61:11 88:4 96:14 100:8,18 101:13 159:24 162:7 180:20 186:9 189:25 195:4 196:16 197:4 261:12 262:15 269:5 269:14,21 272:2,25 283:25
**proposes** 61:24
**propounded** 292:14
**propping** 265:14,14
**prove** 98:10,14 107:9 146:21,22 277:11,13
**proven** 108:4 160:16 186:24 257:4
**provide** 66:23 83:17 173:20 191:17
**provided** 37:13 124:12 229:24
**provides** 20:17
**providing** 43:23 82:9
**proving** 243:6
**public** 5:19 6:9 48:9 48:17,17 59:12,16 59:18 112:8 115:17 115:18,24 116:1,7 121:25 122:1 175:1 182:22 244:2 245:14 249:21 290:1,21 291:5,7 292:25
**publicly** 111:21 116:1 123:17 244:16 248:25
**published** 118:25 167:17
**pull** 25:22 36:6
**pulling** 25:25 35:12
**pundits** 91:10

**purchase** 52:1 74:10 75:3 136:14 181:9 183:13,19 185:23 186:2 192:8 193:24 274:11
**purchased** 179:19 187:17 219:8 273:11
**purchases** 55:20 273:3,7,15 274:15 274:19
**purchasing** 289:16
**pure** 155:20
**purely** 173:4 259:19
**purported** 56:4
**purpose** 10:5 78:1 95:18 103:18
**purposes** 34:5 62:1 79:6,18 80:8 95:2 96:13 110:1 118:2 118:12 129:19 133:1 135:18 136:25 141:9 146:17 150:10 168:18 170:23 182:20 188:3 192:12 192:15 219:16 221:22,23 238:16 241:1,5 270:2,4 279:22
**pursuant** 51:18 52:24 180:25 190:16
**put** 60:5 65:6 67:20 84:4 89:25 90:10 95:16 109:13 116:17 139:14 152:25 153:19 183:22 184:8 187:6 191:8 192:1,2 193:3 208:16 210:13 214:20 217:21 242:17 252:24 253:6 253:13 260:6 263:3
**puts** 191:2 218:18
**putting** 170:8,9
**p-value** 38:2,6
**p-values** 141:12 260:25 261:2
**p.m** 120:1,2,4 121:2,4 178:21,24 222:9,12 224:21,22 268:23 269:1 286:2,5 289:12,25

_____
**Q**
**qualification** 28:14
**qualifications** 28:17 28:21
**qualified** 60:6
**quantify** 101:7 267:21

**quantum** 101:7
**quarter** 85:5 158:24 161:18 209:4 216:4 216:5,5
**quarterly** 162:6
**quarters** 209:4
**question** 8:20 10:5 17:12 21:15,16 26:12 30:1 33:25 38:17 44:15 50:16 50:18 51:11,20 52:16 58:13 63:17 68:14,24 71:17 72:20 74:8 84:23 85:25 86:15 87:3 93:22 94:5,17,20 95:4 96:4 98:12 104:1,14,16 119:9 121:16 130:21 132:24 134:12 136:5 139:7 145:6,17,18 148:1,8 150:6,10,12 150:16 151:6 160:5 160:21 162:16 163:8 169:20 170:3 171:7 172:18 174:6 177:5 178:7 183:16 186:15 190:21 195:21,23,24 195:25 197:1 203:23 207:18 214:18 216:7 217:14,16,18 219:14 219:24,25 220:20,24 221:7 222:4 225:20 234:5,12 238:7,15 239:6,13 241:10 244:23 245:11 248:15,18,23 256:19 264:25 266:4,7,22 270:24 271:25 276:8 276:15,20,22 278:13 279:5,7,22 280:4 281:19 283:9,13,16 284:13 285:1 287:15 287:22,24 288:10,11
**questioning** 114:24 206:22
**questions** 10:8 67:12 75:15 95:19 103:14 103:18,20 115:6,8 127:4 163:3,6 238:12 255:10 270:5 278:4 286:7 288:25 292:13
**quick** 68:23
**quickly** 132:18 155:12 166:6 168:3 237:20
**quintessential** 266:7

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 315

**quite** 103:17 114:18 233:5 278:24
**quote** 125:4
**quote/unquote** 88:9

**R**

**R** 2:1,8 3:1 5:1
**raining** 231:23
**ran** 126:24 130:12 198:14
**random** 128:3 154:13
**range** 122:18 159:5,7
**rapid** 156:24
**rapidly** 112:6 126:16 126:23 127:13 131:14,21 132:24 153:15
**reached** 127:11 142:10
**reaching** 75:19
**react** 125:6
**reacted** 126:16,23 127:13 131:25 137:14 140:18 141:19,23 142:3,8 164:24
**reacting** 125:10,18
**reaction** 88:3,3 89:4 90:9,12 127:18 141:4 142:10,25 143:6,16,24 144:15 145:1 147:21,24 170:20 205:8,11 207:21,22,24 209:6 209:12 211:16,20 214:17 222:19 230:13,16 235:17 248:7
**reactions** 171:21 202:23 203:8 207:12 209:21,22
**read** 4:14 30:6 34:4 35:21 50:21 51:21 52:18 61:19 62:20 63:7 69:20,23,24 70:8,10 100:11,11 111:25 112:1 125:14 144:6 159:9,16 191:20 194:11 195:21,23 203:22 207:8 243:1 254:7,8 254:9 256:22 261:19 276:10 277:15 281:2 281:25 288:12 292:1 292:11
**reader** 63:22
**reading** 11:22 63:13

125:15 167:5 207:7 276:19
**ready** 220:18,18
**really** 38:16 48:9 50:14 52:17 62:21 62:23 63:1 67:19 69:8 103:17 137:25 151:11 153:4 209:3 209:3 229:8 289:3
**realtime** 100:14
**reason** 50:13 52:12 81:6 118:2 133:17 134:15 138:1 142:23 147:20,20,23 148:10 155:16 218:4 271:6 273:24 293:1
**reasonability** 283:4
**reasonable** 59:13 93:6 150:7 160:25 186:3 187:3 189:10 239:1 239:24 240:11 241:22,25 242:14 243:19 251:23 258:4
**reasonably** 233:20 242:15
**reasoning** 270:7
**reasons** 14:21 228:12
**rebuttal** 65:6 66:6 167:25
**recall** 10:2,18 16:22 27:9,14 64:17 77:21 77:24 79:20 82:20 83:1 84:11,17 92:25 102:13 162:3,5,8 181:22 258:20 259:5 269:8
**receipt** 291:12
**receive** 40:22 291:13
**received** 70:1
**receiving** 41:3
**Recess** 178:22 222:10 268:24 286:3
**recessed** 120:4
**recitation** 205:4
**recognize** 40:18 103:10 104:22
**recognized** 102:19 104:20 160:1
**recollection** 9:17 12:13 52:5 88:8 139:2,10,24
**reconvene** 120:4 268:17 285:24
**record** 5:14,21 6:20 7:4 8:8,10 119:25 121:4 178:21,24 191:14 220:5,23

221:8,8,15 222:7,9 222:12 229:19 251:15,22 256:20 260:5 265:14 266:15 268:19,23 269:1 278:24 283:18 285:20 286:2,5 289:10,11,14 290:5
**records** 201:4
**redline** 35:15 286:20 287:1,4,18 288:16 295:20
**redlined** 287:6
**reduced** 159:4 272:15 290:7
**reducing** 106:19
**reduction** 212:3,9 228:25
**redundant** 17:19,25
**refer** 17:8 19:19,22 25:23 32:22,25,25 88:10 107:15 123:25 179:12 200:13 259:2
**reference** 135:12
**referenced** 43:9 107:23 108:6 117:25 214:4 226:25
**referred** 82:13,25 83:25 171:5
**referring** 68:25 70:4 124:9 135:24 180:4 197:23
**refers** 124:10 146:3,4
**refined** 150:21
**reflect** 18:15 112:7 116:22 164:11 166:24
**reflected** 8:10 19:12 80:16 111:21 129:23 131:14,21 132:18 154:5 182:8 216:16
**reflects** 19:14 36:1
**refrain** 225:22
**regarding** 9:18 108:11 108:24
**REGISTRATION** 290:23
**regression** 37:17 38:4 85:12 200:10
**regressions** 37:11
**regular** 132:15 289:20
**regularly** 55:25
**regulation** 66:12,12
**regulatory** 20:7,19
**reinforces** 140:23
**reject** 35:17
**relate** 62:4,14 63:23

184:13 281:5
**related** 14:4 27:4 31:8 56:9 62:11 63:17 66:7 103:15 107:18 128:11 132:22 138:13 149:7 171:4 202:23,25 203:1,4 203:18 204:8,12,20 205:1,14,16 206:14 206:20,23 207:13,16 208:16 210:6 213:19 224:3 230:23 231:5 237:3 238:12 245:14 248:12 256:1 279:8 279:9 285:12 288:4 290:9
**relates** 35:18 52:5 59:20 65:3 66:5 72:21 76:14 81:25 90:24 129:23 134:8 137:3 150:1 160:18 256:12 274:3,4 275:1 279:16 280:12
**relationship** 24:22 25:3 42:9,10 102:11 114:5 130:18 285:10
**relative** 83:19
**relatively** 122:10 179:24 208:6
**release** 116:13 139:20
**released** 122:21 145:3
**relevance** 281:18
**relevant** 116:23 147:5 225:6 255:14 256:10 266:22
**reliability** 241:15 283:4
**reliable** 187:9 192:24 221:2,23 222:3 238:25 239:24 240:3 240:11,23 241:4,21 241:24 242:14
**reliably** 186:8 192:17 192:22 193:7,13 202:2 251:20 252:1 252:3,23 282:25
**relied** 14:25 15:7,13 60:11 61:1 75:19 76:16 95:10 97:4,11 97:25 98:24 288:4
**rely** 14:23 26:18,25 61:13 62:3 117:22 118:2 137:24 160:14 265:22 266:6 284:18
**relying** 38:10,12 76:3 77:3 78:1 81:9 98:14 108:5,7 160:8

