# EXHIBIT 43

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2016

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from       to

**Commission File Number: 1-4364**



# RYDER SYSTEM, INC.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Florida** | **59-0739250** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **11690 N.W. 105th Street,**<br>**Miami, Florida 33178** | **(305) 500-3726** |
| *(Address of principal executive offices, including zip code)* | *(Telephone number, including area code)* |

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of exchange on which registered |
|---|---|
| **Ryder System, Inc. Common Stock ($0.50 par value)** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  YES ☑  NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  YES ☐  NO ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  YES ☑  NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  YES ☑  NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑      Accelerated filer ☐      Non-accelerated filer ☐      Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  YES ☐  NO ☑

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant computed by reference to the price at which the common equity was sold at June 30, 2016 was $3,202,591,552. The number of shares of Ryder System, Inc. Common Stock ($0.50 par value per share) outstanding at January 31, 2017 was 53,464,988.

| Documents Incorporated by Reference into this Report | Part of Form 10-K into which Document is Incorporated |
|---|---|
| **Ryder System, Inc. 2016 Proxy Statement** | **Part III** |

**RYDER SYSTEM, INC.**
**FORM 10-K ANNUAL REPORT**

**TABLE OF CONTENTS**

**Page No.**

PART I

| | | |
|---|---|---|
| ITEM 1 | Business | 1 |
| ITEM 1A | Risk Factors | 12 |
| ITEM 1B | Unresolved Staff Comments | 20 |
| ITEM 2 | Properties | 20 |
| ITEM 3 | Legal Proceedings | 20 |
| ITEM 4 | Mine Safety Disclosures | 20 |

PART II

| | | |
|---|---|---|
| ITEM 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 21 |
| ITEM 6 | Selected Financial Data | 24 |
| ITEM 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| ITEM 7A | Quantitative and Qualitative Disclosures About Market Risk | 64 |
| ITEM 8 | Financial Statements and Supplementary Data | 66 |
| ITEM 9 | Changes In and Disagreements with Accountants on Accounting and Financial Disclosure | 121 |
| ITEM 9A | Controls and Procedures | 121 |
| ITEM 9B | Other Information | 121 |

PART III

| | | |
|---|---|---|
| ITEM 10 | Directors, Executive Officers and Corporate Governance | 121 |
| ITEM 11 | Executive Compensation | 121 |
| ITEM 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 122 |
| ITEM 13 | Certain Relationships and Related Transactions, and Director Independence | 122 |
| ITEM 14 | Principal Accountant Fees and Services | 122 |

PART IV

| | | |
|---|---|---|
| ITEM 15 | Exhibits and Financial Statement Schedules | 123 |
| | Exhibit Index | 124 |

| | |
|---|---|
| SIGNATURES | 128 |

[This page intentionally left blank]

**PART I**

**ITEM 1. BUSINESS**

**OVERVIEW**

Ryder System, Inc. (Ryder) is a global leader in transportation and supply chain management solutions. Our operating segments are aggregated into reportable business segments based upon similar economic characteristics, products, services, customers and delivery methods. We are reporting our financial performance based on three business segments: (1) Fleet Management Solutions (FMS), which provides full service leasing, commercial rental, contract maintenance, and contract-related maintenance of trucks, tractors and trailers to customers principally in the U.S., Canada and the U.K.; (2) DTS, which provides vehicles and drivers as part of a dedicated transportation solution in the U.S.; and (3) SCS, which provides comprehensive supply chain solutions including distribution and transportation services in North America and Asia. Dedicated transportation services provided as part of an integrated, multi-service, supply chain solution to SCS customers are reported in the SCS business segment.

In May of 2016, we expanded our full service lease product line to provide lease customers flexibility, choice and control in fleet management.  Therefore, we have renamed the lease product to ChoiceLease. Our ChoiceLease product line is a scalable lease model, which allows customers to select the terms of their lease alongside the level of maintenance they prefer, from full service or total bumper-to-bumper coverage to on demand or pay-as-you-go maintenance.  We also renamed our contract maintenance product to SelectCare.  Beginning in 2017, FMS will report using these new product names.  In addition, the historical Contract-Related Maintenance product will be included in SelectCare.

For financial information and other information relating to each of our business segments and about our geographic areas, see Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," of this report and Note 27, "Segment Reporting," in the Notes to Consolidated Financial Statements.

**MISSION AND STRATEGY**

Ryder's mission is to provide innovative fleet management and supply chain solutions that are reliable, safe and efficient, enabling our customers to deliver on their promises.  We seek to deliver valuable solutions that will compel customers to outsource their fleet management and supply chain needs to us. Our strategy is to grow our fleet management and supply chain outsourcing services by targeting private fleets not currently outsourcing their fleet-related services (FMS and DTS) and key industries (SCS) with innovative solutions, operational excellence, best in class talent and information technology. This strategy is supported by:

- offering innovative products, solutions and support services that will create and strengthen customer relationships;
- delivering operational excellence through continuous productivity and process improvements;
- attracting, developing and retaining the best talent
- deploying technology that will enable growth while improving operational efficiencies.

1

## INDUSTRY AND OPERATIONS

---
### Fleet Management Solutions
---

### Value Proposition

Through our FMS business, we provide our customers with a variety of fleet solutions that are designed to improve their competitive position. By outsourcing these services to us, our customers can focus on their core business, improve their efficiency and productivity, and lower their costs. Our FMS product offering is comprised of longer-term full service leasing as well as leasing with flexible maintenance options; shorter-term commercial truck rental; contract maintenance services; flexible maintenance services; and value-added fleet support services such as insurance, vehicle administration and fuel services. In addition, we provide our customers the ability to purchase a large selection of used trucks, tractors and trailers through our used vehicle sales program.

### Market Trends

The U.S. commercial fleet market is estimated to include 8.2 million vehicles[1] of which 4.2 million vehicles are with privately held companies, 1.5 million vehicles[2] are with for-hire carriers, 0.5 million vehicles are leased from banks or other financial institutions and 0.8 million vehicles are in the lease and rental market.  The 4.2 million vehicles privately owned by companies provide all or a portion of the transportation services for themselves rather than outsourcing those services to third parties such as Ryder.  Several trends have been increasing the need for outsourcing: increased demand for efficiency and reliability; increased complexity and cost of buying and maintaining vehicles including technology, diagnostics, and training; labor issues including a shortage of qualified truck drivers and mechanics; as well as increased regulation and enforcement of safety requirements.  Because of these trends, we believe the privately held fleets and the for-hire carriers will increasingly decide to outsource.  Ryder also targets customers who are already outsourcing with other providers.

Similar trends apply to outsourcing in Canada, and the Canadian commercial fleet is estimated at 500,000 vehicles, of which approximately 17,000 are in the lease and rental market[3]. In the U.K., the commercial rental and lease market is estimated at 225,000 units [4]. The total lease and rental market in Ryder's major markets totals over 1 million units. However, due to general trends and the trends in market sub-segments described above, combined with our success in converting owners to outsourcing, the total market potential for Ryder is significantly higher.

Over the last several years, many key trends have been reshaping the transportation industry. We strongly believe these trends increase the value of our product offering. Because of increased demand for efficiency and reliability, companies that own and manage their own fleet of vehicles have put greater emphasis on the quality of their preventive maintenance and safety programs. The maintenance and operation of commercial vehicles has become more complicated and expensive, requiring companies to spend a significant amount of time and money to keep up with new technology, diagnostics, retooling and training. Increased regulation and active enforcement efforts by federal and state governments require more stringent and costly operational processes and oversight. Fluctuating energy prices and alternative fuel technologies make it difficult for businesses to predict and manage fleet costs.

### Operations

For the year ended December 31, 2016, our global FMS business accounted for 61% of our consolidated revenue.

*U.S.* Ryder was founded in the U.S. in 1933. Our FMS customers in the U.S. range from small businesses to large national enterprises operating in a wide variety of industries, the most significant of which are food and beverage, transportation and warehousing, housing, business and personal services, and industrial. At December 31, 2016, we had 529 operating locations, excluding ancillary storage locations, in 50 states and Puerto Rico. A location consists of a maintenance facility or "shop".  Our maintenance facilities typically include a shop for preventive maintenance and repairs, a service island for fueling, safety inspections and preliminary maintenance checks, offices for sales and other personnel, and in many cases, a commercial rental vehicle counter. We also operate on-site at 167 customer locations, which primarily provide vehicle maintenance.

*Canada.* We have been operating in Canada for over 50 years. At December 31, 2016, we had 36 operating locations throughout 9 Canadian provinces. We also operated 14 maintenance facilities on-site at customer properties in Canada.

*Europe.* We began operating in the U.K. in 1971. At December 31, 2016, we had 63 operating locations primarily throughout the U.K. We also managed a network of 453 independent maintenance facilities in the U.K. to serve our customers when it is more effective than providing the service in a Ryder location. In addition to our typical FMS operations, we supply and manage vehicles, equipment and personnel for military organizations in the U.K. and Germany.

(1)    *U.S. Fleet as of June 2016, Class 3-8, IHS Markit Ltd. (formerly RL Polk)*
(2)    *U.S. Fleet as of June 2016, Class 3-8, IHS Markit Ltd. (formerly RL Polk)*
(3)    *Canada Outsourced Fleet Market as of September 2016, Class 3-8, IHS Markit Ltd. (formerly RL Polk)*
(4)    *U.K. Lease and Rental HGV Market, Projection for December 2016, Source: The Society of Motor Manufacturers & Traders (SMMT) 2010 & Ryder Internal Estimates*

**FMS Product Offerings**

*Full Service Leasing.*    Our full service leases as well as leases with flexible maintenance options provide customers with vehicles, maintenance services, supplies, and related equipment necessary for operation of the vehicles while our customers furnish and supervise their own drivers and dispatch and exercise control over the vehicles. Our lease customers receive the following benefits:

- We are able to leverage our vehicle buying power for the benefit of our customers because we purchase a large number of vehicles from a limited number of manufacturers. Once we have signed an agreement with the customer, we acquire vehicles and components that are custom engineered to the customer's requirements and lease the vehicles to the customer for periods generally ranging from three to seven years for trucks and tractors and typically ten years for trailers.

- We provide full service lease customers with complete maintenance program designed to reduce vehicle downtime through a preventive maintenance plan that is based on vehicle type and time or mileage intervals. Alternatively, we offer flexible maintenance options to our customers designed to provide them with choices on their preferred level of maintenance. Given our continued focus on improving the efficiency and effectiveness of our maintenance services, particularly in light of changing technology and increased regulation, we provide our lease customers with a cost effective alternative to maintaining their own fleet of vehicles and the flexibility to choose the maintenance program that works for them.  Beginning in 2016 customer's maintenance options include, full service, preventive and on demand.

- Our customers have access to our extensive network of maintenance facilities and trained technicians for maintenance, vehicle repairs, 24-hour emergency roadside service, and replacement vehicles for vehicles that are temporarily out of service.

- We typically retain vehicle residual risk exposure.

- Customers have an opportunity to enhance their standard lease with additional fleet support services including our fuel and related services as described below; liability insurance coverage under our existing insurance policies and related insurance services; safety services including safety training, driver certification and loss prevention consulting; vehicle use and other tax reporting, permitting and licensing, and regulatory compliance (including hours of service administration); environmental services; and access to *RydeSmart*®, a full-featured GPS fleet location, tracking, and vehicle performance management system and to *Ryder FleetCARE* *SM,* our web-based tool that provides customers with 24/7 access to key operational and maintenance management information about their fleets.

For the year ended December 31, 2016, full service lease revenue accounted for 56% of our FMS total revenue. Beginning in 2017, FMS will report this product as ChoiceLease.

*Commercial Rental.*    We target rental customers that have a need to supplement their private fleet of vehicles on a short-term basis (one day up to one year in length), either because of seasonal increases in their business or discrete projects that require additional transportation resources. Lease customers utilize our commercial rental fleet to handle their peak or seasonal business needs. Although a portion of our commercial rental business is purely occasional in nature, we focus on building long-term relationships with customers so that we become their preferred source for commercial vehicle rentals. Our rental representatives assist in selecting a vehicle that satisfies a customer's needs and supervise the rental process, which includes execution of a rental agreement and a vehicle inspection. In addition to vehicle rental, we may extend liability insurance coverage under our existing policies to our rental customers as well as the benefits of cost savings and convenience of our comprehensive fuel services program. For the year ended December 31, 2016, commercial rental revenue accounted for 19% of our FMS total revenue.

*Contract Maintenance.*    Through our contract maintenance product line, we provide maintenance services to customers who do not choose to lease vehicles from us. Our contract maintenance customers commit to utilizing our extensive network of maintenance facilities and trained technicians to maintain the vehicles they own or lease from third parties. We can also customize the services to include ancillary maintenance and/or fleet support services. Vehicles covered under this offering are typically serviced at our own facilities. However, based on the size and complexity of a customer's fleet, we may operate an on-site maintenance facility at the customer's location. For the year ended December 31, 2016, contract maintenance revenue accounted for 4% of our FMS total revenue.  Beginning in 2017, FMS will report this product as SelectCare and it will include Contract-Related Maintenance.

The following table provides information regarding the number of vehicles and customers by FMS product offering at December 31, 2016:

|  | U.S. | | Foreign | | Total | |
|---|---|---|---|---|---|---|
|  | Vehicles | Customers | Vehicles | Customers | Vehicles | Customers |
| Full service leasing | 112,300 | 11,200 | 24,200 | 2,700 | 136,500 | 13,900 |
| Commercial rental [1] | 30,600 | 32,100 | 7,200 | 5,900 | 37,800 | 38,000 |
| Contract maintenance [2] | 43,100 | 1,500 | 5,900 | 400 | 49,000 | 1,900 |

[1]   Commercial rental customers include customers who rented a vehicle for more than 3 days during the year and includes approximately 8,100 lease customers

[2]   Contract maintenance customers include approximately 970  lease customers

*Contract-Related Maintenance*.   Our lease and contract maintenance customers periodically require additional maintenance and repair services that are not included in their lease or contract maintenance contracts. For example, additional maintenance and repair services may arise when a customer damages a leased vehicle.  In addition, because of our existing relationships with the customer, we may provide service on their owned vehicles and charge the customer on an hourly basis for work performed. By servicing all of our customers' maintenance needs, we create stronger, long-term relationships and have greater opportunity to provide customers with a wide range of outsourcing solutions.  For the year ended December 31, 2016, contract-related maintenance revenue accounted for 5% of our FMS total revenue. Beginning in 2017, FMS will report this product within the newly named SelectCare product.

More recently, we have contracted with large private fleet operators and for-hire carriers to provide maintenance on demand, particularly in geographic areas where these customers do not have their own maintenance operations. The contract for on-demand maintenance services is based on a maintenance program that is designed to meet the customers' specific needs and all maintenance is performed only when and as requested by the customer. This product allows us to expand our customer base to include customers that have traditionally chosen to own and maintain their fleet of vehicles.

*Fuel Services.*   We provide our FMS customers with access to diesel fuel at competitive prices at over 450 of our maintenance facilities across the United States and Canada. We also provide fuel services such as fuel planning, fuel tax reporting, centralized billing, fuel cards and fuel monitoring. Although fuel sales do not have a significant impact on our FMS earnings, as it is largely a pass-through cost to customers, we believe allowing customers to leverage our fuel buying power is a significant and valuable benefit to our customers. For the year ended December 31, 2016, fuel services revenue accounted for 13% of our FMS total revenue.

*Used Vehicles.*   We primarily sell our used vehicles at one of our 59 retail sales centers throughout North America (18 of which are co-located at an FMS shop), at our branch locations or through our website at *www.Usedtrucks.Ryder.com*. Typically, before we offer used vehicles for sale, our technicians ensure that the vehicles are *Road Ready*®, which means that they have passed a comprehensive, multi-point performance inspection based on specifications formulated through our maintenance program. Our retail sales centers throughout North America allow us to leverage our maintenance expertise and strong brand reputation to realize higher sales proceeds than in the wholesale market. Given our focus on maximizing sales proceeds, we generally sell our used vehicles through retail centers for prices in excess of book value. However, the extent to which we are able to realize a gain on the sale of used vehicles is dependent upon various other factors, including the general state of the used vehicle market, the supply and demand for used commercial vehicles in retail and wholesale markets, the age and condition of the vehicle at the time of its disposal and vehicle depreciation rates.

### FMS Business Strategy

Our FMS business strategy is to be the leading provider of fleet management outsourcing services for light, medium and heavy duty vehicles. Our strategy will be achieved if we focus on the following goals and priorities:

- Drive profitable fleet growth by (1) successfully implementing sales and marketing initiatives designed to compel private fleet operators and for-hire carriers to outsource all or some portion of their fleet management needs to us; (2) offering innovative products, solutions and support services that will create and strengthen new and existing customer relationships; and (3) completing targeted acquisitions;

- Deliver a consistent, industry-leading and cost-effective maintenance program to our customers through continued process improvement and re-design, productivity initiatives and technology improvements; and

- Optimize asset utilization and management, particularly with respect to our rental fleet, used vehicle operations and maintenance facility infrastructure.

Successfully driving our fleet growth strategy will require significant capital investments in full service lease and commercial rental vehicles. As a result, during periods of significant growth, our free cash flow may be negative.

**Competition**

As an alternative to using our fleet management services, most companies choose to provide these services for themselves, although some may choose to obtain similar or alternative services from other third-party vendors.

Our FMS business segment competes with companies providing similar services on a national, regional and local level. Many regional and local competitors provide services on a national level through their participation in various cooperative programs. Competitive factors include price, equipment, maintenance, service and geographic coverage. We compete with finance lessors, truck and trailer manufacturers and independent dealers who provide full service lease products, finance leases, extended warranty maintenance, rental and other transportation services. With the growth of our on-demand maintenance product, we will also face competition from managed maintenance providers who are hired to coordinate and manage the maintenance of large fleets of vehicles through a network of third-party maintenance providers. Value-added differentiation of the full service leasing, maintenance and commercial rental services, as well as continued commitment to offer innovative products and solutions, such as natural gas vehicles, has been and will continue to be our emphasis.

---

## Dedicated Transportation Solutions

**Value Proposition**

Through our DTS business segment, we combine the equipment, maintenance and administrative services of a full service lease with drivers and additional services to provide a customer with a dedicated transportation solution that is designed to increase their competitive position, improve risk management and integrate their transportation needs with their overall supply chain. Such additional services include routing and scheduling, fleet sizing, safety, regulatory compliance, risk management, technology and communication systems support, including on-board computers and other technical support. These additional services allow us to address, on behalf of our customers, labor challenges associated with maintaining a private fleet of vehicles, such as driver recruitment and retention, government regulation, including hours of service regulations, DOT audits and workers' compensation. Our DTS solution offers a high degree of specialization to meet the needs of customers with sophisticated service requirements such as tight delivery windows, high-value or time-sensitive freight, closed-loop distribution, multi-stop shipments, specialized equipment and integrated transportation needs.

**Market Trends**

The U.S. dedicated contract carriage market is estimated to be $14 billion[1]. This market is affected by many of the same trends that impact our FMS business, including the tightening of capacity in the current U.S. trucking market. The administrative requirements relating to regulations issued by the Department of Transportation (DOT) regarding driver screening, training and testing, as well as record keeping and other costs associated with the hours of service requirements, make our DTS product an attractive alternative to private fleet and driver management. This has become even more significant in light of Compliance, Safety, Accountability (CSA) regulatory changes made effective in 2010. The CSA regulatory changes have also put pressure on the availability of qualified truck drivers, which supply continues to lag market need. In addition, market demand for just-in-time delivery creates a need for well-defined routing and scheduling plans that are based on comprehensive asset utilization analysis and fleet rationalization studies offered as part of our DTS services.

**Operations/Product Offerings**

For the year ended December 31, 2016, our global DTS business accounted for 15% of our consolidated revenue. At December 31, 2016, we had 200 DTS customer accounts in the U.S. Because it is highly customized, our DTS product is particularly attractive to companies that operate in industries that have time-sensitive deliveries or special handling requirements, as well as companies who require specialized equipment. Because DTS accounts typically operate in a limited geographic area, most of the drivers assigned to these accounts are short haul drivers, meaning they return home at the end of each work day. Although a significant portion of our DTS operations are located at customer facilities, our DTS business also utilizes and benefits from our extensive network of FMS facilities.

In order to customize an appropriate DTS transportation solution for our customers, our DTS logistics specialists perform a transportation analysis using advanced logistics planning and operating tools. Based on this analysis, they formulate a logistics design that includes the routing and scheduling of vehicles, the efficient use of vehicle capacity and overall asset utilization. The goal of each customized plan is to create a distribution system that optimizes freight flow while meeting a customer's service goals. A team of DTS transportation specialists can then implement the plan by leveraging the resources, expertise and technological capabilities of both our FMS and SCS businesses.

---

[1]   *Armstrong & Associates Tightened Up - Third-Party Logistics Market Results and Trends for 2016, June 2016*

To the extent a distribution plan includes multiple modes of transportation (air, rail, sea and highway), our DTS team, in conjunction with our SCS transportation specialists, selects appropriate transportation modes and carriers, places the freight, monitors carrier performance and audits billing. In addition, through our SCS business, we can reduce costs and add value to a DTS customer's distribution system by aggregating orders into loads, looking for shipment consolidation opportunities and organizing loads for vehicles that are returning from their destination point back to their point of origin (backhaul).

### DTS Business Strategy

Our DTS business strategy is to focus on customers who need specialized equipment, specialized handling or integrated services. This strategy revolves around the following interrelated goals and priorities:

• Increase market share with customers in the energy and utility, metals and mining, retail, construction, healthcare, and food and beverage industries;

• Leverage the support and talent of the FMS sales team in a joint sales program;

• Align the DTS business with other SCS product lines to create revenue opportunities and improve operating efficiencies in both segments; and

• Improve competitiveness in the non-specialized and non-integrated customer segments.

### Competition

Our DTS business segment competes with truckload carriers and other dedicated providers servicing on a national, regional and local level. Competitive factors include price, equipment, maintenance, service and geographic coverage and driver and operations expertise. We are able to differentiate the DTS product offering by leveraging FMS and integrating the DTS services with those of SCS to create a more comprehensive transportation solution for our customers. Our strong safety record and focus on customer service enable us to uniquely meet the needs of customers with high-value products that require specialized handling in a manner that differentiates us from truckload carriers.

---

## Supply Chain Solutions

---

### Value Proposition

Through our SCS business, we offer a broad range of innovative logistics management services that are designed to optimize a customer's supply chain and address customer's key business requirements. The organization is aligned by industry verticals (Automotive, Technology and Healthcare, Consumer Packaged Goods and Retail, and Industrial) to enable our teams to focus on the specific needs of their customers. Our SCS product offerings are organized into four categories: dedicated services, distribution management, transportation management and professional services. These offerings are supported by a variety of information technology and engineering solutions that are an integral part of our SCS services. These product offerings can be offered independently or as an integrated solution to optimize supply chain effectiveness. A key aspect of our value proposition is our operational execution, which is an important differentiator in the marketplace.

### Market Trends

Global logistics is approximately a $8.7 trillion[1] market, of which approximately $720 billion[1] is outsourced. Logistics spending in the markets we are targeting in North America and Asia equates to approximately $1.8 trillion, of which $193 billion is outsourced. Outsourced logistics is a market with significant growth opportunity. More sophisticated supply chain practices are required as supply chains expand and become more complex, product needs continue to proliferate and companies look for lower cost supply chain alternatives. In addition, disruptions from unexpected events such as natural disasters have caused companies to focus on risk management of their supply chains. The more complicated the supply chain or the product requirements, the greater the need for companies to utilize the expertise of supply chain solution providers.

---

[1] *Armstrong & Associates Tightened Up - Third-Party Logistics Market Results and Trends for 2016, June 2016*

**Operations**

For the year ended December 31, 2016, our global SCS business accounted for 24% of our consolidated revenue.

*U.S.*    At December 31, 2016, we had 313 SCS customer accounts in the U.S., most of which are large enterprises that maintain large, complex supply chains. Most of our core SCS business operations are geographically located to maximize efficiencies and reduce costs. At December 31, 2016, managed warehouse space totaled approximately 38 million square feet for the U.S. We also concentrate certain logistics expertise in locations not associated with specific customer sites. For example, our carrier procurement, contract management, freight bill audit and payment services, and transportation optimization and execution groups operate out of our logistics centers in Novi, Michigan and Fort Worth, Texas.

*Mexico*.   At December 31, 2016, we had 108 SCS customer accounts and managed warehouse space totaling approximately 4.5 million square feet. Our Mexico operations offer a full range of SCS services and manage approximately 15,800 border crossings each month between Mexico and the U.S. and Canada, often highly integrated with our distribution and transportation operations.

*Canada.*   At December 31, 2016, we had 47 SCS customer accounts and managed warehouse space totaling approximately 1.2 million square feet. Given the proximity of this market to our U.S. and Mexico operations, the Canadian operations are highly coordinated with their U.S. and Mexico counterparts, managing cross-border transportation and freight movements.

*Asia.*   At December 31, 2016, we had 72 SCS customer accounts and managed warehouse space totaling approximately 333,000 square feet, primarily in Singapore.

**SCS Product Offerings**

*Distribution Management*.    Our SCS business offers a wide range of services relating to a customer's distribution operations, from designing a customer's distribution network to managing distribution facilities. Services within the facilities generally include managing the flow of goods from the receiving function to the shipping function, coordinating warehousing and transportation for inbound and outbound material flows, handling import and export for international shipments, coordinating just-in-time replenishment of component parts to manufacturing and final assembly, and providing shipments to customer distribution centers or end customer delivery points. Additional value-added services such as light assembly of components into defined units (kitting), packaging and refurbishment are also provided. For the year ended December 31, 2016, distribution management solutions accounted for 50% of our SCS revenue.

*Dedicated Services.*   Dedicated services are offered as part of an integrated supply chain solution to our customers. We fulfill transportation needs for our customers with a combination of outside carriers and dedicated services. The dedicated services offering combines the equipment, maintenance, drivers and additional services to provide a customer with a dedicated transportation solution, which combined with outside transportation, is designed to increase their competitive position, improve risk management and integrate their transportation needs with their overall supply chain. Such additional services include routing and scheduling, fleet sizing, safety, regulatory compliance, risk management, technology and communication systems support including on-board computer, and other technical support. These additional services allow us to address, on behalf of our customers, labor challenges associated with maintaining a private fleet of vehicles, such as driver recruitment and turnover, government regulation (including hours of service regulations), DOT audits and workers' compensation. Our dedicated services solution offers a high degree of specialization to meet the needs of customers with sophisticated service requirements such as tight delivery windows, high value or time-sensitive freight, closed-loop distribution, multi-stop shipments, specialized equipment and integrated transportation needs. Dedicated services operations are located at our customer facilities, and our dedicated offering utilizes and benefits from our extensive network of FMS facilities. For the year ended December 31, 2016, approximately 36% of our SCS revenue was related to dedicated services.

*Transportation Management*.    Our SCS business offers services relating to all aspects of a customer's transportation network. Our team of transportation specialists provides shipment planning and execution, which includes shipment optimization, load scheduling and delivery confirmation through a series of technological and web-based solutions. Our transportation consultants, including our freight brokerage department, focus on carrier procurement of all modes of transportation with an emphasis on truck-based transportation, rate negotiation, and freight bill audit and payment services. In addition, our SCS business provides customers with capacity management services that are designed to meet backhaul opportunities and minimize excess miles. For the year ended December 31, 2016, we purchased and/or executed $4.7 billion in freight moves on our customers' behalf. For the year ended December 31, 2016, transportation management solutions accounted for 9% of our SCS revenue.

*Professional Services*.    In conjunction with providing the SCS core services described previously, our SCS business offers a variety of knowledge-based services that support every aspect of a customer's supply chain. Our SCS professionals are available to evaluate a customer's existing supply chain to identify inefficiencies as well as opportunities for integration and

improvement. Once the assessment is complete, we work with the customer to develop a supply chain strategy that will create the most value for the customer and their target clients. Once a customer has adopted a supply chain strategy, our SCS logistics team, supported by functional experts and representatives from our information technology, real estate and finance groups, work together to design a strategically focused supply chain solution. The solution may include both a network design that sets forth the number, location and function of key components of the network and a transportation solution that optimizes the mode or modes of transportation and route selection. In addition to providing the distribution and transportation expertise necessary to implement the supply chain solution, our SCS representatives can coordinate and manage all aspects of the customer's supply chain provider network to assure consistency, efficiency and flexibility. For the year ended December 31, 2016, knowledge-based professional services accounted for 5% of our SCS revenue.

### SCS Business Strategy

Our SCS business strategy is to offer our customers differentiated functional execution and proactive solutions from deep expertise in key industry verticals. The strategy revolves around the following interrelated goals and priorities:

- Providing customers with best in class execution and quality through reliable and flexible supply chain solutions;
- Developing innovative solutions and capabilities that drive value for our customer within our targeted industry verticals;
- Creating a culture of innovation and collaboration to share capabilities and solutions to meet our client's needs;
- Consistent focus on network optimization and continuous improvement; and
- Successfully executing targeted sales and marketing growth strategies.

### Competition

As an alternative to using our services, most companies choose to internally manage their own supply chains and logistics operations, although some may choose to obtain similar or alternative services from other third-party vendors.

In the SCS business segment, we compete with a large number of companies providing similar services, each of which has a different set of core competencies. We compete with a handful of large, multi-service companies across all of our service offerings and industries. We also compete against other companies on specific service offerings (for example, in transportation management, distribution management or dedicated services) or in a specific industry. We face different competitors in each country or region where they may have a greater operational presence. Competitive factors include price, service, market knowledge, expertise in logistics-related technology and overall performance (e.g. timeliness, accuracy, and flexibility).

## ACQUISITIONS

In addition to our continued focus on organic growth, acquisitions play an important role in enhancing our growth strategy. In assessing potential acquisition targets in our FMS business segment, we look for companies that would create value through operating synergies, leveraging our existing facility infrastructure, improving our geographic coverage and diversifying our customer base.  In our DTS business segment, we are focusing on strategies for growth, including acquisitions that expand our capabilities and vertical market sector. In our SCS business segment, we focus on adding capabilities and product offerings, potentially expanding into new industries, diversifying our customer base within our current industries, and improving our competitive position.

## CYCLICALITY

Ryder's business is impacted by economic and market conditions. In a strong economic cycle, there is generally more demand for our fleet management, dedicated and supply chain services. In a weak or volatile economy, demand for our services decreases and is inconsistent and considerably more unpredictable. Because of these factors, we have continued to focus on increasing the diversity of our customer base and strengthening our long-term business partnerships with our customers. Although we believe these efforts help mitigate the immediate impact of an economic downturn, during a protracted or severe economic downturn, customers are often unwilling to commit to a full-service lease or long-term supply chain contract. Because commercial rental and used vehicle sales are transactional, they are more cyclical in nature, and results can vary significantly in both the short- and long-term. We mitigate some of the potential impact of an economic downturn through a disciplined and centralized approach to asset management. This approach allows us to manage the size, mix and location of our operating fleet and used vehicle inventories to try and maximize asset utilization and used vehicle proceeds in both strong and weak market conditions.

## ADMINISTRATION

Our financial administrative functions for the U.S. and Canada, including credit, billing and collections are consolidated into our Shared Services Center, a centralized processing center located in Alpharetta, Georgia. Our Shared Services Center also manages contracted third parties providing administrative finance and support services outside of the U.S. in order to

reduce ongoing operating expenses and maximize our technology resources. This centralization results in more efficient and consistent centralized processing of selected administrative operations. Certain administrative functions are also performed at the Shared Services Center for our customers. The Shared Services Center's main objectives are to enhance customer service through process standardization, create an organizational structure that will improve market flexibility and allow future reengineering efforts to be attained more easily at lower implementation costs.

## REGULATION

Our business is subject to regulation by various federal, state and foreign governmental entities. The DOT and various federal and state agencies exercise broad powers over certain aspects of our business, generally governing such activities as authorization to engage in motor carrier operations, safety and financial reporting. In 2010, the Federal Motor Carrier Safety Administration (FMCSA) began implementation of the CSA, a compliance and enforcement initiative partnering with State agencies designed to monitor and improve commercial vehicle motor safety. The CSA program includes a Safety Measurement System (SMS) that uses roadside inspections and violations to measure motor carriers and drivers and determines the scores related to these inspections and violations that compare the motor carriers and drivers against peers. The FMCSA established thresholds for seven different measurement areas that identify potential safety risks and result in direct intervention or enforcement action.

We are also subject to a variety of requirements of national, state, provincial and local governments, including the U.S. Environmental Protection Agency and the Occupational Safety and Health Administration, which regulate safety, the management of hazardous materials, water discharges and air emissions, solid waste disposal and the release and cleanup of regulated substances. We must comply with licensing and other requirements imposed by the U.S. Department of Homeland Security and U.S. Customs Service as a result of increased focus on homeland security and our Customs-Trade Partnership Against Terrorism certification. We may also become subject to new or more restrictive regulations imposed by these agencies or other authorities relating to carbon controls and reporting, engine exhaust emissions, drivers' hours of service, wage and hour requirements, security including data privacy and cyber security and ergonomics.

## ENVIRONMENTAL

We have a long-standing commitment to sound environmental practices that reduce risk and build value for us and our customers. We have a history of adopting "green" designs and processes because they are efficient, cost-effective transportation solutions that improve our bottom line and bring value to our customers. We have maintained an environmental mission since 1991 and have updated it periodically as regulatory and customer needs have changed. Our environmental policy reflects our commitment to supporting the goals of sustainable development, environmental protection and pollution prevention in our business. We have adopted proactive environmental strategies that have advanced business growth and continued to improve our performance in ways that reduce emission outputs and environmental impact. Our environmental team works with operating employees to develop and administer programs in support of our environmental policy and to help ensure that environmental considerations are integrated into all business processes and decisions.

In establishing appropriate environmental objectives and targets for our wide range of business activities around the world, we focus on (1) the needs of our customers; (2) the communities in which we provide services; and (3) relevant laws and regulations. We regularly review and update our environmental management procedures, and information regarding our environmental activities is routinely disseminated throughout Ryder. In 2016, we substantially expanded our sustainability reporting with the publication of our 2014/2015 Corporate Sustainability Report, which includes expanded and enhanced disclosures, as well as new metrics related to our environmental and safety performance for the years 2014 and 2015. In addition, we have voluntarily responded to the Carbon Disclosure Project (CDP) since 2008, disclosing direct and indirect emissions resulting from our operations, and earned leadership status for the quality of our disclosure report submitted in 2016. These reports are publicly available on the company website at *www.ryder.com* by clicking on About Us and then selecting Sustainability.

## SAFETY

Our safety culture is founded upon a core commitment to the safety, health and well-being of our employees, customers and the community, a commitment that has made us a long-standing industry leader in safety.

Safety is an integral part of our business strategy because preventing injuries and collisions improves employee quality of life, eliminates service disruptions to our customers, increases efficiency and improves customer satisfaction. As a core value, our focus on safety is embedded in our day-to-day operations, reinforced by many safety programs and continuous operational improvement and supported by a talented and dedicated safety organization.

Training is a critical component of our safety program. Monthly safety training delivered by location safety committees cover specific and relevant safety topics and managers receive annual safety leadership training. Quarterly and remedial training is also delivered online to each driver through our highly interactive Ryder Pro-TREAD comprehensive lesson

platform. Regular safety behavioral observations are conducted by managers throughout the organization everyday and remedial training and coaching takes place on-the-spot. We also deploy state-of-the-art safety technologies in Ryder vehicles and our safety policies require that all managers, supervisors and employees incorporate safe processes in all aspects of our business. Monthly safety scorecards are tracked and reviewed by management for progress toward key safety objectives. Our proprietary web-based safety tracking system, RyderStar$^{SM}$, delivers proactive safety programs tailored to every location and helps measure safety activity effectiveness across the organization.

## EMPLOYEES

At December 31, 2016, we had approximately 34,500 full-time employees worldwide, of which 32,600 were employed in North America, 1,400 in Europe and 500 in Asia. Currently we employ approximately 7,700 drivers and 5,900 technicians. We have approximately 21,600 hourly employees in the U.S., approximately 4,100 of which are organized by labor unions. Those employees organized by labor unions are principally represented by the International Brotherhood of Teamsters, the International Association of Machinists and Aerospace Workers and the United Auto Workers, and their wages and benefits are governed by 98 labor agreements which are renegotiated periodically. Although we have not experienced a material work stoppage or strike, these events can potentially occur given the types of businesses in which we currently engage. We consider that our relationship with our employees is good.

## EXECUTIVE OFFICERS OF THE REGISTRANT

| Name | Age | Position |
|---|---|---|
| Robert E. Sanchez | 51 | Chair and Chief Executive Officer |
| Art A. Garcia | 55 | Executive Vice President and Chief Financial Officer |
| Dennis C. Cooke | 52 | President, Global Fleet Management Solutions |
| John J. Diez | 45 | President, Dedicated Transportation Solutions |
| J. Steven Sensing | 49 | President, Global Supply Chain Solutions |
| Robert D. Fatovic | 51 | Executive Vice President, Chief Legal Officer and Corporate Secretary |
| Frank Lopez | 42 | Senior Vice President and Chief Human Resources Officer |
| Karen M. Jones | 54 | Executive Vice President and Chief Marketing Officer |
| John Gleason | 60 | Executive Vice President and Chief Sales Officer |
| Melvin L. Kirk | 52 | Senior Vice President and Chief Information Officer |

Robert E. Sanchez was appointed Chair of Ryder's Board in May 2013 and promoted to Chief Executive Officer and became a Board member in January 2013. Previously, Mr. Sanchez served as President and Chief Operating Officer from February 2012 to December 2012. He served as President, Global Fleet Management Solutions from September 2010 to February 2012 and as Executive Vice President and Chief Financial Officer from October 2007 to September 2010. He also previously served as Executive Vice President of Operations, U.S. Fleet Management Solutions from October 2005 to October 2007 and as Senior Vice President and Chief Information Officer from January 2003 to October 2005. Mr. Sanchez joined Ryder in 1993 and has held various other positions of increasing responsibility, including leadership positions in all three of Ryder's business segments.

Art A. Garcia has served as Executive Vice President and Chief Financial Officer since September 2010. Previously, Mr. Garcia served as Senior Vice President and Controller from October 2005 to August 2010, and as Vice President and Controller from February 2002 to September 2005. Mr. Garcia joined Ryder in 1997 and has held various other positions within Corporate Accounting.

Dennis C. Cooke has served as President, Global Fleet Management Solutions since February 2012. Previously, Mr. Cooke served as Senior Vice President and Chief of Operations, U.S. and Canada Fleet Management Solutions from July 2011 to February 2012. Prior to joining Ryder in July 2011, Mr. Cooke held various positions with General Electric (GE) and related companies, including Vice President and General Manager of GE Healthcare's Global MRI business from 2000 to 2005.  He then served as President and Chief Executive Officer of GE Security's Homeland Protection business from 2005 to 2009, and continued serving in those roles from 2009 to 2011 after the business was acquired by the Safran Group and became Morpho Detection, Inc.

J. Steven Sensing has served as President of Global Supply Chain Solutions since March 2015. Previously, Mr. Sensing served as Vice President and General Manager of the Technology industry group from February 2007 to February 2015. In July 2014, he also added the Retail industry group under his leadership. Mr. Sensing joined Ryder in 1992 and has since held various positions within Dedicated Services, Transportation Management and Distribution Management.

John J. Diez has served as President of Dedicated Transportation Solutions since March 2015.  Previously, Mr. Diez served as Senior Vice President of Ryder Dedicated from March 2014 to February 2015, and as Senior Vice President of Asset Management from January 2011 to February 2014. Mr. Diez joined Ryder's Finance department in 2002 and has since held various positions within Finance including Senior Vice President Global Field Finance and Vice President and Chief Financial Officer of Fleet Management Solutions.

Robert D. Fatovic has served as Executive Vice President, Chief Legal Officer and Corporate Secretary since May 2004. He previously served as Senior Vice President, U.S. Supply Chain Operations, Hi-Tech and Consumer Industries from December 2002 to May 2004. Mr. Fatovic joined Ryder's Law department in 1994 as Assistant Division Counsel and has held various other positions within the Law department including Vice President and Deputy General Counsel.

Frank Lopez was appointed to Chief Human Resources Officer in February 2016.  Previously, Mr. Lopez held the position of Senior Vice President, Global Human Resources Operations since July 2013.  Mr. Lopez joined Ryder in 2002 and has since held various positions within the Human Resources, Labor Relations and Legal functions.

Karen M. Jones has served as Executive Vice President and Chief Marketing Officer since October 2014. She joined Ryder in September 2013 as Senior Vice President and Chief Marketing Officer. Prior to joining Ryder, Ms. Jones was Chief Marketing Officer for NRG/Reliant Energy, Inc from 2010 to 2013. Previously, Ms. Jones served as Senior Vice President of Marketing and Corporate Communications for DHL Express U.S. from 2006 to 2009 and as Vice President of Advertising, Brand Management and Promotion from 2004 to 2006.  In addition, Ms. Jones has served in key positions responsible for worldwide brand advertising, sponsorship, and strategic alliances for Hewlett Packard.

John Gleason was appointed Executive Vice President and Chief Sales Officer in November 2015.  Previously,  Mr. Gleason served as Senior Vice President of Global Fleet Management Solutions from October 2009, when he joined Ryder, to October 2015.  Prior to joining Ryder, Mr. Gleason served as Chief Sales Officer for Automatic Data Processing (ADP) from April 2005 to September 2009 and as Senior Vice President of Sales from July 1998 to April 2005.

Melvin L. Kirk has served as Senior Vice President and Chief Information Officer since May 2015. He began reporting directly to the CEO and joined Ryder's Executive Leadership Team in January 2016. Mr. Kirk joined Ryder in March 2012 as Vice President of Maintenance, Engineering and Quality Operations within the Fleet Management Solutions organization. Prior to joining Ryder, Mr. Kirk held various roles at Global Service at Safran's Morpho Detection, Inc. (formerly GE Homeland Protection), most recently serving as Vice President and General Manager from 1996 to 2012.

## FURTHER INFORMATION

For further discussion concerning our business, see the information included in Items 7 and 8 of this report. Industry and market data used throughout Item 1 was obtained through a compilation of surveys and studies conducted by industry sources, consultants and analysts.

We make available free of charge through the Investor Relations page on our website at *www.ryder.com* our Annual Report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission. The public may read and copy any materials we have filed with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. Information on the operation of the Public Reference Room may be obtained by calling the SEC at 1-800-SEC-0330. The SEC maintains an Internet site that contains our reports, proxy and information statements, and our other SEC filings. The address of the SEC's website is *www.sec.gov*.

In addition, our Corporate Governance Guidelines, Principles of Business Conduct and Board committee charters are posted on the Corporate Governance page of our website at *www.ryder.com*. Upon request to our Investor Relations page on our website at *www.ryder.com*, we will provide a copy of our Finance Code of Conduct to anyone, free of charge.

**ITEM 1A. RISK FACTORS**

The following contains all known material risks that could affect our business.

**<u>Uncertain or unfavorable economic and industry conditions could adversely impact our business and operating results.</u>**

Although macro-economic risk affects most industries, the transportation industry is particularly susceptible to changes in economic and market conditions as our business relies on the strength of our customers' businesses and the level of confidence our customers have about future market conditions.  Because of this, our business may begin to slow before market slowdowns, at the point of customer uncertainty, and may recover later than market recoveries, as our customers may continue to feel uncertain about future market conditions. Long-term full service lease and short-term rental of commercial vehicles comprise a large portion of our business. Our vehicles are leased or rented to customers that transport goods commercially so that the demand for our products is directly tied to the production and sale of goods by our customers.  As a result, when fewer goods are sold by our customers, demand for our services may decrease.  Also, sudden changes in fuel prices and fuel shortages may adversely impact the total vehicle miles driven by our customers.  If uncertainty and lack of customer confidence around macroeconomic and transportation industry conditions increase, they may impact our future growth prospects and our business and results of operations could be materially adversely affected.

In a weak or volatile economy, demand for our longer-term contractual services may decrease, waver or become less predictable as customers are often unwilling to commit to long-term lease, maintenance, dedicated services or supply chain contracts.  Contractual-based services include full  lease and maintenance contracts in our FMS business segment, dedicated services in our DTS business segment and supply chain contracts in our SCS business segment.  Accordingly, any sustained weakness in demand or a protracted economic downturn can negatively impact performance and operating results in our contractual-based service offerings. Similarly, although we experienced continued growth in full service lease during 2016, our customers still remain cautious about entering into long-term leases.

Customer uncertainty may serve to increase demand for our transactional services (because they do not require a long-term commitment) as these services are generally more cyclical due to their transactional nature, causing results to vary in both the short- and long-term.  Transactional-based services include commercial rental and used vehicle sales in our FMS business segment. Although commercial rental demand began to stabilize in the second half of 2016, following a period of soft demand and uncertainty in the latter part of 2015 and first half of 2016, rental demand may decline again or face more unexpected volatility in the future.

**<u>Our capital intensive business requires us to make capital decisions based upon projected customer activity levels.</u>**

We make significant investments in rental vehicles to support our rental business based on anticipated customer demand.  We make commitments to purchase the vehicles months in advance. We must predict fleet requirements and make commitments based on demand projections and various other factors.  Missing our projections could result in too much or too little capacity in our rental fleet.  Overcapacity could require us to dispose of vehicles at lower than anticipated pricing levels or result in asset write-downs and undercapacity could negatively impact our ability to reliably provide rental vehicles to our customers.

**<u>We bear the residual risk on the value of our vehicles.</u>**

**Impact on Used Vehicle Sales.**  We generally bear the residual risk on the value of our vehicles. Beginning in the latter part of 2015 and continuing through 2016, we saw a weakening of conditions in the used vehicle sales market, which adversely affected used vehicle volume and pricing, especially for tractors. If the market for used vehicles further declines, or there is a concern regarding the quality, maintenance or condition of our vehicles, we may obtain lower sales proceeds upon the sale of used vehicles, which may impact the residual value estimates of our operating fleet.We sell our used vehicles through various channels, including retail sales centers, at our branch locations, through our website at *www.UsedTrucks.Ryder.com*, as well as through the wholesale market.  Pricing and demand for used vehicles varies among selling channels, particularly between the retail and wholesale markets, as we generally obtain lower proceeds on vehicles sold through wholesale channels.  If we are unable to meet our targeted fleet counts through our projected mix of retail versus wholesale sales, we may be required to sell more vehicles than planned through the wholesale market, which will impact our sales proceeds.  In the latter part of 2016, we increased wholesaling activity which contributed to lower used vehicle sales results in 2016.

**Impact on our Full Service Lease Product Line**.  Changes in residual values also impact the overall competitiveness of our full service lease product line, as estimated sales proceeds are a significant component of the overall price of the lease. Additionally, technology changes and sudden changes in supply and demand together with other market factors beyond our control vary from year to year and from vehicle to vehicle, making it difficult to accurately predict residual values used in calculating our depreciation expense. Although we have developed disciplines related to the management and maintenance of our vehicles designed to prevent these losses, there is no assurance that these practices will sufficiently reduce the residual risk. For a detailed discussion on our accounting policies and assumptions relating to depreciation and residual values, please see the "Critical Accounting Estimates - Depreciation and Residual Value Guarantees" section in Management's Discussion and Analysis of Financial Condition and Results of Operations.

### Our inability to maintain appropriate commercial rental fleet utilization rates could adversely impact our profitability.

In our commercial rental product line, we purchase vehicles and optimize the size and mix of the commercial rental fleet based upon our expectations of overall market demand. As a result, we bear the risk for ensuring that we have the proper vehicles in the right condition and location to effectively capitalize on market demand in order to drive the highest levels of utilization and revenue per unit. We employ a sales force and operations team on a full-time basis to manage and optimize this product line; however, their efforts may not be sufficient to overcome a significant change in market demand in the rental business.  In contrast, in our full service lease product line, we typically do not purchase vehicles until we have an executed contract with a customer.

### Failure to execute our growth strategy and develop, market and consistently deliver high-quality services that meet customer expectations, may cause our revenue and earnings to suffer.

Our long-term strategy is to grow our outsourcing services by targeting private fleets new to outsourcing and key industries with innovative solutions, operational excellence, and best-in-class talent and information technology.  To successfully execute on this strategy, we must continue to focus on developing effective solutions that meet our existing and target customers' evolving needs.  This requires the skills, experience and efforts of our management team and continued investment in new technology, sales and marketing.  Notwithstanding our efforts, these new or changed service offerings may not meet customer demands, prove to be profitable or succeed in the long term. If we do not make the right strategic investments to respond to current customer needs and establish and develop new customer relationships, our ability to develop and maintain a competitive advantage and continue to grow could be negatively affected.

Even with the right solutions, our growth strategy depends on delivering consistent operational excellence and strong customer service.  If our services and solutions are not delivered as promised on a consistent basis or our customers have a negative experience or are otherwise dissatisfied, this can impair our relationships with new or existing customers and adversely affect our brand and reputation, which could, in turn, adversely affect revenue and earnings growth.

### We may fail to respond adequately or in a timely manner to innovative changes in new technology in our industry.

In recent years, our industry has been characterized by rapid changes in technology, leading to innovative transportation and logistics concepts that could change the way our industry does business.  For example, new concepts are currently under development for more advanced electric vehicles, automatic or semi-automatic self-driving vehicles and drones. There may be additional innovations impacting the transportation, trucking and supply chain/logistics industries that we cannot yet foresee. Our inability to quickly adapt to and adopt new innovations in products and processes desired by our customers may result in a significant loss of demand for our service offerings. Our lease and rental fleets could become unfavorable with our customers or obsolete within a relatively short period of time, and we may no longer be able to find buyers for our used vehicles.  An increase in customer use of electric vehicles could reduce the need for our vehicle maintenance services, diesel vehicles and related offerings.  Likewise, self-driving vehicles may reduce the need for our dedicated service offerings, where, in addition to a vehicle, Ryder provides a driver as part of an integrated, full service customer solution.

**Failure to maintain, upgrade and consolidate our information technology networks could adversely affect us.**

The success of our strategic initiatives designed to increase our sales and capture a greater percentage of the outsourced transportation and supply chain markets is dependent in varying degrees on the timely delivery and the functionality of information technology systems to support them.  Extended delays or cost overruns in securing, developing and otherwise implementing technology solutions to support the new business initiatives we are developing now, and will be developing in the future, would delay and possibly even prevent us from realizing the projected benefits of these initiatives. Advances in technology require increased investments to remain competitive, and our customers may not be willing to accept higher prices to cover the cost of these investments. In addition, our reputation with our customers may suffer if outages, system failures or delays in timely access to data occur in legacy information technology systems that support key business processes.

We are continuously upgrading and consolidating our systems, including enhancing legacy systems, replacing legacy systems with successor systems and acquiring new systems with newer functionality. These types of activities subject us to additional costs and inherent risks associated with replacing and modifying these systems, including impairment of our ability to provide our services, potential disruption of our internal control structure, substantial capital expenditures, additional administration and operating expenses, retention of sufficiently skilled personnel to implement and operate the new systems, demands on management time, and other risks and costs of delays or difficulties in transitioning to new systems or integrating new systems into our current systems. Our system implementations may not result in productivity improvements at a level that outweighs the costs of implementation, or at all. In addition, the implementation of new technology systems may cause disruptions in our business operations and have an adverse effect on our business and operations, if not anticipated and appropriately mitigated.

**We may be subject to cybersecurity risks, some of which are beyond our control.**

We depend on the proper functioning and availability of our information systems in operating our business, including communications and data processing systems.  It is important that the data processed by these systems remains confidential, as it often includes competitive customer information, confidential customer transaction data, employee records, and key financial and operational results and statistics. Portions of our business utilize information systems that provide critical services to both our employees and our customers. Cyber incidents that impact the availability, reliability, speed, accuracy, or other proper functioning of these systems could have a significant impact on our operations. Some of our software applications are utilized by third parties who provide outsourced administrative functions, which may increase the risk of a cybersecurity incident. Our information systems are protected through physical and software safeguards as well as backup systems considered appropriate by management. However, we may be unable to fully protect against the possibility of damage created by natural disasters, power loss, telecommunications failures, cybersecurity attacks and similar events in every potential circumstance that may arise.

**We and the vehicle and equipment manufacturers in our FMS business rely on a small number of suppliers.**

We buy vehicles and related equipment from a relatively small number of original equipment manufacturers (OEMs) in our FMS business. Some of our vehicle manufacturers rely on a small concentration of suppliers for certain vehicle parts, components and equipment. A discrete event in a particular OEM's or supplier's industry or location, or adverse regional economic conditions impacting an OEM or supplier's ability to provide vehicles or a particular component, could adversely impact our FMS business and profitability. In addition, our business and reputation could also be negatively impacted if any parts, components or equipment from one of our suppliers suffer from broad-based quality control issues or become the subject of a product recall and we are unable to obtain replacement parts from another supplier in a timely manner.

**We derive a significant portion of our SCS and DTS segment revenue from a relatively small number of customers.**

During 2016, sales to our top ten SCS customers representing all of the industry groups we service accounted for 55% of our SCS total revenue and 53% of our SCS operating revenue (revenue less fuel and subcontracted transportation). Additionally, approximately 44% of our global SCS revenue is from the automotive industry and is directly impacted by automotive vehicle production. Our top ten DTS customers accounted for 45% of DTS total revenue and 40% of DTS operating revenue. The loss of any of these customers or a significant reduction in the services provided to any of these customers could impact our operations and adversely affect our SCS or DTS segment financial results. While we continue to focus our efforts on diversifying our customer base, we may not be successful in doing so in the short-term.

14

We are also subject to credit risk associated with the concentration of our accounts receivable from our SCS and DTS customers. If one or more of these customers were to become bankrupt, insolvent or otherwise were unable to pay for the services provided by us, we may incur significant write-offs of accounts receivable or incur lease or asset impairment charges that could adversely affect our operating results and financial condition.

In addition, many of our customers operate in cyclical or seasonal industries, or operate in industries, including the food and beverage industry, that may be impacted by unanticipated weather, growing conditions (such as drought, insects or disease), natural disasters and other conditions over which we have no control. A downturn in our customers' business cycles or unanticipated events impacting their businesses could cause a reduction in freight volume shipped by those customers or a reduction in their need for our SCS or DTS services.

**We operate in a highly competitive industry and our business may suffer if we are unable to adequately address potential downward pricing pressures and other competitive factors.**

Numerous competitive factors could impair our ability to maintain our current profitability. These factors include the following:

- our inability to obtain expected customer retention levels or sales growth targets;

- we compete with many other transportation and logistics service providers, some of which have greater capital resources than we do;

- customers may choose to provide the services we provide for themselves;

- some of our competitors periodically reduce their prices to gain business, and some of our smaller competitors may have lower cost structures than we do, which may limit our ability to maintain or increase prices; and

- because cost of capital is a significant competitive factor, any increase in either the cost of our debt or equity as a result of reductions in our debt rating or stock price volatility could have a significant impact on our competitive position.

**Our profitability could be negatively impacted if the key operational assumptions and pricing structure prove to be invalid.**

Substantially all of our FMS lease and maintenance services and our DTS and SCS services are provided under contractual arrangements with our customers. The pricing structure for our lease and contract maintenance business is based on certain assumptions regarding capital costs, our ability to acquire equipment at competitive rates from our suppliers, maintenance expense over the life of the contract, particularly in light of new engine technologies, residual values, productivity, and the mix of fixed and variable costs, many of which are derived from historical data and trends. Under most of our SCS contracts, all or a portion of our pricing is based on certain assumptions regarding the scope of services, production volumes, operational efficiencies, the mix of fixed versus variable costs, productivity and other factors.

If we are incorrect in our assumptions, or as a result of subsequent changes in our customers' business needs or operations, or market forces that are outside of our control, these assumptions prove to be invalid, we could have lower margins than anticipated or be unable to offer competitive products and services. Although some of our SCS contracts provide for renegotiation upon a material change, there is no assurance that we will be successful in obtaining the necessary price adjustments.

**We may face difficulties in attracting and retaining drivers and technicians.**

**Drivers.** We hire drivers primarily for our DTS business segment. There is significant competition for qualified drivers in the transportation industry. Additionally, interventions and enforcement under the Federal Motor Carrier Safety Administration (FMCSA) Compliance, Safety, Accountability program may shrink the industry's pool of drivers as those drivers with unfavorable scores may no longer be eligible to drive for us. As a result of driver shortages, we could be required to increase driver compensation, let trucks sit idle, utilize lower quality drivers or face difficulty meeting customer demands, all of which could adversely affect our growth and profitability.

**Technicians.**  Similarly, we hire technicians in our FMS business segment to perform vehicle maintenance services on our lease, contract maintenance and rental fleets. In recent years, there has been a decrease in the overall supply of skilled maintenance technicians, particularly new technicians with qualifications from technical programs and schools, which could make it more difficult to attract and retain skilled technicians.

## We may face issues with our union employees.

We have 4,100 employees that are organized by labor unions whose wages and benefits are governed by 98 labor agreements that are renegotiated periodically. Some of the industries in which we currently engage have experienced a material work stoppage, slowdown or strike. Our business and operations could be impacted in the event of labor strikes or work stoppages involving our employees organized by labor unions in our FMS, DTS or SCS business segments.

## We operate in a highly regulated industry, and costs of compliance with, or liability for violation of, existing or future regulations could significantly increase our costs of doing business.

Our business is subject to regulation by various federal, state and foreign governmental agencies. These agencies could institute new laws, rules or regulations or issue interpretation changes to existing regulations at any time. We have also seen an increase in proactive enforcement of existing regulations by some entities. Compliance with new laws, rules or regulations could substantially impair labor and equipment productivity, increase our costs or impact our ability to offer certain services. Conversely, our failure to comply with any applicable laws, rules or regulations to which we are subject, whether actual or alleged, could expose us to fines, penalties or potential litigation liabilities, including costs, settlements and judgments. We are also subject to reputational risk and other detrimental business consequences associated with noncompliance, such as employees, customers, agents, suppliers or other persons using our supply chain or assets to commit illegal acts, including the use of company assets for terrorist activities, or a breach of data privacy laws, the ongoing development of which in the U.S. and other jurisdictions may require changes to our data security policies and procedures to comply with new standards.

**Department of Transportation Regulations**.  The U.S. Department of Transportation and various state and federal agencies exercise broad powers over our motor carrier operations, safety and the generation, handling, storage, treatment and disposal of waste materials. Any regulatory initiatives could increase costs or operating complexity.

**Federal Motor Carrier Safety Administration (FMCSA) Compliance, Safety, Accountability Program**.  The FMCSA's Compliance, Safety, Accountability program may increase the cost for our customers given the potential impact to the driver pool, the additional hours of service requirements and additional investment in vehicle equipment.  In addition, although Ryder's scores are below the thresholds that would trigger concern, if performance worsens, we could risk intervention that may create risk to our operating authority.

**Labor and Employment Laws and Regulations**.  We maintain operations and employees in numerous states throughout the U.S., which are governed by federal and state labor and employment laws and regulations relating to compensation, benefits, healthcare and various workplace issues, all of which are applicable to our employees, and in some cases, independent contractors. State labor and employment rules vary from state to state and in some states, require us to meet much stricter standards than required in other states. Also, we are or may become subject to various class-action lawsuits related to wage and hour violations and improper pay in certain states. Unfavorable or unanticipated outcomes in any of the lawsuits could subject us to increased costs and impact our profitability.

**International Laws Governing Countries Where We Have Operations.**  We currently operate in Canada, Europe, Mexico and Asia, where we are subject to compliance with local laws and regulatory requirements of foreign jurisdictions, including local tax laws, and compliance with the Foreign Corrupt Practices Act. Local laws and regulatory requirements may vary significantly from country to country. Customary levels of compliance with local regulations and the tolerance for noncompliance by regulatory authorities may also vary in different countries and geographical locations, and impact our ability to successfully implement our compliance and business initiatives in certain jurisdictions. Also, adherence to rigorous local laws and regulatory requirements may limit our ability to expand into certain international markets and result in residual liability for legal claims and tax disputes arising out of previously discontinued operations.  In addition, uncertainty resulting from the new U.S. presidential administration and congress or the U.K.'s withdrawal from the European Union (Brexit) could adversely impact our (or our customers) business, financial condition and results of operations.

16

**Laws Governing the Operations of our Customers.** The U.S. government or governments of other nations that regulate the operations of our customers or any instituted laws relating to cross-border tariffs or other penalties could disrupt international or domestic supply chain operations. The laws could adversely affect the ability for customers to continue their international operations, which would have a negative impact on the demand for our services.

**Environmental Regulations Regarding Vehicle Exhaust Emissions, Carbon Emissions and Climate Change May Negatively Impact our Business.** Current and future regulations governing vehicle exhaust emissions could adversely impact our business. The Environmental Protection Agency (EPA) issued regulations that required progressive reductions in exhaust emissions from certain diesel engines. The 2015 regulations require reductions in carbon dioxide, which can only be reduced by improving fuel economy, and which require compliance with different emissions standards for both engines and chassis, based on vocation. OEMs may be required to install additional engine componentry, additional aerodynamics on chassis and low-rolling resistance tires to comply with the regulations, which may result in higher operating costs associated with the more complex componentry and a shorter useful tread life for tires and increased operating costs for customers and us.

Additional EPA regulations are expected to go into effect in 2017, with incremental changes through 2027, that may further impact our business. Although customers may see reduced fuel consumption under the new standards, this could be offset by higher maintenance costs per mile . Each of these requirements could also result in higher prices for vehicles, diesel engine fuel and vehicle maintenance, which are passed on to our customers, as well as higher maintenance costs and uncertainty as to reliability of the new engines, all of which could, over time, increase our costs and adversely affect our business and results of operations. The new technology may also impact the residual values of these vehicles when sold in the future.

Future regulation of other environmental matters, including potential limits on carbon emissions under climate-change legislation, could also impact our business and profitability if enacted.

**Other Regulations.** We may also become subject to new or more restrictive regulations imposed by the Occupational Safety and Health Administration, the Department of Homeland Security, U.S. Customs Service or other authorities.

**New lease accounting rules may negatively impact customer demand for our lease products.**

Demand for our full service lease product line is based in part on customers' decisions to lease rather than buy vehicles. A number of factors can impact whether customers decide to lease or buy vehicles, including economic benefits, accounting considerations, tax treatment, interest rates and operational flexibility. In February 2016, the Financial Accounting Standards Board issued its new accounting standards involving a new approach to lease accounting that differs from current practice. Most notably, the new approach eliminates off-balance sheet treatment of leases and require lessees to recognize a right-of-use asset and a lease liability on their balance sheets for all leases with a term of greater than 12 months. This new accounting standard must be implemented by companies as of January 1, 2019, although companies may opt to adopt the standard before this date. Implementation of the new standard could be perceived to make leasing a less attractive option for some of our full service lease customers.

**Changes in income tax regulations for U.S. and multinational companies may increase our tax liability or adversely impact our tax structure.**

The U.S. Congress, the Organization for Economic Co-operation and Development (OECD), the European Union, and other government agencies in jurisdictions in which we and our affiliates invest or do business have maintained a focus on the taxation of multinational companies. The OECD, which represents a coalition of member countries, is supporting changes to numerous long-standing tax principles through its base erosion and profit shifting (BEPS) project, which is focused on a number of issues, including the shifting of profits between affiliated entities in different tax jurisdictions. The European Union has a number of on-going tax initiatives. Additionally, President Trump and Congress have announced proposals for potential reform to the U.S. federal income tax rules for businesses. Certain of these proposals for reform, if enacted by the United States or by other countries in which we or our affiliates invest or do business, could adversely affect us. It is unclear what any actual legislation would provide or what its prospects for enactment would be.

**Volatility in assumptions and asset values related to our pension plans may reduce our profitability and adversely impact current funding levels.**

We historically sponsored a number of defined benefit plans for employees not covered by union-administered plans, including certain employees in foreign countries. The retirement benefits under the defined benefit plans are frozen for non-grandfathered and certain non-union employees. Our major defined benefit plans are funded, with trust assets invested in a diversified portfolio. The cash contributions made to our defined benefit plans are required to comply with minimum funding requirements imposed by employee benefit and tax laws. The projected benefit obligation and assets of our global defined benefit plans as of December 31, 2016, were $2.2 billion and $1.8 billion, respectively. The difference between plan obligations and assets, or the funded status of the plans, is a significant factor in determining pension expense and the ongoing funding requirements of those plans. Macroeconomic factors, as well as changes in investment returns and discount rates used to calculate pension expense and related assets and liabilities can be volatile and may have an unfavorable impact on our costs and funding requirements. Although we have actively sought to control increases in these costs and funding requirements through investment policies and plan contributions, as well as through a lump-sum buyout offer in 2015, there can be no assurance that we will succeed, and continued cost pressure could reduce the profitability of our business and negatively impact our cash flows.

**We are subject to risk of multi-employer pension plan withdrawal.**

We participate in certain U.S. multi-employer pension (MEP) plans that provide defined benefits to employees covered by collective bargaining agreements. In the event that we withdraw from participation in one of these plans, then applicable law could require us to make an additional lump-sum contribution to the plan. Our withdrawal liability for any MEP plan would depend on the extent of the plan's funding of vested benefits. Economic conditions have caused MEP plans to be significantly underfunded. As a result, although we have taken steps in recent years to withdraw from these MEP plans, we may still have liability for at least a period of time following our withdrawal. If the financial condition of the MEP plans were to continue to deteriorate, we could be subject to additional assessments.

**We establish self-insurance reserves based on historical loss development factors, which could lead to adjustments in the future based on actual development experience.**

We retain a portion of the accident risk under vehicle liability and workers' compensation insurance programs. Our self-insurance accruals are based on actuarially estimated, undiscounted cost of claims, which includes claims incurred but not reported. While we believe that our estimation processes are well designed, every estimation process is inherently subject to limitations. Fluctuations in the frequency or severity of accidents make it difficult to precisely predict the ultimate cost of claims. The actual cost of claims can be different than the historical selected loss development factors because of safety performance, payment patterns and settlement patterns. For a detailed discussion on our accounting policies and assumptions relating to our self-insurance reserves, please see the "Critical Accounting Estimates - Self-Insurance Accruals" section in Management's Discussion and Analysis of Financial Condition and Results of Operations.

**Severe weather or other natural occurrences could result in significant business interruptions and expenditures in excess of available insurance coverage.**

Our operations may be affected by external factors such as severe weather and other natural occurrences, including floods, fires, hurricanes and earthquakes at operating locations where we have vehicles, warehouses and other facilities. As a result, our vehicles and facilities may be damaged, our workforce may be unavailable, fuel costs may rise and significant business interruptions could occur. In addition, the performance of our vehicles could be adversely affected by extreme weather conditions. Insurance to protect against loss of business and other related consequences resulting from these natural occurrences is subject to coverage limitations, depending on the nature of the risk insured. This insurance may not be sufficient to cover all of our damages or damages to others and this insurance may not continue to be available at commercially reasonable rates. Even with insurance, if any natural occurrence leads to a catastrophic interruption of service, we may not be able to mitigate a significant interruption in operations.

**Our international operations subject us to operational and financial risks.**

We provide services outside of the U.S., which subjects our business to various risks, including changes in tariffs, trade restrictions, trade agreements and taxes; difficulties in managing or overseeing foreign operations and agents; foreign currency fluctuations and limitations on the repatriation of funds due to foreign currency controls; different liability standards; and intellectual property laws of countries that do not protect our rights in intellectual property to the same extent as the laws of the U.S. The occurrence or consequences of any of these factors may restrict our ability to operate in the affected region and/or decrease the profitability of our operations in that region.  Also, if we do not correctly anticipate changes in international economic and political conditions, we may not alter our business practices in time to avoid adverse effects.

**We may be negatively impacted by adverse events in the global credit and financial markets.**

Significant uncertainty, volatility, disruptions or downturns in the global credit and financial markets may result in:

- unanticipated interest rate and currency exchange rate fluctuations;

- increased risk of default by counterparties under derivative instruments and hedging agreements; and

- diminished liquidity and credit availability resulting in higher short-term borrowing costs and more stringent borrowing terms.

19

**ITEM 1B. UNRESOLVED STAFF COMMENTS**

None.

**ITEM 2. PROPERTIES**

Our properties consist primarily of vehicle maintenance and repair facilities, warehouses and other real estate and improvements.

We maintain 606 FMS properties in the U.S., Puerto Rico and Canada; we own 402 of these and lease the remaining 204. Our FMS properties are primarily comprised of maintenance facilities generally including a repair shop, rental counter, fuel service island, administrative offices, and used vehicle retail sales centers.

Additionally, we manage 181 on-site maintenance facilities, located at customer locations.

We also maintain 189 locations in the U.S. and Canada in connection with our domestic SCS business. Almost all of our SCS locations are leased and generally include a warehouse and administrative offices.

We maintain 123 international locations (locations outside of the U.S. and Canada) for our international businesses. There are 63 locations in the U.K. and Germany, 57 locations in Mexico and 3 locations in Singapore. The majority of these locations are leased and may be a repair shop, warehouse or administrative office.

Additionally, we maintain 10 U.S. locations primarily used for Central Support Services. These facilities are generally administrative offices, of which we own three and lease the remaining seven.

**ITEM 3. LEGAL PROCEEDINGS**

We are involved in various claims, lawsuits and administrative actions arising in the normal course of our businesses. Some involve claims for substantial amounts of money and/or claims for punitive damages. While any proceeding or litigation has an element of uncertainty, management believes that the disposition of such matters, in the aggregate, will not have a material impact on our consolidated financial condition or liquidity.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Ryder Common Stock Prices**

| | Stock Price | | Dividends per |
| | High | Low | Common Share |
|---|---|---|---|
| **2016** | | | |
| **First quarter** | $   **66.36** | **45.12** | **0.41** |
| **Second quarter** | **71.90** | **56.98** | **0.41** |
| **Third quarter** | **69.78** | **59.57** | **0.44** |
| **Fourth quarter** | **85.42** | **62.03** | **0.44** |
| | | | |
| 2015 | | | |
| First quarter | $   99.32 | 82.29 | 0.37 |
| Second quarter | 100.64 | 86.75 | 0.37 |
| Third quarter | 93.86 | 72.66 | 0.41 |
| Fourth quarter | 76.33 | 53.54 | 0.41 |

Our common shares are listed on the New York Stock Exchange under the trading symbol "R." At January 31, 2017, there were 7,181 common stockholders of record and our stock price on the New York Stock Exchange was $77.60.

**Performance Graph**

The following graph compares the performance of our common stock with the performance of the Standard & Poor's 500 Composite Stock Index and the Dow Jones Transportation 20 Index for a five year period by measuring the changes in common stock prices from December 31, 2011 to December 31, 2016.



| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| Ryder System, Inc. | $100.00 | 96.47 | 145.63 | 186.30 | 116.23 | 156.16 |
| S&P 500 Index | $100.00 | 115.98 | 153.51 | 174.47 | 176.88 | 197.98 |
| Dow Jones Index | $100.00 | 107.48 | 151.95 | 190.01 | 158.21 | 193.47 |

The stock performance graph assumes for comparison that the value of the Company's Common Stock and of each index was $100 on December 31, 2011, and that all dividends were reinvested. Past performance is not necessarily an indicator of future results.

22

**Purchases of Equity Securities**

The following table provides information with respect to purchases we made of our common stock during the quarter ended December 31, 2016:

| | Total Number of Shares Purchased [1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program [2] | Maximum Number of Shares That May Yet Be Purchased Under the Anti-Dilutive Program [2] |
|---|---|---|---|---|
| October 1 through October 31, 2016 | 92 | $ 70.88 | — | 1,620,104 |
| November 1 through November 30, 2016 | 143,547 | 73.72 | 143,547 | 1,476,557 |
| December 1 through December 31, 2016 | 13,288 | 79.96 | 12,855 | 1,463,702 |
| Total | 156,927 | $ 74.24 | 156,402 | |

---

(1) *During the three months ended December 31, 2016, we purchased an aggregate of 525 shares of our common stock in employee-related transactions. Employee-related transactions may include: (i) shares of common stock delivered as payment for the exercise price of options exercised or to satisfy the option holders' tax withholding liability associated with our share-based compensation programs and (ii) open-market purchases by the trustee of Ryder's deferred compensation plans relating to investments by employees in our stock, one of the investment options available under the plans.*

(2) *In December 2015, our Board of Directors authorized a new share repurchase program intended to mitigate the dilutive impact of shares issued under our employee stock plans.  Under the December 2015 program, management is authorized to repurchase (i) up to 1.5 million shares of common stock, the sum of  which will not exceed the number of shares issued to employees under the Company's employee stock plans from December 1, 2015 to December 9, 2017,  plus (ii) 0.5 million  shares issued to employees that were not purchased  under the Company's previous share repurchase program. The December 2015 program limits aggregate share repurchases to no more than 2 million shares of Ryder common stock.  Share repurchases of common stock are made periodically in open-market transactions and are subject to market conditions, legal requirements and other factors. Management may establish prearranged written plans for the Company under Rule 10b5-1 of the Securities Exchange Act of 1934 as part of the December 2015 program, which allow for share repurchases during Ryder's quarterly blackout periods as set forth in the trading plan.*

## ITEM 6. SELECTED FINANCIAL DATA

The following selected consolidated financial information should be read in conjunction with Items 7 and 8 of this report.

| | Years ended December 31 | | | | |
|---|---|---|---|---|---|
| | **2016** | 2015 | 2014 | 2013 | 2012 |
| | (Dollars and shares in thousands, except per share amounts) | | | | |
| **Operating Data:** | | | | | |
| Total Revenue | $ **6,786,984** | 6,571,893 | 6,638,774 | 6,419,285 | 6,256,967 |
| Operating Revenue [1] | $ **5,790,897** | 5,561,077 | 5,252,217 | 4,965,818 | 4,770,259 |
| Earnings from continuing operations | $ **264,640** | 305,989 | 220,225 | 243,275 | 200,668 |
| Comparable earnings from continuing operations [2] | $ **290,357** | 327,331 | 296,868 | 256,640 | 226,584 |
| Net earnings [3] | $ **262,477** | 304,768 | 218,341 | 237,871 | 209,748 |
| **Per Share Data:** | | | | | |
| Earnings from continuing operations -Diluted | $ **4.94** | 5.73 | 4.14 | 4.63 | 3.90 |
| Comparable earnings from continuing operations - Diluted [2] | $ **5.42** | 6.13 | 5.58 | 4.88 | 4.40 |
| Net earnings -Diluted [3] | $ **4.90** | 5.71 | 4.11 | 4.53 | 4.08 |
| Cash dividends | $ **1.76** | 1.56 | 1.42 | 1.30 | 1.20 |
| Book value [4] | $ **38.39** | 37.15 | 34.30 | 35.56 | 28.56 |
| **Financial Data:** | | | | | |
| Total assets | $**10,902,454** | 10,952,580 | 9,837,776 | 9,156,175 | 8,439,027 |
| Average assets [5] | $**11,056,740** | 10,464,001 | 9,594,878 | 8,692,120 | 8,168,023 |
| Return on average assets (%) [5] | **2.4** | 2.9 | 2.3 | 2.7 | 2.6 |
| Long-term debt | $ **4,599,864** | 4,868,097 | 4,681,240 | 4,010,810 | 3,577,289 |
| Total debt | $ **5,391,274** | 5,502,627 | 4,717,524 | 4,283,013 | 3,982,044 |
| Shareholders' equity [4] | $ **2,052,275** | 1,987,111 | 1,819,087 | 1,896,561 | 1,467,237 |
| Debt to equity (%) [4] | **263** | 277 | 259 | 226 | 271 |
| Average shareholders' equity [4], [5] | $ **2,052,371** | 1,894,917 | 1,925,824 | 1,593,942 | 1,405,640 |
| Adjusted return on average capital (%) [5], [6] | **4.8** | 5.8 | 5.8 | 5.8 | 5.7 |
| Net cash provided by operating activities from continuing operations | $ **1,601,022** | 1,441,788 | 1,382,818 | 1,251,811 | 1,160,175 |
| Net cash (used)/provided by financing activities from continuing operations | $ **(185,922)** | 731,485 | 311,650 | 347,070 | 333,805 |
| Net cash used in investing activities from continuing operations | $ **(1,405,833)** | (2,161,355) | (1,704,510) | (1,603,818) | (1,504,273) |
| Free cash flow [7] | $ **193,675** | (727,714) | (315,116) | (339,596) | (488,373) |
| Capital expenditures paid | $ **1,905,157** | 2,667,978 | 2,259,164 | 2,122,628 | 2,133,235 |
| **Other Data:** | | | | | |
| Average common shares — Diluted | **53,361** | 53,260 | 53,036 | 52,071 | 50,740 |
| Number of vehicles — Owned and leased | **185,100** | 185,200 | 174,100 | 172,100 | 172,500 |
| Average number of vehicles — Owned and leased | **185,400** | 180,500 | 172,800 | 171,200 | 173,700 |
| Number of employees | **34,500** | 33,100 | 30,600 | 28,900 | 27,700 |

---

(1)   *Non-GAAP financial measure.  Refer to the "Non-GAAP Financial Measures" section in Item 7 for a reconciliation of total revenue to operating revenue, as well as the reasons management believes these measures are important to investors.*

(2)   *Non-GAAP financial measures. Refer to the "Non-GAAP Financial Measures" section in Item 7 of this report for a reconciliation of net earnings from continuing operations to comparable earnings from continuing operations and net earnings from continuing operations per diluted common share to comparable earnings per diluted common share, as well as the reasons management believes these measures are important to investors.*

(3)   *Net earnings in 2016, 2015, 2014, 2013 and 2012, included (losses)/earnings from discontinued operations of $(2) million, or $(0.04) per diluted common share, $(1) million, or $(0.02) per diluted common share, $(2) million, or $(0.03) per diluted common share, $(5) million, or $(0.10) per diluted common share, and $9 million, or $0.18 per diluted common share, respectively.*

(4)   *Shareholders' equity at December 31, 2016, 2015, 2014, 2013 and 2012, reflected cumulative after-tax equity charges of $627 million, $577 million, $584 million, $474 million, and $645 million, respectively, related to our pension and postretirement plans.*

(5)   *Amounts were computed using an 8-point average based on quarterly information.*

(6)   *Non-GAAP financial measure. Refer to the "Non-GAAP Financial Measures" section in Item 7 of this report for a reconciliation of the non-GAAP elements of this calculation and a numerical reconciliation of net earnings to adjusted net earnings and average total debt and average shareholders' equity to adjusted average total capital used to calculate adjusted return on average capital, as well as the reasons management believes these measures are important to investors.*

(7)   *Non-GAAP financial measure. Refer to the "Non-GAAP financial measures" section in Item 7 of this report for a reconciliation of net cash provided by operating activities to free cash flow, as well as the reasons why management believes this measure is important to investors.*

24

# ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) should be read in conjunction with our consolidated financial statements and related notes contained in Item 8 of this report on Form 10-K. The following MD&A describes the principal factors affecting results of operations, financial resources, liquidity, contractual cash obligations, and critical accounting estimates. The information presented in the MD&A is for the years ended December 31, 2016, 2015 and 2014 unless otherwise noted.

OVERVIEW

Ryder System, Inc. (Ryder) is a global leader in transportation and supply chain management solutions. Our operating segments are aggregated into reportable business segments based upon similar economic characteristics, products, services, customers and delivery methods. We report our financial performance based on three business segments: (1) FMS, which provides full service leasing, commercial rental, contract maintenance, and contract-related maintenance of trucks, tractors and trailers to customers principally in the U.S., Canada and the U.K.; (2) DTS, which provides vehicles and drivers as part of a dedicated transportation solution in the U.S.; and (3) SCS, which provides comprehensive supply chain solutions including distribution and transportation services in North America and Asia. Dedicated transportation services provided as part of an integrated, multi-service, supply chain solution to SCS customers are reported in the SCS business segment.

The FMS business, our largest segment, had total revenue (net of intercompany eliminations) and assets in 2016 of $4.1 billion and $10 billion, respectively, representing 61% of our consolidated revenue and 91% of consolidated assets. DTS total revenue and assets in 2016 were $1.0 billion and $256 million, respectively, representing 15% of our consolidated revenue and 2% of consolidated assets. SCS total revenue and assets in 2016 were $1.6 billion and $713 million, respectively, representing 24% of our consolidated revenue and 7% of consolidated assets.

We operate in highly competitive markets. Our customers select us based on numerous factors including service quality, price, technology and service offerings. As an alternative to using our services, customers may choose to provide these services for themselves, or may choose to obtain similar or alternative services from other third-party vendors. Our customer base includes enterprises operating in a variety of industries including food and beverage service (22%), transportation and warehousing (19%), automotive (11%), retail and consumer goods (10%), industrial (8%), housing (8%), technology (7%), business and personal services (6%) and other (9%).

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

The following discussion provides a summary of financial highlights that are discussed in more detail throughout our MD&A and within the Notes to Consolidated Financial Statements:

|  | 2016 | 2015 | 2014 | Change 2016/2015 | Change 2015/2014 |
|---|---|---|---|---|---|
|  | (Dollars in thousands, except per share amounts) | | | | |
| Total revenue | $ 6,786,984 | 6,571,893 | 6,638,774 | 3% | (1)% |
| Operating revenue [1] | 5,790,897 | 5,561,077 | 5,252,217 | 4% | 6% |
| Earnings before income taxes (EBT) | $ 406,381 | 469,215 | 338,267 | (13)% | 39% |
| Comparable EBT [2] | 448,833 | 505,960 | 462,991 | (11)% | 9% |
| Earnings from continuing operations | 264,640 | 305,989 | 220,225 | (14)% | 39% |
| Comparable earnings from continuing operations [2] | 290,357 | 327,331 | 296,868 | (11)% | 10% |
| Net earnings | 262,477 | 304,768 | 218,341 | (14)% | 40% |
| Earnings per common share — Diluted |  |  |  |  |  |
| Continuing operations | $ 4.94 | 5.73 | 4.14 | (14)% | 38% |
| Comparable [2] | 5.42 | 6.13 | 5.58 | (12)% | 10% |
| Net earnings | 4.90 | 5.71 | 4.11 | (14)% | 39% |

_____

(1) *Non-GAAP financial measure. Refer to the "Non-GAAP Financial Measures" section of this MD&A for a reconciliation of total revenue to operating revenue and the reasons why management believes this measure is important to investors.*

(2) *Non-GAAP financial measures. Refer to the "Non-GAAP Financial Measures" section for a reconciliation of EBT, net earnings and earnings per diluted common share to the comparable measures and the reasons why management believes these measures are important to investors.*

In 2016, total revenue increased 3% to $6.79 billion and operating revenue (a non-GAAP measure excluding fuel and subcontracted transportation) increased 4% to $5.79 billion. Total and operating revenue increased due to growth in the full service lease fleet and higher prices on full service lease replacement vehicles and new business, increased volumes and higher pricing in SCS and DTS. These increases were partially offset by lower demand in commercial rental and negative impacts from foreign exchange. Total revenue was also negatively impacted by lower prices on fuel passed through to customers, partially offset by increased subcontracted transportation in DTS. EBT decreased 13% in 2016, reflecting lower used vehicle and commercial rental results, partially offset by higher full service lease results in FMS and margin growth in SCS and DTS.

Cash provided by operating activities from continuing operations increased to $1.60 billion in 2016 compared with $1.44 billion in 2015. Free cash flow from continuing operations (a non-GAAP financial measure) increased to positive $194 million in 2016 from negative $728 million in 2015 reflecting lower capital expenditures.

Capital expenditures decreased 35% to $1.76 billion in 2016, reflecting planned lower investments in the full service lease and commercial rental fleets. Our debt balance decreased 2% to $5.39 billion at December 31, 2016, due to lower financing needs to fund capital expenditures. Our debt to equity ratio decreased to 263% from 277% in 2015, largely driven by positive free cash flow and lower borrowings to fund capital expenditures.

We increased our annual dividend by 7% to $1.76 per share of common stock during 2016.

*2017 Outlook*

In 2017, we expect to deliver another year of solid revenue growth, however, we expect continued challenges in the used vehicle sales environment to result in lower earnings. While future pricing will be determined by the market, our forecast assumes average vehicle pricing will decline by double digits in 2017. We have also accelerated depreciation on vehicles in operation that are expected to be available for sale through mid-2018 to reflect this lower outlook. We anticipate that secular trends favoring outsourcing will drive continued revenue and earnings growth in our contractual businesses across all three segments and expect lease fleet growth of 3,500 vehicles. We expect better commercial rental results reflecting improved utilization in 2017. In addition to earnings growth from our contractual products and improved rental performance, we also anticipate earnings to benefit from workforce reductions taken in late 2016 and other cost-savings actions.

We expect cash provided by operating activities from continuing operations to increase approximately $100 million to $1.7 billion in 2017. We also expect free cash flow to increase $60 million to $250 million in 2017, reflecting increased cash from operations partially offset by higher capital spending. Given the increase in free cash flow, we expect to reduce our leverage to the middle of our long-term range, supporting our ability to continue anti-dilutive share repurchases.

We forecast 2017 earnings from continuing operations of $4.78 to $5.08 per diluted share, compared with $4.94 per diluted share in 2016, and comparable earnings from continuing operations of $5.10 to $5.40 per diluted share, compared with $5.42 per diluted share in 2016. Comparable earnings exclude non-operating pension costs of $0.32 per diluted share in 2017, as well as non-operating pension, restructuring and other net charges of $0.48 in 2016. Total revenue for 2017 is expected to be up 4% to approximately $7 billion. Operating revenue for 2017 is forecast to be up 3% to approximately $6 billion.

Free cash flow, comparable earnings from continuing operations per diluted share and operating revenue are non-GAAP financial measures. Refer to the "Non-GAAP financial measures" section of this MD&A for a description of these measures, reconciliations to their comparable GAAP measures and the reasons why management believes these measures are important to investors.

FULL YEAR CONSOLIDATED RESULTS

### Revenue and cost of revenue by source

Total revenue increased 3% in 2016 to $6.79 billion and decreased 1% in 2015 to $6.57 billion. Operating revenue (a non-GAAP measure excluding fuel and subcontracted transportation) increased 4% in 2016 to $5.79 billion and increased 6% in 2015 to $5.56 billion. The following table summarizes the components of the change in revenue on a percentage basis versus the prior year:

| | 2016 | | 2015 | |
| | Total | Operating | Total | Operating |
|---|---|---|---|---|
| Organic, including price and volume | 6% | 5% | 7% | 8% |
| Fuel | (2) | — | (6) | — |
| Foreign exchange | (1) | (1) | (2) | (2) |
| Total increase/(decrease) | 3% | 4% | (1)% | 6% |

### Lease and Rental

| | 2016 | 2015 | 2014 | Change 2016/2015 | 2015/2014 |
|---|---|---|---|---|---|
| | | (Dollars in thousands) | | | |
| Lease and rental revenues | $ 3,170,952 | 3,121,553 | 2,939,422 | 2% | 6% |
| Cost of lease and rental | 2,234,284 | 2,153,450 | 2,036,881 | 4% | 6% |
| Gross margin | 936,668 | 968,103 | 902,541 | (3)% | 7% |
| Gross margin % | 30% | 31% | 31% | | |

Lease and rental revenues represent full service lease and commercial rental product offerings within our FMS business segment. Revenues increased 2% in 2016 to $3.17 billion and increased 6% in 2015 to $3.12 billion. In 2016, the increase was due to higher full service lease revenue, driven by growth in the average full service lease fleet (up 4% in 2016) and higher prices on replacement vehicles. Lease and rental revenues in 2016 were negatively impacted by lower commercial rental revenue reflecting weaker demand. Foreign exchange negatively impacted revenue growth by 100 basis points. In 2015, the increase was primarily driven by a larger full service lease fleet, higher prices on full service lease vehicles and increased commercial rental revenue. Foreign exchange negatively impacted 2015 lease and rental revenue growth by 200 basis points.

Cost of lease and rental represents the direct costs related to lease and rental revenues. These costs are comprised of depreciation of revenue earning equipment, maintenance costs (primarily repair parts and labor), and other fixed costs such as licenses, insurance and operating taxes. Cost of lease and rental excludes interest costs from vehicle financing. Cost of lease and rental were $2.2 billion in both 2016 and 2015. In 2016, cost of lease and rental reflected higher depreciation and maintenance costs from a larger average lease fleet and accelerated depreciation on vehicles expected to be made available for sale through June 2018 of $10 million, offset by lower depreciation and maintenance on a smaller average rental fleet (down 8% in 2016). Changes in estimated residual values and useful lives of revenue earning equipment effective January 1, 2016, benefited cost of lease and rental by $35 million in 2016. In 2015, the increase was due to higher depreciation, insurance and maintenance costs resulting from a 4% larger average lease fleet and a 7% larger average rental fleet. Cost of lease and rental benefited by $40 million in 2015 due to changes in estimated residual values and useful lives of revenue earning equipment effective January 1, 2015.

Lease and rental gross margin decreased 3% to $937 million and gross margin as a percentage of revenue decreased to 30% in 2016 due to lower commercial rental demand, partially offset by lease fleet growth, as well as benefits from improved residual values. Gross margin increased 7% to $968 million and gross margin as a percentage of revenue remained at 31% in 2015 due to higher per-vehicle pricing and benefits from improved vehicle residual values.

**Services**

| | 2016 | 2015 | 2014 | Change 2016/2015 | 2015/2014 |
|---|---|---|---|---|---|
| | | (Dollars in thousands) | | | |
| Services revenue | $ 3,152,294 | 2,912,063 | 2,911,465 | 8% | —% |
| Cost of services | 2,602,978 | 2,413,156 | 2,447,867 | 8% | (1)% |
| Gross margin | 549,316 | 498,907 | 463,598 | 10% | 8% |
| Gross margin % | 17% | 17% | 16% | | |

Services revenue represents all the revenues associated with our DTS and SCS business segments as well as contract maintenance, contract-related maintenance and fleet support services associated with our FMS business segment. Services revenue increased 8% in 2016 due to new business, increased volumes and higher pricing in the DTS and SCS segments. The contract-related maintenance and contract maintenance product lines benefited from growth in fleet size, and contract-related maintenance revenue also increased from higher volumes. These increases were partially offset by lower fuel prices passed through to our DTS and SCS customers. Services revenue in 2015 was consistent with the prior year as new business, increased pricing and higher volumes in our SCS and DTS business segments were offset by lower fuel prices and negative impacts from foreign exchange. Foreign exchange negatively impacted revenue growth by 200 basis points in both periods.

Cost of services represents the direct costs related to services revenue and is primarily comprised of salaries and employee-related costs, subcontracted transportation (purchased transportation from third parties), maintenance costs and fuel. Cost of services increased 8% in 2016 to $2.6 billion due to higher volumes, partially offset by lower fuel and insurance costs. Foreign exchange reduced cost of services by 100 basis points in 2016. Cost of services decreased 1% in 2015 to $2.41 billion due to lower fuel costs as well as lower shutdown costs in our SCS business, partially offset by increased insurance and compensation-related costs. The 2015 decrease also reflects higher prior-year start-up and severe winter weather-related costs.

Services gross margin increased 10% to $549 million in 2016, reflecting benefits from higher pricing, new business and higher volumes in our DTS and SCS segments. Services gross margin increased 8% to $499 million in 2015 due to higher revenue. Services gross margin as a percentage of revenue remained at 17% in 2016 and increased to 17% in 2015 due to lower costs.

**Fuel**

| | 2016 | 2015 | 2014 | Change 2016/2015 | 2015/2014 |
|---|---|---|---|---|---|
| | | (Dollars in thousands) | | | |
| Fuel services revenue | $ 463,738 | 538,277 | 787,887 | (14)% | (32)% |
| Cost of fuel services | 448,306 | 519,843 | 768,292 | (14)% | (32)% |
| Gross margin | 15,432 | 18,434 | 19,595 | (16)% | (6)% |
| Gross margin % | 3% | 3% | 2% | | |

Fuel services revenue decreased 14% in 2016 to $464 million and decreased 32% in 2015 to $538 million. In both 2016 and 2015, the revenue decrease was due to lower fuel prices passed through to customers. In addition, foreign exchange negatively impacted revenue growth by 100 basis points in 2015. Foreign exchange did not significantly impact revenue growth in 2016.

Cost of fuel services includes the direct costs associated with providing our customers with fuel. These costs include fuel, salaries and employee-related costs of fuel island attendants and depreciation of our fueling facilities and equipment. Cost of fuel services decreased 14% in 2016 to $448 million and decreased 32% in 2015 to $520 million due to lower fuel prices.

Fuel services gross margin decreased 16% to $15 million in 2016 and decreased 6% to $18 million in 2015. Fuel services gross margin as a percentage of revenue remained at 3% in 2016 and increased to 3% in 2015. Fuel is largely a pass-through to customers for which we realize minimal changes in margin during periods of steady market fuel prices. However, fuel services margin is impacted by sudden increases or decreases in market fuel prices during a short period of time as customer pricing for fuel is established based on trailing market fuel costs.

# ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)

| | 2016 | 2015 | 2014 | Change 2016/2015 | Change 2015/2014 |
|---|---|---|---|---|---|
| | | (In thousands) | | | |
| Other operating expenses | $ 113,461 | 117,082 | 115,808 | (3)% | 1% |

Other operating expenses include costs related to our owned and leased facilities within the FMS business segment such as depreciation, rent, insurance, utilities and taxes. These facilities are utilized to provide maintenance to our lease, rental, contract maintenance and fleet support services customers. Other operating expenses decreased 3% to $113 million in 2016, due to lower utility and maintenance costs for FMS facilities. Other operating expenses increased 1% to $117 million in 2015.

| | 2016 | 2015 | 2014 | Change 2016/2015 | Change 2015/2014 |
|---|---|---|---|---|---|
| | | (Dollars in thousands) | | | |
| Selling, general and administrative expenses (SG&A) | $ 842,697 | 844,497 | 816,975 | —% | 3% |
| Percentage of total revenue | 12% | 13% | 12% | | |

SG&A expenses were down slightly at $843 million in 2016 and increased 3% to $844 million in 2015. SG&A expenses as a percent of total revenue decreased to 12% in 2016 and increased to 13% in 2015. Lower compensation-related expenses, marketing-related costs, professional fees and the effects from foreign exchange in SG&A expenses in 2016, were offset by increased pension expense and information technology costs. Pension expense, which primarily impacts SG&A expenses, increased $20 million in 2016 due to the impact of a lower asset return assumption and a higher discount rate as well as a $8 million one-time charge in the second quarter to reflect pension benefit improvements made in 2009 that were not fully reflected in our pension benefit obligation in prior years. The increase in 2015 primarily reflects higher professional fees and compensation-related expenses, strategic investments in information technology and a settlement of a customer-extended insurance claim partially offset by foreign exchange. Foreign exchange reduced growth in SG&A expenses by 100 basis points in 2016 and 200 basis points in 2015.

| | 2014 |
|---|---|
| | (In thousands) |
| Pension lump sum settlement expense | $ 97,231 |

In 2014, we reduced the size and potential volatility of our U.S. pension plan obligation by offering former employees a one-time option to receive a lump sum distribution of their vested benefits. The transaction resulted in a non-cash pension settlement loss of $97 million. Refer to Note 22, "Employee Benefit Plans," in the Notes to Consolidated Financial Statements for additional information.

| | 2016 | 2015 | 2014 | Change 2016/2015 | Change 2015/2014 |
|---|---|---|---|---|---|
| | | (In thousands) | | | |
| Used vehicle sales, net | $ 972 | 99,853 | 116,060 | (99)% | (14)% |

Used vehicle sales, net includes gains and selling costs from sales of used vehicles as well as the write-downs of vehicles classified as held for sale to fair market value. Used vehicle sales, net decreased 99% to $1 million in 2016, due to a drop in the market value of trucks and tractors, which has resulted in lower gains on sales of used vehicles and higher fair market value write-downs. Average proceeds per unit decreased in 2016 from the prior year reflecting a 14% decrease in tractor proceeds per unit and a 1% decrease in truck proceeds per unit. We expect used vehicle pricing to continue declining through 2017. Used vehicle sales, net decreased 14% to $100 million in 2015 due to lower sales volume and higher fair market value write-downs, partially offset by higher average proceeds per unit.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

|  | | | | Change | |
|---|---|---|---|---|---|
|  | **2016** | 2015 | 2014 | **2016/2015** | 2015/2014 |
|  | (Dollars in thousands) | | | | |
| Interest expense | **$ 147,843** | 150,434 | 144,739 | **(2)%** | 4% |
| Effective interest rate | **2.7%** | 2.9% | 3.1% | | |

Interest expense decreased 2% to $148 million in 2016, reflecting a lower effective interest rate, partially offset by higher average outstanding debt. Interest expense increased 4% to $150 million in 2015, reflecting higher average outstanding debt, partially offset by a lower effective interest rate. The increase in average outstanding debt in 2015 reflects planned higher vehicle capital spending in that year. The lower effective interest rate in both years reflects the replacement of higher interest rate debt with debt issuances at lower rates.

|  | **2016** | 2015 | 2014 |
|---|---|---|---|
|  | (In thousands) | | |
| Miscellaneous income, net | **$ 13,068** | 10,156 | 13,613 |

Miscellaneous income, net consists of investment income on securities used to fund certain benefit plans, interest income, gains from sales of operating property, foreign currency transaction gains and other non-operating items. The increase in 2016 is primarily driven by increased rabbi trust investment income. The decrease in 2015 reflects a gain on a contract settlement that benefited 2014.

|  | **2016** | 2015 | 2014 |
|---|---|---|---|
|  | (In thousands) | | |
| Restructuring and other charges, net | **$ 5,074** | 14,225 | 2,387 |

During the fourth quarter of 2016 and 2015, we approved plans to reduce our workforce in multiple locations as a result of cost containment actions. These actions resulted in pre-tax charges of $5 million in 2016 and $9 million in 2015. The workforce reduction approved in 2016 was substantially completed in December 2016 and is expected to result in annual cost savings of approximately $20 million. The workforce reduction approved in 2015 was completed during 2016. During the fourth quarter of 2015, we also committed to a plan to divest our Ryder Canadian Retail Shippers Association Logistics operations and shutdown our Ryder Container Terminals business in Canada. The sale and shutdown were completed in 2016. We recognized charges in 2015 for this action of $3 million for employee termination costs and $2 million for asset impairment to adjust assets held for sale to fair value. Refer to Note 4, "Restructuring and Other Charges" in the Notes to Consolidated Financial Statements for further discussion.

|  | | | | Change | |
|---|---|---|---|---|---|
|  | **2016** | 2015 | 2014 | **2016/2015** | 2015/2014 |
|  | (Dollars in thousands) | | | | |
| Provision for income taxes | **$ 141,741** | 163,226 | 118,042 | **(13)%** | 38% |
| Effective tax rate from continuing operations | **34.9%** | 34.8% | 34.9% | | |

Our provision for income taxes and effective income tax rates from continuing operations are impacted by such items as enacted tax law changes, settlement of tax audits and the reversal of reserves for uncertain tax positions due to the expiration of statutes of limitation. In the aggregate, these items reduced the effective rate by 0.8% in 2016, 2.2% in 2015 and 1.8% in 2014. The other components of the effective tax rate in 2016 and 2015 remained consistent with the prior year.

On December 18, 2015, the U.S. enacted the Protecting Americans from Tax Hikes Act (PATH). This enactment along with the Tax Increase Prevention Act of 2014, the American Taxpayer Relief Act of 2012, the 2010 Tax Relief, and the Unemployment Insurance Reauthorization and Job Creation Act, expanded and extended bonus depreciation to qualified property placed in service during 2010 through 2019. These changes will continue to significantly reduce our U.S. federal tax payments.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

FULL YEAR OPERATING RESULTS BY BUSINESS SEGMENT

| | 2016 | 2015 | 2014 | Change 2016/2015 | 2015/2014 |
|---|---|---|---|---|---|
| | | (In thousands) | | | |
| **Revenue:** | | | | | |
| Fleet Management Solutions | $ **4,556,194** | 4,545,692 | 4,655,758 | **— %** | (2)% |
| Dedicated Transportation Solutions | **1,020,895** | 895,538 | 899,802 | **14** | — |
| Supply Chain Solutions | **1,637,850** | 1,547,763 | 1,561,347 | **6** | (1) |
| Eliminations | **(427,955)** | (417,100) | (478,133) | **(3)** | 13 |
| Total | $ **6,786,984** | 6,571,893 | 6,638,774 | **3 %** | (1)% |
| | | | | | |
| **Operating Revenue:** [1] | | | | | |
| Fleet Management Solutions | $ **3,947,740** | 3,846,046 | 3,630,521 | **3 %** | 6 % |
| Dedicated Transportation Solutions | **774,319** | 714,453 | 661,228 | **8** | 8 |
| Supply Chain Solutions | **1,352,077** | 1,256,309 | 1,201,250 | **8** | 5 |
| Eliminations | **(283,239)** | (255,731) | (240,782) | **(11)** | (6) |
| Total | $ **5,790,897** | 5,561,077 | 5,252,217 | **4 %** | 6 % |
| | | | | | |
| **EBT:** | | | | | |
| Fleet Management Solutions | $ **370,754** | 462,109 | 433,736 | **(20)%** | 7 % |
| Dedicated Transportation Solutions | **63,611** | 45,800 | 44,556 | **39** | 3 |
| Supply Chain Solutions | **105,561** | 93,754 | 77,800 | **13** | 21 |
| Eliminations | **(50,148)** | (47,193) | (41,361) | **(6)** | (14) |
| | **489,778** | 554,470 | 514,731 | **(12)** | 8 |
| Unallocated Central Support Services | **(40,945)** | (48,510) | (51,740) | **16** | 6 |
| Non-operating pension costs | **(29,728)** | (19,186) | (9,768) | **(55)** | (96) |
| Restructuring and other charges, net and other items | **(12,724)** | (17,559) | (114,956) | **NM** | NM |
| Earnings from continuing operations before income taxes | $ **406,381** | 469,215 | 338,267 | **(13)%** | 39 % |

_____

(1) _Non-GAAP financial measures. Refer to the "Non-GAAP Financial Measures" section of this MD&A for a reconciliation of total revenue to operating revenue, and segment total revenue to segment operating revenue for FMS, DTS and SCS, as well as the reasons why management believes these measures are important to investors._

    As part of management's evaluation of segment operating performance, we define the primary measurement of our segment financial performance as EBT from continuing operations, which includes an allocation of Central Support Services (CSS), and excludes non-operating pension costs, restructuring and other charges, net, as described in Note 4, "Restructuring and Other Charges," and the items discussed in Note 24, "Other Items Impacting Comparability," in the Notes to Consolidated Financial Statements. CSS represents those costs incurred to support all business segments, including human resources, finance, corporate services and public affairs, information technology, health and safety, legal, marketing and corporate communications.

    The objective of the EBT measurement is to provide clarity on the profitability of each business segment and, ultimately, to hold leadership of each business segment and each operating segment within each business segment accountable for their allocated share of CSS costs. Segment results are not necessarily indicative of the results of operations that would have occurred had each segment been an independent, stand-alone entity during the periods presented. Certain costs are not attributable to any segment and remain unallocated in CSS, including costs for investor relations, public affairs and certain executive compensation. See Note 27, "Segment Reporting," in the Notes to Consolidated Financial Statements for a description of the methodology for allocating the remainder of CSS costs to the business segments.

# ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)

Inter-segment revenue and EBT are accounted for at rates similar to those executed with third parties. EBT related to inter-segment equipment and services billed to customers (equipment contribution) are included in DTS and SCS and then eliminated (presented as "Eliminations" in the table above). Refer to Note 27, "Segment Reporting" in the Notes to Consolidated Financial Statements for additional information.

The following table sets forth equipment contribution included in EBT for our DTS and SCS business segments:

|  | | | | Change | |
| --- | --- | --- | --- | --- | --- |
|  | **2016** | 2015 | 2014 | **2016/2015** | 2015/2014 |
|  | (Dollars in thousands) | | | | |
| Equipment Contribution: | | | | | |
| Dedicated Transportation Solutions | $ **32,731** | 32,471 | 28,436 | 1% | 14% |
| Supply Chain Solutions | **17,417** | 14,722 | 12,925 | 18 | 14 |
| Total | $ **50,148** | 47,193 | 41,361 | 6% | 14% |

The following table provides items excluded from our segment EBT measure and their classification within our Consolidated Statements of Earnings:

| Description | Consolidated Statements of Earnings Line Item | **2016** | 2015 | 2014 |
| --- | --- | --- | --- | --- |
|  | | (In thousands) | | |
| Non-operating pension costs | SG&A | $ **(29,728)** | (19,186) | (9,768) |
| Restructuring and other charges, net [1] | Restructuring and other charges | **(5,074)** | (14,225) | (2,387) |
| Consulting fees [2] | SG&A | **—** | (3,843) | (400) |
| Pension-related adjustments [3] | SG&A | **(7,650)** | 509 | (12,564) |
| Pension lump sum settlement expense [3] | Pension lump sum settlement expense | **—** | — | (97,231) |
| Acquisition-related tax adjustment [2] | SG&A | **—** | — | (1,808) |
| Acquisition transaction costs | SG&A | **—** | — | (566) |
|  | | $ **(42,452)** | (36,745) | (124,724) |

_____

(1)  See Note 4, "Restructuring and Other Charges," in the Notes to Consolidated Financial Statements for additional information.
(2)  See Note 24, "Other Items Impacting Comparability," in the Notes to Consolidated Financial Statements for additional information.
(3)  See Note 22, "Employee Benefit Plans," in the Notes to Consolidated Financial Statements for additional information.

**Fleet Management Solutions**

| | 2016 | 2015 | 2014 | Change 2016/2015 | 2015/2014 |
|---|---|---|---|---|---|
| | | (Dollars in thousands) | | | |
| Full service lease | $ 2,573,638 | 2,406,711 | 2,276,381 | 7% | 6% |
| Contract maintenance | 199,923 | 192,470 | 184,591 | 4 | 4 |
| Contractual revenue | 2,773,561 | 2,599,181 | 2,460,972 | 7 | 6 |
| Commercial rental | 846,331 | 940,045 | 876,994 | (10) | 7 |
| Contract-related maintenance | 249,806 | 229,195 | 221,491 | 9 | 3 |
| Other | 78,042 | 77,625 | 71,064 | 1 | 9 |
| Fuel services revenue | 608,454 | 699,646 | 1,025,237 | (13) | (32) |
| FMS Total revenue [1] | $ 4,556,194 | 4,545,692 | 4,655,758 | —% | (2)% |
| FMS Operating revenue [2] | $ 3,947,740 | 3,846,046 | 3,630,521 | 3 | 6 |
| FMS EBT | $ 370,754 | 462,109 | 433,736 | (20)% | 7% |
| FMS Segment EBT as a % of FMS total revenue | 8.1% | 10.2% | 9.3% | (210) bps | 90 bps |
| FMS Segment EBT as a % of FMS operating revenue [1] | 9.4% | 12.0% | 11.9% | (260) bps | 10 bps |

_____

(1) *Includes intercompany fuel sales from FMS to DTS and SCS.*

(2) *Non-GAAP financial measures. Reconciliations of FMS total revenue to FMS operating revenue, and FMS EBT as a % of FMS total revenue to FMS EBT as a % of FMS operating revenue, as well as the reasons why management believes these measures are important to investors are included in the "Non-GAAP Financial Measures" section of this MD&A.*

FMS total revenue increased slightly to $4.56 billion in 2016 and decreased 2% in 2015 to $4.55 billion. FMS operating revenue (a non-GAAP measure excluding fuel) increased 3% in 2016 to $3.95 billion and increased 6% in 2015 to $3.85 billion. The following table summarizes the components of the change in revenue on a percentage basis versus the prior year:

| | 2016 | | 2015 | |
|---|---|---|---|---|
| | Total | Operating [1] | Total | Operating [1] |
| Organic, including price and volume | 3% | 4% | 7% | 8% |
| Fuel | (2) | — | (7) | — |
| Foreign exchange | (1) | (1) | (2) | (2) |
| Total (decrease)/increase | —% | 3% | (2)% | 6% |

_____

(1) *Non-GAAP financial measures. A reconciliation of FMS total revenue to FMS operating revenue as well as the reasons why management believes these measures are important to investors are included in the "Non-GAAP Financial Measures" section of this MD&A.*

**2016 versus 2015**

Full service lease revenue increased 7% in 2016, reflecting a larger average fleet size and higher prices on replacement vehicles. Foreign exchange negatively impacted full service lease revenue growth by 100 basis points. The average number of full service lease vehicles increased 4% from the prior year, reflecting continued strong sales activity. We expect favorable full service lease comparisons to continue next year primarily due to strong 2016 sales activity, as well as 2017 expected sales. Commercial rental revenue decreased 10% in 2016 due to lower demand. Foreign exchange negatively impacted commercial rental revenue growth by 100 basis points. We expect unfavorable commercial rental comparisons next year based on a weaker demand environment. Contract maintenance revenue increased 4% in 2016, primarily due to higher volumes and new business. Contract-related maintenance revenue increased 9% in 2016, reflecting favorable impacts from growth in the full service lease fleet and higher volumes. Fuel services revenue declined 13% in 2016 due to lower prices passed through to customers.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

FMS EBT decreased 20% in 2016 to $371 million, reflecting lower used vehicle sales results, decreased commercial rental performance and accelerated depreciation on vehicles expected to be made available for sale through June 2018 of $10 million, partially offset by higher full service lease performance and lower overhead costs. Used vehicle sales results declined due to lower proceeds per unit, primarily with tractors and higher fair market value write-downs on vehicles held for sale. Commercial rental performance declined 16% in 2016 reflecting decreased demand. Rental power fleet utilization was 74.7% in 2016, down from 76.5% in 2015, on a 7% smaller average rental power fleet. Full service lease comparisons benefited from growth in fleet size and higher per-vehicle pricing. Full service lease and commercial rental results benefited from lower depreciation of $35 million due to residual value changes implemented January 1, 2016.

**2015 versus 2014**

Full service lease revenue increased 6% in 2015 due to lease fleet growth and higher pricing on replacement vehicles. Foreign exchange negatively impacted full service lease revenue growth by 200 basis points. The average number of full service lease vehicles increased 4% from the prior year. Commercial rental revenue increased 7% in 2015, reflecting higher North American demand and increased pricing (up 3% in 2015). Foreign exchange negatively impacted commercial rental revenue growth by 200 basis points. Contract maintenance revenue increased 4% in 2015, primarily due to higher volumes and new business. Contract-related maintenance revenue increased 3% in 2015, reflecting higher volumes and new business. Both contract-related maintenance and contract maintenance were positively impacted in 2015 by the full year impact of the 2014 acquisition of Bullwell Trailer Solutions. Fuel services revenue declined 32% in 2015 due to lower prices passed through to customers.

FMS EBT increased 7% in 2015 to $462 million primarily due to higher full service lease results and strong commercial rental performance, partially offset by lower used vehicle sales results. Full service lease comparisons benefited from growth in fleet size and higher per-vehicle pricing. Commercial rental performance improved 8% in 2015 from the prior year, reflecting increased North American demand and higher pricing. Rental power fleet utilization was 76.5% in 2015, down from 77.6% in 2014 on an 8% larger average rental power fleet. Full service lease and commercial rental results benefited from lower depreciation of $40 million due to residual value changes implemented January 1, 2015. Used vehicle sales results decreased due to lower volume, partially offset by higher proceeds per unit.

The following table provides commercial rental statistics on our global fleet:

| | 2016 | 2015 | 2014 | Change 2016/2015 | 2015/2014 |
|---|---|---|---|---|---|
| | | (Dollars in thousands) | | | |
| Rental revenue from non-lease customers | $ 528,892 | 571,985 | 523,063 | (8)% | 9% |
| Rental revenue from lease customers [1] | $ 317,439 | 368,060 | 353,931 | (14)% | 4% |
| Average commercial rental power fleet size – in service [2], [3] | 31,500 | 33,800 | 31,200 | (7)% | 8% |
| Commercial rental utilization – power fleet [2] | 74.7% | 76.5% | 77.6% | (180) bps | (110) bps |

[1] Represents revenue from rental vehicles provided to our existing full service lease customers, generally in place of a lease vehicle.
[2] Number of units rounded to nearest hundred and calculated using quarterly average unit counts.
[3] Excluding trailers.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

Our global fleet of owned and leased revenue earning equipment and contract maintenance vehicles is summarized as follows (number of units rounded to the nearest hundred):

| | 2016 | 2015 | 2014 | Change 2016/2015 | 2015/2014 |
|---|---|---|---|---|---|
| **End of period vehicle count** | | | | | |
| By type: | | | | | |
|   Trucks[1] | **73,300** | 72,800 | 68,900 | **1%** | 6% |
|   Tractors [2] | **67,900** | 68,700 | 62,400 | **(1)** | 10 |
|   Trailers [3], [4] | **42,800** | 42,400 | 41,400 | **1** | 2 |
|   Other | **1,100** | 1,300 | 1,400 | **(15)** | (7) |
| Total | **185,100** | 185,200 | 174,100 | **—%** | 6% |
| | | | | | |
| By ownership: | | | | | |
|   Owned | **183,700** | 184,700 | 172,300 | **(1)%** | 7% |
|   Leased | **1,400** | 500 | 1,800 | **180** | (72) |
|     Total | **185,100** | 185,200 | 174,100 | **—%** | 6% |
| | | | | | |
| By product line: [4] | | | | | |
|   Full service lease | **136,500** | 131,800 | 125,500 | **4%** | 5% |
|   Commercial rental | **37,800** | 42,100 | 39,900 | **(10)** | 6 |
|   Service vehicles and other | **3,300** | 3,300 | 3,200 | **—** | 3 |
|     Active units | **177,600** | 177,200 | 168,600 | **—** | 5 |
|   Held for sale | **7,500** | 8,000 | 5,500 | **(6)** | 45 |
|     Total | **185,100** | 185,200 | 174,100 | **—** | 6 |
| Customer vehicles under contract maintenance | **49,000** | 46,700 | 42,400 | **5** | 10 |
| Total vehicles serviced | **234,100** | 231,900 | 216,500 | **1%** | 7% |
| | | | | | |
| **Average vehicle count** | | | | | |
| By product line: | | | | | |
|   Full service lease | **134,400** | 128,800 | 123,400 | **4%** | 4% |
|   Commercial rental | **39,200** | 42,400 | 39,800 | **(8)** | 7 |
|   Service vehicles and other | **3,400** | 3,200 | 3,100 | **6** | 3 |
|     Active units | **177,000** | 174,400 | 166,300 | **1** | 5 |
|   Held for sale | **8,400** | 6,100 | 6,500 | **38** | (6) |
|     Total | **185,400** | 180,500 | 172,800 | **3** | 4 |
| Customer vehicles under contract maintenance | **49,200** | 43,300 | 39,500 | **14%** | 10% |
| Customer vehicles under on-demand maintenance [5] | **21,000** | 20,000 | 17,000 | **5%** | 18% |
| Total vehicles serviced | **255,600** | 243,800 | 229,300 | **5%** | 6% |

(1) Generally comprised of Class 1 through Class 7 type vehicles with a Gross Vehicle Weight (GVW) up to 33,000 pounds.
(2) Generally comprised of over the road on highway tractors and are primarily comprised of Class 8 type vehicles with a GVW of over 33,000 pounds.
(3) Generally comprised of dry, flatbed and refrigerated type trailers.
(4) Includes 5,300 UK trailers (3,300 full service lease and 2,000 commercial rental), 6,100 UK trailers (3,900 full service lease and 2,200 commercial rental) and 6,800 UK trailers (4,400 full service lease and 2,400 commercial rental) as of December 31, 2016, 2015 and 2014, respectively, primarily acquired as part of the Hill Hire acquisition.
(5) Comprised of the number of unique vehicles serviced under on-demand maintenance agreements. Vehicles included in the end of period count may have been serviced more than one time during the respective annual period.

Note: Average vehicle counts were computed using a 24-point average based on monthly information.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

The totals in the previous table include the following non-revenue earning equipment for the global fleet (number of units rounded to the nearest hundred):

| | | | | Change | |
|---|---|---|---|---|---|
| Number of Units | **2016** | 2015 | 2014 | **2016/2015** | 2015/2014 |
| Not yet earning revenue (NYE) | **1,700** | 2,800 | 2,300 | **(39)%** | 22% |
| No longer earning revenue (NLE): | | | | | |
| Units held for sale | **7,500** | 8,000 | 5,500 | **(6)** | 45 |
| Other NLE units | **4,400** | 3,300 | 3,000 | **33** | 10 |
| Total | **13,600** | 14,100 | 10,800 | **(4)%** | 31% |

NYE units represent new vehicles on hand that are being prepared for deployment to a lease customer or into the rental fleet. Preparations include activities such as adding lift gates, paint, decals, cargo area and refrigeration equipment. For 2016, the number of NYE units decreased 39% compared with December 31, 2015, reflecting lower lease fleet growth and the redeployment of used vehicles to fulfill lease sales. NLE units represent all vehicles held for sale and vehicles for which no revenue has been earned in the previous 30 days. Accordingly, these vehicles may be temporarily out of service, being prepared for sale or awaiting redeployment. For 2016, the number of NLE units increased 5%, reflecting higher used vehicle inventories and a higher number of vehicles being prepared for sale. We expect NLE units to decline in 2017, as a result of lower expected used vehicle inventories and units being transferred to our used vehicle locations as they are prepared for sale.

**Dedicated Transportation Solutions**

| | | | | Change | |
|---|---|---|---|---|---|
| | **2016** | 2015 | 2014 | **2016/2015** | 2015/2014 |
| | | (Dollars in thousands) | | | |
| DTS Total revenue [1] | **$ 1,020,895** | 895,538 | 899,802 | **14%** | —% |
| DTS Operating revenue [2] | **$ 774,319** | 714,453 | 661,228 | **8%** | 8% |
| DTS EBT | **$ 63,611** | 45,800 | 44,556 | **39%** | 3% |
| DTS EBT as a % of DTS total revenue | **6.2%** | 5.1% | 5.0% | **110 bps** | 10 bps |
| DTS EBT as a % of DTS operating revenue [1] | **8.2%** | 6.4% | 6.7% | **180 bps** | (30) bps |
| *Memo:* | | | | | |
| Average fleet | **8,200** | 7,700 | 7,300 | **6%** | 5% |

_____

(1)   *Includes intercompany fuel sales from FMS to DTS.*

(2)   *Non-GAAP financial measures. Reconciliations of DTS total revenue to DTS operating revenue, DTS EBT as a % of DTS total revenue to DTS EBT as a % of DTS operating revenue, as well as the reasons why management believes these measures are important to investors are included in the "Non-GAAP Financial Measures" section of this MD&A.*

Total revenue increased 14% in 2016 to $1.02 billion and remained unchanged at $896 million in 2015. DTS operating revenue (a non-GAAP measure excluding fuel and subcontracted transportation) increased 8% in 2016 to $774 million and 8% in 2015 to $714 million.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

The following table summarizes the components of the change in revenue on a percentage basis versus the prior year:

|  | 2016 | | 2015 | |
|---|---|---|---|---|
|  | **Total** | **Operating** [1] | Total | Operating [1] |
| Organic, including price and volume | **16%** | **8%** | 5% | 8% |
| Fuel | **(2)** | **—** | (5) | — |
| Total increase | **14%** | **8%** | —% | 8% |

[1] Non-GAAP financial measure. A reconciliation of DTS total revenue to DTS operating revenue, as well as the reasons why management believes this measure is important to investors is included in the "Non-GAAP Financial Measures" section of this MD&A.

We expect favorable operating revenue comparisons to continue next year, however, at a lower growth rate.

**2016 versus 2015**

In 2016, total revenue increased 14% reflecting organic growth, partially offset by lower fuel prices passed through to our customers. Operating revenue increased 8% due to new business, increased volumes and higher pricing. DTS EBT increased 39% due to increased revenue and, to a lesser extent, lower insurance costs.

**2015 versus 2014**

In 2015, total revenue was consistent with the prior year as increased operating revenue was offset by declining fuel prices and lower subcontracted transportation costs passed through to customers. Operating revenue increased 8% due to new business, increased pricing and higher volumes. DTS EBT increased 3% due to the benefits of higher operating revenue partially offset by unfavorable self-insurance developments and customer-related bankruptcy charges.

**Supply Chain Solutions**

|  |  | 2016 | 2015 | 2014 | Change 2016/2015 | Change 2015/2014 |
|---|---|---|---|---|---|---|
|  |  | | (Dollars in thousands) | | | |
| Automotive | $ | **548,659** | 469,178 | 454,888 | **17%** | 3% |
| Technology and healthcare |  | **242,474** | 251,188 | 236,380 | **(3)** | 6 |
| CPG and retail |  | **436,368** | 431,571 | 405,929 | **1** | 6 |
| Industrial and other |  | **124,576** | 104,372 | 104,053 | **19** | — |
| Subcontracted transportation |  | **224,060** | 226,880 | 264,377 | **(1)** | (14) |
| Fuel costs [1] |  | **61,713** | 64,574 | 95,720 | **(4)** | (33) |
| SCS total revenue | $ | **1,637,850** | $1,547,763 | $1,561,347 | **6%** | (1)% |
| SCS operating revenue [2] |  | **1,352,077** | 1,256,309 | 1,201,250 | **8%** | 5% |
| SCS EBT | $ | **105,561** | 93,754 | 77,800 | **13%** | 21% |
| SCS EBT as a % of SCS total revenue |  | **6.4%** | 6.1% | 5.0% | **30 bps** | 110 bps |
| SCS EBT as a % of SCS operating revenue [2] |  | **7.8%** | 7.5% | 6.5% | **30 bps** | 100 bps |
| *Memo:* |  | | | | | |
| Average fleet |  | **7,200** | 6,300 | 6,000 | **14%** | 5% |

[1] Includes intercompany fuel sales from FMS to SCS.

[2] Non-GAAP financial measures. Reconciliations of SCS total revenue to SCS operating revenue, SCS EBT as a % of SCS total revenue to SCS EBT as a % of SCS operating revenue, as well as the reasons why management believes these measures are important to investors are included in the "Non-GAAP Financial Measures" section of this MD&A.

ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)

Total revenue increased 6% in 2016 to $1.64 billion and decreased 1% in 2015 to $1.55 billion. Operating revenue (a non-GAAP measure excluding fuel and subcontracted transportation) increased 8% in 2016 to $1.35 billion and 5% in 2015 to $1.26 billion.

The following table summarizes the components of the change in revenue on a percentage basis versus the prior year:

|  | 2016 | | 2015 | |
|---|---|---|---|---|
|  | Total | Operating [1] | Total | Operating [1] |
| Organic, including price and volume | 8% | 9% | 5% | 8% |
| Foreign exchange | (2) | (1) | (4) | (3) |
| Fuel | — | — | (2) | — |
| Total increase/(decrease) | 6% | 8% | (1)% | 5% |

[1] Non-GAAP financial measure. A reconciliation of SCS total revenue to SCS operating revenue, as well as the reasons why management believes this measure is important to investors is included in the "Non-GAAP Financial Measures" section of this MD&A.

We expect favorable operating revenue comparisons to continue next year in line with 2016 performance.

**2016 versus 2015**

Total revenue increased 6% in 2016 as increased operating revenue was partially offset by a negative impact from foreign exchange. SCS operating revenue increased 8% due to new business, increased volumes and higher pricing, partially offset by a negative impact from foreign exchange.  SCS EBT increased 13% in 2016 to $106 million due to increased revenue.

**2015 versus 2014**

Total revenue decreased 1% in 2015 primarily due to negative impacts from foreign exchange, lower fuel costs passed through to customers and lower subcontracted transportation costs, partially offset by operating revenue growth. Operating revenue increased 5% due to new business, higher volumes and increased pricing, partially offset by a negative impact from foreign exchange.  SCS EBT increased 21% in 2015 to $94 million due to increased operating revenue and favorable comparisons to 2014, despite being negatively impacted by lost automotive business, start-up costs and severe winter weather. These favorable comparisons in 2015 were partially offset by foreign exchange, large medical claims, higher compensation-related expenses and insurance developments that benefited the prior year.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

**Central Support Services**

|  | 2016 | 2015 | 2014 | Change 2016/2015 | 2015/2014 |
|---|---|---|---|---|---|
|  |  | (In thousands) |  |  |  |
| Human resources | $ 17,501 | 20,150 | 19,255 | (13)% | 5% |
| Finance | 59,445 | 60,998 | 57,510 | (3) | 6 |
| Corporate services and public affairs | 11,682 | 12,303 | 11,142 | (5) | 10 |
| Information technology | 82,087 | 84,729 | 79,498 | (3) | 7 |
| Legal and safety | 23,977 | 24,522 | 23,917 | (2) | 3 |
| Marketing | 18,029 | 22,206 | 21,409 | (19) | 4 |
| Other | 24,353 | 33,698 | 36,689 | (28) | (8) |
| Total CSS | 237,074 | 258,606 | 249,420 | (8) | 4 |
| Allocation of CSS to business segments | (196,129) | (210,096) | (197,680) | (7) | 6 |
| Unallocated CSS | $ 40,945 | 48,510 | 51,740 | (16)% | (6)% |

**2016 versus 2015**

Total CSS costs decreased 8% in 2016 to $237 million, due to lower compensation-related expenses and lower marketing-related and information technology costs. Unallocated CSS costs decreased 16% in 2016 to $41 million, primarily due to the 2015 settlement of a customer-extended insurance claim that adversely impacted costs in the prior year and lower compensation-related expenses.

**2015 versus 2014**

Total CSS costs increased 4% in 2015 to $259 million, primarily driven by planned investments in information technology and a settlement of a customer-extended insurance claim, partially offset by lower compensation-related expenses. Unallocated CSS costs decreased 6% in 2015 to $49 million, due to a new allocation of marketing-related costs to the business segments in 2015 and lower compensation-related expenses, partially offset by the insurance settlement and investments in information technology.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

FOURTH QUARTER CONSOLIDATED RESULTS

| | Three months ended December 31, | | Change |
| --- | --- | --- | --- |
| | **2016** | 2015 | **2016/2015** |
| | (Dollars in thousands, except per share amounts) | | |
| Total revenue | **$ 1,729,150** | 1,672,743 | **3%** |
| Operating revenue [1] | **1,466,878** | 1,441,708 | **2** |
| | | | |
| EBT | **$ 69,196** | 111,691 | **(38)%** |
| Comparable EBT [2] | **82,307** | 130,751 | **(37)** |
| Earnings from continuing operations | **49,275** | 75,935 | **(35)** |
| Comparable earnings from continuing operations [2] | **57,519** | 88,832 | **(35)** |
| Net earnings | **48,181** | 76,201 | **(37)** |
| | | | |
| Earnings per common share (EPS) — Diluted | | | |
| Continuing operations | **$ 0.92** | 1.42 | **(35)%** |
| Comparable [2] | **1.07** | 1.66 | **(36)** |
| Net earnings | **$ 0.91** | 1.43 | **(36)** |

(1) Non-GAAP financial measure. Refer to the "Non-GAAP Financial Measures" section of this MD&A for a reconciliation of total revenue to operating revenue and the reasons why management believes this measure is important to investors.

(2) Non-GAAP financial measures. Refer to the "Non-GAAP Financial Measures" section for a reconciliation of EBT, net earnings and earnings per diluted common share to their respective comparable measures and the reasons why management believes these measures are important to investors.

Total revenue increased 3% in the fourth quarter of 2016 to $1.73 billion. Operating revenue (a non-GAAP measure excluding fuel and subcontracted transportation) increased 2% in the fourth quarter of 2016 to $1.47 billion. The following table summarizes the components of the change in revenue on a percentage basis versus the prior year:

| | Three months ended December 31, 2016 | |
| --- | --- | --- |
| | **Total** | **Operating [1]** |
| Organic, including price and volume | **5%** | **3%** |
| Foreign exchange | **(2)** | **(1)** |
| Total increase | **3%** | **2%** |

(1) Non-GAAP financial measure. Refer to the "Non-GAAP Financial Measures" section of this MD&A for a reconciliation of total revenue to operating revenue and the reasons why management believes this measure is important to investors.

EBT decreased 38% in the fourth quarter of 2016 to $69 million. The decrease in EBT reflects lower used vehicle sales results and, to a lesser extent, lower commercial rental results in FMS, partially offset by revenue growth in SCS and DTS. See "Fourth Quarter Operating Results by Business Segment" for further discussion of segment operating results.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

FOURTH QUARTER OPERATING RESULTS BY BUSINESS SEGMENT

| | | Three months ended December 31, | | Change |
| | | **2016** | 2015 | **2016/2015** |
| | | (In thousands) | | |
| Revenue: | | | | |
|   Fleet Management Solutions | $ | **1,151,742** | 1,151,615 | **—%** |
|   Dedicated Transportation Solutions | | **256,870** | 232,444 | **11** |
|   Supply Chain Solutions | | **430,185** | 392,463 | **10** |
|   Eliminations | | **(109,647)** | (103,779) | **(6)** |
|     Total | $ | **1,729,150** | 1,672,743 | **3%** |
| Operating Revenue: [1] | | | | |
|   Fleet Management Solutions | $ | **992,274** | 999,385 | **(1)%** |
|   Dedicated Transportation Solutions | | **193,106** | 187,571 | **3** |
|   Supply Chain Solutions | | **352,650** | 322,056 | **9** |
|   Eliminations | | **(71,152)** | (67,304) | **(6)** |
|     Total | $ | **1,466,878** | 1,441,708 | **2%** |
| EBT: | | | | |
|   Fleet Management Solutions | $ | **64,367** | 123,506 | **(48)%** |
|   Dedicated Transportation Solutions | | **15,284** | 11,099 | **38** |
|   Supply Chain Solutions | | **26,440** | 23,793 | **11** |
|   Eliminations | | **(13,032)** | (12,073) | **(8)** |
| | | **93,059** | 146,325 | **(36)** |
| Unallocated Central Support Services | | **(10,752)** | (15,574) | **31** |
| Non-operating pension costs | | **(8,037)** | (4,835) | **(66)** |
| Restructuring and other charges, net and other items | | **(5,074)** | (14,225) | **NM** |
| Earnings from continuing operations before income taxes | $ | **69,196** | 111,691 | **(38)%** |

_(1)  Non-GAAP financial measure. Refer to the "Non-GAAP Financial Measures" section of this MD&A for a reconciliation of total revenue to operating revenue, and segment total revenue to segment operating revenue, as well as the reasons why management believes these measures are important to investors._

### Fleet Management Solutions

Total revenue remained at $1.15 billion in the fourth quarter of 2016. Operating revenue (a non-GAAP measure excluding fuel) decreased 1% in the fourth quarter of 2016 to $992 million. The following table summarizes the components of the change in revenue on a percentage basis versus the prior year.

| | Three months ended December 31, 2016 | |
| | **Total** | **Operating [1]** |
| Organic, including price and volume | **1%** | **1%** |
| Fuel | **1** | **—** |
| Foreign exchange | **(2)** | **(2)** |
| Total decrease | **—%** | **(1)%** |

_(1)  Non-GAAP financial measure. A reconciliation of FMS total revenue to FMS operating revenue as well as the reasons why management believes this measure is important to investors is included in the "Non-GAAP Financial Measures" section of this MD&A._

Fuel services revenue increased 5% to $159 million in the fourth quarter of 2016 due to higher fuel prices passed through to customers. Full service lease revenue increased 5% in the fourth quarter of 2016, reflecting a larger average lease fleet size and higher prices on replacement vehicles. Foreign exchange negatively impacted full service lease revenue growth by 100 basis points. Commercial rental revenue declined 14% in the fourth quarter of 2016 due to lower demand.

FMS EBT decreased 48% in the fourth quarter of 2016 to $64 million, primarily reflecting lower used vehicle sales results, lower commercial rental results and accelerated depreciation on vehicles expected to be made available for sale through June 2018 of $10 million. FMS EBT benefited from higher full service lease results and lower overhead spending. Used vehicles sales results were impacted by lower pricing and increased used vehicle inventory valuation reserves. Lower pricing, in part, reflects increased wholesaling to bring used vehicle inventories closer to our target range. Commercial rental results declined from lower demand. Rental power fleet utilization decreased slightly to 77.3% in the fourth quarter of 2016 from 77.6% in the year-earlier period. Full service lease results benefited from fleet growth. Full service lease and commercial rental results benefited from approximately $9 million of lower depreciation in the fourth quarter due to residual value changes implemented January 1, 2016.

### Dedicated Transportation Solutions

Total revenue increased 11% in the fourth quarter of 2016 to $257 million. Operating revenue (a non-GAAP measure excluding fuel and subcontracted transportation) increased 3% in the fourth quarter of 2016 to $193 million. The growth in total revenue reflects higher subcontracted transportation and higher operating revenue. DTS operating revenue grew as a result of increased volumes, as well as new business and increased pricing. DTS EBT increased 38% from the fourth quarter of the prior year due to revenue growth, improved operating performance and prior year customer-related bankruptcy charges.

### Supply Chain Solutions

Total revenue increased 10% in the fourth quarter of 2016 to $430 million. Operating revenue (a non-GAAP measure excluding fuel and subcontracted transportation) increased 9% in the fourth quarter of 2016 to $353 million. The following table summarizes the components of the change in revenue on a percentage basis versus the prior year:

|  | Three months ended December 31, 2016 | |
|  | Total | Operating [1] |
| --- | --- | --- |
| Organic, including price and volume | 12% | 11% |
| Foreign exchange | (2) | (2) |
| Total increase/(decrease) | 10% | 9% |

[1] Non-GAAP financial measure. A reconciliation of SCS total revenue to SCS operating revenue, as well as the reasons why management believes this measure is important to investors is included in the "Non-GAAP Financial Measures" section of this MD&A.

SCS total and operating revenue grew as a result of new business and increased volumes, partially offset by the effects of foreign exchange. SCS EBT increased 11% in the fourth quarter of 2016 to $26 million reflecting the impact of revenue growth.

### Central Support Services

Unallocated CSS costs decreased 31% in the fourth quarter of 2016 to $11 million due to the settlement of a customer-extended insurance claim in the prior year and lower compensation-related costs in 2016.

## FINANCIAL RESOURCES AND LIQUIDITY

### Cash Flows

The following is a summary of our cash flows from continuing operations:

|  | 2016 | 2015 | 2014 |
|  | (In thousands) | | |
| --- | --- | --- | --- |
| Net cash provided by (used in): |  |  |  |
| Operating activities | $ 1,601,022 | 1,441,788 | 1,382,818 |
| Financing activities | (185,922) | 731,485 | 311,650 |
| Investing activities | (1,405,833) | (2,161,355) | (1,704,510) |
| Effect of exchange rates on cash | (9,482) | 37 | 297 |
| Net change in cash and cash equivalents | $ (215) | 11,955 | (9,745) |

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

Cash provided by operating activities from continuing operations increased to $1.60 billion in 2016, compared with $1.44 billion in 2015, reflecting higher earnings adjusted for non-cash items, primarily depreciation, and working capital improvements, partially offset by higher pension contributions. The working capital improvements were primarily driven by the timing of trade accounts payable payments to vendors. Cash used in financing activities was $186 million in 2016, compared to cash provided from financing activities of $731 million in 2015 due to lower borrowing needs. Cash used in investing activities decreased to $1.41 billion in 2016, compared with $2.16 billion in 2015, primarily due to lower payments for capital expenditures.

Cash provided by operating activities from continuing operations increased to $1.44 billion in 2015, compared with $1.38 billion in 2014, reflecting higher earnings, excluding depreciation, and lower pension contributions, partially offset by increased working capital needs. The increased working capital needs were primarily driven by timing of trade account payments to vendors and increased receivables related to revenue growth. Cash provided by financing activities increased to $731 million in 2015 from $312 million in 2014, due to increased borrowing needs to fund investing activities. Cash used in investing activities increased to $2.16 billion in 2015, compared with $1.70 billion in 2014, primarily due to higher net capital spending and lower proceeds from revenue earning equipment sales.

The following table shows the components of our free cash flow:

| | | 2016 | 2015 | 2014 |
|---|---|---|---|---|
| | | (In thousands) | | |
| Net cash provided by operating activities | $ | 1,601,022 | 1,441,788 | 1,382,818 |
| Sales of revenue earning equipment [1] | | 414,249 | 423,605 | 493,477 |
| Sales of operating property and equipment [1] | | 7,051 | 3,891 | 3,486 |
| Collections on direct finance leases and other [1] | | 76,510 | 70,980 | 64,267 |
| Total cash generated [2] | | 2,098,832 | 1,940,264 | 1,944,048 |
| Purchases of property and revenue earning equipment [1] | | (1,905,157) | (2,667,978) | (2,259,164) |
| Free cash flow [2] | $ | 193,675 | (727,714) | (315,116) |
| Memo: | | | | |
| Net cash (used in) provided by financing activities | $ | (185,922) | 731,485 | 311,650 |
| Net cash used in investing activities | $ | (1,405,833) | (2,161,355) | (1,704,510) |

(1) *Included in cash flows from investing activities.*
(2) *Non-GAAP financial measures. Reconciliations of net cash provided by operating activities to total cash generated and to free cash flow are set forth in this table. Refer to the "Non-GAAP Financial Measures" section of this MD&A for the reasons why management believes these measures are important to investors.*

Free cash flow increased to positive $194 million in 2016 from negative $728 million in 2015 due to lower capital expenditures in 2016. Free cash flow decreased to negative $728 million in 2015 from negative $315 million in 2014 due to higher capital expenditures and lower proceeds from vehicle sales in 2015.

We expect cash provided by operating activities from continuing operations to increase approximately $100 million to $1.7 billion in 2017, primarily due to higher earnings adjusted for non-cash items, mainly depreciation. We also expect 2017 free cash flow to increase to $250 million reflecting higher cash provided by operating activities, partially offset by higher capital spending.

Capital expenditures are generally used to purchase revenue earning equipment (trucks, tractors and trailers) within our FMS segment. These expenditures primarily support the full service lease and commercial rental product lines. The level of capital required to support the full service lease product line varies based on customer contract signings for replacement vehicles and growth. These contracts are long-term agreements that result in predictable cash flows typically over a three to seven year term for trucks and tractors and ten years for trailers. We utilize capital for the purchase of vehicles in our commercial rental product line to replenish and expand the fleet available for shorter-term use by contractual or occasional customers. Operating property and equipment expenditures primarily relate to spending on items such as vehicle maintenance facilities and equipment, computer and telecommunications equipment, investments in technologies, and warehouse facilities and equipment.

The following is a summary of capital expenditures:

|  | 2016 | 2015 | 2014 |
|---|---|---|---|
|  | (In thousands) | | |
| Revenue earning equipment: |  |  |  |
| Full service lease | $ 1,547,717 | 2,060,254 | 1,732,904 |
| Commercial rental | 82,580 | 522,940 | 415,186 |
|  | 1,630,297 | 2,583,194 | 2,148,090 |
| Operating property and equipment | 132,603 | 112,918 | 150,145 |
| Total capital expenditures [1] | 1,762,900 | 2,696,112 | 2,298,235 |
| Changes in accounts payable related to purchases of revenue earning equipment | 142,257 | (28,134) | (39,071) |
| Cash paid for purchases of property and revenue earning equipment | $ 1,905,157 | 2,667,978 | 2,259,164 |

_____

[1]   Non-cash additions exclude approximately $1 million, $6 million and $8 million in 2016, 2015 and 2014, respectively, in assets held under capital leases resulting from the extension of existing operating leases and other additions.

Capital expenditures decreased in 2016, reflecting planned lower investments in the full service lease and commercial rental fleets. Capital expenditures increased in 2015, reflecting planned higher investments in the full service lease and commercial rental fleets. We expect capital expenditures to increase to approximately $2.0 billion in 2017, primarily due to a planned increase in capital spending in commercial rental. We expect to fund 2017 capital expenditures primarily with internally generated funds and additional debt financing.

### Working Capital

|  | 2016 | 2015 |
|---|---|---|
|  | (In thousands) | |
| Current assets | $ 1,101,557 | $ 1,098,302 |
| Current liabilities | 1,744,069 | 1,680,255 |
| Working capital | $ (642,512) | $ (581,953) |

Our net working capital was negative $643 million at December 31, 2016 compared with negative $582 million at December 31, 2015. The change in net working capital is primarily driven by a $157 million increase in the current portion of long term debt as we intend to repay certain short-term borrowings with positive free cash flow instead of refinancing these borrowings on a long-term basis under the global revolving credit facility. Our global revolving credit facility is used primarily to finance working capital needs. See "Financing and Other Funding Transactions" for further discussion on the adequacy of our funding sources to meet our operating, investing and financing needs.

### Financing and Other Funding Transactions

We utilize external capital primarily to support working capital needs and growth in our asset-based product lines. The variety of financing alternatives typically available to fund our capital needs include commercial paper, long-term and medium-term public and private debt, asset-backed securities, bank term loans, leasing arrangements and bank credit facilities. Our principal sources of financing are issuances of commercial paper and medium-term notes.

45

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

Our ability to access unsecured debt in the capital markets is impacted by both our short-term and long-term debt ratings. These ratings are intended to provide guidance to fixed income investors in determining the credit risk associated with particular Ryder securities based on current information obtained by the rating agencies from us or from other sources. Lower ratings generally result in higher borrowing costs, as well as reduced access to unsecured capital markets. A significant downgrade of our short-term debt ratings would impair our ability to issue commercial paper and likely require us to rely on alternative funding sources. A significant downgrade would not affect our ability to borrow amounts under our revolving credit facility described below, assuming ongoing compliance with the terms and conditions of the credit facility.

Our debt ratings and rating outlooks at December 31, 2016 were as follows:

| | Short-term | | Long-term | |
| --- | --- | --- | --- | --- |
| | Rating | Outlook | Rating | Outlook |
| **Moody's Investors Service** | **P2** | **Stable** | **Baa1** | **Stable (affirmed February 2016)** |
| **Standard & Poor's Ratings Services** | **A2** | **Stable** | **BBB+** | **Stable (upgraded December 2016)** |
| **Fitch Ratings** | **F2** | **Stable** | **A-** | **Stable (affirmed October 2016)** |

Cash and equivalents totaled $59 million as of December 31, 2016. Approximately $21 million was held outside the U.S. as of December 31, 2016 and is available to fund operations and other growth of our non-U.S. subsidiaries. Our intent is to indefinitely reinvest these foreign amounts outside the U.S. If we decide to repatriate cash and equivalents held outside the U.S., we may be subject to additional U.S. income taxes and foreign withholding taxes. However, our intent is to permanently reinvest these foreign amounts outside the U.S. and our current plans do not demonstrate a need to repatriate these foreign amounts to fund our U.S. operations.

We believe that our operating cash flows, together with our access to the public unsecured bond market, commercial paper market and other available debt financing, will be adequate to meet our operating, investing and financing needs in the foreseeable future. However, there can be no assurance that unanticipated volatility and disruption in the public unsecured debt market or the commercial paper market would not impair our ability to access these markets on terms commercially acceptable to us or at all. If we cease to have access to public bonds, commercial paper and other sources of unsecured borrowings, we would meet our liquidity needs by drawing upon contractually committed lending agreements as described below and/or by seeking other funding sources.

At December 31, 2016, we had the following amounts available to fund operations:

| | (In millions) |
| --- | --- |
| **Global revolving credit facility** | **$675** |
| **Trade receivables program** | **$175** |

Refer to Note 15, "Debt," in the Notes to Consolidated Financial Statements for a discussion of these debt facilities. The following table shows the movements in our debt balance:

| | 2016 | 2015 |
| --- | --- | --- |
| | (In thousands) | |
| Debt balance at January 1 | $ 5,502,627 | 4,717,524 |
| Cash-related changes in debt: | | |
| Net change in commercial paper borrowings and revolving credit facilities | (77,798) | 323,359 |
| Proceeds from issuance of medium-term notes | 596,283 | 998,576 |
| Proceeds from issuance of other debt instruments | 78,645 | 284,647 |
| Retirement of medium-term notes | (600,000) | (660,000) |
| Other debt repaid | (69,047) | (138,311) |
| Debt issuance costs paid | (1,254) | (2,134) |
| | (73,171) | 806,137 |
| Non-cash changes in debt: | | |
| Fair market value adjustment on notes subject to hedging | (4,143) | 423 |
| Addition of capital lease obligations | 1,231 | 5,959 |
| Changes in foreign currency exchange rates and other non-cash items | (35,270) | (27,416) |
| Total changes in debt | (111,353) | 785,103 |
| Debt balance at December 31 | $ 5,391,274 | 5,502,627 |

Case 1:20-cv-22109-JB   Document 97-44   Entered on FLSD Docket 12/16/2022   Page 52 of 193

In accordance with our funding philosophy, we attempt to match the aggregate average remaining re-pricing life of our vehicle-related debt with the aggregate average remaining re-pricing life of our vehicle assets. We utilize both fixed-rate and variable-rate debt to achieve this match and generally target a mix of 20% - 40% variable-rate debt as a percentage of total debt outstanding. The variable-rate portion of our total debt (including notional value of swap agreements) was 30% at both December 31, 2016 and 2015.

Ryder's debt to equity ratios were 263% and 277% at December 31, 2016 and 2015, respectively. The debt to equity ratio represents total debt divided by total equity. Additional obligations, including the present value of minimum lease payments under operating leases for vehicles, were not significant as of December 31, 2016 or December 31, 2015. Our debt to equity ratio decreased as of December 31, 2016, due to the impact of foreign exchange rates and lower borrowing needs reflecting lower planned capital expenditures.

### Off-Balance Sheet Arrangements

*Guarantees.* Refer to Note 17, "Guarantees," in the Notes to Consolidated Financial Statements for a discussion of our agreements involving guarantees.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

### Contractual Obligations and Commitments

As part of our ongoing operations, we enter into arrangements that obligate us to make future payments under contracts such as debt agreements, lease agreements and unconditional purchase obligations. The following table summarizes our expected future contractual cash obligations and commitments at December 31, 2016:

| | 2017 | 2018-2019 | 2020-2021 | Thereafter | Total |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Debt | $ 957,358 | 1,859,981 | 2,310,795 | 237,846 | 5,365,980 |
| Capital lease obligations | 8,827 | 12,316 | 2,304 | 737 | 24,184 |
| Total debt, including capital leases [1] | 966,185 | 1,872,297 | 2,313,099 | 238,583 | 5,390,164 |
| Interest on debt [2] | 137,179 | 203,595 | 105,818 | 53,992 | 500,584 |
| Operating leases [3] | 73,064 | 93,178 | 33,774 | 22,276 | 222,292 |
| Purchase obligations [4] | 248,743 | 29,905 | 11,757 | 663 | 291,068 |
| Total contractual cash obligations | 458,986 | 326,678 | 151,349 | 76,931 | 1,013,944 |
| Insurance obligations (primarily self-insurance) | 107,136 | 100,773 | 40,468 | 93,096 | 341,473 |
| Other long-term liabilities [5], [6], [7] | 5,233 | 6,848 | 4,740 | 59,846 | 76,667 |
| Total | $ 1,537,540 | 2,306,596 | 2,509,656 | 468,456 | 6,822,248 |

(1)  Net of unamortized discount and excludes the fair market value adjustment on notes subject to hedging.

(2)  Total debt matures at various dates through fiscal year 2025 and bears interest principally at fixed rates. Interest on variable-rate debt is calculated based on the applicable rate at December 31, 2016. Amounts are based on existing debt obligations, including capital leases, and do not consider potential refinancing of expiring debt obligations.

(3)  Represents future lease payments associated with vehicles, equipment and properties under operating leases. Amounts are based upon the general assumption that the leased asset will remain on lease for the length of time specified by the respective lease agreements. No effect has been given to renewals, cancellations, contingent rentals or future rate changes.

(4)  The majority of our purchase obligations are pay-as-you-go transactions made in the ordinary course of business. Purchase obligations include agreements to purchase goods or services that are legally binding and that specify all significant terms, including: fixed or minimum quantities to be purchased; fixed minimum or variable price provisions; and the approximate timing of the transaction. The most significant item included in the above table are purchase obligations related to vehicles. Purchase orders made in the ordinary course of business that are cancelable are excluded from the above table. Any amounts for which we are liable under purchase orders for goods received are reflected in our Consolidated Balance Sheets as "Accounts payable" and "Accrued expenses and other current liabilities" and are excluded from the above table.

(5)  Represents other long-term liability amounts reflected in our Consolidated Balance Sheets that have known payment streams. The most significant items included were asset retirement obligations and deferred compensation obligations.

(6)  The amounts exclude our estimated pension contributions. For 2017, our pension contributions, including our minimum funding requirements as set forth by ERISA and international regulatory bodies, are expected to be $22 million. Our minimum funding requirements after 2017 are dependent on several factors. However, we estimate that the undiscounted required global contributions over the next five years are approximately $272 million (pre-tax) (assuming expected long-term rate of return realized and other assumptions remain unchanged). We also have payments due under our other postretirement benefit (OPEB) plans. These plans are not required to be funded in advance, but are pay-as-you-go. See Note 22, "Employee Benefit Plans," in the Notes to Consolidated Financial Statements for further discussion.

(7)  The amounts exclude $67 million of liabilities associated with uncertain tax positions as we are unable to reasonably estimate the ultimate amount or timing of settlement. See Note 13, "Income Taxes," in the Notes to Consolidated Financial Statements for further discussion.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

### Pension Information

We have defined benefit retirement plans which are frozen for non-grandfathered and certain non-union employees in the U.S., Canada and the United Kingdom. The funded status of our pension plans is dependent upon many factors, including returns on invested assets and the level of certain market interest rates. We review pension assumptions regularly and we may from time to time make voluntary contributions to our pension plans, which exceed the amounts required by statute. During 2016, total global pension contributions were $128 million compared with $34 million in 2015. We estimate 2017 required pension contributions will be $22 million. The projected present value of estimated global pension contributions that would be required over the next 5 years totals approximately $246 million (pre-tax). Changes in interest rates and the market value of the securities held by the plans could materially change, positively or negatively, the funded status of the plans and affect the level of pension expense and required contributions in future years. The ultimate amount of contributions is also dependent upon the requirements of applicable laws and regulations. See Note 22, "Employee Benefit Plans," in the Notes to Consolidated Financial Statements for additional information.

Due to the underfunded status of our defined benefit plans, we had an accumulated net pension equity charge (after-tax) of $627 million and $577 million at December 31, 2016 and 2015, respectively. The total asset return was positive 10% in 2016.

Pension expense totaled $61 million in 2016 compared to $42 million in 2015. The increase in pension expense is primarily due to the impact of a lower asset return assumption and a higher discount rate as well as a $8 million one-time charge in the second quarter to reflect pension benefit improvements made in 2009 that were not fully reflected in our pension benefit obligation in prior years. We expect 2017 pension expense to decrease approximately $8 million primarily due to the impact of lower expected interest cost. Our 2017 pension expense estimates are subject to change based upon the completion of the actuarial analysis for all pension plans. See the "Critical Accounting Estimates — Pension Plans" section for further discussion on pension accounting estimates.

We participate in certain U.S. multi-employer pension (MEP) plans that provide defined benefits to employees covered by collective bargaining agreements. At December 31, 2016, approximately 1,300 employees (approximately 4% of total employees) participated in these MEP plans. The annual net pension cost of the MEP plans is equal to the annual contribution determined in accordance with the provisions of negotiated labor contracts. Our current year MEP plan contributions total approximately $10 million. Pursuant to current U.S. pension laws, if any MEP plans fail to meet certain minimum funding thresholds, we could be required to make additional MEP plan contributions, until the respective labor agreement expires, of up to 10% of current contractual requirements. Several factors could cause MEP plans not to meet these minimum funding thresholds, including unfavorable investment performance, changes in participant demographics, and increased benefits to participants. The plan administrators and trustees of the MEP plans provide us with the annual funding notice as required by law. This notice sets forth the funded status of the plan as of the beginning of the prior year but does not provide any company-specific information.

Employers participating in MEP plans can elect to withdraw from the plans, contingent upon certain requirements, and be subject to a withdrawal obligation based on, among other factors, the MEP plan's unfunded vested benefits. U.S. pension regulations provide that an employer can fund its withdrawal obligation in a lump sum or over a time period of up to 20 years based on previous contribution rates. During 2016, we determined that certain pension benefit improvements made in 2009 had not been fully reflected in our projected benefit obligation. Because the amounts were not material to our consolidated financial statements in any individual period, and the cumulative amount is not material to 2016 results, we recognized a one-time, non-cash charge of $8 million in "Selling, general and administrative expenses" and a $13 million pre-tax increase to "Accumulated other comprehensive loss" in our consolidated financial statements to correctly state the pension benefit obligation and account for these 2009 benefit improvements. See Note 22, "Employee Benefit Plans," in the Notes to Consolidated Financial Statements for additional information.

### Share Repurchase Programs and Cash Dividends

Refer to Note 18, "Share Repurchase Programs," in the Notes to Consolidated Financial Statements for a discussion on our share repurchase programs.

Cash dividend payments to shareholders of common stock were $91 million in 2016, $83 million in 2015, and $75 million in 2014. During 2016, we increased our annual dividend 7% to $1.76 per share of common stock.

ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)

**Market Risk**

In the normal course of business, we are exposed to fluctuations in interest rates, foreign currency exchange rates and fuel prices. We manage these exposures in several ways, including, in certain circumstances, the use of a variety of derivative financial instruments when deemed prudent. We do not enter into leveraged derivative financial transactions or use derivative financial instruments for trading purposes.

Exposure to market risk for changes in interest rates exists for our debt obligations. Our interest rate risk management program objectives are to limit the impact of interest rate changes on earnings and cash flows and to lower overall borrowing costs. A hypothetical 100 basis point change in short-term market interest rates would change annual pre-tax earnings by $14 million. We manage our exposure to interest rate risk primarily through the proportion of fixed-rate and variable-rate debt we hold in the total debt portfolio. From time to time, we also use interest rate swap agreements to manage our fixed-rate and variable-rate exposure and to better match the repricing of debt instruments to that of our portfolio of assets. See Note 16, "Derivatives," in the Notes to Consolidated Financial Statements for further discussion on interest rate swap agreements.

At December 31, 2016, we had $3.32 billion of fixed-rate debt outstanding (excluding capital leases) with a weighted-average interest rate of 3% and a fair value of $3.35 billion. A hypothetical 10% decrease or increase in the December 31, 2016 market interest rates would impact the fair value of our fixed-rate debt by approximately $32 million at December 31, 2016. Changes in the relative sensitivity of the fair value of our financial instrument portfolio for these theoretical changes in the level of interest rates are primarily driven by changes in our debt maturities, interest rate profile and amount.

At December 31, 2016, we had $1.60 billion of variable-rate debt, including $825 million of fixed-rate debt instruments swapped to LIBOR-based floating-rate debt. Changes in the fair value of the interest rate swaps were offset by changes in the fair value of the debt instruments and no net gain or loss was recognized in earnings. The fair value of our interest rate swap agreements at December 31, 2016 was a net asset of $1 million. The fair value of our variable-rate debt at December 31, 2016 was $1.62 billion. A hypothetical 10% increase in market interest rates would have impacted 2016 pre-tax earnings from continuing operations by approximately $3 million.

We are also subject to interest rate risk with respect to our pension and postretirement benefit obligations, as changes in interest rates will effectively increase or decrease our liabilities associated with these benefit plans, which also results in changes to the amount of pension and postretirement benefit expense recognized each period.

Exposure to market risk for changes in foreign currency exchange rates relates primarily to our foreign operations' buying, selling and financing in currencies other than local currencies and to the carrying value of net investments in foreign subsidiaries. The majority of our transactions are denominated in U.S. dollars. The principal foreign currency exchange rate risks to which we are exposed include the Canadian dollar, British pound sterling and Mexican peso. We manage our exposure to foreign currency exchange rate risk related to our foreign operations' buying, selling and financing in currencies other than local currencies by naturally offsetting assets and liabilities not denominated in local currencies to the extent possible. A hypothetical uniform 10% strengthening in the value of the dollar relative to all the currencies in which our transactions are denominated would result in a decrease to pre-tax earnings from continuing operations of approximately $1 million. We also use foreign currency option contracts and forward agreements from time to time to hedge foreign currency transactional exposure. We generally do not hedge the foreign currency exposure related to our net investment in foreign subsidiaries, since we have no near-term intent to repatriate funds from such subsidiaries.

Exposure to market risk for fluctuations in fuel prices relates to a small portion of our service contracts for which the cost of fuel is integral to service delivery and the service contract does not have a mechanism to adjust for increases in fuel prices. At December 31, 2016, we also had various fuel purchase arrangements in place to ensure delivery of fuel at market rates in the event of fuel shortages. We are exposed to fluctuations in fuel prices in these arrangements since none of the arrangements fix the price of fuel to be purchased. Increases and decreases in the price of fuel are generally passed on to our customers for which we realize minimal changes in profitability during periods of steady market fuel prices. However, profitability may be positively or negatively impacted by sudden increases or decreases in market fuel prices during a short period of time as customer pricing for fuel services is established based on trailing market fuel costs. We believe the exposure to fuel price fluctuations would not materially impact our results of operations, cash flows or financial position.

ENVIRONMENTAL MATTERS

Refer to Note 23, "Environmental Matters," in the Notes to Consolidated Financial Statements for a discussion surrounding environmental matters.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in conformity with U.S. GAAP requires us to make estimates and assumptions. Our significant accounting policies are described in the Notes to Consolidated Financial Statements. Certain of these policies require the application of subjective or complex judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. These estimates and assumptions are based on historical experience, changes in the business environment and other factors that we believe to be reasonable under the circumstances. Different estimates that could have been applied in the current period or changes in the accounting estimates that are reasonably likely can result in a material impact on our financial condition and operating results in the current and future periods. We review the development, selection and disclosure of these critical accounting estimates with Ryder's Audit Committee on an annual basis.

The following discussion, which should be read in conjunction with the descriptions in the Notes to Consolidated Financial Statements, is furnished for additional insight into certain accounting estimates that we consider to be critical.

*Depreciation and Residual Value Guarantees.* We periodically review and adjust the residual values and useful lives of revenue earning equipment of our FMS business segment as described in Note 1, "Summary of Significant Accounting Policies — Revenue Earning Equipment, Operating Property and Equipment, and Depreciation" in the Notes to Consolidated Financial Statements. Reductions in residual values (i.e., the price at which we ultimately expect to dispose of revenue earning equipment) or useful lives will result in an increase in depreciation expense over the life of the equipment. Based on the mix of revenue earning equipment at December 31, 2016, a 10% decline in expected vehicle residual values would increase depreciation expense in 2017 by approximately $125 million. We review residual values and useful lives of revenue earning equipment on an annual basis or more often if deemed necessary for specific groups of our revenue earning equipment. Reviews are performed based on vehicle class, generally subcategories of trucks, tractors and trailers by weight and usage. Our annual review is established with a long-term view considering historical market price changes, current and expected future market price trends, expected life of vehicles included in the fleet and extent of alternative uses for leased vehicles (e.g., rental fleet, and DTS and SCS applications). As a result, future depreciation expense rates are subject to change based upon changes in these factors. While we believe that the carrying values and estimated sales proceeds for revenue earning equipment are appropriate, there can be no assurance that deterioration in economic conditions or adverse changes to expectations of future sales proceeds will not occur, resulting in lower gains or losses on sales.

At the end of each year, we complete our annual review of the residual values and useful lives of revenue earning equipment. Based on the results of our analysis, we adjust the residual values and useful lives of certain classes of our revenue earning equipment effective January 1 of each year. The approximate (unfavorable) / favorable impact on the annual depreciation expense resulting from the residual value and useful life reviews is as follows:

| 2017 | 2016 | 2015 |
|---|---|---|
| ($4 million) | $35 million | $40 million |

In addition, we also monitor market trends throughout the year and assess residual values of vehicles expected to be sold in the near term and may adjust residual values for the vehicles.

Factors that could cause actual results to materially differ from the estimated results include significant changes in the used equipment market brought on by unforeseen changes in technology innovations and any resulting changes in the useful lives of used equipment.

Depreciation expense was $1.19 billion, $1.12 billion and $1.05 billion in 2016, 2015 and 2014, respectively. Depreciation expense relates primarily to FMS revenue earning equipment. Depreciation expense increased 6% in 2016, driven by a larger average full service lease fleet and accelerated depreciation on vehicles expected to be made available for sale through June 2018 of $10 million, partially offset by a smaller average commercial rental fleet. Depreciation expense increased 7% in 2015, driven by larger average full service lease and commercial rental fleets. The increases in both years were partially offset by $35 million and $40 million, respectively, from increases in residual values.

*Pension Plans.* We apply actuarial methods to determine the annual net periodic pension expense and pension plan liabilities on an annual basis, or on an interim basis if there is an event requiring remeasurement. Each December, we review actual experience compared with the assumptions used and make adjustments to our assumptions, if warranted. In determining our annual estimate of periodic pension cost, we are required to make an evaluation of critical factors such as discount rate, expected long-term rate of return on assets, expected increase in compensation levels, retirement rate and mortality. Discount rates are based upon a duration analysis of expected benefit payments and the equivalent average yield for high quality corporate fixed income investments as of our December 31 annual measurement date. In order to estimate the discount rate relevant to our plan, we use models that match projected benefits payments of our primary U.S. plan to coupons and maturities from a hypothetical portfolio of high quality corporate bonds. Long-term rate of return assumptions are based on actuarial review of our asset allocation strategy and long-term expected asset returns. Investment management and other fees paid using plan assets are factored into the determination of asset return assumptions.

Assumptions as to mortality of the participants in our pension plan is a key estimate in measuring the expected payments participants may receive over their lifetime, and therefore the amount of expense we will recognize. We update our mortality assumptions as deemed necessary by taking into consideration relevant actuarial studies as they become available as well as reassessing our own historical experience.

As part of our strategy to manage future pension costs and net funded status volatility, we regularly assess our pension investment strategy. Our U.S. pension investment policy and strategy seek to reduce the effects of future volatility on the fair value of our pension assets relative to our pension liabilities by increasing our allocation of high quality, longer-term fixed income securities and reducing our allocation of equity investments as the funded status of the plan improves. The composition of our pension assets was 51% equity securities and alternative assets and 49% debt securities and other investments at December 31, 2016. We continually evaluate our mix of investments between equity and fixed income securities and adjust the composition of our pension assets when appropriate. In 2016, we adjusted our long-term expected rate of return assumption for our primary U.S. plan to 5.85% from 5.95% based on our expected asset mix. The expected rate of return assumption for the fixed income portion of our portfolio mirrors the discount rate in order to align the expected return on fixed income securities with the movement in the pension liability under our strategy.

Accounting guidance applicable to pension plans does not require immediate recognition of the effects of a deviation between these assumptions and actual experience or the revision of an estimate. This approach allows the favorable and unfavorable effects that fall within an acceptable range to be netted and included in "Accumulated other comprehensive loss." We had a pre-tax actuarial loss of $961 million and $906 million at the end of 2016 and 2015, respectively. To the extent the amount of cumulative actuarial gains and losses exceed 10% of the greater of the benefit obligation or plan assets, the excess amount is amortized over the average remaining life expectancy of active participants or the remaining life expectancy of inactive participants if all or almost all of a plan's participants are inactive. The amount of the actuarial loss subject to amortization in 2017 and future years will be $738 million. We expect to recognize approximately $34 million of the net actuarial loss as a component of pension expense in 2017. The effect on years beyond 2017 will depend substantially upon the actual experience of our plans.

Disclosure of the significant assumptions used in arriving at the 2016 net pension expense is presented in Note 22, "Employee Benefit Plans," in the Notes to Consolidated Financial Statements. A sensitivity analysis of 2016 net pension expense to changes in key underlying assumptions for our primary plan, the U.S. pension plan, is presented below.

| | Assumed Rate | Change | Impact on 2016 Net Pension Expense | Effect on December 31, 2016 Projected Benefit Obligation |
|---|---|---|---|---|
| **Expected long-term rate of return on assets** | 5.85% | +/- 0.25 | +/- $3.0 million | |
| **Discount rate increase** | 4.50% | + 0.25 | + $4.0 million | - $54 million |
| **Discount rate decrease** | 4.50% | - 0.25 | - $4.0 million | + $54 million |
| **Actual return on assets** | 5.85% | +/- 0.25 | -/+ $0.2 million | |
| **Contributions at the beginning of the year** | | + $50 million | - $2.8 million | |

52

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

*Self-Insurance Accruals.* Self-insurance accruals were $337 million and $312 million as of December 31, 2016 and 2015, respectively. The majority of our self-insurance relates to vehicle liability and workers' compensation. We use a variety of statistical and actuarial methods that are widely used and accepted in the insurance industry to estimate amounts for claims that have been reported but not paid and claims incurred but not reported. In applying these methods and assessing their results, we consider such factors as frequency and severity of claims, claim development and payment patterns and changes in the nature of our business, among other factors. Such factors are analyzed for each of our business segments. Our estimates may be impacted by such factors as increases in the market price for medical services, unpredictability of the size of jury awards and limitations inherent in the estimation process. During 2016, we recognized a $9 million charge from the development of estimated prior years' self-insured loss reserves. For 2015 and 2014, we recognized a charge of $4 million and a benefit of $14 million, respectively, from the development of estimated prior years' self-insured loss reserves. Based on self-insurance accruals at December 31, 2016, a 5% adverse change in actuarial claim loss estimates would increase operating expense in 2017 by approximately $15 million.

*Goodwill Impairment.* We assess goodwill for impairment, as described in Note 1, "Summary of Significant Accounting Policies — Goodwill and Other Intangible Assets," in the Notes to Consolidated Financial Statements, on an annual basis or more often if deemed necessary. At December 31, 2016, goodwill totaled $387 million. To determine whether goodwill impairment indicators exist, we are required to assess the fair value of the reporting unit and compare it to the carrying value. A reporting unit is a component of an operating segment for which discrete financial information is available and management regularly reviews its operating performance. In evaluating goodwill for impairment, we have the option to first assess qualitative factors to determine whether further impairment testing is necessary.

Our annual impairment test performed as of April 1, 2016, did not result in any impairment of goodwill. We performed quantitative tests on two of our reporting units consistent with our policy of periodically updating our reporting units' fair values. Based on our quantitative analyses, we determined there was no impairment.

We performed qualitative assessments for three reporting units, which considered individual factors such as macroeconomic conditions, changes in our industry, and the markets in which we operate, as well as our historical and expected future financial performance. Examples of factors we considered included the results of our most recent impairment tests, declines in our financial performance, a lack of significant changes in our competitive landscape, changes in our stock price as compared to a relatively stable carrying value since our most recent impairment tests and improvements in macroeconomic conditions since 2014. After performing the qualitative assessments, we concluded it is more likely than not that fair values are greater than carrying values and no additional testing was performed.

As of December 31, 2016, there have been no events or changes in circumstances that would change our conclusion.

53

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

*Income Taxes.* Our overall tax position is complex and requires careful analysis by management to estimate the expected realization of income tax assets and liabilities.

Tax regulations require items to be included in the tax return at different times than the items are reflected in the financial statements. As a result, the effective tax rate reflected in the financial statements is different than that reported in the tax return. Some of these differences are permanent, such as expenses that are not deductible on the tax return, and some are timing differences, such as depreciation expense. Timing differences create deferred tax assets and liabilities. Deferred tax assets generally represent items that can be used as a tax deduction or credit in the tax return in future years, for which we have already recognized the tax benefit in the financial statements. Deferred tax assets were $809 million and $810 million at December 31, 2016 and 2015, respectively. We recognize a valuation allowance for deferred tax assets to reduce such assets to amounts expected to be realized. At December 31, 2016 and 2015, the deferred tax valuation allowance, principally attributed to foreign tax loss carryforwards in the SCS business segment, was $16 million and $15 million, respectively. In determining the required level of valuation allowance, we consider whether it is more likely than not that all or some portion of deferred tax assets will not be realized. This assessment is based on management's expectations as to whether sufficient taxable income of an appropriate character will be realized within tax carryback and carryforward periods. Our assessment involves estimates and assumptions about matters that are inherently uncertain, and unanticipated events or circumstances could cause actual results to differ from these estimates. Should we change our estimate of the amount of deferred tax assets that we would be able to realize, an adjustment to the valuation allowance would result in an increase or decrease to the provision for income taxes in the period such a change in estimate was made.

As part of our calculation of the provision for income taxes, we determine whether the benefits of our tax positions are at least more likely than not of being sustained upon audit based on the technical merits of the tax position. We accrue the largest amount of the benefit that is more likely than not of being sustained in our consolidated financial statements. These accruals require management to make estimates and judgments with respect to the ultimate outcome of a tax audit. Actual results could vary materially from these estimates. We adjust these reserves, including any impact on the related interest and penalties, in light of changing facts and circumstances, such as the progress of a tax audit.

A number of years may elapse before a particular matter for which we have established a reserve is audited and finally resolved. The number of years with open tax audits varies depending on the tax jurisdiction. The tax benefit that has been previously reserved because of a failure to meet the "more likely than not" recognition threshold would be recognized in our income tax expense in the first interim period when the uncertainty is resolved under any one of the following conditions: (1) the tax position has been determined to be "more likely than not" sustained, (2) the tax position, amount and/or timing is ultimately settled through negotiation or litigation, or (3) the statute of limitations for the tax position has expired. Settlement of any particular issue would usually require the use of cash. See Note 13, "Income Taxes," in the Notes to Consolidated Financial Statements for further discussion of the status of tax audits and uncertain tax positions.

RECENT ACCOUNTING PRONOUNCEMENTS

See Note 2, "Recent Accounting Pronouncements," in the Notes to Consolidated Financial Statements for a discussion of recent accounting pronouncements.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

NON-GAAP AND SEGMENT FINANCIAL MEASURES

*Non-GAAP Financial Measures.* This Annual Report on Form 10-K includes information extracted from consolidated financial information that is not required by generally accepted accounting principles (GAAP) to be presented in the financial statements. Certain elements of this information are considered "non-GAAP financial measures" as defined by SEC rules. Non-GAAP financial measures should be considered in addition to, but not as a substitute for or superior to, other measures of financial performance or liquidity prepared in accordance with GAAP. Also, our non-GAAP financial measures may not be comparable to financial measures used by other companies. We provide a reconciliation of each of these non-GAAP financial measures to the most comparable GAAP measure in the management's discussion and analysis or in this non-GAAP financial measures section. We also provide the reasons why management believes each non-GAAP financial measure is useful to investors in this section.

Specifically, we refer to the following non-GAAP financial measures in this Form 10-K:

| Non-GAAP Financial Measure | Comparable GAAP Measure | Reconciliation in Section Entitled | Page |
|---|---|---|---|
| **Operating Revenue Measures:** | | | |
| Operating Revenue | Total Revenue | MD&A - Non-GAAP Financial Measures section | 60 |
| FMS Operating Revenue | FMS Total Revenue | MD&A - Non-GAAP Financial Measures section | 61 |
| DTS Operating Revenue | DTS Total Revenue | MD&A - Non-GAAP Financial Measures section | 61 |
| SCS Operating Revenue | SCS Total Revenue | MD&A - Non-GAAP Financial Measures section | 61 |
| FMS EBT as a % of FMS Operating Revenue | FMS EBT as a % of FMS Total Revenue | MD&A - Non-GAAP Financial Measures section | 61 |
| DTS EBT as a % of DTS Operating Revenue | DTS EBT as a % of DTS Total Revenue | MD&A - Non-GAAP Financial Measures section | 61 |
| SCS EBT as a % of SCS Operating Revenue | SCS EBT as a % of SCS Total Revenue | MD&A - Non-GAAP Financial Measures section | 61 |
| **Comparable Earnings Measures:** | | | |
| Comparable Earnings Before Income Tax | Earnings Before Income Tax | MD&A - Non-GAAP Financial Measures section | 58 |
| Comparable Earnings | Earnings from Continuing Operations | | 58 |
| Comparable EPS | EPS from Continuing Operations | | 63 |
| Adjusted Return on Average Capital (ROC) | Not Applicable. However, non-GAAP elements of the calculation have been reconciled to the corresponding GAAP measures. A numerical reconciliation of net earnings to adjusted net earnings and average total debt and average shareholders' equity to adjusted average total capital is provided. | | 62 |
| **Cash Flow Measures:** | | | |
| Total Cash Generated and Free Cash Flow | Cash Provided by Operating Activities | MD&A - Non-GAAP Financial Measures section | 60 |

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

Set forth in the table below is an overview of each non-GAAP financial measure and why management believes that presentation of each non-GAAP financial measure provides useful information to investors.  See reconciliations for each of these measures following this table.

| **Operating Revenue Measures:** | |
|---|---|
| Operating Revenue<br><br>FMS Operating Revenue<br><br>DTS Operating Revenue<br><br>SCS Operating Revenue<br><br>FMS EBT as a % of FMS Operating Revenue<br><br>DTS EBT as a % of DTS Operating Revenue<br><br>SCS EBT as a % of SCS Operating Revenue | Operating revenue is defined as total revenue for Ryder System, Inc. or each business segment (FMS, DTS and SCS), respectively, excluding any (1) fuel and (2) subcontracted transportation. We believe operating revenue provides useful information to investors as we use it to evaluate the operating performance of our core businesses and as a measure of sales activity at the consolidated level for Ryder System, Inc., as well as for each of our business segments.  We also use segment EBT as a percentage of segment operating revenue for each business segment for the same reason. Note: FMS EBT, DTS EBT and SCS EBT, our primary measures of segment performance, are not non-GAAP measures.<br><br>Fuel:  We exclude FMS, DTS and SCS fuel from the calculation of our operating revenue measures, as fuel is an ancillary service that we provide our customers, which is impacted by fluctuations in market fuel prices, and the costs are largely a pass-through to our customers, resulting in minimal changes in our profitability during periods of steady market fuel prices. However, profitability may be positively or negatively impacted by rapid changes in market fuel prices during a short period of time, as customer pricing for fuel services is established based on trailing market fuel costs.<br><br>Subcontracted transportation:  We also exclude subcontracted transportation from the calculation of our operating revenue measures, as these services are also typically a pass-through to our customers and, therefore, fluctuations result in minimal changes to our profitability. While our DTS and SCS business segments subcontract certain transportation services to third party providers, our FMS business segment does not engage in subcontracted transportation and, therefore, this item is not applicable to FMS. |
| **Comparable Earnings Measures:** | |
| Comparable earnings before income tax (EBT)<br><br>Comparable Earnings<br><br>Comparable earnings per diluted common share (EPS) | Comparable EBT, comparable earnings and comparable EPS are defined, respectively, as GAAP EBT, earnings and EPS, all from continuing operations, excluding (1) non-operating pension costs and (2) any other significant items that are not representative of our business operations. We believe these comparable earnings measures provide useful information to investors and allow for better year-over-year comparison of operating performance.<br><br>Non-Operating Pension Costs:  Our comparable earnings measures exclude non-operating pension costs, which include the amortization of net actuarial loss, interest cost and expected return on plan assets components of pension and postretirement costs. We exclude non-operating pension costs because we consider these to be impacted by financial market performance and outside the operational performance of our business.<br><br>Other Significant Items:  Our comparable earnings measures also exclude other significant items that are not representative of our business operations as detailed in the reconciliation table below page 58. These other significant items vary from period to period and, in some periods, there may be no such significant items.<br><br>Calculation of comparable tax rate:  The comparable provision for income taxes is computed using the same methodology as the GAAP provision for income taxes. Income tax effects of non-GAAP adjustments are calculated based on the statutory tax rates of the jurisdictions to which the non-GAAP adjustments relate. |
| Adjusted Return on Average Capital (ROC) | Adjusted ROC: Adjusted ROC is defined as adjusted net earnings divided by average total capital and represents the rate of return generated by the capital deployed in our business. The adjustments represent the comparable items described above, which are excluded, as applicable, from the calculation of net earnings and average shareholders' equity (a component of average total capital).<br><br>We use adjusted ROC as an internal measure of how effectively we use the capital invested (borrowed or owned) in our operations. |

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

| Total Cash Generated<br>Free Cash Flow | We consider total cash generated and free cash flow to be important measures of comparative operating performance, as our principal sources of operating liquidity are cash from operations and proceeds from the sale of revenue earning equipment.<br><br>Total Cash Generated:  Total cash generated is defined as the sum of (1) net cash provided by operating activities, (2) net cash provided by the sale of revenue earning equipment and (3) operating property and equipment, (4) collections on direct finance leases and (5) other cash inflows from investing activities. We believe total cash generated is an important measure of total cash flows generated from our ongoing business activities.<br><br>Free Cash Flow:  We refer to the net amount of cash generated from operating activities and investing activities (excluding changes in restricted cash and acquisitions) from continuing operations as "free cash flow". We calculate free cash flow as the sum of (1) net cash provided by operating activities, (2) net cash provided by the sale of revenue earning equipment and (3) operating property and equipment, (4) collections on direct finance leases and (5) other cash inflows from investing activities, less (6) purchases of property and revenue earning equipment. We believe free cash flow provides investors with an important perspective on the cash available for debt service and for shareholders, after making capital investments required to support ongoing business operations. Our calculation of free cash flow may be different from the calculation used by other companies and, therefore, comparability may be limited. |
|---|---|

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

The following table provides a numerical reconciliation of earnings from continuing operations before income taxes (EBT), earnings from continuing operations and earnings per diluted common share from continuing operations to comparable earnings from continuing operations before income taxes, comparable earnings from continuing operations and comparable earnings per diluted common share from continuing operations, respectively, for the years ended December 31, 2016, 2015, 2014, 2013 and 2012. EPS amounts may not be additive due to rounding.

| | | Continuing Operations | | | |
|---|---|---|---|---|---|
| | **2016** | 2015 | 2014 | 2013 | 2012 |
| | | (Dollars in thousands, except per share amounts) | | | |
| **EBT** | $ **406,381** | 469,215 | 338,267 | 369,015 | 302,768 |
| Non-operating pension costs [1] | **29,728** | 19,186 | 9,768 | 24,285 | 31,423 |
| Pension lump sum settlement expense [2] | — | — | 97,231 | — | — |
| Pension-related adjustments [2] | **7,650** | (509) | 12,564 | 2,820 | — |
| Restructuring and other charges (recoveries), net [3] | **5,074** | 14,225 | 2,387 | (470) | 8,070 |
| Acquisition-related tax adjustment [4] | — | — | 1,808 | — | — |
| Acquisition transaction costs | — | — | 566 | — | 368 |
| Consulting fees [4] | — | 3,843 | 400 | — | — |
| Superstorm Sandy vehicle-related (recoveries) losses [4] | — | — | — | (600) | 8,230 |
| Foreign currency translation benefit [4] | — | — | — | (1,904) | — |
| **Comparable EBT**[6] | $ **448,833** | 505,960 | 462,991 | 393,146 | 350,859 |
| | | | | | |
| **Earnings** | $ **264,640** | 305,989 | 220,225 | 243,275 | 200,668 |
| Non-operating pension costs [1] | **17,387** | 10,982 | 5,411 | 14,292 | 19,370 |
| Pension lump sum settlement expense [2] | — | — | 61,333 | — | — |
| Pension-related adjustments [2] | **4,817** | (309) | 7,623 | 1,711 | — |
| Restructuring and other charges (recoveries), net [3] | **3,513** | 10,358 | 1,548 | (360) | 5,263 |
| Acquisition-related tax adjustment [4] | — | — | 1,808 | — | — |
| Acquisition transaction costs | — | — | 444 | — | 277 |
| Consulting fees [4] | — | 2,424 | 252 | — | — |
| Tax law changes and/or benefits from reserve reversals [5] | — | (2,113) | (1,776) | — | 856 |
| Superstorm Sandy vehicle-related (recoveries) losses [4] | — | — | — | (374) | 5,117 |
| Foreign currency translation benefit [4] | — | — | — | (1,904) | — |
| Tax benefit associated with resolution of prior year tax item | — | — | — | — | (4,967) |
| **Comparable Earnings**[6] | $ **290,357** | 327,331 | 296,868 | 256,640 | 226,584 |
| | | | | | |
| **Diluted EPS** | $ **4.94** | 5.73 | 4.14 | 4.63 | 3.90 |
| Non-operating pension costs [1] | **0.33** | 0.21 | 0.10 | 0.28 | 0.37 |
| Pension lump sum settlement expense [2] | — | — | 1.16 | — | — |
| Pension-related adjustments [2] | **0.09** | (0.01) | 0.14 | 0.03 | — |
| Restructuring and other charges (recoveries), net [3] | **0.06** | 0.19 | 0.03 | (0.01) | 0.11 |
| Acquisition-related tax adjustment [4] | — | — | 0.03 | — | — |
| Acquisition transaction costs | — | — | 0.01 | — | — |
| Consulting fees [4] | — | 0.04 | — | — | — |
| Tax law changes and/or benefits from reserve reversals [5] | — | (0.04) | (0.03) | — | 0.02 |
| Superstorm Sandy vehicle-related (recoveries) losses [4] | — | — | — | (0.01) | 0.10 |
| Foreign currency translation benefit [4] | — | — | — | (0.04) | — |
| Tax benefit associated with resolution of prior year tax item | — | — | — | — | (0.10) |
| **Comparable EPS**[6] | $ **5.42** | 6.13 | 5.58 | 4.88 | 4.40 |

_____

(1)  *Includes the amortization of actuarial loss, interest cost and expected return on plan assets components of pension and post-retirement costs, which are tied to financial market performance. 2013 also includes $4 million ($2 million after-tax) or $0.05 charge related to an understatement of pension obligations.*

(2)  *Refer to Note 22, "Employee Benefit Plans," in the Notes to Consolidated Financial Statements for further discussion.*

(3)  *Refer to Note 4, "Restructuring and Other Charges," in the Notes to Consolidated Financial Statements for additional information.*

(4)  *Refer to Note 24, "Other Items Impacting Comparability," in the Notes to Consolidated Financial Statements for further discussion.*

(5)  *Refer to Note 13, "Income Taxes," in the Notes to Consolidated Financial Statements for further discussion.*

(6)  *Refer to page 59 for information on the tax impact of our comparable earnings measures.*

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

The following table provides a numerical reconciliation of EBT from continuing operations, earnings from continuing operations and earnings per diluted common share from continuing operations to comparable EBT from continuing operations, comparable earnings from continuing operations and comparable earnings per diluted common share from continuing operations, respectively, for the three months ended December 31, 2016 and 2015. EPS amounts may not be additive due to rounding:

| | Continuing Operations | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | EBT | | Earnings | | Diluted EPS | |
| | **2016** | 2015 | **2016** | 2015 | **2016** | 2015 |
| | (Dollars in thousands except per share amounts) | | | | | |
| **Three months ended December 31** | | | | | | |
| EBT/Earnings/EPS | $ **69,196** | 111,691 | $ **49,275** | 75,935 | $ **0.92** | 1.42 |
| Non-operating pension costs [1] | **8,037** | 4,835 | **4,734** | 2,792 | **0.09** | 0.05 |
| Restructuring and other charges (recoveries), net [2] | **5,074** | 14,225 | **3,510** | 10,358 | **0.06** | 0.19 |
| Tax law change [3] | — | — | — | (253) | — | — |
| Comparable | $ **82,307** | 130,751 | $ **57,519** | 88,832 | $ **1.07** | 1.66 |

(1)  Includes the amortization of actuarial loss, interest cost and expected return on plan assets components of pension and post-retirement costs, which are tied to financial market performance.
(2)  Refer to Note 4, "Restructuring and Other Charges," in the Notes to Consolidated Financial Statements for additional information.
(3)  Refer to the table below for the information on the tax impact of our comparable earnings measures.

The following table provides a reconciliation of the provision for income taxes to the comparable provision for income taxes:

| | Three months ended December 31, | | Twelve months ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **2016** | **2015** | **2016** | **2015** | **2014** | **2013** | **2012** |
| | (Dollars in thousands) | | | | | | |
| Provision for income taxes [1] | $ **(19,921)** | (35,756) | $ **(141,741)** | (163,226) | (118,042) | (125,740) | (102,218) |
| Income tax effects of non-GAAP adjustments [1] | **(4,867)** | (5,910) | **(16,735)** | (13,290) | (46,305) | (10,766) | (23,031) |
| Tax law change [1] | — | (253) | — | (2,113) | (1,776) | — | 856 |
| Comparable provision for income taxes [1] | $ **(24,788)** | (41,919) | $ **(158,476)** | (178,629) | (166,123) | (136,506) | (124,393) |

(1)  The comparable provision for income taxes is computed using the same methodology as the GAAP provision of income taxes. Income tax effects of non-GAAP adjustments are calculated based on statutory tax rates of the jurisdictions to which the non-GAAP adjustments related.

The following table provides a numerical reconciliation of net cash provided by operating activities to total cash generated and to free cash flow for the years ended December 31, 2016, 2015, 2014, December 31, 2013 and 2012:

| | 2016 | 2015 | 2014 | 2013 | 2012 |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Net cash provided by operating activities | $ 1,601,022 | 1,441,788 | 1,382,818 | 1,251,811 | 1,160,175 |
| Sales of revenue earning equipment [1] | 414,249 | 423,605 | 493,477 | 445,589 | 405,440 |
| Sales of operating property and equipment [1] | 7,051 | 3,891 | 3,486 | 6,782 | 7,350 |
| Collections on direct finance leases [1] | 76,510 | 70,980 | 64,267 | 70,677 | 71,897 |
| Other, net [1] | — | — | — | 8,173 | — |
| Total cash generated | 2,098,832 | 1,940,264 | 1,944,048 | 1,783,032 | 1,644,862 |
| Purchases of property and revenue earning equipment | (1,905,157) | (2,667,978) | (2,259,164) | (2,122,628) | (2,133,235) |
| Free cash flow | $ 193,675 | (727,714) | (315,116) | (339,596) | (488,373) |
| | | | | | |
| Memo: | | | | | |
| Net cash (used)/provided by financing activities | $ (185,922) | 731,485 | 311,650 | 347,070 | 333,805 |
| Net cash used in investing activities | $ (1,405,833) | (2,161,355) | (1,704,510) | (1,603,818) | (1,504,273) |

_____
(1)   Included in cash flows from investing activities.

The following table provides a numerical reconciliation of total revenue to operating revenue for the years ended December 31, 2016, 2015, 2014, 2013 and 2012:

| | 2016 | 2015 | 2014 | 2013 | 2012 |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Total revenue | $ 6,786,984 | 6,571,893 | 6,638,774 | 6,419,285 | 6,256,967 |
| Fuel | (628,525) | (722,734) | (1,050,135) | (1,098,843) | (1,113,458) |
| Subcontracted transportation | (367,562) | (288,082) | (336,422) | (354,624) | (373,250) |
| Operating revenue | $ 5,790,897 | 5,561,077 | 5,252,217 | 4,965,818 | 4,770,259 |

The following table provides a numerical reconciliation of total revenue to operating revenue for the three months ended December 31, 2016 and 2015:

| | Three months ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| | (In thousands) | |
| Total revenue | $ 1,729,150 | 1,672,743 |
| Fuel | (164,349) | (157,727) |
| Subcontracted transportation | (97,923) | (73,308) |
| Operating revenue | $ 1,466,878 | 1,441,708 |

Case 1:20-cv-22109-JB Document 97-44 Entered on FLSD Docket 12/16/2022 Page 66 of 193

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

The following table provides a reconciliation of FMS total revenue to FMS operating revenue, for the three months ended December 31, 2016 and 2015 and for the years ended December 31, 2016, 2015 and 2014:

| | Three months ended December 31, | | Twelve months ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | **2016** | 2015 | **2016** | 2015 | 2014 |
| | (In thousands) | | | | |
| FMS total revenue | **$ 1,151,742** | 1,151,615 | **$ 4,556,194** | 4,545,692 | 4,655,758 |
| Fuel [1] | **(159,468)** | (152,230) | **(608,454)** | (699,646) | (1,025,237) |
| FMS operating revenue | **$ 992,274** | 999,385 | **$ 3,947,740** | 3,846,046 | 3,630,521 |
| | | | | | |
| FMS EBT | **$ 64,367** | 123,506 | **$ 370,754** | 462,109 | 433,736 |
| FMS EBT as a % of FMS total revenue | **5.6%** | 10.7% | **8.1%** | 10.2% | 9.3% |
| FMS EBT as a % of FMS operating revenue | **6.5%** | 12.4% | **9.4%** | 12.0% | 11.9% |

(1)  *Includes intercompany fuel sales from FMS to DTS and SCS.*

The following table provides a reconciliation of DTS total revenue to DTS operating revenue, for the three months ended December 31, 2016 and 2015 and for the years ended December 31, 2016, 2015 and 2014:

| | Three months ended December 31, | | Twelve months ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | **2016** | 2015 | **2016** | 2015 | 2014 |
| | (In thousands) | | | | |
| DTS total revenue | **$ 256,870** | 232,444 | **$ 1,020,895** | 895,538 | 899,802 |
| Subcontracted transportation | **(36,606)** | (18,385) | **(143,502)** | (61,202) | (72,045) |
| Fuel [1] | **(27,158)** | (26,488) | **(103,074)** | (119,883) | (166,529) |
| DTS operating revenue | **$ 193,106** | 187,571 | **$ 774,319** | 714,453 | 661,228 |
| | | | | | |
| DTS EBT | **$ 15,284** | 11,099 | **$ 63,611** | 45,800 | 44,556 |
| DTS EBT as a % of DTS total revenue | **6.0%** | 4.8% | **6.2%** | 5.1% | 5.0% |
| DTS EBT as a % of DTS operating revenue | **7.9%** | 5.9% | **8.2%** | 6.4% | 6.7% |

(1)  *Includes intercompany fuel sales from FMS to DTS.*

The following table provides a reconciliation of SCS total revenue to SCS operating revenue for the three months ended December 31, 2016 and 2015 and for the years ended December 31, 2016, 2015 and 2014:

| | Three months ended December 31, | | Twelve months ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | **2016** | 2015 | **2016** | 2015 | 2014 |
| | (In thousands) | | | | |
| SCS total revenue | **$ 430,185** | 392,463 | **$ 1,637,850** | 1,547,763 | 1,561,347 |
| Subcontracted transportation | **(61,317)** | (54,923) | **(224,060)** | (226,880) | (264,377) |
| Fuel [1] | **(16,218)** | (15,484) | **(61,713)** | (64,574) | (95,720) |
| SCS operating revenue | **$ 352,650** | 322,056 | **$ 1,352,077** | 1,256,309 | 1,201,250 |
| | | | | | |
| SCS EBT | **$ 26,440** | 23,793 | **$ 105,561** | 93,754 | 77,800 |
| SCS EBT as a % of SCS total revenue | **6.1%** | 6.1% | **6.4%** | 6.1% | 5.0% |
| SCS EBT as a % of SCS operating revenue | **7.5%** | 7.4% | **7.8%** | 7.5% | 6.5% |

(1)  *Includes intercompany fuel sales from FMS to SCS.*

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

The following table provides numerical reconciliations of the non-GAAP elements of the calculation to the corresponding GAAP measures and of net earnings to adjusted net earnings and average total debt and average shareholders' equity to adjusted average total capital used to calculate the adjusted return on average capital for the years ended December 31, 2016, 2015, 2014, 2013 and 2012:

| | 2016 | 2015 | 2014 | 2013 | 2012 |
|---|---|---|---|---|---|
| | (Dollars in thousands) | | | | |
| Net earnings | $ 262,477 | 304,768 | 218,341 | 237,871 | 209,748 |
| Restructuring and other charges (recoveries), net and other items [1] | 12,585 | 17,559 | 114,956 | (154) | 16,668 |
| Income taxes | 141,623 | 163,649 | 118,120 | 125,693 | 90,943 |
| Adjusted earnings before income taxes | 416,685 | 485,976 | 451,417 | 363,410 | 317,359 |
| Adjusted interest expense [2] | 148,043 | 150,640 | 144,991 | 140,738 | 143,530 |
| Adjusted income taxes [3] | (198,248) | (224,033) | (213,738) | (177,308) | (166,666) |
| Adjusted net earnings for adjusted return on average capital [A] | $ 366,480 | 412,583 | 382,670 | 326,840 | 294,223 |
| | | | | | |
| Average total debt | $5,549,458 | 5,177,012 | 4,653,476 | 4,015,178 | 3,777,881 |
| Average off-balance sheet debt | 1,472 | 1,467 | 1,919 | 961 | 1,555 |
| Average shareholders' equity | 2,052,371 | 1,894,917 | 1,925,824 | 1,593,942 | 1,405,640 |
| Average adjustments to shareholders' equity [4] | 1,728 | 10,843 | 7,758 | (2,088) | (2,933) |
| Adjusted average total capital [B] | $7,605,029 | 7,084,239 | 6,588,977 | 5,607,993 | 5,182,143 |
| | | | | | |
| Adjusted return on average capital [A]/[B] | 4.8% | 5.8% | 5.8% | 5.8% | 5.7% |

(1) For 2016, 2015 and 2014, see Note 4, "Restructuring and Other Charges" and Note 24, "Other Items Impacting Comparability," in the Notes to Consolidated Financial Statements; 2012 includes $8 million of restructuring and other charges primarily related to position eliminations as a result of cost containment actions.
(2) Represents reported interest expense plus imputed interest on off-balance sheet obligations.
(3) Represents provision for income taxes plus income taxes on restructuring and other items and adjusted interest expense.
(4) Represents the impact to equity of items to arrive at comparable earnings.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS - (Continued)**

The following table provides a numerical reconciliation of forecasted earnings per diluted common share from continuing operations to forecasted comparable earnings per diluted common share from continuing operations for 2017 which was not provided within the MD&A discussion:

|  | 2017 |
|---|---|
| EPS from continuing operations forecast | $4.78 - 5.08 |
| Non-operating pension costs | 0.32 |
| Comparable EPS from continuing operations forecast | $5.10 - 5.40 |

*Segment Financial Measures.* The following table reconciles FMS segment revenue to revenue from external customers for the years ended December 31, 2016, 2015 and 2014:

|  | 2016 | 2015 | 2014 |
|---|---|---|---|
|  | (In thousands) | | |
| Full service lease revenue | $ 2,573,638 | 2,406,711 | 2,276,381 |
| Commercial rental revenue | 846,331 | 940,045 | 876,994 |
| Full service lease and commercial rental revenue | 3,419,969 | 3,346,756 | 3,153,375 |
| Intercompany revenue | (249,017) | (225,203) | (213,953) |
| Full service lease and commercial rental revenue from external customers | $ 3,170,952 | 3,121,553 | 2,939,422 |
| FMS services revenue | $ 527,771 | 499,290 | 477,146 |
| Intercompany revenue | (34,222) | (30,528) | (26,830) |
| FMS services revenue from external customers | $ 493,549 | 468,762 | 450,316 |
| FMS fuel services revenue | $ 608,454 | 699,646 | 1,025,237 |
| Intercompany revenue | (144,716) | (161,369) | (237,350) |
| FMS fuel services revenue from external customers | $ 463,738 | 538,277 | 787,887 |

SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Forward-looking statements (within the meaning of the Federal Private Securities Litigation Reform Act of 1995) are statements that relate to expectations, beliefs, projections, future plans and strategies, anticipated events or trends concerning matters that are not historical facts. These statements are often preceded by or include the words "believe," "expect," "intend," "estimate," "anticipate," "will," "may," "could," "should" or similar expressions. This Annual Report contains forward-looking statements including, but not limited to, statements regarding:

- our expectations as to anticipated revenue and earnings growth specifically, total revenue, operating revenue and product line revenues, used vehicle sales, demand, pricing, inventory and volumes, contract revenues, full service lease growth, on-demand maintenance growth, commercial rental pricing and demand, and actual and planned new sales activity in lease, DTS and SCS;
- our expectations relating to further deterioration in the used vehicle sales market;
- the size and impact of strategic investments;
- our expected cost savings from workforce reductions and restructuring actions;
- the continuing benefits of our maintenance initiatives and a newer fleet;
- our ability to successfully achieve the operational goals that are the basis of our business strategies, including driving fleet growth, delivering a consistent, industry-leading and cost-effective maintenance program, optimizing asset utilization and management, providing differentiated quality of service and best execution, developing broad-based capabilities, creating a culture of innovation, focusing on continuous improvement and standardization and successfully implementing sales and marketing strategies;
- impact of losses from conditional obligations arising from guarantees;
- number of NLE and used vehicles in inventory and the appropriate size of our commercial rental fleet given commercial rental market expectations;
- estimates of cash flows from operations, free cash flow and capital expenditures for 2017;
- the adequacy of our accounting estimates and reserves for pension expense, compensation-related expense, postretirement benefit expense, depreciation and residual value guarantees, rent expense under operating leases, self-insurance reserves, goodwill impairment, accounting changes and income taxes;
- our ability to meet our operating, investing and financing needs in the foreseeable future through internally generated funds and outside funding sources;
- our expected level of use of outside funding sources, anticipated future payments under debt, lease and purchase agreements, and risk of losses resulting from counterparty default under hedging and derivative agreements;
- anticipated impact of exchange rate fluctuations;
- the anticipated impact of fuel price fluctuations on our operations, cash flows and financial position;
- our expectations as to future pension expense and contributions, as well as the continued effect of the freeze of our pension plans on our benefit funding requirements;
- the anticipated deferral of tax gains on disposal of eligible revenue earning equipment under our vehicle like-kind exchange program;
- our expectations relating to withdrawal liabilities and funding levels of multi-employer plans;
- the status of our unrecognized tax benefits related to the U.S. federal, state and foreign tax positions;
- our expectations regarding the completion and ultimate outcome of certain tax audits;
- the ultimate disposition of legal proceedings and estimated environmental liabilities;
- our expectations relating to compliance with new regulatory requirements;
- our expectations regarding the effects of the adoption of recent accounting pronouncements; and
- our plans regarding renewal of our automatic shelf registration statement.

These statements, as well as other forward-looking statements contained in this Annual Report, are based on our current plans and expectations and are subject to risks, uncertainties and assumptions. We caution readers that certain important factors could cause actual results and events to differ significantly from those expressed in any forward-looking statements. For a detailed description of certain of these risk factors, please see "Item 1A—Risk Factors" of this Annual Report.

The risks included in the Annual Report are not exhaustive. New risk factors emerge from time to time and it is not possible for management to predict all such risk factors or to assess the impact of such risk factors on our business. As a result, no assurance can be given as to our future results or achievements. You should not place undue reliance on the forward-looking statements contained herein, which speak only as of the date of this Annual Report. We do not intend, or assume any obligation, to update or revise any forward-looking statements contained in this Annual Report, whether as a result of new information, future events or otherwise.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

The information required by ITEM 7A is included in ITEM 7 of PART II of this report.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

## FINANCIAL STATEMENTS

|  | Page No. |
|---|---|
| Management's Report on Internal Control over Financial Reporting | 67 |
| Report of Independent Registered Certified Public Accounting Firm | 68 |
| Consolidated Statements of Earnings | 69 |
| Consolidated Statements of Comprehensive Income (Loss) | 70 |
| Consolidated Balance Sheets | 71 |
| Consolidated Statements of Cash Flows | 72 |
| Consolidated Statements of Shareholders' Equity | 73 |
| Notes to Consolidated Financial Statements: | |
| Note 1. Summary of Significant Accounting Policies | 74 |
| Note 2. Recent Accounting Pronouncements | 82 |
| Note 3. Acquisitions | 83 |
| Note 4. Restructuring and Other Charges (Recoveries) | 83 |
| Note 5. Receivables | 84 |
| Note 6. Prepaid Expenses and Other Current Assets | 84 |
| Note 7. Revenue Earning Equipment | 85 |
| Note 8. Operating Property and Equipment | 86 |
| Note 9. Goodwill | 87 |
| Note 10. Intangible Assets | 87 |
| Note 11. Direct Financing Leases and Other Assets | 88 |
| Note 12. Accrued Expenses and Other Liabilities | 89 |
| Note 13. Income Taxes | 90 |
| Note 14. Leases | 93 |
| Note 15. Debt | 95 |
| Note 16. Derivatives | 97 |
| Note 17. Guarantees | 98 |
| Note 18. Share Repurchase Programs | 98 |
| Note 19. Accumulated Other Comprehensive Loss | 99 |
| Note 20. Earnings Per Share | 100 |
| Note 21. Share-Based Compensation Plans | 100 |
| Note 22. Employee Benefit Plans | 104 |
| Note 23. Environmental Matters | 112 |
| Note 24. Other Items Impacting Comparability | 113 |
| Note 25. Other Matters | 114 |
| Note 26. Supplemental Cash Flow Information | 114 |
| Note 27. Segment Reporting | 115 |
| Note 28. Quarterly Information (unaudited) | 119 |
| Consolidated Financial Statement Schedule for the Years Ended December 31, 2015, 2014 and 2013: | |
| Schedule II — Valuation and Qualifying Accounts | 120 |

All other schedules are omitted because they are not applicable or the required information is shown in the consolidated financial statements or notes thereto.

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

TO THE SHAREHOLDERS OF RYDER SYSTEM, INC.:

Management of Ryder System, Inc., together with its consolidated subsidiaries (Ryder), is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. Ryder's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the consolidated financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America.

Ryder's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Ryder; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of Ryder's management and directors; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of Ryder's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of Ryder's internal control over financial reporting as of December 31, 2016. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in "Internal Control — Integrated Framework (2013)." Based on our assessment and those criteria, management determined that Ryder maintained effective internal control over financial reporting as of December 31, 2016.

Ryder's independent registered certified public accounting firm has audited the effectiveness of Ryder's internal control over financial reporting. Their report appears on the subsequent page.

**REPORT OF INDEPENDENT REGISTERED CERTIFIED PUBLIC ACCOUNTING FIRM**

TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
RYDER SYSTEM, INC.:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of earnings, comprehensive income, cash flows and shareholders' equity present fairly, in all material respects, the financial position of Ryder System, Inc. and its subsidiaries at December 31, 2016 and 2015, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2016 in conformity with accounting principles generally accepted in the United States of America.  In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.  Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting.  Our responsibility is to express opinions on these financial statements, on the financial statement schedule, and on the Company's internal control over financial reporting based on our integrated audits.  We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects.  Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk.  Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.  A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.  Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

Miami, Florida
February 14, 2017

68

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF EARNINGS**

| | | Years ended December 31, | | |
|---|---|---|---|---|
| | | **2016** | 2015 | 2014 |
| | | (In thousands, except per share amounts) | | |
| Lease and rental revenues | $ | **3,170,952** | 3,121,553 | 2,939,422 |
| Services revenue | | **3,152,294** | 2,912,063 | 2,911,465 |
| Fuel services revenue | | **463,738** | 538,277 | 787,887 |
| Total revenues | | **6,786,984** | 6,571,893 | 6,638,774 |
| | | | | |
| Cost of lease and rental | | **2,234,284** | 2,153,450 | 2,036,881 |
| Cost of services | | **2,602,978** | 2,413,156 | 2,447,867 |
| Cost of fuel services | | **448,306** | 519,843 | 768,292 |
| Other operating expenses | | **113,461** | 117,082 | 115,808 |
| Selling, general and administrative expenses | | **842,697** | 844,497 | 816,975 |
| Pension lump sum settlement expense | | **—** | — | 97,231 |
| Used vehicle sales, net | | **(972)** | (99,853) | (116,060) |
| Interest expense | | **147,843** | 150,434 | 144,739 |
| Miscellaneous income, net | | **(13,068)** | (10,156) | (13,613) |
| Restructuring and other charges, net | | **5,074** | 14,225 | 2,387 |
| | | **6,380,603** | 6,102,678 | 6,300,507 |
| Earnings from continuing operations before income taxes | | **406,381** | 469,215 | 338,267 |
| Provision for income taxes | | **141,741** | 163,226 | 118,042 |
| Earnings from continuing operations | | **264,640** | 305,989 | 220,225 |
| Loss from discontinued operations, net of tax | | **(2,163)** | (1,221) | (1,884) |
| Net earnings | $ | **262,477** | 304,768 | 218,341 |
| | | | | |
| Earnings (loss) per common share — Basic | | | | |
| Continuing operations | $ | **4.98** | 5.78 | 4.18 |
| Discontinued operations | | **(0.04)** | (0.02) | (0.04) |
| Net earnings | $ | **4.94** | 5.75 | 4.14 |
| Earnings (loss) per common share — Diluted | | | | |
| Continuing operations | $ | **4.94** | 5.73 | 4.14 |
| Discontinued operations | | **(0.04)** | (0.02) | (0.03) |
| Net earnings | $ | **4.90** | 5.71 | 4.11 |

*See accompanying notes to consolidated financial statements.*

*Note: EPS amounts may not be additive due to rounding.*

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

| | Years ended December 31, | | |
|---|---|---|---|
| | **2016** | 2015 | 2014 |
| | (In thousands) | | |
| Net earnings | $  262,477 | 304,768 | 218,341 |
| Other comprehensive loss: | | | |
| Changes in cumulative translation adjustment and other | (70,590) | (99,933) | (71,962) |
| Amortization of pension and postretirement items | 29,493 | 27,731 | 18,601 |
| Income tax expense related to amortization of pension and postretirement items | (10,452) | (9,637) | (6,411) |
| Amortization of pension and postretirement items, net of tax | 19,041 | 18,094 | 12,190 |
| Reclassification of net actuarial loss from pension settlement | — | — | 97,231 |
| Change in net actuarial loss and prior service credit | (98,092) | (23,979) | (281,173) |
| Income tax benefit (expense) related to change in net actuarial loss and prior service credit | 28,344 | 13,353 | 61,692 |
| Change in net actuarial loss and prior service credit, net of taxes | (69,748) | (10,626) | (122,250) |
| Other comprehensive loss, net of taxes | (121,297) | (92,465) | (182,022) |
| Comprehensive income | $  141,180 | 212,303 | 36,319 |

*See accompanying notes to consolidated financial statements.*

70

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

|  | December 31, 2016 | December 31, 2015 |
|---|---|---|
|  | (Dollars in thousands, except per share amount) | |
| **Assets:** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 58,801 | 60,945 |
| Receivables, net | 831,947 | 835,489 |
| Inventories | 69,529 | 63,725 |
| Prepaid expenses and other current assets | 141,280 | 138,143 |
| Total current assets | 1,101,557 | 1,098,302 |
| Revenue earning equipment, net | 8,147,722 | 8,184,735 |
| Operating property and equipment, net | 745,870 | 714,970 |
| Goodwill | 386,772 | 389,135 |
| Intangible assets | 48,249 | 55,192 |
| Direct financing leases and other assets | 472,284 | 510,246 |
| Total assets | $ 10,902,454 | 10,952,580 |
| **Liabilities and shareholders' equity:** | | |
| Current liabilities: | | |
| Short-term debt and current portion of long-term debt | $ 791,410 | 634,530 |
| Accounts payable | 445,470 | 502,373 |
| Accrued expenses and other current liabilities | 507,189 | 543,352 |
| Total current liabilities | 1,744,069 | 1,680,255 |
| Long-term debt | 4,599,864 | 4,868,097 |
| Other non-current liabilities | 817,565 | 829,595 |
| Deferred income taxes | 1,688,681 | 1,587,522 |
| Total liabilities | 8,850,179 | 8,965,469 |
| **Shareholders' equity:** | | |
| Preferred stock, no par value per share — authorized, 3,800,917; none outstanding, December 31, 2016 or 2015 | — | — |
| Common stock, $0.50 par value per share — authorized, 400,000,000; outstanding, December 31, 2016 — 53,463,118; December 31, 2015 — 53,490,603 | 26,732 | 26,745 |
| Additional paid-in capital | 1,032,549 | 1,006,021 |
| Retained earnings | 1,827,026 | 1,667,080 |
| Accumulated other comprehensive loss | (834,032) | (712,735) |
| Total shareholders' equity | 2,052,275 | 1,987,111 |
| Total liabilities and shareholders' equity | $ 10,902,454 | 10,952,580 |

*See accompanying notes to consolidated financial statements.*

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | | Years ended December 31, | |
|---|---|---|---|
| | **2016** | 2015 | 2014 |
| | | (In thousands) | |
| Net earnings | $ **262,477** | 304,768 | 218,341 |
| Less: Loss from discontinued operations, net of tax | **(2,163)** | (1,221) | (1,884) |
| Earnings from continuing operations | **264,640** | 305,989 | 220,225 |
| Depreciation expense | **1,187,050** | 1,121,966 | 1,047,049 |
| Used vehicle sales, net | **(972)** | (99,853) | (116,060) |
| Share-based compensation expense | **18,664** | 21,181 | 20,905 |
| Pension lump sum settlement expense | **—** | — | 97,231 |
| Amortization expense and other non-cash charges, net | **68,260** | 70,762 | 47,263 |
| Deferred income tax expense | **124,886** | 154,042 | 104,713 |
| Changes in operating assets and liabilities, net of acquisitions: | | | |
| Receivables | **(51,754)** | (40,323) | (20,687) |
| Inventories | **(5,906)** | 1,448 | (2,153) |
| Prepaid expenses and other assets | **(14,211)** | (292) | (16,040) |
| Accounts payable | **94,320** | (74,381) | 53,481 |
| Accrued expenses and other non-current liabilities | **(83,955)** | (18,751) | (53,109) |
| Net cash provided by operating activities from continuing operations | **1,601,022** | 1,441,788 | 1,382,818 |
| Cash flows from financing activities from continuing operations: | | | |
| Net change in commercial paper borrowings and revolving credit facilities | **(77,798)** | 323,359 | (221,082) |
| Debt proceeds | **674,928** | 1,283,223 | 965,533 |
| Debt repaid, including capital lease obligations | **(669,047)** | (798,311) | (293,488) |
| Dividends on common stock | **(91,043)** | (83,201) | (74,871) |
| Common stock issued | **18,087** | 23,635 | 46,568 |
| Common stock repurchased | **(37,274)** | (6,141) | (106,286) |
| Debt issuance costs and other items | **(3,775)** | (11,079) | (4,724) |
| Net cash (used in) provided by financing activities from continuing operations | **(185,922)** | 731,485 | 311,650 |
| Cash flows from investing activities from continuing operations: | | | |
| Purchases of property and revenue earning equipment | **(1,905,157)** | (2,667,978) | (2,259,164) |
| Sales of revenue earning equipment | **414,249** | 423,605 | 493,477 |
| Sales of operating property and equipment | **7,051** | 3,891 | 3,486 |
| Acquisitions | **—** | — | (9,972) |
| Collections on direct finance leases and other | **76,510** | 70,980 | 64,267 |
| Changes in restricted cash | **1,514** | 8,147 | 3,396 |
| Net cash used in investing activities from continuing operations | **(1,405,833)** | (2,161,355) | (1,704,510) |
| Effect of exchange rates on cash | **(9,482)** | 37 | 297 |
| (Decrease) increase in cash and cash equivalents from continuing operations | **(215)** | 11,955 | (9,745) |
| Decrease in cash and cash equivalents from discontinued operations | **(1,929)** | (1,102) | (1,725) |
| (Decrease) increase in cash and cash equivalents | **(2,144)** | 10,853 | (11,470) |
| Cash and cash equivalents at January 1 | **60,945** | 50,092 | 61,562 |
| Cash and cash equivalents at December 31 | $ **58,801** | 60,945 | 50,092 |

*See accompanying notes to consolidated financial statements.*

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**

| | Preferred Stock | Common Stock | | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|---|
| | Amount | Shares | Par | | | | |
| | | | | (Dollars in thousands, except per share amounts) | | | |
| Balance at January 1, 2014 | $ — | 53,335,386 | $ 26,667 | 917,539 | 1,390,603 | (438,248) | 1,896,561 |
| Comprehensive income | — | — | — | — | 218,341 | (182,022) | 36,319 |
| Common stock dividends declared and paid—$1.42 per share | — | — | — | — | (75,631) | — | (75,631) |
| Common stock issued under employee stock option and stock purchase plans [1] | — | 1,019,341 | 511 | 45,371 | — | — | 45,882 |
| Benefit plan stock purchases [2] | — | 8,239 | 4 | 682 | — | — | 686 |
| Common stock repurchases | — | (1,323,278) | (662) | (22,820) | (82,804) | — | (106,286) |
| Share-based compensation | — | — | — | 20,905 | — | — | 20,905 |
| Tax benefits from share-based compensation | — | — | — | 651 | — | — | 651 |
| Balance at December 31, 2014 | — | 53,039,688 | 26,520 | 962,328 | 1,450,509 | (620,270) | 1,819,087 |
| Comprehensive income | — | — | — | — | 304,768 | (92,465) | 212,303 |
| Common stock dividends declared and paid—$1.56 per share | — | — | — | — | (83,306) | — | (83,306) |
| Common stock issued under employee stock option and stock purchase plans [1] | — | 519,271 | 260 | 23,292 | — | — | 23,552 |
| Benefit plan stock sales [2] | — | 751 | — | 83 | — | — | 83 |
| Common stock repurchases | — | (69,107) | (35) | (1,215) | (4,891) | — | (6,141) |
| Share-based compensation | — | — | — | 21,181 | — | — | 21,181 |
| Tax benefits from share-based compensation | — | — | — | 352 | — | — | 352 |
| Balance at December 31, 2015 | — | 53,490,603 | 26,745 | 1,006,021 | 1,667,080 | (712,735) | 1,987,111 |
| Comprehensive income | — | — | — | — | 262,477 | (121,297) | 141,180 |
| Common stock dividends declared—$1.70 per share | — | — | — | — | (91,100) | — | (91,100) |
| Common stock issued under employee stock option and stock purchase plans [1] | — | 507,104 | 254 | 17,752 | — | — | 18,006 |
| Benefit plan stock sales [2] | — | 1,709 | 1 | 80 | — | — | 81 |
| Common stock repurchases | — | (536,298) | (268) | (9,968) | (27,038) | — | (37,274) |
| Share-based compensation | — | — | — | 18,664 | — | — | 18,664 |
| Adoption of new accounting standard | — | — | — | — | 15,607 | — | 15,607 |
| Balance at December 31, 2016 | $ — | 53,463,118 | $ 26,732 | 1,032,549 | 1,827,026 | (834,032) | 2,052,275 |

(1)   Net of common shares delivered as payment for the exercise price or to satisfy the holders' withholding tax liability upon exercise of options.
(2)   Represents open-market transactions of common shares by the trustee of Ryder's deferred compensation plans.

*See accompanying notes to consolidated financial statements.*

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

1.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Consolidation and Presentation**

The consolidated financial statements include the accounts of Ryder System, Inc. (Ryder) and all entities in which Ryder has a controlling voting interest ("subsidiaries") and variable interest entities ("VIEs") where Ryder is determined to be the primary beneficiary. Ryder is deemed to be the primary beneficiary if we have the power to direct the activities that most significantly impact the entity's economic performance and we share in the significant risks and rewards of the entity. All significant intercompany accounts and transactions have been eliminated in consolidation.

Beginning in 2016, we reclassified the losses from fair value adjustments on our used vehicles from "Other operating expenses" to "Used vehicle sales, net" within the Consolidated Statement of Earnings.  Prior year amounts have been reclassified to conform to the current period presentation.

**Use of Estimates**

The preparation of our consolidated financial statements requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. These estimates are based on management's best knowledge of historical trends, actions that we may take in the future, and other information available when the consolidated financial statements are prepared. Changes in estimates are recognized in accordance with the accounting rules for the estimate, which is typically in the period when new information becomes available. Areas where the nature of the estimate make it reasonably possible that actual results could materially differ from the amounts estimated include: depreciation and residual value guarantees, employee benefit plan obligations, self-insurance accruals, impairment assessments on long-lived assets (including goodwill and indefinite-lived intangible assets), allowance for accounts receivable, income tax liabilities and contingent liabilities.

**Cash Equivalents**

Cash equivalents represent cash in excess of current operating requirements invested in short-term, interest-bearing instruments with maturities of three months or less at the date of purchase and are stated at cost.

**Revenue Recognition**

We recognize revenue when persuasive evidence of an arrangement exists, the services have been rendered to customers or delivery has occurred, the pricing is fixed or determinable, and collectibility is reasonably assured. In our evaluation of whether the price is fixed or determinable, we determine whether the total contract consideration in the arrangement could change based on one or more factors. These factors, which vary among each of our segments, are further discussed below. Generally, the judgments made for these purposes do not materially impact the revenue recognized in any period. Sales tax collected from customers and remitted to the applicable taxing authorities is accounted for on a net basis, with no impact on revenue.

Our judgments on collectibility are initially established when a business relationship with a customer is initiated and is continuously monitored as services are provided. We have a credit rating system based on internally developed standards and ratings provided by third parties. Our credit rating system, along with monitoring for delinquent payments, allows us to make decisions as to whether collectibility may not be reasonably assured. Factors considered during this process include historical payment trends, industry risks, liquidity of the customer, years in business, and judgments, liens or bankruptcies. When collectibility is not considered reasonably assured (typically when a customer is 120 days past due), revenue is not recognized until cash is collected from the customer.

We generate revenue primarily through the lease, rental and maintenance of revenue earning equipment and by providing logistics management and dedicated services. We classify our revenues in one of the following categories:

*Lease and rental*

Lease and rental includes lease and commercial rental revenues from our FMS business segment. We offer a full service lease as well as a lease with more flexible maintenance options which are marketed, priced and managed as bundled lease arrangements, and include equipment, service and financing components. We do not offer a stand-alone unbundled finance lease of vehicles. For these reasons, both the lease and service components of our leases are included within lease and rental revenues.

RYDER SYSTEM, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)

Our lease arrangements include lease deliverables such as the lease of a vehicle and the executory agreement for the maintenance, insurance, taxes and other services related to the leased vehicles during the lease term. Arrangement consideration is allocated between lease deliverables and non-lease deliverables based on management's best estimate of the relative fair value of each deliverable. The arrangement consideration allocated to lease deliverables is accounted for pursuant to accounting guidance on leases. Our full service lease arrangements provide for a fixed charge billing and a variable charge billing based on mileage or time usage. Fixed charges are typically billed at the beginning of the month for the services to be provided that month. Variable charges are typically billed a month in arrears. Costs associated with the activities performed under our full service leasing arrangements are primarily comprised of labor, parts, outside work, depreciation, licenses, insurance, operating taxes and vehicle financing. These costs are expensed as incurred except for depreciation. Refer to "Summary of Significant Accounting Policies – Revenue Earning Equipment, Operating Property and Equipment, and Depreciation" for information regarding our depreciation policies. Non-chargeable maintenance costs have been allocated and reflected within "Cost of lease and rental" based on the maintenance-related labor costs relative to all product lines.

Revenue from lease and rental agreements is recognized based on the classification of the arrangement, typically as either an operating or direct financing lease (DFL).

- The majority of our leases and all of our rental arrangements are classified as operating leases and, therefore, we recognize lease and commercial rental revenue on a straight-line basis as it becomes receivable over the term of the lease or rental arrangement. Lease and rental agreements do not usually provide for scheduled rent increases or escalations. However, most lease agreements allow for rate changes based upon changes in the Consumer Price Index (CPI). Lease and rental agreements also provide for vehicle usage charges based on a time charge and/or a fixed per-mile charge. The fixed time charge, the fixed per-mile charge and the changes in rates attributed to changes in the CPI are considered contingent rentals and are not considered fixed or determinable until the effect of CPI changes is implemented or the equipment usage occurs.

- The non-lease deliverables of our full service lease arrangements are comprised of access to substitute vehicles, emergency road service, and safety services. These services are available to our customers throughout the lease term. Accordingly, revenue is recognized on a straight-line basis over the lease term.

- Leases not classified as operating leases are generally considered direct financing leases. We recognize revenue for direct financing leases using the effective interest method, which provides a constant periodic rate of return on the outstanding investment on the lease. Cash receipts on impaired direct financing lease receivables are first applied to the direct financing lease receivable and then to any unrecognized income. A direct financing lease receivable is considered impaired, based on current information and events, if it is probable that we will be unable to collect all amounts due according to the contractual terms of the lease.

*Services*

Services include contract maintenance, contract-related maintenance and other revenues from our FMS business segment and all DTS and SCS revenues.

Under our contract maintenance arrangements, we provide maintenance and repairs required to keep a vehicle in good operating condition, schedule preventive maintenance inspections and provide access to emergency road service and substitute vehicles. The vast majority of our services are routine services performed on a recurring basis throughout the term of the arrangement. From time to time, we provide non-routine major repair services in order to place a vehicle back in service. Revenue from maintenance service contracts is recognized on a straight-line basis as maintenance services are rendered over the terms of the related arrangements.

Contract maintenance arrangements are generally cancelable, without penalty, after one year with 60 days prior written notice. Our maintenance service arrangement provides for a monthly fixed charge and a monthly variable charge based on mileage or time usage. Fixed charges are typically billed at the beginning of the month for the services to be provided that month. Variable charges are typically billed a month in arrears. Most contract maintenance agreements allow for rate changes based upon changes in the CPI. The fixed per-mile charge and the changes in rates attributed to changes in the CPI are recognized as earned. Costs associated with the activities performed under our contract maintenance arrangements are primarily comprised of labor, parts and outside work. These costs are expensed as incurred. Non-chargeable maintenance costs have been allocated and reflected within "Cost of services" based on the proportionate maintenance-related labor costs relative to all product lines.

Revenue from DTS and SCS service contracts is recognized as services are rendered in accordance with contract terms, which typically include discrete billing rates for the services. In certain contracts, a portion of the contract consideration may be contingent upon the satisfaction of performance criteria, attainment of pain/gain share thresholds or volume thresholds. The contingent portion of the revenue in these arrangements is not considered fixed or determinable until the performance criteria or thresholds have been met. In transportation management arrangements where we act as principal, revenue is reported on a gross basis, without deducting third-party purchased transportation costs. To the extent that we are acting as an agent in the arrangement, revenue is reported on a net basis, after deducting purchased transportation costs.

*Fuel*

Fuel services include fuel services revenue from our FMS business segment. Revenue from fuel services is recognized when fuel is delivered to customers. Fuel is largely a pass-through to our customers for which we realize minimal changes in profitability during periods of steady market fuel prices. However, profitability may be positively or negatively impacted by sudden increases or decreases in market fuel prices during a short period of time as customer pricing for fuel services is established based on trailing market fuel costs.

**Accounts Receivable Allowance**

We maintain an allowance for uncollectible customer receivables and an allowance for billing adjustments related to certain discounts and billing corrections. Estimates are updated regularly based on historical experience of bad debts and billing adjustments processed, current collection trends and aging analysis. Accounts are charged against the allowance when determined to be uncollectible.

**Inventories**

Inventories, which consist primarily of fuel, tires and vehicle parts, are valued using the lower of weighted-average cost or market.

**Revenue Earning Equipment, Operating Property and Equipment, and Depreciation**

Revenue earning equipment, comprised of vehicles and operating property and equipment are initially recorded at cost inclusive of vendor rebates. Revenue earning equipment and operating property and equipment under capital lease are initially recorded at the lower of the present value of minimum lease payments or fair value. Vehicle repairs and maintenance that extend the life or increase the value of a vehicle are capitalized, whereas ordinary maintenance and repairs (including tire replacement or repair) are expensed as incurred. Direct costs incurred in connection with developing or obtaining internal-use software are capitalized. Costs incurred during the preliminary software development project stage, as well as maintenance and training costs, are expensed as incurred.

Leasehold improvements are depreciated over the shorter of their estimated useful lives or the term of the related lease, which may include one or more option renewal periods where failure to exercise such options would result in an economic penalty in such amount that renewal appears, at the inception of the lease, to be reasonably assured. If a substantial additional investment is made in a leased property during the term of the lease, we re-evaluate the lease term to determine whether the investment, together with any penalties related to non-renewal, would constitute an economic penalty in such amount that renewal appears to be reasonably assured.

Provision for depreciation is computed using the straight-line method on all depreciable assets. Depreciation expense has been recognized throughout the Consolidated Statement of Earnings depending on the nature of the related asset. We periodically review and adjust, as appropriate, the residual values and useful lives of revenue earning equipment. Our review of the residual values and useful lives of revenue earning equipment is established with a long-term view considering historical market price changes, current and expected future market price trends, expected lives of vehicles and extent of alternative uses. Factors that could cause actual results to materially differ from estimates include, but are not limited to, unforeseen changes in technology innovations. In addition, we also monitor market trends throughout the year and assess residual values of vehicles expected to be sold in the near term and may adjust residual values for these vehicles.

We routinely dispose of used revenue earning equipment as part of our FMS business. Revenue earning equipment held for sale is stated at the lower of carrying amount or fair value less costs to sell. For revenue earning equipment held for sale, we stratify our fleet by vehicle type (trucks, tractors and trailers), weight class, age and other relevant characteristics and create classes of similar assets for analysis purposes. Fair value is determined based upon recent market prices obtained from our own sales experience for sales of each class of similar assets and vehicle condition, as well as anticipated market price changes. Losses on vehicles held for sale for which carrying values exceeded fair value are recognized at the time they arrive at our used truck centers and are presented within "Used vehicle sales, net" in the Consolidated Statements of Earnings.

Gains and losses on sales of operating property and equipment are reflected in "Miscellaneous income, net."

76

**Goodwill and Other Intangible Assets**

Goodwill on acquisitions represents the excess of the purchase price over the fair value of the underlying acquired net tangible and intangible assets. Factors that contribute to the recognition of goodwill in our acquisitions include (i) expected growth rates and profitability of the acquired companies, (ii) securing buyer-specific synergies that increase revenue and profits and are not otherwise available to market participants, (iii) significant cost savings opportunities, (iv) experienced workforce and (v) our strategies for growth in sales, income and cash flows.

Goodwill and other intangible assets with indefinite useful lives are not amortized, but rather, are tested for impairment at least annually (April 1st). In evaluating goodwill for impairment, we have the option to first assess qualitative factors to determine whether further impairment testing is necessary. Among other relevant events and circumstances that affect the fair value of reporting units, we consider individual factors such as macroeconomic conditions, changes in our industry and the markets in which we operate, as well as our reporting units' historical and expected future financial performance. If we conclude that it is more likely than not that a reporting unit's fair value is less than its carrying value, recoverability of goodwill is evaluated using a two-step process. The first step involves a comparison of the fair value of each of our reporting units with its carrying amount. If a reporting unit's carrying amount exceeds its fair value, the second step is performed. The second step involves a comparison of the implied fair value and carrying value of that reporting unit's goodwill. To the extent that a reporting unit's carrying amount exceeds the implied fair value of its goodwill, an impairment loss is recognized.

Our valuation of fair value for certain reporting units is determined based on a discounted future cash flow model that uses five years of projected cash flows and a terminal value based on growth assumptions. For certain reporting units, fair value is determined based on the application of current trading multiples for comparable publicly-traded companies and the historical pricing multiples for comparable merger and acquisition transactions that have occurred in our industry. Rates used to discount cash flows are dependent upon interest rates and the cost of capital based on our industry and capital structure, adjusted for equity and size risk premiums based on market capitalization. Estimates of future cash flows are dependent on our knowledge and experience about past and current events and assumptions about conditions we expect to exist, including long-term growth rates, capital requirements and useful lives. Our estimates of cash flows are also based on historical and future operating performance, economic conditions and actions we expect to take. In addition to these factors, our DTS and SCS reporting units are dependent on several key customers or industry sectors. The loss of a key customer may have a significant impact to our DTS or SCS reporting units, causing us to assess whether or not the event resulted in a goodwill impairment loss.

In making our assessments of fair value, we rely on our knowledge and experience about past and current events and assumptions about conditions we expect to exist in the future. These assumptions are based on a number of factors, including future operating performance, economic conditions, actions we expect to take and present value techniques. There are inherent uncertainties related to these factors and management's judgment in applying them to the analysis of goodwill impairment. It is possible that assumptions underlying the impairment analysis will change in such a manner that impairment in value may occur in the future.

Identifiable intangible assets not subject to amortization are assessed for impairment using a similar process used to evaluate goodwill as described above. Intangible assets with finite lives are amortized over their respective estimated useful lives. Identifiable intangible assets that are subject to amortization are evaluated for impairment using a similar process used to evaluate long-lived assets described below.

**Impairment of Long-Lived Assets Other than Goodwill**

Long-lived assets held and used, including revenue earning equipment, operating property and equipment and intangible assets with finite lives, are tested for recoverability when circumstances indicate that the carrying amount of assets may not be recoverable. Recoverability of long-lived assets is evaluated by comparing the carrying value of an asset or asset group to management's best estimate of the undiscounted future operating cash flows (excluding interest charges) expected to be generated by the asset or asset group. If these comparisons indicate that the carrying value of the asset or asset group is not recoverable, an impairment loss is recognized for the amount by which the carrying value of the asset or asset group exceeds fair value. Fair value is determined by a quoted market price, if available, or an estimate of projected future operating cash flows, discounted using a rate that reflects the related operating segment's average cost of funds. Long-lived assets to be disposed of, including revenue earning equipment, operating property and equipment and indefinite-lived intangible assets, are reported at the lower of carrying amount or fair value less costs to sell.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**Self-Insurance Accruals**

We retain a portion of the accident risk under auto liability, workers' compensation and other insurance programs. Under our insurance programs, we retain the risk of loss in various amounts, generally up to $3 million on a per occurrence basis. Self-insurance accruals are based primarily on an actuarially estimated, undiscounted cost of claims, which includes claims incurred but not reported. Such liabilities are based on estimates. Historical loss development factors are utilized to project the future development of incurred losses, and these amounts are adjusted based upon actual claim experience and settlements. While we believe that the amounts are adequate, there can be no assurance that changes to our actuarial estimates may not occur due to limitations inherent in the estimation process. Changes in the actuarial estimates of these accruals are charged or credited to earnings in the period determined. Amounts estimated to be paid within the next year have been classified as "Accrued expenses and other current liabilities" with the remainder included in "Other non-current liabilities" in our Consolidated Balance Sheets.

We also maintain additional insurance at certain amounts in excess of our respective underlying retention. Amounts recoverable from insurance companies are not offset against the related accrual as our insurance policies do not extinguish or provide legal release from the obligation to make payments related to such risk-related losses. Amounts expected to be received within the next year from insurance companies have been included within "Receivables, net" with the remainder included in "Direct financing leases and other assets" and are recognized only when realization of the claim for recovery is considered probable. The accrual for the related claim has been classified within "Accrued expenses and other current liabilities" if it is estimated to be paid within the next year, otherwise it has been classified in "Other non-current liabilities" in our Consolidated Balance Sheets.

**Income Taxes**

Our provision for income taxes is based on reported earnings before income taxes. Deferred taxes are recognized for the future tax effects of temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis, using tax rates in effect for the years in which the differences are expected to reverse.

The effects of changes in tax laws on deferred tax balances are recognized in the period the new legislation is enacted. Valuation allowances are recognized to reduce deferred tax assets to the amount that is more likely than not to be realized. In assessing the likelihood of realization, management considers estimates of future taxable income. We calculate our current and deferred tax position based on estimates and assumptions that could differ from the actual results reflected in income tax returns filed in subsequent years. Adjustments based on filed returns are recorded when identified.

We are subject to tax audits in numerous jurisdictions in the U.S. and around the world. Tax audits by their very nature are often complex and can require several years to complete. In the normal course of business, we are subject to challenges from the Internal Revenue Service (IRS) and other tax authorities regarding amounts of taxes due. These challenges may alter the timing or amount of taxable income or deductions, or the allocation of income among tax jurisdictions. As part of our calculation of the provision for income taxes on earnings, we determine whether the benefits of our tax positions are at least more likely than not of being sustained upon audit based on the technical merits of the tax position. The tax benefit to be recognized is measured as the largest amount of benefit that is greater than fifty percent likely of being realized upon ultimate settlement.  Such accruals require management to make estimates and judgments with respect to the ultimate outcome of a tax audit. Actual results could vary materially from these estimates. We adjust these reserves as well as the impact of any related interest and penalties in light of changing facts and circumstances, such as the progress of a tax audit.

Interest and penalties related to income tax exposures are recognized as incurred and included in "Provision for income taxes" in our Consolidated Statements of Earnings. Accruals for income tax exposures, including penalties and interest, expected to be settled within the next year are included in "Accrued expenses and other current liabilities" with the remainder included in "Other non-current liabilities" in our Consolidated Balance Sheets. The federal benefit from state income tax exposures is included in "Deferred income taxes" in our Consolidated Balance Sheets.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

### Severance and Contract Termination Costs

We recognize liabilities for severance and contract termination costs based upon the nature of the cost to be incurred. For involuntary separation plans that are completed within the guidelines of our written involuntary separation plan, we recognize the liability when it is probable and reasonably estimable. For one-time termination benefits, such as additional severance pay or benefit payouts, and other exit costs, such as contract termination costs, the liability is measured and recognized initially at fair value in the period in which the liability is incurred, with subsequent changes to the liability recognized as adjustments in the period of change. Severance related to position eliminations that are part of a restructuring plan is included in "Restructuring and other charges, net" in the Consolidated Statements of Earnings. Severance costs that are not part of a restructuring plan are recognized in the period incurred as a direct cost of revenue or within "Selling, general and administrative expenses," in the Consolidated Statements of Earnings depending upon the nature of the eliminated position.

### Environmental Expenditures

We recognize liabilities for environmental assessments and/or cleanup when it is probable a loss has been incurred and the costs can be reasonably estimated. Environmental liability estimates may include costs such as anticipated site testing, consulting, remediation, disposal, post-remediation monitoring and legal fees, as appropriate. The liability does not reflect possible recoveries from insurance companies or reimbursement of remediation costs by state agencies, but does include estimates of cost sharing with other potentially responsible parties. Estimates are not discounted, as the timing of the anticipated cash payments is not fixed or readily determinable. Subsequent adjustments to initial estimates are recognized as necessary based upon additional information developed in subsequent periods. In future periods, new laws or regulations, advances in remediation technology and additional information about the ultimate remediation methodology to be used could significantly change our estimates. Claims for reimbursement of remediation costs are recognized when recovery is deemed probable.

### Derivative Instruments and Hedging Activities

We use financial instruments, including forward exchange contracts and swaps to manage our exposures to movements in interest rates and foreign currency exchange rates. The use of these financial instruments modifies the exposure of these risks with the intent to reduce the risk or cost to us. We do not enter into derivative financial instruments for trading purposes. We limit our risk that counterparties to the derivative contracts will default and not make payments by entering into derivative contracts only with counterparties comprised of large banks and financial institutions that meet established credit criteria. We do not expect to incur any losses as a result of counterparty default.

On the date a derivative contract is executed, we formally document, among other items, the intended hedging designation and relationship, along with the risk management objectives and strategies for entering into the derivative contract. We also formally assess, both at inception and on an ongoing basis, whether the derivatives we used in hedging transactions are highly effective in offsetting changes in fair values or cash flows of hedged items. Cash flows from derivatives that are accounted for as hedges are classified in the Consolidated Statements of Cash Flows in the same category as the items being hedged. When it is determined that a derivative is not highly effective as a hedge or that it has ceased to be a highly effective hedge, we discontinue hedge accounting prospectively.

The hedging designation may be classified as one of the following:

*No Hedging Designation.* The unrealized gain or loss on a derivative instrument not designated as an accounting hedging instrument is recognized immediately in earnings.

*Fair Value Hedge.* A hedge of a recognized asset or liability or an unrecognized firm commitment is considered a fair value hedge. For fair value hedges, both the effective and ineffective portions of the changes in the fair value of the derivative, along with the gain or loss on the hedged item that is attributable to the hedged risk, are both recognized in earnings.

*Cash Flow Hedge.* A hedge of a forecasted transaction or of the variability of cash flows to be received or paid related to a recognized asset or liability is considered a cash flow hedge. The effective portion of the change in the fair value of a derivative that is declared as a cash flow hedge is recognized net of tax in "Accumulated other comprehensive loss" until earnings are affected by the variability in cash flows of the designated hedged item.

*Net Investment Hedge.* A hedge of a net investment in a foreign operation is considered a net investment hedge. The effective portion of the change in the fair value of the derivative used as a net investment hedge of a foreign operation is recognized in the currency translation adjustment account within "Accumulated other comprehensive loss." The ineffective portion, if any, on the hedged item that is attributable to the hedged risk is recognized in earnings and reported in "Miscellaneous income, net" in the Consolidated Statements of Earnings.

79

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

### Foreign Currency Translation

Our foreign operations generally use local currency as their functional currency. Assets and liabilities of these operations are translated at the exchange rates in effect on the balance sheet date. Items in the Consolidated Statements of Earnings are translated at the average exchange rates for the year. The impact of currency fluctuations is presented in "Changes in cumulative translation adjustment and other" in the Consolidated Statements of Comprehensive Income. Upon sale or upon complete or substantially complete liquidation of an investment in a foreign operation, the currency translation adjustment attributable to that operation is removed from accumulated other comprehensive loss and is reported as part of the gain or loss on sale or liquidation of the investment for the period during which the sale or liquidation occurs. Gains and losses resulting from foreign currency transactions are recognized in "Miscellaneous income, net" in the Consolidated Statements of Earnings.

### Share-Based Compensation

The fair value of stock option awards and nonvested stock awards other than restricted stock units (RSUs), is expensed on a straight-line basis over the vesting period of the awards. RSUs are expensed in the year they are granted. Beginning in 2016, we adopted ASU No. 2016-09, *Stock Compensation*. This standard changed the presentation of cash flows from the tax benefits resulting from tax deductions in excess of the compensation expense recognized for those options (windfall tax benefits) as well as tax shortfalls to be in operating cash flows in the statement of cash flows. In addition, windfall tax benefits and tax shortfalls are now charged directly to income tax expense.

### Earnings Per Share

Earnings per share is computed using the two-class method. The two-class method of computing earnings per share is an earnings allocation formula that determines earnings per share for common stock and any participating securities according to dividends declared (whether paid or unpaid) and participation rights in undistributed earnings. Restricted stock units are considered participating securities since the share-based awards contain a non-forfeitable right to dividend equivalents irrespective of whether the awards ultimately vest. Under the two-class method, earnings per common share are computed by dividing the sum of distributed earnings to common shareholders and undistributed earnings allocated to common shareholders by the weighted average number of common shares outstanding for the period. In applying the two-class method, undistributed earnings are allocated to both common shares and participating securities based on the weighted average shares outstanding during the period.

Diluted earnings per common share reflect the dilutive effect of potential common shares from stock options and other nonparticipating nonvested stock. The dilutive effect of stock options is computed using the treasury stock method, which assumes any proceeds that could be obtained upon the exercise of stock options would be used to purchase common shares at the average market price for the period. The assumed proceeds include the purchase price the grantee pays, the windfall tax benefit that we receive upon assumed exercise and the unrecognized compensation expense at the end of each period.

### Share Repurchases

Repurchases of shares of common stock are made periodically in open-market transactions and are subject to market conditions, legal requirements and other factors. The cost of share repurchases is allocated between common stock and retained earnings based on the amount of additional paid-in capital at the time of the share repurchase.

### Defined Benefit Pension and Postretirement Benefit Plans

The funded status of our defined benefit pension plans and postretirement benefit plans are recognized in the Consolidated Balance Sheets. The funded status is measured as the difference between the fair value of plan assets and the benefit obligation at December 31, the measurement date. The fair value of plan assets represents the current market value of contributions made to irrevocable trusts, held for the sole benefit of participants, which are invested by the trusts. For defined benefit pension plans, the benefit obligation represents the actuarial present value of benefits expected to be paid upon retirement based on estimated future compensation levels. For postretirement benefit plans, the benefit obligation represents the actuarial present value of postretirement benefits attributed to employee services already rendered. Overfunded plans, with the fair value of plan assets exceeding the benefit obligation, are aggregated and reported as a prepaid pension asset. Underfunded plans, with the benefit obligation exceeding the fair value of plan assets, are aggregated and reported as a pension and postretirement benefit liability.

The current portion of pension and postretirement benefit liabilities represents the actuarial present value of benefits payable within the next year exceeding the fair value of plan assets (if funded), measured on a plan-by-plan basis. These liabilities are recognized in "Accrued expenses and other current liabilities" in the Consolidated Balance Sheets.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

Pension and postretirement benefit expense includes service cost, interest cost, expected return on plan assets (if funded), and amortization of prior service credit and net actuarial loss. Service cost represents the actuarial present value of participant benefits earned in the current year.  The expected return on plan assets represents the average rate of earnings expected on the funds invested or to be invested to provide for the benefits included in the obligation. Prior service credit represents the impact of negative plan amendments. Net actuarial losses arise as a result of differences between actual experience and assumptions or as a result of changes in actuarial assumptions. Net actuarial loss and prior service credit not recognized as a component of pension and postretirement benefit expense as they arise are recognized as "Change in net actuarial loss and prior service credit, net of tax" in the Consolidated Statements of Comprehensive Income. These pension and postretirement items are subsequently amortized as a component of pension and postretirement benefit expense over the remaining service period, if the majority of the employees are active, otherwise over the remaining life expectancy, provided such amounts exceed thresholds which are based upon the benefit obligation or the value of plan assets.

The measurement of benefit obligations and pension and postretirement benefit expense is based on estimates and assumptions approved by management. These valuations reflect the terms of the plans and use participant-specific information such as compensation, age and years of service, as well as certain assumptions, including estimates of discount rates, expected return on plan assets, rate of compensation increases, interest rates and mortality rates.

**Fair Value Measurements**

We carry various assets and liabilities at fair value in the Consolidated Balance Sheets. The most significant assets and liabilities are vehicles held for sale, which are stated at the lower of carrying amount or fair value less costs to sell, investments held in Rabbi Trusts and derivatives.

Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Fair value measurements are classified based on the following fair value hierarchy:

Level 1   Quoted prices (unadjusted) in active markets for identical assets or liabilities that we have the ability to access at the measurement date. An active market for the asset or liability is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis.

Level 2   Observable inputs other than Level 1 prices such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or model-derived valuations or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

Level 3   Unobservable inputs for the asset or liability. These inputs reflect our own assumptions about the assumptions a market participant would use in pricing the asset or liability.

When available, we use unadjusted quoted market prices to measure fair value and classify such measurements within Level 1. If quoted prices are not available, fair value is based upon model-driven valuations that use current market-based or independently sourced market parameters such as interest rates and currency rates. Items valued using these models are classified according to the lowest level input or value driver that is significant to the valuation.

 The carrying amounts reported in the Consolidated Balance Sheets for cash and cash equivalents, accounts receivable and accounts payable approximate fair value due to the immediate or short-term maturities of these financial instruments. Revenue earning equipment held for sale is measured at fair value on a nonrecurring basis and is stated at the lower of carrying amount or fair value less costs to sell. Investments held in Rabbi Trusts and derivatives are carried at fair value on a recurring basis. Investments held in Rabbi Trusts include exchange-traded equity securities and mutual funds. Fair values for these investments are based on quoted prices in active markets. For derivatives, fair value is based on model-driven valuations using the LIBOR rate or observable forward foreign exchange rates, which are observable at commonly quoted intervals for the full term of the financial instrument.

2.   RECENT ACCOUNTING PRONOUNCEMENTS

**Intangibles - Goodwill and Other**

In January 2017, the FASB issued ASU No. 2017-04, *Simplifying the Test for Goodwill Impairment*, which requires an entity to perform a one-step quantitative impairment test, whereby a goodwill impairment loss will be measured as the excess of a reporting unit's carrying amount over its fair value (not to exceed the total goodwill allocated to that reporting unit). It eliminates Step 2 of the current two-step goodwill impairment test, under which a goodwill impairment loss is measured by comparing the implied fair value of a reporting unit's goodwill with the carrying amount of that goodwill. The standard is effective January 1, 2020, with early adoption as of January 1, 2017 permitted. We do not expect this standard to have a material impact on our consolidated financial position, results of operations and cash flows.

**Statement of Cash Flows**

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows,* which clarifies how companies present and classify certain cash receipts and cash payments in the statement of cash flows. In November 2016, the FASB issued additional guidance related to the statement of cash flows, which requires companies to explain the change during the period in the total of cash, cash equivalents, and restricted cash or restricted cash equivalents.  The standard is effective January 1, 2018, with early adoption permitted.  The standard will be adopted on a retrospective basis. We do not expect this standard to have a material impact on the presentation of our consolidated cash flows.

**Financial Instruments**

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments - Credit Losses,* which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. The standard applies to financial instruments including, but not limited to, trade and other receivables, held-to-maturity debt securities, loans and net investments in leases.  The standard requires estimating expected credit losses over the remaining life of an instrument or a portfolio of instruments with similar risk characteristics based on relevant information about past events, current conditions and reasonable forecasts. The initial estimate of and the subsequent changes in expected credit losses will be recognized as credit loss expense through current earnings and will be reflected as an allowance for credit losses offsetting the carrying value of the financial instrument(s) on the balance sheet. The standard is effective January 1, 2020, with early adoption as of January 1, 2019 permitted.  The standard is to be applied using a modified retrospective transition method.  We do not expect this standard to have a material impact on our consolidated financial position, results of operations and cash flows.

**Share-Based Payments**

In March 2016, the FASB issued ASU No. 2016-09, *Stock Compensation,* which is intended to simplify several aspects of the accounting for share-based payment award transactions. The guidance changed several aspects of the accounting for share-based awards, including accounting for income taxes, forfeitures, and the minimum statutory tax withholding requirements for share-based awards. The standard eliminates the requirement to record the tax benefits resulting from tax deductions in excess of share-based compensation expense (windfall tax benefits) as well as tax shortfalls to additional paid in capital in the balance sheet.  The standard also requires all tax effects related to share-based payments at settlement (or expiration) be recorded to income tax expense and changes the cash flow presentation of excess tax benefits or shortfalls from share-based awards from financing activities to operating activities. The standard is effective January 1, 2017, with early adoption permitted. We adopted the standard during 2016, and recorded a $16 million cumulative-effect adjustment to retained earnings as of January 1, 2016, related to historical excess tax benefits. The impact of the standard was not material to our consolidated financial position, results of operations and cash flows.

**Leases**

In February 2016, the FASB issued ASU No. 2016-02, *Leases,* which sets out the principles for the recognition, measurement, presentation and disclosure of leases.  The standard requires lessees to apply a dual approach, classifying leases as either finance or operating leases.  This classification will determine whether the lease expense is recognized based on an effective interest method or on a straight-line basis over the term of the lease. A lessee is also required to record a right-of-use asset and a lease liability for all leases with a term of greater than 12 months regardless of their classification. Leases with a term of 12 months or less will be accounted for similar to existing guidance for operating leases. The new standard requires lessors to account for leases using an approach that is substantially equivalent to existing guidance for sales-type leases, direct

financing leases and operating leases.  We will adopt the standard effective January 1, 2019 using the modified retrospective transition method. We do not anticipate a material impact upon adoption of the standard on our consolidated financial position, results of operations and cash flows.

### Revenue Recognition

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers*, which together with related, subsequently issued guidance, requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. The adoption of ASU 2014-09 will primarily impact our full service lease product line, which includes a vehicle lease as well as maintenance and other services related to the vehicle.  We will generally continue to recognize revenue for the vehicle lease portion of the product line on a straight-line basis. Revenue from the non-lease portion of the product line, primarily maintenance services, will be recognized at the time the maintenance services are performed, which will generally require the deferral of some portion of the customer's lease payments when received, as maintenance services are not performed evenly over the life of a full service lease contract. Under current GAAP, substantially all revenues from our full service lease arrangements are recognized on a straight line basis over the term of the lease.  We will adopt the standard on January 1, 2018, using the full retrospective transition method, which will result in a cumulative-effect adjustment for deferred revenue to the opening balance sheet for 2016 and the restatement of the financial statements for all prior periods presented (2016 and 2017). We continue to evaluate the impact of adoption of this standard on our consolidated financial position, results of operations and cash flows.

### Presentation of Debt Issuance Costs

In April 2015, the FASB issued ASU No. 2015-03, *Simplifying the Presentation of Debt Issuance Costs*, which requires an entity to present debt issuance costs as a direct reduction from the carrying amount of the related debt liability on the balance sheet. We adopted this guidance on January 1, 2016 and reclassified $15 million from other assets to long-term debt in our December 31, 2015 balance sheet.  Other than the change in presentation within the Consolidated Balance Sheets, this accounting guidance did not impact our consolidated financial position, results of operations and cash flows.

3.   ACQUISITIONS

On August 1, 2014, we acquired all of the common stock of Bullwell Trailer Solutions, Ltd., a U.K.-based trailer repair and maintenance company, for a purchase price of approximately $15 million, net of cash acquired. The purchase price, which included $6 million in contingent consideration, was paid in total as of December 31, 2016.  The acquisition complements our FMS business segment coverage in the U.K. The purchase accounting for this acquisition resulted in goodwill and customer relationship intangible assets of $12 million and $2 million, respectively, with the remaining amount allocated to tangible assets, less liabilities assumed. Transaction costs related to the acquisition were not material.

4.   RESTRUCTURING AND OTHER CHARGES

In the fourth quarters of 2016, 2015 and 2014, we approved plans to reduce our workforce in multiple locations as a result of cost containment actions, resulting in charges of $5 million, $9 million and $2 million in each of the respective years. In addition, we committed to a plan to divest our Ryder Canadian Retail Shippers Association Logistics (CRSAL) operations and shutdown our Ryder Container Terminals (RCT) business in Canada in the fourth quarter of 2015. We recognized charges for employee termination costs of $3 million and asset impairment of $2 million to adjust assets held for sale, including goodwill and intangible assets, to fair value less costs to sell in 2015. We sold CRSAL to a third party for approximately $2 million during 2016.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The following table summarizes the activities within, and components of, restructuring liabilities for 2016, 2015 and 2014 (in thousands):

| | Employee Termination Costs | Other Charges | Total |
|---|---|---|---|
| Balance as of December 31, 2013 | $ 340 | 319 | 659 |
| Workforce reduction charges | 2,387 | — | 2,387 |
| Utilization [1] | (241) | (319) | (560) |
| Balance as of December 31, 2014 | 2,486 | — | 2,486 |
| Workforce reduction charges | 8,830 | — | 8,830 |
| CRSAL divestiture and RCT shut-down | 3,225 | — | 3,225 |
| Utilization [1] | (2,208) | — | (2,208) |
| Balance as of December 31, 2015 | 12,333 | — | 12,333 |
| Workforce reduction charges | **5,074** | **—** | **5,074** |
| Utilization [1] | **(10,129)** | **—** | **(10,129)** |
| Balance as of December 31, 2016 [2] | **$ 7,278** | **—** | **7,278** |

_____

*Note: The restructuring liabilities shown above are included in "Accrued expenses and other current liabilities" in the Consolidated Balance Sheets.*

*(1) Principally represents cash payments.*
*(2) The majority of the balance remaining for employee termination costs is expected to be paid by the end of 2017.*

As discussed in Note 27, "Segment Reporting," our primary measure of segment financial performance excludes, among other items, restructuring and other charges, net. However, the applicable portion of the restructuring and other charges (recoveries), net that related to each segment in 2016, 2015 and 2014 were as follows:

| | Years ended December 31, | | |
|---|---|---|---|
| | **2016** | 2015 | 2014 |
| | (In thousands) | | |
| Fleet Management Solutions | $ **3,550** | 4,817 | 515 |
| Dedicated Transportation Solutions | **22** | 250 | 154 |
| Supply Chain Solutions | **278** | 7,033 | 797 |
| Central Support Services | **1,224** | 2,125 | 921 |
| Total | $ **5,074** | 14,225 | 2,387 |

## 5.   RECEIVABLES

| | December 31, | |
|---|---|---|
| | **2016** | 2015 |
| | (In thousands) | |
| Trade | $ **739,743** | 708,832 |
| Direct financing leases | **76,322** | 90,055 |
| Other, primarily warranty and insurance | **30,797** | 52,162 |
| | **846,862** | 851,049 |
| Allowance | **(14,915)** | (15,560) |
| Total | $ **831,947** | 835,489 |

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

6. PREPAID EXPENSES AND OTHER CURRENT ASSETS

|  | December 31, | |
|---|---|---|
|  | **2016** | 2015 |
|  | (In thousands) | |
| Restricted cash | $ **3,838** | 5,352 |
| Prepaid vehicle licenses | **50,343** | 47,806 |
| Prepaid operating taxes | **20,242** | 18,510 |
| Prepaid sales commission | **9,731** | 11,446 |
| Prepaid Insurance | **12,074** | 9,057 |
| Other | **45,052** | 45,972 |
| Total | $ **141,280** | 138,143 |

7. REVENUE EARNING EQUIPMENT

| | Estimated Useful Lives | **December 31, 2016** | | | December 31, 2015 | | |
|---|---|---|---|---|---|---|---|
| | | **Cost** | **Accumulated Depreciation** | **Net [1]** | Cost | Accumulated Depreciation | Net [1] |
| | (In years) | (In thousands) | | | | | |
| Held for use: | | | | | | | |
| Full service lease | 3 — 12 | $ **9,486,977** | **(3,031,937)** | **6,455,040** | 8,839,941 | (2,723,605) | 6,116,336 |
| Commercial rental | 4.5 — 12 | **2,499,010** | **(935,346)** | **1,563,664** | 2,811,715 | (907,412) | 1,904,303 |
| Held for sale | | **494,355** | **(365,337)** | **129,018** | 496,634 | (332,538) | 164,096 |
| Total | | $**12,480,342** | **(4,332,620)** | **8,147,722** | 12,148,290 | (3,963,555) | 8,184,735 |

_____

(1)  *Revenue earning equipment, net includes vehicles under capital leases of $43 million, less accumulated depreciation of $22 million, at December 31, 2016 and $47 million, less accumulated depreciation of $22 million, at December 31, 2015.*

Depreciation expense was $1.10 billion, $1.04 billion and $968 million in 2016, 2015 and 2014, respectively.

In 2016, based on current and expected market conditions, we accelerated depreciation on certain classes of vehicles expected to be made available for sale through June 2018.  The impact of the change increased depreciation by $10 million in 2016. Revenue earning equipment held for sale is stated at the lower of carrying amount or fair value less costs to sell.  Losses on vehicles held for sale for which carrying values exceeded fair value are recognized at the time they arrive at our used truck centers and are presented within "Used vehicle sales, net" in the Consolidated Statements of Earnings. For revenue earning equipment held for sale, we stratify our fleet by vehicle type (trucks, tractors and trailers), weight class, age and other relevant characteristics and create classes of similar assets for analysis purposes. For a certain population of revenue earning equipment held for sale, fair value was determined based upon recent market prices obtained from our own sales experience for sales of each class of similar assets and vehicle condition. Expected declines in market prices were also considered when valuing the vehicles held for sale.These vehicles held for sale were classified within Level 3 of the fair value hierarchy. During 2016, 2015, and 2014, we recognized losses to reflect changes in fair value of $67 million, $18 million and $11 million, respectively.

The following table presents our assets that are measured at fair value on a nonrecurring basis and considered a Level 3 fair value measurement:

| | December 31, | | Total Losses [2] Year ended December 31, | |
|---|---|---|---|---|
| | **2016** | 2015 | **2016** | 2015 |
| Assets held for sale: | | | | |
| Revenue earning equipment: [1] | | | | |
| Trucks | $ **28,638** | 11,469 | $ **14,645** | 7,660 |
| Tractors | **82,576** | 19,479 | **47,597** | 7,620 |
| Trailers | **2,839** | 2,475 | **5,173** | 2,676 |
| Total assets at fair value | $ **114,053** | 33,423 | $ **67,415** | 17,956 |

(1)  Assets held for sale in the above table only include the portion of revenue earning equipment held for sale where net book values exceeded fair values and fair value adjustments were recorded. The net book value of assets held for sale not exceeding fair value was $15 million and $131 million as of December 31, 2016 and 2015, respectively.

(2)  Total losses represent fair value adjustments for all vehicles held for sale throughout the period for which fair value less costs to sell was less than carrying value.

For the twelve months ended December 31, 2016, the components of used vehicle sales, net were as follows:

| | Twelve months ended December 31, | | |
|---|---|---|---|
| | **2016** | 2015 | 2014 |
| | | (In thousands) | |
| Gains on vehicle sales, net | $ **(68,387)** | (117,809) | (126,824) |
| Losses from fair value adjustments | **67,415** | 17,956 | 10,764 |
| Used vehicle sales, net | $ **(972)** | (99,853) | (116,060) |

## 8.   OPERATING PROPERTY AND EQUIPMENT

| | Estimated Useful Lives (In years) | December 31, | |
|---|---|---|---|
| | | **2016** | 2015 |
| | | (In thousands) | |
| Land | — | $ **212,660** | 203,543 |
| Buildings and improvements | 10 — 40 | **808,909** | 776,304 |
| Machinery and equipment | 3 — 10 | **737,899** | 709,173 |
| Other | 3 — 10 | **114,442** | 109,554 |
| | | **1,873,910** | 1,798,574 |
| Accumulated depreciation | | **(1,128,040)** | (1,083,604) |
| Total | | $ **745,870** | 714,970 |

Depreciation expense was $88 million, $84 million and $79 million in 2016, 2015 and 2014, respectively.

9.  GOODWILL

The carrying amount of goodwill attributable to each reportable business segment with changes therein was as follows:

| | Fleet Management Solutions | Dedicated Transportation Solutions | Supply Chain Solutions | Total |
|---|---|---|---|---|
| | (In thousands) | | | |
| **Balance at January 1, 2015** | | | | |
| Goodwill | $ 233,217 | 40,808 | 148,225 | 422,250 |
| Accumulated impairment losses | (10,322) | — | (18,899) | (29,221) |
| | 222,895 | 40,808 | 129,326 | 393,029 |
| Reclassification to assets held for sale | — | — | (852) | (852) |
| Foreign currency translation adjustment | (1,859) | — | (1,183) | (3,042) |
| **Balance at December 31, 2015** | | | | |
| Goodwill | 231,358 | 40,808 | 146,190 | 418,356 |
| Accumulated impairment losses | (10,322) | — | (18,899) | (29,221) |
| | 221,036 | 40,808 | 127,291 | 389,135 |
| **Foreign currency translation adjustment** | **(2,526)** | **—** | **163** | **(2,363)** |
| **Balance at December 31, 2016** | | | | |
| **Goodwill** | **228,832** | **40,808** | **146,353** | **415,993** |
| **Accumulated impairment losses** | **(10,322)** | **—** | **(18,899)** | **(29,221)** |
| | **$ 218,510** | **40,808** | **127,454** | **386,772** |

We assess goodwill for impairment on April 1st of each year or more often if deemed necessary. In the second quarter of 2016, we completed our annual goodwill impairment test. We performed quantitative assessments on two of our reporting units and determined there was no impairment. We performed qualitative assessments for three reporting units, which considered individual factors such as macroeconomic conditions, changes in our industry and the markets in which we operate, as well as our historical and expected future financial performance. After performing the qualitative assessments, we concluded it is more likely than not that fair value is greater than the carrying value and determined there was no impairment.

10.  INTANGIBLE ASSETS

| | December 31, | |
|---|---|---|
| | **2016** | 2015 |
| | (In thousands) | |
| Indefinite lived intangible assets — Trade name | $ **8,731** | 8,731 |
| Finite lived intangible assets: | | |
| Customer relationship intangibles | **91,523** | 91,523 |
| Other intangibles, primarily trade name | **2,367** | 2,367 |
| Accumulated amortization | **(51,578)** | (45,736) |
| | **42,312** | 48,154 |
| Foreign currency translation adjustment | **(2,794)** | (1,693) |
| Total | $ **48,249** | 55,192 |

The Ryder trade name has been identified as having an indefinite useful life. Customer relationship intangibles are being amortized on a straight-line basis over their estimated useful lives, generally 7-19 years. We recognized amortization expense associated with finite lived intangible assets of approximately $6 million in 2016 and $7 million in both 2015 and 2014. The future amortization expense for each of the five succeeding years related to all intangible assets that are currently reported in the Consolidated Balance Sheets is estimated to range from $4 - $6 million per year for 2017 - 2021.

11.   DIRECT FINANCING LEASES AND OTHER ASSETS

| | | December 31, | |
| --- | --- | --- | --- |
| | | **2016** | 2015 |
| | | (In thousands) | |
| Direct financing leases, net | $ | **333,152** | 347,703 |
| Investments held in Rabbi Trusts | | **48,451** | 41,720 |
| Contract incentives | | **27,324** | 23,691 |
| Insurance receivables | | **18,402** | 28,999 |
| Debt issuance costs | | **2,593** | 3,365 |
| Prepaid pension asset | | **14,049** | 44,124 |
| Interest rate swap agreements | | **1,864** | 5,421 |
| Other | | **26,449** | 15,223 |
| Total | $ | **472,284** | 510,246 |

Investments held in Rabbi Trusts are assets measured at fair value on a recurring basis, all of which are considered Level 1 of the fair value hierarchy. The following table presents the asset classes at December 31, 2016 and 2015:

| | | December 31, | |
| --- | --- | --- | --- |
| | | **2016** | 2015 |
| | | (In thousands) | |
| Cash and cash equivalents | $ | **5,391** | 5,214 |
| U.S. equity mutual funds | | **30,229** | 24,824 |
| Foreign equity mutual funds | | **5,232** | 4,713 |
| Fixed income mutual funds | | **7,599** | 6,969 |
| Total Investments held in Rabbi Trusts | $ | **48,451** | 41,720 |

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

12.   ACCRUED EXPENSES AND OTHER LIABILITIES

| | December 31, 2016 | | | December 31, 2015 | | |
|---|---|---|---|---|---|---|
| | Accrued Expenses | Non-Current Liabilities | Total | Accrued Expenses | Non-Current Liabilities | Total |
| | (In thousands) | | | | | |
| Salaries and wages | $ 90,913 | — | 90,913 | 99,032 | — | 99,032 |
| Deferred compensation | 2,992 | 46,541 | 49,533 | 2,252 | 41,691 | 43,943 |
| Pension benefits | 3,796 | 451,940 | 455,736 | 3,790 | 484,892 | 488,682 |
| Other postretirement benefits | 1,506 | 19,459 | 20,965 | 1,624 | 20,002 | 21,626 |
| Other employee benefits | 29,358 | 5,854 | 35,212 | 8,956 | 9,706 | 18,662 |
| Insurance obligations [1] | 127,470 | 234,336 | 361,806 | 157,014 | 213,256 | 370,270 |
| Operating taxes | 92,150 | — | 92,150 | 101,649 | — | 101,649 |
| Income taxes | 4,197 | 23,174 | 27,371 | 3,378 | 22,366 | 25,744 |
| Interest | 27,277 | — | 27,277 | 31,218 | — | 31,218 |
| Deposits, mainly from customers | 61,225 | 4,569 | 65,794 | 61,869 | 5,085 | 66,954 |
| Deferred revenue | 14,064 | — | 14,064 | 13,038 | — | 13,038 |
| Other | 52,241 | 31,692 | 83,933 | 59,532 | 32,597 | 92,129 |
| Total | $ 507,189 | 817,565 | 1,324,754 | 543,352 | 829,595 | 1,372,947 |

_____
*(1) Insurance obligations are primarily comprised of self-insured claim liabilities.*

     We retain a portion of the accident risk under vehicle liability and workers' compensation insurance programs. Self-insurance accruals are primarily based on actuarially estimated, undiscounted cost of claims, and include claims incurred but not reported. Such liabilities are based on estimates. Historical loss development factors are utilized to project the future development of incurred losses, and these amounts are adjusted based upon actual claim experience and settlements. While we believe the amounts are adequate, there can be no assurance that changes to our estimates may not occur due to limitations inherent in the estimation process. During 2016 and 2015, we recognized charges within earnings from continuing operations of $9 million and $4 million from the development of estimated prior years' self-insured loss reserves for the reasons noted above, as well as a settlement of a customer-extended insurance claim in 2015. In 2014, we recognized a benefit within earnings from continuing operations of $14 million from the development of estimated prior years' self-insured loss reserves for the reasons noted above.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

13.   INCOME TAXES

The components of earnings from continuing operations before income taxes and the provision for income taxes from continuing operations were as follows:

|  | | Years ended December 31, | |
|---|---|---|---|
|  | **2016** | 2015 | 2014 |
|  | | (In thousands) | |
| Earnings from continuing operations before income taxes: | | | |
| United States | $ **344,614** | 408,757 | 275,630 |
| Foreign | **61,767** | 60,458 | 62,637 |
| Total | $ **406,381** | 469,215 | 338,267 |
| Current tax expense (benefit) from continuing operations: | | | |
| Federal [1] | $ **2,731** | (1,836) | (230) |
| State [1] | **7,713** | 5,748 | 6,396 |
| Foreign | **6,411** | 5,272 | 7,163 |
|  | **16,855** | 9,184 | 13,329 |
| Deferred tax expense from continuing operations: | | | |
| Federal | **106,513** | 135,585 | 90,056 |
| State | **16,259** | 20,111 | 12,429 |
| Foreign | **2,114** | (1,654) | 2,228 |
|  | **124,886** | 154,042 | 104,713 |
| Provision for income taxes from continuing operations | $ **141,741** | 163,226 | 118,042 |

—————————
[1]   Excludes federal and state tax benefits resulting from the exercise of stock options and vesting of restricted stock awards, which were credited directly to "Additional paid-in capital" for years ended December 31, 2015 and 2014.

A reconciliation of the federal statutory tax rate with the effective tax rate from continuing operations follows:

|  | | Years ended December 31, | |
|---|---|---|---|
|  | **2016** | 2015 | 2014 |
|  | | (Percentage of pre-tax earnings) | |
| Federal statutory tax rate | **35.0** | 35.0 | 35.0 |
| Impact on deferred taxes for changes in tax rates | **(0.7)** | (0.9) | (0.9) |
| State income taxes, net of federal income tax benefit | **5.0** | 5.0 | 5.2 |
| Foreign rates varying from federal statutory tax rate | **(3.3)** | (3.3) | (3.7) |
| Tax reviews and audits | **(0.7)** | (1.3) | (1.1) |
| Other, net | **(0.4)** | 0.3 | 0.4 |
| Effective tax rate | **34.9** | 34.8 | 34.9 |

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

### Tax Law Changes

The effects of changes in tax laws on deferred tax balances are recognized in the period the new legislation is enacted. The following provides a summary of the increases to net earnings from continuing operations from changes in tax laws by tax jurisdiction:

| Tax Jurisdiction | Enactment Date | Net Earnings |
|---|---|---|
| | | (in thousands) |
| **2016** | | |
| **North Carolina** | **August 4, 2016** | **$585** |
| 2015 | | |
| Connecticut | June 30, 2015 | $1,616 |
| Other Jurisdictions | April 13, 2015 - November 18, 2015 | $497 |
| 2014 | | |
| New York | March 31, 2014 | $1,776 |
| Rhode Island | June 19, 2014 | $626 |

### Deferred Income Taxes

The components of the net deferred income tax liability were as follows:

| | December 31, | |
|---|---|---|
| | **2016** | 2015 |
| | (In thousands) | |
| Deferred income tax assets: | | |
| Self-insurance accruals | $ **107,252** | 93,352 |
| Net operating loss carryforwards | **396,313** | 429,458 |
| Alternative minimum taxes | **13,901** | 10,727 |
| Accrued compensation and benefits | **81,454** | 76,363 |
| Federal benefit on state tax positions | **19,247** | 18,912 |
| Pension benefits | **162,141** | 148,671 |
| Miscellaneous other accruals | **28,313** | 32,763 |
| | **808,621** | 810,246 |
| Valuation allowance | **(16,387)** | (14,991) |
| | **792,234** | 795,255 |
| Deferred income tax liabilities: | | |
| Property and equipment basis difference | **(2,451,151)** | (2,362,194) |
| Other | **(20,735)** | (20,583) |
| | **(2,471,886)** | (2,382,777) |
| Net deferred income tax liability [(1)] | $ **(1,679,652)** | (1,587,522) |

_____
(1)   *Deferred tax assets of $9 million have been included in "Direct financing leases and other assets" at December 31, 2016.*

U.S. deferred income taxes have not been provided on certain undistributed earnings of foreign subsidiaries, which were $762 million at December 31, 2016. The determination of the amount of the related unrecognized deferred tax liability is not practicable because of the complexities associated with the hypothetical calculations. We have historically reinvested such earnings overseas in foreign operations indefinitely and expect future earnings will also be reinvested overseas indefinitely.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

At December 31, 2016, we had U.S. federal tax effected net operating loss carryforwards of $359 million and various U.S. subsidiaries had state tax effected net operating loss carryforwards of $22 million both expiring through tax year 2034. We also had foreign tax effected net operating losses of $15 million that are available to reduce future income tax payments in several countries, subject to varying expiration rules. A valuation allowance has been established to reduce deferred income tax assets, principally foreign tax loss carryforwards, to amounts more likely than not to be realized. We had unused alternative minimum tax credits of $14 million at December 31, 2016, which are available to reduce future income tax liabilities. The alternative minimum tax credits may be carried forward indefinitely.

### Uncertain Tax Positions

The following is a summary of tax years that are no longer subject to examination:

*Federal* — audits of our U.S. federal income tax returns are closed through fiscal year 2009.

*State* — for the majority of states, tax returns are closed through fiscal year 2009.

*Foreign* — we are no longer subject to foreign tax examinations by tax authorities for tax years before 2009 in Canada, 2011 in Brazil, 2011 in Mexico and 2013 in the U.K., which are our major foreign tax jurisdictions.

The following table summarizes the activity related to unrecognized tax benefits (excluding the federal benefit received from state positions):

|  | December 31, | | |
|---|---|---|---|
|  | **2016** | 2015 | 2014 |
|  | (In thousands) | | |
| Balance at January 1 | **$ 60,740** | 60,482 | 56,813 |
| Additions based on tax positions related to the current year | **3,855** | 4,220 | 6,896 |
| Reductions due to lapse of applicable statutes of limitation | **(2,946)** | (3,962) | (3,227) |
| Gross balance at December 31 | **61,649** | 60,740 | 60,482 |
| Interest and penalties | **5,219** | 4,912 | 5,125 |
| Balance at December 31 | **$ 66,868** | 65,652 | 65,607 |

Of the total unrecognized tax benefits, $48 million (net of the federal benefit on state issues) represents the amount of unrecognized tax benefits that, if recognized, would favorably affect the effective tax rate in future periods. The total includes $5 million and $4 million of interest and penalties, at December 31, 2016 and 2015, respectively, net of the federal benefit on state issues. For 2016, 2015 and 2014, we recognized an income tax benefit related to interest and penalties of $1 million in each period, within "Provision for income taxes" in our Consolidated Statements of Earnings. Unrecognized tax benefits related to federal, state and foreign tax positions may decrease by $3 million by December 31, 2017, if audits are completed or tax years close during 2017.

### Like-Kind Exchange Program

We have a like-kind exchange program for certain of our U.S.-based revenue earning equipment. Pursuant to the program, we dispose of vehicles and acquire replacement vehicles in a form whereby tax gains on disposal of eligible vehicles are deferred. To qualify for like-kind exchange treatment, we exchange through a qualified intermediary eligible vehicles being disposed of with vehicles being acquired, allowing us to generally carryover the tax basis of the vehicles sold ("like-kind exchanges"). The program results in a material deferral of federal and state income taxes, and a decrease in cash taxes in periods when we are not in a net operating loss (NOL) position. As part of the program, the proceeds from the sale of eligible vehicles are restricted for the acquisition of replacement vehicles and other specified applications. Due to the structure utilized to facilitate the like-kind exchanges, the qualified intermediary that holds the proceeds from the sales of eligible vehicles and the entity that holds the vehicles to be acquired under the program are required to be consolidated in the accompanying Consolidated Financial Statements in accordance with U.S. GAAP. The total assets, primarily revenue earning equipment, and the total liabilities, primarily vehicle accounts payable, held by these consolidated entities are equal in value as these entities are solely structured to facilitate the like-kind exchanges. At December 31, 2016 and 2015, these consolidated entities had total assets, primarily revenue earning equipment, and total liabilities, primarily accounts payable, of $140 million and $237 million, respectively.

14.  LEASES

**Leases as Lessor**

We lease revenue earning equipment to customers for periods ranging from three to seven years for trucks and tractors and up to ten years for trailers. From time to time, we may also lease facilities to third parties. The majority of our leases are classified as operating leases. However, some of our revenue earning equipment leases are classified as direct financing leases and, to a lesser extent, sales-type leases. The net investment in direct financing and sales-type leases consisted of:

| | December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| | (In thousands) | |
| Total minimum lease payments receivable | $ 647,111 | 684,600 |
| Less: Executory costs | (196,469) | (205,865) |
| Minimum lease payments receivable | 450,642 | 478,735 |
| Less: Allowance for uncollectibles | (248) | (243) |
| Net minimum lease payments receivable | 450,394 | 478,492 |
| Unguaranteed residuals | 45,748 | 52,885 |
| Less: Unearned income | (86,668) | (93,619) |
| Net investment in direct financing and sales-type leases | 409,474 | 437,758 |
| Current portion | (76,322) | (90,055) |
| Non-current portion | $ 333,152 | 347,703 |

Our direct financing lease customers operate in a wide variety of industries, and we have no significant customer concentrations in any one industry. We assess credit risk for all of our customers including those who lease equipment under direct financing leases. Credit risk is assessed using an internally developed model, which incorporates credit scores from third party providers and our own custom risk ratings and is updated on a monthly basis. The external credit scores are developed based on the customer's historical payment patterns and an overall assessment of the likelihood of delinquent payments. Our internal ratings are weighted based on the industry that the customer operates in, company size, years in business and other credit-related indicators (i.e., profitability, cash flow, liquidity, tangible net worth, etc.). Any one of the following factors may result in a customer being classified as high risk: i) history of late payments; ii) open lawsuits, liens or judgments; iii) in business less than three years; and iv) operates in an industry with low barriers to entry. For those customers who are designated as high risk, we typically require deposits to be paid in advance in order to mitigate our credit risk. Additionally, our receivables are collateralized by the vehicle's fair value, which further mitigates our credit risk.

The following table presents the credit risk profile by creditworthiness category of our direct financing lease receivables at December 31, 2016 and 2015:

| | December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| | (In thousands) | |
| Very low risk to low risk | $ 192,853 | 203,388 |
| Moderate | 194,234 | 197,484 |
| Moderately high to high risk | 63,555 | 77,863 |
| | $ 450,642 | 478,735 |

As of December 31, 2016 and 2015, the amount of direct financing lease receivables which were past due was not significant and there were no impaired receivables.  Accordingly, there was no material risk of default with respect to these receivables.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

### Leases as Lessee

We lease facilities and office equipment. None of our leasing arrangements contain restrictive financial covenants.

During 2016, 2015 and 2014, rent expense (including rent of facilities and contingent rentals) was $127 million, $132 million and $128 million, respectively.

### Lease Payments

Future minimum payments for leases in effect at December 31, 2016 were as follows:

| | As Lessor [1] | | As Lessee |
|---|---|---|---|
| | Operating Leases | Direct Financing and Sales-Type Leases | Operating Leases |
| | (In thousands) | | |
| 2017 | $ 1,093,917 | 97,877 | 73,064 |
| 2018 | 888,570 | 87,195 | 55,481 |
| 2019 | 601,994 | 71,547 | 37,697 |
| 2020 | 461,278 | 62,298 | 20,663 |
| 2021 | 285,233 | 49,515 | 13,111 |
| Thereafter | 227,563 | 82,210 | 22,276 |
| Total | $ 3,558,555 | 450,642 | 222,292 |

_____

[1]   Amounts do not include contingent rentals, which may be received under certain leases on the basis of miles or changes in the Consumer Price Index. Contingent rentals from operating leases included in revenue were $342 million in 2016 and $329 million in both 2015 and 2014. Contingent rentals from direct financing leases included in revenue were $12 million in 2016, $12 million in 2015 and $11 million in 2014 .

The amounts in the previous table related to the lease of revenue earning equipment are based upon the general assumption that revenue earning equipment will remain on lease for the length of time specified by the respective lease agreements. The future minimum payments presented above related to the lease of revenue earning equipment are not a projection of future lease revenue or expense, and no effect has been given to renewals, new business, cancellations, contingent rentals or future rate changes.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

15.   DEBT

| | Weighted-Average Interest Rate December 31, | | | December 31, | |
|---|---|---|---|---|---|
| | **2016** | 2015 | **Maturities** | **2016** | 2015 |
| | | | | (In thousands) | |
| Short-term debt and current portion of long-term debt: | | | | | |
| Short-term debt | **1.07%** | 2.26% | | **$   177,629** | 35,947 |
| Current portion of long-term debt, including capital leases | | | | **613,781** | 598,583 |
| Total short-term debt and current portion of long-term debt | | | | **791,410** | 634,530 |
| Total long-term debt: | | | | | |
| U.S. commercial paper [1] | **0.87%** | 0.55% | **2020** | **342,480** | 547,130 |
| Global revolving credit facility | **2.06%** | 2.31% | **2020** | **4,703** | 25,291 |
| Unsecured U.S. notes – Medium-term notes [1] | **2.67%** | 2.84% | **2017-2025** | **4,113,421** | 4,112,519 |
| Unsecured U.S. obligations, principally bank term loans | **2.19%** | 1.73% | **2018** | **50,000** | 50,000 |
| Unsecured foreign obligations | **1.55%** | 1.92% | **2017-2020** | **232,092** | 275,661 |
| Asset backed U.S. obligations [2] | **1.80%** | 1.81% | **2017-2022** | **459,876** | 434,001 |
| Capital lease obligations | **3.17%** | 3.31% | **2017-2023** | **24,184** | 32,054 |
| Total before fair market value adjustment | | | | **5,226,756** | 5,476,656 |
| Fair market value adjustment on notes subject to hedging [3] | | | | **1,110** | 5,253 |
| Debt issuance costs [4] | | | | **(14,221)** | (15,229) |
| | | | | **5,213,645** | 5,466,680 |
| Current portion of long-term debt, including capital leases | | | | **(613,781)** | (598,583) |
| Long-term debt | | | | **4,599,864** | 4,868,097 |
| Total debt | | | | **$ 5,391,274** | 5,502,627 |

_____

(1)   We had unamortized original issue discounts of $7 million and $8 million at December 31, 2016 and 2015, respectively.
(2)   Asset-backed U.S. obligations are related to financing transactions involving revenue earning equipment.
(3)   The notional amount of the executed interest rate swaps designated as fair value hedges was $825 million at December 31, 2016 and 2015. Refer to Note 16, "Derivatives," for additional information.
(4)   See Note 2, "Recent Accounting Pronouncements," for further discussion of the presentation of debt issuance costs.

Maturities of total debt are as follows:

| | Capital Leases | Debt |
|---|---|---|
| | (In thousands) | |
| 2017 | $   9,303 | 957,358 |
| 2018 | 6,939 | 791,324 |
| 2019 | 6,041 | 1,068,657 |
| 2020 | 880 | 1,606,313 |
| 2021 | 1,548 | 704,482 |
| Thereafter | 777 | 237,846 |
| Total | 25,488 | 5,365,980 |
| Imputed interest | (1,304) | |
| Present value of minimum capitalized lease payments | 24,184 | |
| Current portion | (8,695) | |
| Long-term capitalized lease obligation | $   15,489 | |

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)

### Debt Facilities

We maintain a $1.2 billion global revolving credit facility with a syndicate of twelve lending institutions led by Bank of America N.A., Bank of Tokyo-Mitsubishi UFJ, Ltd., BNP Paribas, Mizuho Corporate Bank, Ltd., Royal Bank of Canada, Lloyds Bank Plc, U.S. Bank National Association and Wells Fargo Bank, N.A. The facility matures in January 2020.  The agreement provides for annual facility fees which range from 7.5 basis points to 25 basis points based on Ryder's long-term credit ratings. The annual facility fee is currently 10 basis points, which applies to the total facility size of $1.2 billion.

The credit facility is used primarily to finance working capital but can also be used to issue up to $75 million in letters of credit (there were no letters of credit outstanding against the facility at December 31, 2016). At our option, the interest rate on borrowings under the credit facility is based on LIBOR, prime, federal funds or local equivalent rates.  The credit facility contains no provisions limiting its availability in the event of a material adverse change to Ryder's business operations; however, the credit facility does contain standard representations and warranties, events of default, cross-default provisions and certain affirmative and negative covenants.

In order to maintain availability of funding, we must maintain a ratio of debt to consolidated net worth of less than or equal to 300%. Net worth, as defined in the credit facility, represents shareholders' equity excluding any accumulated other comprehensive income or loss associated with our pension and other postretirement plans. The ratio at December 31, 2016, was 201%. At December 31, 2016, there was $675 million available under the credit facility.

Our global revolving credit facility enables us to refinance short-term obligations on a long-term basis. Short-term commercial paper obligations not expected to require the use of working capital are classified as long-term as we have both the intent and ability to refinance on a long-term basis.  In addition, we have the intent and ability to refinance the current portion of long-term debt on a long-term basis.  At December 31, 2016, we classified $342 million of short-term commercial paper and $350 million of the current portion of long-term debt as long-term debt. At December 31, 2015, we classified $547 million of short-term commercial paper, $300 million of current debt obligations and $25 million of short-term borrowings under our global revolving credit facilities as long-term.

In 2016, we received $79 million from financing transactions backed by a portion of our revenue earning equipment. The proceeds from these transactions were used to fund capital expenditures. We have provided end of term guarantees for the residual value of the revenue earning equipment in these transactions. The transaction proceeds, along with the end of term residual value guarantees, have been included within "asset-backed U.S. obligations" in the preceding table.

In February 2016, we issued $300 million of unsecured medium-term notes maturing in November 2021. In November 2016, we issued $300 million of unsecured medium-term notes maturing in September 2021. The proceeds from these notes were used to payoff maturing debt and for general corporate purposes. If these notes are downgraded below investment grade following, and as a result of, a change in control, the note holders can require us to repurchase all or a portion of the notes at a purchase price equal to 101% of principal value plus accrued and unpaid interest.

We have a trade receivables purchase and sale program, pursuant to which we sell certain of our domestic trade accounts receivable to a bankruptcy remote, consolidated subsidiary of Ryder, that in turn sells, on a revolving basis, an ownership interest in certain of these accounts receivable to a committed purchaser. The subsidiary is considered a VIE and is consolidated based on our control of the entity's activities. We use this program to provide additional liquidity to fund our operations, particularly when it is cost effective to do so. The costs under the program may vary based on changes in interest rates. The available proceeds that may be received under the program are limited to $175 million. In October 2016, we renewed the trade receivables purchase and sale program. If no event occurs which causes early termination, the 364-day program will expire on October 23, 2017. The program contains provisions restricting its availability in the event of a material adverse change to our business operations or the collectibility of the collateralized receivables. Sales of receivables under this program are accounted for as secured borrowings based on our continuing involvement in the transferred assets. No amounts were outstanding under the program at December 31, 2016 and 2015.

The fair value of total debt (excluding capital lease, asset backed U.S. obligations and debt issuance costs) was $4.97 billion at December 31, 2016 and $5.06 billion at December 31, 2015. For publicly-traded debt, estimates of fair value were based on market prices. For other debt, fair value is estimated based on a model-driven approach using rates currently available to us for debt with similar terms and remaining maturities. The fair value measurements of our publicly-traded debt and our other debt were classified within Level 2 of the fair value hierarchy. The carrying amounts reported in the Consolidated Balance Sheets for "Cash and cash equivalents," "Receivables, net" and "Accounts payable" approximate fair value because of the immediate or short-term maturities of these financial instruments.

In February 2016, Ryder filed an automatic shelf registration statement on Form S-3 with the SEC. The registration is for an indeterminate number of securities and is effective for three years. Under this universal shelf registration statement, we have the capacity to offer and sell from time to time various types of securities, including common stock, preferred stock and debt securities, subject to market demand and ratings status.

16.    DERIVATIVES

From time to time, we enter into interest rate derivatives to manage our fixed and variable interest rate exposure and to better match the repricing of debt instruments to that of our portfolio of assets. We assess the risk that changes in interest rates will have either on the fair value of debt obligations or on the amount of future interest payments by monitoring changes in interest rate exposures and by evaluating hedging opportunities. We regularly monitor interest rate risk attributable to both our outstanding or forecasted debt obligations as well as our offsetting hedge positions. This risk management process involves the use of analytical techniques, including cash flow sensitivity analyses, to estimate the expected impact of changes in interest rates on our future cash flows.

As of December 31, 2016, we had interest rate swaps outstanding which are designated as fair value hedges for certain debt obligations, with a total notional value of $825 million and maturities through 2020.  Interest rate swaps are measured at fair value on a recurring basis using Level 2 fair value inputs. The fair value of these interest rate swaps was approximately $1 million and $5 million as of December 31, 2016 and 2015, respectively.  The amounts are presented in "Direct financing leases and other assets" and "Other non-current liabilities" in our Consolidated Balance Sheets. Changes in the fair value of our interest rate swaps were offset by changes in the fair value of the hedged debt instrument. Accordingly, there was no ineffectiveness related to the interest rate swaps.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

### 17.   GUARANTEES

We have executed various agreements with third parties that contain standard indemnifications that may require us to indemnify a third party against losses arising from a variety of matters such as lease obligations, financing agreements, environmental matters, and agreements to sell business assets. In each of these instances, payment by Ryder is contingent on the other party bringing about a claim under the procedures outlined in the specific agreement. Normally, these procedures allow us to dispute the other party's claim. Additionally, our obligations under these agreements may be limited in terms of the amount and/or timing of any claim. We have entered into individual indemnification agreements with each of our independent directors, through which we will indemnify such director acting in good faith against any and all losses, expenses and liabilities arising out of such director's service as a director of Ryder. The maximum amount of potential future payments under these agreements is generally unlimited.

We cannot predict the maximum potential amount of future payments under certain of these agreements, including the indemnification agreements, due to the contingent nature of the potential obligations and the distinctive provisions that are involved in each individual agreement. Historically, no such payments made by us have had a material adverse effect on our business. We believe that if a loss were incurred in any of these matters, the loss would not have a material adverse impact on our consolidated results of operations or financial position.

At December 31, 2016 and 2015, we had letters of credit and surety bonds outstanding, which primarily guarantee various insurance activities as noted in the following table:

|  | December 31, | |
|---|---|---|
|  | **2016** | 2015 |
|  | (In thousands) | |
| Letters of credit | $ **240,420** | 241,022 |
| Surety bonds | **113,696** | 104,632 |

### 18.   SHARE REPURCHASE PROGRAMS

In December 2015, our Board of Directors authorized a share repurchase program intended to mitigate the dilutive impact of shares issued under our employee stock plans (the program).  Under the program, management is authorized to repurchase (i) up to 1.5 million shares of common stock, the sum of which will not exceed the number of shares issued to employees under the Company's employee stock plans from December 1, 2015 to December 9, 2017, plus (ii) 0.5 million shares issued to employees that were not repurchased under the Company's previous share repurchase program.  The program limits aggregate share repurchases to no more than 2 million shares of Ryder common stock.  Share repurchases of common stock are made periodically in open-market transactions and are subject to market conditions, legal requirements and other factors. Management may establish prearranged written plans for the Company under Rule 10b5-1 of the Securities Exchange Act of 1934 as part of the program, which allow for share repurchases during Ryder's quarterly blackout periods as set forth in the trading plan.

During 2016, 2015 and 2014, we repurchased 0.5 million, 0.1 million and 1.3 million shares for $37 million, $6 million and $106 million, respectively.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

19.    ACCUMULATED OTHER COMPREHENSIVE LOSS

Comprehensive income (loss) presents a measure of all changes in shareholders' equity except for changes resulting from transactions with shareholders in their capacity as shareholders. The following summary sets forth the components of accumulated other comprehensive loss, net of tax:

| | Currency Translation Adjustments and Other | Net Actuarial Loss [1] | Prior Service Credit [1] | Accumulated Other Comprehensive Loss |
|---|---|---|---|---|
| | | (In thousands) | | |
| January 1, 2014 | $ 35,875 | (477,883) | 3,760 | (438,248) |
| Amortization | — | 14,866 | (2,676) | 12,190 |
| Pension lump sum settlement expense | — | 61,333 | — | 61,333 |
| Other current period change | (71,962) | (184,257) | 674 | (255,545) |
| December 31, 2014 | (36,087) | (585,941) | 1,758 | (620,270) |
| Amortization | — | 19,505 | (1,411) | 18,094 |
| Other current period change | (99,933) | (10,557) | (69) | (110,559) |
| December 31, 2015 | (136,020) | (576,993) | 278 | (712,735) |
| Amortization | — | 18,876 | 165 | 19,041 |
| Other current period change | (70,590) | (62,175) | (7,573) | (140,338) |
| December 31, 2016 | $ (206,610) | (620,292) | (7,130) | (834,032) |

_____
[1]    _These amounts are included in the computation of net periodic pension cost and pension settlement charge. See Note 22, "Employee Benefit Plans," for further information._

The loss from currency translation adjustments in 2016 of $71 million was primarily due to the weakening of the British Pound against the U.S. Dollar, partially offset by the strengthening of the Canadian Dollar against the U.S. Dollar.  The losses from currency translation adjustments in 2015 and 2014 of $100 million and $72 million, respectively, were due primarily to the weakening of the Canadian Dollar and British Pound against the U.S. Dollar.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

20.   EARNINGS PER SHARE

The following table presents the calculation of basic and diluted earnings per common share from continuing operations:

| | Years ended December 31, | | |
|---|---|---|---|
| | **2016** | 2015 | 2014 |
| | (In thousands, except per share amounts) | | |
| **Earnings per share — Basic:** | | | |
| Earnings from continuing operations | $ **264,640** | 305,989 | 220,225 |
| Less: Distributed and undistributed earnings allocated to unvested stock | **(840)** | (877) | (858) |
| Earnings from continuing operations available to common shareholders —   Basic | $ **263,800** | 305,112 | 219,367 |
| Weighted average common shares outstanding— Basic | **53,015** | 52,814 | 52,536 |
| Earnings from continuing operations per common share — Basic | $ **4.98** | 5.78 | 4.18 |
| **Earnings per share — Diluted:** | | | |
| Earnings from continuing operations | $ **264,640** | 305,989 | 220,225 |
| Less: Distributed and undistributed earnings allocated to unvested stock | **(836)** | (872) | (853) |
| Earnings from continuing operations available to common shareholders — Diluted | $ **263,804** | 305,117 | 219,372 |
| Weighted average common shares outstanding— Basic | **53,015** | 52,814 | 52,536 |
| Effect of dilutive equity awards | **346** | 446 | 500 |
| Weighted average common shares outstanding— Diluted | **53,361** | 53,260 | 53,036 |
| Earnings from continuing operations per common share — Diluted | $ **4.94** | 5.73 | 4.14 |
| Anti-dilutive equity awards and market-based restrictive stock rights not included above | **716** | 392 | 161 |

21.   SHARE-BASED COMPENSATION PLANS

The following table provides information on share-based compensation expense and related income tax benefits recognized in 2016, 2015 and 2014:

| | Years ended December 31, | | |
|---|---|---|---|
| | **2016** | 2015 | 2014 |
| | (In thousands) | | |
| Stock option and stock purchase plans | $ **7,244** | 8,048 | 9,023 |
| Unvested stock awards | **11,420** | 13,133 | 11,882 |
| Share-based compensation expense | **18,664** | 21,181 | 20,905 |
| Income tax benefit | **(6,644)** | (7,271) | (7,300) |
| Share-based compensation expense, net of tax | $ **12,020** | 13,910 | 13,605 |

Total unrecognized pre-tax compensation expense related to share-based compensation arrangements at December 31, 2016 was $17 million and is expected to be recognized over a weighted-average period of approximately 1.7 years. The total fair value of equity awards vested during 2016, 2015 and 2014 were $17 million, $16 million and $18 million, respectively.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

### Share-Based Incentive Awards

Share-based incentive awards are provided to employees under the terms of various share-based compensation plans (collectively, the "Plans"). The Plans are administered by the Compensation Committee of the Board of Directors. Awards under the Plans principally include at-the-money stock options, unvested stock and cash awards. Unvested stock awards include grants of market-based, performance-based, and time-vested restricted stock rights. Under the terms of our Plans, dividends on unvested stock are not paid unless the award vests. Upon vesting, the amount of the dividends paid is equal to the aggregate dividends declared on common shares during the period from the date of grant of the award until the date the shares underlying the award are delivered. There are 4.4 million shares authorized for issuance under the Plans as of December 31, 2016. There are 3.5 million shares remaining available for future issuance under the Plans as of December 31, 2016.

Stock options are awards which allow employees to purchase shares of our stock at a fixed price. Stock option awards are granted at an exercise price equal to the market price of our stock at the time of grant. These awards, which generally vest one-third each year, are fully vested three years from the grant date. Stock options granted since 2013 have contractual terms of ten years.

Restricted stock awards are unvested stock rights that are granted to employees and entitle the holder to shares of common stock as the award vests. Time-vested restricted stock rights typically vest in three years regardless of company performance. The fair value of the time-vested awards is determined and fixed based on Ryder's stock price on the date of grant.

Performance-based restricted stock awards (PBRSRs) include a performance-based vesting condition. The awards are segmented into three one-year performance periods. For these awards, up to 125% of the awards may be earned based on Ryder's one-year adjusted return on capital (ROC) measured against an annual ROC target. If earned, employees will receive the grant of stock three years after the grant date, provided they continue to be employed with Ryder, subject to Compensation Committee approval. For accounting purposes, the awards are not considered granted until the Compensation Committee approves the annual ROC target. During 2016, 2015 and 2014, 45,000, 42,000 and 23,000 PBRSRs, respectively, were considered granted for accounting purposes. The fair value of the PBRSRs is determined and fixed on the grant date based on Ryder's stock price on the date of grant. Share-based compensation expense is recognized on a straight-line basis over the vesting period, based upon the probability that the performance target will be met.

Market-based restricted stock awards include a market-based vesting provision. The awards are segmented into three performance periods of one, two and three years. At the end of each performance period, up to 125% of the award may be earned based on Ryder's total shareholder return (TSR) compared to the target TSR of a peer group over the applicable performance period. The awards compared Ryder's TSR to the TSR of a custom peer group. If earned, employees will receive the grant of stock at the end of the relevant three-year performance period provided they continue to be employed with Ryder, subject to Compensation Committee approval. The fair value of the market-based awards was determined on the date of grant using a Monte-Carlo valuation model. Share-based compensation expense is recognized on a straight-line basis over the vesting period and is recognized regardless of whether the awards vest.

Certain employees also received cash awards as part of our long-term incentive compensation program. The cash awards have the same vesting provisions as the market-based restricted stock awards granted in the respective years. The cash awards are accounted for as liability awards as they are based upon our own stock performance and are settled in cash. As a result, the liability is adjusted to reflect fair value at the end of each reporting period. The fair value of the market-based cash awards was estimated using a lattice-based option pricing valuation model that incorporates a Monte-Carlo simulation. The liability related to the cash awards was $1 million at both December 31, 2016 and 2015.

The following table is a summary of compensation expense recognized related to cash awards in addition to share-based compensation expense reported in the previous table.

| | Years ended December 31 | | |
| | 2016 | 2015 | 2014 |
| | (In thousands) | | |
|---|---|---|---|
| Cash awards | $ 689 | 532 | 1,900 |

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

We grant restricted stock units (RSUs) to non-management members of the Board of Directors. Once granted, RSUs are eligible for non-forfeitable dividend equivalents but have no voting rights. The fair value of the awards is determined and fixed based on Ryder's stock price on the date of grant. A board member receives the RSUs upon departure from the Board. The initial grant of RSUs will not vest unless the director has served a minimum of one year. When a board member receives RSUs, they are redeemed for an equivalent number of shares of our common stock. Share-based compensation expense is recognized for RSUs in the year the RSUs are granted.

*Option Awards*

The following is a summary of option activity under our stock option plans as of and for the year ended December 31, 2016:

| | Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| | (In thousands) | | (In years) | (In thousands) |
| Options outstanding at January 1 | 1,263 | $ 68.13 | | |
| Granted | 512 | 55.32 | | |
| Exercised | (188) | 47.06 | | |
| Forfeited or expired | (58) | 70.15 | | |
| Options outstanding at December 31 | 1,529 | $ 66.35 | 7.1 | $ 18,400 |
| Vested and expected to vest at December 31 | 1,473 | $ 66.42 | 7.0 | $ 17,727 |
| Exercisable at December 31 | 725 | $ 65.35 | 5.4 | $ 8,737 |

The aggregate intrinsic values in the table above represent the total pre-tax intrinsic value (the difference between the close price of our stock on the last trading day of the year and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders if all options were exercised at year-end. This amount fluctuates based on the fair market value of our stock.

*Restricted Stock Awards*

The following is a summary of the status of Ryder's unvested restricted stock awards as of and for the year ended December 31, 2016:

| | Time-Vested | | Market-Based | | Performance-Based | |
|---|---|---|---|---|---|---|
| | Shares | Weighted-Average Grant Date Fair Value | Shares | Weighted-Average Grant Date Fair Value | Shares | Weighted-Average Grant Date Fair Value |
| | (In thousands) | | (In thousands) | | (In thousands) | |
| Unvested stock outstanding at January 1 | 473 | $ 68.50 | 62 | $ 66.97 | 76 | $ 83.31 |
| Granted | 133 | 57.83 | 34 | 54.10 | 45 | 55.32 |
| Vested [1] | (104) | 58.83 | (21) | 53.43 | (39) | 74.35 |
| Forfeited [2] | (26) | 74.11 | (9) | 69.10 | (10) | 63.95 |
| Unvested stock outstanding at December 31 | 476 | $ 67.31 | 66 | $ 64.33 | 72 | $ 70.92 |

(1)  Includes awards attained above target.
(2)  Includes awards canceled due to performance and market conditions not being achieved.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

### Stock Purchase Plan

We maintain an Employee Stock Purchase Plan (ESPP) that enables eligible participants in the U.S. and Canada to purchase full or fractional shares of Ryder common stock through payroll deductions of up to 15% of eligible compensation. The ESPP provides for quarterly offering periods during which shares may be purchased at 85% of the fair market value of our stock. Beginning with the second quarter of 2015, we amended the ESPP to calculate the exercise price based only on the fair market value of the stock on the last trading day of the quarter. Prior to the second quarter of 2015, the exercise price was based on the lower of the fair market value on the first or last trading day of the quarter. Stock purchased under the ESPP must be held for 90 days. There were 5.5 million shares authorized for issuance under the existing ESPP at December 31, 2016. There were 0.9 million shares remaining available to be purchased in the future under the ESPP at December 31, 2016.

During 2016, 192,000 shares with a weighted average exercise price of $56.17 were granted and exercised. During 2015, 178,000 shares with a weighted average exercise price of $63.93 were granted and exercised. During 2014, 150,000 shares with a weighted average exercise price of $82.27 were granted and exercised.

### Share-Based Compensation Fair Value Assumptions

The fair value of each option award is estimated on the date of grant using a Black-Scholes-Merton option-pricing valuation model that uses the weighted-average assumptions noted in the table below. Expected volatility is based on historical volatility of our stock and implied volatility from traded options on our stock. The risk-free rate for periods within the contractual life of the stock option award is based on the yield curve of a zero-coupon U.S. Treasury bond on the date the stock option award is granted with a maturity equal to the expected term of the stock option award. We use historical data to estimate stock option exercises and forfeitures within the valuation model. The expected term of stock option awards granted is derived from historical exercise experience under the share-based employee compensation arrangements and represents the period of time that stock option awards granted are expected to be outstanding. The fair value of market-based restricted stock awards is estimated using a lattice-based option-pricing valuation model that incorporates a Monte-Carlo simulation. Estimates of fair value are not intended to predict actual future events or the value ultimately realized by employees who receive equity awards, and subsequent events are not indicative of the reasonableness of the original estimates of fair value made by Ryder.

The following table presents the weighted-average assumptions used for options granted:

|  | Years ended December 31, | | |
|  | **2016** | 2015 | 2014 |
|---|---|---|---|
| Option plans: | | | |
| Expected dividends | **3.0%** | 1.6% | 1.9% |
| Expected volatility | **35.2%** | 26.4% | 29.1% |
| Risk-free rate | **1.1%** | 1.4% | 1.3% |
| Expected term in years | **4.3 years** | 4.3 years | 4.3 years |
| Grant-date fair value | **$12.53** | $18.47 | $14.99 |

### Exercise of Employee Stock Options and Purchase Plans

The total intrinsic value of options exercised during 2016, 2015 and 2014 was $5 million, $11 million and $28 million, respectively. The total cash received from employees under all share-based employee compensation arrangements for 2016, 2015 and 2014 was $18 million, $24 million and $46 million, respectively. In connection with these exercises, the tax benefits generated from share-based employee compensation arrangements were $0.6 million, $0.4 million and $1 million for 2016, 2015 and 2014, respectively. As discussed in Note 2 "Recent Accounting Pronouncements," excess tax benefits related to share-based payments are recorded to income tax expense beginning in 2016.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

22.   EMPLOYEE BENEFIT PLANS

**Pension Plans**

We historically sponsored several defined benefit pension plans covering most employees not covered by union-administered plans, including certain employees in foreign countries. These plans generally provided participants with benefits based on years of service and career-average compensation levels.

In past years, we made amendments to defined benefit retirement plans which froze the retirement benefits for non-grandfathered and certain non-union employees in the U.S., Canada and the United Kingdom (U.K.). As a result of these amendments, non-grandfathered plan participants ceased accruing benefits under the plan as of the respective amendment effective date and began receiving an enhanced benefit under a defined contribution plan. All retirement benefits earned as of the amendment effective date were fully preserved and will be paid in accordance with the plan and legal requirements. The funding policy for these plans is to make contributions based on annual service costs plus amortization of unfunded past service liability, but not greater than the maximum allowable contribution deductible for federal income tax purposes. We may, from time to time, make voluntary contributions to our pension plans, which exceed the amount required by statute. The majority of the plans' assets are invested in a master trust that, in turn, is invested primarily in commingled funds whose investments are listed stocks and bonds.

We also have a non-qualified supplemental pension plan covering certain U.S. employees, which provides for incremental pension payments from our funds so that total pension payments equal the amounts that would have been payable from our principal pension plans if it were not for limitations imposed by income tax regulations. The accrued pension liability related to this plan was $53 million and $51 million at December 31, 2016 and 2015, respectively.

*Pension Expense*

Pension expense from continuing operations was as follows:

|  | | Years ended December 31, | | |
|---|---|---|---|---|
|  | | **2016** | 2015 | 2014 |
|  | | (In thousands) | | |
| Company-administered plans: | | | | |
| Service cost | $ | **12,977** | 13,820 | 13,023 |
| Interest cost | | **94,476** | 88,013 | 100,909 |
| Expected return on plan assets | | **(90,588)** | (98,892) | (115,410) |
| Pension lump sum settlement expense | | **—** | — | 97,231 |
| Amortization of: | | | | |
| Net actuarial loss | | **31,777** | 30,741 | 23,573 |
| Prior service loss (credit) | | **2,976** | (306) | (1,788) |
| | | **51,618** | 33,376 | 117,538 |
| Union-administered plans | | **9,597** | 8,328 | 21,118 |
| Net pension expense | $ | **61,215** | 41,704 | 138,656 |
| | | | | |
| Company-administered plans: | | | | |
| U.S. | $ | **53,319** | 34,986 | 118,797 |
| Foreign | | **(1,701)** | (1,610) | (1,259) |
| | | **51,618** | 33,376 | 117,538 |
| Union-administered plans | | **9,597** | 8,328 | 21,118 |
| | $ | **61,215** | 41,704 | 138,656 |

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

During 2016, we determined that certain pension benefit improvements made in 2009 had not been fully reflected in our projected benefit obligation.  Because the amounts were not material to our consolidated financial statements in any individual period, and the cumulative amount is not material to 2016 results, we recognized a one-time, non-cash charge of $8 million in "Selling, general and administrative expenses" and a $13 million pre-tax increase to "Accumulated other comprehensive loss" in our consolidated financial statements to correctly state the pension benefit obligation and account for these 2009 benefit improvements.

During 2015, we recorded adjustments of $0.5 million to previously recorded, estimated pension settlement charges related to the exit from U.S multi-employer pension plans.

During 2014, we offered former vested employees in our U.S. defined benefit plan a one-time option to receive a lump sum distribution of their benefits. We made payments totaling $224 million from the U.S. defined benefit plan assets, which resulted in a settlement of $259 million, representing approximately 12% of our U.S. pension plan obligations.  We recognized pension lump sum settlement expense of $97 million for unrecognized actuarial losses as a result of the partial settlement of our pension plan liability.  The amount of the lump sum settlement expense is based on the proportionate amount of unrecognized U.S. actuarial net losses equal to the settled percentage of our pension benefit obligation.

The following table sets forth the weighted-average actuarial assumptions used for Ryder's pension plans in determining annual pension expense:

| | U.S. Plans Years ended December 31, | | | Foreign Plans Years ended December 31, | | |
|---|---|---|---|---|---|---|
| | **2016** | 2015 | 2014 | **2016** | 2015 | 2014 |
| Discount rate | **4.50%** | 4.15% | 5.00% | **3.70%** | 3.70% | 4.57% |
| Rate of increase in compensation levels | **3.00%** | 3.00% | 3.00% | **3.10%** | 3.10% | 3.09% |
| Expected long-term rate of return on plan assets | **5.85%** | 5.95% | 6.50% | **5.44%** | 5.50% | 5.94% |
| Gain and loss amortization period (years) | **23** | 23 | 23 | **27** | 27 | 27 |

The return on plan assets assumption reflects the weighted-average of the expected long-term rates of return for the broad categories of investments held in the plans. The expected long-term rate of return is adjusted when there are fundamental changes in expected returns or in asset allocation strategies of the plan assets.

RYDER SYSTEM, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)

*Obligations and Funded Status*

The following table sets forth the benefit obligations, assets and funded status associated with our pension plans:

| | December 31, | |
| --- | --- | --- |
| | **2016** | 2015 |
| | (In thousands) | |
| **Change in benefit obligations:** | | |
| Benefit obligations at January 1 | $ **2,091,844** | 2,221,115 |
| Service cost | **12,977** | 13,820 |
| Interest cost | **94,476** | 88,013 |
| Actuarial loss (gain) | **189,523** | (98,996) |
| Benefits paid | **(96,723)** | (98,528) |
| Foreign currency exchange rate changes | **(63,335)** | (33,580) |
| Benefit obligations at December 31 | **2,228,762** | 2,091,844 |
| | | |
| **Change in plan assets:** | | |
| Fair value of plan assets at January 1 | **1,647,286** | 1,775,417 |
| Actual return on plan assets | **176,066** | (29,024) |
| Employer contribution | **127,991** | 33,746 |
| Benefits paid | **(96,723)** | (98,528) |
| Foreign currency exchange rate changes | **(67,545)** | (34,325) |
| Fair value of plan assets at December 31 | **1,787,075** | 1,647,286 |
| Funded status | $ **(441,687)** | (444,558) |
| Funded percent | **80%** | 79% |

The funded status of our pension plans was presented in the Consolidated Balance Sheets as follows:

| | December 31, | |
| --- | --- | --- |
| | **2016** | 2015 |
| | (In thousands) | |
| Noncurrent asset | $ **14,049** | 44,124 |
| Current liability | **(3,796)** | (3,790) |
| Noncurrent liability | **(451,940)** | (484,892) |
| Net amount recognized | $ **(441,687)** | (444,558) |

Amounts recognized in accumulated other comprehensive loss (pre-tax) consisted of:

| | December 31, | |
| --- | --- | --- |
| | **2016** | 2015 |
| | (In thousands) | |
| Prior service credit | $ **11,714** | — |
| Net actuarial loss | **961,010** | 905,944 |
| Net amount recognized | $ **972,724** | 905,944 |

In 2017, we expect to recognize $34 million of net actuarial loss amortization as a component of pension expense.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The following table sets forth the weighted-average actuarial assumptions used in determining funded status:

| | U.S. Plans December 31, | | Foreign Plans December 31, | |
|---|---|---|---|---|
| | **2016** | 2015 | **2016** | 2015 |
| Discount rate | **4.20%** | 4.50% | **3.90%** | 4.00% |
| Rate of increase in compensation levels | **3.00%** | 3.00% | **3.10%** | 3.10% |

At December 31, 2016 and 2015, our accumulated benefit obligations, as well as, our pension obligations (accumulated benefit obligations (ABO), and projected benefit obligations (PBO)), greater than the fair value of the related plan assets for our U.S. and foreign plans were as follows:

| | U.S. Plans December 31, | | Foreign Plans December 31, | | Total December 31, | |
|---|---|---|---|---|---|---|
| | **2016** | 2015 | **2016** | 2015 | **2016** | 2015 |
| | | | (In thousands) | | | |
| Total accumulated benefit obligations | **$1,748,171** | 1,640,844 | **454,301** | 423,555 | **2,202,472** | 2,064,399 |
| Plans with pension obligations in excess of plan assets: | | | | | | |
| PBO | **1,771,968** | 1,671,949 | **7,383** | 7,916 | **1,779,351** | 1,679,865 |
| ABO | **1,748,171** | 1,640,844 | **5,997** | 6,793 | **1,754,168** | 1,647,637 |
| Fair value of plan assets | **1,323,751** | 1,191,182 | **—** | — | **1,323,751** | 1,191,182 |

*Plan Assets*

Our pension investment strategy is to reduce the effects of future volatility on the fair value of our pension assets relative to our pension liabilities. We increase our allocation of high quality, longer-term fixed income securities and reduce our allocation of equity investments as the funded status of the plans improve. The plans utilize several investment strategies, including actively and passively managed equity and fixed income strategies. The investment policy establishes targeted allocations for each asset class that incorporate measures of asset and liability risks. Deviations between actual pension plan asset allocations and targeted asset allocations may occur as a result of investment performance and changes in the funded status from time to time. Rebalancing of our pension plan asset portfolios is evaluated periodically and rebalanced if actual allocations exceed an acceptable range. U.S. plans account for approximately 74% of our total pension plan assets. Equity securities primarily include investments in both domestic and international common collective trusts and publicly traded equities. Fixed income securities primarily include domestic collective trusts and corporate bonds. Other types of investments include private equity fund-of-funds and hedge fund-of-funds.  Equity and fixed income securities in our international plans include actively and passively managed mutual funds.

RYDER SYSTEM, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)

The following table presents the fair value of each major category of pension plan assets and the level of inputs used to measure fair value as of December 31, 2016 and 2015:

| Asset Category | | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|---|
| | | Fair Value Measurements at December 31, 2016 | | | |
| | | (In thousands) | | | |
| Equity securities: | | | | | |
| U.S. common collective trusts | $ | 429,456 | — | 429,456 | — |
| Foreign common collective trusts | | 398,282 | — | 398,282 | — |
| Fixed income securities: | | | | | |
| Corporate bonds | | 76,086 | — | 76,086 | — |
| Common collective trusts | | 780,367 | — | 780,367 | — |
| Private equity and hedge funds | | 102,884 | — | — | 102,884 |
| Total | $ | 1,787,075 | — | 1,684,191 | 102,884 |

| Asset Category | | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|---|
| | | Fair Value Measurements at December 31, 2015 | | | |
| | | (In thousands) | | | |
| Equity securities: | | | | | |
| U.S. common collective trusts | $ | 387,123 | — | 387,123 | — |
| Foreign common collective trusts | | 374,858 | — | 374,858 | — |
| Fixed income securities: | | | | | |
| Corporate bonds | | 64,834 | — | 64,834 | — |
| Common collective trusts | | 719,840 | — | 719,840 | — |
| Private equity and hedge funds | | 100,631 | — | — | 100,631 |
| Total | $ | 1,647,286 | — | 1,546,655 | 100,631 |

The following is a description of the valuation methodologies used for our pension assets as well as the level of input used to measure fair value:

*Equity securities* — These investments include common and preferred stocks and index common collective trusts that track U.S. and foreign indices. Fair values for the common and preferred stocks were based on quoted prices in active markets and were therefore classified within Level 1 of the fair value hierarchy. The common collective trusts were valued at the unit prices established by the funds' sponsors based on the fair value of the assets underlying the funds. Since the units of the funds are not actively traded, the fair value measurements have been classified within Level 2 of the fair value hierarchy.

*Fixed income securities* — These investments include investment grade bonds of U.S. issuers from diverse industries, government issuers, index common collective trusts that track the Barclays Aggregate Index and other fixed income investments (primarily mortgage-backed securities). Fair values for the corporate bonds were valued using third-party pricing services. These sources determine prices utilizing market income models which factor in, where applicable, transactions of similar assets in active markets, transactions of identical assets in infrequent markets, interest rates, bond or credit default swap spreads and volatility. Since the corporate bonds are not actively traded, the fair value measurements have been classified within Level 2 of the fair value hierarchy. The common collective trusts were valued at the unit prices established by the funds' sponsors based on the fair value of the assets underlying the funds. Since the units of the funds are not actively traded, the fair value measurements have been classified within Level 2 of the fair value hierarchy. The other investments are not actively traded and fair values are estimated using bids provided by brokers, dealers or quoted prices of similar securities with similar characteristics or pricing models. Therefore, the other investments have been classified within Level 2 of the fair value hierarchy.

*Private equity and hedge funds* — These investments represent limited partnership interests in private equity and hedge funds. The partnership interests are valued by the general partners based on the underlying assets in each fund. The limited partnership interests are valued using unobservable inputs and have been classified within Level 3 of the fair value hierarchy.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The following table presents a summary of changes in the fair value of the pension plans' Level 3 assets for the years ended December 31, 2016 and 2015:

|  | 2016 | 2015 |
|---|---|---|
|  | (In thousands) | |
| Beginning balance at January 1 | $ 100,631 | 89,727 |
| Return on plan assets: | | |
| Relating to assets still held at the reporting date | 1,548 | 5,399 |
| Relating to assets sold during the period | 703 | 226 |
| Purchases, sales, settlements and expenses | 2 | 5,279 |
| Ending balance at December 31 | $ 102,884 | 100,631 |

The following table details pension benefits expected to be paid in each of the next five fiscal years and in aggregate for the five fiscal years thereafter:

|  | (In thousands) |
|---|---|
| 2017 | $ 102,378 |
| 2018 | 105,256 |
| 2019 | 109,348 |
| 2020 | 113,471 |
| 2021 | 117,724 |
| 2022-2026 | 633,451 |

For 2017, required pension contributions to our pension plans are estimated to be $22 million.

**Multi-employer Plans**

We participate in multi-employer plans that provide defined benefits to certain employees covered by collective-bargaining agreements. Such plans are usually administered by a board of trustees comprised of the management of the participating companies and labor representatives. The net pension cost of these plans is equal to the annual contribution determined in accordance with the provisions of negotiated labor contracts. Assets contributed to such plans are not segregated or otherwise restricted to provide benefits only to our employees. The risks of participating in these multi-employer plans are different from single-employer plans in the following respects: 1) assets contributed to the multi-employer plan by one employer may be used to provide benefits to employees and former employees of other participating employers; 2) if a participating employer is no longer able to contribute to the plan, the unfunded obligations of the plan may be borne by the remaining participating employers at annual contribution rates under the collective bargaining agreements; 3) if there is a mass withdrawal of substantially all employers from the plan, we may be required to pay the plan an annual contribution based on historical contribution levels as prescribed by federal statute; and 4) if we choose to stop participating in some of our multi-employer plans, we may be required to pay those plans an amount based on the underfunded status of the plan, which is referred to as a withdrawal liability.

During 2015, we recognized a benefit of $1 million for adjustments to previously recognized estimated pension settlement charges related to our exit from U.S. multi-employer pension plans. During 2014, we recognized estimated pension settlement charges of $13 million related to the transition of employees from two U.S. multi-employer plans into another multi-employer plan in which we participate, and our exit from two U.S. multi-employer pension plans. These adjustments were included in "Selling, general, and administrative expenses" in our Consolidated Statement of Earnings and are a component of Union-administered plans expense.

Our participation in these plans is outlined in the table below. Unless otherwise noted, the most recent Pension Protection Act zone status available in 2016 and 2015 is for the plan years ended December 31, 2015 and December 31, 2014, respectively. The zone status is based on information that we received from the plan. Among other factors, plans in the red zone are generally less than sixty-five percent funded, plans in the yellow zone are less than eighty percent funded, and plans in the green zone are at least eighty percent funded.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

| Pension Fund | Employer Identification Number | Pension Protection Act Zone Status | | FIP/RP Status Pending/ Implemented [1] | Ryder Contributions | | | Surcharge Imposed | Expiration Date(s) of Collective- Bargaining Agreement(s) |
|---|---|---|---|---|---|---|---|---|---|
| | | 2016 | 2015 | | 2016 | 2015 | 2014 | | |
| | | | | | (Dollars in thousands) | | | | |
| Western Conference Teamsters | 91-6145047 | Green | Green | No | $ 2,613 | 2,430 | 2,315 | No | 1/12/18 to 4/1/21 |
| IAM National | 51-6031295 | Green | Green | No | 4,162 | 3,801 | 3,311 | No | 3/31/17 to 11/30/19 |
| Automobile Mechanics Local No. 701 | 36-6042061 | Yellow | Red | RP Adopted | 2,201 | 1,902 | 1,632 | Yes | 10/31/17 to 5/31/19 |
| Central States Southeast and Southwest Areas | 36-6044243 | Red | Red | RP Adopted | 259 | 254 | 211 | Yes | 5/6/17 to 10/31/17 |
| Other funds | | | | | 501 | 450 | 1,085 | | |
| Total contributions | | | | | 9,736 | 8,837 | 8,554 | | |
| Pension settlement (benefit) charges | | | | | (139) | (509) | 12,564 | | |
| Union-administered plans | | | | | $ 9,597 | 8,328 | 21,118 | | |

_____

(1) *The "FIP/RP Status Pending/Implemented" column indicates plans for which a financial improvement plan (FIP) or a rehabilitation plan (RP) is either pending or has been implemented.*

Our contributions are impacted by changes in contractual contributions rates as well as changes in the number of employees covered by each plan.

### Savings Plans

Employees who do not actively participate in pension plans and are not covered by union-administered plans are generally eligible to participate in enhanced savings plans. These plans provide for (i) a company contribution even if employees do not make contributions, (ii) a company match of employee contributions of eligible pay, subject to tax limits and (iii) a discretionary company match. Savings plan costs totaled $38 million in both 2016 and 2015 and $35 million in 2014.

### Deferred Compensation and Long-Term Compensation Plans

We have deferred compensation plans that permit eligible U.S. employees, officers and directors to defer a portion of their compensation. The deferred compensation liability, including Ryder matching amounts and accumulated earnings, totaled $50 million and $44 million at December 31, 2016 and 2015, respectively.

We have established grantor trusts (Rabbi Trusts) to provide funding for benefits payable under the supplemental pension plan, deferred compensation plans and long-term incentive compensation plans. The assets held in the trusts were $50 million and $43 million at December 31, 2016 and 2015, respectively. The Rabbi Trusts' assets consist of short-term cash investments and a managed portfolio of equity securities, including our common stock. These assets, except for the investment in our common stock, are included in "Direct financing leases and other assets" because they are available to our general creditors in the event of insolvency. The equity securities are classified as trading securities and stated at fair value. Both realized and unrealized gains and losses are included in "Miscellaneous income, net." The Rabbi Trusts' investment of $2 million and $1 million in our common stock at December 31, 2016 and 2015, respectively, is reflected at historical cost and included in shareholders' equity.

### Other Postretirement Benefits

We sponsor plans that provide retired U.S. and Canadian employees with certain healthcare and life insurance benefits. Substantially all U.S. and Canadian employees not covered by union-administered health and welfare plans are eligible for the healthcare benefits. Healthcare benefits for our principal plan are generally provided to qualified retirees under age 65 and eligible dependents. This plan requires employee contributions that vary based on years of service and include provisions that limit our contributions. Effective January 1, 2014, we made amendments to our healthcare benefits for early retirees which modified future eligibility requirements for non-grandfathered retirees in the U.S. The post-retirement medical plan was closed to participants who were not at least age 52 with 12 years of service as of December 31, 2013.

Total postretirement benefit income was as follows:

| | | Years ended December 31, | |
|---|---|---|---|
| | **2016** | 2015 | 2014 |
| | | (In thousands) | |
| Service cost | $ **215** | 363 | 446 |
| Interest cost | **906** | 1,097 | 1,421 |
| Amortization of: | | | |
| Net actuarial gain | **(1,989)** | (1,773) | (725) |
| Prior service credit | **(231)** | (1,083) | (2,459) |
| Postretirement benefit income | $ **(1,099)** | (1,396) | (1,317) |
| | | | |
| U.S. | $ **(1,429)** | (1,887) | (1,839) |
| Foreign | **330** | 491 | 522 |
| | $ **(1,099)** | (1,396) | (1,317) |

The following table sets forth the weighted-average discount rates used in determining annual postretirement benefit expense:

| | U.S. Plan Years ended December 31, | | | Foreign Plan Years ended December 31, | | |
|---|---|---|---|---|---|---|
| | **2016** | 2015 | 2014 | **2016** | 2015 | 2014 |
| Discount rate | **4.50%** | 4.15% | 5.00% | **4.00%** | 4.00% | 4.80% |

Our postretirement benefit plans are not funded. The following table sets forth the benefit obligations associated with our postretirement benefit plans:

| | December 31, | |
|---|---|---|
| | **2016** | 2015 |
| | (In thousands) | |
| Benefit obligations at January 1 | $ **21,626** | 29,001 |
| Service cost | **215** | 363 |
| Interest cost | **906** | 1,097 |
| Actuarial gain | **(338)** | (6,164) |
| Benefits paid | **(1,609)** | (1,468) |
| Foreign currency exchange rate changes | **165** | (1,203) |
| Benefit obligations at December 31 | $ **20,965** | 21,626 |

Amounts recognized in the Consolidated Balance Sheets consisted of:

| | December 31, | |
|---|---|---|
| | **2016** | 2015 |
| | (In thousands) | |
| Current liability | $ **1,506** | 1,624 |
| Noncurrent liability | **19,459** | 20,002 |
| Amount recognized | $ **20,965** | 21,626 |

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

Amounts recognized in accumulated other comprehensive loss (pre-tax) consisted of:

| | December 31, | |
| --- | --- | --- |
| | **2016** | 2015 |
| | (In thousands) | |
| Prior service credit | $ **(385)** | (616) |
| Net actuarial gain | **(10,186)** | (11,825) |
| Net amount recognized | $ **(10,571)** | (12,441) |

In 2017, we expect to recognize approximately $2 million of the net actuarial gain as a component of postretirement benefit expense. The amount of prior service credit we expect to recognize in 2017 as a component of total postretirement benefit expense is not material.

Our annual measurement date is December 31 for both U.S. and foreign postretirement benefit plans. Assumptions used in determining accrued postretirement benefit obligations were as follows:

| | U.S. Plan December 31, | | Foreign Plan December 31, | |
| --- | --- | --- | --- | --- |
| | **2016** | 2015 | **2016** | 2015 |
| Discount rate | **4.50%** | 4.50% | **3.90%** | 4.00% |
| Rate of increase in compensation levels | **3.00%** | 3.00% | **3.00%** | 3.00% |
| Healthcare cost trend rate assumed for next year | **7.50%** | 6.75% | **5.00%** | 5.50% |
| Rate to which the cost trend rate is assumed to decline (ultimate trend rate) | **5.00%** | 5.00% | **5.00%** | 5.00% |
| Year that the rate reaches the ultimate trend rate | **2027** | 2023 | **2018** | 2017 |

Changing the assumed healthcare cost trend rates by 1% in each year would not have a material effect on the accumulated postretirement benefit obligation at December 31, 2016 or annual postretirement benefit expense for 2016.

The following table details other postretirement benefits expected to be paid in each of the next five fiscal years and in aggregate for the five fiscal years thereafter:

| | **(In thousands)** |
| --- | --- |
| 2017 | $ **1,521** |
| 2018 | **1,513** |
| 2019 | **1,502** |
| 2020 | **1,478** |
| 2021 | **1,496** |
| 2022-2026 | **6,923** |

## 23.  ENVIRONMENTAL MATTERS

Our operations involve storing and dispensing petroleum products, primarily diesel fuel, regulated under environmental protection laws.  These laws require us to eliminate or mitigate the effect of such substances on the environment.  In response to these requirements, we continually upgrade our operating facilities and implement various programs to detect and minimize contamination.  In addition, we have received notices from the Environmental Protection Agency (EPA) and others that we have been identified as a potentially responsible party under the Comprehensive Environmental Response, Compensation and Liability Act, the Superfund Amendments and Reauthorization Act and similar state statutes.  We may be required to share in the cost of cleanup of 19 identified disposal sites.

Our environmental expenses which are presented within "Cost of fuel services" in our Consolidated Statements of Earnings, consist of remediation costs as well as normal recurring expenses such as licensing, testing and waste disposal fees. These expenses totaled $10 million, $9 million and $7 million in 2016, 2015 and 2014, respectively. The carrying amount of our environmental liabilities was $9 million and $10 million at December 31, 2016 and 2015, respectively.  Our asset retirement obligations related to fuel tanks to be removed are not included above and are included in "Accrued expenses and other current liabilities" and "Other non-current liabilities" in our Consolidated Balance Sheets.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The ultimate cost of our environmental liabilities cannot presently be projected with certainty due to the presence of several unknown factors, primarily the level of contamination, the effectiveness of selected remediation methods, the stage of investigation at individual sites, the determination of our liability in proportion to other responsible parties and the recoverability of such costs from third parties.  Based on information presently available, we believe that the ultimate disposition of these matters, although potentially material to the results of operations in any one year, will not have a material adverse effect on our financial condition or liquidity.

## 24.   OTHER ITEMS IMPACTING COMPARABILITY

Our primary measure of segment performance as shown in Note 27, "Segment Reporting", excludes certain items we do not believe are representative of the ongoing operations of the segment. Excluding these items from our segment measure of performance allows for better year over year comparison:

|  | Years ended December 31, | | |
|---|---|---|---|
|  | **2016** | 2015 | 2014 |
|  | (In thousands) | | |
| Pension-related adjustments [1] | $   **(7,650)** | 509 | (12,564) |
| Restructuring and other charges, net [2] | **(5,074)** | (14,225) | (2,387) |
| Pension lump sum settlement loss [1] | — | — | (97,231) |
| Acquisition-related tax adjustment | — | — | (1,808) |
| Acquisition transaction costs | — | — | (566) |
| Consulting fees | — | (3,843) | (400) |
| Restructuring and other charges, net and other items | $   **(12,724)** | (17,559) | (114,956) |

_____

*(1) Refer to Note 22, "Employee Benefit Plans," for additional information.*

*(2) Refer to Note 4, "Restructuring and Other Charges," for additional information.*

During 2015 and 2014, we incurred charges of $4 million and $0.4 million, respectively, in "Selling, general and administrative expenses" in our Consolidated Statements of Earnings related to consulting fees associated with cost savings initiatives.

During 2014, we incurred charges of $2 million related to tax adjustments for the 2011 Hill Hire acquisition. We reported the cumulative adjustment within "Selling, general and administrative expenses" in our Consolidated Statements of Earnings.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

25.   OTHER MATTERS

We are a party to various claims, complaints and proceedings arising in the ordinary course of our continuing business operations including, but not limited to, those relating to commercial and employment claims, environmental matters, risk management matters (e.g., vehicle liability, workers' compensation, etc.) and administrative assessments primarily associated with operating taxes. We have established loss provisions for matters in which losses are probable and can be reasonably estimated. For matters from continuing operations, we believe that the resolution of these claims, complaints and legal proceedings will not have a material effect on our consolidated financial statements.

Our estimates regarding potential losses and materiality are based on our judgment and assessment of the claims utilizing currently available information. Although we will continue to reassess our reserves and estimates based on future developments, our objective assessment of the legal merits of such claims may not always be predictive of the outcome and actual results may vary from our current estimates.

Although we discontinued our South American operations in 2009, we continue to be party to various federal, state and local legal proceedings involving labor matters, tort claims and tax assessments. We have established loss provisions for any matters where we believe a loss is probable and can be reasonably estimated. We believe that such losses will not have a material effect on our consolidated financial statements.

In Brazil, various matters related to income taxes and social contribution taxes, as well as tax credits used to offset those taxes, were assessed by the Revenue Department for the 1997, 1998, 2004, 2005 and 2006 tax years. When available and appropriate, we have entered into various amnesty programs offered by the Brazilian tax authorities to settle some of these assessments at a discount and continue to evaluate these when offered.  Payments to resolve open matters through these amnesty programs were not material and were reflected as costs in discontinued operations.  Open matters, combined, total approximately $4 million in assessments, penalties and interest and are pending at various levels of the administrative tax courts.  We believe it is more likely than not that our position will ultimately be sustained either in these administrative courts or in actions before the judicial courts, if required. We do not believe these matters will have a material impact on our consolidated financial statements.

26.   SUPPLEMENTAL CASH FLOW INFORMATION

Supplemental cash flow information was as follows:

|  | Years ended December 31, | | |
|---|---|---|---|
|  | **2016** | 2015 | 2014 |
|  | (In thousands) | | |
| Interest paid | $ **143,990** | 144,973 | 139,595 |
| Income taxes paid | **14,062** | 13,379 | 11,382 |
| Changes in accounts payable related to purchases of revenue earning equipment | **(142,256)** | 28,134 | 39,071 |
| Operating and revenue earning equipment acquired under capital leases | **1,230** | 5,959 | 7,972 |

27.   SEGMENT REPORTING

Our operating segments are aggregated into reportable business segments based upon similar economic characteristics, products, services, customers and delivery methods. We report our financial performance in three business segments: (1) FMS, which provides full service leasing, commercial rental, contract maintenance, and contract-related maintenance of trucks, tractors and trailers to customers principally in the U.S., Canada and the U.K.; (2) DTS, which provides vehicles and drivers as part of a dedicated transportation solution in the U.S.; and (3) SCS, which provides comprehensive supply chain solutions including distribution and transportation services in North America and Asia. Dedicated transportation services provided as part of an integrated, multi-service, supply chain solution to SCS customers are reported in the SCS business segment.

Our primary measurement of segment financial performance, defined as "Earnings Before Tax" (EBT) from continuing operations, includes an allocation of Central Support Services (CSS) and excludes non-operating pension costs, restructuring and other charges (recoveries), net discussed in Note 4, "Restructuring and Other Charges" and items discussed in Note 24, "Other Items Impacting Comparability." CSS represents those costs incurred to support all business segments, including human resources, finance, corporate services, public affairs, information technology, health and safety, legal, marketing and corporate communications. The objective of the EBT measurement is to provide clarity on the profitability of each business segment and, ultimately, to hold leadership of each business segment and each operating segment within each business segment accountable for their allocated share of CSS costs. Certain costs are considered to be overhead not attributable to any segment and remain unallocated in CSS. Included among the unallocated overhead remaining within CSS are the costs for investor relations, public affairs and certain executive compensation. CSS costs attributable to the business segments are predominantly allocated to FMS, DTS and SCS as follows:

- *Finance, corporate services, and health and safety* — allocated based upon estimated and planned resource utilization;

- *Human resources* — individual costs within this category are allocated under various methods, including allocation based on estimated utilization and number of personnel supported;

- *Information technology* — principally allocated based upon utilization-related metrics such as number of users or minutes of CPU time. Customer-related project costs and expenses are allocated to the business segment responsible for the project; and

- *Other* — represents legal and other centralized costs and expenses including certain share-based incentive compensation costs. Expenses, where allocated, are based primarily on the number of personnel supported.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

Our FMS segment leases revenue earning equipment and provides fuel, maintenance and other ancillary services to the DTS and SCS segments. Inter-segment revenue and EBT are accounted for at rates similar to those executed with third parties. EBT related to inter-segment equipment and services billed to customers (equipment contribution) are included in both FMS and the business segment which served the customer and then eliminated (presented as "Eliminations").

Segment results are not necessarily indicative of the results of operations that would have occurred had each segment been an independent, stand-alone entity during the periods presented. Each business segment follows the same accounting policies as described in Note 1, "Summary of Significant Accounting Policies." Business segment revenue and EBT from continuing operations is as follows:

|  | Years ended December 31, | | |
|---|---|---|---|
|  | **2016** | 2015 | 2014 |
|  | (In thousands) | | |
| Revenue: | | | |
| Fleet Management Solutions: | | | |
| Full service lease | $ **2,362,040** | 2,220,929 | 2,102,703 |
| Commercial rental | **808,912** | 900,624 | 836,719 |
| Full service lease and commercial rental | **3,170,952** | 3,121,553 | 2,939,422 |
| Contract maintenance | **197,688** | 190,989 | 182,411 |
| Contract-related maintenance | **217,819** | 200,148 | 196,841 |
| Other | **78,042** | 77,625 | 71,064 |
| Fuel services revenue | **463,738** | 538,277 | 787,887 |
| Total Fleet Management Solutions from external customers | **4,128,239** | 4,128,592 | 4,177,625 |
| Inter-segment revenue | **427,955** | 417,100 | 478,133 |
| Fleet Management Solutions | **4,556,194** | 4,545,692 | 4,655,758 |
| Dedicated Transportation Solutions | **1,020,895** | 895,538 | 899,802 |
| Supply Chain Solutions | **1,637,850** | 1,547,763 | 1,561,347 |
| Eliminations | **(427,955)** | (417,100) | (478,133) |
| Total revenue | $ **6,786,984** | 6,571,893 | 6,638,774 |
| | | | |
| EBT: | | | |
| Fleet Management Solutions | $ **370,754** | 462,109 | 433,736 |
| Dedicated Transportation Solutions | **63,611** | 45,800 | 44,556 |
| Supply Chain Solutions | **105,561** | 93,754 | 77,800 |
| Eliminations | **(50,148)** | (47,193) | (41,361) |
| | $ **489,778** | 554,470 | 514,731 |
| Unallocated Central Support Services | **(40,945)** | (48,510) | (51,740) |
| Non-operating pension costs | **(29,728)** | (19,186) | (9,768) |
| Restructuring and other charges, net and other items [1] | **(12,724)** | (17,559) | (114,956) |
| Earnings before income taxes from continuing operations | $ **406,381** | 469,215 | 338,267 |

[1]   See Note 24, "Other Items Impacting Comparability," for a discussion of items excluded from our primary measure of segment performance.

116

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The following table sets forth share-based compensation expense, depreciation expense, used vehicle sales, net, amortization expense and other non-cash charges, net, interest expense (income), capital expenditures paid and total assets for the years ended December 31, 2016, 2015 and 2014, as provided to the chief operating decision-maker for each of Ryder's reportable business segments:

| | FMS | DTS | SCS | CSS | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (In thousands) | | | |
| **2016** | | | | | | |
| **Share-based compensation expense** | $ 5,464 | 1,254 | 2,764 | 9,182 | — | 18,664 |
| **Depreciation expense** [1] | $ 1,156,888 | 3,222 | 25,956 | 984 | — | 1,187,050 |
| **Used vehicle sales, net** | $ (724) | (90) | (158) | — | — | (972) |
| **Amortization expense and other non-cash charges, net** | $ 34,652 | 1,027 | 3,215 | 29,366 | — | 68,260 |
| **Interest expense (income)** [2] | $ 151,297 | (1,901) | (1,663) | 110 | — | 147,843 |
| **Capital expenditures paid** | $ 1,814,146 | 2,551 | 64,186 | 24,274 | — | 1,905,157 |
| **Total assets** | $ 9,954,452 | 255,845 | 713,190 | 198,394 | (219,427) | 10,902,454 |
| 2015 | | | | | | |
| Share-based compensation expense | $ 5,672 | 1,155 | 3,400 | 10,954 | — | 21,181 |
| Depreciation expense [1] | $ 1,092,750 | 3,184 | 25,721 | 311 | — | 1,121,966 |
| Used vehicle sales, net | $ (99,758) | (54) | (41) | — | — | (99,853) |
| Amortization expense and other non-cash charges, net | $ 36,348 | 1,878 | 2,971 | 29,565 | — | 70,762 |
| Interest expense (income) [2] | $ 154,276 | (1,597) | (2,174) | (71) | — | 150,434 |
| Capital expenditures paid | $ 2,595,961 | 3,570 | 27,841 | 40,606 | — | 2,667,978 |
| Total assets | $10,061,092 | 275,634 | 636,647 | 202,129 | (222,922) | 10,952,580 |
| 2014 | | | | | | |
| Share-based compensation expense | $ 4,895 | 720 | 3,661 | 11,629 | — | 20,905 |
| Depreciation expense [1] | $ 1,018,017 | 3,211 | 25,636 | 185 | — | 1,047,049 |
| Used vehicle sales, net | $ (115,646) | 5 | (419) | — | — | (116,060) |
| Pension lump sum settlement expense | $ 76,239 | 3,335 | 3,277 | 14,380 | — | 97,231 |
| Amortization expense and other non-cash charges, net | $ 19,936 | 516 | 1,309 | 25,502 | — | 47,263 |
| Interest expense (income) [2] | $ 147,247 | (1,520) | (807) | (181) | — | 144,739 |
| Capital expenditures paid [3] | $ 2,166,319 | 1,883 | 20,941 | 70,021 | — | 2,259,164 |
| Total assets | $ 8,998,788 | 211,388 | 673,876 | 193,484 | (239,760) | 9,837,776 |

_____

(1)  *Depreciation expense associated with CSS assets was allocated to business segments based upon estimated and planned asset utilization. Depreciation expense totaling $24 million, $22 million and $21 million during 2016, 2015 and 2014, respectively, associated with CSS assets was allocated to other business segments.*

(2)  *Interest expense was primarily allocated to the FMS segment since such borrowings were used principally to fund the purchase of revenue earning equipment used in FMS; however, interest income was also reflected in DTS and SCS based on targeted segment leverage ratios.*

(3)  *Excludes acquisition payments of $10 million in 2014. See Note 3, "Acquisitions," for additional information.*

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**Geographic Information**

|  | | Years ended December 31, | |
|---|---|---|---|
|  | **2016** | 2015 | 2014 |
|  | | (In thousands) | |
| Revenue: | | | |
| United States | $ **5,892,384** | 5,603,697 | 5,614,037 |
| Foreign: | | | |
| Canada | **387,713** | 408,325 | 435,280 |
| Europe | **339,420** | 391,339 | 400,853 |
| Mexico | **139,176** | 139,583 | 158,481 |
| Asia | **28,291** | 28,949 | 30,123 |
|  | **894,600** | 968,196 | 1,024,737 |
| Total | $ **6,786,984** | 6,571,893 | 6,638,774 |
| Long-lived assets: | | | |
| United States | $ **7,854,845** | 7,817,628 | 6,790,946 |
| Foreign: | | | |
| Canada | **532,403** | 504,027 | 530,316 |
| Europe | **472,027** | 545,630 | 553,467 |
| Mexico | **33,979** | 31,993 | 26,230 |
| Asia | **338** | 427 | 521 |
|  | **1,038,747** | 1,082,077 | 1,110,534 |
| Total | $ **8,893,592** | 8,899,705 | 7,901,480 |

*Certain Concentrations*

We have a diversified portfolio of customers across a full array of transportation and logistics solutions and across many industries. We believe this will help to mitigate the impact of adverse downturns in specific sectors of the economy. Our portfolio of full service lease and commercial rental customers is not concentrated in any one particular industry or geographic region. We derive a significant portion of our SCS revenue from the automotive industry, mostly from manufacturers and suppliers of original equipment parts. During 2016, 2015 and 2014, the automotive industry accounted for approximately 44%, 41% and 43%, respectively, of SCS total revenue.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

28.  QUARTERLY INFORMATION (UNAUDITED)

| | Revenue | Earnings from Continuing Operations Before Income Taxes | Earnings from Continuing Operations | Net Earnings | Earnings from Continuing Operations per Common Share | | Net Earnings per Common Share | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Basic | Diluted | Basic | Diluted |
| | | | (In thousands, except per share amounts) | | | | | |
| **2016** | | | | | | | | |
| First quarter | $ 1,629,672 | 88,708 | 56,185 | 55,794 | 1.06 | 1.05 | 1.05 | 1.04 |
| Second quarter | 1,703,744 | 116,779 | 74,042 | 73,750 | 1.39 | 1.38 | 1.39 | 1.38 |
| Third quarter | 1,724,418 | 131,698 | 85,138 | 84,752 | 1.60 | 1.59 | 1.60 | 1.59 |
| Fourth quarter | 1,729,150 | 69,196 | 49,275 | 48,181 | 0.93 | 0.92 | 0.91 | 0.91 |
| Full year | $ 6,786,984 | 406,381 | 264,640 | 262,477 | 4.98 | 4.94 | 4.94 | 4.90 |
| | | | | | | | | |
| **2015** | | | | | | | | |
| First quarter | $ 1,567,153 | 84,177 | 53,326 | 52,789 | 1.01 | 1.00 | 1.00 | 0.99 |
| Second quarter | 1,662,931 | 133,447 | 85,917 | 85,159 | 1.62 | 1.61 | 1.61 | 1.59 |
| Third quarter | 1,669,066 | 139,900 | 90,811 | 90,619 | 1.71 | 1.70 | 1.71 | 1.69 |
| Fourth quarter | 1,672,743 | 111,691 | 75,935 | 76,201 | 1.43 | 1.42 | 1.44 | 1.43 |
| Full year | $ 6,571,893 | 469,215 | 305,989 | 304,768 | 5.78 | 5.73 | 5.75 | $ 5.71 |

*Note: EPS amounts may not be additive due to rounding.*

Quarterly and year-to-date computations of per share amounts are made independently; therefore, the sum of per-share amounts for the quarters may not equal per-share amounts for the year.

See Note 4, "Restructuring and Other Charges," and Note 24, "Other Items Impacting Comparability," for items included in earnings during 2016 and 2015.

**RYDER SYSTEM, INC. AND SUBSIDIARIES**
**SCHEDULE II - VALUATION AND QUALIFYING ACCOUNTS**

| Description | | Balance at Beginning of Period | Additions | | Deductions [2] | Balance at End of Period |
|---|---|---|---|---|---|---|
| | | | Charged to Earnings | Transferred from Other Accounts [1] | | |
| | | | | (In thousands) | | |
| **2016** | | | | | | |
| Accounts receivable allowance | $ | **15,560** | **13,118** | **—** | **13,763** | **14,915** |
| Direct finance lease allowance | $ | **243** | **396** | **—** | **391** | **248** |
| Self-insurance accruals [3] | $ | **311,821** | **337,554** | **71,703** | **384,177** | **336,901** |
| Valuation allowance on deferred tax assets | $ | **14,991** | **98** | **—** | **(1,298)** | **16,387** |
| **2015** | | | | | | |
| Accounts receivable allowance | $ | 16,388 | 11,172 | — | 12,000 | 15,560 |
| Direct finance lease allowance | $ | 288 | 1,495 | — | 1,540 | 243 |
| Self-insurance accruals [3] | $ | 300,994 | 308,026 | 68,999 | 366,198 | 311,821 |
| Valuation allowance on deferred tax assets | $ | 24,742 | (1,150) | — | 8,601 | 14,991 |
| **2014** | | | | | | |
| Accounts receivable allowance | $ | 16,955 | 7,086 | — | 7,653 | 16,388 |
| Direct finance lease allowance | $ | 501 | 47 | — | 260 | 288 |
| Self-insurance accruals [3] | $ | 290,255 | 273,509 | 62,548 | 325,318 | 300,994 |
| Valuation allowance on deferred tax assets | $ | 33,793 | (976) | — | 8,075 | 24,742 |

(1)   *Transferred from other accounts includes employee contributions made to the medical and dental self-insurance plans.*
(2)   *Deductions represent write-offs, lease termination payments, insurance claim payments during the period and net foreign currency translation adjustments.*
(3)   *Self-insurance accruals include vehicle liability, workers' compensation, property damage, cargo and medical and dental, which comprise our self-insurance programs. Amounts charged to earnings include developments in prior year selected loss development factors which charged earnings by $9 million and $4 million in 2016 and 2015, respectively, and benefited earnings by $14 million in 2014.*

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that at December 31, 2016, Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.

### Management's Report on Internal Control over Financial Reporting

Management's Report on Internal Control over Financial Reporting and the Report of Independent Registered Certified Public Accounting Firm thereon are set out in Item 8 of Part II of this Form 10-K Annual Report.

### Changes in Internal Controls over Financial Reporting

During the three months ended December 31, 2016, there were no changes in Ryder's internal control over financial reporting that has materially affected or is reasonably likely to materially affect such internal control over financial reporting.

## ITEM 9B. OTHER INFORMATION

None.

## PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information required by Item 10 with respect to executive officers is included within Item 1 in Part I under the caption "Executive Officers of the Registrant" of this Form 10-K Annual Report.

The information required by Item 10 with respect to directors, audit committee, audit committee financial experts and Section 16(a) beneficial ownership reporting compliance is included under the captions "Election of Directors," "Audit Committee" and "Section 16(a) Beneficial Ownership Reporting Compliance" in our definitive proxy statement, which will be filed with the Commission within 120 days after the close of the fiscal year, and is incorporated herein by reference.

Ryder has adopted a code of conduct applicable to all employees, including its Chief Executive Officer, Chief Financial Officer, Controller and Senior Financial Management. We will provide a copy of our code of conduct to anyone, free of charge, upon request through our Investor Relations Page, on our website at *www.ryder.com*.

## ITEM 11. EXECUTIVE COMPENSATION

The information required by Item 11 is included under the captions "Compensation Discussion and Analysis," "Executive Compensation," "Compensation Committee," "Compensation Committee Report on Executive Compensation" and "Director Compensation" in our definitive proxy statement, which will be filed with the Commission within 120 days after the close of the fiscal year, and is incorporated herein by reference.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by Item 12 with respect to security ownership of certain beneficial owners and management is included under the captions "Security Ownership of Officers and Directors" and "Security Ownership of Certain Beneficial Owners" in our definitive proxy statement, which will be filed with the Commission within 120 days after the close of the fiscal year, and is incorporated herein by reference.

### Securities Authorized for Issuance under Equity Compensation Plans

The following table includes information as of December 31, 2016, about certain plans which provide for the issuance of common stock in connection with the exercise of stock options and other share-based awards.

| Plans | Number of Securities to be issued upon Exercise of Outstanding Options, Warrants and Rights | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans Excluding Securities Reflected in Column (a) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders: | | | |
| Broad based employee stock plans | 2,018,334 [1] | $66.35 [3] | 3,535,433 |
| Employee stock purchase plan | — | — | 943,086 |
| Non-employee directors' stock plans | 182,328 [2] | — | 39,098 |
| Total | 2,200,662 | $66.35 | 4,517,617 |

[1]   Includes 1,529,365 stock options, 299,740 time-vested restricted stock awards, 66,420 market-based restricted stock awards and 122,809 performance-based restricted stock awards, which includes 50,662 performance-based restricted stock rights not considered granted under accounting guidance for stock compensation. Refer to Note 21, "Share-Based Compensation Plans", for additional information.

[2]   Includes 176,683 time-vested restricted stock awards, as well as, 5,645 time-vested restricted stock awards vested in previous years and are not exercisable until six months after the director's retirement.

[3]   Weighted-average exercise price of outstanding options excludes restricted stock awards and restricted stock units.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by Item 13 is included under the captions "Board of Directors" and "Related Person Transactions" in our definitive proxy statement, which will be filed with the Commission within 120 days after the close of the fiscal year, and is incorporated herein by reference.

## ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required by Item 14 is included under the caption "Ratification of Independent Auditor" in our definitive proxy statement, which will be filed with the Commission within 120 days after the close of the fiscal year, and is incorporated herein by reference.

**PART IV**

**ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

(a)  Items A through H and Schedule II are presented on the following pages of this Form 10-K Annual Report:

|  | Page No. |
|---|---|
| 1. Financial Statements for Ryder System, Inc. and Consolidated Subsidiaries: |  |
| A) Management's Report on Internal Control over Financial Reporting | 67 |
| B) Report of Independent Registered Certified Public Accounting Firm | 68 |
| C) Consolidated Statements of Earnings | 69 |
| D) Consolidated Statements of Comprehensive Income (Loss) | 70 |
| E) Consolidated Balance Sheets | 71 |
| F) Consolidated Statements of Cash Flows | 72 |
| G) Consolidated Statements of Shareholders' Equity | 73 |
| H) Notes to Consolidated Financial Statements | 74 |

| 2. Consolidated Financial Statement Schedule for the Years Ended December 31, 2016, 2015 and 2014 |  |
|---|---|
| Schedule II — Valuation and Qualifying Accounts | 120 |

All other schedules are omitted because they are not applicable or the required information is shown in the consolidated financial statements or notes thereto.

Supplementary Financial Information consisting of selected quarterly financial data is included in Item 8 of this report.

3. Exhibits:

The following exhibits are filed with this report or, where indicated, incorporated by reference (Forms 10-K, 10-Q and 8-K referenced herein have been filed under the Commission's file No. 1-4364). Ryder will provide a copy of the exhibits filed with this report at a nominal charge to those parties requesting them.

123

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| 3.1 | The Ryder System, Inc. Restated Articles of Incorporation dated May 1, 2015 (conformed copy incorporating all amendments through May 1, 2015), previously filed with the Commission on May 1, 2015 as an exhibit to Ryder's Current Report on Form 8-K, is incorporated by reference in this report. |
| 3.2 | The Ryder System, Inc. By-Laws, as amended through February 22, 2016, previously filed with the Commission as an exhibit to Ryder's Quarterly Report on Form 10-Q filed with the Commission on October 25, 2016, are incorporated by reference into this report. |
| 4.1 | Ryder hereby agrees, pursuant to paragraph (b)(4)(iii) of Item 601 of Regulation S-K, to furnish the Commission with a copy of any instrument defining the rights of holders of long-term debt of Ryder, where such instrument has not been filed as an exhibit hereto and the total amount of securities authorized there under does not exceed 10% of the total assets of Ryder and its subsidiaries on a consolidated basis. |
| 4.2(a) | The Form of Indenture between Ryder System, Inc. and The Chase Manhattan Bank (National Association) dated as of June 1, 1984, filed with the Commission on November 19, 1985 as an exhibit to Ryder's Registration Statement on Form S-3 (No. 33-1632), is incorporated by reference into this report. |
| 4.2(b) | The First Supplemental Indenture between Ryder System, Inc. and The Chase Manhattan Bank (National Association) dated October 1, 1987, previously filed with the Commission as an exhibit to Ryder's Annual Report on Form 10-K for the year ended December 31, 1994, is incorporated by reference into this report. |
| 4.3 | The Form of Indenture between Ryder System, Inc. and The Chase Manhattan Bank (National Association) dated as of May 1, 1987, and supplemented as of November 15, 1990 and June 24, 1992, filed with the Commission on July 30, 1992 as an exhibit to Ryder's Registration Statement on Form S-3 (No. 33-50232), is incorporated by reference into this report. |
| 4.4 | The Form of Indenture between Ryder System, Inc. and J.P. Morgan Trust Company (National Association) dated as of October 3, 2003 filed with the Commission on August 29, 2003 as an exhibit to Ryder's Registration Statement on Form S-3 (No. 333-108391), is incorporated by reference into this report. |
| 10.1(a) | The Form of Amended and Restated Severance Agreement for Chief Executive Officer filed with the Commission as an exhibit to this Annual Report on Form 10-K. |
| 10.1(b) | The Form of Amended and Restated Severance Agreement for other named executive officers filed with the Commission as an exhibit to this Annual Report on Form 10-K. |
| 10.1(c) | The Ryder System, Inc. Executive Severance Plan, effective as of January 1, 2013, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on February 14, 2013, is incorporated by reference into this report. |
| 10.1(d) | Agreement, dated April 14, 2016, between Ryder System, Inc. and Gregory F. Greene, previously filed with the Commission on April 26, 2016 as an exhibit to Ryder's Quarterly Report on Form 10-Q, is incorporated by reference into this report. |
| 10.4(a) | The Ryder System, Inc. 2005 Equity Compensation Plan, previously filed with the Commission on March 30, 2005 as Appendix A to Ryder's Definitive Proxy Statement on Schedule 14A, is incorporated by reference into this report. |
| 10.4(b) | The Ryder System, Inc. 2005 Equity Compensation Plan, previously filed with the Commission on March 21, 2008, as Appendix A to Ryder's Definitive Proxy Statement on Schedule 14A, is incorporated by reference into this report. |
| 10.4(c) | The Ryder System, Inc. Stock Purchase Plan for Employees, previously filed with the Commission on March 29, 2010, as Appendix B to Ryder System, Inc.'s Definitive Proxy Statement on Schedule 14A, is incorporated by reference into this report. |
| 10.4(d) | Terms and Conditions applicable to restricted stock rights granted under the Ryder System, Inc. 2005 Equity Compensation Plan, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on February 8, 2008, are incorporated by reference into this report. |
| 10.4(e) | Terms and Conditions applicable to restricted stock units granted under the Ryder System, Inc. 2005 Equity Compensation Plan, previously filed with the Commission as an exhibit to Ryder's Quarterly Report on Form 8-K filed with the Commission on May 11, 2005, are incorporated by reference into this report. |
| 10.4(f) | Terms and Conditions applicable to the 2012 Non-Qualified Stock Options granted under the Ryder System, Inc. 2005 Equity Compensation Plan, previously filed with the Commission as an exhibit to Ryder's report on Form 10-Q for the quarter ended March 31, 2012, are incorporated by reference into this report. |
| 10.4(g) | Terms and Conditions applicable to the 2012 Non-Qualified Stock Options granted to the Company's Chief Executive Officer under the Ryder System, Inc. 2005 Equity Compensation Plan, previously filed with the Commission as an exhibit to Ryder's report on Form 10-Q for the quarter ended March 31, 2012, are incorporated by reference into this report. |

| Exhibit Number | Description |
|---|---|
| 10.4(h) | Terms and Conditions applicable to the 2012 Performance-Based Restricted Stock Rights granted under the Ryder System, Inc. 2005 Equity Compensation Plan, previously filed with the Commission as an exhibit to Ryder's report on Form 10-Q for the quarter ended March 31, 2012, are incorporated by reference into this report. |
| 10.4(i) | Terms and Conditions applicable to the 2012 Performance-Based Restricted Stock Rights granted to the Company's Chief Executive Officer under the Ryder System, Inc. 2005 Equity Compensation Plan, previously filed with the Commission as an exhibit to Ryder's report on Form 10-Q for the quarter ended March 31, 2012, are incorporated by reference into this report. |
| 10.4(j) | Terms and Conditions applicable to the 2012 Performance-Based Cash Awards granted under the Ryder System, Inc. 2005 Equity Compensation Plan, previously filed with the Commission as an exhibit to Ryder's report on Form 10-Q for the quarter ended March 31, 2012, are incorporated by reference into this report. |
| 10.4(k) | Terms and Conditions applicable to the 2012 Performance-Based Cash Awards granted to the Company's Chief Executive Officer under the Ryder System, Inc. 2005 Equity Compensation Plan, previously filed with the Commission as an exhibit to Ryder's report on Form 10-Q for the quarter ended March 31, 2012, are incorporated by reference into this report. |
| 10.4(l) | Terms and Conditions applicable to the 2012 Restricted Stock Rights granted under the Ryder System, Inc. 2005 Equity Compensation Plan, previously filed with the Commission as an exhibit to Ryder's report on Form 10-Q for the quarter ended March 31, 2012, are incorporated by reference into this report. |
| 10.4(m) | Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on May 10, 2012, is incorporated by reference into this report. |
| 10.4(n) | Terms and Conditions applicable to non-qualified stock options granted under the Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on May 10, 2012, are incorporated by reference into this report. |
| 10.4(o) | Terms and Conditions applicable to performance-based restricted stock rights granted under the Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on May 10, 2012, are incorporated by reference into this report. |
| 10.4(p) | Terms and Conditions applicable to performance-based cash awards granted under the Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on May 10, 2012, are incorporated by reference into this report. |
| 10.4(q) | Terms and Conditions applicable to restricted stock rights granted under the Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on May 10, 2012, are incorporated by reference into this report. |
| 10.4(r) | Terms and Conditions applicable to restricted stock units granted under the Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on May 10, 2012, are incorporated by reference into this report. |
| 10.4(s) | Terms and Conditions applicable to 2013 performance-based cash awards granted to named executive officers under the Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on February 14, 2013, are incorporated by reference into this report. |
| 10.4(t) | Terms and Conditions applicable to 2013 performance-based restricted stock rights granted to named executive officers under the Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on February 14, 2013, are incorporated by reference into this report. |
| 10.4(u) | Form of Terms and Conditions applicable to 2014 annual cash incentive awards granted to named executive officers under the Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on February 13, 2014, are incorporated by reference into this report. |
| 10.4(v) | Amended and Restated Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission on May 10, 2016 as an exhibit to Ryder's Quarterly Report on Form 8-K, is incorporated by reference to this report. |
| 10.4(w) | Form of Terms and Conditions applicable to 2016 annual cash incentive awards granted under the Amended and Restated Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission on July 27, 2016 as an exhibit to Ryder's Quarterly Report on Form 10-Q, are incorporated by reference to this report. |
| 10.4(x) | Form of Terms and Conditions applicable to non-qualified stock options granted under the Amended and Restated Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission on July 27, 2016 as an exhibit to Ryder's Quarterly Report on Form 10-Q, are incorporated by reference to this report. |

| Exhibit Number | Description |
|---|---|
| 10.4(y) | Form of Terms and Conditions applicable to performance-based restricted stock rights granted under the Amended and Restated Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission on July 27, 2016 as an exhibit to Ryder's Quarterly Report on Form 10-Q, are incorporated by reference to this report. |
| 10.4(z) | Form of Terms and Conditions applicable to performance-based cash awards granted under the Amended and Restated Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission on July 27, 2016 as an exhibit to Ryder's Quarterly Report on Form 10-Q, are incorporated by reference to this report. |
| 10.4(aa) | Form of Terms and Conditions applicable to restricted stock rights granted under the Amended and Restated Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission on July 27, 2016 as an exhibit to Ryder's Quarterly Report on Form 10-Q, are incorporated by reference to this report. |
| 10.4(bb) | Form of Terms and Conditions applicable to restricted stock units granted under the Amended and Restated Ryder System, Inc. 2012 Equity and Incentive Compensation Plan, previously filed with the Commission on July 27, 2016 as an exhibit to Ryder's Quarterly Report on Form 10-Q, are incorporated by reference to this report. |
| 10.5(a) | The Ryder System, Inc. Directors Stock Award Plan, as amended and restated at February 10, 2005, previously filed with the Commission as an exhibit to Ryder's Annual Report on Form 10-K for the year ended December 31, 2004, is incorporated by reference into this report. |
| 10.5(b) | The Ryder System, Inc. Directors Stock Plan, as amended and restated at May 7, 2004, previously filed with the Commission as an exhibit to Ryder's Annual Report on Form 10-K for the year ended December 31, 2004, is incorporated by reference into this report. |
| 10.6 | The Ryder System Benefit Restoration Plan, as amended and restated, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on February 11, 2009, is incorporated by reference into this report. |
| 10.7 | Form of Indemnification Agreement for independent directors, effective as of February 24, 2016, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on February 29, 2016, is incorporated by reference into this report. |
| 10.10 | The Ryder System, Inc. Deferred Compensation Plan, effective as of January 1, 2009, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on February 11, 2009, is incorporated by reference to this report. |
| 10.14(a) | Global Revolving Credit Agreement dated as of June 8, 2011, by and among, Ryder System, Inc., certain subsidiaries of Ryder System, Inc., and the lenders and agents named therein, previously filed with the Commission as an exhibit to Ryder's Current Report on Form 8-K filed with the Commission on June 8, 2011, is incorporated by reference into this report. |
| 10.14(b) | Amendment No. 1 dated as of April 20, 2012 to Global Revolving Credit Agreement, by and among Ryder System, Inc., certain Ryder System, Inc. subsidiaries, and the lenders and agents named therein, previously filed with the Commission as an exhibit to Ryder's report on Form 10-Q for the quarter ended March 31, 2012, is incorporated by reference into this report. |
| 10.14(c) | Amendment No. 2 dated as of October 18, 2013 to Global Revolving Credit Agreement, by and among Ryder System, Inc., certain subsidiaries of Ryder System, Inc., and the lenders and agents named therein, previously filed with the Commission as an exhibit to Ryder's report on Form 10-Q for the quarter ended September 30, 2013, is incorporated by reference into this report. |
| 10.14(d) | Amendment No. 3 dated as of January 30, 2015 to Global Revolving Credit Agreement, by and among Ryder System, Inc., certain subsidiaries of Ryder System, Inc., and the lenders and agents named therein, previously filed with the Commission as an exhibit to Ryder's report on Form 8-K filed with the Commission on February 2, 2015, is incorporated by reference into this report. |
| 12 | Statements re: Computation of Ratios. |
| 21.1 | List of subsidiaries of the registrant, with the state or other jurisdiction of incorporation or organization of each, and the name under which each subsidiary does business. |
| 23.1 | PricewaterhouseCoopers LLP consent to incorporation by reference in certain Registration Statements on Form S-8 and on Form S-3 of their report on Consolidated Financial Statements financial statement schedule and effectiveness of internal controls over financial reporting of Ryder System, Inc. |

| | | |
|---|---|---|
| 24.1 | Manually executed powers of attorney for each of: | |

| | |
|---|---|
| Robert J. Eck | L. Patrick Hassey |
| Michael F. Hilton | Tamara L. Lundgren |
| Luis P. Nieto, Jr. | Robert A. Hagemann |
| Abbie J. Smith | E. Follin Smith |
| John M. Berra | Hansel E. Tookes, II |

| | |
|---|---|
| 31.1 | Certification of Robert E. Sanchez pursuant to Rule 13a-14(a) or Rule 15d-14(a). |
| 31.2 | Certification of Art A. Garcia pursuant to Rule 13a-14(a) or Rule 15d-14(a). |
| 32 | Certification of Robert E. Sanchez and Art A. Garcia pursuant to Rule 13a-14(b) or Rule 15d-14(b) and 18 U.S.C. Section 1350. |
| 101.INS | XBRL Instance Document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |

(b)   Executive Compensation Plans and Arrangements:

Please refer to the description of Exhibits 10.1 through 10.10 set forth under Item 15(a)3 of this report for a listing of all management contracts and compensation plans and arrangements filed with this report pursuant to Item 601(b)(10) of Regulation S-K.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date:    February 14, 2017

RYDER SYSTEM, INC.

By: /s/ Robert E. Sanchez

Robert E. Sanchez

Chairman, President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

Date:    February 14, 2017

By: /s/ ROBERT E. SANCHEZ

Robert E. Sanchez

Chairman, President and Chief Executive Officer

(Principal Executive Officer)

Date:    February 14, 2017

By: /s/ ART A. GARCIA

Art A. Garcia

Executive Vice President and Chief Financial Officer

(Principal Financial & Accounting Officer)

Date:    February 14, 2017

By: JOHN M. BERRA *

John M. Berra

Director

Date:    February 14, 2017

By: ROBERT J. ECK *

Robert J. Eck

Director

Date:    February 14, 2017

By: ROBERT A. HAGEMANN *

Robert A. Hagemann

Director

Date:    February 14, 2017

By: L. PATRICK HASSEY*

L. Patrick Hassey

Director

Date:    February 14, 2017

By: MICHAEL F. HILTON*

Michael F. Hilton

Director

Date:   February 14, 2017

By: TAMARA L. LUNDGREN*

Tamara L. Lundgren

Director

Date:   February 14, 2017

By: LUIS P. NIETO, JR. *

Luis P. Nieto, Jr.

Director

Date:   February 14, 2017

By: ABBIE J. SMITH *

Abbie J. Smith

Director

Date:   February 14, 2017

By: E. FOLLIN SMITH *

E. Follin Smith

Director

Date:   February 14, 2017

By: HANSEL E. TOOKES, II *

Hansel E. Tookes, II

Director

Date:   February 14, 2017

*By: ALENA BRENNER

Alena Brenner

Attorney-in-Fact

129

[This page intentionally left blank]

**EXHIBIT 10.1 (a)**

**AMENDED AND RESTATED**

**SEVERANCE AGREEMENT**

This AMENDED AND RESTATED SEVERANCE AGREEMENT (the "Agreement") is executed on _____, 201_ ("Execution Date") and is effective as of the date set forth in Section 17 (the "Effective Date"), between Ryder System, Inc., a Florida corporation (the "Company"), and _____(the "Executive").

WHEREAS, the Company and the Executive entered into a Severance Agreement dated _____, which was amended and restated effective **[DATE],** (the "Prior Agreement");

WHEREAS, the Company and the Executive hereby desire to amend and restate the Prior Agreement, in each case on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises contained herein and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      DEFINITIONS.

Capitalized terms used in the Agreement and not elsewhere defined shall have the meanings set forth in this Section:

(a)      "Accrued Benefits" means (i) earned but unpaid base salary accrued through the Termination Date and any accrued but unpaid vacation time to the extent carried to the Termination Date under Company policy; (ii) unreimbursed expenses incurred in accordance with applicable Company policy through the Termination Date; (iii) unpaid amounts under the terms of any incentive plan in which the Executive participates as of the Termination Date, if and to the extent that the Executive is entitled under the terms of any such plan to receive a payment as of the Termination Date; and (iv) all other payments, benefits or perquisites to which the Executive may be entitled through the Termination Date, (including but not limited to rights to indemnification under the Company's By-laws as in effect from time to time) subject to and in accordance with the terms of any applicable compensation arrangement or benefit, or any equity or perquisite arrangement, plan, program or grant.

(b)      "Base Salary" means the Executive's annual base salary in effect on the Termination Date, or, on or before the second anniversary of a Change of Control, and if higher, the highest annual base salary in effect during the six (6) month period immediately preceding the Change of Control. Base Salary for this purpose shall not include or reflect bonuses, overtime pay, compensatory time-off, commissions, incentive or deferred compensation, employer contributions towards employee benefits, cost of living adjustment, or any other additional compensation, and shall not be reduced by any contributions made on the Executive's behalf to any plan of the Company under Section 125, 132, 401(k), or any other analogous section of the Code.

(c)      "Benefits Continuation Period" means the period for each applicable benefit beginning on the Termination Date and ending on the earliest of (i) the day on which the Executive is eligible to receive coverage for such benefit from a new employer; (ii) the date the Executive cancels his COBRA continuation coverage in accordance with the terms of the relevant plan(s); or (iii) the last day of the Executive's Severance Period.

(d)      "Cause" means: (i) fraud, misappropriation or embezzlement by the Executive against the Company or any of its subsidiaries and/or affiliates; (ii) conviction of or plea of guilty or nolo contendere to a felony; (iii) conviction of or plea of guilty or nolo contendere to a misdemeanor involving moral turpitude or dishonesty; (iv) willful failure to report to work for more than thirty (30) continuous days not attributable to eligible vacation or supported by a licensed physician's statement; (v) material breach by the Executive of the provisions of Section 10 of this Agreement (Restrictive Covenants); (vi) willful failure to perform the Executive's key duties or

responsibilities; or (vii) any other activity which would constitute grounds for termination for cause by the Company or its subsidiaries or affiliates, including but not limited to material violations of the Company's Principles of Business Conduct or any analogous code of ethics or similar policy. Notwithstanding the foregoing, if a Change of Control has occurred within the two (2) years preceding a Cause determination, "Cause" shall not include subsection (vii) of the preceding sentence, provided that subsection (vii) shall continue to apply to any terminations that are deemed to have retroactively occurred pursuant to Section 5(c)(iii). For the purposes of this Section 1(d), any good faith interpretation by the Company's Board of Directors (the "Board") of the foregoing definition of "Cause" shall be conclusive on the Executive. For purposes of this Agreement "Cause" shall be determined by the Board or its designee, provided that following a Change of Control, "Cause" shall be determined by a majority of the Incumbent Board (as defined in Section 1(e)), or, if there are fewer than three (3) members in the Incumbent Board (excluding the Executive) at the date of such a determination, by the remaining Incumbent Board members, if any, and two-thirds of the members of the Board. Any good faith interpretation that satisfies the foregoing sentence shall be conclusive on the Executive. The Executive shall not have the right to vote or be counted for purposes of the determination of Cause.

(e) "Change of Control" Except as provided below, for the purpose of this Agreement, a "Change of Control" shall be deemed to have occurred if:

(i) ANY INDIVIDUAL, ENTITY OR GROUP (WITHIN THE MEANING OF SECTION 13(D)(3) OR 14(D)(2) OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "1934 ACT")) (A "PERSON") BECOMES THE BENEFICIAL OWNER, DIRECTLY OR INDIRECTLY, OF THIRTY PERCENT (30%) OR MORE OF THE COMBINED VOTING POWER OF THE COMPANY'S OUTSTANDING VOTING SECURITIES ORDINARILY HAVING THE RIGHT TO VOTE FOR THE ELECTION OF DIRECTORS OF THE COMPANY; PROVIDED, HOWEVER, THAT FOR PURPOSES OF THIS SUBPARAGRAPH (I), THE FOLLOWING ACQUISITIONS SHALL NOT CONSTITUTE A CHANGE OF CONTROL: (A) ANY ACQUISITION BY ANY EMPLOYEE BENEFIT PLAN OR PLANS (OR RELATED TRUST) OF THE COMPANY AND ITS SUBSIDIARIES AND AFFILIATES OR (B) ANY ACQUISITION BY ANY CORPORATION PURSUANT TO A TRANSACTION WHICH COMPLIES WITH CLAUSES (A), (B) AND (C) OF SUBPARAGRAPH (III) OF THIS SECTION 1(E); OR

(ii) THE INDIVIDUALS WHO, AS OF JANUARY 1, 2007, CONSTITUTED THE BOARD (THE "INCUMBENT BOARD") CEASE FOR ANY REASON TO CONSTITUTE AT LEAST A MAJORITY OF THE BOARD, PROVIDED THAT ANY PERSON BECOMING A DIRECTOR SUBSEQUENT TO JANUARY 1, 2007 WHOSE ELECTION, OR NOMINATION FOR ELECTION, WAS APPROVED BY A VOTE OF THE PERSONS COMPRISING AT LEAST A MAJORITY OF THE INCUMBENT BOARD (OTHER THAN AN ELECTION OR NOMINATION OF AN INDIVIDUAL WHOSE INITIAL ASSUMPTION OF OFFICE IS IN CONNECTION WITH AN ACTUAL OR THREATENED ELECTION CONTEST, AS SUCH TERMS ARE USED IN RULE 14A-11 OF REGULATION 14A PROMULGATED UNDER THE 1934 ACT (AS IN EFFECT ON JANUARY 23, 2000)) SHALL BE, FOR PURPOSES OF THIS AGREEMENT, CONSIDERED AS THOUGH SUCH PERSON WERE A MEMBER OF THE INCUMBENT BOARD; OR

(iii) THERE IS A REORGANIZATION, MERGER OR CONSOLIDATION OF THE COMPANY (A "BUSINESS COMBINATION"), IN EACH CASE, UNLESS, FOLLOWING SUCH BUSINESS COMBINATION, (A) ALL OR SUBSTANTIALLY ALL OF THE INDIVIDUALS AND ENTITIES WHO WERE THE BENEFICIAL OWNERS, RESPECTIVELY, OF THE COMPANY'S OUTSTANDING COMMON STOCK AND OUTSTANDING VOTING SECURITIES ORDINARILY HAVING THE RIGHT TO VOTE FOR THE ELECTION OF DIRECTORS OF THE COMPANY IMMEDIATELY PRIOR TO SUCH BUSINESS COMBINATION BENEFICIALLY OWN, DIRECTLY OR INDIRECTLY, MORE THAN FIFTY PERCENT (50%) OF, RESPECTIVELY, THE THEN OUTSTANDING SHARES OF COMMON STOCK AND THE COMBINED VOTING POWER OF THE THEN OUTSTANDING VOTING SECURITIES ORDINARILY HAVING THE RIGHT TO VOTE FOR THE ELECTION OF DIRECTORS, AS THE CASE MAY BE, OF THE CORPORATION RESULTING FROM SUCH BUSINESS COMBINATION (INCLUDING, WITHOUT LIMITATION, A CORPORATION WHICH AS A RESULT OF SUCH TRANSACTION OWNS THE COMPANY OR ALL OR SUBSTANTIALLY ALL OF THE COMPANY'S ASSETS EITHER DIRECTLY OR THROUGH ONE OR MORE

SUBSIDIARIES) IN SUBSTANTIALLY THE SAME PROPORTIONS AS THEIR OWNERSHIP, IMMEDIATELY PRIOR TO SUCH BUSINESS COMBINATION, OF THE COMPANY'S OUTSTANDING COMMON STOCK AND OUTSTANDING VOTING SECURITIES ORDINARILY HAVING THE RIGHT TO VOTE FOR THE ELECTION OF DIRECTORS OF THE COMPANY, AS THE CASE MAY BE, (B) NO PERSON (EXCLUDING ANY CORPORATION RESULTING FROM SUCH BUSINESS COMBINATION OR ANY EMPLOYEE BENEFIT PLAN OR PLANS (OR RELATED TRUST) OF THE COMPANY OR SUCH CORPORATION RESULTING FROM SUCH BUSINESS COMBINATION AND THEIR SUBSIDIARIES AND AFFILIATES) BENEFICIALLY OWNS, DIRECTLY OR INDIRECTLY, 30% OR MORE OF THE COMBINED VOTING POWER OF THE THEN OUTSTANDING VOTING SECURITIES OF THE CORPORATION RESULTING FROM SUCH BUSINESS COMBINATION AND (C) AT LEAST A MAJORITY OF THE MEMBERS OF THE BOARD OF DIRECTORS OF THE CORPORATION RESULTING FROM SUCH BUSINESS COMBINATION WERE MEMBERS OF THE INCUMBENT BOARD AT THE TIME OF THE EXECUTION OF THE INITIAL AGREEMENT, OR OF THE ACTION OF THE BOARD, PROVIDING FOR SUCH BUSINESS COMBINATION; OR

(iv)     THERE IS A LIQUIDATION OR DISSOLUTION OF THE COMPANY APPROVED BY THE SHAREHOLDERS; OR

(v)     THERE IS A SALE OF ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF THE COMPANY.

Notwithstanding anything in this Section 1(e) to the contrary, for purposes of Section 5(c)(ii), a Change of Control shall only be deemed to occur if such transactions or events would give rise to a "change in ownership or effective control" or a change in the "ownership of a substantial portion of the assets" under Section 409A of the Code, and the rulings and regulations issued under that Section.

(f)     "Code" means the Internal Revenue Code of 1986, as amended, supplemented or substituted from time to time.

(g)     "Company Entity" has the meaning set forth in Section 15(e).

(h)     "Disability" means (i) the Executive is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months; (ii) the Executive is, by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, receiving income replacement benefits for a period of not less than three (3) months under an accident and health plan of the Company; or (iii) a determination by the Social Security Administration that the Executive is totally disabled.

(i)     "Employment Term" means the Executive's term of employment commencing on the date the Executive was originally hired by the Company and ending on the first to occur of the events specified in Section 4.

(j)     "Equity Compensation Opportunities" means the Executive's ability to obtain equity in the Company (or a comparable cash-based incentive program) through a compensatory arrangement. Equity Compensation Opportunities are measured using the valuation method applied by the Company for financial accounting purposes and the Board may take into account in determining that no reduction has occurred any exercises, cashing out, or other liquidity in favor of the Executive that is either triggered by the Executive or occurring in connection with a Change of Control. Changes in the underlying value of the stock shall not be treated as a reduction in the Equity Compensation Opportunities, and the Company may take into account in replacing the value of pre-Change of Control equity compensation with post-Change of Control equity compensation (or a comparable cash-based incentive program) that the Executive may have received value for his equity compensation in the Change of Control.

(k)       "Good Reason" only applies within two (2) years following a Change of Control, as defined in Section 1(e), except as otherwise provided in Section 5(c)(iv), and means the occurrence of any of the following without the Executive's consent: (i) any material reduction in the aggregate value of the Executive's compensation (consisting of the Executive's base salary, target bonus opportunity under the Company's annual bonus plan or program, cash perquisites, and Equity Compensation Opportunities); (ii) the Company's requiring the Executive to be based or to perform services at any site or location more than fifty (50) miles from the site or location at which the Executive is based at the time of the Change of Control, except for travel reasonably required in the performance of his responsibilities (which does not materially exceed the level of travel required of the Executive in the six (6) month period immediately preceding the Change of Control); (iii) any failure by the Company to obtain the assumption and agreement to perform under this Agreement by a successor as contemplated by Section 8; (iv) any failure by the Company to pay into the Trust(s) the amounts and at the time or times as are required pursuant to the terms of Section 6; or (v) any material and adverse changes in the Executive's duties and responsibilities.  For the avoidance of doubt, a change in reporting relationship or title shall not constitute "Good Reason."

The Executive's termination of employment shall only constitute a termination for Good Reason if the Executive terminates employment on or prior to the first anniversary of the date on which the circumstances providing a basis for such termination initially occurred.  In addition, the Executive's continued employment shall not constitute consent to, or a waiver of rights with respect to, any circumstance constituting Good Reason, until ninety (90) days have elapsed since the occurrence of the circumstance he would assert constitutes Good Reason, and the Executive has not provided notice in accordance with Section 1(m) prior to the end of such ninety (90) day period.

(l)       "Involuntary Termination" means the termination of the Executive's employment by the Company for any reason other than death, Disability or Cause; provided, however, that an Involuntary Termination of his employment shall not occur if:

(i)       THE TERMINATION OF THE EXECUTIVE'S EMPLOYMENT IS DUE TO THE TRANSFER OF HIS EMPLOYMENT BETWEEN THE COMPANY AND A COMPANY ENTITY, OR AMONG THE COMPANY AND ONE OR MORE COMPANY ENTITIES; OR

(ii)       THE TERMINATION FOLLOWS A CHANGE OF CONTROL AND EITHER (A) THE EXECUTIVE'S EMPLOYMENT IS TRANSFERRED TO THE PURCHASER OR TRANSFEREE OF ALL OR ANY PORTION OF THE OPERATIONS OF THE COMPANY OR ANY SUBSIDIARY OR AFFILIATE (THE "DISPOSED BUSINESS") AND THE OBLIGATIONS OF THIS AGREEMENT ARE ASSUMED BY THE PURCHASER OR TRANSFEREE OR (B) THE EXECUTIVE TERMINATES HIS EMPLOYMENT WITH THE COMPANY OR ANY OF ITS SUBSIDIARIES OR AFFILIATES OR DOES NOT ACCEPT AN OFFER OF EMPLOYMENT FROM A PURCHASER OR TRANSFEREE NOTWITHSTANDING THAT THE EXECUTIVE RECEIVED AN OFFER OF EMPLOYMENT FROM EITHER THE PURCHASER OR TRANSFEREE OF THE DISPOSED BUSINESS OR THE COMPANY OR ANY OF ITS SUBSIDIARIES AND AFFILIATES WHICH OFFER INCLUDED A CONTINUATION OF THE OBLIGATIONS OF THIS AGREEMENT, AS DETERMINED BY THE COMPANY IN ITS SOLE DISCRETION.

In no event shall an "Involuntary Termination" occur if the Executive terminates his employment with the Company or any of its subsidiaries or affiliates for any reason. In the event of the occurrence of any of the events set forth in subsection (ii) above, the Company's obligations under this Agreement shall terminate immediately and the Executive shall not be entitled to any amounts or benefits hereunder but shall still be required to comply with Section 10 hereof. This Agreement shall, however, continue in effect if the Executive's employment is transferred between or among the Company and Company Entities, as contemplated in subsection (i) above.

(m)       "Notice of Termination" means written notice (i) specifying the effective date of the Executive's termination (which shall not be less than thirty (30) days after the date of such notice in the case of a termination on account of Disability or the Executive's voluntary termination other than for Good Reason); (ii) solely with respect to the Executive's terminating for Good Reason, citing the specific provision of this Agreement and the facts and circumstances, in reasonable detail, providing a basis for such termination, provided that if the basis for such Good

Reason is capable of being cured by the Company, the Executive will provide the Company with an opportunity to cure the Good Reason within thirty (30) calendar days after receipt of such notice, and (iii) solely with respect to the Company terminating the Executive's employment on account of Disability, its intent to terminate his employment on account of Disability. A Notice of Termination will, as applicable, be provided by or to the Board.

(n) "Release" means a severance agreement and general release in a comprehensive form used by the Company for such purposes at the time of the Executive's separation from employment (a copy of such form as in effect on the date this Agreement is executed is attached to this Agreement by way of example, but the Executive acknowledges that such form may be updated by the Company from time to time). If the Executive is subject to the Older Workers Benefit Protection Act ("OWBPA"), the Release shall be revocable until the end of the seventh (7th) calendar day after Executive executes the Release.

(o) "Release Effective Date" means, if the Executive is covered by the OWBPA on his Termination Date, the later of: (i) the eighth (8th) calendar day after the execution of the Release, provided that the Executive has not revoked the Release prior to such date, or (ii) the Termination Date. If the Executive is not covered by the OWBPA on his Termination Date, the Release Effective Date means the later of: (i) the date on which the Release is executed by the Executive, or (ii) the Termination Date.

(p) "Severance Multiple" means a multiple of two and one-half (2 1/2). On or after a Change of Control, the Severance Multiple shall mean three (3).

(q) "Severance Period" means a period of two and one-half (2 1/2) years following the Termination Date. On or after a Change of Control, the Severance Period shall mean a period of three (3) years following the Termination Date.

(r) "Specified Employee" means an individual deemed to be a "specified employee" in accordance with the policies and procedures adopted by the Company and generally includes any individual who is an officer of the Company.

(s) "Target Bonus" means the stated target incentive award which the Executive is eligible to receive under the Company's annual incentive compensation plan or awards for the year in which the Termination Date occurs.

(t) "Termination Date" means the effective date of the termination of the Executive's employment with the Company and all subsidiaries or affiliates.

(u) "Three-Year Average Bonus" means the average annual cash incentive award paid to the Executive under the Company's annual incentive compensation plan for the prior three (3) calendar years immediately preceding the Termination Date. If the Executive has been employed for less than three (3) full calendar years at the Termination Date, the Three-Year Average Bonus will be based on the average of the actual annual cash incentive award payout percentages over the prior three (3) calendar years for similarly situated executives multiplied by the Executive's Target Bonus.

(v) "Trustee" shall have the meaning ascribed to such term in Section 6 of this Agreement.

2.      POSITION/DUTIES.

(a) The Company agrees to continue to employ the Executive as its Chief Executive Officer or other equivalent title as approved by the Board, subject to the terms and conditions outlined in this Agreement. The Executive accepts the continuing employment. The Executive will have those responsibilities, duties, authorities and titles consistent with the Executive's status as an officer of the Company as assigned from time to time by the Board, shall be subject to all rules, policies and procedures of the Company, and shall serve in such other executive capacities, without additional compensation, as may be assigned by the Board from time to time.

(b)      During the Employment Term, the Executive shall devote substantially all of his full business time (other than vacation and sick leave), energy and skill in the performance of his duties with the Company. However, this Agreement does not prevent the Executive from (i) managing his and his family's personal passive investments, and (ii) participating in charitable, civic, educational, professional, community or industry affairs or serving on the board of directors of other companies (subject to the consent of the Board), so long as these activities do not materially interfere with the performance of his duties or create a potential actual or perceived conflict of interest or violate Section 10 of this Agreement.

3.      PRIOR ARRANGEMENTS.

The parties agree that, as of the Effective Date, all prior employment, separation, severance, termination, change of control, or similar agreements, arrangements, or plans whether oral or written covering the Executive are terminated and superseded and any notice periods with respect to such terminations are deemed satisfied or explicitly waived.

4.      TERMINATION.

The Executive's employment and the Employment Term shall terminate on the first of the following to occur:

(a)      DISABILITY. Upon thirty (30) days' written notice by the Company to the Executive of termination due to Disability.

(b)      DEATH. On the date of death of the Executive.

(c)      CAUSE. Immediately upon written notice by the Company to the Executive of a termination for Cause.

(d)      INVOLUNTARY TERMINATION WITHOUT CAUSE. Upon written notice by the Company to the Executive of an Involuntary Termination without Cause.

(e)      GOOD REASON ON OR AFTER A CHANGE OF CONTROL. On or after the occurrence of a Change of Control, upon written notice by the Executive to the Company of a termination for Good Reason, subject to Section 1(m) and as provided in Section 9.

(f)      VOLUNTARY TERMINATION. Upon notice by the Executive to the Company of the Executive's voluntary termination of employment, or on or after a Change of Control, upon notice by the Executive to the Company of the Executive's voluntary termination of employment without Good Reason (which the Company may, in its sole discretion, make effective earlier than the termination date proposed by the Executive), subject to Section 1(m) and as provided in Section 9.

5.      CONSEQUENCES OF TERMINATION.

(a)      DISABILITY. In the event the Employment Term ends on account of the Executive's Disability, the Company shall pay and provide the Executive any Accrued Benefits.

(b)      DEATH. In the event the Employment Term ends due to the Executive's death, the Company shall pay and provide Executive's estate (to the extent that beneficiaries have not been designated under applicable benefit or compensation plans) any Accrued Benefits.

(c)      INVOLUNTARY TERMINATION WITHOUT CAUSE NOT DUE TO A CHANGE OF CONTROL. In the event of the Executive's Involuntary Termination not due to a Change of Control, the Executive shall be entitled to receive the compensation listed below, subject to his compliance with the terms and conditions of Section 5(f) ("Additional Terms").

(i)      THE COMPANY SHALL PAY OR PROVIDE TO THE EXECUTIVE THE FOLLOWING PAYMENTS AND BENEFITS:

(A)      ANY ACCRUED BENEFITS PAYABLE AS SOON AS PRACTICAL AFTER THE TERMINATION DATE, OR SUCH OTHER DATE AS THEIR TERMS REQUIRE;

(B)      CONTINUED PAYMENT OF THE EXECUTIVE'S BASE SALARY FOR THE APPLICABLE SEVERANCE PERIOD PAYABLE IN INSTALLMENTS IN ACCORDANCE WITH THE COMPANY'S STANDARD PAYROLL PRACTICES, BUT NO LESS FREQUENTLY THAN MONTHLY, BEGINNING WITHIN SIXTY (60) DAYS FOLLOWING THE TERMINATION DATE (WITH THE FIRST PAYMENT TO INCLUDE AMOUNTS ACCRUED BETWEEN THE TERMINATION DATE AND THE FIRST PAYMENT DATE); PROVIDED THAT, IF THE SIXTIETH (60TH) DAY FOLLOWING THE TERMINATION DATE FALLS IN THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE TERMINATION DATE OCCURS, PAYMENTS WILL NOT COMMENCE PRIOR TO THE FIRST DAY OF THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE TERMINATION DATE OCCURS; PROVIDED FURTHER THAT, IN THE EVENT THE EXECUTIVE IS A SPECIFIED EMPLOYEE ON THE TERMINATION DATE, PAYMENT SHALL BE MADE IN ACCORDANCE WITH THE FOLLOWING PROVISIONS:

a.      IF THE AGGREGATE VALUE OF THE PAYMENTS DUE TO THE EXECUTIVE PURSUANT TO THIS SECTION 5(C)(I)(B) DURING THE SIX (6) MONTH PERIOD FOLLOWING HIS TERMINATION DATE DOES NOT EXCEED TWO (2) TIMES THE LESSER OF: (X) THE SPECIFIED EMPLOYEE'S BASE SALARY FOR THE YEAR PRIOR TO THE YEAR IN WHICH THE TERMINATION DATE OCCURS; OR (Y) THE MAXIMUM AMOUNT THAT MAY BE TAKEN INTO ACCOUNT UNDER A QUALIFIED RETIREMENT PLAN PURSUANT TO SECTION 401(A)(17) OF THE CODE FOR THE YEAR IN WHICH THE TERMINATION DATE OCCURS (SUCH AMOUNT, THE "SEPARATION PAY LIMIT"), THE EXECUTIVE SHALL RECEIVE CONTINUATION OF HIS BASE SALARY FOR THE SEVERANCE PERIOD PAYABLE IN INSTALLMENTS IN ACCORDANCE WITH THE COMPANY'S STANDARD PAYROLL PRACTICES, BUT NO LESS FREQUENTLY THAN MONTHLY, AS SET FORTH ABOVE.

b.      IF THE AGGREGATE VALUE OF THE PAYMENTS DUE TO THE EXECUTIVE PURSUANT TO THIS SECTION 5(C)(I)(B) DURING THE SIX (6) MONTH PERIOD FOLLOWING HIS TERMINATION DATE EXCEEDS THE SEPARATION PAY LIMIT, THE EXECUTIVE SHALL NOT RECEIVE ANY PAYMENTS OF CONTINUED BASE SALARY IN EXCESS OF THE SEPARATION PAY LIMIT DURING SUCH SIX (6) MONTH PERIOD.  ANY AMOUNTS IN EXCESS OF THE SEPARATION PAY LIMIT WHICH WOULD HAVE OTHERWISE BEEN PAID DURING THE SIX (6) MONTH PERIOD FOLLOWING THE EXECUTIVE'S TERMINATION DATE SHALL BE PAID IN A LUMP SUM ON THE FIRST DAY FOLLOWING THE SIX (6) MONTH ANNIVERSARY OF THE EXECUTIVE'S TERMINATION DATE. BEGINNING WITH THE FIRST PAYROLL CYCLE OCCURRING ON OR AFTER THE FIRST DAY FOLLOWING THE SIX (6) MONTH ANNIVERSARY OF THE EXECUTIVE'S TERMINATION DATE AND CONTINUING UNTIL THE END OF THE SEVERANCE PERIOD, THE EXECUTIVE SHALL RECEIVE CONTINUATION PAYMENTS OF THE

EXECUTIVE'S BASE SALARY IN INSTALLMENTS IN ACCORDANCE WITH THE COMPANY'S STANDARD PAYROLL PRACTICES, BUT NO LESS FREQUENTLY THAN MONTHLY.

c.     FOR PURPOSES OF SECTION 409A OF THE CODE, EACH INSTALLMENT PAYMENT OF BASE SALARY MADE PURSUANT TO THIS SECTION 5(C)(I)(B) SHALL BE TREATED AS A SEPARATE PAYMENT OF COMPENSATION.

(C)     A LUMP SUM PAYMENT EQUAL TO (X) THE EXECUTIVE'S THREE-YEAR AVERAGE BONUS MULTIPLIED BY (Y) THE SEVERANCE MULTIPLE, PAYABLE ON THE RELEASE EFFECTIVE DATE OR AS SOON THEREAFTER AS IS REASONABLY PRACTICABLE, BUT IN NO EVENT SHALL SUCH PAYMENT OCCUR LATER THAN MARCH 15 OF THE CALENDAR YEAR FOLLOWING THE YEAR IN WHICH THE TERMINATION DATE OCCURS;

(D)     A LUMP SUM PAYMENT EQUAL TO THE PRO-RATA CASH BONUS FOR THE YEAR IN WHICH THE TERMINATION DATE OCCURS WHICH SHALL BE PAID (X) WHEN SUCH ANNUAL BONUSES ARE PAID TO NON-TERMINATED EMPLOYEES (OR, IF LATER, UPON THE SATISFACTION OF ALL CONDITIONS FOR THE PAYMENT OF BENEFITS HEREUNDER, BUT IN NO EVENT SHALL SUCH PAYMENT OCCUR LATER THAN MARCH 15 OF  THE CALENDAR YEAR FOLLOWING THE YEAR IN WHICH THE TERMINATION DATE OCCURS) AND (Y) BASED ON THE ACTUAL ATTAINMENT OF THE PERFORMANCE GOALS UNDER THE ANNUAL BONUS PLAN FOR THE YEAR IN WHICH THE TERMINATION DATE OCCURS;

(E)     IF THE EXECUTIVE CONTINUES TO RECEIVE HEALTH BENEFITS (INCLUDING, MEDICAL, PRESCRIPTION, DENTAL, VISION AND HEALTH CARE REIMBURSEMENT ACCOUNT BENEFITS) PURSUANT TO THE COMPANY'S HEALTH PLANS UNDER THE CONSOLIDATED OMNIBUS BUDGET RECONCILIATION ACT OF 1985, AS AMENDED, SUPPLEMENTED OR SUBSTITUTED FROM TIME TO TIME ("COBRA") AND PAYS THE FULL COBRA PREMIUMS, THE COMPANY WILL REIMBURSE THE EXECUTIVE FOR THE COBRA PREMIUMS PAID FOR SUCH BENEFITS FOR THE EXECUTIVE AND HIS FAMILY THROUGH COBRA (WITH THE EXCEPTION OF ANY COBRA PREMIUMS PAID FOR HEALTH CARE REIMBURSEMENT ACCOUNT BENEFITS), THROUGH THE BENEFITS CONTINUATION PERIOD, IN ACCORDANCE WITH THE APPLICABLE PLANS, PROGRAMS OR POLICIES OF THE COMPANY, AND ON SUCH TERMS APPLICABLE TO COMPARABLY SITUATED ACTIVE EMPLOYEES DURING SUCH PERIOD (WHICH SHALL OFFSET THE COMPANY'S COBRA OBLIGATION, IF ANY); PROVIDED THAT THE EXECUTIVE MAY CONTINUE TO RECEIVE HEALTH BENEFITS PURSUANT TO THE COMPANY'S HEALTH PLANS DURING A PERIOD OF TIME IN THE BENEFITS CONTINUATION PERIOD DURING WHICH THE EXECUTIVE WOULD NOT OTHERWISE BE ENTITLED TO COBRA CONTINUATION COVERAGE UNDER SECTION 4980B OF THE CODE IF THE EXECUTIVE CONTINUES TO PAY PREMIUMS FOR SUCH HEALTH BENEFITS, AND THE EXECUTIVE SHALL RECEIVE REIMBURSEMENT FOR ALL PREMIUMS PAID BY THE EXECUTIVE FOR SUCH CONTINUED HEALTH BENEFITS ON THE DATE NO LATER THAN DECEMBER 31 OF THE CALENDAR YEAR IMMEDIATELY FOLLOWING THE CALENDAR YEAR IN WHICH THE APPLICABLE EXPENSES HAVE BEEN INCURRED.  IF THE EXECUTIVE FAILS TO ACCEPT AVAILABLE COVERAGE FROM ANOTHER EMPLOYER OR FAILS

TO NOTIFY THE COMPANY (OR FOLLOWING A CHANGE OF CONTROL, THE COMPANY OR THE TRUSTEE) WITHIN THIRTY (30) DAYS OF THE EXECUTIVE'S ELIGIBILITY TO RECEIVE COVERAGE UNDER ANOTHER EMPLOYER'S PLAN, THE EXECUTIVE'S REIMBURSEMENTS UNDER THIS SECTION 5(C)(I)(E) SHALL IMMEDIATELY TERMINATE AND THE EXECUTIVE SHALL CEASE TO BE ENTITLED TO ANY SUCH REIMBURSEMENTS UNDER THIS AGREEMENT AND SHALL BE REQUIRED WITHIN THREE (3) MONTHS AFTER SUCH FAILURE TO REIMBURSE THE COMPANY FOR THE REIMBURSEMENTS PAID TO THE EXECUTIVE AFTER SUCH FAILURE. IN ADDITION, THE EXECUTIVE AGREES THAT THE COMPANY MAY OFFSET AGAINST SUCH REIMBURSEMENT OR DEDUCT SUCH REIMBURSEMENT FROM ANY PAYMENTS DUE TO THE EXECUTIVE IN FULL OR PARTIAL PAYMENT OF SUCH REIMBURSEMENT; PROVIDED THAT NO SUCH OFFSET SHALL BE MADE IN VIOLATION OF SECTION 409A OF THE CODE;

(F)     THE COMPANY SHALL PROVIDE THE EXECUTIVE WITH PROFESSIONAL OUTPLACEMENT SERVICES AS DETERMINED IN THE COMPANY'S SOLE DISCRETION UNTIL THE EARLIEST OF: (W) THIRTY-SIX (36) MONTHS AFTER THE TERMINATION DATE, (X) THE DATE ON WHICH THE EXECUTIVE OBTAINS ANOTHER FULL-TIME JOB, AND (Y) THE DATE ON WHICH THE EXECUTIVE BECOMES SELF-EMPLOYED.  THE AMOUNT OF OUTPLACEMENT SERVICES PROVIDED TO THE EXECUTIVE DURING ANY CALENDAR YEAR WILL NOT AFFECT THE AMOUNT OF OUTPLACEMENT SERVICES PROVIDED TO THE EXECUTIVE IN ANY SUBSEQUENT CALENDAR YEAR. THE COMPANY WILL NOT PAY THE EXECUTIVE CASH OR PROVIDE OTHER BENEFITS IN LIEU OF PROFESSIONAL OUTPLACEMENT SERVICES;

(G)     IF THE EXECUTIVE IS COVERED BY ANY COMPANY-SPONSORED EXECUTIVE LIFE INSURANCE PROGRAM AS OF THE TERMINATION DATE, THE COMPANY SHALL CONTINUE TO PAY FOR THE EXECUTIVE'S COVERAGE UNTIL THE END OF THE SEVERANCE PERIOD. AT THE END OF THE SEVERANCE PERIOD, THE EXECUTIVE WILL HAVE THIRTY-ONE (31) DAYS FROM THE LAST DAY OF THE SEVERANCE PERIOD TO CONVERT HIS LIFE INSURANCE COVERAGE TO AN INDIVIDUAL POLICY;

(H)     IF THE EXECUTIVE IS COVERED BY ANY COMPANY-SPONSORED SUPPLEMENTAL LONG-TERM DISABILITY INSURANCE PROGRAM AS OF THE TERMINATION DATE, THE COMPANY SHALL CONTINUE TO PAY FOR THE EXECUTIVE'S COVERAGE UNTIL THE END OF THE SEVERANCE PERIOD. AT THE END OF THE SEVERANCE PERIOD, THE EXECUTIVE SHALL BE ENTITLED TO KEEP THIS POLICY IF HE CONTINUES TO PAY THE ANNUAL PREMIUMS; AND

(I)     ANY BENEFITS OR RIGHTS TO WHICH THE EXECUTIVE IS ENTITLED UNDER ANY OF THE COMPANY'S STOCK OR EQUITY PLANS IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THOSE PLANS.

(ii)     IF A CHANGE OF CONTROL OCCURS AND THE EXECUTIVE IS THEN RECEIVING, OR IS ENTITLED TO RECEIVE, PAYMENTS AND BENEFITS UNDER SECTION 5(C)(I) OF THIS AGREEMENT AS A RESULT OF HIS INVOLUNTARY TERMINATION WITHOUT CAUSE NOT DUE TO A CHANGE OF CONTROL, THE COMPANY SHALL PAY TO THE EXECUTIVE IN A LUMP SUM, WITHIN SEVEN (7) CALENDAR DAYS AFTER THE CHANGE OF CONTROL, AN AMOUNT (IN LIEU OF FUTURE INSTALLMENT PAYMENTS) EQUAL TO THE PRESENT VALUE OF ALL FUTURE CASH PAYMENTS DUE TO THE EXECUTIVE UNDER SECTION 5(C)(I)(B) OF THIS AGREEMENT USING THE

PRIME COMMERCIAL LENDING RATE PUBLISHED BY THE TRUSTEE AT THE TIME THE CHANGE OF CONTROL OCCURS. THE COMPANY AND THE EXECUTIVE SHALL CONTINUE TO BE LIABLE TO EACH OTHER FOR ALL OF THEIR OTHER RESPECTIVE OBLIGATIONS UNDER THIS AGREEMENT. IN THE EVENT THAT THE EXECUTIVE WAS A SPECIFIED EMPLOYEE ON HIS TERMINATION DATE, IF THE SUM OF THE PAYMENTS WHICH THE EXECUTIVE PREVIOUSLY RECEIVED IN ACCORDANCE WITH SECTION 5(C)(I)(B) AND THE PAYMENT SET FORTH IN THIS SECTION 5(C)(II) EXCEEDS THE SEPARATION PAY LIMIT, ANY AMOUNTS IN EXCESS OF THE SEPARATION PAY LIMIT SHALL BE PAID ON THE LATER OF (A) THE FIRST DAY FOLLOWING THE SIX (6) MONTH ANNIVERSARY OF THE TERMINATION DATE AND (B) WITHIN SEVEN (7) CALENDAR DAYS AFTER THE CHANGE OF CONTROL. FOR THE AVOIDANCE OF DOUBT, IN THE EVENT THAT THE PROVISIONS OF THIS SECTION 5(C)(II) BECOME EFFECTIVE, THEY SHALL SUPERSEDE THE PROVISIONS OF SECTION 5(C)(I)(B).

(iii) IF A CHANGE OF CONTROL OCCURS AND (A) THE EXECUTIVE EXPERIENCED AN INVOLUNTARY TERMINATION WITHIN TWELVE (12) MONTHS PRIOR TO THE DATE ON WHICH THE CHANGE OF CONTROL OCCURS AND (B) IT IS REASONABLY DEMONSTRATED BY THE EXECUTIVE THAT SUCH TERMINATION OF EMPLOYMENT EITHER (A) WAS AT THE REQUEST OF A THIRD PARTY WHO HAS TAKEN STEPS REASONABLY CALCULATED TO EFFECT A CHANGE OF CONTROL OR (B) OTHERWISE AROSE IN CONNECTION WITH OR IN ANTICIPATION OF A CHANGE OF CONTROL, THEN IN ADDITION TO THE PAYMENTS AND BENEFITS SET FORTH IN SECTION 5(C)(I), THE EXECUTIVE SHALL BE ENTITLED TO THE FOLLOWING: (X) A LUMP SUM PAYMENT EQUAL TO 50% OF THE EXECUTIVE'S BASE SALARY, PAYABLE AS SOON AS PRACTICABLE BUT NO LATER THAN SIXTY (60) DAYS FOLLOWING THE CHANGE OF CONTROL; PROVIDED THAT IF THE EXECUTIVE WAS A SPECIFIED EMPLOYEE ON HIS TERMINATION DATE, SUCH PAYMENT SHALL BE PAID ON THE LATER OF (1) AS SOON AS PRACTICABLE BUT NO LATER THAN SIXTY (60) DAYS FOLLOWING THE CHANGE OF CONTROL AND (2) THE FIRST DAY FOLLOWING THE SIX (6) MONTH ANNIVERSARY OF THE EXECUTIVE'S TERMINATION DATE; (Y) THE DIFFERENCE BETWEEN THREE (3) TIMES THE TARGET BONUS AND TWO AND ONE-HALF (2.5) TIMES THE EXECUTIVE'S THREE-YEAR AVERAGE BONUS AMOUNT PAID TO THE EXECUTIVE PURSUANT TO SECTION 5(C)(I)(C), WHICH SHALL BE PAID AS SOON AS PRACTICABLE FOLLOWING THE CHANGE OF CONTROL BUT NO LATER THAN MARCH 15 OF THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE CHANGE OF CONTROL OCCURS; AND (Z) FOR PURPOSES OF DETERMINING THE SEVERANCE PERIOD FOR BENEFITS PROVIDED UNDER SECTIONS 5(C)(I)(E), (G), AND (H), THE EXECUTIVE'S SEVERANCE PERIOD SHALL BE DEFINED AS THE THIRTY-SIX (36) MONTH PERIOD FOLLOWING THE TERMINATION DATE. NOTWITHSTANDING THE FOREGOING, IN THE EVENT THAT (A) A CHANGE OF CONTROL OCCURS AND PAYMENTS AND BENEFITS BECOME PAYABLE TO THE EXECUTIVE PURSUANT TO THIS SECTION 5(C)(III); AND (B) SUCH CHANGE OF CONTROL DOES NOT CONSTITUTE A "CHANGE IN OWNERSHIP OR EFFECTIVE CONTROL" OR A CHANGE IN THE "OWNERSHIP OF A SUBSTANTIAL PORTION OF ASSETS" UNDER SECTION 409A OF THE CODE AND THE RULES AND REGULATIONS ISSUED THEREUNDER, THE LUMP SUM PAYMENT SET FORTH IN (X) ABOVE SHALL BE PAID ON THE FIRST ANNIVERSARY OF THE EXECUTIVE'S TERMINATION DATE.

(iv) IF A CHANGE OF CONTROL OCCURS AND (A) THE EXECUTIVE'S EMPLOYMENT WAS VOLUNTARILY TERMINATED WITHIN TWELVE (12) MONTHS PRIOR TO THE DATE ON WHICH THE CHANGE OF CONTROL OCCURS; (B) SUCH TERMINATION WOULD HAVE CONSTITUTED A TERMINATION FOR GOOD REASON IF IT HAD OCCURRED WITHIN TWO (2) YEARS FOLLOWING THE CHANGE OF CONTROL; AND (C) IT IS REASONABLY DEMONSTRATED BY THE EXECUTIVE THAT THE CIRCUMSTANCES WHICH WOULD HAVE CAUSED THE OCCURRENCE OF GOOD REASON EITHER (A) WERE AT THE REQUEST OF A THIRD PARTY WHO HAD TAKEN STEPS REASONABLY CALCULATED TO EFFECT A CHANGE OF CONTROL OR (B) OTHERWISE AROSE IN CONNECTION WITH OR IN ANTICIPATION OF A CHANGE OF CONTROL, THEN THE EXECUTIVE SHALL BE ENTITLED TO THE FOLLOWING (BASED ON A SEVERANCE MULTIPLE OF THREE (3) AND A SEVERANCE PERIOD OF THIRTY-SIX (36) MONTHS FROM THE TERMINATION DATE):

(A)     A LUMP SUM PAYMENT EQUAL TO THE EXECUTIVE'S BASE SALARY MULTIPLIED BY THE SEVERANCE MULTIPLE PAYABLE WITHIN SIXTY (60) DAYS FOLLOWING THE CHANGE OF CONTROL; PROVIDED THAT, IF THE SIXTIETH (60TH) DAY FOLLOWING THE CHANGE OF CONTROL FALLS IN THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE CHANGE OF CONTROL OCCURS, PAYMENT WILL NOT BE MADE PRIOR TO THE FIRST DAY OF THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE CHANGE OF CONTROL OCCURS; PROVIDED FURTHER THAT, IF THE EXECUTIVE IS A SPECIFIED EMPLOYEE ON THE TERMINATION DATE, ANY AMOUNTS IN EXCESS OF THE SEPARATION PAY LIMIT SHALL BE PAID TO THE EXECUTIVE IN A LUMP SUM ON THE LATER OF (X) THE FIRST DAY FOLLOWING THE SIX (6) MONTH ANNIVERSARY OF THE TERMINATION DATE AND (Y) WITHIN SIXTY (60) DAYS FOLLOWING THE CHANGE OF CONTROL.  IN THE EVENT THAT (I) A CHANGE OF CONTROL OCCURS AND PAYMENTS AND BENEFITS BECOME PAYABLE TO THE EXECUTIVE PURSUANT TO THIS SECTION 5(C)(IV); AND (II) SUCH CHANGE OF CONTROL DOES NOT CONSTITUTE A "CHANGE IN OWNERSHIP OR EFFECTIVE CONTROL" OR A CHANGE IN THE "OWNERSHIP OF A SUBSTANTIAL PORTION OF ASSETS" UNDER SECTION 409A OF THE CODE AND THE RULES AND REGULATIONS THEREUNDER, THE LUMP SUM PAYMENT SET FORTH HEREIN SHALL BE PAID ON THE FIRST ANNIVERSARY OF THE EXECUTIVE'S TERMINATION DATE;

(B)     A LUMP SUM PAYMENT EQUAL TO THE TARGET BONUS MULTIPLIED BY THE SEVERANCE MULTIPLE, PAYABLE ON THE RELEASE EFFECTIVE DATE OR AS SOON THEREAFTER AS IS PRACTICABLE, BUT NO LATER THAN MARCH 15 OF THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE CHANGE OF CONTROL OCCURS;

(C)     A LUMP SUM PAYMENT EQUAL TO THE PRO-RATA CASH BONUS FOR THE YEAR IN WHICH THE TERMINATION DATE OCCURS WHICH SHALL BE PAID (I) WHEN SUCH ANNUAL BONUSES ARE PAID TO NON-TERMINATED EMPLOYEES (OR, IF LATER, UPON THE SATISFACTION OF ALL CONDITIONS FOR THE PAYMENT OF BENEFITS HEREUNDER, BUT IN NO EVENT SHALL SUCH PAYMENT OCCUR LATER THAN MARCH 15 OF  THE CALENDAR YEAR FOLLOWING THE YEAR IN WHICH THE CHANGE OF CONTROL OCCURS) AND (II) BASED ON THE ACTUAL ATTAINMENT OF THE PERFORMANCE GOALS UNDER THE ANNUAL BONUS PLAN FOR THE YEAR IN WHICH THE TERMINATION DATE OCCURS;

(D)     IF THE EXECUTIVE CONTINUES TO RECEIVE HEALTH BENEFITS (INCLUDING, MEDICAL, PRESCRIPTION, DENTAL, VISION AND HEALTH CARE REIMBURSEMENT ACCOUNT BENEFITS) PURSUANT TO THE COMPANY'S HEALTH PLANS UNDER COBRA AND PAYS THE FULL COBRA PREMIUMS, THE COMPANY WILL REIMBURSE THE EXECUTIVE FOR THE COBRA PREMIUMS PAID FOR SUCH BENEFITS FOR THE EXECUTIVE AND HIS FAMILY THROUGH COBRA (WITH THE EXCEPTION OF ANY COBRA PREMIUMS PAID FOR HEALTH CARE REIMBURSEMENT ACCOUNT BENEFITS), FOR THE REMAINDER OF THE BENEFITS CONTINUATION PERIOD, IN ACCORDANCE WITH THE APPLICABLE PLANS, PROGRAMS OR POLICIES, IF ANY, OF THE COMPANY OR ITS SUCCESSOR, AND ON SUCH TERMS APPLICABLE TO COMPARABLY SITUATED ACTIVE EMPLOYEES DURING SUCH PERIOD (WHICH SHALL OFFSET THE COMPANY'S COBRA OBLIGATION, IF ANY); PROVIDED THAT THE EXECUTIVE MAY CONTINUE TO

RECEIVE HEALTH BENEFITS PURSUANT TO THE COMPANY'S HEALTH PLANS DURING A PERIOD OF TIME IN THE BENEFITS CONTINUATION PERIOD DURING WHICH THE EXECUTIVE WOULD NOT OTHERWISE BE ENTITLED TO COBRA CONTINUATION COVERAGE UNDER SECTION 4980B OF THE CODE IF THE EXECUTIVE CONTINUES TO PAY PREMIUMS FOR SUCH HEALTH BENEFITS, AND THE EXECUTIVE SHALL RECEIVE REIMBURSEMENT FOR ALL PREMIUMS PAID BY THE EXECUTIVE FOR SUCH CONTINUED HEALTH BENEFITS ON THE DATE NO LATER THAN DECEMBER 31 OF THE CALENDAR YEAR IMMEDIATELY FOLLOWING THE CALENDAR YEAR IN WHICH THE APPLICABLE EXPENSES HAVE BEEN INCURRED.  IF THE EXECUTIVE FAILS TO ACCEPT AVAILABLE COVERAGE FROM ANOTHER EMPLOYER OR FAILS TO NOTIFY THE COMPANY (OR THE TRUSTEE) WITHIN THIRTY (30) DAYS OF THE EXECUTIVE'S ELIGIBILITY TO RECEIVE COVERAGE UNDER ANOTHER EMPLOYER'S PLAN, THE EXECUTIVE'S REIMBURSEMENTS UNDER THIS SECTION 5(C)(IV)(D) SHALL IMMEDIATELY TERMINATE AND THE EXECUTIVE SHALL CEASE TO BE ENTITLED TO ANY SUCH REIMBURSEMENTS UNDER THIS AGREEMENT AND SHALL BE REQUIRED WITHIN THREE (3) MONTHS AFTER SUCH FAILURE TO REIMBURSE THE COMPANY FOR THE REIMBURSEMENTS PAID TO THE EXECUTIVE AFTER SUCH FAILURE. IN ADDITION, THE EXECUTIVE AGREES THAT THE COMPANY MAY OFFSET AGAINST SUCH REIMBURSEMENT OR DEDUCT SUCH REIMBURSEMENT FROM ANY PAYMENTS DUE TO THE EXECUTIVE IN FULL OR PARTIAL PAYMENT OF SUCH REIMBURSEMENT; PROVIDED THAT, NO SUCH OFFSET SHALL BE MADE IN VIOLATION OF SECTION 409A OF THE CODE;

(E)     A LUMP SUM PAYMENT EQUAL TO THE VALUE OF THE COMPANY-SPONSORED OUTPLACEMENT PROGRAM MAINTAINED BY THE COMPANY IMMEDIATELY PRIOR TO THE CHANGE OF CONTROL, BASED ON THE EXECUTIVE'S MANAGEMENT LEVEL AS OF THE TERMINATION DATE, WHICH SHALL BE PAID WITHIN SIXTY (60) DAYS FOLLOWING THE CHANGE OF CONTROL; PROVIDED THAT, IF THE SIXTIETH (60TH) DAY FOLLOWING THE CHANGE OF CONTROL FALLS IN THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE CHANGE OF CONTROL OCCURS, PAYMENT WILL NOT BE MADE PRIOR TO THE FIRST DAY OF THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE CHANGE OF CONTROL OCCURS; PROVIDED FURTHER THAT, IF THE EXECUTIVE IS A SPECIFIED EMPLOYEE ON THE TERMINATION DATE, SUCH AMOUNT SHALL BE PAID ON THE LATER OF (X) WITHIN SIXTY (60) DAYS FOLLOWING THE CHANGE OF CONTROL AND (Y) THE FIRST DAY FOLLOWING THE SIX (6) MONTH ANNIVERSARY OF THE TERMINATION DATE.  IN THE EVENT THAT (I) A CHANGE OF CONTROL OCCURS AND PAYMENTS AND BENEFITS BECOME PAYABLE TO THE EXECUTIVE PURSUANT TO THIS SECTION 5(C)(IV); AND (II) SUCH CHANGE OF CONTROL DOES NOT CONSTITUTE A "CHANGE IN OWNERSHIP OR EFFECTIVE CONTROL" OR A CHANGE IN THE "OWNERSHIP OF A SUBSTANTIAL PORTION OF ASSETS" UNDER SECTION 409A OF THE CODE AND THE RULES AND REGULATIONS THEREUNDER, THE LUMP SUM PAYMENT SET FORTH HEREIN SHALL BE PAID ON THE FIRST ANNIVERSARY OF THE EXECUTIVE'S TERMINATION DATE;

(F)     IF THE EXECUTIVE IS COVERED BY ANY COMPANY-SPONSORED EXECUTIVE LIFE INSURANCE PROGRAM AS OF THE TERMINATION DATE, THE COMPANY (OR THE TRUSTEE) SHALL CONTINUE TO PAY FOR THE EXECUTIVE'S COVERAGE UNTIL THE END OF THE SEVERANCE PERIOD. AT

THE END OF THE SEVERANCE PERIOD, THE EXECUTIVE WILL HAVE THIRTY-ONE DAYS (31) FROM THE LAST DAY OF THE SEVERANCE PERIOD TO CONVERT HIS LIFE INSURANCE COVERAGE TO AN INDIVIDUAL POLICY;

(G)     IF THE EXECUTIVE IS COVERED BY ANY COMPANY-SPONSORED SUPPLEMENTAL LONG TERM DISABILITY INSURANCE PROGRAM AS OF THE TERMINATION DATE, THE COMPANY (OR THE TRUSTEE) SHALL CONTINUE TO PAY FOR THE EXECUTIVE'S COVERAGE UNTIL THE END OF THE SEVERANCE PERIOD. AT THE END OF THE SEVERANCE PERIOD, THE EXECUTIVE SHALL BE ENTITLED TO KEEP THIS POLICY IF HE CONTINUES TO PAY THE ANNUAL PREMIUMS; AND

(H)     ANY BENEFITS OR RIGHTS TO WHICH THE EXECUTIVE IS ENTITLED UNDER ANY OF THE COMPANY'S STOCK OR EQUITY PLANS IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF ANY SUCH PLANS.

(I)     FOR THE AVOIDANCE OF DOUBT, NO PAYMENTS OR BENEFITS PAYABLE TO THE EXECUTIVE PURSUANT TO THIS SECTION 5(C)(IV) SHALL CONTINUE BEYOND THE DATE WHICH IS THIRTY-SIX (36) MONTHS FOLLOWING THE TERMINATION DATE.

(J)     THE EXECUTIVE SHALL NOT BE ENTITLED TO ANY PAYMENTS OR BENEFITS PURSUANT TO THIS SECTION 5(C)(IV), UNLESS PRIOR TO THE EXECUTIVE'S TERMINATION DATE, THE EXECUTIVE HAD GIVEN THE COMPANY NOTICE OF THE CIRCUMSTANCES FORMING THE BASIS OF TERMINATION FOR GOOD REASON AND AN OPPORTUNITY TO CURE SUCH CIRCUMSTANCES IN ACCORDANCE WITH SECTIONS 1(K) AND (M).

On the Termination Date, the Executive shall no longer be eligible to participate in any Company plan, program or policy, other than those described in Section 5(c) including, but not limited to, the Company's long-term incentive plan, short-term disability plan, long-term disability plan, employee stock purchase plan, and business travel accident plan.

(d)     TERMINATION FOR CAUSE OR VOLUNTARY TERMINATION. If the Executive's employment is terminated (i) by the Company for Cause, or (ii) voluntarily by the Executive (other than for Good Reason on or after a Change of Control), the Company shall pay or provide to the Executive the Accrued Benefits.

(e)     TERMINATION DUE TO A CHANGE OF CONTROL. If, within the two (2) year period commencing on a Change of Control of the Company, (A) the Executive experiences an Involuntary Termination, or (B) the Executive terminates his employment with the Company or a Company Entity for Good Reason, the Executive shall be entitled to receive the compensation and benefits listed below, subject to his compliance with the terms of Section 5(f):

(i)     THE COMPANY SHALL PAY OR PROVIDE TO THE EXECUTIVE THE FOLLOWING PAYMENTS AND BENEFITS:

(A)     ANY ACCRUED BENEFITS PAYABLE AS SOON AS PRACTICAL AFTER THE TERMINATION DATE;

(B)     A LUMP SUM PAYMENT EQUAL TO THE EXECUTIVE'S BASE SALARY MULTIPLIED BY THE SEVERANCE MULTIPLE PAYABLE WITHIN SIXTY (60) DAYS FOLLOWING THE TERMINATION DATE; PROVIDED THAT, IF THE SIXTIETH (60TH) DAY FOLLOWING THE TERMINATION DATE FALLS IN THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE

TERMINATION DATE OCCURS, PAYMENT WILL NOT BE MADE PRIOR TO THE FIRST DAY OF THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE TERMINATION DATE OCCURS; PROVIDED FURTHER THAT, IF THE EXECUTIVE IS A SPECIFIED EMPLOYEE ON THE TERMINATION DATE, ANY AMOUNTS PAYABLE UNDER THIS SECTION 5(E)(I)(B) IN EXCESS OF THE SEPARATION PAY LIMIT SHALL BE PAID TO THE EXECUTIVE IN A LUMP SUM ON THE FIRST DAY FOLLOWING THE SIX (6) MONTH ANNIVERSARY OF THE TERMINATION DATE;

(C)     A LUMP SUM PAYMENT EQUAL TO THE TARGET BONUS MULTIPLIED BY THE SEVERANCE MULTIPLE, PAYABLE ON THE RELEASE EFFECTIVE DATE OR AS SOON THEREAFTER AS IS PRACTICABLE, BUT NO LATER THAN MARCH 15 OF THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE TERMINATION DATE OCCURS;

(D)     A LUMP SUM PAYMENT EQUAL TO THE PRO-RATA CASH BONUS FOR THE YEAR IN WHICH THE TERMINATION DATE OCCURS WHICH SHALL BE PAID (I) WHEN SUCH ANNUAL BONUSES ARE PAID TO NON-TERMINATED EMPLOYEES (OR, IF LATER, UPON THE SATISFACTION OF ALL CONDITIONS FOR THE PAYMENT OF BENEFITS HEREUNDER, BUT IN NO EVENT SHALL SUCH PAYMENT OCCUR LATER THAN MARCH 15 OF  THE CALENDAR YEAR FOLLOWING THE YEAR IN WHICH THE TERMINATION DATE OCCURS) AND (II) BASED ON THE ACTUAL ATTAINMENT OF THE PERFORMANCE GOALS UNDER THE ANNUAL BONUS PLAN FOR THE YEAR IN WHICH THE TERMINATION DATE OCCURS;

(E)     IF THE EXECUTIVE CONTINUES TO RECEIVE HEALTH BENEFITS (INCLUDING, MEDICAL, PRESCRIPTION, DENTAL, VISION AND HEALTH CARE REIMBURSEMENT ACCOUNT BENEFITS) PURSUANT TO THE COMPANY'S HEALTH PLANS UNDER COBRA AND PAYS THE FULL COBRA PREMIUMS, THE COMPANY WILL REIMBURSE THE EXECUTIVE FOR THE COBRA PREMIUMS PAID FOR SUCH BENEFITS FOR THE EXECUTIVE AND HIS FAMILY THROUGH COBRA (WITH THE EXCEPTION OF ANY COBRA PREMIUMS PAID FOR HEALTH CARE REIMBURSEMENT ACCOUNT BENEFITS), FOR THE BENEFITS CONTINUATION PERIOD, IN ACCORDANCE WITH THE APPLICABLE PLANS, PROGRAMS OR POLICIES, IF ANY, OF THE COMPANY OR ITS SUCCESSOR, AND ON SUCH TERMS APPLICABLE TO COMPARABLY SITUATED ACTIVE EMPLOYEES DURING SUCH PERIOD (WHICH SHALL OFFSET THE COMPANY'S COBRA OBLIGATION, IF ANY); PROVIDED THAT THE EXECUTIVE MAY CONTINUE TO RECEIVE HEALTH BENEFITS PURSUANT TO THE COMPANY'S HEALTH PLANS DURING A PERIOD OF TIME IN THE BENEFITS CONTINUATION PERIOD DURING WHICH THE EXECUTIVE WOULD NOT OTHERWISE BE ENTITLED TO COBRA CONTINUATION COVERAGE UNDER SECTION 4980B OF THE CODE IF THE EXECUTIVE CONTINUES TO PAY PREMIUMS FOR SUCH HEALTH BENEFITS, AND THE EXECUTIVE SHALL RECEIVE REIMBURSEMENT FOR ALL PREMIUMS PAID BY THE EXECUTIVE FOR SUCH CONTINUED HEALTH BENEFITS ON THE DATE NO LATER THAN DECEMBER 31 OF THE CALENDAR YEAR IMMEDIATELY FOLLOWING THE CALENDAR YEAR IN WHICH THE APPLICABLE EXPENSES HAVE BEEN INCURRED.  IF THE EXECUTIVE FAILS TO ACCEPT AVAILABLE COVERAGE FROM ANOTHER EMPLOYER OR FAILS TO NOTIFY THE COMPANY (OR THE TRUSTEE) WITHIN THIRTY (30) DAYS OF EXECUTIVE'S ELIGIBILITY TO RECEIVE COVERAGE UNDER ANOTHER EMPLOYER'S PLAN, THE EXECUTIVE'S REIMBURSEMENTS UNDER THIS

SECTION 5(E)(I)(E) SHALL IMMEDIATELY TERMINATE AND THE EXECUTIVE SHALL CEASE TO BE ENTITLED TO ANY SUCH REIMBURSEMENTS UNDER THIS AGREEMENT AND SHALL BE REQUIRED WITHIN THREE (3) MONTHS AFTER SUCH FAILURE TO REIMBURSE THE COMPANY FOR THE REIMBURSEMENTS PAID TO THE EXECUTIVE AFTER SUCH FAILURE. IN ADDITION, THE EXECUTIVE AGREES THAT THE COMPANY MAY OFFSET AGAINST SUCH REIMBURSEMENT OR DEDUCT SUCH REIMBURSEMENT FROM ANY PAYMENTS DUE TO THE EXECUTIVE IN FULL OR PARTIAL PAYMENT OF SUCH REIMBURSEMENT; PROVIDED THAT, NO SUCH OFFSET SHALL BE MADE IN VIOLATION OF SECTION 409A OF THE CODE;

(F) THE COMPANY (OR THE TRUSTEE) SHALL PAY TO THE EXECUTIVE IN A LUMP SUM AN AMOUNT EQUAL TO THE VALUE OF THE COMPANY-SPONSORED OUTPLACEMENT PROGRAM MAINTAINED BY THE COMPANY IMMEDIATELY PRIOR TO THE CHANGE OF CONTROL, BASED ON THE EXECUTIVE'S MANAGEMENT LEVEL AS OF THE TERMINATION DATE, WHICH SHALL BE PAID WITHIN SIXTY (60) DAYS FOLLOWING THE TERMINATION DATE; PROVIDED THAT, IF THE SIXTIETH (60TH) DAY FOLLOWING THE TERMINATION DATE FALLS IN THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE TERMINATION DATE OCCURS, PAYMENT WILL NOT BE MADE PRIOR TO THE FIRST DAY OF THE CALENDAR YEAR FOLLOWING THE CALENDAR YEAR IN WHICH THE TERMINATION DATE OCCURS; PROVIDED FURTHER THAT, IF THE EXECUTIVE IS A SPECIFIED EMPLOYEE ON THE TERMINATION DATE, SUCH AMOUNT SHALL BE PAID ON THE FIRST DAY FOLLOWING THE SIX (6) MONTH ANNIVERSARY OF THE TERMINATION DATE;

(G) IF THE EXECUTIVE IS COVERED BY ANY COMPANY-SPONSORED EXECUTIVE LIFE INSURANCE PROGRAM AS OF THE TERMINATION DATE, THE COMPANY (OR THE TRUSTEE) SHALL CONTINUE TO PAY FOR THE EXECUTIVE'S COVERAGE UNTIL THE END OF THE SEVERANCE PERIOD. AT THE END OF THE SEVERANCE PERIOD, THE EXECUTIVE WILL HAVE THIRTY-ONE (31) DAYS FROM THE LAST DAY OF THE SEVERANCE PERIOD TO CONVERT HIS LIFE INSURANCE COVERAGE TO AN INDIVIDUAL POLICY;

(H) IF THE EXECUTIVE IS COVERED BY ANY COMPANY-SPONSORED SUPPLEMENTAL LONG TERM DISABILITY INSURANCE PROGRAM AS OF THE TERMINATION DATE, THE COMPANY (OR THE TRUSTEE) SHALL CONTINUE TO PAY FOR THE EXECUTIVE'S COVERAGE UNTIL THE END OF THE SEVERANCE PERIOD. AT THE END OF THE SEVERANCE PERIOD, THE EXECUTIVE SHALL BE ENTITLED TO KEEP THIS POLICY IF HE CONTINUES TO PAY THE ANNUAL PREMIUMS; AND

(I) ANY BENEFITS OR RIGHTS TO WHICH THE EXECUTIVE IS ENTITLED UNDER ANY OF THE COMPANY'S STOCK OR EQUITY PLANS IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF ANY SUCH PLANS.

(ii) IN THE EVENT THAT THE EXECUTIVE BECOMES ENTITLED TO PAYMENTS AND BENEFITS PURSUANT TO SECTION 5(E)(I) IN CONNECTION WITH A CHANGE OF CONTROL THAT DOES NOT CONSTITUTE A "CHANGE IN OWNERSHIP OR EFFECTIVE CONTROL" OR A CHANGE IN THE "OWNERSHIP OF A SUBSTANTIAL PORTION OF THE ASSETS" UNDER SECTION 409A OF THE CODE, AND THE RULINGS AND REGULATIONS ISSUED THEREUNDER, THE PAYMENTS AND BENEFITS SET FORTH IN SECTIONS 5(E)(I)(B), (C), (D), (E), (G) AND (H) HEREIN (IN EACH CASE, BASED ON A SEVERANCE PERIOD OF THREE (3) YEARS FROM THE TERMINATION DATE AND A

SEVERANCE MULTIPLE OF THREE (3)), SHALL BE PAID IN ACCORDANCE WITH THE SCHEDULE SET FORTH IN SECTION 5(C)(I), EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION 5(E)(II).  IN ADDITION, THE SERVICES SET FORTH IN SECTION 5(C)(I)(F) (BASED ON A SEVERANCE PERIOD OF TWO AND ONE-HALF YEARS) SHALL BE PROVIDED IN LIEU OF THE PAYMENT SET FORTH IN SECTION 5(E)(I)(F).  NOTWITHSTANDING THE FOREGOING, WITH RESPECT TO THE PAYMENT SET FORTH IN SECTION 5(E)(I)(B), AN AMOUNT EQUAL TO THE LESSER OF (X) THE SEPARATION PAY LIMIT OR (Y) THE AMOUNT SET FORTH IN SECTION 5(E)(I)(B) SHALL BE PAID TO THE EXECUTIVE ON THE RELEASE EFFECTIVE DATE OR AS SOON THEREAFTER AS IS PRACTICABLE, BUT NO LATER THAN SIXTY (60) DAYS FOLLOWING THE TERMINATION DATE.  IN THE EVENT THAT THE AMOUNT SET FORTH IN SECTION 5(E)(I)(B) EXCEEDS THE SEPARATION PAY LIMIT, ANY EXCESS AMOUNTS SHALL BE PAID AT THE TIME THEY WOULD HAVE OTHERWISE BEEN PAID PURSUANT TO SECTION 5 (C)(I)(B).

On the Termination Date, the Executive shall no longer be eligible to participate in any Company plan, program or policy, other than those described in this Section 5(e)(i) including, but not limited to, the Company's long-term incentive plan, short-term disability plan, long-term disability plan, employee stock purchase plan, and business travel accident plan.

(iii)    EFFECT OF SECTION 280G ON PAYMENTS.

(A)    REDUCTION IN PAYMENTS. IN THE EVENT ANY PAYMENT (AS DEFINED BELOW) WOULD CONSTITUTE AN "EXCESS PARACHUTE PAYMENT" WITHIN THE MEANING OF SECTION 280G OF THE CODE, THE COMPANY SHALL REDUCE (BUT NOT BELOW ZERO) THE AGGREGATE PRESENT VALUE OF THE PAYMENTS UNDER THIS AGREEMENT TO THE REDUCED AMOUNT (AS DEFINED BELOW), IF REDUCING THE PAYMENTS UNDER THIS AGREEMENT WILL PROVIDE THE EXECUTIVE WITH A GREATER NET AFTER-TAX AMOUNT THAN WOULD BE THE CASE IF NO REDUCTION WAS MADE.

(B)    DETERMINING NET AFTER-TAX AMOUNTS.  IN DETERMINING WHETHER A REDUCTION IN PAYMENTS UNDER THIS AGREEMENT WILL PROVIDE THE EXECUTIVE WITH A GREATER NET AFTER-TAX AMOUNT, THE FOLLOWING COMPUTATIONS SHALL BE MADE:

a.    THE NET AFTER-TAX BENEFIT TO THE EXECUTIVE WITHOUT ANY REDUCTION IN PAYMENTS SHALL BE DETERMINED BY REDUCING THE PAYMENTS BY THE AMOUNT OF FEDERAL, STATE, LOCAL AND OTHER APPLICABLE TAXES (INCLUDING THE EXCISE TAX (AS DEFINED BELOW)) APPLICABLE TO THE PAYMENTS.  FOR THESE PURPOSES, THE TAX RATES SHALL BE DETERMINED USING THE MAXIMUM MARGINAL RATE APPLICABLE TO SUCH EXECUTIVE FOR EACH YEAR IN WHICH THE PAYMENTS SHALL BE PAID.

b.    THE NET AFTER-TAX BENEFIT TO THE EXECUTIVE WITH A REDUCTION IN THE PAYMENTS TO THE REDUCED AMOUNT SHALL BE DETERMINED BY APPLYING THE TAX RATES UNDER SECTION 5 (E)(III)(B)(A), WITH THE EXCEPTION OF THE EXCISE TAX.

(C)    REDUCTION METHODOLOGY.  IN THE EVENT A REDUCTION IN THE PAYMENTS TO THE REDUCED AMOUNT WILL PROVIDE THE EXECUTIVE WITH A GREATER NET AFTER-TAX AMOUNT, THE FOLLOWING SHALL APPLY:

a. REDUCTION OF PAYMENTS.  THE REDUCTION IN THE PAYMENTS SHALL BE MADE FIRST BY REDUCING AS APPLICABLE, BUT NOT BELOW ZERO, THE CASH PAYMENTS UNDER SECTIONS 5(C)(I)(B), 5 (C)(IV)(A), AND 5(E)(I)(B).  IN THE EVENT THAT SUCH PAYMENTS ARE INSTALLMENT PAYMENTS, EACH SUCH INSTALLMENT PAYMENT SHALL BE REDUCED PRO-RATA.  THE CASH PAYMENTS UNDER SECTIONS 5(C)(I)(C), 5(C)(I)(D), 5(C)(IV)(B), 5(C)(IV)(C),  5(E)(I)(C) AND 5(E)(I)(D) SHALL BE REDUCED NEXT, AS APPLICABLE, BUT NOT BELOW ZERO.  IN THE EVENT THAT FOLLOWING REDUCTION OF THE AMOUNTS SET FORTH IN THE PRECEDING SENTENCE, ADDITIONAL AMOUNTS PAYABLE TO THE EXECUTIVE MUST BE REDUCED, ANY PAYMENTS DUE TO THE EXECUTIVE PURSUANT TO THE COMPANY'S EQUITY PLANS SHALL BE REDUCED ON A PRO-RATA BASIS, BUT NOT BELOW ZERO.

b. RESTRICTIONS. ONLY AMOUNTS PAYABLE UNDER THIS AGREEMENT SHALL BE REDUCED PURSUANT TO THIS SECTION 5(E)(III).  ANY REDUCTION SHALL BE MADE IN A MANNER CONSISTENT WITH THE REQUIREMENTS OF SECTION 409A OF THE CODE.

(D) DEFINITIONS.  FOR PURPOSES OF SECTION 5(E)(III), THE FOLLOWING DEFINITIONS SHALL APPLY.

a. "PAYMENT" SHALL MEAN AN AMOUNT THAT IS RECEIVED BY THE EXECUTIVE OR PAID BY THE COMPANY ON HIS BEHALF, OR REPRESENTS ANY PROPERTY, OR ANY OTHER BENEFIT PROVIDED TO THE EXECUTIVE UNDER THIS AGREEMENT OR UNDER ANY OTHER PLAN, ARRANGEMENT OR AGREEMENT WITH THE COMPANY OR ANY OTHER PERSON, AND SUCH AMOUNT IS TREATED AS CONTINGENT ON A CHANGE IN CONTROL, AS PROVIDED UNDER SECTION 280G OF THE CODE.

b. "REDUCED AMOUNT" SHALL MEAN AN AMOUNT, AS DETERMINED UNDER SECTION 280G OF THE CODE, WHICH DOES NOT CAUSE ANY PAYMENT TO BE SUBJECT TO THE EXCISE TAX.

c. "EXCISE TAX" SHALL MEAN THE EXCISE TAX IMPOSED UNDER SECTION 4999 OF THE CODE.

(E) DETERMINATION OF REDUCTION. ALL DETERMINATIONS REQUIRED TO BE MADE UNDER THIS SECTION 5(E)(III) SHALL BE MADE BY A NATIONALLY RECOGNIZED ACCOUNTING (OR COMPENSATION AND BENEFITS CONSULTING ) FIRM SELECTED BY THE COMPANY (THE "ACCOUNTING FIRM") WHICH SHALL PROVIDE DETAILED SUPPORTING CALCULATIONS BOTH TO THE COMPANY AND THE EXECUTIVE WITHIN TEN (10) BUSINESS DAYS OF THE CHANGE OF CONTROL.  ANY SUCH DETERMINATION BY THE ACCOUNTING FIRM SHALL BE BINDING UPON THE COMPANY AND THE EXECUTIVE.  ALL FEES AND EXPENSES OF THE ACCOUNTING FIRM SHALL BE BORNE SOLELY BY THE COMPANY.

(f) ADDITIONAL TERMS

(i) WITHIN FIFTY (50) DAYS FOLLOWING THE TERMINATION DATE, THE EXECUTIVE SHALL EXECUTE AND AGREE TO BE BOUND BY A RELEASE OF THE COMPANY IN A

FORM PREPARED BY THE COMPANY, WHICH WILL INCLUDE, INTER ALIA, THE EXECUTIVE'S GENERAL RELEASE OF KNOWN AND UNKNOWN CLAIMS, PRIOR TO AND AS A CONDITION OF RECEIVING ANY PAYMENTS OR BENEFITS (OTHER THAN THE ACCRUED BENEFITS) PURSUANT TO THIS AGREEMENT. IF APPLICABLE, THE RELEASE SHALL CONTAIN PROVISIONS REQUIRED BY FEDERAL, STATE OR LOCAL LAW (E.G., THE OLDER WORKER'S BENEFIT PROTECTION ACT) TO EFFECTUATE A GENERAL RELEASE OF ALL CLAIMS. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PAYMENTS OR CONTINUED BENEFITS ON ACCOUNT OF TERMINATION OF EMPLOYMENT HEREUNDER (OTHER THAN ANY ACCRUED BENEFITS PAYABLE IN ACCORDANCE WITH THEIR TERMS) SHALL BE MADE TO THE EXECUTIVE PRIOR TO THE RELEASE EFFECTIVE DATE.  IN THE EVENT THAT THE EXECUTIVE DOES NOT EXECUTE THE RELEASE WITHIN FIFTY (50) DAYS FOLLOWING THE TERMINATION DATE OR THE RELEASE EFFECTIVE DATE DOES NOT OCCUR WITHIN SIXTY (60) DAYS FOLLOWING THE TERMINATION DATE, THE EXECUTIVE SHALL NOT BE ENTITLED TO ANY PAYMENTS OR BENEFITS HEREUNDER (OTHER THAN THE ACCRUED BENEFITS PAYABLE PURSUANT TO THEIR TERMS); PROVIDED THAT, IF THE EXECUTIVE BECOMES ENTITLED TO PAYMENTS AND BENEFITS PURSUANT TO SECTION 5(C)(IV), THE EXECUTIVE SHALL NOT BE ENTITLED TO ANY PAYMENTS OR BENEFITS HEREUNDER IN THE EVENT THE EXECUTIVE DOES NOT EXECUTE THE RELEASE WITHIN FIFTY (50) DAYS FOLLOWING THE CHANGE OF CONTROL OR THE RELEASE EFFECTIVE DATE DOES NOT OCCUR WITHIN SIXTY (60) DAYS FOLLOWING THE DATE OF THE CHANGE OF CONTROL.

(ii)     AS CONSIDERATION FOR THE COMPANY'S OFFER OF THIS AGREEMENT TO THE EXECUTIVE AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, DURING HIS EMPLOYMENT AND UPON TERMINATION OF EMPLOYMENT FOR ANY REASON, THE EXECUTIVE AGREES TO COMPLY WITH THE RESTRICTIVE COVENANTS CONTAINED IN SECTION 10 OF THIS AGREEMENT. IN ADDITION, RECEIPT OF THE SEVERANCE PAYMENTS AND BENEFITS SET FORTH IN SECTION 5 IS EXPRESSLY CONDITIONED UPON THE EXECUTIVE'S CONTINUED COMPLIANCE WITH SECTION 10. IF THE EXECUTIVE IS RECEIVING SEVERANCE PAYMENTS AND/OR BENEFITS UNDER SECTION 5, AND (A) IF THE EXECUTIVE IS REEMPLOYED BY THE COMPANY (OR ANY SUBSIDIARY, AFFILIATE OR SUCCESSOR) OR BREACHES THIS AGREEMENT OR THE RELEASE, OR (B) IF THE COMPANY (OR ANY SUBSIDIARY, AFFILIATE OR SUCCESSOR) DISCOVERS INFORMATION THAT WOULD HAVE PERMITTED THE COMPANY TO TERMINATE THE EXECUTIVE FOR CAUSE OR IF THE COMPANY OR ANY SUBSIDIARY, AFFILIATE OR SUCCESSOR DISCOVERS A BREACH OF SECTION 10, SEVERANCE PAYMENTS AND BENEFITS SHALL IMMEDIATELY CEASE WITH RESPECT TO SUCH TERMINATION. IF THE SEVERANCE PAYMENTS AND BENEFITS CEASE BECAUSE OF RE-EMPLOYMENT AND THE COMPANY HAS PAID SEVERANCE IN A LUMP SUM, THE COMPANY (OR ANY SUBSIDIARY OR SUCCESSOR) SHALL HAVE THE RIGHT TO REQUIRE THAT THE EXECUTIVE REPAY TO THE APPLICABLE ENTITY THE VALUE OF THE SEVERANCE BENEFITS THAT WOULD NOT YET HAVE BEEN PAID BEFORE RE-EMPLOYMENT IF HE HAD BEEN RECEIVING THE SEVERANCE IN SEMI-MONTHLY INSTALLMENTS, AND THE EXECUTIVE SHALL NO LONGER BE ENTITLED TO ANY SEVERANCE PAYMENTS AND BENEFITS WITH RESPECT TO SUCH TERMINATION. IF SEVERANCE PAYMENTS AND BENEFITS CEASE BECAUSE OF A CAUSE DETERMINATION OR A BREACH OF SECTION 10, THE COMPANY (OR ANY SUBSIDIARY OR SUCCESSOR) SHALL HAVE THE RIGHT TO REQUIRE THAT THE EXECUTIVE REPAY TO THE APPLICABLE ENTITY THE FULL VALUE OF ANY PREVIOUSLY RECEIVED SEVERANCE. THE REMEDIES DESCRIBED IN THIS PARAGRAPH ARE IN ADDITION TO ANY OTHER REMEDIES THAT MAY BE AVAILABLE TO THE COMPANY IN THE EVENT OF THE OCCURRENCE OF ANY OF THE CIRCUMSTANCES DESCRIBED IN THIS PARAGRAPH.

(iii)     UPON TERMINATION OF EMPLOYMENT FOR ANY REASON, THE EXECUTIVE AGREES TO PROMPTLY RETURN ALL COMPANY PROPERTY THAT HAS COME INTO HIS POSSESSION OR CONTROL, INCLUDING, WITHOUT LIMITATION, COMPUTER EQUIPMENT (INCLUDING, WITHOUT LIMITATION, COMPUTER HARDWARE, LAPTOP AND OTHER COMPUTERS, SOFTWARE AND PRINTERS, WIRELESS HANDHELD DEVICES, CELLULAR TELEPHONES, PAGERS, ETC.), CLIENT AND CUSTOMER INFORMATION, CLIENT AND CUSTOMER LISTS, EMPLOYEE LISTS, COMPANY FILES, NOTES, CONTRACTS, RECORDS, BUSINESS PLANS, FINANCIAL INFORMATION, SPECIFICATIONS,

COMPUTER-RECORDED INFORMATION, TANGIBLE PROPERTY, CREDIT CARDS, ENTRY CARDS, IDENTIFICATION BADGES, KEYS, AND ANY OTHER MATERIALS OF ANY KIND WHICH CONTAIN OR EMBODY, IN WHOLE OR IN PART, ANY PROPRIETARY OR CONFIDENTIAL MATERIAL OF THE COMPANY (AND ALL REPRODUCTIONS THEREOF), EXCEPT THAT COMPANY PROPERTY SHALL NOT INCLUDE ITEMS, IF ANY, LISTED IN A WRITTEN DOCUMENT SIGNED BY THE EXECUTIVE AND THE COMPANY AT OR BEFORE THE TIME OF THE EXECUTIVE'S TERMINATION FROM EMPLOYMENT AS ITEMS TO BE RETAINED BY THE EXECUTIVE. THE EXECUTIVE FURTHER AGREES THAT HE WILL LEAVE INTACT ALL ELECTRONIC COMPANY DOCUMENTS, INCLUDING THOSE WHICH THE EXECUTIVE DEVELOPED OR HELPED DEVELOP DURING HIS EMPLOYMENT, AND THAT HE WILL PROMPTLY CANCEL ALL ACCOUNTS FOR HIS BENEFIT, IF ANY, IN THE COMPANY'S NAME INCLUDING, WITHOUT LIMITATION, CREDIT CARDS, TELEPHONE CHARGE CARDS, CELLULAR TELEPHONE ACCOUNTS, PAGER ACCOUNTS, AND COMPUTER ACCOUNTS.

(iv)     UPON ANY TERMINATION OF EMPLOYMENT, UPON THE REQUEST OF THE COMPANY, THE EXECUTIVE SHALL RESIGN IN WRITING, FROM ALL OFFICES, DIRECTORSHIPS AND FIDUCIARY POSITIONS OF THE EXECUTIVE IN WHICH THE EXECUTIVE IS SERVING.

(v)     THE EXECUTIVE AGREES THAT, FOLLOWING HIS TERMINATION DATE, EXCEPT AS SET FORTH HEREIN, HE SHALL NOT BE ELIGIBLE FOR OR ENTITLED TO ANY OTHER INCENTIVE COMPENSATION AWARD, INCLUDING ANY PRO RATA INCENTIVE COMPENSATION AWARD, PURSUANT TO THE COMPANY'S AND/OR ITS SUBSIDIARIES' OR AFFILIATES' INCENTIVE COMPENSATION PLANS. THE EXECUTIVE'S AGREEMENT TO THIS PROVISION IS A MATERIAL CONSIDERATION FOR THE COMPANY'S EXECUTING THIS AGREEMENT.

(g)     In the event of the Executive's termination for death or Disability, the Executive and, to the extent applicable, his legal representatives, executors, heirs, legatees and beneficiaries shall have no rights under this Agreement, other than the right to Accrued Benefits, and their sole recourse, if any, shall be under the death or disability provisions of the plans, programs, policies and practices of the Company and/or its subsidiaries and affiliates, as applicable to the Executive. If the Executive dies prior to payment of all severance benefits to which he is entitled, all Company obligations under the Agreement shall cease except for the Accrued Benefits (if unpaid at the time of death).

6.     TRUSTS

(a)     In order to ensure in the event of a Change of Control that timely payment will be made of certain obligations of the Company to the Executive provided for under this Agreement, the Company shall, immediately prior to or in connection with the consummation of a Change of Control, irrespective of whether the Change of Control constitutes a "change in ownership or effective control" or a change in the "ownership of a substantial portion of the assets" under Section 409A of the Code, and the rulings and regulations issued thereunder, pay into one or more trust(s) (the "Trust(s)") established between the Company and any financial institution with assets in excess of $100 million selected by the Company prior to the Change of Control, as trustee (the "Trustee"), such amounts and at such time or times as are required in order to fully pay all cash amounts due the Executive hereunder that are payable or as are otherwise required pursuant to the terms of the Trust(s), with payment to be made in cash or cash equivalents. Thereafter, all such payments required to be paid hereunder shall be made out of the Trust(s); provided, however, that the Company shall retain liability for and pay the Executive any amounts or provide for such other benefits due the Executive under this Agreement for which there are insufficient funds in the Trust(s), for which no funding of the Trust(s) is required or in the event that the Trustee fails to make such payment to the Executive within the time frames set forth in this Agreement. Prior to the Change of Control, and to the extent necessary because of a change in the Trustee, after the Change of Control, the Company shall provide the Executive with the name and address of the Trustee. Nothing in this Agreement shall require the Company to maintain the funding required in this section beyond the second anniversary of a Change of Control unless, before such second anniversary, the Executive's employment has terminated in a manner qualifying him for benefits hereunder. The Executive expressly waives any requirement under this Section 6 or otherwise for the Company to fund the Trust(s) if funding would cause him to be taxed under Section 409A(b) of the Code or any successor law.

(b)    For purposes of this Agreement, the term "the Company and/or the Trustee" means the Trustee to the extent the Company has put funds in the Trust(s) and the Company to the extent the Company has not funded or fully funded the Trust(s). However, in accordance with subsection (a) above, the Company shall retain liability for and pay the Executive any amounts or provide for such other benefits due the Executive under this Agreement for which the Trustee fails to make adequate payment to the Executive within the time frames set forth in this Agreement.

7.    INVENTIONS AND IMPROVEMENTS.

The Executive acknowledges that all ideas, discoveries, inventions and improvements which are made, conceived or reduced to practice by the Executive and every item of knowledge relating to the Company's business interests (including potential business interests) gained by the Executive during the Employment Term are the sole and absolute property of the Company, and the Executive shall promptly disclose and hereby irrevocably assigns all his right, title and interest in and to all such ideas, discoveries, inventions, improvements and knowledge to the Company for its sole use and benefit, without additional compensation, and shall communicate to the Company, without cost or delay, and without publishing the same, all available information relating thereto. The Executive also hereby waives all claims to moral rights in any such ideas, discoveries, inventions, improvements and knowledge. The provisions of this Section 7 shall apply whether such ideas, discoveries, inventions or knowledge are conceived, made, gained or reduced to practice by the Executive alone or with others, whether during or after usual working hours, whether on or off the job, whether applicable to matters directly or indirectly related to the Company's business interests (including potential business interests), and whether or not within the specific realm of the Executive's duties. Any of the Executive's ideas, discoveries, inventions and improvements relating to the Company's business interests or potential business interests and conceived, made or reduced to practice during the Severance Period shall for the purpose of this Agreement, be deemed to have been conceived, made or reduced to practice before the end of the Employment Term. The Executive shall, upon request of the Company, and without further compensation by the Company but at the expense of the Company, at any time during or after his employment with the Company, sign all instruments and documents requested by the Company and otherwise cooperate with the Company and take any actions which are or may be necessary to protect the Company's right to such ideas, discoveries, inventions, improvements and knowledge, including applying for, obtaining and enforcing patents, copyrights and trademark registrations thereon in any and all countries. To the extent this section shall be construed in accordance with the laws of any state which precludes a requirement to assign certain classes of inventions made by an employee, this Section shall be interpreted not to apply to any invention which a court rules and/or the Company agrees falls within such classes.

8.    NO ASSIGNMENTS.

This Agreement shall not be assignable by the Executive. This Agreement shall be assignable by the Company only by merger or in connection with the sale or other disposition of a substantial portion of the assets of the Company. This Agreement shall inure to the benefit and be binding upon the personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees, legatees and permitted assignees of the parties hereto. The Company shall require any successor to all or substantially all of the business and/or assets of the Company, whether directly or indirectly, by purchase, merger, consolidation, acquisition of stock, or otherwise, expressly to assume and agree to perform this Agreement in the same manner and to the same extent as the Company would be required to perform if no such succession had taken place, by a written agreement in form and substance reasonably satisfactory to the Executive, delivered to the Executive within five (5) business days after such succession. As used in this Agreement, "Company" shall mean the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Agreement by operation of law, or otherwise.

9.    NOTICE.

All notices and other communications hereunder, shall be in writing and shall be given to the other party by hand delivery, by overnight express mail or other guaranteed delivery service, or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Executive: at the Executive's last address appearing in the payroll/personnel records of the Company.

If to the Company:

Ryder System, Inc.

11690 N.W. 105th Street
Miami, Florida 33178-1103
Attention: General Counsel

or to such other address as either party shall have furnished to the other in writing. Notice and communications shall be effective on the earliest of (i) when actually received by the addressee, (ii) as indicated by an overnight or other receipt, and (iii) the third business day after the notice is dispatched.

10.     RESTRICTIVE COVENANTS.

(a)     COVENANT OF CONFIDENTIALITY. All documents, records, techniques, business secrets and other information of the Company, its subsidiaries and affiliates which have or will come into the Executive's possession from time to time during the Executive's affiliation with the Company and/or any of its subsidiaries or affiliates and which the Company treats as confidential and proprietary to the Company and/or any of its subsidiaries or affiliates shall be deemed as such by the Executive and shall be the sole and exclusive property of the Company, its subsidiaries and affiliates. The Executive agrees that he will keep confidential and not use or divulge to any other individual or entity any of the Company's or its subsidiaries' or affiliates' confidential information and business secrets, including, but not limited to, such matters as costs, profits, markets, sales, products, product lines, key personnel, pricing policies, operational methods, customers, customer requirements, suppliers, plans for future developments, and other business affairs and methods and other information not readily available to the public. Additionally, the Executive agrees that upon his termination of employment, irrespective of the reason for such termination, he shall promptly return to the Company all confidential and proprietary information of the Company and/or its subsidiaries or affiliates that is in his possession.

The Executive agrees that the terms and provisions of this Agreement, as well as any and all incidents leading to or resulting from this Agreement, are confidential and may not be discussed with anyone other than his spouse, domestic partner, attorney or tax advisor without the prior written consent of the Board, except as required by law. In the event that the Executive is subpoenaed, or asked to provide confidential information or to testify as a witness or to produce documents in any existing or potential legal or administrative or other proceeding or investigation formal or informal related to the Company, to the extent permitted by applicable law, the Executive will promptly notify the Company of such subpoena or request and will, if requested, meet with the Company for a reasonable period of time prior to any such appearance or production.

(b)     COVENANT AGAINST COMPETITION. During the Executive's employment with the Company or any subsidiary or affiliate, and thereafter during the longer of: (i) the Severance Period, if any, or (ii) twelve (12) months following the Executive's Termination Date (irrespective of the reason for the Executive's termination and without any reduction or modification), the Executive shall not, without the prior written consent of the Board directly or indirectly engage or become a partner, director, officer, principal, employee, consultant, investor, creditor or stockholder in/for any business, proprietorship, association, firm or corporation not owned or controlled by the Company or its subsidiaries or affiliates which is engaged or proposes to engage or hereafter engages in a business competitive directly or indirectly with the business conducted by the Company or any of its subsidiaries or affiliates in any geographic area in which the Company is or was engaged in or actively planning to engage in business as of the Executive's Termination Date or during the previous twelve (12) month period; provided, however, that the Executive is not prohibited from owning one percent (1%) or less of the outstanding capital stock of any corporation whose stock is listed on a national securities exchange.

(c)     COVENANT OF NON-SOLICITATION. During the Executive's employment with the Company or any subsidiary or affiliate, and thereafter during the longer of (i) the Severance Period, if any, or (ii) twelve (12) months following the Executive's Termination Date (irrespective of the reason for the Executive's termination and without any reduction or modification), the Executive shall not, directly or indirectly, in any manner or capacity whatsoever, either on the Executive's own account or for any person, firm or company:

(i)     TAKE AWAY, INTERFERE WITH RELATIONS WITH, DIVERT OR ATTEMPT TO DIVERT FROM THE COMPANY ANY BUSINESS WITH ANY CUSTOMER OR ACCOUNT: (X) THAT WAS A CUSTOMER OR ACCOUNT ON THE LAST DAY OF THE EMPLOYMENT TERM AND/OR HAS BEEN SOLICITED OR SERVICED BY THE COMPANY WITHIN ONE (1) YEAR PRIOR TO THE LAST DAY OF THE EMPLOYMENT TERM; AND (Y) WITH WHICH THE EXECUTIVE HAD ANY CONTACT OR ASSOCIATION, OR THAT WAS UNDER THE SUPERVISION OF THE EXECUTIVE, OR THE IDENTITY OF WHICH WAS LEARNED BY THE EXECUTIVE, AS A RESULT OF THE EXECUTIVE'S EMPLOYMENT WITH THE COMPANY, OR

(ii)     SOLICIT, INTERFERE WITH OR INDUCE, OR ATTEMPT TO INDUCE, ANY EMPLOYEE OR INDEPENDENT CONTRACTOR OF THE COMPANY OR ANY OF ITS SUBSIDIARIES OR AFFILIATES TO LEAVE HIS EMPLOYMENT OR SERVICE WITH THE COMPANY OR TO BREACH HIS EMPLOYMENT AGREEMENT OR OTHER AGREEMENT, IF ANY.

(d)     COVENANT OF NON-DISPARAGEMENT AND COOPERATION. The Executive agrees not to make any remarks disparaging the conduct or character of the Company or any of its subsidiaries or affiliates, their current or former agents, employees, officers, directors, successors or assigns ("Ryder Parties"), except as may be necessary in the performance of his duties or as is otherwise required by law. The Executive agrees to cooperate with the Company in the investigation, defense or prosecution of any claims or actions now in existence or that may be brought in the future against or on behalf of the Company. Such cooperation shall include meeting with representatives of the Company upon reasonable notice at reasonable times and locations to prepare for discovery or any mediation, arbitration, trial, administrative hearing or other proceeding or to act as a witness. The Company shall reimburse the Executive for travel expenses approved by the Company or its subsidiaries or affiliates incurred in providing such assistance. The Executive shall notify the Company if the Executive is asked to assist, testify or provide information by or to any person, entity or agency in any such proceeding or investigation. Nothing in this provision is intended to or should be construed to prevent the Executive from providing truthful information to any person or entity as required by law or his fiduciary obligations.

(e)     REPORTS TO GOVERNMENT ENTITIES.   Nothing in this Agreement or any other agreement with, or plan or policy of, the Company restricts the Executive from providing truthful information to a self-regulatory authority or a government agency or entity, including the U.S. Equal Employment Opportunity Commission, the Department of Labor, the National Labor Relations Board, the Department of Justice, the Securities and Exchange Commission, Congress and any agency Inspector General (collectively, the "Regulators"), including in connection with initiating communications directly with, responding to any inquiries from, providing testimony before, providing confidential information to, reporting possible violations of law or regulation to, or from filing a claim or assisting with an investigation directly with a Regulator or making other disclosures that are protected under the whistleblower provisions of state or federal law or regulation.  The Executive does not need the prior authorization of the Company to engage in such communications with the Regulators, respond to such inquiries from the Regulators, provide such confidential information or documents to the Regulators, or make any such reports or disclosures to the Regulators and is not required to notify the Company that Employee has engaged in such communications with the Regulators.

(f)     SPECIFIC REMEDY. The Executive acknowledges and agrees that if the Executive commits a material breach of the Covenant of Confidentiality or, if applicable, the Covenant Against Competition, the Covenant of Non-Solicitation, or the Covenant of Non-Disparagement and Cooperation, the Company shall have the right to have the covenant specifically enforced through an injunction or otherwise, without any obligation that the Company post a bond or prove actual damages, by any court having appropriate jurisdiction on the grounds that any such breach will cause irreparable injury to the Company, without prejudice to any other rights and remedies that

Company may have for a breach of this Agreement, and that money damages will not provide an adequate remedy to the Company. The Executive further acknowledges and agrees that the Covenant of Confidentiality, the Covenant Against Competition, the Covenant of Non-Solicitation, and the Covenant of Non-Disparagement and Cooperation contained in this Agreement are intended to protect the Company's business interests and goodwill, are fair, do not unreasonably restrict his future employment and business opportunities, and are commensurate with the arrangements set out in this Agreement and with the other terms and conditions of the Executive's employment. In addition, in executing this Agreement, the Executive makes an election to receive severance pay and benefits pursuant to Section 5 and is subject to the covenants above, therefore, the Executive shall have no right to return any amounts or benefits that are already paid or to refuse to accept any amounts or benefits that are payable in the future in lieu of his specific performance of his obligations under the covenants above.

(g)      SURVIVAL OF PROVISIONS. The obligations contained in this Section 10 shall survive the termination or expiration of the Executive's employment with the Company for any reason (including Section 5(d) hereof) and shall be fully enforceable thereafter. If it is determined by a court of competent jurisdiction that any restriction in this Section 10 is excessive in duration or scope or extends for too long a period of time or over too great a range of activities or in too broad a geographic area or is unreasonable or unenforceable under the laws of the State of Florida, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the laws of the State of Florida.

11.      NO MITIGATION/NO OFFSET.

In the event of any termination of employment under this Agreement, the Executive shall be under no obligation to seek other employment and there shall be no offset against any amounts due the Executive under this Agreement on account of any remuneration attributable to any subsequent employment that the Executive may obtain. The amounts payable hereunder shall not be subject to setoff, counterclaim, recoupment, defense or other rights which the Company may have against the Executive or others, except as specifically set forth in Sections 5(c)(i)(E), 5(c)(iv)(D), 5(e)(i)(E), 5(f), 10, and 15, or upon obtaining by the Company of a final unappealable judgment against the Executive, in each case to the extent permitted by Section 409A of the Code.

12.      ATTORNEY'S FEES.

To the fullest extent permitted by law, the Company shall promptly pay, upon submission of statements, one-half of all legal and other professional fees, costs of litigation, prejudgment interest, and other expenses in excess of $10,000 in the aggregate incurred in connection with any dispute concerning payments, benefits and other entitlements which the Executive may have under Section 5(c) or 5(e), up to an amount not exceeding $15,000 in the aggregate from the Company; provided, however, the Company shall be reimbursed by the Executive (i) for the fees and expenses advanced in the event the Executive's claim is, in a material manner, in bad faith or frivolous and the court determines that the reimbursement of such fees and expenses is appropriate, or (ii) to the extent that the court determines that such legal and other professional fees are clearly and demonstrably unreasonable. Any payments made pursuant to this Section 12 shall be limited to expenses incurred on or prior to December 31 of the second calendar year following the calendar year in which the Termination Date occurs, and any payments by the Company made pursuant to this Section 12 shall be made on or prior to December 31 of the third calendar year following the calendar year in which the Termination Date occurs.

13.      LIABILITY INSURANCE.

The Company shall cover the Executive under directors and officers liability insurance in the same amount and to the same extent, if any, as the Company covers its other officers and directors.

14.      WITHHOLDING.

The Company shall withhold from any and all amounts payable under this Agreement such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

15.      SECTION 409A OF THE CODE

(a)      CONSTRUCTION AND INTERPRETATION. This Agreement shall be construed and interpreted in a manner so as not to trigger adverse tax consequences under Section 409A of the Code and the rulings and regulations issued thereunder. The Company may amend this Agreement in any manner necessary to comply with Section 409A of the Code or any successor law, without the consent of the Executive. Furthermore, to the extent necessary to comply with Section 409A of the Code, the payment terms for any of the payments or benefits payable hereunder may be delayed without the Executive's consent to comply with Section 409A of the Code.

(b)      SEPARATION FROM SERVICE REQUIREMENTS.  Notwithstanding anything herein to the contrary, the Executive shall not be entitled to any payments or benefits pursuant to this Agreement in the event that his termination of employment does not constitute a "separation from service" as defined by Section 409A of the Code and the regulations issued thereunder.  For purposes of determining whether a "separation from service", as defined by Section 409A of the Code, has occurred, pursuant to Treas. Reg. §1.409A-1(h)(3), the Company has elected to use "at least 80 percent" each place it appears in Sections 1563(a)(1), (2), and (3) of the Code and in Treas. Reg. §1.414(c)-2.

(c)      DELAYED COMMENCEMENT OF BENEFITS.  If the Executive is a Specified Employee at the time of his Termination Date, and the deferral of the commencement of any payments or benefits otherwise payable hereunder is necessary in order to prevent any accelerated or additional tax under Section 409A of the Code, then, to the extent permitted by Section 409A of the Code, the Company will defer the commencement of the payment of any such payments or benefits hereunder until the first day following the six (6) month anniversary of the Termination Date (or the earliest date as is permitted under Section 409A of the Code).  If any payments or benefits are deferred due to such requirements, (whether they would have otherwise been payable in a single sum or in installments in the absence of such deferral) they shall be paid or reimbursed to the Executive in a lump sum on the first day following the six (6) month anniversary of the Termination Date, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(d)      PAYMENTS AND REIMBURSEMENTS.  Except as otherwise provided herein, any reimbursements or in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A of the Code, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during the period of time specified in this Agreement (or, if no such period is specified, the Executive's lifetime), (ii) the amount of expenses eligible for reimbursement, or in kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in kind benefits to be provided, in any other calendar year, (iii) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred, and (iv) the right to reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit.  In addition, for purposes of the limitations on nonqualified deferred compensation under Section 409A, each payment of compensation under this Agreement shall be treated as a separate payment of compensation for purposes of applying the Section 409A deferral election rules and the exclusion from Section 409A for certain short-term deferral amounts and separation pay.  Notwithstanding any other provision set forth herein, any payments which are intended to constitute separation pay due to an involuntary separation from service in accordance with Treas. Reg. §1.409A-1(b)(9)(iii) shall be paid no later than the last day of the second calendar year following the calendar year in which the Termination Date occurs.

(e)      COMPANY ENTITY.  For purposes of this Agreement, Company Entity means any member of a controlled group of corporations or a group of trades or businesses under common control of which the Company is a member; for purposes of this Section 15(e), a "controlled group of corporations" means a controlled group of corporations as defined in Section 414(b) of the Code and a "group of trades or businesses under common control" means a group of trades or businesses under common control as defined in Section 414(c) of the Code, without any modifications.

16.     SECTION HEADINGS.

The Section headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement.

17.     EFFECTIVE DATE; ENTIRE AGREEMENT; TERM.

(a)     If, as the of the Execution Date, the Executive has been continuously employed with the Company or any of its subsidiaries or affiliates for a period of at least one (1) year, the Effective Date of this Agreement shall be the Execution Date.  If, as of the Execution Date, the Executive has not been continuously employed with the Company or any of its subsidiaries or affiliates, for a period of at least one (1) year, the Effective Date of this Agreement shall be the one year anniversary of the Executive's continuous employment with the company and/or its subsidiaries or affiliates.

(b)     Except as the parties may evidence on a Schedule A to be attached to this Agreement and signed by the Executive and the Company after the date this Agreement is executed, from and after the Effective Date, this Agreement contains the entire understanding and agreement between the parties concerning the subject matter hereof and supersedes all prior agreements, understandings, discussions, negotiations and undertakings, whether written or oral, with respect thereto including, without limitation, any offer letters or employment agreements, or severance or change in control agreements, policies, plans or practices, and any nondisclosure, nonsolicitation, inventions and/or noncompetition agreements between the parties; provided, however, that any rights to indemnification, all stock options or other equity granted to the Executive prior to the Effective Date, and all agreements relating thereto shall remain in full force and effect in accordance with their terms except as otherwise modified herein.

(c)     This Agreement shall continue in full force and effect for the duration of the Executive's employment with the Company; provided, however, that the Company may amend this Agreement (A) upon ninety (90) days notice to Executive solely to: (i) comply with any law, rule, statute, regulation, order, consent decree or other legal restriction or requirement enacted or imposed by any governmental entity (including any relevant court or tribunal); or (ii) avoid any tax or legal consequences negatively impacting the company resulting from the provisions of the Agreement; or (B) upon one (1) years notice to Executive to conform to governance practice(s) that may become prevalent and widely accepted in the future by public companies similar in profile to the Company. Notwithstanding the foregoing, the Company may not amend this Agreement (i) before the date that is two (2) years beyond the month in which a Change of Control occurs; or (ii) anytime after a Termination Date has occurred.  The Company's amendment of this Agreement in accordance with the above provisions shall not be considered a termination of Executive's employment under this Agreement and shall not give Executive grounds to terminate employment for Good Reason under this Agreement

18.     CHOICE OF LAW; JURISDICTION; JURY TRIAL WAIVER.

The validity, interpretation, construction, and performance of this Agreement shall be governed by the laws of the State of Florida without regard to its conflicts of law principles. The parties agree that any suit, action or other legal proceeding that is commenced to resolve any matter arising under or relating to any provision of this Agreement shall be commenced only in a court of the State of Florida (or, if appropriate, a federal court located within the State of Florida), in either case located in Miami, Florida, and the parties consent to the jurisdiction of such court. The parties hereto accept the exclusive jurisdiction and venue of those courts for the purpose of any such suit, action or proceeding. The Company and the Executive each hereby irrevocably waive any right to a trial by jury in any action, suit or other legal proceeding arising under or relating to any provision of this Agreement.

19.     SEVERABILITY.

The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.

20.     COUNTERPARTS.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instruments.

21.     MISCELLANEOUS.

From and after the execution of this Agreement, no provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by the Executive and the Chair of the Compensation Committee of the Board, except as provided in Section 15 above regarding Section 409A of the Code. No waiver by either party at any time of any breach by the other party of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not expressly set forth in this Agreement.

22.     GENDER.

All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural as the identity of the person or persons may require.

IN WITNESS WHEREOF, the Executive has hereunto set his hand and the Company has caused these presents to be executed in its name on its behalf, and its corporate seal to be hereunto affixed and attested by its assistant secretary, all as of the day and year first above written.

_____                              _____
Executive                                                                                    Witness


_____
SAP Number


ATTEST:                                                          RYDER SYSTEM, INC.
                                                                        (the "Company")


_____
Asst. Secretary
(Seal)                                                    By: _____

**EXHIBIT 10.1 (b)**

**EXECUTIVE SEVERANCE PLAN**

Effective as of January 1, 2007
Amended and Restated Effective as of January 1, 2013
Amended and Restated Effective as of January 1, 2017

**PREAMBLE**

Ryder System, Inc. (the "Company") adopted the Ryder System, Inc. Executive Severance Plan (the "Plan") to set forth its severance pay policy as it applies to Eligible Employees (as defined below) of the Company and all of its subsidiaries and affiliates effective as of January 1, 2007 for employees elected and promoted to or employed as an officer on or after January 1, 2007, and January 31, 2008 for employees who were already serving as officers on or before December 31, 2006 (each shall be considered an "Effective Date"), unless otherwise prohibited by law. The Plan was amended and restated effective January 1, 2009 to ensure compliance with Section 409A of the Code (as defined below) and the regulations and guidance promulgated thereunder. The Company hereby amends and restates the Plan effective January 1, 2013 to ensure that certain payments to "Covered Employees" as that term is defined in Section 162(m) of the Code, qualify as "performance-based compensation" for purposes of Section 162(m) of the Code. The Company hereby amends and restates the Plan effective January 1, 2017 to ensure compliance with Section 21F of the Code. As used herein, the masculine pronoun shall include the feminine, and the singular shall include the plural, unless a contrary meaning is clearly intended.

The Plan is intended to fall within the definition of a top hat "employee welfare benefit plan" under Section 3 (1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). This document is intended to serve as the Plan document and the summary plan description of the Plan. This document supersedes and replaces any prior plan, summary plan descriptions, agreements (whether oral or written), summaries, policies, publications, memos or notices regarding the Plan and any other severance, termination, or separation benefits (including such benefits payable after a Change of Control (as defined below)) for Eligible Employees.

All rights of Participants (as defined below) to benefits relating to this Plan shall be governed by the Plan and the executed agreement and general release executed by the Company and the Participant in connection with a Participant's termination of employment. Any employee who participates in this Plan shall not be entitled to any severance, separation, notice, or termination benefits under any other severance or change of control policy, plan, agreement or practice of (i) the Company (including any previously executed severance, employment or change of control severance agreements); (ii) any predecessor agreement; or (iii) any respective subsidiary or affiliate thereof, or pursuant to which the Company is bound or obligated to provide such benefits. Except as set forth in this Plan, all such other severance (whether voluntary or involuntary) or change of control policies, plans, agreements and practices of the Company or any of its subsidiaries or affiliates in effect for Eligible Employees prior to the applicable Effective Date of this Plan shall be deemed amended and superseded in their entirety by this Plan to the extent that they would provide benefits to Participants upon their termination of employment.

In the event that the terms of the Plan are inconsistent with other documents or other written or verbal communications provided by the Company or its representatives with respect to this severance program, the terms of the Plan shall govern. The Plan may not be amended or changed except in accordance with the provisions set forth below.

**Section 1**

**Definitions**

Capitalized terms used in the Plan and not elsewhere defined herein shall have the meanings set forth in this Section:

1.1     "Accrued Benefits" means (i) earned but unpaid base salary accrued through the Termination Date and any accrued but unpaid vacation time to the extent carried to the Termination Date under Company policy; (ii) unreimbursed expenses incurred in accordance with applicable Company policy through the Termination Date; (iii) unpaid amounts under the terms of any incentive plan in which the Participant participates as of the Termination Date, if and to the extent that the Participant is entitled under the terms of any such plan to receive a payment as of the Termination Date; and (iv) all other payments, benefits or perquisites to which the Participant may be entitled through the Termination Date, subject to and in accordance with, the terms of any applicable compensation arrangement or benefit, or any equity or perquisite arrangement, plan, program or grant.

1.2     "Base Salary" means the Participant's annual base salary in effect on the Termination Date, or, on or before the second anniversary of a Change of Control, and if higher, the highest annual base salary in effect during the six (6) month period immediately preceding the Change of Control.  Base Salary for this purpose shall not include or reflect bonuses, overtime pay, compensatory time-off, commissions, incentive or deferred compensation, employer contributions towards employee benefits, cost of living adjustment, or any other additional compensation, and shall not be reduced by any contributions made on the Participant's behalf to any plan of the Company under Section 125, 132, 401(k), or any other analogous section of the Code.

1.3     "Benefits Continuation Period" means the period for each applicable benefit beginning on the Termination Date and ending on the earliest of (i) the day on which the Participant is eligible to receive coverage for such benefit from a new employer; (ii) the date the Participant cancels his COBRA continuation coverage in accordance with the terms of the relevant plan(s); or (iii) the last day of the Participant's Severance Period.

1.4     "Cause" means: (i) fraud, misappropriation, or embezzlement by the Participant against the Company or any of its subsidiaries and/or affiliates, (ii) conviction of or plea of guilty or nolo contendere to a felony, (iii) conviction of or plea of guilty or nolo contendere to a misdemeanor involving moral turpitude or dishonesty, (iv) willful failure to report to work for more than thirty (30) continuous days not attributable to eligible vacation or supported by a licensed physician's statement, (v) a material breach by the Participant of Section 9 of this Plan (Restrictive Covenants), (vi) willful failure to perform the Participant's key job duties or responsibilities, or (vii) any other activity which would constitute grounds for termination for cause by the Company or its subsidiaries or affiliates, including but not limited to material violations of the Company's Principles of Business Conduct or any analogous code of ethics or similar policy.  Notwithstanding the foregoing, if a Change of Control has occurred within one year preceding a Cause determination, "Cause" shall not include subsections (vi) or (vii) of the preceding sentence, provided that subsections (vi) and (vii) shall continue to apply to any terminations that are deemed to have retroactively occurred pursuant to Section 5.3(b).  For the purposes of this Section 1.4, any good faith interpretation by the Company of the foregoing definition of "Cause" shall be conclusive on the Participant.  For purposes of the Plan "Cause" shall be determined by such Participant's direct supervisor and the Chief Human Resources Officer ("CHRO").  In the event that a Participant is a direct report to the CHRO, then the decision shall be made by the CHRO and the Chief Financial Officer.

1.5     "Change of Control"  Except as provided below, for the purpose of this Plan, a "Change of Control" shall be deemed to have occurred if:

(a)  any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "1934 Act")) (a "Person") becomes the beneficial owner, directly or indirectly, of thirty percent (30%) or more of the combined voting power of the Company's outstanding voting securities ordinarily having the right to vote for the election of directors of the Company; provided, however, that for purposes of this subparagraph (a), the following acquisitions shall not constitute a Change of Control: (i) any acquisition by any employee benefit plan or plans (or related trust) of the Company and its subsidiaries and affiliates or (ii) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subparagraph (c) of this Section 1.5; or

(b)     the individuals who, as of January 1, 2007, constituted the Board of Directors of the Company (the "Board" generally and as of January 1, 2007, the "Incumbent Board") cease for any reason to constitute at least a majority of the Board, provided that any person becoming a director subsequent to January 1, 2007 whose election, or nomination for election, was approved by a vote of the persons comprising at least a majority of the Incumbent Board (other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened election contest, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the 1934 Act (as in effect on January 23, 2000)), shall be, for purposes of this Plan, considered as though such person were a member of the Incumbent Board; or

(c)     there is a reorganization, merger or consolidation of the Company (a "Business Combination"), in each case, unless, following such Business Combination, (i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Company's outstanding common stock and outstanding voting securities ordinarily having the right to vote for the election of directors of the Company immediately prior to such Business Combination beneficially own, directly or indirectly, more than fifty percent (50%) of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities ordinarily having the right to vote for the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination, of the Company's outstanding common stock and outstanding voting securities ordinarily having the right to vote for the election of directors of the Company, as the case

may be, (ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan or plans (or related trust) of the Company or such corporation resulting from such Business Combination and their subsidiaries and affiliates) beneficially owns, directly or indirectly, 30% or more of the combined voting power of the then outstanding voting securities of the corporation resulting from such Business Combination and (iii) at least a majority of the members of the board of directors of the corporation resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination; or

(d)      there is a liquidation or dissolution of the Company approved by the shareholders; or

(e)      there is a sale of all or substantially all of the assets of the Company.

Notwithstanding anything in this Section 1.5 to the contrary, for purposes of Sections 5.3(a), a Change of Control shall only be deemed to occur if such transactions or events would give rise to a "change in ownership or effective control" or a change in the "ownership of a substantial portion of the assets" under Section 409A of the Code, and the rulings and regulations issued thereunder.

1.6      "<u>Change of Control Termination</u>" means (i) an Involuntary Termination or (ii) a termination of the Participant's employment by the Participant for Good Reason, either of which occurs within twelve (12) months after a Change of Control.

1.7      "<u>Code</u>" means the Internal Revenue Code of 1986, as amended, supplemented or substituted from time to time.

1.8      "<u>Committee</u>" means the Compensation Committee of the Company's Board of Directors.

1.9      "<u>Company Entity</u>" has the meaning set forth in Section 13.7(e).

1.10      "<u>Disability</u>" means (i) the Participant is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months; (ii) the Participant is, by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, receiving income replacement benefits for a period of not less than three (3) months under an accident and health plan of the Company; or (iii) a determination by the Social Security Administration that a Participant is totally disabled.

1.11      "<u>Eligible Employees</u>" means (i) all active officers of the Company employed or residing in the United States in a management level 14 or above (or other classification designating officer status, as those classifications may change from time to time), and (ii) who have not entered into any agreements or arrangements providing severance or change of control benefits with the Company.

1.12      "<u>Equity Compensation Opportunities</u>" means the Participant's ability to obtain equity in the Company (or a comparable cash-based incentive program) through a compensatory arrangement. Equity Compensation Opportunities are measured using the valuation method applied by the Company for financial accounting purposes and the Board may take into account in determining that no reduction has occurred any exercises, cashing out, or other liquidity in favor of the Participant that is either triggered by the Participant or occurring in connection with a Change of Control. Changes in the underlying value of the stock shall not be treated as a reduction in the Equity Compensation Opportunities, and the Company may take into account in replacing the value of pre-Change of Control equity compensation with post-Change of Control equity compensation (or a comparable cash-based incentive program) that the Participant may have received value for his equity compensation in the Change of Control.

1.13      "<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, supplemented or substituted from time to time.

1.14      "<u>Good Reason</u>" only applies within one (1) year following a Change of Control, except as otherwise provided in Section 5.3(c), and only occurs when, without the Participant's consent, the Company: (i) requires the Participant to be based or to perform services at any site or location more than fifty (50) miles from the site or location at which the Participant is based at the time of the Change of Control, except for travel reasonably required in the performance of the Participant's responsibilities (which does not materially exceed the level of travel required of the Participant in the six (6) month period

immediately preceding the Change of Control), or (ii) materially reduces the aggregate value of the compensation (which includes the Participant's base salary, target bonus opportunity under the Company's annual bonus plan or program, Equity Compensation Opportunities and cash perquisites), payable to the Participant, or (iii) materially and adversely changes the Participant's duties and responsibilities. For the avoidance of doubt, a change in reporting relationship or title shall not constitute "Good Reason."  A Participant's termination of employment shall only constitute a termination for Good Reason if the Participant terminates employment on or prior to the first anniversary of the date on which the circumstances providing a basis for such termination initially occurred.  In addition, the Participant's continued employment shall not constitute consent to, or a waiver of rights with respect to, any circumstance surrounding Good Reason until ninety (90) days have elapsed since the occurrence of the circumstance he would assert constitutes Good Reason and the Participant has not provided notice in accordance with Section 1.16 prior to the end of such ninety (90) day period.

1.15    "Involuntary Termination" means the termination of a Participant's employment by the Company for any reason other than death, Disability or Cause; provided, however, that an Involuntary Termination of a Participant's employment shall not occur if:

(a)    the termination of the Participant's employment is due to the transfer of the Participant's employment between the Company and a Company Entity, or among the Company and one or more Company Entities;

(b)    the termination results from the sale or transfer of all or any portion of the operations of the Company or any of its subsidiaries and affiliates (the "Disposed Business") (by means of a stock or asset disposition, or other similar transaction) which sale or transfer does not constitute a Change of Control, and either (i) the Participant's employment is transferred to the purchaser or transferee of the Disposed Business or (ii) the Participant terminates his employment with the Company or any of its subsidiaries or affiliates notwithstanding that the Participant received an offer of employment from either the purchaser or transferee of the Disposed Business or the Company or any of its subsidiaries and affiliates, as determined by the Company in its sole discretion; or

(c)    the termination follows a Change of Control and either (i) the Participant's employment is transferred to the purchaser or transferee of the Disposed Business and the obligations of this Plan are assumed by the purchaser or transferee or (ii) the Participant terminates his employment with the Company or any of its subsidiaries or affiliates or does not accept an offer of employment from a purchaser or transferee notwithstanding that the Participant received an offer of employment from either the purchaser or transferee of the Disposed Business or the Company or any of its subsidiaries and affiliates which offer included a continuation of the obligations of this Plan, as determined by the Company in its sole discretion.

In no event shall an "Involuntary Termination" occur if the Participant terminates his employment with the Company or any of its subsidiaries or affiliates for any reason.  In the event of the occurrence of any of the events set forth in subsection (b) and (c) above, the Company's obligations under this Plan shall terminate immediately and the Participant shall not be entitled to any amounts or benefits hereunder but shall still be required to comply with Section 9 hereof.  This Plan shall, however, continue in effect if the Participant's employment is transferred between or among the Company and Company Entities, as contemplated in subsection (a) above.

1.16    "Notice of Termination" means written notice (i) specifying the effective date of the Participant's termination (which shall not be less than thirty (30) days after the date of such notice in the case of a termination on account of Disability or the Participant's voluntary termination other than for Good Reason); (ii) solely with respect to the Participant terminating for Good Reason, citing the specific provisions of this Plan and the facts and circumstances, in reasonable detail, providing a basis for such termination, provided that if the basis for such Good Reason is capable of being cured by the Company, the Participant will provide the Company with an opportunity to cure the Good Reason within thirty (30) calendar days after receipt of such notice, and (iii) solely with respect to the Company terminating the Participant's employment on account of Disability, its intent to terminate his employment on account of Disability.

1.17    "Participant" means an Eligible Employee who has satisfied the conditions for participation set forth in Section 2.

1.18    "Plan" means this Ryder System, Inc. Executive Severance Plan.

1.19    "Plan Administrator" shall mean the Company's Chief Human Resources Officer or his designate.

1.20    "Release" means a severance agreement and general release in such form as the Company, in its sole discretion, determines appropriate that is executed by the Participant and the Company in connection with the termination of the

Participant's employment with the Company or any of its subsidiaries and affiliates. If the Participant is subject to the Older Workers Benefit Protection Act ("OWBPA"), the Release shall be revocable until the end of the seventh (7th) calendar day after Participant executes the Release

1.21 "Release Effective Date" means, if the Participant is covered by the OWBPA on his Termination Date, the later of: (i) the eighth (8th) calendar day after the execution of the Release, provided that the Participant has not revoked the Release prior to such date, or (ii) the Termination Date.  If the Participant is not covered by the OWBPA on his Termination Date, the Release Effective Date means the later of: (i) the date on which the Release is executed by the Participant, or (ii) the Termination Date.

1.22 "Severance Period" means: (i) one (1) year following the Termination Date if not in connection with a Change of Control Termination, or (ii) eighteen (18) months following the Termination Date if in connection with a Change of Control Termination.

1.23 "Specified Employee" means a Participant who is deemed to be a "specified employee" in accordance with the policies and procedures adopted by the Company and shall generally include any Participant who is an officer of the Company.

1.24 "Target Bonus" means the Participant's stated target annual incentive award opportunity which the Participant is eligible to receive under the Company's annual incentive compensation plan or awards for the year in which the Termination Date occurs.

1.25 "Termination Date" means the effective date of the termination of the Participant's employment with the Company.

1.26 "Trustee" has the meaning set forth in Section 8.

**Section 2**

**Participation**

An Eligible Employee shall participate in the Plan after the completion of twelve (12) consecutive months of continuous employment with the Company provided, however, that any:

(a) employee of the Company who is not an Eligible Employee as of the Effective Date of the Plan shall become a Participant only if, upon becoming an Eligible Employee, he executes an acknowledgement form (the "Form") agreeing to abide by the terms of this Plan within sixty (60) days after being presented with such Form by the Company; and

(b) Eligible Employee who as of the Effective Date of the Plan is subject to an agreement with the Company providing for severance, separation, notice or termination benefits, whether oral or written, (including such benefits payable after a Change of Control) shall become a Participant only if he executes the Form within sixty (60) days after being presented with such Form by the Company.

**Section 3**

**Notice of Termination**

Any termination of employment shall be communicated by a Notice of Termination to the other party.  No notice period is required other than as required in Section 1.16.

**Section 4**

**Conditions and Eligibility for Severance Benefits**

4.1 Conditions for Eligibility.  Subject to the conditions and limitations of this Section 4 and elsewhere in the Plan, a Participant shall be entitled to the severance benefits described herein only upon satisfaction of all the following conditions (and all other applicable conditions contained herein):

(a)      he suffers an Involuntary Termination, a Change of Control Termination, or a termination pursuant to Section 5.3(c) herein;

(b)      he timely executes without modification and in its entirety a Release within fifty (50) days of the Termination Date, and such Release becomes effective so that the Participant no longer has any right to revoke such Release within sixty (60) days of the Termination Date;

(c)      if requested by the Company or any subsidiary or affiliate, he delivers a resignation letter, acceptable to the Company, from all offices, directorships and fiduciary positions in which the Participant was serving;

(d)      he returns to the Company any property of the Company or its subsidiaries or affiliates which has come into his possession or control; and

(e)      he remains actively at work through the date of termination designated in the Notice of Termination, unless the Company agrees in writing to release the Participant from employment earlier than such date of termination, or in the case of a resignation as of a future date, the Company chooses unilaterally to shorten the period before the resignation's effective date.

4.2      Exclusions.  Each Participant shall cease to be entitled to severance benefits, upon the earliest to occur of the following:

(a)      the end of the Severance Period;

(b)      his breach of any provision of the Release, the Plan or any other Company agreement executed by the Participant including, but not limited to, the Form referenced in Section 2 or the refusal to execute the Form;

(c)      the revocation, invalidity, unenforceability, or untimely execution  of the Release;

(d)      his reemployment by the Company, or any of its subsidiaries or affiliates;

(e)      solely with respect to the reimbursement for the continuation of benefits described in Section 5.1(d), 5.3(c)(iv) or 6.1(e), the end of the Benefits Continuation Period; and/or

(f)      termination pursuant to the last sentence in Sections 5.1(d), 5.3(c)(iv) or 6.1(e).

4.3      Early Termination of Payments.

(a)      If a Participant dies prior to payment of all severance benefits to which he is entitled, all Company obligations under the Plan shall cease except that the Accrued Benefits (if unpaid at the time of death) shall be paid to the Participant's surviving spouse or, if no spouse survives, to the Participant's estate.

(b)      If the Participant is receiving severance benefits under Sections 5 or 6, and (A) if the Participant is reemployed by the Company (or any subsidiary, affiliate or successor) or breaches the Plan's terms or the Release, or (B) if the Company (or any subsidiary, affiliate or successor) discovers information that would have permitted the Company to terminate the Participant for Cause or if the Company or any subsidiary, affiliate or successor discovers a breach of Section 9, payment of severance benefits shall immediately cease, and the Participant shall no longer be entitled to any severance benefits with respect to such termination. If severance benefits cease because of re-employment and the Company has paid severance in a lump sum, the Company (or any subsidiary or successor) shall have the right to require that the Participant repay to the applicable entity the value of the severance benefits that would not yet have been paid before re-employment if he had been receiving the severance in semi-monthly installments, and the Participant shall no longer be entitled to any severance benefits with respect to such termination.  If the severance ceases because of a Cause determination or a breach of Section 9, the Company (or any subsidiary or successor) shall have the right to require that the Participant repay to the applicable entity the full value of any previously received severance.  The remedies described in this paragraph are in addition to any other remedies that may be available to the Company in the event of the occurrence of any of the circumstances described in this paragraph.

**Section 5**

**Severance Benefits Other than as a Result of a Change of Control**

5.1     Benefits.  If a Participant experiences an Involuntary Termination other than as a result of a Change of Control and complies with all of the other terms and conditions of the Plan, he shall be eligible to receive:

(a)     the Accrued Benefits, payable in a lump sum as soon as administratively feasible following the Release Effective Date, or such other date as their terms require;

(b)     continuation of the Participant's Base Salary for the Severance Period payable in installments in accordance with the Company's standard payroll practices, but no less frequently than monthly, beginning within sixty (60) days following the Termination Date (with the first payment to include amounts accrued between the Termination Date and the first payment date); provided that, if the sixtieth (60th) day following the Termination Date falls in the calendar year following the calendar year in which the Termination Date occurs, payments will not commence prior to the first day of the calendar year following the calendar year in which the Termination Date occurs; provided further that, in the event the Participant is a Specified Employee on the Termination Date, payment shall be made in accordance with the following provisions:

(i) If the aggregate value of the payments due to the Participant pursuant to this Section 5.1 (b) during the six (6) month period following his Termination Date, does not exceed two (2) times the lesser of: (x) the Specified Employee's base salary for the year prior to the year in which the Termination Date occurs; or (y) the maximum amount that may be taken into account under a qualified retirement plan pursuant to Section 401(a)(17) of the Code for the year in which the Termination Date occurs (such amount, the "Separation Pay Limit"), the Participant shall receive continuation of his Base Salary for the Severance Period payable in installments in accordance with the Company's standard payroll practices, but no less frequently than monthly, as set forth above.

(ii) If the aggregate value of the payments due to the Participant pursuant to this Section 5.1 (b) during the six (6) month period following his Termination Date exceeds the Separation Pay Limit, the Participant shall not receive any payments of continued Base Salary in excess of the Separation Pay Limit during such six (6) month period.  Any amounts in excess of the Separation Pay Limit which would have otherwise been paid during the six (6) month period following the Participant's Termination Date shall be paid in a lump sum on the first day following the six-month anniversary of the Participant's Termination Date.  Beginning with the first payroll cycle occurring on or after the first day following the six-month anniversary of the Participant's Termination Date and continuing until the end of the Severance Period, the Participant shall receive continuation payments of the Participant's Base Salary in installments in accordance with the Company's standard payroll practices, but no less frequently than monthly.

(iii)     For purposes of Section 409A of the Code, each installment payment of Base Salary made pursuant to this Section 5.1(b) shall be treated as a separate payment of compensation.

(c)     a lump sum payment equal to the pro-rata cash bonus for the year in which the Termination Date occurs, which shall be paid (i) when such annual bonuses are paid to non-terminated employees (or, if later, upon the satisfaction of all conditions for the payment of benefits hereunder, but in no event shall such payment occur later than March 15 of the calendar year following the year in which the Termination Date occurs) and (ii) based on the actual attainment of the performance goals under the annual bonus plan for the year in which the Termination Date occurs;

(d)     if the Participant continues to receive health benefits (including, medical, prescription, dental, vision and health care reimbursement account benefits) pursuant to the Company's health plans under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, supplemented or substituted from time to time ("COBRA") and pays the full COBRA premiums, the Company will reimburse the Participant for the COBRA premiums paid for such benefits for the Participant and his family through COBRA (with the exception of any COBRA premiums paid for health care reimbursement account benefits) for the Benefits Continuation Period, in accordance with the applicable plans, programs or policies of the Company, and on such terms applicable to comparably situated active employees during such period (which shall offset the Company's COBRA obligation); provided that the Executive may continue to receive health benefits pursuant to the Company's health plans during a period of time in the Benefits Continuation Period during which the Executive would not otherwise be entitled to COBRA continuation coverage under Section 4980B of the Code if the Executive continues to pay premiums for such health benefits, and the Executive shall receive reimbursement for

all premiums paid by the Executive for such continued health benefits on the date no later than December 31 of the calendar year immediately following the calendar year in which the applicable expenses have been incurred. If the Participant fails to accept available coverage from another employer or fails to notify the Company (or, following a Change of Control, the Company or the Trustee) within thirty (30) days of the Participant's eligibility to receive coverage under another employer's plan, the Participant's reimbursements under this Section 5.1(d) shall immediately terminate and the Participant shall cease to be entitled to any such reimbursements under this Plan and shall be required within three (3) months after such failure to reimburse the Company for the reimbursements paid to the Participant after such failure, and the Participant agrees that the Company may offset against such reimbursement or deduct such reimbursement from any payments due to the Participant by the Company, in full or partial payment of such reimbursement; provided that no such offset shall be made in violation of Section 409A of the Code;

(e)      if the Participant is covered by any Company-sponsored supplemental long-term disability insurance program as of the Termination Date, the Company shall continue to pay for the Participant's coverage until the end of the Severance Period. At the end of the Severance Period, the Participant shall be entitled to keep this policy if he continues to pay the annual premiums;

(f)      if the Participant is covered by any Company-sponsored executive life insurance program as of the Termination Date, the Company shall continue to pay for the Participant's coverage until the end of the Severance Period. At the end of the Severance Period, the Participant will have thirty-one (31) days from the last day of the Severance Period to convert his life insurance coverage to an individual policy;

(g)      professional outplacement services as determined in the Company's sole discretion until the earliest of (i) twenty-four (24) months after the Termination Date, (ii) the date on which the Participant obtains another full-time job, (iii) the date on which the Participant becomes self-employed, and (iv) the date on which the Participant has received all services or benefits due under the applicable Company-sponsored outplacement program. The Company will not pay the Participant cash in lieu of professional outplacement services; and

(h)      any benefits or rights to which the Participant is entitled under any of the Company's stock or equity plans in accordance with the terms and conditions of any such plans.

5.2      Payment of Severance Benefits. Notwithstanding anything herein to the contrary, no payments hereunder (other than Accrued Benefits payable pursuant to their terms) shall be made to a Participant prior to the Release Effective Date. In the event that (a) a Participant does not execute a release within fifty (50) days following the Termination Date or (b) the Release Effective Date does not occur within sixty (60) days following the Termination Date, a Participant shall not be entitled to any payments or benefits hereunder (other than the Accrued Benefits payable pursuant to their terms); provided that, if the Participant becomes entitled to payments and benefits pursuant to Section 5.3(c), the Participant shall not be entitled to any payments or benefits hereunder in the event that (a) the Participant does not execute a release within fifty (50) days following the date of the Change of Control or (b) the Release Effective Date does not occur within sixty (60) days following the date of the Change of Control.

5.3      Terminations Prior to a Change of Control.

(a)      If a Change of Control occurs and the Participant is then receiving, or is entitled to receive, payments and benefits pursuant Section 5.1 of the Plan on account of his prior termination of employment, the Company shall pay to the Participant, in a lump sum, within seven (7) calendar days after the Change of Control, an amount (in lieu of future payments) equal to the present value of all future cash payments due under Section 5.1(b) of the Plan using the prime commercial lending rate published by the Trustee at the time the Change of Control occurs, but the Company and the Participant shall continue to be liable to each other for all other obligations under this Plan. In the event that the Participant was a Specified Employee on his Termination Date, if the sum of the payments which the Participant previously received in accordance with Section 5.1(b) and the payment set forth in this Section 5.3(a) exceeds the Separation Pay Limit, any amounts in excess of the Separation Pay Limit shall be paid on the later of (i) the first day following the six-month anniversary of the Termination Date and (ii) within seven (7) calendar days after the Change of Control. For the avoidance of doubt, in the event that the provisions of this Section 5.3(a) become effective, they shall supersede the provisions of Section 5.1(b).

(b)      If a Change of Control occurs and (i) the Participant experienced an Involuntary Termination within twelve (12) months prior to the date on which the Change of Control occurs and (ii) it is reasonably demonstrated by the Participant that such Involuntary Termination either (A) was at the request of a third party who has taken steps reasonably calculated to effect a Change of Control or (B) otherwise arose in connection with or in anticipation of a

Change of Control, then, in addition to the payments and benefits set forth in Section 5.1, the Participant shall be entitled to the following:  (x) a lump sum payment equal to 50% of the Participant's Base Salary payable as soon as practicable but no later than sixty (60) days following the Change of Control; provided that if the Participant was a Specified Employee on his Termination Date, such payment shall be paid on the later of (1) as soon as practicable but no later than sixty (60) days following the Change of Control and (2) the first day following the six-month anniversary of the Participant's Termination Date; (y) the Target Bonus, which shall be paid as soon as practicable following the Change of Control but no later than March 15 of the calendar year following the calendar year in which the Change of Control occurs; and (z) for purposes of determining the Severance Period for benefits provided under Sections 5.1(d), (e), and (f), the Participant's Severance Period shall be defined as the eighteen (18) month period following the Participant's Termination Date. Notwithstanding the foregoing, in the event that (i) a Change of Control occurs and payments and benefits become payable to a Participant pursuant to this Section 5.3(b); and (ii) such Change of Control does not constitute a "change in ownership or effective control" or a change in the "ownership of a substantial portion of assets" under Section 409A of the Code and the rules and regulations issued thereunder, the lump sum payment set forth in (x) above shall be paid on the first anniversary of the Participant's Termination Date.

(c)        If a Change of Control occurs and (i) the Participant's employment was voluntarily terminated within twelve (12) months prior to the date on which the Change of Control occurs; (ii) such termination would have constituted a termination for Good Reason if it had occurred within one (1) year following the Change of Control; and (iii) it is reasonably demonstrated by the Participant that the circumstances which would have caused the occurrence of Good Reason either (a) were at the request of a third party who had taken steps reasonably calculated to effect a Change of Control or (b) otherwise arose in connection with or in anticipation of a Change of Control, then the Participant shall be entitled to the following (determined based on a Severance Period of eighteen (18) months from the Termination Date):

(i)        A lump sum payment equal to the Participant's Base Salary for the Severance Period payable within sixty (60) days following the Change of Control; provided that, if the sixtieth (60th) day following the Change of Control falls in the calendar year following the calendar year in which the Change of Control occurs, payment will not be made prior to the first day of the calendar year following the calendar year in which the Change of Control occurs; provided further that, if the Participant is a Specified Employee on the Termination Date, any amounts in excess of the Separation Pay Limit shall be paid to the Participant in a lump sum on the later of (x) the first day following the six-month anniversary of the Termination Date and (y) within sixty (60) days following the Change of Control. In the event that (i) a Change of Control occurs and payments and benefits become payable to a Participant pursuant to this Section 5.3(c); and (ii) such Change of Control does not constitute a "change in ownership or effective control" or a change in the "ownership of a substantial portion of assets" under Section 409A of the Code and the rules and regulations issued thereunder, the lump sum payment set forth herein shall be paid on the first anniversary of the Participant's Termination Date.

(ii)        a lump sum payment equal to the pro-rata cash bonus for the year in which the Termination Date occurs, which shall be paid (i) when such annual bonuses are paid to non-terminated employees (or, if later, upon the satisfaction of all conditions for the payment of benefits hereunder, but in no event shall such payment occur later than March 15 of the calendar year following the year in which the Change of Control occurs) and (ii) based on the actual attainment of the performance goals under the annual bonus plan for the year in which the Termination Date occurs;

(iii)        A lump sum payment equal to the Participant's Target Bonus, payable on the Release Effective Date or as soon thereafter as is practicable, but no later than March 15 of the calendar year following the calendar year in which the Change of Control occurs;

(iv)        if the Participant continues to receive health benefits (including, medical, prescription, dental, vision and health care reimbursement account benefits) pursuant to the Company's health plans under COBRA and pays the full COBRA premiums, the Company will reimburse the Participant for the COBRA premiums paid for such benefits for the Participant and his family through COBRA (with the exception of any COBRA premiums paid for health care reimbursement account benefits) for the remainder of the Benefits Continuation Period, in accordance with the applicable plans, programs or policies, if any, of the Company or its successor, and on such terms applicable to comparably situated active employees during such period (which shall offset the Company's COBRA obligation, if any); provided that the Executive may continue to receive health benefits pursuant to the Company's health plans during a period of time in the Benefits Continuation Period during which the Executive would not otherwise be entitled to COBRA continuation coverage under Section 4980B of the Code if the Executive continues to pay premiums for such health benefits, and the Executive shall receive reimbursement for all premiums paid by the Executive for such continued health benefits on the

date no later than December 31 of the calendar year immediately following the calendar year in which the applicable expenses have been incurred..  If the Participant fails to accept available coverage from another employer or fails to notify the Company (or the Trustee) within thirty (30) days of the Participant's eligibility to receive coverage under another employer's plan, the Participant's reimbursements under this Section 5.3(c)(iv) shall immediately terminate and the Participant shall cease to be entitled to any such reimbursements under this Plan and shall be required within three (3) months after such failure to reimburse the Company for the reimbursements paid to the Participant after such failure, and the Participant agrees that the Company may offset against such reimbursement or deduct such reimbursement from any payments due to the Participant by the Company, in full or partial payment of such reimbursement; provided that, no such offset shall be made in violation of Section 409A of the Code; and

(v)        A lump sum payment equal to the value of the Company-sponsored outplacement program maintained by the Company immediately prior to the Change of Control, based on the Participant's management level as of the Termination Date, which shall be paid within sixty (60) days following the Change of Control; provided that, if the sixtieth (60th) day following the Change of Control falls in the calendar year following the calendar year in which the Change of Control occurs, payment will not be made prior to the first day of the calendar year following the calendar year in which the Change of Control occurs; provided further that, if the Participant is a Specified Employee on the Termination Date, such amount shall be paid on the later of (x) within sixty (60) days following the Change of Control and (y) the first day following the six-month anniversary of the Termination Date.  In the event that (i) a Change of Control occurs and payments and benefits become payable to a Participant pursuant to this Section 5.3(c); and (ii) such Change of Control does not constitute a "change in ownership or effective control" or a change in the "ownership of a substantial portion of assets" under Section 409A of the Code and the rules and regulations issued thereunder, the lump sum payment set forth herein shall be paid on the first anniversary of the Participant's Termination Date; and

(vi)        If the Participant is covered by any Company-sponsored executive life insurance program as of the Termination Date, the Company (or the Trustee) shall continue to pay for the Participant's coverage until the end of the Severance Period. At the end of the Severance Period, the Participant will have thirty-one days (31) from the last day of the Severance Period to convert his life insurance coverage to an individual policy; and

(vii)        If the Participant is covered by any Company-sponsored supplemental long term disability insurance program as of the Termination Date, the Company (or the Trustee) shall continue to pay for the Participant's coverage until the end of the Severance Period. At the end of the Severance Period, the Participant shall be entitled to keep this policy if he continues to pay the annual premiums; and

(viii)        Any benefits or rights to which the Participant is entitled under any of the Company's stock or equity plans in accordance with the terms and conditions of any such plans.

For the avoidance of doubt, no payments or benefits payable to the Participant pursuant to this Section 5.3(c) shall continue beyond the end of the second calendar year following the calendar year in which the Termination Date occurs.  The Participant shall not be entitled to any payments or benefits pursuant to this Section 5.3(c), unless prior to the Participant's Termination Date, the Participant had given the Company notice of the circumstances forming the basis of termination for Good Reason and an opportunity to cure such circumstances in accordance with Sections 1.14 and 1.16.

**Section 6**

**<u>Severance Benefits As a Result of a Change of Control</u>**

6.1        <u>Benefits</u>.  If a Participant experiences a Change of Control Termination, and complies with all of the other terms and conditions of the Plan, he shall be eligible to receive:

(a)        the Accrued Benefits, payable in a lump sum as soon as administratively feasible following the Release Effective Date, or such other date as their terms require;

(b)        a lump sum payment equal to the Participant's Base Salary for the Severance Period payable within sixty (60) days following the Termination Date; provided that, if the sixtieth (60th) day following the Termination Date falls in the calendar year following the calendar year in which the Termination Date occurs, payment will not be

made prior to the first day of the calendar year following the calendar year in which the Termination Date occurs; provided further that, if a Participant is Specified Employee on the Termination Date, any amounts payable under this Section 6.1(b) in excess of the Separation Pay Limit shall be paid to the Participant in a lump sum on the first day following the six-month anniversary of the Termination Date;

(c)  a lump sum payment equal to the pro-rata cash bonus for the year in which the Termination Date occurs which shall be paid (i) when such annual bonuses are paid to non-terminated employees (or, if later, upon the satisfaction of all conditions for the payment of benefits hereunder, but in no event shall such payment occur later than March 15 of the calendar year following the year in which the Termination Date occurs) and (ii) based on the actual attainment of the performance goals under the annual bonus plan for the year in which the Termination Date occurs;

(d)  an amount equal to the Participant's Target Bonus payable on the Release Effective Date or as soon thereafter as is practicable but no later than March 15 of the calendar year following the calendar year in which the Termination Date occurs;

(e)  if the Participant continues to receive health benefits (including, medical, prescription, dental, vision and health care reimbursement account benefits) pursuant to the Company's health plans under COBRA and pays the full COBRA premiums, the Company will reimburse the Participant for the COBRA premiums paid for such benefits for the Participant and his family through COBRA (with the exception of any COBRA premiums paid for health care reimbursement account benefits) for the Benefits Continuation Period, in accordance with the applicable plans, programs or policies of the Company, and on such terms applicable to comparably situated active employees during such period (which shall offset the Company's COBRA obligation, if any); provided that the Executive may continue to receive health benefits pursuant to the Company's health plans during a period of time in the Benefits Continuation Period during which the Executive would not otherwise be entitled to COBRA continuation coverage under Section 4980B of the Code if the Executive continues to pay premiums for such health benefits, and the Executive shall receive reimbursement for all premiums paid by the Executive for such continued health benefits on the date no later than December 31 of the calendar year immediately following the calendar year in which the applicable expenses have been incurred. If the Participant fails to accept available coverage from another employer or fails to notify the Company or the Trustee within thirty (30) days of the Participant's eligibility to receive coverage under another employer's plan, the Participant's reimbursements under this Section 6.1(e) shall immediately terminate and the Participant shall cease to be entitled to any such reimbursements under this Plan and shall be required within three (3) months after such failure to reimburse the Company or the Trustee for the reimbursements paid to the Participant after such failure, and the Participant agrees that the Company may offset against such reimbursement or deduct such reimbursement from any payments due to the Participant by the Company, in full or partial payment of such reimbursement; provided that no such offset shall be made in violation of Section 409A of the Code;

(f)  if the Participant is covered by any Company-sponsored supplemental long-term disability insurance program as of the Termination Date, the Company (or the Trustee) shall continue to pay for the Participant's coverage until the end of the Severance Period. At the end of the Severance Period, the Participant shall be entitled to keep this policy if he continues to pay the annual premiums;

(g)  if the Participant is covered by any Company-sponsored executive life insurance program as of the Termination Date, the Company (or the Trustee) shall continue to pay for the Participant's coverage until the end of the Severance Period. At the end of the Severance Period, the Participant will have thirty-one (31) days from the last day of the Severance Period to convert his life insurance coverage to an individual policy;

(h)  a lump sum payment equal to the value of the Company-sponsored outplacement program maintained by the Company immediately prior to the Change of Control, based on the Participant's management level as of the Termination Date, payable within sixty (60) days following the Termination Date; provided that, if the sixtieth (60th) day following the Termination Date falls in the calendar year following the calendar year in which the Termination Date occurs, payment will not be made prior to the first day of the calendar year following the calendar year in which the Termination Date occurs; provided further that, if the Participant is a Specified Employee on the Termination Date, such amount shall be paid on the first day following the six-month anniversary of the Termination Date; and

(i)  any benefits or rights to which the Participant is entitled under any of the Company's stock or equity plans in accordance with the terms and conditions of any such plans.

6.2  In the event that a Participant becomes entitled to payments and benefits pursuant to Section 6.1 in connection with a Change of Control that does not constitute a "change in ownership or effective control" or a change in

the "ownership of a substantial portion of the assets" under Section 409A of the Code, and the rulings and regulations issued thereunder, the payments and benefits set forth in Sections 6.1 (a), (b), (c), (d), (e), (f) and (g) herein (in each case, based on a Severance Period of eighteen (18) months from the Termination Date), shall be provided in accordance with the schedule set forth in Section 5.1, except as otherwise provided in this Section 6.2.  In addition, the services set forth in Section 5.1(g) (based on a Severance Period of twelve (12) months) shall be provided in lieu of the payment set forth in Section 6.1(h).  Notwithstanding the foregoing, with respect to the payment set forth in Section 6.1(b), an amount equal to the lesser of (i) the Separation Pay Limit or (ii) the amount set forth in Section 6.1(b) shall be paid to the Participant on the Release Effective Date or as soon thereafter as is practicable, but no later than sixty (60) days following the Termination Date.  In the event that the amount set forth in Section 6.1(b) exceeds the Separation Pay Limit, any excess amounts shall be paid at the time they would have otherwise been paid pursuant to Section 5.1(b).

6.3     Notwithstanding anything herein to the contrary, no payments hereunder (other than Accrued Benefits payable pursuant to their terms) shall be made to a Participant prior to the Release Effective Date.  In the event that (a) a Participant does not execute a release within fifty (50) days following the Termination Date or (b) the Release Effective Date does not occur within sixty (60) days following the Termination Date, a Participant shall not be entitled to any payments or benefits hereunder (other than the Accrued Benefits payable pursuant to their terms).

**Section 7**

**Effect of 280G on Payments**

7.1     Reduction in Payments. In the event any Payment (as defined below) would constitute an "excess parachute payment" within the meaning of Section 280G of the Code, the Company shall reduce (but not below zero) the aggregate present value of the Payments payable to the Participant pursuant to the terms of this Plan to the Reduced Amount (as defined below), if reducing the Payments payable to the Participant pursuant to the terms of this Plan will provide the Participant with a greater net after-tax amount than would be the case if no reduction was made.

7.2     Determining Net After-Tax Amounts.  In determining whether a reduction in Payments payable to the Participant pursuant to the terms of this Plan will provide the Participant with a greater net after-tax amount, the following computations shall be made:

(a)     The net after-tax benefit to the Participant without any reduction in Payments shall be determined by reducing the Payments by the amount of federal, state, local and other applicable taxes (including the Excise Tax (as defined below)) applicable to the Payments.  For these purposes, the tax rates shall be determined using the maximum marginal rate applicable to such Participant for each year in which the Payments shall be paid.

(b)     The net after-tax benefit to the Participant with a reduction in the Payments to the Reduced Amount shall be determined by applying the tax rates under Section 7.2(a), with the exception of the Excise Tax.

7.3     Reduction Methodology.  In the event a reduction in the Payments to the Reduced Amount will provide the Participant with a greater net after-tax amount, the following shall apply:

(a)     Reduction of payments.  The reduction of the amounts payable hereunder, if applicable, shall be made by first reducing, but not below zero, the cash payments under Sections 5.1(b), 5.3(c)(i), or 6.1(b), as applicable (and in the event that such payments are installment payments, each such installment payment shall be reduced pro-rata, but not below zero), and by next reducing, but not below zero, the cash payments under Sections 5.1(c), 5.3(c)(ii), 5.3 (c)(iii), 6.1(c) or 6.1(d), as applicable.  In the event that following the reduction of the amounts set forth in the preceding sentence, additional amounts payable to the Participant must be reduced, any payments due to the Participant pursuant to the Company's equity plans shall be reduced on a pro-rata basis, but not below zero.

(b)     Restrictions. Only amounts payable under this Plan shall be reduced pursuant to this Section 7.3.  Any reduction shall be made in a manner consistent with the requirements of Section 409A of the Code.

7.4     Definitions.  For purposes of this Section 7, the following definitions shall apply.

(a)     "Payment" shall mean an amount that is received by the Participant or paid by the Company on his behalf, or represents any property, or any other benefit provided to the Participant under this Plan or under any other plan, arrangement or agreement with the Company or any other person, and such amount is treated as contingent on a change in control, as provided under Section 280G of the Code.

(b)    "Reduced Amount" shall mean an amount, as determined under Section 280G of the Code, which does not cause any Payment to be subject to the Excise Tax.

(c)    "Excise Tax" shall mean the excise tax imposed under Section 4999 of the Code.

7.5    Determination of Reduction. All determinations required to be made under this Section 7 shall be made by a nationally recognized accounting (or compensation and benefits consulting) firm selected by the Company (the "Accounting Firm") which shall provide detailed supporting calculations both to the Company and the Participant within ten (10) business days of the Change of Control.  Any such determination by the Accounting Firm shall be binding upon the Company and the Participant.  All fees and expenses of the Accounting Firm shall be borne solely by the Company.

## Section 8

## Trusts

In order to ensure in the event of a Change of Control that timely payment will be made of certain obligations of the Company to the Participant provided for under this Plan, the Company shall, immediately prior to or in connection with the consummation of a Change of Control, irrespective of whether the Change of Control constitutes a "change in ownership or effective control" or a change in the "ownership of a substantial portion of the assets" under Section 409A of the Code, and the rulings and regulations issued thereunder, pay into one or more trust(s) (the "Trust(s)") established between the Company and any financial institution with assets in excess of $100 million selected by the Company prior to the Change of Control, as trustee (the "Trustee"), such amounts and at such time or times as are required in order to fully pay all cash amounts due the Participant hereunder that are payable or as are otherwise required pursuant to the terms of the Trust(s), with payment to be made in cash or cash equivalents.  Thereafter, all such payments required to be paid hereunder shall be made out of the Trust(s); provided, however, that the Company shall retain liability for and pay the Participant any amounts or provide for such other benefits due the Participant under this Plan for which there are insufficient funds in the Trust(s), for which no funding of the Trust(s) is required or in the event that the Trustee fails to make such payment to the Participant within the time frames set forth in this Plan.  Prior to the Change of Control, and to the extent necessary because of a change in the Trustee, after the Change of Control, the Company shall provide the Participant with the name and address of the Trustee.  Nothing in this Plan shall require the Company to maintain the funding required in this section beyond the first anniversary of a Change of Control unless, before such first anniversary, the Participant's employment has terminated in a manner qualifying him for benefits hereunder.  The Participant expressly waives any requirement under this Section 8 or otherwise for the Company to fund the Trust(s) if funding would cause him to be taxed under Section 409A(b) of the Code or any successor law.

For purposes of this Plan, the term "the Company and/or the Trustee" means the Trustee to the extent the Company has put funds in the Trust(s) and the Company to the extent the Company has not funded or fully funded the Trust(s); provided, however, that in accordance with the paragraph above, the Company shall retain liability for and pay the Participant any amounts or provide for such other benefits due the Participant under this Plan for which the Trustee fails to make adequate payment to the Participant within the time frames set forth in this Plan.

## Section 9

## Restrictive Covenants

As consideration for the Company's offer of coverage under this Plan to the Participant and for other good and valuable consideration, during his employment and upon termination of employment for any reason, the Participant agrees to comply with the restrictive covenants contained in Section 9 of this Plan.  In addition, receipt of the severance payments and benefits set forth in Sections 5 and 6 is expressly conditioned upon the Participant's continued compliance with Section 9.

9.1    Confidentiality.  All documents, records, techniques, business secrets and other information of the Company, its subsidiaries and affiliates which have or will come into the Participant's possession from time to time during the Participant's affiliation with the Company and/or any of its subsidiaries or affiliates and which the Company treats as confidential and proprietary to the Company and/or any of its subsidiaries or affiliates shall be deemed as such by the Participant and shall be the sole and exclusive property of the Company, its subsidiaries and affiliates.  The Participant agrees that the Participant will keep confidential and not use or divulge to any other individual or entity any of the Company's or its subsidiaries' or affiliates' confidential information and business secrets, including, but not limited to, such matters as costs, profits, markets, sales, products, product lines, key personnel, pricing policies, operational methods, customers, customer requirements, suppliers, plans for future

developments, and other business affairs and methods and other information not readily available to the public. Additionally, the Participant agrees that upon his termination of employment, irrespective of the reason for such termination, the Participant shall promptly return to the Company any and all confidential and proprietary information of the Company and/or its subsidiaries or affiliates that is in his possession or control.

The Participant agrees that the terms and provisions of this Plan, as well as any and all incidents leading to or resulting from this Plan, are confidential and may not be discussed with anyone other than his spouse, domestic partner, attorney or tax advisor without the prior written consent of the Company's Chief Human Resources Officer, except as required by law. In the event that the Participant is subpoenaed, or asked to provide confidential information or to testify as a witness or to produce documents in any existing or potential legal or administrative or other proceeding or investigation formal or informal related to the Company, to the extent permitted by applicable law, the Participant will promptly notify the Company of such subpoena or request and will, if requested, meet with the Company for a reasonable period of time prior to any such appearance or production.

9.2    Non-Competition. During the Participant's employment with the Company, and thereafter during the Participant's Severance Period, if any, the Participant shall not, without the prior written consent of the Board, directly or indirectly engage or become a partner, director, officer, principal, employee in the same or similar capacity as the Participant worked for the Company, consultant, investor, creditor or stockholder in/for any business, proprietorship, association, firm or corporation not owned or controlled by the Company or its subsidiaries or affiliates which is engaged or proposes to engage or hereafter engages in a business competitive directly or indirectly with the business conducted by the Company or any of its subsidiaries or affiliates in any geographic area the Participant worked in or had responsibility over the previous twelve (12) month period; provided, however, that the Participant is not prohibited from owning one percent (1%) or less of the outstanding capital stock of any corporation whose stock is listed on a national securities exchange.

The Participant and the Company have attempted to limit the Participant's right to compete only to the extent necessary to protect the Company's legitimate business interests. The Participant and the Company recognize however, that reasonable people may differ in making such a determination. Consequently, the Participant and the Company agree that if the scope or enforceability of this Plan is in any way disputed at any time, a court may modify and enforce this Plan to the extent it believes to be reasonable under the circumstances.

9.3    Non-Solicitation. During the Participant's employment with the Company or any subsidiary or affiliate, and thereafter during the longer of (i) the Severance Period, if any, or (ii) twelve (12) months following the Participant's Termination Date (irrespective of the reason for the Participant's termination and without any reduction or modification), the Participant shall not, directly or indirectly, in any manner or capacity whatsoever, either on the Participant's own account or for any person, firm or company:

(a)    take away, interfere with relations with, divert or attempt to divert from the Company any business with any customer or account: (x) which was a customer on the last day of the Participant's employment and/or has been solicited or serviced by the Company within one (1) year prior to the last day of the Participant's employment; and (y) with which the Participant had any contact or association, or which was under the supervision of the Participant, or the identity of which was learned by the Participant, as a result of the Participant's employment with the Company, or

(b)    solicit, interfere with or induce, or attempt to induce, any employee or independent contractor of the Company or any of its subsidiaries or affiliates to leave his employment or service with the Company or to breach his employment agreement or other agreement, if any.

9.4    Inventions and Discoveries. The Participant acknowledges that all ideas, discoveries, inventions and improvements which are made, conceived or reduced to practice by the Participant and every item of knowledge relating to the Company's business interests (including potential business interests) gained by the Participant during the Participant's employment are the sole and absolute property of the Company, and the Participant shall promptly disclose and hereby irrevocably assigns all his right, title and interest in and to all such ideas, discoveries, inventions, improvements and knowledge to the Company for its sole use and benefit, without additional compensation, and shall communicate to the Company, without cost or delay, and without publishing the same, all available information relating thereto. The Participant also hereby waives all claims to moral rights in any such ideas, discoveries, inventions, improvements and knowledge. The provisions of this Section 9 shall apply whether such ideas, discoveries, inventions or knowledge are conceived, made, gained or reduced to practice by the Participant alone or with others, whether during or after usual working hours, whether on or off the job, whether applicable to matters directly or indirectly related to the Company's business interests (including potential business interests), and whether or not within the specific realm of the Participant's duties. Any of the Participant's ideas, discoveries, inventions and improvements relating to the Company's business interests or potential business interests and conceived, made or reduced to practice during the Severance Period shall for the purpose of this Plan, be deemed to have been conceived, made or reduced to practice before the end of the Participant's

employment.  The Participant shall, upon request of the Company, and without further compensation by the Company but at the expense of the Company, at any time during or after his employment with the Company, sign all instruments and documents requested by the Company and otherwise cooperate with the Company and take any actions which are or may be necessary to protect the Company's right to such ideas, discoveries, inventions, improvements and knowledge, including applying for, obtaining and enforcing patents, copyrights and trademark registrations thereon in any and all countries.  To the extent this Section shall be construed in accordance with the laws of any state which precludes a requirement to assign certain classes of inventions made by an employee, this Section shall be interpreted not to apply to any invention which a court rules and/or the Company agrees falls within such classes.

9.5     <u>Non-Disparagement and Cooperation</u>.  The Participant agrees not to make any remarks disparaging the conduct or character of the Company or any of its subsidiaries or affiliates, their current or former agents, employees, officers, directors, successors or assigns ("<u>Ryder Parties</u>"), except as may be necessary in the performance of his duties or as is otherwise required by law. The Participant agrees to cooperate with the Company in the investigation, defense or prosecution of any claims or actions now in existence or that may be brought in the future against or on behalf of the Company.  Such cooperation shall include meeting with representatives of the Company upon reasonable notice at reasonable times and locations to prepare for discovery or any mediation, arbitration, trial, administrative hearing or other proceeding or to act as a witness.  The Company shall reimburse the Participant for travel expenses approved by the Company or its subsidiaries or affiliates incurred in providing such assistance.  The Participant shall notify the Company if the Participant is asked to assist, testify or provide information by or to any person, entity or agency in any such proceeding or investigation.  Nothing in this provision is intended to or should be construed to prevent the Participant from providing truthful information to any person or entity as required by law or his fiduciary obligations.

9.6     <u>Reports to Government Entities</u>. Nothing in this Plan or any other agreement with, or plan or policy of, the Company restricts the Participant from providing truthful information to a self-regulatory authority or a government agency or entity, including the U.S. Equal Employment Opportunity Commission, the Department of Labor, the National Labor Relations Board, the Department of Justice, the Securities and Exchange Commission, Congress and any agency Inspector General (collectively, the "Regulators"), including in connection with initiating communications directly with, responding to any inquiries from, providing testimony before, providing confidential information to, reporting possible violations of law or regulation to, or from filing a claim or assisting with an investigation directly with a Regulator or making other disclosures that are protected under the whistleblower provisions of state or federal law or regulation.  The Participant does not need the prior authorization of the Company to engage in such communications with the Regulators, respond to such inquiries from the Regulators, provide such confidential information or documents to the Regulators, or make any such reports or disclosures to the Regulators and is not required to notify the Company that Employee has engaged in such communications with the Regulators.

9.7     <u>Specific Remedy</u>. The Participant acknowledges and agrees that if he commits a material breach of the Covenant of Confidentiality or, if applicable, the Covenant Against Competition, the Covenant of Non-Solicitation, or the Covenant of Non-Disparagement and Cooperation, the Company shall have the right to have the covenant specifically enforced through an injunction or otherwise, without any obligation that the Company post a bond or prove actual damages, by any court having appropriate jurisdiction on the grounds that any such breach will cause irreparable injury to the Company, without prejudice to any other rights and remedies that Company may have for a breach of this Plan, and that money damages will not provide an adequate remedy to the Company.  The Participant further acknowledges and agrees that the Covenant of Confidentiality, the Covenant Against Competition, the Covenant of Non-Solicitation, and the Covenant of Non-Disparagement and Cooperation contained in this Plan are intended to protect the Company's business interests and goodwill, are fair, do not unreasonably restrict his future employment and business opportunities, and are commensurate with the arrangements set out in this Plan and with the other terms and conditions of the Participant's employment.  In addition, in executing this Plan, the Participant makes an election to receive severance pay and benefits pursuant to Sections 5 and 6 and is subject to the covenants above, therefore, the Participant shall have no right to return any amounts or benefits that are already paid or to refuse to accept any amounts or benefits that are payable in the future in lieu of his specific performance of his obligations under the covenants above.

**Section 10**

**<u>Offset</u>**

Participants in the Plan shall not be entitled to receive any other severance, notice, change of control or termination payments or benefits (or notice in lieu of severance) from the Company.  In addition, to the extent permitted by Section 409A of the Code, the Participant's benefits under the Plan will be reduced by the amount of any other severance or termination payments, or pay in lieu of notice, payable by the Company to the Participant on account of his employment, or termination of employment, with the Company, including, but not limited to, (i) any payments required to be paid by the Company to the Participant under

any other program, policy, practice, or plan, or (ii) any federal, state, national, municipal, provincial, commonwealth or local law (including any payment pursuant to the Worker Adjustment Retraining and Notification Act or any national, State, local, provincial, municipal, or commonwealth equivalent).  A Participant must notify the Plan Administrator if he receives any such payments. Notwithstanding anything to the contrary in this Section 10, no severance payment paid or payable to a Participant, after giving effect to the provisions of this Section 10, shall be less than one week of Participant's Base Salary.

## Section 11

### Cessation of Participation in Employer Plans

Except as otherwise provided herein, a Participant, as of his Termination Date, shall cease to participate in and shall cease to be treated as an employee of the Company for all purposes under the employee benefit plans of the Company, including, without limitation, all retirement, welfare, incentive, bonus and other similar plans, policies, programs and arrangements maintained for employees of the Company.  Each such Participant's rights under any such plan, policy, program or arrangement shall be governed by the terms and conditions of each thereof, as in effect on such Termination Date.

## Section 12

### Administration

12.1    Plan Interpretation and Benefit Determinations.  The Plan is administered and operated by the Plan Administrator who has complete authority, with respect to matters within its jurisdiction, in its sole and absolute discretion, to construe the terms of the Plan (and any related or underlying documents or policies), and to determine the eligibility for, and amount of, severance benefits due under this Plan to Participants and their beneficiaries.  All such interpretations and determinations (including factual determinations) of the Plan Administrator shall be final and binding upon all parties and persons affected thereby. The Plan Administrator may appoint one or more individuals and delegate such of its powers and duties as it deems desirable to any such individual(s), in which case every reference herein made to the Plan Administrator shall be deemed to mean or include the appointed individual(s) as to matters within their jurisdiction.

12.2    Benefit Claims.  A Participant or his beneficiary (if applicable) may file a written claim with the Plan Administrator with respect to his rights to receive a benefit from the Plan.  The Participant will be informed of the decision of the Plan Administrator with respect to the claim within ninety (90) days after it is filed.  Under special circumstances, the Plan Administrator may require an additional period of not more than ninety (90) days to review a claim.  If this occurs, the Participant will be notified in writing as to the length of the extension, the reason for the extension, and any other information needed in order to process the claim.  If the Participant is not notified within the ninety-day (or one hundred and eighty-day, if so extended) period, he may consider the claim to be denied.

If a claim is denied, in whole or in part, the Participant will be notified in writing of the specific reason(s) for the denial, the exact plan provision(s) on which the decision was based, what additional material or information is relevant to his case, and what procedure the Participant should follow to get the claim reviewed again.  The Participant then has sixty (60) days to appeal the decision to the Plan Administrator.

The appeal must be submitted in writing to the Plan Administrator.  A Participant may request to review pertinent documents, and may submit a written statement of issues and comments.  A decision as to a Participant's appeal will be made within sixty (60) days after the appeal is received.  Under special circumstances, the Plan Administrator may require an additional period of not more than sixty (60) days to review an appeal.  If this occurs, the Participant will be notified in writing as to the length of the extension, not to exceed one hundred and twenty (120) days from the day on which the appeal was received.

If a Participant's appeal is denied, in whole or in part, he will be notified in writing of the specific reason(s) for the denial and the exact plan provision(s) on which the decision was based.  The decision on an appeal of the Plan Administrator will be final and binding on all parties and persons affected thereby.  If a Participant is not notified within the sixty-day (or one hundred and twenty-day, if so extended) period, he may consider the appeal as denied.

## Section 13

### Miscellaneous

13.1    Tax Withholding.  The Company may withhold from any and all amounts payable under this Plan such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

13.2     <u>Unfunded Plan</u>.  The Plan is unfunded.  The Company shall pay the full cost of the Plan out of its general assets, to the extent not satisfied by the Trust.

13.3     <u>Not a Contract of Employment</u>.  The Plan shall not be deemed to constitute a contract of employment, or to impose on the Company any obligation to retain any Participant as an employee, to continue any Participant's current employment status or to change any employment policies of the Company; nor shall any provision hereof restrict the right of the Company to discharge any of its employees or restrict the right of any such employee to terminate his employment with the Company.

13.4     <u>Successors</u>.

(a)     This Plan is personal to the Participant and the Participant does not have the right to assign this Plan or any interest herein.

(b)     This Plan shall inure to the benefit of and be binding upon the Company and its successors.  As used in this Plan, "<u>the Company</u>" shall mean the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Plan by operation of law, or otherwise.

13.5     <u>Full Settlement</u>.  Except as specifically provided otherwise in this Plan, the Company's obligation to make the payments provided for herein and otherwise to perform its obligations hereunder shall not be affected by any circumstances, including, without limitation, any setoff, counterclaim, recoupment, defense or other right which the Company may have against the Participant or others.  The Participant shall not be obligated to seek other employment by way of mitigation of the amounts payable to the Participant under any of the provisions of this Plan nor, except as specifically provided otherwise in this Plan, shall the amount of any payment provided for under this Plan be reduced by any compensation or benefits earned by the Participant as the result of employment by another employer after the Termination Date.

13.6     <u>Attorney's Fees</u>.  To the fullest extent permitted by law, the Company shall promptly pay upon submission of statements all legal and other professional fees, costs of litigation, prejudgment interest, and other expenses incurred in connection with any dispute concerning payments, benefits and other entitlements which the Participant may have under Sections 5.1, 5.3(b), 5.3(c), 6.1, or 6.2 subject to a cap of $15,000; provided, however, the Company shall be reimbursed by the Participant (i) for the fees and expenses advanced in the event the Participant's claim is, in a material manner, in bad faith or frivolous and the arbitrator or court, as applicable, determines that the reimbursement of such fees and expenses is appropriate, or (ii) to the extent that the arbitrator or court, as appropriate, determines that such legal and other professional fees are clearly and demonstrably unreasonable.  Any payments made pursuant to this Section 13.6 shall be limited to expenses incurred on or prior to December 31 of the second calendar year following the calendar year in which the Termination Date occurs, and any payments made pursuant to this Section 13.6 shall be made on or prior to December 31 of the third calendar year following the calendar year in which the Termination Date occurs.

13.7     <u>Section 409A of the Code</u>.

(a)   Notwithstanding anything herein to the contrary, this Plan shall be construed and interpreted in a manner so as not to trigger adverse tax consequences under Section 409A of the Code and the rulings and regulations issued thereunder. The Company may amend this Plan in any manner necessary to comply with Section 409A of the Code or any other applicable laws, with or without the consent of the Participant.  Furthermore, to the extent necessary to comply with Section 409A of the Code, the payment terms for any of the payments or benefits payable hereunder shall be amended without the Participant's consent to comply with Section 409A of the Code.

(b)   Notwithstanding anything herein to the contrary, A Participant shall not be entitled to any payments or benefits pursuant to the Plan in the event that the occurrence of his termination of employment does not constitute a "separation from service" as defined by Section 409A of the Code and the regulations issued thereunder.  For purposes of determining whether a "separation from service", as defined by Section 409A of the Code, has occurred, pursuant to Treas. Reg. §1.409A-1(h)(3), the Company has elected to use "at least 80 percent" each place it appears in Sections 1563(a)(1), (2), and (3) of the Code and in Treas. Reg. §1.414(c)-2.

(c)   Notwithstanding anything herein to the contrary, if a Participant is a Specified Employee at the time of his Termination Date, and the deferral of the commencement of any payments or benefits otherwise payable hereunder is necessary in order to prevent any accelerated or additional tax under Section 409A of the Code, then, to the extent permitted by Section 409A of the Code, the Company will defer the commencement of the payment of any such payments or benefits hereunder until the first day following the six-month anniversary of the Termination Date (or the earliest date as is permitted under Section 409A of the

Code).  If any payments or benefits are deferred due to such requirements, (whether they would have otherwise been payable in a single sum or in installments in the absence of such deferral) they shall be paid or reimbursed to the Participant in a lump sum on the first day following the six-month anniversary of the Termination Date, and any remaining payments and benefits due under this Plan shall be paid or provided in accordance with the normal payment dates specified for them herein.

(d)  Except as otherwise provided herein, any reimbursements or in-kind benefits provided under the Plan shall be made or provided in accordance with the requirements of Section 409A of the Code, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during the period of time specified in the Plan (or, if no such period is specified, the Participant's lifetime), (ii) the amount of expenses eligible for reimbursement, or in kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in kind benefits to be provided, in any other calendar year, (iii) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred, and (iv) the right to reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit.  In addition, for purposes of the limitations on nonqualified deferred compensation under Section 409A, each payment of compensation under the Plan shall be treated as a separate payment of compensation for purposes of applying the Section 409A deferral election rules and the exclusion from Section 409A for certain short-term deferral amounts and separation pay. Notwithstanding any other provision set forth herein, any payments which are intended to constitute separation pay due to an involuntary separation from service in accordance with Treas. Reg. §1.409A-1(b)(9)(iii) shall be paid no later than the last day of the second calendar year following the calendar year in which the Termination Date occurs.

(e)  For purposes of this Plan, a Company Entity means any member of a controlled group of corporations or a group of trades or businesses under common control of which the Company is a member.  A "controlled group of corporations" means a controlled group of corporations as defined in Section 414(b) of the Code and a "group of trades or businesses under common control" means a group of trades or businesses under common control as defined in Section 414(c) of the Code, without any modifications.

13.8    Choice of Law and Jury Trial Waiver.   The validity, interpretation, construction, and performance of this Plan shall be governed by the laws of the State of Florida without regard to its conflicts of law principles.  The Parties agree that any suit, action or other legal proceeding that is commenced to resolve any matter arising under or relating to any provision of this Plan shall be commenced only in a court of the State of Florida (or, if appropriate, a federal court located within the State of Florida), in either case located in Miami, Florida, and the parties consent to the jurisdiction of such court.  The parties hereto accept the exclusive jurisdiction and venue of those courts for the purpose of any such suit, action or proceeding.  **The Company and the Participant each irrevocably waive any right to a trial by jury in any action, suit or other legal proceeding arising under or relating to any provision of this Plan.**

13.9    Effect of Invalidity of Provision.  If any provision of the Plan is held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, and such provision shall, to the extent possible, be modified in such manner as to be valid and enforceable but so as to most nearly retain the intent of the Company.  If such modification is not possible, the Plan shall be construed and enforced as if such provision had not been included in the Plan.

13.10    Effect of Plan.  The Plan supersedes any and all prior severance arrangements, policies, plans or practices of the Company and its predecessors (whether written or unwritten) and further supersedes any nondisclosure, nonsolicitation, inventions and/or noncompetition agreements covering the Participants; provided, however, that any rights to indemnification, all stock options or other equity granted to the Participant prior to the Effective Date, and all agreements relating thereto shall remain in full force and effect in accordance with their terms except as otherwise modified herein.

13.11    Records.  The records of the Company with respect to employment history, Base Salary, absences, and all other relevant matters shall be conclusive for all purposes of this Plan.

13.12    Non-transferability.  In no event shall the Company make any payment under this Plan to any assignee or creditor of a Participant, except as otherwise required by law.  Prior to the time of a payment hereunder, a Participant shall have no rights by way of anticipation or otherwise to assign or otherwise dispose of any interest under this Plan, nor shall rights be assigned or transferred by operation of law.

13.13    Other Benefits.  No amount accrued or paid under this Plan shall be deemed compensation for purposes of computing a Participant's benefits under any retirement plan of the Company or its subsidiaries, nor affect any benefits under any other benefit plan now or subsequently in effect under which the availability or amount of benefits is related to the Participant's level of compensation.

## Section 14

### Amendment or Termination of the Plan

The Plan may be amended or terminated, in whole or in part, (i) at any time, with or without prior notice to Participants, by action of the Committee or its designees in order to comply with applicable laws, rules and regulations and (ii) at any time with notice to Participants by action of the Committee.

## Section 15

### Required Information

15.1  Participants' Rights Under ERISA.  A Participant in the Plan is entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA).  ERISA provides that all Plan participants shall be entitled to:

- Examine, without charge, at the Plan Administrator's office, all Plan documents, and copies of all documents filed by the Plan with the U.S. Department of Labor, such as detailed annual reports and Plan descriptions.

- Obtain copies of Plan documents and other Plan information upon written request to the Plan Administrator.  The Plan Administrator may make a reasonable charge for the copies.

- Receive a summary of the Plan's annual financial report if the Plan covers 100 or more people.  The Plan Administrator is required by law to furnish each Participant with a copy of this summary annual report.

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan.  The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of Plan participants and beneficiaries.  No one, including the Company or any other person, may fire a Participant or otherwise discriminate against him in any way to prevent him from obtaining a welfare benefit or exercising his rights under ERISA.  If a Participant's claim for a benefit is denied in whole or in part, he must receive a written explanation of the reason for the denial.  The Participant has the right to have the Plan review and reconsider his claim.  Under ERISA, there are steps a Participant can take to enforce the above rights.

For instance, if a Participant requests materials from the Plan and does not receive them within 30 days, he may file suit in a federal court.  In such a case, the court may require the Plan Administrator to provide the materials and pay the Participant up to $110 a day until the he receives the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If the Participant's claim for benefits is denied or ignored, in whole or in part, he may file suit in a state or federal court.  If a Participant is discriminated against for asserting his rights, he may seek assistance from the U.S. Department of Labor, or may file suit in a federal court.  The court will decide who should pay court costs and legal fees.  If the Participant is successful, the court may order the person the Participant sued to pay these costs and fees.  If the Participant loses, the court may order him to pay these costs and fees, for example, if it finds the Participant's claim is frivolous.  If a Participant has any questions about the Plan, he should contact the Plan Administrator.  If the Participant has any questions about this statement or about his rights under ERISA, he should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in the telephone directory or the Division of Technical Assistance and Inquires, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210.

15.2  <u>Other Important Facts</u>.

| | |
|---|---|
| OFFICIAL NAME OF THE PLAN: | Ryder System, Inc. Executive Severance Plan |
| SPONSOR: | Ryder System, Inc.<br>11690 NW 105th Street<br>Miami, Florida 33178-1103<br>(305) 500-3726 |
| EMPLOYER IDENTIFICATION NUMBER (EIN): | 59-0739250 |
| PLAN NUMBER: | [____] |
| TYPE OF PLAN: | Employee Welfare Severance Benefit Plan |
| END OF PLAN YEAR: | December 31 |
| TYPE OF ADMINISTRATION: | Employer Administered |
| PLAN ADMINISTRATOR: | Ryder's Chief Human Resources Officer<br>11690 NW 105th Street<br>Miami, Florida 33178-1103 |
| RESTATEMENT EFFECTIVE DATE: | January 1, 2013 |

The Plan Administrator keeps records of the Plan and is responsible for the administration of the Plan.  The Plan Administrator will also answer any questions you may have about the Plan.

Service of legal process may be made upon the Plan Administrator.

No individual may, in any case, become entitled to additional benefits or other rights under this Plan after the Plan is terminated.  Under no circumstances, will any benefit under this Plan ever vest or become nonforfeitable.

**EXHIBIT 12**

**Ryder System, Inc. and Subsidiaries**
**Ratio of Earnings to Fixed Charges**
**Continuing Operations**
**(Dollars in thousands)**

| | Years Ended | | | | |
|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** | **2016** |
| EARNINGS: | | | | | |
| Earnings before income taxes | 302,768 | 369,014 | 338,267 | 469,215 | 406,381 |
| Fixed charges | 183,902 | 181,460 | 187,291 | 194,573 | 190,083 |
| Add: Amortization of capitalized interest | 713 | 589 | 535 | 571 | 599 |
| Less: Interest capitalized | — | — | — | — | — |
| Earnings available for fixed charges (A) | 487,383 | 551,063 | 526,093 | 664,359 | 597,063 |
| | | | | | |
| FIXED CHARGES: | | | | | |
| Interest and other financial charges | 143,590 | 140,729 | 144,960 | 150,721 | 147,843 |
| Portion of rents representing interest expense | 40,312 | 40,731 | 42,331 | 43,852 | 42,240 |
| Total fixed charges (B) | 183,902 | 188,144 | 187,291 | 194,573 | 190,083 |
| | | | | | |
| RATIO OF EARNINGS TO FIXED CHARGES (A) / (B) | 2.65x | 3.04x | 2.81x | 3.41x | 3.14x |

**EXHIBIT 21.1**

The following list sets forth (i) all subsidiaries of Ryder System, Inc. at December 31, 2016, (ii) the state or country of incorporation or organization of each subsidiary, and (iii) the names under which certain subsidiaries do business.

| Name of Subsidiary | State or Country of Incorporation or Organization |
|---|---|
| 3241290 Nova Scotia Company | Nova Scotia |
| Associated Ryder Capital Services, Inc. | Florida |
| Bullwell Trailer Solutions Limited | England |
| CRTS Logistica Automotiva S.A. | Brazil |
| Euroway Vehicle Rental Limited | England |
| Euroway Group Holdings Limited | England |
| Euroway Group Limited | England |
| Euroway Vehicle Management Limited | England |
| Euroway Vehicle Engineering Limited | England |
| Euroway Vehicle Contracts Limited | England |
| Far East Freight, Inc. | Florida |
| Hill Hire Limited | England |
| Network Vehicle Central, Inc. | Florida |
| Network Vehicle Central, LLC | Florida |
| Road Master, Limited | Bermuda |
| RSI Holding B.V. | Netherlands |
| RSI Purchase Corp. | Delaware |
| RTI Argentina S.A. | Argentina |
| RTRC Finance LP | Canada |
| RTR Holdings (B.V.I.) Limited | British Virgin Islands |
| RTR Leasing I, Inc. | Delaware |
| RTR Leasing II, Inc. | Delaware |
| Ryder Argentina S.A. | Argentina |
| Ryder Ascent Logistics Pte Ltd. | Singapore |
| Ryder Asia Pacific Holdings B.V. | Netherlands |
| Ryder Capital (Barbados) SRL | Barbados |
| Ryder Canadian Financing US LLC | Delaware |
| Ryder Capital Ireland Holdings II LLC | Delaware |
| Ryder Capital Luxembourg Limited, S.A.R.L. | England |
| Ryder Capital Luxembourg Limited, Corp. | Florida |
| Ryder Capital S. de R.L. de C.V. | Mexico |
| Ryder Capital Services Corporation | Delaware |
| Ryder Capital UK Holdings LLP | England |
| Ryder Chile Sistemas Intergrados de Logistica Limitada[1] | Chile |
| Ryder Container Terminals | Canada |
| Ryder CRSA Logistics[2] | Canada |
| Ryder CRSA Logistics (HK) Limited | Hong Kong |
| Ryder de Mexico S. de R.L. de C.V. | Mexico |

| | |
|---|---|
| Ryder Dedicated Logistics, Inc. | Delaware |
| Ryder Deutschland GmbH | Germany |
| Ryder Distribution Services Limited | England |
| Ryder do Brasil Ltda. | Brazil |
| Ryder Energy Distribution Corporation | Florida |
| Ryder European B.V. | Netherlands |
| Ryder Europe Operations B.V. | Netherlands |
| Ryder Fleet Products, Inc. | Tennessee |
| Ryder Fuel Services, LLC | Florida |
| Ryder Funding LP | Delaware |
| Ryder Funding II LP | Delaware |
| Ryder Global Services, LLC | Florida |
| Ryder Hungary Logistics LLC | Hungary |
| Ryder Integrated Logistics, Inc. [3] | Delaware |
| Ryder Integrated Logistics of California Contractors, LLC | Delaware |
| Ryder Integrated Logistics of Texas, LLC | Texas |
| Ryder International Acquisition Corp. | Florida |
| Ryder International, Inc. | Florida |
| Ryder Limited | England |
| Ryder Logistica Ltda. | Brazil |
| Ryder Logistics (Shanghai) Co., Ltd. | China |
| Ryder Mauritius Holdings, Ltd. | Mauritius |
| Ryder Mexican Holding B.V. | Netherlands |
| Ryder Mexican Investments I LP | Delaware |
| Ryder Mexican Investments II LP | Delaware |
| Ryder Mexicana, S. de R.L. de C.V. | Mexico |
| Ryder Offshore Holdings III LLC | Delaware |
| Ryder Pension Fund Limited | England |
| Ryder Puerto Rico, Inc. | Delaware |
| Ryder Purchasing LLC | Delaware |
| Ryder Receivable Funding III, L.L.C. | Delaware |
| Ryder Risk Solutions, LLC | Florida |
| Ryder Services Corporation [4] | Florida |
| Ryder Servicios do Brasil Ltda. | Brazil |
| Ryder Servicios S. de R.L. de C.V. | Mexico |
| Ryder Singapore Pte Ltd. | Singapore |
| Ryder System B.V. | Netherlands |
| Ryder System Holdings (UK) Limited | England |
| Ryder Thailand I, LLC | Florida |
| Ryder Thailand II, LLC | Florida |
| Ryder Truck Rental Holdings Canada Ltd. | Canada |
| Ryder Truck Rental, Inc. [5] | Florida |
| Ryder Truck Rental I LLC | Delaware |
| Ryder Truck Rental II LLC | Delaware |
| Ryder Truck Rental III LLC | Delaware |
| Ryder Truck Rental IV LLC | Delaware |

| | |
|---|---|
| Ryder Truck Rental I LP | Delaware |
| Ryder Truck Rental II LP | Delaware |
| Ryder Truck Rental Canada Ltd.[6] | Canada |
| Ryder Truck Rental LT | Delaware |
| Ryder Vehicle Purchasing, LLC | Delaware |
| Ryder Vehicle Sales, LLC | Florida |
| Sistemas Logisticos Sigma S.A. | Argentina |
| Tandem Transport, L.P. | Georgia |
| Traslados Americano S. de R.L. de C.V. | Mexico |
| Truck Transerv, Inc. | Delaware |

_____

(1)      *Chile:  d/b/a Ryder Chile Limitada*

(2)      *British Columbia, Ontario, Quebec:  d/b/a CRSA Logistics*

(3)      *Florida:  d/b/a UniRyder*

(4)      *Ohio and Texas:  d/b/a Ryder Claims Services Corporation*

(5)      *Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming:  d/b/a Ryder Transportation Services*

       *Maryland and Virginia:  d/b/a Ryder/Jacobs*

       *Michigan:  d/b/a Atlas Trucking, Inc.*

       *Michigan:  d/b/a Ryder Atlas of Western Michigan*

(6)      *French Name:  Location de Camions Ryder du Canada Ltee*

       *Canadian Provinces:      d/b/a Ryder Integrated Logistics,*
                                    *Ryder Dedicated Logistics,*
                                      *Ryder Canada,*
                                      *Ryder Carrier Management Services*

**EXHIBIT 23.1**

**CONSENT OF INDEPENDENT REGISTERED CERTIFIED PUBLIC ACCOUNTING FIRM**

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (No. 333-19515, No. 333-26653, No. 333-69628, No. 333-108364, No. 333-124828, No. 333-134113, No. 333-153123, No. 333-177285, No. 333-181396, No. 333-211206 and No. 333-212138) and on Form S-3 (No. 333-209536) of Ryder System, Inc. of our report dated February 14, 2017 relating to the financial statements, financial statement schedule and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP

Miami, Florida
February 14, 2017

**EXHIBIT 24.1**

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned, being directors of Ryder System, Inc., a Florida corporation, hereby constitutes and appoints Robert D. Fatovic, Alena S. Brenner and Julie A. Azuaje, and each of them, his or her true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for the undersigned and in his or her name, place and stead, in any and all capacities, to sign the Ryder System, Inc. Form 10-K (Annual Report pursuant to the Securities Exchange Act of 1934) for the fiscal year ended December 31, 2016 (the "Form 10-K"), and any and all amendments thereto, and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission and with the New York Stock Exchange and any other stock exchange on which the Company's common stock is listed, granting unto each said attorney-in-fact and agent full power and authority to perform every act requisite and necessary to be done in connection with the execution and filing of the Form 10-K and any and all amendments thereto, as fully for all intents and purposes as he or she might or could do in person, hereby ratifying all that each said attorney-in-fact and agent, or his or her substitute or substitutes, may lawfully do or cause to be done by virtue thereof.

This Power of Attorney may be signed in any number of counterparts, each of which shall constitute an original and all of which, taken together, shall constitute one Power of Attorney.

IN WITNESS WHEREOF, each of the undersigned has hereunto set his or her hand effective the 14th day of February, 2017.


| | |
|---|---|
| /s/ John M. Berra | /s/ Robert J. Eck |
| John M. Berra | Robert J. Eck |
| | |
| /s/ Robert A. Hagemann | /s/ L. Patrick Hassey |
| Robert A Hagemann | L. Patrick Hassey |
| | |
| /s/ Michael F. Hilton | /s/ Tamara L. Lundgren |
| Michael F. Hilton | Tamara L. Lundgren |
| | |
| /s/ Luis P. Nieto, Jr. | /s/ E. Follin Smith |
| Luis P. Nieto, Jr. | E. Follin Smith |
| | |
| /s/ Abbie J. Smith | |
| Abbie J. Smith | |
| | |
| /s/ Hansel E. Tookes II | |
| Hansel E. Tookes, II | |

EXHIBIT 31.1

CERTIFICATION

I, Robert E. Sanchez, certify that:

1.     I have reviewed this annual report on Form 10-K of Ryder System, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


Date:  February 14, 2017                              /s/ Robert E. Sanchez

                                                     Robert E. Sanchez
                                                     President and Chief Executive Officer

EXHIBIT 31.2

CERTIFICATION

I, Art A. Garcia, certify that:

1. I have reviewed this annual report on Form 10-K of Ryder System, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  February 14, 2017                                      /s/ Art A. Garcia
                                                             _____
                                                             Art A. Garcia
                                                             Executive Vice President and Chief Financial Officer

EXHIBIT 32

CERTIFICATION

   In connection with the Annual Report of Ryder System, Inc. (the "Company") on Form 10-K for the year ended December 31, 2016 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Robert E. Sanchez, President and Chief Executive Officer of the Company, and Art A. Garcia, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


/s/ Robert E. Sanchez
_____

Robert E. Sanchez
President and Chief Executive Officer

February 14, 2017


/s/ Art A. Garcia
_____

Art A. Garcia
Executive Vice President and Chief Financial Officer

February 14, 2017

[This page intentionally left blank]

BR783549 -0317-10K