# EXHIBIT 24

Case 1:20-cv-22109-JB   Document 100-25   Entered on FLSD Docket 01/04/2023   Page 2 of 14

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
-----------------------------------
STATE OF ALASKA, ALASKA PERMANENT
FUND, THE CITY OF FORT LAUDERDALE
GENERAL EMPLOYEES' RETIREMENT
SYSTEM, and THE CITY OF PLANTATION
POLICE OFFICERS PENSION FUND,
on Behalf of Itself and All
Others Similarly Situated,
        Plaintiffs,
        v.
RYDER SYSTEM, INC.; ROBERT E.
SANCHEZ; ART A. GARCIA; and DENNIS
C. COOKE,
        Defendants.

Civil Action No. 1:20-cv-22109-AMC
-----------------------------------

REMOTE VIDEO DEPOSITION OF
Michael L. Hartzmark, Ph.D.
November 30, 2022
Lead: Steven P. Winter, Esquire
Firm: Wachtell Lipton Rosen & Katz

FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

Page 2

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFFS AND THE CLASS

    Adam H. Wierzbowski, Esquire
    John J. Esmay, Esquire
    John Rizio-Hamilton, Esquire
    Mathews R. de Carvalho, Esquire
    BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
    1251 Avenue of the Americas
    New York, New York 10020
    (212) 554-1400

ATTORNEYS FOR DEFENDANTS

    Steven P. Winter, Esquire
    Wilfred T. Beaye, Junior, Esquire
    Alison B. Brockman, Esquire
    WACHTELL LIPTON ROSEN & KATZ
    51 West 52nd Street
    New York, New York 10019
    (212) 403-1000

Page 3

A P P E A R A N C E S   C O N T I N U E D

JANE ROSE REPORTING
    74 Fifth Avenue
    New York, New York 10011
    1-800-825-3341
    Joan V. Cain, Court Reporter
    Marvin Oltman, Legal Videographer

Page 4

TABLE OF CONTENTS

Witness:
Michael L. Hartzmark, Ph.D.

Examination
By Mr. Winter.............................Page 6

Reporter Certificate......................Page 290

Notice to Read and Sign...................Page 292

Index of Exhibits.........................Page 294

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 21

A   Over what period of time?

Q   Let's start with the last four years.

A   The last four years, 95 to 99 percent is associated with litigation.

Q   Okay.  And would that percentage change if we went back in time?

MR. WIERZBOWSKI:  Objection.  Vague.

THE WITNESS:  If you'd go back to its founding in 2013, I'd say it's still in 90s.  It's in the 90 percent, but it's -- you know, that would take it down, you know, between 90 and 95 percent litigation.

BY MR. WINTER:

Q   Got it.

And I think we -- I asked the question in terms of the amount of work.  If I ask the question in terms of the amount of earnings that come from matters in support of litigation, can you give me a rough sense of the percentage breakdown there?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Earnings?  You mean my personal earnings?

BY MR. WINTER:

Q   Well, the earnings of Hartzmark Economics Litigation.  We'll start there.

Page 22

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Over what period?

BY MR. WINTER:

Q   Last four years.

A   Last four years, the earnings associated with Hartzmark Economics Litigation Practice is probably in the same percentages that I gave you earlier in terms of the amount of time that I spend.

Q   So something on the order of 95-plus percentage?

A   Of the earnings of Hartzmark Economics Litigation, yes.

Q   And I think you mentioned some different types of litigation matters that Hartzmark Economics Litigation works on.

Securities litigation is one of those areas?

A   Securities litigation?

Q   Yes.

A   Generally, there's -- securities litigation is something that I am -- I've -- I've been engaged in, yes.

Q   Okay.  And I think you said that one of your principal responsibilities as president was to serve as an expert witness in connection with or in

Page 23

support of litigation matters; is that accurate?

A   Yes, I'm often engaged as an expert, which often turns into becoming a testifying expert.

Q   And about what portion of your expert witness experience has been in securities litigation matters as compared to other litigation matters?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Can you be more specific?

BY MR. WINTER:

Q   Sure.

Of all of the litigation matters that you've served as an expert witness in the last four years, what percentage were securities cases, approximately?

A   Can you be more specific as to what you mean by "securities"?

Q   Oh, sure.  Yeah.

Cases involving claims under the Securities Act or the Exchange Act.

A   Securities or exchange?  Okay.  I think the easiest way to look at that is -- is going to page 4 of my CV, which is header page 79, and I'm happy to walk you through which involved Exchange Act or Securities Act.  If we go through it, Finisar was the Exchange and Securities Act.

Page 24

TerraForm was more associated with plan of allocation, but it was involved in the Securities Act.

Illumina, Adeptus, and I'm leaving out the other ones.  HD Supply, Signet, U.S. Steel, Applied Optoelectronics, Navient, Volkswagen, Symantec, CenturyLink, Mallinckrodt, Tesla, Sasol, Amneal, Evoqua.  I don't remember -- CitiGroup probably, but I don't remember.  Myriad, Alta Mesa, McDermott, Venator, Facebook Meta.  I believe Activision was, Mohawk.  I think Bumble.  I don't -- I don't think Pattern was, and that would be -- that would be associated.

And so I don't know if that's -- is that half, maybe, in the last four years?

Q   It's like a little more than half, but we can count later.

So you mentioned that you had staff working under your direction.  Where are they employed?

