**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

STATE OF ALASKA, ALASKA
PERMANENT FUND, THE CITY OF FORT
LAUDERDALE GENERAL EMPLOYEES'
RETIREMENT SYSTEM, and THE CITY
OF PLANTATION POLICE OFFICERS
PENSION FUND, On Behalf of Itself and All
Others Similarly Situated,

     *Plaintiffs*,

v.

RYDER SYSTEM, INC., ROBERT E.
SANCHEZ, ART A. GARCIA, and DENNIS
C. COOKE,

     *Defendants*.

Civil Action No. 1:20-cv-22109-AMC

**LEAD PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS
CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND
APPOINTMENT OF CLASS COUNSEL AND LIAISON CLASS COUNSEL**

**TABLE OF CONTENTS**

Page

I. Lead Plaintiffs' Proposed Damages Methodology Satisfies *Comcast*.................................1

  A. Defendants Misstate *Comcast*'s Requirement and Ignore that Courts Routinely Certify Classes Advancing the Same Damages Methodology Proposed in This Case...............................................................................................1

  B. There Is No "Mismatch" Between the False Statements and the Corrective Disclosures.......................................................................................................5

  C. Defendants' Argument Concerning Disaggregation Is a Premature Attack on Loss Causation and Irrelevant to Class Certification.........................................6

  D. Defendants' Attempts to Misstate Plaintiffs' Theory Are Factually Incorrect and Legally Unavailing ..............................................................................8

  E. There Is Only One Theory of Liability, and Lead Plaintiffs' Damages Methodology Is Consistent with that Theory............................................................9

II. Defendants' Arguments on Typicality and Adequacy Contradict Binding Precedent and Ignore the Record ......................................................................................10

III. Lead Plaintiffs' Class Period Is Proper and Should Not be Shortened.............................13

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Acuity Brands, Inc. Sec. Litig.*,
2020 WL 5088092 (N.D. Ga. Aug. 25, 2020) ......................................................................3, 8

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)..................................................................................................................7

*Bovee v. Coopers & Lybrand*,
216 F.R.D. 596 (S.D. Oh. 2003) .............................................................................................14

*In re BP p.l.c. Sec. Litig.*,
2014 WL 2112823 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow,* 800
F.3d 674 (5th Cir. 2015) ............................................................................................................9

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ..................................................................................................1

*In re CenturyLink Sales Practices and Sec. Litig.*,
337 F.R.D. 193 (D. Minn. 2020).....................................................................................2, 7, 8

*City of Sunrise v. FleetCor Tech., Inc.*,
2019 WL 3449671 (N.D. Ga. July 17, 2019)...............................................................1, 3, 7, 11

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).......................................................................................................... passim

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2013)..................................................................................................................7

*FindWhat Inv. Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ..........................................................................................9, 12

*Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*,
141 S. Ct. 1951 (2021).........................................................................................................5, 6

*Hatamian v. Advanced Micro Devices, Inc.*,
2016 WL 1042502 (N.D. Cal. Mar. 16, 2016).....................................................................10n

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
762 F.3d 1248 (11th Cir. 2014) ...........................................................................3, 10, 11, 13

*Loritz v. Exide Technologies*,
2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015).............................................................4

*Ludlow v. BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015) ........................................................................................9

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  328 F.R.D. 86 (S.D.N.Y. 2018) ..................................................................................10n

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353 (3d Cir. 2015)........................................................................................10

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortgage Corporation*,
  2018 WL 3861840, at *18-20 (N.D. Ohio Aug. 14, 2018)........................................4

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ..................................................................................8

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
  2021 WL 229310 (N.D. Cal. Jan. 21, 2021)...............................................................4n

*Pub. Employees' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*,
  2022 WL 17920570 (N.D. Ga. Nov. 28, 2022) ..........................................................11

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019)................................................................................3, 5

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
  2018 WL 4931543 (N.D. Cal. Oct. 11, 2018).............................................................5

*Rougier v. Applied Optoelectronics, Inc.*,
  2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ...........................................................3

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
  335 F.R.D. 276 (N.D. Cal. 2020)...............................................................................3, 7, 8

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019).............................................................4, 7

*In re Snap Inc. Sec. Litig.*,
  334 F.R.D. 209 (C.D. Cal. 2019) ...............................................................................4

*St. Clair Cnty. Empls. Ret. Sys. v. Acadia Healthcare Co.*,
  2022 WL 4598044 ......................................................................................................6

*Thorpe v. Walter Inv. Mgmt., Corp.*,
  2016 WL 4006661, at *15–16 (S.D. Fla. Mar. 16, 2016)............................... passim

*Vrakas v. United States Steel Corp.*,
  2019 WL 7372041 (W.D. Pa. Dec. 31, 2019)............................................................3

iii

*In re WorldCom, Inc. Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) .......................................................................................13, 14

Defendants concede that this case satisfies several requirements for class certification, including numerosity, commonality, and superiority. Defendants recycle a handful of mistaken arguments concerning Lead Plaintiffs' damages methodology, typicality, and adequacy, which the Eleventh Circuit and numerous courts nationwide have rejected. The Class should be certified.

