# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| STATE OF ALASKA, ALASKA PERMANENT FUND, THE CITY OF FORT LAUDERDALE GENERAL EMPLOYEES' RETIREMENT SYSTEM, and THE CITY OF PLANTATION POLICE OFFICERS PENSION FUND, On Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> RYDER SYSTEM, INC., ROBERT E. SANCHEZ, ART A. GARCIA, and DENNIS C. COOKE, <br><br> Defendants. | Civil Action No. 1:20-cv-22109-AMC |

**Expert Reply Report of Michael L. Hartzmark, Ph.D.**

**February 17, 2023**

## Table of Contents

I.     Qualifications and Compensation ...............................................................1

II.    Summary of Opinions ..............................................................................1

III.   Dr. Hutton Does Not Appear to Dispute My Opinion that Ryder Common
       Stock Traded in an Efficient Market ......................................................10

IV.    Dr. Hutton's Criticisms of My Damages Methodology Related to Ryder's
       Common Stock Are Premature *Loss Causation* Arguments that Rest on
       Flawed Assumptions and Raise No Individualized Issues.....................15

       A.     The Out-of-Pocket Methodology Is Used to Calculate Damages in
              Virtually All Section 10(b) Cases....................................................15

       B.     Two Primary Reasons Why Dr. Hutton's Criticisms Are Misleading
              and Erroneous ..................................................................................16

              1.     Dr. Hutton's Criticisms of My Damages Methodology Rehash
                     Standard "Loss Causation" Arguments that Are Not Relevant to
                     the Question of How the Damages Methodology Ties to
                     Plaintiffs' Theory of Liability ..................................................17

              2.     Dr. Hutton's Criticism of My Damages Model Raises No
                     Individualized Issues...............................................................22

       C.     Dr. Hutton's Flawed Generic Claim that Plaintiffs Will Be Unable to
              Reliably Calculate the Inputs Used to Construct the Inflation Ribbon
              When There Are Supposedly Multiple Theories of Liability.........23

       D.     Dr. Hutton's Flawed Generic Claim that Plaintiffs Will Be Unable to
              Reliably Calculate the Inputs Used to Construct the Inflation Ribbon
              when There Are Statistically Significant Price Declines on the Dates
              of the Alleged Partial Corrective Disclosures ..............................24

              1.     Dr. Hutton's Flawed Argument Related to Truth-on-the-Market.........25

              2.     Dr. Hutton's Flawed Argument Related to Materialization of
                     Concealed Risks......................................................................37

              3.     Dr. Hutton's Flawed Argument Related to Timely Information
                     and Mismatched Information ...................................................38

       E.     Dr. Hutton's Flawed Generic Claim that Plaintiffs Will Be Unable to
              Reliably Calculate the Inputs Used to Construct the Inflation Ribbon
              when There Are Exogenous Factors that Contribute to Investor Losses........39

              1.     Dr. Hutton's Flawed Argument Related to Used Vehicle Prices..........39

              2.     Dr. Hutton's Flawed Argument Related to Hypothetical "But
                     For" Residual Value Estimates ...............................................40

       F.     Dr. Hutton's Flawed Generic Claim that Plaintiffs Will Be Unable to
              Reliably Calculate the Inputs Used to Construct the Inflation Ribbon

- ii -

Because They Do Not Employ the Facts of the Case, Even Though the Case Is in the Discovery Stage and the Facts Have Yet to Be Determined by the Trier of Fact ........................................................................43

V.   Court Precedent, Including Decisions Where My Reports Were Credited in the Courts' Conclusion that There Is a Common Damages Methodology ..............44

    A.   The Same Opinion Regarding the Common Damages Methodology I Have Presented in Other Matters Has Been Credited by Numerous Other Federal Courts.......................................................................................44

    B.   The Same Opinion Regarding the Common Damages Methodology Other Economics Experts Have Presented in Other Matters Has Been Credited by Eleventh Circuit Courts.................................................................46

VI.  Dr. Hutton Offers No Evidence of a Lack of Price Impact from Either the Alleged Partial Corrective Disclosures or the Alleged Misrepresentations or Omissions ...........................................................................................................47

    A.   Price Impact on Alleged Partial Corrective Disclosure Dates........................47

    B.   Price Impact on Dates with Misrepresentations or Omissions ......................48

## I.     QUALIFICATIONS AND COMPENSATION

1.     I am President of Hartzmark Economics Litigation Practice, LLC. My qualifications and remuneration for this matter are set forth in my Expert Report dated September 22, 2022 (the "Hartzmark Report" or "Opening Report").[1]

## II.     SUMMARY OF OPINIONS

2.     I have reviewed the Rebuttal Report of Amy Hutton, Ph.D. (the "Hutton Report"), submitted on December 16, 2022,[2] and the transcript from Dr. Hutton's deposition held on February 2, 2023 (the "Hutton Dep. Tr."), and maintain the two opinions set forth in my Opening Report,[3] namely:

> **OPINION 1:** An economic analysis of a basket of factors typically used by courts to analyze market efficiency — including those set forth in *Cammer* and *Krogman* — supports the conclusion that throughout the Class Period Ryder common stock traded in an efficient market. These factors are consistent with the fundamental principles of economics and finance and academic research. The economic analyses, which employ commonly utilized and generally accepted statistical tests, demonstrate that Ryder common stock rapidly responded to unanticipated and material Company-specific information consistent with efficient markets.

> **OPINION 2:** The calculations of damages for violations of Section 10(b) of the Exchange Act may be computed on a class-wide basis using broadly accepted methodologies that would be common to all Class members.

3.     After reviewing the Hutton Report and Dr. Hutton's deposition testimony, I have the following additional opinions in response to the opinions she expressed.

> **REPLY OPINION 1:** Dr. Hutton does not dispute **OPINION 1** in my Opening Report, namely that Ryder common stock traded in an open, well-developed and

---

[1]   An updated *curriculum vitae* is attached to this Reply Report as **Appendix A**. Hartzmark Economics Litigation Practice, LLC is being compensated at a rate of $825 per hour for my work in this matter. My compensation is not contingent on the outcome of this case in any way. The same defined terms used in my Opening Report are also used in this Expert Reply Report.

[2]   The Hutton Report was submitted in support of Defendants' Memorandum of Law in Opposition to Lead Plaintiffs' Motion for Class Certification filed December 16, 2022 (the "Opposition Brief").

[3]   *See* Hartzmark Report, ¶10.

efficient market.  Moreover, she does not even address in the body of her report any of the analyses of the 12 factors I presented as support for my **OPINION 1**.  Indeed, Dr. Hutton does not offer any evidence related to the basket of factors courts generally rely upon when evaluating whether a common stock trades in an efficient market. [4]   Rather, Dr. Hutton chose to focus her attention on an irrelevant observation, and without any scientific analysis or academic support claims:

> From a financial economics perspective, Dr. Hartzmark's analyses of "price-related factors" fail to reliably establish a cause-and-effect relationship between news and Ryder's price movements.  … In particular, Dr. Hartzmark's use of multi-day event windows conflicts with fundamental underpinnings of market efficiency ….[5]

4.      Dr. Hutton is mistaken for multiple reasons.  First, she is at odds with peer-reviewed academic research and a multitude of court rulings, wherein it is widely accepted that multi-day event windows are commonly observed in efficient markets.  Second, and more critically, **nowhere in the empirical analyses I presented in my Opening Report did I employ multi-day windows**.[6]  My evaluation in the Opening Report of *Cammer* factor five — or the scientific, academic-based empirical tests evaluating the price-related factor of cause and effect, whether examining and comparing abnormal returns on news and no-news dates or examining autocorrelation of abnormal returns — were **all based on single day returns** (*i.e.,* single day "event windows").  Needless to say, Dr. Hutton does not consider, evaluate or critique these empirical tests, and simply makes her observation irrelevant.

5.      Most important as it relates to my opinion that Ryder common stock traded in an efficient market, Dr. Hutton does not opine that the market for Ryder common stock was inefficient nor does she provide any analysis whatsoever relating to the efficiency of the market for Ryder common stock.

---

[4]     Dr. Hutton offers two footnotes related to my market efficiency analyses: a footnote on the cause-and-effect factor (fn 190) and one on the operational factors (fn 191).

[5]     Hutton Report, ¶22.

[6]     Dr. Hutton appears to agree that the empirical tests I relied upon for my opinion are based on one-day returns: "… his use of a one-day return[] to measure abnormal returns when he analyzed the cause-and-effect relationship between news and Ryder stock price movement.  So yes, he -- as I state here, he used a one day return." (Hutton Dep. Tr., 125:5-10).

**REPLY OPINION 2:** Dr. Hutton opines that: "Dr. Hartzmark fails to articulate a methodology that can reliably measure class-wide damages in a manner consistent with Plaintiffs' theories of liability in this matter, and only those damages attributable to those liability theories."[7]  In this regard, Dr. Hutton specifies eight issues that my common damages methodology purportedly does not address.  To avoid redundancy, I have consolidated these eight issues into four subcategories.  These four subcategories also represent the generic categories that, in my experience, Defendants generally use to criticize plaintiffs' expert reports at the class certification stage.

**(i) Dr. Hutton's flawed generic claim that Plaintiffs did not reliably provide a methodology to attribute damages when there are multiple theories of liability**

6.      In this regard, Dr. Hutton states:

> Dr. Hartzmark fails to articulate a methodology that can reliably measure damages attributable to Plaintiffs' two theories of liability, if needed.  I understand that Plaintiffs allege two separate theories regarding how Ryder allegedly overstated the residual values of its vehicles ….[8]

7.      First of all, it is my understanding from Counsel that Dr. Hutton mischaracterizes the overall theory of liability put forth by Plaintiffs, which I understand is alleged as a single theory.  Moreover, as it relates to the common damages methodology I propose, Dr. Hutton makes this generic claim yet fails to account for the fact that, whatever finding of liability is made (if any) by the finder of fact in a later stage of this litigation, such a finding would apply class-wide and would be used to determine the common inputs utilized to construct an artificial inflation ribbon.  This common artificial inflation ribbon would be the basis for the common damages methodology I proposed and would be implemented class-wide.

**(ii) Dr. Hutton's flawed generic claim that Plaintiffs will be unable to reliably calculate the inputs used to construct the inflation ribbon when there are statistically significant price declines on the dates of the alleged partial corrective disclosures.**

---

[7]    Hutton Report, ¶13.

[8]    Hutton Report, ¶19.

8.   In this regard, Dr. Hutton states:

> Dr. Hartzmark fails to articulate a methodology that can reliably measure damages based on Ryder's stock price declines on the alleged corrective disclosure dates.   … Dr. Hartzmark fails to provide a reliable damages methodology that can address the following potential findings:
>
> a. *New, value-relevant information.*  Dr. Hartzmark fails to propose a damages methodology that can reliably address a finding that not all information in the alleged corrective disclosures was new, value-relevant information.  …
>
> b. *Confounding information.*  Dr. Hartzmark fails to articulate a methodology that can reliably account for the confounding, firm-specific information that was simultaneously announced on the alleged corrective disclosure dates.  …
>
> c. *Timely-disclosed information.*   Dr. Hartzmark fails to articulate a methodology that can reliably account for information that was timely disclosed on the alleged corrective disclosure dates.  …
>
> d. *Mismatched information.*  Dr. Hartzmark fails to articulate a damages methodology that can address a finding that there is a mismatch between the alleged corrective disclosures and the "correctly estimated" accounting numbers Ryder allegedly could or should have disclosed earlier.[9]

9.   In addition, Dr. Hutton states:

> Dr. Hartzmark simply claims that there are commonly used and widely accepted techniques that can "parse" or "scale" stock price reactions on the alleged corrective disclosure dates to measure inflation earlier during the Proposed Class Period.[10]
>
> Dr. Hartzmark fails to articulate a methodology that can reliably account for the possibility that the alleged corrective

---

[9]   Hutton Report, ¶16 (footnote omitted, emphasis in original).

[10]   Hutton Report, ¶18 (footnote omitted).

- 4 -

disclosures include the materialization of publicly known risks.[11]

10.     As set forth in my Opening Report, there are ample techniques, procedures or models to parse and scale stock price reactions and these techniques, procedures or models have been used in numerous securities class actions, and courts regularly adopt or endorse them.  And, again, when Dr. Hutton makes these multiple generic claims, she fails to acknowledge that, (i) whatever techniques, procedures or models are used at the damages stage of this litigation to parse or otherwise separate the abnormal price declines into the portion related to the alleged fraud and the portion unrelated to the alleged fraud, if necessary, and (ii) whatever techniques, procedures or models are used at the damages stage of this litigation to construct the inputs into the inflation ribbon, including any necessary adjustments or scaling, these inputs and the resulting inflation ribbon will be applied class-wide and the common damages methodology will be utilized to measure individual investor damages.

**(iii) Dr. Hutton's flawed generic claim that Plaintiffs will be unable to reliably calculate the inputs used to construct the inflation ribbon when there are exogenous factors (which can change over time) that contribute to investor losses**

11.     In this regard, Dr. Hutton states:

> Dr. Hartzmark fails to articulate a damages methodology that can reliably account for information about the decline in the used vehicles sales ("UVS") market that was publicly available throughout the Proposed Class Period.[12]

> Dr. Hartzmark fails to articulate a damages methodology that can reliably account for information Ryder had already disclosed about its residual value estimates.[13]

> Dr. Hartzmark fails to articulate a methodology that can reliably evaluate how Ryder's stock price would have changed had

---

[11]   Hutton Report, ¶20.

[12]   Hutton Report, ¶14.

[13]   Hutton Report, ¶15.

> Ryder adopted different accounting estimates for residual values.[14]

12.    Again, Dr. Hutton makes this generic claim yet fails to point out that whatever the inputs used to construct the inflation ribbon, including the techniques, procedures and models to adjust the level of artificial inflation at any point in time and/or adjust for exogenous factors, they will be applied class-wide and the common damages methodology will be utilized to measure individual investor damages.

**(iv) Dr. Hutton's flawed generic claim that Plaintiffs will be unable to reliably calculate the inputs used to construct the inflation ribbon because they do not employ the facts of the case, even though the case is in the discovery stage and the facts have yet to be determined by the trier of fact**

13.    In this regard, Dr. Hutton states:

> Dr. Hartzmark does not discuss any information specific to Ryder when opining that damages in this matter can be calculated using the "out-of-pocket" methodology.[15]

14.    Again, Dr. Hutton makes this generic claim yet fails to point out that whatever inputs are used to construct the inflation ribbon, based on the determination of the trier of fact, they will be applied class-wide and the common damages methodology will be utilized to measure individual investor damages.  In addition, Dr. Hutton does not take into account that the eventual parsing and scaling (if necessary) techniques, procedures or models that would be employed in a later report providing an estimate of artificial inflation generally requires a more complete fact discovery, including the findings of other possible expert witnesses on liability issues (such as, for example, accounting or industry issues), which could be germane to an analysis of parsing and/or scaling.

15.    Overall, as in most if not all Section 10(b) securities litigation, all these generic claims in subcategories (ii) and (iii) are, in my understanding, *premature loss causation issues* and do not address the "fit" between the damages methodology and

---

[14]   Hutton Report, ¶17.

[15]   Hutton Report, ¶21.

Plaintiffs' claims, but rather the *causal relationship* between the observed price movements of Ryder common stock and the alleged misstatements and corrective disclosures. Thus, underlying Dr. Hutton's generic claims are quintessential elements of *loss causation* (*i.e.*, what specific amount of an observed price movement was caused by alleged misstatements or the revelation of the truth). Yet, it is my understanding that *loss causation* is not an issue that is addressed by the courts at the class certification stage, nor was I asked to opine on it or develop the techniques, procedures or models that will be used in later stages to measure the inputs used to construct an inflation ribbon. Indeed, it is my experience that the out-of-pocket damages methodology I propose is the standard approach in federal securities litigation to calculate damages. Moreover, rather than resulting in the determination of damages that would be applied on an individual basis, the common damages methodology I have proposed applies formulaically across the Class as a whole.

16.    Further, Dr. Hutton's assignment included to "review and respond to … whether Dr. Hartzmark has articulated a methodology that is capable of reliably measuring class-wide damages in a manner consistent with Plaintiffs' theories of liability in this matter, and only those damages attributable to those liability theories."[16] This assignment (and her opinions) appears to have been undertaken based upon Defendants' argument that:

> … plaintiffs fail to demonstrate compliance with Rule 23(b)(3):
> they fail to prove (as they must) that damages may be calculated
> on a classwide basis consistent with their theories of liability.
> *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33-34 (2013).[17]

17.    Clearly the issues related to the exchange of information about and the trading activity of Ryder common stock and the nature of the market for information in this *Ryder* matter is different from the issues about the exchange of goods or service (for money) and the nature of the market for products and services. Namely, in this securities matter, there is an alleged fraud that relates to allegations of misinformation that is released and spread freely amongst all market participants (*i.e.,* investors in the market for common stock of Ryder), while in *Comcast* there was an alleged anti-trust violation that related to the

---

[16]    Hutton Report, ¶10.

[17]    Opposition Brief, p. 1.

exchange of cable services that indisputably harmed disparate groups of consumers who were differently situated based on their geographical location and their separate and distinct cable service providers.[18]  In other words, an individual cable consumer's harm is his or her own and does not impact others, which is unlike a securities market where the misinformation impacts investors in a common manner because the information is reflected in the market price which is broadcast freely to all other participants.  This failure to separate the effects of misinformation in an informationally efficient securities market versus market power in a services market, by itself makes Dr. Hutton's generic, red herring criticisms of the virtual standard and common damages methodology I propose misleading, erroneous, irrelevant and premature at the class certification stage.

