# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<table>
<tr>
<td>

STATE OF ALASKA, ALASKA
PERMANENT FUND, THE CITY OF FORT
LAUDERDALE GENERAL EMPLOYEES'
RETIREMENT SYSTEM, and THE CITY
OF PLANTATION POLICE OFFICERS
PENSION FUND, On Behalf of Themselves
and All Others Similarly Situated,

     *Plaintiffs*,

          v.

RYDER SYSTEM, INC., ROBERT E.
SANCHEZ, ART A. GARCIA, and DENNIS
C. COOKE,

     *Defendants*.

</td>
<td>

Civil Action No. 1:20-cv-22109-JB

</td>
</tr>
</table>

## LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AND INCORPORATED MEMORANDUM OF LAW

**<u>TABLE OF CONTENTS</u>**

**Page**

TABLE OF AUTHORITIES. ................................................................................................. iii

I. PRELIMINARY STATEMENT ................................................................ 1

II. ARGUMENT ........................................................................................... 5

    A. The Proposed Settlement Warrants Final Approval ................................. 5

        1. Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class ...................................................................... 7

        2. The Settlement Was Reached After Arm's-Length Negotiations with the Assistance of an Experienced Mediator .......................... 8

        3. The Relief that the Settlement Provides for the Settlement Class is Adequate, Taking into Account the Costs and Risks of Further Litigation and All Other Relevant Factors ................................... 10

            a) The Risks of Establishing Liability and Damages Support Approval of the Settlement ................................. 12

                (1) Risks to Proving Liability .................................. 12

                (2) Risks to Proving Loss Causation and Damages ............... 13

            b) The Settlement is Reasonable in Light of the Likely Recoverable Damages ................................................... 15

            c) The Costs and Delays of Continued Litigation Support Approval of the Settlement ................................. 16

            d) All Other Factors Set Forth in Rule 23(c)(2)(C) Support Approval of the Settlement ................................. 17

        4. The Settlement Treats Settlement Class Members Equitably ................. 19

        5. Other Factors Considered by the Eleventh Circuit Support Approval of the Settlement ......................................................... 19

    B. The Plan of Allocation is Fair and Reasonable ................................... 20

    C. The Settlement Class Should be Certified ......................................... 22

    D. Notice to the Settlement Class Satisfied Rule 23 and Due Process .................... 23

III. CONCLUSION ...................................................................................... 24

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Am. Bank Note Holographies, Inc., Sec. Litig.*,
   127 F. Supp. 2d 418 (S.D.N.Y. 2001)....................................................................................14

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)............................................................................................................7

*Aranaz v. Catalyst Pharm. Partners Inc.*,
   2014 WL 11870214 (S.D. Fla. Dec. 3, 2014) ....................................................................23

*Behrens v. Wometco Enters., Inc.*,
   118 F.R.D. 534 (S.D. Fla. 1998) ........................................................................................15

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) ..........................................................................5, 6, 10, 19

*Berman v. Gen. Motors LLC*,
   2019 WL 6163798 (S.D. Fla. Nov. 18, 2019)...............................................................8, 20

*Camden I Condo. Ass'n, Inc. v. Dunkle*,
   946 F.2d 768 (11th Cir. 1991) ...........................................................................................18

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
   2008 WL 11336122 (N.D. Ga. Oct. 20, 2008) ............................................................11, 14

*In re Checking Acct. Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) ........................................................................5, 9, 10

*In re Chicken Antitrust Litig. Am. Poultry*,
   669 F.2d 228 (5th Cir. 1982) .............................................................................................20

*In re China Sunergy Sec. Litig.*,
   2011 WL 1899715 (S.D.N.Y. May 13, 2011) ....................................................................15

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
   2020 WL 256132 (N.D. Ga. Mar. 17, 2020)...............................................................6, 7, 8

*Faught v. Am. Home Shield Corp.*,
   668 F.3d 1233 (11th Cir. 2012) .....................................................................................6, 18

*Ferron v. Kraft Heinz Foods Co.*,
   2021 WL 2940240 (S.D. Fla. July 13, 2021)......................................................................9

*Glickenhaus & Co. v. Household Int'l Inc.*,
   787 F.3d 408 (7th Cir. 2015) .............................................................................................16

*Gutter v. E.I. Dupont De Nemours & Co.*,
  2003 U.S. Dist. LEXIS 27238 (S.D. Fla. May 30, 2003) .......................................................11

*In re HealthSouth Corp. Sec. Litig.*,
  572 F.3d 854 (11th Cir. 2009) ...........................................................................................5

*Hefler v. Wells Fargo & Co.*,
  2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) .........................................................................18

*Holman v. Student Loan Xpress, Inc.*,
  2009 WL 4015573 (M.D. Fla. Nov. 19, 2009) ........................................................................8

*Jairam v. Colourpop Cosmetics, LLC*,
  2020 WL 5848620 (S.D. Fla. Oct. 1, 2020)..............................................................................9

*Kirkpatrick v. J.C. Bradford Co.*,
  827 F.2d 718 (11th Cir. 1987) ...........................................................................................7

*Kuhr v. Mayo Clinic Jacksonville*,
  2020 WL 5912350 (M.D. Fla. Oct. 6, 2020) .........................................................................22

*Lipuma v. Am. Express Co.*,
  406 F. Supp. 2d 1298 (S.D. Fla. 2005) ................................................................................20

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
  233 F.R.D. 306 (E.D.N.Y. 2006) ........................................................................................10

*M.D. v. Centene Corp., Inc.*,
  2020 WL 7585033 (S.D. Fla. Oct. 7, 2020) (Becerra, J.) .......................................................18

