**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| STATE OF ALASKA, ALASKA PERMANENT FUND, THE CITY OF FORT LAUDERDALE GENERAL EMPLOYEES' RETIREMENT SYSTEM, and THE CITY OF PLANTATION POLICE OFFICERS PENSION FUND, On Behalf of Themselves and All Others Similarly Situated, | Civil Action No. 1:20-cv-22109-JB |
| *Plaintiffs*, | |
| v. | |
| RYDER SYSTEM, INC., ROBERT E. SANCHEZ, ART A. GARCIA, and DENNIS C. COOKE, | |
| *Defendants*. | |

**DECLARATION OF JOHN RIZIO-HAMILTON IN SUPPORT OF**
**(I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL**
**OF SETTLEMENT AND PLAN OF ALLOCATION AND (II) LEAD**
**COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................................... 2

II.     HISTORY OF THE ACTION ....................................................................................... 5

        A.      Background .......................................................................................................... 5

        B.      Commencement of the Action and the Appointment of Lead Plaintiffs and
                Lead Counsel ...................................................................................................... 6

        C.      The Investigation and Filing of the Complaint ................................................... 6

        D.      Defendants' Motion to Dismiss .......................................................................... 8

        E.      The Parties Conduct Significant Fact Discovery ................................................ 9

        F.      Class Certification Motion ................................................................................. 15

        G.      The Parties Settle the Action............................................................................. 17

        H.      The Court Grants Preliminary Approval to the Settlement ............................... 18

III.    RISKS OF CONTINUED LITIGATION .................................................................... 19

        A.      Risks Concerning Liability ................................................................................ 19

                1.      Falsity...................................................................................................... 20

                2.      Scienter ................................................................................................... 21

        B.      Risks Related to Loss Causation and Damages ................................................. 22

        C.      Risks After Trial ............................................................................................... 23

        D.      The Settlement Amount Compared to Damages that Likely Could Have
                Been Proved at Trial ......................................................................................... 25

IV.     LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY
        APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE......................................... 27

V.      ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT.................................. 29

VI.     THE FEE AND EXPENSE APPLICATION ................................................................ 32

        A.      The Fee Application........................................................................................... 32

1.  Lead Plaintiffs Have Authorized and Support the Fee Application ......... 33

2.  The Time and Labor Devoted to the Action by Plaintiffs' Counsel ......... 33

3.  The Experience and Standing of Lead Counsel ....................................... 35

4.  Standing and Caliber of Defendants' Counsel ........................................ 36

5.  The Risks of Litigation and the Need to Ensure the Availability of
    Competent Counsel in High-Risk Contingent Cases ............................... 36

6.  The Reaction of the Settlement Class to the Fee Application ................. 38

B.  The Litigation Expense Application ....................................................................... 39

VII.  CONCLUSION ..................................................................................................................... 40

**TABLE OF EXHIBITS**

Exhibit 1        Declaration of Benjamin Hofmeister on Behalf of the State of Alaska, Alaska Permanent Fund, in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 2        Declaration of Nick Schiess, Pension Administrator of the City of Fort Lauderdale General Employees' Retirement System, in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 3        Declaration of Brian Kendall, Member and Former Chairman of the City of Plantation Police Officers Pension Fund, in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 4        Cornerstone Research, Securities Class Action Settlements: 2023 Review and Analysis (2024)

Exhibit 5        Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date

Exhibit 6        Summary of Plaintiffs' Counsel's Lodestar and Expenses

Exhibit 6A        Declaration of John Rizio-Hamilton on Behalf of Bernstein Litowitz Berger & Grossmann LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 6B        Declaration of Robert D. Klausner on Behalf of Klausner, Kaufman, Jensen & Levinson in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 7        Compendium of Unpublished Authority

iv

I, JOHN RIZIO-HAMILTON, declare as follows:

1.       I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel"), the Court-appointed Lead Counsel in the above-captioned action (the "Action").[1]  BLB&G represents the Court-appointed Lead Plaintiffs State of Alaska, Alaska Permanent Fund ("Alaska"); The City of Fort Lauderdale General Employees' Retirement System ("Fort Lauderdale"); and The City of Plantation Police Officers Pension Fund ("Plantation Police," and collectively, "Lead Plaintiffs").  I have personal knowledge of the matters set forth herein based on my active participation in all aspects of the prosecution and settlement of the Action.

2.       I respectfully submit this declaration in support of Lead Plaintiffs' motion, pursuant to Federal Rule of Civil Procedure 23(e), for final approval of the proposed settlement of the Action with Defendants Ryder System, Inc. ("Ryder" or the "Company"), Robert E. Sanchez, Art A. Garcia, and Dennis C. Cooke ("Defendants") that will resolve the claims asserted in the Action for $45 million in cash (the "Settlement").  The Court preliminarily approved the Settlement by its Order dated February 20, 2024 (the "Preliminary Approval Order").  ECF No. 124.  I also respectfully submit this declaration in support of: (i) Lead Plaintiffs' motion for approval of the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation" or "Plan") and (ii) Lead Counsel's motion for an award of attorneys' fees and Litigation Expenses (the "Fee and Expense Application").

3.       In support of these motions, Lead Plaintiffs and Lead Counsel are also submitting the exhibits attached hereto, Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of

---

[1]  All capitalized terms used herein that are not otherwise defined shall have the meanings provided in the Stipulation and Agreement of Settlement dated May 19, 2023 (the "Stipulation") (ECF No. 117-1).

Allocation, and Incorporated Memorandum of Law (the "Settlement Memorandum"), and Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, and Incorporated Memorandum of Law (the "Fee Memorandum").

## I.      INTRODUCTION

4.      The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $45,000,000 for the benefit of the Settlement Class.  As detailed herein, Lead Plaintiffs and Lead Counsel believe that the proposed Settlement is a strong result and is in the best interests of the Settlement Class.  As explained further below, the Settlement provides a considerable benefit to the Settlement Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation and delay.

5.      The proposed Settlement is the result of substantial efforts by Lead Plaintiffs and Plaintiffs' Counsel, which included, among other things detailed herein: (i) conducting an extensive investigation into the alleged fraud, including a thorough review of SEC filings, analyst reports, conference call transcripts, press releases, company presentations, media reports, and other public information, consultation with experts, and interviews with numerous former employees of Ryder; (ii) drafting a detailed 131-page amended complaint based on this investigation; (iii) defeating Defendants' motion to dismiss through substantial briefing and oral argument; (iv) conducting substantial fact discovery, including obtaining and reviewing over one million pages of documents from Defendants and third parties; (v) fully briefing Lead Plaintiffs' motion for class certification and taking or defending six depositions in connection with that motion; (vi) consulting extensively with experts, including in the fields of accounting, the trucking

industry, damages, and loss causation; and (vii) engaging in extensive arm's-length settlement negotiations to achieve the Settlement, including two in-person mediation sessions with Jed D. Melnick, Esq. of JAMS.

6. Due to the efforts summarized in the foregoing paragraph, and more fully set forth below, Lead Plaintiffs and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they reached the proposed Settlement. Lead Plaintiffs and Lead Counsel believe that the Settlement represents a very favorable outcome for the Settlement Class and that its approval is in the best interests of the Settlement Class.

7. As noted above, the Settlement was reached only after extended arm's-length settlement negotiations, which included two mediation sessions with Mr. Melnick, a highly experienced mediator of class actions and other complex litigation, and weeks of additional discussion and negotiation facilitated by Mr. Melnick. The Settlement was ultimately reached pursuant to a mediator's recommendation from Mr. Melnick that the Action be resolved in exchange for payment of $45 million, which both sides accepted on a double-blind basis.