171:16,17 185:13,21 211:17 266:10
**remain** 176:10
**remained** 43:13
**remember** 24:8,9 28:6 46:12 56:24 69:24 121:12 152:22 158:20 162:3 245:25 275:9
**REMOTE** 1:16
**remotely** 6:18
**removal** 199:15
**remove** 143:2 199:25
**removed** 16:16 146:4 146:7 188:23
**removing** 199:22
**repeatedly** 254:12
**rephrase** 163:17
**reply** 167:4,13
**report** 7:25 9:2 10:13 10:20 11:2,8,25 12:7 12:15,16 13:5,15,23 14:2,3,13,20,22 15:1 15:4,14,16,17,20 16:5,17,25 17:3,5 18:12 25:16 26:4,9 26:17 27:2,9,11,14 27:15,16 28:6,8,15 28:19,22,24 29:7,13 29:16 30:2,7,8,9,11 30:11,15,18,20 31:5 31:6,16,16 32:1,8,21 32:22,25 33:1,8,22 34:3,9,14,14,17 35:12 45:17 46:24 47:4,9 48:3 49:5,9 49:13 52:5,10,14 56:3,15,18,19,20,21 56:22,23 57:7 60:11 63:12 64:7,20 65:6 65:20 66:6 67:6 68:4 73:15 75:12,21 76:5 79:19 81:24 82:21 86:16 87:15 88:5 89:6 90:14 93:23 95:2,3 96:13 103:13 105:1,14 106:10 107:12,24 108:13 110:19,21,22 118:24 121:9 126:18 130:4 131:6 134:25 136:18 137:9 146:14,17 150:10 179:2,12 182:9 197:15 198:2 201:25 219:2 222:15 225:13 226:5 228:4 235:25 236:6 238:16

Case 1:20-cv-22109-JB  Document 97-25  Entered on FLSD Docket 12/16/2022  Page 96 of 104

State of Alaska                                    [FINAL]                        November 30, 2022
v. Ryder System                                                                  Michael Hartzmark, Ph.D.

Page 316

241:18,20 250:20 256:13,23 257:15 258:20 265:6 266:24 268:4 270:2 272:19 274:4,6 275:1,1 278:25 280:12,24 281:4 282:9,15 285:7 286:8,12,21 286:22 287:6,9,10 287:17 288:14 294:5 295:19

**reported** 125:6,10 158:23

**reporter** 3:7 4:12 5:12 5:15,17,18 6:11 46:13 61:19 73:22 167:9 178:13,15 196:10 213:5,6 217:20 249:18 268:20 283:15 289:15,20 290:1

**Reporting** 1:25 3:3 5:13 291:22

**reports** 13:12 26:19 26:22,22,24,25 27:14,17,21,25 31:7 32:8 36:7 44:11,14 45:2,5,6,7 46:1,5 49:16 50:2,25 51:4 51:14,17 52:20,23 53:2 56:5,25 80:21 81:2,10,18 83:1 84:3 84:11,25 85:1 86:9 86:21 87:10,17,19 87:20,24 116:6 125:1 145:10 152:8 154:19 171:4,10 189:6,7 194:4,7 201:4 236:8

**represent** 57:24 264:1

**representing** 279:22

**represents** 14:3 202:19

**request** 65:7

**requested** 17:3

**required** 216:18 291:6 291:7

**requirement** 88:16

**requirements** 65:11

**requires** 166:5

**resale** 97:22

**research** 70:7 126:3 133:15 152:2,3

**residual** 69:10 91:18 92:2,5,13,15 93:3,15 94:7,23 95:25 96:6 96:14,19 98:1,15,20

99:2,7,25 100:7,17 101:11 102:12 103:9 104:1,4,19 105:4,11 105:18,21 106:6,20 109:9 159:4 164:25 169:4,13 172:8 173:11,22 174:11 227:24 228:18,25 230:22 233:25 234:17 235:1 243:7 246:2 247:20 254:14 254:16 261:5 263:21 265:24 269:5,9 270:8,17 271:3,6,21

**resolve** 189:9

**respect** 48:13 123:20 124:14 131:23 155:7 166:20 259:19 281:3

**respects** 154:15

**respond** 129:9 153:15 166:6 262:17 281:13

**responded** 153:23

**responding** 157:10 169:25

**responds** 157:2 168:3

**response** 122:22 154:3 156:8 222:21 235:19

**responses** 127:9

**responsibilities** 22:24 39:17

**restate** 216:2 234:15

**result** 98:14 150:4 159:1,4 204:13

**resulted** 13:18 141:20

**results** 98:2 125:7,11 158:25 256:8

**Retirement** 1:4 295:13

**return** 85:13 89:23 108:17 132:21,22 133:11 161:24 163:20,21,24 164:8 164:25 169:4,6,13 169:21 170:2 201:1 201:8 213:18 223:19 224:13 246:24 291:11,18

**returns** 125:24 126:12 128:7,9 129:5 130:8 130:13 133:13,14,16 138:14 145:20 156:6 156:14 167:18 198:19 199:10,12 259:4,7 260:19,22 261:6,8 263:21 264:14 265:4,24

**reveal** 233:15

**revealed** 216:8

**revealing** 202:24 203:2,5,13,15,16,16 203:17 204:1,8 205:17 207:2,14,25

**reveals** 206:25 210:1 267:19

**revelation** 201:9,15 208:10 209:22 222:19 223:25 235:18 256:8

**revelations** 208:8

**revenues** 223:8

**review** 10:16 33:6 34:13,16 35:9 36:1 36:15,20 37:1,9 69:22 70:12 77:16 77:25 79:15,24 81:17 186:20 211:14

**reviewed** 9:1,2,4 34:18,19,23 35:22 36:12,18 37:7,16 38:1 69:17,21 82:22 84:17 146:14 276:11

**reviewing** 33:21 84:11 242:24

**rewrote** 27:22

**ribbon** 58:1 87:16 102:4,6 109:20 110:2 178:1,1 180:11,13,14 184:24 187:19,21 188:16 189:16,16 192:2,3 192:16,21,24,25 193:6,19,19,20 198:13 200:1 201:13 202:10,11,17,19 203:11 207:9 209:18 209:20 213:2 218:10 218:11,13 219:6 239:1,1,25 240:3,10 240:14,23 241:4,22 241:25 243:13,15,19 251:16 257:6,7,8 266:19 268:8 272:2 272:4,13,23 273:7 280:18 282:17,21,25 284:22

**ribbons** 58:7 193:13

**rich** 168:10

**Richard** 66:9

**right** 8:14,17 11:5,14 11:19 17:7 18:14 31:6 32:24 38:2 41:1 41:4,12 43:9 46:20 46:22 48:1 61:13 64:9 66:25 67:5,6,14

73:13 74:16 75:6,17 75:24 76:5 79:24 83:5,7,16 85:13,15 85:16,24 89:21 91:8 91:13 94:21 96:20 97:7,13 102:17,18 104:8,8,17,19,23 106:4 107:3 110:18 112:11 113:15 115:6 116:9 118:12 121:11 123:18 124:10 125:16,24 126:13 127:14 128:8 130:3 130:20 134:24 135:2 136:11 137:8,10,20 138:17,21,23 139:9 139:11,22 140:15 144:8,24 146:10 147:5 148:17 151:17 157:13 158:4 159:11 159:13 161:18 162:2 163:15 164:4 167:2 168:13,25 169:5 172:4,17,22,25 173:8,11 181:1 182:25 190:4,7 193:17 194:25 197:14,15,22 202:10 203:8 207:7,19 208:18 210:4 214:3 216:3,18 219:12,18 221:14 222:3,14 223:22 226:4,21 227:11 230:13,16 237:20 240:23 242:25 243:24 248:14 250:18,21 253:15,23 254:10,21 258:11,24 259:14 260:13 262:15,21 263:18 264:10,12 269:11,19 270:16 271:5 272:25 273:4 275:21 277:15 282:16,23 284:20 286:10 287:12

**right-hand** 259:10

**risk** 117:19 175:12 192:5 254:16 255:18 255:19,20 256:1,7,9 256:25 257:4,5,18 257:20 258:4

**riskiness** 114:5 176:12

**risks** 255:7,12,24 256:5 257:21 258:3 258:8,8

**risky** 246:13,18

**Rizio-Hamilton** 2:7

**RMBS** 59:4

**ROBERT** 1:9

**rock** 31:21 32:13

**rocket** 31:20 32:12

**role** 39:18 41:11 55:9

**roles** 39:3

**room** 8:16

**Rose** 1:25 3:3 5:13 291:22

**Rosen** 1:20 2:19

**rough** 20:22 21:19 289:16,19

**roughly** 9:10 25:15,18

**Rougier** 183:7,8

**Rougier/Applied** 287:25

**routine** 29:25 182:13

**routinely** 29:20 32:5 194:15

**rules** 6:19

**run** 133:5,6 134:9 198:20 208:5

**running** 7:14

**Ryder** 1:9 5:8 6:16 9:3 14:5 62:14 66:18 69:7,9 72:23 73:8 76:19 77:15 80:2,9 80:25 81:2,12 85:5 85:13 88:13 92:24 94:8,22 95:23 103:8 103:10 104:18 106:16,18 107:4,4 108:22 112:22 113:18 121:10 122:13 123:16,24 126:22 129:8 131:24 137:13 139:17 140:10 145:12 153:1 155:7 159:4,25 160:19 165:1 171:22 172:2 173:12 174:10 175:7 181:25 182:1 182:3,6,8,22 202:20 215:13 220:10 224:3 228:18 236:15,17 242:25 245:1,13 249:1 258:6,17 271:17,20 282:5

**Ryder's** 67:15 70:21 70:23 83:14 85:19 86:19 91:18 95:12 98:15 99:2 101:11 105:11 106:6 107:25 108:11 111:9 113:7 115:22 116:15 124:6

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 317

126:15 127:12,16 128:7 131:13,21 137:14 141:19 153:12,14 156:15 165:8 169:15 174:1 174:12 233:25 234:16 235:1 254:15 269:4,13 270:8,17 270:19 271:3,4,6,8 273:12
**R-O-G-M-A-N** 62:8