A   Most of the staff is employed by a company called Forensic Economics.

Q   And what relationship, if any, does Hartzmark Economics Litigation have with Forensic Economics?

MR. WIERZBOWSKI:  Objection.  Vague.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 25

THE WITNESS: I don't think I have any -- I don't think -- now that you made me think about it, there's no written or defined relationship or no written contract between the two companies.

BY MR. WINTER:

Q   So how did it come about that persons employed by Forensic Economics are assisting you in this matter?

A   About a decade ago when I -- when I and everybody else pretty much left Navigant Economics and I went out on my own, I had -- I had a -- I actually had a couple groups that supported me, and I migrated to using personnel at Forensic Economics to support my practice.

Q   And, roughly, how many people at Forensic Economics have helped you with the report in this matter?

A   In this matter, I would say roughly five.

Q   And generally what type of work did they do to help support you in this matter?

A   Forensic Economics' personnel under my direction and supervision will pull down data, including the voluminous chronology that I refer to as Appendix C.  The personnel will assist me in pulling down data in data analysis and in, for

Page 26

example, creation of the -- the tables that I have -- well, the construction of the tables that I had created, and they will also offer me suggestions, suggested edits to my report, which is, you know, sort of the common practice in both I think plaintiffs' and defense firms -- or economics consulting firms.

Q   And approximately how many hours did you spend working on your report in this case?

A   How many hours has been billed in total on this case?

Q   If that's easier to answer the question that way, that's fine.

A   Yeah, I -- I'll -- I mean, it's somewhat speculative because I don't know exactly, but I would say in the area of, you know, 150.

Q   And when you wrote your report in this case, did you start from scratch, or did you rely on other reports as precedents?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I'm not sure what you mean, "as precedents." Whose reports? What reports?

BY MR. WINTER:

Q   Your -- your prior reports.

Did you rely on any of your prior reports

Page 27

in other matters as a -- as a template for starting this report?

A   Yes, I would -- I would do that.  The -- for example, the academic literature related to efficient markets hasn't changed, so I will utilize language associated with that, the Cammer factors and the Krogman factors and the discussions associated with them haven't changed so, yes.

Q   Was there a specific report, if you recall, that you started with when you were writing this report here?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: Well, I mean, the -- the report goes back many reports.  I don't recall any specific report that I utilized in -- in drawing certain language in this report.  It might have come from multiple reports.

But often, again, as I mentioned, issues associated with efficiency, Cammer, the basically universal and standard damages methodology are consistent across reports, and it would both get my -- the folks that engage me upset if I rewrote it from scratch with -- in terms of billing; and, two, potential -- you know, one could find inconsistencies associated with reports which --

Page 28

which don't exist.

So -- but I couldn't say specifically where I began.

BY MR. WINTER:

Q   But mechanically speaking, even if you don't remember which report, was it a process of taking certain sections and copying them and pasting them into the report here?

Is that how you proceeded?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I'll generally, you know, do that, depending on the nature of the specific -- the case.  You know, again, for example, take my qualification section.  It's generally the case that I would look at a report associated with 10(b) litigation that is most recent because it would have my most up-to-date qualifications to utilize that as the starting point for the -- the text that you see in this report.

BY MR. WINTER:

Q   And in addition to your qualifications, you do the same thing for sections of the report describing, for example, the Cammer factors if those had not changed since the last report you worked on?

MR. WIERZBOWSKI: Objection to form.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 49

So there's nothing here, but that's much more a function of the defense bar's bias than mine.

Q   So -- and since founding Hartzmark Economics Litigation, have you submitted an expert report in a securities case in opposition to class certification?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  No defense has engaged me to submit a report in opposition to class certification in a 10(b) or Section 11 or Section 12 case.

BY MR. WINTER:

Q   Okay.  So I think this is true just based upon those two answers.  But -- so in every report that you've submitted since founding Hartzmark Economics Litigation in a securities case, those reports have been in support of class certification, correct?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Again, you're using an ambiguous term.  What do you mean by "securities cases"?

BY MR. WINTER:

Q   Cases -- well, I'll make it more specific.

Since founding Hartzmark Economics Litigation, in all of the cases that involved claims

Page 50

under Section 10(b) of the Exchange Act and where class certification was at issue, the reports you submitted were in support of class certification, correct?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  The nature of my engagements since Hartzmark Economics Litigation was founded has been associated with the plaintiffs, and that became the case after unsuccessful attempts to -- to serve as an expert in securities litigation for defense firms.

BY MR. WINTER:

Q   I understand that's the reason you're giving.  I just really want the -- just the factual answer, though.

So the answer to my prior question was yes?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Prior question was associated with?

BY MR. WINTER:

Q   Yeah.  I'll just -- I'll just read it back.

So since founding Hartzmark Economics Litigation, in all of the cases that involved claims under Section 10(b) of the Exchange Act and where class certification was at issue, the reports you

Page 51

submitted were in support of class certification -- class certification, yes?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  The reports that I submitted were much like this, offering opinions on whether the security traded in an open, well-developed, and efficient market and whether there was a common damages methodology and potential other issues that might have emerged.

Whether in support or not, I -- that's a legal question.

BY MR. WINTER:

Q   Okay.  So let's break those up.

In the reports that you've submitted since founding Hartzmark Economics Litigation in cases under Section 10(b) of the Exchange Act, have any of those reports offered the opinion that damages could not be calculated on a classwide basis pursuant to a common methodology?