## I.   Lead Plaintiffs' Proposed Damages Methodology Satisfies *Comcast*

Defendants argue that Lead Plaintiffs have not established predominance because they have failed to propose a damages methodology that satisfies *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ("*Comcast*"). Opp. at 8-14.[1] This argument fails for several reasons, explained below.

### A.   Defendants Misstate *Comcast*'s Requirement and Ignore that Courts Routinely Certify Classes Advancing the Same Damages Methodology Proposed in This Case

Defendants read *Comcast* far more broadly than courts ever have. Defendants contend that *Comcast* requires Lead Plaintiffs to present a fully-formed damages model—including a complete disaggregation analysis and scaling the changes in artificial inflation over time. Contrary to this assertion, the Eleventh Circuit has held that *Comcast* does not require a plaintiff to submit a fully-fledged damages model, but rather "simply requires that any model supporting a plaintiff's damages case must be consistent with its liability case." *Carriuolo v. Gen. Motors Co.,* 823 F.3d 977, 988 (11th Cir. 2016) (collecting cases); *see also City of Sunrise v. FleetCor Tech., Inc.*, 2019 WL 3449671, at *6 (N.D. Ga. July 17, 2019) (at class certification, *Comcast* "simply requires a plaintiff to show a linkage between its theory of liability and theory of damages").

Significantly, here, Lead Plaintiffs have proposed the universally-accepted damages

---

[1] Internal citations and quotations are omitted. Unless otherwise noted, "¶__" refers to paragraphs of the Amended Complaint (ECF No. 28). "Opp." refers to Defendants' opposition brief (ECF No. 100). "Rpt." refers to the Expert Report of Dr. Michael Hartzmark (ECF No. 90-5). "Reply Rpt." refers to Dr. Hartzmark's Reply Report, submitted herewith as Exhibit A to the Declaration of John Rizio-Hamilton (the "Rizio-Hamilton Decl.").

methodology for securities class actions that scores of courts have held satisfies this modest requirement. Lead Plaintiffs "rely on Hartzmark's out-of-pocket or event study damages model, which is the standard measurement of damages in Section 10(b) securities cases." *In re CenturyLink Sales Practices and Sec. Litig.*, 337 F.R.D. 193, 212 (D. Minn. 2020) (quotation marks omitted). This out-of-pocket damages method is the industry standard for calculating damages in virtually every securities class action arising under Section 10(b), including in district courts throughout the Eleventh Circuit. *See, e.g., Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 4006661, at *15–16 (S.D. Fla. Mar. 16, 2016) ("Plaintiffs' [out-of-pocket] damage model is consonant with their theory of liability and thus satisfies Rule 23(b)(3)."). Defendants ignore at least 82 other post-*Comcast* cases that have certified classes where plaintiffs proposed to use the same "out-of-pocket" damages methodology based on an event study. *See* Ex. B.

In this case (as in so many others), Lead Plaintiffs' damages methodology clearly aligns with their liability theory, thus satisfying *Comcast*. Lead Plaintiffs allege that: (i) Ryder artificially inflated its stock price by misstating its residual values, depreciation expense, and related financial metrics; and (ii) investors were harmed when the truth was disclosed, causing the artificial inflation to be removed from the stock price. ¶268. As Dr. Hartzmark explains, the event study first isolates the decline in Ryder's stock price on the alleged disclosure dates based on price reactions to disclosures related to or revealing the alleged misstatements and omissions. Rpt. ¶91. Then, with that information, it measures the amount of artificial inflation in Ryder stock during each day of the Class Period caused by Defendants' alleged misrepresentations and omissions. *Id*. ¶¶87, 90. Finally, damages for each class member are mechanically calculated by determining the inflation at the purchase price minus the inflation at the sale price, based on the class member's transactional data. "Thus, the calculation of damages for violations of Section 10(b) (and SEC Rule 10b-5) of