18.    For example, Dr. Hutton suggests that there are two theories of liability in this *Ryder* matter.[19]  I understand from Plaintiffs' Counsel that this is a flawed interpretation of the Plaintiffs' Complaint.  Even so, Dr. Hutton then incorrectly suggests liability is found for only one of the two purported theories of liability, I have "not articulated a methodology that can reliably measure damages specific to that one specific theory of liability."[20]  Dr. Hutton's suggestion implies that, in the case of one purported theory of liability being dismissed, (a) the impact on all Class members would not be the same to all shareholders and (b) the losses *caused* by the remaining theory of liability are not calculable across the class in a common manner.  Dr. Hutton's suggestion is misguided as the elimination of either one of these purported theories of liability would simply leave behind a common inflation ribbon based on the remaining theory that would be applied class wide.

19.    My conclusion is the same for the other generic claims and red herrings in the Hutton Report.  For example, whether there are certain exogenous factors that *caused* losses to investors (*e.g.*, declines in used vehicle prices), or there is confounding information on misstatement or corrective disclosure dates that *caused* some non-recoverable losses to investors (*e.g.*, *unanticipated* declines in used vehicle prices), or the

---

[18]    *Comcast Corp.* v. *Behrend*, 569 U.S. 27 (2013).

[19]    Hutton Report, ¶93.

[20]    Hutton Report, ¶94.

impact of the alleged misstatements *caused* losses that differ over time, then even so the results are common to all investors — meaning the financial impact of these losses *caused* by the purported non-fraudulent factors will impact all Class members in a common manner; and conversely the financial impact of the losses *caused* by the alleged fraudulent factors will impact all Class members in a common manner.   In other words, it is indisputable that the techniques, methods and procedures to measure the inputs that are used to construct the inflation ribbon will be common to all Class members no matter how many misstatements are sustained or dismissed, no matter what exogenous factors caused increases or declines in Ryder's common stock, no matter what potentially confounding information impacted Ryder's stock price, or no matter how the magnitude of the losses caused by the alleged misstatements changed over time.

> **REPLY OPINION 3: Dr. Hutton has presented no opinion that there is a lack of price impact**.  I showed in the Opening Report that there is extensive evidence that Ryder common stock traded in an efficient market.  It is my understanding that the Court held in *Halliburton II* that "defendants must be afforded an opportunity before class certification to defeat the presumption [of reliance] through evidence that an alleged misrepresentation did not actually affect the market price of the stock."[21]  It does not appear that Dr. Hutton was tasked with analyzing whether there was a lack of price impact, and therefore did not address or express an opinion on this issue.  In other words, Dr. Hutton does not provide any evidence — based either on price reactions at the time of the alleged misrepresentations or at the time of the alleged corrective disclosures — that there is a lack of price impact.  .

20.    In addition, Dr. Hutton does not dispute that on the first trading day following each of the three alleged partial corrective disclosures there was rapid price impact with statistically significant negative abnormal returns observed on all three days.[22]  Nor does Dr. Hutton offer any empirical evidence demonstrating that 100% of any of these statistically significant negative abnormal returns observed on any of the three days with

---

[21]   *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2417 (2014) ("*Halliburton II*").

[22]   Hutton Dep. Tr. 127:17-128:12 ("Q      Did the price of Ryder's stock begin to move in a statistically significant manner within the first 24 hours of the disclosure of the corrective information?  … THE WITNESS: I haven't examined the stock price movement within the first 24 hours.  If there's a part of Dr. Hartzmark's report that you want to bring up where he shows the daily returns and then his aggregation to the multiwindow return, we can take a look at that.  … Q      So sitting here today, you have no reason to dispute that Ryder's stock price -- it's initial reaction to the news was rapid on those dates?  … THE WITNESS: I have to reason to endorse the statement, either.  I have not done the analysis.").

alleged partial corrective disclosures is caused by information wholly unrelated to the revelation of the truth.

21.     In reaching these opinions, I have relied upon various materials, which are listed in **Appendix B**.  The research and analysis upon which my opinions are based has been conducted by me with the assistance of personnel working under my direction and supervision.  My conclusions are based on information available to me as of the date of this report.  I understand that discovery is ongoing, and I may review, evaluate, and analyze relevant material that becomes available to me in the future.  I reserve the right to modify my conclusions based on additional information.

### III.     DR. HUTTON DOES NOT APPEAR TO DISPUTE MY OPINION THAT RYDER COMMON STOCK TRADED IN AN EFFICIENT MARKET

22.     Dr. Hutton does not appear to dispute that Ryder common stock traded in an efficient market throughout the Class Period based on the in-depth examination presented in my Opening Report of the basket of *Cammer* and *Krogman* factors.  In addition, Dr. Hutton does not appear to take issue with my market model and event study analysis, nor has she implemented her own market model and event study analysis.  Indeed, she cites to the statistics presented in my market model and has not offered any specific criticisms of my market model in calculating daily abnormal returns or testing for statistical significance.[23]

23.     In terms of her assignment to "review and respond to Dr. Hartzmark's cause-and-effect analyses regarding market efficiency during the Proposed Class Period,"[24]

---

[23]     For example, Dr. Hutton references the abnormal returns contained in my Opening Report in footnote 4 to Appendix D-1, footnote 20 to Appendix D-2 and footnote 35 to Appendix D-3. Dr. Hutton testified that she did not look closely at my statistical analysis ("Hutton Dep. Tr. 140:13-20 ("So I have not redone Dr. Hartzmark's event study.  As I discuss in my report, even if one were to assume his event study is correct or done well -- and I'm not endorsing it, because I haven't looked at it sufficiently closely -- the problem is with the -- is a matter of methodology.").

[24]     Hutton Report, ¶10 (footnote omitted)

within the body of her report,[25] Dr. Hutton cites to and then criticizes my simple observation in my Opening Report that:

> **Although not necessary to support my conclusions as to the efficiency of the market for Ryder common stock**, I have been asked by Counsel to also analyze whether Ryder's stock price reacted to the alleged corrective disclosures in a way that would be expected of a stock that trades in an efficient market. In Appendix C and Appendix E, I present empirical information related to the calculation of all the abnormal returns throughout the Class Period+, including those days when the Complaint alleges there were corrective disclosures: July 30, 2019 (price impact alleged on July 30, 2019), October 29, 2019 (price impact alleged on October 29 and 30, 2019), and February 13, 2020 (price impact alleged on February 13, 14, and 18, 2020).
>
> All of the days with potential impacts from the disclosures have rapid price responses.  All have negative abnormal returns that are highly statistically significant (with p-values below 0.01, which denotes statistical significance with greater than 99% confidence).[26]

24.    From this observation, Dr. Hutton then erects a straw man argument and claims in the body of her report based on this simple observation (which is not even used as empirical support for my opinion) that:

> Dr. Hartzmark's report does not provide a reliable basis to assess whether the trading of Ryder's stock reflected market efficiency.  As discussed below, his use of multi-day event windows conflicts with fundamental underpinnings of market efficiency.  His consideration of other indicia does not provide

---

[25]    Dr. Hutton does include a lengthy footnote discussing my two main analyses of the fifth *Cammer* factor (analyses of news vs. no news and autocorrelation) (Hutton Report, fn 190).  In addition, she offers a second footnote related to the operational factors, where she offers the generalized opinion: "However, from a financial economic perspective, these other factors can at most serve as indicia of market efficiency.  They are not sufficient for an economist to conclude that a specific security traded in an efficient market.  I am not offering an opinion regarding the legal relevance of those other factors."  Hutton Report, fn 191.

[26]    Hartzmark Report, ¶¶80-81 (emphasis added and omitted, footnote omitted).

> him with a basis in financial economics to draw an inference on the question of market efficiency.[27]

25.     First, although Dr. Hutton's lengthy footnote (191) does not appear to accept these "other indicia" as meaningful metrics, I disagree with her assessment.  I find Dr. Hutton's footnoted discussion of the operational factors as being dismissive without support, as well as being contrary to "other indicia" or important operational factors that courts have relied upon for over thirty years when assessing market efficiency of a single security.[28]  The courts' reliance upon these operational factors is based on an extensive base of academic research presented in peer-reviewed journals over the past fifty years.

26.     Second, the two cause-and-effect analyses I performed in my Opening Report examining *Cammer* factor five have been widely used and accepted by courts in assessing market efficiency.[29]  Moreover, even if I relied upon multi-day windows to support my opinion on market efficiency (**which I do not**), multi-day windows have been widely used by both academic economists and the courts if the circumstances are appropriate.  For example, based on the empirical analyses of price movements I provided in my Opening Report in combination with the lack of scientific-based empirical evidence in the Hutton Report, Dr. Hutton's claim is contrary to the ruling in *Halliburton II* where the Court reaffirmed *Basic Inc. v Levinson*, 485 U.S. 224 (1988):

> The Court in *Basic* acknowledged, however, the debate among economists about the efficiency of capital markets and refused to endorse "any particular theory of how quickly and completely publicly available information is reflected in market price."  The Court instead based the presumption of reliance on the fairly modest premise that "market professionals generally consider most publicly announced material statements about

---

[27]   Hutton Report, ¶120 (footnotes omitted).

[28]   Dr. Hutton apparently makes a semantic distinction between the factors being "indicia" but not "sufficient for an economist to conclude that a specific security traded in an efficient market. I am not offering an opinion regarding the legal relevance of those other factors."  Hutton Report, fn 191.

[29]   *See, e.g.*, *In re Gaming Lottery Sec. Litig.*, 2001 WL 204219, at *17 (S.D.N.Y. Mar. 1, 2001) (market efficiency supported by the fact that the stock "did not exhibit autocorrelation"); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 429-30 (S.D.N.Y. 2014) ("News Days versus Non-News Days" analysis supports efficiency).

> companies, thereby affecting stock market prices."  Moreover, in making the presumption rebuttable, *Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof.[30]

27.    For example, examining an alleged corrective disclosure over a multi-day window is a case-specific inquiry that may be appropriate given the nature, complexity and flow of information, as well as how long it takes for market participants to digest the material, unanticipated news.[31]  More critically, I also note that as it relates to the empirical

---

[30]    *Halliburton II*, 134 S.Ct. at 2403 (quoting *Basic*, 485 U.S. at 247, 248, nn. 24 & 28).

[31]    The Court in *Monroe Cnty. Empls. Retirement Syst., et al. v. The Southern Co., et al.,*332 F.R.D. 370, 391-392 (N.D. Ga. 2019), laid out the arguments as follows:

First, using exclusively one-day event windows does not change [] conclusion[s] concerning market efficiency.  []  As a result, the debate about event windows in this case is largely academic.  Second, there are many cases that find that multi-day event windows are appropriate for event study analysis in securities fraud class actions.  *See, e.g., In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) (rejecting argument that a two-day event window is inconsistent with an efficient market); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3rd Cir. 2011) ("That some information took two days to affect the price does not undermine a finding of efficiency."), abrogated on other grounds by *Amgen Inc. v. Connecticut Retirement Plains and Trust Funds*, 133 S. Ct. (2013); *In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) (using a three-day window for analysis); *In re Diamond Foods, Inc.*, 295 F.R.D. 240, 249 (N.D. Cal. 2013) (citing defense expert's assertion that a "proper test of market efficiency" required analyzing whether the market price reacted to new information over more than one trading day in order to "assess[] whether there are delayed price responses to the events of interest"); *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 104 (S.D.N.Y. 2009) (accepting event study with three-day event window and rejecting argument that this rule only applied "where the timing of discrete events was [not] ascertainable"); *Aranaz*, 302 F.R.D. at 669 (citing significant two-day stock decline as "strong empirical evidence of market efficiency").  In another securities fraud case, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, the court explicitly considered and rejected Professor Gompers' exact same argument against two-day windows that he offers in this case, finding that "[a] two- to three-day window is *common* in event studies" because "it is standard for experts to utilize an event window including both the day of the event and the day following an event."  310 F.R.D. at 96.  The *Barclays* court noted that Professor Gompers "agree[d] that event studies often use a two-day window, the date of the announcement and the day after."  *Id.* at 96 n.183.  Third, and more broadly, the Supreme Court has expressly refused to "adopt any particular theory of how quickly and completely publicly available information is reflected in market price."  *Basic*, 485 U.S. at 248 n.28.  Following its decision in *Basic*, the Supreme Court in *Halliburton II* reiterated that it would not "enter the fray" of academic debates about the speed at which information is impounded into a stock price, and reconfirmed that market efficiency is based on "the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"  *Halliburton Co,*

- 13 -

support for my opinion, the initial one-day responses to information released in the alleged partial corrective disclosures were rapid and statistically significant below the 1% level on each alleged partial corrective disclosure, which supports that the price reacted quickly to the release of new, material, unanticipated information.  In other words, I am able to conclude with 99% confidence that all three negative returns following each of the three alleged partial corrective disclosure are outside the bounds of what would be expected by chance.

28.    Finally, Dr. Hutton does not offer an opinion that the market for Ryder common stock was not efficient, nor does she provide any analysis related to the efficiency of the market for Ryder common stock.

---

*et al. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2410 (2014).  (quoting *Basic*, 485 U.S. at 247 n.24).  Fourth, academic literature supports the use of two-day (or more) event windows. [footnote: "Event Studies in Economics and Finance" by Craig A. MacKinlay, *Journal of Economic Literature*, Vol. 35, No. 1, 1997, pp. 14-15.  MacKinlay makes clear that examination of stock price effects that occur on the second trading day is perfectly appropriate in event study analysis.]  Professor Feinstein cited multiple other legal and academic papers endorsing the use of multi-day event windows and explaining that price reactions to news sometimes occur over two or more trading days, including a paper by David I. Tabak, who explains that "[i]n securities fraud cases, many experts have adopted the convention of looking at one-day, two-day, or five-day periods following an announcement."  [footnote to multiple articles omitted] And although Defendants and Professor Gompers cite academic literature for the proposition that stock price reactions generally *begin* quickly, this does not necessarily mean that stock price reactions always *end* quickly.  Rather, as Professor Feinstein explained, "[i]t is not settled science that an efficient market price reaction is over within a matter of minutes," and "the articles [Professor Gompers cites] do not conclude that the stock price reaction in an efficient market necessarily ends quickly and cannot continue on the day after an earnings announcement.  [].  Fifth, the Court finds, in accordance with the academic literature, that when the particular facts and circumstances justify investigating multi-day event windows, such analysis is appropriate.  … Finally, the Court rejects Defendants' suggestion that [multi-day] analysis should be disregarded because [it] did not analyze *only* one-day windows or only two-day windows.  The Court is unaware of any rule, and Defendants cite none, requiring that one must commit at the outset, before analyzing the data, to investigate only one-day or only two-day event windows.  [An] event study analysis is "an investigation, and the results might compel you to look at a larger window."  [citation omitted].

## IV.   DR. HUTTON'S CRITICISMS OF MY DAMAGES METHODOLOGY RELATED TO RYDER'S COMMON STOCK ARE PREMATURE *LOSS CAUSATION* ARGUMENTS THAT REST ON FLAWED ASSUMPTIONS AND RAISE NO INDIVIDUALIZED ISSUES

A.   The Out-of-Pocket Methodology Is Used to Calculate Damages in Virtually All Section 10(b) Cases

29.   Dr. Hutton opines that:

> **It is my understanding that the out-of-pocket methodology provides a <u>definition of damages for Section 10(b) matters like the current one.</u>** However, Dr. Hartzmark's mere statement that "[t]his class-wide damages methodology is generally referred to as the 'out-of-pocket' methodology" is a tautology rather than evidence that damages in the current matter can indeed be reliably measured in a way consistent with Plaintiffs' liability theories, in the absence of any explanation from Dr. Hartzmark of what specific approach he would take to determine and calculate the inputs and implement the out-of-pocket methodology.[32]

30.   Dr. Hutton appears to agree that the traditional "out-of-pocket" ("OOP") methodology I described in detail in my Opening Report as the common damages methodology  is a "definition of damages for Section 10(b) matters like the current one" and can be applied on a class-wide basis.  She is correct that the methodology is routinely, indeed, virtually universally, used to calculate damages in securities class action cases arising under Section 10(b) and is admittedly definitional much like the formula for the slope of a straight line.  As I explained in the Opening Report and discuss below, to construct an inflation ribbon (or time series of daily artificial inflation) that measures how much the alleged misrepresentations and omissions artificially inflated Ryder stock on each day during the Class Period, I would begin by using the results of a commonly-utilized event study along with firm-specific information.[33]  To disaggregate price movements related to the alleged partial corrective disclosures, if necessary, and scale those price

---

[32]   Hutton Report, ¶113 (emphasis added, footnote omitted).

[33]   As a financial economist, I generally would begin to estimate inflation by using an event study.

movements backward in time, if necessary, I would use, as appropriate given the facts in this case, the standard tools of economics, finance and statistics. I further explained in my Opening Report that the calculation of daily inflation, along with the actual trading activity of the Class members, would then be used along with the daily measures of inflation to calculate damages for all Class members in a mechanical fashion. Dr. Hutton claims, without any economic or legal support, that this is insufficient.

B. Two Primary Reasons Why Dr. Hutton's Criticisms Are Misleading and Erroneous

31.     Dr. Hutton critiques my damages methodology opinion on the grounds that I supposedly do not say: (a) specifically how I might disaggregate the price reaction on the alleged partial corrective disclosure dates and exclude the portion of the price decline, if any, that was possibly caused by the alleged misrepresentations of those claims that have been dismissed or other non-fraudulent confounding news;[34] or (b) specifically how I might use this disaggregated price reaction to estimate or backcast artificial inflation on each day of the Class Period — *i.e.*, account for time-varying inflation or scaling.[35] Dr. Hutton also opines that I might be unable to account and adjust for exogenous factors that caused investor losses and quantify the harm based on which of the two purported Plaintiffs' theories of liability caused investor losses.[36] For two primary reasons explained below, I find Dr. Hutton's critique of my common damages methodology to lack merit.[37] These

---

[34]   Hutton Report, Section V.B., V.C., VII., and VIII.