*N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*,
  315 F.R.D. 226 (E.D. Mich. 2016), *aff'd*, 2017 WL 6398014 (6th Cir. Nov.
  27, 2017) .....................................................................................................................19

*Nelson v. Mead Johnson & Johnson Co.*,
  484 F. App'x 429 (11th Cir. 2012) .......................................................................................9

*In re NetBank, Inc. Sec. Litig.*,
  2011 WL 13353222 (N.D. Ga. Nov. 9, 2011) ...................................................................10, 20

*Peoples v. TurtleFTPierce*,
  No. 22-cv-14345 (S.D. Fla. 2023) ........................................................................................6

*In re Rayonier Inc. Sec. Litig.*,
  2017 WL 4542852 (M.D. Fla. Oct. 5, 2017) ..........................................................................18

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) ...........................................................................................16

*In re Signet Jewelers Ltd. Sec. Litig.*,
2020 WL 4196468 (S.D.N.Y. July 21, 2020) ........................................................................18

*Strube v. Am. Equity Inv. Life Ins. Co.*,
226 F.R.D. 688 (M.D. Fla. 2005)..........................................................................................10

*In re Terazosin Hydrochloride Antitrust Litig.*,
2005 WL 8181045 (S.D. Fla. Apr. 20, 2005) ......................................................................20

*Thorpe v. Walter Inv. Mgmt. Corp.*,
2016 WL 10518902 (S.D. Fla. Oct. 17, 2016)......................................................................15

*Tung v. Dycom Indus., Inc.*,
No. 18-cv-81448 (S.D. Fla. Oct. 13, 2020)..........................................................................15

*In re U.S. Oil & Gas Litig.*,
967 F.2d 489 (11th Cir. 1992) ................................................................................................5

*In re Veeco Instruments Inc. Sec. Litig.*,
2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) .........................................................................9

*Vinh Nguyen v. Radient Pharms. Corp.*,
2014 WL 1802293 (C.D. Cal. May 6, 2014) ........................................................................20

*In re Vivendi Universal SA Sec. Litig.*,
765 F. Supp. 2d 520 (S.D.N.Y. 2011)...................................................................................16

*Wal-Mart Stores, Inc. v. Visa U.S.A.*,
396 F.3d 96 (2d Cir. 2005)....................................................................................................22

*Waters v. Int'l Precious Metals Corp.*,
190 F.3d 1291 (11th Cir. 1999) ............................................................................................18

*Yang v. Focus Media Holding Ltd.*,
2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014)..................................................................8, 20

**STATUTES & RULES**

15 U.S.C. § 78u-4(a)(7) ....................................................................................................21, 23

Fed. R. Civ. P. 23(c)(2)(B) .....................................................................................................22

Fed. R. Civ. P. 23(e)(2)................................................................................................ *passim*

In accordance with Rule 23(e)(2) of the Federal Rules of Civil Procedure, Lead Plaintiffs State of Alaska, Alaska Permanent Fund; The City of Fort Lauderdale General Employees' Retirement System; and The City of Plantation Police Officers Pension Fund (collectively, "Lead Plaintiffs"), on behalf of themselves and the other members of the Settlement Class, respectfully submit this motion for: (1) final approval of the proposed settlement resolving the Action for a payment of $45 million in cash for the benefit of the Settlement Class (the "Settlement"), and (2) approval of the proposed plan of allocation of the proceeds of the Settlement.[1]

## MEMORANDUM OF LAW

## I.     PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiffs have agreed to settle the Action in exchange for a cash payment of $45,000,000. As detailed in the accompanying Rizio-Hamilton Declaration and summarized below, this is an excellent result. The proposed Settlement is the seventh largest settlement of a securities class action in the history of this District, and represents a meaningful portion of the damages that investors could realistically prove at trial. Lead Plaintiffs respectfully submit that the proposed Settlement satisfies the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure.

The Settlement was reached only after lengthy arm's-length settlement negotiations between experienced counsel, which were assisted by Jed D. Melnick, Esq. of JAMS, an experienced and highly respected class-action mediator. The mediation process included the

---

[1] Unless otherwise noted, capitalized terms shall have the meanings provided in the Stipulation and Agreement of Settlement dated May 19, 2023 (the "Stipulation"), or in the Declaration of John Rizio-Hamilton in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Rizio-Hamilton Declaration" or "Rizio-Hamilton Decl."), filed herewith. In this memorandum, citations to "¶ __" refer to paragraphs in the Rizio-Hamilton Declaration and citations to "Ex. __" refer to exhibits to the Rizio-Hamilton Declaration.

exchange of detailed written mediation statements concerning liability and damages; two full-day mediation sessions; and extended negotiations after the mediation session that were facilitated by Mr. Melnick.  ¶¶ 5, 54-60.  This process ultimately culminated in Mr. Melnick issuing a mediator's recommendation that the Action be settled for $45 million, which the Parties accepted on a double-blind basis.  ¶ 58.

Lead Plaintiffs and Lead Counsel were knowledgeable about the strengths and risks of the case when the Settlement was reached.  Before the Settlement was agreed to, Lead Counsel had (i) conducted an extensive investigation into the claims asserted, including through a detailed review of public documents, and interviews with dozens of potential witnesses; (ii) researched and drafted a detailed consolidated complaint; (iii) fully briefed and argued Defendants' motion to dismiss the Complaint; (iv) prepared Lead Plaintiffs' class certification motion, including deposing Defendants' expert and defending the deposition of Lead Plaintiffs and their expert in connection with that motion; (v) consulted extensively with experts, including accounting, trucking industry, and damages and loss causation experts; (vi) engaged in comprehensive discovery efforts, including preparing and serving initial disclosures, requests for production of documents, interrogatories, and third-party subpoenas, and obtaining and analyzing more than one million pages of documents produced by Defendants and third parties; and (vii) engaged in the mediation process summarized above.  ¶¶ 5, 18-53.