8. The close attention paid and oversight provided by the Lead Plaintiffs throughout this case is another factor in favor of the reasonableness of the Settlement. In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to sophisticated investors and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case. *See* H.R. Conf. Rep. No. 104-369, at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733. Here, Lead Plaintiffs are all sophisticated institutional investors, were actively involved in overseeing the litigation and settlement negotiations, and have endorsed the Settlement as fair and reasonable. *See* Declarations of

Benjamin Hofmeister ("Hofmeister Decl."); Nick Schiess ("Schiess Decl."); and Brian Kendall ("Kendall Decl."), attached hereto as Exhibits 1, 2, and 3 respectively, at ¶¶ 2-6.

9.      In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, the Plan of Allocation was developed with the assistance of Lead Plaintiffs' damages expert, and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis based on losses attributable to the alleged fraud.

10.      For its efforts in achieving the Settlement, Lead Counsel requests a fee award of 25% of the Settlement Fund net of Litigation Expenses awarded, or $11,126,521.40 plus interest earned at the same rate as the Settlement Fund, for all Plaintiffs' Counsel.[2]  The 25% fee request has been authorized by the Lead Plaintiffs.  As discussed in the Fee Memorandum, this request comports with the Eleventh Circuit's 25% "benchmark" for percentage-fee awards and is lower than numerous percentage awards granted by courts in this Circuit and elsewhere in similarly sized class action settlements.  Moreover, the requested fee represents a multiplier of 1.36 of Plaintiffs' Counsel's lodestar, which is well within the range of multipliers typically awarded in class actions with significant contingency risks such as this one, and, thus, the lodestar cross-check also supports the reasonableness of the fee.  Lead Counsel respectfully submits that the fee request is fair and reasonable in light of the result achieved in the Action, the efforts of Plaintiffs' Counsel, and the risks and complexity of the litigation.  Lead Counsel also seeks payment of the reasonable

---

[2] "Plaintiffs' Counsel" consist of Lead Counsel Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") and Liaison Counsel Klausner, Kaufman, Jensen & Levinson ("Klausner Kaufman").

Litigation Expenses it incurred in prosecution and resolving the Action in the amount of $493,914.39.

11.     For all of the reasons set forth herein and in the accompanying memoranda, including the quality of the result obtained and the numerous significant litigation risks discussed below, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate, and should be approved.  In addition, Lead Counsel respectfully submits that the motion for attorneys' fees and Litigation Expenses is also fair and reasonable, and should be granted.

## II.     HISTORY OF THE ACTION

### A.     Background

12.     Defendant Ryder is a global provider of transportation and supply chain management solutions.  During the Class Period—July 23, 2015 through February 13, 2020—Ryder was a publicly traded company whose common stock traded on the New York Stock Exchange ("NYSE"), under ticker symbol "R."

13.     Throughout the Class Period, Ryder and its CEO Robert Sanchez ("Sanchez"), CFO Art Garcia ("Garcia"), and the President of its Global Fleet Management Solutions segment Dennis Cooke ("Cooke") represented to investors, among other things, that Ryder's financial results "benefited from lower depreciation associated with increased residual values" and that the Company had been "conservative" in establishing the residual values of its vehicles.

14.     On July 30, 2019, the Company sharply reduced its full-year 2019 earnings forecast and management indicated that the majority of the lowered guidance reflected Ryder's weaker valuations of its tractors.  In response to these disclosures, Ryder's stock price declined sharply. On October 29, 2019, the Company disclosed that it was reducing its residual value estimates by $844 million.  Defendants disclosed to investors that "management concluded that our residual

5

value estimates likely exceeded the expected future values that would be realized upon the sale of power vehicles in our fleet." Then, on February 13, 2020, Ryder reported that adjustments to Ryder's residual value exceeded $1 billion.

**B.      Commencement of the Action and the Appointment of Lead Plaintiffs and Lead Counsel**

15.      On May 20, 2020, Ryder shareholder Key West Police & Fire Pension Fund filed a complaint for violations of the federal securities laws in the United States District Court for the Southern District of Florida (the "Court"), styled *Key West Police & Fire Pension Fund v. Ryder System, Inc. et al*, Case No. 1:20-cv-22109, asserting federal securities claims against Ryder, Sanchez, Garcia, and Scott Parker (a former Ryder executive). (ECF No. 1.)

16.      On July 20, 2020, Alaska, Fort Lauderdale, and Plantation Police moved for appointment as lead plaintiffs and for approval of their counsel, BLB&G, as Lead Counsel. (ECF No. 22.)

17.      By Order dated August 3, 2020, the Court appointed Alaska, Fort Lauderdale, and Plantation Police to serve as Lead Plaintiffs for the Action, and approved Lead Plaintiffs' selection of BLB&G as Lead Counsel. (ECF No. 25.)

**C.      The Investigation and Filing of the Complaint**

18.      Prior to filing the amended complaint on behalf of Lead Plaintiffs, Lead Counsel undertook an extensive investigation into the allegations and the facts surrounding the alleged fraud. This investigation included a thorough review and analysis of: (i) regulatory filings made by Ryder with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued and disseminated by the Company; (iii) analyst and media reports concerning Ryder; (d) transcripts of Ryder's investor conference calls; and (iv) other public information regarding the Company.

6

19.     In connection with this investigation, Lead Counsel and its in-house investigators contacted numerous potential witnesses, including numerous former employees of Ryder believed to potentially possess information relevant to the claims.  Lead Counsel eventually spoke to dozens of potential witnesses and included information received from twelve former Ryder employees in the Complaint.

20.     Lead Counsel also retained and consulted with an expert in loss causation and damages in connection with the preparation of the Complaint.  Among other things, Lead Counsel consulted with the expert concerning the impact of Defendants' alleged misstatements and omissions on the market price of Ryder's common stock, and the damages suffered by Ryder shareholders.

21.     On October 5, 2020, Lead Plaintiffs filed and served their Amended Complaint (ECF No. 28) asserting claims against Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against Defendants Sanchez, Garcia, and Cooke under Section 20(a) of the Exchange Act.  The claims were premised on Defendants' allegedly materially false and misleading statements relating to the residual value of Ryder's trucking fleet.  Lead Plaintiffs alleged that, contrary to Ryder's statements concerning its "conservative" estimates and the benefits of "lower depreciation associated with increased residual values," Ryder and the Individual Defendants had artificially inflated Ryder's vehicle fleet's residual values and thus understated its depreciation expense, which in turn overstated the Company's profits.

22.     Lead Plaintiffs alleged that, as a result of the above, Defendants (i) increased their incentive compensation packages (ii) artificially inflated Ryder's stock price, and (iii) sold their

7

shares at inflated prices. The Complaint further alleged that the price of Ryder common stock declined when the truth was revealed.

### D. Defendants' Motion to Dismiss

23. On December 4, 2020, Defendants moved to dismiss the Complaint. (ECF No. 42.) Defendants argued that the Complaint should be dismissed because Lead Plaintiffs had failed to plead particularized facts establishing that Ryder's stated residual values were false when made, and failed to adequately allege any intent or scienter by Defendants to defraud Ryder investors. Specifically, Defendants argued, among other things, that:

(a) Lead Plaintiffs insufficiently alleged that Ryder's stated residual values were false at the time they were made, including because those residual values were merely estimates of what vehicles will sell for in the future, and Ryder disclosed to investors the methodology it used to estimate residual values;

(b) Ryder adjusted its residual values to account for deteriorating market conditions during the Class Period and increased its reported depreciation expenses to account for those conditions;

(c) many of the alleged misstatements were inactionable because they were statements of opinion, and Lead Plaintiffs failed to adequately plead that Defendants did not believe in the statements of opinion;

(d) Ryder's residual values were inactionable "forward-looking" statements protected by the PSLRA safe harbor;

(e) the Complaint did not adequately plead scienter, including because Defendants had disclosed the deteriorating market conditions during the Class Period; and

(f) the Section 20(a) claims against the Individual Defendants for control-person liability should be dismissed because the Complaint failed to plead a primary violation of Section 10(b).