**S**

**S** 2:1 3:1 5:1 124:1 294:1 295:1
**Sachs** 275:23 295:11
**sale** 51:25 74:11 75:4 92:16,18 103:11 104:22,22 181:9 183:13,19 185:23 192:8 193:24 274:10
**sales** 158:25 174:4 186:3
**Sam** 66:10 124:1
**sample** 127:9 129:14 132:8,20,21 141:13 154:15,16,17 155:3 155:15
**samples** 132:13
**SANCHEZ** 1:9
**Sasol** 24:7
**saw** 54:2 285:9
**saying** 10:1 73:10 86:15 109:3 110:3 125:5 136:9,10 147:12 162:17,24,25 168:8 183:7 186:22 187:6,6 191:6,7 193:16 196:3,4 198:5 201:11,25 205:5 206:13,14 207:8 209:20,25 219:1 220:7,8 221:13 228:8 230:21 231:8 235:7 236:22 247:11 253:9 260:24 271:17 274:21,23 278:18 280:4
**says** 11:10,12 16:14 60:16 76:18,22 83:22 97:25 107:25 108:3 138:21 146:14 158:22 167:23 183:21 184:1 188:21 188:25 191:7,8 202:18 217:23 231:22 250:21

253:12 254:10 256:17,21 277:22 281:20
**scale** 209:13 212:13 212:14 215:8,17 216:13 217:5 218:6 218:9 219:14,16 225:15 227:10 231:15 235:3,8 238:19 278:17
**scaling** 180:8 200:3 209:13 212:16 214:4 214:6,8,18 216:18 218:13 219:1,19,23 220:9,22 221:1,11 221:17,17,22 222:17 226:6 228:2 232:14 232:21 233:3 235:15 237:25 238:22,23 239:10,21
**scholarly** 118:25
**school** 19:3 41:9 251:1
**science** 62:23
**scope** 73:3 93:19 94:11,25 96:2 98:8 98:18 99:5,14 102:23 103:13 104:25 105:14 146:12 149:20 160:3
**scratch** 26:18 27:23
**screen** 7:6 11:7,11
**se** 53:24
**seal** 290:13
**search** 36:5 84:8
**searchable** 106:11
**searched** 76:25
**searches** 84:5
**sec** 79:24 80:4 81:12 84:2 115:22 116:9 116:12 262:4
**second** 29:12 62:16 68:14,25 85:5 86:1 91:15 106:12,14,20 112:5,15 131:10 135:11 148:15,23 156:10 158:23 166:5 178:11 179:6 202:18 205:5 206:10 227:5 233:11 242:5 254:5 254:10 255:3 264:3 264:11 279:18
**Secondly** 281:2
**section** 14:15 28:14 29:18 30:6,8,9 49:10 49:10 50:1,24 51:16 52:22 56:8 57:4,20

58:3,9 70:9,10 71:3 71:11,23 72:1,15 73:11,16 74:2,20 115:3 158:18 178:10 179:1 181:23 182:4 182:8,23 195:5 196:23 197:18 198:1 216:16,25 219:16 240:16 241:19 256:15 282:9,12 286:9,20,21,22 287:7 288:14
**sections** 28:7,22 29:11 70:7 158:19 254:11 287:16
**securities** 20:3 22:16 22:18,20 23:5,13,16 23:18,20,24,25 24:2 29:22 47:21 48:3,24 49:5,15,20 50:10 53:21 56:3 62:21 66:18 80:3 112:6 179:16 185:25 194:16 218:22,22 242:22 294:17
**security** 31:10 51:6 65:10
**see** 6:24 11:11 13:2 16:12 28:18 29:23 36:24 42:13 48:1 60:17,22 61:9 62:9 67:24 75:22 76:20 76:24 80:22 83:23 89:10 97:15,19 98:3 98:4 112:9 131:16 135:4,9,10,13 137:18 138:19 140:6 144:8 159:8 167:19 173:7,9 180:2 197:20 200:15 206:2 215:24 216:10 222:22 226:1 229:18 229:20,22,23,25 230:1,8 233:17 235:9 236:8,9 248:7 251:5 254:19 255:8 256:13,17 259:12 263:24,25 265:24 271:24 277:12 278:2 279:10,18 281:24 286:24
**seen** 156:21,22 276:11 284:4 285:2
**segue** 212:22
**selection** 54:24
**sell** 93:4,17 94:9 173:12,23,25 174:3

174:5
**seller** 42:18
**selling** 125:7
**sells** 103:8 104:18 173:13 174:14
**Senior** 56:13
**sense** 17:19 19:5 21:19 44:13 45:14 81:13 91:25 133:22 140:1 151:12 169:2 206:18 279:16
**sentence** 68:25 97:17 97:21 107:2 112:4,5 112:16 126:21 131:10 135:11,25 137:11 200:12 202:18 204:2 205:5 206:10 207:3,4 223:11 238:3,12 250:21 254:5,11 255:3 277:6,7 280:21 281:20
**separate** 130:17 132:19 213:18,21 231:10
**separated** 127:7 132:12
**September** 11:23
**series** 33:2,4 37:10 126:14 131:11 171:5 208:22,23
**serve** 22:25 50:9
**served** 23:12
**service** 66:16 126:8 289:20
**services** 20:18
**serving** 48:15
**SESSION** 121:1
**sessions** 9:16
**set** 38:13 194:2 290:12
**settings** 7:11
**settlement** 219:9
**seven** 37:8
**sexual** 250:9
**sexually** 250:11
**share** 107:7 155:22 159:5 223:4 227:18 233:9,10,12 236:15
**shareholders** 275:4
**shares** 106:16 165:12 169:23 179:19,21 274:8
**sheet** 92:8 292:16
**shocked** 172:6
**shocks** 228:20
**short** 122:17

**shorter** 225:18
**SHORTHAND** 290:1
**shorts** 122:9 154:21 171:10
**show** 131:11 156:25 158:1 166:12 258:19 279:15
**showing** 154:23
**shown** 156:6
**shows** 188:13 198:18 227:22 237:11
**shy** 213:10
**sic** 61:7 235:18 277:5 281:21
**side** 37:23 44:23 48:6 48:15 53:9,10,12,23 54:4,5 63:5 104:17 104:18 190:25 228:23
**sides** 272:20
**sig** 141:15
**Sign** 4:14 292:1
**signature** 289:23 291:5,7
**signed** 45:17 291:11 291:13,18 292:21
**Signet** 24:5 56:19 61:4 61:10 183:12 288:1
**significance** 90:9 91:3 108:9,13 125:9,17 141:14 142:4 259:18 259:20 264:23
**significant** 89:24 106:1 108:17 127:18 127:23 136:6 140:23 141:1,5,8,15,20 142:7 145:19 146:25 148:21 156:5 161:23 163:20 165:10 169:21 170:21 188:15 199:14 259:3 259:7 260:19,21 261:5,14 263:22 264:5,14,18 265:4 267:6,16
**significantly** 141:24 142:9
**signing** 45:22
**similar** 29:7 30:21 31:11 130:7 198:6 198:14 201:23 250:23 264:24
**Similarly** 1:6
**simple** 104:2,7,13,13 104:15,16,16 185:22 189:21,21 215:9 234:17 238:16 251:2

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 318

279:23 287:15
**simpler** 70:20 197:2
**simplest** 199:9 217:2
238:1,2
**simplify** 214:15
**simply** 61:5 251:3
**simulations** 134:10,11
**simultaneously** 42:24
287:14
**single** 208:21 242:24
259:11,16,20
**Sir** 158:14
**sit** 14:12 75:13 82:25
84:16 91:10
**sitting** 74:1 77:22
82:20 84:19 240:2
**Situated** 1:6
**situation** 13:15 73:14
73:18,19 74:2
201:12,16 211:25
212:2 225:4 231:9
240:9 256:2 259:15
272:13 284:17,20
**situations** 235:24
246:20 247:10 248:3
**six** 37:8 198:1
**sixth** 80:19 81:19
230:9
**sixty** 262:6
**sizable** 34:20
**size** 155:15
**skipping** 111:8
**slash** 62:7
**sliced** 131:1
**slightly** 94:5 155:5
167:20 243:24
**slope** 30:18 31:3,4,8
31:14 32:10,14
189:21 250:25
**slower** 61:19
**small** 122:1,10,16
208:6 209:7
**smaller** 43:25
**smart** 168:10,14
**smiling** 255:9
**sold** 42:1,1,19 93:5
94:9 102:20 179:20
**solicit** 48:12
**Solitaire** 134:5
**solve** 53:18 54:18,21
55:16,18 58:25 59:6
251:1,4
**solved** 55:4,5,7,11,19
55:23 56:1 63:24
251:20
**somebody** 48:17
63:16 123:9

**Somebody's** 190:1
**someplace** 139:25
**somewhat** 26:14
37:25 184:9 257:21
**soon** 29:3
**sorry** 40:1 46:14 61:20
73:23 77:19 84:25
119:24 125:13
140:25 143:21
145:23 179:8 192:13
194:18 196:12 198:1
203:13,25 206:8
212:6 234:4 259:21
268:21 271:22
**sort** 17:24 26:5 33:1
37:6 40:13 58:18
73:17 109:9 113:13
118:10 119:8 121:14
122:12 124:16
128:14 129:19
132:12 208:21
229:21 244:12 274:1
**sound** 139:22 237:25
**sounded** 10:1 34:2,2
57:9
**sounds** 46:22 92:11
119:18 178:19
181:18 206:12
237:23 240:21
**source** 40:3 174:24
249:2
**sources** 116:12
**SOUTHERN** 1:1
**so-and-so** 54:4,4
**so-called** 62:6
**Spain** 246:11
**Spanish** 246:9
**speak** 9:7,15,17,18
14:13 67:21 166:17
208:4
**speaking** 10:2 28:5
173:5 208:7
**specialist** 5:11
**specializes** 20:1
**specific** 23:8,15 27:9
27:15 28:12 29:7
33:3 47:2 49:23 58:6
63:15,17,20 64:13
71:12 73:6 78:11
82:21 83:1,10 89:11
92:24 93:2 114:3
115:11 127:15
154:11 158:2 174:3
180:8 181:25 182:1
182:6,14 211:9,24
213:22 223:24
224:17 236:2 250:13