A   Well, that question is -- I hate to use the word "absurd," on two levels.  One, that I've read it before, and I've been involved -- you know, the 50 cases I've been involved with, the common damages methodology is -- is very straightforward and standard and is basically inflation at sale and

Page 52

inflation at purchase, the difference between those two, and it's consistent across those in the 10(b) cases that I've been there.

So I have not been -- I've not written a report, to my recollection, there.  As it relates to the -- whether the market is open, well-developed, and efficient, no client that I'm aware of, who -- which I have suggested that the market is not open or well-developed or efficient has submitted a report.

Q   So --

A   The -- I think -- and the reason I say absurd is I can't imagine that they would want to submit a report when I suggest the market is not open or not well-developed or not efficient.

Q   So it may be an absurd question, but I really just want to limit it to a yes or no if we can, and then we can move on.  So I'll just read it back.

In the reports that you've submitted since founding Hartzmark Economics Litigation in cases under Section 10(b) of the Exchange Act, have any of those reports offered the opinion that damages could not be calculated on a classwide basis pursuant to a common methodology?

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 77

Factiva, period."
Q  Understood.
So what news articles are you relying on?
A  All the news articles as a -- as a whole. Doing the analysis that I'm offering -- or doing the analysis that supports my opinions is a holistic analysis.
Q  Okay.  And just --
A  All of it.
Q  Take it in steps.  So what news articles are they?  Are these the ones in Appendix C or -- I just want to understand the --
A  Yeah, Appendix C lists articles that were found -- well, articles and other disclosures associated with Ryder.
Q  Okay.  And did you review any of those news articles?
A  Possibly.
Q  Sorry.  I think someone is on -- not on mute.
But you don't recall -- you can't say, sitting here today, that you definitely looked at any of those articles?
A  I can't recall.
Q  Okay.  And if you didn't review them, for

Page 78

what purpose are you relying on them for?
A  For evaluating the Cammer and Krogman factors.
Q  So it's not what's in the article, the content; it's the fact that the article exists.  Is that fair?
MR. WIERZBOWSKI:  Objection to form.
THE WITNESS:  Yeah.  I mean, the nature of media and disclosure is associated with whether a market is an open, well-developed, and efficient market.  The specific contents which might, you know, for example, offer insight into how much the alleged fraud inflated the stock at this stage is not necessary that I examine it.
As I stated before, this is a holistic approach, and I'm listing -- I'm trying to evaluate and help the court to evaluate whether this is an open, well-developed, and efficient market, and by looking at the media coverage, that can assist my -- that can support my opinion and assist the court.
BY MR. WINTER:
Q  Got it.
And just to try to make this a little more efficient, the testimony you just gave about news articles, would that be the same for the transcripts

Page 79

of teleconference that are identified on the third -- third line?
MR. WIERZBOWSKI:  Objection to form.
THE WITNESS:  Well, again, it's all a holistic -- the transcripts are for a couple different purposes, but, again, they're there for supporting my opinion on Cammer and Krogman, you know, in terms of participation, frequency of transcript, timing, and such.
But so, yes, again, the issue is that they exist, that you can identify participants, and that is assisting me -- well, support -- assists -- helps support my opinion and assists the court.
BY MR. WINTER:
Q  Okay.  But you didn't review the transcripts themselves?
MR. WIERZBOWSKI:  Objection to form.
THE WITNESS:  For the purposes of this opening report, you know, maybe I looked at a transcript or two, but I don't recall it and -- as being something that was -- that I -- that I looked at.
BY MR. WINTER:
Q  All right.  And you didn't review the SEC filings listed in the fifth line?

Page 80

MR. WIERZBOWSKI:  Objection to form.
THE WITNESS:  Oh.  The -- oh, the Ryder System's, Inc. filings with U.S. securities and exchange, U.S. SEC?
BY MR. WINTER:
Q  Yeah.
A  I would look at those -- for example, I think I looked at them for the purposes of examining, you know, what companies Ryder compared itself to, what other indices in terms of its stock performance, a description of the company.  But, again, the issue there is the timing, the frequency. You know, is this a company that, you know, is -- is -- is disclosing information?  Is that information getting disseminated, and is that information getting digested and reflected in the market price?
Q  Understood.  Understood.
And then on the fourth line and the sixth line, you say: "List of investor/conferences," and then list of analyst reports.
Do you see that?
A  Yeah, the one, two, three, four, fourth line, "List of investor/conferences participated by Ryder System, Inc.," -- from -- "July 23rd, 2015 -

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 81

February 18th, 2020 from Bloomberg."  And then I also created a "List of analyst reports on Ryder System, Inc., July 23rd, 2015 - February 18, 2020," -- that were -- "available through S&P Capital IQ and Thomson Eikon databases."

Q   And is there a reason you say, in lines 4 and 6, "list of," but don't say list of on the other lines?  Are you trying to draw some distinction between how you're relying on the investor conferences and the analyst reports as compared to the news articles, the transcripts of teleconference, and the Ryder SEC filings?

A   Yes, in the sense that those are backups, backup to various exhibits that are basically numerical and, therefore, the lists are, in essence, utilized to create the numbers.

Q   Okay.  Okay.  But you didn't review the content of any of the analyst reports that are identified in the sixth line here?