the Exchange Act may be computed on a class-wide basis using common methodologies." *Id.* ¶99. *See In re Acuity Brands, Inc. Sec. Litig.*, 2020 WL 5088092, at *6-7 (N.D. Ga. Aug. 25, 2020) ("Plaintiffs' expert articulates an approach to calculate damages based on this theory of liability using an accepted event study methodology that examines information and evidence common to all class members to measure (1) the artificial inflation in Acuity stock for every day of the class period and (2) out-of-pocket damages for all class members"); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 398 (N.D. Ga. 2019) (same "proposed damages model has been accepted in securities fraud class actions in cases like this one, where Plaintiffs seek out-of-pocket damages to recover artificial inflation caused by Defendants' misrepresentations."); *City of Sunrise*, 2019 WL 3449671, at *6–7 ("event-study methodology to measure out-of-pocket damages" was "sufficiently linked to its theory of liability to satisfy predominance"); *see also* Ex. B.

Indeed, in certifying classes, courts have not only repeatedly endorsed this method, but have also specifically endorsed Dr. Hartzmark's elucidation of this methodology as satisfying *Comcast*. *See, e.g.*, *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020) ("[Dr. Hartzmark's] out-of-pocket method does not involve any individualized issues."); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *15 (S.D. Tex. Nov. 13, 2019) ("[C]ourts recognize event studies, like the one used by Dr. Hartzmark, as an accepted method for determining artificial inflation and out-of-pocket damages in suits involving fraud on the market liability."); *Vrakas v. United States Steel Corp.*, 2019 WL 7372041, at *9 (W.D. Pa. Dec. 31, 2019) ("Plaintiffs cite several cases in this Circuit and elsewhere that affirm the appropriateness of the out-of-pocket methodology that Dr. Hartzmark proposes as a sufficient damages model for class certification purposes."); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019) ("[T]he Court sees no reason why [Dr. Hartzmark's] event study—the generally accepted

3

method for measuring damages in a securities fraud class action—cannot work in this case.").[2]

Defendants fail to cite a single case in which a court refused to certify a class invoking the out-of-pocket damages methodology on *Comcast* grounds. In *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, plaintiffs' expert failed to demonstrate market efficiency, and thus, defendants' expert offered affirmative evidence that it would be impossible to measure artificial inflation in the stock price. 2018 WL 3861840, at *18-20 (N.D. Ohio Aug. 14, 2018). Here, Defendants do not contest market efficiency, and offer no expert evidence that it is impossible to calculate damages; in fact, Dr. Hutton conceded that it is possible in this case to measure artificial inflation caused by the false statements.[3] In *Loritz v. Exide Techs.*, "[p]laintiffs failed to set forth any model of damages (let alone one tied to their theory of liability)." 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015). Notably, in a subsequent decision, the *Loritz* court distinguished his own opinion and rejected defendants' *Comcast* arguments where the plaintiff proposed the same out-of-pocket model at issue here, which "relie[d] on an event study." *In re Snap Inc. Sec. Litig.,* 334 F.R.D. 209, 217 (C.D. Cal. 2019).

Defendants criticize Dr. Hartzmark for proposing the same methodology he has used in other cases without incorporating "case-specific" information. Opp. at 9. But as Dr. Hartzmark repeatedly testified, the case-specific inputs Defendants raise are all premature loss causation arguments. *See, e.g.*, Ex. D ("Hartzmark Dep. Tr.") 184:18-185:8; *see infra* at 6-8. Notably, courts

---

[2] Several of Defendants' arguments suggest that the out-of-pocket methodology does not apply to cases involving financial statements, but this is the quintessential context in which this methodology is applied. *See, e.g., Thorpe*, 2016 WL 4006661, at *2, *16 (endorsing method where misrepresentations included those that "concern[ed] the Company's financial statements"); *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2021 WL 229310, at *2, *7 (N.D. Cal. Jan. 21, 2021) (method satisfied Rule 23 where defendant "artificially inflated [] revenue").