[35]   Hutton Report, Section V.A.

[36]   Hutton Report, Section VI.

[37]   For example, her claim is at odds with the decision in *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084 (S.D.N.Y. July 10, 2019) ("*Signet*") at *20, where I served as the testifying expert. The *Signet* Court concluded:

> This [Hartzmark] methodology, which applies on a class-wide basis, is capable of measuring the out-of-pocket losses suffered by the Class members. Defendants' remaining arguments are unpersuasive.

The *Signet* Court also concluded:

> Despite Defendants' arguments to the contrary, the Court sees no reason why an event study—the generally accepted method for measuring damages in a securities fraud class action—cannot work in this case. As an initial matter, the Court rejects the suggestion

reasons include Dr. Hutton's: (1) reliance upon issues appropriately considered in a *loss causation* analysis; and (2) failure to demonstrate that her criticisms raise any individualized issues.

### 1. Dr. Hutton's Criticisms of My Damages Methodology Rehash Standard "Loss Causation" Arguments that Are Not Relevant to the Question of How the Damages Methodology Ties to Plaintiffs' Theory of Liability

32.     The OOP damages methodology that I described in my Opening Report shows how, based on a straightforward, standard and commonly-used formula that includes the measures of daily artificial inflation throughout the Class Period, Class member damages are appropriately calculated, *assuming that Plaintiffs will prevail on liability* — an assumption that any economic expert must make when evaluating the applicability of a proposed damages methodology at the class certification stage.

33.     Dr. Hutton's critique of the OOP damages methodology that I describe in my Opening Report — and that she understands is the standard approach in federal securities litigation to calculate damages[38] — are thinly disguised *loss causation* arguments that do not implicate the validity or class-wide application of my damages methodology.  As mentioned above, Dr. Hutton's criticisms generally consist of two primary challenges of my damages methodology on the grounds that I supposedly fail to explain how: (a) I will disaggregate (*i.e.*, parse) the portion of the price reaction on the alleged partial corrective disclosure dates caused by revelation of the truth concerning the alleged misstatements from the portion caused by other "confounding" information (or more than one theory of liability); and (b) I will scale (*i.e.*, make daily adjustments to) artificial inflation over time.

34.     Generally, Dr. Hutton claims in the list in **Reply Opinion 2** that I do not specify *in detail* how I will disaggregate or scale over time the *specific* price reactions on the alleged partial corrective disclosure dates *in this matter*.  That is, she states that I have

---

that an event study is incapable of disaggregating the effects of confounding information. Were it otherwise, nearly every securities fraud class action would fail.

[38]     Dr. Hutton states that: "It is my understanding that the out-of-pocket methodology provides a definition of damages for Section 10(b) matters like the current one."  Hutton Report, ¶113.

failed to say how I would isolate that portion of the price decline caused by the revelation of the truth about the alleged misrepresentations and omissions — in essence, I have not stated how I would calculate actual artificial inflation and account for any time-varying inflation.

35.     However, these criticisms are quintessential elements of *loss causation*, and, as I understand the economic rationale underlying the *Halliburton I* Opinion,[39] more critically, even if questions of *loss causation* were relevant at the class certification stage those questions do not involve individualized issues.[40] Moreover, clearly cognizant that the OOP damages methodology is routinely used to calculate or in her terms "define" damages in federal securities litigation just like this *Ryder* matter, Dr. Hutton claims in her report that I did not provide "… evidence that there is a reliable damages methodology that can accommodate the specific facts and circumstances of the current matter in a way that is consistent with Plaintiffs' theories of liability."[41] Yet, Dr. Hutton then acknowledged during her deposition that it is not impossible to calculate the inputs to the inflation ribbon.[42] Not only are Dr. Hutton's opinions speculative, but they imply incorrectly that, in general, most if not all Section 10(b) cases are difficult and therefore, unless the Plaintiffs offer specific techniques, procedures and models for calculating artificial inflation at class certification, they should immediately cease. As discussed in my Opening Report and this Reply Report, there is nothing in this matter beyond the garden variety

---

[39]  *Erica P. John Fund, Inc. v. Halliburton Co, et al.*, 131 S.Ct. 2179 (2011) ("*Halliburton I*").

[40]  This is also consistent with the *Signet* Court's conclusion that: "[Defendant's expert's] contention that Plaintiff's methodology did not adequately isolate the impact … is simply a **loss causation argument in disguise**, because it tests the causal relationship between the alleged misstatements and the price decline. Such an argument 'goes beyond the *Rule 23* inquiry.'" *Signet* at *20 (emphasis added and in original, citations omitted).

[41]  Hutton Report, ¶21.

[42]  *See* Hutton Dep. Tr. 158:22-159:4 ("[Q] … Is it -- is it possible for someone to develop a methodology to measure inflation in Ryder's stock price caused by the alleged misstatements here? [A] So I've not opined that it's not possible. What I've opined is that Dr. Hartzmark has not provided an articulation of a methodology that can reliably measure inflation in this matter consistent with Plaintiffs' theory of liability.").

issues that are commonly scrutinized in most securities class action cases, where disaggregating and scaling price impact are commonly done.[43]

36.   Indeed, Dr. Hutton testified that she has disaggregated confounding information using some of the standard techniques[44] that I referred to in my Opening Report[45] and discuss below.  Moreover, and most critically, she does not suggest that such disaggregation would involve an individual determination of damages across Class members.

37.   Dr. Hutton does not dispute that the OOP damages methodology I described in Section VII of my Opening Report is widely accepted and commonly used to calculate damages under Section 10(b).  Rather, she attempts to obfuscate the issue by raising a number of premature *loss causation*-related arguments that I understand are not relevant at class certification to determine whether my damages methodology satisfies the predominance requirement (as I believe it does based on a number of court decisions where I submitted expert testimony).[46]  Indeed, Dr. Hutton does not claim the OOP damages methodology I propose is not sufficiently tethered to Plaintiffs' theory of the case, but

---

[43]   This is consistent with the *Signet* Court's conclusion that: "Dr. Hartzmark's [methodology for calculating damages] purports to 'us[e] the results of an event study along with the disclosures of firm-specific information' to measure 'the level of artificial inflation in the prices of the Signet common stock' based upon 'price reactions to disclosures revealing [Defendants'] alleged misstatements and omissions.' [] 'From this, daily levels of inflation can be calculated by adjusting the inflation measure for each day throughout the Class Period.' []   This methodology, which applies on a class-wide basis, is capable of measuring the out-of-pocket losses suffered by the Class members." *Signet* at \*20.

[44]   Hutton Dep. Tr. 63:19-25 ("Q  Have you ever used intraday trading to parse news that was disclosed on an alleged corrective disclosure date?  A   … I do believe in one of my prior reports I had looked at intraday trading data."); Hutton Dep. Tr. 88:2-14 ("Q  In preparing your report for this case here, you reviewed the analyst reports around the corrective disclosures, is that right?  A  Yes, I did.  Q  And why did you do that?  A  Well, one of the purposes was, as we just went over, to look for observations that would suggest that the – there may have been other relevant incremental information that was revealed on the alleged corrective disclosure dates.  The confounding news[], for instance, that we were just talking about, that may have affected the stock price reaction documented for that day.").

[45]   Hartzmark Report, ¶97.

[46]   For example, *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303 at \*15 (S.D. Tex. Nov. 13, 2019); *Christakis Vrakas, et al. v. U.S. Steel Corp., et al.*, 2019 U.S. Dist. LEXIS 222783 (W.D. Pa., Dec. 31, 2019) at \*21; and *Signet* at \*20.

- 19 -

rather simply claims that I have not articulated the specific inputs to the damages methodology that can reliably measure the inflation ribbon or the estimated daily artificial inflation throughout the Class Period consistent with Plaintiffs' theory of liability.[47]  Based on this circular logic, Dr. Hutton offers a misleading and erroneous critique of the OOP methodology.  This critique has nothing to do with the fit between the proposed damages methodology and Plaintiffs' claims.  Instead, Dr. Hutton is criticizing my opinion for not constituting a complete damages analysis — including *loss causation*.  Indeed, should Plaintiffs fail to prove their affirmative liability case, then it will still be possible to measure the estimated daily inflation throughout the Class Period, and it will be zero, which would then be used as the input into the common damages methodology.

38.    Even so, as an economic matter, Dr. Hutton's purported criticisms are actually *loss causation* arguments that concern the ***inputs*** to a ***damages methodology***, not the validity or common application of the methodology itself.[48]  Dr. Hutton's criticism of my damages methodology is, in its essence, that I have not specified the techniques, procedures or models I would use to calculate the ***inputs*** (*i.e.*, the artificial inflation ribbon) that will be fed into the class-wide ***damages formula***.[49]  These criticisms are misplaced.  The issue of whether and how much a particular price reaction is caused by the revelation of the truth concerning a particular alleged misstatement or omission (as opposed to confounding information) is a quintessential *loss causation* inquiry because it is focused on the causal relationship between the misstatements, the price reaction and investor harm.

---

[47]    *See* Hutton Dep. Tr. 158:22-159:4 ("[Q]  Is it -- is it possible for someone to develop a methodology to measure inflation in Ryder's stock price caused by the alleged misstatements here?  [A]  So I've not opined that it's not possible.  What I've opined is that Dr. Hartzmark has not provided an articulation of a methodology that can reliably measure inflation in this matter consistent with Plaintiff's theory of liability.").

[48]    For example, *see In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 217 (C.D. Cal. 2019) ("To the extent that Defendant's arguments seek to challenge [plaintiff's expert's] ability *in practice* to adjust for the confounding factors that may prevent isolation of price movement based on the alleged partial corrective disclosures, this is an inquiry to consider at the merits stage."); *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020) ("Calculating the actual inputs into the out-of-pocket method by parsing and scaling the abnormal returns requires an analysis of *loss causation*.  For present purposes, one need only realize that the inflation-ribbon inputs will be common and applied classwide.").

[49]    *See*, for example, Hutton Report ¶¶15-21.

39. Further, Dr. Hutton's arguments are irrelevant because any analysis to separate the impact on prices of alleged fraudulent from non-fraudulent information **would be dependent on the claims being tried after discovery is mostly if not fully complete and, eventually, a determination of liability by the finder of fact**. In general, to the extent it was even appropriate, disaggregating alleged fraudulent from non-fraudulent information would be based on a disclosure-specific inquiry that would generally occur on a full factual record. Furthermore, assuming disaggregation were appropriate or necessary, there are a multitude of techniques that could be used to estimate the portion of the price reaction due to the revelation of the truth. These include, among others: the analysis of intraday pricing (if disclosures are made at different times of the day); analysis of market and media commentary; examination of the elements that cause changes in actual or estimated earnings-per share or EBITDA (by individual analysts, the company or a consensus of analysts); ratio analysis (*e.g.*, price to earnings ratio, EBITDA to earnings, etc.); or analysis of detailed <u>external</u> accounting and company information, such as a breakdown of revenues and earnings for different divisions, businesses, types of customers, facilities, geographic locations, etc. Dr. Hutton stated she has used similar techniques for disaggregation, testifying that she has used an analysis of intraday pricing to parse news[50] and that her own report relied on an analysis of analyst commentary to opine on the potential existence of confounding information.[51] In addition, material produced in discovery, such as <u>internal</u> accounting and company information, emails, presentations, letters and other communications could shed light on the underlying reasons for the disclosures (if such reasons were misstated or omitted), and other expert testimony related to liability issues could also provide a basis for disaggregation.

---

[50] Hutton Dep. Tr. 63:19-25 ("Q Have you ever used intraday trading to parse news that was disclosed on an alleged corrective disclosure date? A … I do believe in one of my prior reports I had looked at intraday trading data.").

[51] Hutton Dep. Tr. 88:2-14 ("Q In preparing your report for this case here, you reviewed the analyst reports around the corrective disclosures, is that right? A Yes, I did. Q And why did you do that? A Well, one of the purposes was, as we just went over, to look for observations that would suggest that the -- there may have been other relevant incremental information that was revealed on the alleged corrective disclosure dates. The confounding news[], for instance, that we were just talking about, that may have affected the stock price reaction documented for that day.").

40.     Dr. Hutton's arguments related to time-varying inflation are also irrelevant at this stage of the litigation and, because I have not been asked to opine on issues of *loss causation*, I have not addressed whether artificial inflation (*i.e.,* investor losses caused by misstatements) varies over time.  Indeed, it is not possible to address those issues at this time because there has not been discovery presented to me (or opinions of other experts related to liability) that might be needed for an economist to perform an analysis of potential changes in *what* was misrepresented or omitted, and *when* it was misrepresented or omitted, which **would be dependent on the claims being tried after discovery is complete and, eventually, a determination of liability by the finder of fact**.  Again, assuming an adjustment for time-varying inflation is appropriate, there are a multitude of techniques that could be used.  These include, among others: fixed scaling based on the constant dollar approach; scaling based on a percentage of Ryder's stock price (*i.e.*, the constant percentage approach); scaling based on the change in an appropriate index (*e.g.*, used vehicle prices); scaling based on the amount of an alleged overstatement of revenue or earnings; or more variable scaling approaches that might examine the financial and accounting variables presented in the previous paragraph and compare the internal measures to those actually disclosed or discussed by analysts and others.

### 2.     *Dr. Hutton's Criticism of My Damages Model Raises No Individualized Issues*

41.     In my Opening Report, I stated: "In other words, no matter which technique might be chosen at the merits stage of this litigation to construct the inflation ribbon, the techniques used to estimate the true price (and thus calculate artificial inflation) will be common to all putative Class members and will be applied on a class-wide basis."[52] Therefore, should the finder of fact determine, after considering the parties' competing evidence of loss causation (or lack thereof), that non-fraudulent information, including information related to the claims that were dismissed, did cause some of the economic harm, that finding will impact the measurement of artificial inflation on a class-wide basis

---

[52]   Hartzmark Report, ¶92 (footnote omitted).

— in other words, ***no individualized questions would arise***, whether or not Dr. Hutton is correct about the need to disaggregate or scale the artificial inflation.

42.     Further, the common damages methodology I propose is flexible and can account for whatever the finder of fact determines as to whether the alleged partial corrective disclosures reveal all or a portion of the truth and when the misrepresentations or omissions commenced.  Thus, to the extent the finder of fact determines at a later stage in this case that all or a portion of the information allegedly revealed on a particular alleged partial corrective disclosure date is not corrective and the inflation ribbon I calculate at the damages stage magnifies the price impact of the alleged misrepresentations, then artificial inflation can be adjusted to remove the appropriate level of the price impact from my inflation ribbon.  Once I adjust my estimate of the inflation ribbon based on the findings of the Court or finder of fact, I then will apply this adjusted input in my common damages methodology on a class-wide basis.[53]

43.     In summary, Dr. Hutton's criticisms concerning disaggregation, the apportionment of artificial inflation, and the need to account for changes in daily artificial inflation over time, **raise no individualized damages issues**.  This is because the measure of harm for every damaged Ryder investor — *i.e.,* the members of the proposed Class — will derive from the same alleged partial corrective disclosures, along with other adjustments, and will be based upon a common artificial inflation ribbon and a common mathematical damages formula.

C.   Dr. Hutton's Flawed Generic Claim that Plaintiffs Will Be Unable to Reliably Calculate the Inputs Used to Construct the Inflation Ribbon When There Are Supposedly Multiple Theories of Liability

44.     Dr. Hutton claims:

> Dr. Hartzmark fails to articulate a methodology that can reliably measure damages attributable to Plaintiffs' two theories of liability, if needed.  I understand that Plaintiffs allege two

---

[53]   I understand that in a damages report, I will still have to make assumptions that the allegations will be proven at trial.  However, my damages methodology is flexible enough to account for the decision of the finder of fact as to which allegations are proven and which are not.

separate theories regarding how Ryder allegedly overstated the residual values of its vehicles ….[54]

45.     Dr. Hutton suggests there are two theories of liability in this *Ryder* matter.  I understand from Plaintiffs' Counsel that this is a flawed interpretation of the Plaintiffs' Complaint because there is a single theory of liability, namely:

> The action arises from Defendants' materially false and misleading statements and omissions concerning Ryder's financial performance and the value of its core assets. … This case concerns how Defendants artificially inflated Ryder's vehicle fleet's residual values in order to knowingly or recklessly understate depreciation expense, overstate profits, increase incentive compensation, and make highly-lucrative insider sales of Ryder stock at artificially inflated stock prices.[55]

46.     Even so, should as Dr. Hutton speculate, one of the two purported theories of liability be dismissed, (a) the impact of this finding would be common to all Class members and thus applied in the same manner to all Class members; and (b) the measurement of the losses *caused* by the single remaining theory of liability would be calculable across the class in a common manner.  Dr. Hutton is simply wrong that the elimination of either one of her purported theories of liability would leave behind anything other than a common inflation ribbon that would be applied class wide.  In other words, this criticism has nothing to do with whether the OOP damages methodology can be applied class-wide.

D.    Dr. Hutton's Flawed Generic Claim that Plaintiffs Will Be Unable to Reliably Calculate the Inputs Used to Construct the Inflation Ribbon when There Are Statistically Significant Price Declines on the Dates of the Alleged Partial Corrective Disclosures

47.     Dr. Hutton claims:

> Dr. Hartzmark fails to articulate a methodology that can reliably measure damages based on Ryder's stock price declines on the alleged corrective disclosure dates.  …

---

[54]   Hutton Report, ¶19.

[55]   Complaint, ¶1.