Lead Plaintiffs and Lead Counsel believe that the $45 million Settlement is particularly favorable given the substantial risks of continued litigation.  In agreeing to settle the Action, Lead Plaintiffs and Lead Counsel made an informed evaluation of those risks. As detailed in the Rizio-Hamilton Declaration, Lead Plaintiffs faced substantial risks that they might not succeed on an expected motion for summary judgment, at trial, and on appeal.  ¶¶ 66-80.

Specifically, as to liability, Lead Plaintiffs faced challenges in proving that Defendants made materially false or misleading statements or material omissions, and that Defendants made the misstatements or omissions with fraudulent intent or were reckless in making them. ¶¶ 66-75. Defendants argued that the core of the case concerned Ryder's prediction of the estimated value of its trucks five years into the future, which Ryder had to predict in the context of a dynamic, changing market. This type of forward-looking estimate, Defendants argued, was naturally susceptible to mistakes, and the fact that Ryder may have been mistaken did not mean its estimates were false when made. Defendants also argued that Ryder made contemporaneous disclosures that undermined the assertion that it fraudulently misstated its residual values, including disclosures describing its methodology for calculating residual values, downward adjustments to its residual values, acknowledgments that the market was challenging, and warnings that more charges may be necessary if the market did not improve. Defendants likely would have pointed to the fact that neither the SEC nor any other regulatory body investigated the falsity of Defendants' public statements, that Ryder did not restate its financial results, and that its auditor PwC—one of the "Big Four" accounting firms—signed off on its financial statements every single quarter.

Defendants further would have argued that Lead Plaintiffs could not establish loss causation because factors other than information related to the alleged fraud caused investors' losses. For example, the lion's share of damages was concentrated in the stock price declines following the last corrective disclosure date of February 13, 2020. Defendants argued that the disclosures on that date were unrelated to the fraud because they did not reveal any significant new information to investors with respect to Ryder's residual values. Defendants also would have continued to argue that the Class Period should start years later than its current start date. Specifically, Defendants would have continued to argue that the used vehicle market did not begin

to decline significantly until almost a year into the Class Period, and that the decline did not appear to be lasting (as opposed to cyclical) until long after it materialized. Further, Defendants would have argued that Lead Plaintiffs would not be able to disentangle the effect of information unrelated to the alleged misconduct that the market learned at the same time as the alleged corrective disclosures. If Defendants prevailed on their loss causation arguments at summary judgment or trial, this could have resulted in no recovery for the class.

The Settlement has the full support of the Court-appointed Lead Plaintiffs, sophisticated institutional investors that took an active role in supervising the litigation and participated in settlement negotiations. *See* Hofmeister Decl. (Ex. 1) ¶¶ 2-6; Schiess Decl. (Ex. 2) ¶¶ 2-6; Kendall Decl. (Ex. 3) ¶¶ 2-6. Further, although the deadline to request exclusion from the Settlement Class or object to the Settlement has not yet passed, to date, no Settlement Class Members have objected to the Settlement and only five requests for exclusion from the Settlement Class have been received. ¶ 95; Segura Decl. (Ex. 5) ¶¶ 13-14.

Given these considerations and the other factors discussed below, Lead Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court. Additionally, Lead Plaintiffs request the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Settlement Class Members. The Plan of Allocation, which Lead Counsel developed in consultation with Lead Plaintiffs' damages expert, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims based on damages they suffered on purchases of Ryder common stock that were attributable to the alleged fraud.

## II.     ARGUMENT

The Rizio-Hamilton Declaration is cited to throughout this brief, and is an integral part of this submission.  We respectfully refer the Court to it for a more detailed description of, among other things: the history of the Action (¶¶ 12-65); the nature of the claims asserted (¶¶ 21-22, 24); the negotiations leading to the Settlement (¶¶ 54-65); the risks and uncertainties of continued litigation (¶¶ 66-85); and the terms of the Plan of Allocation (¶¶ 96-105).

### A.     The Proposed Settlement Warrants Final Approval

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims.  *See* Fed. R. Civ. P. 23(e).  A class-action settlement should be approved if the court finds it "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

The Eleventh Circuit has recognized that public and judicial policy favor the settlement of disputed claims among private litigants, particularly in class actions.  *See In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 862 (11th Cir. 2009) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (same); *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1341 (S.D. Fla. 2011) (the Court's "Rule 23(e) analysis should be 'informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement'").

Rule 23(e)(2) provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Historically, the Eleventh Circuit has held that district courts should consider following factors set forth in *Bennett v. Behring Corp*. in evaluating a class-action settlement:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

737 F.2d 982, 986 (11th Cir. 1984); *accord Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2012).

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendments.

Accordingly, Lead Plaintiffs will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the factors set forth in Rule 23(e)(2), but will also discuss the application of relevant, non-duplicative *Bennett* factors. *See Peoples v. TurtleFTPierce*, No. 2022-cv-14345, at 5 (S.D. Fla. 2023), ECF No. 64 ("Given that the Bennett and Rule 23(e)(2) factors overlap significantly, [the Court] consider[s] them together."); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *10 (N.D. Ga. Mar. 17, 2020) (reviewing final approval of class action settlement under both the Rule 23(e)(2) factors and *Bennett* factors).

All of the applicable factors support approval of the Settlement here.