24. On February 2, 2021, Lead Plaintiffs filed their papers in opposition to the motion. (ECF No. 51.) Among other things, Lead Plaintiffs argued that:

(a) Lead Plaintiffs adequately alleged that Defendants (1) misstated Ryder's residual value estimates and depreciation expense; (2) had access to information and trends directly contradicting those statements; (3) artificially inflated Ryder's stock prices as a result; and (4) sold their shares to investors at inflated prices, after which the stock prices subsequently plummeted;

8

(b) Defendants' statements were not inactionable opinions, and even if certain statements were opinions, they were actionable because they did not fairly align with information in Defendants' possession;

(c) Defendants' alleged misstatements were not protected by the PSLRA safe harbor because they were material misstatements or omissions of present or historical facts and because the accompanying cautionary language, which included often general, boilerplate caveats, was insufficient;

(d) Lead Plaintiffs adequately pled scienter, including because Defendants (1) were aware of the rapid decline in resale truck values and knew that Ryder's residual values were overstated; (2) were highly focused on the residual value and depreciation of Ryder's truck fleet; and (3) made large write-downs that were indicative of scienter; and

(e) Defendants made approximately $11 million in insider sales of Ryder stock while the stock traded at artificially inflated prices.

25.     On March 4, 2021, Defendants filed their reply papers in further support of their motion to dismiss.  (ECF No. 62).

26.     On April 7, 2021, the Court held a hearing on Defendants' motion to dismiss.  (ECF Nos. 73-74).

27.     On May 12, 2022, the Court entered an Order denying Defendants' motion to dismiss in its entirety.  (ECF No. 75).

28.     On June 16, 2022, Defendants filed their Answer to the Complaint. (ECF No. 79). Defendants' Answer denied Lead Plaintiffs' allegations of wrongdoing and asserted various defenses to the claims pled against Defendants.

29.     On June 24, 2022, the Parties filed a joint scheduling report pursuant to Rule 16.1 setting forth a case management schedule.  (ECF No. 80).  On June 27, 2022, the Court entered an Order setting trial, setting pre-trial deadlines, and referring certain matters to a Magistrate Judge. (ECF No. 81).

### E.     The Parties Conduct Significant Fact Discovery

30.     Discovery in the Action commenced in May 2022, following the Court's denial of Defendants' motion to dismiss.

31.     Lead Plaintiffs obtained significant document discovery from Defendants and numerous third parties, comprising over one million pages of documents.  Lead Plaintiffs worked diligently to obtain this discovery, including by serving comprehensive discovery requests, and negotiating vigorously with Defendants over a period of several months in order to obtain an agreement to run extensive search terms, and search files belonging to multiple custodians.  In addition, Lead Plaintiffs frequently corresponded and conferred with Defendants and third parties to obtain fulsome discovery.  As detailed below, Lead Plaintiffs' efforts to obtain broad discovery in this case were critical to obtaining the recovery here.

32.     On June 28, 2022, Lead Plaintiffs served their First Set of Requests for the Production of Documents.  Lead Plaintiffs requested that Defendants produce documents concerning, among other things, Ryder's valuation of, and accounting for, the residual value of Ryder vehicles; sales of used Ryder vehicles; the depreciation expenses associated with Ryder's vehicles; the lease rates for vehicles Ryder owned; Board, Audit Committee, and Finance Committee materials concerning the residual value of Ryder vehicles; Defendant Garcia's termination; Defendants' trading in Ryder securities; Ryder's allegedly false public statements; Ryder's stock price movement; and Ryder's document retention policies.

33.     As Lead Counsel continued to receive and review documents from Defendants, Lead Counsel identified numerous third parties who it determined likely had relevant information. Once Ryder's trucks reached the end of their "useful lives," the Company sold the trucks to various customers in order to recoup the residual value.  Ryder also had relationships with various consultants who conducted analyses concerning its residual values.  Thus, in addition to seeking discovery from Defendants, Lead Plaintiffs served subpoenas on 18 third parties.  Lead Plaintiffs held numerous meet and confers with these third parties—some of which were difficult and

10

contentious—before receiving document productions.  During these meet and confers, Lead Counsel negotiated with each third party the scope of the third party's document production.

34.     As Lead Counsel received documents, it reviewed and analyzed those documents through weekly team meetings, running targeted searches aimed at locating the most relevant documents, analyzing the document trail on several key issues, and creating timelines of events germane to the case.  The magnitude and complexity of the document production was substantial and included, among other things, complex analyses of how Ryder determined its residual values throughout the Class Period.

35.     As part of its discovery efforts, Lead Counsel assembled a team of staff attorneys. This team consisted of many lawyers who have been with the firm for years and have worked on other significant class actions.  Their biographies, along with those of all lawyers who worked on this case, are attached hereto in Exhibit 6A.  As explained below, this team was integral in helping Lead Counsel review and analyze the documentary record and compile the strongest evidentiary support for Lead Plaintiffs' claims.

36.     Throughout this process, Lead Counsel ensured that the review and analysis of documents was conducted efficiently.  At the outset of Lead Counsel's document review efforts, Lead Counsel consulted with its in-house litigation support team who provided document-management services, including algorithm-based "technology-assisted review" ("TAR") (also known as "predictive coding").  The TAR software enabled Lead Counsel to efficiently streamline the review by "learning" the coding of documents as they were reviewed.  While Lead Counsel could not rely on this machine algorithm to identify all of the necessary documents to prosecute this Action, it did use the algorithm to assist Lead Counsel in efficiently prioritizing the review of documents most likely to be relevant.  Lead Counsel employed Relativity, a sophisticated

11

document review platform to host the documents it collected, to ensure that the documents could be sorted, searched, and reviewed in an efficient and cost-effective manner.

37.     Lead Counsel reviewed, analyzed, and categorized the documents in Relativity's electronic database.  Lead Counsel developed a search protocol, issue "tags," and guidelines for identifying "hot" documents, as well as a manual and guidelines for the review and "coding" of documents.  Using these tools, Lead Counsel tasked its attorneys with reviewing documents.  Lead Counsel's review and analysis of those documents included substantive analytical determinations as to the importance and relevance of each document—including whether each document was "hot," "relevant," or "not relevant."  For documents identified as "hot," attorneys often documented their substantive analysis of the documents' importance by making notations on the document review system, explaining what portions of the documents were hot, how they related to the issues in the case, and why the attorney believed that information to be significant.  Attorneys also "tagged" the specific issues that documents related to, which enabled Lead Counsel to effectively and efficiently collect documents in preparation for upcoming depositions.  Given the dynamic, evolving nature of discovery, Lead Counsel revised and refined its tools, techniques, and "tags" as it developed its understanding of the issues.

38.     Throughout its review, Lead Counsel also analyzed the adequacy and scope of the document productions by Defendants and third parties.  For example, attorneys reviewed privilege redactions and entries in Defendants' privilege logs to assess whether Defendants redacted or withheld potentially non-privileged information.  Lead Counsel also reviewed the productions to determine whether they substantively tracked what had been agreed to be produced in response to document requests.

39.     In addition to regular communications that occurred throughout the review process, attorneys who primarily focused on the document review participated in regular meetings with the litigation team.   In advance of these meetings, "hot" documents and documents that raised questions for discussion were compiled and circulated.   At the meetings, Lead Counsel discussed those documents, including the reasons they identified them as "hot," and attorneys asked questions and discussed similar documents that had been reviewed.   These efforts ensured that the litigation team was apprised of the documentary evidence being developed, provided an opportunity for Lead Counsel to further refine its legal and factual theories, focused the document-review team on developing other supporting evidence, and enabled Lead Counsel to ensure that documents were reviewed consistently.   Lead Counsel also often conducted follow-up research concerning topics of interest that arose at these meetings.