**specifically** 28:2
37:11 62:13 72:21
76:15 82:4 86:1
101:24 105:15
**specifics** 244:25
**specified** 15:8 68:5
**specifies** 85:12
**spectrum** 121:18
**speculate** 45:10 95:5
133:25 177:18
**speculated** 11:6
**speculating** 92:23
**speculative** 26:15
168:17 223:15
**speed** 106:24
**spelling** 34:25
**spend** 22:8 26:9
**spending** 158:20
**spent** 41:17
**spoke** 9:9
**spouting** 224:7
**spread** 122:18
**spreadsheet** 83:5
**staff** 10:7,10,11 24:18
24:20
**stage** 43:22 61:5
78:13 108:8 185:10
185:14 186:5 191:22
191:25 198:25
**stair** 207:22
**stairstep** 208:1
**stamina** 114:18
**stamped** 11:17
**stand** 144:23 271:5,6
**standard** 27:20 29:21
29:25 32:6,15,17
51:25 73:17 128:14
128:17,18 172:23
179:16,25 182:13
194:15 250:23 288:6
**stands** 94:17
**start** 6:1,19 18:19
19:10 21:2,25 26:18
31:12 33:21 34:12
35:11 45:17 85:11
135:8 157:15 198:14
199:2,2,8 200:10
210:17 214:20
223:12 248:3 262:4
269:21 271:8 276:19
**started** 27:10 43:8
46:5 128:25 134:2,7
134:17 225:2 252:19
**starting** 16:13 27:1
28:18 29:8,10 30:11
36:23 134:18,20
**starts** 15:11 135:5

224:7 277:4,24
**state** 1:3 5:7 14:14
29:15 32:3 36:16
65:14 93:12 96:4
209:10 278:22
279:14
**stated** 33:7 53:20
74:24 78:15 85:25
150:11 177:4,11
209:2 216:6 256:22
257:21 268:4 271:18
278:15 279:16 280:5
280:7 285:6
**statement** 13:24 92:8
122:24 144:10
206:20
**statements** 15:22,24
75:1 135:23,25
136:3 140:12 149:3
186:21,21 193:11
201:6 254:13
**States** 1:1 276:17
**stating** 148:9 196:9
**statistical** 90:8 91:2
128:1 135:19 141:14
142:3,4 186:19
259:18,19 264:23
**statistically** 89:22,24
106:1 108:17 127:18
136:6 140:23 141:1
141:4,8,15,19,24
142:7,9 145:19
146:25 148:20 156:5
161:23 163:19 165:9
169:21 170:21
188:15 199:14 259:3
259:7 260:18,21
261:5,13 263:22
264:5,14 265:4
267:6,15
**statistician's** 132:23
**statistics** 20:2 188:13
**steel** 24:5 56:20 59:5
61:15 64:15,25
65:10 183:11 288:1
**stenographic** 8:10
**stenographically**
290:6
**step** 241:5
**stepping** 207:23
**steps** 77:10
**Steve** 103:14 114:13
212:24 248:20
**Steven** 1:19 2:16 6:16
288:24
**stick** 46:16
**sticking** 226:19

**stipulate** 5:21 279:11
**stock** 12:9 14:4 55:13
67:15 69:7 70:21,24
74:3,8,12,13,19,25
78:13 80:10 83:14
83:17,18 85:19 86:7
86:19 87:23 88:3
89:4 90:9,11 96:6,8
102:1,2 105:12
106:16 107:7 108:12
109:16,24,25 110:12
110:13 111:10,17,18
111:22 113:8,12,23
114:1,4 117:5
119:10 121:10
122:16 123:17 124:8
124:18 125:7 126:15
126:22 127:12,17
129:7,9,24 131:14
131:21,24 132:16,25
137:4,13,14,16,24
139:6 141:4,19
144:25 147:20 149:4
153:1,9,12,14,23
155:8,12 157:4,5,6
160:19 164:12 165:1
165:8,11 166:6,23
168:11,12 169:15
170:8,9,12,20 171:7
171:22 175:1,25
176:11,15,17 177:20
179:18,20 182:5,5
182:25 184:14,20
187:1 195:3 196:16
197:3,4,10 199:24
202:21 204:18
208:18 209:10 210:2
211:16 212:2 214:15
214:16,19 215:5
224:15,25 228:13
229:2 230:13,16
231:23 233:9,12,22
250:14 258:18 264:6
265:10,23 269:13,17
270:19 271:4,8,15
273:12 277:17 282:5
**stockholders** 273:10
**stocks** 91:7,11 121:18
123:2 156:14 219:8
**stock's** 170:24 196:19
**stop** 71:24 190:6
205:3 210:4
**stopped** 224:25
**stopping** 66:25 115:14
**stories** 105:18
**straight** 164:6 272:17
**straightforward** 51:24

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 319

179:24 242:9 250:23
**Street** 2:20
**strength** 151:9
**stricken** 64:7,21
**strike** 141:21 192:14
194:1
**strong** 122:24 124:23
153:9,11 154:2
177:20
**strongly** 121:10 153:1
153:17 282:5
**struck** 65:5
**structure** 36:7
**struggling** 187:23
**student** 66:7 76:13
118:21
**studies** 155:11 156:13
252:23
**study** 114:9 126:20,24
127:2,12 128:15,18
129:1 130:1,8
131:20 163:11
186:17 197:18,22,24
198:4,5,10,14
199:17 201:23
203:20 204:14
216:15,25 217:3,7
217:19,22,23,23
252:20 280:16
**stuff** 116:4
**sub** 190:5
**subject** 58:15 68:16
**subjectively** 198:24
**submit** 12:15 49:9
52:14 56:16 66:6
**submitted** 11:3,23
13:5,13,16,21 15:15
16:5,21 44:14 45:1
46:24 47:4 48:3 49:4
49:14 50:3 51:1,4,14
52:9,20 53:3 56:3,5
56:7 73:15 265:6
286:8 287:7,9,11
**submitting** 12:2,17
**subscribed** 292:21
**subsequent** 136:17
**subsequently** 96:8
245:22
**substance** 292:15
**substantial** 59:14
105:25 110:21
117:21 288:7
**substantially** 30:1
65:21 134:13 269:20
**substantive** 287:16
288:13
**subtracting** 181:7

**successful** 243:6
**sued** 123:8
**sufficient** 61:24
185:14
**suggest** 52:14 67:19
82:10 98:23 109:15
119:5 151:11 152:7
163:13 165:14,22
166:1 169:10,22,23
170:5 184:6 194:20
233:20 234:24
265:12,20 269:15
281:23
**suggested** 12:14 26:4
35:13 52:8 65:9
123:6 124:23 155:17
186:1 284:14
**suggesting** 220:15,21
**suggestions** 26:4
**suggests** 82:5 128:2
163:1 164:15 166:23
169:23 183:9
**sum** 192:10
**summaries** 276:11
**summarize** 111:2
**summarized** 68:20
70:15
**summary** 14:14 35:4
70:17 111:4 159:14
159:16 210:11
**sun** 244:21
**Sunday** 83:11
**Sunita** 124:11
**supervision** 25:22
290:8
**supplement** 16:25
17:3,4
**supply** 24:5 63:15
**support** 8:3 11:4 12:2
13:6 14:1,22 20:18
20:24 21:18 23:1
25:14,20 41:21 42:3
47:5 49:16 50:3 51:1
51:10 78:20 79:12
79:13 90:1 118:23
118:23 119:5 121:10
124:23 133:8 137:11
137:21,25 153:1
156:11 165:10
171:22 281:4 282:4
282:5
**supported** 25:12
131:20 148:22
153:17 171:3
**supporting** 44:24 79:7
131:12
**supportive** 121:14

**supports** 77:6 108:19
111:8
**supposed** 175:17,19
**supposedly** 248:4
**Supreme** 64:20
275:22 276:16
295:10
**Surana** 123:22 124:11
**sure** 6:19 9:23 14:20
15:6,9 23:10,17
26:21 30:5 38:17
45:15 57:17 67:17
72:11 74:16 89:9
90:4 92:11 99:15
100:14 103:17 112:1
119:21 124:3 125:22
131:3 149:15 160:16
162:23 168:1 169:11
176:16 178:15
194:25 205:12
217:15 219:12
220:24 230:11
241:16 244:8 254:8
260:23 268:18
280:23
**surfaced** 206:4
**sustained** 146:16
**swap** 182:22
**swear** 5:15,22
**swiftly** 125:6,10,18,21
125:22
**Swiss** 246:9
**switch** 229:12
**sworn** 6:8
**Syllabus** 295:11
**Symantec** 24:6 56:22
**synonym** 203:13
**System** 1:4,9 5:8 14:5
76:19 80:25 81:3
295:14
**systematically** 168:4
**Systems** 258:17
**System's** 80:3 85:5
**S&P** 81:4
**S-3** 122:19 154:20
171:10

---

**T**

**T** 2:17 3:1 124:1 294:1
295:1
**Tab** 7:17 11:8,12
96:20 158:7 253:18
253:21,22 259:24
261:24 262:23,24
275:15 286:20
**table** 4:1 33:16
**tables** 26:1,2