A   I --

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Yeah, I think that's a little bit overly broad.  Possibly, I might have looked at an analyst report or two throughout.  But the critical issue, as it relates to evaluating whether

Page 82

the market is open, well-developed, and efficient, is the fact that, again, there's extensive analyst coverage.

In fact, Cammer 2 -- Cammer 2 specifically, you know, addresses that issue and suggests why that's important, and, therefore, the number is more critical at this point than the content.  Same thing with the list of investor conferences and such.  Are they out there providing information to the market, which would suggest that it's then more open, well-developed, and efficient.

So, yeah, in the case, for example, of analysts, the number is often referred to and there -- because that's an important issue as to whether there's coverage, and, therefore, the disclosures are disseminated and digested by investment professionals.

BY MR. WINTER:

Q   Understood.

But sitting here today, you don't recall or can't identify any specific analyst report that you reviewed in forming your opinions today?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Yeah, I would say that I've probably referred to them, but I can't, as I sit

Page 83

here today, recall which specific analyst reports I might have looked at.

BY MR. WINTER:

Q   Okay.  So if we go to Appendix C -- all right.  So this is the very long spreadsheet you mentioned earlier.

So if you -- am I right that column 1 lists a trading date?  Is that -- is that correct?

A   Column 1 is like -- yeah.  Lists a date and a specific day, such as Monday through -- Monday, Tuesday, Wednesday, through Sunday.

Q   Understood.

And so for each of those days, you've included information about Ryder's stock price performance on that day in the columns that go to the right?

A   What I provide is both the stock price performance, the stock activity in the market, and then also how it performed relative to certain benchmarks.

Q   Okay.  And number -- in column 13, there's a heading that says:  "Events."

Do you see that?

A   Yeah.  I didn't want to interrupt you.  And that was, yes, the third column are what I referred

Page 84

to as events, which -- yeah, which is in column 13, which are many of those news articles, SEC filings, analyst reports, et cetera.

Q   Okay.  And this list was put together by your team through the Factiva and other searches?

A   Well, this was, I think in this particular case with five years in terms of the class period, I only did ask them to do a Factiva search.

Q   Okay.  And just to -- you may have taken a look at something, you know, one of these, but you don't recall actually reviewing the reports that are listed under the Events for any of these trading days, correct?

MR. WIERZBOWSKI:  Objection to form.  Asked and answered.

THE WITNESS:  Yeah, as I sit here today, I can't recall which of these I reviewed.

BY MR. WINTER:

Q   And sitting here today, you wouldn't know what they say?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I don't understand the question.  What they say is -- is written out here.

BY MR. WINTER:

Q   Sorry.  What the actual reports themselves,

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 89

BY MR. WINTER:

Q   Understood.

But is it correct that you didn't consider the direction of the stock price reaction on this trading day or any other trading day informing the two opinions that you express in this report?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Okay.  So let me -- let me make sure I'm clear.  You're asking me did I look at any day to see whether any loss or gain was caused by any specific information disclosed on that date?  Is that correct?

BY MR. WINTER:

Q   Not from -- not precisely.  I'm asking if you considered -- I thought we were almost there.

I'm asking if you were -- you considered on each of the trading days whether there was a loss or a gain.

MR. WIERZBOWSKI:  Objection.  Assumes facts.

THE WITNESS:  I don't understand.  Right as I look here statistically, there was a negative 3.57 percent abnormal return, which is highly statistically significant.  Okay?  I examined -- I took that, put it into my bucket that evaluates in a

Page 90

holistic approach whether there is support for an opinion as to whether the market is open, well-developed, and efficient.  Okay?

I'm not sure what you're asking.

BY MR. WINTER:

Q   Yeah.  So I think we may be talking past each other.

So leaving aside the statistical significance of a stock price reaction on a given day -- put that aside -- I'm just asking whether you considered the direction of the stock price reaction, whether it's positive or negative, on any of the trading days in forming the two opinions in this report?

MR. WIERZBOWSKI:  Objection to form.  Assumes facts.  Incomplete hypothetical.

THE WITNESS:  Yeah, I did not examine losses, you know, what -- you know, whether there was a lot or a gain.

BY MR. WINTER:

Q   Okay.  That's all I was asking.  That's it.

A   And I -- I'm not -- if you could be clear as -- it's not -- it does not affect my opinion as it relates to the -- the issue of open, well-developed, and efficient and you eliminated the

Page 91

criteria, that is generally used -- not wholly used, but generally used for that, which was statistical significance.  So when --

Q   Yeah, we'll get to it.  I just want to understand.

A   Yeah, hypothetical, you know, on any given day, stocks move.

Q   Right.

A   I mean, it's just the nature -- even though we're willing to sit and listen to those pundits on CNBC and Bloomberg, stocks move, and they can try and explain them all they want.

Q   All right.  So I want to talk a little about plaintiffs' theories of liability in this case for a second.

So I think you said this earlier, but just so we have a common frame, your understanding is that plaintiffs' claim that Ryder's residual value estimates were inflated during the class period.

Is that your understanding of the -- of the claim?

MR. WIERZBOWSKI:  Objection.

THE WITNESS:  In its most general form, it's my understanding, and -- and it's almost like the common damages formula in the sense that the

Page 92

value of -- of a truck, for example, less its, you know, residual value is equal to some measure of depreciation which is then expensed.  And so it's my understanding that the primary issues in this case are associated with inflated residual values and, thus, deflated depreciation expenses.

But that flows through into the balance sheet and the income statement in the various ways that I'll let the accountant describe.