[3] *See* Ex. C ("Hutton Dep. Tr.") 158:20-159:4 ("Q . . . Is it – is it possible for someone to develop a methodology to measure inflation in Ryder's stock price caused by the alleged misstatements here? A So I've not opined that it's not possible.").

have endorsed similar explanations of the out-of-pocket methodology proposed by Dr. Hartzmark in the past. *See* authorities cited *supra* at 3-4; Reply Rpt. ¶¶81-86. Courts have also endorsed explanations of the out-of-pocket methodology by experts who provided comparable levels of— and less—case-specific detail than Dr. Hartzmark. *See* Exs. E-G. The out-of-pocket methodology's consistency—regardless of the specifics of any given case—affirmatively demonstrates it is appropriate because the methodology accurately does what it is supposed to do: calculate damages on a classwide basis. *See, e.g., Monroe Cnty. Emps.' Ret. Sys.*, 332 F.R.D. at 399 (rejecting defendants' argument that plaintiffs' expert's damages model was "boilerplate" and that plaintiffs' expert "ha[d] proposed this same model in dozens of other securities cases"); *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.,* 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (the fact that plaintiffs' "proposed method [did] not contain anything that 'addresse[d] any of the specifics of this litigation' . . . seems to reflect the fact that securities fraud cases fit Rule 23 'like a glove,' rather than suggest that class treatment is inappropriate"). As Dr. Hartzmark testified, it would actually be problematic if this methodology "change[d] substantially from one report to another." Hartzmark Dep. Tr. 29:23-30:2.

B. **There Is No "Mismatch" Between the False Statements and the Corrective Disclosures**

Defendants next suggest that the universally accepted out-of-pocket methodology somehow "runs afoul" of the Supreme Court's decision in *Goldman Sachs Grp., Inc.* v. *Arkansas Teacher Ret. Sys.,* 141 S. Ct. 1951 (2021) by failing to address a purported "mismatch" between the false statements and corrective disclosures. Opp. at 10. First, this argument ignores that, even since *Goldman*, courts throughout the country have certified at least a dozen securities class actions employing this same methodology. *See* Ex. B. Defendants are unable to provide the Court with a single case where their theory has been endorsed post-*Goldman*.

Second, Defendants are mischaracterizing what *Goldman* concerns. *Goldman* does not address damages methodologies or *Comcast*'s requirements. *Goldman* concerns the distinct issue of how a defendant many challenge "price impact." In *Goldman*, the Supreme Court held that a conceptual "break down" between the "contents of the misrepresentation and the corrective disclosure" can be used to prove an absence of "price impact"—an argument Defendants <u>do not make here</u>. *Goldman*, 141. S.Ct. at 1961; *see also St. Clair Cnty. Empls. Ret. Sys. v. Acadia Healthcare Co.*, 2022 WL 4598044, at *6 ("[U]nder *Goldman*, the generic nature of an alleged misrepresentation can be evidence of a lack of <u>price impact</u> . . ."). Because <u>Defendants do not challenge price impact here</u>, *Goldman* is irrelevant.

Finally, even if *Goldman* had any conceptual application to the *Comcast* question, it is inapposite on its facts. The "mismatch" at issue in *Goldman* is nowhere to be found here. In *Goldman*, the Supreme Court noted that the "mismatch" issue "may occur when the earlier misrepresentation is generic (e.g., 'we have faith in our business model') and the later corrective disclosure is specific (e.g., 'our fourth quarter earnings did not meet expectations')." *Id.* Here, there is no question that (i) the alleged misrepresentations concerned Ryder's residual values and depreciation expense, and the "<u>specific financial metrics</u>" that they impacted, and (ii) the alleged corrective disclosures were "adjustments to residual values" and corresponding adjustments to the previously misstated financial metrics. Each corrective disclosure directly relates to—and in fact, discusses in detail—the financial metrics that Lead Plaintiffs allege were misstated. ¶¶134-147. The alleged misrepresentations and the corrective disclosures are both specific and well-matched.

**C.      Defendants' Argument Concerning Disaggregation Is a Premature Attack on Loss Causation and Irrelevant to Class Certification**

Invoking another widely-rejected argument, Defendants claim that Lead Plaintiffs must show how they will "account for information unrelated to the alleged fraud." Opp. at 12.

Defendants contend that Lead Plaintiffs must show how they will disentangle or disaggregate: (i) "publicly available information," (ii) "other bad news," and (iii) "new information," from information related to the alleged fraud. *Id.* As countless courts have held, the argument "that confounding information will be difficult to desegregate from the impact of the alleged corrective disclosure" is a loss causation attack, and "Plaintiffs are not required to prove loss causation at the class certification stage." *Thorpe*, 2016 WL 4006661, at *16.