New, value-relevant information. Dr. Hartzmark fails to propose a damages methodology that can reliably address a finding that not all information in the alleged corrective disclosures was new, value-relevant information. …

Confounding information. Dr. Hartzmark fails to articulate a methodology that can reliably account for the confounding, firm-specific information that was simultaneously announced on the alleged corrective disclosure dates. …

Timely-disclosed information. Dr. Hartzmark fails to articulate a methodology that can reliably account for information that was timely disclosed on the alleged corrective disclosure dates. …

Mismatched information. Dr. Hartzmark fails to articulate a damages methodology that can address a finding that there is a mismatch between the alleged corrective disclosures and the "correctly estimated" accounting numbers Ryder allegedly could or should have disclosed earlier.[56]

Dr. Hartzmark simply claims that there are commonly used and widely accepted techniques that can "parse" or "scale" stock price reactions on the alleged corrective disclosure dates to measure inflation earlier during the Proposed Class Period.[57]

Dr. Hartzmark fails to articulate a methodology that can reliably account for the possibility that the alleged corrective disclosures include the materialization of publicly known risks.[58]

### 1.   *Dr. Hutton's Flawed Argument Related to Truth-on-the-Market*

#### a)   **Background of Dr. Hutton's Flawed Argument Related to Truth-on-the-Market**

48.   As I discuss below, many of the speculative issues raised by Dr. Hutton concern a purported truth-on-the-market ("TOTM") defense that is based on the predicate

---

[56]   Hutton Report, ¶16 (emphasis, footnote, and list letters omitted).

[57]   Hutton Report, ¶18.

[58]   Hutton Report, ¶20.

that "some alleged corrective information was not new, but only repeated information the market already knew …."[59] This purported TOTM defense and the opinions Dr. Hutton offers based on it presume that Plaintiffs will fail to prove at least some part of their case. Dr. Hutton's assumption is inconsistent with my understanding of the role of an expert economist, *i.e.,* that in examining price impact and constructing a damages methodology, an expert economist must assume liability.

49.   Dr. Hutton's claim that certain alleged corrective information released on July 30, 2019 and February 13, 2020 was not new information is a red herring.[60] From her own interpretation of the allegations and a series of selectively culled cites from documents she interprets to fit this view, Dr. Hutton concludes that any model that derives any price impact attributable to those alleged partial corrective disclosures must implicitly assume that market participants irrationally reacted to previously disclosed news as if it were unanticipated, material new information.  I first note that Dr. Hutton makes no such challenge related to the disclosures on the second alleged partial corrective disclosure on October 29, 2019.[61] With respect to the two other alleged partial corrective disclosures (on

---

[59]   Hutton Report, ¶70.

[60]   Hutton Report, ¶71.  For example, "Dr. Hartzmark fails to propose a damages methodology that could address a finding that information regarding 'higher depreciation of $7.6 million due to residual value changes' was stale, not *new* value-relevant information that first became available on July 30, 2019." (emphasis in original, footnote omitted); and "Dr. Hartzmark fails to propose a damages methodology that could reliably address a finding that the depreciation expense Ryder announced this day, 'reflecting the impacts of previously announced change in residual value estimates,' was largely 'in-line' with market expectations as shown below." (footnote omitted).

[61]   Indeed, in "Contents" (p. 3) of Ryder's Third Quarter 2019 Earnings Conference Call Presentation dated October 29, 2019, the top entry is the "Residual Value Estimate Change," and the term "residual value" or "residual values" is mentioned 57 times, "depreciation" is mentioned 54 times and "used vehicle" is mentioned 26 times in the 57-page document.

Based on "quantitative content analysis" and given the prominence in the earnings reports related to "residual value" and "depreciation," it is reasonable to conclude that the changes in "residual value" and "depreciation" represent statements that are material in that they would be "important" and "alters the total mix of information."  *See*, for example, David Tabak, *Making Assessments About Materiality Less Subjective Through the Use of Content Analysis*, NERA Economic Consulting (2007), available at https://www.nera.com/content/dam/ nera/publications/archive1/PUB_Tabak_Content_Analysis_SEC1646-FINAL.pdf.

July 30, 2019 and February 13, 2020), Dr. Hutton has implicitly assumed that Plaintiffs will be unable to prove that the alleged misstatements related to the allegations about residual values and depreciation expense were material and that the alleged partial corrective disclosures revealed the truth.  She puts forth this speculative assumption without offering any scientific empirical evidence.  Thus, Dr. Hutton's specious argument goes to issues of materiality and causation and implicitly assumes those issues in favor of Defendants (which is an inappropriate assumption for an economic expert to make at this stage of the litigation).

50.    Although I have not been asked by Plaintiffs' Counsel to analyze *what* information was known by investors and *when* such information was known by investors — a highly fact-intensive exercise that is subject to dispute and will be resolved at trial — I discuss below the reasons why the information about the weaker valuations of Ryder's vehicles revealed on July 30, 2019 and the information about the additional residual value and depreciation expense adjustments revealed on February 13, 2020 could plausibly represent alleged partial corrective disclosures that contained new, material and unanticipated information.

### b)    Dr. Hutton's Flawed TOTM Argument For July 30, 2019

51.    On July 30, 2019, Ryder issued its earnings release for the second quarter of 2019, including updated guidance for fiscal year 2019.  Plaintiffs allege the information in this release and related conference call partially revealed the truth about the alleged misrepresentations and omissions.[62]  The earnings release included:

> Second quarter GAAP EPS was up 64% to $1.43, reflecting prior-year tax adjustments and a current-year gain on sale of property.  Comparable EPS was down 4% to $1.40, reflecting

---

Moreover, the prominence management places on the discussion of "residual value" and "depreciation," as well as the impact on Ryder's financial performance, would also suggest that it is reasonable to conclude the information was unanticipated.

[62]    Complaint, ¶¶135-137.

lower used vehicle sales results (primarily for heavy-duty tractors), partially offset by improved operating performance.[63]

52.    In describing its Second Quarter Business Segment Operating Results, Ryder stated:

> We saw better than expected operating performance from our contractual businesses largely offset by lower demand conditions in used vehicle sales and rental that began late in the quarter.[64]
>
> …
>
> FMS earnings before tax were $57.7 million, down 25%, compared with $76.6 million in 2018, reflecting lower used vehicle sales results.  Used vehicle sales results declined from the prior year as a result of higher valuation adjustments of $10.4 million on a larger inventory and higher depreciation of $7.6 million due to vehicle residual value changes.[65]

53.    Based on my understanding of the allegations, the information in the partial corrective disclosure on July 30, 2019 allegedly revealed Ryder's misrepresentations and omissions about the valuation of its vehicles, including higher than expected valuation adjustments due to lower used vehicle prices, and represented new, material and unanticipated information that would offer investors the ability to better assess the materiality and importance of the claims.[66]

---

[63]  Ryder SEC Form 8-K dated July 30, 2019, Exhibit 99.1, p. 1.

[64]  Ryder SEC Form 8-K dated July 30, 2019, Exhibit 99.1, p. 2.

[65]  Ryder SEC Form 8-K dated July 30, 2019, Exhibit 99.1, p. 3.

[66]  In Ryder's Second Quarter 2019 Earnings Conference Call Presentation dated July 30, 2019, p. 4, Management noted: "Comparable earnings per share from continuing operations was $1.40 vs. $1.46 in 2Q18 — Lower comparable earnings per share primarily reflect lower used vehicle results, partially offset by better operating performance."  Indeed, "used vehicle" is mentioned 24 times, "residual value" or "residual values" is mentioned 5 times, and "depreciation" is mentioned 18 times in the 44-page document.

Moreover, the prominence management places on the discussion of "used vehicle," "residual value" and "depreciation," as well as the impact on Ryder's financial performance, would also suggest that it is reasonable to conclude the information was unanticipated.

54. My conclusion is supported by the response of analysts to the disclosures by Ryder management, including many of the analysts cited by Dr. Hutton in her report. Such analyst response supports that it is plausible that this information could be reasonably considered as new, material and unanticipated, as well as partially revealing the truth about the alleged misstatements. For example:

> J.P.Morgan, "First Look at 2Q19 Earnings" (July 30, 2019): "FMS was weaker than expected, as used vehicle results and higher bad debt weighed on performance, partially offset by a solid topline and operating beat at DTS during the quarter."

> J.P.Morgan, "Limited Visibility to a U-Turn in Used Tractor Prices, Lowering Estimates and Price Target" (July 30, 2019, emphasis omitted): "We believe the used vehicle headwind will remain through 2021 as the five year rolling average valuation adjustment cycles out the 2016 peak in tractor pricing. … Lowering estimates for persistent used tractor price uncertainty. Ryder did not quantify the impact of used vehicle prices on the 2019 outlook, but did indicate the majority of the lowered guide reflected weaker tractor valuations."

> Deutsche Bank, "Good operating Q, but used truck prices sting" (July 30, 2019): "Ryder can't seem to shake the impact of weaker used truck prices, which is something that is taking longer to recover than we had previously expected (even despite well-flagged incremental headwinds on depreciation)."

> Loop Capital Markets, "Ryder Overgrows Again – Lowering EPS and PT" (July 31, 2019): "[W]hat will concern investors is the company's insistence on growing in the face of slowing trucking markets, and sabotaging the FMS business earnings with depreciation write-downs and lower gains on sale."

> Stephens, "2Q19 First Look: Adj. EPS in Line; 2019 Guidance Reduced on Used Truck Weakness" (July 30, 2019): "Ryder notes in the release that better than expected performance in its contractual businesses was largely offset by lower demand conditions in used vehicle sales and its rental business that started late in the quarter."

> SunTrust Robinson Humphrey, "In Line 2Q But Lower Used Pricing Outlook Whacks Guidance" (July 30, 2019, emphasis omitted): "Lowered 2019 EPS Guidance on Weaker Used

- 29 -

Vehicle Sales: While it continues to see a healthy demand environment across each of its segments, Ryder lowered its full-year EPS guidance by -8% at the midpoint due to weaker demand for used heavy-duty tractors. … Beginning late in 2Q, Ryder saw slower demand from for-hire transportation companies for its used tractors. It now expects used truck pricing to be below its previous negative estimate."

Wolfe Research, "In Line 2Q but Large Cut to 2H Guidance" (July 30, 2019): "Due to weaker used truck pricing and slowing rental demand, R reduced its full-year C19 guidance by 9% at the midpoint to a new range of $5.50-$5.80."

Wolfe Research, "Another Big Cut on Used Truck Headwinds" (July 30, 2019): "R reported much worse FMS pre-tax income than we expected, down 25% y/y and 17% below our estimates. FMS results included valuation adjustments of $10.4M and accelerated depreciation of $7.6M related to lower used vehicle prices. … R reported an $18.1M loss on sales in 2Q which includes $10.4M in valuation adjustments to inventory and equates to -$0.25/share. This was $10.9M worse than our estimate."

Baird Equity Research, "2Q19 Results in Line; 2H19 Outlook Lowered Given Noted Cyclical Headwinds" (July 31, 2019): "2Q19 results were in line with expectations as solid performances in SCS and DTS were offset by weakness in FMS given deterioration in used equipment pricing in the quarter."

Buckingham Research Group, "2019E Guidance Meaningfully Reduced Given Used Tractor Softness; Maintain BUY" (July 31, 2019, emphasis omitted): "[M]anagement reduce[d] their guidance for 2019E by 9% due to greater than expected UVS headwinds given incremental used truck market softness. … The quarter was highlighted by downside at FMS brought on by greater than anticipated used vehicle sale losses …. Despite continued growth momentum and what appears to be real operating improvement in non FMS divisions … R's used truck hangover continues to unfortunately mitigate the company's true earnings growth potential."

Stifel, "Get Used to Used Vehicle Drag; Lowering Estimates" (July 31, 2019, emphasis omitted): "2019 EPS guidance was cut by 9% yesterday due to lower used tractor pricing and the expectation for greater wholesaling activity in 2H19."

- 30 -

### c)   Dr. Hutton's Flawed TOTM Argument For February 13, 2020

55.   On February 13, 2020, Ryder issued its earnings release for the 2019 fourth quarter and fiscal year, including guidance for fiscal year 2020.   Plaintiffs allege the information in this release and related conference call revealed the truth about the alleged misrepresentations and omissions.[67]   The earnings release included:

> Total and operating revenue increased in all three segments reflecting new business and higher volumes for the full year. GAAP and comparable EPS for both the fourth quarter and full year were impacted by higher depreciation expense resulting from the previously announced change in residual value estimates.[68]

56.   In describing its Fourth Quarter Business Segment Operating Results, Ryder stated:

> FMS loss before tax was $80 million compared with earnings before tax of $111 million in 2018, reflecting $118 million of higher depreciation expense resulting from the vehicle residual value estimate change effective July 1, 2019, as well as lower rental earnings, higher insurance-related costs, and increased expense related to a higher number of vehicles being prepared for sale.[69]

57.   In describing its 2020 forecasts, Ryder stated:

> Used vehicle pricing is forecast to remain soft during the first half of 2020, with a modest recovery in the second half of the year.
>
> …
>
> We expect earnings headwinds from prior-year favorable insurance developments, residual value estimate changes on vehicles used in this segment, and strategic investments.

---

[67]   Complaint, ¶¶143-146.

[68]   Ryder SEC Form 8-K dated February 13, 2020, Exhibit 99.1, p. 1.

[69]   Ryder SEC Form 8-K dated February 13, 2020, Exhibit 99.1, p. 3.

…

> First quarter earnings in 2020 reflect the impact of the previously announced vehicle residual value estimate change and are typically the lowest quarter seasonally in the year. Additionally, first quarter earnings comparisons are challenging versus very strong results in the first quarter of 2019.[70]

58.     In its February 13, 2020 conference call presentation, Ryder provided further detail on the impact of its changed residual value estimates, and used vehicle sales, on its financial performance for the 2019 fourth quarter and fiscal year, and guidance for fiscal year 2020.

59.     Specifically, on February 13, 2020, Ryder reported a total of $415 million in impact from depreciation and used vehicle sales losses for fiscal year 2019.[71]  This total amount included additional depreciation expense that the Company had recognized after its October 29, 2019 disclosure, as well as additional losses on used vehicle sales since the October disclosure.[72]  This was confirmed on the conference call by Ryder Executive Vice President and Chief Financial Officer Scott Parker.  On the call, Parker walked investors through what had "changed" since the October disclosure, when Ryder had disclosed $289 million of forecasted depreciation impact from lower residual value estimates for the second half of 2019.  In explaining the impacts that brought Ryder to a new total of $415 million from actual depreciation and used vehicle sales losses for the full year 2019, Parker stated:

> [W]e added a slide on page 26 of the deck that I'll tie into -- kind of refer to your question <u>about what changed from the third quarter estimate</u>.  So if you go back there, we had, for the impact of the second half of 2019, just from the estimate change, was $289 million.  We mentioned that there was a slight refinement and true-up as we pushed that down in the fourth quarter of

---

[70]  Ryder SEC Form 8-K dated February 13, 2020, Exhibit 99.1, pp. 5-6.

[71]  Ryder's Fourth Quarter 2019 Earnings & 2020 Forecast Conference Call Presentation dated February 13, 2020, p. 26.

[72]  Ryder's Fourth Quarter 2019 Earnings & 2020 Forecast Conference Call Presentation dated February 13, 2020, p. 26.

about $8 million.  So, the total impact from the change was $297 million.  There will be more details in the K for that.  <u>We also mentioned that there was some policy and depreciation that was effective 1/1 of 2019.  That number was about $60 million.  So, the total depreciation impact in 2019 was around $357 million. And then we add the losses from used vehicle sales.  So we had some additional in the fourth quarter than what we had in the third quarter.  So total of all of the depreciation and UVS losses for 2019 was around $415 million.</u>[73]

60.     Ryder also disclosed new information regarding its fiscal year 2020 forecasts on February 13, 2020.  Ryder now forecasted an additional $25 million in depreciation expense that had not been previously reported, and an additional $20 million in estimated losses from used vehicle sales that had not been previously reported.[74]  As Parker stated on the conference call:

> As you kind of go into 2020, and <u>the chart we had last quarter had the impact from the estimate change at $250 million.  The follow-through of some of the 1/1/2019 does trail into 2020, so that's about $25 million.  So the total impact from depreciation, we're expecting at $275 million.</u>  And then, when it comes to estimation for the used vehicles, we expect that there are some assets that are not in our accelerated classification that, on a monthly basis, <u>we do take back units that are outside of that definition that we will have some potential slight losses in 2020 related to those assets.  So, that gets you to $295 million for the total impact for 2020.</u>[75]

61.     In sum, on February 13, 2020, Ryder forecasted a total impact of $295 million from depreciation and used vehicle sales losses for fiscal year 2020.[76]  This figure was $45

[73]   Ryder's Fourth Quarter 2019 Earnings & 2020 Forecast Conference Call Transcript dated February 13, 2020, Thomson StreetEvents, p. 6 (emphasis added).

[74]   Ryder's Fourth Quarter 2019 Earnings & 2020 Forecast Conference Call Presentation dated February 13, 2020, p. 26.

[75]   Ryder's Fourth Quarter 2019 Earnings & 2020 Forecast Conference Call Transcript dated February 13, 2020, Thomson StreetEvents, p. 6 (emphasis added).

[76]   Ryder's Fourth Quarter 2019 Earnings & 2020 Forecast Conference Call Presentation dated February 13, 2020, p. 26.

million higher than the $250 million in total negative impact forecasted for fiscal year 2020 previously disclosed on October 29, 2019.[77]

62.   Based on my understanding of the allegations, the information in the partial corrective disclosure on February 13, 2020 allegedly revealed that Ryder had not entirely adjusted its residual values and depreciation expense, or revealed the full impact of its adjustments, at the time of the October 29, 2019 disclosure and represented new, material and unanticipated information that would offer investors the ability to better assess the materiality and importance of the claims.[78]   Ryder disclosed new information related to the allegations on February 13, 2020 that included worse than expected 4Q 2019 results and worse than expected FY 2020 forecast, in part because of higher depreciation impact from residual value estimate changes and losses from used vehicle sales.