### 1. Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class

In evaluating a class action settlement, the Court should consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). Courts consider (1) whether class representatives have interests antagonistic to the interests of other class members; and (2) whether class counsel has the necessary qualifications and experience to lead the litigation. *See, e.g., Kirkpatrick v. J.C. Bradford Co.*, 827 F.2d 718, 726 (11th Cir. 1987); *Equifax*, 2020 WL 256132, at *5.

First, there is no antagonism or conflict between Lead Plaintiffs and the proposed Settlement Class. Lead Plaintiffs have claims that are typical of and coextensive with those of other Settlement Class Members, and have no interests antagonistic to the interests of other members of the Settlement Class. Lead Plaintiffs and the other Settlement Class Members all purchased Ryder common stock during the Class Period and were allegedly damaged by the same alleged false and misleading statements. If Lead Plaintiffs proved their claims at trial, they would also prove the Settlement Class's claims. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions).

Second, Lead Plaintiffs and Lead Counsel have adequately represented the Settlement Class in their vigorous prosecution of the Action and in the negotiation and achievement of the Settlement. Lead Counsel BLB&G is highly qualified and experienced in securities litigation, as set forth in its firm resume (see Ex. 6A-3) and was able to successfully conduct the litigation against skilled opposing counsel and obtain a favorable settlement. Klausner, Kaufman, Jensen & Levinson has also worked with BLB&G to successfully prosecute this litigation. In sum, Lead Plaintiffs have adequately represented the Settlement Class.

7

### 2. The Settlement Was Reached After Arm's-Length Negotiations with the Assistance of an Experienced Mediator

In weighing approval of a class action settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). Here, the Parties reached the Settlement only after extensive arm's-length negotiations conducted with the assistance of an experienced mediator. The mediation process included the exchange of detailed mediation statements and two full-day mediation sessions before Jed D. Melnick of JAMS, one of the country's preeminent mediators of securities class actions and other complex litigation. ¶¶ 54-57. After no agreement was reached at the mediation sessions, the Parties engaged in further discussions with the mediator. ¶ 58. These discussions culminated in Mr. Melnick issuing a proposal that the Parties settle the Action for $45 million, which both sides accepted on a double-blind basis. *Id.*

These facts strongly support the conclusion that the Settlement is fair. *See Berman v. Gen. Motors LLC*, 2019 WL 6163798, at *4 (S.D. Fla. Nov. 18, 2019) ("the Settlement was reached with the assistance of a neutral mediator with substantial experience mediating class actions, which further demonstrates the absence of collusion"); *Equifax*, 2020 WL 256132, at *6 ("readily conclud[ing]" that a settlement was negotiated at arm's-length where mediation was conducted by an experienced mediator); *Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) ("The participation of this highly qualified mediator [Mr. Melnick] strongly supports a finding that negotiations were conducted at arm's length and without collusion."); *Holman v. Student Loan Xpress, Inc.*, 2009 WL 4015573, at *5 (M.D. Fla. Nov. 19, 2009) (no fraud or collusion on reaching settlement because the settlement was the product of arm's-length negotiations before a mediator).

In addition, Lead Plaintiffs and Lead Counsel were sufficiently knowledgeable about the strengths and weaknesses of the case prior to reaching the agreement to settle. Lead Counsel's settlement was informed by its work on all aspects of this case for over three years, including conducting an investigation into the alleged facts; preparing the detailed Complaint; briefing and successfully opposing Defendants' motion to dismiss; preparing Lead Plaintiffs' class certification motion; deposing Defendants' expert and defending the deposition of Lead Plaintiffs' expert in connection with that motion; conducting significant discovery, which included the analysis of more than one million pages of documents produced by Defendants and third parties; engaging in extensive settlement discussions with Defendants noted above; and consulting extensively with experts in residual trucking values, accounting, damages, and loss causation. ¶¶ 5, 111.

Accordingly, the Court should give weight to Lead Plaintiffs' and Lead Counsel's informed judgment that the Settlement is in the best interests of the Settlement Class. Indeed, "[i]n evaluating a proposed class action settlement, the Court will not substitute its business judgment for that of the parties." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330,1341 (S.D. Fla. 2011); *Ferron v. Kraft Heinz Foods Co.*, 2021 WL 2940240, at *5 (S.D. Fla. July 13, 2021). Lead Counsel's substantial experience in cases of this nature gives further weight to its judgment that the Settlement is fair and reasonable. *See Jairam v. Colourpop Cosmetics, LLC*, 2020 WL 5848620, at *3 (S.D. Fla. Oct. 1, 2020) ("In evaluating a proposed class action settlement, 'the district court may rely upon the judgment of experienced counsel for the parties.'") (quoting *Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012)); *Checking Account Overdraft*, 830 F. Supp. 2d at 1351 ("The Court gives great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation"). Finally, the fact that Lead Plaintiffs are sophisticated institutional investors, of the

type favored by Congress when it passed the PSLRA, strengthens the force of their recommendation that the Settlement be approved. *See In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("a settlement reached . . . under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness….'").

### 3. The Relief that the Settlement Provides for the Settlement Class is Adequate, Taking into Account the Costs and Risks of Further Litigation and All Other Relevant Factors

In determining whether a settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C).[2] Here, the Settlement represents a very favorable result for the Settlement Class.