40.     In addition to their Requests for the Production of Documents, Lead Plaintiffs also served two sets of interrogatories on Defendants on June 28, 2022 and April 14, 2023.   Lead Plaintiffs' interrogatories focused on, among other issues: (i) the identities of Ryder executives and employees involved in setting and analyzing Ryder's residual values; (ii) the identities of Ryder's largest customers; (iii) the composition of Ryder's truck and tractor fleet; and (iv) Defendants' sales of Ryder stock.

41.     Defendants served Responses and Objections to Lead Plaintiffs' first set of interrogatories on August 4, 2022.   Lead Plaintiffs' second set of interrogatories were mooted by the Parties' agreement to resolve the Action.

42.     On July 5, 2022, Defendants served their First Set of Requests for Production of Documents on Lead Plaintiffs, comprising 71 requests.   Lead Plaintiffs responded and objected to

those requests on August 11, 2022, and thereafter Lead Plaintiffs engaged in extensive meet-and-confers with Defendants to discuss the scope of Lead Plaintiffs' responsive document production.

43.     In response to Defendants' document requests, Lead Counsel worked with Lead Plaintiffs to gather potentially relevant and responsive materials.  Lead Counsel then reviewed those documents carefully, and subsequently produced the relevant, responsive, nonprivileged documents in Lead Plaintiffs' possession.  In total, Lead Plaintiffs produced approximately 14,000 pages of documents to Defendants.

44.     In addition to conducting extensive document discovery with Defendants and third parties, prior to the resolution of the matter, Lead Plaintiffs noticed depositions of seven key Ryder employees, including the Individual Defendants.  In addition, Lead Plaintiffs had begun preparing to take the depositions of numerous other Ryder witnesses and third parties.  To build an efficient and effective deposition program, Lead Counsel constructed "key players" lists compiled from various sources, including: (i) its investigation in connection with the Complaint; (ii) document searches, including analyses of hot documents; and (iii) Defendants' initial disclosures and interrogatory responses.

45.     Once deponents were identified, effectively preparing for depositions required that Lead Counsel devote substantial time, effort, and resources.

46.     One of Lead Counsel's most significant projects in preparation for the depositions was the preparation of detailed "deposition kits."  These kits typically consisted of dozens of documents with an index summary.  The kits also included a detailed memorandum analyzing those documents and the witness's background, likely areas of knowledge, and role in the events at issue in the case.  In addition, as noted above, the attorney team prepared analyses and

14

chronologies concerning several key issues in the case, which would have been used to prepare for the depositions of each witness who was involved with that issue.

47.     Lead Counsel had begun preparing deposition kits for numerous fact witnesses at the time that the Action resolved.  Preparing deposition kits required a comprehensive, deep dive into each witness's associated materials, including their: (i) custodial documents, *i.e.*, documents the deponent drafted, received, or maintained in their files; (ii) role in the events at issue, including with respect to information in relevant documents they may not have personally reviewed; (iii) prior relevant testimony or interviews; and (iv) information gleaned from public searches.

**F.     Class Certification Motion**

48.     Shortly after the Court issued its decision on the motion to dismiss and Defendants filed their answer to the Complaint, Lead Plaintiffs filed their Motion for Class Certification on September 23, 2022 (the "Class Certification Motion") (ECF No. 90), requesting that the Court certify a class comprising all persons who purchased or otherwise acquired the publicly-traded common stock of Ryder during the Class Period, and who were damaged thereby.  In addition, Lead Plaintiffs moved to be appointed Class Representatives and moved for the appointment of BLB&G as Class Counsel, and of Klausner, Kaufman, Jensen & Levinson ("Klausner Kaufman") as Liaison Class Counsel.

49.     Lead Plaintiffs' motion attached and was supported by the expert report of Dr. Michael Hartzmark, Ph.D., who opined that the market for Ryder common stock was efficient throughout the Class Period, and that damages for investors in Ryder common stock could be calculated through a common methodology.

50.     In connection with class certification, in addition to serving document requests to Lead Plaintiffs, Defendants noticed and took the depositions of Lead Plaintiffs' representatives. From Alaska, Defendants deposed Benjamin Hofmeister (Assistant Attorney General for the State

15

of Alaska) on December 6, 2022, and Fawad Razzaque (Director of Public Equity Investments for the Alaska Permanent Fund) on December 9, 2022.  From Fort Lauderdale, Defendants deposed Nick Schiess (Pension Administrator) on December 12, 2022.  From Plantation Police, Defendants deposed Brian Kendall (Chairman of Board of Trustees) on December 2, 2022.  Lead Counsel carefully reviewed Lead Plaintiffs' documents and reviewed those documents with each of the Lead Plaintiffs' representatives in preparation for their depositions.  Defendants also deposed Dr. Hartzmark on November 30, 2022.

51.     On December 16, 2022, Defendants opposed the Class Certification Motion.  (ECF Nos. 97, 100).  Among other things, Defendants argued that: (1) there was a "mismatch" between the alleged misstatements and the corrective disclosures; (2) Lead Plaintiffs had not sufficiently explained how they would calculate damages on a class-wide basis; and (3) Lead Plaintiffs had not explained how they would account for information unrelated to the alleged fraud that was disclosed on the same days as the corrective disclosures.  Defendants also argued that Lead Plaintiffs had not actually relied on Defendants' alleged misrepresentations, that Alaska had engaged in atypical trading, and that the Class Period should be shortened because the final corrective disclosure on February 13, 2020 did not reveal any new material information concealed by the alleged fraud.

52.     On February 17, 2023, Lead Plaintiffs filed their reply in support of their motion for class certification, addressing each of Defendants' arguments, including by citing supporting documents in the record.  (ECF No. 105).  In preparing the reply in support of the Class Certification Motion, Lead Counsel deposed Defendants' expert witness, Professor Amy P. Hutton, and Dr. Hartzmark prepared a reply report which addressed arguments made by Defendants and Professor Hutton.

16

53.     The Class Certification Motion was pending before the Court when the Parties reach their agreement in principle to settle the Action.

## G.     The Parties Settle the Action

54.     In the Court's Order Setting Trial, Setting Pre-trial Deadlines, and Referring Certain Matters to Magistrate Judge (ECF No. 81), the Honorable Aileen M. Cannon ordered the parties to select a mediator, schedule a mediation, and file a joint proposed notice.  (ECF No. 92).

55.     The parties selected Jed D. Melnick, Esq. of JAMS, an experienced mediator of securities class actions and other complex litigation.  An in-person mediation session with Mr. Melnick was scheduled for January 26, 2023.  In advance of the mediation, the Parties prepared detailed mediation statements addressing liability and damages issues that they exchanged and submitted to Mr. Melnick.

56.     At the January 26, 2023 mediation session, the parties engaged in vigorous negotiations with the assistance of Mr. Melnick but were not able to reach an agreement.

57.     The parties conducted a second mediation session on March 28, 2023.  In advance of that session, Lead Plaintiffs submitted a supplemental mediation statement and Defendants prepared a responsive presentation.  During the March 28, 2023 mediation session, the parties once again engaged in vigorous settlement negotiations with the assistance of Mr. Melnick, but again were unable to reach an agreement.

58.     The Parties then engaged in weeks of additional discussion and negotiation facilitated by Mr. Melnick.  Following that process, Mr. Melnick issued a mediator's recommendation that the Action be settled for $45 million, which the Parties accepted on a double-blind basis on April 18, 2023.