**take** 7:10 8:19,22
21:11 28:13 35:25
36:20 38:21,23
60:15 67:1 70:16,19
77:10 97:10,16
104:17 111:23 115:2
116:9 119:15 122:13
129:14,15 131:5
134:3,24 137:8
140:15,21 154:16
155:15 157:9 161:4
167:5 168:21 173:8
176:6 179:1,22
183:7 199:9 200:20
200:20 204:17 209:1
211:25 212:1 213:18
214:10,19 222:6,14
224:2 231:25 236:16
241:5 245:11 250:1
251:24 253:23
254:21 258:11
262:21 272:24
273:14 276:12 289:9
289:19
**taken** 39:2 84:9 103:1
154:17 155:4 249:3
290:3,6
**takes** 166:16
**talk** 34:9 91:13 110:19
124:5 157:13 200:9
282:15,16,21
**talked** 124:25 152:15
173:10 208:10
260:17 269:3 272:1
**talking** 20:12 71:25
72:2 90:6 121:8
124:3 167:8 175:5,6
175:7,7 193:15
196:12 198:10 204:7
206:8,9 215:23
227:4 236:9,14
248:3
**tangent** 195:19
**target** 236:11
**targets** 157:9
**taught** 66:11 250:25
**tax** 104:10 158:23
**taxes** 234:23
**teacher** 19:3 295:13
**team** 84:5
**technique** 177:24
188:7,9,10,18,25
191:11,13 213:24
221:13 223:13 225:6
225:24 226:6,20,22
227:1,4,5 228:2
231:13 232:12 233:2

235:3 241:8,9
266:14
**techniques** 57:23 58:6
95:13 189:19,25
190:2,4,11,15
191:17,18 209:20
213:2 217:9,11
219:17 222:18,24
225:14 227:7 228:5
235:16 237:22 239:8
252:18,22 272:1
**Technology** 97:8
**teleconference** 79:1
81:12
**television** 66:16
**tell** 94:18 106:2
114:21 130:10
167:15 171:19
208:12 211:9,9
212:4 220:5 242:16
246:23,23 247:2
266:9 267:10 280:11
**telling** 138:9
**tells** 219:25
**Telser** 66:10
**template** 27:1
**ten** 37:8 42:14 70:7,9
97:15 115:4 136:22
209:4,8,9 216:2,2,3
216:6 233:11,13,13
236:19 261:4,7
289:21
**tenure** 41:9
**term** 49:20 57:16 68:6
133:10 213:17,17
**terminology** 93:14
181:20 283:8
**terms** 8:4 15:8,12
21:16,17 22:8 27:23
33:15 40:15 67:21
79:8 80:10 84:7
95:17 113:24 115:2
116:17 123:19,24
126:8 133:10 150:2
153:8 155:21 156:21
156:22,23 208:6
247:11
**TerraForm** 24:1 56:11
**Tesla** 24:7 56:22
**test** 107:17 126:20
130:13 131:23 132:2
132:23,23 133:2,12
149:11
**testified** 282:23
**testify** 6:9
**testifying** 8:14 20:12
23:3 46:2

State of Alaska                    [FINAL]                    November 30, 2022
v. Ryder System                                              Michael Hartzmark, Ph.D.

Page 320

| | | | | |
|---|---|---|---|---|
| **testimony** 12:20 34:7 43:9 53:14 54:8 78:24 102:13,23 146:12 165:24 171:1 190:19 192:19 232:11,16,18 239:18 240:1 | 67:1,10 70:15 74:1,7 74:7 76:10 77:19 80:8 81:22 84:6 85:25 90:6 91:16 92:22 94:5 95:9 97:3 99:21 102:10 104:16 106:24 113:11,21 | 141:17,22,25 142:3 142:3 146:19 176:25 189:13 195:6 196:5 199:12 212:5,7 216:6 225:7 246:1 253:20 259:2 260:12 260:18 261:2 284:11 285:15 | **toolbox** 225:14 **toolkit** 54:19 58:25 210:25 228:22 **tools** 59:21 63:25 119:10 225:14 **top** 17:8,15 18:7,10 56:17 76:18 123:24 179:3 277:7 | 146:21 160:16 186:24 189:9 243:4 253:11 257:4 **tried** 48:11 182:2 **trier** 110:7 183:25 221:9,11 257:9 274:25 283:4 |
| **testing** 128:1 | 114:24 115:13 | **three-day** 151:19 | **topic** 243:24 | **trigger** 241:11 |
| **tests** 126:15 131:11 149:11 152:24 | 119:14 121:17 122:9 123:10,21 126:13 | **throwing** 31:20 32:13 109:9 | **topics** 231:11 268:11 **Torchio** 123:22 124:12 | **truck** 92:1 97:22 **true** 44:7 49:12 72:5,7 |
| **text** 28:18 33:1,22 34:14 35:5,10,20 37:12 95:4 107:16 | 128:21 133:10 136:8 136:22 139:17,20,25 141:10 142:19 147:3 | **thrown** 241:14 **time** 5:10,10,24 21:1,6 22:8 36:9 41:1,14 | **total** 26:10 44:20 107:5,25 **totally** 144:1 204:5 | 98:10,14 108:4 146:17,22,23 147:9 160:16 166:24 |
| **textbook** 76:11 | 147:11,11 148:12 | 42:23 44:9 53:17 | 208:7 232:17 244:22 | 172:16,24 173:5 |
| **textbooks** 76:12 | 149:14 153:3,24 | 68:23 70:3 92:24 | 246:20 | 197:5 249:16,20 |
| **thank** 6:11 8:6 58:13 58:14 200:11 250:3 276:21,21 282:8 283:20 289:1,2,4,5,6 | 157:17 158:19 159:9 163:10 165:9,12,21 165:25 166:16,21 167:19 168:16 169:11 170:17 | 93:2 101:2 104:22 105:12 114:15 119:14 122:17 155:5 157:9 158:20 164:19 166:19,20 167:9 | **track** 41:9 **tracking** 260:23 263:10 **trade** 133:21 139:5 **traded** 12:9 14:5 51:6 | 255:18,19 290:4 **truth** 70:10 158:18 159:15 201:9 203:16 222:20 224:1 235:18 **try** 35:20 54:13 78:23 |
| **Thanks** 288:24 | 176:22 181:19 | 177:4,5 178:13 | 65:10 67:15 70:21 | 91:11 114:10 138:2 |
| **That'd** 44:15 | 183:16 184:3 186:7 | 180:9 182:4 196:3 | 70:24 111:10,17 | 174:8,8 189:23 |
| **then-current** 254:14 | 187:25 192:10 | 196:10 200:3,8 | 121:11 123:11,17 | 196:13,13 210:2 |
| **theories** 91:14 | 196:14 198:11 202:9 | 211:19 212:24 214:9 | 149:4 153:1,9,12 | 215:6,10 277:10,13 |
| **theory** 61:7 95:23 96:12 126:5 184:19 196:18 197:9 208:16 221:4 224:14 265:22 270:19 | 203:15 209:24,24 214:3 215:2,21,21 219:6 220:25 222:6 225:12,19 231:7 237:20 238:1,1 | 214:14 215:23 216:3 217:20 222:21 228:19 235:19 236:20 244:3,16 247:25 249:18 264:7 | 169:15 171:22 177:20 282:6 **traders** 65:21 111:15 113:7 133:20 164:15 246:19 | **trying** 38:9 54:5 71:21 73:1 78:16 81:8 95:14 112:12 148:4 148:7 198:9 204:6 205:13 210:8 211:18 |
| **thing** 28:22 35:1,22 37:6 54:25 82:7 | 239:17 240:21 241:17 245:1 246:8 | 268:11 276:12,14 289:1 | **trades** 87:23 110:12 119:11 137:16 | 217:15 240:25 241:13,14 267:24 |
| 124:4 148:3 155:16 197:8 216:21 217:14 | 250:6,22 253:15 258:4,20,22 259:2 | **times** 42:1 53:9 69:24 70:6,8,9 74:25 118:1 | 156:16,22,24 160:19 265:10 | 282:18 **Tuesday** 83:11 135:17 |
| 231:21 234:3 238:1 | 259:15 263:7 264:24 | 124:22 127:24 | **trading** 36:21 37:1,19 | **turn** 18:6 29:16 38:4 |
| 238:2 247:24 252:25 | 271:5 272:12,12,16 | 165:14 166:25 | 83:8 84:12 87:11 | 97:13 158:16 178:10 |
| 272:7 | 273:1 276:12 279:23 | 172:14 182:4 209:16 | 89:5,5,17 90:13 | 183:2 276:24 |
| **things** 34:5 35:13 | 280:20 281:10 | 223:2 233:13,13 | 122:15 124:5 151:2 | **turned** 6:25 7:1 108:22 |
| 117:14 122:20 | 282:13,17,20 284:6 | 241:15 250:6 251:21 | 154:22 156:15 161:8 | **turning** 282:11 |
| 157:17 162:15 | 284:14,17 285:1,9 | 253:14 280:8 285:6 | 168:22 170:24 | **turnover** 122:3,14 |
| 163:25 171:12 | 286:11 289:18 | **timing** 79:9 80:12 | 180:18 224:25 225:2 | 124:6,14 154:18 |
| 195:13 196:5 199:1 | **Thinking** 62:16 | **titled** 258:17 | 251:8,24 253:7 | 171:9 |
| 210:8 216:2 224:7 | **third** 47:17 79:2,2 | **titles** 35:6 85:9 161:17 | **trained** 53:16 | **turns** 23:3 124:18 |
| 227:9 228:22 229:21 | 83:25 97:17,20,21 | **today** 7:8,23,24 8:14 | **trajectory** 31:19 32:13 | 208:8 |
| 230:4,6,8 255:8 | 125:2 135:7 151:14 | 8:20 14:12,17 16:23 | **trans** 116:3 | **TV** 55:17 |
| 265:13 284:20 | 227:24 277:6,7 | 17:10,18 20:12 30:5 | **transcript** 79:9,20 | **twice** 44:16,18,21 70:4 |
| **think** 8:7,13 10:13,19 | **Thomson** 81:5 | 42:9 44:4 45:13 74:1 | 289:19 290:4 292:3 | **two** 9:9 14:8,15,15 |
| 11:2 12:12 14:19 | **thought** 55:14 89:15 | 75:14 77:22 82:20 | **transcription** 292:12 | 20:25 25:4 27:23 |
| 17:12,25 18:7 19:7 | 172:19 173:4 190:4 | 82:22 83:1 84:16,19 | **transcripts** 78:25 79:5 | 36:17 37:7 41:17 |
| 20:18,20 21:15 | 194:9 199:19 204:23 | 93:17 119:3 132:22 | 79:16 81:11 116:5 | 44:8 45:5 49:13 |
| 22:13,23 23:20 | 217:1 264:16 267:1 | 240:2 274:5 280:8 | **transportation-relat...** | 51:21 52:2 62:12 |
| 24:11,11 25:1,2,2 | 267:2 272:1 274:5 | **today's** 5:9,21 8:24 | 59:1 | 65:5 67:12 74:14 |
| 26:6 29:25 31:3,6 | 282:24 | 9:1 130:18 | **treasurer** 42:15 | 79:20 80:23 81:24 |
| 37:5 38:21,21,25 | **thousand** 134:10 | **told** 35:19 93:21 | 121:24 | 87:1 88:5 89:6 90:13 |
| 40:6 42:24 44:11,19 | **three** 9:13 10:17 16:15 | 164:19 250:6 279:7 | **treated** 219:5 | 119:1 129:21 132:20 |
| 45:1,4,8 46:19 49:12 | 16:15 37:7 46:19 | **Tom** 124:2 | **trends** 130:22 199:4 | 135:18 155:19 |
| 52:12 54:20 56:10 | 67:21 80:23 124:22 | **tool** 217:8,8 | **trial** 107:9 108:4 | 160:20 162:14 |
| 56:14 60:3 62:12 | 138:16 139:2,8 | | | 163:25 164:7 171:17 |
| 63:10 64:6,15,19 | | | | |