BY MR. WINTER:

Q   Sounds good.  Let's just make sure we're on the same page.

What is your understanding of a residual value?

A   Residual value?  The anticipated value that you would get, you know, upon the sale of a particular asset.

Q   Okay.  And the -- that sale might be well into the future, correct?

MR. WIERZBOWSKI:  Objection to form.  Vague.

THE WITNESS:  Well, I think in this particular case, and I -- well, I'm speculating that it -- that Ryder had specific time periods in their analyses, but I -- I can't recall.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 93

BY MR. WINTER:

Q   Okay.  But whatever the specific time periods, the residual value estimate would be an estimate of what the vehicle would sell for whenever it sold at some point in the future?

A   That seems a reasonable explanation.

Q   Okay.  And that's different from -- let me ask it this way:  What is fair market value?

A   I'm not offering an accounting -- I don't want to --

Q   Okay.

A   I don't want to state what -- I'm not offering an accounting --

Q   So let me do it without some terminology.

You'd agree that a residual value estimate is different from the price at which a firm could sell the vehicle for today?

MR. WIERZBOWSKI:  Objection to form.  Outside the scope.

THE WITNESS:  Yeah, I -- I'm not offering -- I told you I'm not offering an accounting opinion.  That -- that question has nothing to do with anything in this report associated with whether the market is open, well-developed, and efficient or whether there's a

Page 94

common damages methodology.

BY MR. WINTER:

Q   Well, I understand that's your -- your view.  We might differ a little bit, but let me ask a slightly different question that I think you'd be able to answer.

So a residual value estimate is a forward-looking measure of what Ryder expects to sell the vehicle for in the future when it's sold?

MR. WIERZBOWSKI:  Objection to form.  Calls for a legal conclusion.  Outside the scope.

MR. WINTER:  I'm not asking for his legal understanding.  I'm asking if he understands the claims --

MR. WIERZBOWSKI:  You said forward looking.

BY MR. WINTER:

Q   The question stands.

A   I'm not answering -- if you tell me that that's what you're defining it as, I can follow on to the next question.  Go ahead.

Q   All right.  Do you have an understanding of the methodology that Ryder uses to estimate its residual values?

MR. WIERZBOWSKI:  Objection.  Outside the scope.

Page 95

THE WITNESS:  I have not evaluated that for the purposes of my report.  If you can point to me in my report where -- you know, especially in the text, I'm happy to answer that question, but -- but I'm not going to speculate at this point.  I've not evaluated that methodology.

BY MR. WINTER:

Q   Understood.  So --

A   Plus, I would think that's an internal issue, and as I -- there's no materials relied upon that are -- you know, I haven't looked at internal documents on Ryder's algorithms, methodologies, whatever it might be, techniques.

Q   Yeah.  I'm just trying to get a lay of the land of what you understand or have not -- let me put it this way:  What you focused on and what you didn't focus on in terms of plaintiffs' allegations in forming your opinions.  So that's the purpose of these questions.

MR. WIERZBOWSKI:  Objection to form.

BY MR. WINTER:

Q   So the -- are the plaintiffs -- is the plaintiffs' theory here that Ryder failed to disclose the methodology that it was using to estimate residual values?

Page 96

MR. WIERZBOWSKI:  Objection to form.  Outside the scope.  Calls for a legal conclusion.

THE WITNESS:  Yeah, that's a -- that's a legal question.  I -- as I state in here, I assume that the allegations that there was inflation in the stock caused by misstatements and the residual value and the depreciation expenses were both introduced into the stock and then subsequently eliminated and that investors were harmed because of that.

BY MR. WINTER:

Q   Okay.  So your -- your understanding of -- your understanding of plaintiffs' theory of liability, for purposes of your report, is that the residual value estimates during the proposed class period were higher than they should have been; is that -- is that fair?

A   I believe, yes, in the complaint and the Motion to Dismiss, it's alleged as one of the allegations that residual values were misstated.

MR. WINTER:  All right.  Let's mark Tab 3 as Exhibit 2.

- - -

(Hartzmark Exhibit 2 was marked for identification.)

- - -

State of Alaska                                    [FINAL]                              November 30, 2022
v. Ryder System                                                                   Michael Hartzmark, Ph.D.

Page 145

reaction on July 30th, 2019, so the first alleged corrective disclosure date, was consistent with the expected impact of the news released on that day?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I don't understand the -- the question.

BY MR. WINTER:

Q   Yeah.

Did you look at the -- any of the -- did you look at any of the reports that were issued on or after July 30th to understand whether or not the information that Ryder disclosed on July 30th was different than the information that the market anticipated it would disclose?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I don't understand the question. I looked -- these are dates with alleged corrective disclosures, and I asked the question were there statistically significant negative returns, and the answer is yes. And that's consistent with an efficient market. It's also consistent with there being what's called, at least initially -- or I'm sorry. It's consistent with what's called back-end price impact.

BY MR. WINTER:

Page 146

Q   Okay. What's back-end price impact?

A   Back end is that -- that it's -- back end generally refers to dates when the inflation is removed, where front end is -- generally refers to when inflation is maintained or introduced.

Q   Okay. But your conclusion that inflation was removed on the alleged corrective disclosure dates, that's based on the allegations in plaintiffs' complaint, not an analysis of the actual disclosures on those dates; is that right?

MR. WIERZBOWSKI: Objection to form. Misstates testimony. Outside the scope.