As these courts explain, in *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2013), the Supreme Court squarely held that a plaintiff is not required to demonstrate loss causation to obtain class certification. *See also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 475 (2013) (loss causation "need not be adjudicated before a class is certified"). While Lead Plaintiffs ultimately "will need to disaggregate confounding factors to prove economic loss [at the merits phase], [they] need not do so at this juncture to establish that common issues relating to damages predominate." *Signet*, 2019 WL 3001084, at *20 (rejecting identical challenge to Dr. Hartzmark's methodology); *SEB Inv. Mgmt. AB*, 335 F.R.D. at 288 (same); *In re CenturyLink*, 337 F.R.D. at 212-213 (same). Thus, Defendants' criticism that Dr. Hartzmark has not yet performed this loss causation analysis is without merit, as "nothing in *Comcast* requires an expert to perform his analyses at the class certification stage." *Thorpe*, 2016 WL 4006661, at *16; *see also City of Sunrise*, 2019 WL 3449671, at *7 n.2 ("To the extent that Defendants argue that Plaintiff's damages model fails to disentangle the impact of old or non-fraud information released on the same day as the corrective disclosures, Plaintiff is not required to prove loss causation at the class certification stage."); *In re Acuity Brands, Inc.*, 2020 WL 5088092, at *9 (N.D. Ga. Aug. 25, 2020).

At bottom, Defendants conflate Dr. Hartzmark's explanation of the methodology with "[c]alculating the actual inputs into the out-of-pocket method." *SEB Inv. Mgmt. AB*, 335 F.R.D. at

288. Calculating the inputs—such as parsing to account for confounding information and scaling changes in inflation over time—is "an analysis of loss causation" that is not required at class certification. *Id*. "Calculating the actual inputs into the out-of-pocket method by parsing and scaling the abnormal returns requires an analysis of loss causation," *id.*, which "goes beyond the Rule 23 inquiry." *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 47 (S.D.N.Y. 2018).

In any event, Dr. Hartzmark has provided numerous examples, both during his deposition and in his Reply Report, of how he would eventually disaggregate the confounding information Defendants discuss. *See* Hartzmark Dep. Tr. 213:15-214:2; Reply Rpt. ¶39. Importantly, as courts recognize—including when evaluating Dr. Hartzmark's own methodology—whatever the outcome of these techniques, predominance will exist because they will apply classwide. Whether "there is one plaintiff or one million plaintiffs," *In re CenturyLink*, 337 F.R.D. at 213, the "inflation-ribbon inputs will be common and applied classwide. Thus, the out-of-pocket method does not involve any individualized issues." *SEB Inv. Mgmt.*, 335 F.R.D. at 288.

**D.      Defendants' Attempts to Misstate Plaintiffs' Theory Are Factually Incorrect and Legally Unavailing**

Defendants next mischaracterize the Complaint by claiming that Lead Plaintiffs are proceeding on a materialization of the risk theory. Opp. at 13. Not so. Rather, Lead Plaintiffs are proceeding on a corrective disclosure theory and allege that Ryder materially misstated its financial statements, the truth about which was later revealed. As the Eleventh Circuit has noted, along with other Courts of Appeals, a plaintiff may plead securities fraud by, *inter alia*, "identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud)." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 (11th Cir. 2011). That is precisely what Lead Plaintiffs have done in this case. *See* ¶2, ¶¶134-147 (alleging "corrective disclosures"), ¶268.

8

Ignoring the Complaints' allegations, Defendants cite one inapposite case. In *Ludlow v. BP, P.L.C.,* 800 F.3d 674 (5th Cir. 2015), the plaintiffs advanced two distinct damages theories for two subclasses: one class of investors who bought stock before the Deepwater Horizon oil spill, and a second class who bought stock after the spill. For the post-spill subclass, the plaintiffs proceeded on a corrective disclosure theory and set forth the same out-of-pocket damages model at issue here, and the district court certified that subclass. *In re BP p.l.c. Sec. Litig.,* 2014 WL 2112823, at *13-14 (S.D. Tex. May 20, 2014). In contrast, the court denied certification of the pre-spill subclass, where plaintiffs proceeded on a materialization of the risk theory and "expressly eschw[ed]" the out-of-pocket model, seeking consequential damages instead. *Id.* at *11, 13-14. Recognizing this distinction, the Fifth Circuit endorsed the out-of-pocket methodology proposed by Lead Plaintiffs here. *See Ludlow*, 800 F.3d at 683-89.