63.   My conclusion is supported by the response of analysts to the disclosures by Ryder management, including many of the analysts cited by Dr. Hutton in her report.  Such analyst response supports that it is plausible that this information could be reasonably considered as new, material and unanticipated, as well as revealing the truth about the alleged misstatements.  For example:

---

[77]   Ryder's Third Quarter 2019 Earnings Conference Call Presentation dated October 29, 2019, p. 10.  The $250 million figure was discussed in the conference call, for example: "[Question] … The $250 million that you're showing in Slide 10, that's $250 million or about $3.50 of higher depreciation that you'd be expecting in 2020 compared to where you'd be in 2019?  **Answer – Scott T. Parker:**  Yes.  That's correct.  Understood, but it's all -- these estimates are based on the portfolio as of the third quarter.  So it does not have additional assets that will be coming on in regards to subsequent quarters, in the fourth quarter and the first quarter.  But that – as of the third quarter, that is correct."  Ryder's Third Quarter 2019 Earnings Conference Call Transcript dated October 29, 2019, Thomson StreetEvents, p. 6.

[78]   In Ryder's Fourth Quarter 2019 Earnings & 2020 Forecast Conference Call Presentation dated February 13, 2020, p. 4, Management noted: "Comparable earnings (loss) per share from continuing operations was $(0.01) vs. $1.87 in 4Q18 — 4Q19 comparable earnings per share included $1.67 of higher depreciation expense (non-cash) related to reduced vehicle residual value estimates."  Indeed, "residual value" or "residual values" is mentioned 47 times, "depreciation" is mentioned 34 times "and used vehicle" is mentioned 32 times in the 59-page document.

Moreover, the prominence management places on the discussion of "residual value" and "depreciation," as well as the impact on Ryder's financial performance, would also suggest that it is reasonable to conclude the information was unanticipated.

Baird Equity Research, "Book Value Remains the Focus While Mgmt. Works to Shift Strategic Focus" (Feb. 13, 2020, emphasis omitted): "Used vehicle pricing is expected to remain soft in 1H20 as well before beginning to firm in 2H20, consistent with views of an improving truckload supply/demand dynamic by mid-2020.  Provided that cyclical view holds, coupled with waning depreciation headwinds, FMS margins should turn positive in 2H20.  … Full-year 2020 comparable EPS outlook of $1.10-1.50 well below consensus' recent $2.56 estimate at the midpoint.  The delta between management's outlook and recent estimates appear to be a function of continued cyclical headwinds (commercial rental weakness a $0.62/sh yoy drag) …."

J.P.Morgan, "First Look at 4Q19 Earnings" (Feb. 13, 2020, emphasis added and omitted): "The 2020 forecast for depreciation also increased to $275mm from $250mm plus an additional $20mm estimated loss on used vehicle sales.  We had previously modeled a $250mm impact with no loss on sales given the significant write-downs pulled forward into 2019.  … Management's 2020 forecast assumptions include a 2H20 recovery common to the transports group, but headwinds from used vehicle prices and commercial rental remain specific to Ryder.  … 4Q19 results miss on larger drag from lower residual values.  Ryder's comparable EPS of ($0.01) was toward the low end of the prior ($0.03) to $0.07 range and a miss vs. consensus and JPMe of $0.03 and $0.07.  Revenue came in +1% over expectations although headwinds from used vehicles continued to weigh on results, the -$127mm YoY drag was larger than the -$112mm we forecasted."

J.P.Morgan, "Stuck in Low Gear" (Feb. 13, 2020, emphasis added): "We are lowering our estimates and December 2020 price target for Ryder and reiterating our Underweight rating following the initial 2020 outlook which fell short of expectations (see our alert for further details).  … The trajectory of used vehicle prices remains the key determinant of near term performance in our view considering the additional drag in 4Q19 and continued loss on sale in 2020 are indicative that last quarter's 'big bath' and write-down of residual values did not completely clear the deck."

KeyBanc Capital Markets, "ALERT: 4Q19 First Take" (Feb. 13, 2020): "Current quarter results were below expectations stemming from a greater than anticipated drag from

- 35 -

depreciation, as well as lower rental and dedicated revenue, offset by a significant tax benefit."

Stephens, "First Look at 4Q19: Adj. EPS Miss & 2020 Guidance Below Street" (Feb. 13, 2020): "The miss relative to the Street was margin-driven, and R noted that results were at the lower end of its forecast range due to a modest increase in the depreciation impact of vehicle residual value estimate changes .... While the outlook is expectedly messy (and the quarterly impact form [*sic*] residual changes was tough to predict), this 2020 forecast is clearly disappointing vs. expectations."

Stephens, "Slight Adj. EPS Miss in 4Q19; Guidance for 2020 Well Below the Street" (Feb. 13, 2020): "Higher depreciation expense related to reduced vehicle residual value estimates negatively impacted EPS by $1.67 y/y (adj. EPS was down 11% y/y excluding this headwind). The miss relative to the Street was margin-driven, and R noted that results were at the lower end of its forecast range due to a modest increase in the depreciation impact of vehicle residual value estimate changes."

SunTrust Robinson Humphrey, "4Q EPS Miss; 2020 Guidance Well Below as Company Shifts to Higher Returns/Positive FCF" (Feb. 13, 2020): "We had hoped the company cleared the decks in 3Q after significantly lowering EPS expectations following its residual value changes."

SunTrust Robinson Humphrey, "4Q Recap; Not the Guidance we Expected But the Right Investments for the Long Term; Reiterate Buy" (Feb. 13, 2020): "We are certainly frustrated as this marks the third consecutive quarter of meaningful EPS estimate revisions."

Pacific Square Research, "The Road for Ryder Gets Rougher" (Feb. 28, 2020, emphasis omitted): "Quite simply, we believe that Ryder is paying the price for years of underpricing its leases to drive growth. … Enter a Depreciation Policy Gone Awry … introduce[d] a significant distortion into earnings."

64.     Moreover, prior to the February 13, 2020 disclosure, analysts stated that they believed Ryder had already "cleared the deck" related to residual value and depreciation changes, suggesting that the residual value write-downs Ryder disclosed on February 13,

- 36 -

2020 had not been disclosed prior to that date.  For example, on October 30, 2019, J.P. Morgan reported, "Residual write-down and updated estimates should help clear the deck."[79]  In addition, in her deposition Dr. Hutton stated that not all news disclosed on February 13, 2020 was previously disclosed to the market.[80]

65.   Although materiality is a fact question to be answered at trial, it seems reasonable to conclude at this stage that this information would be considered new and important because prior reports had been issued by third-party sources, had been limited in scope, and had been denied by management.

### 2.   *Dr. Hutton's Flawed Argument Related to Materialization of Concealed Risks*

66.   Dr. Hutton also asserts "Dr. Hartzmark fails to articulate a methodology that can reliably account for the possibility that the alleged corrective disclosures include the materialization of publicly known risks."[81]  Here again, Dr. Hutton only raises loss causation and TOTM issues.[82]  Thus, at best, Dr. Hutton has constructed a straw man argument so she can easily knock it down.  Indeed, until fact-intensive discovery has begun, neither Dr. Hutton nor I can precisely measure how much, if any, of the decline in Ryder's share price following the alleged partial corrective disclosures was caused by any facts or the materialization of risks that were understood by investors versus the facts or risks that were concealed by Ryder.

---

[79]   J.P.Morgan, "Big Residual Bath Came Earlier Than Expected, But the Book Value Anchor is Still a Drag," October 30, 2019 (emphasis omitted).

[80]   Hutton Dep. Tr. 201:4-19 ("Q  With respect to the February 13th, 2020 alleged corrective disclosure, is it your testimony that all of the news disclosed that day was previously disclosed to the market? … THE WITNESS: So, I'm sorry.  I thought I answered it by pointing out that I wasn't just saying that the depreciation expense was potentially announced previously, but also that some of the alleged corrective disclosure regarding the losses from the used sales was timely in its disclosure.  Those are -- so I'm not saying it's all previously disclosed, but some of it may have been timely.").  Dr. Hutton's testimony that the news might have been timely disclosed improperly assumes that Plaintiffs' claims fail on the merits.

[81]   Hutton Report, ¶20.

[82]   Similar to Dr. Hutton, I have not performed *any* loss causation analysis, nor have I been asked to perform such an analysis.

67.     Therefore, should the finder of fact determine, after considering the parties' competing evidence of loss causation (or lack thereof), that non-fraudulent information caused some of the economic harm, that some of the allegedly corrective information was previously known to the market, or that the allegedly corrective information was a materialization of a previously known risk, that finding will impact the measurement of artificial inflation on a class-wide basis — in other words, ***no individualized questions would arise***, whether or not Dr. Hutton is correct in her arguments regarding losses caused by the purported materialization of "publicly known," as well as concealed risks.

68.     Further, the common damages methodology I propose is flexible and can account for whatever the finder of fact determines as to whether the alleged partial corrective disclosure reveals "publicly known," as well as concealed risks, and when the misrepresentations or omissions about the risks commenced.  Thus, to the extent the finder of fact determines at a later stage in this case that all or a portion of the information allegedly revealed on an alleged partial corrective disclosure date is not corrective (*i.e.*, where "publicly known risks") and the inflation ribbon I calculate at the damages stage magnifies the price impact of the alleged misrepresentations, then artificial inflation can be adjusted by utilizing a probabilistic model to remove some of the price impact related to the "publicly known" risks from my inflation ribbon.  Once I adjust my estimate of the inflation ribbon based on the findings of the Court or finder of fact, I then will apply this adjusted input in my common damages methodology on a class-wide basis.[83]

### 3.     *Dr. Hutton's Flawed Argument Related to Timely Information and Mismatched Information*

69.     Dr. Hutton also states that I have not given techniques, procedures or models for accounting for "timely-disclosed" information or "mismatched" information.[84]  Again, these are simply additional categories of potentially confounding information that would be accounted for in a class-wide matter.  I note that her example of "mismatched"

---

[83]   I understand that in a damages report, I will still have to make assumptions that the allegations will be proven at trial.  However, my damages methodology is flexible enough to account for the decision of the finder of fact as to which allegations are proven and which are not.

[84]   Hutton Report, ¶¶16c, 16d.

information also relates to the issue of scaling, and would likely require the opinion of an expert accountant.[85]   The fact that accounting for "timely-disclosed" information or "mismatched" information,[86] requires the input of the analyses of other experts who would be engaged at the merits stage offers support for my opinion that this is an issue of loss causation.   Even so, whatever the Plaintiffs' or Defendants' experts find would be incorporated into the techniques, procedures and models to construct the inflation ribbon, which would be applied class-wide when utilizing the common damages methodology. Moreover, to undertake these analyses, in-depth accounting, industry and possibly other internal information would be required to determine who knew what and when.

E.   Dr. Hutton's Flawed Generic Claim that Plaintiffs Will Be Unable to Reliably Calculate the Inputs Used to Construct the Inflation Ribbon when There Are Exogenous Factors that Contribute to Investor Losses

1.   *Dr. Hutton's Flawed Argument Related to Used Vehicle Prices*

70.   Dr. Hutton claims:

> Dr. Hartzmark fails to articulate a damages methodology that can reliably account for information about the decline in the used vehicles sales ("UVS") market that was publicly available throughout the Proposed Class Period.[87]

71.   Dr. Hutton further states:

> Throughout the Proposed Class Period, there were publicly available data sources that documented pricing and sales trends in the UVS market.   For example, Americas Commercial Transportation Research ("ACT") published monthly "State of the Industry" reports that provided updates on pricing and volume trends in the U.S. UVS market.   ACT reports included comprehensive historical data on prices and volume in the UVS

---

[85]   Hutton Report, ¶16d ("For example, the alleged corrective disclosure on October 29, 2019 concerned a change in Ryder's accounting estimates (residual value estimates) and its impact on Ryder's depreciation expense for the second half of 2019 through 2024–2025.   It did not reveal what Ryder's pre-tax income should have been for each year between 2015 and 2019 as specified in the Amended Complaint, even assuming Plaintiffs' allegations that Ryder's residual value estimates were overstated during this period.").

[86]   Hutton Report, ¶¶16c, 16d.

[87]   Hutton Report, ¶14.

> market summarized by vehicle class (*e.g.*, Class 8 (heavy duty), Classes 6–7 (medium duty), and Classes 3–5 (light duty)) and by market (retail, wholesale, or auction), as well as analysis of various trends (*e.g.*, volumes, pricing, mileage, and export trends; month-over-month, year-over-year, year-to-date, and six-month moving averages; among others). [88]

72.     First, Dr. Hutton's comments about the availability of UVS market information and the impact, if any, on damages, will impact the measurement of artificial inflation on a class-wide basis — in other words, *no individualized questions would arise*, whether or not Dr. Hutton is correct about the impact of UVS market information. Furthermore, Dr. Hutton fails to show why, given the availability of UVS market information, research analysts were surprised when Ryder disclosed changes in its residual value estimates and its stock price declined by statistically significant amounts.

### 2.     *Dr. Hutton's Flawed Argument Related to Hypothetical "But For" Residual Value Estimates*

73.     Dr. Hutton claims:

> Dr. Hartzmark fails to articulate a damages methodology that can reliably account for information Ryder had already disclosed about its residual value estimates. … Dr. Hartzmark fails to offer a reliable methodology to examine, had Ryder disclosed hypothetical "but for" residual value estimates, how that would have changed the Company's disclosure of policy depreciation, accelerated depreciation, valuation adjustments, and gains or losses on sales, respectively, and how these changes would have affected the valuation of Ryder's stock.[89]

74.     Dr. Hutton further claims:

> Dr. Hartzmark fails to articulate a methodology that can reliably evaluate how Ryder's stock price would have changed had Ryder adopted different accounting estimates for residual values. An alternative purported "correct" accounting estimate would have changed Ryder's stock price only if it would have revealed additional new, value-relevant information about economic conditions in the UVS market and changed the

---

[88]   Hutton Report, ¶42 (footnotes omitted).

[89]   Hutton Report, ¶15.

> market's expectations of Ryder's future cash flows and/or risks to those cash flows.  As discussed in Section V.C, peer-reviewed accounting academic research has documented that certain accounting changes may not affect firm valuation.[90]

75.    These criticisms show that Dr. Hutton misinterprets the allegations in this case and how they relate directly to violations of Generally Accepted Accounting Principles ("GAAP") and an actual overstatement of earnings, and not about "hypothetical" residual value estimates.  Moreover, Dr. Hutton fails to acknowledge that the alleged wrongdoing inflated Ryder's stock price for all investors in common and that the alleged revelation of the "true" residual values caused investor losses.[91]  In addition, the academic textbook and papers cited by Dr. Hutton are either (i) not relevant to the allegations in this case because the papers are about changes from one to another proper alternative accounting methods allowed under GAAP,[92] whereas Plaintiffs allege that Ryder's

---

[90]    Hutton Report, ¶17.

[91]    *See, e.g.*, Complaint, ¶¶13, 16: "Indeed, despite the pronounced negative developments and trends in the used vehicle sales market, throughout the Class Period, Defendants misstated Ryder's true financial condition by overstating the residual value of its vehicle fleet, which caused the Company to record smaller depreciation expenses on those assets each year, and artificially inflated Ryder's earnings. … These and similar statements during the Class Period about consistent or increased residuals values, were misleading because Defendants knew or recklessly disregarded that the residual values that Ryder assigned to its trucking fleet were grossly overstated.  This had the intended effect of allowing the Company to record smaller depreciation expenses, artificially inflated Ryder's earnings in violation of Generally Accepted Accounting Principles ("GAAP"), and, in turn, artificially inflated Ryder's stock price."

[92]    *See* Stephen A. Ross, Randolph W. Westerfield, and Jeffrey Jaffe, Corporate Finance (McGraw Hill/Irwin, 9th ed., 2010), p. 453 "The accounting profession provides firms with a significant amount of leeway in their reporting practices.  For example, companies may choose between the last-in, first-out (LIFO) or the first-in, first-out (FIFO) method of valuing inventories.  They may choose either the percentage-of-completion or the completed-contract method for construction projects.  They may depreciate physical assets by either accelerated or straight-line depreciation."; Robert S. Kaplan and Richard Roll, *Investor Evaluation of Accounting Information: Some Empirical Evidence*, 45 Jnl. Bus. 225 (1972), who "measure the effect that two widely adopted accounting changes had on stock prices of firms" and the two methods were the "flow-through method of reporting the investment credit" and "the switch back from reporting accelerated depreciation to reporting straight-line depreciation"; and Hai Hong, Robert S. Kaplan, and Gershon Mandelker, *Pooling vs. Purchase: The Effects of Accounting for Mergers on Stock Prices*, 53 Acctg. Rev. 31 (1978) who compare the choice of alternative GAAP methods of accounting for mergers (pooling-of-interests and purchase methods).

- 41 -

accounting and financial statements were in violation of GAAP;[93] or (ii) the academic papers contradict Dr. Hutton's interpretation of the impact of accounting method changes on firm value.[94]

76.     Furthermore, as discussed in the previous section, to the extent at the merits stage the measurement of these "different accounting estimates" or the "hypothetical 'but for' residual value estimates" would be undertaken by other experts, including an accounting expert, whatever the Plaintiffs' or Defendants' experts find would be incorporated into the techniques, procedures and models to construct the inflation ribbon, and such ribbon would be applied class-wide using the common damages methodology. Moreover, to undertake these analyses, in-depth accounting and other internal information only available after full discovery would be required to determine who knew what and when.

---

[93]   *See, e.g.*, Complaint, ¶16 "These and similar statements during the Class Period about consistent or increased residuals values, were misleading because Defendants knew or recklessly disregarded that the residual values that Ryder assigned to its trucking fleet were grossly overstated.  This had the intended effect of allowing the Company to record smaller depreciation expenses, artificially inflated Ryder's earnings in violation of Generally Accepted Accounting Principles ("GAAP"), and, in turn, artificially inflated Ryder's stock price."