A key factor in assessing the approval of a class action settlement is plaintiff's likelihood of success on the merits, balanced against the relief offered in settlement. In making this assessment, "the Court can limit its inquiry to determining whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of settlement." *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 697-98 (M.D. Fla. 2005); *see also Checking Account Overdraft*, 830 F. Supp. 2d at 1345 (the court need not determine whether the settlement "is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial"). Moreover, courts have recognized that the complexity of securities class actions renders this type of litigation "notably difficult and

---

[2] This factor under Rule 23(e)(2)(C) encompasses four of the six factors of the traditional *Bennett* analysis: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; [and] (4) the complexity, expense and duration of litigation." 737 F.2d at 986.

notoriously uncertain." *In re NetBank, Inc. Sec. Litig.*, 2011 WL 13353222, at *3 (N.D. Ga. Nov. 9, 2011). Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

The proposed Settlement provides for a cash payment of $45 million. As discussed in detail at the hearing in front of the Honorable Aileen M. Cannon on July 24, 2023, the Settlement is a very favorable result for Settlement Class Members, especially considering the significant risks of continued litigation. *See Gutter v. E.I. Dupont De Nemours & Co.*, 2003 U.S. Dist. LEXIS 27238, at *5 (S.D. Fla. May 30, 2003) ("[T]he risks associated with proceeding to trial in . . . complex securities litigation, particularly the risks associated with establishing materiality, causation and damages favor approval of the [s]ettlement."); *see also Carpenters Health & Welfare Fund v. Coca-Cola Co.,* 2008 WL 11336122, at *9 (N.D. Ga. Oct. 20, 2008) ("Courts have repeatedly noted that [s]tockholder litigation is notably difficult and notoriously uncertain.") (quotation marks and citations omitted).

As discussed in detail in the Rizio-Hamilton Declaration and below, continued litigation of the Action presented a number of significant risks to Lead Plaintiffs and the Settlement Class. ¶¶ 66-75. Moreover, continuing the litigation through trial and appeals would impose substantial additional costs on the Settlement Class and would result in extended delays before any recovery could be achieved. ¶¶ 76-84. The Settlement, which provides an immediate $45 million cash payment for the benefit of the Settlement Class, avoids these risks and further costs and delays. The Settlement is also reasonable when considered in relation to the range of potential recoveries that might be obtained if Lead Plaintiffs prevailed at trial (which was uncertain).

a)      **The Risks of Establishing Liability and Damages Support Approval of the Settlement**

While Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize that this Action presented several substantial risks to establishing both liability and damages that might have prevented the Settlement Class from recovering in this Action.  Lead Plaintiffs faced challenges in proving: (1) that Defendants made materially false or misleading statements or material omissions; (2) that Defendants made the misstatements or omissions with fraudulent intent or severe recklessness; and (3) loss causation and damages.

(1)      **Risks to Proving Liability**

**Falsity.**  Lead Plaintiffs faced significant risks that, at either summary-judgment or at trial, they may not be able to establish that Defendants' statements about the residual value and depreciation expense of Ryder's trucking fleet were false when made.  ¶¶ 68-69.  For example, Defendants would have continued to argue that their statements concerning Ryder's residual value estimates and related financial disclosures were factual and transparent.  ¶ 70.  On this point, Defendants contended that Ryder accurately disclosed its methodology for calculating residual value.  *Id.*  In addition, Defendants asserted that they made contemporaneous disclosures of negative adjustments in residual values and depreciation expense during the Class Period that accurately reflected the decline in value of Ryder's used vehicles.  *Id.*  Moreover, Defendants likely would have argued that neither the SEC nor any other regulatory body investigated the falsity of Defendants' public statements. ¶ 71.  Defendants also would have argued that Ryder did not restate its financial results, and that its auditor—PwC, one of the "Big Four" accounting firms—signed off on its financial statements every single quarter.  *Id.*   In light of all of these arguments, Lead Plaintiffs faced considerable risk that the Court or a jury would conclude that Ryder's statements

12

concerning the residual value and depreciation expense of Ryder's trucking fleet were not false or were not actionable.

**Scienter.**  Even if Lead Plaintiffs succeeded in proving that Defendants' statements were false, Lead Plaintiffs would have faced additional challenges in proving that Defendants made the alleged false statements with scienter, *i.e.*, that they acted with intent or severe recklessness.  ¶¶ 73-75.  Defendants would have continued to argue that, at bottom, the claims concerned their failure to predict how much Ryder would be able to sell its used vehicles for at the end of their useful lives, which was at least five years in the future.  ¶ 74.  They would have argued that any failure on their part to predict residual values years forward, and in the face of a changing and dynamic market, was accidental and not fraudulent.  *Id.*  They also would have contended that any inference of scienter was undermined by the fact that they accurately disclosed Ryder's accounting methodology; repeatedly adjusted residual values and depreciation expense negatively during the Class Period; PwC uniformly signed off on Ryder's financial statements; and no regulator has even investigated them.  *Id.*

### (2)   Risks to Proving Loss Causation and Damages

Defendants would argue that Lead Plaintiffs could not establish loss causation.  Had Defendants' arguments been accepted, they would have severely reduced damages.

*First*, Defendants would have continued to argue that the Class Period should start years later than its current start date, which would have materially reduced damages.  Specifically, Defendants would have continued to argue that the used vehicle market did not begin to decline significantly until almost a year into the Class Period, and that the decline did not appear to be lasting (as opposed to cyclical) until long after it materialized.  ¶¶ 76-80.  Indeed, at oral argument

on Defendants' motion to dismiss, Judge Cannon had questioned whether the Class Period starting date was too early.  ¶ 77.

*Second*, Defendants would have also continued to argue that the Class Period should end earlier, *i.e.*, on October 29, 2019, the date that Ryder disclosed that it was decreasing residual value estimates by more than $840 million.  ¶¶ 14, 70, 78.  Defendants argued that the final alleged corrective disclosure on February 13, 2020, should be excluded from the Class Period because, on that date, the only new information released to the market was a modest $8 million adjustment to residual values.  ¶ 78.  Had this corrective disclosure been excluded (even in part), the negative impact on potential damages would have been highly material.