59.     On April 18, 2023, the parties filed a Notice of Settlement with the Court (ECF No. 109), informing the Court of the Parties' agreement, and asking the Court to adjourn the hearing

17

on Lead Plaintiffs' Class Certification Motion, which had previously been scheduled to take place on April 20, 2023.

60.     After the parties reached their agreement in principle to settle, they negotiated the final terms of the Settlement and drafted the Stipulation (ECF No. 111-1) setting forth the final terms of the Settlement, and related settlement papers.  On May 19, 2023, the parties executed the Stipulation, as well as a Supplemental Agreement concerning Defendants' right to terminate the Settlement if a certain threshold number of opt-outs is reached.

**H.     The Court Grants Preliminary Approval to the Settlement**

61.     On May 19, 2023, Lead Plaintiffs filed their Unopposed Motion for Preliminary Approval of Settlement and Authorization to Disseminate Notice of Settlement.  (ECF No. 111.)

62.     On July 24, 2023, Judge Cannon held a hearing on Lead Plaintiffs' motion.  (ECF Nos. 114, 115).  During the hearing, Judge Cannon noted that she would likely request certain changes to technical provisions of the Proposed Schedule of Events and the Proposed Order Preliminarily Approving Class Settlement.  On August 10, 2023, Judge Cannon issued an order (ECF No. 116) denying without prejudice Lead Plaintiffs' motion, directing Lead Plaintiffs to make those specific changes, and file a renewed motion for preliminary approval by August 17, 2023.

63.     Lead Counsel made the changes as directed in Judge Cannon's order, and on August 17, 2023, Lead Plaintiffs filed a Renewed Unopposed Motion for Preliminary Approval of Settlement and Authorization to Disseminate Notice of Settlement.  (ECF No. 117).

64.     On February 20, 2024, Judge Cannon entered the Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement (ECF No. 124) (the "Preliminary Approval Order"), which, among other things: (i) preliminarily approved the Settlement; (ii) approved the form of Notice, Summary Notice, and Claim Form, and authorized

18

notice to be given to Settlement Class Members through mailing of the Notice and Claim Form, posting of the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *Investor's Business Daily* and over the *PR Newswire*; (iii) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, or the fee and expense application; and (iv) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application. The Preliminary Approval Order also set a Settlement Hearing for October 23, 2024 at 9:30 a.m. to determine, among other things, whether the Settlement should be finally approved.

65. On March 7, 2024, the Action was reassigned from Judge Cannon to the Honorable Jacqueline Becerra.

## III. RISKS OF CONTINUED LITIGATION

66. The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $45,000,000 cash payment. Lead Plaintiffs and Lead Counsel believe that the proposed Settlement is an excellent result for the Settlement Class in light of the risks of continued litigation. As explained below, Lead Plaintiffs faced substantial risks with respect to proving liability, loss causation and damages, which impaired the ability to recover a judgment against Defendants that was substantially larger than the Settlement.

### A. Risks Concerning Liability

67. While Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants in the Action have merit, they recognize that this Action presented a number of substantial risks to establishing Defendants' liability. Defendants had vigorously contended and would have continued to argue that their challenged statements about Ryder's residual values and depreciation expense were not false or misleading and were not actionable, and, in any event, that

19

Defendants did not know that the statements were false or were not reckless in making the alleged misstatements.

### 1.      Falsity

68.      Defendants argued in their motion to dismiss, and would have continued to argue, that the alleged false statements regarding the residual value and depreciation expense of Ryder's trucking fleet were not false or were otherwise not actionable.

69.      First, Defendants argued that the core of the case concerned Ryder's prediction of the estimated value of its trucks years into the future, which Ryder had to predict in the context of a dynamic, changing market.  This type of forward-looking estimate, Defendants argued, was naturally susceptible to mistakes, and the fact that Ryder may have been mistaken did not mean its estimates were false when made.

70.      Second, Defendants would have continued to argue that their statements concerning Ryder's residual-value estimates and related financial disclosures were factual and transparent. Defendants contended that Ryder accurately disclosed its methodology for calculating residual value.  For example, during the Class Period, Ryder disclosed to investors that it used a "straight line" methodology based on a rolling five-year average of used vehicle prices to estimate residual values.  Ryder also disclosed the change in this methodology on October 29, 2019, when it adjusted its five-year rolling average by eliminating the fifth historical year from the rolling average and replaced it with a forecast year, leading to the large write-down during the Class Period.  Moreover, Defendants argued that Ryder made contemporaneous disclosures that undermined the assertion that it fraudulently misstated its residual values, including (i) downward adjustments to its residual values (which it made repeatedly during the Class Period); (ii) acknowledgments that the market was challenging; and (iii) warnings that more charges may be necessary if the market did not improve.

71.     Third, Defendants would have argued that Ryder did not restate its financial results, and its auditor—PricewaterhouseCoopers ("PwC"), one of the "Big Four" accounting firms—signed off on its financial statements every single quarter.  Further, neither the SEC, nor any other regulatory body, opened an investigation into the falsity of Defendants' public statements or took any enforcement action against the Company.

72.     In light of all of these arguments, Lead Plaintiffs faced considerable risk that the Court or a jury would conclude that Ryder's statements concerning the residual value and depreciation expense of Ryder's trucking fleet were not false or were not actionable.

**2.     Scienter**

73.     Even if Lead Plaintiffs succeeded in proving that Defendants' statements were false, Lead Plaintiffs would have faced challenges in proving that Defendants made the alleged false statements with the intent to mislead Ryder investors or were reckless in making the statements.

74.     Defendants would have continued to argue that, at bottom, the claims concerned their failure to accurately predict how much Ryder would be able to sell its used vehicles for, at least five years into the future.  Defendants would have argued that this failure, in the face of a changing market, was simply accidental—not fraudulent.  They also would have argued that any inference of scienter was undermined by the fact that they accurately disclosed Ryder's accounting methodology; they repeatedly adjusted residual values and depreciation expense negatively during the Class Period; PwC uniformly signed off on Ryder's financial statements; and no regulator has even investigated them.

75.     On all these issues, Lead Plaintiffs would have had to prevail at several stages—on a motion for summary judgment, and at trial, and if it prevailed on those, on the appeals that would likely to follow—which would likely have taken years.  At each stage, there would have been very

21

significant risks attendant to the continued prosecution of the Action, as well as considerable delay. Had Lead Plaintiffs failed to create a triable issue regarding scienter at summary judgment, or failed to prevail on establishing scienter at trial, the Settlement Class would not be able to recovery anything in this Action.

**B.      Risks Related to Loss Causation and Damages**

76.      Even assuming that Lead Plaintiffs overcame each of the above risks and successfully established liability, Lead Plaintiffs would have confronted considerable additional challenges in establishing loss causation and damages. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'").

77.      First, Defendants would have argued that the Class Period should start years later than Lead Plaintiffs alleged—*i.e.*, in mid-2017 or 2018, rather than 2015. Defendants would have argued that market prices were actually above Ryder's residual values at the start of the Class Period, and the used vehicle market did not start to decline until about a year into the Class Period. At the motion to dismiss hearing, Judge Cannon noted that the 2015 start date for the Class Period might have been overly aggressive and premature.

78.      Second, Defendants argued in their opposition to Lead Plaintiffs' motion for class certification that the Class Period should end after the second corrective disclosure date— excluding the February 13, 2020 corrective disclosure, which accounted for a significant amount of the potential damages in the case. Defendants argued that this disclosure should be excluded from the Class Period because, in their view, the only new information released to the market was a modest $8 million adjustment to residual values, which had no impact on the stock price. Even if Defendants' argument were unsuccessful at the class certification stage, Defendants would have almost certainly raised the argument again at summary judgment and trial.