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 321

192:22 216:5 224:23
231:10 247:10,22,23
249:10 250:12,16
279:11,13
**two-day** 133:13
**two-thirds** 233:19,22
**type** 25:19 35:1 47:24
128:4,19 136:22
140:3 174:25 184:15
197:17,22 198:4
200:2 201:23 204:4
216:15 242:9 247:12
250:13 255:15
256:11
**types** 13:12 20:11
22:14 104:10,11
117:14,14 123:22
132:15 186:18 223:9
226:15 246:20
279:13
**typewriting** 290:7
**typically** 111:6 277:10
277:13

_____

**U**

**U** 3:1
**Uh-huh** 131:7 230:14
**ultra** 156:25
**unacceptable** 189:1
**unanticipated** 112:7
261:21
**unbelievable** 54:20
**unclear** 100:12 284:13
**uncomfortable** 242:12
**underlying** 147:9
**understand** 7:9 8:11
11:21 30:5 33:24
38:8 50:13 54:5
71:21 72:12 73:5
74:17 77:12 84:22
86:14,19 89:21 91:5
94:3 95:15 101:10
106:10 112:13
118:20 126:13
136:14 142:21 145:5
145:11,16 148:5,9
149:21 160:4 164:21
168:2 169:19 170:17
172:2,12,17,18,25
184:19 185:11
190:20,21 191:24
196:6 198:9 205:13
220:14,25 228:5
231:1,7 238:10
243:1 244:7,20,22
245:19 264:1 280:3
283:13 284:25

285:12,13,14 287:21
**understanding** 12:22
13:20 41:24 54:9
69:3,6,14 70:12
91:17,20,24 92:4,13
94:13,21 96:11,12
98:5 99:1,6 100:6,16
100:21,24 101:1
102:11,21,25 103:10
105:10 107:24 108:2
131:4 149:16 157:19
159:22 162:10
173:18,22
**understands** 94:13
233:15
**understated** 101:21
269:10
**understood** 12:1 13:4
31:13 60:9 67:24
68:12 75:17 76:18
77:2 80:18,18 82:19
83:12 89:2 95:8
99:22 100:3 102:15
104:15 159:19
191:21 238:7
**undertaken** 257:16
**unequal** 155:15
**unfold** 230:8
**United** 1:1 276:17
**universal** 27:20 29:24
194:11 288:6,22
**university** 18:22 19:1
41:3 53:16 58:24
66:8 134:4
**unpack** 112:15
**unreasonable** 184:3,5
187:15
**unrelated** 204:5
213:20 236:17
272:18
**unreliable** 184:3,5,8
187:15 188:2,6,25
190:3,12,17 191:6,7
191:8 192:24,25
193:1 202:6
**unsuccessful** 50:9
**update** 154:10 157:8
**updated** 15:16,19
155:24
**upset** 27:22 37:6
**up-to-date** 28:17
**use** 7:1 30:11 38:22
51:20 54:21 57:14
113:7 114:9,9
124:13 132:20 133:9
136:19 141:13
148:23 171:15

177:24 198:22
199:16 208:9 210:2
210:21,25 213:24
215:9 217:3,5,10
219:18 226:16 227:8
227:9,13,13,15,20
227:25 228:1,21
230:22,23 235:3,7
235:10,24 237:12
238:3,9 241:12
244:25 255:14 256:9
256:10
**useful** 126:18 232:14
258:1
**uses** 94:22 166:7
172:23 251:2
**usually** 139:16,22
208:20,23 285:4
**utilize** 27:5 28:17 29:7
57:23 59:15,21
88:23 112:19 119:9
163:15,18 201:10
209:11 210:14
226:14
**utilized** 27:15 58:5
63:10 81:16 88:19
109:22 119:7 163:11
174:18 178:4 180:10
180:17 193:23
197:25 208:15 211:7
211:12 212:18
213:17 217:24
218:15,24 220:12
229:16 232:6,6
239:3 240:16 243:17
252:19 257:12
**utilizing** 67:22 163:16
191:16
**U.S** 24:5 56:19 61:14
64:25 65:9 80:3,4
183:11 295:10

_____

**V**

**v** 1:8 3:7 48:7 290:2
295:12
**Vague** 21:7 24:25
92:21 105:14 108:15
113:1 244:5 261:17
**valuation** 159:1
**value** 69:10 91:18 92:1
92:2,14,15,15 93:3,8
93:15 94:7 96:6,14
98:1,15 100:7
102:12 103:9 104:3
104:19 105:4,11,19
106:20 107:7 109:9
112:23 159:4 166:25

172:8 173:11,22,23
174:11 184:10
227:25 228:19,25
230:22 233:25
234:17 235:1 243:7
246:2 254:17 262:7
271:21 272:15,16
**values** 92:5 94:23
95:25 96:19 97:22
98:20 99:2,7,25
100:17 101:12
105:21 106:7 254:14
269:5,9 270:8,17
271:3,7
**valuing** 236:10
**variety** 116:11
**various** 29:3 35:6
36:22 39:3,13 70:3
75:19 81:14 86:9
92:8 186:17 225:13
232:5 237:12
**vehicle** 93:4,17 94:9
102:20 103:8 104:3
104:19,21 158:25
173:12,23,25 174:13
174:14,24 254:15
269:7,20 270:2
**Venator** 24:10
**venturing** 64:8
**versus** 5:8 47:18
100:1 127:2,9
183:11 259:16
274:18 280:6 288:3
**VI** 197:18 216:16,25
254:12
**victory** 48:7
**video** 1:16 5:11
289:14
**Videographer** 3:8 5:5
119:24 121:3 178:20
178:23 222:8,11
268:21,25 286:1,4
289:7,9
**view** 94:4 164:25
165:7 166:4 168:3
170:18 186:7,10
190:10 192:11 202:1
**views** 112:23 166:20
**VII** 30:6,8,9 58:3,9
73:16 178:11 179:2
182:8 219:17 240:16
241:20 256:15 282:9
282:12 286:21
**violation** 29:18 194:12
195:5 196:22
**violations** 71:3,11,23
72:1,15 294:16

**Virginia** 5:19 290:22
290:23
**virtual** 29:21,24 32:6
32:15,16 73:17
128:3 179:16 182:13
194:15
**virtually** 128:3 194:11
288:5,6
**visible** 8:9
**VI(B)(1)** 198:1,2
**volatility** 164:17
**Volkswagen** 24:6
**volume** 5:6 36:23
124:5 165:14 169:22
**voluminous** 25:23
**Vrakas** 61:14 183:11
**Vrakas/U.S** 64:15
288:1

_____

**W**

**Wachtell** 1:20 2:19
37:24 42:4 54:10,25
**Wait** 69:1 195:21
264:3 276:25
**walk** 23:23
**Wallace** 183:17 288:3
**want** 7:13 11:16 29:5
33:2 45:10 50:14
52:13,17 67:1,3
72:11 75:14 77:12
83:24 91:4,12,13
93:10,12 97:24
104:9 110:19 112:15
114:21 117:13 119:2
119:15 131:3 132:9
132:17 134:16
137:23 148:4,6
152:18 154:13,16
155:1,14 156:25
157:13 161:7 162:23
163:5 165:20 178:18
183:6 195:18,19
199:6 214:10 215:6
220:24 229:8 240:18
241:16 255:7 260:22
264:2 268:12 270:5
270:6 278:21 281:24
282:11,20 284:17
289:16
**wanted** 17:12,16 19:1
19:4 34:6 134:9
**wants** 126:5 268:16
**wasn't** 46:21 117:4
195:18
**watch** 7:3
**watching** 58:19,20
**way** 16:25 23:21 26:13

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 322

88:23 93:8 95:16 103:2 108:25 129:2 133:5 137:15 140:16 140:18 141:20 164:22 165:1,8 168:11 169:15 173:9 174:9 189:23 191:12 201:11 206:6,11 208:2 210:14 215:20 217:22 218:25 219:5 219:5 221:2,23 222:3 233:24 236:22 241:17 246:21 248:7 262:17,20 265:5 272:9,20 274:3 283:17 284:21
**ways** 18:1 57:18,19 92:8 186:16 237:23
**wear** 7:2,3
**Wednesday** 83:11
**week** 128:25,25 129:21 287:11,11
**weekly** 124:5,6 133:14 133:18
**weighted** 103:3
**Wells** 286:9,22 287:7 287:17,23,25 288:14 295:19
**well-developed** 14:5 51:6 52:6,9,15 67:20 78:10,18 82:1,11 90:3,25 93:25 111:16,19 116:14 119:6,11 122:25 123:12 169:24 171:7 171:23
**went** 13:3 21:6 25:11 44:6 46:21 194:9 204:18 212:2 237:2 252:10
**weren't** 65:12 123:5 153:16 216:3 256:5
**West** 2:20 288:2
**we'll** 10:9 21:25 30:4 33:21 38:20,21,22 60:14 91:4 114:25 213:12,13 237:6 289:19
**we're** 6:18,20 7:4 8:8 15:10 17:17 19:7 38:20 91:10 92:11 102:15 119:25 124:3 131:8 147:3 178:23 193:15 196:12 218:2 219:4 247:7,19,19 247:22,23 268:23 271:2 286:1