THE WITNESS: The -- if you look at paragraph 2 of my report, it says I've reviewed the complaint, Motion to Dismiss order, and assume the allegations sustained in the Motion to Dismiss order are true for the purposes of this report.

Within the Motion to Dismiss and the complaint, there are three dates that are alleged to be corrective disclosure dates. Okay? I assume that plaintiffs will prove at trial the allegations to be true. To the extent they prove that those are true and, therefore, the alleged corrective disclosure dates are corrective disclosure dates, there are statistically significant price movements

Page 147

on those dates. That --

BY MR. WINTER:

Q   Okay. So I think we're having --

A   That is what I've demonstrated.

Q   Right. So -- so whatever new or relevant information that was disclosed on those dates, that would come from plaintiffs' complaint or the Motion to Dismiss decision accepting those allegations as true, not any of the underlying disclosures?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: Well, I think -- I think what you're saying is did I look at whether the losses incurred on those days were caused by the allegations.

Is that what you're asking?

BY MR. WINTER:

Q   Not precisely.

What I'm asking is not whether the losses were caused by those allegations, but whether or not the reason the market -- the reason for the stock price reaction was consistent with plaintiffs' allegations.

A   But isn't that -- the reason for the market's reaction being consistent with the plaintiffs' allegations -- okay? -- is basically

Page 148

asking the question of whether the decline is due to the allegations, isn't it? Isn't that the same thing? Or am I mistaken?

I'm trying -- I just want to clarify --

Q   Yeah, I understand.

A   -- I don't want to be argumentative, but it seems to me as though you're asking -- you're trying to word a question without just being direct and stating it. And I don't understand it. The reason --

Q   Yeah. Let me -- let me come back to this when we have an actual example. I think that will help.

So on October 29th, 2019, which is the second alleged corrective disclosure, you considered price impact on both October 29th and October 30th; is that right?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I examined that, and interestingly enough, they were both statistically significant so that the allegations in the complaint were -- were supported, but conservatively I did not use the second date as a news date.

That, in essence, demonstrates actually why I'm conservative in the news/no news, because when

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 181

methodology you just described; is that right?

A   Yeah.  It basically describes my opinion and how it's implemented, what the equation is, and, you know, it -- you know, it's consistent with either examining it and looking at inflation and going backwards or calculating a but-for price and subtracting that from the actual price and calculating inflation.  But the concept is inflation at purchase, less inflation at sale.

Q   I'm going to come back to that, but when you said inflation and going backward, is that called backcasting?

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  I mean, some people might call it backcasting.

BY MR. WINTER:

Q   Is that not an accurate description?  It sounds like you were --

A   I -- you know, I don't think I've ever used that terminology --

Q   Okay.

A   -- that I can recall.

Q   Now, in this section that we just bracketed, I guess, paragraphs 85 through 98, are any of these paragraphs specific to Ryder?

Page 182

A   They're all specific to Ryder.

Q   So it looks like you used -- I tried to count.  Looks like the word "Ryder" is used five times in this section, and each time it precedes either common stock or stock.

Is there anything specific about Ryder as a company or the -- the claims that are asserted here against Ryder that's reflected in Section VII of your report?

MR. WIERZBOWSKI:  Objection to form.  Assumes facts.

THE WITNESS:  It's very clear from -- from this that this is a virtual standard, a routine.  It's a formula.  As for the specific facts that are under dispute between you and the plaintiffs, those will be evaluated during discovery, and that will enable a defense expert and an economic expert to calculate those inputs.

BY MR. WINTER:

Q   Okay.  But for purposes of your opinion that damages can be calculated on a classwide basis, you could just swap Ryder for any other public company that's a defendant in a Section 10(b) claim where there's an alleged misrepresentation that inflates the stock price, right?

Page 183

MR. WIERZBOWSKI:  Objection to form.

THE WITNESS:  Well, let me -- let's turn back to page -- to page 4.

BY MR. WINTER:

Q   Page 4.

A   Okay?  Because I don't want to basically take what you're saying about -- Rougier -- footnote 6, Rougier, Applied Optoelectronics.  Okay?  Basically, it suggests that -- I can say that the out-of-pocket damages method is -- is acceptable.  Vrakas versus U.S. Steel, the damages model was accepted.  Signet Jewelers Limited, the notion of inflation at sale and purchase is accepted.  DFC was accepted.  Cobalt was more associated with efficiency.  They didn't discuss because I don't think there was a question of damages.

William Wallace, very clear while calculating proper damages based on the date of purchase and sale may be complicated, does not demand excessive individual inquiry.  In essence, it basically says what I say is that, whatever that number is, whatever that input is, is put into this common damages methodology formula, and it's applied classwide.

Should it be the case that the trier of

Page 184

fact says this is so difficult in this particular 10(b)(5) case and Dr. Hartzmark's calculation is so unreliable and unreasonable?  Again, I don't think any court is looking for perfection, but is unreliable, unreasonable, doesn't measure it, that still allows me to suggest that there's a common damages methodology because in that case, if it's unreliable, you put in zero, or possibly if the defendant is being at least somewhat honest, some value that they calculate it other than zero.

The fact is that all of these cases, as well as the others that I've done, this is the nature of the damages because the allegations relate to the stock price being inflated.  Okay?  If it's a different type of allegation, then, yeah, the out-of-pocket methodology is not -- wouldn't necessarily be applied.  Okay?