**E.      There Is Only One Theory of Liability, and Lead Plaintiffs' Damages Methodology Is Consistent with that Theory**

Defendants' remaining *Comcast* argument—that Lead Plaintiffs present multiple theories of liability—is also without merit. Opp. at 13-14. Lead Plaintiffs allege a single theory of fraud by which Defendants misstated the residual values and depreciation expenses associated with Ryder's trucking fleet, which flowed through Ryder's financial statements and inflated its income and other associated metrics. *See, e.g.,* ¶148.

Defendants' attempt to spin off Lead Plaintiffs' allegations regarding the Navistar vehicles into a separate theory of liability fails. Opp. at 14. The Navistar allegations are simply one example of how Defendants overstated the residual value of Ryder's trucking fleet and are part and parcel of Lead Plaintiffs' single theory of liability. *See, e.g.,* ¶¶105, 107, 276, 284-85.

*Comcast*, the only case Defendants cite for this argument, is inapposite. In *Comcast*, an antitrust case, plaintiffs alleged four distinct theories of antitrust impact, all but one of which was

subsequently rejected by the court as non-viable. Because the plaintiffs' damages model failed to exclude the three dismissed theories (a defect which plaintiffs conceded), their damages model could not tie exclusively to their remaining theory of antitrust impact. *Comcast*, 569 U.S. at 36-38; *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 (3d Cir. 2015) ("A close reading ... [of Comcast] makes it clear that the predominance analysis was specific to the antitrust claim at issue."). In contrast, here, there is only one liability theory: that Ryder overstated residual values.[4]

## II. Defendants' Arguments on Typicality and Adequacy Contradict Binding Precedent and Ignore the Record

Defendants assert that Lead Plaintiffs are atypical and/or inadequate class representatives because (i) Lead Plaintiffs continued to purchase Ryder common stock after the first partial corrective disclosure and (ii) Alaska engaged in purportedly "atypical trading." Defendants fail to acknowledge that both arguments are foreclosed by seminal Eleventh Circuit precedent.

Defendants first claim that because Lead Plaintiffs "increased their Ryder holdings" after some or all of the corrective disclosures, they are somehow atypical of the Class. Opp. at 14-17. The Eleventh Circuit has spoken clearly on this issue. The general "rule" is that reliance "on the integrity of the market prior to disclosure of alleged fraud (i.e., during the class period) is unlikely to be defeated by postdisclosure reliance on the integrity of the market." *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.,* 762 F.3d 1248, 1260 (11th Cir. 2014).

As the Eleventh Circuit explained, this is "particularly true where, as here," the purchases Defendants complain of were made "after the stock price has been 'corrected' by the market's

---

[4] Even taking Defendants' characterization of the Complaint as true, "disaggregate[ing] the price inflation attributable to particular theories of liability . . . is appropriately understood as a loss causation analysis" and "Plaintiffs need not show loss causation as a condition of class certification." *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016); *see also Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 98–99 (S.D.N.Y. 2018) (same).

assimilation of the new information." *Id.* Such purchases do not render a plaintiff atypical or inadequate because after the market has corrected the stock price, investors are entitled to rely on the integrity of the adjusted stock price. While Defendants suggest that "courts have found" that such purchases render a plaintiff atypical (Opp. at 15), Defendants ignore that none of the cases they cite post-dates the Eleventh Circuit's clear ruling in *Regions*. *Regions* applies with equal force to cases involving multiple partial corrective disclosures, such as this one, because Lead Plaintiffs and other investors were "in the same factual position" at all times during the Class Period. *City of Sunrise*, 2019 WL 3449671, at *5; *see also Pub. Empls.' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*, 2022 WL 17920570, at *5 (N.D. Ga. Nov. 28, 2022) (plaintiff typical where it purchased after corrective disclosures).

Further, it is unsurprising that Lead Plaintiffs bought following certain partial corrective disclosures: this case involves multiple partial disclosures that leaked out the truth over the span of 8 months, ¶¶134-147, Ryder continued to make false reassurances during that time, *see id.,* ¶¶262-267, and Lead Plaintiffs continued to rely on the integrity of the adjusted stock price throughout, as they are permitted to do under Eleventh Circuit law. Ultimately, Defendants' suggestions that Lead Plaintiffs may not have relied on the misstatements are pure speculation: there is no proof that the Lead Plaintiffs did not rely on Ryder's false financial statements.[5]

Defendants' suggestion that Alaska sold some Ryder shares because it received an email noting "cautious commentary" about the used truck market is, frankly, preposterous. Opp. at 16. The email was an unsolicited blast mass-marketing email (ECF No. 100-33), which contained only

---

[5] Defendants' argument is also undercut by the fact that Plantation Police sold significant amounts of Ryder stock after the first two corrective disclosures (ECF No. 22-3), and that Fort Lauderdale sold significant amounts of Ryder stock after the final corrective disclosure. Ex. H (Schiess Tr.) 201:13-202:25.

public information about Ryder, and which Alaska disregarded. Ex. I ("Razzaque Dep. Tr.") 183:17-24 ("We see thousands of emails with mixed reviews . . . We generally pay very little attention to these emails."). There is also no evidence that Alaska's investment manager—which actually made the sale decision—ever received this benign email.