[94]   *See* S.P. Kothari, *Capital Markets Research in Accounting*, 31 Jnl. Acctg. & Econ. 105 (2001) at 197 (emphasis added, footnote omitted): "**Another problem is that surprise announcements of accounting method changes themselves often convey information that causes market participants to reassess firm value**.  For example, the market frequently greets firms' announcements of changes in capitalization and revenue recognition policies with large price swings (e.g., on March 18, 1992, Chambers Development Co. experiences a –63% stock price reaction to its announcement that it would expense instead of capitalize development costs; see Revsine et al., 1999, pp. 19–23).  Some academics and the financial press interpret the reaction as the market's fixation on reported accounting numbers because the accounting method change in itself did not affect the firm's cash flow for the accounting period. The reasoning is only partially right in that **the accounting method change might easily have influenced the market's expectation of future cash flows.  Thus, in order to interpret the market's reaction to accounting method changes as consistent with market efficiency, one must model changes in cash flow expectations concurrent with the accounting method change and other cash flow effects arising from contracting, tax, and/or regulatory considerations**."

F.   Dr. Hutton's Flawed Generic Claim that Plaintiffs Will Be Unable to Reliably Calculate the Inputs Used to Construct the Inflation Ribbon Because They Do Not Employ the Facts of the Case, Even Though the Case Is in the Discovery Stage and the Facts Have Yet to Be Determined by the Trier of Fact

77.   Dr Hutton claims:

Dr. Hartzmark does not discuss any information specific to Ryder when opining that damages in this matter can be calculated using the "out-of-pocket" methodology.[95]

78.   I am unsure why Dr. Hutton would expect a fact-specific analysis at this stage in the litigation because it is still in the early stages of discovery and, it is my understanding, there is ongoing document production and no fact depositions yet taken.  In addition, this stage of the litigation does not include reports and opinions provided by accounting and/or industry experts, which I would expect to rely upon for the construction of the actual inflation ribbon that would be applied class-wide to implement the common OOP damages methodology.

79.   As I stated before, should the finder of fact determine, after considering the parties' competing evidence of loss causation (or lack thereof), that non-fraudulent information did cause some of the economic harm, that finding will impact the measurement of artificial inflation on a class-wide basis — in other words, *no individualized questions would arise*, whether or not Dr. Hutton is correct about the need to disaggregate or scale the artificial inflation.

80.   Further, the damages methodology I propose is flexible and can account for whatever the finder of fact determines as to whether the alleged partial corrective disclosures reveal all or a portion of the truth and when the misrepresentations or omissions commenced.  Thus, to the extent the finder of fact determines at a later stage in this case that all or a portion of the information allegedly revealed on an alleged partial corrective disclosure date is not corrective and the inflation ribbon I calculate at the damages stage magnifies the price impact of the alleged misrepresentations, then artificial inflation can be adjusted by fully or partially removing some of the price impact from my inflation ribbon.

---

[95]   Hutton Report, ¶21.

Once I adjust my estimate of the inflation ribbon based on the findings of the Court or finder of fact, I then will apply this adjusted input in my common damages methodology on a class-wide basis.[96]

## V.   COURT PRECEDENT, INCLUDING DECISIONS WHERE MY REPORTS WERE CREDITED IN THE COURTS' CONCLUSION THAT THERE IS A COMMON DAMAGES METHODOLOGY

A. <u>The Same Opinion Regarding the Common Damages Methodology I Have Presented in Other Matters Has Been Credited by Numerous Other Federal Courts</u>

81.    My opinion regarding a common damages methodology has been credited in numerous other federal court decisions and orders at the class certification stage.  Thus, it would be suspect if I were to now argue an alternative common damages methodology were superior.  In addition, federal courts have also credited other economic experts offering a similar, if not identical common damages methodology.[97]

82.    For example, in *Signet*, the *Signet* Court — referencing my expert report, which presented the same opinion and analysis that I presented in my Opening Report — found that:

> Because Plaintiff has provided a class-wide model for calculating damages arising from its theory of liability, it has met its burden under *Comcast* [and] [b]ased upon the foregoing,

---

[96]    I understand that in a damages report, I will still have to make assumptions that the allegations will be proven at trial.  However, my damages methodology is flexible enough to account for the decision of the finder of fact as to which allegations are proven and which are not.

[97]    For example, *See* Hartzmark Opening Report, ¶5 ("My expert reports, which included the topics of market efficiency and common damages methodology, have been cited with approval by the respective courts in *N.J. Carpenters Health Fund v. Royal Bank of Scotland Group PLC*, *Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al.*, *Christakis Vrakas, et al. v. U.S. Steel Corp., et al.*, *In re Signet Jewelers Limited Securities Litigation*, *West Palm Beach Police Pension Fund, et al. v. DFC Global Corp., et al.*, *In re Cobalt International Energy, Inc. Securities Litigation*, and *William D. Wallace, et al. v. IntraLinks Holdings, Inc., et al.* (footnotes omitted).").

Plaintiff has established that common questions of law and fact will predominate in this case.[98]

83.   Citing extensively from my opening and rebuttal reports in *Signet*, the *Signet* Court concluded:

> Despite Defendants' arguments to the contrary, the Court sees no reason why an event study—the generally accepted method for measuring damages in a securities fraud class action—cannot work in this case.
>
> As an initial matter, the Court rejects the suggestion that an event study is incapable of disaggregating the effects of confounding information.   Were it otherwise, nearly every securities fraud class action would fail.
>
> More to the point, while Plaintiff ultimately will need to disaggregate confounding factors to prove economic loss, it need not do so at this juncture to establish that common issues relating to damages predominate.[99]

84.   In addition, other expert damages reports I have authored in cases where class certification has been granted contain similar sections on the out-of-pocket damages methodology.   For example,

> *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020) ("[Dr. Hartzmark's] out-of-pocket method does not involve any individualized issues.");
>
> *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *15 (S.D. Tex. Nov. 13, 2019) ("[C]ourts recognize event studies, like the one used by Dr. Hartzmark, as an accepted method for determining artificial inflation and out-of-pocket damages in suits involving fraud on the market liability."); and
>
> *Vrakas v. U.S. Steel Corp..*, 2019 U.S. Dist. LEXIS 222783 (W.D. Pa., Dec. 31, 2019) at *21 ("Plaintiffs cite several cases in this Circuit and elsewhere that affirm the appropriateness of

---

[98]   *Signet* Order at *20.

[99]   *Signet* Order at *20.

the out-of-pocket methodology that Dr. Hartzmark proposes as a sufficient damages model for class certification purposes.").

B. The Same Opinion Regarding the Common Damages Methodology Other Economics Experts Have Presented in Other Matters Has Been Credited by Eleventh Circuit Courts

85.   Finally, other courts in the Eleventh Circuit have granted class certification in cases where plaintiffs' experts have submitted expert reports using a similar, if not identical out-of-pocket damages methodology.  For example:

> Expert Report of Joseph R. Mason, PhD, *In re Acuity Brands, Inc. Sec. Litig.* (N.D. Ga.) (Dkt. No. 101-3) ¶¶ 92-99 (class certification granted in *In re Acuity Brands, Inc. Sec. Litig.*, 2020 WL 5088092, at *6-7 (N.D. Ga. Aug. 25, 2020));

> Expert Report of Chad Coffman, CFA, *City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.* (N.D. Ga.) (Dkt. No. 68-3) ¶¶ 76-77 (class certification granted in *City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*, 2019 WL 3449671, at *6–7 (N.D. Ga. July 17, 2019));

> Expert Report of Zachary Nye, Ph.D., *Thorpe v. Walter Inv. Mgmt. Corp.* (S.D. Fla.) (Dkt. No. 114-2) ¶¶ 70-74 (class certification granted in *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 4006661, at *15–16 (S.D. Fla. Mar. 16, 2016)); and

> Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA, *Monroe Cnty. Emps.' Ret. Sys. v. The Southern Co.* (N.D. Ga.) (Dkt. No. 77-2) ¶¶ 175-79 (class certification granted in *Monroe Cnty. Emps.' Ret. Sys. v. The Southern Co.*, 332 F.R.D. 370, 399-401 (N.D. Ga. 2019)).

86.   Notably, the first three expert reports listed above contain no discussion of parsing or scaling methods, unlike the details I presented in my Opening Report.  Dr. Feinstein's report in *Monroe Cnty. Emps.' Ret. Sys. v. The Southern Co.* provided a list of valuation tools for computing damages, which are virtually identical to the parsing and

scaling procedures I presented in my Opening Report.[100]  Such procedures have been approved by the courts.[101]

## VI. DR. HUTTON OFFERS NO EVIDENCE OF A LACK OF PRICE IMPACT FROM EITHER THE ALLEGED PARTIAL CORRECTIVE DISCLOSURES OR THE ALLEGED MISREPRESENTATIONS OR OMISSIONS

### A. Price Impact on Alleged Partial Corrective Disclosure Dates

87.    It is my understanding that the Court held in *Halliburton II* that "defendants must be afforded an opportunity before class certification to defeat the presumption [of reliance] through evidence that an alleged misrepresentation did not actually affect the market price of the stock."[102]  It does not appear that Dr. Hutton was tasked with analyzing whether there was a lack of price impact.  Dr. Hutton has thus not offered any empirical evidence — either at the time of the alleged misstatements and omissions (*i.e.,* on the "front end" prior to the disclosures of the truth) or at the time of the alleged partial corrective

---

[100]  Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA, *Monroe Cnty. Emps.' Ret. Sys. v. The Southern Co.* (N.D. Ga.) (Dkt. No. 77-2) ¶176 ("To the extent that there are specific issues complicating the quantification of artificial inflation and damages encountered due to the unique facts and circumstances of this case, the standard tools of valuation and attribution analysis can be applied to measure inflation and damages caused by the alleged misrepresentations and omissions according to Plaintiffs' theory of liability.  … Among the commonly used valuation tools that are available to investors and analysts in real time, and to forensic analysts when computing damages, are for example: valuation multiple models, such as those based on earnings, EBITDA, revenue, book value, and cash flow; discounted cash flow models (DCF); return attribution analysis; and the literature regarding valuation effects of factors such as reputation and quality of accounting.  In addition, forensic analysts have the added benefit of event study analysis, which quantifies price effects when information did reach the market.").

[101]  *See* Order Denying Motions to Exclude Expert Testimony, *In re Twitter, Inc. Sec. Litig.*, No. 16-cv-05314 (N.D. Cal. Jan. 28, 2020) (Dkt. No. 421) at 18 ("In his Report on Market Efficiency, Feinstein opines that 'damages in this matter can be computed using a common methodology for all Class members' by 'using readily available daily pricing information, in accordance with widely used and generally accepted methodologies and the PSLRA.' ECF No. 387-2 ¶ 2, 152.  … Feinstein bases his damages opinions on the same event study and regression analyses employed in his loss causation opinions, as well as the construction of an inflation ribbon.  As discussed above, the methodologies employed in the event study and regression analyses are reliable for purposes of admissibility.").

[102]  *Halliburton II* at 2417.

- 47 -

disclosures (*i.e.,* on the "back end" on or after the dates when there are disclosures revealing the truth) — there was a lack of price impact.

88.    In addition, Dr. Hutton does not dispute that there were statistically significant negative abnormal returns (or were outside of the bounds of what would be expected by chance), observed on the first trading day after each of the three alleged partial corrective disclosures that rapidly reflected the new, material, unanticipated information.[103]  Indeed, Dr. Hutton has not undertaken any empirical analysis that would demonstrate that 100% of each of the price declines observed on any of the three alleged partial corrective disclosure dates are caused by information unrelated to the allegations.  In other words, Dr. Hutton's report provides **no evidence of a lack of "back end" price impact when one examines the reaction of Ryder's common stock price to the alleged partial corrective disclosures**.

B.    Price Impact on Dates with Misrepresentations or Omissions

89.    Dr. Hutton's report also provides **no evidence of a lack of "front end" price impact when one examines the reaction of Ryder's common stock price to the alleged misstatements**.

90.    Dr. Hutton states:

> For example, of the 20 news days that Dr. Hartzmark analyzes, 18 are days with alleged misrepresentations.  Excluding July 30, 2019 and October 30, 2019 which are also alleged corrective disclosure days, according to Dr. Hartzmark's Exhibit VIII and Appendix E, Ryder's stock price had a *negative* and statistically significant abnormal return[] on 9 of these news days.  Dr. Hartzmark fails to articulate what methodology he would use to

---

[103]  Hutton Dep. Tr. 127:17-128:12 ("Q      Did the price of Ryder's stock begin to move in a statistically significant manner within the first 24 hours of the disclosure of the corrective information?  … THE WITNESS: I haven't examined the stock price movement within the first 24 hours.  If there's a part of Dr. Hartzmark's report that you want to bring up where he shows the daily returns and then his aggregation to the multiwindow return, we can take a look at that.  … Q      So sitting here today, you have no reason to dispute that Ryder's stock price -- it's initial reaction to the news was rapid on those dates?  … THE WITNESS: I have no reason to endorse the statement, either.  I have not done the analysis.").

reliably measure damages based on Ryder's price movements on those days.[104]

91.    Dr. Hutton, who has not analyzed any of these nine news dates, does not consider that these negative price declines that impacted Ryder's stock price were possibly cushioned by potentially favorable information related to the misstatements.  Nor does Dr. Hutton consider that the information omitted or misstated on these dates might have simply maintained the level of artificial inflation; with the negative price movement caused by information that was new, material, unanticipated and, most critically, unrelated to the alleged misstatements.  Moreover, for five of the 20 news dates where the abnormal price increases were statistically significant, Dr. Hutton does not consider or evaluate whether the price increases were caused by information wholly unrelated to the alleged misstatements.

92.    **Table 1** below provides the daily statistical results for the 31 misstatement dates (11 dates with positive abnormal returns in Panel A and 20 with negative abnormal returns in Panel B).  I note, Dr. Hutton apparently does not dispute the specification, Control Period, Dummy Dates or other tools I used in my market model for the event study.

---

[104]   Hutton Report, fn 131.

**Table 1**
**Ryder System, Inc. Common Stock Data**
**on Dates with Alleged Misrepresentations**

*Panel A: Dates with Positive Abnormal Returns*

| Date | Price | Return | Abnormal Return | p-Value |
|------|-------|--------|-----------------|---------|
| 8/7/2015 | $90.50 | -1.15% | 0.11% | 86.85% |
| 11/11/2015 | $69.11 | 0.22% | 0.87% | 35.91% |
| 4/26/2016 | $69.45 | 6.44% | 4.51% | 0.11% |
| 5/19/2016 | $66.69 | 2.52% | 2.51% | 6.04% |
| 10/25/2016 | $66.07 | 0.79% | 1.17% | 19.06% |
| 11/8/2016 | $73.01 | 2.20% | 2.21% | 2.96% |
| 7/26/2017 | $76.46 | 3.97% | 4.13% | 0.00% |
| 10/25/2017 | $81.50 | -0.49% | 0.68% | 44.11% |
| 5/2/2018 | $67.20 | 0.52% | 0.96% | 27.57% |
| 7/25/2018 | $78.32 | 6.95% | 5.02% | 0.00% |
| 2/14/2019 | $63.70 | 5.25% | 4.63% | 0.03% |

*Panel B: Dates with Negative Abnormal Returns*

| Date | Price | Return | Abnormal Return | p-Value |
|------|-------|--------|-----------------|---------|
| 7/23/2015 | $88.42 | -5.01% | -3.57% | 0.00% |
| 9/10/2015 | $81.62 | 0.74% | -0.13% | 83.74% |
| 10/22/2015 | $71.37 | -0.87% | -1.90% | 2.65% |
| 11/3/2015 | $72.39 | -0.81% | -0.59% | 50.86% |
| 11/10/2015 | $68.96 | -2.53% | -2.91% | 0.16% |
| 2/2/2016 | $51.52 | -5.81% | -1.84% | 13.81% |
| 2/11/2016 | $52.47 | -5.15% | -3.43% | 1.38% |
| 2/12/2016 | $54.14 | 3.18% | -0.25% | 86.14% |
| 7/27/2016 | $64.52 | -7.51% | -6.03% | 0.00% |
| 2/2/2017 | $71.81 | -7.75% | -7.03% | 0.00% |
| 2/14/2017 | $76.60 | -0.74% | -0.44% | 70.30% |
| 4/25/2017 | $68.28 | -13.87% | -14.40% | 0.00% |
| 2/16/2018 | $76.43 | -9.19% | -9.27% | 0.00% |
| 2/20/2018 | $75.10 | -1.74% | -0.15% | 86.76% |
| 2/22/2018 | $74.35 | -0.50% | -0.64% | 47.81% |
| 4/24/2018 | $68.39 | -8.61% | -6.40% | 0.00% |
| 10/26/2018 | $57.22 | -6.15% | -4.90% | 0.00% |
| 2/21/2019 | $63.90 | -1.01% | -1.10% | 38.82% |
| 4/30/2019 | $63.00 | -3.80% | -4.00% | 0.15% |
| 5/9/2019 | $61.33 | -0.65% | -0.45% | 72.04% |

Sources: Appendix E to Class Certification Report and the highlighted dates in Tab 18 - Appendix E Demonstrative (Alleged Misrepresentation Days) to Hartzmark Deposition Entered on FLSD Docket 9/23/2022.

93.   On 16 of the 31 dates (approximately 50%) there are abnormal returns that are statistically significant at the 5% level.  As shown in Panel A, on 5 of these 16 dates the abnormal return is positive, while in Panel B on 11 of these 16 dates the abnormal return is negative. [105]   To determine whether there is a lack of price impact from misstatements would require investigating each of these dates to determine whether or not any of the positive increases on the "front end" were unrelated to the alleged misstatements.  Or, conversely, determining and showing empirical evidence that 100% of the price increases was caused by information unrelated to the allegations.