*Third*, Defendants would have also contended that Lead Plaintiffs bear the burden of proof in "disaggregating" the impact of confounding, non-fraud related information from any actionable disclosures and that Lead Plaintiffs would not be able to so.  For example, with respect to the first corrective disclosure on July 30, 2019, Ryder also disclosed higher overhead and increased debt on the same day, and with respect to the February 13, 2020 corrective disclosure, Ryder also disclosed costs related to strategic investments.  ¶ 79.  Defendants would likely argue that these non-fraud related factors caused some or all of the stock price declines at issue.

These disputed issues would have boiled down to a "battle of experts" at trial.  Defendants would have undoubtedly presented a well-qualified expert who would opine that the class's damages were small or nonexistent.  As Courts have long recognized, the uncertainty as to which party's expert's view might be credited by the jury presents another substantial litigation risk in securities cases.  *See Carpenters Health*, 2008 WL 11336122, at *8  ("The reaction of a jury to such expert testimony is highly unpredictable and [as a result of this unpredictability] 'a jury could be swayed by experts for Defendants, and find that there were no damages or only a fraction of

the amount of damages Lead Plaintiffs contended.") (quoting *In re Am. Bank Note Holographies, Inc., Sec. Litig.*, 127 F. Supp. 2d 418, 426-427 (S.D.N.Y. 2001)).  Thus, proving loss causation and damages at summary judgment or at trial would have significant risks.

      **b)**      **The Settlement is Reasonable in Light of the Likely Recoverable Damages**

Finally, the Settlement is reasonable when considered in relation to the range of potential recoveries that might be obtained if Lead Plaintiffs prevailed, which was far from certain for the reasons noted above.  While Lead Plaintiffs would have sought to prove damages of approximately $900 million, this figure was a "shoot the moon" scenario.  That figure assumes that Lead Plaintiffs (i) would have prevailed completely on every single contested liability, loss causation, and damages issue noted above, <u>and</u> (ii) would have prevailed on all those issues for the full Class Period of almost five years.  Had Defendants prevailed on their loss causation and damages arguments noted above, the maximum potential damages at trial would be approximately $110-$170 million—and that is <u>even if</u> Lead Plaintiffs established liability.  ¶ 87.

The Settlement Amount achieved therefore represents approximately 5% of the theoretical maximum potential damages, or 26% to 40% of more realistic recoverable damages.  This represents a strong recovery for the Settlement Class, particularly in light of the other significant risks in the litigation, and the substantial additional costs and delays that would result from continued litigation.  Courts have routinely approved settlements with comparable or lower percentage recoveries than here. *See, e.g.*, *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534 (S.D. Fla. 1998) (finding recovery at trial of 3-5% would have been "fairly realistic"); *Tung v. Dycom Indus., Inc.*, No. 18-cv-81448, ECF No. 95 (S.D. Fla. Oct. 13, 2020) (approving settlement of 5.7% of the maximum possible recovery); *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at *10 (S.D. Fla. Oct. 17, 2016) (approving securities class action settlement representing "5.5% of

maximum damages and 10% of the most likely damages" as an "excellent" recovery); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting that the average settlement in securities class actions ranges from 3% to 7% of the class's total estimated losses).

### c) The Costs and Delays of Continued Litigation Support Approval of the Settlement

The substantial costs and delays required before any recovery could be obtained through litigation also strongly support approval of the Settlement. This case settled after substantial discovery but while Lead Plaintiffs' motion for class certification was still pending. ¶¶ 53-64. Accordingly, achieving a litigated verdict in the Action would have required substantial additional litigation. In the absence of the Settlement, achieving a recovery for the Settlement Class would have required: (i) additional fact discovery; (ii) conducting complex and expensive expert discovery; (iii) briefing a motion for summary judgment; (iv) a trial involving substantial fact and expert testimony; (v) post-trial motions; and (vi) additional post-trial proceedings where Defendants could have challenged the damages of every class member, and whittled down the impact of any verdict. ¶¶ 66-85.

Finally, whatever the outcome at trial, it is virtually certain that appeals would be taken from any verdict. ¶ 81-82. At each step of the way, the risks in the case could have materialized. For instance, even after the plaintiff prevailed at a securities class action trial, defendants have successfully challenged the damages of class members in years of ensuing individual proceedings. *See, e.g., In re Vivendi Universal SA Sec. Litig.*, 765 F. Supp. 2d 520, 583-84 (S.D.N.Y. 2011). Further, Courts of Appeals have vacated plaintiffs' trial verdicts in securities class actions after many years of litigation. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1145-49 (11th Cir. 1997) (reversing jury verdict on appeal after seven years of litigation); *Glickenhaus & Co. v. Household Int'l Inc.,* 787 F.3d 408 (7th Cir. 2015). Even assuming success at all these stages,

such a protracted process would pose substantial expense to the class and delay any recovery for years.

*      *      *

In sum, Lead Plaintiffs respectfully submit that, considering the risks of continued litigation and the time and expense which would be incurred to prosecute the action through trial and appeal, the $45 million Settlement represents a favorable and immediate recovery that is in the best interests of the Settlement Class.

### d) All Other Factors Set Forth in Rule 23(c)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors supports approval here.

First, the procedures for processing Settlement Class Members' claims and distributing the proceeds of the Settlement are equitable and effective. The proceeds of the Settlement will be distributed to eligible Settlement Class Members who submit required Claim Forms and supporting documentation to the Court-appointed Claims Administrator, JND Legal Administration ("JND"), an independent company with extensive experience handling the administration of securities class actions. JND will (a) review and process the submitted Claims, (b) provide Claimants with an opportunity to cure any deficiencies and bring any unresolved Claims disputes to the Court, and (c) ultimately send claimants their *pro rata* share of the Net Settlement Fund. *See* Stipulation ¶¶ 26, 30, 32. This type of claims processing is standard in securities class actions and has long been found to be effective. Such claim filing and processing

17

is necessary because neither Lead Plaintiffs nor Ryder possess the trading data for individual Settlement Class Members that would otherwise allow for a "claims-free" process to distribute the Settlement Fund.