22

79.     Third, Defendants argued that Lead Plaintiffs would not be able to disentangle the effect of information unrelated to the alleged misconduct that the market learned at the same time as the alleged corrective disclosures.  For example, with respect to the first corrective disclosure on July 30, 2019, Ryder also disclosed higher overhead and increased debt on the same day, and with respect to the February 13, 2020 corrective disclosure, Ryder also disclosed costs related to strategic investments.

80.     To advance these arguments, Defendants would have introduced expert testimony that would likely have played out in a hotly-contested and difficult-to-predict "battle of the experts" at summary judgment or trial.  If accepted, these argument would have reduced damages very substantially, or eliminated them entirely.

## C.     Risks After Trial

81.     Even if Lead Plaintiffs had succeeded in proving all elements of their case at trial and in post-trial proceedings, Defendants would almost certainly have appealed.  An appeal would not only have renewed all the risks faced by Lead Plaintiffs and the class, as Defendants would have been able to re-assert all their arguments summarized above, it would also have engendered significant additional delay and costs before class members could have received any recovery from this case.  At minimum, such an appeal could have taken years.  Worse, the appeal could have been successful.  One example is *Robbins v. Kroger Properties, Inc.*, 116 F.3d 1441 (11th Cir. 1997), in which the Eleventh Circuit overturned an $81 million jury verdict on appeal for lack of loss causation.  Another example is *Glickenhaus & Co. v. Household International Inc.,* 787 F.3d 408 (7th Cir. 2015), a securities fraud class action alleging a massive predatory lending scheme, where the plaintiffs won a trial verdict.  Defendants appealed, challenging loss causation, as well as a jury instruction about who legally "made" a statement for liability purposes. Defendants prevailed, and the Seventh Circuit set aside the judgment that plaintiffs had won.  *See also In re*

23

*BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605, at *1 (S.D. Fla. Apr. 25, 2011), *aff'd* *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012) (district court granted judgment as a matter of law in favor of defendants on loss causation grounds overturning a jury verdict in favor of plaintiff class estimated at $42 million, the Eleventh Circuit affirmed on appeal).

82.     Moreover, even if a judgment in Lead Plaintiffs' favor was affirmed on appeal, Defendants could then have challenged the reliance and damages of each class member, including Lead Plaintiffs, in an extended series of individual proceedings.  That process could have taken multiple additional years, and could have severely reduced any recovery to the class as Defendants "picked off" class members.  For example, in *In re Vivendi Universal SA Securities Litigation,* the district court acknowledged that in any post-trial proceedings, "Vivendi is entitled to rebut the presumption of reliance on an individual basis," and that "any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into the individual circumstances of particular class members."  765 F. Supp. 2d 520, 583-584 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016).  Over the course of several years, Vivendi indeed successfully challenged several class members' damages in individual proceedings.

83.     There is also the risk that an intervening change in the law can result in the dismissal of a case after significant effort has been expended.  The Supreme Court has heard several securities cases in recent years, often announcing holdings that dramatically changed the law in the midst of long-running cases—including after trial.  *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.,* 601 U.S. 257 (2024); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175 (2015); *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258 (2014); *Janus Cap. Grp., Inc. v. First Derivative Traders,* 564 U.S. 135 (2011); *Morrison v. Nat'l Austl. Bank Ltd.,* 561 U.S. 247 (2010) ("*Morrison"*).  As a result, many cases have been lost

24

after thousands of hours have been invested in briefing and discovery.  For example, in *In re Vivendi Universal, S.A. Securities Litigation,* after a verdict for class plaintiffs, the district court granted judgment for defendants following a change in the law announced in *Morrison,* dismissing claims that had been proven at trial for the vast majority of the class.  765 F. Supp. 2d 512, 524-25, 533 (S.D.N.Y. 2011) *aff'd*, 838 F.3d 223 (2d Cir. 2016).  Changes in the law at the Circuit level have similarly upended pending cases; for example, in *Murphy v. Precision Castparts Corp.,* the court reconsidered its denial of summary judgment and granted it for defendants based explicitly on an intervening Ninth Circuit decision. 2021 WL 2080016, at *6 (D. Or. May 24, 2021).

84.    Thus, even if Lead Plaintiffs and the class prevailed at trial, the subsequent processes of an appeal, challenges to individual class members, and intervening changes in the law could have severely reduced or even eliminated any recovery—and, at minimum, could have added several years of further delay.

85.    The Settlement eliminates these significant litigation risks and provides a substantial and certain recovery for the Settlement Class.  *See Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *13 (S.D.N.Y. Oct. 16, 2019) ("The Parties developed and would have presented competing evidence on these issues, including competing expert evidence. While Lead Plaintiffs proceeded as though it had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages[.]").

**D.    The Settlement Amount Compared to Damages that Likely Could Have Been Proved at Trial**

86.    The Settlement Amount—$45 million in cash, plus interest—represents a significant recovery for the Settlement Class.  The Settlement is the seventh largest PSLRA settlement in the history of the Southern District of Florida.  It is also more than three times the

25

size of the median securities class-action settlement in the Eleventh Circuit from 2014 to 2023 ($13.7 million). *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2023 REVIEW AND ANALYSIS (2024), attached hereto as Exhibit 4, at 20.

87.     The $45 million Settlement is also a very favorable result when it is considered in relation to the maximum amount of damages that could be reasonably established at trial, in the event that Lead Plaintiffs prevailed on class certification and liability issues, including falsity and scienter, at summary judgment. While Lead Plaintiffs would have sought to prove damages of approximately $900 million, this figure was not realistic because it assumes that they (i) would have prevailed completely on every single contested liability, loss causation, and damages issue noted above; and (ii) would have prevailed on all those issues for the full Class Period of almost five years. Had Defendants prevailed on their loss causation and damages arguments noted above, the maximum potential damages at trial would be approximately $110-$170 million—and that is even if Lead Plaintiffs established liability.

88.     Thus, the $45 million Settlement represents 5% of the maximum theoretical damages, or 26% to 40% of the likely recoverable damages, which is well above the median percentage recovery seen in comparable cases. *See, e.g.*, *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534 (S.D. Fla. 1998) (noting that a "settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery" and finding recovery at trial of 3-5% would have been "fairly realistic"); *Tung v. Dycom Indus., Inc.*, No. 18-cv-81448, ECF No. 95 (S.D. Fla. Oct. 13, 2020) (approving settlement of 5.7% of the maximum possible recovery); *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at *10 (S.D. Fla. Oct. 17, 2016) (approving securities class action settlement representing "5.5% of maximum damages and 10% of the most likely damages" and referring to this as an "excellent" recovery); *In re China*

26

*Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting that the average settlement in securities class actions ranges from 3% to 7% of the class' total estimated losses).

## IV.   LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

89.   The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class.  The Preliminary Approval Order also set a September 11, 2024 deadline for Settlement Class Members to submit Claim Forms, to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class, and set a final approval hearing date of October 23, 2024.

90.   Pursuant to the Preliminary Approval Order, Lead Counsel instructed JND Legal Administration ("JND"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, net of Litigation Expenses, or $11,126,521.40 plus interest earned at the same rate as the Settlement Fund, and for payment of Litigation Expenses incurred in connection with the institution, prosecution, and resolution of the Action in the amount of $493,914.39.

91.   To disseminate the Notice, JND obtained information from Ryder and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class

27

Members.  *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date ("Segura Decl."), attached hereto as Exhibit 5, ¶¶ 2-5.

92.     JND began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominee owners on March 11, 2024.  *See* Segura Decl. ¶¶ 2-6.  As of August 8, 2024, JND had disseminated a total of 146,570 Notice Packets to potential Settlement Class Members and nominees.  *Id.* ¶ 9.