**we've** 67:18 141:20 169:21 227:14 260:6 261:3 263:2,3 286:19
**whatsoever** 109:6
**wheels** 42:19
**WHEREOF** 290:12
**white** 124:16 155:20 257:23
**wholly** 91:1
**WI** 291:25
**wide** 122:17
**widely** 242:8,8
**widespread** 154:19
**Wierzbowski** 2:5 6:4 9:22 12:4,19 13:8 14:11 15:2,18,25 16:6,10 17:1 21:7,20 22:1 23:7 24:25 26:20 27:12 28:10 28:25 29:14 30:16 30:25 31:17 32:2 33:10,23 36:3 37:4 37:21 38:15 40:5 43:10 45:9,23 47:7 49:7,18 50:5,17 51:3 53:1,13 54:7 55:6 57:21 58:17 60:1 64:3,10,23 69:5,15 71:14 72:19 74:6,22 75:9 76:6 78:7 79:3 79:17 80:1 81:21 82:23 84:14,21 85:20 86:12,23 87:12 88:6 89:7,19 90:15 91:22 92:20 93:18 94:10,15,24 95:20 96:1 98:7,17 99:4,13 100:9,19 101:3,15 102:22 103:12 104:24 105:13 107:13 108:14 109:1 110:4 112:25 113:19 114:13 117:6 118:4 118:14 119:19,21 121:20 127:5 128:16 129:12 133:24 139:23 140:20 141:6 142:13 143:7,17 144:2 145:4,15 146:11 147:10 148:18 149:19 151:23 153:18 156:18 157:23 160:2 160:13 163:9,22 165:3 166:10 167:7

168:6 169:17 170:25 173:1,14 174:15 175:3 176:2 177:3 177:17 181:13 182:10 183:1 185:15 185:20 186:13 190:18 192:18 194:5 195:10 203:21 210:12 211:21 212:23 213:9,11 214:24 216:19 219:20 221:5,25 222:7 225:9,21 229:5 231:16 232:15 234:6,19 235:6 238:20 239:11 244:5 244:18 245:4,17 248:17,20 249:6,24 252:4 255:21 261:16 265:8 266:1 267:8 268:14 269:24 270:11,22 271:11 273:5,17 278:10 279:1 280:2 284:1 284:24 286:25 287:20 288:17,24 289:17,18,22
**Wilfred** 2:17
**William** 183:17 288:2
**willing** 48:9,20 91:10
**window** 133:2 151:20
**windows** 128:23 152:3
**Winter** 1:19 2:16 4:9 6:3,14,16 9:25 11:1 12:5 13:1,22 14:18 15:5,21 16:3,8,18 17:6 21:13,23 22:3 23:9 25:5 26:23 28:4 28:20 29:9 30:3,22 31:2,22 32:20 33:18 34:1 36:19 37:14 38:7,19 40:8 43:17 45:12 46:3,18 47:10 49:11,22 50:12,20 51:12 53:7,25 55:3,8 58:12,21 60:8 62:15 64:5,14 66:24 69:12 69:19 71:20 72:25 73:25 74:15 75:5,16 76:17 78:21 79:14 79:23 80:5 82:18 83:3 84:18,24 85:22 86:17 87:2 88:1 89:1 89:13 90:5,20 92:10 93:1 94:2,12,16 95:7 95:21 96:10,20 97:1

98:11,25 99:9,17 100:13,23 101:9 102:9 103:7,21,22 105:9 106:3 107:21 108:21 109:23 110:17 113:4 114:17 114:20 117:24 118:7 119:13 121:6 123:13 127:10 129:6,25 134:22 140:14 141:2 141:16 142:17 143:12,20 144:3 145:7,25 147:2,16 149:13 150:8 151:24 155:9 157:12,24 158:6,13 160:7 161:3 163:14 164:3 165:6 167:1,12 168:19 170:16 171:24 173:6,16,24 174:20 175:21 176:21 177:14 178:9 178:12,18,25 181:16 182:19 183:4 185:16 186:6 187:22 192:9 193:4 194:24 195:12 195:14 196:11 203:24 210:19 212:20 213:3,10,12 213:14 215:7 217:12 218:1 220:2 221:20 222:1,6,13 225:17 225:23 230:10 232:9 232:23 234:11,21 235:12 239:5,13,16 244:10,24 245:8 248:13,19,22,24 249:15,19,25 252:8 253:2 256:18 259:23 260:4 261:23 262:9 265:19 266:25 267:9 268:16,18 269:2 270:3,13,25 271:19 273:9 275:6,14,20 278:23 279:2,3 280:25 284:8 285:20 286:6,18 287:2 288:9,19,23 289:2,4
**wish** 238:2
**witness** 4:3 5:16 9:23 12:21 13:10 14:12 15:3,19 16:1,7,11 17:2 21:8,21 22:2,25 23:5,8,12 25:1 26:21 27:13 28:11 29:1,15 30:17 31:1,18 32:3 33:11,24 36:4 37:5

37:22 38:16 40:6 43:11 45:10,24 46:15 47:8 49:8,19 50:6,18 51:4 53:2,15 54:9 55:7 57:22 58:18 60:2 61:20 64:4,12,25 69:6,16 71:16 72:20 73:24 74:7,24 75:11 76:7 78:8 79:4,18 80:2 81:22 82:24 84:16 84:22 85:21 86:14 86:24 87:14 88:7 89:8,21 90:17 91:23 92:22 93:20 95:1 96:3 98:9,19 99:6,15 100:11,21 101:5,16 102:24 105:2,15 107:15 108:16 109:3 110:6 113:2,21 117:8 118:6,16 119:20,23 121:21 127:6 128:17 129:13 133:25 139:24 140:21 141:7 142:15 143:9,19 145:5,16 146:13 147:11 148:19 149:21 153:19 156:20 160:4 160:14 163:10,24 165:5 166:12 167:10 168:8 169:19 171:2 173:3,19 174:17 175:5 176:4 177:4 177:18 178:16,19 181:14 182:12 183:2 185:21 186:14 190:20 192:20 194:6 195:13 203:22 210:13 211:23 213:1 213:5,7 215:1 216:20 217:21 219:22 221:6 225:10 229:6 231:18 232:17 234:8 235:7 238:21 239:14 244:6,19 245:6,18 249:7 252:6 255:22 261:18 262:4 265:9 266:3 268:15,16,17 270:1 270:24 271:12 273:6 273:19 278:12 280:3 284:3,25 285:25 287:1,21 288:18 289:4,8 290:12 292:5
**witnesses** 243:6

State of Alaska
v. Ryder System
[FINAL]
November 30, 2022
Michael Hartzmark, Ph.D.

Page 323

**women** 250:11
**wondering** 114:15
212:23 272:3
**word** 51:21 112:16
148:8 175:6 182:3
216:24 219:19
230:22,23 241:7,11
283:13
**words** 70:20 166:17
187:25 188:5 194:8
204:7 217:2
**work** 19:16 20:24
21:16 25:19 36:1
40:12,17 42:4,5 43:2
43:5,15 44:5,23
48:20,23,24,25
205:15
**worked** 28:24 37:24
48:5
**working** 10:10 24:18
26:9 44:20 97:8
287:13
**works** 10:11 22:15
268:14
**worksheet** 191:10
**world** 37:23 53:18
58:25 104:2,7 110:7
111:19 207:20
211:17 238:14
271:13 273:22
**worry** 170:22
**wouldn't** 31:5,25 34:4
37:18 84:19 85:1
117:4 153:13 162:9
184:16 229:1
**write** 30:18 32:11
45:25 224:5
**writes** 228:18
**writing** 12:16 27:10
31:4,15 32:18
134:17
**written** 25:3,4 52:4
84:23 136:4 238:3
**wrong** 130:10 155:2
168:4,5,12 170:4
188:13,17 195:12
267:10
**wrote** 11:25 12:7 13:4
26:17 71:22 172:11
198:3 251:6

___
**X**
___
**X** 228:19 251:3,7,21
252:24 253:14 294:1
294:1 295:1,1

___
**Y**
___

**Y** 251:1,2,4,10,12,20
251:25 252:2
**yeah** 7:16 10:11 11:21
13:10 17:19 18:2,10
23:17 26:14 31:7,18
33:11 34:2 35:8 38:8
40:16 43:3,21 45:24
47:3 50:21 55:9
56:13 57:9 64:12,15
64:25 67:4 68:21,22
74:24 75:11 76:10
77:13 78:8 80:6,23
81:22 82:12,24 83:9
83:24 84:1,16 85:10
85:10,23 86:14 87:3
87:6,14 90:6,17 91:4
91:6 93:20 95:14
96:3 97:9 98:9 99:6
99:15,18 100:14,14
100:21 101:14
102:14,15,24 105:2
107:3 109:3 110:6
113:2,6 114:23
115:19 116:2 117:8
117:20 125:22
128:12 133:5 135:7
140:24 142:18 145:8
148:5,11 151:8
152:18 158:4 160:4
161:11,16,19 166:12
169:6 172:12 181:2
184:15 186:15 198:1
202:15 203:15,16
210:13 211:23
224:19 227:8 229:13
231:25 234:8 244:6
244:11 247:18,24
249:7 251:22 252:6
253:22 254:4 255:1
255:3 256:20 260:24
261:18 262:5,10,25
263:15,17 266:3
267:13 268:15 271:1
271:23,24 272:16,17
275:11 276:4,13
277:8 278:3 284:3
284:10 287:3,5,10
287:12
**year** 44:6,6 124:19,21
159:1 167:11 169:3
**years** 21:2,3 22:4,5
23:13 24:15 39:11
39:16 41:17 42:14
44:12,16,19,20 46:5
46:23 48:2,5 54:21
56:9 57:1 76:8 84:7
247:22 250:12,16