But this is a very clear-cut case, as I understand it.  The liability theory is that because of misstatements on financial metrics, stock was inflated.  Inflation came out, investors were harmed by buying at inflated levels, whatever those levels are.  Whatever that input is to create the inflation ribbon will be calculated, and when I do a loss -- or when someone does a loss causation analysis and

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 209

Take, for example, a classic inventory case where you have -- your inventory is stated to be a hundred -- okay? -- and it really -- it's really 90. Okay? And every quarter for ten quarters you overstated it for a dollar and there's no price impact, no price reaction from that overstatement. It's too small.

And then you say, "Oops. It's ten. I overstated it by ten." The cumulative amount -- and I state that on one day and the stock price falls. Okay? Economists will generally utilize that price reaction on that day and then do what's called scaling going backwards, and we might scale based on, say, the inventory at those different points. Okay?

So there are times when you're using -- and this is -- this is why -- this is -- again, this is more associated with the inflation ribbon and how you're going to do it. You had asked me before, techniques. What I'm saying, the inflation ribbon sometimes is used in the price reactions on the revelation and sometimes using the price reactions on the misstatements or sometimes both.

Q   Okay. So I think -- I think what I hear you saying is that if the disclosure is corrected

Page 210

and reveals an alleged misstatement, then you can use the stock price drop on the back end to try to estimate inflation during the class period -- I'll just stop there -- right?

A   Yes.

Q   And that if -- if a disclosure is related to an alleged misstatement, that is a bigger category of things that could include trying to estimate inflation on the front end based on the alleged misstatement.

Is that -- Is that a fair summary?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: Yeah, you -- I guess, put another way, you might utilize the misstatements on the front end. To the extent that they're measurable, material, you can decompose it to alter the level of inflation that you start with going backwards on the back end.

BY MR. WINTER:

Q   How would -- how would you know whether or not you could use the misstatements on the front end in order to estimate inflation?

A   You'd have to do loss causation. I'd have to look at internal documents. You know, again, you use the -- the toolkit that's available.

Page 211

But what I can say -- okay? Again -- and I'll say it again. Whatever that is -- okay? -- however it's determined, whether it be by your expert or by a plaintiffs' expert, whatever that input is, whatever that amount is, it's applied classwide, and then the common damages methodology is utilized to calculate individual damages. Okay?

I haven't done a loss causation. I can't tell you, and I can't tell you in this specific instance how I exactly would do it. Okay? But that's -- those are -- I've given you a whole bunch of methods that have been utilized in the past, and, indeed, the last one I gave you, the court just came out with a very favorable review of it.

Q   Okay. And if there was not a positive stock price reaction to the alleged misstatement, does that mean that you're in the world of relying on the corrective disclosure and trying to go backwards in time and estimate inflation based on the price reaction to the corrective disclosure?

MR. WIERZBOWSKI: Objection to form. Incomplete hypothetical.

THE WITNESS: Yeah, not necessarily.

Again, I'd have to look at the specific situation. As I said before, maybe -- take --

Page 212

again, I've given you the example. Take the situation where the stock went down by nine -- nine points. First of all, maybe there was a reduction in inflation. I can't tell you. Maybe there was a -- you know, maybe inflation is a billion, three at the end -- I'm sorry -- at its largest based on the declines over those three corrective disclosures and it's adjusted going backwards, and maybe that 9 percent is a reduction. Maybe it should have been 15 percent. Okay? You can look, and you can do analyses to look at that and -- and account for it.

The idea, then again, is first you parse, if you're doing backcasting, and then you scale, and so I -- I -- you know, again, how I'm going to scale in this particular case, that's an issue of loss causation. However that scaling factor is determined, though, will be applied classwide, and the common damages methodology will be utilized to calculate individual damages.

BY MR. WINTER:

Q   So that's where I was going to go next. So that's a good segue.

MR. WIERZBOWSKI: I'm just wondering, Steve, if this is a good time to break or if Dr. Hartzmark would like a break.

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 237

Let's assume in a prior period the price went down by $9 -- okay? -- and that they had announced an inventory adjustment that was related to $3 of that price decline and that had they been honest, they would have had to announce another $3 -- we'll make it easier -- $4.

Well, we know that the -- the $3 caused the $3. So you would have had an extra $4 decline on that inventory on that misrepresentation, and you could do that using maybe EPS, maybe some other accounting method. But what that shows is, A, how you use various methods to come up with what the price might have been or should have been and also you know, how that can go backward -- how you can go backwards on that and also how you might have a price decline but it's cushioned. Because had they announced what they announced in a corrective disclosure in a prior period, it would have fallen even more.

Q   All right. I think we can do this quickly, hopefully.

So the four techniques that you list in paragraph 97 are examples of ways it sounds like you in the past have used to calculate parsing and scaling, just -- does that sound correct?

Page 238

A   I think the simplest thing -- I think the simplest thing would be that I wish I would have written the sentence: These include the use of a number of factors, among others, such as the analysis of -- none of these have I used in isolation.

Q   Understood. My only question is --

A   You keep asking in isolation how would I use it --

Q   It's impossible to understand --

A   Okay. So that's how I've changed this sentence, and maybe we can get questions related to how are these used with the others in a hypothetical world when I haven't done a loss causation analysis.