Contrary to Defendants' assertion (Opp. at 16), no court has ever held that a lead plaintiff is not adequate or typical because its investment manager did not issue what amounts to a fraud alert after a partial corrective disclosure. Further, Alaska's representative explained that an investment manager would not do so because investigation of fraud is "not within the bound of their competency." Razzaque Dep. Tr. 248:1-23. Counsel and courts, not third-party financial advisors, assess claims of fraud.

The bottom line is that these are institutional investors—precisely the kind of lead plaintiffs Congress endorsed under the PSLRA—who collectively lost approximately $7 million on their transactions in Ryder stock during the Class Period. Their interests are aligned with the Class, and they have every incentive to prosecute the case vigorously, as they have done to date.

Defendants' remaining argument is equally unavailing under Eleventh Circuit precedent. The mere fact that Alaska sold shares of Ryder common stock early in the Class Period and purchased later in the Class Period has no bearing on class certification. As the Eleventh Circuit has recognized, "[e]very investor who purchases at an inflated price—whether at the beginning, middle, or end of the inflationary period—is at risk of losing the inflationary component of his investment when the truth underlying the misrepresentation comes to light." *FindWhat Inv. Grp.*, 658 F.3d at 1315. Defendants' reliance on an outdated and out-of-Circuit district court opinion cannot overcome clear direction from the Eleventh Circuit; *see also Regions*, 762 F.3d at 1260 (fact that the lead plaintiff "purchased its shares late in the class period" no obstacle).  As courts

12

in this District have found, "[t]he substantial majority of courts that have addressed the propriety of class certification based on the timing of the class representative's sales or purchases have found, however, that the timing of the transactions does not necessarily create fundamentally divergent interests with the putative class." *Thorpe*, 2016 WL 4006661, at \*9 (collecting cases). This "supposed intra-class conflict" is merely "a damages issue, which is an inquiry premature at the class certification stage." *Id.*

The "conflict" Defendants conjure—that Alaska may at some unspecified date in the future favor a damages analysis that maximizes inflation at the end of the Class Period—is again speculative. There is no evidence that it has actually arisen, let alone that it is disabling. Further, the two other Lead Plaintiffs are not even arguably subject to this speculation, and they exercise stewardship over this case and the damages analysis as well.[6]

## III.     Lead Plaintiffs' Class Period Is Proper and Should Not be Shortened

Defendants argue that the final disclosure on February 13, 2020 must be excluded from the Class Period as a matter of law. But "a class period should not be cut off if questions of fact remain as to whether the [earlier] disclosures completely cured the market." *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 307 (S.D.N.Y. 2003) (questions of fact remained "as to when and how the market was informed" of full extent of misrepresentations). Courts routinely recognize that, at class certification, they "must tread a fine line when parties dispute whether a particular release cured prior misrepresentations," so as to not delve too far into the merits of a case. *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 614 (S.D. Oh. 2003) (refusing to truncate class period despite

---

[6] Defendants filed their original opposition to class certification on December 16, 2022 (ECF No. 97). That opposition inaccurately accused one of the Lead Plaintiffs of engaging in certain undisclosed transactions in Ryder securities, including short sales of Ryder stock. Defendants then filed revised opposition papers (ECF No. 100) that omitted the incorrect arguments. *See* Declaration of Jonathan K. Osborne, ECF 100-1 at 4 n.1.

significant negative information being released earlier in class period). Thus, to establish that the Class Period should be cut short at this stage, Defendants would need to prove that the October 29, 2019 corrective disclosure "effected a complete cure of the market," *In re WorldCom*, 219 F.R.D at 307 (emphasis added), and that the February 13, 2020 disclosure had no price impact because no new information concerning residual values or depreciation was disclosed that day.