94.   In terms of the observed negative price reactions on days with alleged misstatements in Panel B, it is important to understand that on many of these dates the Defendants allegedly omitted material information or were simply confirming previously disclosed (mis)information about Ryder's financial performance or Ryder's procedures to evaluate residual values and depreciation expense.[106]   In other words, it would not be expected in an efficient market for there to have been a material change in the level of artificial inflation from the alleged misstatements causing a material increase in the price of Ryder common stock.  For example, on these observed negative price reaction days with alleged misrepresentations and omissions, it is important to understand that had the residual values (depreciation expenses) been overstated (understated) this material information could have been more than offset by the disclosure of non-fraudulent negative financial or other information unrelated to the allegations.  In other words, on these dates it would not be expected in an efficient market for there to have been a positive change in the price of

[105]   For the 11 dates in Panel A the aggregate (summed) abnormal return is 27%.  For the five abnormal returns that are statistically significant below the 5% level, the aggregate (summed) abnormal return is 20%.  For the 20 dates in Panel B the aggregate (summed) abnormal return is 69%.  For the 11 abnormal returns that are statistically significant below the 5% level, the aggregate (summed) abnormal return is 64%.

[106]   For example, the Complaint alleges that, on November 3, 2015, "Defendants presented at the Goldman Sachs Industrial Conference.  During the conference, an analyst asked Defendant Sanchez, 'So if you have the environment where used trucks sales prices are coming down, can residual values still go up in that environment?'  To which Defendant Sanchez responded 'Well, they can because of the way we calculate our residual values . . . Obviously we step back and take a look at it and make sure that we're still selling vehicles below -- still selling vehicles above where our residual values are going to be set.'"  Complaint, ¶169 (emphasis in original).  On its face, this statement appears to be a simple confirmatory statement.

- 52 -

Ryder common stock, as the increase in artificial inflation and stock price would have been more than offset by the negative non-fraudulent information.

95.   In summary, because Dr. Hutton does not provide any empirical analysis or evidence demonstrating that none of the "back-end" price reaction was caused by the revelation of the truth, along with not providing any empirical evidence as to whether the price impact observed on the "front end" was due to the misrepresentations or omissions, Dr. Hutton's report has not provided any evidence that there is a lack of price impact from the alleged misstatements and omissions.

**RESPECTFULLY SUBMITTED THIS 17ᵀᴴ DAY OF FEBRUARY 2023**

_____

Michael L. Hartzmark, Ph.D.

# APPENDIX A

# MICHAEL L. HARTZMARK, PH.D.

1018 Bucida Road
Delray Beach, FL 33483
(312) 718-9699
mhartzmark@HELP-Econ.com

## PRESENT POSITIONS

HARTZMARK ECONOMICS LITIGATION PRACTICE, LLC
President (2013 - present)
Specializing in the application of economic, financial and accounting principles to securities, complex commercial, investment, intellectual property, antitrust and automotive litigation and regulatory matters

MDA FINANCIAL, INC.
President (1981 - present)

## EDUCATION

Ph.D.   Department of Economics, the University of Chicago, 1984
(Doctoral Exams in Industrial Organization and Regulation; Public Finance)
M.A.    Department of Economics, the University of Chicago, 1982
B.A.    The University of Michigan (Economics, High Honors and Phi Beta Kappa), 1978

## ACADEMIC HONORS AND FELLOWSHIPS

*John M. Olin Faculty Fellowship*, (George Stigler, Director) (1986 - 1987)
*PEW Teaching Fellow*, the University of Chicago (1980 - 1981)
*Phi Beta Kappa,* the University of Michigan (1978)
*Parker Prize,* in Labor Economics, University of Michigan (1978) -- Given for the best graduate or undergraduate paper in Labor Economics

## GRANTS

Grant from the University of Chicago (1984).  Center for the Study of Futures Prices: grant to analyze margin regulation for the Chicago Board of Trade Studies.

1

**PROFESSIONAL EXPERIENCE**

FINRA (fka NATIONAL ASSOCIATION OF SECURITY DEALERS) Dispute Resolution
    <u>Member Arbitrator</u> (2005 - 2021)
OFFICE OF THE ATTORNEY GENERAL – STATE OF NEW JERSEY
    <u>Independent Contractor</u> (2015 - 2022)
OFFICE OF THE ATTORNEY GENERAL – STATE OF NEW YORK
    <u>Independent Contractor</u> (2013 - 2019)
CRA INTERNATIONAL, INC.
    <u>Independent Contractor</u> (2015)
NAVIGANT ECONOMICS (FORMERLY CHICAGO PARTNERS, LLC)
    <u>Academic Affiliate</u> (2012 - 2013)
    <u>Principal/Director</u> (2008 - 2012)
    <u>Vice President</u> (2004 - 2007)
DARMA, LLC
    <u>President</u> (2005 - 2008)
PACIFIC BIOMETRICS, INC.
    <u>Interim Chief Financial Officer</u> (2004 - 2006)
CRAGAR INDUSTRIES, INC.
    <u>Chairman, CEO, President and Treasurer</u> (1993 - 2004)
MDA FINANCIAL, INC.
    <u>President</u> (1981 - present)
FAHNESTOCK & Co., Inc. (now Oppenheimer & Co., Inc.)
    <u>Financial Consultant</u> (Series 7 and Series 63) (2001 - 2003)
ECONOHIO CORPORATION
    <u>President</u> (1989 - 1992)
LEXECON INC.
    <u>Senior Economist</u> (1987 - 1989)
UNIVERSITY OF CHICAGO, Center for the Study of the Economy and the State, and the
    Graduate School of Business (now the Chicago Booth School of Business)
    <u>John M. Olin Visiting Scholar</u> (1986 - 1987)
UNIVERSITY OF MICHIGAN, Joint with Michigan Business School (now the Stephen M.
    Ross School of Business) and Department of Economics
    <u>Assistant Professor</u> (1984 - 1988)
    <u>Lecturer</u> (1984)
COMMODITY FUTURES TRADING COMMISSION, Division of Economics and
    Education, Washington, D.C.
    <u>Financial Economist</u> (1982 -1983)
UNIVERSITY OF CHICAGO, Department of Economics
    <u>Instructor for Economic Analysis</u> (1981)
    <u>Research Assistant</u> for A. C. Harberger (1982)
    <u>Research Assistant</u> for Sam Peltzman (1981 - 1982)
U. S. DEPARTMENT OF THE TREASURY, Office of Tax Analysis, Washington, D.C.
    <u>Research Assistant</u> (1981)

2

**PUBLICATIONS**

"Understanding the Efficiency of the Market for Preferred Stock," (with H. Nejat Seyhun), Virginia Law & Business Review, Volume 8, Number 2, Spring 2014.

"An Economist's View of Amgen," Law360, May 2, 2013. http://www.law360.com/articles/438303/an-economist-s-view-of-amgen.

"The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation," (with H. Nejat Seyhun), Virginia Law & Business Review, Volume 6, Number 3, 2012.

"Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market," (with Cindy A. Schipani and H. Nejat Seyhun), Columbia Business Law Review, Number 3, Volume 2011.

"Luck Versus Forecast Ability: Determinants of Trader Performance in Futures Markets," Journal of Business, January 1991. Also reprinted in Classic Futures: Lessons from the Past for the Electronic Age, by Lester Telser, Risk Books, March 2000.

"Business Valuations for the Personal Lawyer," Law and Fact, September 1991.

"Is Risk Aversion a Theoretical Diversion?" The Review of Futures Markets, Volume 7, Number 1, 1988.

"Returns to Individual Traders of Futures: Aggregate Results," Journal of Political Economy, December 1987.

"Regulating Futures Margin Requirements," Review of Research on Futures Markets, Volume 5, Number 3, 1986.

"The Effects of Changing Margin Levels on Futures Market Activity, the Composition of Traders in the Market, and Price Performance," Journal of Business, April 1986.

"Individual Income Taxation, 1947-1979," (with Eugene Steuerle), National Tax Journal, June 1981.

**BOARDS**

POWHATAN BUILDING CORPORATION, Director, Treasurer, (2010 - 2016)

MIDTOWN EDUCATIONAL FOUNDATION, Auxiliary Board Member, (2009 - 2013)

GLOBAL ENTERTAINMENT CORPORATION (Formerly AMEX: GEE, currently not listed); Director, Audit Committee Member (2004 - 2008);

THE BOARD INSTITUTE (private software company), Financial Advisory Board (2004 - 2006)

SHAKER INVESTMENTS, Financial Advisory Board (1992 - 2005)

PACIFIC BIOMETRICS, INC. (OTC BB: PBMC currently not listed and renamed as Pacific Biomarkers), Director and Chairman of Audit Committee (2002 - 2004)

CRAGAR INDUSTRIES, INC. (Formerly OTC BB: CRGR, company sold); Director and Chairman of the Board (1993 - 2004)

**EXPERT REPORTS, DECLARATIONS AND DISCLOSURES PAST FOUR YEARS**

In Re Finisar Corporation, Inc. Securities Litigation. U.S. District Court for the Northern District of California; Report (8/14/2017); Deposition (9/14/2017); Rebuttal Report (11/3/2017); Deposition (11/7/2018).

Christopher S. Porrino, Attorney General of New Jersey on behalf of Amy G. Kopleton, Deputy Chief of the New Jersey Bureau of Securities v. Credit Suisse Securities (USA) LLC, et al. Superior Court of New Jersey, Chancery Division Mercer County; Report (12/1/2017); Opposition Report (5/14/2018); Reply Report (7/16/2018); Deposition (2/13/2019).

In Re TerraForm Global, Inc. Securities Litigation. U.S. District Court for the Southern District of New York; Report (7/30/2018); Updated Report (8/17/2018); Reply Report (11/1/2018).

In Re Illumina, Inc. Securities Litigation. U.S. District Court Southern District of California; Report (9/14/2018); Deposition (10/19/2018).

John Cumming, derivatively on behalf of New Senior Investment Group, Inc., v. Wesley R. Edens, et al. Court of Chancery of the State of Delaware; Report (11/9/2018).

The Arbitrage Fund, on behalf of itself and all other similarly situated shareholders of Exactech, Inc. v. William Petty, et al. Circuit Court of Florida, Eleventh Judicial Circuit, Miami-Dade County; Report (12/6/2018).

Oklahoma Law Enforcement Retirement System vs. Adeptus Health Inc. U.S. Eastern District of Texas, Sherman Division; Report (12/7/2018); Rebuttal Report (3/22/19).

In the Matter of the Trusts established under the Pooling and Servicing Agreements relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C30, et al. v. Appaloosa Investment L.P., et al. U.S. District Court for the Southern District of New York; Report (1/18/2019); Rebuttal Report (2/8/2019); Deposition (3/12/2019).

Marc J. Muri, individually and on behalf of all others similarly situated v. National Indemnity Company. U.S. District Court District of Nebraska; Report (1/24/2019); Reply Report (2/14/2019); Deposition (3/4/2019).

In Re HD Supply Holdings, Inc. Securities Litigation. U.S. District Court for the Northern District of Georgia; Report (3/1/2019); Deposition (5/2/2019).

In Re Signet Jewelers Limited Securities Litigation. U.S. District Court for the Southern District of New York; Report (3/15/2019); Rebuttal Report (5/17/2019); Deposition (6/7/2019); Damages Report (9/20/2019); Damages Rebuttal Report (11/13/2019).

Tracey Rogers v. Aphria et al./ Garri Mirzoian v. Aphria et al. Ontario, Superior Court of Justice; Affidavit (4/5/2019).

In Re U.S. Steel Consolidated Cases. U.S. District Court for the Western District of Pennsylvania; Report (4/19/2019); Deposition (6/4/2019) Rebuttal Report (7/18/2019); Damages Report (7/12/2021); Deposition (8/23/2021); Damages Reply Report (9/13/2021).

Timber Hill LLC. v. Kraft Heinz Company et al. U.S. District Court for the Northern District of Illinois; Declaration (5/15/2019).

Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al. U.S. District Court for the Southern District of Texas; Report (5/28/2019); Supplemental Report (8/26/2019).

Lord Abbett Affiliated Fund, Inc., et al, v Navient Corporation, et al. U.S. District Court for the District of Delaware; Report (9/6/2019); Deposition (10/23/2019); Reply Report (12/20/2019); Damages Report (11/3/2020); Damages Rebuttal (12/1/2020); Stock Damages Reply (1/21/2021); Deposition (6/25/2021).

Graaf v. SNC-Lavalin Group Inc., et al. Quebec, Superior Court; Expert Report (10/15/2019); Reply Report (2/4/2021).

BRS v. Volkswagen AG, et al. ("Bondholders Securities Action"). U.S. District Court for the Northern District of California; Report (11/8/2019); Deposition (1/10/2020).

4

SEB Investment Management AB. v. Symantec Corp. and Gregory S. Clark. U.S. District Court for the Northern District of California; Report (1/17/2020); Deposition (2/7/2020); Reply Report (3/14/2020); Damages Report (1/29/2021); Damages Reply Report (2/19/2021); Deposition (2/25/2021).

In re: CenturyLink Sales Practices and Securities Litigation. U.S. District Court for the District of Minnesota; Report (1/21/2020); Deposition (2/25/2020); Rebuttal Report (5/4/2020); Deposition (6/5/2020).

Abram B. Dyck v. Tahoe Resources Inc. and Ronald Wayne Clayton. Ontario, Superior Court of Justice; Affidavit (5/28/2020) Reply Report (3/17/2021); Examination (5/3/2021).

Patricia A. Shenk, et al., v. Mallinckrodt PLC et al. U.S. District Court for the District of Columbia; Report (7/22/2020).

In Re Tesla, Inc. Securities Litigation. U.S. District Court for the Northern District of California; Report (9/22/2020); Deposition (11/19/2020); Damages Report (11/10/2021); Deposition (3/18/2022 Supplemental Damages Report (12/31/2022); Deposition (1/9/2023); Court Testimony (1/31/2023 and 2/1/2023).

Jennifer Phillips, et al., v. Help at Home, LLC. U.S. District Court for the Northern District of Illinois Eastern Division; Report (10/2/2020).

Chad Lindsey Moshell, et al., v. Sasol Limited et al. U.S. District Court for the Southern District of New York; Report (10/2/2020); Deposition (8/17/2021).

Cambridge Retirement System, et al. v Amneal Pharmaceuticals, Inc., et al. Superior Court of New Jersey, Somerset County Law Division; Report (10/30/2020); Deposition (3/2/2021).

In Re Evoqua Water Technologies Corp. Securities Litigation. U.S. District Court for the Southern District of New York; Report (12/4/2020).

City of Sunrise Firefighters' Pension Fund, et al. v. Citigroup Inc., et al. U.S. District Court for the Southern District of New York; Declaration (1/19/2021).

In Re Myriad Genetics, Inc. Securities Litigation. U.S. District Court for the Central District of Utah; Report (6/7/2021).

In Re Alta Mesa Resources, Inc. Securities Litigation. U.S. District Court for the Southern District of Texas; Report (7/30/2021); Deposition (11/17/2021); Supplemental Report (1/14/2022).

Miriam Edwards, Individually and On Behalf of All Others Similarly Situated versus McDermott International, Inc., David Dickson, and Stuart Spence. U.S. District Court for the Southern District of Texas; Report (9/29/2021); Deposition (11/11/2021).

In re Venator Materials PLC Securities Litigation. U.S. District Court for the Southern District of Texas; Report (11/19/2021).

Ngian, individually and on behalf of all others similarly situated v. Facebook, Inc. n/k/a Meta Platforms, Inc., et al. U.S. District Court for the Eastern District of New York; Ohio Public Employees Retirement System v. Meta Platforms, Inc. f/k/a Facebook, Inc., et al. U.S. District Court for the Northern District of California; Declaration (12/27/2021).

Gary Cheng, individually and on behalf of all others similarly situated v. Activision, et al. U.S. District Court for the Central District of California; Declaration (1/3/2022).

Camelot Event Driven Fund, et al. v. Morgan Stanley & Co. LLC, et al. Supreme Court for the State of New York, County of New York; Report (1/3/2022).

Public Employees' Retirement System of Mississippi, et al. v. Mohawk Industries, Inc. and Jeffrey S. Lorberbaum. U.S. District Court for the Northern District of Georgia; Report (1/25/2022); Deposition (2/25/2022); Rebuttal Report (6/8/2022).

UA Local 13 Pension Fund, et al. v. Bumble Inc., et al. U.S. District Court for the Southern District of New York; Declaration (4/15/2022).

In re Pattern Energy Group Inc. Securities Litigation. U.S. District Court for the District of Delaware; Report (5/5/2022); Supplemental Report (7/22/2022).

Paiman Rahimi v. SouthGobi Resources Ltd.. Ontario, Superior Court of Justice; Report (7/6/2022).

5

State of Alaska, et al. v. Ryder System, Inc., et al., U.S. District Court for the Southern District of Florida; Report (9/22/2022); Deposition (11/30/2022).

In Re Wells Fargo & Company Securities Litigation. U.S. District Court for the Southern District of New York; Report (10/3/2022); Deposition (12/8/2022).

In Re BioMarin Pharmaceutical Inc. Securities Litigation. U.S. District Court for the Northern District of California; Report (10/17/2022).

**Appendix B**
**Materials Relied Upon in the Opening and Reply Report**

<u>RYDER SYSTEM, INC. NEWS AND DISCLOSURES</u>

News Articles, July 23, 2015 – February 18, 2020, searched through Factiva.

News headline count for Bloomberg First Word and Bloomberg News articles, July 23, 2015 – February 18, 2020, searched through Bloomberg.