Second, the relief provided for the Settlement Class in the Settlement is also adequate when the terms of the proposed award of attorneys' fees are taken into account.  As discussed in the accompanying Fee Memorandum, the requested attorneys' fees of 25% of the Settlement Fund, net of Litigation Expenses awarded, to be paid upon approval by the Court, are reasonable in light of the efforts of Lead Counsel and the risks in the litigation.  The percentage fee request is consistent with the Eleventh Circuit benchmark and represents only a modest multiplier of Plaintiffs' Counsel's lodestar.  *See M.D. v. Centene Corp., Inc.*, 2020 WL 7585033, at *8 (S.D. Fla. Oct. 7, 2020) (Becerra, J.) ("Generally, the benchmark for a reasonable class counsel fee is considered between twenty to thirty percent, i.e., twenty five percent.") (citing *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 775 (11th Cir. 1991)); *Faught*, 668 F.3d at 1243 ("25% is generally recognized as a reasonable fee award in common fund cases."); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293-98 (11th Cir. 1999) (affirming award of 33.3% of $40 million settlement); *In re Rayonier Inc. Sec. Litig.*, 2017 WL 4542852, at *2-4 (M.D. Fla. Oct. 5, 2017) (awarding 30% of $73 million settlement achieved after two and a half years of litigation and before a ruling on class certification motion).  Most importantly, approval of attorneys' fees is entirely separate from approval of the Settlement, and no party has the right to terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees.  *See* Stipulation ¶¶ 20, 41.

Last, Rule 23 asks the court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3).  *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).

Here, the only such agreement (other than the Stipulation itself) is the Parties' confidential Supplemental Agreement, which sets forth the conditions under which Defendants may terminate the Settlement if the requests for exclusion from the Settlement Class reach a certain threshold. *See* Stipulation ¶ 42.  This type of agreement is "a standard provision in securities class actions and has no negative impact on the fairness of the Settlement."  *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020); *see also Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, *7 (N.D. Cal. Sept. 4, 2018) ("There are compelling reasons to keep this information confidential in order to prevent third parties from utilizing it for the improper purpose of obstructing the settlement and obtaining higher payouts."); *N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 240 (E.D. Mich. 2016) (same), *aff'd*, 2017 WL 6398014 (6th Cir. Nov. 27, 2017).

### 4.    The Settlement Treats Settlement Class Members Equitably

Rule 23(e)(2)(D) requires that the Court assess whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D).  The proposed Settlement treats members of the Settlement Class equitably relative to one another.  As discussed below in Part II.B, pursuant to the Plan of Allocation, eligible claimants will receive their *pro rata* share of the recovery based on their purchases or acquisitions of Ryder common stock during the Class Period. Lead Plaintiffs will receive the same level of *pro rata* recovery under the Plan of Allocation as all other Settlement Class Members.

### 5.    Other Factors Considered by the Eleventh Circuit Support Approval of the Settlement

Other factors considered by the Eleventh Circuit, including the reaction of the Settlement Class to the Settlement and the stage of proceedings at which the Settlement was achieved, *see Bennett*, 737 F.2d at 986, also support approval of the Settlement.

The reaction of the Settlement Class has been positive to date.  Under the Preliminary Approval Order, the deadline for Settlement Class Members to exclude themselves from the Settlement Class or object to the Settlement is September 11, 2024.  To date, five requests for exclusion and no objections to the proposed Settlement have been received.  ¶ 95; Segura Decl. (Ex. 5) ¶ 13.  Lead Plaintiffs will file a reply brief by October 16, 2024, addressing all requests for exclusion and any objections that may be received.

The stage of proceedings at which the Settlement was achieved also supports its approval. This factor is evaluated to determine whether plaintiff and its counsel "had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Berman*, 2019 WL 6163798, at *8; *accord Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005).  Here, Lead Plaintiffs had conducted an investigation into the claims and substantial discovery, and engaged in an extensive mediation process, through which they obtained sufficient information about the strengths and weaknesses of the claims and other risks in the litigation to adequately evaluate the merits of the case.

In sum, all of factors to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

### B.     The Plan of Allocation is Fair and Reasonable

Like a settlement, a plan of allocation for distribution of the settlement must be "fair, reasonable and adequate."  *NetBank, Inc.*, 2011 WL 13353222, at *2; *see also In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982).  A plan of allocation need not be precise, but "is [] sufficient where ... there is 'a rough correlation' between the settlement distribution and the relative amounts of damages recoverable by Class Members."  *In re Terazosin Hydrochloride Antitrust Litig.*, 2005 WL 8181045, at *4 (S.D. Fla. Apr. 20, 2005) (alterations in

original); *see Vinh Nguyen v. Radient Pharms. Corp*., 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) ("[a]n allocation formula need only have a reasonable, rational basis").  Courts give great weight to the opinion of experienced counsel in evaluating plans of allocation.  *See Yang*, 2014 WL 4401280, at *9.

Here, the proposed Plan of Allocation (or "Plan") was developed by Lead Counsel in consultation with Lead Plaintiffs' damages expert and was set forth in full in the Notice mailed to potential Settlement Class Members.  *See* Segura Decl. (Ex. 5) Ex. A, Appendix A (at 19-25). Lead Counsel respectfully submits that the Plan provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms, based on the damages they suffered related to the alleged fraud.  ¶ 97.