93.     On March 18, 2024, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over the *PR Newswire*.  *Id.* ¶ 10.

94.     Lead Counsel also caused JND to establish a dedicated settlement website, www.RyderSystemSecuritiesLitigation.com, to provide Settlement Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and Complaint.  *See* Segura Decl. ¶ 11.  That website became operational on March 8, 2024.  *Id.*  Lead Counsel also made copies of the Notice and Claim Form available on its own website, www.blbglaw.com.

95.     As set forth above, the deadline for Settlement Class Members to file Claims and to file objections to the Settlement, Plan of Allocation, and/or Fee and Expense Application, or to request exclusion from the Settlement Class is September 11, 2024.  To date, five requests for exclusion have been received and no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received.  *See* Segura Decl. ¶¶ 13, 14.  Lead Counsel will file reply papers on or before October 16, 2024, that will address all requests for exclusion and any objections that may be received.

## V.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

96.   Pursuant to the Preliminary Approval Order, and as set forth in the Notice, Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed) or submitted online no later than September 11, 2024.  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

97.   Lead Counsel consulted with Lead Plaintiffs' damages expert in developing the proposed Plan of Allocation.  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action.

98.   The proposed Plan of Allocation is set forth at Appendix A to the Notice.  *See* Segura Decl. Exhibit A, Appendix A (19-25).  As described in the Notice, the objective of the Plan of Allocation is to distribute the Settlement proceeds equitably among those Settlement Class Members who suffered economic losses as a proximate result of the alleged wrongdoing.  The calculations under the Plan of Allocation are intended as a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.  *See* Plan ¶ 1.

99.   In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per-share price of Ryder common stock which allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions during the Class Period.  *See* Plan ¶ 2.  In calculating the estimated artificial inflation, Lead Plaintiffs' damages expert considered the price changes in Ryder common

29

stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry factors. *Id*.

100.    Lead Plaintiffs allege that Defendants made false statements and omitted material facts during the Class Period (from July 23, 2015, through February 13, 2020, inclusive), which had the effect of artificially inflating the prices of Ryder common stock, and that corrective information was released to the market which partially removed the artificial inflation from the price of Ryder common stock on July 30, 2019, October 29, 2019, October 30, 2019, February 13, 2020, February 14, 2020, and February 18, 2020.    In order to be eligible under the Plan of Allocation, a Settlement Class Member that purchased or otherwise acquired Ryder common stock during the Class Period must have held those shares through at least one of the dates where new corrective information was released to the market and partially removed the artificial inflation from the price of Ryder common stock. *See* Plan ¶¶ 3, 5.

101.    Recognized Loss Amounts are calculated under the Plan of Allocation for each purchase or acquisition of Ryder common stock during the Class Period that is listed on a Claimant's Claim Form and for which adequate documentation is provided. *See* Plan ¶ 4.    In general, Recognized Loss Amounts under the Plan are calculated as the lesser of: (a) the difference between the amount of alleged artificial inflation at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price for the shares. *See id*. ¶¶ 3, 5.    For shares sold before July 30, 2019, the Recognized Loss Amount is zero, because those shares were sold before first alleged corrective disclosure and thus were not damaged by the alleged fraud. *Id*. ¶ 5(i).    In addition, consistent with PSLRA, Recognized Loss Amounts for shares of Ryder common stock sold during the 90-day period after the end of the Class Period, or held to

the end of that 90-day period, are further limited to the difference between the purchase price and the average closing price of the stock during that period. *Id.* at ¶¶ 5(iii), 5(iv).

102.    The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases or acquisitions of Ryder common stock during the Class Period is the Claimant's "Recognized Claim." Plan ¶ 6. The Plan of Allocation also limits Claimants' Recognized Claim based on whether they had an overall market loss in their transactions in Ryder common stock during the Class Period. A Claimant's Recognized Claim will be limited to the amount of his, her, or its market loss in Ryder common stock transactions during the Class Period, and Claimants who have an overall market gain will not be eligible for a recovery. *Id.* ¶¶ 13-14.

103.    The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. Plan ¶¶ 15-16. If an Authorized Claimant's *pro rata* distribution amount calculates to less than ten dollars, no payment will be made to that Authorized Claimant. *Id.* ¶ 17. Those funds will be included in the distribution to the Authorized Claimants whose payments exceed the ten-dollar minimum.

104.    One hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted. Plan ¶ 18. Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective (for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available), will those funds be donated to one or more non-sectarian, not-for-profit, 501(c)(3) organization(s) to be recommended by Lead Counsel and approved by the Court. *Id.*

31

105.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases of Ryder common stock that were attributable to the misconduct alleged in the Action.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.  To date, no objections to the proposed Plan of Allocation have been received.

## VI.    THE FEE AND EXPENSE APPLICATION

106.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees for all Plaintiffs' Counsel of 25% of the Settlement Fund, net of Litigation Expenses awarded.  Assuming the Court awards the Litigation Expenses as requested, the fee comes to $11,126,521.40, plus interest earned at the same rate as the Settlement Fund (the "Fee Application").  Lead Counsel also requests payment from the Settlement Fund for Litigation Expenses incurred in the amount of $493,914.39.  The requested attorneys' fees and Litigation Expenses are to be paid from the Settlement Fund

107.    The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum.  The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

108.    For the efforts of Plaintiffs' Counsel on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of Lead Plaintiffs and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances and taking into account the litigation risks faced in a

class action.  Use of the percentage method has been recognized as appropriate by the Supreme Court and Eleventh Circuit for cases of this nature.

109.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 25% fee award is fair and reasonable for attorneys' fees in common fund cases such as this and is well within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

### 1.    Lead Plaintiffs Have Authorized and Support the Fee Application

110.    Each of the Lead Plaintiffs is a sophisticated institutional investor that was closely involved in supervising and monitoring the prosecution and settlement of the Action.  *See* Hofmeister Decl. (Exhibit 1), ¶¶ 2-5; Schiess Decl. (Exhibit 2), at ¶¶ 2-5; Kendall Decl. (Exhibit 3), at ¶¶ 2-5.  Each of the three Lead Plaintiffs entered into a separate retainer agreement with Lead Counsel at the outset of the litigation that governed the maximum percentage fees that Lead Counsel could seek at the conclusion of the litigation.  The 25% fee, net of Litigation Expenses, now sought is consistent with all three of those fee retainer agreements.  *See* Hofmeister Decl. ¶ 7; Schiess Decl. ¶ 7; Kendall Decl. ¶ 7.  In addition, each of the Lead Plaintiffs believes that the proposed fee is fair and reasonable in light of the work performed by Plaintiffs' Counsel, the risks of the litigation, and the substantial recovery obtained for the Settlement Class.  *Id*.  Lead Plaintiffs' endorsement of the fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2.    The Time and Labor Devoted to the Action by Plaintiffs' Counsel

111.    Plaintiffs' Counsel devoted substantial time to the prosecution of the Action.  As described above in greater detail, the work that Plaintiffs' Counsel performed in this Action

included: (i) conducting an extensive investigation into the alleged fraud, including interviews of numerous former employees of Ryder and other potential witnesses and a thorough review of public information such as SEC filings, analyst reports, conference call transcripts, and news articles; (ii) drafting a detailed consolidated complaint based on Lead Counsel's investigation; (iii) researching and drafting briefing in opposition to Defendants' motion to dismiss; (iv) conducting substantial fact discovery, including preparing and serving initial disclosures, requests for production of documents, and interrogatories on Defendants and eighteen document subpoenas on third parties, and obtaining and reviewing over one million pages of documents; (v) moving for class certification, which including submitting a report from Lead Plaintiffs' financial expert on market efficiency and class-wide damages; (vi) defending the depositions of four representatives of Lead Plaintiffs and Lead Plaintiffs' expert and taking the deposition of Defendants' expert in connection with the Class Certification Motion; (vi) consulting with experts on loss causation, damages, the trucking industry, and accounting throughout the litigation; and (vii) engaging in extensive arm's-length settlement negotiations, including two full-day mediation sessions with an experienced mediator to achieve the Settlement.