252:21
**year-and-a-half** 276:6
**yesterday** 132:22
**yesterday's** 130:18
**yield** 241:4
**York** 2:11,11,21,21 3:5
3:5 5:13,13 111:18
122:15 123:17 124:8
139:6
**young** 63:19
**younger** 118:19

___
**Z**
___

**zero** 109:25 110:10
184:8,10 187:21
189:12 190:5,14
193:3,3 242:13
253:13,14,14 274:24
**zeros** 191:8
**Zoom** 6:22 7:6,19 9:5

___
**$**
___

**$1** 107:6 108:1 216:11
**$1.3** 189:12
**$1.65** 85:6
**$10** 216:12 233:9,10
236:21,21
**$10.4** 159:2
**$100** 215:14,18 224:5
224:12
**$2.5** 262:18
**$3** 237:4,6,7,8
**$38** 262:6 266:11
**$38.45** 265:16
**$4** 237:6,8
**$4.80** 159:6
**$5.10** 159:6
**$5.28** 159:7
**$5.58** 159:7
**$55** 262:6
**$7.6** 159:3
**$840** 172:9
**$844** 106:21
**$9** 236:15 237:2
**$93** 262:5

___
**0**
___

**09** 134:7

___
**1**
___

**1** 5:5,6 7:18 10:23 11:8
11:12,16 14:23 67:7
67:8,9 70:19 75:7,12
83:7,9 87:11 97:21
134:25 216:4 259:20
259:21,22 294:5
**1,131** 127:22

**1,150** 132:21 154:17
**1-800-825-3341** 1:25
3:6
**1-800-825-9055**
291:19
**1:20-cv-22109-AMC**
1:13
**10** 14:16 70:17,18
97:13,15 111:2
230:2 233:8,10
294:5
**10(b)** 28:15 29:18
32:18 49:10 50:1,24
51:16 52:2,22 56:8
57:5,20 58:11 71:3
71:11,23 72:1,15,23
73:11,19 74:2,12,20
182:23 185:25
194:13 195:5 196:23
286:9
**10(b)(5)** 154:1 179:16
184:2 242:22
**10-K** 116:12
**10-Q** 116:12
**10/5/20** 294:17
**100** 199:11 200:25
224:6
**10011** 3:5
**10019** 2:21
**10020** 2:11
**101** 285:6
**107144** 290:23
**11** 37:8 49:10 75:18
139:22 152:24
170:10 204:20
264:20,21 276:24
277:3
**11:00** 139:25
**112** 254:1
**1150** 37:9 130:20
**1150-plus** 130:19
**12** 37:8 49:10 111:24
111:25 127:24 155:1
**12-page** 287:4
**12:06** 119:25 120:2
**12:45** 119:17
**12:47** 224:21,22,24
**12:49** 120:4 121:2,4
**123** 168:21
**1251** 2:10
**13** 33:3 37:8 68:8
83:21 84:1 86:11,22
87:7 153:3
**13th** 68:1 69:8 105:23
106:7 107:1,4,11,17
107:18,23 108:11,23
109:19 110:10

136:15 137:5 138:18
151:14,16 153:22
156:3,6,9 157:6
188:14,23 200:21
**13:19** 144:11
**135** 158:16
**14** 97:12 142:5 153:3
260:19,25 261:1,4,7
**14th** 135:17 137:5
151:17 156:2,6
188:14 200:21
**143** 167:4
**15** 128:24 212:10
213:4,13 226:12
**150** 26:16
**158** 294:15
**16** 264:13,17 286:20
**16th** 168:22,23
**17** 127:20 140:25
142:1,1,2 153:20,22
154:24 259:6 260:14
275:15
**17th** 152:22
**18** 81:3 153:3 261:24
262:23,24
**18th** 76:23 81:1
135:17 137:6 151:17
152:22 153:6 155:3
156:2,6 188:14
200:21
**19** 88:19 106:18
163:12 171:20
259:24
**1970s** 118:21
**1974** 18:25
**1976** 167:14,15,20
**1978** 18:24
**1980s** 29:2 252:20
**1981** 18:16,21 19:10
19:11
**1984** 41:6,7
**1988** 41:11
**1991** 167:18
**1998** 167:19

___
**2**
___

**2** 11:12 14:23 19:12
36:23 71:1 72:21
73:6 75:7,13 82:4,4
87:11 96:21,23
97:24 106:13 107:2
107:3 135:3,5
146:14 158:7 169:22
204:21 216:5 224:25
253:18,21,22 282:10
282:16 294:9
**2nd** 161:8,12,13

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 324

162:12
**2,000** 218:22,22
**2.5** 262:7
**2:02** 178:17
**2:03** 178:21
**2:10** 178:18,19
**2:13** 178:24
**20** 44:20 60:20,24 67:2
  127:20 140:24,25,25
  153:20,22 154:24
  161:19 213:4 247:7
  247:7,7,8,8 258:22
  259:6 260:12
**20th** 156:4
**2004** 43:16 44:1,4 63:2
  119:8
**2008** 44:2 48:18
  128:20 134:7
**2011** 269:22 270:9,17
  270:21 272:5 273:13
**2013** 21:9
**2015** 68:1,7 69:8 76:23
  80:25 81:3 85:5,15
  86:20 87:11 187:10
  187:19 269:22 270:9
  270:18,21 272:5
  273:13 274:9
**2016** 38:3 161:18
**2017** 161:8,13 162:12
  169:3
**2018** 168:22,23
**2019** 105:24,24 106:18
  106:21 110:9 140:17
  140:21 145:1 148:14
  153:21,21 156:8,9
  157:5 158:22,24
  159:5 162:13 187:10
  187:12
**202** 292:22
**2020** 68:2,8 69:8 76:23
  81:1,4 105:23 106:7
  107:1,4,11,23
  108:11,23 109:19
  110:10 135:17,18
  136:15 153:22 156:9
  157:6 187:12,19
  188:23
**2021** 275:22 276:18
**2022** 1:18 5:4,9 11:24
  290:14
**2024-2025** 106:21
**2025** 290:17
**21st** 276:17
**212** 2:12,22
**22** 97:2
**223** 36:13 87:7,9 161:9
**23** 68:1

**23rd** 11:23 68:7 69:8
  76:23 80:25 81:3
  85:5,11,15 86:20
  87:11 136:15
**23%** 107:7
**24** 124:4
**24-hour** 128:12
**26** 263:19
**260** 294:20
**262** 295:5
**268** 254:22,25 255:2
**275** 295:10
**28** 276:23 281:25
**28th** 157:4
**28-page** 276:3
**286** 295:18
**29th** 105:24,24 110:9
  138:17 148:14,16
  149:4,5,7,18,23,25
  150:5,15,20,22
  153:21 156:8 172:1
  172:6
**290** 4:12
**292** 4:14
**294** 4:16
**299** 253:24,25

---
**3**

**3** 35:1 36:23 96:20
  158:7,10 165:12
  216:5 225:1 253:16
  253:21 294:15
**3rd** 38:3
**3.57** 85:13 89:22
**3:10** 222:9
**3:15** 225:2
**3:24** 222:12
**30** 1:18 5:4 158:22
  291:12
**30th** 5:9 138:17,21,22
  140:17,21 145:1,11
  145:12 148:16 149:7
  149:18 150:1,4,14
  150:16,23 153:20,21
  156:8 157:3,15
  160:9 162:13 290:13
**300** 36:13
**306** 16:14 33:13
**307** 198:17
**31** 125:4,15 263:7,19
  263:21 264:4,12,13
  264:17,18 284:12
  290:17
**36** 45:5 130:4
**387** 8:5 11:12 16:12
  67:9 70:18

---
**4**

**4** 23:21 35:4 44:11,17
  46:17 81:6 183:3,5
  260:1 294:20
**4:22** 268:23
**4:30** 268:17
**4:35** 269:1
**4:57** 286:2
**40** 39:16 54:21 65:21
  76:8 252:21
**40-year** 58:24 193:8
  242:3
**403-1000** 2:22
**41** 39:11 110:25 179:2
  179:4 193:22
**45** 29:17 110:25 179:3
  193:22

---
**5**

**5** 35:7 44:17 46:17
  47:17 88:22 108:19
  141:9,11,13 142:4,4
  142:7 261:1,2 262:1
  295:5
**5%** 127:19
**5/12/22** 294:12
**5/9/2019** 263:12
**5:02** 285:24
**5:04** 286:5
**5:08** 289:11
**5:09** 289:25
**50** 45:2,6,7,18 51:23
**51** 2:20
**52nd** 2:20
**542** 291:24
**54853** 291:25
**55** 262:11
**554-1400** 2:12
**56** 126:17,19

---
**6**

**6** 4:9 35:7 81:7 183:8
  275:17 295:10
**6.3** 124:22
**6.7** 127:21
**6/21/21** 295:15
**66** 259:1
**67** 127:16

---
**7**

**7** 61:14 71:2 164:1,24
  286:15 295:18
**7.03** 161:24
**70** 201:8
**71** 130:5 131:5 161:8
  161:10

**74** 3:4
**75** 18:8
**75th** 124:7
**76** 18:7,10,10 127:22
**79** 23:22 130:5

---
**8**

**8** 61:9 139:21 276:24
  277:4,9
**80** 137:9 246:16
**80s** 62:22
**81** 15:11 17:22 18:2
  60:12
**84** 16:12,13
**85** 153:22 179:11
  180:22 181:24 194:2
  259:6
**85%** 127:19
**86** 29:17 30:8
**86.03** 38:6
**87** 179:22
**89** 250:20

---
**9**

**9** 204:19 212:8
**9.27** 169:4,7,13 170:2
**9/22/22** 294:6
**9:36** 5:3
**9:37** 5:10
**90** 21:10,11 197:14
  200:9,12 209:3
**90s** 21:9
**90th** 124:7
**90-5** 11:22
**91** 202:8
**95** 21:3,11
**95-plus** 22:9
**96** 294:9
**97** 222:15 237:23
**98** 180:22 181:24
  194:3
**99** 21:3

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com