Q   The next question is actually a little bit more simple, which is: For purposes of this report, you haven't determined or done an analysis as to whether or not any of these factors in isolation or together could be used to parse or scale, correct?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: No. You're -- it's correct that I have not done any parsing or scaling, but I can say that whatever the parsing and scaling that is done at the loss causation and damages, whenever that is, will be used to determine a reliable,

Page 239

reasonable inflation ribbon, that inflation ribbon will be applied classwide, and the common damages methodology will be utilized to calculate individual damages.

BY MR. WINTER:

Q   Okay. Not my question.

So have you done an analysis to determine whether any of these techniques, in isolation or together, can be used to calculate parsing or scaling in this case?

MR. WIERZBOWSKI: Objection to form. Asked and answered.

MR. WINTER: He didn't answer the question.

THE WITNESS: I have not been asked to do that.

BY MR. WINTER:

Q   And you said before, I think -- let me just get the testimony so we have it.

You said:

"...but I can say that whatever the parsing and scaling that is done at the loss causation and damages, whenever that is, will be used to determine a reliable, reasonable inflation ribbon..."

Page 240

So it's your testimony that you know, sitting here today, based on the analysis you've done, that a reliable inflation ribbon can be calculated consistent with plaintiffs' allegations in this case?

A   That's -- you're -- you're basically asking me to be the finder of fact, and I can't -- I -- I -- it's my opinion I can calculate -- I haven't been presented with a situation where I can't calculate an inflation ribbon that I believe is reasonable and reliable.

But the finder of fact will determine that, and whatever the finder of fact determines is the appropriate inflation ribbon will be applied classwide, and the common damages methodology that is discussed in this Section VII will be utilized to calculate individual damages.

Q   Okay. I just want to be very clear about this.

Does it matter -- let me break it up.

It sounds like you think, based on your prior experience, that you'd be able to do a reliable inflation ribbon in this case, right?

A   Yes.

Q   Okay. What I'm trying to ask, though, is:

State of Alaska
v. Ryder System

[FINAL]

November 30, 2022
Michael Hartzmark, Ph.D.

Page 285

that question. I've never -- I don't think I've seen it, from a defense or plaintiffs, where the front end adds up to the back end. Because, usually, you do one or the other and the court agrees that they're linked. I have not linked these because, as I've stated now 101 times, I haven't done a loss causation report.

In this particular issue when you're dealing with -- I think I saw on the first page a customer relationship as opposed to black-and-white financial measures and metrics. I don't even understand how this is -- this is related. I don't understand what a mismatch is, and I don't understand how you would have a mirror image corrective disclosure in a case where you have three corrective disclosures. I mean, it just seems as though it's counterintuitive to this case.

And then, moreover, all of those issues are issues associated with loss causation.

MR. WINTER: Okay. Let's go off the record for five minutes. I might be able to -- to cut this back end and finish a little early.

So let's do that, and then if we can reconvene at 5:02.

THE WITNESS: Okay.

Page 286

THE VIDEOGRAPHER: We're now going off the record at 4:57 p.m.

(Recess.)

THE VIDEOGRAPHER: We are now going on the record at 5:04 p.m.

BY MR. WINTER:

Q   Just a few more questions, Dr. Hartzmark.

Last month you submitted an expert report in a Section 10(b) case involving Wells Fargo; is that right?

A   I think so, yes.

Q   Okay. And we have the report if you'd like to look at it, the full one.

- - -

(Hartzmark Exhibit 7 was marked for identification.)

- - -

BY MR. WINTER:

Q   But what we've marked as the next exhibit, Tab 16, is a redline that just compares the section of your report that's Section VII with the comparable section in the Wells Fargo report addressing classwide methodology.

Do you see that?

MR. WIERZBOWSKI: Objection to form.

Page 287

THE WITNESS: This redline?

BY MR. WINTER:

Q   Yeah.

A   It's a 12-page redline.

Q   Yeah. So this is a -- what we did is we redlined and compared the expert report you submitted in Wells Fargo last month, the section having to do with calculating damages on a classwide basis, with the report submitted in this case.

A   Yeah. It looks like I did this report about a week before -- a week after I submitted the -- this one, right? Yeah. They're -- they're -- I was doing them -- working on them simultaneously.

Q   Okay. And simple question, but is there any substantive difference between the sections of the report in the Wells Fargo case and this case that you could discern from the redline?

A   I'm not --

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: I don't understand the question. I -- I will -- I mean, the fact is that whether it be Wells Fargo -- I mean, didn't we go through this question?

Whether it be Wells Fargo, Rougier/Applied

Page 288

Optoelectronics, Vrakas/U.S. Steel, Signet Jewelers Limited, West Palm Beach/DFC, Cobalt, William Wallace versus IntraLinks, any of the ones where the court has relied on my opinion related to the damages, it's virtually -- the damages methodology is virtually universal standard, and, therefore, I'd be a little concerned if there were substantial differences.

BY MR. WINTER:

Q   Okay. So the answer is no to my question?

A   What was the question again?

Q   I'll read it back.

Are there any substantive differences between the section of the report in the Wells Fargo case and this case that you can discern from the redline?

MR. WIERZBOWSKI: Objection to form.

THE WITNESS: No --

BY MR. WINTER:

Q   Okay.

A   -- as would be expected because it's a universal, out-of-pocket damages methodology.

MR. WINTER: I have nothing further.

MR. WIERZBOWSKI: Thanks, Steven.

I have no questions for Dr. Hartzmark.