Neither Defendants nor their expert makes any such claim, because it would be impossible. Carefully phrasing their argument, Defendants incorrectly assert that "virtually" no new information related to the fraud was revealed on February 13. Opp. at 17-18. Defendants thereby concede that some new information related to the fraud was revealed that day. Further, Defendants' expert does not opine that the new information disclosed that day had no price impact. These facts alone preclude them from establishing that the Class Period should be shortened.

Moreover, the record is clear that new, allegation-related information concerning Ryder's financial performance for both 2019 and 2020 was disclosed on February 13, which impacted Ryder's stock price. Previously, on October 29, 2019, Ryder had disclosed depreciation expenses for the second half of 2019 totaling $289 million. *See* Ex. J. Then, on February 13, 2020, Ryder disclosed that additional depreciation expenses and losses from used vehicle sales brought the full-year pre-tax impact for 2019 to $415 million. *See* Ex. K; Reply Rpt. ¶59. This new figure included additional losses caused by new depreciation expense as well as new losses on the sale of used vehicles since the October disclosure. This was confirmed by Ryder's CFO on the February 2020 call, who, explaining "what changed from the third quarter estimate," stated that the "total of all the depreciation and UVS losses for 2019 was around $415 million." Ex. L; Reply Rpt. ¶59.

On February 13, 2020, Ryder also disclosed new information concerning its 2020 forecast. Previously, in October 2019, Ryder stated that its projected impact for 2020 from residual value

14

changes totaled $250 million. *See* Ex. J; Reply Rpt. ¶60. But on February 13, 2020, Ryder disclosed additional information which brought the total estimated pre-tax impact from depreciation and UVS losses to $295 million. *See* Ex. K; Reply Rpt. ¶61. Once again, Ryder CFO Scott Parker explained how Ryder added another $45 million in anticipated impact for 2020 between the two disclosures. *See* Ex. L; Reply Rpt. ¶¶60-61. Defendants' narrow focus on the purported $8 million of depreciation expense that was disclosed ignores all these facts.

In response to these disclosures, the price of Ryder stock fell by 10% on February 13 alone, which was statistically significant at the 99% confidence level, further demonstrating that new, material information impacted the stock price. Rpt. App. E. at 19; Reply Rpt. ¶27. Defendants' expert conceded that some of the information Ryder published on February 13 was newly disclosed. *See* Hutton Dep. Tr. 201:9-19 ("I'm not saying it's all previously disclosed . . . .").

Moreover, multiple analysts reported that Ryder's disclosure of this new information was surprising because Ryder had not fully cleared its books of the excess expenses in the prior two financial quarters. *See, e.g.*, Ex. M (Ryder's "continued loss on sale in 2020 are indicative that last quarter's 'big bath' and write-down of residual values did not completely clear the deck."); Ex. N ("Following the 4Q EPS miss and much lower-than-expected 2020 EPS guidance, we expect the stock to be down today. We had hoped the company cleared the decks in 3Q after significantly lowering EPS expectations following its residual value changes."); *see also* Reply Rpt. ¶¶63-65. In sum, the third corrective disclosure related to the alleged fraud, disclosed new information, and had price impact. At a bare minimum, there is at least a fact issue that cannot be decided in Defendants' favor now. *See Thorpe*, 2016 WL 4006661, at *13.

Accordingly, Lead Plaintiffs request that the Court grant the motion for class certification.

Dated: February 17, 2023

Respectfully submitted,

/s/ *Robert D. Klausner*
Robert D. Klausner
**KLAUSNER KAUFMAN JENSEN**
    **& LEVINSON**
Florida Bar No. 244082
Stuart A. Kaufman
Florida Bar No. 979211
7080 NW 4th Street
Plantation, FL 33317
Tel: (954) 916-1202
Fax: (954) 916-1232
Email: bob@robertdklausner.com
Email: stu@robertdklausner.com

*Liaison Counsel for Lead Plaintiffs the State of Alaska, Alaska Permanent Fund; the City of For Lauderdale General Employees' Retirement System; and the City of Plantation Police Officers Pension Fund*

**BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
John Rizio-Hamilton (admitted *pro hac vice*)
Adam Wierzbowski (admitted *pro hac vice*)
John Esmay (admitted *pro hac vice*)
Mathews R. de Carvalho (admitted *pro hac vice*)
Emily A. Tu (*pro hac vice* pending)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
Email: johnr@blbglaw.com
Email: adam@blbglaw.com
Email: john.esmay@blbglaw.com
Email: mathews.decarvalho@blbglaw.com
Email: emily.tu@blbglaw.com

*Lead Counsel for Lead Plaintiffs and the Class*

16