Transcripts of teleconference (source: Bloomberg):
> Ryder System, Inc. Conference Calls: 7/23/2015; 10/22/2015; 2/2/2016; 4/26/2016; 7/27/2016; 10/26/2016; 2/2/2017; 4/25/2017; 7/26/2017; 10/24/2017; 2/16/2018; 4/24/2018; 7/25/2018; 10/26/2018; 2/14/2019; 4/30/2019; 7/30/2019; 10/29/2019; and 2/13/2020.

List of investor / conferences participated by Ryder System, Inc., July 23, 2015 – February 18, 2020, from Bloomberg.

Ryder System, Inc. filings with the U.S. Securities and Exchange Commission (SEC).

List of analyst reports on Ryder System, Inc., July 23, 2015 – February 18, 2020, available through S&P Capital IQ and Thomson Eikon Databases.

Ryder's Second Quarter 2019 Earnings Conference Call Presentation dated July 30, 2019.

Ryder's Third Quarter 2019 Earnings Conference Call Presentation dated October 29, 2019.

Ryder's Third Quarter 2019 Earnings Conference Call Transcript dated October 29, 2019, Thomson StreetEvents.

Ryder's Fourth Quarter 2019 Earnings & 2020 Forecast Conference Call Presentation dated February 13, 2020.

Ryder's Fourth Quarter 2019 Earnings & 2020 Forecast Conference Call Transcript dated February 13, 2020, Thomson StreetEvents.

Ryder SEC Form 8-K dated July 30, 2019.

Ryder SEC Form 8-K dated February 13, 2020.

<u>ANALYST REPORTS</u>

Buckingham Research Group, "2019E Guidance Meaningfully Reduced Given Used Tractor Softness; Maintain BUY," July 31, 2019.

Deutsche Bank, "Good operating Q, but used truck prices sting," July 30, 2019.

J.P.Morgan, "First Look at 2Q19 Earnings," July 30, 2019.

J.P.Morgan, "Limited Visibility to a U-Turn in Used Tractor Prices, Lowering Estimates and Price Target," July 30, 2019.

Stephens, "2Q19 First Look: Adj. EPS in Line; 2019 Guidance Reduced on Used Truck Weakness," July 30, 2019.

SunTrust Robinson Humphrey, "In Line 2Q But Lower Used Pricing Outlook Whacks Guidance," July 30, 2019.

Wolfe Research, "In Line 2Q but Large Cut to 2H Guidance," July 30, 2019.

Wolfe Research, "Another Big Cut on Used Truck Headwinds," July 30, 2019.

Baird Equity Research, "2Q19 Results in Line; 2H19 Outlook Lowered Given Noted Cyclical Headwinds," July 31, 2019.

Loop Capital Markets, "Ryder Overgrows Again – Lowering EPS and PT," July 31, 2019.

Stifel, "Get Used to Used Vehicle Drag; Lowering Estimates," July 31, 2019.

J.P.Morgan, "Big Residual Bath Came Earlier Than Expected, But the Book Value Anchor is Still a Drag," October 30, 2019.

Baird Equity Research, "Book Value Remains the Focus While Mgmt. Works to Shift Strategic Focus," February 13, 2020.

J.P.Morgan, "First Look at 4Q19 Earnings," February 13, 2020.

J.P.Morgan, "Stuck in Low Gear," February 13, 2020.

KeyBanc Capital Markets, "ALERT: 4Q19 First Take," February 13, 2020.

Stephens, "First Look at 4Q19: Adj. EPS Miss & 2020 Guidance Below Street," February 13, 2020.

Stephens, "Slight Adj. EPS Miss in 4Q19; Guidance for 2020 Well Below the Street," February 13, 2020.

SunTrust Robinson Humphrey, "4Q EPS Miss; 2020 Guidance Well Below as Company Shifts to Higher Returns/Positive FCF," February 13, 2020.

SunTrust Robinson Humphrey, "4Q Recap; Not the Guidance we Expected But the Right Investments for the Long Term; Reiterate Buy," February 13, 2020.

Pacific Square Research, "The Road for Ryder Gets Rougher," February 28, 2020.

<u>COURT DOCUMENTS</u>

Amended Complaint for Violations of the Federal Securities Laws, filed October 5, 2020 (ECF No. 28).

Order Denying Defendants' Motion to Dismiss Plaintiffs' Amended Complaint entered May 12, 2022 (ECF No. 75).

Rebuttal Report of Amy Hutton, Ph.D., December 16, 2022 (ECF No. 97-2) and production.

Deposition Transcript of Amy P. Hutton, Ph.D., February 2, 2022.

Tab 18 – Appendix E Demonstrative (Alleged Misrepresentation Days) to Hartzmark Deposition Entered on FLSD Docket 9/23/2022.

Defendants' Memorandum of Law in Opposition to Lead Plaintiffs' Motion for Class Certification filed December 16, 2022.

**Appendix B**
**Materials Relied Upon in the Opening and Reply Report**

**COURT DOCUMENTS, CONT'D.**

*Aranaz v. Catalyst Pharmaceutical Partners, Inc.*, 302 F.R.D. 657 (S.D. Fla. 2014).

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

*Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150 (S.D.N.Y. 2012).

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

*Carpenters Pension Trust Fund of St. Louis, et al. v. Barclays PLC, et al.*, 2015 U.S. Dist. LEXIS 110382 (S.D.N.Y. 2015).

*Cheney v. Cyberguard Corp.*, 213 F.R.D. 484 (S.D. Fla. 2003).

*Christakis Vrakas, et al. v. U.S. Steel Corp., et al.*, 2019 U.S. Dist. LEXIS 222783 (W.D. Pa., Dec. 31, 2019).

*City of Ann Arbor Emps' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247 (D.S.C. 2010).

*City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*, 2019 WL 3449671 (N.D. Ga. July 17, 2019); Expert Report of Chad Coffman, CFA, *City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.* (N.D. Ga.) (Dkt. No. 68-3).

*Comcast Corp.* v. *Behrend*, 569 U.S. 27 (2013).

*Erica P. John Fund, Inc. v. Halliburton Co, et al.*, 131 S.Ct. 2179 (2011).

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014).

*In re Acuity Brands, Inc. Sec. Litig.*, 2020 WL 5088092 (N.D. Ga. Aug. 25, 2020); Expert Report of Joseph R. Mason, PhD, *In re Acuity Brands, Inc. Sec. Litig.* (N.D. Ga.) (Dkt. No. 101-3).

*In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008).

*In re Cobalt Intl. Energy, Inc., Sec. Litig.*, 2017 WL 2608243 (S.D. Tex. 2017).

*In re Computer Sciences Corp. Securities Litig.*, 288 F.R.D. 112 (E.D. Va. 2012).

*In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196 (E.D. Pa. 2008).

*In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011).

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006).

*In re Gaming Lottery Sec. Litig.*, 2001 WL 204219 (S.D.N.Y. Mar. 1, 2001).

*In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321 (N.D. Ill. 2015).

*In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616 (N.D. Ala. 2009).

*In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260 (D. Mass. 2006).

*In re Scientific-Atlanta*, 571 F. Supp. 2d 1315 (N.D. Ga. 2007).

*In re Signet Jewelers Limited Sec. Litig.*, 2019 WL 3001084 (S.D.N.Y. 2019).

*In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209 (C.D. Cal. 2019).

*In Re Teva Securities Litigation*, 2021 WL 872156 (D.Conn. March 9, 2021).

*In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005).

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

*Lapin v. Goldman Sachs & Co.,* 254 F.R.D. 168 (S.D.N.Y. 2008).

*Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004).

Order Denying Motions to Exclude Expert Testimony, *In re Twitter, Inc. Sec. Litig.*, No. 16-cv-05314 (N.D. Cal. Jan. 28, 2020) (Dkt. No. 421).

*McIntire v. China MediaExpress*, 38 F. Supp. 3d. 415 (S.D.N.Y. 2014).

*Monroe Cnty. Empls . Retirement Syst., et al. v. The Southern Co., et al.,*332 F.R.D. 370 (N.D. Ga. 2019); Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA, *Monroe Cnty. Emps.' Ret. Sys. v. The Southern Co.* (N.D. Ga.) (Dkt. No. 77-2).

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Group PLC*, 2016 WL 7409840 (S.D.N.Y. Nov. 4, 2016).

*Vinh Nguyen v. Radient Pharm. Corp.,* 287 F.R.D. 563 (C.D. Cal. 2012).

*Peil v. Speiser*, 806 F.2d 1154 (3d Cir. 1986).

*Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303 (S.D. Tex. Nov. 13, 2019), *adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019).

*SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276 (N.D. Cal. 2020).

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196 (2d Cir. 2008).

*The Pennsylvania Avenue Funds v. Inyx Inc.*, 2011 U.S. Dist. LEXIS 72999 (S.D.N.Y 2011).

*Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 4006661 (S.D. Fla. Mar. 16, 2016); Expert Report of Zachary Nye, Ph.D., *Thorpe v. Walter Inv. Mgmt. Corp.* (S.D. Fla.) (Dkt. No. 114-2).

*W. Palm Beach Police Pension Fund v. DFC Global Corp.*, *et al.*, 2016 WL 4138613 (E.D. Pa. 2016).

*Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702, (2018)

*William D. Wallace, et al. v. IntraLinks et al.*, 302 F.R.D. 310 (S.D.N.Y., September 30, 2014)

**Appendix B**
**Materials Relied Upon in the Opening and Reply Report**

**ACADEMIC PAPERS AND BOOKS**

Daniella Acker, *Implied Standard Deviations and Post-Earnings Announcement Volatility*, 29 J. of Bus., Fin. and Accounting 429 (2002).

Nihat Aktas, Eric de Bodt, and Jean-Gabriel Cousin, *Event Studies with a Contaminated Estimation Period*, 13 Jnl. Corp. Fin. 129 (2007).

Carol Alexander, Market Models: A Guide to Financial Data Analysis (John Wiley & Sons, 2001).

Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stock Efficiency*, 19 J. Corp. L. 285 (Winter 1994).

William H. Beaver, *The Informational Content of Annual Earnings Announcements*, 6 J. of Accounting Research 67 (1968).

Bharat Bhole, Sunita Surana, and Frank Torchio, *Benchmarking Market Efficiency Indicators for Securities Litigation*, 2020 U. of Ill. Online L. Rev. 96 (2020).

Ekkehart Boehmer, Jim Masumeci, & Annette B. Poulsen. *Event-study methodology under conditions of event-induced variance*, 30 J. Fin. Econ. 253 (1991).

Michael J. Brennan, Narasimhan Jegadeesh, and Bhaskaran Swaminathan, *Investment Analysis and the Adjustment of Stock Prices to Common Information*, 6 Rev. of Fin. Stds. 799 (1993).

G. E. P. Box & G. C. Tiao, *Intervention Analysis with Applications to Economic and Environmental Problems*, 70 J. Am. Stat. Assn., 70 (1975).

Nicholas I. Crew, Kevin L. Gold and Marnie A. Moore, *Federal Securities Acts and Areas of Expert Analysis*, Litigation Services Handbook: The Role of the Financial Expert (Wiley, 5th ed. 2012).

Bradley Efron & Robert J. Tibshirani, An Introduction to the Bootstrap (CRC Press LLC, 2d ed.) (1993).

Frank J. Fabozzi and Steven V. Mann, The Handbook of Fixed Income Securities (McGraw-Hill Education, 7th ed. 2005).

Ray Fair, *Events That Shook the Market*, 75 Jnl. of Bus. 713 (2002).

Eugene Fama, *Efficient Capital Markets:  A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970).

Eugene Fama, *Efficient Capital Markets: II*, 46 J. Fin. 1575 (1991).

Eugene Fama, *Market Efficiency, Long-Term Returns, and Behavioral Finance*, 49 J. Fin. Econ. 283 (1998).

Jill E. Fisch, *The Role and Regulation of the Research Analyst*, Research Handbook on the Economics of Corporate Law, Edgar Elgar Publishing (2012).

William H. Greene, Econometric Analysis (Prentice Hall, 2d ed. 1993).

Larry Harris, Trading and Exchanges: Market Microstructure for Practitioners (Oxford University Press, 2003).

Michael L. Hartzmark, Cindy A. Schipani, and H. Nejat Seyhun, *Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market*, 2011 Colum. Bus. L. Rev. 654 (2011).

Michael L. Hartzmark, H. Nejat Seyhun, *The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev. 415 (Winter 2012).

Michael L. Hartzmark and H. Nejat Seyhun, *Understanding the Efficiency of the Market for Preferred Stock*, 8 Va. L. & Bus. Rev. 149 (Spring 2014).

Glenn V. Henderson, Jr., *Problems and Solutions in Conducting Event Studies*, 57 J. of Risk and Ins. 282 (June 1990).

Hai Hong, Robert S. Kaplan, and Gershon Mandelker, *Pooling vs. Purchase: The Effects of Accounting for Mergers on Stock Prices*, 53 Acctg. Rev. 31 (1978).

Robert S. Kaplan and Richard Roll, *Investor Evaluation of Accounting Information: Some Empirical Evidence*, 45 Jnl. Bus. 225 (1972).

Jonathan M. Karpoff, *The Relation between Price Changes and Trading Volume: A Survey*, 22 J. of Fin. and Quantitative Analysis, 109 (1987).

David H. Kaye and David A. Freedman, *Reference Guide on Statistics*, in Reference Manual on Scientific Evidence (National Academy of Sciences, 3d. ed. 2011).

S.P. Kothari, *Capital Markets Research in Accounting*, 31 Jnl. Acctg. & Econ. 105 (2001).

David F. Larcker, Lawrence A. Gordon & George E. Pinches, *Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis*, 15 J. Fin. & Quant. Analysis 267 (1980).

Paul H. Malatesta, *Measuring Abnormal Performance: The Event Parameter Approach Using Joint Generalized Least Squares*, 21 J. Fin. & Quant. Analysis, 27 (1986).

Burton G. Malkiel, *The Efficient Market Hypothesis and Its Critics*, 17 J. Econ. Perspectives 59 (2003).

Mahesh Pritamani and Vijay Singal, *Return Predictability Following Large Price Changes and Information Releases*, 25 Jnl. of Banking & Fin. 631 (2001).

Stephen A. Ross, Randolph W. Westerfield, and Jeffrey Jaffe, Corporate Finance (Mc Graw Hill/Irwin, 9th ed. 2010).

G. William Schwert, *Anomalies and Market Efficiency*, in *Handbook of the Economics of Finance* (G. Constantinides, et al., eds., 2003).

David Tabak, *Making Assessments About Materiality Less Subjective Through the Use of Content Analysis*, NERA Economic Consulting (2007).

B-3

**Appendix B**
**Materials Relied Upon in the Opening and Reply Report**

**DATA**

Bloomberg price and volume data for Ryder System, Inc. common stock, January 2015 – June 2020.

Miscellaneous stock return index data, January 2015 – June 2020, from Bloomberg (Bloomberg identifier in parentheses): the S&P 500 Total Return Index (SPTR), the S&P MidCap 400 Total Return Index (SPTRMDCP), the Dow Jones Transportation Average Total Return Index (DJTTR); the S&P 400 Transportation Industry Group GICS Level 2 Total Return Index (S4TRANT); the S&P Supercomposite Transportation Industry Group GICS Level 2 Total Return Index (STRTRAN); the S&P Transportation Select Industry Total Return Index (SPSITNTR); and the S&P Transportation Select Industry FMC Capped Total Return Index (SPTSCUT).

Daily weights of Ryder System, Inc. common stock in the Dow Jones Transportation Average Total Return Index (DJTTR); the S&P 400 Transportation Industry Group GICS Level 2 Total Return Index (S4TRANT); the S&P Supercomposite Transportation Industry Group GICS Level 2 Total Return Index (STRTRAN); and the S&P Transportation Select Industry Total Return Index (SPSITNTR), January 2015 – June 2020.

Bloomberg short interest in Ryder System, Inc. common stock, July 2015 – February 2020.

Bloomberg bid and ask prices for Ryder System, Inc. common stock, July 2015 – February 2020.

Bloomberg total analyst recommendations for Ryder System, Inc., July 2015 – February 2020.

Number of analysts providing consensus I/B/E/S estimates for Ryder System, Inc., July 2015 – February 2020.

Quarterly institutional holdings in Ryder System, Inc. common stock, June 2015 – June 2020, from S&P Capital IQ.

Date and time stamps of press releases or SEC filings for earnings and guidance for Ryder System, Inc., January 2015 – February 2020, from Business Wire on Factiva and SEDAR.

**MISCELLANEOUS**

The NYSE Market Model, https://www.nyse.com/market-model.

102.01 Minimum Numerical Standards-Domestic Companies-Equity Listings, https://nyseguide.srorules.com/listed-company-manual/document?treeNodeId=csh-da-filter!WKUS-TAL-DOCS-PHC-%7B0588BF4A-D3B5-4B91-94EA-BE9F17057DF0%7D--WKUS_TAL_5667%23teid-4.

Miscellaneous Bloomberg information regarding Ryder System, Inc.

"NYSE GROUP ANNOUNCES 2020, 2021 AND 2022 HOLIDAY AND EARLY CLOSINGS CALENDAR," ICE release, December 9, 2019, available at https://ir.theice.com/press/news-details/2019/NYSE-Group-Announces-2020-2021-and-2022-Holiday-and-Early-Closings-Calendar/default.aspx.

Private Securities Litigation Reform Act of 1995.

SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933, General Instructions" (updated November 2018).

Securities Exchange Act of 1934.

U.S. Securities and Exchange Commission: Division of Investment Management: Frequently Asked Questions About Form 13F, February 24, 2020, http://www.sec.gov/divisions/investment/13ffaq.htm.

17 C.F.R § 240.10b-5 (2011).

15 U.S.C. §§ 78p(b), 78p(c), 78p(a) (2011).

15 U.S.C. § 78u-4(e)(1).

All other specific materials and information otherwise described or set forth in the body of this Reply Report, the Opening Report, or Exhibits or Appendices to the Opening Report.