The Plan calculates a Recognized Loss Amount for each purchase or acquisition of Ryder common stock during the Class Period. ¶ 101.  Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the price of Ryder common stock during the Class Period that allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions.  The expert did this by considering the price change in Ryder common stock in reaction to the alleged corrective disclosures on July 30, 2019, October 29, 2019, and February 13, 2020, adjusting for price changes attributable to market or industry factors those days. ¶¶ 99-100.

In general, Recognized Loss Amounts under the Plan are calculated as the lesser of: (a) the difference between the amount of alleged artificial inflation at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price for the shares.  ¶ 101. Claimants who purchased and sold all their Ryder shares before the first corrective disclosure occurred on July 30, 2019 will have no Recognized Loss Amount under the Plan of

Allocation with respect to those transactions, because any loss suffered on those sales would not be the result of the alleged misstatements in the Action.  *Id.*[3]

The sum of a claimant's Recognized Loss Amounts for all purchases and acquisitions of Ryder common stock during the Class Period is the Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  ¶¶ 102-03.  To date, there have been no objections to the proposed Plan of Allocation.  ¶ 105.

### C.     The Settlement Class Should be Certified

In connection with the Settlement, the Parties have stipulated to the certification of the Settlement Class for the purposes of the Settlement.  *See* Stipulation ¶¶ 1(tt), 2.  As detailed in Lead Plaintiffs' brief in support of preliminary approval of the Settlement, the Settlement Class satisfies all the requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.  *See* ECF No. 117 at 17-21; *see also* Preliminary Approval Order (ECF No. 124) at ¶¶ 3-4 (finding that the Court will likely be able to certify the Settlement Class).  None of the facts regarding certification of the Settlement Class have changed since Lead Plaintiffs submitted their motion for preliminary approval, and there has been no objection to certification.  Accordingly, Lead Plaintiffs respectfully request that the Court certify the Settlement Class under Rules 23(a) and (b)(3).

---

[3] In addition, consistent with PSLRA, Recognized Loss Amounts for shares of Ryder common stock sold during the 90-day period after the end of the Class Period, or held to the end of that 90-day period, are further limited to the difference between the purchase price and the average closing price of the stock during that period.  ¶ 101.

**D.**      **Notice to the Settlement Class Satisfied Rule 23 and Due Process**

The Notice to the Settlement Class satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Notice also satisfies Rule 23(e)(1), which requires a court to "direct notice in a reasonable manner to all class members who would be bound" by the proposed settlement. *Kuhr v. Mayo Clinic Jacksonville*, 2020 WL 5912350, at *9 (M.D. Fla. Oct. 6, 2020); *see generally Wal-Mart Stores, Inc. v. Visa U.S.A.*, 396 F.3d 96, 114 (2d Cir. 2005) (the settlement notice should "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings").

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards. In addition, the Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7). In accordance with the Court's Preliminary Approval Order, JND began mailing copies of the Notice and Claim Form to potential Settlement Class Members on March 11, 2024. *See* Segura Decl. (Ex. 5) ¶¶ 3-6. As of August 8, 2024, JND had disseminated 146,570 copies of the Notice Packet to potential Settlement Class Members and nominees. *See id*. ¶ 9. Lead Counsel also caused the Summary Notice to be published in the *Investor's Business Daily* and over the *PR Newswire* on March 18, 2024. *See id*. ¶ 10. This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by publication in relevant, widely circulated newspapers and over a newswire, was the best notice practicable under the circumstances. *See Aranaz v. Catalyst Pharm. Partners Inc.*, 2014 WL 11870214, at *2-3 (S.D. Fla. Dec. 3, 2014) (notice distributed by first class mail to all class

23

members "who can be identified with reasonable effort . . . constitute[s] the best notice practicable under the circumstances; and constitute[s] due and sufficient notice to all persons and entities entitled thereto").

## III.   CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.  A final proposed Judgment and proposed Order approving the proposed Plan of Allocation will be submitted with Lead Plaintiffs' reply papers after the deadlines for objecting to the Settlement and requesting exclusion from the Settlement Class have passed.

Dated: August 12, 2024                         Respectfully submitted,

                                               */s/ Robert D. Klausner*
                                               Robert D. Klausner
                                               **KLAUSNER KAUFMAN JENSEN**
                                                 **& LEVINSON**
                                               Florida Bar No. 244082
                                               Stuart A. Kaufman
                                               Florida Bar No. 979211
                                               7080 NW 4th Street
                                               Plantation, FL 33317
                                               Tel: (954) 916-1202
                                               Fax: (954) 916-1232
                                               Email: bob@robertdklausner.com
                                               Email: stu@robertdklausner.com

                                               *Liaison Counsel for Lead Plaintiffs the State of*
                                               *Alaska, Alaska Permanent Fund; the City of Fort*
                                               *Lauderdale General Employees' Retirement*
                                               *System; and the City of Plantation Police Officers*
                                               *Pension Fund*

                                               **BERNSTEIN LITOWITZ BERGER**
                                                 **& GROSSMANN LLP**
                                               John Rizio-Hamilton (admitted *pro hac vice*)
                                               Adam Wierzbowski (admitted *pro hac vice*)
                                               John Esmay (admitted *pro hac vice*)
                                               Mathews R. de Carvalho (admitted *pro hac vice*)
                                               Emily A. Tu (admitted *pro hac vice*)

                                                         24

1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
Email: johnr@blbglaw.com
Email: adam@blbglaw.com
Email: john.esmay@blbglaw.com
Email: mathews.decarvalho@blbglaw.com
Email: emily.tu@blbglaw.com

*Lead Counsel for Lead Plaintiffs and the
Settlement Class*