112.    Throughout the litigation, Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.   I personally monitored and maintained control of work performed by Plaintiffs' Counsel.  Other experienced attorneys at Plaintiffs' Counsel were also involved in the drafting of pleadings, motion papers, and in the settlement negotiations.  More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

113.    Attached hereto as Exhibits 6A and 6B, respectively, are my declaration on behalf of BLB&G and the declaration of Robert D. Klausner on behalf of Liaison Counsel Klausner

Kaufman in support of Lead Counsel's motion for an award of attorneys' fees and Litigation Expenses (the "Fee and Expense Declarations"). Each of the Fee and Expense Declarations includes information about the lodestar of the firm. The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly rates. These Declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court. The first page of Exhibit 6 is a chart that summarizes the information set forth in the Fee and Expense Declarations, listing the total hours expended and lodestar amounts for each firm, and the Litigation Expense incurred by Lead Counsel, and gives totals for the numbers provided.

114. As set forth in Exhibit 6, Plaintiffs' Counsel collectively expended a total of 15,070.70 hours in the investigation and prosecution of the Action from its inception through July 31, 2024. The resulting lodestar is $8,152,013.75. The vast majority of the total lodestar—approximately 98%—was incurred by Lead Counsel.

115. The requested fee, assuming the Litigation Expenses are awarded as requested, is $11,126,521.40 plus interest accrued at the same rate as the Settlement Fund, and therefore represents a multiplier of approximately 1.36 of Plaintiffs' Counsel's total lodestar. As discussed in further detail in the Fee Memorandum, the requested multiplier cross-check is well within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

### 3. The Experience and Standing of Lead Counsel

116. As demonstrated by the firm resume attached as Exhibit 6A-3 hereto, Lead Counsel is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases. BLB&G is consistently ranked

35

among the top plaintiffs' firms in the country. Further, BLB&G has taken complex cases such as this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions. I believe this willingness and ability added valuable leverage in the settlement negotiations.

### 4. Standing and Caliber of Defendants' Counsel

117. The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of its opposition. Here, Defendants were represented by experienced and extremely able counsel from Wachtell, Lipton, Rosen & Katz, who vigorously represented their clients. In the face of this skillful and well-financed opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms that are favorable to the Settlement Class.

### 5. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

118. The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above. Those risks are relevant to the Court's evaluation of an award of attorneys' fees. Here, the risks assumed by Lead Counsel, and the time and expenses incurred by Lead Counsel without any payment, were extensive.

119. From the outset, Lead Counsel understood that it was embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that vigorous prosecution of the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case

36

vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands. Because complex shareholder litigation generally proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel has received no compensation during the course of this Action and no reimbursement of out-of-pocket expenses, yet it has incurred more than $490,000 in expenses in prosecuting this Action for the benefit of Ryder investors.

120.    Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset this case presented a number of significant risks and uncertainties, including challenges in proving the falsity of Defendants' statements, establishing scienter, and establishing loss causation and damages.

121.    As noted above, the Settlement was reached while discovery was ongoing and Lead Plaintiffs' motion for class certification was pending before the Court. Had the Settlement not been reached when it was and this litigation continued, Lead Counsel would have been required to complete substantial fact discovery, which would have included taking of depositions of a number of high-level Ryder employees, including the Individual Defendants. Following the conclusion of fact discovery, Lead Counsel would have had to engage in extensive expert discovery efforts, including assisting with the preparation of opening and rebuttal reports from Lead Plaintiffs' experts on topics such as damages and loss causation and accounting, preparing for and defending their depositions, and taking the depositions of Defendants' experts. After the close of discovery, it would be highly likely that Defendants would move for summary judgment, which would have to be briefed and argued, a pre-trial order would have to be prepared, proposed jury instructions would have to be submitted, and motions *in limine* would have to be filed and

37

argued.  Substantial time and expense would also need to be expended in preparing the case for trial.  The trial itself would be expensive and uncertain.  Moreover, even if the jury returned a favorable verdict after trial, it is likely that any verdict would be the subject of post-trial motions, post-trial challenges to individual class members' damages, and appeals.

122.    Plaintiffs' Counsel's efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class.  In light of this recovery and Plaintiffs' Counsel's investment of time and resources over the course of the litigation, Lead Counsel believes the requested attorneys' fee is fair and reasonable and should be approved.

### 6.    The Reaction of the Settlement Class to the Fee Application

123.    As stated above, as of August 8, 2024, over 146,500 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 25% of the Settlement Fund, net of Litigation Expenses.  *See* Segura Decl. ¶ 9 and Ex. A (Notice ¶¶ 5, 54).  In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*.  *Id*. ¶ 10.  To date, no objections to the request for attorneys' fees have been received.  *See id.* ¶ 14.  Any objections that may be received will be addressed in Lead Counsel's reply papers to be filed on October 16, 2024, after the deadline for submitting objections has passed.

124.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success.  Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that the requested fee is fair and reasonable.

B.      **The Litigation Expense Application**

125.    Lead Counsel also seeks payment from the Settlement Fund of $493,914.39 for Litigation Expenses that it reasonably incurred in connection with the prosecution of the Action (the "Expense Application").

126.    From the outset of the Action, Lead Counsel was aware that it might not recover any of its expenses and, even in the event of a recovery, would not recover any of its out-of-pocket expenditures until such time as the litigation might be successfully resolved.  Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate it for the lost use of funds advanced by Lead Counsel to prosecute the Action.  Accordingly, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

127.    Lead Counsel have incurred a total of $493,914.39 in Litigation Expenses.  The expenses are summarized in Exhibit 6A-2, which identifies each category of expense, *e.g.*, expert charges, mediation fees, and on-line research costs, and the amount incurred for each category. These expense items are billed separately by Lead Counsel, and such charges are not duplicated in the firm's hourly rates.

128.    The largest category of expenses was for the retention of experts, in the amount of $329,281.00, or 67% of the total Litigation Expenses.  As noted above, Lead Counsel consulted with experts in the fields of loss causation, damages, the trucking industry, and accounting throughout the litigation.

129.    Another large component of the Litigation Expenses was for online legal and factual research, which was necessary to conduct the factual investigation and identify potential witnesses, prepare the Complaint, research the law pertaining to the claims asserted in the Action,

39

oppose Defendants' motion to dismiss, and prepare Lead Plaintiffs' Class Certification Motion and mediation submissions.  The charges for on-line research amounted to $78,113.41, or 16% of the total amount of expenses.

130.    Lead Plaintiffs' share of the mediation costs paid to JAMS for the services of Mr. Melnick was $33,171.19, or 7% of the total expenses.

131.    The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, document management costs, out-of-town travel costs, photocopying costs, telephone charges, and postage and delivery expenses.

132.    The Notice informed potential Settlement Class Members that Lead Counsel would seek Litigation Expenses in the amount of $493,914.39.  Notice ¶¶ 5, 54.  The total amount requested is the same as the amount disclosed in the Notice.  To date, no objection has been raised as to the amount of expenses set forth in the Notice.

133.    In sum, the expenses incurred by counsel were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submits that the application for payment of Litigation Expenses from the Settlement Fund should be approved.

134.    Attached hereto in Exhibit 7 is a compendium of true and correct copies of the unpublished opinions and authority cited in the Settlement Memorandum and Fee Memorandum.

VII.    CONCLUSION

135.    For all the reasons set forth above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submits that the requested fee should be approved as fair and

40

reasonable, and the request for payment of litigation expenses in the amount of $493,914.39 should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed August 12, 2024.

John Rizio-Hamilton

41